# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
:
*In re*                                          : **Chapter 11 Case No.**
:
**CAPMARK FINANCIAL GROUP INC.,** *et al.,*      :
                                                 : **09- _____ (   )**
     **Debtors.**                     :
                                                 : **Joint Administration Requested**
:
---------------------------------------------------------------x

### DECLARATION OF THOMAS L. FAIRFIELD, EXECUTIVE VICE PRESIDENT, GENERAL COUNSEL AND SECRETARY OF CAPMARK FINANCIAL GROUP INC., IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS AND APPLICATIONS

Thomas L. Fairfield, being duly sworn, hereby deposes and says:

1.     I am Executive Vice President, General Counsel and Secretary of

Capmark Financial Group Inc. ("CFGI").  On the date hereof (the "Commencement Date"),

CFGI and certain of its subsidiaries and affiliates, as debtors and debtors in possession

(collectively, the "Debtors"),[1] each commenced a voluntary case under chapter 11 of title 11,

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are:  Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), and Capmark Affordable Equity Inc. (2381).  CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044.

United States Code (the "Bankruptcy Code").  I am familiar with the day-to-day operations, business, and financial affairs of the Debtors.

2.      I submit this Declaration to advise the Court and other parties in interest of the circumstances that compelled the commencement of these chapter 11 cases.  I also submit this Declaration in support of the first day motions and applications (collectively, the "First Day Pleadings") filed by the Debtors contemporaneously herewith, or as soon as reasonably practicable hereafter, and by which the Debtors seek relief necessary to enable the Debtors and their affiliates to operate effectively, minimize certain of the potential adverse effects of the commencement of their chapter 11 cases, and preserve and maximize the value of the Debtors' estates.

3.      Parts I through IV of this Declaration provide an overview of the Debtors' businesses, organizational structure, capital structure, events giving rise to the commencement of these chapter 11 cases, and the Debtors' financial outlook.  Part V summarizes the relief sought in the First Day Pleadings and the factual and legal bases therefor.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management and the Debtors' employees, my review of relevant documents, and/or my opinion based upon my experience and knowledge concerning the Debtors' operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

## I.      Capmark's Business

5.      The Debtors and their nondebtor subsidiaries and affiliates (together with the Debtors, "Capmark") are a group of commercial real estate financial services companies that operate in North America, Asia and Europe and provide commercial real estate-related products

and services to borrowers, investors and other customers. Capmark's operations began after the 1994 separation of GMAC Mortgage LLC's residential and commercial real estate financing operations. In March 2006, a controlling interest in CFGI, then known as GMAC Commercial Holding Corp., was sold by GMAC Mortgage LLC to an entity owned by a group of investors.[2] Attached hereto as Exhibit A is an organizational chart setting forth the corporate structure of the Debtor and nondebtor entities in the Capmark group, as of the Commencement Date.

6.      As of June 30, 2009, Capmark had total assets of approximately $20.1 billion and total liabilities of approximately $21.0 billion. Consolidated revenues for the six months ended June 30, 2009 were approximately negative $1.6 billion.

## A.      Capmark's Three Core Business Lines

7.      Capmark's commercial real estate services are generally divided into three core business lines: (i) lending and mortgage banking, (ii) servicing, and (iii) investments and funds management.

*Lending and Mortgage Banking*

8.      Capmark operates a lending and mortgage banking platform in North America. The platform provides financial products that may be used by real estate owners and developers to finance most types of commercial property. Capmark's financial products have historically included permanent loans, interim and bridge loans, mezzanine loans, construction loans, secured and unsecured lines of credit and tax credit syndications. Capmark also has lending groups that specialize in new markets tax credit funds ("NMTC funds") and military

---

[2] On March 23, 2006, GMACCH Investor LLC, an investor entity owned by four sponsor investors (the "Sponsors"), acquired a controlling equity stake in CFGI from GMAC Mortgage Group LLC, a wholly-owned subsidiary of GMAC LLC. As of the Commencement Date, the Sponsors own a majority interest of approximately 75.4 percent of the equity in CFGI through GMACCH Investor LLC. Certain employees and non-employee directors own an equity interest of approximately 3.3 percent of CFGI. GMAC Mortgage Group LLC retains an equity interest of approximately 21.3 percent. Shay Ventures LLC owns an equity interest of approximately 0.02 percent.

housing financing.

9.      In each of 2006 and 2007, Capmark originated approximately $30 billion of commercial mortgage loans, covering many commercial property types across the major markets in the United States.  In reaction to the changes in the overall economy and its operating results, Capmark reduced its proprietary originations to $10.4 billion in 2008, and focused on originating loans for third parties, including originating loans pursuant to programs of government-sponsored enterprises Fannie Mae and Freddie Mac (the "GSEs") and funding U.S. Department of Housing and Urban Development ("HUD")-insured multifamily mortgage loans through the pre-sale of Ginnie Mae mortgage-backed securities issued by subsidiaries of Capmark.

10.      The Debtors are lenders with respect to approximately 275 commercial mortgage loans having an outstanding principal balance of approximately $2.4 billion (the "Proprietary Loans").  In many of these Proprietary Loans, a Debtor acts as agent for itself and for many other financial institutions as co-lenders or participants.  These loans are secured by commercial properties of every description, including multi-family housing complexes, shopping malls, office buildings, warehouse facilities, and mixed-use developments, and range in size from $8 million to $84 million.

11.      If a Proprietary Loan is performing according to its terms, the Debtors' role as asset manager is simply to monitor covenant and payment compliance.  A large and growing number of these loans, however, are in technical or payment default.  As lender, and particularly as agent for other lenders, the Debtors' role is to negotiate resolutions to these defaults or to pursue remedies against defaulting borrowers.  Once a foreclosure remedy has been exercised and title to collateral is obtained, it is the Debtors' role to either hold, maintain

and improve the property, or to market and sell the property, depending on the Debtors' judgment as to which strategy will maximize the value of the property.[3] The Debtor has a well-earned reputation in the marketplace for identifying and implementing strategies for recovery on distressed commercial real estate loans.

12. Beginning in late 2007, Capmark focused its efforts on allocating capital effectively and preserving its liquidity position in each of the geographic regions where it operates. Consequently, Capmark discontinued proprietary lending operations in Europe and Asia.

13. Capmark's loan origination and mortgage banking offices are located in various cities, including, Horsham, Pennsylvania; Tysons Corner, Virginia; Chicago, Illinois; and Birmingham, Alabama. Originations are also funded through nondebtor Capmark Bank.

*Global Servicing*

14. Capmark operates a loan servicing business which includes acting as master, primary and special servicer.[4] Capmark has substantial servicing relationships with the GSEs, FHA and HUD. It is the sole back-up servicer for both Fannie Mae and Freddie Mac and

---

[3] Debtor Capmark REO Holding LLC owns foreclosed real estate properties and mortgage loans.

[4] A primary servicer acts as the primary contact with the borrower and generally is responsible for, among other things, all cash management functions relating to the loan (billing and collection), administering reserve and escrow funds, obtaining and analyzing operating and financial statements, and preparing and providing periodic reports and remittances to the master servicer. A master servicer is responsible for administration of a pool of loans that is transferred to a trust or other special purpose entity in connection with a securitization transaction. Generally, a master servicer enters into a pooling and servicing agreement that requires it to assume ultimate responsibility for administering all pooled loans and ensuring that primary servicers act in a diligent manner when carrying out their collection and administration activities. Master servicers handle all remittance and reporting activities required by the pooling and servicing agreement and CFI's pooling and servicing agreements generally require it to advance funds to cover any delinquent payments on the securitized loans and any taxes and insurance premiums not covered by borrowers' escrow funds. A special servicer is a specialist in dealing with defaulted loans and is usually selected by the holder of the subordinated interest in a securitization vehicle. Under most pooling and servicing agreements, only loans that are subject to a servicing transfer event (generally a 60-day delinquency, borrower's bankruptcy or imminent default) may be transferred from the master servicer to the special servicer. A special servicer's asset managers take measures to collect all sums due and payable on each defaulted loan and to bring the account to a current status.

the sole back-up asset manager for Freddie Mac. On a daily average basis, nondebtor affiliate Capmark Bank manages approximately $3.4 billion in escrow funds relating to the servicing business platform. Capmark has historically been a top-tier rated servicer by Standard & Poor's, Fitch Ratings and DBRS, although in March 2009 Fitch Ratings downgraded Capmark's servicer ratings due to uncertainty regarding the financial condition of CFGI.

15.     Capmark's servicing activities include master, primary and special servicing of pools of loans that Capmark or third parties securitized. Capmark acts as a primary servicer of commercial real estate loans that it originates as a proprietary or correspondent lender, and commercial real estate loans that third parties originate but outsource for servicing. In addition to originating and acquiring loan servicing rights, Capmark also services loans under contracts with customers under the customer's brand name (private label services). Generally, these customers are insurance companies, banks, and financial institutions who seek to take advantage of Capmark's servicing experience and economies of scale. Capmark provides private label services for several large life insurance companies in the United States.

16.     Capmark conducts its servicing activities across North America and in India. Capmark operates its primary and master servicing business through central processing centers located in Horsham, Pennsylvania and Hyderabad, India and from North American regional client relations offices. The special servicing activities are carried out in regional offices located in North America. The servicing platform employs approximately 750 people.

17.     Capmark previously conducted servicing activities in Europe and Asia. The European servicing operations were sold to Capita Group Plc ("Capita") in June 2009. In October 2009, Capmark entered into an agreement to sell its Asian servicing operations, although the transaction has not closed.

*Investments and Funds Management*

18.    Capmark also has an investment and funds management business. Capmark began investing in real estate equity and mortgage debt in 1996, and in late 2000, Capmark Investments LP, a nondebtor registered investment adviser, was established as a separate direct subsidiary of Debtor CFI.  The investment and funds business has sponsored and manages third party real estate debt and equity funds, as well as Capmark's own equity investments.  Capmark's investments consist of a range of debt and real estate equity investments, including mortgage loans and securities, mezzanine loans, commercial mortgage backed securities ("CMBS"), residential mortgage backed securities, REIT securities and synthetic securities.  The investment structures used in this business line have included commingled investment funds and commercial real estate collateralized debt obligations ("CDOs"), direct investments that Capmark makes with its own capital, and joint ventures and similar arrangements with other investors in North America and Europe.

19.    As of September 30, 2009, debt and equity investments under Capmark Investments LP's management totaled approximately $3.50 billion.  On July 7, 2009, Capmark Investments LP, a nondebtor, entered into a sale agreement with Ventras, an entity currently owned in part by former officers of Capmark Investments LP, Capmark Securities Inc., and CFGI, to assign the management contracts of various Capmark-sponsored CDOs to Ventras for an initial purchase price of $3.0 million.  The purchase price may increase to a maximum of $5.5 million based upon the terms of the agreement.

20.    On September 30, 2009, Capmark Investments LP entered into a non-discretionary sub-advisory agreement with Urdang Capital Management Inc. (a subsidiary of Bank of New York) with respect to two debt investment vehicles – Capmark Structured Real Estate Partners LP and Capmark VII-CRE Ltd.  Capmark Investments LP remains the investment

adviser to both of these debt investment vehicles.

**B.      Capmark's Global Business Segments**

21.     For management reporting purposes, the Debtors' and their nondebtor subsidiaries' and affiliates' business lines are conducted through six business segments organized by geography and type of business – (i) North America Lending and Mortgage Banking; (ii) North American Servicing; (iii) Investments and Funds Management; (iv) Low Income Housing Tax Credit Operations; (v) Asian Operations; and (vi) European Operations.

*North American Lending and Mortgage Banking*

22.     Debtors CFGI and CFI directly or indirectly own the nondebtor entities that operate in this business segment.  This business segment includes most North American activities relating to the lending and mortgage banking businesses, including commercial mortgage banking, loan origination, capital markets activities and syndication of NMTC funds. Through this segment, Capmark originates loans and arranges other forms of financing for third parties, including the GSEs.  Historically, Capmark also originated loans for its proprietary account primarily through CFI and nondebtor Capmark Bank.  Prior to the dislocations in the credit markets, Capmark reduced the principal risk associated with its North American proprietary lending activities by monetizing a significant portion of its originated loans through securitizations, syndications, participations, and other sales.   In the current market environment, these mechanisms are no longer available.  Capmark currently operates this business only in the United States, as it ceased originating loans in Canada as of year-end 2007.

*North American Servicing*

23.     Debtor CFI operates or directly owns a large portion of the entities that operate in the North American Servicing business.  Through this segment, the relevant entities conduct all of Capmark's North American activities relating to loan servicing.  Capmark has

substantial servicing portfolios both within the private sector and with the GSEs and HUD.

*North American Investments and Funds Management*

24.     Several of the Debtors (namely, CFGI, CFI and Commercial Equity Investments, Inc.) directly or indirectly operate and/or own the nondebtor entities that operate in this business segment.  Much of these operations are conducted in the United States through nondebtor Capmark Investments LP.  This segment includes all North American activities relating to investments and funds management, including sponsorship and management of real estate debt and equity funds for third-party investors, as well as management of the relevant Capmark entities' own real estate equity investments.

*North American Affordable Housing*

25.     Debtor Capmark Capital Inc. ("CCI"), a wholly-owned subsidiary of CFGI, owns a debtor holding company, Capmark Affordable Equity Holdings Inc. ("Affordable Equity Holdings"), which in turn owns Capmark Affordable Equity Inc. ("Affordable Equity") and all of the nondebtor and certain debtor operating entities in this business segment.  The debtor operating entities in this segment include certain managing member entities (the "LIHTC Manager Debtors"), which, collectively with CCI, Affordable Equity Holdings and Affordable Equity (collectively, the "Affordable Equity Entities"), manage affordable housing debt investments and low income housing tax credit ("LIHTC") equity investments on behalf of third-party investors.  Historically, as part of this business, the Affordable Equity Entities aggregated LIHTC investments into funds and sold equity in those funds to tax credit investors.  These funds generate a return or yield to the investors over the life of the tax credits based on the purchase price of the underlying real estate.  In many cases, CFGI has guaranteed yields to these investors, which has created contingent liabilities for CFGI.  In certain cases, Affordable Equity Holdings and Affordable Equity also provided certain guarantees for these funds.  The Affordable Equity

Entities no longer originate, aggregate and sell LIHTC equity investments, choosing instead to focus solely on the management of these assets, including certain LIHTC equity and affordable housing debt investments owned by CCI and its subsidiaries. As of June 30, 2009, the Affordable Equity Entities managed LIHTC funds with over $2.4 billion of invested and committed capital, $1.9 billion of which was in guaranteed funds.

*Asian Operations*

26.     Debtors CFGI (indirectly), SJM Cap, LLC (directly), Summit Crest Ventures, LLC (directly) and CFI (directly and indirectly) own the nondebtor entities that operate the Asian Operations business segment. Capmark's Asian Operations segment has historically carried out commercial real estate finance activities in Japan, Taiwan, the Philippines and China. The Asian Operations historically included real estate equity investments, acquiring portfolios of non-performing commercial and residential real estate loans and originating and servicing commercial real estate loans. In 2008, Capmark curtailed its lending and investing activities in Asia and focused its efforts on managing its existing loan, investment and fee-for-services businesses.

*European Operations*

27.     Until June 2009, Capmark operated the European Operations segment out of offices in Ireland, the United Kingdom and Germany. In support of this business, CFGI had an indirect, wholly-owned interest in Capmark Bank Europe p.l.c., which ceased its banking activities and surrendered its banking license in 2009. The activities in this segment historically included lending, real estate equity investments and servicing, including a primary, master and special servicing portfolio. In 2008, the Company curtailed its lending and investing activities in Europe and focused its efforts on managing the Company's existing loan, investment and fee-for-services businesses.

28.     In early June 2009, Capmark sold its European servicing operations to Capita, which included Capmark's European loan servicing, administration, asset management administration and CMBS administration services operating out of offices based in the UK, Ireland and Germany.  Capmark entities acquired by Capita included Capmark Services Ireland Limited, Capmark Services UK Limited and Capmark Asset Management GmbH.

29.     Following the completion of the sale to Capita, the remaining material interests in the European Operations segment consist of the loan portfolio held by Capmark Management plc (formerly Capmark Bank Europe) and indirect equity investments held through a nondebtor subsidiary of CFGI.

## C.     Capmark Bank and CFGI's Capital Maintenance Obligations

30.     Many of the proprietary loans originated by Capmark in North America in recent years were originated by nondebtor subsidiary Capmark Bank.  Capmark Bank also holds servicing escrow deposits that are managed by CFI as part of its servicing business.  Capmark Bank is insured by the Federal Deposit Insurance Corporation ("FDIC") and headquartered in Midvale, Utah.  Capmark Bank accepts deposits in the form of time and money market deposits, and issues callable and non-callable brokered certificates of deposit ("Brokered CDs"), the latter being the bank's main source of liquidity.[5]

31.     Capmark Bank is jointly regulated by the FDIC and the Utah Department of Financial Institutions (the "Department" and together with the FDIC, the "Bank Regulators").

---

[5] CFGI previously owned another industrial bank chartered by the State of Utah, Escrow Bank USA ("Escrow Bank").  The focus of Escrow Bank's operations included accepting deposits of principal, interest, escrow and reserve balances that borrowers maintain in custodial accounts for the purposes of paying principal and interest on their loans and funding repairs, tenant improvements, taxes and insurance on the properties that are financed with loans.  A portion of these deposits were eligible for investment as money market deposits at Capmark Bank, and these deposits also provided Capmark Bank with an alternative form of financing.  In June 2008, Escrow Bank ceased its trust operations and the trust customers of Escrow Bank appointed Capmark Bank as their new trustee. Following the cessation of its trust operations, Escrow Bank no longer had any daily operations and, as a result, it was dissolved and its deposit insurance was terminated effective June 30, 2009.

The Bank Regulators impose strict restrictions on Capmark Bank's operations, including capital maintenance obligations.  In connection with the sale of CFGI to the Sponsors, CFGI and Capmark Bank entered into a capital maintenance agreement (the "<u>Capital Maintenance Agreement</u>") with the FDIC that requires CFGI to contribute cash or other assets acceptable to the FDIC to Capmark Bank if it falls below "well-capitalized" status or its Tier 1 leverage ratio falls below 8 percent.

        32.      Pursuant to applicable banking laws and regulations and the Capital Maintenance Agreement, if Capmark Bank fails to maintain its well-capitalized status or fails to meet other regulatory requirements, the Bank Regulators may impose further restrictions on the activities of Capmark Bank, including the issuance of cease and desist orders prohibiting Capmark Bank's issuance of Brokered CDs.  Moreover, the Bank Regulators may require CFGI to contribute cash or assets to Capmark Bank pursuant to the terms of the Capital Maintenance Agreement and governing regulations.  In the event Capmark Bank becomes "undercapitalized" or "critically undercapitalized," as defined by the applicable regulations, the FDIC may be appointed as a receiver or conservator to seize and liquidate Capmark Bank's assets.  As a result, throughout the life of Capmark Bank, CFGI has regularly made contributions consisting of cash and other assets to Capmark Bank to maintain compliance with these capital rules and requirements.  As discussed further below, in the months leading up to the Commencement Date, CFGI made substantial capital contributions to Capmark Bank to ensure compliance with applicable capital rules and requirements, and Capmark Bank agreed with each of the Bank Regulators to the entry of cease and desist orders that require Capmark Bank to maintain certain capital ratios and comply with other restrictions.  As a result of the orders, Capmark Bank is prohibited from issuing new Brokered CDs without the consent of the FDIC.

33.     To enable the Bank Regulators to monitor Capmark Bank's capital, the bank is required, among other things, to file quarterly financial reports of its operation and condition (the "Call Reports"), reflecting financial information determined in accordance with generally accepted accounting principles.  Capmark Bank's most recent Call Reports, dated June 30, 2009, indicated that the bank's total assets totaled $11.12 billion and its outstanding deposits totaled $8.39 billion.  Also as of such date, Capmark Bank was a "well-capitalized" financial institution pursuant to the FDIC's rules and regulations.

## II.     Current Organizational Structure

34.     As discussed above, CFGI, as the ultimate parent company of the Capmark group, the other Debtors, and CFGI's nondebtor subsidiaries, either operates or owns equity in entities that operate Capmark's global business segments and business lines.  The controlling interest in CFGI is directly owned by GMACCH Investor LLC, which in turn is owned by the Sponsors.  CFGI's corporate headquarters is located in Horsham, Pennsylvania, consisting of four buildings and approximately 159,600 square feet of office space, all of which are wholly owned by debtor CFI.  From the Horsham location, CFGI and other Capmark entities operate and oversee a large portion of the North American Lending and Mortgage Banking, North American Investments and Funds Management and North American Servicing business segments, as well as certain other general corporate related operations.  CFI leases property in several other United States locations to carry out related business functions.  Internationally, one of CFGI's nondebtor subsidiaries also leases substantial office space in Tokyo, Japan to operate the Asian Operations business segment.

35.     As of the Commencement Date, Capmark employed approximately 1,000 employees located in 37 offices worldwide.

### III. Prepetition Debt Structure

36. The instruments evidencing the Debtors' significant prepetition indebtedness are described below.

### A. Secured Debt

*The Term Loan Facility*

37. CFGI, as borrower, is party to a $1.5 billion Term Loan Credit and Guaranty Agreement, dated as of May 29, 2009 (as amended, modified, and supplemented from time to time through and including the Commencement Date, the "Term Loan Facility"), with Citicorp North America, Inc., as administrative agent, and the other lenders party thereto. The Term Loan Facility is guaranteed by limited guarantees of nine of the Debtors and by certain nondebtor guarantors. [6] The liability of each guarantor is limited to the maximum amount as will not result in the guarantee constituting a fraudulent transfer or conveyance and the liability of each guarantor for the intercompany claims of CFGI and the other guarantors is subordinated to the liability of each guarantor under the Term Loan Facility. The Term Loan Facility is also secured by a first priority pledge and security interest on all of CFGI's, the Guarantors' and their subsidiaries' United States and Canadian mortgage loan assets and foreclosed real estate and proceeds thereof, but excluding mortgage servicing rights, certain assets pledged to Capmark Bank, loans originated by Capmark Bank and CFI for the GSEs, FHA and HUD and certain other excluded assets.[7] The Term Loan Facility also specifically provides that Capmark Bank and certain other subsidiaries are not required to pledge their assets.

---

[6] The Debtor guarantors (the "Guarantors") are: Capmark Finance Inc.; Capmark Capital Inc.; Commercial Equity Investments, Inc.; Mortgage Investments, LLC; Net Lease Acquisition LLC; SJM Cap, LLC; Capmark Affordable Equity Holdings Inc.; Capmark REO Holding LLC; and Summit Crest Ventures, LLC. The nondebtor guarantors are Capmark Investments LP and Crystal Ball Holding of Bermuda Limited.

[7] Capmark REO Holding LLC was formed to own the equity interest in all of the special purpose entities that foreclose on loans serving as collateral to the Term Loan Facility or acquire title to property that secures defaulted loans which serve as collateral for the Term Loan Facility.

38.     Proceeds from the Term Loan Facility, along with $75 million in cash, were used to refinance a portion of the Bridge Loan and Senior Credit Facility (each as described below).  The maturity date of the Term Loan Facility is March 23, 2011, but such maturity may be accelerated under certain circumstances.

## B.     Unsecured Debt

### *The Bridge Loan*

39.     CFGI, as borrower, is party to a $5.25 billion Bridge Loan Agreement, dated as of March 23, 2006 (as amended, modified, and supplemented from time to time through and including the Commencement Date, the "Bridge Loan"), with Citicorp North America, Inc., as administrative agent, and the other lenders party thereto.  The Bridge Loan is guaranteed by limited guarantees of all the non-obligor Debtors (excluding the LIHTC Manager Debtors), and by certain nondebtor guarantors.  The liability of each guarantor is limited to the maximum amount as will not result in the guarantee constituting a fraudulent transfer or conveyance.  The proceeds of the Bridge Loan were used to refinance prior indebtedness.

40.     The Bridge Loan was originally scheduled to mature and become payable in full on March 23, 2009, but CFGI entered into several amendments to extend the maturity date while the parties to the Bridge Loan and the Senior Credit Facility negotiated a broader restructuring of the obligations under both facilities.  During this time period, CFGI also repaid certain lenders under the Bridge Loan which did not agree to the extensions and the extending lenders under the Bridge Loan agreed to waive any event of default and forebear from exercising any rights and remedies relating to CFGI's failure to pay any other amounts due on the original maturity date.  One holder of approximately $48 million principal amount of the Bridge Loan that did not extend the maturity date on the obligations owed to it and was not repaid filed a complaint in New York state court seeking, among other remedies, collection on the debt.  The

parties settled the lawsuit and the plaintiff holder agreed to join the group of extending lenders.

41.     Finally, as discussed above, on May 29, 2009, the parties to the Bridge Loan and the Senior Credit Facility (as defined below) reached agreement on a restructuring, pursuant to which certain proceeds from the Term Loan Facility were used to repay a portion of the principal amount outstanding under the Bridge Loan.  At that time, CFGI and the other parties to the Bridge Loan also entered into certain amendments to the Bridge Loan, which extended the maturity date of the Bridge Loan to March 23, 2011 and conformed certain financial covenants in the Bridge Loan to those in the Term Loan Facility.  As of the Commencement Date, the principal amount outstanding under the Bridge Loan was approximately $234.2 million.

*The Senior Credit Facility*

42.     CFGI, CFI, SJM Cap, LLC, and certain nondebtors, as Borrowers (the "Borrowers"), are parties to a Credit Agreement, dated as of March 23, 2006 (as amended, modified, and supplemented from time to time through and including the Commencement Date, the "Senior Credit Facility"), with Citibank, N.A., as administrative agent, and the other lenders party thereto.  The Senior Credit Facility was comprised of (i) a $2.75 billion revolving credit facility (the "Revolver"), which was divided into several U.S. and foreign-denominated sub facilities (including euros, pounds sterling, Japanese yen and U.S. and Canadian dollars), and (ii) a $2.75 billion term loan (the "Term Loan").  Principal outstanding under the Senior Credit Facility matures on March 23, 2011.  The liability of each Borrower is limited to its outstanding borrowings under the Senior Credit Facility.  The Senior Credit Facility is guaranteed by limited guarantees of all the Guarantors and by certain nondebtor guarantors.  The liability of each guarantor is limited to the maximum amount as will not result in the guarantee constituting a fraudulent transfer or conveyance.  The proceeds of the Senior Credit Facility were used to

refinance prior indebtedness and to fund subsequent investments and operating activities.

43.     As described above, on May 29, 2009, certain proceeds from the Term Loan Facility were used to repay a portion of the principal amount outstanding under the Senior Credit Facility.  At that time, CFGI and the other parties to the Senior Credit Facility also entered into certain amendments to the Senior Credit Facility, which conformed certain financial covenants in the Senior Credit Facility to those in the Term Loan Facility.  In addition, the Senior Credit Facility was amended to terminate the revolving nature of the facility and all remaining amounts outstanding were converted to term loans.  As of the Commencement Date, the principal amount outstanding under the Senior Credit Facility was approximately $4.6 billion.

### Three, Five, and Ten Year Notes

44.     Pursuant to the Indenture, dated as of May 10, 2007, between CFGI, as issuer, Deutsche Bank Trust Company Americas ("Deutsche Bank"), as indenture trustee, and certain Debtor and nondebtor guarantors named therein, CFGI issued approximately $850,000,000 of senior unsecured floating rate notes maturing on May 10, 2010 (the "Floating Rate Notes").  The Floating Rate Notes bear interest at variable rates which reset for each interest period based on three month LIBOR plus 0.650%, payable quarterly on February 10, May 10, August 10 and November 10 of each year.  The Floating Rate Notes are guaranteed by limited guarantees of each of the Guarantors and by certain nondebtor guarantors.

45.     Pursuant to the Indenture, dated as of May 10, 2007, between CFGI, as issuer, Deutsche Bank, as indenture trustee, and certain Debtor and nondebtor guarantors named therein, CFGI also issued approximately $1,200,000,000 of senior unsecured notes, which bear interest at the rate of 5.875% per annum and mature on May 10, 2012 (the "5.875% Notes").  Interest on the 5.875% Notes is payable semi-annually on May 10 and November 10 of each

year.  The 5.875% Notes are guaranteed by limited guarantees of each of the Guarantors and by certain nondebtor guarantors.

46.     Pursuant to the Indenture, dated as of May 10, 2007, between CFGI, as issuer, Deutsche Bank, as indenture trustee, and certain Debtor and nondebtor guarantors named therein, CFGI also issued approximately $500,000,000 of senior unsecured notes, which bear interest at the rate of 6.300% per annum and mature on May 10, 2017 (the "6.300% Notes").[8] Interest on the 6.300% Notes is payable semi-annually on May 10 and November 10 of each year.  The 6.300% Notes are guaranteed by limited guarantees of each of the Guarantors and by certain nondebtor guarantors.

47.     The Floating Rate Notes, 5.875% Notes and the 6.300% Notes are collectively referred to herein as the "Notes."  The liability of each guarantor under the Notes is limited to the maximum amount as will not result in the guarantee constituting a fraudulent transfer or conveyance.

48.     On April 30, 2008, CFGI completed an exchange offer for the outstanding Notes and cancelled the Notes issued under the Indentures dated May 10, 2007 in exchange for the issuance of substantially similar publicly registered Notes.  The interest rates payable on the Notes are subject to adjustment from time to time if either Moody's Investors Service or Standard & Poor's downgrades the debt ratings assigned to the Notes below certain threshold ratings.

49.     The Notes are senior unsecured obligations and rank equally with all of CFGI's and the Debtor borrowers' and guarantors' existing and future senior unsecured indebtedness and are senior to any subordinated indebtedness.  A portion of the net proceeds of the issuance of the Notes was used to repay approximately $2.0 billion due under the Bridge

---

[8] On September 29, 2009, Wilmington Trust FSB was appointed successor trustee under the 6.300% Note indenture.

Loan and the remainder was used for general corporate purposes.

50.    As of the Commencement Date, the principal amount outstanding under the Notes was approximately (i) $637.5 million under the Floating Rate Notes, (ii) $1.2 billion under the 5.875% Notes and (iii) $500 million of under the 6.300% Notes.

## C.    Junior Subordinated Debentures

51.    On March 23, 2006, CFGI issued $250 million of junior subordinated debentures to Capmark Trust, a Delaware statutory trust, under an Indenture among CFGI, as issuer, Law Debenture Trust Company of New York, as trustee, and Deutsche Bank, as agent. Interest accrues and is payable on the junior subordinated debentures on a quarterly basis at an annual rate equal to three-month LIBOR plus an applicable margin.  The junior subordinated debentures will mature on March 23, 2046.  As of the Commencement Date, the entire principal amount of $250 million is outstanding under the junior subordinated debentures.

52.    Contemporaneously with the issuance of the junior subordinated debentures, CFGI and Capmark Trust entered into a purchase agreement with General Motors Acceptance Corporation ("GMAC") under which GMAC purchased $250 million in aggregate liquidation amount of floating rate trust preferred securities issued by Capmark Trust in exchange for the reduction of an equivalent amount of indebtedness that CFGI owed GMAC at the time.

## D.    Other Debts and Contingent Obligations

53.    As part of their businesses, the Debtors have also incurred certain other substantial debt obligations, some of which are contingent obligations.  As discussed above, the Affordable Equity Entities manage LIHTC fund equity investments on behalf of third-party investors.  The LIHTC funds generate a return or yield to the investors over the life of the tax credits based on the purchase price of the underlying real estate.  Debtors CFGI, CCI, Affordable

Equity Holdings and Affordable Equity have guaranteed yields to many of these investors and in the event that yield is not realized, CFGI, CCI, Affordable Equity Holdings and Affordable Equity will be called upon to make up the guaranteed yield. In the case of certain LIHTC funds, the yields to investors were guaranteed by third party financial institutions pursuant to credit enhancement arrangements and Debtors CFGI and Affordable Equity Holdings agreed to reimburse such third party credit enhancers in the event such parties were required to make payments in respect of the yield guarantees to the fund investors. The obligations of the Debtors to reimburse the credit enhancement parties are secured by pledges of collateral, including investment securities. As of September 30, 2009, book value of the aggregate contingent liability for such guarantees was approximately $290 million and the maximum potential exposure under such guarantees was approximately $1.5 billion.

54. Debtors CFGI, CFI and CCI have certain repurchase, indemnification and loan obligations under the NMTC funds which they lend to, sponsor and manage. CFI also utilizes various derivative instruments in connection with their risk management and investment activities. These instruments allow CFI to minimize market risk volatility associated with interest rate and foreign currency risks and to match interest rate characteristics of interest-bearing liabilities with interest-earning assets. During 2009, the Debtors have reduced the amount of outstanding derivative instruments in connection with the reduction of their lending and investment activities and the sale of certain assets. Depending on counterparty terminations and the collateral posted under these transactions, CFI may incur liabilities during the chapter 11 cases and may have certain assets depleted from enforcement of counterparty collateral rights.

## IV.     Events Leading to the Chapter 11 Cases

**A.     Capmark's Businesses Rely on the Normal Functioning of Financial Markets**

55. As commercial real estate financing companies, the Debtors and

nondebtor entities of the Capmark group are heavily dependent on generating income and cash flow from (i) the volume of loans they originate and the credit performance of such loans, (ii) their ability to securitize, sell, participate or otherwise finance loan originations, (iii) the size of their servicing portfolios, (iv) the magnitude and value of real estate-related assets under management, (v) the value of the loans on their balance sheet, and (vi) the spreads generated on interest-earning assets.  The volume of Capmark's origination activities impacts its level of placement fees and net interest income and impacts the amount of loans it has available for future sale and servicing opportunities; in turn, this affects its levels of net gains or losses and fee-based income.  Capmark's ability to increase the size of its servicing portfolios, which is driven by the level of its loan origination and distribution activities, as well as the volume of mortgage servicing rights it acquires, affects the level of servicing fees that Capmark earns and income that it derives from escrow balances, each of which are an important source of recurring income and which, in the case of special servicing, provide countercyclical income, and in the case of earnings on escrow balances, tend to partially offset the negative impact on placement fees in a rising interest rate environment.

56.     The amount of financing that Capmark arranges, the number of servicing opportunities that are presented, the spreads Capmark generates on interest-earning assets and the gains or losses realized on asset sales are subject to various factors.  These factors include the availability of funding sources, the cost of capital, changes in the interest rate environment, CMBS spreads, commercial real estate prices, levels of supply and demand for commercial real estate and real estate-related investments, industry competition, and local, national, and international economic conditions.

57.     Capmark has also relied on debt financing to fund a portion of its

operations. The cost and availability of unsecured debt financing depend on Capmark's short-term and long-term credit ratings. Factors significant to the determination of Capmark's credit ratings or that otherwise affect its ability to raise short-term and long-term financing include the level and volatility of earnings, relative competitive position, risk management policies, access to sources of liquidity, capital adequacy, level of leverage, the credit quality of its balance sheet, the value of its assets, ability to retain key personnel, and legal, regulatory and tax developments.

**B.      Capmark's Businesses Have Suffered Ratings Downgrades**

58.      The unprecedented conditions in domestic and international financial markets – a "once-in-a-century" economic storm unlike any crisis since the Great Depression – have presented a particularly difficult challenge for Capmark and similarly situated finance companies. Beginning in the second half of 2007, credit markets tightened and stopped generating liquidity as lending institutions severely tightened lending standards and restricted access to credit. These market malfunctions significantly worsened during 2008 and continued unabated into 2009. Global markets experienced widening of credit spreads, deleveraging, and volatility, which resulted in reduced values for a wide variety of assets, including commercial real estate properties and commercial real estate loans. The U.S. structured credit markets – a material component of Capmark's funding – remained severely limited with respect to new issuances, including the CMBS and CDO markets, which effectively ceased functioning. As property values deteriorated and borrowers' resources became stressed, delinquency and default rates on commercial mortgage loans increased.

59.      These difficult market conditions had a particularly negative effect on CFGI's three core businesses. The general lack of liquidity in the debt markets severely decreased the availability of financing and significantly increased Capmark's average cost of capital, to the extent capital was available at all. In response to the decrease in availability and

increase in cost of capital, Capmark significantly decreased its proprietary lending activities, which negatively impacted the growth of its loan and servicing portfolios.

60.     The scarcity of liquidity in the markets also made it difficult for commercial real estate borrowers to obtain replacement financing.  The unavailability of financing for commercial real estate materially and adversely affected the value of commercial real estate assets, which in turn adversely affected the credit quality and increased the duration of Capmark's loan portfolio.  Deteriorating economic conditions also negatively impacted property values due to lower occupancy rates, declining rental income rates, and tenant bankruptcies.

61.     Capmark's ability to raise new real estate investment funds was severely constrained by adverse real estate market conditions, which have also negatively impacted the performance of the investment funds CFGI's subsidiaries manage.  The decline in fund performance resulted in a decline in performance based fees as well as losses on Capmark's own investments as a limited partner in the funds.

62.     Since July of 2007, and particularly beginning in the fourth quarter of 2008, these conditions led to significant increases in Capmark's non-performing loans, as well as increased credit provisions, impairments and declines in fair value on loans, real estate investments and securities.

**C.     Capmark's Businesses Have Been Undermined by the Global Financial Crisis**

63.     As a result of the continued deterioration of Capmark's assets and value, in late February 2009, Fitch Ratings downgraded CFGI's debt rating and placed CFGI on negative watch based on significant valuation adjustments CFGI was expected to report for the fourth quarter of 2008 due to mark-to-market provisions and impairments.  Fitch Ratings indicated its concerns that anticipated losses could place CFGI in violation of the leverage ratio covenants in the Senior Credit Facility and Bridge Loans and CFGI's auditors could include a

statement in their audit opinion expressing doubt about the company's ability to continue as a "going concern."  For similar reasons, each of S&P and Moody's reduced CFGI's long-term senior unsecured debt ratings to below investment grade during the first quarter of 2009.  Similarly, in early March 2009, Fitch Ratings also downgraded CFI's primary, master and special servicing ratings and placed the servicer ratings on further negative watch out of concern for the ability of CFI to maintain its current servicing platform.  Fitch noted that any further downgrade would necessitate a transfer of servicing due to concerns Capmark could not perform the advancing obligations of the master servicer.  In April 2009, S&P and Moody's further downgraded Capmark's credit ratings.  In early September 2009, Moody's Investors Service, Fitch Ratings, and Standard & Poor's all further downgraded CFGI's credit ratings, citing concerns regarding the possible sale of its North American mortgage and servicing operations, further impairment in asset quality, and the possibility of a required capital infusion into nondebtor affiliate Capmark Bank.

**D.      Capmark's Efforts to Address the Global Financial Crisis**

64.      To address the global financial crisis, Capmark has focused its efforts on allocating capital effectively and enhancing its liquidity position in each of the geographic regions where it operates.  As part of these efforts, Capmark curtailed European lending activities starting in the fourth quarter of 2007 and sold a large portion of its European loan portfolio in April 2008.  More recently, Capmark closed its European bank, Capmark Bank Europe p.l.c., and sold a substantial portion of its European loan servicing, administration, asset management administration and CMBS administration services to Capita.  In addition, Capmark reduced its Asian proprietary lending and investing activities.  In Asia and Europe, Capmark also focused on managing and monetizing existing loan and investment portfolios, managing fee for services businesses and selling business platforms.  During 2008 and 2009, Capmark also

reduced staffing levels to correspond with the decreased level of activities in Europe and Asia. In light of the difficult market conditions, Capmark also substantially reduced proprietary loan originations in North America.

65.     In December 2008, CFGI applied to the Board of Governors of the Federal Reserve System to become a bank holding company and financial holding company.  After communications with the staff of the Federal Reserve regarding qualification requirements and in light of operating results and other priorities, CFGI withdrew its application on February 26, 2009.

66.     At the same time, Capmark focused on out-of-court restructuring negotiations with certain of its creditor constituencies to address the pending maturity of $833 million coming due under the Bridge Loan on March 23, 2009, payment of which was projected to cause Capmark to suffer a cash shortfall that would leave it with insufficient short term capital by the fourth quarter of 2009.  In connection with the attempt to negotiate an out-of-court restructuring of its debt, Capmark engaged Lazard Frères & Co. LLC as financial adviser and Loughlin Meghji + Co. to provide financial analysis and support.  Capmark and its advisers conducted negotiations with the lenders under the Bridge Loan and Senior Credit Facility, during which time the parties agreed to various extensions of the maturity date under the Bridge Loan. Capmark paid fees to the extending lenders and the waiving Senior Credit Facility lenders in exchange for the extensions of the maturity date on the Bridge Loan and certain covenant relief, including waivers of the requirements that Capmark deliver unaudited financial statements and comply with the leverage ratio covenant for the quarters ending December 31, 2008, and March 31, 2009.

67.     Before negotiations concluded, on April 24, 2009, CFGI filed its annual

report for the year ending December 31, 2008, in which the Capmark group reported a net loss of $1.1 billion for the quarter ending December 31, 2008, and a net loss of $1.4 billion for the full year 2008. Capmark also reported that the severity of these losses caused it to be out of compliance with the leverage ratio covenants in the Senior Credit Facility and Bridge Loan as of December 31, 2008. As a result of the net losses and breach of the financial covenants, Capmark's auditors concluded there was substantial doubt about Capmark's ability to continue as a going concern.

68.     Under the terms of the Indentures relating to the Notes as well as the Senior Credit Facility, the failure to pay the Bridge Loan when due would result in a cross default on the Notes and the Senior Credit Facility. Accordingly, the prospective payment default on the Bridge Loan would have resulted in a cross default on $7.8 billion of additional debt.

69.     To address these pending defaults, Capmark engaged its lenders in substantial negotiations for a restructuring of obligations that would avoid near-term defaults while Capmark considered its strategic options. After several rounds of substantial negotiations, on May 8, 2009, Capmark obtained a term sheet commitment from certain of its lenders to provide funds under the Term Loan Facility and an extension of the maturity date of the Bridge Loan and waiver of the leverage ratio covenants in the Senior Credit Facility and Bridge Loan. Under the term sheet, the parties were to complete the consummation of the transaction by May 21, 2009.

70.     Unable to reach agreement on definitive documents by May 21, 2009, CFGI obtained an additional extension of the maturity date under the Bridge Loan and waiver of the leverage ratio covenants in the Senior Credit Facility and Bridge Loan until May 29, 2009.

Finally, on May 29, 2009, CFGI and the Guarantors entered into the Term Loan Facility and amended the Senior Credit Facility and Bridge Loan. As described above, the proceeds of the Term Loan Facility were used to pay down portions of the Bridge Loan and the Senior Credit Facility.

**E.      Negotiations for a Comprehensive Restructuring of the Debtors' Obligations**

71.      Following entry into the Term Loan Facility, Capmark engaged in broader discussions and negotiations with its creditor constituencies to reach a comprehensive, consensual agreement for the restructuring of all of its major debt obligations. To this end, over the course of the several months after consummation of the Term Loan Facility and leading up to the Commencement Date, the Debtors regularly met with the holders of substantial portions of the debt under the Bridge Loan, Senior Credit Facility and Term Loan Facility and their advisors to discuss the terms of a potential global resolution of the Debtors' liabilities. The Debtors also engaged in discussions with substantial holders of the Notes and their advisors. Certain of the holders of the Notes formed an ad hoc group (the "<u>Bondholders' Group</u>") representing at least 35% of the holders of the Notes for the purposes of discussing and negotiating a potential restructuring with the Debtors.

72.      Following months of discussions and negotiations with these creditor constituencies and their advisors, the Debtors could not come to an agreement for an out-of-court, pre-packaged or pre-arranged restructuring prior to the Commencement Date that would be amenable to all parties.

**F.      Asset Put Agreement for the Potential Sale of the North American Servicing and Mortgage Banking Business**

73.      During the time the Debtors were seeking to broker a global restructuring plan and pursue strategic business alternatives and transactions, they were also given indications

from the GSEs and other private label counterparties that without a deal for the transfer of their

North American servicing businesses to an approved servicer in the near term, such parties could

begin to take actions to terminate CFI's servicing rights.  Given the significant value of the

servicing rights, the Debtors commenced a substantial marketing effort for their North American

servicing businesses in July 2009 to ensure that bidders could be procured and top-dollar value

could be attained for such assets before any counterparty terminations.  In connection with their

efforts to negotiate with servicing counterparties and sell the North American servicing

businesses, the Debtors engaged Lazard Frères & Co. LLC and Beekman Advisors, Inc.

(together, the "Advisors").  As a result of  these substantial marketing and advisory efforts, on

September 2, 2009, CFGI, CFI and CCI (collectively, the "Sellers"), entered into an Asset Put

Agreement (the "APA") with Berkadia Commercial Mortgage LLC (f/k/a Berkadia III, LLC)

("Berkadia").  Berkadia is a newly formed entity owned by Berkshire Hathaway Inc. and

Leucadia National Corporation.

> 74.     The APA provides for a put option (the "Put Option") whereby the Sellers
have the right to sell to Berkadia all assets primarily used in, or primarily related to, the Sellers'

Global Servicing and Lending and Mortgage Banking business lines (as described above, and

referred to herein as the "MSB Business").

> 75.     The Sellers paid the Purchaser $40.0 million in cash for the Put Option.  If
the Put Option is exercised by the Sellers, upon the terms and subject to the conditions provided

for in the APA, the Sellers will transfer to MSB Business to Berkadia for an aggregate purchase

price of $490.0 million, subject to various closing adjustments.

> 76.     The Sellers have sixty days from the Commencement Date to exercise the
Put Option per the terms of the APA.  The Agreement will terminate if the closing does not

occur by December 31, 2009, unless extended (i) by either party for up to fifteen days to obtain

Fannie Mae, Freddie Mac, Ginnie Mae and HUD/FHA licenses and/or consents or (ii) by

Berkadia for up to thirty days to obtain required state licenses to operate the MSB Business.

Given these tight timelines, as described below, the Debtors have contemporaneously herewith

filed a motion seeking authority to sell the MSB Business to Berkadia, or, potentially, to a

different purchaser pursuant to a higher or better bid that may be obtained through the Sellers'

ongoing marketing efforts of the MSB Business.

**G.      Agreements for the Potential Sale of the Asian Servicing and Military Housing
         Servicing Businesses**

77.      In October 2009, Capmark entered into an agreement to sell the Asian

servicing operations to Sandringham Capital Partners Limited.

78.      On October 16, 2009, Capmark and Jefferies Mortgage Finance, Inc.

("Jefferies") entered into a purchase agreement pursuant to which Capmark agreed to sell to

Jefferies its military housing business for $9 million, subject to adjustments.  The consummation

of theses sales are subject to various conditions, including certain third party consents and the

issuance of an order of this Court approving the sales.

**H.      CFGI's Capital Contributions to Capmark Bank, the Cease and Desist Orders and
         CFGI's Deemed Assumption of Its Capital Maintenance Obligations**

79.      As discussed above, to ensure that Capmark Bank meets its capital

requirements, CFGI has regularly made substantial capital contributions to Capmark Bank,

principally in the form of contributions of cash, servicing advance receivables and mortgage

loans.  In accordance with this past practice, in June 2009, CFGI made a $302.8 million capital

contribution to Capmark Bank consisting of servicing advance receivables and cash.  Moreover,

on September 30, 2009, after extensive discussions with, among others, the Bank Regulators,

regarding the capital adequacy of Capmark Bank, CFGI made a further capital contribution to

Capmark Bank in the amount of $600.0 million.  The capital contribution consisted of $492.2 million in cash and $105.8 million in servicing advance receivables.

80.     Soon thereafter, on October 2, 2009, following substantial discussions with the Bank Regulators, Capmark Bank agreed to the entry of Orders to Cease and Desist (together, the "C&D Orders").  Pursuant to the C&D Orders, Capmark Bank must maintain a Tier 1 leverage ratio of at least 8% and a Total Risk-Based Capital ratio of at least 10%.  Within 45 days of entry of the C&D Orders, Capmark Bank must submit a capital plan to the Bank Regulators and without the prior written consent of the Bank Regulators, Capmark Bank cannot make any extensions of credit to CFGI or its subsidiaries, declare or pay any dividends or issue Brokered CDs.

81.     I am advised by counsel that, as of the Commencement Date, pursuant to section 365(o) of the Bankruptcy Code, CFGI is deemed to have assumed its commitments to the FDIC to maintain the capital of Capmark Bank and any damages that may arise from any subsequent breach of such obligations are entitled to priority under section 507 of the Bankruptcy Code.

I.      **The Debtors' Decision to File These Chapter 11 Cases**

82.     Although the Debtors' attempted to reach agreement with their various creditor and counterparty constituencies regarding an out-of-court restructuring, such efforts fell short.  As a result, after carefully reviewing and exploring all their alternatives and after implementing numerous cost-saving strategies, the Debtors determined that an orderly reorganization of their debts under chapter 11 represents the best of all available strategic options to maximize value for their creditors, shareholders, and other parties in interest.  As a result, the Debtors have commenced these chapter 11 cases.

83.     During the course of these chapter 11 cases, the Debtors will consider all

alternatives in evaluating the best course of action to maximize and preserve value for the parties in interest in these chapter 11 cases.

<h2 style="text-align:center">V.     <u>Summary of First Day Motions</u></h2>

84.     Concurrently with the filing of their chapter 11 petitions, or as soon as practicable thereafter, the Debtors have filed (or will file) the First Day Pleadings and a number of accompanying proposed orders (the "<u>First Day Orders</u>"), pursuant to which the Debtors seek relief they believe is critical to enable them to operate with minimum disruption to their businesses in the ordinary course following the filing of the chapter 11 petitions.  The relief sought in the First Day Pleadings is also imperative for the Debtors to remain on good business terms with certain third parties whose continuing cooperation is the linchpin for preserving value for the Debtors' estates and creditors.  Toward that end, the Debtors have filed several motions (the "<u>First Day Motions</u>") designed to facilitate the transition into chapter 11 and minimize disruption of the Debtors' business operations.  Unless the relief requested by the First Day Pleadings is granted, I believe the Debtors' (and Capmark's global businesses generally) will suffer devastating consequences.  A brief description of the relief requested and the facts supporting each of the First Day Pleadings and First Day Orders is set forth below.

**A.     First Day Motions Seeking Procedural and Administrative Relief**

**(i)     DEBTORS' MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY RULE 1015(b) AND LOCAL RULE 1015-1 DIRECTING JOINT ADMINISTRATION OF CHAPTER 11 CASES**

85.     Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rule 1015-1 of the Local Bankruptcy Rules for the District of Delaware (the "<u>Local Rules</u>"), the Debtors seek entry of an order directing the joint administration of their cases for procedural purposes only.  The Debtors request the joint administration of their separate chapter 11 cases for procedural purposes, and not the substantive

consolidation of their cases.  I am advised that the Debtors are "affiliated" entities, as per the Bankruptcy Code.

86.     Joint administration of these chapter 11 cases will provide significant administrative convenience for all parties in interest.  Many of the motions, hearings, and orders that will arise in these chapter 11 cases will jointly affect the Debtors.  By jointly administering these chapter 11 cases, I believe the Debtors will be able to reduce their fees and costs by avoiding duplicative filings and objections.  In addition, I believe the ability of parties in interest to monitor these chapter 11 cases will be facilitated by having all pleadings grouped together on one docket.  The joint administration of these chapter 11 cases will neither give rise to any conflicts of interest among the Debtors' estates nor adversely affect the Debtors' creditors.

87.     I believe joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors, their estates, and all parties in interest, and that the requested relief should be granted in all respects.

**(ii)     DEBTORS' MOTION FOR AN EXTENSION OF TIME TO FILE SCHEDULES OF ASSETS AND LIABILITIES, EXECUTORY CONTRACTS AND UNEXPIRED LEASES, SCHEDULES OF CURRENT INCOME AND EXPENDITURES, AND STATEMENTS OF FINANCIAL AFFAIRS**

88.     Pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and Local Rule 1007-1(b), the Debtors are seeking an order extending the time for the Debtors to file schedules of assets and liabilities, executory contracts and unexpired leases, current income and expenditures, and statements of financial affairs (collectively, the "Schedules") for an additional 30 days beyond the already extended 30-day deadline established by the Local Rules, without prejudice to the Debtors' ability to request additional time should it become necessary. The Debtors have filed a list of creditors in accordance with Local Rule 1007-2, which reflects the total number of their creditors exceeds 200 and, therefore, absent the relief requested in this

motion, the Debtors must file their Schedules within 30 days of the commencement date.

89.     Due to the size and complexity of their operations, I believe that the

Debtors will be unable to complete their Schedules in the 30-day period, as extended by Local

Rule 1007-1(b).  To prepare their Schedules, the Debtors must compile information from books,

records, and documents relating to thousands of claims, assets, and contracts.  Collecting the

necessary information requires the Debtors, their employees, and professionals to expend an

enormous amount of time, effort and resources.

90.     In view of the amount of work entailed in completing the Schedules and

the competing demands upon the Debtors' employees and professionals in stabilizing business

operations during this critical initial postpetition period, I believe that the Debtors will not be

able to properly and accurately complete the Schedules within the required 30-day time period,

and that there is ample cause for the requested extension for filing the Debtors' schedules.

**B.      Operational First Day Motions**

      **(i)      DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a), 345, 363, AND 364 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6003 AND 6004 (I) AUTHORIZING DEBTORS TO CONTINUE USING EXISTING CASH MANAGEMENT SYSTEM AND MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS, (II) AN EXTENSION OF THE DEBTORS' TIME TO COMPLY WITH THE DEPOSIT AND INVESTMENT REQUIREMENTS OF SECTION 345 OF THE BANKRUPTCY CODE, (III) SCHEDULING A FINAL HEARING THEREON**

91.     Pursuant to sections 105(a), 345, 363, and 364 of the Bankruptcy Code

and Bankruptcy Rules 6003 and 6004, the Debtors request entry of an interim order (i)

authorizing the Debtors to continue the Cash Management System, by, among other things,

prohibiting banks from asserting a setoff against or administrative freeze of any funds held in the

Servicing Escrow Accounts (as defined below) and maintaining existing Bank Accounts and

Business Forms (both as defined below), (ii) extending the deposit and investment requirements of section 345(b) of the Bankruptcy Code on an interim basis, and (iii) scheduling a final hearing thereon to consider granting the relief on a final basis.

92.     To manage their businesses efficiently and seamlessly, the Debtors and their nondebtor affiliates utilize a centralized cash management system (the "Cash Management System") to collect and transfer funds from numerous sources and centralized accounts, disburse funds to satisfy obligations arising from the daily operation of their businesses, and invest funds pursuant to the Debtors' investment guidelines (the "Investment Guidelines").

93.     In the ordinary course of business, the Debtors and their nondebtor affiliates use the Cash Management System to collect, transfer, distribute, and invest the funds generated by their businesses. Several of the Debtors maintain four general corporate accounts at two or more financial institutions: (i) an "Operating Account," (ii) an "Accounts Payable Account," (iii) a "Payroll Account," and (iv) a "Collection Account." For Debtors that operate in multiple currencies, these accounts may be duplicated for each currency. In addition, CFGI maintains "Investment Accounts" in which daily excess funds from the Debtors' businesses are concentrated and invested on a daily basis. The Operating Accounts, Accounts Payable Accounts, Payroll Accounts, Collection Accounts, and Investment Accounts are collectively referred to herein as the "Corporate Accounts." Disbursements made by wire transfer, ACH (EFT), and credit cards are paid via the Operating Accounts, Accounts Payable Accounts, and Payroll Accounts. Payments made by check are also made via the Accounts Payable Accounts and Payroll Accounts. Receipts are deposited into the Collection Accounts and Operating Accounts, and excess funds from the Debtors' businesses are concentrated and invested in the Investment Accounts.

94.     The Debtors' North American servicing business is operated primarily through CFI.  The servicing operations maintain a multitude of escrow and similar accounts with numerous financial institutions, the majority of which are in the name of CFI, in trust and for the benefit of third parties, including, for example, trustees for securitized loan portfolios or government sponsored enterprises.  The funds in these servicing accounts, although managed by CFI, are owned by third parties and thus, I am advised, are not property of the Debtors' estates.  These third party escrow accounts include "<u>Lockbox Accounts</u>," "<u>Payment Clearing Accounts</u>," "<u>Custodial Accounts</u>," "<u>Distribution Clearing Accounts</u>," and "<u>Securitization Collection Accounts</u>" (collectively, the "<u>Servicing Escrow Accounts</u>").  I believe that any disruption in the normal flow of funds in and out of the Servicing Escrow Accounts could severely impair the operation of the Debtors' servicing business.  As such, the Debtors have requested an order providing that the Banks are not entitled to administratively freeze or setoff any funds held in the Servicing Escrow Accounts.  I am told that the rights to direct the appropriate distribution of the Servicing Escrow Accounts are property of the Debtors' estates under Bankruptcy Code section 541, and thus, any freeze or setoff of the Servicing Escrow Accounts would violate the automatic stay imposed by Bankruptcy Code section 362.

95.     To ensure the continuing transparency of the Cash Management System, the Debtors will continue to maintain all records relating to receipts, disbursements, and transfers in accordance with substantially all of its prepetition practices.  However, after the Commencement Date, if the Debtors make a payment on behalf of a nondebtor subsidiary or affiliate, the nondebtor subsidiary or affiliate will reimburse the applicable Debtor for such expenses at the close of each month.

96.     Through the Cash Management System, CFGI provides intercompany

transfers of cash to CFI (the "Advance Transfers"), from which CFI then makes servicer advances and grants CFGI an intercompany payable. In connection with CFGI's continuation of Advance Transfers to CFI postpetition to enable CFI to make servicer advances, I believe it is necessary that CFGI be granted (i) an administrative expense claim pursuant to section 503(b) of the Bankruptcy Code against CFI's estate equal to the Advance Transfer; and (ii) a first priority security interest in the CFI receivable directly related to the servicer advance funded by the Advance Transfer. Granting CFGI an administrative expense status and a first priority security interest in connection with the Advance Transfers will ensure that cash continues to flow smoothly between the Debtors, thereby promoting uninterrupted business operations.

97.      By this motion, the Debtors also request authority to maintain the Bank Accounts in the ordinary course of business, to continue utilizing the Cash Management System to manage cash in accordance with prepetition practices, and to pay any ordinary course bank fees that may be incurred in connection with their corporate bank accounts (other than in respect of prepetition checks issued) or any other new account that may be opened in the ordinary course of the Debtors' businesses.

98.      In addition, the Debtors are seeking a sixty (60) day extension of the time to comply with section 345(b) of the Bankruptcy Code, in order to permit the Debtors to maintain their bank accounts without the need to post a bond or other security to the extent that, at any given time, funds have accumulated in the bank accounts in excess of the limits of section 345(b). The Debtors are large, sophisticated institutions and their business operations require them to maintain large account balances. All of the bank accounts are maintained at federally insured institutions and most of the Debtors' excess funds are currently invested in the PNC Accounts. Given the Debtors' concerns with respect to potential setoff and freeze risks and the

multitude of bank creditors holding claims against the Debtors, the PNC Accounts are one of the few options currently available for them to maintain cash and investments on a day-to-day basis without the threat of substantial disruptions and inability to access funds as a result of administrative freezes of such accounts  As a result, I believe there is cause to grant the Debtors an extension from the requirements of section 345.

99.     The Cash Management System constitutes an ordinary course, essential business practice that provides significant benefits to the Debtors' estates, including maintaining the stability of the Debtors' businesses.  Any disruption of the Cash Management System could have a severe and adverse impact upon the Debtors' operations.  Given the nature of the Debtors' businesses and the considerable disruption and cost that would result if the Debtors were forced to close the Cash Management System accounts, I believe the maintenance of the existing Cash Management System is in the best interests of their estates and all parties in interest.

**(ii)     DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6003 AND 6004 FOR AN ORDER (I) AUTHORIZING DEBTORS TO PAY PREPETITION (a) WAGES, COMPENSATION, PAYROLL TAXES, AND EMPLOYEE BENEFITS, (b) BUSINESS EXPENSES, AND (c) CONTRIBUTIONS TO, AND UNDER, EMPLOYEE BENEFIT PLANS, (II) AUTHORIZING DEBTORS TO PAY PREPETITION PAYROLL SERVICES AND BENEFITS PROVIDERS, (III) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS, AND (IV) SCHEDULING A FINAL HEARING THEREON**

100.     Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors request that this Court (i) authorize, but not direct, on an interim basis until the Final Hearing, the Debtors to (a) pay, in their sole discretion, all obligations incurred in respect of Wage Obligations, Payroll Taxes, Expense Reimbursements, and Employee Benefits (each as defined in the motion, and collectively, the "Employee Obligations") and all costs incident to the

foregoing, and (b) maintain and continue to honor their practices, programs, and policies for their employees as they were in effect as of the commencement of these chapter 11 cases, and as such may be modified, amended, or supplemented from time to time in the ordinary course; (ii) authorize and direct applicable banks and other financial institutions to receive, honor, process, and pay any and all prepetition and postpetition checks drawn on the Debtors' payroll accounts and all postpetition checks drawn on the Debtors' general disbursement accounts (collectively, the "Disbursement Accounts") and automatic payroll transfers, to the extent that such prepetition and postpetition checks or transfers relate to any of the foregoing Employee Obligations; and (iii) schedule a final hearing to consider entry of a final order approving of all of the relief requested in the Motion on a permanent basis.

101. In the ordinary course of their businesses, the Debtors incur payroll and various other obligations and provide other benefits to their employees in exchange for the employees' performance of services. As of the Commencement Date, the Debtors employed over 1,000 individuals (collectively, the "Employees").

102. The Debtors estimate that the aggregate amount of the prepetition Employee Obligations that are accrued and unpaid as of the Commencement Date, including, but not limited to, the Wage Obligations (exclusive of the estimated Commission Plan payments), Payroll Taxes/Garnishment, Expense Reimbursements, and Employee Benefits, and all costs incident to the foregoing, does not exceed approximately $6.9 million. The Debtors seek authority to pay such prepetition amount pursuant to the Interim Order. The Debtors do not seek authority to pay other amounts associated with the Bonus and Award Programs and the Severance Plan (as discussed below) pursuant to the Interim Order.

103. Pursuant to the interim order, the Debtors also seek authority to pay the

accrued and unpaid prepetition obligations owed pursuant to the Commission Plan (as defined in the motion) as and when normally due, including amounts for commissions that accrued prepetition, and to continue paying such amounts as they accrue postpetition. These commissions constitute a portion of the ordinary course compensation due to Employees who work in the loan origination business. The estimated amounts owed under the Commission Plan are not included in the total aggregate amount of Employee Obligations. The Debtors will not know the actual amounts of the accrued amounts owed to Employees under the Commission Plan for the prepetition period until the reports for income earned in October are generated in the first week of November; however, the Debtors estimate the accrued and prepetition Commission Plan obligations outstanding are approximately $1.3 million.

104. In this case, any delay in payment or failure to pay wages, salaries, commissions, benefits, and other similar items would irreparably impair the Employees' morale, dedication, confidence, and cooperation, and would adversely impact the Debtors' relationship with its Employees at a time when the Employees' support is critical to the Debtors' chapter 11 cases. At this critical juncture, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably result from a rapid decline in their Employees' morale. Absent relief requested herein, the Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable the Employees to meet their own personal financial obligations. Without the requested relief, I believe the stability of the Debtors' operations will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal Employees will seek other employment alternatives. In addition, it would be inequitable to require the Debtors' Employees to bear personally the cost of any business expenses they incurred prepetition, for the benefit of the Debtors, with the understanding that

they would be reimbursed.

105. Further, I believe the payment of wage obligations owed pursuant to the Commission Plan is essential to maintaining the stability of the Debtors' operations, as these Employees generate substantial revenue for the Debtors' businesses and without the payment of the Commission Plan obligations, the Employees will likely seek other employment opportunities in the industry. Should these Employees seek alternative employment, the value of the Debtors' estates will decline immensely at this critical juncture. Moreover, in the event the Court approves the sale of the MSB Business to Berkadia (as described above), payments under the Commission Plan to Employees in the MSB Business will be assumed by Berkadia on a going forward basis. Without the assurance that such Employees will receive Commission Plan payments before any such assumption or in the event the Court does not approve the sale, the Debtors' business operations would likely suffer serious adverse consequences from the departure of important income generating Employees.

106. The Debtors do not seek to alter their compensation, vacation and holiday program, or other employee benefit policies at this time. The motion is intended only to permit the Debtors, in their discretion, to make payments consistent with the Debtors' existing policies to the extent that, absent the benefit of an order approving the motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and to permit the Debtors, in their discretion, to continue to honor their practices, programs, and policies with respect to their Employees, as such practices, programs, and policies were in effect as of the Commencement Date. Payment of the Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors' estates, their creditors, and all parties in interest and will enable the Debtors to continue to operate their businesses in an economic and

efficient manner without disruption.

107.     Pursuant <u>only</u> to any final order approving the motion or another motion, and not pursuant to the Interim Order, the Debtors request authority to continue making payments pursuant to the Bonus and Award Programs (as defined in the motion) and to pay any prepetition amounts that may be owed with respect thereto.  The Debtors do not seek to make any payments on account of the Bonus and Award Programs in violation of section 503(c) of the Bankruptcy Code and are not seeking authority to continue the Bonus and Award Programs absent presenting such programs before the Court for approval through a motion process.  Any relief Debtors may seek with respect to the approval of a new bonus program for post-Commencement Date employee services will be addressed in a separate motion.

108.     The Debtors also seek authority to continue the Severance Plan with respect to eligible salaried Employees other than "insiders," as defined in section 101(31) of the Bankruptcy Code (the "<u>Insiders</u>").  The Debtors respectfully request that the Court schedule a hearing on regular notice to consider whether to continue the Severance Plan with respect to salaried Employees other than Insiders.

109.     As financial services companies, the Debtors are particularly reliant on their Employees, who are integral to their operations and vital to these chapter 11 cases.  I believe a significant deterioration in Employee morale at this critical time undoubtedly would have a devastating impact on the Debtors, their customers and vendors, and the value of the Debtors' assets and businesses.  I also submit the total amount sought to be paid pursuant to the motion is relatively modest compared with the size of the Debtors' overall businesses and the importance of the Employees to the Debtors' chapter 11 cases.

**(iii) DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363(b), AND 503(b) OF THE BANKRUPTCY CODE (I) AUTHORIZING DEBTORS TO MAINTAIN INSURANCE PROGRAMS AND PAY ALL PREPETITION AND POSTPETITION OBLIGATIONS IN RESPECT THEREOF, AND (II) DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS POSTPETITION CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**

110.     Pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code the Debtors request entry of an order (i) authorizing the Debtors to continue their insurance programs without interruption, in accordance with the same practices and procedures as were in effect prior to the commencement of their chapter 11 cases, and to pay all undisputed premiums, deductibles, administrative and broker's fees, commissions, and other charges arising under the insurance programs that were or became due or related to the periods before or after the Commencement Date (the "Insurance Obligations"), and (ii) directing banks and financial institutions to honor and process checks and transfers related to such Insurance Obligations.

*Workers' Compensation Program*

111.     The laws of the states in which the Debtors operate require the Debtors to maintain workers' compensation policies and programs to provide their employees with workers' compensation benefits for claims arising from or related to their employment with the Debtors. In connection therewith, the Debtors maintain workers' compensation coverage (the "Workers' Compensation Program") with Chubb Indemnity Insurance Company ("Chubb").

112.     Under the Workers' Compensation Program, the Debtors prepay Chubb an annual premium (the "Workers' Compensation Premium"), calculated based upon the Debtors' projected payroll and historic loss rates. At the conclusion of each policy year, Chubb conducts an audit of the Debtors' payroll records and issues a premium adjustment to the Debtors based upon, among other factors, the difference between the Debtors' projected and actual payroll for

the previous year. The premium adjustment can result in either a refund of an overpayment or a charge for an underpayment. Based upon the last audit by Chubb, the Debtors' projected 2009-2010 Workers' Compensation Premium will be approximately eleven percent lower than the Debtors' 2008-2009 Workers' Compensation Premium, which amount totaled $623,000.

*General Insurance Programs*

113.    The Debtors maintain many insurance programs to provide coverage for, among other things, general liability, property, automobile liability, employment practices liability, directors and officers' liability, umbrella and excess liability, and other liability policies (collectively, the "General Insurance Programs").

114.    The Debtors prepay premiums for the General Insurance Programs based upon a fixed rate established by each Insurance Carrier (the "General Insurance Premiums"). I submit that continuation of the General Insurance Programs is essential to the ongoing operation of the Debtors' businesses and to protect the value of the Debtors' estates.

115.    The Debtors are required to obtain certain insurance programs in connection with their mortgage banking, lending, and servicing operations. For example, CFI is required to maintain its errors & omissions and fidelity liability policies in connection with its contractual obligations to Fannie Mae, Freddie Mac, and Ginnie Mae.

116.    The Debtors do not anticipate that any amounts are due and owing under the General Insurance Programs as of the Commencement Date. However, to the extent any deductible becomes due and owing at a later date, the Debtors seek authority to pay such deductible even if it relates to a loss that accrued prepetition.

117.    I believe that granting the authority to pay the insurance programs in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11

without disruption. The nature of the Debtors' businesses makes it essential for the Debtors to maintain the insurance programs on an uninterrupted basis, including payment of the Insurance Obligations whenever arising. The nonpayment of any Insurance Obligation could result in insurance carriers declining to renew policies or refusing to enter into new insurance agreements with the Debtors. If the insurance programs lapse without renewal, the Debtors could be exposed to substantial liability, to the detriment of the Debtors' estates and all parties in interest. The Debtors would also then be required to obtain replacement policies on an expedited basis at a significant additional cost. In addition, as described above, certain insurance programs are required in connection with the Debtors' MSB Business, the absence of which could have significant detrimental effects.

118. I believe that continuation of the Debtors' insurance programs is in the best interests of the Debtors, their estates, and all parties in interest.

**(iv)** **DEBTORS' MOTION FOR ORDER PURSUANT TO SECTIONS 105(a), 363(b), 507(a)(8), AND 541 OF THE BANKRUPTCY CODE (I) AUTHORIZING PAYMENT OF PREPETITION TAXES AND OTHER GOVERNMENTAL ASSESSMENTS, (II) DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS, AND (III) SCHEDULING A FINAL HEARING THEREON**

119. Pursuant to sections 105(a), 363(b), 507(a)(8), and 541 of the Bankruptcy Code, the Debtors request entry of the interim order (i) authorizing, but not directing, the Debtors to pay certain prepetition property, sales, and use tax obligations and other certain governmental assessments of franchise fees and business license fees, including any penalties and interest thereon, to various federal, state and local authorities (collectively, the "Taxing Authorities"), including those obligations subsequently determined upon audit to be owed for periods prior to the Commencement Date, (ii) directing banks and other financial institutions to honor and process related checks and transfers, and (iii) scheduling a final hearing to consider granting the

44

relief requested herein on a permanent basis.

*Real and Personal Property Taxes*

120.     The Debtors pay real and personal property taxes (collectively, the "Property Taxes") in certain states in respect of real and personal property the Debtors own in such jurisdictions.  The Property Taxes are typically paid on a bi-annual basis, in the case of personal property, or annual basis, in the case of real property.

121.     While the amount the Debtors pay in respect of the Property Taxes fluctuates yearly, in 2008 the Debtors accrued approximately $77,000 in Property Taxes.  The Debtors estimate that they owe approximately $63,000 in respect of Property Taxes incurred prior to the Commencement Date.

*Sales Taxes*

122.     In the ordinary course of business, the Debtors are or may be required to collect sales taxes (the "Sales Taxes") in connection with certain of their business operations.  Typically, Sales Taxes accrue as tangible goods and services are invoiced to customers and are calculated based on a statutory percentage of the sale price invoiced to the customer.  The Debtors then remit the Sales Taxes to the relevant Taxing Authorities according to the requirements of that Taxing Authority, either on the basis of the Sales Tax actually invoiced to customers during a specified period or on the basis of estimated sales tax collections for the coming period.  Similarly, jurisdictions differ with regard to the frequency of payments, with payments ranging from monthly to quarterly to semi-annually.  With respect to jurisdictions that require the Debtors to remit estimated Sales Taxes, the applicable Taxing Authority subsequently reconciles payments to determine any payment deficiency or surplus for the period, and the applicable refund or payment is then made to the Debtors.  As of the Commencement Date, the Debtors estimate that approximately $440,000 is due and owing in respect of Sales Taxes.

123.     The Debtors also incur and collect use taxes (the "Use Taxes," and together with the Property Taxes and Sales Taxes, the "Taxes") when property or services are purchased from vendors that have no nexus to the resident states of the Debtors.  Such vendors are not obligated to charge or remit Sales Taxes for sales to parties outside the state of the vendors' operations.  Nevertheless, a purchaser, such as the Debtors, is obligated to self-assess and pay such taxes when applicable, to the states in which the Debtors operate.  The Debtors remit Use Taxes on a rolling basis after regular audits are conducted by Taxing Authorities and assessments are made pursuant to such audits.  Thus, the Debtors may be assessed for Use Taxes that arose before the Commencement Date, which the Debtors estimate to be in an approximate amount of $670,000 as of the Commencement Date.

*Other Governmental Assessments*

124.     The Debtors are also required to pay franchise taxes in certain states (the "Franchise Taxes").  The Franchise Taxes are typically paid annually to the applicable Taxing Authorities.  The Debtors estimate that each year they pay approximately $950,000 in respect of Franchise Taxes.  Further, many local governments require the Debtors to obtain a business license and pay fees associated with such license ("Business License Fees," and, collectively with the Franchise Taxes, "Other Governmental Assessments").  The requirements for a company to obtain a business license and the manner in which the fees are computed vary according to the tax law of the applicable jurisdiction.  The Debtors estimate that each year they pay approximately $25,500 in Business License Fees.

125.     Payment of the prepetition Taxes and Other Governmental Assessments is critical to the Debtors' operations.  I am advised that nonpayment of these obligations may also cause the Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the applicable jurisdictions, and seeking to

lift the automatic stay, all of which would disrupt the Debtors' day-to-day operations. Failure to pay such Taxes and Other Governmental Assessments could also trigger unwarranted governmental action in the form of increased audits, which would also be disruptive of the Debtors' operations and detrimental to all parties in interest. As such, paying the Taxes and Other Governmental Assessment may reduce the amounts ultimately paid to the Taxing Authorities because penalties and interest will be avoided by prompt payment.

126. I am further advised that many federal and state statutes hold officers and directors of collecting entities personally liable or criminally responsible for certain taxes and other governmental assessments owed by those entities. To the extent that certain Taxes and Other Governmental Assessments remain unpaid by the Debtors, the Debtors' officers, directors, and other employees may be subject to lawsuits or criminal prosecution during the pendency of these chapter 11 cases. The threat of a lawsuit or criminal prosecution, and any ensuing liability, would distract the Debtors and their personnel from important tasks related to the Debtors' chapter 11 cases, to the detriment of all parties in interest. The dedicated and active participation of the Debtors' directors, officers, and other employees is not only integral to the Debtors' continued, uninterrupted operations, but essential to the orderly administration of these chapter 11 cases, particularly during this critical postpetition period. Thus, I submit that the proposed relief is in the best interests of the Debtors' estates.

127. I submit that paying the Taxes and Other Governmental Assessments is well within the Debtors' sound business judgment and is in the best interest of the Debtors' estates. Further, I believe that interim relief is warranted with respect to prepetition Taxes and Other Governmental Assessments, as without such immediate relief, the Debtors' businesses will suffer irreparable harm.

**(v)  DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 366 OF THE BANKRUPTCY CODE (I) APPROVING THE DEBTORS' PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT TO UTILITY COMPANIES, (II) ESTABLISHING PROCEDURES FOR RESOLVING OBJECTIONS BY UTILITY COMPANIES, (III) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES, AND (IV) SCHEDULING A FINAL HEARING THEREON**

128.    Pursuant to sections 105(a) and 366 of the Bankruptcy Code, the Debtors seek entry of an interim order (i) approving the Debtors' proposed form of adequate assurance to utility companies (the "Utility Companies"); (ii) establishing procedures for resolving any objections by Utility Companies to the proposed adequate assurance; (iii) prohibiting Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, any of the Debtors solely on the basis of the commencement of these chapter 11 cases, or the existence of a debt that is owed by any Debtor for services rendered prior to the Commencement Date, and (iv) scheduling a final hearing to consider granting the relief requested on a permanent basis.

129.    In connection with the operation of the Debtors' businesses, the Debtors obtain natural gas, electricity, water, sewerage, internet, and other services (collectively, the "Utility Services") from a number of Utility Companies.

130.    Given the nature of the Debtors' business operations and that the Debtors operate many domestic offices, uninterrupted Utility Services are essential to the Debtors' ongoing business operations.  In addition, in light of the nature of the services provided by the Utility Companies, the Debtors cannot easily, if at all, find replacement Utility Services.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, if not shut down altogether.  Therefore, it is critical that uninterrupted Utility Services continue to be provided to the Debtors postpetition.

131.    The Debtors intend to pay all postpetition obligations owed to the Utility

Companies in a timely manner, and believe they will have sufficient funds to do so. If, however, any Utility Company believes additional assurance is required over what the Debtors propose herein, such Utility Company may file an objection to the motion.

132.     The Debtors propose to provide adequate assurance of payment to each Utility Company, pursuant to section 366(c)(1)(A)(i) of the Bankruptcy Code, in the form of a cash deposit. The Debtors propose to provide a deposit to any requesting Utility Company no later than five (5) business days after the receipt of such request. Each deposit will be equal to two (2) weeks of Utility Service, based on the historical average usage by the Debtors for such Utility Service over the prior 12 months (the "<u>Adequate Assurance Deposit</u>"), provided: (i) such request is made in accordance with the procedures set forth below; (ii) the requesting Utility Company does not already hold a deposit equal to or greater than two (2) weeks of Utility Service; and (iii) the requesting Utility Company is not currently paid in advance (for at least a two-week minimum) for its Utility Service. As a condition to requesting and accepting an Adequate Assurance Deposit, the requesting Utility Company shall be deemed to have stipulated that the Adequate Assurance Deposit constitutes adequate assurance of payment to such Utility Company within the meaning of section 366 of the Bankruptcy Code.

133.     In light of the severe consequences to the Debtors of any interruption in utility services, but recognizing the right of the Utility Companies to evaluate the proposed adequate assurance on a case-by-case basis, the Debtors are proposing procedures that will enable them to work with the Utility Companies to consensually resolve adequate assurance issues. If the Debtors and a Utility Company cannot consensually resolve such issues, the Debtors will ask the Court to determine whether an additional adequate assurance payment is necessary and, if so, how much it should be before the Utility Company may cease performance

for failure of adequate assurance. The procedures the Debtors propose to effectuate this result are identified in the motion as the "Adequate Assurance Procedures."

134. I submit that by ensuring uninterrupted Utility Services, the relief requested by the Debtors serves the best interests of the Debtors, their estates, and all parties in interest. An interruption in Utility Service would be devastating to the Debtors' ability to conduct their businesses postpetition. Further, I believe that the proposed procedures are the best way to address Utility Companies' concerns; that is, in an orderly and non-disruptive manner. Therefore, in my opinion, the relief requested with respect to Utility Services should be granted in its entirety.

**(vi)    MOTION FOR AN ORDER, PURSUANT TO SECTIONS 105(a), 363(c), 1107(a) AND 1108 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6003(b) AND 6004(h), (I) AUTHORIZING DEBTORS' CONTINUED OPERATION OF THEIR BUSINESS IN THE ORDINARY COURSE, (II) AUTHORIZING PAYMENT OF PREPETITION ESCROW ACCOUNT FEES AND SERVICING INTEREST AND CUSTOMER DEPOSITS, (III) DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS POSTPETITION CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS, AND (IV) GRANTING RELATED RELIEF**

135. Pursuant to sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003(b) and 6004(h), the Debtors request entry of an order (i) authorizing the Debtors to continue operation of the Business (as defined in the motion) in the ordinary course, (ii) authorizing payment of prepetition obligations attendant to the Business, including certain Escrow Account Fees, Customer Deposit Programs and Servicing Interest Payments (as defined in the motion), (iii) authorizing and directing banks and financial institutions to honor and process postpetition checks and transfers related to such obligations.

*Loan Servicing and Asset Management*

136. The Debtors' Business includes all of their activities primarily related to

50

their role as a master, primary, and special servicer of pools of commercial real estate loans securitized by the Debtors or third parties. The Debtors also act as a primary servicer of commercial real estate loans that they originate as a proprietary or correspondent lender, and commercial real estate loans that third parties originate but outsource for servicing. In addition, when acting as servicer for loans that the Debtors have originated or acquired, either as sole or correspondent lender, the Debtors are managing their own assets.

137. Loan servicing and asset management activities typically includes: (i) collecting and remitting loan payments received from borrowers; (ii) accounting for principal and interest in connection with serviced loans; (iii) customer service; (iv) holding escrow or impound funds for payment of taxes and insurance; (v) contacting delinquent borrowers to request payment or to engage in loan resolutions (such as establishing deferred payment obligations); (vi) managing collateral and supervising foreclosures and property dispositions in the event of unremedied defaults; (vii) negotiating and accepting discounted payoffs of defaulted loans; (viii) negotiating and accepting deeds in lieu of foreclosure; (ix) negotiating and consummating other forms of settlement with borrowers, including provision of partial or full releases to borrowers and/or guarantors for payment or performance obligations; and (x) selling, leasing or otherwise disposing of properties that have been obtained through foreclosure, settlement, or other exercise of remedies. Servicing contracts also generally require the master servicer to advance principal, interest, and certain "property protection" costs such as taxes and insurance with respect to delinquent mortgage loans, unless such amounts are determined to be unrecoverable from the related loans. The Debtors are requesting an order authorizing them to continue these practices in the ordinary course postpetition, to provide assurance to borrowers, banks, and other parties in interest.

138.     In addition, certain servicing contracts also require the Debtors, in their role as servicers, to remit to certain borrowers interest payments accrued on deposits held in servicing escrow accounts ("Servicing Interest Payments") (as such accounts are more fully described in the Cash Management Motion).  The servicing escrow accounts are non-interest bearing accounts maintained at several large financial institutions.  Although the Debtors do not earn interest on these accounts, the Debtors do receive material economic benefits from the financial institutions that maintain the Debtors' servicing escrow accounts.  The economic benefits from the financial institutions earned by the Debtors exceed the aggregate amount of Servicing Interest Payments.  The Servicing Interest Payments are calculated in accordance with the terms of the applicable servicing contract and paid by the Debtors into the applicable servicing escrow accounts at the end of each month.  Accordingly, as of the Commencement Date, there are accrued Servicing Interest Payments owing in the aggregate amount of approximately $500,000 for the stub period for October.

139.     I believe that if the Debtors are precluded from remitting the accrued but unpaid Servicing Interest Payments, it could have a materially harmful effect on the Business, including, the impairment of the Debtors' reputation as a premier servicer and their servicer rating.

140.     Servicing contracts also require the Debtors, in their role as servicers of loans, to collect payments and aggregate them into a complex and interrelated network of servicing escrow accounts, as more fully described in the Cash Management Motion.  These servicing accounts are held in the name of CFI for the benefit of the beneficiaries of these accounts, such as the securitization investors, their trustees, or the direct owners of the loans that have outsourced their servicing to CFI.  As such, the funds deposited into these servicing

accounts are not property of the Debtors' estates.

141.    I believe it is self-evident that these numerous escrow accounts are integral to the smooth operation of the servicing aspect of the Business.  The Banks at which these escrow accounts are held charge administrative fees for maintaining these accounts (the "Escrow Account Fees").  The Escrow Account Fees are collected monthly, in arrears, following reconciliation of the account activities for the prior month.  Accordingly, as of the Commencement Date, the Debtors estimate that there are accrued Escrow Account Fees owing in the aggregate amount of approximately $250,000 for the month of September, and for the stub period for October.  The Debtors are concerned that if these Escrow Account Fees cease to be paid in the ordinary course, the Banks may attempt to freeze or even close the accounts to secure payment of the arrearages.  I submit that closing the accounts would further entail additional burdens, as thousands of borrowers/mortgagors would have to be instructed to re-direct payments to a new account, and potentially millions of dollars would be lost in the process and never collected.  I believe that those events would have a disastrous affect on the Debtors' servicing business.

*Loan Origination*

142.    Loan origination is another component of the Business.  The new loan process typically begins with a prospective borrower submitting to the Debtors a loan application, together with deposits to cover certain costs of the loan approval process.  These customer deposits (the "Customer Deposits") are standard practice as part of the loan application process in the commercial mortgage loan origination industry, and include certain "Customer Deposit Programs" as set forth in the motion.

143.    The Debtors request that they be authorized to pay any prepetition

obligations owed by the Debtors in respect of the Escrow Account Fees and the Customer Deposit Programs. The escrow accounts and Customer Deposits that are part of the Business are not property of the Debtors' estate. Such amounts are held by the Debtors solely for the benefit of borrowers or loan applicants, and therefore, do not constitute property of the Debtors' estates.

144. I believe the Debtors' failure to honor their prepetition obligations with respect to the escrow accounts and the Customer Deposit Programs, will severely and irreparably harm the Debtors' goodwill and the going concern value of the loan servicing and loan origination platform, a key part of the Business, and, thus, the requested relief should be authorized.

**(vii) MOTION, PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, AND LOCAL RULES 2002-1 AND 6004-1 REQUESTING ENTRY OF TWO ORDERS: (I) THE SALE HEARING ORDER, (a) SCHEDULING THE SALE HEARING; (b) ESTABLISHING OBJECTION DEADLINE; (c) APPROVING SALE HEARING NOTICE AND NOTICE OF ASSUMPTION AND ASSIGNMENT; (d) SCHEDULING AN AUCTION; AND (e) APPROVING MARKETING AND BIDDING PROCESS; AND (II) THE SALE ORDER, (a) APPROVING EXERCISE OF PUT OPTION; AND/OR (b) AUTHORIZING SALE OF MSB BUSINESS (INCLUDING ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES) FREE AND CLEAR OF ALL CLAIMS AND INTERESTS**

145. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002-1 and 6004-1, the Debtors are requesting entry of two orders. First, the Debtors request entry of a "Sale Hearing Order":

(i) scheduling a hearing (the "Sale Hearing") to consider approval of the proposed Sale by CFGI and its wholly-owned subsidiaries, CFI and CCI of the MSB Business, to (a) Berkadia under the APA or (b) another successful offeror;

(ii) establishing the objection deadline in connection with the proposed Sale;

(iii) approving the form of, and notice procedures relating to, the (a) sale hearing notice, and (ii) notice of assumption and assignment of executory contracts and leases;

(iv) scheduling an auction ("<u>Auction</u>") to the extent the Sellers receive additional higher or better offers for the MSB Business postpetition; and

(v) approving the Sellers' prepetition and postpetition marketing efforts and bidding process.[9]

Second, at the conclusion of the Sale Hearing, entry of a "Sale Order":

(i) if no higher or better offers have been received, approving the Sellers' exercise of the Put Option (as defined below) pursuant to the APA, and without the necessity of conducting an Auction; and/or

(ii) if a higher or better offer is received, and therefore, an Auction is held, authorizing the Sale of the MSB Business to Berkadia, or a Successful Offeror (including the assumption and assignment of any purchased executory contracts and leases), free and clear of any and all liens, encumbrances, claims, and interests (collectively, the "<u>Liens</u>") pursuant to section 363(f) of the Bankruptcy Code and the APA, or a Modified APA (as defined below).

146. I believe there is a need for the immediate Sale of the MSB Business. The MSB Business is a profitable part of the Debtors' business operations, but without an orderly and expeditious Sale its value will likely be significantly and irreparably impaired. The servicing agreements and, thus, the value of the MSB Business are susceptible to potential default triggers that relate largely to market forces beyond the Sellers' control. Current market conditions have resulted in an ever increasing number of commercial real estate borrower defaults and have made it difficult for borrowers to find replacement financing or to sell their properties, which are the typical sources of repayment for commercial mortgage loans. Loan defaults trigger an obligation of the servicer to make servicer advances to cover the payments in default and other costs. As a result, increased defaults cause an increase in Sellers' obligations to fund servicer advances.

---

[9] As explained below, prior to the Commencement Date, the Sellers marketed the MSB Business and invited potential bidders to submit bids pursuant to bidding procedures included in the Bidding Process Letter (as defined herein), attached as Exhibit A to the Wilkerson Declaration, filed concurrently herewith. If the Court requires Court-approved bidding procedures, the Debtors shall withdraw their request for the Sale Hearing Order, and, in the alternative, request approval of the Bidding Procedures Order. The Bidding Procedures Order contains the requested relief identified above in (i) – (iv) of the Sale Hearing Order, but additionally contains the provision of Court-approved bidding procedures.

Declines in loan values, among other things, have also resulted in downgrades by the various rating agencies of CFGI and, correspondingly, of the Sellers' servicer ratings. These developments have raised general market concerns about the Debtors' financial condition and general ability to operate the MSB Business, and have increased the risk that counterparties may seek to lift the automatic stay to terminate servicing agreements with the Sellers, without any consideration paid to the Sellers, although the Debtors believe the stay should remain in place to protect the assets of the MSB Business until the proposed Sale is effectuated. As such, in my opinion, it is necessary to sell the MSB Business through an orderly and expeditious Sale to preserve value in the MSB Business, to avoid impairment of the business, and to provide comfort to the servicing agreements counterparties that the services on which they rely will continue to be provided by a stable and properly capitalized and funded servicing company under the servicing agreements.

147. Without a quick sale, I am gravely concerned that the value of the MSB Business will deteriorate materially as a result of a loss of cooperation and confidence of the servicing agreements counterparties, including the GSEs, securitization trusts, and private label counterparties. In addition, there are substantial price adjustments for each day the Sale is not closed after October 1, 2009. In my opinion, the proposed Sale is the result of arms'-length and good faith negotiations, and extensive marketing efforts.

148. Notably, the APA does not restrict the Debtors from pursuing or accepting offers superior to the APA, and the Debtors and their advisors have continued to pursue higher and better offers. In the event a superior offer to the APA is not received by the deadline established by the "Bidding Process Letter," sent prior to the Commencement Date to prospective purchasers of the MSB Business, I believe the Sale to Berkadia pursuant to the APA

represents the best and only transaction available to the Debtors under the circumstances, as the Sale simultaneously maximizes the value of the MSB Business for the Debtors' estates and provides the maximum recovery to all stakeholders. In addition, the Debtors have met with Fannie Mae, Ginnie Mae, Freddie Mac, Standard & Poor's and Fitch Ratings to discuss the Sale and have received positive feedback. As such, absent a superior offer, in my opinion, entry into the APA and consummation of the sale to Berkadia represents the sound exercise of the Debtors' business judgment, is supported by good business reasons, preserves value, and should be authorized by this Court.

149. Indeed, in light of the nature and substantial liquidity needs of the MSB Business, the financial and market challenges facing the Debtors in trying to maximize the value of the MSB Business, the extensive marketing efforts to sell the MSB Business, and the fairness of the terms of the APA, all as set forth above, I believe there is sound business justification for the Sale. I believe that in the absence of receiving an offer superior to the APA (such that no auction would be held), the exercise of the Put Option and a prompt Sale of the MSB Business, without further delay necessarily attendant to additional formal marketing, presents the best opportunity to maximize and preserve value for their estates. I also believe that, absent a prompt sale, the value of the MSB Business may decline substantially as a result of counterparties who may seek relief from the automatic stay to allow termination of the servicing agreements without any consideration paid to the Sellers, and substantial downward purchase price adjustments for each day the Sale is not closed past October 1, 2009.

150. In addition, in my opinion, the price offered by Berkadia for the MSB Business is fair and reasonable. The Debtors thoroughly marketed the MSB Business prior to the commencement of these cases, and are continuing to market the MSB Business, and, if no higher

or better offers are obtained, then the offer made by Berkadia is, in my view, the best available offer for the MSB Business.

> **(viii)** **DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTION 365(a) AND BANKRUPTCY RULES 6006 AND 9014 FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO REJECT CERTAIN UNEXPIRED, NONRESIDENTIAL REAL PROPERTY OFFICE FACILITY LEASES**

151. Pursuant to Bankruptcy Code section 365(a) and Bankruptcy Rules 6006 and 9014, the Debtors seek authority to reject five (5) unexpired nonresidential real property office facility leases, (collectively, the "Rejected Leases"), *nunc pro tunc* to the Commencement Date. The properties relating to the Rejected Leases are currently vacant (the "Vacant Properties") and the Debtors do not intend to use the Vacant Properties during the chapter 11 cases. Thus, the Rejected Leases are no longer integral to the Debtors' ongoing business operations.

152. In an effort to maximize the value of their estates and reduce their administrative costs in these chapter 11 cases, the Debtors have reviewed their overall operations and have determined, in their sound business judgment, that the Rejected Leases are burdensome and provide no economic value to their estates. The Rejected Leases are unprofitable and are not necessary for the Debtors' restructuring efforts. Therefore, rejection of the Rejected Leases at this time will increase revenues and allow management to focus their limited resources on the operation of the Debtors' more profitable operations. If the relief requested in this motion is granted, the Debtors estimate they will save in excess of approximately $238,000 per month in administrative expenses that would otherwise arise under the Rejected Leases.

153. Given that the Debtors have vacated the leased premises, the affected landlords received notice of the Debtors' intent to reject the leases *nunc pro tunc* to the Commencement Date, the consolidated list of the Debtors' top 30 unsecured creditors has been

properly served with this motion and such creditors shall have a reasonable opportunity to object, and the Debtors will not withdraw any of the Rejected Leases from the motion without the prior consent of the respective landlord, I believe that rejecting these leases is in the best interests of the Debtors, their estates, and all parties in interest. I further believe retroactive relief is warranted, in order to maximize the cost savings to the Debtors.

      **(ix)    DEBTORS' MOTION FOR ORDER PURSUANT TO SECTIONS 105, 362 AND 541 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3001 (I) ESTABLISHING NOTIFICATION AND HEARING PROCEDURES FOR TRANSFERS OF CLAIMS AND EQUITY SECURITIES, AND (II) SCHEDULING A FINAL HEARING APPROVING NOTICE PROCEDURES**

      154.    Pursuant to sections 105, 362 and 541 of the Bankruptcy Code and Bankruptcy Rule 3001, the Debtors seek authorization to protect and preserve the potential value of their net operating losses and other tax attributes, including tax credits and tax basis in their assets (collectively, "<u>Tax Attributes</u>"), by establishing certain notice and hearing procedures that must be complied with as a precondition to the effectiveness of transfers of certain beneficial interests in equity securities in CFGI or claims against the Debtors.

      155.    I am advised that such transfers, if unmonitored, could severely limit or preclude the Debtors' ability to use a valuable asset of their estates—namely, their Tax Attributes—and could have significant negative economic consequences for the Debtors, their estates, their creditors and the reorganization process. Specifically, I am advised that transfers of beneficial interests in equity securities in CFGI or claims against the Debtors could, under U.S. federal income tax law, adversely affect the Debtors' Tax Attributes if:

      (a)    too many 5-percent or greater blocks of equity securities are created, or too many shares are added to or sold from such blocks, such that, together with previous transfers by 5-percent shareholders during the preceding three-year period, an ownership change within the meaning of section 382 of the Internal Revenue Code of 1986, as amended ("<u>IRC</u>"), is triggered

prior to consummation, and outside the context, of a confirmed chapter 11 plan, or

(b)    the beneficial ownership of claims against the Debtors that are currently held by "Qualified Creditors" (as defined for purposes of IRC section 382 and the Treasury Regulations thereunder) is transferred, prior to consummation of a chapter 11 plan, and those claims (either alone or when accumulated with other claims currently held by non-qualified creditors) would be converted under a chapter 11 plan into a 5-percent or greater block of the stock of a reorganized Debtor.

156.    To preserve, to the fullest extent possible, the flexibility to craft a chapter 11 plan that maximizes the use of the Debtors' Tax Attributes, the Debtors seek limited relief that will enable them to closely monitor certain transfers of claims and equity securities, so as to be in a position to act expeditiously to prevent such transfers if necessary to preserve Tax Attributes. I believe that by establishing procedures for monitoring the ownership, acquisition and disposition of beneficial interests in claims and equity securities, the Debtors can preserve their ability to seek substantive relief at the appropriate time if it appears that the use of their Tax Attributes may be jeopardized. Thus, I believe that it is in the best interest of the Debtors for this Court to enter an order approving the proposed monitoring procedures.

**C.    Motions Related to Retention and Payment of Professionals**

**(i)    DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 327, 328, AND 330 OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO EMPLOY ORDINARY COURSE PROFESSIONALS *NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

157.    Pursuant to sections 105(a), 327, 328, and 330 of the Bankruptcy Code, the Debtors request entry of an order authorizing them to retain, *nunc pro tunc* to the Commencement Date, professionals utilized by the Debtors in the ordinary course of business (the "Ordinary Course Professionals") without the submission of separate employment applications or retention orders.

158.    I believe it is essential that the employment of the Ordinary Course

Professionals, many of whom are already familiar with the Debtors' businesses and financial affairs, be continued to avoid disruption of the Debtors' normal business operations during this critical time.

159.     The Debtors propose that they be permitted to pay each Ordinary Course Professional, without a prior application to the Court by such Ordinary Course Professional, one hundred percent (100%) of the professional fees and disbursements incurred, upon the submission to, and approval by, the Debtors of an appropriate invoice setting forth, in reasonable detail, the nature of the services rendered and disbursements actually incurred; *provided, however*, that, if the total amount owed for an Ordinary Course Professional's fees and disbursements exceed a total of $50,000 per month on a "rolling basis," as explained below, then the payments to such Ordinary Course Professional for the excess amounts shall be withheld pending approval of the Court.  Paying fees on a "rolling basis" means that an Ordinary Course Professional whose fees and disbursements are less than $50,000 in any month will be eligible to apply the difference between $50,000 and the amount billed in such month to any following month in which fees and disbursements exceed $50,000; *provided, however*, that payment during any such subsequent month shall not exceed $60,000 per Ordinary Course Professional.  In the event an Ordinary Course Professional seeks more than $50,000 per month on a "rolling basis," or more than the $60,000 cap in any month, that professional will be required to file a fee application for the full amount of the fees and expenses for the month or months in which amounts incurred exceed the limits proposed for Ordinary Course Professionals.

160.     I believe the relief requested will save the estates substantial costs that would arise from preparing separate applications for the employment of each Ordinary Course Professional.  The relief requested will also avoid additional fees relating to the preparation and

prosecution of voluminous interim fee applications. In light of the additional costs associated with the preparation of multiple employment applications for the Ordinary Course Professionals who will receive relatively small fees, I submit that it is impractical and inefficient for the Debtors to submit individual retention applications for each Ordinary Course Professional.

161.    Thus, in my opinion, the employment of the Ordinary Course Professionals and the payment of monthly compensation thereto are in the best interests of the Debtors, their estates, and all parties in interest.

**(ii)    DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 331 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 2016(a) FOR AUTHORIZATION TO ESTABLISH PROCEDURES FOR INTERIM MONTHLY COMPENSATION AND REIMBURSEMENT OF EXPENSES OF PROFESSIONALS**

162.    Pursuant to sections 105(a), and 331 of the Bankruptcy Code, Bankruptcy Rule 2016(a), and Local Rule 2016-2, the Debtors request entry of an order establishing an orderly and regular process for the allowance and payment of interim compensation and reimbursement of expenses for attorneys and other professionals whose services are authorized by this Court pursuant to sections 327 or 1103 of the Bankruptcy Code, and who will be required to file fee applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code on terms that satisfy Local Rule 2016-2. Additionally, the Debtors seek approval of a procedure for reimbursement of reasonable out-of-pocket expenses incurred by members of any statutory committee appointed in these cases. The Debtors propose that, except as otherwise provided in an order of the Court authorizing the retention of a particular professional, the professionals be permitted to seek interim payment of compensation and reimbursement of expenses in accordance with the "Interim Compensation Procedures" set forth in the motion.

163.    I believe the implementation of the proposed Interim Compensation

Procedures is justified in these cases. The Debtors' chapter 11 cases present a number of complex issues that, together with the day-to-day administration of these chapter 11 cases, must be addressed by the Debtors' limited staff and resources. It is anticipated that the professionals retained will provide integral advice and services to the Debtors in administering these cases. Absent streamlined compensation procedures, the professional fee application and review process could be exceptionally burdensome on the Debtors, their professionals, the Court, and other parties. The proposed Interim Compensation Procedures will enable the Debtors to closely monitor the costs of administering these cases, maintain a level cash flow, and implement efficient cash management procedures. Moreover, these procedures will also allow the Court and the key parties in interest to verify the reasonableness and necessity of the compensation and reimbursement sought pursuant to such Interim Compensation Procedures. In my opinion, therefore, the proposed Interim Compensation Procedures are in the best interests of the Debtors, their estates, and all parties in interest.

> **(iii)** **DEBTORS' APPLICATION PURSUANT TO BANKRUPTCY CODE SECTIONS 327(a) AND 328(a), BANKRUPTCY RULE 2014(a) AND LOCAL RULE 2014-1, FOR AUTHORIZATION TO EMPLOY AND RETAIN DEWEY & LEBOEUF LLP AS ATTORNEYS FOR THE DEBTORS *NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

164. Pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Rule 2014-1, the Debtors request entry of an order authorizing the employment and retention of Dewey & LeBoeuf LLP ("D&L"), *nunc pro tunc* to the Commencement Date, as their attorneys, to perform the extensive legal services as Debtors' counsel that will be necessary during these chapter 11 cases, in accordance with D&L's normal hourly rates and reimbursement policies in effect when services are rendered.

165. The Debtors have selected D&L as their attorneys because of D&L's

knowledge of the Debtors' businesses and financial affairs, and D&L's extensive experience and knowledge in, among other areas, and business reorganizations and restructurings under chapter 11 of the Bankruptcy Code. D&L and its members currently represent, and have represented, debtors and creditors in multiple large and complex chapter 11 cases.

166. D&L has represented the Debtors since February 2, 2009 in connection with the Debtors' restructuring efforts. Since that time, D&L, working together with Richards, Layton & Finger, P.A. ("RL&F"), as local counsel to the Debtors, was primarily responsible for the preparation of the chapter 11 petitions, initial motions, and applications relating to the Debtors' chapter 11 cases and their commencement. In addition, prior to retaining D&L in connection with their restructuring efforts, the Debtors retained D&L in connection with various corporate matters, including asset and equity sale transactions, including, but not limited to, the APA, and with respect to certain tax, regulatory, corporate governance and employment matters. During the course of these representations, D&L has become intimately familiar with the Debtors' businesses, financial affairs, capital structure, and restructuring alternatives. Accordingly, I believe D&L has the necessary background to deal effectively with the potential legal issues and problems that may arise in the context of the Debtors' chapter 11 cases and restructuring efforts. In my opinion, D&L is both well qualified and able to represent them in their chapter 11 cases.

167. To the best of the my knowledge, the members, counsel, and associates of D&L do not have any connection with or any interest adverse to the Debtors, their creditors, or any other party in interest, or their respective attorneys and accountants, except as may be set forth in the Kessler Affidavit. In view of the foregoing, I submit that D&L is a "disinterested person," as such term is defined in section 101(14) of the Bankruptcy Code, as modified by

section 1107(b) of the Bankruptcy Code.

168.     I believe the relief requested in the application is necessary and appropriate, is in the best interests of the Debtors, their estates, and their creditors, and should be granted in all respects.

**(iv)    APPLICATION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF RICHARDS, LAYTON & FINGER, P.A. AS DELAWARE COUNSEL TO THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE PURSUANT TO SECTION 327(a) OF THE BANKRUPTCY CODE**

169.     The Debtors also have proposed to retain Richards, Layton & Finger, P.A. ("RLF") as Delaware counsel.  RLF will provide additional necessary legal services to the Debtors and will advise the Debtors in connection with the Local Rules and local practice in Delaware in connection with the prosecution of the chapter 11 cases.  D&L, the Debtors and RLF have conferred and will continue to confer to ensure that there will be no undue duplication of effort or overlap of work between and among the co-counsel, and that the estate receives the best possible value.

170.     As of the Commencement Date, the Debtors do not owe RLF for legal services rendered before the Commencement Date. All prepetition amounts have been or will be satisfied by the classic retainer and payment disclosed in the affidavit attached to this motion.

**(v)    DEBTORS' APPLICATION PURSUANT TO 28 U.S.C. § 156(c), BANKRUPTCY RULE 2002 AND LOCAL RULE 2002-1(f) FOR AN ORDER (I) AUTHORIZING THE EMPLOYMENT AND RETENTION OF EPIQ BANKRUPTCY SOLUTIONS, LLC AS CLAIMS AND NOTICING AGENT FOR THE DEBTORS AND (II) APPOINTING EPIQ BANKRUPTCY SOLUTIONS, LLC AS AN AGENT OF THE BANKRUPTCY COURT**

171.     Pursuant to section 156(c) of title 28 of the United States Code, Bankruptcy Rule 2002, and Local Rule 2002-1(f), the Debtors request entry of an order (i)

authoring the employment and retention Epiq Bankruptcy Solutions, LLC ("Epiq") as claims and noticing agent for the Debtors and (ii) appointing Epiq as agent of this Court.

172.    The Debtors estimate they have thousands of creditors. The Debtors expect many of their creditors to file proofs of claim. Noticing, receiving, docketing and maintaining proofs of claim from such a large number of creditors may be unduly time consuming and burdensome for the Clerk.

173.    I believe the retention of Epiq as the Court's outside agent is in the best interests of their estates and parties in interest. Epiq is a nationally recognized specialist in chapter 11 administration and has vast experience in noticing and claims administration in large chapter 11 cases in this and other districts.

174.    The Debtors have been advised that, except as set forth more fully in the Affidavit of Daniel C. McElhinney (submitted with the Epiq application), based on the results of the search performed by Epiq, (i) Epiq has no connection with the Debtors, their creditors or other parties in interest in these cases, and (ii) Epiq does not hold or represent any interest adverse to the Debtors' estates. To the best of my knowledge, therefore, Epiq is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

175.    The appointment of Epiq as the Court's outside agent will relieve the Court and the Clerk of heavy administrative and other burdens. Additionally, the retention of Epiq as the claims and noticing agent will promote the efficient administration of the Debtors' estates.

**(vi)** **DEBTORS' APPLICATION PURSUANT TO SECTIONS 327(a) AND 328(a) OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 2014(a), AND LOCAL RULE 2014-1 FOR AUTHORIZATION TO EMPLOY AND RETAIN LAZARD FRÈRES & CO. LLC AS INVESTMENT BANKER AND FINANCIAL ADVISOR *NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

176.     Pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rule 2014-1, the Debtors request entry of an order authorizing the employment and retention of Lazard, *nunc pro tunc* to the Commencement Date, as their investment banker and financial advisor in connection with the commencement and prosecution of their chapter 11 cases.

177.     In my opinion, the resources, capabilities, and experience of Lazard in advising the Debtors are crucial to the Debtors' successful restructuring.  An experienced financial advisor such as Lazard fulfills a critical need that complements the services offered by the Debtors' other restructuring professionals.  Broadly speaking, Lazard will concentrate its efforts on formulating restructuring alternatives, negotiating with the Debtors' creditor constituencies, and assisting the Debtors in developing and implementing an asset or other sale strategy and/or a viable chapter 11 plan.  For these reasons, I believe the Debtors require the services of a capable and experienced financial advisory firm such as Lazard.  Lazard's professionals have a wealth of experience in providing financial advisory services in restructurings and reorganizations and enjoy an excellent reputation as a result of their work in complex chapter 11 cases on behalf of debtors and creditors in the United States.

178.     To the best of the Debtors' knowledge, Lazard does not have any connection with or any interest adverse to the Debtors, their creditors, or any other party in interest, or their respective attorneys or accountants, except as may be set forth in the affidavit of Carol Flaton submitted therewith.  In view of the foregoing, I submit that Lazard is a

"disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code and as required under section 327(a) of the Bankruptcy Code.

179.    I believe approval of the employment and retention of Lazard, *nunc pro tunc* to the Commencement Date, as investment banker and financial advisor, is in the best interest of the estates.

**(vii)    MOTION OF THE DEBTORS PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE FOR AN ORDER AUTHORIZING THE EMPLOYMENT OF LOUGHLIN MEGHJI + COMPANY AND DESIGNATING MOHSIN Y. MEGHJI AS CHIEF RESTRUCTURING OFFICER *NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

180.    Pursuant to section 363 of the Bankruptcy Code, the Debtors request entry of an order authorizing (a) the employment of Loughlin Meghji + Company ("LM+Co") as crisis managers to the Debtors to provide interim management and restructuring services, and (b) the designation of Mohsin Y. Meghji as Chief Restructuring Officer ("CRO") to the Debtors, *nunc pro tunc* to the Commencement Date.

181.    I believe the employment of LM+Co and its professionals is a sound exercise of the Debtors' business judgment.  Mr. Meghji has extensive experience as a senior officer and as an advisor for many troubled companies.  I believe the CRO, in conjunction with other LM+Co professionals, will provide services that benefit the Debtors' estates and creditors. In light of the foregoing, in my opinion, the employment of LM+Co and its professionals is appropriate and in the best interests of the Debtors and their estates and creditors.

182.    The services of LM+Co and are necessary to enable the Debtors to execute their duties as debtors in possession.  LM+Co's familiarity with the Debtors' financial affairs, and the business and financial circumstances surrounding the commencement of these chapter 11

cases, will minimize charges to the Debtors' estates for the services contemplated herein.

183.    LM+Co's professionals have a wealth of experience in providing financial advisory services in restructurings and reorganizations and enjoy an excellent reputation as a result of their work in complex chapter 11 cases on behalf of debtors and creditors in the United States, all as disclosed in the affidavit of Mr. Meghji.

184.    To the best of my knowledge, information and belief, LM+Co has no connection with, and holds no interest adverse to, the Debtors, their estates, their creditors, or any other parties in interest, or their respective attorneys or accountants in the matters for which LM+Co is proposed to be retained, except as may be set forth in the affidavit of Mr. Meghji.  In view of the foregoing, I submit that LM+Co is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

185.    I submit that the employment of LM+Co and the designation of Mr. Meghji as CRO on the terms and conditions set forth in the application is in the best interest of the Debtors, its creditors, and all parties in interest.

**(viii)    DEBTORS' APPLICATION PURSUANT TO SECTIONS 327(a) AND 328(a) OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 2014(a), AND LOCAL RULE 2014-1 FOR AUTHORIZATION TO EMPLOY AND RETAIN BEEKMAN ADVISORS, INC. AS STRATEGIC ADVISOR TO THE DEBTORS *NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

186.    Pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, the Debtors request entry of an order authorizing the employment and retention of Beekman Advisors, Inc. ("Beekman") as strategic advisor ("Strategic Advisor") to the Debtors, *nunc pro tunc* to the Commencement Date, in connection with in connection with the sale of the Debtors' MSB Business.

187.     The employment of Beekman is appropriate and necessary to enable the Debtors to execute their duties as debtors and debtors in possession, and pursue strategic business and restructuring efforts and transactions.  Beekman's expertise is in, among other things, its knowledge and expertise in the servicing business, GSE regulations, and knowledge of the GSE approval process, which proved beneficial in qualifying the potential purchasers for the MSB Business, and the negotiation and entry into the APA with Berkadia.  Notably, however, the APA does not restrict the Debtors from soliciting, pursuing, or entering into alternative transactions for the sale of the MSB Business.  Accordingly, Beekman has continued to pursue and will continue to pursue topping bids from earlier interested parties and others. In this regard, I believe Beekman has the necessary background to continue pursuing transactions involving the MSB Business.  In my opinion, therefore, Beekman is both well-qualified and uniquely able to continue to serve the Debtors as Strategic Advisor in their chapter 11 cases.

188.     To the best of my knowledge, Beekman does not have any connection with or any interest adverse to the Debtors, their creditors, or any other party in interest, or their respective attorneys or accountants, except as may be set forth in the affidavit filed with the application.  In view of the foregoing, I submit that Beekman is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code and as required under section 327(a) of the Bankruptcy Code.

189.     I submit that Beekman is well-qualified to serve as the Debtors' Strategic Advisor, and that its employment and retention is in the best interests of the Debtors, their estates, and all parties in interest.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

_____
Thomas L. Fairfield

**EXHIBIT A**


**ORGANIZATIONAL CHART**



Capmark Financial Group Inc.

Commercial Equity Investments, Inc.

Capmark Finance Inc.

99%

1%

Mortgage Investments, LLC

SJM Cap, LLC

Capmark Capital Inc.

Capmark Bank (Nondebtor)

Direct and Indirect Nondebtor Subsidiaries

Capmark REO Holding LLC

Summit Crest Ventures, LLC

Direct and Indirect Nondebtor Subsidiaries

Direct and Indirect Nondebtor Subsidiaries

Capmark Affordable Equity Holdings Inc.

Net Lease Acquisition LLC

Direct and Indirect Nondebtor Subsidiaries

Direct and Indirect Nondebtor Subsidiaries

LIHTC (Direct and Indirect) Debtor Entities

LIHTC (Direct and Indirect) Nondebtor Entitles

Note: All lines reflect 100% equity ownership unless otherwise stated.

All entities referenced herein are debtor entities unless otherwise indicated.