## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
                                          :
In re                                     :    Chapter 11
                                          :
CAPMARK FINANCIAL GROUP INC., et al.,     :
                                          :    Case No. 09- _____ (  )
            Debtors.                      :
                                          :    Joint Administration Requested
-----------------------------------------------------------x
```

**MOTION, PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, AND LOCAL RULES 2002-1 AND 6004-1, REQUESTING ENTRY OF TWO ORDERS: (I) THE SALE HEARING ORDER, (a) SCHEDULING THE SALE HEARING; (b) ESTABLISHING OBJECTION DEADLINE; (c) APPROVING SALE HEARING NOTICE AND NOTICE OF ASSUMPTION AND ASSIGNMENT; (d) SCHEDULING AN AUCTION; AND (e) APPROVING MARKETING AND BIDDING PROCESS; AND (II) THE SALE ORDER, (a) APPROVING EXERCISE OF PUT OPTION; AND/OR (b) AUTHORIZING SALE OF MSB BUSINESS (INCLUDING ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES) FREE AND CLEAR OF ALL CLAIMS AND INTERESTS**

Capmark Financial Group Inc. ("CFGI") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"),[1] submit this motion

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P.

(the "Motion") requesting entry of two orders – the first to, among other things, set a hearing and approve notices with regard to the proposed sale of the Debtors' commercial mortgage servicing and mortgage banking business; and the second, to approve the terms of the sale, all as more fully discussed below.

## Background

1.      On the date hereof (the "Commencement Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code.

2.      Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Capmark's Businesses

*Overview*

3.      The Debtors and their non-debtor subsidiaries and affiliates (together with the Debtors, "Capmark") are a group of commercial real estate finance companies that provide real estate-related products and services to borrowers, investors and other customers along three core business lines:  (i) commercial real estate lending and mortgage banking; (ii) servicing; and

---

(7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), and Capmark Affordable Equity Inc. (2381).  CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044.

2

(iii) investments and funds management.  Capmark's business lines are conducted through six business segments organized by geography and type of business:

- *North American Lending and Mortgage Banking.*  This segment includes most North American activities relating to the real estate lending and mortgage banking business, including commercial mortgage banking, loan origination and capital markets activities, and syndication of new markets tax credit funds.

- *North American Servicing.*  This segment includes all North American loan servicing activities, including activities with respect to the primary, master and special servicing of loan portfolios originated by Capmark, third parties, and securitized loan pools.

- *North American Investments and Funds Management.*  This segment includes all North American activities relating to investments and funds management, including sponsorship of real estate debt and equity funds and management of Capmark's own real estate debt and equity investments.

- *North American Affordable Housing.*  The North American Affordable Housing segment manages affordable housing debt investments and low income housing tax credit equity investments on behalf of third-party investors.

- *Asian Operations.*  This segment historically included all Asian activities relating to all three core business lines.  Capmark has ceased all Asian proprietary lending and investing activities and is currently focused on managing existing loan, investment and fee-for-services businesses in Asia.

- *European Operations.*  This segment historically included all European activities relating to all three core business lines.  Capmark has ceased all European proprietary lending and investing activities, has sold its European servicing business and closed its Irish banking subsidiary, and is currently focused on managing existing loan, investment and fee-for-services businesses in Europe.

4.    As of June 30, 2009, the carrying value of Capmark's total loan portfolio of commercial real estate loans held for sale or investment was $10.7 billion.  Capmark also owns substantial real estate and equity investments and certain other tangible and intangible assets.  On a consolidated basis, as of June 30, 2009, Capmark's assets were approximately $20.1

3

billion and liabilities were approximately $21 billion. Consolidated losses for the three months ending June 30, 2009 were approximately $1.6 billion.

*Events Leading to Chapter 11*

5.    As a commercial real estate finance company, Capmark's ability to generate income and cash flow is highly dependent on (i) the volume of financing it originates and the credit performance of that financing; (ii) its ability to securitize, sell, participate or otherwise finance loans; (iii) the fair value of the loans on its balance sheet; and (iv) the spreads it generates on its interest-earning assets. In addition, Capmark's financial performance is driven by, among other things, its ability to increase the size of its servicing portfolios and the amount of real estate-related assets under management. Capmark's origination activities impact the level of placement fees and net interest income, and impact the amount of loans it has available for future sale and servicing opportunities, which in turn affect its levels of net gains or losses and fee-based income. Capmark's ability to increase the size of its servicing portfolios affects the level of servicing fees it earns and income it derives from escrow balances.

6.    The unprecedented conditions in domestic and international financial markets have adversely affected Capmark's businesses. The lack of credit available to potential purchasers of Capmark's assets and the current condition of the securitization markets has severely impaired its ability to sell assets in the normal course of business. Capmark has historically utilized the proceeds from such asset sales as a source of liquidity for new originations and the repayment of debt. Dislocations in worldwide capital markets, together with the deterioration of Capmark's operating results, have also impaired its ability to obtain alternative means of financing its origination and investment activities. Capmark's inability to sell its assets has required it to hold a greater portion of its assets for a longer duration, thereby increasing the credit risk related to lending and investment activities. The negative impact from

4

this increased credit exposure has been exacerbated by the fact that the performance of Capmark's loans and real estate investments has sharply deteriorated. The current market conditions have made it difficult for Capmark's borrowers to find replacement financing or to sell their properties, which are the typical sources of repayment for commercial mortgage loans. The lack of available replacement financing decreases Capmark's cash flow, by increasing the average duration of Capmark's loan portfolio and decreasing transaction-related servicing fees.

7.      These developments have effectively made it impossible for the Debtors to continue their business operations in a profitable manner absent a restructuring of their businesses and obligations.

8.      After carefully reviewing and exploring strategic business alternatives and transactions, and after implementing numerous cost-saving strategies, the Debtors determined that an orderly restructuring of their debts under chapter 11 represents the best of all available strategic options to maximize and preserve the value of their estates for their creditors and other parties in interest.

### Jurisdiction and Venue

9.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

10.      By this Motion, the Debtors request entry of two orders, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002-1 and 6004-1. First, the Debtors request entry of an order, substantially in the form of Exhibit A attached hereto (the "Sale Hearing Order"):

(i)     scheduling a hearing (the "Sale Hearing") to consider approval of the proposed sale (the "Sale") by CFGI and its wholly-owned subsidiaries, Capmark Finance Inc. ("CFI"), and Capmark Capital Inc. ("CCI") (collectively, the "Sellers"), of the Sellers' commercial mortgage servicing and mortgage banking business assets (collectively, the "MSB Business"), to (a) Berkadia Commercial Mortgage LLC (f/k/a Berkadia III, LLC) ("Berkadia") under that certain Asset Put Agreement (the "APA"), between the Sellers and Berkadia, dated September 2, 2009, attached hereto as Exhibit C,[2] or (b) another Successful Offeror (as defined below);

(ii)    establishing the objection deadline in connection with the proposed Sale;

(iii)   approving the form of, and notice procedures relating to, the (a) Sale Hearing Notice (as defined below), and (b) Notice of Assumption and Assignment (as defined below);

(iv)    scheduling an auction ("Auction") to the extent the Sellers receive additional higher or better offers for the MSB Business postpetition; and

(v)     approving the Sellers' prepetition and postpetition marketing efforts and bidding process.

As explained below, prior to the Commencement Date, the Sellers marketed the MSB Business and invited potential bidders to submit bids pursuant to bidding procedures included in the Bidding Process Letter (as defined herein), attached as Exhibit A to the Wilkerson Declaration, filed concurrently herewith.    If the Court requires Court-approved bidding procedures, the Debtors shall withdraw their request for the Sale Hearing Order, and, in the alternative, request approval of the Bidding Procedures Order, attached hereto as Exhibit D.    The Bidding Procedures Order contains the requested relief identified above in (i) – (iv) of the Sale Hearing Order, but additionally contains the provision of Court-approved bidding procedures.

        11.     Second, at the conclusion of the Sale Hearing, entry of an order, substantially in the form of Exhibit B attached hereto (the "Sale Order"):

---

[2] Pursuant to the Debtors' Motion for Order, Pursuant to Bankruptcy Code Section 107(B), Bankruptcy rule 9018, and Local Rule 9018-1, Authorizing Debtors to File Under Seal Schedules to the APA and Cure Schedule Related to Proposed Sale of MSB Business , filed contemporaneously herewith, or as soon as reasonably practicable hereafter, in accordance with the confidentiality provisions of the APA, the Debtors have requested a seal order authorizing them to file the schedules to the APA, and the cure schedules related to the proposed Sale, under seal.

(i)     if no higher or better offers have been received, approving the Sellers' exercise of the Put Option (as defined below) pursuant to the APA, and without the necessity of conducting an Auction free and clear of any and all liens, encumbrances, claims, and interests (collectively, the "Liens") pursuant to section 363(f) of the Bankruptcy Code, the APA, or a Modified APA (as defined below); and/or

(ii)    if a higher or better offer is received, and therefore, an Auction is held, authorizing the Sale of the MSB Business to Berkadia, or a Successful Offeror (including the assumption and assignment of any purchased executory contracts and leases), free and clear of any and all Liens pursuant to section 363(f) of the Bankruptcy Code and the APA, or a Modified APA (as defined below).

12.     The proposed Sale Order contemplates the Sale of the MSB Business to Berkadia pursuant to the APA. If a higher or better offer than the APA is received, however, the Sellers will submit a revised Sale Order (with a blackline against the order submitted hereto as Exhibit B) reflecting the proposed sale to the Successful Offeror.

13.     This Motion is supported by the Declaration of Thomas L. Fairfield, Executive Vice President, General Counsel and Secretary of CFGI, in Support of the Debtors' Chapter 11 Petitions and First-Day Motions and Applications (the "Fairfield Declaration"); and the Declaration of Michael Wilkerson in Support of the Motion.

## The Sellers' MSB Business

14.     The Sellers' MSB Business is comprised of the Sellers' loan servicing and loan origination activities primarily related to their role as a master and special servicer, and subservicer, of pools of commercial real estate loans originated and securitized by the Debtors or third parties. The Sellers also act as a primary servicer of commercial real estate loans that they originate as a proprietary or correspondent lender, and commercial real estate loans that third parties originate but outsource for servicing.[3]  When the Sellers retain or acquire a subordinated

---

[3] A primary servicer acts as the primary contact with the borrower and generally is responsible for, among other things, all cash management functions relating to the loan (billing and collection), administering reserve and escrow funds, obtaining and analyzing operating and financial statements, and preparing and providing periodic reports and remittances to the master servicer. A master servicer is

7

residual interest in a securitization transaction, they may also act as the special servicer for the securitized pool of loans.

15.    Loan servicing typically includes: (i) collecting and remitting loan payments received from borrowers; (ii) accounting for principal and interest in connection with serviced loans; (iii) customer service; (iv) holding escrow or impound funds for payment of taxes and insurance; and, if applicable, (v) contacting delinquent borrowers and supervising foreclosures and property dispositions in the event of unremedied defaults.  Proper servicing requires diligence and sensitivity in order to maximize collections, particularly on delinquent loans, and at the same time maintaining compliance with applicable servicing contracts, laws and regulations.  Servicing contracts also generally require the servicer to advance principal, interest, and certain "property protection" costs such as taxes and insurance (collectively, "Advances") with respect to delinquent mortgage loans, unless such amounts are determined to be unrecoverable from the related loans.  These Advances receive a priority of payment in the securitization trust documents, but require the servicer to have substantial working capital to finance them pending repayment.

16.    The Sellers have achieved a leading market position in the servicing of commercial real estate loans comprising the MSB Business.  The Sellers have one of the largest

---

responsible for administration of a pool of loans that is transferred to a trust or other special purpose entity in connection with a securitization transaction.  Generally, a master servicer enters into a pooling and servicing agreement that requires it to assume ultimate responsibility for administering all pooled loans and ensuring that primary servicers act in a diligent manner when carrying out their collection and administration activities.  Master servicers handle all remittance and reporting activities required by the pooling and servicing agreement and the MSB Business' pooling and servicing agreements generally require the Sellers to advance funds to cover any delinquent payments on the securitized loans and any taxes and insurance premiums not covered by borrowers' escrow funds.  A special servicer is a specialist in dealing with defaulted loans and is usually selected by the holder of the subordinated interest in a securitization vehicle.  Under most pooling and servicing agreements, only loans that are subject to a servicing transfer event (generally a 60-day delinquency, borrower's bankruptcy or imminent default) may be transferred from the master servicer to the special servicer.  A special servicer's asset managers take measures to collect all sums due and payable on each defaulted loan and to bring the account to a current status.

8

commercial real estate loan servicing and loan origination networks in the United States, with over 20 mortgage banking offices, including 11 offices dedicated to originating and servicing loans for the Federal Housing Administration ("FHA") and U.S. Department of Housing and Urban Development ("HUD"). Prior to the Commencement Date, the Sellers have consistently been a top tier rated servicer by Standard & Poor's, Fitch Ratings and DBRS, although the Sellers' servicer ratings have been downgraded recently due to uncertainty regarding CFGI's financial condition. In the United States commercial real estate industry, the Sellers are ranked as the largest fee-for-services provider, third largest master and primary servicer, and fifth largest special servicer. As of June 30, 2009, the Sellers' U.S. servicing portfolio consisted of $260 billion in principal amount of loans.

17.    The Debtors have substantial servicing relationships with various government sponsored enterprises ("GSEs"), for which the Debtors are an approved servicer. By principal amount, operation of the MSB Business results in the Sellers being the second largest servicer of commercial mortgage loans that qualify for insurance through the FHA and Government National Mortgage Association ("Ginnie Mae") and the third largest servicer of commercial mortgage loans for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). Through the MSB Business, the Sellers are also the sole back-up servicer for both Fannie Mae and Freddie Mac and the sole back-up asset manager for Freddie Mac, and are a top originator of mortgage loans for Freddie Mac, Fannie Mae, FHA, and numerous other lenders.

18.    As part of the MSB Business, the Sellers are also a leading originator of commercial real estate loans. They are a top ten originator of commercial real estate loans covering all commercial property types in the United States, the number one originator of

9

multifamily loans for Freddie Mac, a top five multifamily originator for Fannie Mae, and a top originator of commercial loans for the insurance industry. In each of 2006 and 2007, the Sellers originated approximately $30 billion of commercial mortgage loans, covering all commercial property types across the major markets in the United States. In 2008, in reaction to the dramatic changes in the overall economy, the Sellers' direct originations were $10.4 billion and focused on third party liquidity for originations. In 2009, an historically low year, the Sellers have originated approximately $1.9 billion of new commercial real estate loans through June 30, 2009.

### Need for Immediate Sale

19.    The MSB Business is a profitable part of the Debtors' business operations, but without an orderly and expeditious Sale its value will likely be significantly and irreparably impaired. The servicing agreements and, thus, the value of the MSB Business are susceptible to potential default triggers that relate largely to market forces beyond the Sellers' control. Current market conditions have resulted in an ever increasing number of commercial real estate borrower defaults and have made it difficult for borrowers to find replacement financing or to sell their properties, which are the typical sources of repayment for commercial mortgage loans. Loan defaults trigger an obligation of the servicer to make Advances to cover the payments in default and other costs. As a result, increased defaults cause an increase in Sellers' obligation to fund Advances. Declines in loan values, among other things, have also resulted in downgrades by the various rating agencies of CFGI and, correspondingly, of the Sellers' servicer ratings. These developments have raised general market concerns about the Debtors' financial condition and general ability to operate the MSB Business, and have increased the risk that counterparties may seek to lift the automatic stay to terminate servicing agreements with the Sellers without any consideration paid to the Sellers, although the Debtors believe the stay should remain in place to protect the assets of the MSB Business until the proposed Sale is effectuated. As such, the

10

Debtors have determined it is necessary to sell the MSB Business to Berkadia through an orderly and expeditious Sale to preserve value in the MSB Business, to avoid impairment of the business, and to provide comfort to the servicing agreements counterparties that the servicers on which they rely will continue to operate under the servicing agreements.

20.    In light of the foregoing, a great effort was expended by the Debtors prior to the Commencement Date to maintain the value of the MSB Business and continue servicing loans in accordance with the Debtors' historically high standards.  In addition, the Debtors extensively marketed the MSB Business.  The culmination of the Debtors' efforts to realize value for their stakeholders is the proposed Sale.  To realize maximum value for the MSB Business it is necessary that the Sellers obtain approval of and consummate the Sale early in these cases.  Without a quick sale, the Sellers have a grave concern that value will deteriorate materially as a result of a loss of cooperation and confidence of the servicing agreements counterparties, including the GSEs, securitization trusts, and private label counterparties.  In addition, there are substantial price adjustments for each day the Sale is not closed past October 1, 2009.  Accordingly, the Sellers believe it is in the best interest of their estates and creditors to authorize a sale to Berkadia as soon as possible without the necessity of a further competitive process.  As shown below, the proposed Sale is the result of arms'-length and good faith negotiations, and extensive marketing efforts.

### The Debtors' Pre-Commencement Date Marketing of the MSB Business

21.    Prior to the Commencement Date, the Debtors initiated a broad, strategic and fair marketing effort to sell the MSB Business.  During May and June 2009, the Debtors' financial advisors (Lazard Frères & Co. LLC and Beekman Advisors (collectively, the "Advisors")), began the marketing process by conducting extensive due diligence and preparing a comprehensive confidential information memorandum detailing the MSB Business.  In June

11

2009, thirty-one potential buyers were contacted and twenty signed non-disclosure agreements and received the confidential memorandum.[4]   On July 8, 2009, the Advisors received nine preliminary indications of interest, six of which were written indications of interest and three of which were verbal indications of interest.  Of the six written indications, three expressed interest in acquisition of the MSB Business in its entirety; the remaining three expressed interest in parts of the MSB Business but not the whole.   The three parties which bid for the whole MSB Business were advanced to a final round of the sale process and each committed substantial time and resources to business and legal diligence in advance of the August 18, 2009 final bid deadline established by the Debtors.

22.    Two of the three parties withdrew from the process in the week prior to August 18, 2009, and the Debtors received only one firm offer for the MSB Business by the final bid deadline.  That offer, by Berkadia, was negotiated at length and ultimately memorialized in the APA.

### The Proposed Sale to Berkadia Pursuant to the APA[5]

23.    On September 2, 2009, the Sellers entered into the APA with Berkadia, a newly formed entity owned by Berkshire Hathaway Inc. and Leucadia National Corporation. The Debtors have no prior affiliation with either Berkshire Hathaway Inc. or Leucadia National Corporation.  The following is a summary of the salient provisions of the APA:

(A)    **Put Option and Sale of MSB Business**.  The APA provides for a put option (the "Put Option"), by which the Sellers have the right to sell the MSB Business to Berkadia. The MSB Business comprises all assets primarily used in, or primarily related to, the

---

[4]  The size of the MSB Business restricts the potential field of bidders in a sale; a buyer would need $1 billion or more of liquidity to operate the MSB Business.

[5]  This summary of the salient terms of the APA is provided for convenience purposes only, and is qualified in its entirety by the precise terms and conditions of the APA.   To the extent of any inconsistency between the summary set forth herein and the APA, the terms and conditions of the APA shall govern.  Capitalized terms used in this summary, but not defined herein, shall have the meanings ascribed to them in the APA.

12

Sellers' mortgage servicing and lending and mortgage banking business lines that are owned, managed, and conducted by the Sellers in the United States and India and included within the definition, and more specifically set forth in the definition of "Acquired Assets" under the APA (set forth below).

(B)    **Put Option Fee**.  The Sellers paid Berkadia $40 million in cash for the Put Option (the "Put Option Fee"), which can be exercised by the Sellers before or after the Commencement Date.  If the Put Option is timely exercised, subject to the conditions of the APA, the Sellers are committed to sell, and Berkadia is committed to purchase, the MSB Business.  If the Put Option is not timely exercised, the APA terminates without the obligations of the Sellers to sell and Berkadia to purchase, and Berkadia retains the $40 million Put Option Fee.  If the Put Option is exercised and the transaction does not close due to an inability to obtain certain required third party consents, Berkadia is committed to refund $20 million to the Sellers.  Prior to exercise of the Put Option, the Sellers are not restricted from pursuing alternative transactions for the sale of the MSB Business and terminating the APA.  The APA provides, however, that the Put Option expires if not exercised by the Sellers prior to sixty days from execution of the APA or sixty days after the Commencement Date, if the Sellers file chapter 11 petitions prior to the expiration of the first sixty day period.  Accordingly, the Put Option must be exercised by December 24, 2009, or it will terminate without exercise.

(C)    **Acquired Assets**.  The APA defines "Acquired Assets" as "all Properties, rights and claims of the Sellers primarily used in, or related primarily to, the [MSB Business,] wherever situated and of whatever kind and nature (tangible or intangible, and whether or not reflected on the books and records of Sellers), including all of the following: (a) Purchased Contracts [which consist of the Servicing Agreements, Service Provider Agreements, Loan Applications, Committed Loans, Purchased Loans, Purchased Real Property Leases and Pipeline Transactions relating to the MSB Business] and all rights thereunder, (b) Purchased IP and Purchased IT Systems [which consist of the intellectual property and information technology systems used in the MSB Business], (c) Purchased Equity Interest [which consist of the Sellers' equity interest in an Indian subsidiary to which the Sellers outsource certain servicing operations to capitalize on the reduced labor costs in India and recognize other efficiencies based primarily on the education levels in Hyderabad, India], (d) Purchased Fixtures and Equipment, (e) [MSB Business] Books and Records, (f) prepaid expenses, security deposits funded by the Sellers, accounts receivable, and insurance claims (including HUD Mortgage Insurance claims), each to the extent related to a Purchased Contract or the [MSB Business], (g) Servicing Rights [*i.e.,* the right to receive servicing fees and other income under the Servicing Agreements], (h) Advances, (i) all assignable Licenses of the Sellers relating to the [MSB Business], (j) all assignable rights of the Sellers under non-disclosure, non-compete or non-solicitation agreements with current or former employees, consultants or agents, or third parties, relating to the [MSB Business], (k) all assignable rights of the Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to any Acquired Assets or Assumed Liabilities, (l) all goods and services and other economic benefits to be received subsequent to the Closing arising out of prepayments and payments by the Sellers prior to the Closing relating to the Acquired Assets, (m) all insurance (and proceeds thereof) to

13

the extent received or receivable in respect of Acquired Assets or Assumed Liabilities in respect of events occurring after the date of [the APA], (n) to the extent not otherwise enumerated above, all items that constitute Accruals [relating to the MSB Business], and (o) all other assets that are set forth on <u>Schedule 1.1(i)</u>; <u>provided</u> that the Acquired Assets shall not include the Excluded Assets."

(D)    **Purchase Price**.  The aggregate purchase price for the business is in excess of $1.093 billion as described herein.  If the Sale of the MSB Business is approved by this Court, the purchase price will be $490 million, subject to certain closing adjustments. There are substantial price adjustments for each day the Sale is not closed past September 30, 2009.  A portion of the purchase price will be paid to the Sellers via a $75 million promissory note and one or more additional promissory notes in amounts to be determined at closing, in each case subject to later adjustments to cover realized losses that may be incurred by Berkadia under the Sellers' loss-sharing arrangements with Fannie Mae and Freddie Mac.  The balance of the purchase price will be paid by wire transfers.  As part of the closing adjustments, Berkadia will also purchase warehoused loans and servicing advances related to the MSB Business units being sold at a price of par value, plus interest, and fees receivable.  Capmark Bank, a non-debtor subsidiary of CFGI, currently owns the majority of the warehoused loans and servicing advances to be transferred to Berkadia at closing, but Capmark Bank will transfer such assets to the Sellers at closing for the simultaneous transfer of such assets by the Sellers to Berkadia, and Capmark Bank will receive a purchase price which will include the purchase consideration paid for such assets at the closing.  In addition to selling the MSB Businesses for the purchase price above (subject to adjustments), the company will be selling for cash its carrying value of approximately $303 million of warehoused loans and approximately $294 million in servicing advances, and approximately $6.0 million in servicing receivables, interest and prepaid expenses, net of certain good faith loan deposits and commission accruals based on current values at September 30, 2009.  It is anticipated that the Sellers' share of the assets to be sold will be $94 million and Capmark Bank's share of the assets will be $509 million.  The carrying amounts of these assets are subject to change prior to the date of closing the APA.

(E)    **Non-Solicitation/Competition**.  The APA includes a three-year mutual covenant by each of the Sellers and Berkadia to not solicit each other's employees and a three-year covenant by the Sellers and their affiliates (with the exception of Capmark Bank) not to compete with the MSB Business, subject to certain exceptions.  The exceptions include allowing the Sellers to "special service" loans on a contract basis, to service their own and their affiliates' loans and to service loans for third parties as currently conducted, provided that no such servicing may include loans owned by Fannie Mae, Freddie Mac or HUD, or loans in commercial mortgage-backed securities, but the subservicing of any such loans would be permitted.

(F)    **Mutual Transition Services Agreement and Horsham Lease**.  The APA contemplates the Sellers and Berkadia entering into a mutual transition services agreement upon the closing date and the Sellers granting Berkadia a perpetual, non-exclusive royalty-free license to use certain of the Sellers' MSB Business proprietary software.  In addition, the Sellers and Berkadia will enter into a seven-year, triple net

14

lease for $1 for certain of the Sellers' buildings located in Horsham, Pennsylvania and used in the MSB Business.

(G)    **Advisors' Fees**.  Upon the closing of the Sale, Beekman Advisors, Inc., shall receive a completion fee, which is to be calculated as 0.5% of the purchase price and estimated to be approximately $2.0 – 2.5 million, pursuant to the terms of the retention of Beekman Advisors by the Sellers.[6]  Upon the closing of the Sale, Lazard Frères & Co. LLC, shall receive a completion fee of approximately $3.5 million, pursuant to the terms of the retention of Lazard Frères & Co. LLC by the Sellers.[7]

(H)    **Closing Conditions**.  The closing of the transaction contemplated by the APA is subject to the satisfaction of certain closing conditions intended to protect the interests of the Sellers and Berkadia, including, but not limited to, (i) approval by the GSEs of Berkadia as a servicer, (ii) termination of the waiting period under the Hart-Scott-Rodino Act without objection to the transaction, (iii) acknowledgement by the applicable rating agencies that they will issue confirmations that the substitution of Berkadia as successor servicer under the applicable servicing agreements will not result in a downgrade, withdrawal or qualification of any securities issued by the securitization trusts whose servicing agreements will be transferred to Berkadia, (iv) that fee generating escrow balances are not less than $3.5 billion, (v) that other third party consents have been obtained, except for those consents that if not obtained, individually or in the aggregate, would not materially adversely affect the operation of the MSB Business, (vi) that the representations and warranties of the parties contained in the APA are true and correct, except where the failure to be true and correct, individually or in the aggregate, would not have a material adverse effect, (vii) that the purchase price adjustments related to loss of servicing agreements and inaccuracies in the Sellers' June 2009 mortgage servicing and mortgage loan data tape shall not have resulted in a reduction in the purchase price of $125 million or more, (viii) that no injunction or other governmental order shall have been entered prohibiting the consummation of the transactions, and (ix) an order of the Court in an agreed form shall have been issued approving the transaction under sections 363 and 365 of the Bankruptcy Code.

24.    In addition to the above-described salient features of the APA, in accordance with Local Rule 6004-1(b)(iv), the Debtors highlight the following with respect to the APA:

---

[6] Contemporaneously herewith, or as soon as practicable hereafter, the Debtors have filed the Debtors' Application Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rule 2014-1 for Authorization to Employ and Retain Beekman Advisors, Inc. as Strategic Advisor to the Debtors *Nunc Pro Tunc* to the Commencement Date.

[7] Contemporaneously herewith, or as soon as practicable hereafter, the Debtors have filed the Debtors' Application Pursuant to Sections 327(a) and 328(a), Bankruptcy Rule 2014(a), and Local Rule 2014-1of the Bankruptcy Code for Authorization to Employ and Retain Lazard Frères & Co. LLC as Investment Banker and Financial Advisor t to the Debtors *Nunc Pro Tunc* to the Commencement Date.

(A)    **No Sale to an Insider**:  Berkadia is not an insider of the Debtors within the meaning set forth in section 101(31) of the Bankruptcy Code.

(B)    **Agreements with Management**:  Pursuant to section 5.7 of the APA, Berkadia shall offer each employee of the Sellers and their Affiliates (other than the Indian Subsidiary) who provides services exclusively or primarily with respect to the MSB Business as listed on Section 5.7(a) of the Sellers Disclosure Schedule, employment with Berkadia or its Affiliates effective on the Closing Date.  Each offer shall provide for (i) base salary and retention bonus opportunity which are no less favorable than that which such employee would have received from the Sellers, and (ii) benefits comparable in the aggregate to those currently provided by the Sellers to the employees.  The Sellers submit that such agreements are fair both in respect of such agreements and in connection with the Sellers' entry into the APA.  The MSB Business is dependent upon the persons involved therewith.  Other than the provisions of section 5.7 of the APA, which apply to scheduled employees of the MSB Business described above, Berkadia has confirmed to the Sellers in writing that it has not discussed or entered into or discussed any special or separate agreements with management or key employees of the MSB Business regarding compensation or future employment, other than general discussions regarding Berkadia's desire to have them continue in their existing roles following the closing at compensation levels comparable to amounts they currently receive.

(C)    **Releases**:  The APA does not provide for any releases.

(D)    **Private Sale/No Competitive Bidding**:  As discussed below, the Sellers believe the pre-Commencement Date and post-Commencement Date marketing efforts of the MSB Business were and will be exhaustive and that no formal bidding procedures and process should be required before the Sale to Berkadia under the APA.

(E)    **Closing and Other Deadlines**:  The APA will terminate by its terms if the Put Option is not exercised by December 24, 2009, or the closing is not consummated by December 31, 2009, although closing may be extended (i) by either party for up to fifteen days to obtain Fannie Mae, Freddie Mac, Ginnie Mae and HUD/FHA licenses and/or consents or (ii) by Berkadia for up to thirty days to obtain required state licenses to operate the MSB Business.

(F)    **Good Faith Deposit**:  The APA does not provide for a good faith deposit.

(G)    **Interim Arrangements with Proposed Buyer**:  No interim arrangements have been entered into with Berkadia, other than the Put Option expressly provided for under the APA.

(H)    **Use of Proceeds**:  No provisions in the APA address the use of proceeds.

(I)    **Tax Exemption**:  No tax exemptions under section 1146(a) of the Bankruptcy Code are contemplated in connection with the APA.

(J)    **Record Retention**:  Berkadia and the Sellers shall not, for a period extending three (3) years after the closing date (or for such longer period as required by law),

16

destroy or otherwise dispose of any such books and records unless such party shall first offer in writing to surrender such books, records and other data to the other parties and such other parties shall not agree in writing to take possession thereof during the ten (10) day period after such offer is made.

(K)    **Sale of Avoidance Actions**:  The APA does not involve the sale of, or impose limitations on, any chapter 5 causes of action.

(L)    **Requested Findings as to Successor Liability**:  Pursuant to section 2.2(a) of the APA, Berkadia shall only be liable for the Assumed Liabilities, and not liable for any Excluded Liabilities.  Also, pursuant to section 6.1 of the APA, it is a condition of closing that this Court enter an order, among other things, authorizing the delivery of the Acquired Assets to Berkadia free and clear of Liens (other than Permitted Liens).  The definition of Liens includes all interests within the meaning of section 363(f) of the Bankruptcy Code.

(M)    **Sale Free and Clear of Unexpired Leases**:  Pursuant to section 2.2(a) of the APA, Berkadia shall acquire the Acquired Assets free and clear of all Liens other than certain Permitted Liens.  Also, pursuant to section 6.1 of the APA, it is a condition of closing that this Court enter an order that, among other things, authorizes the delivery of the Acquired Assets to Berkadia free and clear of all Liens.

(N)    **Credit Bid**:  The MSB Business is unencumbered by any lien, mortgage, or any other security interest.  Accordingly, there will be no credit bidding under section 363(k) of the Bankruptcy Code.

(O)    **Relief from Bankruptcy Rule 6004(h)**:  The Sellers are requesting relief from the 10-day stay imposed by Rule 6004(h).

### The Debtors' Marketing of the MSB Business Post-Execution of the APA

25.    Notably, the APA does not restrict the Sellers from soliciting, pursuing, or entering into alternative transactions for the sale of the MSB Business.  Accordingly, the Advisors have continued to pursue topping bids from previously interested parties and others.  To that end, since the execution of the APA on September 2, 2009, the Advisors contacted twenty-six parties to retest interest in the MSB Business, including twenty parties that were involved in the marketing process prior to the execution of the APA.  Twelve parties expressed some degree of preliminary interest in purchasing the MSB Business, eight new participants signed confidentiality agreements, and each party that signed the confidentiality agreement has

been granted access to diligence information. The Debtors' management and their Advisors have had numerous communications with a number of these parties to further their diligence review.

26.    In connection with these efforts, one party has provided a preliminary, non-binding, written indication of interest in the whole MSB Business at an unspecified purchase price "in excess of the $490 million" purchase price contemplated by the APA. In light of this indication and other potential interest in the MSB Business, on October 11, 2009, the Advisors circulated to the parties expressing a continued interest in purchasing the MSB Business a bidding process letter (the "Bidding Process Letter"), attached as Exhibit A to the Wilkerson Declaration, to establish another formal bid deadline and process in the hope of obtaining an offer superior to the APA. Pursuant to the Bidding Process Letter, interested parties have been requested to submit a qualifying offer for the MSB Business no later than Friday October 30, 2009.

27.    Because of the extensive marketing efforts focused on the MSB Business, the Debtors submit that no further marketing of the MSB Business pursuant to Court-approved bidding procedures is necessary or warranted, as the Bidding Process Letter contained bidding procedures which are consistent with the Bankruptcy Rules and Local Rules of this Court, and any additional formal marketing would result in unnecessary additional expense and delay of the Sale, all of which may result in a reduction in the net proceeds of the Sale. In the event, however, the Debtors' marketing efforts through the Bidding Process Letter result in the Debtors receiving an offer superior to the APA, the Debtors will hold an Auction, and in such case, propose to conduct the Auction in accordance with the following procedures:

RLF1-3474834-1

(A)    **Auction**: In the event the Debtors timely receive one or more Qualifying Offers (as defined in the Bidding Process Letter)[8] other than the APA, the Debtors shall conduct an Auction with respect to the MSB Business.  The Auction will be conducted at the offices of Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019 on [DATE], 2009 at _:00 _.m. (prevailing Eastern Time), or such other location as designated by the Debtors in a notice to all qualified offerors (each, a "Qualified Offeror").  The Auction shall be governed by the following procedures:

> (i)     Berkadia shall be provided with any Qualifying Offers received on or before the offer deadline established in the Bidding Process Letter;
>
> (ii)    Berkadia and the Qualified Offerors shall appear in person at the Auction, or through a duly authorized representative;
>
> (iii)   Only representatives of the Debtors, Berkadia, Qualified Offerors, counsel and other advisors selected by any creditors committee appointed in these cases (the "Committee"), shall be entitled to be present at the Auction;
>
> (iv)    The Auction process shall be transcribed by a qualified court reporter;
>
> (v)     Only Berkadia and Qualified Offerors shall be entitled to make any subsequent bids at the Auction;
>
> (vi)    Each Qualified Offeror shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;
>
> (vii)   Bidding shall commence at the amount of the highest Qualifying Offer submitted by the Qualified Offerors prior to the Auction and such offer shall be announced prior to the start of the Auction;
>
> (viii)  Qualified Offerors (including Berkadia) may then submit successive bids in increments of at least $5,000,000 higher than the previous bid;
>
> (ix)    All Qualified Offerors shall have the right to submit additional bids and make additional modifications to the APA or Modified APA, as applicable, at the Auction;
>
> (x)     The Auction may include individual negotiations with the Qualified Offerors (including Berkadia) and/or open bidding in the presence of all other Qualified Offerors (including Berkadia);

---

[8] Attached as Exhibit A to the Wilkerson Declaration.

(xi)     The Auction shall continue until there is only one offer that the Sellers determine, subject to Court approval, is the highest or best offer from among the Qualified Offerors (including Berkadia) submitted at the Auction (the "Successful Bid"). In making this decision, the Debtors may consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Offeror's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the APA requested by each Qualified Bidder, and the net benefit to the Debtors' estates. The Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the applicable Modified APA; and

(xii)    Within three (3) days after conclusion of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities. Bids made after the close of the Auction shall not be considered by the Debtors.

(B)     **Back-Up Bidder and Return of Good Faith Deposits:**

(i)      If an Auction is conducted, the Qualified Offeror with the next highest or otherwise best Qualifying Offer, as determined by the Debtors in the exercise of their business judgment at the Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until 24 hours after the closing of the sale transaction with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court.

(ii)     Except as otherwise provided herein, Good Faith Deposits[9] shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) business day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall be held by the

---

[9] Pursuant to the Bidding Process Letter, potential offerors were required to submit a "Good Faith Deposit" comprising a cash deposit by wire transfer equal to ten (10%) percent of the amount offered to purchase the MSB Business.

20

Debtors until one (1) business day after the closing of the sale transaction with the Successful Bidder.

28.    In the event a superior offer to the APA is not received by the deadline established by the Bidding Process Letter, the Debtors and their Advisors believe the Sale to Berkadia pursuant to the APA represents the best and only transaction available to the Debtors under the circumstances, as the Sale simultaneously maximizes the value of the MSB Business for the Debtors' estates and provides the maximum recovery to all stakeholders.  In addition, the Debtors have met with Fannie Mae, Ginnie Mae, Freddie Mac, Standard & Poor's and Fitch Ratings to discuss the Sale and have received positive feedback.  As such, absent a superior offer, entry into the APA and consummation of the sale to Berkadia represents the sound exercise of the Debtors' business judgment, is supported by good business reasons, preserves value, and should be authorized by this Court in the form set forth in the proposed Sale Order.

### Alternative to Private Sale: Court-Approved Bidding Procedures

29.    As noted, the Debtors submit that the comprehensive prepetition and continuing postpetition marketing efforts to sell the MSB Business, including the dissemination of the Bidding Process Letter subsequent to the execution of the APA, and the fairness of the terms of the APA obviate the need for Court-approved bidding procedures[10] to govern yet a third round of bidding.  If the Sellers receive a higher or better offer pursuant to the Bidding Process Letter, the Auction procedures proposed will be used (if approved by the Court) to determine the Successful Bidder.  In the alternative, if, notwithstanding all previous marketing efforts the Court declines to approve a private Sale under the APA, the Debtors hereby request entry of a bidding

---

[10] Indeed, the Debtors submit that the bidding process that resulted in the execution of the APA, and subsequently, the process implemented pursuant to the Bidding Procedures Letter, substantially equate to procedures regularly approved by courts in this District.  The Debtors, therefore, submit that Court-approved bidding procedures and implementation of a third round of bidding would likely not result in any superior bids for the MSB Business.

21

procedures order (the "Bidding Procedures Order"), substantially in the form attached hereto as Exhibit D, (i) approving the bidding procedures (the "Bidding Procedures"), described below, for the sale of the MSB Business; (ii) subject to receipt of one or more Qualifying Bids (as defined below), scheduling an Auction on [DATE], 2009 at __:00 _.m. (prevailing Eastern Time), at which the Sellers will evaluate competing bids for a sale of the MSB Business; (iii) scheduling [DATE], 2009 at __:00 _.m. (prevailing Eastern Time) as the date and time for the Sale Hearing to approve the sale to Berkadia or the winning bidder selected at the Auction, if applicable; and (iv) approving the notice of the Sale Hearing and the Auction (the "Sale and Auction Notice"), attached to the Bidding Procedures Order as Schedule 1.

### Proposed Bidding Procedures

30.    As noted above, if this Court determines that a third bidding process for the sale of the MSB Business is necessary, the Debtors propose the following Bidding Procedures:

(A)    **Assets to Be Sold**:  The Auction shall consist of the MSB Business (as defined herein);

(B)    **Confidentiality Agreements**:  Upon execution of a confidentiality agreement, in form and substance satisfactory to the Sellers, any party that wishes to conduct due diligence in respect of the MSB Business may be granted access to all material information that has been or will be provided to Berkadia and other bidders;

(C)    **Bid Deadline**:  Any person or entity interested in participating in the Auction must submit a Qualifying Bid (as defined below) on or before [DATE] at __:00 _.m. (prevailing Eastern Time) (the "Bid Deadline") in writing, to (1) counsel to the Sellers, Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019, Attention: Michael P. Kessler, Esq. and Judy G.Z. Liu, and (2) Capmark Financial Group Inc., 116 Welsh Road, Horsham, Pennsylvania, 19044, Attention: Thomas L. Fairfield, Esq.;

(D)    **Qualifying Bids**:  To participate in the bidding process and be deemed a "Qualified Bidder", each potential bidder (other than Berkadia) must submit a "Qualifying Bid" by the Bid Deadline. To constitute a Qualifying Bid, a bid must:

22

(i)     be in writing and state that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the MSB Business on terms and conditions no less favorable to the Sellers than the terms and conditions contained in the APA;

(ii)     include a mark-up of the APA (the "Modified APA") reflecting the variations from the APA, including which contracts and leases are not to be assumed and assigned pursuant to the Modified APA, and a clean and executed Modified APA;

(iii)     provide that such bidder's offer is irrevocable until the closing of the purchase of the MSB Business if such bidder is the Successful Bidder or the Back-Up Bidder (each as defined below);

(iv)     state such bidder is financially capable of consummating the transactions contemplated by the Modified APA;

(v)     include such financial and other information that will allow the Sellers to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA;

(vi)     describe the intended source of funding of the purchase price and for reimbursement of current and future advances and warehouse lines under the servicing portfolio, its availability and any contingencies or material conditions relating thereto;

(vii)     describe any transition services that will be required by the bidder in connection with an acquisition of the MSB Business;

(viii)     include a statement that there are no conditions precedent to the bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid. The bidder's bid and Modified APA should also highlight any governmental or third-party consents needed to consummate the acquisition of the MSB Business to the extent they are not already contemplated in the APA;

(ix)     not request or entitle the bidder to any transaction or breakup fee, expense reimbursement, put option fee, or similar type of payment;

(x)     fully disclose the identity of each entity that will be bidding for the MSB Business or otherwise participating in connection with such bid, and the complete terms of any such participation;

(xi)     not contain any due diligence or financing contingencies of any kind;

23

(xii)    include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified APA;

(xiii)    include the names and contact information of members of the bidder who will be available to answer questions regarding the offer;

(xiv)    include the names of external advisors including financial, legal and accounting firms, as well as industry consultants or other resources;

(xv)    include any other information or factors that may be relevant to the Sellers and its advisors in consideration of the bid; and

(xvi)    include a cash deposit by wire transfer equal to ten (10%) percent of the amount offered to purchase the MSB Business (the "Good Faith Deposit").

The Debtors shall make a determination regarding whether a bid is a Qualifying Bid and shall notify bidders whether their bids have been determined to be Qualifying Bids by no later than __:00 _.m. (prevailing Eastern Time) on [DATE], 2009;

(E)    **No Qualifying Bid**: If no timely, conforming Qualifying Bids, other than the APA, are submitted by the Bid Deadline, the Debtors shall not hold an Auction and, instead, shall request at the Sale Hearing that the Court approve the APA with Berkadia;

(F)    **Auction**: In the event the Debtors timely receive one or more Qualifying Bids other than the APA, the Debtors shall conduct the Auction with respect to the MSB Business. The Auction will be conducted at the offices of Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019 on [DATE], 2009 at _:00 _.m. (prevailing Eastern Time), or such other location as designated by the Debtors in a notice to all Qualified Bidders. The Auction shall be governed by the following procedures:

(i)    Berkadia shall be provided with any Qualifying Bid received on or before the Bid Deadline;

(ii)    Berkadia and the Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative;

(iii)    Only representatives of the Debtors, Berkadia, Qualified Bidders, counsel and other advisors selected by any creditors committee appointed in these cases (the "Committee"), shall be entitled to be present at the Auction;

24

(iv)    The Auction process shall be transcribed by a qualified court reporter;

(v)    Only Berkadia and Qualified Bidders shall be entitled to make any subsequent bids at the Auction;

(vi)    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

(vii)    Bidding shall commence at the amount of the highest Qualifying Bid submitted by the Qualified Bidders prior to the Auction and such Bid shall be announced prior to the start of the Auction;

(viii)    Qualified Bidders may then submit successive bids in increments of at least $5,000,000 higher than the previous bid;

(ix)    All Qualified Bidders shall have the right to submit additional bids and make additional modifications to the APA or Modified APA, as applicable, at the Auction;

(x)    The Auction may include individual negotiations with the Qualified Bidders (including Berkadia) and/or open bidding in the presence of all other Qualified Bidders (including Berkadia);

(xi)    The Auction shall continue until there is only one offer that the Sellers determine, subject to Court approval, is the highest or best offer from among the Qualified Bidders (including Berkadia) submitted at the Auction (the "Successful Bid"). In making this decision, the Debtors may consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the APA requested by each Qualified Bidder, and the net benefit to the Debtors' estates. The Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the applicable Modified APA; and

(xii)    Within three (3) days after conclusion of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities. Bids made after the close of the Auction shall not be considered by the Debtors.

(G)     **Back-Up Bidder and Return of Good Faith Deposits:**

        (i)     If an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their business judgment at the Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until 24 hours after the closing of the sale transaction with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court.

        (ii)    Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) business day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall be held by the Debtors until one (1) business day after the closing of the sale transaction with the Successful Bidder.

      31.     Also, in accordance with Local Rule 6004-1(c)(i), the Debtors respectfully represent the following with respect to the Auction:

(A)     **Provisions Governing Qualifications of Bidders**: *See* preceding paragraph 30(D), (E), and (F).

(B)     **Provisions Governing Qualified Bids**: *See* preceding paragraph 30(D) and (E).

(C)     **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**: Not applicable.

(D)     **No Shop or No-Solicitation Provisions**: Not applicable.

(E)     **Break-Up/Topping Fees and Expense Reimbursement**: Not applicable.

(F)     **Bidding Increments**: *See* preceding paragraph 30(F)(vii).

(G)     **Treatment of Break-Up or Topping Fees and Expense Reimbursement at Auction**: Not applicable.

(H)     **Modification of Bidding and Auction Procedures**: Not applicable.

(I)     **Closing with Alternative Backup Bidder**: *See* preceding paragraph 30(G).

26

## Approval of the Sale Hearing Schedule and  Sale Hearing Notice

32.     The Debtors request that the Court schedule a Sale Hearing on or about

____, 2009 at __:__ _.m. (prevailing Eastern Time), or as soon as practicable thereafter, to

consider approval of the APA and the Sale, or the approval of any higher or better offer, if any,

resulting from an Auction (if held).  Bankruptcy Rule 6004(a) provides that "[n]otice of a

proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of

business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) and, if applicable, in

accordance with § 363(b)(2) of the Code."  Bankruptcy Rule 2002(a)(2) requires the Debtors

give all creditors and certain other parties "at least 20 days' notice by mail" of the proposed Sale.

Bankruptcy Rule 6004(b) also provides that objections to the proposed Sale "shall be filed and

served not less than five days before the date set for the proposed action or within the time fixed

by the court."  Bankruptcy Rule 6006(a) provides that "[a] proceeding to assume, reject, or

assign an executory contract or unexpired lease, other than as part of a plan, is governed by Rule

9014."

33.     The Sale Hearing Notice contains the type of information required under

Bankruptcy Rule 2002(c), and also includes information regarding the Auction procedures to the

extent a higher or better offer than the APA is obtained and an Auction takes place.  Therefore,

the Debtors request that this Court approve the form and content of the Sale Hearing Notice.[11]

The Debtors propose at least 20 days' notice for the Sale Hearing, which complies with the

notice procedures mandated by the Bankruptcy Rules, according to the following procedures:

    (a)     The Debtors shall serve, within 3 business days after entry of the Sale Hearing
Order (the "Mailing Deadline"), by overnight courier, electronic mail, or same-

---

[11] To the extent the Court requires further marketing with Court-approved bidding procedures, the Debtors request approval of the Sale Hearing Notice attached as Schedule 1 to the Bidding Procedures Order, which notice is substantially in the form of the Sale Hearing Notice except with the addition of the Court-approved bidding process.

day messenger delivery, copies of the Sale Hearing Notice upon: (i) the U.S. Trustee, (ii) attorneys for the Committee, if appointed, (iii) attorneys for Berkadia, (iv) any party who, in the past 12 (twelve) months, expressed in writing to the Debtors an interest in acquiring the MSB Business, and who the Debtors and their representatives reasonably and in good faith determine potentially have the desire and financial wherewithal to effectuate the Sale, (v) all parties who are known to possess or assert a secured claim against the MSB Business, (vi) the Internal Revenue Service, (vii) all applicable state attorneys general, local realty enforcement agencies, and local regulatory authorities, and (vii) any parties entitled to notice under Rule 2002-1(b) of the Local Rules for the United States Bankruptcy Court District of Delaware.

(b)     On or before the Mailing Deadline, or as soon as practicable thereafter, the Debtors will publicize the Sale Hearing Notice in the Wall Street Journal (National Edition) for 2 consecutive business days.

Scheduling the Sale Hearing on, and at, the requested date and time is also reasonable given the extensive pre-Commencement Date and post-Commencement Date marketing performed, and to be performed, by the Debtors, as described above.  Under the circumstances facing the Debtors and in light of the significant marketing of the MSB Business, the Debtors believe the reasonableness of the private Sale process is self-evident.

### Procedures for Assumption and Assignment of Assumed Contracts and Leases

34.     To facilitate the Sale and the assumption and assignment of the contracts and leases provided for under the APA (collectively, the "Assumed Contracts and Leases"), the Debtors will serve a notice of intent to assume and assign the Assumed Contracts and Leases that are part of the Sale (the "Notice of Assumption and Assignment") on all nondebtor parties to the Assumed Contracts and Leases according to the following procedures:

(a) On or before the Mailing Deadline, the Debtors (or their agent) shall serve, by overnight courier, electronic mail, or same-day messenger delivery, the Notice of Assumption and Assignment, substantially in the form attached to the Sale Hearing Order as Schedule 2, upon all known nondebtor parties to the Assumed Contracts and Leases. The Notice of Assumption and Assignment shall set forth (i) the intent of the Debtors to assume the Assumed Contracts and Leases and assign them to Berkadia (or to any Successful Bidder), and (ii) applicable cure amounts, if any (the "Cure Amounts"). In the Notice of Assumption and Assignment the Sellers will identify the Assumed Contracts and Leases and the

28

Cure Amounts that the Sellers believe must be paid to cure all defaults under the Assumed Contracts and Leases. If no amount is listed on the Notice of Assumption and Assignment, the Sellers believe that there is no Cure Amount due.

(b) Any objections to (i) the assumption and assignment of an Assumed Contract or Lease, or (ii) the amount asserted as the Cure Amount (each, an "Assumption and/or Cure Objection") must be in writing and set forth with specificity the nature of the objection and the cure amount that the objecting party believes should be paid in connection with the assumption of the Assumed Contract or Lease (the "Claimed Cure Amount").

(c) If an Assumption and/or Cure Objection is timely filed, the Debtors request that a hearing with respect to that objection shall be held before the Court at the Sale Hearing. If, however, an Assumption and/or Cure Objection is not timely filed and served, the assumption and assignment of the applicable Assumed Contract or Lease will proceed without further notice at the Sale Hearing to approve the sale of the MSB Business. The Debtors also request that parties that fail to file and serve timely Assumption and/or Cure Objections shall be deemed to have waived and released any and all rights to assert Cure Amounts differing from those listed on the exhibit to the Notice of Assumption and Assignment and, subject to payment of the Cure Amount(s) listed on such contract with respect to their Assumed Contract(s) or Lease(s), shall be forever barred and estopped from asserting or claiming against the pertinent Seller, Berkadia, or any Successful Bidder that any additional amounts are due or defaults exist, or prohibitions or conditions to assignment exist or must be satisfied, under such Assumed Contract or Lease.

(d) If no Cure Amounts are due under the Assumed Contract or Lease, and the nondebtor party to the Assumed Contract or Lease does not otherwise object to the pertinent Seller's assumption and assignment of the Assumed Contract or Lease, no further action need be taken on the part of that nondebtor party. The Debtors also request that Assumption and/or Cure Objections that object solely to the Cure Amount may not prevent or delay the pertinent Sellers' assumption and assignment of any Assumed Contracts and Leases. If a party objects solely to a Cure Amount, the pertinent Seller may, in its sole discretion, hold the Claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties. So long as the pertinent Seller holds the Claimed Cure Amount in reserve, and there are no other unresolved objections to assumption and assignment, the pertinent Seller can, without further delay, assume and assign the Assumed Contract or Lease that is the subject of the objection. Under such circumstances, the objecting party's recourse shall be limited to the funds held in reserve.

The Sellers submit the aforementioned procedures provide sufficient notice to non-debtor parties to the Assumed Contracts and Leases and should be approved in all respects.

### Objection Deadline

35.    The Debtors request that, pursuant to Bankruptcy Rule 9014, objections, if any, to the Sale (a "Sale Objection") or an Assumption and/or Cure Objection (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware, 19801, on or before 4:00 p.m. on _____, 2009 (prevailing Eastern Time) (the "Objection Deadline"), or on such later date and time as the Debtors may agree, and (iv) be served with a copy on: (a) counsel for the Debtors, Dewey & LeBoeuf LLP, Attention: Michael P. Kessler, Esq., and Judy G.Z. Liu, Esq., 1301 Avenue of the Americas, New York, New York, 10019; (b) local counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware, 19801, Attention: Mark D. Collins, Esq.; (c) counsel for Berkadia, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York, 10153, Attention: Andrea Bernstein, Esq., and William Gutowitz, Esq.; (d) DLA Piper LLP (US) 1251 Avenue of the Americas, New York, New York, 10020, Attention: Thomas R. Califano; (e) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801; (f) counsel for any official committee of unsecured creditors (the "Committee"), if appointed; (g) administrative agent under the Debtors' prepetition senior credit facility, bridge loan agreement and term loan facility, Citicorp North America, Inc., and Citibank, N.A., 1615 Brett Rd. Bldg. 3, New Castle, Delaware, 19720, Attention: Ralph Townley; (h) indenture trustee under the Debtors' prepetition floating rate and 5.875% senior unsecured note indentures, Deutsche Bank Trust Company Americas, 60

Wall Street, 27th Floor, MS:NYC60-2710, New York, New York, 10005, Attention: Trust &

Securities Services; (i) successor trustee under the prepetition 6.300% senior unsecured note

indenture, Wilmington Trust FSB, 166 Mercer Street, Suite 2-R, New York, New York, 10012-

3249, Attention: Adam Berman; (j) counsel for the ad hoc committee of prepetition unsecured

bondholders of CFGI, Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway, New York,

New York, 10019, Attention: Adam L. Shiff, Esq.; (k) trustee under CFGI's prepetition floating

rate junior subordinated indenture, Law Debenture Trust Company of New York, 767 Third

Avenue, Thirty First Floor, New York, New York, 10017, Attention: Corporate Trust

Administration; (l) any proposed DIP lender; (m) those creditors holding the thirty (30) largest

unsecured claims against the Debtors' estates (on a consolidated basis); and (n) the Federal

Deposit Insurance Corporation.

## **Basis for Relief Requested**

### I. **Approval of the Sale under Bankruptcy Code Sections 363(b) and 105(a) is Warranted**

36.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (providing

that debtors in possession have "all the rights . . . of a trustee"). In addition, section 105(a)

provides the authority for this Court to carry out the provisions of section 363(b). *See* 11 U.S.C.

§ 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate

to carry out the provisions of this title."). Although section 363(b) does not specify a standard

for determining when it is appropriate for a court to authorize the use, sale or lease of property of

the estate, bankruptcy courts routinely authorize sales of a debtor's assets if the sale is based

upon the sound business judgment of the debtor. *In re Dura Auto. Sys.,* 2007 Bankr. LEXIS

31

2764 at *258 (Bankr. D. Del. 2007) (citing *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d

Cir. 1996)); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063,

1070 (2d Cir. 1983); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly

adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re*

*Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit

adopted the "sound business judgment" test in the *Abbotts Dairies* decision); *In re Montgomery*

*Ward Holding Corp.*, 242 B.R 147, 153 (D. Del. 1999) (same).

37.     When a valid business judgment exists, the law vests the debtor's decision

to sell assets with a strong presumption that "in making a business decision, the directors of a

corporation acted on an informed basis, in good faith, and in honest belief that the action taken

was in the best interests of the company." *In re Dura Auto. Sys.*, 2007 Bankr. LEXIS at *260

(citing *The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re*

*Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Von Gorkum*, 488

A.2d 858, 872 (Del. 1985)).  Once a court is satisfied there is a sound business judgment for the

proposed sale, the court must then determine whether (i) the debtor in possession has provided

the interested parties with adequate and reasonable notice, (ii) the sale price is fair and

reasonable, and (iii) the purchaser is proceeding in good faith. *See, e.g., Del. and Hudson Ry.*

*Co.*, 124 B.R. at 166.

38.     In light of the nature and substantial liquidity needs of the MSB Business,

the financial and market challenges facing the Debtors in trying to maximize the value of the

MSB Business, the extensive marketing efforts to sell the MSB Business, and the fairness of the

terms of the APA, all as set forth above, the Debtors submit they have demonstrated a valid

business justification for the Sale.  The Debtors believe that in the absence of receiving an offer

superior to the APA (such that no Auction would be held), the exercise of the Put Option and a prompt Sale of the MSB Business without further delay necessarily attendant to additional formal marketing presents the best opportunity to maximize and preserve value for their estates. The Debtors also believe that, absent a prompt sale, the value of the MSB Business may decline substantially as a result of counterparties who may seek relief from the automatic stay to allow termination of the servicing agreements without any consideration paid to the Sellers (although the Debtors believe the stay should be maintained to permit the Sale to be effectuated), and substantial downward purchase price adjustments for each day the Sale is not closed past October 1, 2009.

39.    In addition, the Debtors submit that the price offered by Berkadia for the MSB Business is fair and reasonable.    The Debtors thoroughly marketed the MSB Businesss prior to the Commencement Date, and are continuing to market the MSB Business, and, if no higher or better offers are obtained, then the offer made by Berkadia is, in the Debtors' business judgment, the best available offer for the MSB Business.

**II.**    **Approval of the Private Sale to Berkadia is Warranted**

40.    Bankruptcy Rule 6004 sets forth the procedural parameters for asset sales outside of the ordinary course of business and provides that such sales may be effected by either public or private sale.  Fed. R. Bankr. P. 6004(f)(l); *see also* Local Rule 6004-1(iv)(D), which contemplates private sales.  Accordingly, a debtor may sell assets of the estate outside of the ordinary course of business without conducting a public auction thereof, or, as the case may be, soliciting bids higher or better than that contained in a privately negotiated purchase agreement. *See In re Woodscape Ltd. P'ship*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) ("There is no

prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

       41.    It has been held that a "bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)." *In re Ancor Exploration Co.*, 30 B.R. 802, 808 (N.D. Okla. 1983). To this end, Courts in this and other districts often allow a chapter 11 debtor to sell assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code. *See, e.g., In re IH 1 Inc. (f/k/a Indalex Holdings Fin., Inc.)*, No. 09-10982 (PJW) (Bankr. D. Del. Sept. 28, 2009) [Docket No. 673] (approving private sale of nonresidential real property); *In re Goody's, LLC*, No. 09-10124 (CSS) (Bankr. D. Del. Mar. 18, 2009) [Docket No. 507] (approving private sale of certain merchandise); *In re KB Toys, Inc.*, No. 08-13269 (KJC) (Bankr. D. Del. Jan. 14, 2009) [Docket No. 265] (approving private sale where consideration was fair and reasonable, was the highest or best offer, provided a greater recovery for creditors than would be provided by any other available alternative, and constituted reasonably equivalent value and fair consideration); *In re KCMVNO, Inc. (f/k/a Movida Commc'ns, Inc.)*, No. 08-10600 (BLS) (Bankr. D. Del. Dec. 19, 2008) [Docket No. 365] (same); *In re Midway Games, Inc.*, No. 09-20465 (KG) (Bankr. D. Del. Oct. 1, 2008) [Docket No. 657] (same); *In re Powermate Holding Corp.*, No. 08-10498 (KG) (Bankr. D. Del. May 5, 2008) [Docket No. 213] (same); *In re Thompson Prods., Inc.*, No. 08-10319 (PJW) (Bankr. D. Del Mar. 20, 2008) [Docket No. 121] (approving private sale of any and all assets, where private sale was last and best chance to maximize value of debtors' assets and avoid liquidation, and purchase agreement was negotiated at arms'-length and in good faith); *Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*, 233 B.R. 619 (D.P.R. 1999)

(upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving a private sale of a chapter 11 debtor's assets where the standards of section 363(b) were met); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming the right of a chapter 11 debtor to transfer assets by private sale).

42.    Indeed, a debtor is obligated to maximize the return to its estate resulting from an asset sale, whether public or private. *See In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) ("When a debtor or trustee conducts a sale under § 363(b), it has an obligation to maximize revenues for the estate."); *In re Nepsco, Inc.*, 36 B.R. 25, 26 (D. Me. 1983) ("Clearly, the thrust of the statutory scheme is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, *i.e.*, the creditors of the estate."). Accordingly, if a debtor concludes that a particular private purchase offer is the "most advantageous of the estate," a court should defer to the debtor's business judgment. *Bakalis*, 220 B.R. at 532. As noted, having extensively marketed the MSB Business, the Debtors believe that the Sale to Berkadia is a sound exercise of their business judgment and represents the best price for such assets. Therefore, private Sale of the MSB Business is warranted.

## III.    As an Alternative to the Private Sale to Berkadia, the Sellers' Proposed Bidding and Auction Procedures Should be Approved

43.    As stated above, pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. If a superior offer for the MSB Business is received as a result of the Bidding Process Letter, the Sellers intend to hold an Auction pursuant to the Auction procedures proposed above, and to sell the MSB Business to the Successful Bidder. If the Court declines to approve a private sale, however, and instead requires the Sale to be effectuated through a bidding and auction process

RLF1-3474834-1

sanctioned by the Court, the Debtors believe the proposed Bidding Procedures are fair, reasonable and appropriate under the circumstances, and will maximize the sale proceeds received by the estate, which is the paramount goal in any proposed sale of property of the estate. *In re Dura Auto. Sys., Inc.,* 2007 Bankr. LEXIS at *253 ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.") (internal citations omitted).

44.     The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby offering one more opportunity for the Debtors to receive the best possible consideration for the MSB Business. Bidding procedures should be approved when they provide a benefit to the estate by enhancing competitive bidding. *Id.* (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc.,* 181 F.3d 527, 535-537 (3d Cir. 1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate)). The Debtors believe the Bidding Procedures are consistent with other procedures previously approved in this district and other bankruptcy courts.

45.     Although the Debtors believe the purchase price pursuant to the terms set forth in the APA is fair and reasonable, the Debtors submit that, if required, the Bidding Procedures and the Auction will ensure the Debtors' estates exhaust all opportunities to receive the highest or best value available by allowing the market to test the purchase price established in the APA for the MSB Business. Accordingly, if the Court declines to grant Sellers' request for a private sale, the Debtors alternatively request the Court's approval of the process and procedures set forth in the Bidding Procedures for the submission and consideration of competing bids from other interested parties for the MSB Business.

**IV.    Sale of MSB Business Free and Clear of Liens is Warranted**

46.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions are satisfied:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

47.    The Debtors believe that one or more of these tests in section 363(f) of the Bankruptcy Code are easily satisfied with respect to the Sale of the MSB Business. First and foremost, the MSB Business assets are unencumbered by any recorded lien, security interest, mortgage, judgment or other encumbrance. To the extent there is any unrecorded "interest" in the MSB Business other than the Debtors', the Debtors submit that subsection 363(f)(5) would apply to permit the Sale free and clear of such interest. The Debtors believe the rights of any unknown claimant could be valued and allowed as a claim against the Sellers' estates, and thus the claimant could be compelled to accept a money satisfaction of its interest in property, and section 363(f)(5) would be satisfied. *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289, 291

(3d Cir. 2003) (the Court of Appeals for the Third Circuit held that section 363(f)(5) was satisfied in respect of successor liability claims because "[h]ad TWA liquidated its assets under Chapter 7 of the Bankruptcy Code, the claims at issue would have been converted to dollar amounts and the claimants would have received the distribution provided to other general unsecured creditors on account of their claims."). In addition, because the Sellers are unaware of the existence of any interest in, or of the right of any third party to assert such an interest in, the MSB Business, the Sellers submit that the surprise assertion of an interest will be in bona fide dispute, and, therefore, subsection 363(f)(4) would apply.

48.     Because the section 363(f) requirements have been met, Berkadia should not be liable, as a successor to the MSB Business or otherwise, for any of the Debtors' pre-petition liabilities, unless expressly assumed. As a matter of logic, bankruptcy estates would be unable to sell assets for fair value if the estates' liabilities followed the assets. The Third Circuit Court of Appeals has held that a buyer of a debtor's assets pursuant to sections 363(b) or 363(f) takes free from successor liability resulting from any pre-existing claims. *See, e.g.*, *In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of . . . successor liability claims achieves the purpose of [Bankruptcy Code] section 363 intended by Congress"), *aff'd*, 332 F.3d 283, 285 (3d Cir. 2003) ("Because section 363(f) of the Bankruptcy Code permits a sale of property 'free and clear' of an 'interest in such property' and because the claims against TWA here were connected to or arise from the assets sold, we affirm the Bankruptcy Court's order approving the sale 'free and clear' of successor liability.").

**V.**    **Assumption and Assignment of Executory Contracts and Leases is Warranted**

49.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to Court approval, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. 11 U.S.C. § 365. The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease may be assumed is the debtor's "business judgment" that the assumption is in its economic best interests. *See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing the business judgment test as "traditional").

50.    To facilitate and effect the sale of the MSB Business, Berkadia has agreed to take assignment of the Assumed Contracts and Leases. The Debtors believe they can demonstrate at the Sale Hearing that all requirements for assumption and/or assignment of such contracts and leases will be satisfied. The Debtors have evaluated the financial wherewithal of Berkadia and, in exercising their sound business judgment, believe that selling the MSB Business and assuming and assigning the Assumed Contracts and Leases to Berkadia would be in the best interests of their estates. Moreover, as noted above, each non-debtor party to an Assumed Contract or Lease will receive notice of the proposed assumption and assignment, and the proposed cure amount, and have a reasonable opportunity to object thereto.

**VI.**    **Finding of Good Faith is Warranted**

51.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

39

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Seventh

Circuit in *In re Andy Frain Serv., Inc.*, held that:

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings.  Typically,
> the misconduct that would destroy a purchaser's good faith status at a
> judicial sale involves fraud, collusion between the purchaser and other
> bidders or the trustee, or an attempt to take grossly unfair advantage of
> other bidders.

798 F.2d 1113, 1125 (7th Cir. 1986) (emphasis and citations omitted).

52.    Berkadia is an entity unrelated to the Debtors.  The APA was intensely

negotiated at arm's length with all parties involved acting in good faith, and each party was

represented by sophisticated counsel.  The Debtors are unaware of any facts or circumstances

that might compromise or taint Berkadia's good faith in negotiating and entering into the APA.

Accordingly, the Debtors request the Court to determine that Berkadia has acted in good faith

and is entitled to the protections of a good faith purchaser under section 363(m) of the

Bankruptcy Code.

## VII.    Relief From Ten-Day Waiting Periods

53.    The Debtors request the Court to waive the ten-day stay period under

Bankruptcy Rules 6004(h) and 6006(d) and order that, if and when entered, the Sale Order be

effective immediately.  Bankruptcy Rule 6004(h) provides that an "order authorizing the use,

sale, or lease of property . . . is stayed until the expiration of ten days after entry of the order,

unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order

authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the

expiration of 10 days after the entry of the order, unless the court orders otherwise."

54.    The purpose of these rules is to provide sufficient time for an objecting

party to appeal before an order can be implemented.  *See* Advisory Committee Notes to

Bankruptcy Rules 6004(h) and 6006(d).  Although these rules and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the ten-day stay period, Collier on Bankruptcy suggests the ten-day stay period should be waived to allow a transaction to close immediately "where there has been no objection to the procedure."  10 Collier on Bankruptcy 15th Ed. Rev. ¶ 6004.10 (15th rev. ed. 2006).  Further, it suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  *Id.*

## Notice

55.    No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.  Notice of this Motion has been provided by facsimile, electronic mail transmission, overnight delivery and/or hand delivery to (i) the Office of the United States Trustee for the District of Delaware, (ii) Citibank, N.A. and Citicorp North America, Inc., as administrative agents under the Debtors' prepetition senior credit facility, bridge loan agreement and term loan facility, (iii) Deutsche Bank Trust Company Americas, as trustee under the prepetition senior unsecured floating rate note and 5.875% senior unsecured note indentures, (iv) Wilmington Trust FSB, as successor trustee under the prepetition 6.300% senior unsecured note indenture, (v) counsel for the ad hoc committee of prepetition unsecured bondholders of CFGI, (vi) Law Debenture Trust Company of New York, as trustee under CFGI's prepetition floating rate junior subordinated indenture, (vii) any proposed DIP lender, (viii) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis), (ix) counsel to Berkadia, and (x) the Federal Deposit Insurance Corporation.  The Debtors submit that no other or further notice need be provided.

41

**No Previous Request**

56.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request (i) entry of the Sale Hearing Order, attached hereto as Exhibit A, (ii) at the completion of the Sale Hearing, entry of the Sale Order, attached hereto as Exhibit B, and (iii) such other and further relief as the Court deems just and proper.

Dated: October 25, 2009
       Wilmington, Delaware

Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Jason M. Madron (No. 4431)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  302.651.7700
Facsimile:  302.651.7701

-and-

Martin J. Bienenstock
Michael P. Kessler
Judy G.Z. Liu
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone:  212.259.8000
Facsimile:  212.259.6333

*Proposed Attorneys for the Debtors and
Debtors in Possession*