## EXHIBIT C

**(Asset Put Agreement)**

**EXECUTION VERSION**

**ASSET PUT AGREEMENT**

**BY AND AMONG**

**BERKADIA III, LLC,**

**CAPMARK FINANCE INC.,**

**CAPMARK CAPITAL INC.**

and

**CAPMARK FINANCIAL GROUP INC.**

and with respect to Sections 2.5, 10.5, 10.7, 10.11, 10.16 and 10.17 only

**LEUCADIA NATIONAL CORPORATION**

and

**BERKSHIRE HATHAWAY INC.**

**Dated as of September 2, 2009**

# TABLE OF CONTENTS

Page

ARTICLE I      DEFINITIONS...................................................................................... 1
    SECTION 1.1.      Definitions.................................................................... 1
ARTICLE II      THE PUT, PURCHASE AND SALE............................................ 20
    SECTION 2.1.      The Put Option.......................................................... 20
    SECTION 2.2.      Purchase and Sale .................................................... 20
    SECTION 2.3.      Consideration ........................................................... 22
    SECTION 2.4.      Adjustment Amount.................................................. 23
    SECTION 2.5.      Guaranty.................................................................... 25
    SECTION 2.6.      Purchase Price Allocation ........................................ 25
ARTICLE III      REPRESENTATIONS AND WARRANTIES OF THE
               SELLERS........................................................................ 26
    SECTION 3.1.      Organization and Qualification................................. 26
    SECTION 3.2.      Subsidiary ................................................................. 26
    SECTION 3.3.      Authorization ............................................................ 27
    SECTION 3.4.      No Violation............................................................... 27
    SECTION 3.5.      Consents and Approvals ........................................... 28
    SECTION 3.6.      Brokers' Fees and Commissions............................... 28
    SECTION 3.7.      Title to Acquired Assets; Sufficiency. ..................... 28
    SECTION 3.8.      Contracts ................................................................... 30
    SECTION 3.9.      Legal Proceedings..................................................... 31
    SECTION 3.10.      Intellectual Property................................................. 31
    SECTION 3.11.      Real Property ............................................................ 31
    SECTION 3.12.      Environmental Matters.............................................. 32
    SECTION 3.13.      Licenses; Compliance with Laws ............................ 33
    SECTION 3.14.      Employee Benefit Plans............................................ 34
    SECTION 3.15.      Labor Relations......................................................... 35
    SECTION 3.16.      Financial Matters ...................................................... 35
    SECTION 3.17.      Taxes......................................................................... 35
    SECTION 3.18.      Purchased and Serviced Loans................................. 36
    SECTION 3.19.      Servicing Agreements and Securitizations ............. 39

**TABLE OF CONTENTS**
**(continued)**

Page

| | | |
|---|---|---|
| SECTION 3.20. | Disclaimer of Other Representations and Warranties | 40 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF THE PURCHASER | 40 |
| SECTION 4.1. | Organization and Qualification | 40 |
| SECTION 4.2. | Authorization | 40 |
| SECTION 4.3. | No Violation | 41 |
| SECTION 4.4. | Consents and Approvals | 41 |
| SECTION 4.5. | Brokers' Fees and Commissions | 41 |
| SECTION 4.6. | Legal Proceedings | 41 |
| SECTION 4.7. | Purchase for Investment | 42 |
| SECTION 4.8. | Inspections; Limitation of Sellers Warranties | 42 |
| SECTION 4.9. | OFAC | 42 |
| ARTICLE V | COVENANTS | 42 |
| SECTION 5.1. | Conduct of Business of the Sellers Prior to the Closing | 42 |
| SECTION 5.2. | Access to Information | 46 |
| SECTION 5.3. | All Reasonable Efforts | 47 |
| SECTION 5.4. | Consents and Approvals; Purchased Contracts | 47 |
| SECTION 5.5. | Public Announcements | 51 |
| SECTION 5.6. | Disclosure Supplements | 52 |
| SECTION 5.7. | Employee Benefit Matters. | 52 |
| SECTION 5.8. | Confidentiality | 55 |
| SECTION 5.9. | Control of Business | 55 |
| SECTION 5.10. | Non-Solicitation; Additional Confidentiality Provisions | 55 |
| SECTION 5.11. | Non-Competition | 57 |
| SECTION 5.12. | Tax Matters | 57 |
| SECTION 5.13. | Notice and Cure | 58 |
| SECTION 5.14. | Names and Mark; Name Changes | 58 |
| SECTION 5.15. | Indian Subsidiary Net Worth | 60 |
| SECTION 5.16. | Capmark Bank Contracts | 60 |

## TABLE OF CONTENTS
### (continued)

Page

SECTION 5.17.  Further Assurances ................................................................. 60

SECTION 5.18.  Additional Post-Closing Covenants of the Sellers ............................. 60

SECTION 5.19.  Purchased Real Property Leases ............................................... 60

SECTION 5.20.  Late Charges .................................................................... 60

ARTICLE VI     CLOSING CONDITIONS ............................................................ 61

SECTION 6.1.   Conditions to the Obligations of the Purchaser Under this Agreement ........ 61

SECTION 6.2.   Conditions to the Obligations of the Sellers under this Agreement .......... 63

ARTICLE VII    CLOSING ........................................................................ 64

SECTION 7.1.   Closing ........................................................................ 64

ARTICLE VIII   INDEMNIFICATION ................................................................ 66

SECTION 8.1.   Indemnification ................................................................ 66

ARTICLE IX     TERMINATION AND ABANDONMENT .................................................. 70

SECTION 9.1.   Termination .................................................................... 70

SECTION 9.2.   Procedure and Effect of Termination ......................................... 70

ARTICLE X      MISCELLANEOUS PROVISIONS ...................................................... 71

SECTION 10.1.  Survival of Representations and Warranties .................................. 71

SECTION 10.2.  Amendment and Modification .................................................. 71

SECTION 10.3.  Validity ....................................................................... 72

SECTION 10.4.  Expenses and Obligations ..................................................... 72

SECTION 10.5.  Specific Performance ......................................................... 72

SECTION 10.6.  Auction Process ............................................................... 72

SECTION 10.7.  Parties in Interest ........................................................... 72

SECTION 10.8.  Construction ................................................................... 73

SECTION 10.9.  Severability ................................................................... 73

SECTION 10.10. Notices ........................................................................ 73

SECTION 10.11. Governing Law ................................................................. 74

SECTION 10.12. Counterparts ................................................................... 74

**TABLE OF CONTENTS**
**(continued)**

Page

SECTION 10.13. Headings ..................................................................... 75

SECTION 10.14. Entire Agreement ........................................................ 75

SECTION 10.15. Assignment ................................................................. 75

SECTION 10.16. Jurisdiction and Venue................................................. 75

SECTION 10.17. Waiver of Jury Trial..................................................... 75

SECTION 10.18. Interpretation............................................................... 76

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of DUS Note |
| Exhibit B | Form of Holdback Note |
| Exhibit C | Terms of Dynex Fannie Mae Note |
| Exhibit D | Terms of Dynex Freddie Mac Note |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(i) | Acquired Assets |
| Schedule 1.1(ii) | [RESERVED] |
| Schedule 1.1(iii) | Sellers Knowledge Persons |
| Schedule 1.1(iv) | Purchaser Knowledge Persons |
| Schedule 1.1(v) | Lease Agreements |
| Schedule 1.1(vi) | Servicing Agreements |
| Schedule 1.1(vii) | June Proforma Accruals and Adjustment |
| Schedule 1.1(viii) | Servicing Adjustment |
| Schedule 1.1(ix) | Retention Adjustment |
| Schedule 1.1(x) | June Data Tape Adjustment |
| Schedule 1.1(xi) | Form of Horsham Lease Agreements |
| Schedule 1.1(xii) | Form of Software License Agreement |
| Schedule 1.1(xiii) | Form of Capmark Capital Subservicing Agreement |
| Schedule 1.1(xiv) | Form of Capmark Finance Servicing Agreement |
| Schedule 1.1(xv) | Form of Capmark Finance Subservicing Agreements |
| Schedule 1.1(xvi) | Form of Transition Services Agreement |
| Schedule 2.2(b) | Excluded Assets |
| Schedule 3.16(b) | Unaudited Balance Sheet of the Indian Subsidiary |
| Schedule 5.1(b) | Conduct of Business of the Sellers Prior to the Closing |

Sellers Disclosure Schedule
Purchaser Disclosure Schedule

## ASSET PUT AGREEMENT

**ASSET PUT AGREEMENT**, dated September 2, 2009, by and among Berkadia III, LLC, a Delaware limited liability company (the "Purchaser"), CAPMARK FINANCE INC., a California corporation ("Capmark Finance"), CAPMARK CAPITAL INC., a Colorado corporation ("Capmark Capital"), and CAPMARK FINANCIAL GROUP INC., a Nevada corporation ("Parent" and, collectively with Capmark Finance and Capmark Capital, the "Sellers") and solely with respect to Sections 2.5, 10.5, 10.7, 10.11, 10.16 and 10.17 hereof, LEUCADIA NATIONAL CORPORATION, a New York corporation ("Leucadia"), BERKSHIRE HATHAWAY INC., a Delaware corporation ("Berkshire" and together with Leucadia, the "Limited Guarantors").

### RECITALS:

WHEREAS, the Sellers presently conduct the Mortgage Business (as hereinafter defined);

WHEREAS, the Purchaser desires to grant and sell to the Sellers, and the Sellers desire to acquire and purchase from the Purchaser, the Put Option (as hereinafter defined), subject to and in accordance with the terms and conditions of this Agreement (as hereinafter defined); and

WHEREAS, the Purchaser and the Sellers desire to make certain representations, warranties and agreements in connection with the Put Option and the sale, transfer, assignment, acquisition and assumption of the Acquired Assets (as hereinafter defined) and Assumed Liabilities (as hereinafter defined) contemplated thereby upon the exercise of the Sellers' rights under the Put Option, and also desire to set forth various conditions precedent thereto.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements herein contained, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

SECTION 1.1. Definitions. For purposes of this Agreement, the term:

"Accruals" means an amount equal to the result of the following, without duplication, as of the Closing Date, but in each case only to the extent included in the Acquired Assets transferred to (and, in the case of clauses (i) and (j) below, Assumed Liabilities assumed by) the Purchaser on the Closing Date: (a) the amount of Advances outstanding with respect to Servicing Agreements, (b) plus unpaid (accreted) principal balance of, and accrued and unpaid interest on, the Purchased Loans (including any

1

outstanding construction loan draws), (c) plus accrued and unpaid Servicing Fees, (d) plus accrued and unpaid Ancillary Income (including Advance Interest but excluding late charges), (e) plus prepaid expenses on Purchased Contracts assigned to the Purchaser, (f) plus security deposits funded by the Sellers for the Purchased Real Property Leases, (g) plus accounts receivable, (h) plus accrued and unpaid placement fees (interest float) due to the Sellers with respect to Custodial Accounts and other accounts transferred to the Purchaser by the Sellers, (i) minus good faith deposits and similar deposits of potential borrowers held by the Sellers in respect of Pipeline Transactions, (j) minus earned and unpaid commissions related to the Purchased Loans due to any Hired Employee; each of the foregoing shall be calculated consistent with the June proforma estimates of such amounts set forth on Schedule 1.1(vii).

"Acquired Assets" means all Properties, rights and claims of the Sellers primarily used in, or related primarily to, the Mortgage Business, wherever situated and of whatever kind and nature (tangible or intangible, and whether or not reflected on the books and records of Sellers), including all of the following: (a) Purchased Contracts (including the Servicing Agreements, Service Provider Agreements, Loan Applications, Committed Loans, Purchased Loans, Purchased Real Property Leases and Pipeline Transactions) and all rights thereunder, (b) Purchased IP and Purchased IT Systems, (c) Purchased Equity Interest, (d) Purchased Fixtures and Equipment, (e) Mortgage Business Books and Records, (f) prepaid expenses, security deposits funded by the Sellers, accounts receivable, and insurance claims (including HUD Mortgage Insurance claims), each to the extent related to a Purchased Contract or the Mortgage Business, (g) Servicing Rights, (h) Advances, (i) all assignable Licenses of the Sellers relating to the Mortgage Business, (j) all assignable rights of the Sellers under non-disclosure, non-compete or non-solicitation agreements with current or former employees, consultants or agents, or third parties, relating to the Mortgage Business, (k) all assignable rights of the Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to any Acquired Assets or Assumed Liabilities, (l) all goods and services and other economic benefits to be received subsequent to the Closing arising out of prepayments and payments by the Sellers prior to the Closing relating to the Acquired Assets, (m) all insurance (and proceeds thereof) to the extent received or receivable in respect of Acquired Assets or Assumed Liabilities in respect of events occurring after the date of this Agreement, (n) to the extent not otherwise enumerated above, all items that constitute Accruals, and (o) all other assets that are set forth on Schedule 1.1(i); provided that the Acquired Assets shall not include the Excluded Assets.

"Adjustment Amount" has the meaning set forth in Section 2.4(a).

"Advance Interest" means the interest that accrues or has accrued on an Advance pursuant to the applicable Servicing Agreement.

"Advances" means, with respect to any Servicing Agreement, the aggregate amount that as of any date of determination has been advanced directly by Sellers or their Affiliates from their own funds or funds borrowed by Sellers or their

2

Affiliates from a third party (but not with funds borrowed from any Custodial Account or other accounts under a Servicing Agreement) in connection with servicing the Serviced Loans in accordance with the terms of such Servicing Agreement, including with respect to principal, interest, overdrafts, taxes, property protection and insurance premiums, together with the related accrued Advance Interest.

"Affiliate" of any Person means another Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person; provided that with respect to any Person, the term "Affiliate" shall not include investment funds managed by such Person or any of its Affiliates.

"Agreement" means this Asset Put Agreement and all schedules and exhibits hereto.

"Ancillary Income" means all revenue or income payable to the Servicer with respect to the Serviced Loans (other than Servicing Fees) including any and all assumption fee income, defeasance fees, rights to reimbursement for Advances (including all accrued and unpaid Advance Interest), late charges, overdrafts and default interest.

"Assignment and Assumption Agreement" means an assignment and assumption agreement in form and substance customary for a transaction of the kind contemplated by this Agreement.

"Assignment of Intellectual Property" means an assignment of Intellectual Property in form and substance customary for a transaction of the kind contemplated by this Agreement.

"Assumed Liabilities" means (a) all of the Liabilities of the Sellers to be performed after the Closing Date under the Purchased Contracts (including the Servicing Agreements, Purchased Loans, Service Provider Agreements, Loan Applications, Committed Loans, Purchased IP and Purchased Real Property Leases, in each case, to the extent constituting Acquired Assets), (b) all of the Liabilities of the Sellers to be performed after the Closing Date under the Pipeline Transactions entered into prior to the date of this Agreement and all Pipeline Transactions entered into subsequent to the date of this Agreement in compliance with Section 5.1, (c) all of the Sellers' duties, obligations, representations, warranties and Liabilities (in each case, other than pre-Closing Legal Proceedings) under the Contracts with the Mortgage Program Sponsors with respect to the Mortgage Programs arising or to be performed prior to, on or after the Closing Date, but only to the extent that the Mortgage Program Sponsors expressly condition their approval and execution of the Fannie Mae Transfer Agreement or the Freddie Mac Transfer Agreement, granting of a License or Required Consent to the Purchaser by Ginnie Mae or HUD, or consenting to the transfer of a Purchased Contract to the Purchaser, as the case may be, upon the express assumption by the Purchaser of, and the prohibition of recourse by the Purchaser from or against the Sellers in respect of, such pre-Closing duties, obligations, representations, warranties and Liabilities, (d) all Liabilities to refund the good faith deposits and similar deposits of potential borrowers in

3

respect of Pipeline Transactions transferred to the Purchaser to be performed after the Closing Date, and (e) earned and unpaid commissions related to the Purchased Loans due to any Hired Employee; provided that Assumed Liabilities shall not include any Excluded Liabilities or, except to the extent otherwise provided under clause (c) above, any Liabilities (1) arising out of or otherwise related to any breach, violation or default by a Seller or any Affiliate thereof or (2) for which a Seller is required to provide indemnification, contribution or other recourse in respect of pre-Closing representations, events, actions or omissions.

"Balance Sheet Date" has the meaning set forth in Section 3.16(b).

"Bankruptcy Code" means the United States Code, 11 U.S.C. § 101 et seq.

"Bankruptcy Court Order" has the meaning set forth in Section 6.1(n).

"Base Amount" has the meaning set forth in Section 2.3(a).

"Base Salary Amount" has the meaning set forth in Section 3.14(h).

"Basket" has the meaning set forth in Section 8.1(c)(i).

"Beekman" means Beekman Advisors LLC.

"Benefit Plans" has the meaning set forth in Section 3.14(a).

"Berkshire" has the meaning set forth in the Preamble.

"Bill of Sale and General Assignment" means a bill of sale and general assignment in form and substance customary for a transaction of the kind contemplated by this Agreement.

"Borrower" means each obligor in respect of a Serviced Loan.

"Business Day" means any day other than a Saturday, a Sunday, a legal holiday in the State of New York or a day on which banking institutions in the State of New York are authorized or obligated by law to close.

"Business Employee" has the meaning set forth in Section 5.7(a).

"Business Licenses" has the meaning set forth in Section 3.13.

"Cap" has the meaning set forth in Section 8.1(c)(ii).

"Capmark Bank Contracts" has the meaning set forth in Section 5.16.

"Capmark Capital" has the meaning set forth in the Preamble.

4

"Capmark Capital Subservicing Agreement" means that certain subservicing agreement by and between Capmark Capital and Purchaser, substantially in the forms attached hereto as Schedule 1.1(xiii).

"Capmark Finance" has the meaning set forth in the Preamble.

"Capmark Finance Servicing Agreement" means that certain servicing agreement by and between Capmark Finance and Purchaser, substantially in the forms attached hereto as Schedule 1.1(xiv).

"Capmark Finance Subservicing Agreements" means those certain subservicing agreements by and between Capmark Finance and Purchaser, substantially in the forms attached hereto as Schedule 1.1(xv).

"Closing" has the meaning set forth in Section 7.1.

"Closing Adjustment" has the meaning set forth in Section 2.4(a).

"Closing Date" has the meaning set forth in Section 7.1.

"Closing Period" has the meaning set forth in Section 7.1.

"Closing Resolution Period" has the meaning set forth in Section 2.4(e).

"Code" means the Internal Revenue Code of 1986, as amended.

"Committed Loans" means unexpired written commitments by any of the Sellers to make loans under one or more Mortgage Programs to prospective borrowers which commitments have not yet funded or closed and are listed on Schedule 1.1(i), as updated pursuant to Section 2.2(e).

"Confidential Information" means all confidential, proprietary and/or non-public financial or other information concerning a Party or its Affiliates, including information concerning the assets, liabilities, accounting practices and general operations of such Party or its Affiliates, and all analyses, summaries, notes, and written or electronic records prepared by a Recipient that reflect upon, or are based upon, such information that is furnished to a Recipient in connection with this Agreement, any Transaction Document or the transactions contemplated hereby or thereby; provided, however, that Confidential Information shall not include information that: (a) is or becomes generally available to the public through no violation of this Agreement, (b) is or becomes available to the Recipient on a non-confidential basis from a source other than a Disclosing Party or its Affiliates that is not known to the Recipient to be prohibited from disclosing such information by a contractual, legal or fiduciary obligation of confidentiality, (c) is independently developed by the Recipient without use of or reliance on, either directly or indirectly, the Confidential Information, or (d) was known to or in the possession of the Recipient on a non-confidential basis prior to disclosure by a Disclosing Party under the terms of this Agreement.

"Contract" means any contract, agreement, indenture, note, bond, loan, instrument, lease, conditional sales contract, Mortgage, License, franchise, insurance policy, commitment or other arrangement or agreement.

"Contribution Agreement" has the meaning set forth in Section 5.4(h)(i).

"Control" (including, with correlative meanings, the terms "Controlled by", "Controlling" and "under common Control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Custodial Accounts" means those certain cash accounts, Escrow Accounts, reserve accounts and lockbox accounts held by any of the Sellers pursuant to or as contemplated by a Servicing Agreement, including all bank accounts and investment accounts established and maintained under, or in connection with, the Mortgage Programs and the applicable Contracts for the purpose of holding deposits of principal and interest, tax, insurance, replacement reserves, and other reserves required of borrowers under the Purchased Loans and with respect to the Serviced Loans.

"Customer" means (a) any Person that is an obligor, borrower, or purchaser under any Purchased Loan and (b) any Person that guarantees or is otherwise liable to the Sellers for all or part of the obligations of any such obligor, borrower, purchaser or lessee.

"Data Tape" means, with reference to a particular date, a date tape containing all of the information as of such date with respect to Mortgage Loans, Serviced Loans and Servicing Agreement included in the as part of the Mortgage Business of the same type and in the same detail as is contained in the June Data Tape.

"Day Sixty" means the date that is the 60th day immediately following the date of this Agreement.

"DBRS" means DBRS, Inc. and its successors and assigns.

"Disabling Code" has the meaning set forth in Section 5.4(h)(ii).

"Disclosing Party" means a Party that discloses or has disclosed (or whose Affiliate or Representative discloses or has disclosed) Confidential Information to a Recipient in connection with this Agreement, any Transaction Document or the transactions contemplated hereby or thereby.

"DOJ" has the meaning set forth in Section 3.5.

"Draft Adjustment" has the meaning set forth in Section 2.4(c).

6

"DUS Note" means a promissory note of the Purchaser payable to Capmark Finance, substantially in the form attached hereto as Exhibit A.

"Dynex Fannie Mae Loans" means the portfolio of eleven (11) multifamily mortgage loans sold by Capmark Capital to Fannie Mae pursuant to the Special Pool Purchase Contract dated August 2, 2001 between Capmark Capital and Fannie Mae (the "Dynex Fannie Mae Contract").

"Dynex Fannie Mae Note" means a promissory note of the Purchaser payable to Parent consistent with the terms set forth on Exhibit C.

"Dynex Fannie Mae Note Principal Amount" means an amount equal to the maximum Liability of Capmark Capital for losses with respect to the Dynex Fannie Mae Loans under the Dynex Fannie Mae Contract as of the Closing Date.

"Dynex Freddie Mac Loans" means the portfolio of thirteen (13) multifamily mortgage loans sold by Capmark Capital to Freddie Mac pursuant to the Purchase Agreement for Multifamily PC Swaps dated September 24, 2004 between Capmark Capital and Freddie Mac (the "Dynex Freddie Mac Contract").

"Dynex Freddie Mac Note" means a promissory note of the Purchaser payable to Parent consistent with the terms set forth on Exhibit D.

"Dynex Freddie Mac Note Principal Amount" means an amount equal to the maximum Liability of Capmark Capital for losses with respect to the Dynex Freddie Mac Loans under the Dynex Freddie Mac Contract as of the Closing Date.

"Earnings Adjustment Amount" means an amount equal to (a) $394,000 multiplied by (b) the number of days from and including October 1, 2009 through the Closing Date.

"Environmental, Health, and Safety Requirements" means all applicable federal, state, local, and foreign Laws worker health and safety as related to environmental matters, pollution or protection of the environment or natural resources including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any Hazardous Materials, as such Laws are enacted and in effect on or prior to the Closing Date.

"Epitome" has the meaning set forth in Section 5.4(h)(i).

"Equity Securities" means, with respect to any Person, any and all shares, interests, participations, options, warrants, rights in or other equivalents (however designated, whether voting or non-voting) in the equity capital of such Person, whether outstanding on the date of this Agreement or issued hereafter.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Account" means an account maintained for the deposit of Escrow Payments for one or more Serviced Loans.

"Escrow Payments" means, for each Serviced Loan, any payments required to be escrowed by the Borrower or other third party pursuant to the requirements of the Serviced Loan Documents, including amounts constituting ground rents, taxes, assessments, water fees, sewer fees, municipal charges, fire and hazard and other insurance premiums, replacement reserves, tenant improvement and leasing commission reserves, debt service reserves, construction, rehabilitation or repair amounts and/or any other reserve held in connection with or as collateral for, the Serviced Loan, and amounts held in lieu of payments such as letters of credit and other non-cash items.

"Estimated Accruals" means the aggregate amount of Accruals estimated in good faith by the Sellers and the Purchaser (or by Beekman, in the event the parties do not agree) at least three (3) Business Days prior to the Closing Date consistent with the proforma Accruals as of June 30, 2009 set forth on Schedule 1.1(vii).

"Estimated Adjustment" means an amount (which may be a negative number) equal to 90% of the result of (a) the Estimated Accruals (b) minus the Estimated Servicing Adjustment Amount (c) minus the Estimated Retention Adjustment Amount (d) minus the Estimated June Data Tape Adjustment Amount.

"Estimated June Data Tape Adjustment Amount" means the June Data Tape Adjustment Amount estimated in good faith by the Sellers and the Purchaser (or by Beekman, in the event the parties do not agree) at least three (3) Business Days prior to the Closing Date, consistent with Schedule 1.1(x).

"Estimated Retention Adjustment Amount" means the Retention Adjustment Amount estimated in good faith by the Sellers and the Purchaser (or by Beekman, in the event the parties do not agree) at least three (3) Business Days prior to the Closing Date, consistent with Schedule 1.1(ix).

"Estimated Servicing Adjustment Amount" means the Servicing Adjustment Amount estimated in good faith by the Sellers and the Purchaser (or by Beekman, in the event the parties do not agree) at least three (3) Business Days prior to the Closing Date, consistent with Schedule 1.1(viii).

"Exchange Act" means the Securities and Exchange Act of 1934, as amended.

"Exchange Act Rules" means the rules and regulations promulgated under the Exchange Act.

8

"Excluded Assets" has the meaning set forth in Section 2.2(b).

"Excluded Liabilities" has the meaning set forth in Section 2.2(d).

"Fannie Mae" means the Federal National Mortgage Association.

"Fannie Mae Transfer Agreement" means the agreement or agreements by and among Fannie Mae, the Sellers and the Purchaser, relating to the assignment by the Sellers and the assumption by the Purchaser of the Sellers' rights and Liabilities relating to the Fannie Mae DUS program and other programs and agreements with Fannie Mae which are Assumed Liabilities, and the release by Fannie Mae of the Sellers from all Assumed Liabilities with respect thereto unless Fannie Mae expressly conditions its execution of the Fannie Mae Transfer Agreement upon the Sellers remaining liable with respect thereto, in which case the Fannie Mae Transfer Agreement shall not contain such release.

"Final Order" means an Order: (a) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending or (b) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; provided that the theoretical possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed with respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

"Fitch" means Fitch Ratings, Ltd. and its successors and assigns.

"Freddie Mac" means the Federal Home Loan Mortgage Corp.

"Freddie Mac Transfer Agreement" means the agreement or agreements by and among Freddie Mac, the Sellers and the Purchaser, relating to the assignment by the Sellers and the assumption by the Purchaser of the Sellers' rights and Liabilities relating to the Multifamily Program Plus Seller/Servicer program and other programs and agreements of Freddie Mac which are Assumed Liabilities, and the release by Freddie Mac of the Sellers from all Assumed Liabilities with respect thereto, unless Freddie Mac expressly conditions its execution of the Freddie Mac Transfer Agreement upon the Sellers remaining liable with respect thereto, in which case the Freddie Mac Transfer Agreement shall not contain such release.

"GAAP" means United States generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby.

"Ginnie Mae" means the Government National Mortgage Association.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, or any political subdivision thereof, whether federal, state, local or foreign, or any agency or instrumentality thereof, or any court.

"Guaranteed Obligations" has the meaning set forth in Section 2.5.

"Hazardous Materials" means any and all substances, materials or wastes that are regulated, defined, classified or otherwise characterized as "hazardous," "toxic," a "pollutant" or "contaminant" under any Environmental, Health and Safety Requirement, and including crude oil, petroleum and its derivatives and by-products, asbestos and asbestos-containing materials, lead, lead-based paint, mold, polychlorinated biphenyls and urea formaldehyde.

"Hired Employee" has the meaning set forth in Section 5.7(a).

"Holdback Note" means a promissory note of the Purchaser payable to Parent in the principal amount of $40,000,000, which shall mature on the second anniversary of the Closing Date and bear interest at the rate of 6% per annum, substantially in the form attached hereto as Exhibit B.

"Horsham Lease Agreements" means those certain lease agreements between Parent and the Purchaser for the lease of Horsham Premises to Purchaser, substantially in the form attached hereto as Schedule 1.1(xi).

"Horsham Premises" has the meaning set forth in Section 3.11(a).

"HSR Act" has the meaning set forth in Section 3.5.

"HUD" means the U.S. Department of Housing and Urban Development, and includes, without limitation, the Federal Housing Administration.

"HUD Mortgage Insurance" means insurance by HUD under the National Housing Act against loss occasioned by a default on a Serviced Loan.

"Indebtedness" of any Person means any of the following Liabilities or obligations of such Person: (a) indebtedness for borrowed money (including any principal, premium, accrued and unpaid interest), (b) liabilities evidenced by bonds, debentures, notes, or other similar instruments or debt securities, (c) liabilities under or in connection with letters of credit or bankers' acceptances or similar items (in each case whether or not drawn, contingent or otherwise), (d) liabilities related to the deferred purchase price of property or services other than those trade payables incurred in the ordinary course of business, (e) liabilities arising from cash/book overdrafts, (f) liabilities under leases which, under GAAP or other applicable accounting principles, are required

10

to be capitalized for balance sheet purposes, (g) liabilities under conditional sale or other title retention agreements, (h) liabilities with respect to vendor advances or any other advances, (i) liabilities under interest rate or currency swap transactions (valued at the termination value thereof), and (j) all Liabilities or obligations of any other Person of the type referred in to in clauses (a) through (i) guaranteed by such Person.

"Independent Accountants" has the meaning set forth in Section 2.4(e).

"Indian Material Contracts" has the meaning set forth in Section 3.8(b).

"Indian Premises" has the meaning set forth in Section 3.11(b).

"Indian Subsidiary" means CapMark Overseas Processing India Private Limited, an Indian company incorporated with limited liability.

"Indian Subsidiary Leases" has the meaning set forth in Section 3.11(b).

"Indian Transfer Deed" has the meaning set forth in Section 7.1(a)(ii).

"Insolvency Proceeding" means a voluntary or involuntary petition for liquidation or reorganization relief pursuant to the Bankruptcy Code, or a proceeding under similar law or statute relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts of any of the Sellers or the Indian Subsidiary.

"Intellectual Property" means (a) all registered and unregistered trademarks, service marks, trade names, trade dress, logos, slogans, domain names, and the goodwill associated therewith, (b) all patents, inventions (whether or not patentable), trade secrets, know-how, data, software, tools, methods, and processes, (c) all copyrights and works of authorship, including all computer programs (source and object code) and related documentation, and (d) all registrations and applications for each of the foregoing.

"Investor" means the holders of the legal and/or beneficial rights and benefits in the Serviced Loans pursuant to the Servicing Agreements and/or Mortgage Programs, including the holders of the certificates issued under the Servicing Agreements.

"IRS" means the Internal Revenue Service.

"June Data Tape" means the Data Tape delivered by the Sellers to the Purchaser regarding the Purchased Loans, the Serviced Loans and the Servicing Agreements included in the Acquired Assets and certain information with respect thereto, each as of June 30, 2009.

"June Data Tape Adjustment Amount" means the amount of losses, damages, deficiencies or reduction in value to the Purchaser that, in the aggregate, exceed $1,000,000 from or arising out of misstatements or other errors in the June Data Tape determined in accordance with Schedule 1.1(x).

"Knowledge" means, as of the date the applicable representation is given, (a) with respect to the Sellers, the actual knowledge after reasonable due inquiry of any of the Persons set forth in Schedule 1.1(iii) and (b) with respect to the Purchaser, the actual knowledge after reasonable due inquiry of any of the Persons set forth in Schedule 1.1(iv).

"Laws" means all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law (including common law) of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority.

"Lease Agreements" means those certain lease agreements set forth on Schedule 1.1(v).

"Leased Premises" means the leased premises pursuant to the Purchased Real Property Leases.

"Legal Proceeding" means any judicial, equitable, or administrative action, suit, audit, mediation, arbitration, investigation or proceeding (public, private, or governmental).

"Leucadia" has the meaning set forth in the Preamble.

"Liabilities" means any liability or obligation of any nature (including those that are contingent, unknown, undisclosed, unmatured, unaccrued, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such liability or obligation is required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether such liability or obligation is immediately due and payable.

"License" means any license, approval, registration, permit or other governmental authorization and any license, permit or other authorization granted by any Governmental Authority or Mortgage Program Sponsor.

"Lien" means any Mortgage, pledge, lien, assessment, option, right of first refusal, encumbrance, charge, or other security interest, or any conditional sale Contract, title retention Contract or other Contract to give any of the foregoing.

"Limited Guarantee" has the meaning set forth in Section 2.5.

"Limited Guarantors" has the meaning set forth in the Preamble.

"Loan Applications" means applications to any of the Sellers or their Affiliates for loans under the Mortgage Programs which are not yet Committed Loans as of the Closing Date listed on Schedule 1.1(i), as updated pursuant to Section 2.2(e).

"Losses" has the meaning set forth in Section 8.1(a).

12

"Marks" has the meaning set forth in Section 5.14(a).

"Material Adverse Effect" means any event, change, fact, circumstance or effect, which individually or together with other events, changes, facts, circumstances or effects, resulted, results or would reasonably be expected to result (whether before or after the Closing) in a material adverse effect on the business, financial condition or results of operations of the Mortgage Business, taken as a whole; provided that none of the following (to the extent they do not disproportionately affect a Seller, the Indian Subsidiary or the Mortgage Business compared to other participants in the industries in which the Mortgage Business operates) shall be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect: (a) any adverse change in general business, financial or economic conditions generally in the industries in which the Mortgage Business and the Indian Subsidiary operate, (b) national or international political conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (c) any adverse change in general financial, banking or securities markets (including any disruption thereof and any decline in the price of any market index), (d) changes after the date of this Agreement in GAAP, (e) the performance of any obligations under this Agreement, (f) the announcement or pendency of the transactions contemplated by this Agreement, (g) changes after the date of this Agreement in Laws, rules, regulations or other binding directives issued by any Governmental Authority, (h) the failure of any Seller to meet any analyst estimates or expectations or any projections, forecasts or budgets, (i) any Business Employees not becoming Hired Employees, or (j) in the event of any Insolvency Proceeding with respect to a Seller, the fact, solely in and of itself, that such Seller will be operating as a debtor-in-possession under the Bankruptcy Code; provided that the underlying cause or causes of the changes, events, circumstances or effects with respect to clauses (h) and (j) above may be taken into account in determining whether there has been a Material Adverse Effect.

"Moody's" means Moody's Investors Service, Inc. and its successors and assigns.

"Mortgage" means a mortgage, deed of trust, pledge, or collateral assignment of a property trust beneficiary interest or other instrument creating a Lien on or ownership interest in a Mortgaged Property.

"Mortgage Banking Business" means the business of soliciting, originating, underwriting, financing, refinancing or brokering of Mortgages, mortgage loans, Serviced Loans or Pipeline Transactions as conducted by the Sellers in the United States.

"Mortgage Business" means, collectively, the Mortgage Servicing Business and the Mortgage Banking Business.

13

"Mortgage Business Books and Records" means all Servicing Files, books, ledgers, files, reports, plans, records, manuals, forms, letters, tapes and other materials (in each case whether in paper, tape, electronic or other form) primarily of, or maintained primarily for, or primarily related to, the Mortgage Business, other than those relating to any Taxes or Tax Returns of the Sellers or their Affiliates.

"Mortgage Business Confidential Information" has the meaning set forth in Section 5.10(d)(i).

"Mortgage Program Sponsor" means each of Ginnie Mae, Fannie Mae, Freddie Mac and HUD.

"Mortgage Programs" means the multifamily mortgage loan programs of Fannie Mae, Freddie Mac, HUD, Ginnie Mae and other governmental agencies, including the Fannie Mae DUS program, the Freddie Mac Multifamily Program Plus Seller/Servicer program, the HUD Modified Accelerated Processing ("MAP") Program and the Ginnie Mae Multifamily MBS program, as issuer servicer, in each case relating solely to Serviced Loans, forward purchase contracts, commitments or pipeline transactions under the Mortgage Programs and relating to the Mortgage Business.

"Mortgage Servicing Business" means the business of servicing Serviced Loans, including acting as a Servicer, conducted by the Sellers in the United States and the Indian Subsidiary.

"Mortgaged Property" means the real and personal property or properties securing any Serviced Loan.

"Non-U.S. Benefit Plan" has the meaning set forth in Section 3.14(f).

"OFAC" has the meaning set forth in Section 4.9.

"Officer's Certificate" means a certificate signed on behalf of the applicable entity by the Manager, Member, Chairman of the Board, the Vice Chairman of the Board, the President, the CEO, a Senior Vice President, Vice President, Associate, Director, Managing Director or Assistant Vice President (each, however denominated), the Treasurer, or the Secretary of the Purchaser, the Sellers or the Indian Subsidiary, as the case may be, authorized to act with respect to a particular matter.

"Order" means any writ, judgment, decision, decree, injunction, ruling, memorandum of understanding, disciplinary action or similar order of any Governmental Authority or Mortgage Program Sponsor (in each such case whether preliminary or final).

"Ordinary Course of Business" means the ordinary and usual course of the Sellers' and the Indian Subsidiary's conduct of the Mortgage Business consistent with past custom and practice.

14

"Organizational Documents" means, with respect to an entity, its articles of incorporation, articles of association, memorandum of association, by-laws, certificate of trust, trust agreement, certificate of formation, limited liability company agreement or operating agreement, as applicable, as the same has been amended from time to time.

"Parent" has the meaning set forth in the Preamble.

"Parties" means collectively the Sellers, the Purchaser, and with respect to Sections 2.5, 10.5, 10.7, 10.11, 10.16 and 10.17 only, the Guarantors.

"Permitted Lien" means any (a) statutory Lien for Taxes not yet due or delinquent, (b) mechanic's, warehouseman's and other statutory Liens arising by operation of Law with respect to a Liability that is not yet due or delinquent and does not arise out of any violation of Law or Contract, and (c) with respect to the Leased Premises, the Horsham Premises and the Indian Premises only, such imperfections of title, charges, easements, restrictions or encumbrances which individually and in the aggregate do not materially interfere with the present use of such Properties or the use thereof contemplated by the Horsham Lease Agreements, the Purchased Real Property Leases and the Indian Subsidiary Lease.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or, as applicable, any other entity.

"Pipeline Transactions" means all Loan Applications received by and all rate lock agreements and commitments (including forward loan commitments to replace construction loans with permanent loans) issued by any of the Sellers or their Affiliates pursuant to the operation of the Mortgage Business.

"Pre-Closing Data Tape" has the meaning set forth in Section 2.2(e).

"Property" or "Properties" means all property and assets of whatsoever nature, including real and personal property, whether tangible or intangible, and claims, rights and choses in action.

"Purchase and Sale" has the meaning set forth in Section 2.1(a).

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Purchased Contracts" means the Contracts that are acquired by the Purchaser as part of the Acquired Assets (solely to the extent set forth on Schedule 1.1(i) and any other Schedules expressly incorporated by reference therein, as updated in accordance with Section 2.2(e)).

"Purchased Equity Interest" means all of the issued and outstanding Equity Securities of the Indian Subsidiary.

"Purchased Fixtures and Equipment" means all furniture, furnishings, vehicles, equipment, computers, tools, supplies and other tangible personal property related primarily to the Mortgage Business and set forth in Schedule 1.1(i), as updated pursuant to Section 2.2(e).

"Purchased IP" has the meaning set forth in Section 3.10(a).

"Purchased IT Systems" has the meaning set forth in Section 3.10(b).

"Purchased Loans" means those loans listed on Schedule 1.1(i), as updated in accordance with Section 2.2(e), which have been funded by the Sellers or an Affiliate of the Sellers pursuant to the Mortgage Banking Business and held by Sellers pending sale under (and eligible for sale pursuant to) one of the Mortgage Programs.

"Purchased Real Property Leases" has the meaning set forth in Section 5.19.

"Purchased Straddle Contracts" has the meaning set forth in Section 5.4(g).

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Disclosure Schedule" has the meaning set forth in the introductory paragraph of Article IV.

"Purchaser Indemnified Parties" has the meaning set forth in Section 8.1(a).

"Purchaser Plans" has the meaning set forth in Section 5.7(a).

"Purchaser Termination Fee" has the meaning set forth in Section 10.4(b).

"Put Option" has the meaning set forth in Section 2.1(a).

"Put Option Exercise Notice" means the irrevocable written notice of the Sellers' exercise of the Put Option.

"Put Option Fee" has the meaning set forth in Section 2.1(b).

"Put Termination Date" has the meaning set forth in Section 2.1(b).

"Qualified Escrow Accounts" means Custodial Accounts other than those labeled on the June Data Tape as "outside invested" or "account closed."

"Rating Agencies" means, as applicable, any one or more of S&P, Moody's, Fitch and DBRS.

"Recipient" means a Party, its Affiliate or a Party's Representative that receives or has received Confidential Information from a Disclosing Party in connection with this Agreement, any Transaction Document or the transactions contemplated hereby or thereby.

"Remaining Business" has the meaning set forth in Section 5.4(g).

"Representatives" means the members, managers, officers, directors, employees, agents, counsel, accountants, financial or other advisors, lenders and financing sources, consultants and other representatives of any Person.

"Required Consents" means the consents set forth on Section 3.5 of the Sellers Disclosure Schedule.

"Restricted Business" has the meaning set forth in Section 5.11.

"Retained Straddle Contracts" has the meaning set forth in Section 5.4(g).

"Retention Adjustment Amount" means an amount equal to (a) 56.7% of the aggregate amount of the Retention Bonus Amounts due to all of the Hired Employees as set forth on Schedule 1.1(ix) less (b) the aggregate amount of the Retention Bonus Amount actually paid by the Sellers to the Hired Employees between the date of this Agreement and the Closing Date.

"Retention Bonus Amount" has the meaning set forth in Section 3.14(h).

"S&P" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

"Securities Act" means the Securities Act of 1933, as amended.

"Securities Act Rules" means the rules and regulations promulgated under the Securities Act.

"Securitization" means, generally, any transaction in which any Person transferred loans, other debt instruments or interests therein to a trust or other special-purpose entity, either taking back or selling securities or other similar interests and in connection with which a Seller entered into a Servicing Agreement.

"Seeking Party" has the meaning set forth in Section 5.4(g).

"Seller Indemnified Parties" has the meaning set forth in Section 8.1(b).

"Sellers" has the meaning set forth in the Preamble.

"Sellers Disclosure Schedule" has the meaning set forth in the introductory paragraph of Article III.

17

"Service Provider Agreements" means agreements entered into in the Ordinary Course of Business between the Sellers and any third party service providers (such as, without limitation, closing attorneys, title insurers, appraisers, engineers, and environmental firms) for the provision of services relating to the Mortgage Business.

"Serviced Loan" means a mortgage loan on property that is located in the United States and serviced by the Sellers as the Servicer pursuant to a Servicing Agreement.

"Serviced Loan Documents" means, for each Serviced Loan, the documents pertaining to such Serviced Loan, including the Mortgage, the promissory note, all assignments of the Mortgage, all endorsements and allonges to the promissory note, the title insurance policy with all endorsements thereto, any security agreement and financing statements, all documents and agreements establishing and controlling any Escrow Accounts and Custodial Accounts, and any ground lease, guaranty, letter of credit, cash management agreement, indemnity, intercreditor agreement and franchise agreement and any assignments, assumptions, modifications, continuations, or amendments to any of the foregoing.

"Servicer" means the designated capacity of Capmark Finance as "servicer", "primary servicer", "master servicer", "special servicer" or "subservicer" in respect of the applicable Servicing Agreement.

"Servicing Adjustment Amount" means the adjustment determined in accordance with Schedule 1.1(viii) with respect to loss of Servicing Agreements occurring between June 30, 2009 and the Closing Date, whether as a result of cancellation, rights of first refusal, failure to validly assign to Purchaser pursuant to this Agreement, termination of servicing, or otherwise (a "Cancellation").

"Servicing Agreements" means those pooling and servicing agreements, trust and servicing agreements, primary servicing agreements, sub-servicing agreements and other servicing agreements listed on Schedule 1.1(vi), as updated pursuant to Section 2.2(e), pursuant to which the Sellers conduct the Mortgage Servicing Business.

"Servicing Fee" means the servicing fee payable to the Servicer with respect to each Serviced Loan.

"Servicing Files" means the documents, files, and other items pertaining to a particular Serviced Loan, including the computer files, data disks, books, records, Data Tapes, notes and all additional documents held by the Sellers and used in the Mortgage Servicing Business.

"Servicing Rights" means the right to receive the Servicing Fee, Ancillary Income and any other income or other benefit or right arising from or in connection with the servicing of the Serviced Loans or Servicing Agreements, including in respect of Custodial Accounts.

18

"Software License Agreement" means that certain license agreement between Sellers and Purchaser whereby Sellers grant a perpetual, non-exclusive license to Purchaser with respect to certain proprietary software used in the Mortgage Business, substantially in the form attached hereto as Schedule 1.1(xii).

"Spending Accounts" has the meaning set forth in Section 5.7(f).

"Straddle Contracts" has the meaning set forth in Section 5.4(g).

"Subject Sections" has the meaning set forth in Section 6.1(d)(B).

"Survival Period" has the meaning set forth in Section 10.1.

"Tax" or "Taxes" means (a) any and all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, *ad valorem*, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges imposed by any Governmental Authority; (b) all interest, penalties, fines, additions to tax or additional amounts imposed with respect to any item described in clause (a); and (c) any liability in respect of any items described in clauses (a) and/or (b) payable by reason of Contract, assumption, transferee liability, operation of law, Treasury Regulation section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under law) or otherwise.

"Tax Return" means any return, report or statement filed or required to be filed with respect to any Tax (including any elections, declarations, schedules or attachments thereto, and any amendment thereof), including any information return, claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes any of the Sellers or the Indian Subsidiary.

"Taxing Authority" means the Internal Revenue Service and any other Governmental Authority responsible for the administration of any Tax.

"Third Party Claim" has the meaning set forth in Section 8.1(f).

"Total Consideration" has the meaning set forth in Section 2.6.

"Transaction Documents" means this Agreement, the Assignment and Assumption Agreement, the Bill of Sale and General Assignment, the Assignment of Intellectual Property, the Fannie Mae Transfer Agreement, the Freddie Mac Transfer Agreement, the Transition Services Agreement, the Indian Transfer Deed, the DUS Note, the Dynex Fannie Mae Note, the Dynex Freddie Mac Note, the Holdback Note, the Horsham Lease Agreements, the Software License Agreement, the Capmark Capital

Subservicing Agreements, the Capmark Finance Servicing Agreement, and the Capmark Finance Subservicing Agreements.

"Transfer Taxes" has the meaning set forth in Section 5.12(a).

"Transition Services Agreement" means the transition services agreement in the form attached hereto as Schedule 1.1(xvi).

"Vendor" has the meaning set forth in Section 5.4(g).

"WARN" shall have the meaning set forth in Section 5.7(g).

"1060 Allocation Schedule" has the meaning set forth in Section 2.6.

**ARTICLE II**
THE PUT, PURCHASE AND SALE

SECTION 2.1. The Put Option.

(a)    The Purchaser hereby sells and grants to the Sellers, and the Sellers hereby purchase and acquire from the Purchaser, the option and right (the "Put Option") to sell, assign, transfer and convey to the Purchaser all of the Acquired Assets, and to require the Purchaser to assume from the Sellers all of the Assumed Liabilities, in each case subject to and in accordance with the terms and conditions of this Agreement (such sale, assignment, transfer and conveyance of Acquired Assets and assumption of Assumed Liabilities, the "Purchase and Sale").

(b)    The Put Option shall be exercisable by the Sellers in their sole discretion by delivery to the Purchaser of a Put Option Exercise Notice prior to the earliest to occur (the "Put Termination Date") of the following: (i) if an Insolvency Proceeding with respect to the Sellers has been commenced prior to Day Sixty, the Put Termination Date shall be the 60th day immediately following the date such Insolvency Proceeding shall have commenced, (ii) if an Insolvency Proceeding with respect to the Sellers has not been commenced prior to Day Sixty, the Put Termination Date shall be Day Sixty, and (iii) termination of this Agreement pursuant to Section 9.1. In the event that the Put Option shall not have been exercised prior to the Put Termination Date, all rights of the Sellers under the Put Option shall expire. In consideration of the grant by the Purchaser of the Put Option, the Sellers shall pay to the Purchaser on the date of this Agreement $40,000,000 (the "Put Option Fee") by wire transfer to a bank account specified in writing by Purchaser.

SECTION 2.2. Purchase and Sale. Following the exercise of the Put Option by the Sellers' delivery to the Purchaser of the Put Option Exercise Notice prior to the Put Termination Date, the following shall apply with respect to the Purchase and Sale:

(a)    On the terms and subject to the conditions hereof, at the Closing, (i) the Sellers shall sell, assign, transfer and convey to the Purchaser, free and clear of all

20

Liens (other than Permitted Liens), all of the Sellers' respective right, title and interest in, to and under the Acquired Assets, and (ii) the Purchaser will purchase and acquire from the Sellers all of the Sellers' respective right, title and interest in, to and under the Acquired Assets.

(b)      The Sellers hereby acknowledge and agree that the Purchaser shall not purchase or acquire from the Sellers pursuant to this Agreement any Properties of the Sellers set forth in Schedule 2.2(b), any real property owned by a Seller (other than rights under the Horsham Lease Agreements), any Lease Agreements not included in the Purchased Real Property Leases or any other Property that is not an Acquired Asset (such Properties of the Sellers being referred to herein, collectively, as the "Excluded Assets").

(c)      On and subject to the terms and conditions of this Agreement (and subject to Article IX hereof), the Purchaser will, effective as of the Closing, assume and become responsible for, and thereafter pay, perform or discharge when due, all of the Assumed Liabilities.

(d)      Notwithstanding anything in this Section 2.2 or any other provision hereof to the contrary, the Sellers expressly covenant and agree that the Purchaser shall assume only the Assumed Liabilities and shall not accept, assume, agree to pay, perform or otherwise discharge, satisfy or be liable for any other Liabilities of the Sellers (the "Excluded Liabilities"). Without limiting the generality of the foregoing, "Excluded Liabilities" include, without limitation, (i) all Liabilities and obligations of any of the Sellers under, arising out of, in respect of or related to (A) Excluded Assets, (B) Indebtedness, (C) Legal Proceedings or Orders, (D) Taxes (except to the extent otherwise provided in Section 5.12(b)), (E) any breach or violation of, or default by any of the Sellers under, any Contract, Law or License, except to the extent otherwise provided under clause (c) of the definition of "Assumed Liabilities" in Article I hereof, or (F) Benefit Plans, (ii) Sellers' obligations under or in connection with this Agreement or any Transaction Document, and (iii) environmental conditions at the Horsham Premises, the Indian Premises and the Leased Premises not caused by Purchaser, Purchaser's employees, agents, contractors or invitees.

(e)      On the second Business Day prior to the Closing Date, the Sellers shall cause to be prepared and delivered to the Purchaser an updated Schedule 1.1(i) (including any other applicable schedule expressly cross-referenced therein) of Acquired Assets, as of a date no more than five (5) Business Days prior to the Closing Date. Such updated schedules shall reflect solely those assets in respect of the Mortgage Business that (i) are of the type set forth in the definition of "Acquired Assets" in Article I hereof that provide for updating in accordance with this Section 2.2(e), and (ii) are (y) acquired or assumed or (z) disposed of or discharged, in each case, between the date of this Agreement and the Closing Date in compliance with the provisions of Section 5.1. On the second Business Day prior to the Closing Date, the Sellers shall cause to be prepared and delivered to the Purchaser a Data Tape reflecting the Serviced Loans and the Mortgage loans (and information relating thereto), as of a date no more than five (5) Business Days prior to the Closing Date (the "Pre-Closing Data Tape").

SECTION 2.3. <u>Consideration</u>.

(a)    The consideration for the Acquired Assets (the "<u>Purchase Price</u>") payable to Parent (for itself and as agent for the other Sellers) shall be equal to (i) $490,000,000 minus the Earnings Adjustment Amount (the "<u>Base Amount</u>"), (ii) plus the Accruals, (iii) minus the Servicing Adjustment Amount, (iv) minus the Retention Adjustment Amount (v) minus the June Data Tape Adjustment Amount. The Purchase Price shall be paid as set forth in Sections 2.3(b) and 2.4.

(b)    On and subject to the terms and conditions of this Agreement, on the Closing Date, the Purchaser shall remit to the Parent (for itself and as agent to the other Sellers) an amount equal to the Base Amount plus the amount of the Estimated Adjustment, if the amount of the Estimated Adjustment is a positive number (or minus the amount of the Estimated Adjustment, expressed as a positive number, if the amount of the Estimated Adjustment is a negative number), as follows:

(i)    $75,000,000 shall be paid by delivery to Parent of the DUS Note;

(ii)    an amount equal to the Dynex Fannie Mae Note Principal Amount shall be paid to Parent (A) in the event that Fannie Mae assures the Purchaser that Fannie Mae shall not seek recourse against the Purchaser for any Liabilities in respect of the Dynex Fannie Mae Loans under the Dynex Fannie Mae Contract, by wire transfer to a bank account specified in writing by Parent at least two (2) Business Days prior to the Closing Date, and (B) otherwise, by delivery of the Dynex Fannie Mae Note;

(iii)    an amount equal to the Dynex Freddie Mac Note Principal Amount shall be paid to Parent (A) in the event that Freddie Mac assures the Purchaser that Freddie Mac shall not seek recourse against the Purchaser for any Liabilities in respect of the Dynex Freddie Mac Loans under the Dynex Freddie Mac Contract, by wire transfer to a bank account specified in writing by Parent at least two (2) Business Days prior to the Closing Date, and (B) otherwise, by delivery of the Dynex Freddie Mac Note;

(iv)    $40,000,000 shall be paid to Parent, (A) in the event that an Insolvency Proceeding with respect to the Sellers has been commenced and a Bankruptcy Court Order has been entered on or before the Closing Date, by wire transfer to a bank account specified in writing by Parent at least two (2) Business Days prior to the Closing Date, and (B) otherwise, by delivery of the Holdback Note; and

(v)    the balance shall be paid by wire transfer to a bank account specified in writing by Parent at least two (2) Business Days prior to the Closing Date.

SECTION 2.4.  Adjustment Amount.

(a)     The "Adjustment Amount" (which may be a positive or negative number) will be equal to the amount determined by subtracting the absolute amount of the Closing Adjustment (as hereafter defined) from the Estimated Adjustment.  If the Adjustment Amount is positive, the Adjustment Amount shall be paid by wire transfer by the Sellers to an account specified in writing by the Purchaser.  If the Adjustment Amount is negative, the difference between the Closing Adjustment and the Estimated Adjustment, expressed as a positive number, shall be paid by wire transfer by the Purchaser to an account specified in writing by the Sellers.  Within three (3) Business Days after the calculation of the Closing Adjustment becomes binding and conclusive on the Parties pursuant to this Section 2.4, the Sellers or the Purchaser, as the case may be, shall make the wire transfer payment provided for in this Section 2.4(a).  The "Closing Adjustment" means an amount (which may be a positive or negative number) equal to the result of (A) the Accruals (B) minus the Servicing Adjustment Amount (C) minus the Retention Adjustment Amount (D) minus the June Data Tape Adjustment Amount. Notwithstanding anything in this Agreement to the contrary, there shall be no duplication of adjustments to the Purchase Price under Article II and indemnification under Article VIII shall not be available for a Loss to the extent that such Loss is fully reimbursed by an adjustment under Article II.

(b)     The Sellers and the Purchaser shall (or, in the event they do not agree, they shall cause Beekman to) deliver to the Purchaser and the Sellers, no later than three (3) Business Days prior to the Closing Date, their or its (as applicable) good faith calculation, in reasonable detail and accompanied by sufficient information reasonably necessary to allow the Parties to verify such calculation, of the amount of the Estimated Accruals, the Estimated Retention Adjustment Amount, the Estimated Servicing Adjustment Amount, and Estimated June Data Tape Adjustment Amount based upon, among other things, the Pre-Closing Data Tape and a review of the June Data Tape.

(c)     As soon as practicable, but in no event later than twenty (20) Business Days following the Closing Date, the Sellers shall cause to be prepared and delivered to the Purchaser a draft calculation of the Accruals, the Retention Adjustment Amount, the Servicing Adjustment Amount and the June Data Tape Adjustment Amount (the "Draft Adjustment"), in reasonable detail and accompanied by sufficient information reasonably necessary to allow the Purchaser to verify such calculation.

(d)     If within twenty (20) Business Days following delivery of the Draft Adjustment and the other information described in Section 2.4(c), the Purchaser has not given the Sellers written notice of its objection thereto (which notice shall state the basis of any such objection in reasonable detail), then the Draft Adjustments calculated by the Sellers shall constitute the amount of the Accruals, the Retention Adjustment Amount, the Servicing Adjustment Amount and the June Data Tape Adjustment Amount for purposes of the Closing Adjustment and be binding and conclusive on the Parties and be used in computing the Adjustment Amount.

23

(e)    If the Purchaser gives the Sellers such notice of objection on or prior to the twentieth (20th) Business Day following Purchaser's receipt of the Draft Adjustments and the other information described in Section 2.4(c), the Sellers and the Purchaser shall attempt to resolve their differences with respect to the calculation of the Accruals, the Retention Adjustment Amount, the Servicing Adjustment Amount and the June Data Tape Adjustment Amount within ten (10) Business Days of the Sellers' receipt of the Purchaser's objection notice (the "Closing Resolution Period"), and any resolution by them as to any disputed amounts shall be binding and conclusive. The Sellers and the Purchaser shall submit any amounts or issues remaining in dispute to a firm of nationally recognized independent public accountants (the "Independent Accountants") selected by the Parties within five (5) days after the expiration of the Closing Resolution Period for resolution. If Sellers and Purchaser are unable to agree on the Independent Accountants, then each of the Sellers, on the one hand, and the Purchaser, on the other hand, shall have the right to request the American Arbitration Association to appoint Independent Accountants who shall not have had a material relationship with the Sellers, the Purchaser or any of their respective Affiliates within the past two (2) years. Each Party agrees to execute, if requested by the Independent Accountants, a reasonable engagement letter, including customary indemnities. If amounts or issues are submitted to the Independent Accountants for resolution:

(i)    the Sellers and the Purchaser shall furnish or cause to be furnished to the Independent Accountants such data, documents and information relating to the disputed amounts or issues as the Independent Accountants may reasonably request and are available to that Party or its agents and shall be afforded the opportunity to present to the Independent Accountants any material relating to the disputed amounts or issues and to discuss them with the Independent Accountants;

(ii)    the determination by the Independent Accountants, as set forth in a notice to be delivered to both the Sellers and the Purchaser within thirty (30) days of the submission to the Independent Accountants of the amounts or issues remaining in dispute, shall be final, binding and conclusive on the Parties and shall be used in the computation of the Adjustment Amount;

(iii)    The Independent Accountants will be instructed that (A) they may only consider those items and amounts which the Sellers and the Purchaser have disputed within the time periods and on the terms specified above, and (B) they must resolve the dispute in accordance with the terms and conditions of this Agreement; and

(iv)    the Sellers, on the one hand, and the Purchaser, on the other hand, will each bear fifty percent (50%) of the fees and costs of the Independent Accountants for such determination.

SECTION 2.5.  Guaranty.  Subject to the terms and conditions set forth in this Agreement (including this Section 2.5), the Limited Guarantors, jointly and severally,

24

hereby irrevocably guarantee (the "Limited Guarantee") to the Sellers (a) all of the obligations and liabilities of the Purchaser that are to be performed by the Purchaser under this Agreement from the date of this Agreement through the Closing, including any of Sellers' Losses and remedies (including specific performance and injunctive relief) resulting or arising from any breaches thereof, and (b) the punctual payment, when and as due, of the Purchase Price, including any payments due under the DUS Note, the Dynex Fannie Mae Note, the Dynex Freddie Mac Note, or the Holdback Note, any Adjustment Amount due to the Sellers pursuant to Section 2.4, and the Purchaser Termination Fee (collectively, the "Guaranteed Obligations"). Each Limited Guarantor agrees that the Sellers may enforce the Limited Guarantee without the necessity of first exhausting remedies against the Purchaser in respect of the Guaranteed Obligations. Notwithstanding anything to the contrary, the Limited Guarantors do not waive rights, setoffs, counterclaims and other defenses that the Purchaser may have in respect of Guaranteed Obligations (including failure of any condition in Section 6.1 to be satisfied) and if Purchaser is relieved of any of the Guaranteed Obligations, the Limited Guarantors shall be similarly relieved of their obligations with respect thereto (except any legal discharge or defense arising from bankruptcy, insolvency, dissolution or liquidation of the Purchaser). Notwithstanding anything to the contrary, the Limited Guarantee shall terminate and be of no further force or effect upon the date a Limited Guarantor's obligations under the Limited Guarantee are irrevocably satisfied and paid in full.

SECTION 2.6. Purchase Price Allocation. Not later than seventy-five (75) days after the Closing Date, the Sellers shall prepare and deliver to the Purchaser a draft allocation schedule (the "1060 Allocation Schedule") pursuant to which the Purchase Price and the Assumed Liabilities (plus any other relevant items, and subject to appropriate adjustments in accordance with Section 1060 of the Code) (such amount, as adjusted, the "Total Consideration") shall be allocated among the Acquired Assets for all applicable Tax purposes in a manner consistent with Section 1060 of the Code and the Treasury regulations thereunder. The Parties agree that for purposes of such allocation and all other applicable Tax purposes, (a) the Put Option Fee shall be treated as option premium and, in the event the Put Option is exercised, shall be a reduction in the Total Consideration, and (b) the consideration allocable to the Purchased Equity Interest shall include only cash, and not any portion of the DUS Note, the Dynex Fannie Mae Note, the Dynex Freddie Mac Note, or the Holdback Note. Promptly following such delivery, the Parties shall in good faith work to resolve any disagreements and to finalize a mutually agreeable 1060 Allocation Schedule, which shall be, if so mutually agreed, final and binding on the Parties. To the extent the 1060 Allocation Schedule becomes final and binding on the Parties, all Tax Returns filed by the Purchaser and Sellers shall be prepared consistently with such allocation. If no mutual agreement is reached within sixty (60) days, then the 1060 Allocation Schedule shall not be binding on either party. The 1060 Allocation Schedule may be modified, as agreed to by the Parties, to reflect any adjustments to the Total Consideration.

**ARTICLE III**
REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Each of the Sellers represents and warrants, jointly and severally, to the Purchaser that the statements contained in this Article III are correct and complete, except as set forth in the disclosure schedule accompanying this Agreement with specific reference to the applicable section of this Article III to which the disclosures on such schedule relate (the "Sellers Disclosure Schedule").

SECTION 3.1. Organization and Qualification. Each of the Sellers is a corporation duly organized, validly existing, and in good standing under the Laws of the state of its jurisdiction of incorporation, and has all requisite corporate power and authority to own, operate and lease its assets and properties and to carry on its business as it is now being conducted. Each of the Sellers is duly qualified and authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

SECTION 3.2. Subsidiary.

(a)    The Indian Subsidiary is a company incorporated with limited liability duly organized and validly existing under the laws of the country of its jurisdiction of formation, with all requisite corporate power and authority to own, operate and lease its assets and properties and to carry on its business as it is now being conducted. The Indian Subsidiary is duly qualified and authorized to do business under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    A complete and accurate list of the Purchased Equity Interest is set forth on Section 3.2(b) of the Sellers Disclosure Schedule. The Purchased Equity Interest is owned beneficially and of record by the applicable Seller as set forth on Section 3.2(b) of the Sellers Disclosure Schedule. The Purchased Equity Interest is duly authorized, validly issued and fully paid and non-assessable and was not issued in violation of any purchase or call option, right of first refusal, subscription right, preemptive right or any similar right.

(c)    There are no outstanding subscriptions, options, warrants, puts, calls, convertible or exchangeable securities, agreements, understandings, claims or other commitments or rights of any type (including stock appreciation rights, phantom stock or similar rights) or other securities (i) requiring the issuance, sale, transfer, exchange, repurchase, redemption or other acquisition of any Equity Securities of the Indian Subsidiary, (ii) restricting the transfer of any of the Equity Securities of the Indian

26

Subsidiary or (iii) relating to the voting rights of any of the Equity Securities of the Indian Subsidiary.

(d)    There are no Persons in which the Indian Subsidiary owns, of record or beneficially, any direct or indirect equity or other ownership interest (including Equity Securities) or possesses any right (contingent or otherwise) to acquire the same. There are no obligations of the Indian Subsidiary to (A) repurchase, redeem or otherwise acquire any Equity Securities of any other Person or (B) make any equity investment in or capital contribution to, any other Person. The Indian Subsidiary is not a member of or party to (and no part of its business is conducted through) any partnership, joint venture or similar arrangement.

SECTION 3.3. Authorization.

(a)    Each of the Sellers has all necessary corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby.

(b)    This Agreement has been duly and validly authorized, executed and delivered by each of the Sellers, and each of the other Transaction Documents to which such Seller is a party, when so executed and delivered by such Seller, will have been duly and validly authorized, executed and delivered by such Seller, and assuming the due authorization, execution and delivery by the other Parties to this Agreement and the Transaction Documents, this Agreement constitutes, and the other Transaction Documents when so executed and delivered will constitute, a valid and binding obligation of each such Seller, enforceable against it in accordance with its respective terms, except to the extent that such enforcement may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws now or hereafter in effect relating to creditors' rights generally, and to the extent that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

SECTION 3.4. No Violation.  Except as set forth in Section 3.4 of the Sellers Disclosure Schedule, none of the execution and delivery of this Agreement or the other Transaction Documents by each of the Sellers (as applicable), the performance by each of the Sellers of its obligations hereunder and thereunder, nor the consummation by each of the Sellers of the transactions contemplated hereby and thereby will (a) conflict with or result in a breach of any provision of the Organizational Documents of either Seller or the Indian Subsidiary, (b) conflict with or result in a breach of, or constitute a default (with or without due notice or lapse of time or both) or result in or give any Person any right of termination, cancellation, acceleration or modification, under the terms, conditions or provisions of any note, bond, Mortgage or indenture, or any material License, lease or Contract to which either Seller or the Indian Subsidiary is a party, (c) violate, in any material respect, any Law or Order of any Governmental Authority applicable to either of

27

the Sellers or the Indian Subsidiary, or (d) result in the imposition or creation of a material Lien (other than a Permitted Lien) upon or with respect to the Acquired Assets or the assets and properties of the Indian Subsidiary.

SECTION 3.5. Consents and Approvals. Except as set forth in Section 3.5 of the Sellers Disclosure Schedule (the "Required Consents") and without giving effect to the provisions of Sections 5.4(b) or 5.4(d), no filing or registration with, notice to or permit, authorization, waiver, consent or approval of any Person or any Governmental Authority or Mortgage Program Sponsor is necessary for the consummation by the Sellers of the transactions contemplated by this Agreement and the other Transaction Documents other than (i) consents and approvals of or filings or registrations with the Federal Trade Commission and the Antitrust Division of the United States Department of Justice (the "DOJ") pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and (ii) those already obtained.

SECTION 3.6. Brokers' Fees and Commissions. Neither the Sellers nor the Indian Subsidiary has any Liability or obligation to pay any fees or commissions or any similar payment to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which the Purchaser could become liable or obligated.

SECTION 3.7. Title to Acquired Assets; Sufficiency.

(a)     Except as set forth on Section 3.7(a) of the Sellers Disclosure Schedule, the Sellers own and have good and valid title to (or, with respect to the leased Properties listed on Section 3.7(a) of the Sellers Disclosure Schedule, a valid leasehold interest in) each of the Acquired Assets (other than Purchased IP which is covered by Section 3.10(a)), in each case free and clear of all Liens (other than Permitted Liens). Pursuant to this Agreement and the other Transaction Documents, at the Closing the Purchaser will receive all right, title and interest in, under and to all of the Acquired Assets free and clear of all Liens other than (i) Permitted Liens and (ii) any Liens created by the Purchaser.

(b)     Subject to the Purchaser obtaining and maintaining all Licenses necessary for it to conduct the Mortgage Business, the Purchaser's ability to fund Advances and Mortgage loans, the Purchaser's ability to maintain capital requirements and satisfy other conditions of the Rating Agencies necessary to maintain adequate credit ratings, the Purchaser not obtaining any real property or leases to real property (other than pursuant to the Horsham Lease Agreements and Purchased Real Property Leases), the Purchaser not hiring all of the Business Employees and not currently maintaining human resources, accounting, tax, legal or other items of corporate overhead not covered by the Transition Services Agreement, and except as set forth on Section 3.7(b) of the Sellers Disclosure Schedule, the Acquired Assets (together with the Property to be leased to the Purchaser pursuant to the Purchased Real Property Leases and the Horsham Lease Agreements, the software to be licensed to Purchaser pursuant to the Software License Agreement, the Marks to be licensed pursuant to this Agreement and the services to be

28

provided pursuant to the Transition Services Agreement) constitute all of the Properties and rights primarily used in, or related primarily to, the Mortgage Business and are sufficient for Purchaser to conduct the Mortgage Business as it is presently conducted by Sellers.

SECTION 3.8.  Contracts.

(a)    Purchased Contracts.    Schedule 1.1(i) sets forth a true and complete list of the Purchased Contracts as of the date of this Agreement.

(b)    Indian Subsidiary Contracts.    Section 3.8(b) of the Sellers Disclosure Schedule lists the following Contracts to which the Indian Subsidiary is a party or by which it is bound as of the date of this Agreement (collectively, the "Indian Material Contracts"):

(i)    any Contract (or group of related Contracts) for the purchase or sale of assets, or for the furnishing or receipt of services, the performance of which will extend over a period of more than one (1) year, or involve amounts payable by the Indian Subsidiary in excess of $100,000;

(ii)    any Contract relating to the incurrence, assumption or guarantee of any Indebtedness or imposing a material Lien on any of the assets of the Indian Subsidiary;

(iii)    any Contract between the Indian Subsidiary and either of the Sellers or their Affiliates;

(iv)    any Contract with an officer, director, stockholder or Affiliate of the Indian Subsidiary which is still in effect or has any ongoing obligations as of the date of this Agreement;

(v)    any Contract under which the Indian Subsidiary has made advances or loans to any other Person;

(vi)    any Contract for joint ventures, strategic alliances, partnerships, licensing arrangements, or sharing of profits or proprietary information;

(vii)    any Contract containing covenants of the Indian Subsidiary not to compete in any line of business or with any Person in any geographical area or not to solicit or hire any Person with respect to employment or covenants of any other Person not to compete with the Indian Subsidiary in any line of business or in any geographical area or not to solicit or hire any Person with respect to employment;

(viii)    any Contract providing for severance, retention, change in control or other similar payments;

29

             (ix)     any Contract for the employment of any individual on a full-time, part-time or consulting or other basis providing annual compensation in excess of $50,000;

             (x)     any material management Contracts and Contracts with independent contractors or consultants (or similar arrangements) that are not cancelable without penalty or further payment and without more than 30 days' notice;

             (xi)     any outstanding Contract of guaranty, surety or indemnification, direct or indirect, by the Indian Subsidiary;

             (xii)     any power of attorney given to a third party by the Indian Subsidiary that is currently effective and outstanding; and

             (xiii)     any outstanding written commitment to enter into any Contract of the type described above.

             (c)     Each of the Indian Material Contracts and the Purchased Contracts is in full force and effect and is the legal, valid and binding obligation of a Seller or the Indian Subsidiary which is a party thereto, and, to the Knowledge of Sellers, of the other parties thereto, enforceable against each of them in accordance with its terms, except to the extent that such enforcement may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws now or hereafter in effect relating to creditors' rights generally, and to the extent that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought, and, upon consummation of the transactions contemplated by this Agreement, shall, except as otherwise stated in Section 3.8(c) of the Sellers Disclosure Schedule, continue in full force and effect without penalty or other adverse consequence. None of the Sellers or the Indian Subsidiary, as applicable, is in breach in any material respect of or in default under any Purchased Contract or Indian Material Contract, nor, to the Knowledge of the Sellers, is any other party to any Purchased Contract or Indian Material Contract in breach in any material respect of or in default thereunder, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a material breach or default by a Seller or the Indian Subsidiary, as applicable, or to the Knowledge of the Sellers any other party thereunder.  As of the date of this Agreement, no party to any of the Purchased Contracts or Indian Material Contracts has exercised any termination rights with respect thereto, and no such party has given notice of any significant dispute with respect to, or any intention to terminate, any Purchased Contract or Indian Material Contract. The Sellers have delivered to Purchaser true, correct and complete copies of all of the Purchased Contracts and Indian Material Contracts, together with all amendments, modifications or supplements thereto.

        SECTION 3.9. Legal Proceedings.  Except as set forth on Section 3.9 of the Sellers Disclosure Schedule, (a) there are no material Legal Proceedings pending or, to

the Knowledge of the Sellers, threatened against either of the Sellers (with respect to the Mortgage Business), the Indian Subsidiary or the Acquired Assets; (b) neither of the Sellers nor the Indian Subsidiary is subject to any outstanding Order which has had or would reasonably be expected to have a Material Adverse Effect or could reasonably prevent the consummation of the transactions contemplated by this Agreement, and (c) there are, to the Knowledge of the Sellers, no facts or circumstances that are likely to give rise to any Legal Proceedings that would be required to be disclosed pursuant to clauses (a) or (b) above. There are no Legal Proceedings pending, or to the Knowledge of the Sellers, threatened against either of the Sellers or the Indian Subsidiary that question the legality of the transactions contemplated by this Agreement.

SECTION 3.10.  Intellectual Property.

(a)    The Sellers or the Indian Subsidiary own all right, title and interest in and to, or have the right to use and transfer its interest in, the Intellectual Property listed on Section 3.10(a) of the Sellers Disclosure Schedule (the "Purchased IP").

(b)    The Sellers or the Indian Subsidiary own all right, title and interest in and to, or have the right to use and transfer its interest in, information technology and computer systems listed on Section 3.10(b) of the Sellers Disclosure Schedule (the "Purchased IT Systems"). Except as set forth on Section 3.10(a) and (b) of the Sellers Disclosure Schedule, the Sellers or the Indian Subsidiary exclusively own all right, title and interest in and to, or have the right to use and transfer its interest in, the Purchased IP and the Purchased IT Systems.

(c)    None of the Purchased IP nor the operation or conduct of the business of the Indian Subsidiary or the Mortgage Business infringes, misappropriates, or otherwise violates any material Intellectual Property right of any Person.   To the Knowledge of the Sellers, no Person is infringing, misappropriating, or otherwise violating (or has infringed, misappropriated or otherwise violated) any Purchased IP.

(d)    The Sellers and their Affiliates have the right to grant the rights and licenses granted under the Software License Agreement.  None of the Licensed Intellectual Property (as defined in the Software License Agreement) infringes, misappropriates or otherwise violates any Intellectual Property right of any Person.

SECTION 3.11.  Real Property.

(a)    The Sellers have, in all material respects, a valid and subsisting leasehold estate in and the right to quiet enjoyment of the Leased Premises for the full term of the Purchased Real Property Leases, subject only to rights of subtenants pursuant to valid sublease agreements and to the terms and conditions of the Purchased Real Property Leases.  The Sellers are not in material default under, and there are no outstanding notices of material default or termination under, any of the Purchased Real Property Leases, and at the Closing, there shall not exist a material default or an event which, with the passage of time or the giving of notice or both, would constitute a

material default on the part of the Sellers or, to the Knowledge of Sellers, the other parties thereto. The Sellers have made available to Purchaser true and correct copies of each Purchased Real Property Lease, together with all amendments, renewals, extensions or waivers thereof. No Seller owes any brokerage commission with respect to any such leased space. The Sellers hold good, marketable fee simple title to that portion of the premises in Horsham, PA that will be leased to the Purchaser pursuant to the Horsham Lease Agreements (the "Horsham Premises").

(b)     The Indian Subsidiary does not own any real property. The Indian Subsidiary has in all material respects a valid and subsisting leasehold estate in and the right to quiet enjoyment of the leased real properties (the "Indian Premises") subject to the lease agreement set forth on Section 3.11(b) of the Sellers Disclosure Schedule (such leases the "Indian Subsidiary Leases") for the full term thereof, subject to rights of subtenants and to the terms and conditions of the leases and subleases set forth on Section 3.11(b) of the Sellers Disclosure Schedule.

SECTION 3.12. Environmental Matters.

(a)     There are no pending private or governmental claims, citations, complaints, notices of violation or letters made, issued to or, to the Knowledge of Sellers, threatened against any of the Sellers in respect of the Leased Premises, the Horsham Premises or the Indian Premises by any Governmental Authority or private or other party for the impairment or diminution of, or damage, injury or other adverse effects to, the environment or public health resulting from either Seller's use or operation of any the Leased Premises, Horsham Premises or the Indian Premises, or asserting or seeking recovery for any violation of or any liability or obligation under Environmental, Health and Safety Requirements.

(b)     Except for non-compliance that would not reasonably be expected to result in the Purchaser or the Indian Subsidiary incurring material Liabilities under Environmental, Health and Safety Requirements, the Sellers are, and at all relevant times since March 23, 2006 have been, in material compliance with Environmental, Health, and Safety Requirements in respect of the Leased Premises, the Horsham Premises and the Indian Premises, which compliance includes obtaining, maintaining and complying with all material environmental permits or other authorizations required under Environmental, Health and Safety Requirements.

(c)     To the Knowledge of Sellers, there are no current facts, circumstances or conditions arising out of or relating to the Leased Premises, the Horsham Premises or the Indian Premises that would reasonably be expected to result in the Purchaser or the Indian Subsidiary incurring material Liabilities under Environmental, Health and Safety Requirements.

(d)     The Sellers have made available for inspection by the Purchaser true and correct copies of all material environmental reports, assessments and investigations related to the Leased Premises, the Horsham Premises or the Indian

Premises and all material correspondences related to material Liabilities or potentially material Liabilities under Environmental, Health and Safety Requirements to the extent such materials are in the possession, custody or control of the Sellers.

(e)     This Section 3.12 contains the sole and exclusive representations and warranties of Sellers with respect to any environmental, health, or safety matters, including any arising under any Environmental, Health, and Safety Requirements.

SECTION 3.13. Licenses; Compliance with Laws.  Section 3.13 of the Sellers Disclosure Schedule contains a true and complete list of all material Licenses required by Law or any Governmental Authority to own and operate the Acquired Assets and otherwise engage in the Mortgage Business (the "Business Licenses").  Except as set forth on Section 3.13 of the Sellers Disclosure Schedule:

(a)     each Business License is, and at all relevant times since March 23, 2006 has been, held by the Sellers and the Indian Subsidiary and is valid, binding and in full force and effect;

(b)     neither of the Sellers nor the Indian Subsidiary has received any written notice that it is in default under, or in violation of the terms of, any Business License, and to the Sellers' Knowledge, no suspension or cancellation or restriction of any such Business License has been threatened;

(c)     neither of the Sellers nor the Indian Subsidiary is in material default under or in material violation of the terms of any Business License;

(d)     Capmark Finance is, and at all relevant times since March 23, 2006 has been: (i) a Fannie Mae approved DUS lender and seller/servicer, (ii) an FHA/MAP approved mortgagee eligible to originate, purchase, hold, sell and service FHA insured Mortgages, (iii) a Freddie Mac approved program plus seller/servicer, and (iv) a Ginnie Mae approved issuer of mortgage backed securities guaranteed by Ginnie Mae;

(e)     since March 23, 2006, the Sellers have not received any written notification from Fannie Mae, HUD, Freddie Mac or Ginnie Mae that any Seller is not in compliance with all requirements for maintaining the approved status set forth in Section 3.13(d) above other than notifications which have been withdrawn; and

(f)     since March 23, 2006, each of the Sellers and the Indian Subsidiary has operated the Mortgage Business in material compliance, and is in compliance in all material respects, with all requirements of Law, the Mortgage Programs, the Mortgage Program Sponsors applicable to the Mortgage Business, the ownership and operation of the Acquired Assets and the operations of the Indian Subsidiary, and neither Seller nor the Indian Subsidiary has received any written notice of or been charged with (or, to the Seller's Knowledge, is under investigation with respect to) any material violation of Law.

SECTION 3.14. <u>Employee Benefit Plans</u>.

(a)    <u>Section 3.14(a) of the Sellers Disclosure Schedule</u> contains a list of all "<u>employee benefit plans</u>" (as defined in Section 3(3) of ERISA), each severance, incentive or equity incentive plan, program, agreement or arrangement, and all other material employee compensation and fringe benefit plans or arrangements, other than Non-U.S. Benefit Plans, which are sponsored or contributed to by the Sellers for the benefit of Business Employees (the "<u>Benefit Plans</u>").  With respect to each Benefit Plan, true and complete copies of the following documents have been furnished to the Purchaser or were made available for inspection by the Purchaser prior to the date of this Agreement, to the extent, in each case, that such documents exist: (i) current plan documents and plan amendments; (ii) current summary plan descriptions, if any; (iii) the most recent tax qualified determination letters, if any, received from (or applications pending with) the IRS; and (iv) the most recent Form 5500 Annual Reports, if any.

(b)    Each Benefit Plan with respect to which the Purchaser may have any Liabilities has been maintained and administered by the Sellers in compliance, in all material respects, with its terms and with the requirements of applicable Law, including ERISA and the Code.

(c)    To the Knowledge of the Sellers, there are no investigations or termination proceedings by any Governmental Authority or other claims (except for routine claims for benefits), suits or proceedings against or involving any Benefit Plan which would reasonably be expected to result in a material Tax Liability or penalty.

(d)    Neither of the Sellers has been required in the past six (6) years or is required currently to contribute to any "<u>multiemployer plan</u>" (as defined in Section 3(37) of ERISA) with respect to the Business Employees.

(e)    All contributions to the Benefit Plans that were required to be made or accrued in accordance with such Benefit Plans or any applicable Law have been timely made or accrued.

(f)    Except as set forth on <u>Section 3.14(f) of the Sellers Disclosure Schedule</u>, the Sellers do not maintain any Benefit Plans (i) pursuant to the Laws of a country other than the United States or (ii) that benefit any individual whose principal place of employment is outside of the United States (each a "<u>Non-U.S. Benefit Plan</u>").  To the Knowledge of the Sellers, each Non-U.S. Benefit Plan has been maintained in compliance, in all material respects, with its terms and the requirements of applicable Laws.

(g)    Sellers have received a timely favorable determination letter, or are entitled to rely on a timely opinion letter, from Internal Revenue Service with respect to the Sellers' tax-qualified 401(k) plan and, to the Knowledge of Sellers, no circumstances exist which would reasonably be expected to result in the disqualification of such 401(k) plan.

34