IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------------x
: 
*In re* : Chapter 11 Case No.
:
CAPMARK FINANCIAL GROUP INC., *et al.*, :
: 09-_____ ( )
Debtors. :
: Joint Administration Requested
:
----------------------------------------------------------------x

## DECLARATION OF MICHAEL WILKERSON OF LAZARD FRÈRES & CO. LLC IN SUPPORT OF MOTION, PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, AND LOCAL RULES 2002-1 AND 6004-1 REQUESTING ENTRY OF TWO ORDERS: (I) THE SALE HEARING ORDER, (a) SCHEDULING THE SALE HEARING; (b) ESTABLISHING OBJECTION DEADLINE; (c) APPROVING SALE HEARING NOTICE AND NOTICE OF ASSUMPTION AND ASSIGNMENT; (d) SCHEDULING AN AUCTION; AND (e) APPROVING MARKETING AND BIDDING PROCESS; AND (II) THE SALE ORDER, (a) APPROVING EXERCISE OF PUT OPTION; AND/OR (b) AUTHORIZING SALE OF MSB BUSINESS (INCLUDING ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES) FREE AND CLEAR OF ALL CLAIMS AND INTERESTS

Michael Wilkerson, being duly sworn, hereby deposes and says:

1. I am a Managing Director of the firm Lazard Frères & Co. LLC ("Lazard"),[1] which has its principal office at 30 Rockefeller Plaza, New York, New York, 10020. Unless otherwise stated, all facts set forth in this declaration (the "Declaration") are based upon: (a) my personal knowledge; (b) my extensive experience and expertise in providing investment banking and financial advisory services; (c) information provided to me by authorized representatives of Capmark Finance Group Inc., and certain of its subsidiaries and affiliates, as

---

[1] Contemporaneously herewith, the Debtors have filed the Debtors' Application Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014(A), and Local Rule 2014-1 For Authorization to Employ and Retain Lazard Frères & Co. LLC as Investment Banker and Financial Advisor to the Debtors *Nunc Pro Tunc* to the Commencement Date (the "Lazard Retention Application").

debtors and debtors in possession (collectively, the "Debtors"),[2] concerning the operation, structure, and financial affairs of the Debtors; and (d) information provided to me by Lazard colleagues and employees working under my supervision. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of Lazard.

2. I make this Declaration in support of the Motion, Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002-1 and 6004-1 Requesting Entry of Two Orders: (I) The Sale Hearing Order, (a) Scheduling the Sale Hearing; (b) Establishing Objection Deadline; (c) Approving Sale Hearing Notice and Notice of Assumption and Assignment; (d) Scheduling an Auction; and (e) Approving Marketing and Bidding Process; and (II) the Sale Order, (a) Approving Exercise of Put Option; and/or (b) Authorizing Sale of MSB Business (Including Assumption and Assignment of Contracts and Leases) Free and Clear of All Claims and Interests (the "Sale Motion"), filed concurrently with this Declaration.

---

[2] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), and Capmark Affordable Equity Inc. (2381). CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044.

3.  For the reasons set forth below, I support the Debtors' request for approval of the Sale Hearing Order[3] and the Sale Order, as, in my opinion (i) the MSB Business was fairly and extensively marketed, (ii) the proposed Sale under the APA[4] represents the highest purchase price obtainable for the MSB Business, (iii) the APA was negotiated fairly and at arm's length and entered into in good faith, and (iv) the Sale represents the sound exercise of the Seller's business judgment. The bases for my opinion are set forth below.

4.  As more fully set forth in the Lazard Retention Application, Lazard was employed by the Debtors on January 1, 2009, in connection with the Debtors' restructuring efforts. During the course of its employment, Lazard has become intimately familiar with the Debtors' businesses, financial affairs, capital structure, and restructuring alternatives and options. Accordingly, I have the necessary background to attest to the extensive marketing of the MSB Business and the propriety of the proposed Sale.

### Lazard's Extensive Experience in Asset Sales

5.  Lazard is a global, full service investment bank founded in 1848. Lazard focuses on providing financial and investment banking advice and transaction execution for its clients. Lazard advises clients worldwide and provides both domestic and cross-border merger and acquisition advisory services for some of the world's largest companies across multiple industries. Lazard is also a leading restructuring advisor with extensive experience in the reorganization and restructuring of troubled companies, both out-of-court and in chapter 11 cases. Since 1990, Lazard's professionals have been involved in over 250 restructurings, representing over $1 trillion in assets. Among Lazard's various qualifications as a restructuring

---

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

[4] A summary of the salient terms of the APA is provided in the Motion.

-3-

advisor, Lazard has considerable experience assisting debtors in exploring various business alternatives available to them and analyzing and determining what manner of disposition, if any, of the debtors' assets will maximize value for the benefit of the debtor's estates and their creditors.

6. When advising clients contemplating large scale asset sales, the services Lazard provides include advising on the appropriate sales process for the situation, advising on valuation issues, assisting in the preparation of an offering memorandum or other appropriate sales materials and rendering, if appropriate, a fairness opinion. As part of this process, Lazard, among other things, identifies and contacts selected qualified acquirors and assists in negotiating and closing the proposed sale. Lazard also provides recommendations with respect to the structure, timing and pricing of these alternatives.

7. Lazard's major clients, which in the aggregate represent a significant portion of its mergers and acquisitions and strategic advisory revenue for the financial year to date, included Anheuser-Busch InBev, Biovail, Ciba Specialty Chemicals, Debenhams, Haas Trusts, IBM, Republic of Ecuador, TATA Teleservices, TM International, and Transatlantic Holdings. Notable assignments completed in the second quarter of 2009 included Cresa Patrimonial S.L, Hellenic Republic, Lehman Brothers, R.H. Donnelly and the UAW (with the regard to restructuring advice).

8. As a managing director in Lazard's banking group, I am responsible for, *inter alia,* overseeing on behalf of clients all aspects of sale assignments including identifying prospective buyers, preparing marketing materials, organizing diligence information, facilitating interactions with buyers, establishing bidding procedures, and engaging in negotiations. Prior to my role as Managing Director I served as a Director, Vice President and Associate at Lazard. I

have a broad range of experience in financial advisory assignments, having spent approximately twelve years at Lazard focused on mergers and acquisitions. I have advised and led a number of sale processes for Lazard on behalf of U.S. and international corporate clients across a broad range of industries, including banking and specialty finance, consumer products, diversified industrial, media, retail and technology. My assignments over this time have included a number of corporate carve-outs and asset sales including in the context of financial distress or restructuring.

### **Need for Immediate Sale**

9. The MSB Business is a profitable part of the Sellers' business operations, but the Sellers' management, Lazard and other advisors are concerned that without an orderly and expeditious sale its value will likely be significantly and irreparably impaired. The servicing agreements and, thus, the value of the MSB Business, are susceptible to potential default triggers determined largely by market forces beyond the Sellers' control. Current market conditions have resulted in a continually increasing number of commercial real estate borrower defaults and have made it difficult for borrowers to find replacement financing or to sell properties, which are the typical sources of repayment for commercial mortgage loans. Delinquencies and loan defaults trigger an obligation of the servicer to make Advances to cover the payments of principal, interest, taxes and other costs. As a result, increased delinquencies or defaults cause an increase in Sellers' obligation to fund Advances. I am aware that declines in loan values, among other things, have also resulted in downgrades of CFGI by the various rating agencies and, correspondingly, of the Sellers' servicer rankings. These developments have raised general market concerns about the Sellers' financial condition and general ability to operate the MSB Business, and have increased the risk that counterparties and other stakeholders may seek to terminate servicing agreements with the Sellers without any consideration paid to the Sellers. As

such, the Sellers, in consultation with Lazard, determined it prudent to market and sell the MSB Business through an orderly and expeditious process to preserve the value of the MSB Business, and to provide assurance to the counterparties to the servicing agreements and other stakeholders that the servicers on which they rely will continue to operate in the ordinary course under the servicing agreements.

10. To this end, attention was focused on securing an appropriate buyer for the MSB Business. A substantial effort was coordinated by the Debtors, Lazard, and Beekman Advisors, Inc. ("Beekman") (Lazard and Beekman together, the "Advisors") prior to the commencement of the Debtors' chapter 11 cases to preserve the value of the MSB Business. The culmination of these efforts is the proposed Sale to Berkadia or another purchaser making a superior bid. To realize maximum value for the MSB Business it is absolutely necessary that the Sellers consummate the Sale in a timely and expeditious manner. In my opinion, without a quick sale, there is a grave risk that the value and salability of the MSB Business will deteriorate materially as a result of a loss of cooperation from and confidence of the counterparties to the servicing agreements, including the GSEs, securitization trusts, and private label counterparties.

**The Pre-Commencement Date Marketing of the MSB Business**

11. The prepetition marketing effort for the MSB Business was broad, comprehensive, and fair. During May and June 2009, I, with the assistance of my Lazard colleagues and Beekman, began the marketing process by conducting extensive due diligence and preparing a comprehensive confidential information memorandum detailing the MSB Business. In June 2009, the Advisors contacted thirty-one potential buyers which we believed might have a potential interest in the MSB Business. These parties were selected based on a number of factors we considered relevant, including but not limited to an existing presence in the

-6-

servicing business, a known interest in the servicing business, or which had sufficient capital to support the ongoing financial requirements of the MSB Business. From this group, twenty parties signed non-disclosure agreements and received the confidential information memorandum.[5] On July 8, 2009, the Advisors received nine preliminary indications of interest, six of which were written indications of interest and three of which were verbal indications of interest. Of the six written indications, three expressed interest in an acquisition of the MSB Business in its entirety; the remaining three expressed interest in parts of the MSB Business but not the whole. Each of these parties which bid for the whole were either banks or represented diversified financial institutions with sufficient financial capacity, were operating similar businesses, or had a stated strategic interest in the MSB Business. The three parties interested in acquiring the entire MSB Business advanced to a final round of the sale process and each committed substantial time and resources to business and legal diligence in advance of the August 18, 2009 final bid deadline established by the Sellers.

12. Two of the three parties withdrew from the process in the week prior to August 18, 2009, and the Sellers received only one offer for the MSB Business by the final bid deadline. That offer, from Berkadia, was ultimately memorialized in the APA, which was executed on September 2, 2009 after extensive arm's-length and good faith negotiations. I participated in multiple and extensive negotiating sessions with representatives of Berkadia, including on matters related to purchase price and other economic terms, as well as on issues related to certainty, financing and timing. It is my belief that the marketing process culminating in the execution of the APA was fair, comprehensive and targeted at obtaining the highest possible price for the MSB Business.

---

[5] The size of the MSB Business necessarily restricts the potential field of bidders in a sale; based on cash-flow projections provided by the Sellers to the Advisors, a buyer would need $1 billion or more of liquidity to operate the MSB Business.

## The Sellers' Marketing of the MSB Business Post-Execution of the APA

13. Notably, the APA does not restrict the Sellers or their Advisors from soliciting, pursuing, or entering into alternative transactions for the Sale of the MSB Business. Accordingly, I, with the assistance of my Lazard colleagues and Beekman, have continued to pursue superior bids from previously interested parties and others. To that end, since the execution of the APA on September 2, 2009, I, or my Lazard colleagues working under my supervision, contacted twenty-six parties[6] to retest interest in the MSB Business, including twenty parties involved in the initial marketing process prior to the execution of the APA. Twelve parties expressed to Lazard some degree of preliminary interest in purchasing the MSB Business, eight new participants[7] signed confidentiality agreements, and each party that signed a confidentiality agreement has been granted access to diligence information. The Sellers' management and their Advisors, including myself, have had numerous communications with a number of these parties since September 2, 2009 to further their diligence review.

14. In connection with these efforts, one party has provided a preliminary, non-binding, written indication of interest in the whole MSB Business at an unspecified purchase price of "in excess of $490 million" (the purchase price provided for in the APA). In light of this indication and other potential interest in the MSB Business, on October 11, 2009, Lazard circulated to the parties a bidding process letter (the "Bidding Process Letter"), attached hereto as Exhibit A, which expressed a continued interest in purchasing the MSB Business. The purpose of the Bidding Process Letter was to establish another formal bid deadline and process

---

[6] Some parties contacted were working with additional parties who also signed confidentiality agreements.

[7] Some parties contacted were working with additional parties who also signed confidentiality agreements.

in the hope of obtaining a superior offer to the APA. Pursuant to the Bidding Process Letter, interested parties have been asked to submit a qualifying offer for the MSB Business no later than Friday, October 30, 2009.

15. Because of the extensive marketing efforts implemented with respect to the MSB Business, in my opinion, no further marketing of the MSB Business pursuant to Court-approved bidding procedures is necessary or warranted, as the Bidding Process Letter contained bidding procedures which I am told are consistent with the form of bidding procedures typically used in section 363 sales processes in this Court, and any additional formal marketing would not likely produce a higher or better offer and would result in unnecessary additional expense and delay of the Sale, all of which may result in a reduction in the net proceeds of the Sale, or worse, put in jeopardy the sale to Berkadia if conditions to the APA are not timely satisfied.

### Entry into the APA and Closing of the Sale is in the Sound Business Judgment of the Sellers

16. I believe that the proposed Sale represents an exercise of the Sellers' sound business judgment because (i) the Sellers and the Advisors provided the parties interested in purchasing the MSB Business with adequate and reasonable notice of the bidding process; (ii) the purchase price, and other terms of the APA, are fair and reasonable under the circumstances; (iii) all parties proceeded with the utmost good faith in negotiating and entering into the APA; and (iv) the Sellers have continued in good faith to pursue superior offers.

17. I believe that the prompt Sale of the MSB Business pursuant to the APA to Berkadia, or to another purchaser who submits a superior offer, without further delay necessarily attendant to additional formal marketing is the best way to maximize and preserve the value of the MSB Business. Based upon my extensive involvement in the Sale process and my

experience with businesses of this kind, I believe that absent a prompt Sale, the value of the MSB Business would likely decline substantially.

18. Indeed, the proposed Sale is the only avenue I am aware of which can, with certainty, be consummated. The proposed Sale is the Sellers' best means of maximizing and preserving the value of the MSB Business. The proposed Sale is the culmination of extensive, arm's length, good faith, and hard-nosed negotiations, and should without reservation be approved in all respects.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

_____
Michael Wilkerson

# Exhibit A

**Bidding Process Letter**

October 11, 2009

[NAME AND ADDRESS]

**PERSONAL & CONFIDENTIAL**

On behalf of Capmark Financial Group Inc. ("Capmark"), Lazard and Beekman Advisors thank you for your expression of potential interest in an acquisition of the assets of Capmark's North American mortgage servicing and banking businesses (collectively, the "MSB Business").

As previously disclosed to you, on September 2, 2009, Capmark entered into an Asset Put Agreement (the "APA") with Berkadia III, LLC ("Berkadia," a newly formed entity owned by Berkshire Hathaway Inc. and Leucadia National Corporation). The APA allows Capmark to solicit, pursue and enter into alternative transactions for the sale of the MSB Business.[8]

We are pleased to invite you to conduct further due diligence in advance of your submission of a definitive binding offer to acquire the MSB Business. All offers will be subject to the following bidding process:

**Bidding Process**

**(A)   Assets to Be Sold:** The MSB Business (as defined herein), and more fully defined and set forth in the definition of the "Acquired Assets" under the APA.

**(B)   Confidentiality Agreements:** You have entered into a confidentiality agreement with Capmark (the "Confidentiality Agreement") and have been provided material, non-public information, including (a) the Project Kixx Confidential Information Memorandum and (c) access to an electronic data room, containing, among other things, all exhibits and schedules to the APA (together, the "Information"). The Information constitutes Confidential Information as defined in the Confidentiality Agreement. In addition, you may submit requests for additional information not already made available to you as well as requests for meetings or calls with Capmark management via email to the following representatives of Lazard and Beekman Advisors:

| | |
|---|---|
| Elizabeth A. LaPuma | John Cibinic |
| 212-632-6624 | 703-752-8322 |
| elizabeth.lapuma@lazard.com | john.cibinic@beekmanadvisors.com |

**(C)   Qualifying Offer Deadline:** To participate in the bidding process you must submit a "Qualifying Offer" no later than 12:00 Noon (EDT) on Friday, October 30, 2009 (the "Qualifying Offer Deadline"). Your Qualifying Offer must remain open until 5:00PM (EST) on Friday, November 13, 2009.

---

[8] For the complete text of the Put Agreement and related documents, we refer you to the 8-K SEC filing made by Leucadia National Corporation on September 3, 2009 and available at http://www.sec.gov/Archives/edgar/data/96223/000090951809000535/0000909518-09-000535-index.htm

**(D)    Qualifying Offers**: Each offeror must submit a Qualifying Offer by the Qualifying Offer Deadline. To constitute a Qualifying Offer, an offer must:

(i)     be in writing;

(ii)    state that such offeror is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the MSB Business on terms and conditions no less favorable to Capmark than the terms and conditions contained in the APA;

(iii)   include a mark-up of the APA (the "Modified APA") reflecting the variations from the APA (including which contracts and leases are <u>not</u> to be assumed and assigned pursuant to the Modified APA), as well as a clean and executed Modified APA;

(iv)    provide that such offeror's offer is irrevocable until the closing of the purchase of the MSB Business if such offeror's offer is accepted;

(v)     state such offeror is financially capable of consummating the transactions contemplated by the Modified APA;

(vi)    include such financial and other information that will allow Capmark to make a reasonable determination as to the offeror's financial and other capabilities to consummate the transactions contemplated by the Modified APA;

(vii)   describe the intended source of funding for reimbursement of current and future advances and warehouse lines under the servicing portfolio, its availability and any contingencies or material conditions relating thereto;

(viii)  describe any transition services that will be required by the offeror in connection with an acquisition of the MSB Business;

(ix)    include a statement that there are no conditions precedent to the offeror's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the offer. The offeror's offer and Modified APA should also highlight any governmental or third-party consents needed to consummate the acquisition of the MSB Business to the extent they are not already contemplated in the APA;

(x)     not request or entitle the offeror to any transaction or breakup fee, expense reimbursement, put option fee, or similar type of payment;

(xi)    fully disclose the identity of each entity that will be bidding for the MSB Business or otherwise participating in connection with such offer, and the complete terms of any such participation;

(xii)    not contain any due diligence or financing contingencies of any kind;

(xiii)    include evidence of authorization and approval from the offeror's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified APA;

(xiv)    include the names and contact information of members of the offeror who will be available to answer questions regarding the offer;

(xv)    include the names of external advisors including financial, legal and accounting firms, as well as industry consultants or other resources;

(xvi)    include any other information or factors that may be relevant to Capmark and its advisors in consideration of the offer; and

(xvii)    include a cash deposit by wire transfer equal to ten (10%) percent of the amount offered to purchase the MSB Business (the "Good Faith Deposit").

In reviewing your Qualifying Offer, Capmark and its advisors will consider a number of factors including, *inter alia,* net present financial value to Capmark, contractual terms and obligations, conditions and timing to closing, and impact on the MSB Business. The extent and quality of any amendments to the APA relative to relevant terms and conditions of the APA will be taken into account in determining the merits of your Qualifying Offer.

Should you have any questions prior to submitting a Qualifying Offer regarding the APA, please direct them to:

Mr. John Altorelli
Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019-6092
United States
Tel: (212) 259-6580
Email: jaltorelli@dl.com

**(E)**    **Other Considerations:** Capmark reserves the right, in its sole discretion, to consider any and all factors in choosing the parties with which to proceed and whether to do so, and to reject any or all Qualifying Offers without giving reasons therefore. A Qualifying Offer will be deemed accepted only

# LAZARD                                              BEEKMAN ADVISORS

when the definitive agreements relating thereto shall have been executed and delivered by Capmark or their respective affiliates party thereto. Until such time, none of Capmark or any of its respective affiliates or representatives will have any obligations to any potential acquiror with respect to a potential transaction and following such time the only obligations will be those set forth in the executed definitive agreements. Capmark does not have any obligation to accept any Qualifying Offer, whether or not such Qualified Offer represents the highest proposed purchase price, and it is possible that a Qualifying Offer having the highest nominal value may not be accepted as a result of tax, regulatory, legal or other considerations.

Capmark expressly reserves the right at any time and in any respect, without giving reasons, to amend or terminate these procedures, to amend the contents of any information regarding the MSB Business provided, orally or in writing, to a potential acquiror, to terminate discussions with any or all prospective acquirors, to reject any or all Qualifying Offers or to negotiate with any party with respect to a transaction involving the MSB Business. By submitting a Qualifying Offer, you agree not to make any claim against Capmark, its advisors or any of their management, employees, affiliates or other advisors in the event that your Qualifying Offer is not accepted.

The existence, contents and terms of this letter and all information provided or to be provided to you in connection with this opportunity are subject to the Confidentiality Agreement. Accordingly, without the prior written consent of Capmark, you are expressly prohibited from contacting any party other than your Representatives (as defined in the Confidentiality Agreement) regarding this potential transaction and the process described in this letter.

It is understood that each potential acquiror will bear all costs and expenses of its investigation and evaluation of the MSB Business, including the fees and disbursements of its representatives.

**All questions concerning the MSB Business or the process described in this letter should be addressed only to personnel of Lazard and Beekman Advisors. Under no circumstances should employees of Capmark be contacted directly.**

Please submit your Offer in the form of a fax, letter or email to both:

Capmark Financial Group Inc.  
c/o Lazard Frères & Co. LLC  
Michael Wilkerson  
30 Rockefeller Plaza  
New York, NY 10020  
Phone: 212-632-1907  
Fax: 212-332-5671  
michael.wilkerson@lazard.com

Capmark Financial Group Inc.  
c/o Beekman Advisors Inc.  
Shekar Narasimhan  
8000 Westpark Drive, Suite 250  
McLean, VA 22102  
Phone: 703-752-8321  
Fax: 703-940-8003  
shekar@beekmanadvisors.com

Please do not hesitate to contact us if you have questions regarding any of the above.

Best regards,

Michael Wilkerson                                                         Shekar Narasimhan