IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
                                                :   Chapter 11
In re                                           :
                                                :   Case No. 09-13684 (CSS)
CAPMARK FINANCIAL GROUP INC., et al.,           :
                                                :   Jointly Administered
        Debtors.                                :
                                                :   Hearing Date: November 24, 2009 at 9:00 a.m. (ET)
                                                :
                                                :   Objection Deadline: November 17, 2009 at 4:00 p.m. (ET)
-----------------------------------------------------------x
```

**MOTION, PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, AND LOCAL RULES 2002-1 AND 6004-1, REQUESTING ENTRY OF TWO ORDERS: (I) THE BIDDING PROCEDURES ORDER, (a) SCHEDULING AN AUCTION AT WHICH THE SELLER DEBTORS WILL SOLICIT HIGHER AND BETTER OFFERS IN CONNECTION WITH THE SALE OF MILITARY HOUSING BUSINESS ASSETS; (b) APPROVING BIDDING PROCEDURES WITH RESPECT TO THE SALE OF SUCH ASSETS; (c) APPROVING A BREAK-UP FEE; (d) SCHEDULING THE SALE HEARING; (e) ESTABLISHING OBJECTION DEADLINE; AND (f) APPROVING SALE HEARING NOTICE AND NOTICE OF ASSUMPTION AND ASSIGNMENT; AND (II) THE SALE ORDER, APPROVING SALE OF MILITARY HOUSING BUSINESS ASSETS (INCLUDING ASSUMPTION AND ASSIGNMENT OF CONTRACTS) <u>FREE AND CLEAR OF ALL LIENS, CLAIMS, AND INTERESTS</u>**

Capmark Financial Group Inc. ("<u>CFGI</u>") and certain of its subsidiaries and affiliates,

as debtors and debtors in possession (collectively, the "<u>Debtors</u>"),[1] submit this motion (the

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount

"Motion") requesting entry of two orders – the first to, among other things, schedule an auction, approve bidding procedures and a break-up fee, set a hearing for and approve notices with regard to the proposed sale of substantially all the assets comprising the Debtors' military housing origination and servicing business; and the second, to approve the terms of the sale, as more fully discussed below.

## Background

1.       On October 25, 2009 (the "Commencement Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code.

2.       On October 27, 2009, the Court entered an order authorizing the joint administration and consolidation of the Debtors' chapter 11 cases for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 1015-1 of the Local Bankruptcy Rules for the District of Delaware (the "Local Rules").

## Capmark's Businesses

*Overview*

3.       The Debtors and their non-debtor subsidiaries and affiliates (together with the Debtors, "Capmark") are a group of commercial real estate finance companies that provide real estate-related products and services to borrowers, investors and other customers along three core

---

Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), and Capmark Affordable Equity Inc. (2381). CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044. The addresses for all of the Debtors are available at the following World Wide Web address: http://chapter11.epiqsystems.com/capmark.

business lines: (i) commercial real estate lending and mortgage banking; (ii) servicing; and (iii)

investments and funds management. Capmark's business lines are conducted through six business

segments organized by geography and type of business:

- *North American Lending and Mortgage Banking*. This segment includes most North American activities relating to the real estate lending and mortgage banking business, including commercial mortgage banking, loan origination and capital markets activities, and syndication of new markets tax credit funds.

- *North American Servicing*. This segment includes all North American loan servicing activities, including activities with respect to the primary, master and special servicing of loan portfolios originated by Capmark, third parties, and securitized loan pools.

- *North American Investments and Funds Management*. This segment includes all North American activities relating to investments and funds management, including sponsorship of real estate debt and equity funds and management of Capmark's own real estate debt and equity investments.

- *North American Affordable Housing*. The North American Affordable Housing segment manages affordable housing debt investments and low income housing tax credit equity investments on behalf of third-party investors.

- *Asian Operations*. This segment historically included all Asian activities relating to all three core business lines. Capmark has ceased all Asian proprietary lending and investing activities and is currently focused on managing existing loan, investment and fee-for-services businesses in Asia.

- *European Operations*. This segment historically included all European activities relating to all three core business lines. Capmark has ceased all European proprietary lending and investing activities, has sold its European servicing business and closed its Irish banking subsidiary, and is currently focused on managing existing loan, investment and fee-for-services businesses in Europe.

4.      As of June 30, 2009, the carrying value of Capmark's total loan portfolio of

commercial real estate loans held for sale or investment was $10.7 billion. Capmark also owns

substantial real estate and equity investments and certain other tangible and intangible assets. On a

consolidated basis, as of June 30, 2009, Capmark's assets were approximately $20.1 billion and

3

liabilities were approximately $21 billion.  Consolidated losses for the three months ending June 30, 2009 were approximately $1.6 billion.

*Events Leading to Chapter 11*

5.    As a commercial real estate finance company, Capmark's ability to generate income and cash flow is highly dependent on (i) the volume of financing it originates and the credit performance of that financing; (ii) its ability to securitize, sell, participate or otherwise finance loans; (iii) the fair value of the loans on its balance sheet; and (iv) the spreads it generates on its interest-earning assets.  In addition, Capmark's financial performance is driven by, among other things, its ability to increase the size of its servicing portfolios and the amount of real estate-related assets under management.  Capmark's origination activities impact the level of placement fees and net interest income, and impact the amount of loans it has available for future sale and servicing opportunities, which in turn affect its levels of net gains or losses and fee-based income.  Capmark's ability to increase the size of its servicing portfolios affects the level of servicing fees it earns and income it derives from escrow balances.

6.    The unprecedented conditions in domestic and international financial markets have adversely affected Capmark's businesses.  The lack of credit available to potential purchasers of Capmark's assets and the current condition of the securitization markets has severely impaired its ability to sell assets in the normal course of business.  Capmark has historically utilized the proceeds from such asset sales as a source of liquidity for new originations and the repayment of debt.  Dislocations in worldwide capital markets, together with the deterioration of Capmark's operating results, have also impaired its ability to obtain alternative means of financing its origination and investment activities. Capmark's inability to sell its assets has required it to hold a greater portion of its assets for a longer duration, thereby increasing the credit risk related to lending and investment activities.  The negative impact from this increased credit exposure has been

4

exacerbated by the fact that the performance of Capmark's loans and real estate investments has sharply deteriorated. The current market conditions have made it difficult for Capmark's borrowers to find replacement financing or to sell their properties, which are the typical sources of repayment for commercial mortgage loans. The lack of available replacement financing decreases Capmark's cash flow, by increasing the average duration of Capmark's loan portfolio and decreasing transaction-related servicing fees.

7.      These developments have effectively made it impossible for the Debtors to continue their business operations in a profitable manner absent a restructuring of their businesses and obligations. After carefully reviewing and exploring strategic business alternatives and transactions, and after implementing numerous cost-saving strategies, the Debtors determined that an orderly restructuring of their debts under chapter 11 represents the best of all available strategic options to maximize and preserve the value of their estates for their creditors and other parties in interest. As described below, as part of their orderly restructuring the Debtors have determined that the assets of the Military Housing Business (as defined below) must quickly be sold in order to preserve the value of the assets to the Debtors' estates.

**Jurisdiction and Venue**

8.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relief Requested**

9.      By this Motion, the Debtors seek entry of (A) a bidding procedures order (the "Bidding Procedures Order"), substantially in the form of Exhibit A annexed hereto, (i) scheduling an auction (the "Auction") on December 4, 2009 at 1 p.m. (prevailing Eastern Time), at which the Sellers (as defined below) will solicit competing bids for a sale (the "Sale") of the Acquired Assets

5

(as defined below); (ii) approving the bidding procedures (the "Bidding Procedures") set forth in the Bidding Procedures Order for the Sale of the Acquired Assets; (iii) approving a break-up fee for the stalking horse bidder as protection against a topping bid that represents a higher or better offer; (iv) scheduling a hearing on December 7, 2009 at 10:00 a.m. (prevailing Eastern Time) to approve the Sale (the "Sale Hearing") of the Acquired Assets to the winning bidder at the Auction; (v) approving the notice of the Sale Hearing and the Auction (the "Sale Notice"), annexed as Schedule 1 to the Bidding Procedures Order; and (vi) approving the notice of assumption and assignment of certain executory contracts as part of the Sale transaction (the "Notice of Assumption and Assignment"), annexed as Schedule 2 to the Bidding Procedures Order; and (B) unless Purchaser is not the Successful Bidder (as defined below), an order, substantially in the form of Exhibit B annexed hereto, authorizing the Sale of the Acquired Assets to the Purchaser (the "Sale Order") on substantially the same terms and conditions set forth in the APA (as defined below), annexed hereto as Exhibit C, free and clear of any and all liens, claims, encumbrances and interests of any kind, nature or description (collectively, the "Liens"), pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Rules 2002-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

**The Proposed Sale of Capmark's**
**Military Housing Business to Jefferies Pursuant to the APA**

10.    Capmark Finance Inc. and Capmark Capital Inc. (together, the "Sellers") engage in the business of, among other things, arranging and providing financing for United States government public-private venture related projects, including the privatization of military housing and the origination and servicing of loans relating thereto (the "Military Housing Business"). As with many of the Debtors' businesses, the Military Housing Business relies upon financing made

available through structured loans and securitization facilities.   Given the overall decline in the availability of such financing sources, the Military Housing Business revenues, which derive substantially from investment banking fees generated from the placement volume of related loans, have declined significantly in 2008 and 2009 as a result of reductions in military housing placement volumes, and is not a component of the Debtors' anticipated reorganization or the Debtors' sale of their North American Servicing and North American Lending and Mortgage Banking businesses and the assets primarily related to such businesses (the "MSB Business") to Berkadia Commercial Mortgage LLC ("Berkadia"), which is the subject of a separate motion pending before the Court. The commencement of the Debtors' chapter 11 cases threatens to further impair the value that remains in the Military Housing Business, as financing counterparties will be unwilling to enter into transactions with the Sellers while they remain in bankruptcy, even if the securitization and structured loan markets experience some recoveries in the near future.   In light of the foregoing, and the financial burden imposed on the Debtors' estates by the operation of the Military Housing Business, the Debtors, in consultation with their professionals, do not believe that continuing to own the Military Housing Business is in the best interests of the Debtors' estates.

11.    Sellers and Jefferies Mortgage Finance, Inc. (the "Purchaser") have entered into that certain Purchase Agreement (the "APA"), dated as of October 16, 2009, whereby Purchaser agreed to purchase from Sellers the following assets (the "Acquired Assets"), which substantially comprise the Military Housing Business:[2]

  (a)    Assigned Contracts (including, without limitation, the Servicing Agreements);

  (b)    Military Housing Business Books and Records maintained by the Sellers on the Closing Date;

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the APA.

(c)     Retained Rights; and

(d)     all other assets that are set forth on <u>Schedule 1.1(i)</u> of the APA, <u>provided that</u> the Acquired Assets shall not include the Excluded Assets.

12.     The APA provides that the Sale of the Acquired Assets to Purchaser is subject to higher or better offers. The principal terms and conditions of the APA are as follows:[3]

(a)     <u>Purchase Price</u>. The consideration for the Acquired Assets (the "Purchase Price") payable to the Sellers at the Closing shall be equal to nine million dollars ($9,000,000), (i) less an amount equal to two hundred fifty thousand dollars ($250,000) (ii) plus any accrued and unpaid servicing fees as of the Closing Date payable to the Servicer pursuant to the Serviced Loans; <u>provided</u> that if the Closing does not occur prior to November 30, 2009, the Purchase Price shall be reduced on the first day of each calendar month until the Closing occurs by an additional two hundred fifty thousand dollars ($250,000); <u>provided, however</u>, that the aggregate amount of such reductions to the Purchase Price for the delay of Closing beyond November 30, 2009 shall not exceed five hundred thousand dollars ($500,000).

(b)     <u>Break-Up Fee</u>. In the event that the Sellers, prior to the Closing, (a) consummate a transaction in respect of an offer other than that of the Purchaser, or (b) sell, transfer, lease or otherwise dispose, directly or indirectly, including without limitation through an asset sale, stock sale merger or other similar transaction, all or substantially all of the Acquired Assets (or agree to do any of the foregoing) in a transaction or series of transactions within twelve (12) months from entry into the APA (either of clause (a) or (b) being an "Alternative Transaction"), the Sellers shall pay in cash in immediately available funds to the Purchaser a break-up fee in an amount equal to two hundred fifty thousand dollars ($250,000) (the "Break-Up Fee") not later than the closing of the Alternative Transaction; <u>provided</u> that in no event shall the Break-Up Fee be payable to the Purchaser if this Agreement is terminated pursuant to Section 8.1(b)(ii) or Section 8.1(b)(iii) of the APA where the breach thereof by the Purchaser has been the cause of, or resulted in, the failure of the Closing to occur on or before the dates specified in Section 8.1(b)(ii) or Section 8.1(b)(iii) thereof (as set forth in subparagraph (c)(ii)(B) and (C) below).

---

[3] To the extent there are any inconsistencies between the summary description of the APA contained herein and the terms and conditions of the APA, the terms of the APA control.

(c)    <u>Termination of APA</u>.

    i.    <u>Termination By Mutual Consent</u>.  At any time prior to the Closing Date, the Sellers and the Purchaser may terminate the APA by mutual consent.

    ii.    <u>Termination By Either Party</u>.  At any time prior to the Closing Date and provided that the right to terminate the APA shall not be available to any Party whose breach of the APA has been the cause of, or resulted in, the failure of the Closing to occur on or before the dates below, either the Sellers or the Purchaser may terminate the APA if:

        (A)    A court of competent jurisdiction or other Governmental Authority shall have issued a Final Order or ruling or taken any other action (which Order or ruling the Parties shall use their best efforts to lift), in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement;

        (B)    The Closing shall not have occurred on or before January 31, 2010; or

        (C)    The Sale Order has not been entered by January 15, 2010.

13.    Moreover, in addition to the aforementioned salient features of the APA, in accordance with Local Rule 6004-1(b)(iv), the Debtors note the following with respect to the APA:

    (a)    **No Sale to an Insider**: The prospective Purchaser is not an insider of the Debtors within the meaning set forth in section 101(31) of the Bankruptcy Code.  For purposes of full disclosure, Debtors note that Leucadia National Corp. currently owns 28.16% of Jeffries Group Inc., an affiliate of the Buyer.  Leucadia National Corp. is an affiliate of one of the joint venture entities that owns Berkadia, which will purchase the MSB Business if the business is ultimately sold pursuant to a separate motion pending before the Court.  Neither Leucadia National Corp. nor Berkadia has been a part of the transactions under the Sale Agreement at issue in this Motion.  Debtors also note that Buyer's affiliates also conduct arm's-length trading activities with the Debtors and their nondebtor affiliates in the ordinary course of their businesses, which are not a part of the transactions under the Sale Agreement.

RLF1-3496758-1

(b) **Agreements with Management**: There are certain pre-petition employment arrangements as referenced in Section 5.6 of the APA. No other agreements with management have been entered into in connection with the Sale of the Acquired Assets.

(c) **Releases**: No releases have been entered into in connection with the Sale of the Acquired Assets.

(d) **Private Sale/No Competitive Bidding**: As discussed above, Sellers intend to conduct an Auction for the Sale of the Acquired Assets. Neither the APA nor any other agreement prohibits the Sellers from soliciting competing offers for the Acquired Assets and the Sellers are not otherwise limited in shopping the Acquired Assets.

(e) **Closing and Other Deadlines**: As set forth in Section 7.1 of the APA, the closing is scheduled to occur on the second business day following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated by the APA (other than conditions with respect to actions the respective Parties will take at the Closing itself) and in no case later than the dates set forth in paragraph 12(c)(ii)(B) and (C) or such other date as the Parties may mutually determine or if there is a stay of the Court in place with respect to the Sale Order, within two (2) Business Days after such stay has been lifted.  As set forth above, Sellers or Purchaser may terminate the APA if Closing shall not have occurred on or before January 31, 2010 or the Sale Order has not been entered by January 15, 2010.

(f) **Good Faith Deposit**: The APA does not require submission of a good faith deposit in the amount of ten percent (10%) of the Purchase Price.

(g) **Interim Arrangements with Proposed Buyer**: As set forth in Sections 5.6 and 5.15 of the APA, Purchaser shall assist Sellers in maintaining the Military Housing Business prior to the Closing Date in accordance with current practices of the Sellers.

(h) **Use of Proceeds**: No provisions of the APA address the use of proceeds.

(i) **Tax Exemption**: Section 6.1(c) of the APA provides that transfers thereunder are nontaxable to the fullest extent permitted by 11 U.S.C. § 1146.

(j) **Record Retention**: Section 5.2(b) of the APA provides that Purchaser and Seller shall not, for a period extending six (6) years after the Closing Date (or for such longer period as required by law), destroy or otherwise dispose of the Military Housing Business Books and Records unless such party shall first offer in writing to surrender

10

such books, records and other data to the other parties and such other parties shall not agree in writing to take possession thereof during the ten (10) day period after such offer is made.

(k)     **Sale of Avoidance Actions**: The APA does not involve the sale of, or impose limitations on, any chapter 5 causes of action.

(l)     **Requested Findings as to Successor Liability**: Pursuant to Section 2.1 of the APA, Purchaser shall only be liable for the Assumed Liabilities, and not liable for any Excluded Liabilities. Also, pursuant to section 6.1 of the APA, it is a condition of closing that this Court enter an order, among other things, authorizing the delivery of the Acquired Assets to Purchaser free and clear of all interests within the meaning of Section 363(f) of the Bankruptcy Code, including free and clear of all Liens.

(m)     **Sale Free and Clear of Unexpired Leases**: Pursuant to Section 2.1(a) of the APA, the Purchaser shall acquire the Acquired Assets free and clear of all Liens other than certain Permitted Liens (as defined in the APA).

(n)     **Credit Bid**: The Acquired Assets are unencumbered by any Lien, mortgage, or any other security interest. Accordingly, there will be no credit bidding under section 363(k) of the Bankruptcy Code.

(o)     **Relief from Bankruptcy Rule 6004(h)**: The Sellers are requesting relief from the 10-day stay imposed by Rule 6004(h).

### Bidding Procedures and the Auction

14.     As noted above, in order to maximize the value of the Acquired Assets, the Debtors seek to implement a competitive bidding process for the Sale of the Acquired Assets pursuant to the APA, subject to higher or better offers.    The proposed Auction and Bidding Procedures are as follows:

(a)     **Assets to Be Sold**: The Auction shall consist of the Acquired Assets and Assumed Liabilities.

(b)     **Confidentiality Agreements**: Upon execution of a confidentiality agreement, in form and substance satisfactory to the Sellers, any party that wishes to conduct due diligence in respect of the Military Housing Business and the Acquired Assets and Assumed Liabilities may be granted access to all material information that has been or will be provided to the Purchaser and other bidders.

11

(c) **Bid Deadline**: Any person or entity interested in participating in the Auction must submit a Qualifying Bid (as defined below) on or before November 30 at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline") in writing, to (1) counsel to the Sellers, Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019, Attention: Michael P. Kessler, Esq. and Judy G.Z. Liu, and (2) Capmark Financial Group Inc., 116 Welsh Road, Horsham, Pennsylvania, 19044, Attention: Thomas L. Fairfield, Esq.

(d) **Qualifying Bids**: In order to participate in the bidding process and be deemed a "Qualifying Bidder," each potential bidder (other than the Purchaser) must submit a "Qualifying Bid" by the Bid Deadline. To constitute a Qualifying Bid, a bid must:

    i. be in writing and state that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the Acquired Assets on terms and conditions no less favorable to the Sellers than the terms and conditions contained in the APA;

    ii. include a mark-up of the APA (the "Modified APA") reflecting the variations from the APA, including which contracts and leases are not to be assumed and assigned pursuant to the Modified APA, and a clean and executed Modified APA;

    iii. provide that such bidder's offer is irrevocable until the closing of the purchase of the Acquired Assets if such bidder is the Successful Bidder or the Back-Up Bidder (each as defined below);

    iv. state such bidder is financially capable of consummating the transactions contemplated by the Modified APA;

    v. exceed the Purchase Price in the APA by five hundred thousand dollars ($500,000) plus payment of the Break-Up Fee and in the case of any subsequent bid, exceed the prior bid by two hundred fifty thousand dollars ($250,000);

    vi. include such financial and other information that will allow the Sellers to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA and evaluate bidder's demonstration of its actual experience in the origination and servicing of military housing loans;

vii.    describe any transition services that will be required by the bidder in connection with an acquisition of the Acquired Assets;

viii.    include a statement that there are no conditions precedent to the bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid. The bidder's bid and Modified APA should also highlight any governmental or third-party consents needed to consummate the acquisition of the Acquired Assets to the extent they are not already contemplated in the APA;

ix.    not request or entitle the bidder to any transaction or breakup fee, expense reimbursement, put option fee, or similar type of payment;

x.    fully disclose the identity of each entity that will be bidding for the Acquired Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

xi.    not contain any due diligence or financing contingencies of any kind;

xii.    include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified APA;

xiii.    include the names and contact information of members of the bidder who will be available to answer questions regarding the offer;

xiv.    include the names of external advisors including financial, legal and accounting firms, as well as industry consultants or other resources;

xv.    include any other information or factors that may be relevant to the Sellers and its advisors in consideration of the bid;

xvi.    include a cash deposit by wire transfer equal to ten (10%) percent of the amount offered to purchase the Acquired Assets (the "Good Faith Deposit"); and

xvii.    provide that such bidder will execute an appropriate confidentiality agreement prior to receipt of any information (including, but not limited to, business and financial

information and access to representatives of Sellers) from Sellers.

The Debtors shall make a determination regarding whether a bid is a Qualifying Bid and shall notify bidders whether their bids have been determined to be Qualifying Bids by no later than 4:00 p.m. (prevailing Eastern Time) on December 2, 2009.

(e)   **No Qualifying Bids**.: If no timely, conforming Qualifying Bids, other than the APA, are submitted by the Bid Deadline, the Debtors shall not hold an Auction and, instead, shall request at the Sale Hearing that the Court approve the APA with the Purchaser.

(f)   **Auction**: In the event the Debtors timely receive one or more Qualifying Bids other than the APA, the Debtors shall conduct the Auction with respect to the Military Housing Business. The Auction will be conducted at the offices of Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019 on December 4, 2009 at 1:00 p.m. (prevailing Eastern Time), or such other location as designated by the Debtors in a notice to all Qualified Bidders. The Auction shall be governed by the following procedures:

   i.    The Purchaser and the Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

   ii.    Only representatives of the Debtors, the Purchaser, Qualified Bidders, counsel and other advisors selected by any creditors' committee appointed in these cases (the "Committee"), shall be entitled to be present at the Auction;

   iii.    The Auction process shall be transcribed by a qualified court reporter;

   iv.    Only the Purchaser and Qualified Bidders shall be entitled to make any subsequent bids at the Auction;

   v.    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

   vi.    Bidding shall commence at the amount of the highest Qualifying Bid submitted by the Qualified Bidders prior to the Auction and such Bid shall be announced three (3) hours prior to the start of the Auction;

14

vii.   Qualified Bidders may then submit successive bids in increments of at least two hundred fifty thousand dollars ($250,000) higher than the previous bid;

viii.  All Qualified Bidders and the Purchaser shall have the right to submit additional bids and make additional modifications to the APA or Modified APA, as applicable, at the Auction;

ix.    The Auction may include individual negotiations with the Qualified Bidders and the Purchaser and/or open bidding in the presence of all other Qualified Bidders and the Purchaser;

x.     The Auction shall continue until there is only one offer that the Sellers determine, subject to Court approval, is the highest or best offer from among the Qualified Bidders and the Purchaser submitted at the Auction (the "Successful Bid"). In making this decision, the Debtors, may consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the APA requested by each Qualified Bidder, and the net benefit to the Debtors' estates. The Purchaser or the Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the applicable Modified APA; and

xi.    Within three (3) days after conclusion of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities. Bids made after the close of the Auction shall not be considered by the Debtors.

(g)    **Back-Up Bidder and Return of Good Faith Deposits:**

i.     If an Auction is conducted, the Qualifying Bidder with the next highest or otherwise best Qualifying Bid, as determined by the Debtors in the exercise of their business judgment in consultation with the Creditors' Committee and the Agent, at the Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until 24 hours after the closing of the Sale transaction with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale

because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the Sale with the Back-Up Bidder without further order of the Court.

ii.   Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) Business Day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall be held by the Debtors until one (1) Business Day after the closing of the Sale transaction with the Successful Bidder.

15.   In accordance with Local Rule 6004-1(c), the Debtors note the following with respect to the Auction and the Bidding Procedures:

(a)   **Provisions Governing Qualifications of Bidders**: *See* preceding paragraph 14(d), (e), and (f).

(b)   **Provisions Governing Qualified Bids**: *See* preceding paragraph 14(d) and (e).

(c)   **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**:

i.   No Shop or No-Solicitation Provisions: Not applicable.

ii.   Break-Up/Topping Fees and Expense Reimbursement: *See* preceding paragraph 14(b); APA, Section 5.14.

iii.   Bidding Increments: *See* preceding paragraph 14(f); APA, Section 5.11(a).

iv.   Treatment of Break-Up or Topping Fees and Expense Reimbursement at Auction: *See* preceding paragraph 14(d) and (f); APA, Section 5.11(a).

(d)   **Modification of Bidding and Auction Procedures**: Not applicable.

(e)   **Closing with Alternative Backup Bidder**: *See* preceding paragraph 14(g); APA, Sections 5.11 and 5.12.

16

### Approval of the Bidding
### Procedures and the Auction

16.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe the Sale of the Acquired Assets pursuant to a public auction governed by the proposed Bidding Procedures will maximize the sale proceeds received by the estate, which is the paramount goal in any proposed sale of property of the estate. *In re Dura Automotive Sys., Inc.,* No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, *253 (Bankr. D. Del. Aug. 15, 2007) ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.") (internal citations omitted).

17.    The Bidding Procedures allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Acquired Assets. Bidding procedures should be approved when they provide a benefit to the estate by maximizing the value of the assets and enhance competitive bidding. *Id.* (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc.,* 181 F.3d 527, 535-537 (3d Cir. 1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate)). The Debtors believe that the proposed Bidding Procedures are consistent with other procedures previously approved in this district and other bankruptcy courts.

18.    Although the Debtors believe that the value to be provided pursuant to the terms set forth in the APA is fair and reasonable, the Debtors submit that the Bidding Procedures and the Auction will ensure that the Debtors' estates receive the highest or best value available by allowing the market to test the Purchase Price (as defined in the APA) of the Acquired Assets. The Debtors thus hereby request the Court's approval of the process and procedures set forth in the

Bidding Procedures for the submission and consideration of competing bids from other interested parties for the Acquired Assets.

### Approval of the Sale Hearing
### Schedule and Sale Hearing Notice

19.    The Debtors request that the Court schedule a Sale Hearing on or about December 7, 2009 at 10:00 a.m. (prevailing Eastern Time), or as soon as practicable thereafter, to consider approval of the APA and the sale contemplated thereby, or the approval of any higher or better offer, if any, resulting from an Auction.  Bankruptcy Rule 6004(a) provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k), and if applicable, in accordance with section 363(b)(2) of the Code."  Bankruptcy Rule 2002(a)(2) requires the Debtors give all creditors and certain other parties "at least 20 days' notice by mail" of the Sale.  Bankruptcy Rule 6004(b) also provides that objections to the proposed Sale "shall be filed and served not less than five days before the date set for the proposed action or within the time fixed by the court."

20.    The Sale Hearing Notice contains the type of information required under Bankruptcy Rule 2002(c), and also includes information regarding the Auction procedures to the extent a higher or better offer than the APA is obtained and an Auction takes place.  Therefore, the Debtors request that this Court approve the form and content of the Sale Hearing Notice.  The Debtors propose at least 20 days' notice for the Sale Hearing, which complies with the notice procedures mandated by the Bankruptcy Rules, according to the following procedures:

(a)    The Debtors shall serve, within 3 business days after entry of the Sale Hearing Order (the "Mailing Deadline"), by overnight courier, electronic mail, or same-day messenger delivery, copies of the Sale Hearing Notice upon: (i) the U.S. Trustee, (ii) attorneys for the Committee, if appointed, (iii) attorneys for Purchaser, (iv) any party who, in the past 12 (twelve) months, expressed in writing to the Debtors an interest in acquiring the Military Housing Business, and who the Debtors and their representatives reasonably and in good

18

faith determine to potentially have the desire and financial wherewithal to effectuate the sale, (v) all parties who are known to possess or assert a secured claim against the Acquired Assets, (vi) the Internal Revenue Service, (vii) all applicable state attorneys general, local realty enforcement agencies, and local regulatory authorities, and (vii) any parties entitled to notice under Rule 2002-1(b) of the Local Rules for the United States Bankruptcy Court District of Delaware.

(b)     On or before the Mailing Deadline, the Debtors (or their agent) shall serve, by overnight courier, electronic mail, or same-day messenger delivery, the Notice of Assumption and Assignment (the "Notice of Assumption and Assignment"), substantially in the form attached hereto as Schedule 2, upon all known nondebtor parties to the Assigned Contracts. The Notice of Assumption and Assignment shall set forth (i) the intent of the Debtors to assume the Assigned Contracts and assign them to Purchaser or the Successful Bidder, as applicable and (ii) applicable cure amounts (the "Cure Amounts").

(c)     On or before the Mailing Deadline, or as soon as practicable thereafter, the Debtors will publicize the Sale Hearing Notice in the Wall Street Journal (National Edition) for 2 consecutive business days.

21.     The Debtors submit that such notice shall constitute good and sufficient notice of the Auction and the Sale of the Acquired Assets, and that no other or further notice need be given. Accordingly, the Debtors request that the Court approve the form and manner of the Sale Notice.

### Approval of Procedures for Assumption and Assignment of Assigned Contracts and Leases

22.     To facilitate the Sale and the assumption and assignment of the Assigned Contracts, the Debtors will serve a notice of intent to assume and assign the executory contracts and leases that are part of the Sale (the "Notice of Assumption and Assignment") on all nondebtor parties to the Assigned Contracts according to the following procedures:  On or before the Mailing Deadline, the Debtors (or their agent) shall serve, by overnight courier, electronic mail, or same-day messenger delivery, the Notice of Assumption and Assignment, substantially in the form attached to

19

the Bidding Procedures Order as Schedule 2, upon all known nondebtor parties to the Assigned Contracts. The Notice of Assumption and Assignment shall set forth (i) the intent of the Debtors to assume the Assigned Contracts and assign them to Purchaser (or to any Successful Bidder), and (ii) applicable cure amounts, if any (the "Cure Amounts").   In the Notice of Assumption and Assignment the Sellers will identify the Assigned Contracts and the Cure Amounts that the Sellers believe must be paid to cure all defaults under the Assigned Contracts. If no amount is listed on the Notice of Assumption and Assignment, the Sellers believe that there is no Cure Amount due.

23.     Bankruptcy Rule 6006(a) provides that "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease other than as part of a plan, is governed by Rule 9014." Any objections to (i) the assumption and assignment of an Assigned Contract, or (ii) the amount asserted as the Cure Amount (each, an "Assumption and/or Cure Objection") must be in writing and set forth with specificity the nature of the objection and the cure amount that the objecting party believes should be paid in connection with the assumption of the Assigned Contract (the "Claimed Cure Amount").

24.     If an Assumption and/or Cure Objection is timely filed, the Debtors request that a hearing with respect to that objection shall be held before the Court at the Sale Hearing.  If, however, an Assumption and/or Cure Objection is not timely filed and served, the assumption and assignment of the applicable Assigned Contract will proceed without further notice at the Sale Hearing to approve the Sale of the Acquired Assets. The Debtors also request that parties that fail to file and serve timely Assumption and/or Cure Objections shall be deemed to have waived and released any and all rights to assert Cure Amounts differing from those listed on the exhibit to the Notice of Assumption and Assignment and, subject to payment of the Cure Amount(s) listed on such contract with respect to their Assigned Contract(s), shall be forever barred and estopped from

asserting or claiming against the pertinent Seller, Purchaser, or any Successful Bidder that any additional amounts are due or defaults exist, or prohibitions or conditions to assignment exist or must be satisfied, under such Assigned Contract.

25.    If no Cure Amounts are due under the Assigned Contract, and the nondebtor party to the Assigned Contract does not otherwise object to the pertinent Seller's assumption and assignment of the Assigned Contract, no further action need be taken on the part of that nondebtor party.  The Debtors also request that Assumption and/or Cure Objections that object solely to the Cure Amount may not prevent or delay the pertinent Sellers' assumption and assignment of any Assigned Contracts.  If a party objects solely to a Cure Amount, the pertinent Seller may, in its sole discretion, hold the Claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties.  So long as the pertinent Seller holds the Claimed Cure Amount in reserve, and there are no other unresolved objections to assumption and assignment, the pertinent Seller can, without further delay, assume and assign the Assigned Contract that is the subject of the objection. Under such circumstances, the objecting party's recourse shall be limited to the funds held in reserve.

26.    The Sellers submit the aforementioned procedures provide sufficient notice to nondebtor parties to the Assigned Contracts and should be approved in all respects.

### Approval of Objection Deadline

27.    The Debtors request that, pursuant to Bankruptcy Rule 9014, objections, if any, to the Sale (a "Sale Objection") or an Assumption and/or Cure Objection (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware, 19801, on or before 4:00 p.m. on December 1, 2009 (prevailing Eastern Time) (the "Objection Deadline"), or on such later date and time as the Debtors may agree, and (iv) be served with a copy on: (a)

21

counsel for the Debtors, Dewey & LeBoeuf LLP, Attention: Michael P. Kessler, Esq., and Judy G.Z. Liu, Esq., 1301 Avenue of the Americas, New York, New York, 10019; (b) local counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware, 19801, Attention: Mark D. Collins, Esq. and Jason M. Madron, Esq.; (c) counsel for Purchaser, K&L Gates LLP, 599 Lexington Avenue, New York, New York 10022, Attention: Richard S. Miller, Esq.; (d) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801; (e) counsel for any official committee of unsecured creditors (the "Committee"), if appointed; (f) administrative agent under the Debtors' prepetition senior credit facility, bridge loan agreement and term loan facility, Citicorp North America, Inc., and Citibank, N.A., 1615 Brett Rd. Bldg. 3, New Castle, Delaware, 19720, Attention: Ralph Townley; (g) indenture trustee under the Debtors' prepetition floating rate and 5.875% senior unsecured note indentures, Deutsche Bank Trust Company Americas, 60 Wall Street, 27th Floor, MS:NYC60-2710, New York, New York, 10005, Attention: Trust & Securities Services; (h) successor trustee under the prepetition 6.300% senior unsecured note indenture, Wilmington Trust FSB, 166 Mercer Street, Suite 2-R, New York, New York, 10012-3249, Attention: Adam Berman; (i) counsel for the ad hoc committee of prepetition unsecured bondholders of CFGI, Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway, New York, New York, 10019, Attention: Adam L. Shiff, Esq.; (j) trustee under CFGI's prepetition floating rate junior subordinated indenture, Law Debenture Trust Company of New York, 767 Third Ave., 31st Floor, New York, New York, 10017, Attention: Corporate Trust Administration; (k) any proposed DIP lender; (l) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis); and (m) the Federal Deposit Insurance Corporation.

22

**Basis for Requested Relief**

A.    **Approval of the Sale under Bankruptcy Code Sections 363(b) and 105(a) is Warranted**

28.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (providing that debtors in possession have "all the rights . . . of a trustee"). In addition, section 105(a) provides the authority for this Court to carry out the provisions of section 363(b). *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."). Although section 363(b) of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *In re Dura Auto. Sys.,* 2007 Bankr. LEXIS 2764 at *258 (Bankr. D. Del. 2007) (citing *Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Penn., Inc.,* 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson Ry. Co.,* 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision); *In re Montgomery Ward Holding Corp.,* 242 B.R 147, 153 (D. Del. 1999) (same).

29.    When a valid business judgment exists, the law vests the debtor's decision to sell assets with a strong presumption that "in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in honest belief that the action taken was in the best interests of the company." *In re Dura Auto. Sys.,* 2007 Bankr. LEXIS at *260 (citing *The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res.,*

23

*Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Von Gorkum*, 488 A.2d 858, 872 (Del. 1985)). Once a court is satisfied there is a sound business judgment for the proposed sale, the court must then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See, e.g., Del. and Hudson Ry. Co.*, 124 B.R. at 166.

30.     The Debtors submit that the decision to sell the Acquired Assets is based upon their sound business judgment and should be approved.    Both before and after the Commencement Date, the Debtors have worked diligently with their financial advisors to explore alternatives to sell certain of their business assets in circumstances like those presented here where sales would provide value to the estates and relieve the Debtors from ongoing operational expenses. The Military Housing Business, as discussed above, is generating significantly diminished revenues as a result of current economic conditions and the Debtors' status as chapter 11 debtors.    The Debtors believe that if no timely, conforming Qualifying Bids other than the APA are submitted by the Bid Deadline, the prompt Sale of the Acquired Assets without an Auction and without further delay presents the best opportunity to maximize and preserve value for their estates.

31.     In addition, the Debtors believe their prepetition marketing efforts, arms' length negotiations with the Purchaser, and the proposed Bidding Procedures will achieve the best results for their estates and maximize value for all constituents.    Furthermore, the Bidding Procedures contemplate an open auction process and are designed to ensure that the ultimate purchase price of the Acquired Assets is fair and reasonable.    Thus, the Debtors submit that the proposed sale of the Acquired Assets is within their sound business judgment.

**B.      Sale of Military Housing Business Free and Clear of Interests is Warranted**

32.      Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions are satisfied:

(1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)      such entity consents;

(3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)      such interest is in bona fide dispute; or

(5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

33.      The Debtors believe that one or more of these tests in section 363(f) of the Bankruptcy Code are easily satisfied with respect to the Sale of the Acquired Assets. First and foremost, the Acquired Assets are unencumbered by any recorded lien, security interest, mortgage, judgment or other encumbrance. To the extent there is any unrecorded "interest" in the Acquired Assets other than the Debtors', the Debtors submit that subsection 363(f)(5) would apply to permit the Sale free and clear of such interest. The Debtors believe the rights of any unknown claimant could be valued and allowed as a claim against the Sellers' estates, and thus the claimant could be compelled to accept a money satisfaction of its interest in property, and section 363(f)(5) would be satisfied. *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289, 291 (3d Cir. 2003) (the Court of Appeals for the Third Circuit held that section 363(f)(5) was satisfied in respect of successor

liability claims because "[h]ad TWA liquidated its assets under Chapter 7 of the Bankruptcy Code, the claims at issue would have been converted to dollar amounts and the claimants would have received the distribution provided to other general unsecured creditors on account of their claims.").

34.     Because the section 363(f) requirements have been met, Purchaser should not be liable, as a successor to the Military Housing Business or otherwise, for any of the Debtors' pre-petition liabilities, unless expressly assumed.  As a matter of logic, bankruptcy estates would be unable to sell assets for fair value if the estates' liabilities followed the assets.  The Third Circuit Court of Appeals has held that a buyer of a debtor's assets pursuant to sections 363(b) or 363(f) takes free from successor liability resulting from any pre-existing claims.  *See, e.g., In re Trans World Airlines, Inc.,* 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of . . . successor liability claims achieves the purpose of [Bankruptcy Code] section 363 intended by Congress"), *aff'd,* 332 F.3d 283, 285 (3d Cir. 2003) ("Because section 363(f) of the Bankruptcy Code permits a sale of property 'free and clear' of an 'interest in such property' and because the claims against TWA here were connected to or arise from the assets sold, we affirm the Bankruptcy Court's order approving the sale 'free and clear' of successor liability.").

**C.     Assumption and Assignment of Executory Contracts is Warranted**

35.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to Court approval, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. 11 U.S.C. § 365.  The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease may be assumed is the debtor's "business judgment" that the assumption is in its economic best interests.  *See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,* 872

26

F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984)

(describing the business judgment test as "traditional").

      36.    To facilitate and effect the sale of the Acquired Assets, Purchaser has agreed

to take assignment of the Assigned Contracts. The Debtors believe they can demonstrate at the Sale

Hearing that all requirements for assumption and/or assignment of such contracts will be satisfied.

The Debtors have evaluated the financial wherewithal of Purchaser and, in exercising their sound

business judgment, believe that selling the Acquired Assets and assuming and assigning the

Assigned Contracts to Purchaser would be in the best interests of their estates. Moreover, as noted

above, each nondebtor party to an Assigned Contract will receive notice of the proposed assumption

and assignment, and the proposed cure amount, and have a reasonable opportunity to object thereto.

**D.**    **Finding of Good Faith is Warranted**

      37.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Seventh Circuit

in *In re Andy Frain Serv., Inc.*, held that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

798 F.2d 1113, 1125 (7th Cir. 1986) (emphasis and citations omitted).

      38.    Purchaser is an entity unrelated to the Debtors. The APA was intensely

negotiated at arm's-length with all parties involved acting in good faith, and each party was

represented by sophisticated counsel.  The Debtors are unaware of any facts or circumstances that might compromise or taint Purchaser's good faith in negotiating and entering into the APA. Accordingly, the Debtors request the Court to determine that Purchaser has acted in good faith and is entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

**E.      The Break-Up Fee is Reasonable and Appropriate**

39.     Bidding incentives, such as the Break-Up Fee, encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process.  "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers."  *In re S. N.A, Nut Co.,* 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); *see also In re 995 Fifth Ave. Assoc. L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

40.     A proposed bidding incentive, such as the Break-Up Fee, should be approved when it is in the best interests of the estate.  *S.N.A. Nut Co.,* 186 B.R. at 104; *see also In re America West Airlines, Inc.,* 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc,,* 140 B.R. 191 (Bankr. N.D. Ohio 1992).  Typically, this requires that the bidding incentive provide some benefit to the debtor's estate.  *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

41.     Here, the Break-Up Fee will only be paid if the Acquired Assets are sold to a purchaser with a bid that is higher or better than Purchaser's offer for the Acquired Assets, including taking into account the cost of the Break-Up Fee when considering the competing bid. If this occurs, the Debtor will effectively net at least the amount offered by Purchaser and consequently the Debtors' estates will have benefited from the floor set by Purchaser's initial bid.

42.     "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *In re Integrated Res., Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992). As is customary, the Break-Up Fee required by the Purchaser as a condition to it spending the significant time and expense to negotiate and ultimately agree to the APA. The Debtor believes that the Break-Up Fee will not stifle bidding. To the contrary, the Debtor believes that in the event of an auction, the Break-Up Fee will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *Id.* at 662. In other words, if the assets are sold to a competing bidder, it will – in all likelihood – be because of Purchaser's crucial role as an initial bidder generating interest in the assets.

43.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." *Id.* The Break-Up Fee is equal to approximately 2.8% of the Purchase Price, which is within the range of fees typically paid in other significant sales transactions that have been approved by this Court. *See, e.g., In re Maxide Acquisition, Inc.,* Case No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (approving break-up fee of 3%, or $2.5 million, in connection with a $75 million sale); *In re Ameriserve Food Distrib.,*

*Inc.*, Case No. 00-00358 (PJW) (Bankr. D. Del. June 15, 2000) (approving break-up fee of 3.6%, or $4 million, in connection with $110 million sale). Given the relatively small Purchase Price, the Debtors, in their business judgment, believe $250,000 as a Break-Up Fee is appropriate.

44.    For these reasons, and given the benefits to the Debtors' estates conferred by the Purchaser and the APA, the Debtors respectfully request that the Court approve the Break-Up Fee.

### Relief From Ten-Day Waiting Periods

45.    The Debtors request the Court to waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d) and order that, if and when entered, the Sale Order be effective immediately. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of ten days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."

46.    The purpose of these rules is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Bankruptcy Rules 6004(h) and 6006(d). Although these rules and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the ten-day stay period, Collier on Bankruptcy suggests the ten-day stay period should be waived to allow a transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev. ¶ 6004.10 (15th rev. ed. 2006). Further, it suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

**Notice**

47.    No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.  Notice of this Motion shall be provided via U.S. first class mail to (i) the Office of the United States Trustee for the District of Delaware, (ii) Citibank, N.A. and Citicorp North America, Inc., as administrative agents under the Debtors' prepetition senior credit facility, bridge loan agreement and term loan facility, (iii) Deutsche Bank Trust Company Americas, as trustee under the prepetition senior unsecured floating rate note and 5.875% senior unsecured note indentures, (iv) Wilmington Trust FSB, as successor trustee under the prepetition 6.300% senior unsecured note indenture, (v) counsel for the ad hoc committee of prepetition unsecured noteholders of CFGI, (vi) Law Debenture Trust Company of New York, as trustee under CFGI's prepetition floating rate junior subordinated indenture, (vii) any proposed DIP lender, (viii) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis), and (ix) the Federal Deposit Insurance Corporation, (x) counsel to the Purchaser, and (xi) all parties to any agreements sought to be assumed and assigned pursuant to the APA.  The Debtors submit that no other or further notice need be provided.

**No Previous Request**

48.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request (i) entry of the proposed Bidding Procedures Order attached hereto as Exhibit A, (ii) at the completion of the Sale Hearing, entry of the Sale Order attached hereto as Exhibit B approving the Sale of the Acquired Assets to the Purchaser, or, in the event of a higher or better offer, the Successful Bidder, and (iii) such other and further relief as the Court may deem just and appropriate.

Dated: October 30, 2009
      Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Jason M. Madron (No. 4431)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  302.651.7700
Facsimile:  302.651.7701

-and-

Martin J. Bienenstock
Michael P. Kessler
Judy G.Z. Liu
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone:  212.259.8000
Facsimile:  212.259.6333

*Proposed Attorneys for the Debtors and Debtors in Possession*