# **EXHIBIT C**

**(Purchase Agreement)**

PURCHASE AGREEMENT

BY AND AMONG

JEFFERIES MORTGAGE FINANCE, INC.

CAPMARK FINANCE INC.,

and

CAPMARK CAPITAL INC.,

Dated October 16, 2009

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ..................................................................1
    SECTION 1.1    Definitions..................................................1

ARTICLE II THE ACQUISITION ...........................................................8
    SECTION 2.1    Purchase and Sale ......................................8
    SECTION 2.2    Consideration .............................................8

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS ......................8
    SECTION 3.1    Organization and Qualification...................9
    SECTION 3.2    Authorization ............................................9
    SECTION 3.3    No Violation...............................................9
    SECTION 3.4    Consents and Approvals .............................9
    SECTION 3.5    Brokers' Fees and Commissions..................9
    SECTION 3.6    Ownership................................................10
    SECTION 3.7    Origination and Servicing ........................10
    SECTION 3.8    No Defaults..............................................10
    SECTION 3.9    Disclaimer of Other Representations and Warranties...................10

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ...............10
    SECTION 4.1    Organization and Qualification.................10
    SECTION 4.2    Authorization ..........................................10
    SECTION 4.3    No Violation.............................................11
    SECTION 4.4    Consents and Approvals ...........................11
    SECTION 4.5    Brokers' Fees and Commissions................11
    SECTION 4.6    Financing.................................................11
    SECTION 4.7    Eligibility Requirements ...........................12
    SECTION 4.8    Inspections; Limitation of Sellers Warranties................................12

ARTICLE V COVENANTS..................................................................12
    SECTION 5.1    Conduct of Business of the Sellers Prior to the Closing...............12
    SECTION 5.2    Access to Information ...............................12
    SECTION 5.3    All Reasonable Efforts..............................13
    SECTION 5.4    Consents and Approvals; Assigned Contracts ..............................13
    SECTION 5.5    Public Announcements ..............................15
    SECTION 5.6    Employee Matters ....................................15
    SECTION 5.7    Confidentiality ........................................15
    SECTION 5.8    Control of Business...................................16
    SECTION 5.9    Sales, Transfer and Similar Taxes ..............16
    SECTION 5.10    Names and Mark; Name Changes................16
    SECTION 5.11    Bankruptcy Actions .................................17
    SECTION 5.12    Other Bids ...............................................18
    SECTION 5.13    Bankruptcy Matters..................................18
    SECTION 5.14    Break-Up Fee ..........................................19
    SECTION 5.15    Transition Services....................................19

ARTICLE VI CLOSING CONDITIONS.................................................................19
    SECTION 6.1        Conditions to Each Party's Obligations Under this
                                        Agreement............................................................19
    SECTION 6.2        Conditions to the Obligations of the Purchaser Under this
                                         Agreement............................................................20
    SECTION 6.3        Conditions to the Obligations of the Sellers under this
                                         Agreement............................................................21

ARTICLE VII CLOSING............................................................................................21
    SECTION 7.1        Closing ..................................................................21

ARTICLE VIII TERMINATION AND ABANDONMENT ......................................22
    SECTION 8.1        Termination............................................................22
    SECTION 8.2        Procedure and Effect of Termination............................23

ARTICLE IX MISCELLANEOUS PROVISIONS....................................................23
    SECTION 9.1        Nonsurvival of Representations and Warranties............23
    SECTION 9.2        Amendment and Modification ......................................23
    SECTION 9.3        Validity ..................................................................23
    SECTION 9.4        Expenses and Obligations............................................23
    SECTION 9.5        Specific Performance .................................................24
    SECTION 9.6        Parties in Interest......................................................24
    SECTION 9.7        Construction............................................................24
    SECTION 9.8        Severability ............................................................24
    SECTION 9.9        Notices ..................................................................24
    SECTION 9.10      Governing Law ........................................................25
    SECTION 9.11      Counterparts............................................................25
    SECTION 9.12      Headings ................................................................25
    SECTION 9.13      Entire Agreement ......................................................25
    SECTION 9.14      Assignment ............................................................25
    SECTION 9.15      Jurisdiction and Venue...............................................26
    SECTION 9.16      Waiver of Jury Trial.................................................26

## **EXHIBITS**

Exhibit A                Form of Bill of Sale and General Assignment

## **SCHEDULES**

Schedule 1.1(i)          Acquired Assets
Schedule 1.1(ii)         Retained Rights
Schedule 2.1(b)          Excluded Assets
Schedule 5.1(b)          Conduct of Business of the Sellers Prior to the Closing
Schedule 6.1(b)          Required Consents

Disclosure Schedule

PURCHASE AGREEMENT

PURCHASE AGREEMENT, dated as of October 16, 2009, by and among JEFFERIES MORTGAGE FINANCE, INC., a Delaware corporation, or its designee (the "Purchaser"), CAPMARK FINANCE INC., a California corporation ("Capmark Finance"), and CAPMARK CAPITAL INC., a Colorado corporation ("Capmark Capital" and, together with Capmark Finance, the "Sellers").

RECITALS:

WHEREAS, the Sellers presently conduct the Military Housing Business (as hereinafter defined);

WHEREAS, the Sellers desire to sell, assign and transfer to the Purchaser, and the Purchaser desires to purchase and assume from the Sellers, all of the Acquired Assets (as hereinafter defined) and Assumed Liabilities (as hereinafter defined), all in accordance with the provisions of this Agreement; and

WHEREAS, the Purchaser and the Sellers desire to make certain representations, warranties and agreements in connection with the sale and acquisition of the Acquired Assets, and also desire to set forth various conditions precedent thereto.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements herein contained, the Parties agree as follows:

ARTICLE I
DEFINITIONS

SECTION 1.1    Definitions.  For purposes of this Agreement, the term:

"Acquired Assets" means all of the right, title and interest in and to the following assets (without duplication): (a) Assigned Contracts (including, without limitation, the Servicing Agreements), (b) Military Housing Business Books and Records maintained by the Sellers on the Closing Date, (c) the Retained Rights and (d) all other assets that are set forth on Schedule 1.1(i), provided that the Acquired Assets shall not include the Excluded Assets.

"Affiliate" of any Person means another Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person.

"Agreement" means this Purchase Agreement and all schedules and exhibits hereto.

"Alternative Transaction" has the meaning set forth in Section 5.14.

- 1 -

"Assigned Contracts" means the Contracts that are acquired by the Purchaser as part of the Acquired Assets (as set forth on Schedule 1.1(i)).

"Assumed Liabilities" means (a) all of the Liabilities of the Sellers pertaining to the period, and to be performed, after the Closing Date under the Assigned Contracts (including, without limitation, the Servicing Agreements), (b) all Liabilities that relate primarily to, or that arise primarily out of, any Acquired Asset, or that arise out of the ownership by the Purchaser of any Acquired Asset or associated with the realization of the benefits of any Acquired Asset, in each case pertaining to the period, and to be performed, from and after the Closing Date and (c) all accounts payable pertaining to the period and arising after the Closing Date from the operation or conduct of the Military Housing Business; provided, that Assumed Liabilities shall not include any Excluded Liabilities.

"Auction" means the auction conducted by the Sellers pursuant to the Bidding Procedures Order for substantially all of the Acquired Assets in the event a Qualifying Bid is timely received prior to the deadline set for the submission of Bids in the Bidding Procedures Order.

"Bankruptcy Code" means the United States Code, 11 U.S.C. § 101 et seq.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bid" has the meaning set forth in Section 5.12.

"Bidder" has the meaning set forth in Section 5.12.

"Bidding Procedures Order" means has the meaning set forth in Section 5.11(a).

"Bill of Sale and General Assignment" means a bill of sale and general assignment in the form attached hereto as Exhibit A.

"Break-Up Fee" has the meaning set forth in Section 5.14.

"Business Day" means any day other than a Saturday, a Sunday, a legal holiday in the State of New York or a day on which banking institutions in the State of New York are authorized or obligated by law to close.

"Business Employees" has the meaning set forth in Section 5.6(a).

"Capmark Capital" has the meaning set forth in the Preamble.

"Capmark Finance" has the meaning set forth in the Preamble.

"Closing" has the meaning set forth in Section 7.1.

"Closing Date" has the meaning set forth in Section 7.1.

"Confidential Information" means all confidential, proprietary and/or non-public financial or other information concerning a Party or its Affiliates, including without limitation information concerning the assets, liabilities, accounting practices and general operations of such Party or its Affiliates, and all analyses, summaries, notes, and written or electronic records prepared by a Recipient that reflect upon, or are based upon, such information that is furnished to a Recipient in connection with this Agreement, any Transaction Document or the transactions contemplated hereby or thereby; provided, however, that Confidential Information shall not include information that: (a) is or becomes generally available to the public through no fault of the Recipient in violation of this Agreement, (b) is or becomes available to the Recipient on a non-confidential basis from a source other than a Disclosing Party or its Affiliates that is not known to the Recipient to be prohibited from disclosing such information by a contractual, legal or fiduciary obligation of confidentiality, (c) is independently developed by the Recipient without use of or reliance on, either directly or indirectly, the Confidential Information, or (d) was known to or in the possession of the Recipient on a non-confidential basis prior to disclosure by a Disclosing Party under the terms of this Agreement.

"Contract" means any contract, agreement, indenture, note, bond, loan, instrument, lease, conditional sales contract, Mortgage, License, franchise, insurance policy, commitment or other arrangement or agreement.

"Control" (including, with correlative meanings, the terms "Controlled by", "Controlling" and "under common Control with"), as used with respect to any Person, means the possession, directly or indirectly, of more than fifty percent (50%) of the voting equity interests in such Person, whether through ownership of voting securities, by contract or otherwise.

"Custodial Accounts" means those certain cash accounts, Escrow Accounts, reserve accounts and lockbox accounts held by the Sellers pursuant to a Servicing Agreement.

"Disclosing Party" means a Party that discloses or has disclosed (or whose Affiliate or Representative discloses or has disclosed) Confidential Information to a Recipient in connection with this Agreement, any Transaction Document or the transactions contemplated hereby or thereby.

"Disclosure Schedule" has the meaning set forth in the introductory paragraph of Article III.[1]

"Eligibility Requirements" has the meaning set forth in Section 4.7.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Account" means an account maintained by the Sellers for the deposit of Escrow Funds for one or more Serviced Loans.

_____

[1] Need to see Schedules.

"Escrow Funds" means, for each Serviced Loan, any funds required to be held by the Servicer on behalf of the borrower or any other person pursuant to the requirements of the Serviced Loan Documents, including, but not limited to, amounts constituting ground rents, taxes, assessments, utility fees, municipal service charges, fire and hazard and other insurance premiums, replacement reserves, debt service reserves, construction, rehabilitation or repair amounts and/or any other accounts held in connection with or as collateral for, the Serviced Loan, and amounts held in lieu of payments such as letters of credit and other non-cash items.

"Excluded Assets" has the meaning set forth in Section 2.1(b).

"Excluded Liabilities" has the meaning set forth in Section 2.1(d).

"Final Order" shall mean an Order: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; provided, that the theoretical possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed with respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

"GAAP" means United States generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, or any political subdivision thereof, whether federal, state, local or foreign, or any agency or instrumentality thereof, or any court.

"Hired Employee" has the meaning set forth in Section 5.6(a).

"Insolvency Proceeding" means a voluntary or involuntary petition for liquidation or reorganization relief pursuant to the Bankruptcy Code, or a proceeding under similar law or statute relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts of any of the Sellers.

"Knowledge of Sellers" means, as of the date the applicable representation is given, the actual knowledge, after due inquiry, of Dan Ray and Peter Kisluk.

"Laws" means all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law (including common law) of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority.

"Legal Proceeding" means any judicial, equitable, or administrative action, suit, audit, mediation, arbitration, investigation or proceeding (public, private, or governmental).

"Liabilities" means any liability or obligation of any nature (contingent, unknown, undisclosed, unmatured, unaccrued, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such liability or obligation is required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether such liability or obligation is immediately due and payable.

"License" means any license, approval, registration, permit or other governmental authorization and any license, permit or other authorization granted by any Governmental Authority.

"Lien" means any Mortgage, pledge, lien, assessment, encumbrance, charge, or other security interest, or any conditional sale Contract, title retention Contract or other Contract to give any of the foregoing.

"Marks" has the meaning set forth in Section 5.10(a).

"Military Housing Business" means the origination, underwriting, sale, securitization and servicing of loans secured by military housing projects in the United States, and the securities underwriting, securities placement, investment banking, broker/dealer, consulting and advising services with respect to such loans and their securitization.

"Military Housing Business Books and Records" means all or that portion of the Servicing Files, loan origination and underwriting files, books, ledgers, files, reports, plans, records, manuals, sales and trading records, banking records and customer lists, and other materials exclusively of, or maintained exclusively for, the Military Housing Business, including such materials in the form of computer files and all other electronic media, data disks and data tapes, other than those relating to any Taxes or Tax Returns of the Sellers or their Affiliates.

"Mortgage" means a mortgage, deed of trust, pledge, or collateral assignment of a property trust beneficiary interest or other instrument creating a lien on or ownership interest in a Mortgaged Property.

"Mortgaged Property" means the real and personal property or properties securing any Serviced Loan.

"Order" means any writ, judgment, decision, decree, injunction, ruling, memorandum of understanding, disciplinary action or similar order of any Governmental Authority (whether preliminary or final).

"Ordinary Course of Business" means the ordinary course of the Sellers' Military Housing Business consistent with past custom and practice.

"Organizational Documents" means, with respect to an entity, its articles of incorporation, articles of association, memorandum of association, by-laws, certificate of trust,

trust agreement, certificate of formation, limited liability company agreement or operating agreement, as applicable, as the same has been amended from time to time.

"Parties" means collectively the Sellers and the Purchaser.

"Permitted Lien" means (a) any Lien for Taxes not yet due or delinquent, or being contested in good faith by appropriate proceedings for which adequate reserves have been established to the extent required by GAAP or other applicable accounting principles, (b) any statutory Lien arising by operation of Law with respect to a Liability that is not yet due or delinquent, (c) any minor imperfection of title or similar Lien which individually or in the aggregate with other such Liens does not materially impair the value of the property subject to such Lien or the use of such property in the Military Housing Business, and (d) any other Lien arising in the Ordinary Course of Business.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or, as applicable, any other entity.

"Purchase Price" has the meaning set forth in Section 2.2.

"Purchaser" has the meaning set forth in the Preamble.

"Qualified Successor" means an entity whose business includes servicing of mortgage loans and that is qualified to transact business and has obtained all necessary Licenses and permits in the state or states in which the related Mortgaged Properties are located to the extent required to originate loans secured by the Mortgaged Properties or to service such properties under the applicable Servicing Agreements.

"Qualifying Bid" has the meaning set forth in Section 5.11(a).

"Recipient" means a Party, its Affiliate or a Party's Representative that receives or has received Confidential Information from a Disclosing Party in connection with this Agreement, any Transaction Document or the transactions contemplated hereby or thereby.

"Representatives" means the officers, directors, employees, agents, counsel, accountants, financial or other advisors, lenders and financing sources, consultants and other representatives of any Person.

"Required Consents" means the consents set forth on Schedule 6.1(b).

"Retained Rights" means the rights of Seller in its individual or other capacity related to the provision of additional financing to borrowers under Serviced Loans, the rights of Seller to change or consent to the change of servicer under the Serviced Loan Documents, and certain consent rights of Seller with respect to the Serviced Loan Documents related to the foregoing, which were granted to a Seller in its individual capacity under the Serviced Loan Documents or retained by a Seller in connection with the deposit of a Serviced Loan into a grantor trust or pursuant to a participation, custodial or similar arrangement, and as listed on Schedule 1.1(ii).

"Sale Motion" has the meaning set forth in Section 5.11(a).

"Sale Order" means an Order or Orders of the Bankruptcy Court issued pursuant to Sections 363 and 365 of the Bankruptcy Code, authorizing and approving, among other things, the purchase and sale contemplated by this Agreement, free and clear of all interests in property as set forth in Section 363 of the Bankruptcy Code and the assignment to Purchaser of executory and other Contracts included within the Acquired Assets.

"Sellers" has the meaning set forth in the Preamble.

"Serviced Loan" means a mortgage loan relating to the Military Housing Business and serviced by either of the Sellers as the Servicer pursuant to a Servicing Agreement.

"Serviced Loan Documents" means, for each Serviced Loan, the documents pertaining to such Serviced Loan, including but not limited to the loan agreement, the Mortgage, the promissory note, servicing agreement, lockbox agreement, credit enhancement agreement, grantor trust agreement, all assignments of the Mortgage, all endorsements and allonges to the promissory note, the title insurance policy with all endorsements thereto, any security agreement and financing statements, all documents and agreements establishing and controlling any Escrow Accounts and Custodial Accounts, and any ground lease, guaranty, forward commitment, collateral assignments, oversight agreements, investment agreements, letter of credit, cash management agreement, indemnity, intercreditor agreement, custodial agreement, participation agreement and any assignments, assumptions, modifications, continuations, or amendments to any of the foregoing.

"Servicer" means the designated capacity of either of the Sellers as "servicer in respect of the applicable Servicing Agreement.

"Servicing Agreements" means those servicing agreements, lockbox agreements, servicing and lockbox agreements, and similar agreements listed on Schedule 1.1(i).

"Servicing Files" means the Serviced Loan Documents, files, and other items pertaining to a particular Serviced Loan, including but not limited to the computer files and all other electronic media, data disks, books, records, data tapes, notes and all additional documents held by the Sellers and used in the Military Housing Business.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, employment, excise, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, or other tax imposed by any Governmental Authority, including any interest, penalty, or addition imposed with respect thereto.

"Tax Return" means any return, informational return, report, declaration or other document required to be filed with any Taxing authority with respect to Taxes.

"Transaction Documents" means this Agreement and the Bill of Sale and General Assignment.

"Transfer Taxes" has the meaning set forth in Section 5.9.

## ARTICLE II
## THE ACQUISITION

SECTION 2.1     Purchase and Sale.

(a)     On the terms and subject to the conditions hereof, at the Closing, the Sellers will sell, assign, transfer and convey to the Purchaser, without recourse, and the Purchaser will purchase and acquire from the Sellers, all of the Acquired Assets, free and clear of all Liens, other than Permitted Liens.

(b)     The Sellers hereby acknowledge and agree that the Purchaser shall not purchase, acquire or accept from the Sellers any of the assets or properties of the Sellers set forth in Schedule 2.1(b) to this Agreement or any other asset that is not an Acquired Asset (such assets and properties of the Sellers being referred to herein, collectively, as the "Excluded Assets").

(c)     On and subject to the terms and conditions of this Agreement (and subject to Section 8.2 hereof), the Purchaser will, effective as of the Closing, assume and become responsible for, and thereafter pay, perform or discharge when due, all of the Assumed Liabilities.

(d)     Notwithstanding anything in this Section 2.1 or any other provision hereof to the contrary (other than Section 5.9 hereof), the Sellers expressly covenant and agree that the Purchaser shall assume only the Assumed Liabilities and shall not accept, assume, agree to pay, perform or otherwise discharge or satisfy or be liable for (i) the obligations of the Sellers to fund construction financing for the Nellis Air Force project loan and (ii) any other Liabilities of the Sellers, including without limitation any Liability of the Sellers that pertains to the period prior to the Closing even if the payment obligation does not arise until after the Closing (the "Excluded Liabilities").

SECTION 2.2     Consideration.    The consideration for the Acquired Assets (the "Purchase Price") payable to the Sellers at the Closing shall be equal to nine million dollars ($9,000,000), (i) less an amount equal to two hundred fifty thousand dollars ($250,000) (ii) plus any accrued and unpaid servicing fees as of the Closing Date payable to the Servicer pursuant to the Serviced Loans; provided that if the Closing does not occur prior to November 30, 2009, the Purchase Price shall be reduced on the first day of each calendar month until the Closing occurs by two hundred fifty thousand dollars ($250,000); provided, however, that the aggregate amount of such reductions to the Purchase Price for the delay of Closing beyond November 30, 2009 shall not exceed five hundred thousand dollars ($500,000).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Each of the Sellers represents and warrants, jointly and severally, to the Purchaser that the statements contained in this Article III are correct and complete as of the date of this Agreement, except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule").

- 8 -

SECTION 3.1    <u>Organization and Qualification</u>.  Each of the Sellers is a corporation duly organized, validly existing, and in good standing under the Laws of the state of its jurisdiction of incorporation, has all requisite corporate power and authority to own, operate and lease its assets and properties and to carry on its business as it is now being conducted.

SECTION 3.2    <u>Authorization</u>.

(a)    Each of the Sellers has all necessary corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder.

(b)    This Agreement has been duly and validly authorized, executed and delivered by each of the Sellers, and each of the other Transaction Documents to which such Seller is a party, when so executed and delivered by such Seller, will have been duly and validly authorized, executed and delivered by such Seller, and (assuming the due authorization, execution and delivery by the other Parties to this Agreement and the Transaction Documents) this Agreement constitutes, and the other Transaction Documents when so executed and delivered will constitute, a valid and binding obligation of each such Seller, enforceable against it in accordance with its respective terms, except to the extent that such enforcement may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws now or hereafter in effect relating to creditors' rights generally, and to the extent that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

SECTION 3.3    <u>No Violation</u>.  Except as set forth in the Disclosure Schedule, none of the execution and delivery of this Agreement or the other Transaction Documents by each of the Sellers (as applicable), the performance by each of the Sellers of its obligations hereunder and thereunder, nor the consummation by each of the Sellers of the transactions contemplated hereby and thereby will (a) conflict with or result in a breach of any provision of the Organizational Documents of either Seller, (b) conflict with or result in a breach of, or constitute a default (with or without due notice or lapse of time or both) or result in or give any Person any right of termination, cancellation, acceleration or modification, under the terms, conditions or provisions of any note, bond, Mortgage or indenture, or any material License, lease or material Contract to which either Seller is a party, (c) violate, in any material respect, any Law or Order of any Governmental Authority applicable to either of the Sellers, or (d) result in the imposition or creation of a material Lien (other than a Permitted Lien) upon or with respect to the Acquired Assets.

SECTION 3.4    <u>Consents and Approvals</u>.  Except as set forth in the Disclosure Schedule, no material filing or registration with, material notice to or permit, authorization, consent or approval of any Governmental Authority is necessary for the consummation by the Sellers of the transactions contemplated by this Agreement and the other Transaction Documents other than the Required Consents and those already obtained.

SECTION 3.5    <u>Brokers' Fees and Commissions</u>.  The Sellers have no Liability or obligation to pay any fees or commissions or any similar payment to any broker, finder, or agent

with respect to the transactions contemplated by this Agreement for which the Purchaser would become liable or obligated.

SECTION 3.6    Ownership.    The Sellers are the sole owners and holders of the Acquired Assets, free and clear of all Liens, claims and other encumbrances of any kind, other than Permitted Liens, and the Sellers have good and marketable title thereto and full right and authority to transfer and sell the Acquired Assets to the Purchaser.

SECTION 3.7    Origination and Servicing.    To the Knowledge of Sellers, the Serviced Loans were originated, transferred and sold, and have been serviced at all times in accordance with, and the Serviced Loans otherwise comply in all material respects with, any and all applicable Laws, the Serviced Loan Documents and the Servicing Agreements.

SECTION 3.8    No Defaults.    To the Knowledge of Sellers, other than as a result of an Insolvency Proceeding, Seller is not in breach of or default under any Servicing Agreement, and there are no facts or circumstances existing that with the passage of time and failure to cure to the extent permitted pursuant to the applicable Servicing Agreement, would constitute a breach or default thereunder.

SECTION 3.9    Disclaimer of Other Representations and Warranties.    The Sellers are not making any representation or warranty whatsoever, express or implied, except those representations and warranties of the Sellers explicitly set forth in this Agreement or in the Disclosure Schedule or in any certificate or other Transaction Document contemplated hereby and delivered by the Sellers in connection herewith.    Subject to the foregoing, the assets and business of the Sellers being acquired by the Purchaser at the Closing as a result of this Agreement and the transactions contemplated hereby shall be acquired by the Purchaser on an "as-is, where-is" basis and in their then present condition, and the Purchaser shall rely solely upon its own examination thereof and the representations and warranties set forth in this Agreement or in the Disclosure Schedule or in any certificate or any other Transaction Document delivered by the Sellers.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Sellers that the statements contained in this Article IV are correct and complete as of the date of this Agreement.

SECTION 4.1    Organization and Qualification.    The Purchaser is a corporation duly organized, validly existing, and in good standing under the Laws of the state of its jurisdiction of incorporation, with all requisite corporate power and authority to own, operate and lease its assets and properties and to carry on its business as it is now being conducted.

SECTION 4.2    Authorization.

(a)    The Purchaser has full corporate power and authority to execute and deliver this Agreement and the other Transaction Documents and to perform its obligations hereunder and thereunder.

(b)    This Agreement has been duly and validly authorized, executed and delivered by the Purchaser, and each of the other Transaction Documents, when so executed and delivered by the Purchaser, will have been duly and validly authorized, executed and delivered by the Purchaser, and (assuming the due authorization, execution and delivery by the other Parties to this Agreement and the Transaction Documents) this Agreement constitutes, and the other Transaction Documents when so executed and delivered will constitute, a valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its respective terms, except to the extent that such enforcement may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, and to the extent that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

SECTION 4.3    No Violation.    None of the execution and delivery of this Agreement or the other Transaction Documents by the Purchaser, the performance by the Purchaser of its obligations hereunder and thereunder nor the consummation by the Purchaser of the transactions contemplated hereby and thereby will (a) conflict with or result in a breach of any provision of its Organizational Documents, (b) conflict with or result in a breach of, or constitute a default (with or without due notice or lapse of time or both) or result in or give any Person any right of termination, cancellation, acceleration or modification under the terms, conditions or provisions of any note, bond, Mortgage, indenture or deed of trust, or any material License, lease or material Contract to which the Purchaser is a party, or (c) violate, in any material respect, any Law or Order of any Governmental Authority applicable to the Purchaser.

SECTION 4.4    Consents and Approvals.    No material filing or registration with, no material notice to or permit, authorization, consent or approval of any third party or any Governmental Authority is necessary for the consummation by the Purchaser of the transactions contemplated by this Agreement other than the Required Consents and those already obtained.

SECTION 4.5    Brokers' Fees and Commissions.    Neither the Purchaser nor any of its Affiliates has any liability or obligation to pay any fees or commissions or any similar payment to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which the Sellers could become liable or obligated.

SECTION 4.6    Financing.    The Purchaser has available, and at the Closing shall have available, sufficient funds to satisfy, among other things, its obligation to pay (a) the Purchase Price, and (b) all expenses incurred by the Purchaser in connection with the transactions contemplated hereby.    In no event shall the receipt or availability of any funds or financing by the Purchaser or any Affiliate or any other financing or other transactions be a condition to any of Purchaser's obligations hereunder.

SECTION 4.7    <u>Eligibility Requirements</u>.    The Purchaser acknowledges that the Servicing Agreements impose objective servicing qualifications (the "<u>Eligibility Requirements</u>") and that the Purchaser understands the Eligibility Requirements.

SECTION 4.8    <u>Inspections; Limitation of Sellers Warranties</u>.    The Purchaser is an informed and sophisticated participant in the transactions contemplated hereby and has undertaken such investigation, and has been provided with and has evaluated such documents and information, as it has deemed necessary in connection with the execution, delivery and performance of this Agreement.

ARTICLE V
COVENANTS

SECTION 5.1    <u>Conduct of Business of the Sellers Prior to the Closing</u>.

(a)    Except as contemplated by this Agreement or with the prior written consent of the Purchaser (which consent shall not be unreasonably withheld), during the period from the date of this Agreement to the Closing Date, the Military Housing Business will be conducted in the Ordinary Course of Business.

(b)    Except as set forth in <u>Schedule 5.1(b)</u> or as otherwise provided in this Agreement, the Sellers shall not take any of the following actions, between the date of this Agreement and the Closing Date, without the prior written consent of the Purchaser:

(i)    except in the Ordinary Course of Business, sell, transfer, assign or otherwise dispose of any of the Acquired Assets or subject any of the Acquired Assets to any Lien (other than a Permitted Lien);

(ii)    (A) enter into material Contracts with respect to the Military Housing Business, except Contracts made in the Ordinary Course of Business or Contracts for the purchase or sale of mortgage loans not reasonably expected to require the payment by or to a Seller of more than two hundred and fifty thousand dollars ($250,000) or Contracts that will not be Assigned Contracts, or (B) amend or modify, in each case in any material respect, terminate (partially or completely), grant any material waiver or give any material consent under, any material Contract with respect to the Military Housing Business, except in the Ordinary Course of Business; or

(iii) comm    it to do any of the foregoing.

SECTION 5.2    <u>Access to Information</u>.

(a)    Between the date of this Agreement and the Closing Date, upon reasonable notice and at reasonable times without significant disruption to the businesses of the Sellers, the Sellers will give the Purchaser and its Representatives reasonable access to all offices, properties, facilities, personnel, books and records, Contracts, and documents of or pertaining to the Military Housing Business (and shall provide the Purchaser with reasonable access to Business Employees, including as provided in Section 5.6), and will permit the

- 12 -

Purchaser to make and will fully cooperate with regard to such inspections as it may reasonably require. The Purchaser will treat and hold all information it receives from either of the Sellers in the course of the reviews contemplated by this Section 5.2 as Confidential Information and will not use any of the Confidential Information except in connection with this Agreement, and, if this Agreement is terminated for any reason whatsoever, will treat such Confidential Information in the manner provided in Section 5.7 hereof.

(b)    Following the Closing, each Party shall afford the other Party and its Representatives during normal business hours, reasonable access to the Military Housing Business Books and Records in its possession with respect to periods prior to the Closing and the right to make copies and extracts therefrom, to the extent that such access may be reasonably required by the requesting Party in connection with (i) compliance with the requirements of Law or any Governmental Authority or (ii) in connection with any actual or threatened Legal Proceedings. Further each Party agrees for a period extending six (6) years after the Closing Date (or for such longer period as such Party is required to keep books, records and other data under Law) not to destroy or otherwise dispose of any such books and records unless such Party shall first offer in writing to surrender such books, records and other data to the other Parties and such other Parties shall not agree in writing to take possession thereof during the ten (10) day period after such offer is made.

(c)    If, in order to properly prepare its financial statements and/or any documents or reports required to be filed with any Governmental Authority, or to fulfill its obligations hereunder, it is necessary that a Party be furnished with additional information, documents or records relating to the Military Housing Business not referred to in subsection (b) above, and such information, documents or records are in the possession or control of any other Party, such other Party shall use its commercially reasonably efforts to furnish or make available such information, documents or records (or copies thereof) at the recipient's reasonable request and out of pocket cost and expense. Any information obtained by either Party in accordance with this paragraph shall be treated as Confidential Information.

SECTION 5.3    All Reasonable Efforts.   Subject to the terms and conditions herein provided, each of the Parties hereto agrees to use all commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper and advisable under applicable Laws and this Agreement to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement including satisfaction of the Closing conditions set forth below, and shall not take or fail to take any commercially reasonable action that could reasonably be expected to result in the non-fulfillment of any such Closing conditions. If at any time after the Closing any further reasonable action is necessary or desirable to carry out the purposes of this Agreement, including, without limitation, the execution of additional instruments, the Parties shall take all such necessary action without further consideration, provided, that no Party shall be obligated to pay any fees or other amounts other than customary filing fees in connection with such actions.

SECTION 5.4    Consents and Approvals; Assigned Contracts.

(a)    The Parties will each cooperate with one another and use all commercially reasonable efforts to, as promptly as practicable, prepare all necessary documentation, to give

- 13 -

any notices to, to effect promptly all necessary filings and to obtain all necessary Licenses, consents, approvals, Orders and authorizations of, or any exemptions by, all third parties and Governmental Authorities necessary to consummate the transactions contemplated by this Agreement or otherwise reasonably required in connection therewith. Each Party will keep the other Parties apprised of the status of any inquiries made of such Party by any of such third parties or Governmental Authority or members of their respective staffs with respect to this Agreement or the transactions contemplated hereby.

(b)     At the Closing, effective as of the Closing Date, the Sellers shall assign all of their rights and obligations under the Assigned Contracts arising after and with respect to the period after the Closing Date. Notwithstanding the foregoing, to the extent that any Assigned Contract is not assignable without the consent of a third party, this Agreement shall not constitute an assignment or an attempted assignment thereof if such assignment or attempted assignment would constitute a breach thereof or a default thereunder and, with respect to Assigned Contracts that cannot be assigned to the Purchaser on the Closing Date, the rights and performance obligations of the Sellers thereunder shall, unless not permitted by such Contract or applicable Law, be deemed to be subleased or subcontracted to the Purchaser until such Contract has been assigned. The Sellers and the Purchaser shall use commercially reasonable efforts to obtain the consent of such third parties to the assignment of any such Assigned Contract to the Purchaser in all cases in which such consent is or may be required for such assignment. For purposes of this Agreement, "commercially reasonable efforts" shall not require the payment of any fees or other amount to obtain any License, consent, authorization or approval, other than customary filings fees or as specifically provided in this Agreement or any other Transaction Document, and any costs or fees to be paid under any Assigned Contracts which shall be paid by Purchaser. If any such consent shall not be obtained, the Sellers and the Purchaser shall cooperate in any reasonable arrangement designed to provide for the Purchaser the benefits and obligations intended to be assigned to and assumed by the Purchaser under the relevant Assigned Contract, including enforcement for the account of the Purchaser (and at the Purchaser's expense) of any and all rights of the Sellers against the other party thereto arising out of the breach or cancellation thereof by such other party or otherwise, provided that in the event of an Insolvency Proceeding, the transfer of the Assigned Contract shall be in accordance with the orders of the Bankruptcy Court.

(c)     Following the Closing, in the event any amount due under a Assigned Contract or otherwise to a Party in accordance with the terms of this Agreement or the other Transaction Documents is paid to another Party, such other Party shall promptly remit such amount to the Party to which such amount was due.

(d)     In the event of any Insolvency Proceeding in respect of any Seller following the date of this Agreement, the Sellers shall use commercially reasonable efforts to seek approval of the transactions contemplated by this Agreement and the other Transaction Documents by the Bankruptcy Court and entry of the Sale Order in substance reasonably satisfactory to Purchaser solely to confirm consistency with this Agreement, which provides, in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Sale Order, that the transactions contemplated by this Agreement are undertaken by the Purchaser and the Sellers at arm's length, without collusion and in good faith within the meaning of Section 363 of the Bankruptcy Code, and that the Parties are entitled to the protections of

- 14 -

Section 363(m) of the Bankruptcy Code. The Purchaser agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining the Sale Order. In the event the entry of the Sale Order shall be appealed, the Sellers and Purchasers shall use their respective reasonable efforts to defend such appeal.

SECTION 5.5    Public Announcements. At all times at or before the Closing, the Purchaser and the Sellers will consult with each other and will mutually agree (the agreement of each Party not to be unreasonably withheld) upon the content and timing of any press release or other public statements (including written statements and releases to employees) with respect to the transactions contemplated by this Agreement and shall not issue any such press release or make any such public statement prior to such consultation and agreement, except as may be required by any Party by applicable Law or by obligations pursuant to any listing agreement with any securities exchange or any stock exchange regulations; provided, however, that the Purchaser and the Sellers will give prior notice to the other Party of the content and timing of any such press release or other public statement required by applicable Law or by obligations pursuant to any listing agreement with any securities exchange or any stock exchange regulations. Each Party will also obtain the other Party's prior approval (such approval not to be unreasonably withheld) of any press release to be issued immediately following the Closing announcing the consummation of the transactions contemplated by this Agreement.

SECTION 5.6    Employee Matters. The Purchaser shall be permitted to meet with and solicit employees of the Sellers and their Affiliates who provide services exclusively or primarily with respect to the Military Housing Business and who are listed on Section 5.6 of the Disclosure Schedule (each, a "Business Employee"), for employment with the Purchaser or its Affiliates effective on the date hereof with respect to those Business Employees identified on the Disclosure Schedule as "Banking Employees", and effective on the Closing Date with respect to those employees identified on the Disclosure Schedule as "Servicing Employees", or such other dates as agreed to by the Parties. Such offer of employment for each Business Employee shall provide for base salary which is no less favorable than the base salary provided for such Business Employee immediately prior to the Closing Date.    Sellers acknowledge and ratify the permissibility of any such meetings with and solicitations of the Business Employees prior to the date of this Agreement.    The Purchaser shall include in any such offer of employment a provision conditioning such offer on the employee's a resignation of employment with the Sellers and their Affiliates simultaneous with commencement of employment by Purchaser or its Affiliates. The Sellers and the Purchaser shall reasonably cooperate so that the Purchaser can fulfill its obligations under this Section 5.6. Each Business Employee that accepts an offer of employment with the Purchaser pursuant to this Section 5.6 shall be deemed a "Hired Employee."

SECTION 5.7    Confidentiality. Each Party that is a Recipient will hold, and will cause its Affiliates and Representatives to hold, all Confidential Information in strict confidence from any other Person (other than any such Affiliate or Representative).    Notwithstanding the foregoing, a Recipient may disclose Confidential Information to the extent (a) necessary to obtain any License, approval, consent or waiver required or reasonably desired in connection with this Agreement, the Transaction Documents or the transactions contemplated hereby or thereby, including but not limited to approvals, consents and waivers related to the assignment of the Assigned Contracts, (b) consented to in writing by the Disclosing Party prior to such

disclosure, (c) required by Law, (d) in connection with the preparation or filing of, or statement, report, notice or notification to (whether oral or written), any Governmental Authority, or (e) necessary in connection with any Legal Proceeding in respect of this Agreement, the transactions contemplated by this Agreement, or in defending or asserting any claim or Legal Proceeding relating to the Military Housing Business.

In the event the transactions contemplated hereby are not consummated, upon the request of a Disclosing Party, the Recipient will, and will cause its Affiliates and Representatives to, promptly (and in no event later than five (5) Business Days after such request) redeliver or cause to be redelivered all written Confidential Information furnished by another Party in connection with this Agreement or the transactions contemplated hereby, and, except to the extent required to retain copies of such documents and information pursuant to any Party's regular document retention procedures and practices, destroy or cause to be destroyed all notes, memoranda, summaries, analyses, compilations and other writings related thereto or based thereon.

SECTION 5.8     Control of Business.  Except as otherwise set forth in this Agreement, the Purchaser acknowledges on behalf of itself and its Affiliates and their respective directors, officers, employees, Affiliates, agents, Representatives, successors and assigns that the operation of the Military Housing Business remains in the dominion and control of the Sellers until the Closing and that none of the foregoing Persons will provide, directly or indirectly, any directions, orders, advice, aid, assistance or information to any director, officer or employee of either of the Sellers or solicit or request, directly or indirectly, any information relating to the Military Housing Business from any director, officer or employee of the Sellers, except as specifically contemplated or permitted by this Article V, or as otherwise consented to in advance by an authorized officer of a Seller.

SECTION 5.9     Sales, Transfer and Similar Taxes.  All sales, use, transfer, stamp, registration, value added and similar Taxes, and any conveyance fees and recording and similar charges, incurred in connection with the transactions contemplated by this Agreement (collectively, "Transfer Taxes") shall be paid by the Purchaser.[2]   The Purchaser shall be responsible for preparing and timely filing all Tax Returns required to be filed with respect to Transfer Taxes.

SECTION 5.10     Names and Mark; Name Changes.

(a)     The Purchaser acknowledges and agrees that it does not have any rights in or to any marks or names owned, used or licensed by the Sellers incorporating, utilizing or otherwise including "CAPMARK" name, any logos associated with CAPMARK, and all related trademarks or any derivations or formatives thereof or any trademarks confusingly similar thereto (the "Marks") and, following the Closing Date the Purchaser shall not have any right, title or interest in and to, or right to use, the Marks or any marks or names confusingly similar thereto, other than the names of securities issued by grantor trusts holding the Serviced Loans and the related Assigned Contracts as to which such change is not reasonably practicable.

---

2 We are not aware of any transfer taxes that would apply.

(b)    The Purchaser covenants that after the Closing Date, it will not adopt, use or register or authorize others to adopt, use or register, any trade names, trademarks, service marks or Internet domain names consisting of or incorporating the Marks or any marks, names or Internet domain name confusingly similar thereto.

(c)    The Parties acknowledge and agree that any remedy at Law for any breach of the provisions of this Section would be inadequate, and hereby consent to the pursuit of a grant by any court of an injunction or other equitable relief, without the necessity of actual monetary loss being proved, in order that the breach or threatened breach of such provision may be effectively restrained.

SECTION 5.11    <u>Bankruptcy Actions</u>.

(a)    If an Insolvency Proceeding with respect to a Seller has been commenced prior to the Closing Date:

(i)    Within a reasonably practicable time following the commencement of the Insolvency Proceeding, but in no event in more than five (5) Business Days, the Sellers shall file with the Bankruptcy Court a motion reasonably acceptable to Purchaser (the "<u>Sale Motion</u>") seeking the Bankruptcy Court's approval of (A) the transactions contemplated by this Agreement, (B) the Sellers' performance under this Agreement, and (C) a bidding procedures Order (the "<u>Bidding Procedures Order</u>") for the sale of the Acquired Assets.  The Bidding Procedures Order shall be in form and substance reasonably acceptable to Purchaser and shall include, at a minimum, (U) approval of the Break-Up Fee (V) a requirement that (1) any Bids exceed the purchase price by five hundred thousand dollars ($500,000) plus payment of the Break-Up Fee and (2) a requirement that any subsequent Bid exceed the prior bid by two hundred fifty thousand dollars ($250,000), (W) customary bid protections for a transaction of this size and complexity, including overbid protections, (X) a requirement that any Bidder demonstrate experience in origination and servicing of military housing loans, (Y) prior to receipt by a prospective Bidder of any information (including, but not limited to, business and financial information and access to representatives of Sellers) from Sellers, each Bidder will be required to execute an appropriate confidentiality agreement and deliver evidence reasonably satisfactory to Sellers establishing such potential Bidders' financial capability to timely consummate a purchase of the all the Purchased Assets; and (Z) as part of any Bid, each Bidder shall submit a copy of this form of asset purchase agreement marked to show changes, along with any other bid package requirements to Purchaser and Seller, and place into escrow a cash deposit of no less than ten percent (10%) of the Qualifying Bid.

(ii)    A Bid will only be considered by Sellers as qualified for the Auction ("<u>Qualifying Bid</u>") if it (A) does not contain financing or due diligence contingencies of any kind or any other conditions precedent to such Person's obligation to purchase the Acquired Assets; (B) is received by Purchaser

and Seller in writing on or prior to 5:00 p.m. Eastern Time at least sixty (60) hours prior to the date of the Auction, and (C) provides for the immediate payment of the Breakup Fee to Purchaser by the Person submitting such Bid (it being agreed and understood that such payment shall reduce the proceeds to be received by the Seller from the Person submitting such Bid and the value attributed to such Person's Bid shall include such direct payment to Purchaser).

(iii)Sellers       shall use their reasonable best efforts to (A) obtain promptly entry of the Bidding Procedures Order, (B) obtain entry of the Sale Order in sufficient time to permit closing to occur by the Closing Date, (C) consummate the Closing as soon as practicable after the approval of the Sale Order and no later than three (3) days following the expiration of the appeal period and final entry of the Sale Order.  Sellers agree that they will take such actions as are reasonably requested by Purchaser to assist in obtaining entry of the Sale Order and the Bidding Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by the Sellers of their obligations under this Agreement and demonstrating that Purchaser is a good faith purchaser under Section 363(m) of the Bankruptcy Code.

(iv)      Seller shall file with the Bankruptcy Court a motion (which may be included in the Sale Motion), in form and substance reasonably acceptable to Purchaser, for an order authorizing the assumption and assignment pursuant to section 365 of the Bankruptcy Code of the Assigned Contracts.  Seller shall use commercially reasonable efforts such that such motion shall reflect that Purchaser's promise to perform from and after the Closing under the Assigned Contracts shall be the only adequate assurance of future performance necessary to satisfy the requirements of section 365 of the Bankruptcy Code in respect of the assignment to Purchaser of such Assigned Contracts.

(b)      Only the Persons who submitted Qualifying Bids and Purchaser may bid at the Auction.

SECTION 5.12    Other Bids.  Purchaser acknowledges that pursuant to the Bidding Procedures Order, and after entry of the Bidding Procedures Order on the Bankruptcy Court's docket, the Sellers may solicit bids ("Bids") from other prospective Purchasers (collectively, "Bidders") for the sale of the Acquired Assets, on terms and conditions substantially the same in all respects to this Agreement and in accordance with the procedures set forth in the Bidding Procedures Order.

SECTION 5.13    Bankruptcy Matters.

(a)      If an Insolvency Proceeding with respect to a Seller has been commenced prior to the Closing Date, Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval.    Sellers and Purchaser acknowledge that to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest and otherwise best offer feasible for the Acquired Assets,

and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and interested parties as ordered by the Bankruptcy Court.

(b)     In the event an appeal is taken or a stay pending appeal is requested, from either the Bidding Procedures Order or the Sale Order, Sellers shall immediately notify Purchaser of such appeal or stay request and shall promptly provide to Purchaser a copy of the related notice of appeal or Order to stay.

SECTION 5.14    Break-Up Fee.  In consideration of the Purchaser having expended considerable time and expense in connection with the negotiation of this Agreement and the identification and quantification of the assets of the Sellers, in the event that the Sellers, pursuant to an Insolvency Proceeding prior to the Closing, (a) consummate a transaction in respect of an offer other than that of the Purchaser, or (b) sells, transfers, leases or otherwise disposes, directly or indirectly, including without limitation through an asset sale, stock sale merger or other similar transaction, all or substantially all of the Acquired Assets (or agrees to do any of the foregoing) in a transaction or series of transactions within twelve (12) months from the date hereof (either of clause (a) or (b) being an "Alternative Transaction"), the Sellers shall pay in cash in immediately available funds to the Purchaser a break-up fee in an amount equal to two hundred fifty thousand dollars ($250,000) (the "Break-Up Fee"); provided that in no event shall the Break-Up Fee be payable to the Purchaser if this Agreement is terminated pursuant to Section 8.1(b)(ii) or Section 8.1(b)(iii) where the breach of this Agreement by the Purchaser has been the cause of, or resulted in, the failure of the Closing to occur on or before the date specified in Section 8.1(b)(ii) or Section 8.1(b)(iii).  The Sellers' obligation to pay the Break-Up Fee shall survive termination of this Agreement, and if the Break-Up Fee becomes payable, concurrently with making the Sale Motion or entry of a Sale Order to accept a Bid other than from Purchaser, the Sellers shall make a motion seeking an Order that provides that the Break-Up Fee then shall be immediately paid as administrative expense claims in the Sellers' Insolvency Proceeding under Sections 503(b) and 507(a)(1) of the Bankruptcy.  The Break-Up Fee shall be payable not later than the closing of the Alternative Transaction.

SECTION 5.15    Transition Services.  If any Business Employee is hired by the Purchaser or any of its Affiliates prior to the Closing Date pursuant to Section 5.6 of this Agreement, the Purchaser shall cause such employee to provide to the Sellers such reasonable assistance as may be required by the Sellers to manage and operate the Military Housing Business prior to the Closing Date in accordance with current practices of the Sellers and such Business Employees are authorized by the Sellers to communicate with representatives of the counterparties to the Assigned Contracts on behalf of the Sellers in the Ordinary Course of Business.

ARTICLE VI
CLOSING CONDITIONS

SECTION 6.1    Conditions to Each Party's Obligations Under this Agreement.  The respective obligations of each Party under this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions:

- 19 -

(a)     no injunction, restraining Order or other ruling or Order issued by any court of competent jurisdiction or Governmental Authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall be in effect;

(b)     the Required Consents shall have been obtained and shall be in full force and effect, provided, however, that in the event that the Required Consents associated with at least eighty percent (80%) of the aggregate unpaid principal balance of the Serviced Loans shall have been obtained, and Purchaser concludes that the remaining Required Consents cannot be obtained without commercially unreasonable costs, expense or delay, it may elect to close, and exclude the Servicing Agreements for which Required Consents have not need obtained from the Assigned Contracts and Acquired Assets; provided, however, the Parties shall have the obligations set forth in Section 5.4(b);

(c)     if an Insolvency Proceeding with respect to a Seller has been commenced, the Bankruptcy Court shall have issued the Sale Order that (i) approves this Agreement and authorizes the Sellers to enter into and consummate the transactions contemplated by this Agreement and the Transaction Documents; (ii) determines and finds that the Purchaser is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code; (iii) authorizes the delivery of the Acquired Assets to the Purchaser free and clear of all interests within the meaning of Section 363(f) of the Bankruptcy Code and including free and clear of all liens, claims and encumbrances; (iv) finds that the Purchase Price hereunder constitutes "reasonably equivalent value" for the Acquired Assets; (v) authorizes the assumption by the Sellers and assignment to the Purchaser of the Assigned Contracts including approving the assumption and assignment to Purchaser of the Assigned Contracts, pursuant to section 365(f)(2) of the Bankruptcy Code, without further assurances except for Purchaser's promise to perform following the Closing obligations under the Assigned Contracts and transferring and assigning the Assigned Contracts such that the Assigned Contracts will be in full force and effect from and after the Closing; (vi) relieves the Purchaser and its Affiliates of (A) any potential responsibility or Liability to any Seller, or any other Person, for Excluded Liabilities and (B) any potential Liabilities for a claim that the transactions contemplated by this Agreement constitutes a fraudulent conveyance, fraudulent transfer, or similar claim; (vii) provides for the Sellers to assume this Agreement and each executory agreement to be entered into by any Seller at or prior to Closing as contemplated by this Agreement or the other Transactions Documents; (viii) which Bankruptcy Court Order is a Final Order, or if an appeal has been taken and the Bankruptcy Court Order is not a Final Order, no stay has been entered barring the Closing; and (ix) provides that the provisions of Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure are waived and there will be no stay of execution of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure; (x) provides that the transfers and other transactions contemplated by this Agreement are nontaxable to the fullest extent permitted by 11 U.S.C. § 1146 and the Bankruptcy Court.

SECTION 6.2    Conditions to the Obligations of the Purchaser Under this Agreement. The obligations of the Purchaser under this Agreement shall be further subject to the satisfaction, at or prior to the Closing, of the following conditions:

(a)    each of the covenants, agreements and obligations of the Sellers required to be performed by them at or prior to the Closing pursuant to this Agreement shall have been duly performed and complied with in all material respects; and

(b)    the representations and warranties of the Sellers contained in this Agreement shall be true and correct as of the date of this Agreement and as of the Closing as though made at and as of the Closing (except as to any representation or warranty which specifically relates to an earlier date), except where the failure of such representations and warranties to be true and correct, individually or in the aggregate, is not reasonably likely to have a material adverse effect on the Military Housing Business.

SECTION 6.3    Conditions to the Obligations of the Sellers under this Agreement. The obligations of the Sellers under this Agreement shall be further subject to the satisfaction, at or prior to the Closing, of the following conditions:

(a)    each of the covenants, agreements and obligations of the Purchaser required to be performed by the Purchaser at or prior to the Closing pursuant to the terms of this Agreement shall have been duly performed and complied with in all material respects; and

(b)    the representations and warranties of the Purchaser contained in this Agreement shall be true and correct as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except as to any representation or warranty which specifically relates to an earlier date), except where the failure of such representations and warranties to be true and correct, individually or in the aggregate, is not reasonably likely to have a material adverse effect on the ability of the Purchaser to perform its obligations under this Agreement or consummate the transactions contemplated by this Agreement.

ARTICLE VII
CLOSING

SECTION 7.1    Closing.    The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019, subject to the satisfaction or waiver of the conditions set forth in Article VI, commencing at 9:30 a.m. local time two (2) Business Days following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective Parties will take at the Closing itself), and in no case later than the date set forth in Section 8.1(b)(ii), Section 8.1(b)(iii) or such other date as the Parties may mutually determine or, if any Seller shall become subject to any Insolvency Proceeding and if there is a stay of the Bankruptcy Court in place, within two (2) Business Days after such stay has been lifted (the "Closing Date"); provided that if no Insolvency Proceeding with respect to the Sellers has been commenced, the Closing shall not occur prior to November 30, 2009, unless otherwise agreed by the Sellers in their sole discretion. At the Closing:

(a)    The Sellers shall deliver or cause to be delivered to the Purchaser an executed copy of the following:

- 21 -

(i)      (A) the Bill of Sale and General Assignment and (B) such other instruments of conveyance, assignment and transfer, in form and substance reasonably acceptable to the Purchaser's counsel, as shall be necessary to vest in the Purchaser good title to the Acquired Assets; and

(ii)      all other previously undelivered documents required to be delivered by the Sellers to the Purchaser at or prior to the Closing pursuant to the terms of this Agreement, in form and substance reasonably acceptable to the Purchaser, as may be reasonably necessary to effect the Closing.

(b)      The Purchaser shall deliver or cause to be delivered to the Sellers an executed copy of the following:

(i)      (A) the Bill of Sale and General Assignment and (B) such other instruments of assumption with respect to the Assumed Liabilities as the Sellers and their counsel may reasonably request; and

(ii)      all other previously undelivered documents required to be delivered by the Purchaser to the Sellers at or prior to the Closing pursuant to the terms of this Agreement, in form and substance reasonably acceptable to the Sellers, as may be reasonably necessary to effect the Closing.

(c)      The Purchaser shall pay the Purchase Price to the Sellers, in United States dollars by wire transfer of immediately available funds to an account or accounts designated by the Sellers, such account to be designated by the Sellers prior to the Closing Date.

ARTICLE VIII
TERMINATION AND ABANDONMENT

SECTION 8.1      Termination.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a)      by mutual consent of the Sellers and the Purchaser; or

(b)      by either the Sellers or the Purchaser:

(i)      if a court of competent jurisdiction or other Governmental Authority shall have issued a Final Order or ruling or taken any other action (which Order or ruling the Parties shall use their best efforts to lift), in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement;

(ii)      if the Closing shall not have occurred on or before January 31, 2010; or

(iii)if      any Seller shall become subject to any Insolvency Proceeding and if the Sale Order has not been entered by January 15, 2010.

- 22 -

provided, however, that the right to terminate this Agreement shall not be available to any Party whose breach of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date.

SECTION 8.2    Procedure and Effect of Termination.  In the event of termination and abandonment of the transactions contemplated hereby pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Parties and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the Parties.  If this Agreement is terminated as provided herein, this Agreement shall become null and void and no Party shall have any liability or further obligation to any other Party to this Agreement resulting from such termination except (a) that the provisions of this Section 8.2 shall remain in full force and effect, (b) no Party waives any claim or right against a breaching Party to the extent that such termination results from the breach by a Party hereto of any of its representations, warranties, covenants or agreements set forth in this Agreement and the Sellers or the Purchaser may seek such remedies, including damages, against the other with respect to such breach as provided in this Agreement, or, in the case of fraud or willful breach, as are otherwise available at Law or in equity, (c) the confidentiality provisions contained in Section 5.7 above shall survive termination, (d) the provisions relating to the Break-Up Fee contained in Section 5.14 above shall survive termination and (e) the expense provisions contained in Section 9.4 below shall survive termination.

ARTICLE IX

MISCELLANEOUS PROVISIONS

SECTION 9.1    Nonsurvival of Representations and Warranties.  The representations and warranties of the Sellers contained in this Agreement or in any other Transaction Document or instrument or writing delivered in connection with this Agreement shall terminate at Closing.

SECTION 9.2    Amendment and Modification.  This Agreement may be amended, modified or supplemented or any provision of this Agreement may be waived; provided that any such amendment, modification, supplement or waiver shall be binding upon the Sellers, on the one hand, and the Purchaser, on the other hand, only if set forth in a writing executed by the Sellers and the Purchaser and referring specifically to the provision alleged to have been amended, modified, supplemented or waived.  No course of dealing between or among any persons having any interest in this Agreement or failure to insist on strict compliance with any of the terms or conditions hereof shall be deemed effective to amend, modify, supplement, waive or discharge any part of this Agreement or any rights or obligations of any person under or by reason of this Agreement, nor shall any waiver or relinquishment of, or failure to insist upon strict compliance with, any right or power hereunder at any one or more times be deemed a waiver or relinquishment of such right or power at any other time or times.

SECTION 9.3    Validity.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect.

SECTION 9.4    Expenses and Obligations.  Except as otherwise expressly provided in this Agreement, all costs and expenses incurred in connection with the consummation of the

transactions contemplated by this Agreement by the Purchaser shall be paid by the Purchaser, and all costs and expenses incurred in connection with the consummation of the transactions contemplated by this Agreement by the Sellers shall be paid by the Sellers. All fees payable to third parties with respect to obtaining consent from such third parties for the assignment of the Acquired Assets to the Purchaser shall be paid by the Purchaser.

SECTION 9.5      Specific Performance.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the Parties shall be entitled to, in addition to any other remedies at law or otherwise, specific performance of this Agreement or an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement.

SECTION 9.6      Parties in Interest.  This Agreement shall be binding upon and, except as provided below, inure solely to the benefit of each Party hereto, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

SECTION 9.7      Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

SECTION 9.8      Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

SECTION 9.9      Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given upon the earlier of delivery thereof if by hand or upon receipt if sent by mail (registered or certified, postage prepaid, return receipt requested) or on the second next Business Day after deposit if sent by a recognized overnight delivery service or upon transmission if sent by telecopy or facsimile transmission (with request of assurance of receipt in a manner customary for communication of such type) as follows:

(a)      If to the Purchaser, to:

    Jefferies Mortgage Finance, Inc.
    520 Madison Avenue
    New York, NY 10022
    Attention: Sonia Han, Esq.
    Telecopy: (212) 284 2280

    with a copy to:

    K&L Gates LLP
    1601 K St., N.W.

Washington, DC 20006
Attention: Laurence E. Platt, Esq.
Telecopy: (202) 778 9100

(b)     If to the Sellers, to:

Capmark Capital Inc.
116 Welsh Road
Horsham, PA 19044
Attention: Thomas L. Fairfield, Esq.
Telecopy:  (215) 328 3674

with a copy to:

Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019
Attention:  John Altorelli, Esq.
Telecopy:  (212) 632-0367

SECTION 9.10    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State without regard to the conflicts-of-laws rules thereof.

SECTION 9.11    Counterparts.   This Agreement may be executed in two or more counterparts (including by means of telecopied signature pages), each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

SECTION 9.12    Headings.    The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not affect in any way the meaning or interpretation of this Agreement.

SECTION 9.13    Entire Agreement.   This Agreement, the Disclosure Schedule, the other Transaction Documents and the schedules, annexes and exhibits attached hereto embody the entire agreement and understanding of the Parties in respect of the subject matter contained herein or therein.  There are no agreements, representations, warranties or covenants other than those expressly set forth herein or therein.  This Agreement, the Disclosure Schedule, the other Transaction Documents and the schedules, annexes and exhibits attached hereto supersede all prior agreements and understandings between the Parties with respect to such subject matter. The schedules, annexes and exhibits attached hereto are incorporated herein by reference and made a part hereof.

SECTION 9.14    Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Parties.

- 25 -

SECTION 9.15    Jurisdiction and Venue.    Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York or any New York State court sitting in Manhattan for the purposes of enforcing this Agreement.  In any action, suit or other proceeding, each of the Parties irrevocably and unconditionally waives and agrees not to assert by way of motion, as a defense or otherwise any claims that it is not subject to the jurisdiction of the above courts, that such action or suit is brought in an inconvenient forum or that the venue of such action, suit or other proceeding is improper.  Each of the Parties also agrees that any final and nonappealable judgment against a Party in connection with any action, suit or other proceeding shall be conclusive and binding on such Party and that such award or judgment may be enforced in any court of competent jurisdiction, either within or outside of the United States.  A certified or exemplified copy of such award or judgment shall be conclusive evidence of the fact and amount of such award or judgment.  In the event of any Insolvency Proceeding with respect to a Seller, the Parties agree that jurisdiction and venue in any action brought by any Party pursuant to this Agreement or any other Transaction Document shall properly lie in the Bankruptcy Court, and that any claim, action or Legal Proceeding by any Party seeking any relief whatsoever arising out of, or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby and thereby may be brought in the Bankruptcy Court.  By execution and delivery of this Agreement, each Party irrevocably submits to the jurisdiction of such court for itself and in respect of its property with respect to any such Legal Proceeding.  The Parties irrevocably agree that venue would be proper in such court, and hereby waive any objection that such court is an improper or inconvenient forum for the resolution of such action.

SECTION 9.16    Waiver of Jury Trial.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT AND ANY OTHER DOCUMENT REQUIRED TO BE DELIVERED HEREBY OR THE TRANSACTIONS PROVIDED FOR HEREBY.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties have executed this Purchase Agreement as of the date first written above.

CAPMARK FINANCE INC.

By: _____
Name:  William Gallagher
Title:  Executive Vice President

CAPMARK CAPITAL INC.

By: _____
Name David Cheung
Title:  Senior Vice President and General Counsel

JEFFERIES MORTGAGE FINANCE, INC.

By: _____
Name:  Johan Eveland
Title:  Executive Vice President

IN WITNESS WHEREOF, the Parties have executed this Purchase Agreement as of the date first written above.

CAPMARK FINANCE INC.

By: _____
Name:  William Gallagher
Title:  Executive Vice President

CAPMARK CAPITAL INC.

By: _____
Name David Cheung
Title:  Senior Vice President and General Counsel

JEFFERIES MORTGAGE FINANCE, INC.

By: _____
Name:  Johan Eveland
Title:  Executive Vice President

IN WITNESS WHEREOF, the Parties have executed this Purchase Agreement as of the date first written above.

CAPMARK FINANCE INC.

By: _____
Name:  William Gallagher
Title:  Executive Vice President

CAPMARK CAPITAL INC.

By: _____
Name David Cheung
Title:  Senior Vice President and General Counsel

JEFFERIES MORTGAGE FINANCE, INC.

By: _____
Name:  Johan Eveland
Title:  Executive Vice President

## EXHIBIT A

### Form of Bill of Sale and General Assignment

This BILL OF SALE AND GENERAL ASSIGNMENT (this "Agreement") is made this _____ day of _____, 200_, by and among CAPMARK CAPITAL INC., a Colorado corporation, CAPMARK FINANCE INC., a California corporation (each of the foregoing, collectively, the "Sellers") and JEFFERIES MORTGAGE FINANCE, INC., a Delaware corporation (the "Purchaser").

## W I T N E S S E T H :

WHEREAS, the Sellers and the Purchaser have entered into a Purchase Agreement dated as of October 16, 2009 (the "Purchase Agreement"; capitalized terms not defined herein shall have the meanings ascribed to them in the Purchase Agreement); and

WHEREAS, pursuant to, and in accordance with the terms of, the Purchase Agreement, the Sellers have agreed to sell and assign and the Purchaser has agreed to purchase all right, title and interest in and to, as the same shall exist on the date hereof, the Acquired Assets set forth on Schedule I hereto (the "Assigned Assets").

NOW THEREFORE, in consideration of the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.    Transfer. Each Seller does hereby sell, convey, assign, transfer and deliver to Purchaser all of each Seller's right, title and interest in and to, as the same shall exist on the date hereof, the Assigned Assets owned by such Seller, TO HAVE AND TO HOLD unto Purchaser, and Purchaser's successors and assigns, to and for its and their use forever. Purchaser hereby accepts the sale, transfer, conveyance, assignment and delivery of the Assigned Assets.

2.    Purchase Agreement. This Agreement is in accordance with and is subject to all of the terms and conditions of the Purchase Agreement. Nothing contained in this Agreement shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of the Sellers or Purchaser contained in the Purchase Agreement. If any conflict or other difference exists between the terms of this Agreement and the Purchase Agreement, then the terms of the Purchase Agreement shall govern and control.

3.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

4.    Further Assurances. Each Seller shall execute and deliver, or cause to be executed and delivered, from time to time hereafter, upon request and without further consideration, all such further documents and instruments and shall do and perform all such acts as may be reasonably necessary to give full effect to the intent of this Agreement.

5.    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflicts-of-laws rules thereof.

6.    <u>Counterparts</u>.   This Agreement may be executed in two or more counterparts, each of which shall be deemed to constitute an original, but all of which together shall constitute one and the same instrument.

7.    <u>Miscellaneous</u>.   The section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not affect in any way the meaning or interpretation of this Agreement.

*[Signature Page Follows.]*

IN WITNESS WHEREOF, the Sellers and Purchaser have executed this Bill of Sale and General Assignment as of the date first written above.

CAPMARK CAPITAL INC.

By: _____

Name: _____

Title: _____


CAPMARK FINANCE INC.

By: _____

Name: _____

Title: _____


JEFFERIES MORTGAGE FINANCE, INC.

By: _____

Name: _____

Title: _____


*[Signature Page to Bill of Sale and General Assignment]*

## Schedule I

## Assigned Assets