IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| | : | **Chapter 11** |
| *In re* | : | |
| | : | **Case No. 09-13684 (CSS)** |
| **CAPMARK FINANCIAL GROUP INC.**, *et al.*, | : | |
| | : | **(Jointly Administered)** |
| Debtors. | : | |
| | : | **Hearing Date (Requested):** |
| | : | November 24, 2009 at 3:00 p.m. |
| | : | |
| | : | **Objection Deadline (Requested):** |
| | : | November 17, 2009 at 4:00 p.m. |

-------------------------------------------------------------x

**MOTION, PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, AND 9014, AND LOCAL RULES 2002-1 AND 6004-1, REQUESTING ENTRY OF THE FOLLOWING ORDERS: (I) AN ORDER AUTHORIZING PRIVATE SALE OF ALL OUTSTANDING SHARES IN PREMIER ASSET MANAGEMENT COMPANY FREE AND CLEAR OF ALL CLAIMS AND INTERESTS, OR, IN THE ALTERNATIVE, (II) (a) A BIDDING PROCEDURES ORDER, (i) SCHEDULING AN AUCTION FOR THE SALE OF SUCH SHARES; (ii) APPROVING BIDDING PROCEDURES; (iii) APPROVING BREAK-UP FEE; (iv) SCHEDULING SALE HEARING; (v) ESTABLISHING OBJECTION DEADLINE; AND (vi) APPROVING SALE HEARING NOTICE; AND (b) THE SALE ORDER**

Capmark Financial Group Inc. ("CFGI") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"),[1] submit this motion

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754),

(the "Motion") requesting an order approving a private sale to Sandringham Investment Inc. (the "Buyer") of all the issued and outstanding shares (the "Shares") that Capmark Finance Inc. ("CFI," or the "Seller") holds in Premier Asset Management Company ("Premier") pursuant to the Sale Agreement (as defined below).  In the alternative, if the Court declines to approve a private sale of the Shares, the Debtors seek entry of two orders: (i) a bidding procedures order, scheduling an auction, approving bidding procedures and the break-up fee, scheduling a sale hearing and objection deadline, and approving the notice of proposed sale of the Shares; and (ii) a sale order, approving the terms of the sale of the Shares to the highest or best bidder, as more fully discussed below.

### Background

1.      On October 25, 2009 (the "Commencement Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11, United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On October 27, 2009, this Court entered an order authorizing the joint administration of the Debtors' chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 1015-1 of the Local Bankruptcy Rules for the District of Delaware (the "Local Rules").

---

Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), and Capmark Affordable Equity Inc. (2381).  CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044.  The addresses for all of the Debtors are available at the following World Wide Web address: http://chapter11.epiqsystems.com/capmark.

3.     On November 2, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed a statutory creditors committee pursuant to section 1102 of the Bankruptcy Code (the "Creditors Committee").

## Capmark's Businesses

*Overview*

4.     The Debtors and their non-debtor subsidiaries and affiliates (together with the Debtors, "Capmark") are a group of commercial real estate finance companies that provide real estate-related products and services to borrowers, investors and other customers along three core business lines:  (i) commercial real estate lending and mortgage banking; (ii) investments and funds management; and (iii) commercial loan servicing.  Capmark's business lines are conducted through six business segments organized by geography and type of business:

- *North American Lending and Mortgage Banking.*  This segment includes most North American activities relating to the real estate lending and mortgage banking business, including commercial mortgage banking, loan origination and capital markets activities, and syndication of new markets tax credit funds.

- *North American Servicing.*  This segment includes all North American loan servicing activities, including activities with respect to the primary, master and special servicing of loan portfolios originated by Capmark, third parties, and securitized loan pools.

- *North American Investments and Funds Management.*  This segment includes all North American activities relating to investments and funds management, including sponsorship of real estate debt and equity funds and management of Capmark's own real estate debt and equity investments.

- *North American Affordable Housing.*  The North American Affordable Housing segment manages affordable housing debt investments and low income housing tax credit equity investments on behalf of third-party investors.

- *Asian Operations.*  This segment historically included all Asian activities relating to all three core business lines.  Capmark has ceased all Asian proprietary lending and investing activities and is currently focused on

3

managing existing loan, investment and fee-for-services businesses in Asia.

- *European Operations.* This segment historically included all European activities relating to all three core business lines. Capmark has ceased all European proprietary lending and investing activities, has sold its European servicing business and closed its Irish banking subsidiary, and is currently focused on managing existing loan, investment and fee-for-services businesses in Europe.

5.    As of June 30, 2009, the carrying value of Capmark's total loan portfolio of commercial real estate loans held for sale or investment was $10.7 billion. Capmark also owns substantial real estate and equity investments and certain other tangible and intangible assets. On a consolidated basis, as of June 30, 2009, Capmark's assets were approximately $20.1 billion and liabilities were approximately $21 billion. Consolidated losses for the three months ending June 30, 2009 were approximately $1.6 billion.

*Events Leading to Chapter 11*

6.    As a commercial real estate finance company, Capmark's ability to generate income and cash flow is highly dependent on (i) the volume of financing it originates and the credit performance of that financing; (ii) its ability to securitize, sell, participate or otherwise finance loans; (iii) the fair value of the loans on its balance sheet; and (iv) the spreads it generates on its interest-earning assets. In addition, Capmark's financial performance is driven by, among other things, its ability to increase the size of its servicing portfolios and the amount of real estate-related assets under management. Capmark's origination activities impact the level of placement fees and net interest income, and impact the amount of loans it has available for future sale and servicing opportunities, which in turn affect its levels of net gains or losses and fee-based income. Capmark's ability to increase the size of its servicing portfolios affects the level of servicing fees it earns and income it derives from escrow balances.

4

7.    The unprecedented conditions in domestic and international financial markets have adversely affected Capmark's businesses. The lack of credit available to potential purchasers of Capmark's assets and the current condition of the securitization markets has severely impaired its ability to sell assets in the normal course of business. Capmark has historically utilized the proceeds from such asset sales as a source of liquidity for new originations and the repayment of debt. Dislocations in worldwide capital markets, together with the deterioration of Capmark's operating results, have also impaired its ability to obtain alternative means of financing its origination and investment activities. Capmark's inability to sell its assets has required it to hold a greater portion of its assets for a longer duration, thereby increasing the credit risk related to lending and investment activities. The negative impact from this increased credit exposure has been exacerbated by the fact that the performance of Capmark's loans and real estate investments has sharply deteriorated. The current market conditions have made it difficult for Capmark's borrowers to find replacement financing or to sell their properties, which are the typical sources of repayment for commercial mortgage loans. The lack of available replacement financing decreases Capmark's cash flow, by increasing the average duration of Capmark's loan portfolio and decreasing transaction-related servicing fees.

8.    These developments have effectively made it impossible for the Debtors to continue their business operations in a profitable manner absent a restructuring of their businesses and obligations. After carefully reviewing and exploring strategic business alternatives and transactions, and after implementing numerous cost-saving strategies, the Debtors determined that an orderly restructuring of their debts under chapter 11 represents the best of all available strategic options to maximize and preserve the value of their estates for their creditors and other parties in interest.

## Jurisdiction and Venue

9.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

10.     By this Motion, pursuant to sections 105(a), and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 9014, and Local Rules 2002-1 and 6004-1, the Debtors request entry of an order (the "Private Sale Order"), substantially in the form of Exhibit A attached hereto, approving a private sale (the "Sale") of the Shares, pursuant to the Sale Agreement for the Sale and Purchase of All Ordinary Shares in Premier Asset Management Company (the "Sale Agreement"), between the Seller and Buyer, dated as of October 8, 2009, free and clear of any and all liens, claims, encumbrances, and interests (collectively, the "Liens").  A copy of the Sale Agreement is attached hereto as Exhibit B.[2]  As explained below, prior to the Commencement Date, the Seller and Premier extensively marketed the Shares and Premier's underlying servicing business (collectively, the "Premier Servicing Business") for over half a year.  After receiving only two offers, Seller determined, given the complexity of transferring the business and the lack of qualified bidders, that the transaction contemplated by the Sale Agreement and the other Transaction Documents (as defined in the Sale Agreement) is the best and only viable option for disposing of Seller's Shares and the Premier Servicing Business in a manner that will maximize value to the Debtors' estates.

---

[2] The Sale Agreement is subject to strict confidentiality requirements.  The parties have agreed to attach the Sale Agreement exclusive of the schedules to the Sale Agreement, and the parties agree that the filing of the Motion with the Sale Agreement attached does not breach any confidentiality provisions. The parties may subsequently file certain schedules to the Sale Agreement to the extent such filing will not disclose confidential information.

11.    In the alternative, if the Court declines to approve the Sale pursuant to the Private Sale Order, the Debtors request entry of an order (the "Bidding Procedures Order"), substantially in the form of Exhibit C attached hereto:

(i)    scheduling an auction (the "Auction") on December 14, 2009 at 10:00 a.m. (prevailing Eastern Time), at which the Sellers (as defined below) will solicit competing bids for the Sale of the Shares (as defined below);

(ii)    approving the bidding procedures (the "Bidding Procedures") set forth in the Bidding Procedures Order for the Sale of the Shares;

(iii)    approving a break-up fee (the "Break-Up Fee") for the stalking horse bidder as protection against a topping bid that represents a higher or better offer;

(iv)    scheduling December 18, 2009 at 10:00 a.m. (prevailing Eastern Time) as the date and time for the hearing (the "Sale Hearing") to approve the Sale of the Shares to the winning bidder at the Auction;

(v)    establishing the objection deadline in connection with the proposed Sale; and

(vi)    approving the proposed form of notice of the Sale Hearing and the Auction (the "Sale Notice"), annexed as Schedule 1 to the Bidding Procedures Order.

If the Court enters the Bidding Procedures Order and bids are received at the Auction, the Debtors request entry of an order authorizing the Sale of the Shares to the Successful Bidder on substantially the same terms and conditions set forth in the Sale Agreement or a Modified Sale Agreement (as defined below), free and clear of any and all Liens pursuant to section 363(f) of the Bankruptcy Code.[3]  If no higher or better bids are received before or at the Auction, the Debtors request approval of the Sale to Buyer pursuant to the Sale Agreement.

---

[3] The proposed Private Sale Order contemplates the Sale of the Shares to Buyer as a private sale pursuant to the Sale Agreement. If, as an alternative to the private sale, the Court enters the Bidding Procedures Order and a higher or better offer than the Sale Agreement is received, the Sellers will submit a revised version of the Private Sale Order (with a blackline against the Private Sale Order) reflecting the proposed sale to the Successful Bidder.

7

12.    This Motion is supported by the Declaration of Allen Atchley, Senior Vice President of Asia Servicing for Capmark Japan KK and Representative Director of Premier Asset Management Company (the "Atchley Declaration"), filed in support of the Motion.

### Premier's Business

13.    Premier is a wholly owned subsidiary of the Seller and is the first licensed servicer in the Japanese servicing industry, having acquired the first license issued by the Minister of Justice in April 1999. Premier is one of the largest loan servicing companies specializing in commercial mortgage backed securities ("CMBS") in Japan. Premier is based in Tokyo and is a full product-line servicer offering master, primary, and special servicing. Premier's services also include cash management, collateral analysis, disbursement, and reporting. Premier has servicing staff based in Japan. Currently, Premier services mortgage loans with an aggregate outstanding unpaid principal balance of approximately $18 billion (of which $13 billion is CMBS servicing and the remainder is servicing of various types of loans, including, among others, warehouse loans, corporate loans and residential loans). The employees that support the Premier Servicing Business are employees of a nondebtor affiliate of the Seller, Capmark Japan KK, which employees work at Premier as secondees.

14.    As part of its business, Premier is subject to oversight by the major servicing Rating Agencies (as defined in the Sale Agreement to include Fitch Ratings Limited, Moody's Investors Services Limited, and Standard & Poor's). When it acts as advancing agent in CMBS transactions, Premier must make servicer advances to cover shortfalls in the payment of interest and other payments required by borrowers/mortgagors under the mortgages Premier securitizes and pools together in CMBS trusts. In sixteen securitizations serviced by Premier, CFGI, Seller or Seller's relevant subsidiary (a "Seller's Group Company") has guaranteed Premier's advancing obligations. As a result of the deterioration of Seller's and CFGI's

creditworthiness, triggers were activated in the servicing advance guarantees that required cash to be posted as servicing advance collateral in the aggregate amount of approximately $75 million in back-up reserve accounts for the benefit of the securitization trusts or note issuers (the "Servicer Advancing Reserve Accounts," as defined in the Sale Agreement). A large amount of the funds in the Servicing Advancing Reserve Accounts (approximately $46 million) has been funded by an intercompany loan from CFI to Premier (the "Capmark Facilities," as defined in the Sale Agreement). The remainder has been posted to the accounts directly by Premier.

### Pre-Commencement Date
### Marketing of the Premier Servicing Business

15. Beginning in the first quarter of 2009, the Debtors initiated discussions with several parties to obtain a third party-funded servicing advance facility to support Premier's advancing obligations and to facilitate the release of funds in the Servicer Advancing Reserve Accounts and/or the potential sale of the Premier Servicing Business. Given the credit ratings required of third parties to release the Seller's Group Companies of their servicing advance guarantees and release the funds deposited in the Servicer Advancing Reserve Accounts, the Debtors' marketing efforts were concentrated on companies with both sufficient credit quality as well as active real estate businesses in Japan. The Premier Servicing Business was also marketed as part of the pre-Commencement Date marketing of the Debtors' North American Servicing and North American Lending and Mortgage Banking segments and the assets primarily related to such businesses, which sale is the subject of a separate motion filed with the Court.

16. Japanese regulatory requirements and practical business considerations limited the universe of potential purchasers to certain leading investment banks, investment funds, and financial companies active in the Japanese real estate market. Japanese megabanks met credit ratings requirements, but none are active in the third party servicing business in Japan,

9

due to regulatory and reputational concerns. Interest was thus solicited only from parties capable of meeting the regulatory and business requirements accompanying a purchase of the Premier Servicing Business or capable of providing sufficient credit support for Premier's servicing advance obligations. The parties solicited included five international banks and nine investment funds and financial companies. In almost every case, the solicitations were met with little or no interest. The parties approached either had no interest in purchasing a Japanese third party servicing company or were unable or unwilling to offer sufficient credit quality to meet the Rating Agencies' requirements and enable the release of funds in the Servicer Advancing Reserve Accounts. Ultimately, two parties meeting the credit requirements expressed interest: one international bank and Chuo Mitsui Trust Holding Group ("Chuo Mitsui"), which is an investor to investment funds managed by Buyer (Buyer together with Chuo Mitsui, collectively, the "Buyer's Group"). The Buyer's Group proposal included the use of a credit enhancement facility, which will be provided by Chuo Mitsui under the CMBS Advancing Facility Agreement (as defined in the Sale Agreement) to provide sufficient credit support for Premier's advancing obligations.

17.     Premier entered into confidentiality agreements with the international bank and Chuo Mitsui on May 21, 2009 and, June 22, 2009, respectively. In addition, another potential buyer entered into a confidentiality agreement with Premier on May 25, 2009 to explore a purchase of Premier's CMBS contracts, a back-up advancing facility, and other deal structures; however, that party did not make a formal offer in writing. Regardless, that party's offer was deemed uncompetitive, as the buyer requested a fee to take over Premier's CMBS servicing contracts, Premier's most valuable business assets. In addition, it was not clear that the credit support offered by that party would be sufficient under the conditions of CFGI's servicing

advance guarantees and enable the release of the Debtors' ongoing guarantee obligations and of the funds deposited to secure those obligations.    Thereafter, in August 2009, both the international bank and the Buyer's Group made formal offers in writing to Premier, both of which included servicing advance facilities that would allow CFGI to recover the $75 million deposited in the Servicer Advancing Reserve Accounts.

18.    After carefully considering the two offers with the aid of their legal and financial advisors, including Loughlin Meghji + Company, CFI and Premier determined Buyer's Group's offer to be the highest or best available offer for the Shares; further, CFI and Premier determined that Buyer's Group's offer provides for the fastest possible recovery of the servicing advance deposits.    The Seller believes the pre-Commencement Date marketing efforts for the sale of the Premier Servicing Business were fair and exhaustive and, as a result, no formal bidding procedures and additional sale process should be required before approving the Sale to Buyer under the Sale Agreement.    Under the circumstances presented, the reasonableness of the private sale process is self-evident.

## The Proposed Sale to Buyer Pursuant to the Sale Agreement[4]

19.    On October 8, 2009, the Seller entered into the Sale Agreement with Buyer.    The Debtors have no prior affiliation with Buyer.    The following is a summary of the salient provisions of the Sale Agreement:

(A)    **Sale of Shares**.  The Sale Agreement provides for the Sale of the Shares and each right attaching to the Shares in accordance with the Sale Agreement.  The Shares comprise 20,000 fully-paid ordinary shares in the capital of Premier, which constitutes the whole of the total issued and outstanding shares of Premier.

---

[4] This summary of the salient terms of the Sale Agreement is provided for convenience purposes only, and is qualified in its entirety by the precise terms and conditions of the Sale Agreement. To the extent of any inconsistency between the summary set forth herein and the Sale Agreement, the terms and conditions of the Sale Agreement shall govern. Capitalized terms used in this summary, but not defined herein, shall have the meanings ascribed to them in the Sale Agreement.

RLF1-3501179-1

(B)    **Purchase Price**. The purchase price of the Shares is the aggregate of (i) JPY 100,000,000 ($1,103,570); (ii) JPY 2,002,314,311 ($22,096,941); and (iii) as the case may be, the Premium (as defined in the Sale Agreement), which is equal to JPY 200,000,000 ($2,207,140) (the "Purchase Price").[5] The Premium will be payable if the winning bidder for certain Non-Performing Loans being sold by Premier elects to continue using Premier to service such loans on or before March 31, 2010.

(C)    **Break-Up Fee**. In the event that the Seller, prior to the Completion, (a) consummates a transaction in respect of an offer other than that of the Buyer, or (b) sells, transfers, leases or otherwise disposes, directly or indirectly, including without limitation through an asset sale, stock sale merger or other similar transaction, all or substantially all of the assets of the Company (or agrees to do any of the foregoing) in a transaction or series of transactions within twelve (12) months from entry into the Sale Agreement (either of clause (a) or (b) being an "Alternative Transaction"), the Seller shall pay in cash in immediately available funds to the Buyer the Break-Up Fee in an amount equal to JPY 50,000,000 ($551,785) not later than the closing of the Alternative Transaction; provided that in no event shall the Break-Up Fee be payable to the Buyer if Completion does not occur by the Completion Date (as defined below) as a result of the actions or inactions of the Buyer. The Break-Up Fee shall be payable upon the closing of the Alternative Transaction.

(D)    **Non-Solicitation/Competition.** Except as otherwise provided therein, Section 11.8 of the Sale Agreement provides that for a period of one (1) year starting on the date of the Sale Agreement, Buyer will not directly or indirectly solicit or contact with a view to his engagement or employment by another person, or employ or engage a director, officer, employee or manager of Seller or its relevant Seller's Group Company.

(E)    **Closing Conditions**. The Completion of the transaction contemplated by the Sale Agreement is subject to the satisfaction of certain closing conditions intended to protect the interests of the Seller and Buyer, including, but not limited to, (i) the execution of the IT Transfer Agreement between Premier and Capmark Japan KK or the relevant Seller's Group Company, (ii) the execution of the Transitional Services Agreement by Premier and Capmark Japan KK or the relevant Seller's Group Company, (iii) the execution of the CMBS Advancing Facility Agreement by Premier and the Chuo Mitsui Trust & Banking Company Limited, (iv)the written confirmation by the Rating Agencies of the rating of each securitization listed in the CMBS Advancing Facility Agreement; (v) the release to Premier by each CMBS Issuer/Lender of all the funds kept by it on Servicer Advancing Reserve Accounts, (vi) the release of all guarantees given by the relevant Seller's Group Company on account of Premier's Servicer Advancing Obligation (as defined in the CMBS Advancing Facility Agreement); and (xiii) the termination of the Capmark Facilities.

---

[5] United States dollar equivalents to Japanese Yen are stated in approximate amounts as of the date of this Motion.

20.    In addition to the above-described salient features of the Sale Agreement, in accordance with Local Rule 6004-1(b)(iv), the Debtors note the following with respect to the Sale Agreement:

(A)    **No Sale to an Insider**: Buyer is not an insider of the Debtors within the meaning set forth in section 101(31) of the Bankruptcy Code.

(B)    **Sale Agreements with Management**: Subject to certain exceptions, Section 11 of the Sale Agreement contains certain provisions for the transfer of Capmark Japan KK employees engaged in Premier's business as secondees, which employees are to be transferred to Premier on or before the Completion Date (as defined below). Seller shall cause Capmark Japan KK to make commercially reasonable efforts to transfer the employees to Premier on terms and conditions of employment to be agreed upon by the Buyer. Premier will make reasonable commercial efforts to offer terms and conditions of employment which shall be no less favorable to each employee as the current terms and conditions provided to such employee by Capmark Japan KK. The employees are to resign from Capmark Japan KK before any transfer to Premier.

(C)    **Releases**: The Sale Agreement does not provide for any releases; however, the consummation of the related CMBS Advancing Facility Agreement will release the relevant Seller's Group Companies of all guarantees given on account of Premier's servicer advancing obligations and shall release the $75 million in servicing advance deposits in the Servicer Advancing Reserve Accounts.

(D)    **Private Sale/No Competitive Bidding**: As discussed below, the Seller believes the pre-Commencement Date marketing efforts for sale of the Premier Servicing Business were exhaustive and that no formal bidding procedures and process should be required before approving the Sale to Buyer under the Sale Agreement. In fact, to insist on an auction process now would only jeopardize and delay the Sale, causing potential harm to the Debtors' estates.

(E)    **Closing and Other Deadlines (Completion and Completion Date)**: As set forth in Section 5 of the Sale Agreement, the closing (the "Completion," as defined in the Sale Agreement) is scheduled to occur on the "Completion Date," which is the later of December 31, 2009 and the date which is three Business Days after the date (not being later than January 31, 2010 or such later date as the parties agree) on which the last of the Conditions to Completion are satisfied or waived.

(F)    **Good Faith Deposit**: No provisions in the Sale Agreement address the use of a Good Faith Deposit.

(G)    **Interim Arrangements with Proposed Buyer**: Although Seller has not entered into any interim arrangements with the Buyer, the Sale Agreement contemplates that Premier and Capmark Japan KK or a Seller's Group Company shall enter into a transition services agreement upon Completion for infrastructure and application support for

13

Premier, which shall include, *inter alia*, network and telecommunication, servers and database, email, desktop support, data storage and its backup, BCP solutions for the above, H20 (support and development), IPIC (support and development), strategy (support only), banking personal computers (connectivity support only), and BCP solutions for the above. Further, Premier is currently seeking to transfer its residential servicing platform in advance of the Completion Date to a party other than the Buyer. In the event Premier's residential servicing business is not transferred prior to the Completion Date, Premier may need to continue servicing the platform for a time period before finding a willing bidder for the residential servicing business. In such case, Seller and Premier may enter into a sublicense agreement to allow Premier to utilize the software Strategy (a module of McCracken), which Premier currently uses to operate the residential servicing portfolio. To the extent Court authorization is required to approve such sublicense (if needed), Seller will seek authority from the Court to enter into the sublicense.

(H)    **Use of Proceeds**:  No provisions in the Sale Agreement address the use of proceeds.

(I)    **Tax Exemption**:  No tax exemptions under section 1146(a) of the Bankruptcy Code are contemplated in connection with the Sale Agreement.

(J)    **Record Retention**:  While the Sale Agreement does not address the retention of records, Seller is not selling substantially all of its assets. Seller will thus retain, or have reasonable access to, its books and records to enable it to administer its chapter 11 case following the sale.

(K)    **Sale of Avoidance Actions**:  The Sale Agreement does not involve the sale of, or impose limitations on, any chapter 5 causes of action.

(L)    **Requested Findings as to Successor Liability**:  No provisions in the Sale Agreement address successor liability.

(M)    **Sale Free and Clear of Unexpired Leases**:  No provisions in the Sale Agreement address the sale free and clear of unexpired leases.

(N)    **Credit Bid**:  The Shares are unencumbered by any Lien, mortgage, or any other security interest. Accordingly, there will be no credit bidding under section 363(k) of the Bankruptcy Code.

(O)    **Relief from Bankruptcy Rule 6004(h)**:  The Seller is requesting relief from the 10-day stay imposed by Rule 6004(h).

### Need for Immediate Private Sale

21.    After an extensive marketing process, the Sale of the Shares represents the highest or best available offer for Seller to realize maximum value for the Debtors' estates.

14

Given the fragile state of Premier's servicing platform, the Sale of the Shares to Buyer will provide value to the Debtors' estates while releasing the Seller's Group Companies from ongoing liabilities relating to Premier's advancing obligations and releasing nearly $75 million of the Debtors' funds which will inure to the benefit of the estates. Any substantial delay in the transaction with the Buyer could have serious adverse consequences, including the loss of any potential transaction and, importantly, the delay in recovery of some or all of the $75 million the Debtors have deposited in the Servicer Advancing Reserve Accounts. Indeed, immediately before the Commencement Date, Fitch revised upward its CMBS special servicer rating for Premier from Rating Watch Negative to Rating Watch Evolving based on the proposed change of Premier's ownership by the transfer of the Shares to Buyer and the credit availability to backstop Premier's advancing obligations represented by the CMBS Advancing Facility Agreement. The CMBS Advancing Facility Agreement has been approved by the Rating Agencies and is to be executed on November 9, 2009, although the agreement will not go into effect until the Sale to Buyer is approved by the Court.

22.     Premier has ordered confirmations from the Rating Agencies for its CMBS securitizations, which are required for the funds deposited in the Servicer Advancing Reserve Accounts to be released to the Debtors. The failure to gain approval of the Sale to Buyer could cause the Rating Agencies to downgrade Premier, resulting in the termination of all of Premier's servicing contracts. Premier has already received notices from the trustees of five CMBS transactions requiring that Seller be replaced as guarantor within 30 days of the Commencement Date. Termination of such contracts could place any recovery of the funds deposited in the Servicer Advancing Reserve Accounts in serious jeopardy.

23.    In light of the foregoing, a great effort was expended by the Seller and Premier prior to the Commencement Date to maintain the value of the Shares and continue servicing loans in accordance with Premier's historically high standards.  In addition, the Debtors extensively marketed the Premier Servicing Business while searching for a creditworthy buyer that could provide the credit support necessary to release the estates from further guarantee obligations relating to Premier's advancing obligations and to release the funds deposited in the Servicer Advancing Reserve Accounts.  The culmination of the Seller's efforts to realize value for its stakeholders and the estates is the proposed Sale and entry by Premier into the CMBS Advancing Facility Agreement.  The prompt Sale of the Shares pursuant to the Sale Agreement to Buyer, without further delay necessarily attendant to additional formal marketing, is the best way to maximize and preserve the value for the Debtors' estates.  Absent a prompt Sale, the value of the Premier Servicing Business could decline substantially.

### Alternative to Private Sale:
### Court-Approved Bidding Procedures and Auction

24.    The Debtors believe the Court should approve the Sale of the Shares to Buyer as soon as possible as a private sale given the substantial pre-Commencement Date marketing of the Premier Servicing Business and the lack of bidders, other than Buyer, capable of meeting the complex requirements for transfer of the business, including obtaining Rating Agency approvals necessary for the release of the advances deposits in the Servicer Advancing Escrow Accounts.  In the event the Court declines to enter the Private Sale Order and requires a public bidding process, the Debtors seek to implement a competitive auction and bidding process for the Sale of the Shares pursuant to the Sale Agreement, subject to higher or better offers.  The proposed Auction and Bidding Procedures are as follows:

(A)    **Assets to Be Sold**: The Auction shall consist of the Shares (as defined herein);

16

(B)    **Confidentiality Sale Agreements**:    Upon execution of a confidentiality agreement, in form and substance satisfactory to the Seller, any qualified party that wishes to conduct due diligence in respect of the Shares and transfer of the Premier Servicing Business may be granted access to all necessary information that has been or will be provided to Buyer and other bidders;

(C)    **Bid Deadline**:  Any person or entity interested in participating in the Auction must submit a Qualifying Bid (as defined below) on or before December 7, 2009 at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline") in writing, to (1) counsel to the Seller, Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019, Attention: Michael P. Kessler, Esq. and Judy G.Z. Liu, Esq., (2) Capmark Financial Group Inc., 116 Welsh Road, Horsham, Pennsylvania, 19044, Attention: Thomas L. Fairfield, Esq.; (3) counsel for Buyer, White & Case LLP, Attention: Andrew C. Ambruoso, Esq., 1155 Avenue of the Americas, New York, New York, 10036; and (4) counsel for the Creditors Committee, Kramer Levin Naftalis & Frankel LLP, Attention: Thomas Moers Mayer, Esq., and Amy Caton, Esq., 1177 Avenue of the Americas, New York, NY 10036.

(D)    **Qualifying Bids**:    To participate in the bidding process and be deemed a "Qualified Bidder", each potential bidder (other than Buyer) must submit a "Qualifying Bid" by the Bid Deadline.  To constitute a Qualifying Bid, a bid must:

(i)    be in writing and state that such bidder is prepared to enter into a legally binding purchase and sale agreement that is substantially similar to, and not materially different from, the Sale Agreement for the acquisition of the Shares on terms and conditions no less favorable to the Seller than the terms and conditions contained in the Sale Agreement;

(ii)    include a mark-up of the Sale Agreement (the "Modified Sale Agreement") reflecting the variations from the Sale Agreement and a clean and executed Modified Sale Agreement;

(iii)    provide that such bidder's offer is irrevocable until the closing of the purchase of the Shares if such bidder is the Successful Bidder or the Back-Up Bidder (each as defined below);

(iv)    demonstrate that such bidder is financially able to consummate the transactions contemplated by the Modified Sale Agreement, including providing written and, if requested, audited financial statements demonstrating such financial wherewithal.

(v)    demonstrate that such bidder, by itself or in partnership with another entity, (a) shall have, at a minimum, short term unsecured, unsubordinated, unguaranteed debt obligations being rated, in the case of Fitch, "F-1"; in the case of Moody's, short tem bank deposit rating (or if such rating is not available, short term debt rating) of "P-1"; and in the case of S&P, "A-2"; and (b) can provide the Servicer Advancing Guarantee and other credit support for the Premier Servicing

17

Business, either through providing financing on terms substantially the same as the CMBS Advancing Facility to support Premier's Servicer Advancing Obligations or through another form of credit support, such that all funds in the Servicing Advance Reserve Accounts will be released upon closing of a transaction with such bidder, all as may be determined by the Seller and Premier after consultation with the Creditors Committee;

(vi)    describe the source of funding of the purchase price and for reimbursement of current and future advances and warehouse lines under the servicing portfolio, its availability and any contingencies or material conditions relating thereto;

(vii)    describe any transition services that will be required by the bidder in connection with an acquisition of the Shares;

(viii)    include a statement that there are no conditions precedent to the bidder's ability to enter into a definitive Sale Agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

(ix)    include a statement that any governmental or third-party consents needed to consummate the acquisition of the Shares, to the extent they are not already contemplated in the Sale Agreement, can and will be obtained before the Completion Date;

(x)    not request or entitle the bidder to any transaction or breakup fee, expense reimbursement or similar type of payment;

(xi)    fully disclose the identity of each entity that will be bidding for the Shares or otherwise participating in connection with such bid, and the complete terms of any such participation;

(xii)    not contain any due diligence or financing contingencies of any kind;

(xiii)    include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Sale Agreement;

(xiv)    include the names and contact information of members of the bidder who will be available to answer questions regarding the offer;

(xv)    include the names of external advisors including financial, legal and accounting firms, as well as industry consultants or other resources;

(xvi)    include any other information or factors that may be relevant to the Seller and its advisors in consideration of the bid; and

(xvii)  include a cash deposit by wire transfer equal to twenty-five (25%) percent of the Purchase Price, or such higher amount offered to purchase the Shares (the "Good Faith Deposit").

The Debtors, after consultation with the Creditors Committee, shall make a determination regarding whether a bid is a Qualifying Bid and shall notify bidders whether their bids have been determined to be Qualifying Bids by no later than 4:00 p.m. (prevailing Eastern Time) on December 10, 2009;

(E)    **No Qualifying Bid**: If no timely, conforming Qualifying Bids other than the Sale Agreement are submitted by the Bid Deadline, the Debtors shall not hold an Auction and, instead, shall immediately file the Sale Order approving the Sale Agreement with Buyer, which the Court shall consider at the Sale Hearing;

(F)    **Auction**: In the event the Debtors timely receive one or more Qualifying Bids other than the Sale Agreement, the Debtors shall conduct the Auction with respect to the Shares. The Auction will be conducted at the offices of Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019 on December 14, 2009 at 10:00 a.m. (prevailing Eastern Time), or such other location as designated by the Debtors in a notice to all Qualified Bidders.  The Auction shall be governed by the following procedures:

(i)      Buyer and the Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative;

(ii)     Only representatives of the Debtors, Buyer, Qualified Bidders, counsel and other advisors selected by the Creditors Committee, shall be entitled to be present at the Auction;

(iii)    The Auction process shall be transcribed by a qualified court reporter;

(iv)     Only Buyer and Qualified Bidders shall be entitled to make any subsequent bids at the Auction;

(v)      Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

(vi)     Bidding shall commence at the amount of the highest Qualifying Bid submitted by the Qualified Bidders prior to the Auction and such Bid shall be announced prior to the start of the Auction;

(vii)    Qualified Bidders may submit bids in increments of JPY 100,000,000 ($1,103,570) plus payment of the Break-Up Fee;

(viii)   Qualified Bidders may then submit successive bids in increments of at least JPY 50,000,000 ($551,785) higher than the previous bid;

19

(ix)    All Qualified Bidders shall have the right to submit additional bids and make additional modifications to the Sale Agreement or Modified Sale Agreement, as applicable, at the Auction, which shall be considered at the discretion of the Debtors and the Creditors Committee;

(x)    The Auction may include individual negotiations with the Qualified Bidders (including Buyer) and/or open bidding in the presence of all other Qualified Bidders (including Buyer), which shall be considered at the discretion of the Debtors and the Creditors Committee;

(xi)    The Auction shall continue until there is only one offer that the Seller determines, subject to Court approval, is the highest or best offer from among the Qualified Bidders (including Buyer) submitted at the Auction (the "Successful Bid"). In making this decision, the Debtors may consider, after consultation with the Creditors Committee, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Sale Agreement requested by each Qualified Bidder, and the net benefit to the Debtors' estates.    The Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the applicable Modified Sale Agreement; and

(xii)    Within three (3) days after conclusion of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all Sale Agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities. Bids made after the close of the Auction shall not be considered by the Debtors.

(G)    **Back-Up Bidder and Return of Good Faith Deposits:**

(i)    If an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their business judgment at the Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until 24 hours after the closing of the sale transaction with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court.

(ii)    Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) business day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall

be held by the Debtors until one (1) business day after the closing of the sale transaction with the Successful Bidder.

25.    Also, in accordance with Local Rule 6004-1(c)(i), the Debtors respectfully represent the following with respect to the Auction:

(A)    **Provisions Governing Qualifications of Bidders**: *See* preceding paragraphs 24(D), (E), and (F).

(B)    **Provisions Governing Qualified Bids**: *See* preceding paragraphs 24(D) and (E).

(C)    **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**: Not applicable.

(i)    No Shop or No-Solicitation Provisions: Not applicable.

(ii)    Break-Up/Topping Fees and Expense Reimbursement: *See* preceding paragraph 19(C); Sale Agreement, Section 4.4.

(iii)    Bidding Increments: *See* preceding paragraph 24(F); Sale Agreement, Section 4.1.2.

(iv)    Treatment of Break-Up or Topping Fees and Expense Reimbursement at Auction: *See* preceding paragraphs 19(C) and 24(F); Sale Agreement, Sections 4.1.2 and 4.4.

(D)    **Modification of Bidding and Auction Procedures**: Not applicable.

(E)    **Closing with Alternative Backup Bidder**: *See* preceding paragraph 24(G).

**Approval of the Sale Hearing Schedule and Sale Hearing Notice**

26.    If an Auction and Bidding Procedures are required, the Debtors request that the Court schedule a Sale Hearing on December 18, 2009 at 10:00 a.m. (prevailing Eastern Time), to consider approval of the Sale Agreement and the Sale resulting from an Auction. Bankruptcy Rule 6004(a) provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) and, if applicable, in accordance with § 363(b)(2) of the Code." Bankruptcy Rule 2002(a)(2) requires the Debtors give all creditors and certain other parties "at least 20 days' notice by mail" of the proposed Sale. Bankruptcy Rule 6004(b) also provides that

objections to the proposed Sale "shall be filed and served not less than five days before the date set for the proposed action or within the time fixed by the court."

27.    The Sale Hearing Notice contains the type of information required under Bankruptcy Rule 2002(c), and also includes information regarding the Auction procedures to the extent a higher or better offer than the Sale Agreement is obtained and an Auction takes place. Therefore, if the Court requires a bidding and auction process, the Debtors request that this Court approve the form and content of the Sale Hearing Notice. The Debtors propose at least 20 days' notice for the Sale Hearing, which complies with the notice procedures mandated by the Bankruptcy Rules, according to the following procedures:

(a)    The Debtors shall serve, within 3 business days after entry of the Bidding Procedures Order (the "Mailing Deadline"), by overnight courier, electronic mail, or same-day messenger delivery, copies of the Sale Hearing Notice upon: (i) the U.S. Trustee, (ii) counsel for the Creditors Committee, (iii) attorneys for Buyer, (iv) any party who, in the past 12 (twelve) months, expressed in writing to the Debtors an interest in acquiring the Shares, and who the Debtors and their representatives reasonably and in good faith determine, after consultation with the Creditors Committee, potentially have the desire and financial wherewithal to effectuate the Sale, (v) the Internal Revenue Service, and (vi) any parties entitled to notice under Rule 2002-1(b) of the Local Rules for the United States Bankruptcy Court District of Delaware.

(b)    On or before the Mailing Deadline, or as soon as practicable thereafter, the Debtors will publicize the Sale Hearing Notice in the Wall Street Journal (National Edition) for 2 consecutive business days.

Scheduling the Sale Hearing for the requested date and time is also reasonable given the extensive pre-Commencement Date marketing performed by the Debtors, as described above.

### Objection Deadline

28.    The Debtors request that, pursuant to Bankruptcy Rule 9014, objections, if any, to the Sale (a "Sale Objection") (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware, 19801, on or before 4:00 p.m. on

RLF1-3501179-1

December 15, 2009 (prevailing Eastern Time) (the "Objection Deadline"), or on such later date and time as the Debtors may agree, and (iv) be served with a copy on: (a) counsel for the Debtors, Dewey & LeBoeuf LLP, Attention: Michael P. Kessler, Esq., and Judy G.Z. Liu, Esq., 1301 Avenue of the Americas, New York, New York, 10019; (b) local counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attention: Mark D. Collins, Esq.; (c) counsel for Buyer, White & Case LLP, Attention: Andrew C. Ambruoso, Esq., 1155 Avenue of the Americas, New York, New York, 10036; (d) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (e) counsel for the Creditors Committee, Kramer Levin Naftalis & Frankel LLP, Attention: Thomas Moers Mayer, Esq., and Amy Caton, Esq., 1177 Avenue of the Americas, New York, NY 10036; (f) administrative agent under the Debtors' prepetition senior credit facility, bridge loan agreement and term loan facility at Citicorp North America, Inc., 1615 Brett Rd. Bldg. 3, New Castle, Delaware, 19720, Attention: Ralph Townley; (g) the Federal Deposit Insurance Corporation; and (h) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b).

## Basis for Relief Requested

**A.     Approval of the Sale under Bankruptcy Code Sections 363(b) and 105(a) is Warranted**

29.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (providing that debtors in possession have "all the rights . . . of a trustee"). In addition, section 105(a) provides the authority for this Court to carry out the provisions of section 363(b). *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate

23

to carry out the provisions of this title."). Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if the sale is based upon the sound business judgment of the debtor. *In re Dura Auto. Sys.*, 2007 Bankr. LEXIS 2764 at *258 (Bankr. D. Del. 2007) (citing *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996)); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision); *In re Montgomery Ward Holding Corp.*, 242 B.R 147, 153 (D. Del. 1999) (same).

30.    When a valid business judgment exists, the law vests the debtor's decision to sell assets with a strong presumption that "in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in honest belief that the action taken was in the best interests of the company." *In re Dura Auto. Sys.*, 2007 Bankr. LEXIS at *260 (citing *The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Von Gorkum*, 488 A.2d 858, 872 (Del. 1985)). Once a court is satisfied there is a sound business judgment for the proposed sale, the court must then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See, e.g., Del. and Hudson Ry. Co.*, 124 B.R. at 166.

RLF1-3501179-1

31.    The Debtors believe a prompt private Sale of the Shares to Buyer without further delay or an auction process is the best opportunity to maximize and preserve value for the Debtors' estates.  The Debtors thoroughly marketed the Shares for over a half year prior to the Commencement Date and were not able to find a qualified bidder other than Buyer to purchase the Shares and accept the transfer of the Premier Servicing Business.  In the Debtors' sound business judgment, the best available offer for the Shares is Buyer's offer.  Accordingly, the Court should immediately enter the Private Sale Order.

**B.    Approval of the Private Sale to Buyer is Warranted**

32.    Bankruptcy Rule 6004 sets forth the procedural parameters for asset sales outside of the ordinary course of business and provides that such sales may be effected by either public or private sale.  Fed. R. Bankr. P. 6004(f)(l); *see also* Local Rule 6004-1(iv)(D), which contemplates private sales.  Accordingly, a debtor may sell assets of the estate outside of the ordinary course of business without conducting a public auction thereof, or, as the case may be, soliciting bids higher or better than that contained in a privately negotiated purchase agreement. *See In re Woodscape Ltd. P'ship*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) ("There is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

33.    It has been held that a "bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)." *In re Ancor Exploration Co.*, 30 B.R. 802, 808 (N.D. Okla. 1983).  To this end, Courts in this and other districts often allow a chapter 11 debtor to sell assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code.  *See, e.g., In re IH 1 Inc. (f/k/a Indalex Holdings Fin., Inc.)*, No. 09-10982 (PJW) (Bankr. D. Del. Sept. 28, 2009) [Docket No.

673] (approving private sale of nonresidential real property); *In re Goody's, LLC*, No. 09-10124 (CSS) (Bankr. D. Del. Mar. 18, 2009) [Docket No. 507] (approving private sale of certain merchandise); *In re KB Toys, Inc.*, No. 08-13269 (KJC) (Bankr. D. Del. Jan. 14, 2009) [Docket No. 265] (approving private sale where consideration was fair and reasonable, was the highest or best offer, provided a greater recovery for creditors than would be provided by any other available alternative, and constituted reasonably equivalent value and fair consideration); *In re KCMVNO, Inc. (f/k/a Movida Commc'ns, Inc.)*, No. 08-10600 (BLS) (Bankr. D. Del. Dec. 19, 2008) [Docket No. 365] (same); *In re Midway Games, Inc.*, No. 09-20465 (KG) (Bankr. D. Del. Oct. 1, 2008) [Docket No. 657] (same); *In re Powermate Holding Corp.*, No. 08-10498 (KG) (Bankr. D. Del. May 5, 2008) [Docket No. 213] (same); *In re Thompson Prods., Inc.*, No. 08-10319 (PJW) (Bankr. D. Del Mar. 20, 2008) [Docket No. 121] (approving private sale of any and all assets, where private sale was last and best chance to maximize value of debtors' assets and avoid liquidation, and purchase Sale Agreement was negotiated at arms'-length and in good faith); *Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*, 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving a private sale of a chapter 11 debtor's assets where the standards of section 363(b) were met); and *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming the right of a chapter 11 debtor to transfer assets by private sale).

34.    Indeed, a debtor is obligated to maximize the return to its estate resulting from an asset sale, whether public or private. *See In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) ("When a debtor or trustee conducts a sale under § 363(b), it has an obligation to maximize revenues for the estate."); *In re Nepsco, Inc.*, 36 B.R. 25, 26 (D. Me. 1983) ("Clearly,

26

the thrust of the statutory scheme is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, *i.e.*, the creditors of the estate."). Accordingly, if a debtor concludes that a particular private purchase offer is the "most advantageous of the estate," a court should defer to the debtor's business judgment. *Bakalis*, 220 B.R. at 532. As noted, having extensively marketed the Shares to the relatively few parties that would be able to meet the unique credit requirements of the transaction necessary to release the $75 million of servicing advance deposits back to the estates, the Debtors believe that the Sale to Buyer is a sound exercise of their business judgment and represents the best possible offer for the Shares. The proposed Sale is the best means of maximizing and preserving the value of the Premier Servicing Business and ensuring the release of the $75 million of servicing advance deposits back to the estates. Therefore, a private Sale of the Shares to Buyer is warranted.

**C.    As an Alternative to the Private Sale to Buyer, the Sellers' Proposed Bidding and Auction Procedures Should be Approved**

35.    As stated above, pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. If the Court declines to approve a private sale and instead requires the Sale to be effectuated through a bidding and auction process sanctioned by the Court, the Debtors believe the proposed Bidding Procedures are fair, reasonable and appropriate under the circumstances, and will maximize the sale proceeds received by the estate, which is the paramount goal in any proposed sale of property of the estate. *In re Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS at *253 ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.") (internal citations omitted).

36.    The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable

27

bidders, thereby offering an additional opportunity for the Debtors to obtain the greatest consideration possible for the Shares. Bidding procedures should be approved when they provide a benefit to the estate by enhancing competitive bidding. *Id.* (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 535-537 (3d Cir. 1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate)). The Debtors believe the Bidding Procedures are consistent with other procedures previously approved in this district and other bankruptcy courts.

37.     Although the Debtors believe the purchase price, pursuant to the terms set forth in the Sale Agreement, is fair and reasonable, the Debtors submit that, if required, the Bidding Procedures and the Auction will ensure the Debtors exhaust all opportunities to obtain the highest or best offer available, by allowing the market to test the purchase price provided in the Sale Agreement. Accordingly, if the Court declines to grant Seller's request for a private sale, the Debtors alternatively request the Court's approval of the process and procedures set forth in the Bidding Procedures for the submission and consideration of competing bids from other interested parties for the Shares.

**D.    Sale of Shares Free and Clear of Liens is Warranted**

38.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions are satisfied:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

39.    The Debtors believe that one or more of these tests in section 363(f) of the Bankruptcy Code are easily satisfied with respect to the Sale of the Shares. First and foremost, the Shares are unencumbered by any recorded lien, security interest, mortgage, judgment or other encumbrance. To the extent there is any unrecorded "interest" in the Shares other than the Debtors', the Debtors submit that subsection 363(f)(5) would apply to permit the Sale free and clear of such interest. The Debtors believe the rights of any unknown claimant could be valued and allowed as a claim against the Debtors' estates, and thus the claimant could be compelled to accept a money satisfaction of its interest in property, and section 363(f)(5) would be satisfied. *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289, 291 (3d Cir. 2003) (the Court of Appeals for the Third Circuit held that section 363(f)(5) was satisfied in respect of successor liability claims because "[h]ad TWA liquidated its assets under Chapter 7 of the Bankruptcy Code, the claims at issue would have been converted to dollar amounts and the claimants would have received the distribution provided to other general unsecured creditors on account of their claims."). In addition, because the Seller is unaware of the existence of any interest in, or of the right of any third party to assert such an interest in, the Shares, the Seller submits that the surprise assertion of an interest will be in bona fide dispute, and, therefore, subsection 363(f)(4) would apply.

40.    Because the section 363(f) requirements have been met, Buyer should not be liable, as a successor to the Shares or otherwise, for any of the Debtors' pre-petition liabilities, unless expressly assumed. As a matter of logic, bankruptcy estates would be unable to sell assets for fair value if the estates' liabilities followed the assets. The Third Circuit Court of Appeals

has held that a buyer of a debtor's assets pursuant to sections 363(b) or 363(f) takes free from successor liability resulting from any pre-existing claims. *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of . . . successor liability claims achieves the purpose of [Bankruptcy Code] section 363 intended by Congress"), *aff'd*, 332 F.3d 283, 285 (3d Cir. 2003) ("Because section 363(f) of the Bankruptcy Code permits a sale of property 'free and clear' of an 'interest in such property' and because the claims against TWA here were connected to or arise from the assets sold, we affirm the Bankruptcy Court's order approving the sale 'free and clear' of successor liability.").

**E.    Finding of Good Faith is Warranted**

41.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Seventh Circuit in *In re Andy Frain Serv., Inc.*, held that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

798 F.2d 1113, 1125 (7th Cir. 1986) (emphasis and citations omitted).

42.    Buyer is an entity unrelated to the Debtors.  The Sale Agreement was intensely negotiated at arms'-length with all parties involved acting in good faith, and each party was represented by sophisticated counsel.  The Debtors are unaware of any facts or

30

circumstances that might compromise or taint Buyer's good faith in negotiating and entering into the Sale Agreement. Accordingly, the Debtors request the Court determine that Buyer has acted in good faith and is entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

**F.     The Break-Up Fee is Reasonable and Appropriate**

43.     Bidding incentives, such as the Break-Up Fee, encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." *In re S. N.A, Nut Co.*, 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); *see also In re 995 Fifth Ave. Assoc. L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

44.     A proposed bidding incentive, such as the Break-Up Fee, should be approved when it is in the best interests of the estate. *S.N.A. Nut Co.*, 186 B.R. at 104; *see also In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.,* 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

31

45.    Here, the Break-Up Fee will only be paid if the Shares are sold to a purchaser with a bid that is higher or better than Buyer's offer for the Shares, including taking into account the cost of the Break-Up Fee when considering the competing bid. If this occurs, the Debtor will effectively net at least the amount offered by Buyer and consequently the Debtors' estates will have benefited from the floor set by Buyer's initial bid.

46.    "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *In re Integrated Res., Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992). As is customary, the Break-Up Fee required by the Buyer as a condition to it spending the significant time and expense to negotiate and ultimately agree to the APA. The Debtor believes that the Break-Up Fee will not stifle bidding. To the contrary, the Debtor believes that in the event of an auction, the Break-Up Fee will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *Id.* at 662. In other words, if the assets are sold to a competing bidder, it will – in all likelihood – be because of Buyer's crucial role as an initial bidder generating interest in the assets.

47.    In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." *Id.* The Break-Up Fee is equal to approximately 2.38% (without the Premium) or 2.18% (with the Premium) of the Purchase Price, which is within the range of fees typically paid in other significant sales transactions that have been approved by this Court. *See, e.g., In re Maxide*

*Acquisition, Inc.,* No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (approving break-up fee of 3%, or $2.5 million, in connection with a $75 million sale); *In re Ameriserve Food Distrib., Inc.,* No. 00-00358 (PJW) (Bankr. D. Del. June 15, 2000) (approving break-up fee of 3.6%, or $4 million, in connection with $110 million sale). Given the Purchase Price, the Debtors, in their business judgment, believe the Break-Up Fee of JPY 50,000,000 is appropriate.

48.    For these reasons, and given the benefits conferred upon the Debtors' estates by the Buyer's entry into the Sale Agreement, the Debtors respectfully request that the Court approve the Break-Up Fee.

## G.    Relief From Ten-Day Waiting Period is Warranted

49.    The Debtors request the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and order that, if and when entered, the Sale Order be effective immediately. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of ten days after entry of the order, unless the court orders otherwise."

50.    The purpose of these rules is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Bankruptcy Rules 6004(h). Although these rules and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the ten-day stay period, Collier on Bankruptcy suggests the ten-day stay period should be waived to allow a transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev. ¶ 6004.10 (15th rev. ed. 2006). Further, it suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

33

### Notice

51.    No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been provided by first-class mail to (i) the U.S. Trustee, (ii) Citibank, N.A. and Citicorp North America, Inc., as administrative agents under the Debtors' prepetition senior credit facility, bridge loan agreement and term loan facility, (iii) Deutsche Bank Trust Company Americas, as trustee under the prepetition senior unsecured floating rate note and 5.875% senior unsecured note indentures, (iv) the Federal Deposit Insurance Corporation, (v) counsel to the Creditors Committee, and (vi) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b). The Debtors submit that no other or further notice need be provided.

### No Previous Request

52.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

34

WHEREFORE the Debtors respectfully request (i) entry of the Private Sale Order, or, in the alternative, (ii) (a) entry of the proposed Bidding Procedures Order and (b) at the completion of the Sale Hearing, entry of the Sale Order approving the Sale of the Shares to the Buyer, or, in the event of a higher or better offer, the Successful Bidder, and (iii) such other and further relief as the Court may deem just and appropriate.

Dated: November 5, 2009
      Wilmington, Delaware

Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Jason M. Madron (No. 4431)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: 302.651.7700
Facsimile: 302.651.7701

-and-

Martin J. Bienenstock
Michael P. Kessler
Judy G.Z. Liu
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: 212.259.8000
Facsimile: 212.259.6333

*Proposed Attorneys for the Debtors and Debtors in Possession*

RLF1-3501179-1