IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
: 
*In re:* : Chapter 11
:
**CAPMARK FINANCIAL GROUP INC.,** *et al.*, : Case No. 09-13684 (CSS)
:
Debtors. : Jointly Administered
:
---------------------------------------------------------------x  Re: Docket No. 112

**DECLARATION OF DAN J. RAY OF CAPMARK FINANCE INC. IN SUPPORT OF DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, AND LOCAL RULES 2002-1 AND 6004-1, REQUESTING ENTRY OF TWO ORDERS: (I) THE BIDDING PROCEDURES ORDER, (a) SCHEDULING AN AUCTION AT WHICH THE SELLER DEBTORS WILL SOLICIT HIGHER AND BETTER OFFERS IN CONNECTION WITH THE SALE OF MILITARY HOUSING BUSINESS ASSETS; (b) APPROVING BIDDING PROCEDURES WITH RESPECT TO THE SALE OF SUCH ASSETS; (c) APPROVING A BREAK-UP FEE; (d) SCHEDULING THE SALE HEARING; (e) ESTABLISHING OBJECTION DEADLINE; AND (f) APPROVING SALE HEARING NOTICE AND NOTICE OF ASSUMPTION AND ASSIGNMENT; AND (II) THE SALE ORDER, APPROVING SALE OF MILITARY HOUSING BUSINESS ASSETS (INCLUDING ASSUMPTION AND ASSIGNMENT OF CONTRACTS) FREE AND CLEAR OF ALL LIENS, CLAIMS, AND INTERESTS**

Dan J. Ray, pursuant to section 1746, title 28, United States Code, hereby declares as follows:

1.  I am a Managing Director of Capmark Finance Inc. ("CFI"), a subsidiary of Capmark Financial Group Inc. ("CFGI" and, together with certain of its subsidiaries, the "Debtors").[1] CFI has its principal office at 116 Welsh Road, Horsham, Pennsylvania, 19044.

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II,

Unless otherwise stated, all facts set forth in this declaration (the "Declaration") are stated in my capacity as a Managing Director at CFI and are based upon: (a) my personal knowledge; (b) my experience at CFI; and (c) information provided to me by my colleagues and employees working under my supervision at CFI and Capmark Capital Inc. ("CCI"), concerning the operation, structure, and financial affairs of the Debtors and, specifically, the Military Housing Business (as defined below). If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

2. I make this declaration in support of the Debtors' Motion, Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002-1 and 6004-1, Requesting Entry of Two Orders: (I) the Bidding Procedures Order, (a) Scheduling an Auction at which the Seller Debtors Will Solicit Higher and Better Offers in Connection with the Sale of Military Housing Business Assets; (b) Approving Bidding Procedures with Respect to the Sale of Such Assets; (c) Approving a Break-Up Fee; (d) Scheduling the Sale Hearing; (e) Establishing Objection Deadline; and (F) Approving Sale Hearing Notice and Notice of Assumption and Assignment; and (II) the Sale Order, Approving

---

LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), and Capmark Affordable Equity Inc. (2381). CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044. The addresses for all of the Debtors are available at the following World Wide Web address: http://chapter11.epiqsystems.com/capmark.

2

Sale of Military Housing Business Assets (Including Assumption and Assignment of Contracts) Free and Clear of All Liens, Claims, and Interests [Docket No. 112] (the "Motion")[2], filed on October 30, 2009.

3. For the reasons set forth below, I support the Debtors' request for an order approving the sale (the "Sale") of the Military Housing Business (as defined below) to Jefferies Mortgage Finance, Inc. ("Jefferies"), as, in my opinion (i) the Military Housing Business was fairly marketed, (ii) the proposed Sale of the Military Housing Business pursuant to that certain Purchase Agreement (the "APA"), dated as of October 16, 2009,[3] represents the highest and best available offer for the Military Housing Business, (iii) the APA was negotiated fairly and at arms' length and entered into in good faith, and (iv) the Sale is a sound exercise of the Debtors' business judgment. The bases for my conclusions are set forth below.

### The Debtors' Decision to Sell the Military Housing Business

4. Debtors CFI and CCI engage in the business of, among other things, arranging and providing financing for United States government public-private venture related projects, including the privatization of military housing and the origination and servicing of loans relating thereto (the "Military Housing Business"). As with many of the Debtors' businesses, the Military Housing Business relies upon financing made available through structured loans and securitization facilities. Given the overall decline in the availability of such financing sources, the Military Housing Business revenues, which derive substantially from origination and servicing fees generated from the origination volume of related loans, have declined significantly in 2008 and 2009 as a result of reductions in military housing origination volumes. As such, the

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

[3] A summary of the salient terms of the APA is provided in the Motion.

3

Military Housing Business is not a component of the Debtors' anticipated reorganization.

5. The commencement of the Debtors' chapter 11 cases has further impaired the value that remains in the Military Housing Business, as financing counterparties are and will continue to be unwilling to enter into transactions with the Sellers while they remain in bankruptcy, even if the securitization and structured loan markets recover in the near future. In light of the foregoing, and the financial burden the operation of the Military Housing Business imposes on the Debtors' estates, the Debtors, in consultation with their professionals, believe that continued ownership of the Military Housing Business is not in the best interests of the Debtors' estates.

6. In light of the Debtors' decision to sell the Military Housing Business, attention was focused on identifying an appropriate buyer for the Military Housing Business. The culmination of these efforts is the proposed Sale to Jefferies, pursuant to the APA.

### The Marketing of the Military Housing Business

7. The marketing effort for the Military Housing Business was comprehensive and fair. In August of 2009, I conducted discussions regarding a possible sale of the Military Housing Business with: Jay N. Levine, CEO and President of CFGI; Thomas L. Fairfield, Executive Vice President and General Counsel of CFGI; Gregory J. McManus, formerly the Chief Financial Officer of CFI; and William Gallagher, Executive Vice President and Chief Risk Officer of CFGI and Executive Vice President and Director of CFI.

8. Following these discussions, I, with the assistance of my colleagues at CFI, prepared a comprehensive presentation detailing the Military Housing Business. I then contacted several financial institutions regarding their potential interest in a sale of the Military Housing Business. These parties were selected based on a number of factors I am my team

considered significant, including, but not limited to, overall financial strength, mortgage origination capabilities, and broker-dealer capabilities. After numerous phone calls to such institutions, the presentation was circulated to JPMorgan, the Royal Bank of Canada, and CW Capital based on their initial interest. A more extensive in-person presentation was made at a subsequent meeting with JPMorgan and CW Capital. JPMorgan determined it had no interest in purchasing the Military Housing Business, while CW Capital was somewhat interested but did not have a broker-dealer unit, which is necessary to the Military Housing Business. A follow up conference call with the Royal Bank of Canada was also held but it too had no interest in purchasing the Military Housing Business.

9. In September of 2009, further efforts were made to canvass the limited marketplace for potential purchasers of the Military Housing Business. Mr. Gallagher, Mr. John Cibinic of Beekman Advisors, Inc. (the Debtors' proposed strategic advisors), and I discussed the possibility of adding the Military Housing Business to the asset purchase transaction being negotiated at that time for the sale of the Debtors' North American servicing and North American lending and mortgage banking businesses to Berkadia Commercial Mortgage LLC ("Berkadia"). Mr. Gallagher arranged a meeting with Leucadia National Corp. ("Leucadia"), one of the joint venture partners in Berkadia. On September 10, 2009, Mr. Gallagher and I made a presentation to several executives from Leucadia. Leucadia concluded the Military Housing business was not a fit for Berkadia but that it might be a good fit for Jefferies & Company, a publicly traded investment banking firm in which Leucadia has approximately a thirty percent ownership interest. Leucadia executives arranged an introductory meeting with Jefferies for the following day.

10. On September 11, 2009, William Gallagher and I made a presentation to

Jefferies. In attendance from Jefferies were Richard Handler, CEO and President, Johan Eveland and Bill Jennings, Co-heads of the Mortgage and Asset-Backed Group, and Joe Accurso, Senior Agency Trader in the Mortgage and Asset-Backed Group. The presentation to Jefferies was followed by meetings and calls to respond to questions regarding, among other things, the licensing requirements for a military housing commercial mortgage lender and servicer. On September 22 and 23, 2009, initial diligence materials were sent to Jefferies. After further communications, Jefferies issued a draft term sheet, which was reviewed by William Gallagher, Thomas Fairfield, myself, and legal advisors to the Debtors, Dewey & LeBoeuf LLP.

11. Pursuant to the term sheet provided by Jefferies, on October 8, 2009, the Debtors circulated a draft purchase agreement. After several subsequent discussions and negotiations, CFI, CCI, and Jefferies signed the APA on October 16, 2009. The APA provides for a purchase price of $9 million, (i) less an amount equal to $250,000 (ii) plus any accrued and unpaid servicing fees as of the Closing Date payable to the Servicer pursuant to the Serviced Loans. The Purchase Price was and is subject to further reductions on the first day of each month if the Closing did not occur prior to November 30, 2009. Thus, the Purchase Price was further reduced by $250,000 as of December 1, 2009, and will be reduced by an additional $250,000 if the closing does not occur by December 31, 2009. According to the APA, the aggregate amount of such reductions to the Purchase Price for the delay of Closing beyond November 30, 2009 may not exceed $500,000.

**Bankruptcy Filings and Bidding Procedures**

12. On October 25, 2009 ("Commencement Date"), CFI and the other Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court. Because the APA required the filing of the Motion within 5 business days of the Commencement Date, and in light of the necessity to close by year end to

6

avoid another Purchase Price reduction, on October 30, 2009, the Debtors filed the Motion and the Court scheduled a hearing for November 24, 2009 to consider entry of the proposed bidding procedures. Following the hearing on November 24, 2009, the Court entered the Order (a) Scheduling an Auction at which the Seller Debtors will Solicit Higher and Better Offers in connection with the Sale of Military Housing Business Assets; (b) Approving Bidding Procedures with respect to the Sale of Such Assets; (c) Approving Break-up Fee; (d) Scheduling the Sale Hearing; (e) Establishing Objection Deadline; and (f) Approving Sale Hearing Notice and Notice of Assumption and Assignment [Docket No. 350] (the "Bidding Procedures Order").

13. The Bidding Procedures Order contains several key requirements potential bidders must satisfy to begin the due diligence process and to submit a qualifying bid for the Military Housing Business. As required by Section 5.11 of the APA, the Bidding Procedures Order requires a potential bidder to (a) execute a confidentiality agreement and, prior to receipt of any diligence information, (b) deliver evidence satisfactory to the Debtors establishing such bidder's financial capability to consummate a timely purchase of the Military Housing Business. The latter requirement was specifically included in the Bidding Procedures Order to ensure that any potential bidder would be able to close prior to the December 31, 2009, the deadline by which a further purchase price reduction would occur under the APA. The Bidding Procedures Order also provides that among other requirements, potential bidders must provide information demonstrating the bidder's actual experience in the origination and servicing of military housing loans. This requirement was included in the Bidding Procedures Order because of the various governmental and private party consents required to consummate a sale of the Military Housing Business.

14. During the time spanning the execution of the APA, the entry of the

Bidding Procedures Order by the Court and the final Bid Deadline in the Bidding Procedures Order (*i.e.*, from October 16 through December 7, 2009), CFI was contacted by only one party that expressed an interest in potentially purchasing the Military Housing Business and was willing to sign a confidentiality agreement to conduct diligence: Duxbury Financial LLC ("Duxbury").

15. Duxbury's interest in acquiring the business presented several challenges for Duxbury. First, Duxbury is a two person broker-dealer that is involved in the placement of military housing privatized loans for its affiliate Clark Realty Builders ("Clark Realty"), one of the major developers in the military housing business and also a major competitor to the other developers (borrowers) whose loans are serviced in Sellers' Military Housing Business. Duxbury's relationship with Clark Realty created a conflict of interest for Duxbury and Clark Realty in purchasing the Military Housing Business because the developer-borrowers whose loans are currently serviced by the Sellers are competitors of Clark Realty and would likely not consent to a sale of the Debtors' business to a direct competitor. Moreover, Duxbury, as a two person broker-dealer, declined to provide financial information necessary to establish its financial capability to timely consummate a purchase of the Military Housing Business, a requirement of the APA and the Bidding Procedures. Finally, neither Duxbury nor Clark Realty has experience in servicing military housing loans, which is also a requirement of the Bidding Procedures Order.

16. Duxbury first contacted the Debtors in the week before the Bidding Procedures Order was entered and delivered a signed confidentiality agreement on November 19, 2009. On Saturday November 21, the Debtors also signed the confidentiality agreement. The Debtors thereafter explained that as required by the APA (and as would be required by the

Bidding Procedures Order, once entered), Duxbury must deliver financial information satisfactory to the Debtors to establish Duxbury's capability to consummate a timely sale of the Military Housing Business. In the interim, on Monday, November 23, 2009, the Debtors sent Duxbury an overview of the Military Housing Business and schedules listing the loan balances and related servicing fee schedules for the loans serviced by CFI so Duxbury and its advisors could better understand the general structure and nature of the business and the portfolio being serviced. After several discussions with Duxbury, the Debtors also agreed that, to accommodate Duxbury while it searched for a financial partner that would meet the requirements of the APA that bidders submit appropriate financial information, the Debtors would extend the Bidding Deadline in the proposed Bidding Procedures Order from November 30, 2009, to December 7, 2009. After consulting with the creditors' committee (the "Committee") and Jefferies regarding this revised timeframe for the submission of bids in light of Duxbury's interest, the Bidding Procedures Order entered on November 24, 2009 by the Court reflected the week's-long extension of the Bid Deadline, which had been agreed to at Duxbury's request. Under the Bidding Procedures Order, the Hearing Date for the Sale was set for December 10, 2009, and Duxbury filed no objection to the schedule of dates set forth in such order.

17. On the same day the Bidding Procedures Order was entered, the Debtors informed Duxbury that the Bid Deadline had been extended to December 7, 2009, and requested again that Duxbury, before conducting diligence, provide necessary financial information, including audited financial statements, to allow the Debtors to determine whether Duxbury had the financial capability to consummate a timely sale of the Military Housing Business. Notwithstanding the express requirement in the APA and the Bidding Procedures Order that Duxbury provide such information, Duxbury did not, at that time, provide such information.

Instead, on Friday, November 27, 2009, Duxbury's counsel emailed the Debtors' counsel, attaching a self-certification letter stating that Clark Realty Capital was an affiliate of Duxbury and including representations of Clark Realty Capital's net worth. The letter further stated that Duxbury had partnered with a firm called Trimont (a servicer) to meet the necessary financial prerequisites required to begin diligence.

18. On Saturday, November 28, 2009, Debtors' counsel replied, noting that Trimont had yet to sign a confidentiality agreement and asking for basic information regarding how Trimont would partner with Duxbury as part of any proposed transaction. Debtors' counsel also noted that a self-certification letter representing Duxbury's net worth (through its affiliate Clark Realty Capital) was insufficient to provide the Debtors with the comfort that Duxbury would be able to submit a timely bid for the Military Housing Business. That same day, Duxbury's counsel replied, and, notwithstanding the requirement in the Bidding Procedures Order and APA as to the submission of financial information before diligence may commence, Duxbury's counsel wrote that further financial information would be provided when and if a bid was submitted. Duxbury's counsel also withdrew Trimont's name as a potential partner.

19. Thereafter, on Monday, November 30, 2009, the date of the original Bid Deadline and a week before the revised December 7, 2009 Bid Deadline, Duxbury's counsel contacted Debtors' counsel to report Duxbury was now intending to partner with a new entity, Forest City Capital, an affiliate of Forest City Enterprises, Inc. ("Forest City"), a publicly traded company. Notably, like Clark Realty, Forest City Capital is involved in numerous military housing projects as developer/owner and thus also directly competes with the developer-borrowers whose loans are serviced by the Sellers. Given that Forest City is a public company, the Debtors concluded that it had the requisite financial wherewithal to close a transaction for the

Military Housing Business, but neither Duxbury nor Forest City Capital provided any indication regarding how Forest City Capital and Duxbury would structure a transaction or how they would use Forest City's financial strength to provide certainty of closing. The Debtors further asked, again, for financials on Duxbury or its affiliate, Clark Realty, and Duxbury's counsel explained that Clark Realty would only provide such financial information if the Debtors and the Committee executed a confidentiality agreement. No such agreements were signed.

20. Thereafter, over the course of the business week spanning November 30, 2009 through December 4, 2009, the Debtors provided diligence information consistent with that provided to Jefferies, and additional information as requested by Duxbury and Forest City, as well as held various calls with Duxbury, Forest City and their advisors to follow up on diligence requests. The information produced included all deal documents for one Army transaction and one sample Air Force transaction, servicing fee spreadsheets, promissory Notes for each loan, sample additional debt language from several loan agreements, debt service coverage information on each loan, and fee data for each servicing agreement, which information went beyond that provided to Jefferies as part of its diligence prior to entering into the APA. I made myself available to answer questions from Duxbury and Forest City regarding outstanding information and to discuss matters relating to the business, employee matters, and diligence requests. I also answered questions regarding why certain information was withheld because of competitive or confidentiality concerns associated with each borrower's competitive information

21. On Friday morning, December 4, 2009, the Debtors held a follow-up call with Duxbury and its advisors regarding diligence and produced substantially all the servicing agreements relating to the Military Housing Business. During the call, Duxbury made a further request for an extension of the Bid Deadline to at least Monday, December 7 at 5 p.m., rather

than 10 a.m. The Debtors, after consultation with the Committee, agreed to the further extension, but given the Sale Hearing was scheduled for December 10, 2009, the Debtors made it clear the second extension of the Bid Deadline would be the final and last extension granted to Duxbury. Later that Friday night, at approximately 11:30 p.m., Duxbury's counsel sent a further email to Debtors' counsel, the Committee and myself, asking for a further extension of the Bid Deadline for five more days to complete diligence, and access to 100 percent of all diligence files, even though Duxbury had already been provided more information than Jefferies received prior to their original term sheet submission. On Sunday, December 6, 2009, Debtors' counsel responded, noting that Duxbury had already been granted two extensions of the Bid Deadline. Debtors' counsel further asked Duxbury to submit a bid by the Bid Deadline and noted, as the Debtors had offered before, that the Debtors would allow Duxbury to perform confirmatory diligence after the Bid Deadline if a bid was received timely on the Bid Deadline. On the Bid Deadline, Duxbury did not submit a bid of any kind. As a result, the Debtors began preparations to move forward to closing the Sale with Jefferies.

### Entry into the APA and Closing of the Sale is in the Sound Business Judgment of the Debtors

22. I believe the proposed Sale represents an exercise of the Debtors sound business judgment because (i) the Sellers provided adequate and reasonable notice of the bidding process; (ii) the purchase price, and other terms of the APA, are fair and reasonable under the circumstances; (iii) all parties proceeded with the utmost good faith in negotiating and entering into the APA; and (iv) the Debtors in good faith pursued superior offers.

23. I believe a prompt Sale of the Military Housing Business is the best way to maximize and preserve the value of the Military Housing Business and realize that value for the Debtors' estates. Based upon my extensive involvement in the Sale process and my experience

with the Military Housing Business, I believe that absent a prompt Sale, the value of the Military Housing Business will likely decline substantially and put additional economic pressure on the Debtors' estates.

24. Indeed, the proposed Sale is the only means of maximizing and preserving the value of the Military Housing Business. The proposed Sale is the culmination of extensive, arms' length, good faith, and hard-nosed negotiations, and should without reservation be approved in all respects. Moreover, if the Sale is not completed by December 31, 2009, the estates stand to lose another $250,000 as a result of a further reduction in the Purchase Price under the APA.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated: December 9, 2009
      New York, New York

_____
Dan J. Ray