# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

| | |
|---|---|
| *In re* | : Chapter 11 |
| | : |
| **CAPMARK FINANCIAL GROUP INC.,** *et al.,* | : Case No. 09-13684 (CSS) |
| | : |
| **Debtors.** | : Jointly Administered |

-------------------------------------------------------------x

## MOTION, PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, AND LOCAL RULES 2002-1 AND 6004-1, REQUESTING ENTRY OF TWO ORDERS IN CONNECTION WITH THE SALE OF REAL ESTATE EQUITY INVESTMENT ADVISORY GROUP BUSINESS ASSETS: (I) THE BIDDING PROCEDURES ORDER, (A) SCHEDULING AN AUCTION; (B) APPROVING BIDDING PROCEDURES; (C) APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (D) SCHEDULING SALE HEARING; (E) ESTABLISHING OBJECTION DEADLINE; AND (F) APPROVING SALE HEARING NOTICE AND NOTICE OF ASSUMPTION AND ASSIGNMENT OF CONTRACTS; AND (II) THE SALE ORDER, APPROVING SALE OF REAL ESTATE EQUITY INVESTMENT ADVISORY GROUP BUSINESS ASSETS (INCLUDING ASSUMPTION AND ASSIGNMENT OF CONTRACTS) FREE AND CLEAR OF ALL LIENS, CLAIMS, AND INTERESTS

Capmark Financial Group Inc. ("CFGI") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "First Filed Debtors"), together with Capmark Investments LP, a subsidiary of CFGI, as debtor and debtor in possession ("CILP" and together with the First Filed Debtors, the "Debtors"),[1] submit this motion (the "Motion")

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), (Continued)

requesting entry of two orders: (i) a bidding procedures order, (a) scheduling an auction, (b) approving bidding procedures, (c) approving a break-up fee and expense reimbursement, (d) scheduling a sale hearing, (e) establishing an objection deadline, and (f) approving the proposed form and manner of sale notice and notice of assumption and assignment; and (ii) a sale order, approving the sale of substantially all the assets of CILP's REEG Business (as defined below). In support of this Motion the Debtors respectfully represent:

## **Background**

1.      On October 25, 2009 (the "Commencement Date"), each of the First Filed Debtors commenced a voluntary case under chapter 11 of title 11, United States Code (the "Bankruptcy Code").

2.      On October 27, 2009, this Court entered an order authorizing the joint administration of the First Filed Debtors' chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 1015-1 of the Local Bankruptcy Rules for the District of Delaware (the "Local Rules").

3.      On November 2, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed a statutory creditors committee pursuant to section 1102 of the Bankruptcy Code (the "Committee").

---

Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), Capmark Affordable Equity Inc. (2381), and Capmark Investments LP (7999). CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044. The addresses for all of the Debtors are available at the following World Wide Web address: http://chapter11.epiqsystems.com/capmark.

2

4. On the date hereof, CILP commenced a voluntary case under chapter 11 of the Bankruptcy Code. CILP is a subsidiary of CFGI and an affiliate of the other First Filed Debtors.

5. Contemporaneously herewith, CILP has filed a motion with the Court requesting that (i) CILP's chapter 11 case be jointly administered for procedural purposes only with those of the First Filed Debtors, and (ii) all generally applicable orders previously entered, and all generally applicable orders currently pending before the Court in the First Filed Debtors' chapter 11 cases apply to CILP in its chapter 11 case.

6. The Debtors continue to operate their businesses and manage their properties as debtors in possession as authorized by sections 363(c), 1107(a) and 1108 of the Bankruptcy Code.

### Capmark's Businesses

7. The Debtors and their non-debtor subsidiaries and affiliates (together with the Debtors, "Capmark") are a group of commercial real estate finance companies that provide real estate-related products and services to borrowers, investors and other customers along three core business lines: (i) commercial real estate lending and mortgage banking; (ii) investments and funds management; and (iii) commercial loan servicing.[2]

8. A detailed description of Capmark's business, capital structure, and the events leading to the commencement of these chapter 11 cases is contained in the Declaration of Thomas L. Fairfield, Executive Vice President, General Counsel and Secretary of CFGI, in

---

[2] Pursuant to an order of this Court dated November 24, 2009, the Debtors were authorized to sell all of their commercial mortgage banking and mortgage servicing assets (collectively, the "MSB Business") to Berkadia Commercial Mortgage LLC, which sale closed December 11, 2009.

RLF1 3527691v.1

Support of the Debtors' Chapter 11 Petitions and First Day Motions and Applications, filed on the Commencement Date [Docket No. 13].

## Jurisdiction and Venue

9.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

10.     By this Motion, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002-1 and 6004-1, the Debtors request entry of two orders: (i) a bidding procedures order (the "Bidding Procedures Order"), substantially in the form annexed hereto as Exhibit A, (a) scheduling an auction (the "Auction"), at which the Sellers (as defined below) shall solicit competing bids for the sale (the "Sale") of substantially all the assets of the Sellers' real estate equity investment advisory group business (the "REEG Business"); (b) approving certain bidding procedures (the "Bidding Procedures") related thereto; (c) approving a break-up fee and expense reimbursement for the stalking horse bidder as protection against a topping bid; (d) scheduling a hearing (the "Sale Hearing") to approve the Sale of the REEG Business to the stalking horse or to the successful bidder at the Auction; (e) establishing an objection deadline to file objections to the Sale (the "Objection Deadline"); (f) approving the proposed form and manner of notice of the Sale Hearing and the Auction (the "Sale Notice"), annexed to the Bidding Procedures Order as Schedule 1; and (g) approving the proposed form and manner of notice of assumption and assignment of certain executory contracts as part of the Sale transaction (the "Notice of Assumption and Assignment"), annexed to the Bidding Procedures Order as Schedule 2; and (ii) upon the completion of the Sale Hearing, an order (the "Sale Order"), substantially in the form

4

annexed hereto as Exhibit B, authorizing the Sale of CILP's portion of the REEG Business to the Purchaser (as defined below) on substantially the same terms and conditions set forth in the Purchase Agreement (as defined below), annexed hereto as Exhibit C, or to a Successful Bidder (as defined below), free and clear of any and all liens, claims, encumbrances, and interests of any kind, nature, or description (collectively, the "Liens").[3]

## Description of CILP and its REEG Business

11.     CILP is an investment advisory firm registered with the Securities and Exchange Commission (the "SEC") since 2000 that provides institutional investment management services with respect to real estate equity investments and real estate-related (debt) investments in both the public and private markets. As of September 30, 2009, CILP had more than $3.49 billion in assets under management. CILP provides investment management services through its operation of the REEG Business (the subject of the proposed Sale), as well as through operation of its debt investment advisory business (including through a non-discretionary, non-affiliated, sub-advisory relationship). CILP provides investment management services to sixteen (16) privately-offered commingled pooled funds, other separate accounts, and to CILP's direct parent, Debtor Capmark Finance Inc.

12.     CILP provides real estate investment strategies including income-growth, value-added, and opportunistic return/risk objectives for qualified institutional investors, including large governmental plans, pension funds, corporations, endowments and high net worth individuals. CILP currently manages a broad range of investment opportunities including debt and real estate equity investments, such as mortgage loans and securities, mezzanine loans,

---

[3] If the Auction is held and a sale of the REEG Business is agreed to according to a Modified Purchase Agreement (as defined herein), the Debtors will submit a revised sale order reflecting the sale contemplated by the Modified Purchase Agreement, with a blackline against the Sale Order showing changes made.

commercial mortgage-backed securities, residential mortgage-backed securities, REIT securities, and synthetic financial products.

13.     CILP's REEG Business funds and other separate accounts invest in private commercial real estate equity through the acquisition of interests in limited liability companies, which are formed by third party operating partners. CILP currently has more than $880 million in real estate equity assets under management (as of September 30, 2009). The REEG Business is comprised of: (i) the general partner and limited liability company interests and management agreements in four commingled equity funds (Capmark Commercial Realty Partners, Capmark Commercial Realty Partners II, Capmark Commercial Realty Partners III, and Capmark UK Realty Partners), and (ii) management agreements on certain equity joint ventures. Incentive vehicles connected to three of the four commingled real estate equity funds contain the REEG employees' co-investments in the funds. Because Capmark Carried Interest LLC is the non-debtor general partner/managing member of each of these three incentive vehicles, it is also a Seller under the Purchase Agreement described below.

14.     Investment management services provided through the REEG Business typically include: (i) evaluation, (ii) selection, (iii) acquisition, (iv) valuation, (v) ongoing asset management, and (vi) disposition of equity interests in commercial real estate properties located throughout the United States, United Kingdom and other European Union countries, including Germany, the Netherlands, and France. Through the REEG Business, CILP has forged relationships with leading operating partners in major markets and has investment expertise in all types of commercial real estate: office, apartment, industrial, and retail. Its senior investment professionals have, on average, more than 20 years of real estate experience through multiple business cycles and are skilled real estate investment managers.

6

## The Proposed Sale of the REEG Business to TRECAP Partners LLC

15.     CILP and Capmark Carried Interest LLC (a non-debtor affiliate of the Debtors) (together, the "Sellers") have entered into that certain Purchase Agreement (the "Purchase Agreement"), dated as of January 14, 2010, with TRECAP Partners LLC (the "Purchaser"), whereby Purchaser has agreed to purchase the REEG Business from the Sellers.

## Summary of Purchase Agreement[4]

16.     The salient terms of the Purchase Agreement are as follows:

(a)     **Assets to be Sold**. The following assets of the REEG Business will be sold pursuant to the Purchase Agreement:

(1)     investment management contracts associated with four commingled real estate equity funds and certain real estate equity joint venture separate accounts, as described on Schedule 2.1(a) to the Purchase Agreement (the "Investment Management Contracts");

(2)     the general partner interests and limited liability company interests associated with the four commingled real estate equity funds, described in Schedule 2.1(b) to the Purchase Agreement the "Fund Interests");

(3)     the non-debtor limited liability company interests, general partner interests and limited partner interests associated with the fund incentive vehicles described in Schedule 2.1(c) to the Purchase Agreement (the "Incentive Vehicle Interests");

(4)     the entire issued share capital of non-debtor Capmark Investments Europe Limited, a private company limited by shares incorporated and registered in England and Wales, as described in Schedule 2.1(d) to the Purchase Agreement (the "UK Interests"); and

(5)     the physical assets described in Schedule 2.1(e) to the Purchase Agreement (the "Other Assets").

---

[4] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Purchase Agreement. To the extent there are any inconsistencies between the summary description of the Purchase Agreement contained herein and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement control.

(b) **Purchase Price**.  At the Closing, Purchaser shall pay to Sellers the purchase price (the "Purchase Price") equal to $19,222,801, less the deposit of $500,000 (the "Deposit") (and any interest accrued thereon) and the Asset Management Agreement Adjustment (as defined below), if applicable, for the REEG Business, as follows:

    i.    Purchaser shall pay $18,472,801 less the Deposit (and any interest accrued thereon) and the Asset Management Agreement Adjustment (as defined below), if applicable, to Sellers, by wire transfer of immediately available funds to an account designated by Sellers;

    ii.    Purchaser shall pay $750,000 (the "Indemnity Escrow Amount") to the Escrow Agent to be held in an escrow account administered by the Escrow Agent.  Pursuant to Section 2.7 of the Purchase Agreement, the Indemnity Escrow Amount shall serve as security for Purchaser with respect to Sellers' obligations under Article 7 of the Purchase Agreement.  The Indemnity Escrow Amount shall be held and distributed pursuant to the terms of the Indemnity Escrow Agreement (as defined below) (the "Indemnity Escrow Fund").  At the Closing, Purchaser and CILP shall concurrently execute and deliver an escrow agreement substantially in the form of Exhibit B-2 to the Purchase Agreement (the "Indemnity Escrow Agreement");

    iii.    The Escrow Agent shall release the Deposit, and all interest thereon, to Sellers;

    iv.    In the event that prior to the Closing Purchaser and Parent have not entered into an asset management agreement substantially in the form attached to the Purchase Agreement as Exhibit C (the "Asset Management Agreement") for the equity investments of Parent (previously managed by REEG) set forth therein, the Purchase Price shall be reduced by the amount of $547,355 (the "Exhibit C Asset Management Agreement Adjustment"); and

    v.    In addition, from and after the Closing, Purchaser shall promptly (and in any event within five Business Days of receipt) cause the payment to Seller of 50% of any and all promote distributions received from Capmark Commercial Realty Partners, L.P., and Crystal City Partners LLC (each, a "Promote Entity," and collectively, the "Promote Entities") by the general partner or managing member of each Promote Entity, as applicable, and that are actually received by the general partner and/or managing member of the Promote Entities.

8

The Purchase Price shall be allocated among the REEG Business in the manner required by Section 1060 of the Internal Revenue Code as shown on the allocation schedule attached to the Purchase Agreement as Schedule 2.9.

(c)     **Break-Up Fee and Expense Reimbursement**.  In the event each of the following occurs:  (i) the Purchase Agreement is terminated by Purchaser pursuant to Section 8.1(d) of the Purchase Agreement, which provides for termination in the event the Bankruptcy Court enters an order authorizing the sale or transfer of some or all of the REEG Business to a Third Party Buyer, (ii) Purchaser is not in material default under the Purchase Agreement (provided that this clause (ii) shall not be applicable in the event that Sellers are also in material default under the Purchase Agreement), and (iii) Purchaser does not purchase the REEG Business, Purchaser shall be entitled to a break-up fee in an amount equal to 2.75% of the Purchase Price (the "Termination Fee" or "Break-Up Fee") and an expense reimbursement for the reasonable out-of-pocket costs and expenses (incurred by Purchaser or its Affiliates in connection with negotiation, documentation and implementation of this Agreement) up to a maximum amount of $240,000 (the "Expense Reimbursement").  The Termination Fee and Expense Reimbursement shall be payable to Purchaser from the proceeds of sale to a Third Party Buyer (notwithstanding any Encumbrance on such proceeds) within three (3) Business Days of the closing of the sale.

(d)     **Termination of Purchase Agreement**.  The Purchase Agreement may be terminated at any time before the Closing:

i.      by mutual written consent of Sellers and Purchaser;

ii.     by Sellers, by notice to Purchaser, if the Closing shall not have occurred on or before the date that is 15 days after the date upon which the Sale Order becomes final and not appealable (the "Drop Dead Date"), and the conditions set forth in Sections 6.1 and 6.2 of the Purchase Agreement (other than any condition that by its nature is to be satisfied by actions to be taken at the Closing by Sellers if Sellers are prepared to take such actions as of such date) have been satisfied;

iii.    by Purchaser, by notice to Sellers, if the Closing shall not have occurred on or before the Drop Dead Date and the conditions set forth in Sections 6.1 and 6.3 of the Purchase Agreement (other than any condition that by its nature is to be satisfied by actions to be taken at the Closing by Purchaser if Purchaser is prepared to take such actions as of such date) have been satisfied;

RLF1 3527691v.1

iv.     by Purchaser, by notice to Sellers, if the Bankruptcy Court enters an order authorizing the sale or transfer of some or all of the REEG Business to a party other than Purchaser (a "Third Party Buyer"); or

v.     by Purchaser or Sellers, by notice to the other party if the Drop Dead Date has not occurred on or prior to June 30, 2010.

17.     In addition to the aforementioned salient features of the Purchase Agreement, in accordance with Local Rule 6004-1(b)(iv), the Debtors note the following with respect to the Purchase Agreement:

(a)     **No Sale to an Insider**: The prospective Purchaser is not an insider of CILP within the meaning set forth in section 101(31) of the Bankruptcy Code.

(b)     **Agreements with Management**: The Purchaser shall offer employment to all of the employees listed on Schedule 5.8 of the Purchaser Agreement (as well as the UK Employees), which employment shall commence immediately after closing. The REEG Business is dependent upon the persons involved therewith. Other than as discussed above, the Purchaser has confirmed to the Sellers that it has not entered into any special or separate agreements with management or key employees of the REEG Business regarding compensation or future employment.

(c)     **No Releases**: No releases have been entered into in connection with the Sale of the REEG Business.

(d)     **No Private Sale; Competitive Bidding**: As discussed above, Sellers intend to conduct an open bidding process for the Sale of the REEG Business. Neither the Purchase Agreement nor any other agreement prohibits the Sellers from soliciting competing offers for the REEG Business and the Sellers are not otherwise limited in marketing the REEG Business.

(e)     **Closing and Other Deadlines**: As set forth in the Purchase Agreement, the closing is scheduled to occur one Business Day after each of the conditions to closing set forth in Article 6 of the Purchase Agreement have been satisfied or validly waived, at 10:00 a.m. Eastern Time in the offices of Goodwin Procter LLP in New York, New York, or on such other date or at such other time or place as is mutually agreed by the parties hereto. As set forth above, Sellers or Purchaser may terminate the Purchase Agreement if Closing shall not have occurred and if the Drop Dead Date has not occurred on or prior to June 30, 2010.

(f) **Good Faith Deposit**:  The Purchase Agreement requires submission by the Purchaser of a good faith deposit in the amount of $500,000.

(g) **Interim Arrangements with Proposed Purchaser**:  As set forth in Section 6.2(*l*) of the Purchase Agreement, Sellers shall provide certain short-term transition services pursuant to the Transition Services Agreement (attached as Exhibit G to the Purchase Agreement).

(h) **Use of Proceeds**:  Section 6.1(k) provides that, to the extent any defaults under Executory Contracts to be assumed and assigned are not cured by the Sellers, CILP shall use proceeds of the Purchase Price to cure any and all defaults under the Executory Contracts that are required to be cured as a condition to assumption under the Bankruptcy Code and pursuant to the Sale Order, so that the Executory Contracts may be assumed by CILP and assigned to Buyer in accordance with the provisions of section 365 of the Bankruptcy Code

(i) **No Tax Exemption**:  No provision of the Purchase Agreement addresses tax exemptions.

(j) **Record Retention**:  There is no provision in the Purchase Agreement governing record retention; however, both CILP and the Purchaser are registered investment advisers under the Advisers Act, and therefore, Rule 204-2 thereof shall govern the recordkeeping requirements.

(k) **No Sale of Avoidance Actions**:  The Purchase Agreement does not involve the sale of, or impose limitations on, any chapter 5 causes of action.

(l) **Requested Findings as to Successor Liability**:  Pursuant to Section 2.1 of the Purchase Agreement, Purchaser shall only be liable for the Assumed Liabilities, and not liable for any Excluded Liabilities.  Also, pursuant to section 6.1 of the Purchase Agreement, it is a condition of closing that this Court enter the Sale Order authorizing, among other things, the transfer of CILP's portion of the REEG Business to Purchaser free and clear of all interests within the meaning of section 363(f) of the Bankruptcy Code, including free and clear of all Liens other than certain Permitted Encumbrances (as defined in the Purchase Agreement).

(m) **Sale Free and Clear of Unexpired Leases**:  Pursuant to Section 2.1(a) of the Purchase Agreement, the Purchaser shall acquire CILP's portion of the REEG Business free and clear of all Liens other than certain Permitted Encumbrances (as defined in the Purchase Agreement).

(n) **No Credit Bidding**:  The assets comprising the REEG Business are unencumbered by any Lien, mortgage, or any other security interest. Accordingly, there will be no credit bidding under section 363(k) of the Bankruptcy Code.

11

(o)  **Relief from Bankruptcy Rule 6004(h)**:  The Sellers are requesting relief from the 10-day stay imposed by Rule 6004(h).

### Bidding Procedures and the Auction

18.  As noted above, to maximize the value of the REEG Business the Debtors seek to implement a competitive bidding process for the Sale of the REEG Business pursuant to the Purchase Agreement, to solicit higher or better offers through the Bidding Procedures.  The proposed Auction and Bidding Procedures are as follows:

(a)  **Assets to Be Sold**:  The assets to be sold shall consist of the assets comprising the REEG Business.

(b)  **Confidentiality Agreements**:  Upon execution of a confidentiality agreement, in form and substance satisfactory to the Sellers, any party that wishes to conduct due diligence in respect of the REEG Business may be granted access to all material information that has been or will be provided to Purchaser and other bidders; *provided, however,* prior to receipt by a party of any information from the Debtors (including, but not limited to, the Purchase Agreement and its schedules and exhibits, business and financial information and access to representatives of the Sellers), each such party will be required to deliver evidence reasonably satisfactory to the Sellers establishing such party's financial capability to timely consummate a purchase of the REEG Business.

(c)  **Bid Deadline**:  Any person or entity interested in participating in the Auction must submit a Qualifying Bid (as defined below) on or before February 18, 2010 at 12:00 p.m. noon (prevailing Eastern Time) (the "Bid Deadline") in writing, to (1) counsel to the Debtors, Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019, Attention: Michael P. Kessler, Esq. and Judy G.Z. Liu, Esq., (2) corporate counsel to the Sellers, Goodwin Procter LLP, The New York Times Building, 620 8th Avenue, New York, New York, 10018, Attention: Edward Braum, Esq., (3) Capmark Investments LP, 116 Welsh Road, Horsham, Pennsylvania, 19044, Attention: Keith Kooper, President, and (4) counsel to the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036, Attention: Thomas Moers Mayer, Esq. and Amy Caton, Esq.

(d)  **Qualifying Bids**:  To participate in the bidding process and be deemed a "Qualifying Bidder," each potential bidder (other than the Purchaser) must submit a "Qualifying Bid" by the Bid Deadline.  The Purchase Agreement is deemed a Qualifying Bid and the Purchaser is deemed a Qualifying Bidder.  Otherwise, to constitute a Qualifying Bid, a bid must:

i.    be in writing and state that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the REEG Business on terms and conditions no less favorable to the Sellers than the terms and conditions contained in the Purchase Agreement, and with a purchase price of no less than the Purchaser's purchase price plus the Termination Fee, the Expense Reimbursement, and $500,000;

ii.    provide details of any assumptions about the transaction that are key to the purchase price, including a break-out of value ascribed, as applicable, to: (a) asset management fees, (b) general partnership interests, and/or (c) incentive management fees;

iii.    include a mark-up of the Purchase Agreement (a "Modified Purchase Agreement") reflecting the variations from the Purchase Agreement, and a clean and executed Modified Purchase Agreement;

iv.    otherwise include terms and conditions substantially the same in all respects to the Purchase Agreement (including with respect to the representations and warranties);

v.    provide that such bidder's offer is irrevocable until the closing of the purchase of the REEG Business if such bidder is the Successful Bidder or the Back-Up Bidder (each as defined below);

vi.    state such bidder is financially capable of consummating the transactions contemplated by the Modified Purchase Agreement, and that there are no financing or due diligence contingencies for the bidder to consummate the Modified Purchase Agreement;

vii.    provide that such bidder will not require additional representations or warranties that relate to the limited liability company interests/limited partnership owned by the funds and joint venture separate accounts except as stated in Article 4 of the Purchase Agreement;

viii.    state such bidder is a registered investment adviser with the SEC;

ix.    provide that such bidder will close on the sale of the REEG Business within the same time period provided for in the Purchase Agreement;

x.    include such financial and other information that will allow the Sellers to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement and evaluate

bidder's demonstration of its experience as a fiduciary in the investment management business;

xi.    describe the bidder's intention for the management and employees of the REEG Business, including the bidder's working assumption for sharing of promote revenue with management going forward, if applicable, and the integration of the REEG Business with the bidder's current business with regard to personnel and a pro forma business plan;

xii.    provide a summary of the key economic elements of the bidder's proposal that affect the third party investors of the funds and joint venture separate accounts of the REEG Business including any change, if necessary, to the key economic or governance terms of these investment vehicles;

xiii.    describe any transition services that will be required by the bidder in connection with an acquisition of the REEG Business;

xiv.    include a statement that there are no conditions precedent to the bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid. The bidder's bid and Modified Purchase Agreement should also highlight any governmental or third-party consents needed to consummate the acquisition of the REEG Business to the extent they are not already contemplated in the Purchase Agreement;

xv.    not request or entitle the bidder to any transaction or breakup fee, termination fee, expense reimbursement, or similar type of payment;

xvi.    fully disclose the identity of each entity that will be bidding for the REEG Business or otherwise participating in connection with such bid, and the complete terms of any such participation;

xvii.    include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Purchase Agreement;

xviii.    include the names and contact information of members of the bidder who will be available to answer questions regarding the offer;

xix.    include the names of external advisors including financial, legal, and accounting firms, as well as industry consultants or other resources;

xx. include any other information or factors that may be relevant to the Sellers and their advisors in consideration of the bid; and

xxi. include a cash deposit by wire transfer equal to ten (10%) percent of the amount offered to purchase the REEG Business (the "Good Faith Deposit").

The Sellers shall make a determination regarding whether a bid is a Qualifying Bid, after consultation with the Committee, and shall notify bidders whether their bids have been determined to be Qualifying Bids by no later than one hour before the start of the Auction (as defined below);

(e) **No Qualifying Bids**: If no timely, conforming Qualifying Bids, other than the Purchase Agreement, are submitted by the Bid Deadline, the Sellers shall not hold an Auction (as defined below) and, instead, shall request at the Sale Hearing that the Court approve the Purchase Agreement with Purchaser.

(f) **Right to Disseminate Information Relating to Bid**. At any time, whether before or after the Auction, the Sellers may share or not share, in their sole discretion, any bid for the REEG Business with the other bidders.

(g) **Auction**: In the event the Sellers timely receive one or more Qualifying Bids other than the Purchase Agreement, the Sellers shall conduct the Auction with respect to the REEG Business. The Auction will be held at the offices of Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019, on February 23, 2010, at 12:00 p.m. noon (prevailing Eastern Time), or such other location as designated by the Debtors in a notice to all Qualifying Bidders. The Auction shall be governed by the following procedures (which may be amended, modified and waived, as applicable by the Debtors at any time in their sole discretion after consultation with the Committee):

i. The Purchaser and the Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

ii. Only representatives of the Debtors, the Purchaser, the Qualifying Bidders, counsel and other advisors selected by the Committee, and representatives from the Office of the U.S. Trustee shall be entitled to be present at the Auction;

iii. The Auction process shall be transcribed by a qualified court reporter, unless otherwise provided herein;

iv. Only the Purchaser and Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

v.     Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

vi.     Bidding shall commence at the amount of the highest Qualifying Bid submitted by the Qualifying Bidders prior to the Auction and such Bid shall be announced prior to the start of the Auction (the "Initial Highest Bid");

vii.     Qualifying Bidders may submit subsequent bids to the Initial Highest Bid and all such subsequent bids must be stated in an amount exceeding each prior bid by USD $250,000 in purchase price consideration;

viii.     The Sellers may determine the order in which Qualifying Bidders shall bid at the Auction;

ix.     All Qualifying Bidders and the Purchaser shall be able to submit additional bids and make additional modifications to the Purchase Agreement or Modified Purchase Agreement, as applicable, as determined by the Sellers at any time in their sole discretion after consultation with the Committee;

x.     The Auction may include individual negotiations with the Qualifying Bidders and the Purchaser and/or open bidding in the presence of all other Qualifying Bidders and the Purchaser;

xi.     The Sellers may determine, in their sole discretion and after consulting with the Committee, which portions of the Auction shall be transcribed on the record and which shall not be transcribed;

xii.     The Sellers may, in their sole discretion and after consulting with the Committee, discuss any Qualifying Bid with other Qualifying Bidders individually or together in any other group or groups of Qualifying Bidders, as determined by the Sellers;

xiii.     The Auction shall continue until there is only one offer that the Sellers determine, after consultation with the Committee, and subject to Court approval, with respect to the REEG Business, is the highest and/or best offer from among the Qualifying Bidders submitted at the Auction (the "Successful Bid"). In making this decision, the Debtors may consider any factors they deem relevant, including without limitation, the amount of the purchase price, the form of consideration being offered, expense to the Debtors of any obligation to pay the Break-Up Fee and Expense Reimbursement, the likelihood of the Qualifying Bidder's ability to close a transaction and the timing thereof, the number, type, and nature of any changes to the Purchase Agreement requested by each Qualifying Bidder, any contingencies relating to a Qualifying

Bidder's offer, and the net benefit to the Debtors' bankruptcy estates. The Purchaser or Qualifying Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the applicable Purchase Agreement Modified Purchase Agreement; and

xiv.     Within three (3) days after conclusion of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments, or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities; *provided however,* that any Successful Bidder shall have fifteen days to obtain requisite consents. Bids made after the close of the Auction shall not be considered by the Sellers.

(h)     **Back-Up Bidder and Return of Good Faith Deposits**:

i.     If an Auction is conducted, the Qualifying Bidder with the next highest or otherwise best Qualified Bid, as determined by the Sellers in the exercise of their business judgment at the Auction and in consultation with the Committee, shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until 24 hours after the closing of the sale transaction with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the Sale with the Back-Up Bidder without further order of the Court.

ii.     Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Sellers as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) Business Day following the conclusion of the Auction. Each Good Faith Deposit of the Back-Up Bidder shall be held by the Debtors until one (1) Business Day after the closing of the Sale transaction with the Successful Bidder for the REEG Business.

19.     In accordance with Local Rule 6004-1(c), the Debtors note the following with respect to the Auction and the Bidding Procedures:

(a)     **Provisions Governing Qualifications of Bidders**:     *See* preceding paragraphs 18(d).

(b) **Provisions Governing Qualified Bids**: *See* preceding paragraphs 18(b), (c), and (d).

(c) **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**:

    i.    No Shop or No-Solicitation Provisions: Not applicable.

    ii.    Break-Up/Topping Fees and Expense Reimbursement: *See* preceding paragraph 18(d).

    iii.    Bidding Increments: *See* preceding paragraph 18(d)(i), (g)(vii).

    iv.    Treatment of Break-Up or Topping Fees and Expense Reimbursement at Auction: *See* preceding paragraphs 18(d)(xv).

(d) **Modification of Bidding and Auction Procedures**: *See* preceding paragraph 18(d), (g).

(e) **Closing with Alternative Backup Bidder**: *See* preceding paragraph 18(h).

### Approval of the Bidding Procedures and the Auction

20.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe the Sale of the REEG Business pursuant to a public auction governed by the proposed Bidding Procedures will maximize the sale proceeds received by the estate, which is the paramount goal in any proposed sale of property of the estate. *In re Dura Auto. Sys., Inc.,* No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *253 (Bankr. D. Del. Aug. 15, 2007) ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.") (internal citations omitted).

21.    The Bidding Procedures allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors receive the best possible consideration for the REEG Business. Bidding procedures should be approved when they provide a benefit to

18

the estate by maximizing the value of the assets and enhance competitive bidding. *Id.* (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 535-537 (3d Cir. 1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate)). The Debtors believe the proposed Bidding Procedures are consistent with procedures previously approved in this district and other bankruptcy courts.

22. Although the Debtors believe the value to be provided pursuant to the terms set forth in the Purchase Agreement is fair and reasonable, the Debtors submit that the Bidding Procedures and the Auction will ensure that the Debtors' estates receive the most value possible by allowing the market to test the Purchase Price (as defined in the Purchase Agreement). The Debtors thus request the Court to approve the process and procedures set forth in the Bidding Procedures for the submission and consideration of competing bids for the REEG Business from other interested parties.

### Approval of the Sale Hearing Schedule and Sale Hearing Notice

23. The Debtors request that the Court schedule a Sale Hearing on or before March 4, 2010 at 10:00 a.m. (prevailing Eastern Time), or as soon as practicable thereafter, to consider approval of the Purchase Agreement and the Sale contemplated thereby, or the approval of any higher or better offer, if any, resulting from an Auction. Bankruptcy Rule 6004(a) provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k), and if applicable, in accordance with section 363(b)(2) of the Code." Bankruptcy Rule 2002(a)(2) requires that Debtors give all creditors and certain other parties "at least 20 days' notice by mail" of the Sale. Bankruptcy Rule 6004(b) also provides that objections to the proposed Sale "shall be filed and served not less than five days before the date set for the proposed action or within the time fixed by the court."

19

24.     The Sale Hearing Notice contains the type of information required under Bankruptcy Rule 2002(c), and also includes information regarding Auction procedures in the event a higher or better offer than the Purchase Agreement is received and an Auction is necessary. Therefore, the Debtors request the Court to approve the form and manner of the Sale Hearing Notice. The Debtors propose at least 20 days' notice for the Sale Hearing, which complies with the notice procedures mandated by the Bankruptcy Rules, according to the following procedures:

(a)     The Debtors shall serve, within 3 business days after entry of the Sale Hearing Order (the "Mailing Deadline"), by overnight courier, electronic mail, or same-day messenger delivery, copies of the Sale Hearing Notice upon: (i) the U.S. Trustee, (ii) counsel to the Committee, (iii) counsel to the Purchaser, (iv) any party who, in the past twelve (12) months, expressed to the Debtors, in writing, an interest in acquiring the REEG Business and who the Debtors and their representatives reasonably and in good faith determine to potentially have the desire and financial wherewithal to effectuate the sale, (v) the SEC, and (vi) any parties entitled to notice under Local Rule 2002-1(b).

(b)     On or before the Mailing Deadline, or as soon as practicable thereafter, the Debtors will publicize the Sale Hearing Notice in the Wall Street Journal (National Edition) for 1 business day.

25.     The Debtors submit that such notice shall constitute good and sufficient notice of the Auction and the Sale of the REEG Business, and that no other or further notice is necessary. Accordingly, the Debtors request the Court to approve the form and manner of the Sale Hearing Notice.

## Approval of Procedures for Assumption and Assignment of Assigned Contracts

26.     To facilitate the Sale and the assumption and assignment of the Assigned Contracts, the Debtors will serve the Notice of Assumption and Assignment on all nondebtor parties to the Assigned Contracts according to the following procedures:

i.      On or before the Mailing Deadline, the Debtors (or their agent) shall serve, by overnight courier, electronic mail, or same-day

messenger delivery, the Notice of Assumption and Assignment upon all known nondebtor parties to the Assigned Contracts. The Notice of Assumption and Assignment shall set forth (i) the intent of the Debtors to assume the Assigned Contracts and assign them to Purchaser (or to any Successful Bidder), and (ii) applicable cure amounts (the "Cure Amounts"), if any. The Notice of Assumption and Assignment shall identify the Assigned Contracts and the Cure Amounts that the Sellers believe must be paid to cure all defaults under the Assigned Contracts. If no amount is listed on the Notice of Assumption and Assignment, the Sellers believe that there is no Cure Amount due.

ii.  Bankruptcy Rule 6006(a) provides that "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease other than as part of a plan, is governed by Rule 9014." Any objections to (i) the assumption and assignment of an Assigned Contract, or (ii) the amount asserted as the Cure Amount (each, an "Assumption and/or Cure Objection") must be in writing and set forth with specificity the nature of the objection and the cure amount that the objecting party believes should be paid in connection with the assumption of the Assigned Contract (the "Claimed Cure Amount").

iii. If an Assumption and/or Cure Objection is timely filed, the Debtors request that a hearing with respect to that objection shall be held before the Court at the Sale Hearing. If, however, an Assumption and/or Cure Objection is not timely filed and served, the assumption and assignment of the applicable Assigned Contract will proceed without further notice at the Sale Hearing to approve the Sale of the REEG Business. The Debtors also request that parties failing to file and serve timely Assumption and/or Cure Objections shall be deemed to have waived and released any and all rights to assert Cure Amounts differing from those listed on the exhibit to the Notice of Assumption and Assignment and, subject to payment of the Cure Amount(s) listed on such contract with respect to their Assigned Contract(s), shall be forever barred and estopped from asserting or claiming against the Sellers, Purchaser, or any Successful Bidder that any additional amounts are due or defaults exist, or prohibitions or conditions to assignment exist or must be satisfied, under such Assigned Contract.

iv.  If no Cure Amounts are due under the Assigned Contract, and the nondebtor party to the Assigned Contract does not otherwise object to the Sellers' assumption and assignment of the Assigned Contract, no further action need be taken on the part of that nondebtor party. The Debtors also request that Assumption and/or Cure Objections that object solely to the Cure Amount may not

21

prevent or delay the Sellers' assumption and assignment of any Assigned Contracts. If a party objects solely to a Cure Amount, the Sellers may, in their sole discretion, hold the Claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties. So long as the Sellers hold the Claimed Cure Amount in reserve, and there are no other unresolved objections to assumption and assignment, the Sellers can, without further delay, assume and assign the Assigned Contract that is the subject of the objection. Under such circumstances, the objecting party's recourse shall be limited to the funds held in reserve.

27.     The Debtors submit the aforementioned procedures provide good and sufficient notice to nondebtor parties to the Assigned Contracts and should be approved in all respects. In addition, the Debtors believe that each counterparty to an executory contract which will be assumed and assigned in connection with the Sale has consented, or will consent, to such assumption and assignment.

**Approval of Objection Deadline**

28.     The Debtors request that, pursuant to Bankruptcy Rule 9014, objections, if any, to the Sale (a "Sale Objection") or an Assumption and/or Cure Objection (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware, 19801, on or before 4:00 p.m. (prevailing Eastern Time) on February 25, 2010 (the "Objection Deadline"), or on such later date and time as the Debtors may agree; and (iv) be served with a copy on: (a) counsel for the Debtors, Dewey & LeBoeuf LLP, Attention: Michael P. Kessler, Esq., and Judy G.Z. Liu, Esq., 1301 Avenue of the Americas, New York, New York, 10019; (b) local counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware, 19801, Attention: Mark D. Collins, Esq. and Jason M. Madron, Esq.; (c) corporate counsel to the Sellers, Goodwin Procter LLP, The New York Times Building, 620 8th Avenue, New York, New York, 10018, Attention: Edward Braun, Esq.; (d)

22

counsel for Purchaser, Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 4100,

Dallas, Texas, 75201-4675, Attention: R. Terry Miller, Esq.; (e) the U.S. Trustee, 844 King

Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801; (f) Citibank, N.A. and Citicorp

North America, Inc., as administrative agents under the Debtors' prepetition senior credit

facility, bridge loan agreement and term loan facility, 1615 Brett Rd. Bldg. 3, New Castle,

Delaware, 19720, Attention: Ralph Townley; (g) successor trustee under the prepetition senior

unsecured floating rate note, 5.875% senior unsecured note, and 6.300% senior unsecured note

indentures, Wilmington Trust FSB, 166 Mercer Street, Suite 2-R, New York, New York, 10012-

3249, Attention: Adam Berman; (h) counsel to the Committee, Kramer Levin Naftalis & Frankel

LLP, 1177 Avenue of the Americas, New York, New York, 10036, Attention: Thomas Moers

Mayer, Esq. and Amy Caton, Esq.; and (i) all parties requesting notice pursuant to Bankruptcy

Rule 2002 and Local Rule 2002-1(b).

## Basis for Requested Relief

**A.      Approval of the Sale under Bankruptcy Code Sections 363(b) and 105(a) is Warranted.**

29.      Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (providing

that debtors in possession have "all the rights . . . of a trustee"). In addition, section 105(a)

provides the authority for this Court to carry out the provisions of section 363(b). *See* 11 U.S.C.

§ 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate

to carry out the provisions of this title."). Although section 363(b) of the Bankruptcy Code does

not specify a standard for determining when it is appropriate for a court to authorize the use, sale

or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets

23

if such sale is based upon the sound business judgment of the debtor. *In re Dura Auto. Sys.,* 2007 Bankr. LEXIS 2764, at \*258 (Bankr. D. Del. 2007) (citing *Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Penn., Inc.,* 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson Ry. Co.,* 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *In re Montgomery Ward Holding Corp.,* 242 B.R 147, 153 (D. Del. 1999) (same).

30.     When a valid business judgment exists, the law vests the debtor's decision to sell assets with a strong presumption that "in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in honest belief that the action taken was in the best interests of the company." *In re Dura Auto. Sys.,* 2007 Bankr. LEXIS, at \*260 (citing *The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Von Gorkum,* 488 A.2d 858, 872 (Del. 1985)). Once a court is satisfied there is a sound business judgment for the proposed sale, the court must then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See, e.g., Del. and Hudson Ry. Co.,* 124 B.R. at 166.

31.     The Debtors submit that the decision to sell the REEG Business is based upon their sound business judgment and should be approved.   Both before and after the Commencement Date, the Debtors have worked diligently to explore alternatives to sell certain of their business assets where such sales would provide greater value to the estates, relieve the

24

Debtors of ongoing operational expenses, as well as mitigate any potential liability. Due to the Debtors' financial difficulties, the third party investors in the funds and joint venture separate accounts (as well as their consultant) have stated a strong preference that the REEG Business be sold as soon as possible to minimize interruption to the active management required of the portfolios. The commencement of these chapter 11 cases also threatens to strain CILP's high fiduciary standards as a registered investment adviser. In light of the foregoing, the Debtors, in consultation with their professionals, do not believe continued ownership of the REEG Business is in the best interests of the Debtors' estates. If no timely, conforming Qualifying Bids other than the Purchase Agreement are submitted by the Bid Deadline, the Debtors believe the prompt Sale of the REEG Business to the Purchaser (who has already received or will soon receive all requisite consents under the Purchase Agreement) without an Auction and without further delay presents the best opportunity to maximize and preserve value for their estates.

32. In addition, the Debtors believe their extensive prepetition marketing efforts, arms'-length negotiations with Purchaser, and the proposed Bidding Procedures together will achieve the best results for their estates and maximize value for all parties in interest. Fifteen potential third-party bidders expressed interest in the REEG Business, with five potential bidders (including the Purchaser) executing non-disclosure agreements to conduct extensive pre-bid diligence. The Debtors' criteria for a potential acquirer of the REEG Business included that the prospective acquirer possess a demonstrated high level of knowledge and expertise with respect to real estate investment operations and, more importantly, embrace the best practices of the investment adviser/fiduciary elements of the investment advisory business as practiced by CILP. The fifteen potential third-party bidders who expressed interest in the REEG Business (inclusive of the five parties who executed non-disclosure agreements) represented a cross-

25

section of (a) real estate practitioners or operators (those who are presently real estate operators and are interested in getting involved in the real estate private equity fiduciary business), and (b) well resourced sponsors who are either presently in the real estate private equity fiduciary business or who have spent their careers in the business, presenting a firm understanding of the investment management business. Three formal written bids were received (including from the Purchaser), with the Purchaser's bid being the highest and best offer. Continued arms'-length negotiations with the Purchaser after receipt of their offer resulted in the execution of the Purchase Agreement. The Bidding Procedures contemplate an open auction process and are designed to ensure that the final purchase price of the REEG Business is fair and reasonable, and the maximum amount possible for the REEG Business. Thus, the Debtors submit that the proposed Sale of the REEG Business is within their sound business judgment.

**B.  Sale of the REEG Business Free and Clear of Interests is Warranted.**

33.  Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions are satisfied:

(1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)  such entity consents;

(3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)  such interest is in bona fide dispute; or

(5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

34.  The Debtors believe one or more of these tests in section 363(f) of the Bankruptcy Code are easily satisfied with respect to the proposed Sale CILP's property rights

26

and interests in the REEG Business. The REEG Business assets are unencumbered by any recorded lien, security interest, mortgage, judgment, or other encumbrance. To the extent there is any unrecorded "interest" in the REEG Business other than the Debtors', the Debtors submit that subsection 363(f)(5) would apply to permit the Sale free and clear of such interest. The Debtors believe the rights of any unknown claimant could be valued and allowed as a claim against CILP's estate and the claimant could be compelled to accept a money satisfaction of its interest in the property, thus satisfying section 363(f)(5). *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289, 291 (3d Cir. 2003) (the Court of Appeals for the Third Circuit held that section 363(f)(5) was satisfied in respect of successor liability claims because "[h]ad TWA liquidated its assets under Chapter 7 of the Bankruptcy Code, the claims at issue would have been converted to dollar amounts and the claimants would have received the distribution provided to other general unsecured creditors on account of their claims."). In addition, because the Sellers are unaware of the existence of any interest in, or of the right of any third party to assert such an interest in, the REEG Business, the Sellers submit that the surprise assertion of an interest will be in bona fide dispute, and, therefore, subsection 363(f)(4) would apply.

35.     Because the section 363(f) requirements have been met, Purchaser should not be liable, as a successor to the REEG Business or otherwise, for any of the Debtors' pre-petition liabilities, unless expressly assumed. As a matter of logic, bankruptcy estates would be unable to sell assets for fair value if the estates' liabilities followed the assets. The Third Circuit Court of Appeals has held that a buyer of a debtor's assets pursuant to sections 363(b) or 363(f) takes free from successor liability resulting from any pre-existing claims. *See, e.g.*, *In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of . . . successor liability claims achieves the purpose of

27

[Bankruptcy Code] section 363 intended by Congress"), *aff'd*, 332 F.3d 283, 285 (3d Cir. 2003) ("Because section 363(f) of the Bankruptcy Code permits a sale of property 'free and clear' of an 'interest in such property' and because the claims against TWA here were connected to or arise from the assets sold, we affirm the Bankruptcy Court's order approving the sale 'free and clear' of successor liability.").

## C. Assumption and Assignment of Executory Contracts is Warranted.

36.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to court approval, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. 11 U.S.C. § 365. The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease may be assumed is the debtor's "business judgment" that the assumption is in its economic best interests. *See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing the business judgment test as "traditional").

37.     To facilitate and effect the Sale of the REEG Business, Purchaser has agreed to take assignment of and assume the obligations under the Assigned Contracts. The Debtors will demonstrate at the Sale Hearing that all requirements for assumption and/or assignment of such contracts will be satisfied. The Debtors have evaluated the financial wherewithal of Purchaser and, in their sound business judgment, believe that selling the REEG Business and assuming and assigning the Assigned Contracts to Purchaser is in the best interests of their estates. Moreover, as noted above, each nondebtor party to an Assigned Contract will receive notice of the proposed assumption and assignment, and the proposed cure amount, and have a reasonable opportunity to object thereto.

## D. Finding of Good Faith is Warranted.

38.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Seventh Circuit in *In re Andy Frain Serv., Inc.*, held that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

798 F.2d 1113, 1125 (7th Cir. 1986) (emphasis and citations omitted).

39.     Purchaser is an entity unrelated to the Debtors. The Purchase Agreement was intensely negotiated at arms'-length, all parties involved acted in good faith, and each party was represented by sophisticated counsel. The Debtors are unaware of any facts or circumstances that might compromise or taint Purchaser's good faith in negotiating and entering into the Purchase Agreement. Accordingly, the Debtors request the Court to find that Purchaser has acted in good faith and is entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

## E. The Break-Up Fee and Expense Reimbursement is Reasonable and Appropriate.

40.     Bidding incentives, such as the Break-Up Fee and Expense Reimbursement, encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of

RLF1 3527691v.1

a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." *In re S. N.A, Nut Co.,* 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); *see also In re 995 Fifth Ave. Assoc. L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

41.    A proposed bidding incentive, such as the Break-Up Fee, should be approved when it is in the best interests of the estate. *S.N.A. Nut Co.,* 186 B.R. at 104; *see also In re America West Airlines, Inc.,* 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc,,* 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

42.    Here, the Break-Up Fee and Expense Reimbursement will be paid only in the event the REEG Business is sold to a bidder presenting a higher or better offer than that of Purchaser, taking into account the Break-Up Fee and Expense Reimbursement in comparing offers. In such case, the Debtors will receive more than the Purchase Price offered by Purchaser. Consequently, the Debtors' estates will benefit from the floor set by Purchaser's offer.

43.    "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *In re Integrated Res., Inc.,* 147

B.R. 650, 660 (S.D.N.Y. 1992). As is customary, the Break-Up Fee and Expense Reimbursement required by the Purchaser is compensation for investing considerable time and expense in negotiating and entering into the Purchase Agreement. The Debtors do not believe the Break-Up Fee and Expense Reimbursement will stifle bidding. To the contrary, the Debtors believe that, should an auction be held, the Break-Up Fee and Expense Reimbursement will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *Id.* at 662. If the REEG Business is sold to a competing bidder, the sale likely will be the result of Purchaser's crucial role as an initial bidder generating interest in the assets and establishing a minimum acceptable price.

44.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." *Id.* The Break-Up Fee is equal to approximately 2.75% of the Purchase Price (and together with the Expense Reimbursement, is 4% of the Purchase Price, as defined in the Purchase Agreement) which is within the range of break-up fees typically paid in sales transactions that have been approved by this Court. *See, e.g., In re Maxide Acquisition, Inc.,* No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (approving break-up fee of 3%, or $2.5 million, in connection with a $75 million sale); *In re Ameriserve Food Distrib., Inc.,* No. 00-00358 (PJW) (Bankr. D. Del. June 15, 2000) (approving break-up fee of 3.6%, or $4 million, in connection with $110 million sale). Given the size of the Purchase Price, the Debtors, in their business judgment, believe the amount of the

31

Break-Up Fee, $528,627, is appropriate, and also submit that the Expense Reimbursement of $240,000 is appropriate.

45.     For these reasons, the Debtors respectfully request that the Court approve the Break-Up Fee.

### Relief From Ten-Day Waiting Periods

46.     The Debtors request the Court to waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d) and order that, if and when entered, the Sale Order be effective immediately. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of ten days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."

47.     The purpose of these rules is to provide sufficient time for an objecting party to appeal before an order is effective. *See* Advisory Committee Notes to Bankruptcy Rules 6004(h) and 6006(d). Although these rules and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the ten-day stay period, Collier on Bankruptcy suggests the ten-day stay period should be waived to allow a transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev. ¶ 6004.10 (15th rev. ed. 2006). Further, it suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

### Notice

48.     No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been provided by overnight delivery to (i) the U.S. Trustee, (ii)

32

Citibank, N.A. and Citicorp North America, Inc., as administrative agents under the Debtors' prepetition senior credit facility, bridge loan agreement and term loan facility, (iii) counsel to the Purchaser, (iv) Wilmington Trust FSB, as successor trustee under the prepetition senior unsecured floating rate note, 5.875% senior unsecured note, and 6.300% senior unsecured note indentures, (v) counsel to the Committee, and (vi) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b). The Debtors submit that no other or further notice need be provided.

## No Previous Request

49. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request (i) entry of the proposed Bidding Procedures Order, (ii) at the completion of the Sale Hearing, entry of the Sale Order approving the Sale of the REEG Business to the Purchaser, or, in the event of a higher or better offer received at an Auction, the Successful Bidder, and (iii) such other and further relief as the Court may deem just and appropriate.

Dated: January 15, 2010
      Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Jason M. Madron (No. 4431)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: 302.651.7700
Facsimile: 302.651.7701

-and-

Martin J. Bienenstock
Michael P. Kessler
Judy G.Z. Liu
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: 212.259.8000
Facsimile: 212.259.6333

*Attorneys for the Debtors and Debtors in Possession*

RLF1 3527691v.1