# **Exhibit C**

**(Purchase Agreement)**

ASSET PURCHASE AGREEMENT

among

TRECAP Partners LLC,

(the "<u>Buyer</u>")

Capmark Investments LP

and

Capmark Carried Interest, L.L.C.

(the "<u>Sellers</u>")

January 14, 2010

# TABLE OF CONTENTS

**Page**

ARTICLE 1 CERTAIN DEFINITIONS. ................................................................... 1

ARTICLE 2 PURCHASE AND SALE. ................................................................... 8

| | | |
|---|---|---|
| 2.1 | Covenant of Purchase and Sale | 8 |
| 2.2 | Excluded Assets | 9 |
| 2.3 | Assumed Liabilities | 9 |
| 2.4 | Excluded Liabilities | 9 |
| 2.5 | Deposit | 9 |
| 2.6 | Purchase Price | 10 |
| 2.7 | Indemnity Escrow | 10 |
| 2.8 | Exhibit C Asset Management Agreement Adjustment | 10 |
| 2.9 | Allocation of Purchase Price | 10 |

ARTICLE 3 BUYER'S REPRESENTATIONS AND WARRANTIES. ................... 11

| | | |
|---|---|---|
| 3.1 | Organization of Buyer | 11 |
| 3.2 | Authority | 11 |
| 3.3 | No Conflict; Required Consents | 11 |
| 3.4 | Accredited Investor | 11 |
| 3.5 | Equity Commitment | 12 |
| 3.6 | No Broker | 12 |
| 3.7 | RIA Status | 12 |

ARTICLE 4 SELLERS' REPRESENTATIONS AND WARRANTIES. ................ 12

| | | |
|---|---|---|
| 4.1 | Organization and Qualification of Sellers | 12 |
| 4.2 | Organization and Qualification of Funds | 13 |
| 4.3 | Organization and Qualification of Joint Ventures | 13 |
| 4.4 | Organization and Qualification of Incentive Vehicles | 13 |
| 4.5 | Organization and Qualification of UK Entity | 13 |
| 4.6 | Organization and Qualification of Intermediate Entities. | 13 |
| 4.7 | Authority. | 14 |
| 4.8 | Capitalization | 14 |
| 4.9 | No Conflict; Required Consents | 14 |
| 4.10 | Title to Assets | 15 |
| 4.11 | Investment Management Contracts | 15 |
| 4.12 | Material Contracts | 15 |
| 4.13 | Litigation | 15 |
| 4.14 | Tax Matters. | 15 |
| 4.15 | Compliance with Legal Requirements | 17 |
| 4.16 | Books and Records | 17 |

| | | |
|---|---|---|
| 4.17 | Further Co-Investment Obligations | 17 |
| 4.18 | Broker | 17 |
| 4.19 | Permits | 17 |
| 4.20 | Intellectual Property | 17 |
| 4.21 | Financial Information | 18 |
| 4.22 | Condition of Assets | 18 |
| 4.23 | Undisclosed Liabilities | 18 |
| 4.24 | Employees and Employee Benefit Plans | 18 |
| 4.25 | UK Entity Agreements | 19 |
| 4.26 | Required Consents | 19 |

**ARTICLE 5 COVENANTS.** .......... **19**

| | | |
|---|---|---|
| 5.1 | Conduct of Business | 19 |
| 5.2 | Reasonable Efforts; Further Assurances | 19 |
| 5.3 | Certain Filings | 20 |
| 5.4 | Required Consents; Transfer of Assets | 20 |
| 5.5 | Fund and Joint Venture Management | 20 |
| 5.6 | Adequate Assurances Regarding Executory Contracts and Required Orders | 20 |
| 5.7 | Performance under Executory Contracts and Assumed Liabilities | 20 |
| 5.8 | Employees | 21 |
| 5.9 | Notices | 21 |
| 5.10 | Change of Name; Use of Name | 22 |
| 5.11 | Track Record; Certain Assets | 22 |
| 5.12 | Management Fees | 22 |
| 5.13 | Limited Partner Interest in Funds; Advisory Boards | 23 |
| 5.14 | Non-Competition | 23 |
| 5.15 | Payment of Promote Distributions.LP under this Section 5.15 shall be includable in income by CILP. | 23 |
| 5.16 | Non-Disparagement | 23 |
| 5.17 | SEC Review | 24 |
| 5.18 | Bankruptcy Court Approval | 24 |
| 5.19 | Tax Matters. | 24 |
| 5.20 | Intercompany Debt. | 25 |
| 5.21 | Other Assets. | 25 |
| 5.22 | Financial Information. | 26 |

**ARTICLE 6 CONDITIONS TO CLOSING** .......... **26**

| | | |
|---|---|---|
| 6.1 | Conditions to the Obligations of Buyer and Sellers | 26 |
| 6.2 | Conditions to the Obligations of Buyer | 26 |
| 6.3 | Conditions to the Obligation of Sellers | 28 |

**ARTICLE 7 INDEMNIFICATION.** ................................................................... **29**

7.1   Survival ........................................................................................... 29
7.2   Indemnification by Sellers ............................................................. 29
7.3   Indemnification by Buyer .............................................................. 30
7.4   Procedure for Indemnification Claims............................................ 31
7.5   Determination of Indemnification Amounts and Related Matters...... 32
7.6   Remedies Exclusivity .................................................................... 33

**ARTICLE 8 TERMINATION** .......................................................................... **33**

8.1   Conditions of Termination.............................................................. 33
8.2   Effect of Termination; Remedies.................................................... 34

**ARTICLE 9 BANKRUPTCY MATTERS.** ....................................................... **34**

9.1   Bankruptcy Court Approval of Preliminary Order and Sale Order ..... 34
9.2   Bidding Procedures........................................................................ 35

**ARTICLE 10 MISCELLANEOUS PROVISIONS.** ........................................... **36**

10.1   Expenses ...................................................................................... 36
10.2   Waivers ........................................................................................ 36
10.3   Notices ......................................................................................... 36
10.4   Entire Agreement; Amendments..................................................... 37
10.5   Binding Effect; Benefits ................................................................ 37
10.6   Headings, Schedules, and Exhibits.................................................. 37
10.7   Counterparts and Facsimile Signatures............................................ 37
10.8   Governing Law ............................................................................. 38
10.9   Severability .................................................................................. 38
10.10  Specific Performance .................................................................... 38
10.11  Third Parties; Joint Ventures ......................................................... 38
10.12  Construction.................................................................................. 38

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Sale Motion |
| Exhibit B-1 | Form of Deposit Escrow Agreement |
| Exhibit B-2 | Form of Indemnity Escrow Agreement |
| Exhibit C | Form of Asset Management Agreement |
| Exhibit D | Form of Form of FIRPTA Certificate |
| Exhibit E | Form of Bill of Sale |
| Exhibit F | Form of Assignment and Assumption Agreements |
| Exhibit G | Form of Transition Services Agreement |
| Exhibit H | Form of Bidding Procedures |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made and entered into as of January 14, 2010, by and among TRECAP Partners LLC, a Delaware limited liability company ("Buyer"), Capmark Investments LP, a Delaware limited partnership ("CILP") and Capmark Carried Interest, L.L.C., a Delaware limited liability company ("CCI LLC" and together with CILP, "Sellers" and each, a "Seller").

### Recitals

Whereas, Sellers are engaged in the business of managing private real estate equity investment funds with co-mingled investors and separate accounts and joint ventures (the "Business");

Whereas, CILP intends to file a voluntary petition (the "Bankruptcy Case") under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and

Whereas, Buyer desires to purchase and Sellers desire to sell certain of the assets of Sellers relating to the Business, subject to the terms and conditions set forth in this Agreement and in accordance with Sections 363 and 365 and other applicable provisions of the Bankruptcy Code.

### Agreements

In consideration of the mutual covenants and promises in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Sellers agree as follows:

### ARTICLE 1
### Certain Definitions.

As used in this Agreement, the following terms, whether in singular or plural forms, shall have the following meanings:

"Advisers Act" means the Investment Advisers Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"Affiliate" means with respect to any Person, any other Person controlling, controlled by or under common control with such Person, with "control" for such purpose meaning the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or voting interests, by contract or otherwise. For purposes of this Agreement, neither Transwestern Commercial Services LLC nor its Affiliates shall be considered Affiliates of Buyer. Except as otherwise specified, for purposes of this Agreement, with respect to Sellers, "Affiliate" means Capmark Financial Group Inc. and any wholly-owned subsidiary of Capmark Financial Group Inc.

"Agreement" has the meaning given in the preamble.

"Asset Management Agreement" has the meaning given in Section 2.8.

"Assets" has the meaning given in Section 2.1.

"Assignment and Assumption Agreements" has the meaning given in Section 6.2(f).

"Assumed Liabilities" has the meaning given in Section 2.3.

"Bankruptcy Case" has the meaning given in the recitals.

"Bankruptcy Code" has the meaning given in the recitals.

"Bankruptcy Court" has the meaning given in the recitals.

"Bidding Procedures" has the meaning given in Section 9.1(b).

"Bill of Sale" has the meaning given in Section 6.2(e).

"Business" has the meaning given in the recitals.

"Business Day" means any day other than Saturday, Sunday or a day on which banking institutions in New York, New York are required or authorized to be closed.

"Buyer" has the meaning given in the preamble.

"Buyer Indemnified Party" and "Buyer Indemnified Parties" have the meanings given in Section 7.2(a).

"Closing" means the consummation and effectuation of the transactions contemplated by this Agreement pursuant to the terms and conditions of this Agreement, which shall be held one Business Day after each of the conditions to closing set forth in Article 6 have been satisfied or validly waived, at 10:00 a.m. Eastern Time in the offices of Goodwin Procter LLP in New York, New York or on such other date or at such other time or place as is mutually agreed by the parties hereto.

"Closing Date" means the date on which the Closing actually occurs.

"Code" means the Internal Revenue Code of 1986, as amended, or any successor law, and the rules and regulations promulgated thereunder, all as the same may from time to time be in effect.

"Contract" means any written contract, mortgage, deed of trust, bond, indenture, lease, license, note, franchise, certificate, option, warrant, right, or other instrument, document, obligation, or agreement, and any oral obligation, right, or agreement.

"Covenant Cut-Off Date" has the meaning given in Section 7.2(d).

"Deposit" has the meaning given in Section 2.5(a).

"Deposit Escrow Agreement" has the meaning given in Section 2.5(b).

"Direct Claim" has the meaning given in Section 7.4(a).

"Drop Dead Date" has the meaning given in Section 8.1(b).

"Employee Benefit Plans" means all "employee benefit plans" within the meaning of Section 3(3) of ERISA, and all written bonus, stock option, stock purchase, retention, termination, phantom stock, other equity based compensation, employment, change in control, salary continuation, profit-sharing, vacation, medical, dental, life, cafeteria, flexible benefit, employee loan, educational assistance, fringe benefit, deferred compensation, supplemental retirement, severance and/or other employee benefit plans, programs, policies or arrangements, written, in each case for the benefit of, or relating to, any current employee or former employee, director, officer, leased employee, agent or consultant of Sellers or their Affiliates.

"Employees" has the meaning given in Section 5.8(a).

"Encumbrance" means any security agreement, financing statement filed with any Governmental Authority, conditional sale or other title retention agreement, any lease, consignment or bailment given for purposes of security, any lien, mortgage, indenture, pledge, option, encumbrance, constructive trust or other trust, claim, attachment, exception to or defect in title or other ownership interest of any kind, which otherwise constitutes an interest in or claim against property, whether arising pursuant to any Legal Requirement, Contract, or otherwise; provided, however, that Encumbrances shall not include any Required Consent.

"Equity Financing" has the meaning given in Section 3.5.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any Seller subsidiaries or any employer that would be considered a single employer with the Sellers under Sections 414(b), (c), (m) or (o) of the Code.

"Escrow Agent" has the meaning given in Section 2.5(a).

"Escrow Agreements" means the Deposit Escrow Agreement and the Indemnity Escrow Agreement.

"Excluded Assets" has the meaning given in Section 2.2.

"Excluded Liabilities" has the meaning given in Section 2.4.

"Executory Contracts" means all of the Assets that are executory contracts (which shall include agreements, unexpired leases, consensual obligations, promises or undertakings (whether written or oral), whether or not legally binding), and all outstanding offers or solicitations made by or to CILP to enter into any such contract, listed on Schedule A. Such list is subject to the approval of the Bankruptcy Court.

"Exhibit C Asset Management Agreement Adjustment" has the meaning given in Section 2.8.

"Expense Reimbursement" has the meaning given in Section 9.1(a).

"Financial Statements" has the meaning given in Section 4.21.

"Fund Constituent Documents" means, for each Fund, its certificate of limited partnership and partnership agreement, both as amended.

"Fund Interests" has the meaning given in Section 2.1(b).

"Funds" means those entities listed on Schedule B hereto.

"GAAP" means generally accepted accounting principles in the United States consistently applied.

"Governmental Authority" means the United States of America, any state, commonwealth, territory, or possession thereof and any political subdivision or quasi-governmental authority of any of the same, including but not limited to courts, tribunals, departments, commissions, boards, bureaus, agencies, counties, municipalities, provinces, parishes, and other instrumentalities.

"Governmental Entity" means any national, federal, state, local or foreign court, tribunal, arbitral body, administrative agency or commission or other governmental or regulatory authority or instrumentality.

"Incentive Vehicle Constituent Documents" means, for each Incentive Vehicle, its formation and governing agreements, both as amended.

"Incentive Vehicle Interests" has the meaning given in Section 2.1(c).

"Incentive Vehicles" means those entities listed on Schedule C hereto.

"Indemnification Cut-Off Date" has the meaning given in Section 7.1.

"Indemnitee" has the meaning given in Section 7.4(a).

"Indemnitor" has the meaning given in Section 7.4(a).

"Indemnity Escrow Agreement" has the meaning given in Section 2.7

"Indemnity Escrow Amount" has the meaning given in Section 2.6(b).

"Indemnity Escrow Fund" has the meaning given in Section 2.6(b).

"Intellectual Property" means all intellectual property rights arising under the laws of the United States or any other jurisdiction with respect to the following: (i) trade names, trademarks and service marks (registered and unregistered), domain names, trade dress and similar rights

and applications to register any of the foregoing; (ii) patents and patent applications and rights in respect of utility models or industrial designs (collectively, "Patents"); (iii) copyrights and registrations and applications therefor (collectively, "Copyrights"); and (iv) know-how, inventions, discoveries, methods, processes, technical data, specifications, research and development information, technology, databases and other proprietary or confidential information, including customer lists, in each case that derives economic value from not being generally known to other Persons who can obtain economic value from its disclosure, but excluding any Copyrights or Patents that cover or protect any of the foregoing.

"Intermediate Entities" has the meaning given in Section 4.6.

"Intermediate Entity Constituent Documents" means, for each Intermediate Entity, its formation and governing agreements, both as amended.

"Investment Management Contracts" has the meaning given in Section 2.1(a).

"Joint Venture Constituent Documents" means, for each Joint Venture, its certificate of formation and limited liability company agreement, both as amended.

"Joint Ventures" means those entities listed on Schedule D hereto.

"Judgment" means any judgment, writ, order, injunction, award, or decree of any court, judge, justice, or magistrate, including any bankruptcy court or judge, any binding arbitration and any order of or by any Governmental Authority.

"knowledge" of any Person of or with respect to any fact or matter means that such Person (if a natural person) has, actual awareness or knowledge of such matter or any of the officers, directors, and senior managers of such Person (if not a natural Person) has, actual awareness or knowledge of such matter; provided, that the terms "Sellers' knowledge", "to the knowledge of the Sellers", "knowledge of CILP" or any variation of any of the foregoing means the actual awareness or knowledge of only Keith Kooper, Edward Brace, John Lucerne, Michelle Vaughn, Robert Fabiszewski, Eugene Conway, William Martin, Wayne Harris, Christopher Boyle. Edward Oprindick, Christopher Lawton-Smith, Paul Dolinoy, and Timothy Fuller.

"Legal Requirements" means applicable common law and any statute, ordinance, code or other law, rule, regulation, order, technical or other standard, requirement, or procedure enacted, adopted, promulgated, applied, or followed by any Governmental Authority, including Judgments.

"Litigation" means any claim, action, suit, proceeding, arbitration, mediation, investigation, hearing, or other activity or procedure that could result in a Judgment.

"Losses" of a Person means any and all losses, liabilities, damages, claims, awards, judgments, costs and expenses (including, without limitation, reasonable attorneys' fees) actually suffered or incurred by such Person; provided, that in no event shall any Person be entitled to indemnification for any consequential, exemplary or punitive damages or any multiple of damages or diminution in value.

"Material Adverse Effect" means a change or effect in the condition (financial or otherwise) of the Assets which change or effect, individually or in the aggregate, is, or would reasonably be expected to be, materially adverse to the condition of the Assets (financial or otherwise), taken as a whole, except any such change or effect resulting from or arising in connection with (i) changes or conditions generally affecting the industry in which Sellers operate and which do not disproportionately affect Sellers as compared to other companies in the same or similar industries in which Sellers operate, (ii) changes in economic, capital market, regulatory or political conditions generally and which do not disproportionately affect Sellers as compared to other companies in the same or similar industries in which the Sellers operate, (iii) the announcement or pendency of the transactions contemplated by this Agreement and/or (iv) the Bankruptcy Case. Notwithstanding the foregoing, any negative change in portfolio valuations determined by CILP or Buyer is not, in and of itself, and will not, in and of itself, be deemed to be, indicative of a Material Adverse Effect, it being understood that the cause or causes underlying any such negative change in portfolio valuation will be taken into consideration in determining whether any change or effect in the condition of the Assets constitutes a Material Adverse Effect.

"Obtained Required Consents" has the meaning given in Section 4.26.

"Other Assets" has the meaning given in Section 2.1(e).

"Parent" means Capmark Finance Inc., a California corporation.

"Permits" means permits, licenses, franchises, approvals, certificates, consents, waivers, concessions, exemptions, orders, registrations, notices or other authorizations of any Governmental Authority.

"Permitted Encumbrances" means Encumbrances for Taxes, assessments and governmental charges not yet due and payable; other than Encumbrances for unpaid contributions or premiums or any termination liability in respect of an Employee Benefit Plan that is subject to Title IV of ERISA.

"Person" means any natural person, Governmental Authority, corporation, general or limited partnership, joint venture, limited liability company, trust, association, or unincorporated entity of any kind.

"Petition Date" means the date on which the Bankruptcy Case is filed.

"Pre-Closing Tax Period" has the meaning given in Section 5.19.

"Preliminary Order" has the meaning given in Section 9.1(b).

"Promote Distributions" means any and all promote distributions received from the Promote Entities by the general partner or managing member of such Promote Entities, as applicable.

"Promote Entities" shall mean Capmark Commercial Realty Partners, L.P., a Delaware limited partnership, and Crystal City Partners LLC, a Delaware limited liability company.

"Purchase Price" has the meaning given in Section 2.6.

"Relevant Entities" has the meaning given in Section 4.21.

"Required Consents" means all franchises, licenses, authorizations, approvals and consents required under the Investment Management Contracts, Fund Constituent Documents, Joint Venture Constituent Documents, Incentive Vehicle Constituent Documents, UK Constituent Documents, or otherwise for Sellers to transfer the Business or any of the Assets to Buyer, all of which are listed on Schedule E.

"Restricted Period" has the meaning given in Section 5.14(a).

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement or a competing transaction.

"Sale Motion" means the motion attached hereto as Exhibit A to be filed by CILP pursuant to, inter alia, Sections 363 and 365 of the Bankruptcy Code to secure entry of the Sale Order by the Bankruptcy Court.

"Sale Order" has the meaning given in Section 9.1(b).

"SEC Review" has the meaning given in Section 5.17.

"Securities Act" has the meaning given in Section 3.4.

"Seller" and "Sellers" have the meanings given in the preamble.

"Seller Indemnified Party" and "Seller Indemnified Parties" have the meanings given in Section 7.3(a).

"Side Letters" has the meaning given in Section 4.12.

"Tax" and, with correlative meaning, "Taxes" means with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including, without limitation, any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, ad valorem, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), custom duty or other tax, governmental fee or other like assessment, charge, or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Entity responsible for the imposition of any such tax (domestic or foreign) whether such Tax is disputed or not; and (ii) liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person.

"Tax Return" shall mean any return, declaration, report, claim for refund, or information return or statement or other form relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Fee" has the meaning given in Section 9.1(a).

"Third Party Buyer" has the meaning given in Section 8.1(d).

"Third Party Claim" has the meaning given in Section 7.4(a).

"Transaction Documents" means the Escrow Agreements, the Bill of Sale, the Assignment and Assumption Agreements, the Transition Services Agreement and the Closing certificates contemplated by Article 6 hereof.

"Transfer Taxes" has the meaning set forth in Section 5.19(e).

"Transition Services Agreement" has the meaning given in Section 6.2(l).

"UK Employees" means Timothy Fuller, Toby Monckton, Christopher Lawton-Smith, Michael Delaney and Samuel Dishon.

"UK Entity" means Capmark Investments Europe Limited, a private company limited by shares incorporated and registered in England and Wales.

"UK Entity Constituent Documents" means, for the UK Entity, its certificate of incorporation and memorandum and articles of association.

"UK Fee Agreement" has the meaning given in Section 4.25.

"UK Interests" has the meaning given in Section 2.1(d).

"UK Lease" means the office service agreement, dated December 4, 2009, by and between the UK Entity and Regus Management (UK) Limited.

"WARN" has the meaning given in Section 5.8(d).

## ARTICLE 2
## Purchase and Sale.

2.1     Covenant of Purchase and Sale.  Subject to the terms and conditions set forth in this Agreement, Sellers shall sell, convey, assign, transfer and deliver or cause to be sold, conveyed, assigned, transferred and delivered to Buyer, and Buyer shall purchase and acquire from Sellers, for the Purchase Price, free and clear of all Encumbrances except for Permitted Encumbrances, all of the following assets (collectively, the "Assets") in accordance with Section 363(f) of the Bankruptcy Code:

(a)     the contracts as described on Schedule 2.1(a) (the "Investment Management Contracts");

(b)     the limited liability company interests and general partner interests described on Schedule 2.1(b) (the "Fund Interests");

(c)     the limited liability company interests, general partner interests and limited partner interests described on Schedule 2.1(c) (the "Incentive Vehicle Interests");

(d)     the entire issued share capital of the UK Entity as described on Schedule 2.1(d) (the "UK Interests"); and

(e)     the physical assets described on Schedule 2.1(e) (the "Other Assets").

2.2     Excluded Assets.  All of Sellers' assets that are not specifically described in Schedules 2.1(a)-(e) are referred to herein as "Excluded Assets."

2.3     Assumed Liabilities.  From and after the Closing, Buyer shall assume and pay, discharge, and perform all of the obligations and liabilities of Sellers with respect to (i) the Assets arising at or after the Closing, including without limitation, (A) the capital contribution obligations with respect to the Fund Interests and general partner interests of the Funds, (B) obligations and liabilities as the investment manager and general partner of each Fund pursuant to the terms of the Investment Management Contracts, Fund Constituent Documents and then-existing Side Letters, (C) obligations and liabilities as the investment manager and/or non-member manager of each Joint Venture pursuant to the terms of the Investment Management Contracts and Joint Venture Constituent Documents, including, without limitation, any future funding obligations agreed to between Buyer and any such Joint Venture and (D) obligations and liabilities as the general partner/managing member and limited partner/members, as applicable, in the Incentive Vehicles pursuant to the terms of the Incentive Vehicle Constituent Documents, (ii) (A) the UK Employees and (B) the Employees arising at or after the Closing, excluding any liabilities in respect of the Employee Benefit Plans, whether arising prior to or after the Closing and (iii) liability arising under the UK Lease from and after the Closing (collectively (i), (ii) and (iii), the "Assumed Liabilities").  From and after the Closing, Sellers shall have no liability with respect to any Assumed Liability.

2.4     Excluded Liabilities.  Except for the Assumed Liabilities, it is expressly understood and agreed that Buyer is not assuming or becoming liable in any manner for any obligations and liabilities of Sellers (collectively, the "Excluded Liabilities").  Sellers shall remain liable for and shall pay when due all of the Excluded Liabilities.  Buyer has no, and from and after the Closing, Buyer shall have no liability with respect to any Excluded Liability.

2.5     Deposit.

(a)     Upon the execution of this Agreement, Buyer shall deliver Five Hundred Thousand Dollars ($500,000) (the "Deposit") to be held in an escrow account that is administered by CSC Trust Company of Delaware, as escrow agent (the "Escrow Agent").  The Deposit shall be held by the Escrow Agent in an interest-bearing account.  The Deposit shall be paid to Sellers at the Closing and, if the Closing does not occur, Article 8 and the Deposit Escrow Agreement (as defined below) shall govern the payment of the Deposit.

(b)     Upon the execution of this Agreement, Buyer and CILP shall concurrently execute and deliver an escrow agreement with respect to the Deposit in the form of Exhibit B-1 (the "Deposit Escrow Agreement").

2.6     Purchase Price.  At the Closing, Buyer shall pay to Sellers the purchase price (the "Purchase Price") equal to Nineteen Million Two Hundred Twenty-Two Thousand Eight Hundred and One Dollars ($19,222,801.00), less the Deposit (and any interest accrued thereon) and the Exhibit C Asset Management Agreement Adjustment (as defined below), if applicable, for the Assets, as follows:

(a)     Buyer shall pay Eighteen Million Four Hundred Seventy-Two Thousand Eight Hundred and One Dollars ($18,472,801.00) less the Deposit (and any interest accrued thereon) and the Exhibit C Asset Management Agreement Adjustment, if applicable, to Sellers, by wire transfer of immediately available funds to an account designated by Sellers;

(b)     Buyer shall pay Seven Hundred and Fifty Thousand Dollars ($750,000) ("Indemnity Escrow Amount") to the Escrow Agent to be held in an escrow account that is administered by the Escrow Agent, which Indemnity Escrow Amount shall be held and distributed pursuant to the terms of the Indemnity Escrow Agreement (as defined below) (the "Indemnity Escrow Fund"); and

(c)     The Escrow Agent shall release the Deposit, and all interest thereon, to Sellers.

2.7     Indemnity Escrow.  At the Closing, Buyer and CILP shall concurrently execute and deliver an escrow agreement substantially in the form of Exhibit B-2 (the "Indemnity Escrow Agreement").  The Indemnity Escrow Fund shall serve as security for Buyer with respect to Sellers' obligations under Article 7 of this Agreement.  The Indemnity Escrow Amount shall be distributed in accordance with the terms and conditions of this Agreement and the Indemnity Escrow Agreement.

2.8     Exhibit C Asset Management Agreement Adjustment.  In the event that prior to the Closing Buyer and Parent have not entered into an asset management agreement substantially in the form attached hereto as Exhibit C (the "Asset Management Agreement") for the balance sheet assets of Parent set forth therein, the Purchase Price shall be reduced by the amount of Five Hundred Forty-Seven Thousand Three Hundred Fifty-Five Dollars ($547,355) (the "Exhibit C Asset Management Agreement Adjustment").

2.9     Allocation of Purchase Price.  The Purchase Price shall be allocated among the Assets in the manner required by Section 1060 of the Code as shown on the allocation schedule attached hereto as Schedule 2.9.  After the Closing, the parties will make consistent use of the allocations set forth in such allocation schedule for all purposes, including for purposes of any Tax Returns required to be filed pursuant to Section 1060 of the Code (including Internal Revenue Service Form 8594), or any comparable provision of state, local or foreign law.  Concurrently with Closing, Buyer will prepare and deliver to Sellers Internal Revenue Service Form 8594 to be filed with the Internal Revenue Service.  Any subsequent adjustment to the Purchase Price will be allocated in accordance with Section 1060 of the Code.  Buyer and Sellers

agree that the form of the transactions, the consideration provided for in this Agreement and the allocation of the Purchase Price as provided above were arrived at on the basis of arm's length negotiation between Buyer and Sellers, and shall be respected by each of them and their respective Affiliates for federal, state, local and other tax reporting purposes, including filings on Internal Revenue Service Form 8594, and that none of them will assert or maintain a position inconsistent with the foregoing.

## ARTICLE 3
### Buyer's Representations and Warranties.

Buyer represents and warrants to Sellers, as of the date of this Agreement as follows:

3.1     Organization of Buyer.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own and lease the properties and assets it currently owns and leases and to conduct its activities as such activities are currently conducted.  Buyer is duly qualified to do business as a foreign corporation and is in good standing in all jurisdictions in which the ownership or leasing of the properties and assets owned or leased by it or the nature of its activities makes such qualification necessary.  Buyer is not in breach of any provision of its certificate of formation or limited liability company agreement.

3.2     Authority.  Buyer has all requisite power and authority to execute, deliver, and perform this Agreement and each of the Transaction Documents to which Buyer will be a party and consummate the transactions contemplated hereby and thereby.  The execution, delivery, and performance of this Agreement and each of the Transaction Documents to which Buyer will be a party and the consummation of the transactions contemplated hereby and thereby by Buyer have been duly and validly authorized by all necessary action on the part of Buyer.  This Agreement has been duly and validly executed and delivered by Buyer, and is the valid and binding obligation of Buyer, and each of the Transaction Documents to which Buyer will be a party, upon execution and delivery by Buyer, will be valid and binding obligations of Buyer, in each case enforceable against Buyer in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization moratorium or similar laws affecting creditor's rights generally and by general principles of equity.

3.3     No Conflict; Required Consents.  The execution, delivery, and performance by Buyer of this Agreement and each of the Transaction Documents to which Buyer will be a party do not and will not:  (i) conflict with or violate any provision of the certificate of formation or limited liability company agreement of Buyer; (ii) violate any provision of any Legal Requirements; (iii) without regard to requirements of notice or lapse of time, conflict with, violate, result in a breach of, constitute a default under, accelerate, or permit the acceleration of the performance required by, any Contract to which Buyer is a party or any Encumbrance by which Buyer or the assets or properties owned or leased by it are bound or affected; or (iv) require any consent, approval, or authorization of, or filing of any certificate, notice, application, report, or other document with, any Governmental Authority or other Person.

3.4     Accredited Investor.  Buyer (i) has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the

Fund Interests, Incentive Vehicle Interests and UK Interests and making an informed investment decision with respect thereto, (ii) is able to bear the economic and financial risk of an investment in the Fund Interests, Incentive Vehicle Interests and UK Interests for an indefinite period of time, (iii) is acquiring the Fund Interests, Incentive Vehicle Interests and UK Interests for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof, (iv) understands the Fund Interests, Incentive Vehicle Interests and UK Interests have not been registered under the Securities Act of 1933 (the "Securities Act") or the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws or are sold pursuant to an exemption therefrom and (v) is an "accredited investor" as such term is defined in Regulation D, Rule 501 of the Securities Act, as amended.

3.5     Equity Commitment. Schedule 3.5 sets forth a complete and correct copy of the commitment letter for the equity financing to be used in connection with the transactions contemplated hereby (the "Equity Financing"). The amount of the Equity Financing will provide sufficient funds for Buyer to consummate the transactions contemplated by this Agreement.

3.6     No Broker. Except as set forth on Schedule 3.6, no brokers or financial advisers to whom any fees would be payable in connection with the transactions contemplated hereby have been engaged by Buyer or any of its Affiliates.

3.7     RIA Status. Buyer is a registered investment adviser under the Advisers Act.

ARTICLE 4
Sellers' Representations and Warranties.

Sellers represent and warrant jointly and severally to Buyer, as of the date of this Agreement, as follows:

4.1     Organization and Qualification of Sellers.

(a)     CILP is a limited partnership duly organized, validly existing, and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own and lease the properties and assets it currently owns and leases and to conduct its activities as such activities are currently conducted. CILP is duly qualified to do business as a foreign limited partnership and is in good standing in all jurisdictions in which the ownership or leasing of the properties and assets owned or leased by it or the nature of its activities makes such qualification necessary. CILP is not in breach of any provision of its certificate of limited partnership or limited partnership agreement.

(b)     CCI LLC is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own and lease the properties and assets it currently owns and leases and to conduct its activities as such activities are currently conducted. CCI LLC is duly qualified to do business as a foreign limited liability company and is in good standing in all jurisdictions in which the ownership or leasing of the properties and assets owned or leased by it or the nature of its

activities makes such qualification necessary. CCI LLC is not in breach of any provision of its certificate of formation or limited liability company agreement.

4.2     Organization and Qualification of Funds. Each of the Funds is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own and lease the property and assets it currently owns and leases and to conduct its activities as currently conducted. Each of the Funds is duly qualified to do business as a foreign limited partnership and is in good standing in all jurisdictions in which the ownership or leasing of the assets or properties owned or leased by it or the nature of its activities makes such qualifications necessary. None of the Funds is in breach of any provision of its respective Fund Constituent Documents.

4.3     Organization and Qualification of Joint Ventures. Each of the Joint Ventures is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own and lease the property and assets it currently owns and leases and to conduct its activities as currently conducted. Each of the Joint Ventures is duly qualified to do business as a foreign limited liability company and is in good standing in all jurisdictions in which the ownership or leasing of the assets or properties owned or leased by it or the nature of its activities makes such qualifications necessary. None of the Joint Ventures is in breach of any provision of its respective Joint Venture Constituent Documents.

4.4     Organization and Qualification of Incentive Vehicles. Each of the Incentive Vehicles is a limited partnership or limited liability company, as applicable, duly organized, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own and lease the property and assets it currently owns and leases and to conduct its activities as currently conducted. Each of the Incentive Vehicles is duly qualified to do business as a foreign limited partnership or limited liability company, as applicable, and is in good standing in all jurisdictions in which the ownership or leasing of the assets or properties owned or leased by it or the nature of its activities makes such qualifications necessary. None of the Incentive Vehicles is in breach of any provision of its respective Incentive Vehicle Constituent Documents.

4.5     Organization and Qualification of UK Entity. The UK Entity is a private company limited by shares incorporated and registered and in good standing in England and Wales, and has all requisite power and authority to own and lease the property and assets it currently owns and leases and to conduct its activities as currently conducted. The UK Entity is duly qualified to do business and is in good standing in all jurisdictions in which the ownership or leasing of the assets or properties owned or leased by it or the nature of its activities makes such qualifications necessary. The UK Entity is not in breach of any provision of its UK Constituent Documents.

4.6     Organization and Qualification of Intermediate Entities. Each of the entities between the applicable Seller and each of the Funds, Incentive Vehicles and UK Entity, as applicable, as set forth on Schedule 4.6 (the "Intermediate Entities") is duly organized, validly existing, and in good standing under the laws of the jurisdiction in which it was formed as set forth on Schedule 4.6, and has all requisite power and authority to own and lease the properties

and assets it currently owns and leases and to conduct its activities as such activities are currently conducted. Each Intermediate Entity is duly qualified to do business as a foreign entity and is in good standing in all jurisdictions in which the ownership or leasing of the properties and assets owned or leased by it or the nature of its activities makes such qualification necessary. Each Intermediate Entity is not in breach of any provision of its formation and governing documents.

4.7     Authority. Sellers have all requisite limited partnership and limited liability company power and authority to execute, deliver, and perform this Agreement and each of the Transaction Documents to which each Seller will be a party and consummate the transactions contemplated hereby and thereby. The execution, delivery, and performance of this Agreement and each of the Transaction Documents to which any Seller will be a party and the consummation of the transactions contemplated hereby and thereby by Sellers have been duly and validly authorized by all necessary action on the part of Sellers. This Agreement has been duly and validly executed and delivered by Sellers, and is the valid and binding obligation of Sellers, and each of the Transaction Documents to which each Seller will be a party, upon execution and delivery by such Seller, will be valid and binding obligations of such Seller, in each case enforceable against such Seller in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization moratorium or similar laws affecting creditor's rights generally and by general principles of equity.

4.8     Capitalization. The Fund Interests, Incentive Vehicles Interests and UK Interests are owned beneficially and of record by Sellers in each case as set forth on Schedule 4.8, free of all Encumbrances, other than Permitted Encumbrances, and, except for the transactions contemplated by this Agreement, no other Person has any interest therein or any option or other right to acquire any interest in the Incentive Vehicles, the UK Entity, or any of the Funds, and there are no agreements with respect to voting or transfer of any such interests. All of the Fund Interests, Incentive Vehicles Interests and UK Interests have been issued in compliance with applicable federal and state securities laws and not in breach of any Contract of either Seller. Sellers have provided to Buyer a true and correct listing of the investors in each of the Funds and Joint Ventures together with the capital commitment of each investor. All of the interests of the investors in the Funds and Joint Ventures have been issued in compliance with applicable federal and state securities laws and not in breach of any Contract of either Seller.

4.9     No Conflict; Required Consents. Except for the Required Consents and the approval of the Bankruptcy Court, the execution, delivery, and performance by Sellers of this Agreement do not and will not: (i) conflict with or violate any provision of the certificate of limited partnership or partnership agreement of Sellers, or any of the Fund Constituent Documents, Joint Venture Constituent Documents, Incentive Vehicle Constituent Documents, UK Constituent Documents and Intermediate Entity Constituent Documents; (ii) violate any material provision of any Legal Requirements; (iii) without regard to requirements of notice or lapse of time, conflict with, violate, result in a breach of, constitute a default under, accelerate, or permit the acceleration of the performance required by, any material Contract (including and Investment Management Contract) or Encumbrance to which either Seller, any Fund, the UK Entity, any Joint Venture, any Incentive Vehicle or any Intermediate Entity is a party or by which either Seller, any Fund, the UK Entity, any Joint Venture, any Incentive Vehicle or any Intermediate Entity or the assets or properties owned or leased by any of them are bound or affected; (iv) result in the creation or imposition of any Encumbrance against or upon any of the

Assets; or (v) require any consent, approval or authorization of, or filing of any material certificate, notice, application, report, or other document with, any Governmental Authority or other Person.

4.10   Title to Assets. Sellers have good and marketable title to the Assets. The Assets are free and clear of all Encumbrances of any kind or nature, except Permitted Encumbrances. Upon entry of the Sale Order and execution and delivery by Sellers to Buyer of the instruments of conveyance referred to in Article VI, Buyer will be the true and lawful owner of and will receive good title to all of the Assets, free and clear of all Encumbrances, except Permitted Encumbrances.

4.11   Investment Management Contracts. CILP has delivered to Buyer true and complete copies of each of the Investment Management Contracts, including any amendments thereto. Each of the Investment Management Contracts is valid, in full force and effect, and enforceable in accordance with its terms against CILP and to CILP's knowledge, the other parties thereto; CILP has not breached or defaulted under, and to the knowledge of CILP no event has occurred which notice, lapse of time or both would constitute a breach or default thereunder and CILP has not received written notice of any alleged breach or default under any Investment Management Contract.

4.12   Material Contracts. Schedule 4.12 contains a list of all of the Fund Constituent Documents, Joint Venture Constituent Documents and each side letter or similar written agreement entered into with respect to any of the Funds or the Joint Ventures that establishes rights or otherwise benefits any investor in any of the Funds or the Joint Ventures outside of the Fund Constituent Documents or the Joint Venture Constituent Documents, as applicable ("Side Letters"). CILP has delivered to Buyer true and complete copies of each such agreement, including amendments thereto. Each of the Fund Constituent Documents, Joint Venture Constituent Documents and Side Letters is valid, in full force and effect, and enforceable in accordance with its terms against the applicable CILP affiliated party to such Fund Constituent Document, Joint Venture Constituent Document or Side Letter and to their knowledge, the other parties thereto, and such CILP affiliated party has not materially breached or defaulted under, and, to the knowledge of CILP, no event has occurred which notice, lapse of time or both would constitute a material breach or default thereunder and CILP has not received notice of any alleged breach or default under any Fund Constituent Document, Joint Venture Constituent Document or Side Letter.

4.13   Litigation. Except for the Bankruptcy Case and the Litigation set forth on Schedule 4.13, there is no Litigation pending or, to Sellers' knowledge, threatened, or any Judgment outstanding, directly involving or affecting all or any part of the Business or Assets.

4.14   Tax Matters.

(a)   All Tax Returns required to be filed by the Funds, the Incentive Vehicles and the UK Entity have been filed and all Taxes for which the Funds may be held liable, have been paid or accrued.

(b)     The Sellers have previously delivered to the Buyer true, correct and complete copies of (i) all Tax Returns filed by or on behalf of each Fund, each Incentive Vehicle and the UK Entity for all completed Tax years of each Fund, each Incentive Vehicle and the UK Entity as relevant that remain open for audit or review by the relevant Governmental Entity and (ii) all ruling requests, private letter rulings, notices of proposed deficiencies, closing agreements, settlement agreements, and any similar documents or communication sent or received by each Fund, each Incentive Vehicle and the UK Entity relating to Taxes.

(c)     Except as set forth on Schedule 4.14(c), none of the Funds, the Incentive Vehicles or the UK Entity the Sellers has been notified in writing that the Internal Revenue Service has raised any issues, or intends to raise any issues, in connection with any Tax Return of any Fund, any Incentive Vehicle or the UK Entity; there are no pending U.S. federal income Tax audits and no waivers of statutes of limitations with respect to U.S. federal income Taxes have been given or requested in writing with respect to each Fund and each Incentive Vehicle and there is nothing equivalent or similarly outstanding in respect of the UK Entity.

(d)     None of the Funds or the Incentive Vehicles has agreed to, or is required to, make any adjustments or changes either on, before or after the Closing Date, to its accounting methods pursuant to Section 481 of the Code (or similar provisions of state, local or foreign law), and neither the Internal Revenue Service nor any other Governmental Entity has proposed any such adjustments or changes in the accounting methods of any Fund or any Incentive Vehicle. None of the Funds or the Incentive Vehicles will be required to include in post-Closing income any amount resulting from a change in accounting method, closing agreement pursuant to Section 7121 of the Code, installment sale, inter-company transaction or excess loss account or similar type of adjustment and in respect of the whole of this sub-clause (d) there is nothing equivalent or similarly outstanding in respect of the UK Entity.

(e)     None of the Funds has engaged in any listed transaction described in Treasury Regulation Section 1.6011-3(b)(2).

(f)     With respect to each Fund, each Incentive Vehicle and the UK Entity, as of the date hereof, no Fund, Incentive Vehicle or the UK Entity has ever been found liable for Taxes by any Governmental Entity in a jurisdiction in which the Funds, Incentive Vehicles or the UK Entity, as relevant, do not file Tax Returns.

(g)     All Taxes required to be withheld by the Funds, the Incentive Vehicles or the UK Entity, including, but not limited to, Taxes arising as a result of payments or distributions (or amounts allocable) to foreign partners or foreign persons or to employees of the Funds, the Incentive Vehicles or the UK Entity, as relevant, have been collected and withheld, and have been either paid to the respective Governmental Entities, set aside in accounts for such purpose, or accrued, reserved against, and entered upon the books and records of the employer.

(h)     There are no Tax liens upon any Assets or any property of the Funds or the Incentive Vehicles except for liens for current Taxes not yet due and payable.

(i)     Each Fund and each Incentive Vehicle qualifies (and has since the date of its formation qualified) and will qualify immediately after the Closing Date, to be treated as a

partnership for federal income tax purposes and none of the Funds, the Incentive Vehicles or any Seller or any Governmental Entity has taken a position inconsistent with such treatment.

(j)     None of the Sellers is a "foreign person" within the meaning of Code Section 1445 and each Seller will furnish the Buyer with an affidavit that satisfies the requirements of Code Section 1445(b)(2), in the form attached as Exhibit D.

(k)     The UK Entity has paid all Taxes due and payable by it and any liability associated with such Taxes.

4.15    Compliance with Legal Requirements. Except as described on Schedule 4.15, Sellers have operated and currently operate the Business in material compliance with all applicable Legal Requirements, including but not limited to the Advisers Act. Sellers have received no notice claiming a violation by Sellers, any Fund or any Joint Venture of any material Legal Requirement applicable to Sellers or any Fund or Joint Venture. Each of the Funds and Joint Ventures has been and currently is in material compliance with all applicable Legal Requirements.

4.16    Books and Records. All of the books, records, and accounts of the Business are in all material respects true and complete, are maintained in accordance with good business practice and in material compliance with all applicable Legal Requirements. Sellers have delivered to Buyer true and correct copies of the Fund Constituent Documents, Joint Venture Constituent Documents, Incentive Vehicle Constituent Documents and UK Constituent Documents, in each case as amended to date, as well as true and correct copies of all minutes of meetings or resolutions of the members or managers of each of the Funds, Joint Ventures, UK Entity, Incentive Vehicles and all books and records required under the Advisers Act.

4.17    Further Co-Investment Obligations. Schedule 4.17 sets forth the remaining funding obligation of the general partner, managing member, or adviser with respect to its co-investment interest in each of the Funds as of the date of this Agreement. Except as set forth on Schedule 4.17, there are no further co-investment funding obligations on the part of the general partner, managing member, or adviser (or other Person acting in a similar capacity) with respect to the Funds.

4.18    Broker. Any brokers or financial advisers to whom any fees would be payable in connection with the transactions contemplated hereby that have been engaged by either Seller or any of their Affiliates shall be Excluded Liabilities.

4.19    Permits. Other than the Permits identified at Schedule 4.19, none of which are being transferred to Buyer, to the knowledge of Sellers, there are no Permits required to operate the Business as currently conducted or to own or lease any of the Assets which cannot be obtained by Buyer in the ordinary course without material disruption to the Business.

4.20    Intellectual Property. Other than (a) licenses to software used by Sellers for word processing, human resource, data management, and other similar administrative purposes set forth on Schedule A1 to the Transition Services Agreement, none of which are being transferred to Buyer, (b) any Intellectual Property contained in the transferred books and records, and (c) any know-how or other similar intellectual capital attributable to employees who are not

Employees, to the knowledge of Sellers, there is no Intellectual Property necessary for the operation of the Business as currently conducted.

4.21  Financial Information. Copies of (i) the audited consolidated balance sheets of the Funds, the UK Entity, and the Joint Ventures (collectively, the "Relevant Entities") as of December 31, 2007 and December 31, 2008 and the related audited consolidated statements of results of operations and cash flows of the Relevant Entities for the periods then ended, together with all related notes and schedules thereto, accompanied by the reports thereon of such Relevant Entities' independent auditors and (ii) the unaudited consolidated balance sheets of the Relevant Entities as of June 30, 2009 and September 30, 2009 and the related unaudited consolidated statements of results of operations and cash flows of the Relevant Entities for the periods then ended (collectively referred to as the "Financial Statements") are attached hereto as Schedule 4.21. The Financial Statements (i) have been prepared based on the books and records of the Relevant Entities (except as may be indicated in the notes thereto); (ii) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto) and (iii) fairly present, in all material respects, the consolidated financial position, results of operations and cash flows of the Relevant Entities as at the respective dates thereof and for the respective periods indicated therein, except as otherwise noted therein.

4.22  Condition of Assets. Except as set forth on Schedule 4.22, to the knowledge of the Sellers, the tangible personal property included in the Other Assets are free of material defects and in good operating condition, reasonable wear and tear excepted, usable in the ordinary course of the operation of the Business and have been maintained in a reasonably prudent manner.

4.23  Undisclosed Liabilities. Except for the obligations and liabilities (a) reflected in the Financial Statements, (b) constituting Excluded Liabilities, (c) incurred as a result of or arising our of the transactions contemplated under this Agreement, (d) incurred in the ordinary course of business since June 30, 2009 or (e) set forth on Schedule 4.23, Sellers do not have any material liabilities or obligations affecting the Assets. Except as set forth on Schedule 4.23, there is no obligation by either Seller or any of the Relevant Entities to return any distributions or management fees, or pay any other amount to the Funds, Joint Ventures or the investors in the Funds or Joint Ventures. Since June 30, 2009, there has been no Material Adverse Effect, and no event or series of events has occurred that would reasonably be expected to have a Material Adverse Effect.

4.24  Employees and Employee Benefit Plans.

(a)  Neither the Sellers nor any ERISA Affiliate maintain, contribute to or have any liability, whether contingent or otherwise, with respect to, and neither the Sellers nor any ERISA Affiliate has within the preceding six years maintained, contributed to or had any liability, whether contingent or otherwise, with respect to, any Employee Benefit Plan that is, or has been (i) subject to Title IV of ERISA or Section 412 and/or Section 430 of the Code; (ii) maintained by more than one employer within the meaning of Section 413(c) of the Code; (iii) subject to Sections 4063 or 4064 of ERISA; (iv) a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA; (v) a multiple employer welfare arrangement as defined in Section

3(40) of ERISA; or (vi) an employee pension benefit plan within the meaning of Section 3(2) of ERISA and that is not intended to be qualified under Section 401(a) of the Code. The Sellers do not maintain, contribute to or have any liability, whether contingent or otherwise, and could not reasonably be expected to have any liability, with respect to any post-employment benefit under any Employee Benefit Plan that is a "welfare plan" (as defined in Section 3(1) of ERISA) for any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries), except as may be required by COBRA.

(b)    None of the Funds or Joint Ventures, and none of the Assets constitute "plan assets" of any "employee pension plan," within the meaning of Section 3(2) of ERISA, which is subject to Title I of ERISA or any plan that is subject to Section 4975 of the Code, within the meaning of United States Department of Labor Regulation 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA.

4.25    UK Entity Agreements. Except for the employment agreements with the UK Employees, the Fee Agreement, by and between CILP and the UK Entity, dated September 29, 2006 (the "UK Fee Agreement") and the UK Lease, there are no other agreements between the UK Entity and any third parties.

4.26    Required Consents. Schedule 4.26 contains a listing of the Required Consents that have been obtained as of the date of this Agreement (the "Obtained Required Consents"). Sellers have provided Buyer with a true and correct copy of each of the Obtained Required Consents (together with any exhibits or schedules thereto). Each of the Obtained Required Consents is valid and binding and in full force and effect. Sellers have not received any written notice or other written communication from any investor withdrawing or rescinding an Obtained Required Consent.

ARTICLE 5
Covenants.

5.1    Conduct of Business. Except as otherwise contemplated by this Agreement, other than those filings and proceedings before the Bankruptcy Court and the incurrence of expenses required thereunder, Sellers covenant and agree that from the date hereof to the Closing Date, Sellers shall cause the Business to be conducted in the ordinary course of business consistent with past practices.

5.2    Reasonable Efforts; Further Assurances. Subject to the terms and conditions of this Agreement, Buyer and Sellers will use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable law to cause its representations and warranties to remain true and correct through the Closing Date, to cause the conditions to its obligations to close to be satisfied and to consummate the transactions contemplated by this Agreement. Sellers and Buyer agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate the Closing. No party hereto, nor any of their Affiliates and direct and indirect equityholders, shall commence any Litigation or other action the result of which could cause the condition to Closing set forth in Section 6.1(a) to not be met.

5.3     Certain Filings.  Sellers and Buyer shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any Government Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material Contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in taking such actions, causing such actions to be taken, making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

5.4     Required Consents; Transfer of Assets.  Sellers shall exercise commercially reasonable efforts at Sellers' expense to obtain the Required Consents prior to Closing; provided, however, that (i) Sellers shall not be required to threaten or commence any Litigation in order to obtain any Required Consents, and (ii) Sellers shall not, without the prior written consent of Buyer (which Buyer may withhold in its discretion), agree to any material amendment or material modification to any of the Investment Management Contracts, Fund Constituent Documents, Joint Venture Constituent Documents, Incentive Vehicle Documents, UK Constituent Documents or Side Letters in order to obtain any Required Consents, except as required by Section 5.5.  Sellers and Buyer shall cooperate in soliciting and obtaining any Required Consent that is not an Obtained Required Consent and any Obtained Required Consent that becomes a non-Obtained Required Consent.  Buyer will use commercially reasonable efforts to assist Sellers, at Sellers' expense, in obtaining the Required Consents prior to Closing.

5.5     Fund and Joint Venture Management.  From and after the Closing, Buyer shall become (i) investment manager and general partner of each Fund and shall assume all rights, obligations and liabilities as investment manager and general partner, pursuant to the terms of the Investment Management Contracts, Fund Constituent Documents and then-existing Side Letters, (ii) the investment manager and a non-member manager (to the extent necessary) of each Joint Venture and shall assume all rights, obligations and liabilities as investment manager of each Joint Venture, pursuant to the terms of the Investment Management Contracts and Joint Venture Constituent Documents and (iii) the general partner/managing member and limited partner/member, as applicable, in the Incentive Vehicles pursuant to the terms of the Incentive Vehicle Constituent Documents.  Buyer and Sellers agree that until Closing they shall take all commercially reasonable actions necessary to amend the limited liability company agreements of the applicable Joint Ventures in a manner reasonably acceptable to Buyer to provide that Buyer shall become the non-member manager of each such Joint Venture.

5.6     Adequate Assurances Regarding Executory Contracts and Required Orders.  Between the date hereof and the Closing Date, Buyer agrees that it will promptly take all actions as are reasonably requested by CILP to assist in obtaining the Bankruptcy Court's entry of the Preliminary Order (including approval of the Bidding Procedures) and the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.

5.7     Performance under Executory Contracts and Assumed Liabilities.  Subject to the terms of the Sale Order, from and after the Closing Date, Buyer shall (i) assume and fully perform all obligations and liabilities of CILP under the Executory Contracts that accrue or are to be performed from and after the Closing Date and shall assume and fully perform all obligations

and liabilities of CILP with respect to the other Assumed Liabilities and (ii) take all actions as are reasonably necessary to satisfy its obligations and liabilities under the terms and conditions of each of the Executory Contracts and all other Assumed Liabilities.

5.8    Employees.

(a)    CILP shall terminate each employee listed on Schedule 5.8 (the "Employees") immediately prior to the Closing. Buyer shall offer employment to all of the Employees to commence immediately after Closing on terms and conditions acceptable to Buyer. Nothing contained in this Agreement shall confer upon any Employee any right to continued employment for any period by Buyer, or require Buyer to employ any Employee or any other person other than on an exclusively "at will" basis.

(b)    All of Sellers' liabilities with respect to each Employee are Excluded Liabilities. Without limiting the generality of the foregoing, Sellers shall be responsible for all liabilities with respect to Employees for all wages, salary, compensation, supplemental employee benefits, payroll taxes and all other liabilities attributable to the Employees employment with Sellers, including, without limitation, all amounts due with respect to the termination of employment with Sellers, accrued vacation time, sick days and/or other benefits or compensation, if any. Sellers agree that Buyer is not assuming, and does not assume, any sponsorship, obligation or liability associated with, or arising under, any Employee Benefit Plan (whether or not covered by ERISA) that is or has ever been maintained, contributed to or sponsored by the Sellers or any ERISA Affiliate. Any liability for the provision of continuation coverage under COBRA or any similar state statute or regulation with regard to qualifying events that occur at or prior to the Closing Date with respect to Employees shall be and remain the sole liability of Sellers and the welfare benefit plans sponsored or maintained by Sellers.

(c)    Buyer and Sellers agree that Buyer is intended to be the "successor employer" for reporting, withholding, FICA and related purposes with respect to the Employees in accordance with and to the extent permitted pursuant to the alternate procedures set for the in Revenue Procedure 2004-53, 2004-34 I.R.B. 320.

(d)    Buyer shall not, at any time prior to ninety-one (91) days after the Closing Date, effectuate a "mass layoff" as that term is defined in the Worker Adjustment and Retraining Notification Act of 1988, as amended ("WARN"), or comparable conduct under any applicable state law, affecting in whole or in part any facility, site of employment, operating unit or employee without complying fully with the requirements of WARN or such applicable state law.

(e)    As of the Closing, Sellers shall take all actions necessary or shall procure that all liabilities due and payable as of the Closing with respect to the UK Employees have been paid, settled, satisfied or discharged in full.

5.9    Notices. If at any time (i) Buyer becomes aware of any material breach by either Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by such Seller, or (ii) either Seller becomes aware of any breach by Buyer of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Buyer, the party becoming aware of such breach shall promptly

notify the other party, in accordance with Section 10.3 in writing of such breach. Any disclosure of such breach will have no effect on a party's representations, warranties or covenants hereunder or otherwise relieve a party of liability for such breach.

5.10    Change of Name; Use of Name.

(a)    Buyer shall within thirty (30) days of the Closing Date change the name, as applicable, of each Fund, Joint Venture, Incentive Vehicle, Intermediate Entity, the UK Entity and each of their respective subsidiaries to a name that does not include the word "Capmark" or is not otherwise similar to such name.

(b)    Buyer hereby agrees that, after the Closing Date, neither Buyer nor any Affiliate of Buyer will for any reason, directly or indirectly, for itself or any other Person sell or lease, or use the name "Capmark" or any variation thereof. Notwithstanding the foregoing, Buyer and its Affiliates shall be permitted to use the name "Capmark" solely in connection with marketing efforts for purposes of indicating (i) the prior employment by Capmark Financial Group, Inc. entities of Employees hired by Buyer at Closing, (ii) such Employees' association with the management of the Funds and Joint Ventures and (iii) CILP's role as investment adviser to the Funds and Joint Ventures prior to the Closing. For the avoidance of doubt, Buyer acknowledges and agrees that the name "Capmark" is intellectual property that is owned by Sellers or their Affiliates and is an Excluded Asset.

5.11    Track Record; Certain Assets. Effective as of Closing, Sellers hereby consent to the use by Buyer of each of the Funds' and Joint Ventures' track record and financial models, subject to Buyer's compliance with applicable laws and regulations, including the Advisers Act. At or prior to the Closing, Sellers shall provide to Buyer complete copies of books and records of the investment activities of the Funds and the Joint Ventures in which the Employees were involved so as to comply with applicable regulations regarding the portability of investment track records.

5.12    Management Fees. From and after the Closing, Buyer shall promptly (and, in any event, within fifteen (15) days after the last day of the fiscal quarter in which the Closing occurs, unless the Closing occurs on the last day of a fiscal quarter, then fifteen (15) days from the Closing Date (except the timeframe with respect to Select Apartment Properties, LLC shall be no later than October 15, 2010)) pay to CILP, all management fees received by Buyer, if any, and earned by CILP from the Funds or Joint Ventures prior to the Closing, but which were unpaid as of the Closing. Such management fees shall include (a) all accrued but unpaid management fees as of last day of the month immediately preceding the month in which the Closing occurs plus (b) an amount equal to the pro rata portion of the aggregate management fees accrued attributable to the period from and including the first day of the calendar month in which the Closing occurs through and including the Closing Date. In furtherance of the foregoing, Buyer agrees to enforce the provisions of and not waive any rights under the Fund Constituent Documents and the Joint Venture Constituent Documents with respect to such management fees until such time that CILP has been paid all management fees received by Buyer, if any, and earned by CILP from the Funds or Joint Ventures prior to the Closing, but which were unpaid as of the Closing; provided that Buyer's or its successor's obligation with respect to enforcement

and non-waiver shall terminate to the extent Buyer or its successor is removed or otherwise ceases to serve as general partner or manager of a Fund or Joint Venture, as applicable.

5.13    Limited Partner Interest in Funds; Advisory Boards. From and after the Closing, Buyer agrees that (i) any limited partner interest in a Fund which is held by Parent or any of its Affiliates shall no longer be treated as affiliated with the general partner of a Fund for purposes of voting under any such Fund's partnership agreement and (ii) effective within five (5) Business Days of the Closing, to the extent permitted by the Fund Constituent Documents and any existing Side Letter, Buyer (via its Fund Interests and in its capacity as the general partner of each Fund) shall appoint a designee of the limited partner interest in a Fund which is held by Parent or any of its Affiliates, as a member to each Fund's advisory board.

5.14    Non-Competition.

(a)    Until the second anniversary of the Closing Date (the "Restricted Period"), Sellers shall not own, manage, operate, join, control, promote, invest or participate in or be connected with in any capacity, directly or indirectly (either as an employee, employer, trustee, consultant, agent, principal, partner, corporate officer, director, creditor, owner or shareholder or in any other individual or representative capacity) with any business, individual, partnership, firm, corporation or other entity which is engaged, wholly or partly, in the Business.

(b)    Sellers hereby agree that this Section 5.14 is entered into in partial consideration of the Purchase Price, is necessary for the protection of the business of Buyer and is reasonable in geographic scope and duration and that any breach hereof would result in continuing and irreparable harm to Buyer. Therefore, Sellers agree and consent that Buyer shall be entitled to seek an injunction or any appropriate decree of specific performance for any actual or threatened violation or breach by any Seller of this Section 5.14.

5.15    Payment of Promote Distributions. From and after the Closing, Buyer shall promptly (and in any event within five (5) Business Days of receipt) cause the payment to CILP of fifty percent (50%) of any Promote Distributions actually received by the general partner and/or managing member of the Promote Entities. Buyer shall cause to be paid thirty-five percent (35%) of any such Promote Distributions to the Employees and UK Employees. The apportionment and time and manner of such payments to such Employees and UK Employees shall be determined solely by Buyer. In furtherance of the foregoing, Buyer agrees to enforce or cause to be enforced the provisions of and not waive any rights under the relevant agreements with respect to such Promote Distributions. Amounts collected by the general partner and/or managing member of the Promote Entities on behalf of CILP and paid to CILP under this Section 5.15 shall be includable in income by CILP.

5.16    Non-Disparagement. Following the Closing, neither party hereto will disparage the other party, or any of their shareholders, members, partners, representatives, directors, officers, employees, or agents; provided, however, that any statements made under oath in any legal proceeding or arbitration proceeding by either party, or any of their shareholders, members, partners, representatives, directors, officers, employees, or agents shall not be deemed a violation of this Section 5.16.

5.17    SEC Review.  Following the Closing, in the event the Securities and Exchange Commission reviews, audits or otherwise investigates CILP in its capacity as a registered investment adviser for any period of time that includes a pre-Closing period (an "SEC Review"), the Buyer shall fully cooperate with CILP and its counsel in connection with such SEC Review, including, but not limited to, making available the Employees and the UK Employees to the extent reasonably requested in connection with the SEC Review.

5.18    Bankruptcy Court Approval.

(a)    CILP and Buyer acknowledge that this Agreement and the sale of the Assets are subject to Bankruptcy Court approval.  CILP and Buyer acknowledge that to obtain such approval, CILP must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court.

(b)    As soon as reasonably possible, but in any event no later than twenty (20) Business Days, after the Petition Date, CILP shall file the Sale Motion with the Bankruptcy Court, together with required supporting papers and required notices.

(c)    In the event an appeal is taken or a stay pending appeal is requested, with respect to the Sale Order, CILP shall promptly notify Buyer of such appeal or stay request and shall promptly provide to Buyer a copy of the related notice of appeal or order of stay.  CILP shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

(d)    From and after the date hereof, CILP shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order.

5.19    Tax Matters.

(a)    Tax Return Preparation.  The Sellers shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for each Fund with respect to each taxable period ending on or prior to the Closing Date (the "Pre-Closing Tax Period").  The Buyer shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for each Fund with respect to each taxable period beginning after or including any period after the Closing Date; provided that for any taxable period that begins before but does not end on the Closing Date, such Tax Returns shall be prepared in a manner consistent with past practice except as required by applicable law.

(b)    Subsequent Allocations.  Each Fund shall "close its books" for U.S. federal income tax purposes as of the Closing Date and the Sellers shall not be allocated any income, gain, loss deduction or other item arising after such date.

(c)    Tax Matters Relating to the UK Entity.  The Buyer shall claim all refunds in connection with Tax Returns filed for the UK Entity on Tax Returns filed after the Closing Date that include tax periods beginning before the Closing Date and shall pay all such refunds to the Sellers within five (5) days after receipt thereof, to the extent such refunds are attributable to

any taxable period ending on or before the Closing Date. The Sellers shall reimburse Buyer for any Taxes shown on such Tax Returns for the UK Entity to the extent such Taxes are attributable to any taxable period ending on or before the Closing Date and such Taxes have not been accrued prior to the Closing Date. Buyer shall deliver to Sellers copies of all such Tax Returns for the UK Entity for the Sellers' review and comment at least fifteen (15) days prior to the filing of such Tax Returns and Buyer shall incorporate any reasonable comments of Sellers with respect thereto.

      (d)    Tax Cooperation.

      (i)    The Buyer, each Fund and the Sellers shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other party's request) the provision of records and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

      (ii)    The Buyer, each Fund and the Sellers further agree, upon request, to use their commercially reasonable efforts to obtain any certificates or other document from any Governmental Entity or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including with respect to the transactions contemplated hereby).

      (e)    Conveyance Taxes. The Sellers shall pay all sales, use, value added, transfer, stamp, documentary, excise, real property transfer or gains, or similar Taxes ("Transfer Taxes") incurred by reason of the transactions contemplated by this Agreement, and the Sellers shall, at their own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and, if required, the Buyer shall join in the execution of any such Tax Returns and other documentation.

    5.20    Intercompany Debt. CILP hereby acknowledges that prior to Closing that CILP and the UK Entity will take all steps necessary to remove any intercompany debt so that the only UK Entity Assumed Liabilities are those specified in Section 2.3(ii)(A) hereof and those with respect to the UK Lease.

    5.21    Other Assets. CILP shall conduct a final review of its assets and the Assets promptly after Closing in order to remove any items inadvertently included within Other Assets. After the Closing, if Buyer discovers any item(s) inadvertently delivered to Buyer that is not an Other Asset, then Buyer shall notify CILP and, upon CILP's request, in CILP's sole discretion, Buyer shall return or destroy any such item(s). Buyer will take possession of the Other Assets upon the Closing; provided, however, that Buyer will not take possession of any computers included in the Other Assets until CILP has removed ("wiped") from such computers all CILP and its Affiliates data.

5.22   Financial Information.

(a)   As soon as available, Sellers shall provide Buyer with draft unaudited, internally prepared balance sheets and related consolidated statements of results of operations and cash flows of the Relevant Entities as of December 31, 2009 and for the year then ended.

(b)   If the Closing occurs on or after April 30, 2010, as soon as available, Sellers shall provide Buyer with the audited consolidated balance sheets of the Relevant Entities as of December 31, 2009, and the related audited consolidated statements of results of operations and cash flows of the Relevant Entities for the periods then ended, together with all related notes and schedules thereto, accompanied by the reports thereon of such Relevant Entities' independent auditors.

(c)   If the Closing occurs on or after May 15, 2010, as soon as available, Sellers shall provide Buyer with the internally generated unaudited consolidated balance sheets of the Relevant Entities as of the end of the first quarter of 2010 and the related unaudited consolidated statements of results of operations and cash flows of the Relevant Entities for the period then ended.


ARTICLE 6
Conditions to Closing

6.1   Conditions to the Obligations of Buyer and Sellers. The obligations of Buyer and Sellers to consummate at Closing the transactions contemplated by this Agreement shall be subject to the following conditions:

(a)   no preliminary or permanent injunction or other order, decree or ruling issued by a court of competent jurisdiction or by a governmental, regulatory or administrative agency or commission nor any statute, rule, regulation or executive order promulgated or enacted by any Government Authority shall be in effect that would make the acquisition or holding directly or indirectly by Buyer of the Assets illegal or otherwise prevent the consummation of the sale and purchase of the Assets; and

(b)   the Bankruptcy Court shall have entered the Preliminary Order and the Sale Order and provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement.

6.2   Conditions to the Obligations of Buyer. The obligations of Buyer to consummate at Closing the transactions contemplated by this Agreement shall be subject to the following conditions, which may be waived by Buyer:

(a)   Sellers shall have in all material respects performed their obligations and agreements and complied with their covenants to be performed and complied with by them hereunder on or prior to the Closing Date; provided, that Sellers shall have complied with their covenant in Section 5.4(ii) in all respects;

(b)     the representations and warranties of Sellers in this Agreement shall be correct in all material respects at the Closing Date with the same force and effect as though made at such time (except to the extent that such representations and warranties are qualified by a materiality qualifier, in which case such representations and warranties shall be true and correct in all respects at the Closing Date), except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date;

(c)     Sellers shall have furnished to Buyer a certificate, dated the Closing Date, signed by a responsible and authorized officer of Sellers, to the effect that all conditions set forth in Sections 6.2(a) and (b) have been satisfied;

(d)     CILP shall have executed and delivered the Indemnity Escrow Agreement;

(e)     Sellers shall have executed and delivered the Bill of Sale in the form attached as Exhibit E (the "Bill of Sale");

(f)     Sellers shall have executed and delivered the Assignment and Assumption Agreements in the forms attached as Exhibit F (the "Assignment and Assumption Agreements");

(g)     None of the Obtained Required Consents shall have been modified, amended, revised, rescinded or withdrawn;

(h)     Sellers shall have obtained and delivered the Required Consents set forth on Schedule 6.2(h), each substantially in the form attached to Schedule 6.2(h);

(i)     Sellers shall have obtained and delivered the Required Consents set forth on Schedule 6.2(i), each in a form to be reasonably approved by Buyer and Seller, subject to Section 5.4(ii), such approval not to be unreasonably withheld, conditioned or delayed;

(j)     CILP shall not have received written notice from any investor in the Joint Ventures to cause the dissolution or initiating a buy sell of a Joint Venture and Sellers shall not have received written notice from the limited partners in any of the Funds exercising any right to remove the general partner of a Fund or exercising any right to cause the dissolution of a Fund;

(k)     Buyer shall have received (i) certificates of good standing with respect to Sellers issued by the Secretary of State of Delaware, dated within thirty (30) days prior to Closing and (ii) certificates of good standing for each Fund and Joint Venture entity in their respective jurisdictions of formation, dated within thirty (30) days prior to Closing;

(l)     Buyer shall have received a certificate of the assistant secretary of Sellers, dated the Closing Date, as to the incumbency and signature of the officers of Sellers executing this Agreement and any certificate, agreement or other documents to be delivered pursuant hereto, together with evidence of the incumbency of such secretary;

(m)     Buyer shall have received a copy of the resolutions of Sellers authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, certified by the assistant secretary of Sellers as of the Closing Date;

(n)     CILP shall have cured, or shall use proceeds of the Purchase Price, to cure, any and all defaults under the Executory Contracts that are required to be cured under the Bankruptcy Code and pursuant to the Sale Order, so that such Executory Contracts may be assumed by CILP and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code;

(o)     CILP shall have executed and delivered a transition services agreement, by and between CILP and Buyer substantially in the form attached as Exhibit G (the "Transition Services Agreement");

(p)     Buyer shall have received evidence of the termination of the UK Fee Agreement; and

(q)     since the date of this Agreement, there shall have been no Material Adverse Effect.

6.3    Conditions to the Obligation of Sellers.  The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the following conditions, which may be waived by Sellers:

(a)     Buyer shall have in all material respects performed its obligations and agreements and complied with its covenants to be performed and complied with by it hereunder on or prior to the Closing Date;

(b)     the representations and warranties of Buyer in this Agreement shall be correct in all material respects when made and at the Closing Date with the same force and effect as though made at such time (except to the extent that such representations and warranties are so qualified by a materiality qualifier, in which case such representations and warranties shall be true and correct in all respects when made and at the Closing Date), except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date;

(c)     Buyer shall have furnished to Sellers a certificate, dated the Closing Date, signed by an authorized officer of Buyer, to the effect that all conditions set forth in Sections 6.3(a) and (b) above have been satisfied;

(d)     Sellers shall have received a copy of the resolutions of Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, certified by the secretary of Buyer on the Closing Date;

(e)     Sellers shall have received a certificate of good standing with respect to Buyer issued by the Secretary of State of its respective state of formation, dated within thirty (30) days prior to Closing;

(f)     Sellers shall have received a certificate of the secretary of Buyer, dated the Closing Date, as to the incumbency and signature of the officers of Buyer executing this Agreement and any certificate, agreement or other documents to be delivered pursuant hereto, together with evidence of the incumbency of such secretary;

(g)     Buyer shall have paid the Purchase Price;

(h)     Buyer shall have executed and delivered the Indemnity Escrow Agreement;

(i)     Buyer shall have executed and delivered the Bill of Sale;

(j)     Buyer shall have executed and delivered the Assignment and Assumption Agreements;

(k)     Buyer shall have executed and delivered the Transition Services Agreement; and

(l)     Buyer shall be a registered investment adviser under the Advisers Act.

ARTICLE 7
Indemnification.

7.1     <u>Survival</u>.  Subject to the limitations and other provisions of this Agreement, (i) the representations and warranties of the parties hereto contained herein, as the case may be, shall survive the Closing and shall remain in full force and effect until the first anniversary of the Closing Date (the "<u>Indemnification Cut-Off Date</u>") and (ii) the covenants and agreements of the parties hereto contained herein, as the case may be, shall expire as of the Closing, except for the covenants and agreements that by their terms are to be performed after the Closing Date.  The covenants and agreements that by their terms are to be performed after the Closing Date shall survive the Closing and remain in full force and effect until their expiration in accordance with their terms.

7.2     <u>Indemnification by Sellers</u>.

(a)     From and after Closing, Buyer, its Affiliates and its shareholders, members, partners, managers, officers and directors (each a "<u>Buyer Indemnified Party</u>" and together, the "<u>Buyer Indemnified Parties</u>"), shall be held harmless and indemnified out of the Indemnity Escrow Fund from and against any Losses to the extent any Loss arises out of or results from:

(i)     the breach of any representations and warranties made by Sellers in this Agreement;

(ii)    any failure by Sellers to perform any of their covenants in this Agreement;

(iii)   any Excluded Liabilities; and

(iv)    the operation or ownership of, or conditions occurring with respect to, the Assets or the Business prior to the Closing.

(b)     The Buyer Indemnified Parties shall not be entitled to any indemnification under Section 7.2(a) for any Losses (individually or in the aggregate) in excess of the amount of the Indemnity Escrow Fund and the right to recover for such indemnifiable Losses shall be limited solely to funds in the Indemnity Escrow Fund.

(c)     All claims for indemnification by a Buyer Indemnified Party under Section 7.2(a)(i) must be made on or before the Indemnification Cut-Off Date.  No indemnification shall be payable to a Buyer Indemnified Party with respect to claims asserted by such Buyer Indemnified Party under Section 7.2(a)(i) after the Indemnification Cut-Off Date, regardless of when the claim accrued or the circumstances that resulted in the claim being asserted after the Indemnification Cut-Off Date.  In the event a claim under Section 7.2(a)(i) has been properly made on or prior to the Indemnification Cut-Off Date, and such claim is unresolved as of the Indemnification Cut-Off Date, then the right to indemnification with respect to such claim shall remain in effect until such matter shall have been finally determined. Any claim for indemnification under Section 7.2(a)(i) shall be paid out of the Indemnity Escrow Fund.

(d)     All claims for indemnification by a Buyer Indemnified Party under Section 7.2(a)(ii) must be made on or before the date that is six (6) months after the expiration of such covenant, but in any event no later than one year after the Closing Date (each, a "Covenant Cut-Off Date").  No indemnification shall be payable to a Buyer Indemnified Party with respect to claims asserted by such Buyer Indemnified Party under Section 7.2(a)(ii) after the Covenant Cut-Off Date, regardless of when the claim accrued or the circumstances that resulted in the claim being asserted after the Covenant Cut-Off Date.  In the event a claim under Section 7.2(a)(ii) has been properly made on or prior to the Covenant Cut-Off Date, and such claim is unresolved as of the Covenant Cut-Off Date, then the right to indemnification with respect to such claim shall remain in effect until such matter shall have been finally determined. Any claim for indemnification under Section 7.2(a)(ii) shall be paid out of the Indemnity Escrow Fund.

7.3     Indemnification by Buyer.

(a)     From and after Closing, Buyer shall hold harmless and indemnify Sellers, their Affiliates and their shareholders, members, partners, managers, officers and directors (each a "Seller Indemnified Party"), from and against any and all Losses arising out of or resulting from:

(i)     breach of any representations and warranties made by Buyer in this Agreement;

(ii)     any failure by Buyer to perform any of its covenants in this Agreement;

(iii)     any Assumed Liabilities; and

(iv)     the operation or ownership of, or conditions occurring with respect to, the Assets or the Business after the Closing.

(b)     The Seller Indemnified Parties shall not be entitled to any indemnification under Section 7.3(a) for any Losses (individually or in the aggregate) in excess of an amount equal to the Indemnity Escrow Amount.

(c)     All claims for indemnification by a Seller Indemnified Party under Section 7.3(a)(i) must be made on or before the Indemnification Cut-Off Date. No indemnification shall be payable to a Seller Indemnified Party with respect to claims asserted by such Seller Indemnified Party under Section 7.3(a)(i) after the Indemnification Cut-Off Date, regardless of when the claim accrued or the circumstances that resulted in the claim being asserted after the Indemnification Cut-Off Date. In the event a claim under Section 7.3(a)(i) has been properly made on or prior to the Indemnification Cut-Off Date, and such claim is unresolved as of the Indemnification Cut-Off Date, then the right to indemnification with respect to such claim shall remain in effect until such matter shall have been finally determined.

(d)     All claims for indemnification by a Seller Indemnified Party under Section 7.3(a)(ii) with respect to a covenant must be made on or before the Covenant Cut-Off Date. No indemnification shall be payable to a Seller Indemnified Party with respect to claims asserted by such Seller Indemnified Party under Section 7.3(a)(ii) after the Covenant Cut-Off Date, regardless of when the claim accrued or the circumstances that resulted in the claim being asserted after the Covenant Cut-Off Date. In the event a claim under Section 7.3(a)(ii) has been properly made on or prior to the Covenant Cut-Off Date, and such claim is unresolved as of the Covenant Cut-Off Date, then the right to indemnification with respect to such claim shall remain in effect until such matter shall have been finally determined.

7.4     Procedure for Indemnification Claims.

(a)     Notice of Claim. Any party seeking indemnification pursuant to this Agreement (the "Indemnitee") agrees to give written notice to the party from whom indemnification is sought (the "Indemnitor") of such claims and any Losses related thereto as promptly as practicable after learning of the claim or other facts and circumstances giving rise to such Losses. The failure of the Indemnitee to give the Indemnitor notice as provided herein shall not relieve the Indemnitor of its obligations hereunder except to the extent that the Indemnitor is adversely prejudiced thereby. The notice shall specify whether the Losses are related to the defense of any action, lawsuit, proceeding, investigation, hearing, or like matter which is asserted or overtly threatened by a Person other than the parties hereto, their successors and permitted assigns, against any Indemnitee or to which any Indemnitee is subject (a "Third Party Claim") or whether the Losses are not so related (a "Direct Claim"), and shall also specify with reasonable particularity, to the extent that the information is readily available to the Indemnified Party, the factual basis for the Third Party Claim or the Direct Claim.

(b)     Direct Claims. With respect to any Direct Claim, following receipt of notice from the Indemnitee of such Direct Claim, the Indemnitor shall have fifteen days to make such investigation of the Direct Claim as is considered necessary or desirable by the Indemnitor. For the purpose of such investigation, the Indemnitee shall promptly make available to the Indemnitor the information relied upon by the Indemnitee to substantiate the Direct Claim, together with all such other information as the Indemnitor may reasonably request, in each case other than privileged documents and subject to the Indemnitor's agreement to keep such

information confidential. Subject to Sections 7.2(b) and 7.3(b), if both parties agree at or prior to the expiration of such fifteen day period (or any mutually agreed upon extension of such period) to the validity of such Direct Claim and the amount of Losses related thereto, the Indemnitor shall immediately pay to the Indemnitee the agreed-upon amount of such Losses. If the parties do not reach agreement at or prior to the expiration of such fifteen day period (or any mutually agreed upon extension of such period) as to the validity of such Direct Claim or the amount of Losses related thereto, either party may initiate an action to have the matter settled in accordance with the provisions of Section 10.8 hereof.

(c) Third Party Claims. With respect to any Third Party Claim, the Indemnitor shall be entitled to participate in the defense of such Third Party Claim and, at its option, assume the defense thereof with counsel of its own choosing, at the Indemnitor's sole expense; in which case, provided that the Indemnitor and its counsel diligently defend the claim, the Indemnitor shall not thereafter be responsible for the fees and expenses of the Indemnitee and such fees and expenses shall not be recoverable as part of any indemnification claim. If the Indemnitor shall assume the defense of any Third Party Claim, the Indemnitee shall be entitled to participate in the defense of such Third Party Claim at its expense, it being understood that Indemnitor shall control such defense. If Indemnitor elects to assume the defense of any Third Party Claim, the Indemnitee shall cooperate with Indemnitor in the defense or prosecution thereof. Such cooperation shall include the retention and (upon Indemnitor's request) the provision to Indemnitor of records and information which are reasonably relevant to such Third Party Claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Whether or not Indemnitor shall have assumed the defense of a Third Party Claim, Indemnitee shall not admit any liability with respect to, or settle, compromise or discharge, such Third Party Claim without the Indemnitor's prior written consent (which consent shall not be unreasonably withheld). If Indemnitor shall have assumed the defense of a Third Party Claim, Indemnitor shall have the right to settle such claim without the consent of the Indemnitee, unless such settlement (i) includes injunctive or other equitable relief imposed against Indemnitee or (ii) contains an admission of wrongdoing or liability on behalf of Indemnitee.

7.5 Determination of Indemnification Amounts and Related Matters. The amount of any Loss for which indemnification is provided under this Agreement shall be net of (i) any amounts actually recovered by the Indemnitee pursuant to any indemnification by or indemnification agreement with any third party and (ii) any insurance proceeds or other cash receipts or sources of reimbursements actually received as an offset against such. The Indemnitee shall seek full recovery under all insurance policies covering any Loss to the same extent as they would if such Loss were not subject to indemnification hereunder. The indemnifying party shall be subrogated to all rights of the Indemnitee in respect of any Loss borne by the indemnifying party. Indemnitee shall use reasonable best efforts to bring indemnity claims against any third party which has an indemnification obligation to the Indemnitee with respect to any Loss and to diligently pursue such claims until finally adjudicated. In the event that an insurance or other recovery is made by any Indemnitee with respect to any Loss for which any such Indemnitee has been indemnified hereunder, then a refund equal to the lesser of (x) the aggregate amount of the recovery or (y) the amount of the indemnification payment made hereunder with respect to such Loss shall be made promptly to the Person or Persons that provided such indemnity payments to such Indemnitee.

7.6 <u>Remedies Exclusivity</u>. From and after the Closing, except with respect to fraud, the rights of the parties to indemnification relating to this Agreement or the transactions contemplated hereby shall be strictly limited to those contained in this Article 7, such indemnification rights shall be the sole and exclusive remedies of the parties subsequent to the Closing with respect to any matter in any way relating to this Agreement or its subject matter or arising in connection herewith. To the maximum extent permitted by law, except with respect to fraud, the parties hereby waive all other rights and remedies with respect to any matter in any way relating to this Agreement or arising in connection herewith, whether under any laws at common law, in equity or otherwise. Except as provided in this Article 7 or in the case of fraud, no claim, action or remedy shall be brought or maintained by any party against any other party, and no recourse shall be brought or granted against any of them, by virtue of or based upon any alleged misstatement or omission respecting an inaccuracy in or breach of any of the representations, warranties, covenants or agreements of any of the parties hereto set forth or contained in this Agreement. Notwithstanding the foregoing, each of the parties hereto acknowledges and agrees that the other parties would be damaged irreparably in the event any of the provisions of Article 2 or 5 of this Agreement are not performed in accordance with their specific terms or otherwise are breached or violated. Accordingly, each of the parties agrees that, without posting bond or other undertaking, the other parties will be entitled to an injunction or injunctions to prevent breaches or violations of the provisions of Articles 2 and 5 of this Agreement and to enforce specifically the provisions thereof.

## ARTICLE 8
### Termination

8.1 <u>Conditions of Termination</u>. This Agreement may be terminated at any time before the Closing:

(a) by mutual written consent of Sellers and Buyer;

(b) by Sellers, by notice to Buyer, if the Closing shall not have occurred on or before the date that is fifteen (15 days) after the date upon which the Sale Order becomes final and not appealable (the "<u>Drop Dead Date</u>"), and the conditions set forth in Sections 6.1 and 6.2 of this Agreement (other than any condition that by its nature is to be satisfied by actions to be taken at the Closing by Sellers if Sellers are prepared to be able to take such actions as of such date) have been satisfied;

(c) by Buyer, by notice to Sellers, if the Closing shall not have occurred on or before the Drop Dead Date and the conditions set forth in Sections 6.1 and 6.3 of this Agreement (other than any condition that by its nature is to be satisfied by actions to be taken at the Closing by Buyer if Buyer is prepared to be able to take such actions as of such date) have been satisfied;

(d) by Buyer, by notice to Sellers, if the Bankruptcy Court enters an order authorizing the sale or transfer of some or all of the Assets to a party other than Buyer (a "<u>Third Party Buyer</u>"); and

(e) by Buyer or Sellers, by notice to the other party if the Drop Dead Date has not occurred on or prior to June 30, 2010.

8.2     Effect of Termination; Remedies.

(a)     In the event of termination pursuant to Section 8.1, this Agreement shall become null and void and have no effect (other than Articles 8 and 10, which shall survive termination), with no liability on the part of Sellers or Buyer, or their respective Affiliates, with respect to this Agreement, except for (i) the liability of a party for its own expenses pursuant to Section 10.1, (ii) liability of any party for any willful breach of this Agreement, and (iii) any liability provided for in Sections 8.2(b), (c) and (d) and Section 9.1(a), inclusive.

(b)     If this Agreement is terminated pursuant to Section 8.1(b), then Sellers shall be paid the Deposit, together with any interest accrued thereon, in accordance with the terms of the Deposit Escrow Agreement.

(c)     If this Agreement is terminated pursuant to Sections 8.1(a), (c), (d) or (e), then the Deposit shall be returned to Buyer, together with any interest accrued thereon, in accordance with the terms of the Deposit Escrow Agreement.

(d)     If this Agreement is terminated pursuant to Section 8.1(d), then Buyer, subject to Section 9.1(a), shall be paid the Termination Fee and Expense Reimbursement.

## ARTICLE 9
### Bankruptcy Matters.

9.1     Bankruptcy Court Approval of Preliminary Order and Sale Order.

(a)     CILP hereby confirms that it is integral to the process of arranging an orderly sale of the Assets to proceed by selecting Buyer to enter into this Agreement in order to present the Bankruptcy Court with arrangements for obtaining the highest realizable prices for the Assets and that, without Buyer having committed substantial time and effort to such process, the estate of CILP may have had to employ a less orderly sale process and thereby incur higher costs and risk attracting lower prices. Accordingly, the contributions of Buyer to the process have provided substantial benefit to the estate of CILP. CILP acknowledges that Buyer would not have invested the effort in negotiating and documenting the transaction provided for herein and incurring duties to pay its outside advisers if Buyer were not entitled to a break-up fee in an amount equal to 2.75% of the Purchase Price (the "Termination Fee") and an expense reimbursement for the reasonable out-of-pocket costs and expenses (incurred by Buyer or its Affiliates) in connection with negotiation, documentation and implementation of this Agreement up to a maximum amount of $240,000 (the "Expense Reimbursement"). The Termination Fee and Expense Reimbursement shall be payable to Buyer in the event that each of the following occurs: (i) this Agreement is terminated by Buyer pursuant to Section 8.1(d) of this Agreement, (ii) Buyer is not in material default hereunder, (iii) Buyer does not purchase the Assets, and (iv) the Bankruptcy Court enters an order authorizing the sale or transfer of some or all of the Assets to a Third Party Buyer. The payment of the Termination Fee and Expense Reimbursement, if payable in accordance with the foregoing, shall be made solely from the proceeds of the sale of the Third Party Buyer (notwithstanding any Encumbrance on such proceeds) within three (3) Business Days of the closing of the sale.

(b)　　As promptly as practicable but in any event not more than twenty (20) Business Days after the Petition Date, CILP shall file and serve a motion with the Bankruptcy Court in form and substance reasonably satisfactory to Buyer seeking: (i) an order approving the Termination Fee and Expense Reimbursement obligations of Seller having priority as an administrative expense in its case before the Bankruptcy Court under 11 U.S.C. Sections 503(b) and 507(a); approving the bidding procedures attached hereto as <u>Exhibit H</u> with any amendments or modifications that may be required by the Bankruptcy Court, and provided that such amendments or modifications do not materially and adversely effect the interests of Buyer under this Agreement (the "<u>Bidding Procedures</u>"); approving procedures relating to the sale of the Assets under Sections 363 and 365 of the Bankruptcy Code with any amendments or modifications that may be required by the Bankruptcy Court, and provided that such amendments or modifications do not materially and adversely effect the interests of Buyer under this Agreement; approving the adequacy of notice to creditors and parties in interest for the approval of the transactions contemplated hereby and setting a date for a hearing on the asset sale no later than thirty (30) days after the approval of the Bidding Procedures (the "<u>Preliminary Order</u>"); and (ii) an order authorizing Sellers to sell the Assets to Buyer pursuant to this Agreement or to a Third Party Buyer and Sections 105, 363 and 365 of the Bankruptcy Code, free and clear of all liens, claims, restrictions, mortgages and encumbrances in or on the Assets (including any and all "interests" in the Assets within the meaning of Section 363(f) of the Bankruptcy Code) and otherwise free and clear of claims and liabilities, such that Buyer or Third Party Buyer, as applicable, shall not, among other things, incur any liability as a successor to the Business and authorizing, among other things, CILP, pursuant to Section 365 of the Bankruptcy Code, to assume and to assign to Buyer or Third Party Buyer, as applicable, the Assumed Liabilities and the Executory Contracts and liabilities thereunder under Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement or an agreement with a Third Party Buyer and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code (the "<u>Sale Order</u>").

(c)　　The Preliminary Order shall be in form and substance reasonably satisfactory to CILP and Buyer. The Sale Order shall be in form and substance reasonably satisfactory to CILP and Buyer and shall, among other things, contain a finding that Buyer is a good faith purchaser as that term is defined pursuant to Section 363(m) of the Bankruptcy Code.

(d)　　Subject to the Preliminary Order, CILP shall promptly make any filings, take all actions, and use all reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the transactions contemplated hereby, subject to CILP's obligations to comply with any order of the Bankruptcy Court and other applicable laws.

9.2　　<u>Bidding Procedures</u>. CILP (a) shall conduct the auction process of the Assets in material accordance with the Bidding Procedures, subject to the approval of the Bankruptcy Court and (b) shall not amend, waive, modify or supplement in a material respect the Bidding Procedures except as set forth therein or as required by the Bankruptcy Court.

## ARTICLE 10
## Miscellaneous Provisions.

10.1     Expenses.  Except as otherwise provided elsewhere in this Agreement, each of the parties shall pay its own expenses and the fees and expenses of its counsel, accountants, and other experts in connection with this Agreement.

10.2     Waivers.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party hereto, shall be deemed to constitute a waiver by the party taking the action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of any condition or of a breach of another provision of this Agreement shall not operate or be construed as a waiver of any other condition or subsequent breach.  The waiver by any party of any of the conditions precedent to its obligations under this Agreement shall not preclude it from seeking redress for breach of this Agreement other than with respect to the condition so waived.

10.3     Notices.  All notices, requests, demands, applications, services of process, and other communications which are required to be or may be given under this Agreement shall be in writing and shall be deemed to have been duly given if sent by telecopy or facsimile transmission, or delivered by recognized overnight courier or mailed, certified first class mail, postage prepaid, return receipt requested, to the parties hereto at the following addresses:

To Sellers:

Capmark Investments LP
Capmark Carried Interest, L.L.C.
116 Welsh Road
Horsham, PA 19044
Attn:  President of Capmark Investments LP; Vice President of Capmark Carried Interest, L.L.C.
Facsimile:  (215) 441-7645

Copies:

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Attention:  Edward J. Braum
Facsimile:  (212) 355-3333

Dewey & LeBouef  LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Attention:  Patrick de Carbuccia
Facsimile:  (212) 259-6333

To Buyer:

> TRECAP Partners LLC
> 1626 Ringling Blvd., Suite 400
> Sarasota, FL 34236
> Attention: Douglas A. Tibbetts
> Facsimile: (941) 373-3836

Copies:

> Akin Gump Strauss Hauer & Feld LLP
> 1700 Pacific Avenue, Suite 4100
> Dallas, TX 75201-4675
> Attention: R. Terry Miller, Esq.
> Facsimile: (214) 969-4343

or to such other address as any party shall have furnished to the other by notice given in accordance with this Section. Such notice shall be effective when received.

10.4   Entire Agreement; Amendments. This Agreement embodies the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect thereto. This Agreement may not be modified orally, but only by an agreement in writing signed by the party or parties against whom any waiver, change, amendment, modification, or discharge may be sought to be enforced.

10.5   Binding Effect; Benefits. This Agreement shall inure to the benefit of and will be binding upon the parties hereto and their respective heirs, legal representatives, successors, and permitted assigns. Neither Buyer nor Sellers shall assign this Agreement or delegate any of its duties hereunder to any other Person without the prior written consent of the other. For purposes of this Section any change in control of Buyer or Sellers shall constitute an assignment of this Agreement, except that the Sellers acknowledge and agree that a change of control of Buyer will occur in connection with the Equity Financing and such transaction shall not require the prior written consent of Sellers.

10.6   Headings, Schedules, and Exhibits. The section and other headings in this Agreement are for reference purposes only and will not affect the meaning of interpretation of this Agreement. Reference to Schedules or Exhibits shall, unless otherwise indicated, refer to the Exhibits and Schedules attached to this Agreement, which shall be incorporated in and constitute a part of this Agreement by such reference. Any item that could be deemed to be properly disclosable on more than one Schedule to this Agreement shall be deemed to be properly disclosed on all such Schedules if it is disclosed in reasonable detail on any Schedule to the Agreement.

10.7   Counterparts and Facsimile Signatures. This Agreement may be executed in any number of counterparts, each of which, when executed, shall be deemed to be an original and all of which together will be deemed to be one and the same instrument. Facsimile or pdf signatures to this Agreement shall be valid signatures.

10.8    Governing Law.

(a)    The validity, performance, and enforcement of this Agreement and all transaction documents, unless expressly provided to the contrary, shall be governed by the laws of the State of New York, without giving effect to the principles of conflicts of law of such state, and the Bankruptcy Code, to the extent applicable.

(b)    During the pendency of the Bankruptcy Case, any dispute, controversy or claim arises between Buyer and any Seller with respect to whether Buyer or any Seller is in breach or default of its respective obligations under this Agreement (each a "Claim") may only be brought in the Bankruptcy Court, and each of the parties consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts) in any such action or proceeding and waive any objection to venue laid therein.

10.9    Severability. Any term or provision of this Agreement which is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining rights of the Person intended to be benefited by such provision or any other provisions of this Agreement.

10.10    Specific Performance. Buyer and Sellers each agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by them in accordance with the terms hereof and that each party shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

10.11    Third Parties; Joint Ventures. This Agreement constitutes an agreement solely among the parties hereto, and, except as otherwise specifically provided herein, is not intended to and will not confer any rights, remedies, obligations, or liabilities, legal or equitable, including any right of employment, on any Person (including but not limited to any employee or former employee of either Seller) other than the parties hereto and their respective successors, or assigns, or otherwise constitute any Person a third party beneficiary under or by reason of this Agreement. Nothing in this Agreement, expressed or implied, is intended to or shall constitute the parties hereto partners or participants in a joint venture.

10.12    Construction. This Agreement has been negotiated by Buyer and Sellers and their respective legal counsel, and legal or equitable principles that might require the construction of this Agreement or any provision of this Agreement against the party drafting this Agreement shall not apply in any construction or interpretation of this Agreement.

*[Signature Page Follows]*

Buyer and Sellers have executed this Agreement as of the date first written above.

SELLERS:

CAPMARK INVESTMENTS LP

By: _____
Name: Keith Kooper
Title: President

CAPMARK CARRIED INTEREST, L.L.C.

By: _____
Name: Keith Kooper
Title: Vice President

BUYER:

TRECAP PARTNERS LLC


By: _____
Name:
Title:

[Signature Page to Asset Purchase Agreement]

Buyer and Sellers have executed this Agreement as of the date first written above.

SELLERS:

CAPMARK INVESTMENTS LP

By: _____
Name:
Title:

CAPMARK CARRIED INTEREST, L.L.C.

By: _____
Name:
Title:

BUYER:

TRECAP PARTNERS LLC

By: _____
Name: Douglas A Tibbetts
Title: CEO

[Signature Page to Asset Purchase Agreement]

## Exhibit A

### Form of Sale Motion

See attached.

**[See Sale Motion filed January 15, 2010]**

## Exhibit B-1

### Form of Deposit Escrow Agreement

See attached.

# FORM OF DEPOSIT ESCROW AGREEMENT

THIS ESCROW AGREEMENT (the "**Agreement**") is made and entered into as of January \_\_\_, 2010 by and among Capmark Investments LP (a limited partnership organized under the laws of Delaware) ("**CILP**"), TRECAP Partners LLC (a limited partnership organized under the laws of Delaware) ("**TRECAP**"), and CSC Trust Company of Delaware, a trust company duly organized and existing under the laws of Delaware (the "**Escrow Agent**").

WHEREAS, concurrent with the execution of this Agreement, CILP, Capmark Carried Interest, L.L.C. ("**CCI LLC**") (a limited liability company organized under the laws of Delaware) and TRECAP have entered into that certain Asset Purchase Agreement, dated as of the date hereof (the "**Purchase Agreement**");

WHEREAS, pursuant to Section 2.5 of the Purchase Agreement, the parties have agreed that the Deposit Escrow Amount (as defined below) shall be placed in escrow and distributed pursuant to this Agreement;

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## ESTABLISHMENT OF ESCROW

1.1     Subsequent to the execution of this Agreement, the following will occur:

(a)     Five Hundred Thousand Dollars ($500,000) (the "**Deposit Escrow Amount**") will be deposited by TRECAP with the Escrow Agent. The Deposit Escrow Amount, together with any investment earnings thereon, shall hereinafter collectively be referred to as the "**Deposit Escrow Fund**"; and

(b)     The parties hereto hereby appoint the Escrow Agent, and the Escrow Agent hereby agrees to serve, as the escrow agent and depositary subject to the terms and conditions set forth herein. The Escrow Agent shall receive the Deposit Escrow Amount and agrees to hold the Deposit Escrow Fund in a separate and distinct escrow account (the "**Deposit Escrow Account**") which is hereby established and which will be held and disbursed by Escrow Agent only in accordance with the express terms and conditions of this Agreement.

## ARTICLE II
## INVESTMENT OF DEPOSIT ESCROW FUND

2.1     The Deposit Escrow Fund shall be invested, as instructed in writing by CILP, provided that the Escrow Agent shall not be required to make investments which it determines in its sole good faith discretion to be administratively or

operationally impracticable. In the absence of written instructions, the Escrow Agent shall invest and reinvest the Deposit Escrow Fund in BlackRock Temp Fund Cash Management Class (the "**Share Class**"), an institutional money market mutual fund for which the Escrow Agent serves as shareholder servicing agent and/or custodian or subcustodian. The parties hereto: (i) acknowledge Escrow Agent's disclosure of the services CSC is providing to and the fees it receives from BlackRock; (ii) consent to the Escrow Agent's receipt of these fees in return for providing shareholder services for the Share Class; and (iii) acknowledge that the Escrow Agent has provided on or before the date hereof a BlackRock Temp Fund Cash Management Class prospectus which discloses, among other things, the various expenses of the Share Class and the fees to be received by the Escrow Agent.

2.2    The Escrow Agent shall not be responsible to any party hereto or to any other person or entity for any loss or liability arising in respect of any directed investment in Section 2.1 except to the extent that such loss or liability should arise from the Escrow Agent's fraud, gross negligence or willful misconduct. The Escrow Agent may earn compensation in the form of short-term interest on items such as uncashed distribution checks (from the date issued until the date cashed), funds that Escrow Agent is directed not to invest, deposits awaiting investment direction or received too late to be invested overnight in previously directed investments.

## ARTICLE III
## DISBURSEMENTS FROM THE ESCROW ACCOUNT

3.1    The Escrow Agent shall disburse amounts held in the Deposit Escrow Account upon receipt of either (i) joint written instructions from CILP and TRECAP specifying (A) the amount to be disbursed, (B) the date of disbursement, (C) the recipient of the disbursement, and (D) the manner of disbursement and delivery instructions or (ii) a final non-appealable order of a court or final non-appealable arbitration decision directing the disbursement of the Deposit Escrow Fund from either CILP or TRECAP. The Escrow Agent shall use its best efforts to make such payment out of the Deposit Escrow Fund in the timeframe included in said joint written instructions, court order or arbitration decision.

3.2    All payments required to be made by the Escrow Agent under this Agreement shall be made by wire transfer or by check, as elected by the party receiving the funds.

## ARTICLE IV
## COMPENSATION; EXPENSES

4.1    As compensation for its services to be rendered under this Agreement, for each year or any portion thereof, the Escrow Agent shall receive a fee in the amount specified in Exhibit A to this Agreement and shall be reimbursed upon request for all reasonable expenses, disbursements and advances, including reasonable fees of outside counsel, if any, incurred or made by it in connection with the carrying out of its duties under this Agreement. CILP and TRECAP shall each pay one-half of such

2

compensation and expenses. The Escrow Agent is hereby authorized and directed to withdraw from the Deposit Escrow Fund for its own account amounts invoiced for fees and expenses which remain unpaid for more than thirty days.

## ARTICLE V
## EXCULPATION AND INDEMNIFICATION

5.1     The obligations and duties of the Escrow Agent are confined to those specifically set forth in this Agreement, notwithstanding references herein to other documents or agreements. In the event that any of the terms and provisions of any other agreement between any of the parties hereto conflict or are inconsistent with any of the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control the duties of Escrow Agent in all respects. The Escrow Agent shall not be subject to, nor be under any obligation to ascertain or construe the terms and conditions of any other instrument, or to interpret this Agreement in light of any other agreement whether or not now or hereafter deposited with or delivered to the Escrow Agent or referred to in this Agreement, nor shall the Escrow Agent be obligated to inquire as to the form, execution, sufficiency, or validity of any such instrument nor to inquire as to the identity, authority, or rights of the person or persons executing or delivering same. For purposes hereof, the Escrow Agent shall presume that any person purporting to act or give notice on behalf of any entity which is a party hereto as an officer, director, partner or employee thereof is authorized by the respective party to act on its behalf and the Escrow Agent shall incur no liability in so presuming. If any party hereto provides the Escrow Agent with a list of authorized representatives, then the Escrow Agent shall act only upon written notices, instructions (and the like) and oral communications from individuals appearing on that list of authorized representatives and shall incur no liability in refusing to act on the basis of communications from individuals not on such list.

5.2     The Deposit Escrow Account shall be maintained in accordance with applicable laws, rules and regulations and policies and procedures of general applicability to escrow accounts established by the Escrow Agent. The Escrow Agent shall not be personally liable for any act that it may do or omit to do hereunder in good faith and in the exercise of its own best judgment nor for any damages not directly resulting from its fraud, gross negligence or willful misconduct. Without limiting the generality of the foregoing sentence, it is hereby agreed that in no event will the Escrow Agent be liable for any lost profits or other indirect, special, incidental or consequential damages which the parties may incur or experience by reason of having entered into or relied on this Agreement or arising out of or in connection with the Escrow Agent's duties hereunder, notwithstanding that the Escrow Agent was advised or otherwise made aware of the possibility of such damages; nor shall the Escrow Agent be liable for acts of God, acts of war, breakdowns or malfunctions of machines or computers, interruptions or malfunctions of communications or power supplies, labor difficulties, actions of public authorities, or any other similar cause or catastrophe beyond the Escrow Agent's reasonable control. Any act done or omitted to be done by the Escrow Agent pursuant to the advice of its attorneys shall be conclusively presumed to have been performed or omitted in good faith by the Escrow Agent.

3

5.3　In the event the Escrow Agent is notified of any dispute, disagreement or legal action relating to or arising in connection with the escrow, the Deposit Escrow Fund, or the performance of the Escrow Agent's duties under this Agreement, the Escrow Agent will not be required to determine the controversy or to take any action regarding it. The Escrow Agent may hold all documents and funds and may wait for settlement of any such controversy by final appropriate legal proceedings, arbitration, or other means as, in the Escrow Agent's discretion, it may require. In such event, the Escrow Agent will not be liable for interest or damage. Furthermore, the Escrow Agent may, at its option, file an action of interpleader requiring the parties to answer and litigate any claims and rights among themselves. The Escrow Agent is authorized, at its option, to deposit with the court in which such action is filed, all documents and funds held in escrow, except all costs, expenses, charges, and reasonable attorneys' fees incurred by the Escrow Agent due to the interpleader action and which CILP and TRECAP agree on a joint and several basis to pay. Upon initiating such action, the Escrow Agent shall be fully released and discharged of and from all obligations and liability imposed by the terms of this Agreement.

5.4　CILP and TRECAP hereby agree, on a joint and several basis, to indemnify and hold the Escrow Agent, and its directors, officers, employees, and agents, harmless from and against all costs, damages, judgments, attorneys' fees (whether such attorneys shall be regularly retained or specifically employed), expenses, obligations and liabilities of every kind and nature which the Escrow Agent, and its directors, officers, employees, and agents, may incur, sustain, or be required to pay in connection with or arising out of this Agreement, unless the aforementioned results from the Escrow Agent's gross negligence or willful misconduct, and to pay the Escrow Agent on demand the amount of all such costs, damages, judgments, attorneys' fees, expenses, obligations, and liabilities. The costs and expenses of enforcing this right of indemnification also shall be paid by CILP and TRECAP. The foregoing indemnities in this paragraph shall survive the resignation or substitution of the Escrow Agent and the termination of this Agreement.

## ARTICLE VI
## TERMINATION OF AGREEMENT

6.1　This Agreement shall automatically terminate if and when, but in no event shall it terminate before, all amounts in the Deposit Escrow Account (including all the securities in which any of the funds deposited into the Deposit Escrow Account shall have been invested) shall have been distributed by the Escrow Agent in accordance with its terms.

## ARTICLE VII
## RESIGNATION OF ESCROW AGENT

7.1　The Escrow Agent may resign at any time upon giving at least thirty (30) days prior written notice to CILP and TRECAP; provided, however, that no such resignation shall become effective until the appointment of a successor escrow agent which shall be accomplished as follows: CILP and TRECAP shall use commercially

4

reasonable efforts to select a successor escrow agent within thirty (30) calendar days after receiving such notice. If CILP and TRECAP fail to appoint a successor escrow agent within such time, the Escrow Agent shall have the right at the expense of both CILP and TRECAP to petition any court of general jurisdiction sitting in Wilmington, Delaware for the appointment of a successor escrow agent. The successor escrow agent shall execute and deliver an instrument accepting such appointment and it shall, without further acts, be vested with all the estates, properties, rights, powers, and duties of the predecessor escrow agent as if originally named as escrow agent. Upon delivery of such instrument, the Escrow Agent shall be discharged from any further duties and liability under this Agreement. The Escrow Agent shall be paid any outstanding fees and expenses prior to transferring assets to a successor escrow agent.

## ARTICLE VIII
## NOTICES

8.1     All notices required by this Agreement shall be in writing and shall be deemed to have been received (a) immediately if sent by facsimile transmission (with a confirming copy sent the same Business Day by registered or certified mail), or by hand delivery (with signed return receipt), (b) the next Business Day if sent by nationally recognized overnight courier or (c) the second following Business Day if sent by registered or certified mail, in any case to the respective addresses as follows:

**Notices involving claims or objections to claims must be sent by registered or certified mail or by overnight courier and may not be sent via facsimile.**

If to CILP and/or CCI LLC:

Capmark Investments LP
Capmark Carried Interest, L.L.C.
116 Welsh Road
Horsham, PA  19044
Attn:  Keith Kooper
Fax: (215) 441-7645

with a copy to:

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Attn: Edward J. Braum, Esq.
Fax: (212) 355-3333

If to TRECAP:

5

TRECAP Partners LLC
1626 Ringling Blvd., Suite 400
Sarasota, FL 34236
Attention: Douglas A. Tibbetts
Facsimile: (941) 373-3836

with a copy to:

Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4675
Attention: R. Terry Miller, Esq.
Facsimile: (214) 969-4343

If to the Escrow Agent:

CSC Trust Company of Delaware
2711 Centerville Road, Suite 400
Wilmington, DE 19808
Attn: Escrow Administration
Fax: (302) 636-8666

## ARTICLE IX
## TAX REPORTING

9.1     Except as otherwise set forth herein, the parties hereto acknowledge and agree that no interest income or other income accrued on the Deposit Escrow Fund shall be due to or remitted to CILP or TRECAP for the period of time the Deposit Escrow Fund is held by the Escrow Agent. Notwithstanding the foregoing, the Escrow Agent shall, for each calendar year (or portion thereof) that the Deposit Escrow Account is in existence, report the income of the Deposit Escrow Account to TRECAP on IRS Forms 1099-DIV. The sole tax reporting obligation of the Escrow Agent hereunder shall be to file appropriate versions of Forms 1099-DIV with the Internal Revenue Service with respect to interest income earned on funds held in the Deposit Escrow Account and to provide copies hereof to TRECAP. Pursuant to Proposed Treasury Regulations 1.468B-8, the Forms 1099 shall show the Escrow Agent as payor and TRECAP as payee. Further, neither CILP nor TRECAP shall take any position in connection with the preparation, filing or audit of any Tax Return that is in any way inconsistent with the foregoing determination or the Forms 1099 provided by the Escrow Agent. The parties hereto acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable Foreign Investment in Real Property Tax Act ("FIRPTA") reporting with respect to the Escrow Fund. The Escrow Agent shall withhold any taxes it deems appropriate, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities as it determines may be required by any law or regulation in effect at the time of the distribution.

6

9.2    Within thirty (30) calendar days after it is finally determined how the Deposit Escrow Fund held in the Deposit Escrow Account shall be paid to CILP and/or TRECAP (the **"Determination Date"**), if funds as to which such determination has been made continue to be held and invested in the Deposit Escrow Account, then CILP and TRECAP must provide the Escrow Agent with a written statement that is signed by CILP and TRECAP, that specifies the Determination Date, and specifies CILP's and TRECAP's ownership interests in each asset of the Deposit Escrow Fund remaining in the Deposit Escrow Account after the Determination Date, pursuant to Proposed Regulations 1.468B-8(f).  The Escrow Agent will report the interest income earned by the Deposit Escrow Fund to CILP and TRECAP in accordance with such written statement.  Absent timely receipt of such statement, the Escrow Agent will continue to report all interest income solely to TRECAP as provided above.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

10.1    The validity, performance, and enforcement of this Agreement and all transaction documents, unless expressly provided to the contrary, shall be governed by the laws of the state of Delaware, without giving effect to the principles of conflicts of law of such state.

10.2    Any bank or corporation into which the Escrow Agent may be merged or with which it may be consolidated, or any bank or corporation to whom the Escrow Agent may transfer a substantial amount of its escrow business, shall be the successor to the Escrow Agent without the execution or filing of any paper or any further act on the part of any of the parties, anything herein to the contrary notwithstanding.

10.3    This Agreement may be amended, modified, and/or supplemented only by an instrument in writing executed by all parties hereto.

10.4    This Agreement may be executed by the parties hereto individually or in one or more counterparts, each of which shall be an original and all of which shall together constitute one and the same agreement.  This Agreement, signed and transmitted by facsimile machine or pdf file, is to be treated as an original document and the signature of any party hereon, if so transmitted, is to be considered as an original signature, and the document so transmitted is to be considered to have the same binding effect as a manually executed original.

10.5    The section and other headings in this Agreement are for reference purposes only and will not affect the meaning of interpretation of this Agreement.  Reference to schedules or Exhibits shall, unless otherwise indicated, refer to the Exhibits and schedules attached to this Agreement, which shall be incorporated in and constitute a part of this Agreement by such reference.

10.6    As used in this Agreement, "Business Day" means any day other than Saturday, Sunday or a day on which banking institutions in Wilmington, Delaware are required or authorized to be closed.

7

10.7    This Agreement constitutes an agreement solely among the parties hereto, and, except as otherwise provided herein, is not intended to and will not confer any rights, remedies, obligations, or liabilities, legal or equitable, on any Person (as defined in the Purchase Agreement) other than the parties hereto and their respective successors, or assigns, or otherwise constitute any Person a third party beneficiary under or by reason of this Agreement. Nothing in this Agreement, expressed or implied, is intended to or shall constitute the parties hereto partners or participants in a joint venture.

10.8    Any term or provision of this Agreement which is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining rights of the intended to be benefited by such provision or any other provisions of this Agreement.

*[The next page is the signature page]*

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Escrow Agreement as of the day and year first above written.

**CAPMARK INVESTMENTS LP**

By: _____
Name: _____
Title: _____

**TRECAP PARTNERS LLC**

By: _____
Name: _____
Title: _____

**CSC TRUST COMPANY OF DELAWARE,**
as Escrow Agent

By: _____
Name: _____
Title: _____

<u>**EXHIBIT A**</u>

**ESCROW AGENT FEE SCHEDULE**
**[Provided Separately Based Upon Account Specifics]**

| | |
|---|---|
| Acceptance Fee: | waived |
| Annual Administration Fee: | waived |
| Wire Transfers | $20.00 each |
| Check Preparation and Mailing | $25.00 each |
| 1099 Preparation and Reporting | $5.00 each ($250 annual minimum if any 1099 reports required for account) |

**THE ACCEPTANCE AND FIRST YEAR'S ANNUAL ADMINISTRATION FEES ARE DUE UPON EXECUTION OF THE ESCROW AGREEMENT.**

All out-of-pocket expenses will be billed at the Escrow Agent's cost. Out-of-pocket expenses include, but are not limited to, professional services (e.g. legal or accounting), travel expenses, telephone and facsimile transmission costs, postage (including express mail and overnight delivery charges), and copying charges.

Form of Indemnity Escrow Agreement

See attached.

## FORM OF INDEMNITY ESCROW AGREEMENT

THIS ESCROW AGREEMENT (the "**Agreement**") is made and entered into as of _____, 2010 by and among Capmark Investments LP (a limited partnership organized under the laws of Delaware) ("**CILP**"), TRECAP Partners LLC (a limited partnership organized under the laws of Delaware) ("**TRECAP**"), and CSC Trust Company of Delaware, a trust company duly organized and existing under the laws of Delaware (the "**Escrow Agent**").

WHEREAS, on January __, 2010, CILP, Capmark Carried Interest, L.L.C. ("**CCI LLC**") (a limited liability company organized under the laws of Delaware) and TRECAP entered into that certain Asset Purchase Agreement (the "**Purchase Agreement**");

WHEREAS, pursuant to Section 2.7 of the Purchase Agreement, the parties have agreed that this Agreement shall be executed as of the Closing Date and the Indemnity Escrow Amount (as defined below) shall be placed in escrow and distributed pursuant to this Agreement;

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## ESTABLISHMENT OF ESCROW

1.1    Subsequent to the execution of this Agreement, the following will occur:

(a)    Seven Hundred Fifty Thousand Dollars ($750,000) (the "**Indemnity Escrow Amount**") will be deposited by TRECAP with the Escrow Agent. The Indemnity Escrow Amount, together with any investment earnings thereon, shall hereinafter collectively be referred to as the "**Indemnity Escrow Fund**" ; and

(b)    The parties hereto hereby appoint the Escrow Agent, and the Escrow Agent hereby agrees to serve, as the escrow agent and depositary subject to the terms and conditions set forth herein.  The Escrow Agent shall receive the Indemnity Escrow Amount and agrees to hold the Indemnity Escrow Fund in a separate and distinct escrow account (the "**Indemnity Escrow Account**") which is hereby established and which will be held and disbursed by Escrow Agent only in accordance with the express terms and conditions of this Agreement.

## ARTICLE II
## INVESTMENT OF INDEMNITY ESCROW FUND

2.1    The Indemnity Escrow Fund shall be invested, as instructed in writing by CILP, provided that the Escrow Agent shall not be required to make investments which it determines in its sole good faith discretion to be administratively or

operationally impracticable. In the absence of written instructions, the Escrow Agent shall invest and reinvest the Indemnity Escrow Fund in BlackRock Temp Fund Cash Management Class (the "**Share Class**"), an institutional money market mutual fund for which the Escrow Agent serves as shareholder servicing agent and/or custodian or subcustodian. The parties hereto: (i) acknowledge Escrow Agent's disclosure of the services CSC is providing to and the fees it receives from BlackRock; (ii) consent to the Escrow Agent's receipt of these fees in return for providing shareholder services for the Share Class; and (iii) acknowledge that the Escrow Agent has provided on or before the date hereof a BlackRock Temp Fund Cash Management Class prospectus which discloses, among other things, the various expenses of the Share Class and the fees to be received by the Escrow Agent.

   2.2  The Escrow Agent shall not be responsible to any party hereto or to any other person or entity for any loss or liability arising in respect of any directed investment in Section 2.1 except to the extent that such loss or liability should arise from the Escrow Agent's fraud, gross negligence or willful misconduct. The Escrow Agent may earn compensation in the form of short-term interest on items such as uncashed distribution checks (from the date issued until the date cashed), funds that Escrow Agent is directed not to invest, deposits awaiting investment direction or received too late to be invested overnight in previously directed investments.

**ARTICLE III**
**DISBURSEMENTS FROM THE ESCROW ACCOUNT**

   3.1  At any time or times before the first anniversary of the Closing Date (the "**Escrow Release Date**"), TRECAP may make claims against the Indemnity Escrow Fund in accordance with Section 2.7 and Article 7 of the Purchase Agreement. TRECAP shall provide written notice of any such claim to CILP in accordance with Section 7.4 of the Purchase Agreement and shall simultaneously send a copy of such written notice and evidence of delivery of such written notice to CILP, to the Escrow Agent. CILP shall have fifteen (15) days from the receipt of TRECAP's written notice to respond to any such claim made by TRECAP. If CILP agrees with such claim, within such 15-day period it shall deliver a written notice to the TRECAP and Escrow Agent acknowledging such agreement and directing the Escrow Agent to release to TRECAP an amount equal to the amount claimed by TRECAP in such written notice with respect to such claim and the Escrow Agent shall release such amount from the Indemnity Escrow Fund to TRECAP, in accordance with payment instructions provided by TRECAP, within three (3) Business Days after expiration of such 15-day period. In the event CILP shall dispute such claim, within such 15-day period CILP shall deliver written notice to TRECAP and the Escrow Agent notifying each of such dispute, in which case the Escrow Agent shall continue to hold in the Indemnity Escrow Fund, in accordance with the terms of this Agreement, the amount specified by TRECAP in its notice of claim. In the event CILP fails to respond within such 15-day period, as described above, it shall be deemed to have disputed such claim, in which case the Escrow Agent shall continue to hold in the Indemnity Escrow Fund, in accordance with the terms of this Agreement, the amount specified by TRECAP in its notice of claim. Within two (2) Business Days following the Escrow Release Date, the Escrow Agent shall deliver to CILP, in accordance with

2

payment instructions provided by CILP, (i) the then remaining balance of the Indemnity Escrow Fund minus (ii) the sum of all amounts specified by TRECAP in written notices of claims that are unresolved as of the Escrow Release Date.

3.2     If CILP shall dispute, or shall be deemed to have disputed, a claim of TRECAP as provided in Section 3.1 above, said claim shall be resolved by CILP and TRECAP pursuant to the terms of the Purchase Agreement. In no event shall the Escrow Agent be responsible for any fee or expense of any party to any proceeding. Upon resolution of any such claim, CILP and TRECAP shall deliver joint written instructions to the Escrow Agent as to the resolution of the claim and the disbursement of the portion of the Indemnity Escrow Fund in connection therewith, if applicable, or either of CILP or TRECAP shall deliver to the Escrow Agent and the other party a final non-appealable order of a court or final non-appealable arbitration decision directing the disbursement of the Indemnity Escrow Fund. The Escrow Agent shall use its best efforts to make such payment out of the Indemnity Escrow Fund within five (5) Business Days following the Escrow Agent's receipt of said joint written instructions, court order or arbitration decision.

3.3     Notwithstanding anything to the contrary in this Agreement, if the Escrow Agent receives joint written instructions from CILP and TRECAP or their respective successors or assigns as to the disbursement of the Indemnity Escrow Fund, the Escrow Agent shall disburse the Indemnity Escrow Fund pursuant to such joint written instructions.

3.4     All payments required to be made by the Escrow Agent under this Agreement shall be made by wire transfer or by check, as elected by the party receiving the funds.

**ARTICLE IV**
**COMPENSATION; EXPENSES**

4.1     As compensation for its services to be rendered under this Agreement, for each year or any portion thereof, the Escrow Agent shall receive a fee in the amount specified in Exhibit A to this Agreement and shall be reimbursed upon request for all reasonable expenses, disbursements and advances, including reasonable fees of outside counsel, if any, incurred or made by it in connection with the carrying out of its duties under this Agreement. CILP and TRECAP shall each pay one-half of such compensation and expenses. The Escrow Agent is hereby authorized and directed to withdraw from the Indemnity Escrow Fund for its own account amounts invoiced for fees and expenses which remain unpaid for more than thirty days.

**ARTICLE V**
**EXCULPATION AND INDEMNIFICATION**

5.1     The obligations and duties of the Escrow Agent are confined to those specifically set forth in this Agreement, notwithstanding references herein to other documents or agreements. In the event that any of the terms and provisions of any other

3

agreement between any of the parties hereto conflict or are inconsistent with any of the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control the duties of Escrow Agent in all respects. The Escrow Agent shall not be subject to, nor be under any obligation to ascertain or construe the terms and conditions of any other instrument, or to interpret this Agreement in light of any other agreement whether or not now or hereafter deposited with or delivered to the Escrow Agent or referred to in this Agreement, nor shall the Escrow Agent be obligated to inquire as to the form, execution, sufficiency, or validity of any such instrument nor to inquire as to the identity, authority, or rights of the person or persons executing or delivering same. For purposes hereof, the Escrow Agent shall presume that any person purporting to act or give notice on behalf of any entity which is a party hereto as an officer, director, partner or employee thereof is authorized by the respective party to act on its behalf and the Escrow Agent shall incur no liability in so presuming. If any party hereto provides the Escrow Agent with a list of authorized representatives, then the Escrow Agent shall act only upon written notices, instructions (and the like) and oral communications from individuals appearing on that list of authorized representatives and shall incur no liability in refusing to act on the basis of communications from individuals not on such list.

     5.2    The Indemnity Escrow Account shall be maintained in accordance with applicable laws, rules and regulations and policies and procedures of general applicability to escrow accounts established by the Escrow Agent. The Escrow Agent shall not be personally liable for any act that it may do or omit to do hereunder in good faith and in the exercise of its own best judgment nor for any damages not directly resulting from its fraud, gross negligence or willful misconduct. Without limiting the generality of the foregoing sentence, it is hereby agreed that in no event will the Escrow Agent be liable for any lost profits or other indirect, special, incidental or consequential damages which the parties may incur or experience by reason of having entered into or relied on this Agreement or arising out of or in connection with the Escrow Agent's duties hereunder, notwithstanding that the Escrow Agent was advised or otherwise made aware of the possibility of such damages; nor shall the Escrow Agent be liable for acts of God, acts of war, breakdowns or malfunctions of machines or computers, interruptions or malfunctions of communications or power supplies, labor difficulties, actions of public authorities, or any other similar cause or catastrophe beyond the Escrow Agent's reasonable control. Any act done or omitted to be done by the Escrow Agent pursuant to the advice of its attorneys shall be conclusively presumed to have been performed or omitted in good faith by the Escrow Agent.

     5.3    In the event the Escrow Agent is notified of any dispute, disagreement or legal action relating to or arising in connection with the escrow, the Indemnity Escrow Fund, or the performance of the Escrow Agent's duties under this Agreement, the Escrow Agent will not be required to determine the controversy or to take any action regarding it. The Escrow Agent may hold all documents and funds and may wait for settlement of any such controversy by final appropriate legal proceedings, arbitration, or other means as, in the Escrow Agent's discretion, it may require. In such event, the Escrow Agent will not be liable for interest or damage. Furthermore, the Escrow Agent may, at its option, file an action of interpleader requiring the parties to

4

answer and litigate any claims and rights among themselves. The Escrow Agent is authorized, at its option, to deposit with the court in which such action is filed, all documents and funds held in escrow, except all costs, expenses, charges, and reasonable attorneys' fees incurred by the Escrow Agent due to the interpleader action and which CILP and TRECAP agree on a joint and several basis to pay. Upon initiating such action, the Escrow Agent shall be fully released and discharged of and from all obligations and liability imposed by the terms of this Agreement.

5.4     CILP and TRECAP hereby agree, on a joint and several basis, to indemnify and hold the Escrow Agent, and its directors, officers, employees, and agents, harmless from and against all costs, damages, judgments, attorneys' fees (whether such attorneys shall be regularly retained or specifically employed), expenses, obligations and liabilities of every kind and nature which the Escrow Agent, and its directors, officers, employees, and agents, may incur, sustain, or be required to pay in connection with or arising out of this Agreement, unless the aforementioned results from the Escrow Agent's gross negligence or willful misconduct, and to pay the Escrow Agent on demand the amount of all such costs, damages, judgments, attorneys' fees, expenses, obligations, and liabilities. The costs and expenses of enforcing this right of indemnification also shall be paid by CILP and TRECAP. The foregoing indemnities in this paragraph shall survive the resignation or substitution of the Escrow Agent and the termination of this Agreement.

## ARTICLE VI
## TERMINATION OF AGREEMENT

6.1     This Agreement shall automatically terminate if and when, but in no event shall it terminate before, all amounts in the Indemnity Escrow Account (including all the securities in which any of the funds deposited into the Indemnity Escrow Account shall have been invested) shall have been distributed by the Escrow Agent in accordance with its terms.

## ARTICLE VII
## RESIGNATION OF ESCROW AGENT

7.1     The Escrow Agent may resign at any time upon giving at least thirty (30) days prior written notice to CILP and TRECAP; provided, however, that no such resignation shall become effective until the appointment of a successor escrow agent which shall be accomplished as follows: CILP and TRECAP shall use commercially reasonable efforts to select a successor escrow agent within thirty (30) calendar days after receiving such notice. If CILP and TRECAP fail to appoint a successor escrow agent within such time, the Escrow Agent shall have the right at the expense of both CILP and TRECAP to petition any court of general jurisdiction sitting in Wilmington, Delaware for the appointment of a successor escrow agent. The successor escrow agent shall execute and deliver an instrument accepting such appointment and it shall, without further acts, be vested with all the estates, properties, rights, powers, and duties of the predecessor escrow agent as if originally named as escrow agent. Upon delivery of such instrument, the Escrow Agent shall be discharged from any further duties and liability under this

5

Agreement. The Escrow Agent shall be paid any outstanding fees and expenses prior to transferring assets to a successor escrow agent.

## ARTICLE VIII
## NOTICES

8.1     All notices required by this Agreement shall be in writing and shall be deemed to have been received (a) immediately if sent by facsimile transmission (with a confirming copy sent the same Business Day by registered or certified mail), or by hand delivery (with signed return receipt), (b) the next Business Day if sent by nationally recognized overnight courier or (c) the second following Business Day if sent by registered or certified mail, in any case to the respective addresses as follows:

**Notices involving claims or objections to claims must be sent by registered or certified mail or by overnight courier and may not be sent via facsimile.**

If to CILP and/or CCI LLC:

Capmark Investments LP
Capmark Carried Interest, L.L.C.
116 Welsh Road
Horsham, PA 19044
Attn: Keith Kooper
Fax: (215) 441-7645

with a copy to:

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Attn: Edward J. Braum, Esq.
Fax: (212) 355-3333

If to TRECAP:

TRECAP Partners LLC
1626 Ringling Blvd., Suite 400
Sarasota, FL 34236
Attention: Douglas A. Tibbetts
Facsimile: (941) 373-3836

with a copy to:

Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100

6

Dallas, TX 75201-4675
Attention: R. Terry Miller, Esq.
Facsimile: (214) 969-4343

If to the Escrow Agent:

CSC Trust Company of Delaware
2711 Centerville Road, Suite 400
Wilmington, DE 19808
Attn: Escrow Administration
Fax: (302) 636-8666

## ARTICLE IX
## TAX REPORTING

9.1     Except as otherwise set forth herein, the parties hereto acknowledge and agree that no interest income or other income accrued on the Indemnity Escrow Fund shall be due to or remitted to CILP or TRECAP for the period of time the Indemnity Escrow Fund is held by the Escrow Agent. Notwithstanding the foregoing, the Escrow Agent shall, for each calendar year (or portion thereof) that the Indemnity Escrow Account is in existence, report the income of the Indemnity Escrow Account to TRECAP on IRS Forms 1099-DIV. The sole tax reporting obligation of the Escrow Agent hereunder shall be to file appropriate versions of Forms 1099-DIV with the Internal Revenue Service with respect to interest income earned on funds held in the Indemnity Escrow Account and to provide copies hereof to TRECAP. Pursuant to Proposed Treasury Regulations 1.468B-8, the Forms 1099 shall show the Escrow Agent as payor and TRECAP as payee. Further, neither CILP nor TRECAP shall take any position in connection with the preparation, filing or audit of any Tax Return that is in any way inconsistent with the foregoing determination or the Forms 1099 provided by the Escrow Agent. The parties hereto acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable Foreign Investment in Real Property Tax Act ("FIRPTA") reporting with respect to the Escrow Fund. The Escrow Agent shall withhold any taxes it deems appropriate, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities as it determines may be required by any law or regulation in effect at the time of the distribution.

9.2     Within thirty (30) calendar days after it is finally determined how the Indemnity Escrow Fund held in the Indemnity Escrow Account shall be paid to CILP and/or TRECAP (the "**Determination Date**"), if funds as to which such determination has been made continue to be held and invested in the Indemnity Escrow Account, then CILP and TRECAP must provide the Escrow Agent with a written statement that is signed by CILP and TRECAP, that specifies the Determination Date, and specifies CILP's and TRECAP's ownership interests in each asset of the Indemnity Escrow Fund remaining in the Indemnity Escrow Account after the Determination Date, pursuant to Proposed Regulations 1.468B-8(f). The Escrow Agent will report the interest income earned by the Indemnity Escrow Fund to CILP and TRECAP in accordance with such

7

written statement. Absent timely receipt of such statement, the Escrow Agent will continue to report all interest income solely to TRECAP as provided above.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

10.1    The validity, performance, and enforcement of this Agreement and all transaction documents, unless expressly provided to the contrary, shall be governed by the laws of the state of Delaware, without giving effect to the principles of conflicts of law of such state.

10.2    Any bank or corporation into which the Escrow Agent may be merged or with which it may be consolidated, or any bank or corporation to whom the Escrow Agent may transfer a substantial amount of its escrow business, shall be the successor to the Escrow Agent without the execution or filing of any paper or any further act on the part of any of the parties, anything herein to the contrary notwithstanding.

10.3    This Agreement may be amended, modified, and/or supplemented only by an instrument in writing executed by all parties hereto.

10.4    This Agreement may be executed by the parties hereto individually or in one or more counterparts, each of which shall be an original and all of which shall together constitute one and the same agreement. This Agreement, signed and transmitted by facsimile machine or pdf file, is to be treated as an original document and the signature of any party hereon, if so transmitted, is to be considered as an original signature, and the document so transmitted is to be considered to have the same binding effect as a manually executed original.

10.5    The section and other headings in this Agreement are for reference purposes only and will not affect the meaning of interpretation of this Agreement. Reference to schedules or Exhibits shall, unless otherwise indicated, refer to the Exhibits and schedules attached to this Agreement, which shall be incorporated in and constitute a part of this Agreement by such reference.

10.6    As used in this Agreement, "Business Day" means any day other than Saturday, Sunday or a day on which banking institutions in Wilmington, Delaware are required or authorized to be closed.

10.7    This Agreement constitutes an agreement solely among the parties hereto, and, except as otherwise provided herein, is not intended to and will not confer any rights, remedies, obligations, or liabilities, legal or equitable, on any Person (as defined in the Purchase Agreement) other than the parties hereto and their respective successors, or assigns, or otherwise constitute any Person a third party beneficiary under or by reason of this Agreement. Nothing in this Agreement, expressed or implied, is intended to or shall constitute the parties hereto partners or participants in a joint venture.

10.8    Any term or provision of this Agreement which is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability

8

without rendering invalid or unenforceable the remaining rights of the intended to be benefited by such provision or any other provisions of this Agreement.

*[The next page is the signature page]*

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Escrow Agreement as of the day and year first above written.

**CAPMARK INVESTMENTS LP**

By: _____
Name: _____
Title: _____


**TRECAP PARTNERS LLC**

By: _____
Name: _____
Title: _____


**CSC TRUST COMPANY OF DELAWARE,**
as Escrow Agent

By: _____
Name: _____
Title: _____

## EXHIBIT A

## ESCROW AGENT FEE SCHEDULE
**[Provided Separately Based Upon Account Specifics]**

| | |
|---|---|
| Acceptance Fee: | $500.00 |
| Annual Administration Fee: | $4,000.00 |
| Wire Transfers | $20.00 each |
| Check Preparation and Mailing | $25.00 each |
| 1099 Preparation and Reporting | $5.00 each ($250 annual minimum if any 1099 reports required for account) |

**THE ACCEPTANCE AND FIRST YEAR'S ANNUAL ADMINISTRATION FEES ARE DUE UPON EXECUTION OF THE ESCROW AGREEMENT.**

All out-of-pocket expenses will be billed at the Escrow Agent's cost. Out-of-pocket expenses include, but are not limited to, professional services (e.g. legal or accounting), travel expenses, telephone and facsimile transmission costs, postage (including express mail and overnight delivery charges), and copying charges.

<u>Exhibit C</u>

Form of Asset Management Agreement

See attached.

# FORM OF ASSET MANAGEMENT AGREEMENT

This Asset Management Agreement (this "**Agreement**") is entered into as of [_____] [__], 2010 by and between Capmark Finance Inc., a California corporation ("**CFI**" or "**Client**") and TRECAP Partners LLC, a Delaware limited liability company ("**TRECAP**" or "**Manager**").

## WITNESSETH:

**WHEREAS**, CFI, together with its Affiliates (as defined below) is an international commercial real estate finance company; and

**WHEREAS**, Manager is registered as an investment adviser under the Investment Advisers Act of 1940, as amended (the "**Advisers Act**"); and

**WHEREAS**, CFI desires to appoint Manager as the non-discretionary asset manager with respect to the management, surveillance and disposition of the Investments on Schedule 1 hereto, and Manager desires to accept such appointment.

**NOW, THEREFORE**, in consideration of the foregoing premises, the representations, warranties and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1. **Definitions**. As used in this Agreement, the following terms shall have the following meanings:

"**Advisers Act**" shall have the meaning ascribed to it in the Recitals.

"**Affiliate**" shall mean a Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with a specified Person. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. For purposes of this Agreement, neither Transwestern Commercial Services LLC nor its Affiliates shall be considered Affiliates of Buyer. Except as otherwise specified, for purposes of this Agreement, with respect to CFI, "Affiliate" means Capmark Financial Group Inc. and any wholly-owned subsidiary of Capmark Financial Group Inc.

"**Agreement**" shall have the meaning set forth in the Introduction, as amended, modified or restated from time to time.

"**Effective Date**" shall have the meaning set forth in Section 13(a) hereto.

"**Event of Default**" shall have the meaning set forth in Section 13(e) hereto.

"**Investments**" shall collectively mean the Investments listed on Schedule 1 hereto.

"**Losses**" shall have the meaning set forth in Section 8(b) hereto.

"**Management Fee**" shall have the meaning set forth in Section 9 and Exhibit A hereto.

"**Manager**" shall have the meaning set forth in the Introduction.

"**Person**" shall mean any individual, partnership, limited liability company, corporation, unincorporated association, trust, government authority or other entity.

**"Real Estate Equity Group"** shall mean the business unit of Manager responsible for the management of the Investments.

**"Standard of Care"** shall have the meaning set forth in Section 2(b) hereto.

Any of the terms used in this Agreement, unless the context otherwise requires, may be used in the singular or the plural depending on the reference. The terms "herein," "hereof" and "hereunder" shall refer to this Agreement as a whole, unless the context otherwise requires. The term "including" as used in this Agreement, shall be deemed to mean "including, without limitation."

## 2. Engagement of Manager.

(a)     Appointment and Authorization.   Client hereby appoints Manager to act as a non-discretionary asset manager for Client pursuant to the terms and conditions of this Agreement. Manager hereby accepts this engagement on the terms and conditions set forth in this Agreement. In the performance of its duties hereunder, the actions of Manager shall be based on its professional judgment and experience, but in no way shall the engagement and undertaking of Manager pursuant to this Agreement be considered or construed to be a guarantee of investment results.

(b)     Standard of Care.  Manager shall discharge its duties under this Agreement in good faith with the care, skill and diligence that a prudent person acting in a like capacity and familiar with investment matters of the nature and character of the Investments would employ. The standard set forth in this paragraph shall be referred to herein as the **"Standard of Care"**.

(c)     Reliance on Others.  In rendering advice to Client, Manager shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, of the following Persons or groups, unless it has knowledge concerning the matter in question that would cause such reliance to be unwarranted, and so long as Manager acts in good faith: any attorney, independent accountant, valuation consultant or other Person as to matters that Manager reasonably believes to be within such Person's professional competence.

(d)     Insurance.  Manager shall at all times during the term of this Agreement keep in force policy or policies of insurance covering loss occasioned by the errors and omissions of Manager's officers, employees and other persons acting on its behalf in connection with its performance hereunder, which insurance shall be appropriate in form and amount as determine by the Manager. Coverage of Manager under a policy obtained by an Affiliate and providing the coverage set forth above shall satisfy the requirements of this section.

3.     **Duties.** Subject to the restrictions herein, Manager will manage and dispose of Investments for the benefit of Client, and, without limiting the generality of the foregoing, to the extent reasonably requested by Client:

(i)     advise Client about, provide surveillance on, and implement the asset management of, Client's Investments;

(ii)     advise Client with respect to, and implement on behalf of, Client the disposition of the Investments;

(iii)     provide input to Client's valuation committee as to the valuation of each Investment by the tenth day after each fiscal quarter, in accordance with the valuation policies in effect from time to time;

2

(iv)    engage legal counsel reasonably acceptable to Client, and third-party experts and consultants, including, without limitation, environmental specialists, market consultants, appraisers, engineers, construction consultants, and architects;

(v)    provide and maintain, at its own expense, offices, together with all administrative services, staff and accommodations reasonably required for the due performance of its duties under this Agreement;

(vi)    prepare or assist in the preparation of forms or reports of Client whenever and in whatever form Client may reasonably require, including, but not limited to, a quarterly asset review report delivered no later than forty five (45) days after each fiscal quarter;

(vii)    attend meetings of Client to discuss its portfolio of Investments; and

(viii)    such other maters as reasonably requested by Client in writing.

**4.    Books and Records; Accounting.**

(a)    Manager shall keep or cause to be kept accurate, complete and proper books, records and accounts pertaining to the Investments in accordance with the recordkeeping requirements of the Advisers Act.

(b)    Manager shall furnish to Client such other reports (financial or otherwise) as Client reasonably requests in writing.

(c)    Manager will prepare and maintain books and records for each Investment. Manager will arrange for the financial statements of the Investment to be audited annually in accordance with generally accepted accounting principles by independent public accountants of a nationally recognized standing.

**5.    Restrictions.**  Manager shall carry out its duties under this Agreement subject always to:

(i)    the Advisers Act and the rules promulgated thereunder and all other applicable laws, rules, regulations, orders and ordinances;

(ii)    the objectives, restrictions, directions and guidelines applicable under this Agreement;

(iii)    Client's policies and procedures provided to Manager in writing;

(iv) Client's internal corporate governance provided to Manager in writing; and

(v)    such other reasonable direction and guidelines from time to time issued by Client which are provided to Manager in writing.

**6.    Reports/Documentation.**

(a)    Manager shall maintain a complete and accurate set of files, books and records of all business activities and operations conducted by Manager in connection with Manager's performance under this Agreement. All such books and records shall be open to inspection by the authorized representatives of Client or its designees at the office of Manager during normal business hours at all times during the term of this Agreement. If the Agreement is terminated, Manager shall promptly deliver such files, books and records to Client, but may maintain copies as required by applicable law, rule or organization.

3