(b)     Client will promptly provide, make available or make known to Manager the following information: (i) copies of all documents which Manager may reasonably require in connection with the performance of its duties hereunder; and (ii) copies of relevant actions adopted by Client which govern its investment management process and Client's internal corporate governance policies.

**7.     Communications.**   In carrying out its duties under this Agreement, Manager shall use commercially reasonable efforts to comply with all reasonable instructions and requests of Client relating to Manager's duties under the subject matter of this Agreement.  Any instructions given by Client to Manager and any advice or recommendations given by Manager to Client pursuant to this Agreement must be in writing via letter, telex, facsimile transmission, e-mail or other method of communication in writing.

**8.     Independent Contractor Status; Limitation of Liability/Damages; Indemnification.**

(a)     Independent Contractor Status.   Manager shall for all purposes of this Agreement be deemed to be an independent contractor and not an employee of Client, nor shall anything herein be construed as making Client a partner or co-venturer with Manager or any of its Affiliates or clients.  Unless otherwise expressly provided herein or authorized by Client in writing from time to time (i.e., delegated authority), Manager shall have no authority to act for, represent Client or represent itself as Client in any way or otherwise be deemed an agent of Client.  The parties further agree that any amounts paid to Manager pursuant to this Agreement shall constitute payments for services rendered.

(b)     Limitation of Liability.   Neither Manager, any Affiliate of Manager nor any principal, heir, executor, administrator, partner, member, stockholder, employee, employer, officer, director, manager, agent, successor or assign of any of the foregoing shall have any liability to Client, any Affiliate of Client and any principal, heir, executor, administrator, partner, member, stockholder, employee, employer, officer, director, manager, agent, successor or assign of any of the foregoing (collectively, the "**Client Parties**") for any claims, liabilities, losses, judgments, damages and expenses incurred (including actions or proceedings in respect thereof) (collectively, "**Losses**") suffered by the Client Parties to the extent such Losses result or arise out of any action or inaction in connection with providing services to Client pursuant to the terms of this Agreement or the performance of Manager's duties under this Agreement, unless such action or inaction constitutes bad faith, gross negligence, willful or criminal misconduct or a breach of the Standard of Care.

(c)     Indemnification of Manager.   Client shall, to the fullest extent permitted by law, indemnify and hold harmless the Manager, any Affiliate of Manager and any principal, heir, executor, administrator, partner, member, stockholder, employee, employer, officer, director, manager, agent, successor or assign of any of the foregoing (collectively, the "**Manager Indemnitees**") from and against any Losses suffered by any of the Manager Indemnitees resulting or arising out of any action or inaction in connection with providing services to Client pursuant to the terms of this Agreement or the performance of Manager's duties under this Agreement or by reason of any act or omission of Client, agent or third party selected by Client; provided that such Losses did not result from any Manager Indemnitees' fraud, bad faith, gross negligence, willful or criminal misconduct or a breach of the Standard of Care.

(d)     Limitation of Damages.   In no event shall either party to this Agreement be liable to the other for any incidental, consequential, punitive or special damages in connection with this Agreement.  In no event shall the liability of Manager and the Client Parties in connection with this Agreement exceed the amount of the aggregate Management Fee actually paid to Manager.

**9.     Management Fee.**   Client shall pay Manager a management fee (the "**Management Fee**") in accordance with Exhibit A of this Agreement.

**10.** **Expenses.**

(a)     Client shall reimburse Manager for the following (to the extent not directly paid by Client):

(i)     the charges and expenses of maintaining Client's custodians or depositories appointed for the safekeeping of the Investments or other property of Client, including the third-party costs of bookkeeping and accounting services; and

(iii)     all reasonable out-of-pocket costs incurred by Manager pursuant to the performance of this Agreement that are related directly to the Investments, including pre-approved travel costs, fees and other out-of-pocket expenses directly related to the asset management, or sale of Investments, fees of auditors, counsel and consultants, custodial expenses, litigation expenses, the costs of any third parties retained to provide necessary services other than those to be provided by Manager pursuant to this Agreement relating to the Investments and other assets held by Client.

(b)     All expenses other than those described above in Section 10(a) will be paid by Manager and not charged to Client.

**11.**     **Conflicts; Waiver.** Manager and its Affiliates, and any of its or their legal, financial and other advisors, shall in no way be prohibited from spending a portion of their time in connection with other businesses or activities for itself or any third parties unrelated to Client, including advising or managing entities whose investment objectives are the same as or overlap with those of Client, providing sourcing, underwriting, originating, financing and hedging for investments or related collateral for investments, providing consulting, merger and acquisition, structuring or financial advisory services (including with respect to actual, contemplated or potential Investments of Client) or acting as a director, officer or creditors' committee member of, adviser to, or participant in, any Person. Notwithstanding the foregoing, Manager hereby covenants that it will provide sufficient resources, effort and time necessary to perform its duties as required by this Agreement

**12.**     **Representations and Warranties.**

(a)     By Manager.  Manager represents and warrants to Client that:

(i)     Manager is duly organized, validly existing and in good standing under the laws of the State of Delaware;

(ii)     Manager has the power and authority to enter into this Agreement and carry out its obligations hereunder;

(iii)     the execution of this Agreement by Manager has been duly authorized by Manager, and no other consents or proceedings are necessary to authorize the execution or delivery by Manager this Agreement or the performance by Manager of its obligations under this Agreement; and

(iv)     none of the execution by Manager of this Agreement, the acts of Manager contemplated hereby or the compliance by Manager any order, law or resolution applicable to Manager of and court, governmental body, administrative agency or self-regulatory authority having jurisdiction over Manager, with any provisions of this Agreement will violate any provision of the operating agreement of Manager, any material agreement of Manager or any agreements with other clients of Manager.

5

(b)    By Client.  Client represents and warrants to Manager that:

(i)    Client is duly organized, validly existing and in good standing under the laws of the State of California;

(ii)    except as required by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") in connection with Client's voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "**Bankruptcy Case**"), Client has the power and authority to enter into this Agreement and carry out its obligations hereunder;

(iii)    except as required by the Bankruptcy Court in connection with the Bankruptcy Case, the execution of this Agreement by Client has been duly authorized by Client, and no other consents or proceedings are necessary to authorize the execution or delivery of this Agreement or the performance by Client of its obligations under this Agreement including the appointment of Manager as a the non-discretionary asset manager hereunder; and

(iv)    none of the execution by Client of this Agreement, the acts of Client contemplated hereby or the compliance by Client with any provisions of this Agreement will violate any provision of the certificate of incorporation or bylaws of Client, any material agreement of Client or, as long as the requisite approvals are obtained from the Bankruptcy Court in connection with the Bankruptcy Case any order, law or regulation applicable to Client of any court, governmental body, administrative agency or self-regulatory authority having jurisdiction over Client or any agreements of Client with third parties.

**13.    Term, Termination and Event of Default.**

(a)    Term.  This Agreement shall be effective on [_____] [__], 2010 (the "**Effective Date**") and will terminate upon sale or other disposition of all the Investments on Schedule 1 hereto, unless terminated in accordance with this Agreement.

(b)    Termination of Agreement.  Client shall have the right to terminate this Agreement in its sole and absolute discretion ("**Without Cause**") upon ninety (90) calendar days' prior written notice to Manager, which advance notice may be waived by Manager.  If Client shall terminate Without Cause greater than ninety (90) calendar days before the first year anniversary of the Effective Date of this Agreement, then Manager shall be paid its Management Fee for the entire first calendar year of the Agreement.  Additionally, Client shall have the right to terminate this Agreement immediately upon the occurrence of:  (i) Manager's gross misconduct, gross negligence or fraud; (ii) an Event of Default by Manager; or (iii) Manager's failure to remain a registered investment adviser under the Advisers Act.

In addition, this Agreement may be terminated by Manager, upon ninety (90) calendar days' prior written notice to Client which advance notice may be waived by Client.  During such ninety (90) day's notice, Manager will, at Client's request, cooperate with Client and use commercially reasonable efforts to provide such services as are reasonably necessary to accomplish an orderly transfer of the management of the Investments to a person designated by Client.  Notwithstanding the foregoing, Manager shall have the right to terminate this Agreement immediately upon the occurrence of an Event of Default by Client.

(c)    Effect of Termination of Manager.  Any termination of this Agreement shall not relieve any party of any liability that may be incurred by it for its activities hereunder prior to the effective date of such termination.  Manager shall be entitled to receive all Management Fees accrued through the date of termination, which will be due and payable by Client to Manager within ten (10) calendar days

6

following the effective date of any such termination. After the effective date of such termination all other rights and obligations hereunder shall cease, other than with respect to liabilities that may have been incurred as a result of a party's activities prior to the effective date of termination.

(d)     Duties upon Termination. On the effective date of a termination, and provided that all outstanding amounts under Agreement have been paid, Manager shall promptly deliver to Client any and all of the materials and records as pertain to this Agreement. Subject to the second paragraph of Section 13(b) above, no further services will be performed by Manager under this Agreement after the effective date of a termination.

(e)     Event of Default. **"Event of Default"** shall mean the failure of either party to comply with the provisions of this Agreement if such failure is not cured within ten (10) business days after notice thereof from the non-defaulting party; provided, however, with respect to any matter not curable by the payment of money, if curing such failure reasonably requires more than ten (10) business days, the time period for curing such default will be extended for up to a total of forty-five (45) business days so long as the defaulting party promptly commences to cure the failure after the notice and thereafter diligently pursues such cure.

## 14.    Qualifications; ADV.

(a)     Manager shall, at its own expense, qualify to do business and obtain and maintain such licenses or authorizations as may be required by applicable law for the performance of Manager of its services hereunder, including its registration as an investment adviser with the U.S. Securities and Exchange Commission (the "SEC").

(b)     Client acknowledges receipt from Manager (at least 48 hours prior to entering into this Agreement) of Part II of Manager's Form ADV as filed with the U.S. Securities and Exchange Commission. Manager shall send to Client a copy of Part II of Manager's Form ADV as filed with the U.S. Securities and Exchange Commission annually during the term of this Agreement, and in addition each time any changes are made to Part II of Manager's Form ADV.

**15.    Notices.** Unless expressly provided otherwise herein, all notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing (including by telecopy) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of telecopy notice, when received in legible form, addressed as set forth below:

If to Client:

Capmark Finance Inc.
116 Welsh Road
Horsham, PA 19044
Attention: General Counsel
Facsimile: (215) 441-7645
E-mail: Marc.Joseph@Capmark.com

LIBNY/4864301.3

If to Manager:

TRECAP Partners LLC
116 Welsh Road
Horsham, PA 19044
Attention: Douglas A. Tibbetts
Facsimile: (941) 373-3836
E-mail: Doug.Tibbetts@TRECAPPartners.net

Any party may alter the address or telecopy number to which communications are to be sent by giving notice of such change of address in conformity with the provisions of this Section 15 for the giving of notice.

**16.     Confidentiality.**

(a) Manager and Client each acknowledge that, during the term of this Agreement, each party shall have access to confidential and proprietary information of the other party, including information regarding investment strategies, investments made by clients and funds, and any information relating to the Investments furnished to Manager and/or Client by any custodians ("**Confidential Information**"). Without the other party's consent, such Confidential Information of a party may not be used in any way by the other party for its own private, commercial or marketing purposes or disclosed to any persons other than those directors, officers, employees, advisors, or agents of each party who have a need to know such information, or as required by applicable law or regulation.

(b)     Confidential Information shall not include information that is (i) or becomes publicly available other than as a result of a breach of this Agreement by the receiving party, (ii) already known to the receiving party, (iii) independently acquired or developed by the receiving party without violating any obligations of such receiving party under this Agreement, or (iv) required to be disclosed by law, regulation or judicial process.

(c)     All records, notes, documents and other tangible information supplied by one party to the other in connection with this Agreement and all copies, reprints, reproductions or translations thereof made will, upon written request, be returned by the receiving party to the disclosing party, or destroyed, provided that the receiving party may retain archival copies of the Confidential Information as it is required to retain for legal, regulatory or internal compliance purposes.

**17.     Governing Law.**  This Agreement shall be governed by the internal laws of the Commonwealth of New York, without regard to any conflict of laws provisions, and shall be binding upon the parties hereto and their respective successors and permitted assigns. The parties hereby waive the right to trial by jury.

**18.     Amendment; Merger.**  No amendment or modification of this Agreement shall have any force or effect unless it is in writing and signed by the parties.  This Agreement supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

**19.     Assignment; Waiver.**  Neither this Agreement nor any of the rights or obligations hereunder may be assigned (as such term is defined in the Advisers Act and in related rules and SEC and SEC staff interpretations and guidance) by either party without the prior written consent of the other party hereto, which consent may be withheld in the sole and absolute discretion of either party. No delay in exercising or failure to exercise any right under this Agreement on the part of either party shall operate as a waiver of such right by that party.  Any waiver of this Agreement must be in writing and signed by both parties.

8

**20.     Counterparts.** This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

**21.     Severability.** Any term or provision of this Agreement which is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining rights of the Person intended to be benefited by such provision or any other provisions of this Agreement.

**22.     Headings, Schedules, and Exhibits.** The section and other headings in this Agreement are for reference purposes only and will not affect the meaning of interpretation of this Agreement. Reference to Schedules or Exhibits shall, unless otherwise indicated, refer to the Exhibits and Schedules attached to this Agreement, which shall be incorporated in and constitute a part of this Agreement by such reference.

**23.     No Third Party Beneficiaries.** This Agreement is not intended, and shall not be deemed, to confer any rights or remedies upon any Person other than the parties that are signatories hereto and their respective successors and permitted assigns or to otherwise create any third party beneficiary hereto.

*[The remainder of this page has been left blank intentionally.]*

LIBNY/4864301.3

**IN WITNESS WHEREOF**, the parties hereto, each intending to be legally bound hereby, have caused this Asset Management Agreement to be executed as of the date first written above.

<div style="margin-left: 40%;">

**TRECAP PARTNERS LLC,**
a Delaware limited liability company

By: _____
        Name:
        Title:


**CAPMARK FINANCE INC.,** a California corporation


By: _____
        Name:
        Title:

</div>

10

<u>EXHIBIT A</u>

MANAGEMENT FEE

Manager (TRECAP) will receive from Client (Capmark Finance) for its management services an annual asset management fee of .50% times the amount of investment cash outstanding in the Investments listed on <u>Schedule 1</u> hereto, plus a disposition fee of .50% on the amount of cash received by Client from the sale of such Investments listed on <u>Schedule 1</u> hereto (the disposition fee, together with the asset management fee, shall be the "**Management Fee**").

The asset management fee shall be accrued and paid quarterly in arrears. The cash invested in such Investment as of the end of each quarter shall be used in the calculation of the asset management fee. For purposes of the calculation of the initial asset management fee, the current investment cash outstanding and current exchange rates shown on <u>Schedule 1</u> hereto shall be utilized. The disposition fee shall be paid at settlement and shall be paid in the currency of the Investment sold ($/£/€). If an asset in <u>Schedule 1</u> is sold during the middle of a quarter, the quarterly asset management fee for that Investment shall be calculated for the number of days during such quarter that it remained an Investment of Client.

Any amendment to Exhibit A or <u>Schedule 1</u> must be approved in writing by both Manager and Client.

11

Form of Form of FIRPTA Certificate

See attached.

## FORM OF NON-FOREIGN CERTIFICATION

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest, the undersigned (the "Transferor") hereby certifies the following on behalf of the Transferor:

1.      Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Transferor is not a disregarded entity as defined in §1.1445-2(b)(2)(iii);

3.      Transferor's U.S. employer identification number is [_____]; and

4.      The office address of Transferor is [_____].

The Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of seller.

Date: [_____], 2010          [SELLER],


                                      By:      _____
                                      Name:
                                      Title:

Form of Bill of Sale

See attached.

# FORM OF BILL OF SALE

## [_____], [__]. 2010

KNOW ALL PERSONS BY THESE PRESENTS, that Capmark Investments LP, a Delaware limited liability company ("CILP") and Capmark Carried Interest, L.L.C., a Delaware limited liability company (together with CILP, the "Sellers"), in consideration of the Purchase Price and other good and valuable consideration paid to it by TRECAP Partners LLC, a Delaware limited liability company (the "Buyer"), the receipt and sufficiency of which is hereby acknowledged, does hereby transfer, convey, sell, assign and deliver to the Buyer and its successors and assigns, pursuant to that certain Asset Purchase Agreement (the "Asset Purchase Agreement"), dated January [__], 2010, by and among the Buyer and the Sellers, all of Sellers' right, title and interest in and to the Assets. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Asset Purchase Agreement.

The terms of the Purchase Agreement, including but not limited to Sellers' and Buyer's representations, warranties, covenants, agreements and indemnities, are incorporated herein by this reference. Sellers and Buyer acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

The Sellers hereby confirms, acknowledges and agrees that the Buyer is not purchasing any other assets other than the Assets.

TO HAVE AND TO HOLD, all and singular, the aforesaid Assets and all appurtenances thereto unto the Buyer and its successors and assigns forever for its and their own use forever.

*[The remainder of this page has been intentionally left blank.]*

IN WITNESS WHEREOF, the undersigned have caused this Bill of Sale to be executed on their behalf by an authorized officer as of the date set forth above.

**SELLERS:**

Capmark Investments LP

By:_____
        Name: _____
        Title: _____


Capmark Carried Interest, L.L.C.

By:_____
        Name: _____
        Title: _____


**BUYER:**

TRECAP PARTNERS LLC

By:     _____
        Name: _____
        Title: _____

Form of Assignment and Assumption Agreements

See attached.

# FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Agreement") is made and entered into as of [＿＿＿＿＿＿] [＿＿], 2010, by and among Capmark Investments LP, a Delaware limited liability company ("CILP"), Capmark Carried Interest, L.L.C., a Delaware limited liability company (together with CILP, the "Sellers") and TRECAP Partners LLC, a Delaware limited liability company (the "Buyer").

WHEREAS, Sellers and Buyer are parties to a certain Asset Purchase Agreement, dated January [＿＿], 2010 (the "Purchase Agreement"), pursuant to which Buyer has purchased the Assets from Sellers; and

WHEREAS, pursuant to the Purchase Agreement, Sellers have agreed to assign the Assets and the Assumed Liabilities to Buyer, and Buyer has agreed to assume the obligations of Sellers in connection with the Assumed Liabilities; and

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.     Capitalized Terms.  Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Purchase Agreement.

2.     Sale and Transfer of Assets.  Sellers hereby sell, convey, assign, transfer and deliver to Buyer, effective as of the Closing, all of Sellers' right, title and interest in and to all of the Assets.

3.     Assignment and Assumption.  Effective as of the Closing, Buyer hereby assumes, covenants, undertakes and agrees to pay, perform, discharge or otherwise satisfy all of the Assumed Liabilities.  Buyer and Sellers agree that Buyer shall have no obligation to discharge or otherwise perform any Excluded Liabilities.

4.     Terms of the Purchase Agreement.  The terms of the Purchase Agreement, including but not limited to Sellers' and Buyer's representations, warranties, covenants, agreements and indemnities, are incorporated herein by this reference.  Sellers and Buyer acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.     Amendment.  This Agreement may not be amended, supplemented, or otherwise modified except by a written agreement executed by the party to be charged with the amendment.

1

6.     Parties Bound. This Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as shall inure to a successor or permitted assignee pursuant to this Section 6.

7.     Governing Law. This Agreement will be governed by and construed under the laws of the State of New York without giving effect to the principles of conflicts of law.

8.     Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile transmission or a photocopy thereof or other electronic means from which a paper replica can be reproduced shall constitute effective execution and delivery of this Agreement as to the parties and may be used, as may any photocopy thereof or any photocopy of this Agreement bearing one or more original signatures, in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile or a photocopy thereof or other electronic means from which a paper replica can be reproduced shall be deemed to be their original signatures for all purposes.

[Signature Page Follows]

LIBNY/4859161.1

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**SELLERS:**

CAPMARK INVESTMENTS LP

By:_____
      Name: _____
      Title:  _____

CAPMARK CARRIED INTEREST, L.L.C.

By:_____
      Name: _____
      Title:  _____

**BUYER:**

TRECAP PARTNERS LLC

By:   _____
      Name: _____
      Title:  _____

# FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT (UK INTERESTS)

This Assignment and Assumption Agreement (the "Agreement") is made and entered into as of [＿＿＿＿＿] [＿＿], 2010, by and among Capmark Investments LP, a Delaware limited liability company ("CILP"), Capmark Carried Interest, L.L.C., a Delaware limited liability company (together with CILP, the "Sellers") and TRECAP Partners LLC, a Delaware limited liability company (the "Buyer").

WHEREAS, Sellers and Buyer are parties to a certain Asset Purchase Agreement, dated January [＿], 2010 (the "Purchase Agreement"), pursuant to which Buyer has purchased the UK Interests from Sellers; and

WHEREAS, pursuant to the Purchase Agreement, Sellers have agreed to assign the UK Interests and the Assumed Liabilities to Buyer, and Buyer has agreed to assume the obligations of Sellers in connection with the Assumed Liabilities.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1. <u>Capitalized Terms</u>. Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Purchase Agreement.

2. <u>Sale and Transfer of UK Interests</u>. Sellers hereby sell, convey, assign, transfer and deliver to Buyer, effective as of the Closing, all of Sellers' right, title and interest in and to the UK Interests.

3. <u>Assignment and Assumption</u>. Effective as of the Closing, Buyer hereby assumes, covenants, undertakes and agrees to pay, perform, discharge or otherwise satisfy all of the Assumed Liabilities. Buyer and Sellers agree that Buyer shall have no obligation to discharge or otherwise perform any Excluded Liabilities.

4. <u>Terms of the Purchase Agreement</u>. The terms of the Purchase Agreement, including but not limited to Sellers' and Buyer's representations, warranties, covenants, agreements and indemnities, are incorporated herein by this reference. Sellers and Buyer acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5. <u>Additional Terms</u>. In addition to the terms incorporated herein pursuant to Section 4 hereof, set forth below are additional terms with respect to the transfer of the UK Interests.

LIBNY/4861051.2

(a) At Closing, CCI LLC shall deliver or cause to be delivered to Buyer the following documents and evidence:

    (i)    a transfer of the UK Interests executed by the registered holder in favour of Buyer;

    (ii)    the share certificates for the UK Interests in the name of the registered holder or an indemnity in the agreed form for any lost certificates;

    (iii)    the waivers, consents and other documents required to enable Buyer to be registered as the holder of the UK Interests;

    (iv)    an irrevocable power of attorney in agreed form given by Sellers in favour of Buyer to enable the beneficiary (or its proxies) to exercise all voting and other rights attaching to the UK Interests before the transfer of the UK Interests is registered in the register of members;

    (v)    in relation to the UK Entity, the statutory registers and minute books (written up to the time of Closing), the common seal, certificate of incorporation and any certificates of incorporation on change of name;

    (vi)    the written resignation, executed as a deed and in the agreed form, of the directors and secretary of the UK Entity from their offices with the UK Entity, except for the following persons who are not resigning: [NAME OF PERSONS WHO IS NOT RESIGNING];

    (vii)    the written resignation of the auditors of the UK Entity accompanied by:

        (1) a statement in accordance with section 519 of the Companies Act 2006 that there are no circumstances connected with the auditors' resignation which should be brought to the notice of the members or creditors of the UK Entity; and

        (2) a written assurance that the resignation and statement have been, or will be, deposited at the registered office of the UK Entity in accordance with section 519 of the Companies Act 2006;

    (viii)    signed copies of special resolutions of the UK Entity in a form appropriate for filing at Companies House to change the name of the UK Entity to a name selected by Buyer in accordance with the Purchase Agreement;

2

(ix)    a certified copy of the minutes of the board meetings held pursuant to Part 2 of this Schedule 6.2(n);

(x)    in relation to the UK Entity:

(1) statements from each bank at which the UK Entity has an account, giving the balance of each account at the close of business on the last Business Day before Closing;

(2) all cheque books in current use and written confirmation that no cheques have been written since those statements were prepared;

(3) details of their cash book balances; and

(4) reconciliation statements reconciling the cash book balances and the cheque books with the bank statements delivered.

(b) Sellers shall cause a board meeting of the UK Entity to be held at Closing at which the following matters shall take place:

(i)    a resolution to register the transfer of the UK Interests shall be passed at such board meeting of the UK Entity, subject to the transfer(s) being stamped at the cost of Buyer;

(ii)    all directors and the secretary and auditors of the UK Entity shall resign from their offices with the UK Entity with effect from the end of the relevant board meeting, except for the following persons:  [NAME OFFICERS WHO ARE NOT RESIGNING];

(iii)    the persons Buyer nominates shall be appointed as directors and secretary of the UK Entity. The appointments shall take effect at the end of the board meeting;

(iv)    [NAME OF NEW AUDITORS] shall be appointed as the auditors of the UK Entity with effect from the end of the board meeting;

(v)    all the existing instructions and authorities to bankers shall be revoked and replaced with new instructions and authorities to those banks in the form Buyer requires;

(vi)    The address of the registered office of the UK Entity shall be changed to the address required by Buyer; and

(vii)    The accounting reference date of the UK Entity shall be changed to the date required by Buyer.

7. <u>Amendment</u>. This Agreement may not be amended, supplemented, or otherwise modified except by a written agreement executed by the party to be charged with the amendment.

8. <u>Parties Bound</u>. This Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as shall inure to a successor or permitted assignee pursuant to this Section 8.

9. <u>Governing Law</u>. This Agreement will be governed by and construed under the laws of the State of New York without giving effect to the principles of conflicts of law.

10. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile transmission or a photocopy thereof or other electronic means from which a paper replica can be reproduced shall constitute effective execution and delivery of this Agreement as to the parties and may be used, as may any photocopy thereof or any photocopy of this Agreement bearing one or more original signatures, in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile or a photocopy thereof or other electronic means from which a paper replica can be reproduced shall be deemed to be their original signatures for all purposes.

[Signature Page Follows]

4

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**SELLERS:**

CAPMARK INVESTMENTS LP

By:_____
      Name: _____
      Title:   _____

CAPMARK CARRIED INTEREST, L.L.C.

By:_____
      Name: _____
      Title:   _____

**BUYER**:

TRECAP PARTNERS LLC

By:    _____
      Name: _____
      Title:   _____

## Exhibit G

### Form of Transition Services Agreement

See attached.

<div align="center">**FORM OF TRANSITION SERVICES AGREEMENT**</div>

This TRANSITION SERVICES AGREEMENT, dated as of _____, 2010 (this "**Agreement**"), is by and between CAPMARK INVESTMENTS LP, a Delaware limited partnership ("**Seller**") and TRECAP PARTNERS LLC, a Delaware limited liability company ("**Buyer**").

<div align="center">R E C I T A L S</div>

WHEREAS, Seller, Capmark Carried Interest, L.L.C., a Delaware limited liability company, and Buyer have entered into that certain Asset Purchase Agreement, dated as of _____, 2010 (the "**Asset Purchase Agreement**"), whereby Seller has agreed to transfer certain assets and liabilities to Buyer (the "**Transaction**");

WHEREAS, Buyer desires that Seller provide certain services related to the Business following the Closing Date, and Seller is willing to provide such services upon the terms and conditions set forth herein; and

WHEREAS, the Asset Purchase Agreement provides that the parties hereto shall enter into this Agreement as a condition to Closing.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Definitions.   For purposes of this Agreement, capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Asset Purchase Agreement.

2.     Transition Services; Modification of Transition Services; Additional Transition Services; Interim Basis; Service Coordinators.

(a)     During the Term (as defined below), Seller shall provide (or cause to be provided) to Buyer the services set forth on Schedule A1, Schedule A2 and Schedule A3 attached hereto in accordance with the terms of and subject to any conditions specified in this Agreement and/or on Schedule A1, Schedule A2 and Schedule A3 (each a "**Transition Services**" and collectively, the "**Transition Services**"); provided, however, that Seller's obligation to provide any Transition Services that require third party consent in order for Seller to be able to provide such services to Buyer is contingent upon Seller obtaining the consent of any such third party, at no cost to Seller.

(b)     Seller may subcontract to another provider (including Seller's Affiliates or independent third parties) or charge an existing provider with some or all of the Transition Services. Each of Seller and any such other provider shall act under this Agreement solely as an independent contractor and not as an agent of Buyer or Seller.

(c)     Upon the mutual agreement of the parties in writing, this Agreement may be amended to include any additional services or modifications of the

Transition Services at a price and on such terms as the parties shall mutually agree in good faith.

(d) Each party acknowledges that the purpose of this Agreement is to provide Transition Services to Buyer on an interim basis. Accordingly, at all times from and after the Closing, Buyer shall use commercially reasonable efforts to make or obtain any approvals, permits or licenses, implement any systems and take, or cause to be taken, any and all other actions necessary or advisable for Buyer to provide (or secure from a third party) the Transition Services for itself as soon as reasonably practicable, but in any event prior to the Termination Date. Seller shall use commercially reasonable efforts to cooperate, at no cost to Seller, with Buyer's efforts to provide (or secure from a third party) the Transition Services for itself.

(e) Buyer and Seller shall each nominate a representative to act as the primary contact person with respect to the performance of the Transition Services (each, a "**Service Coordinator**"). Unless otherwise agreed upon by Buyer and Seller, all communications relating to this Agreement and to the Transition Services provided hereunder shall be directed to the relevant Service Coordinator. The initial Service Coordinators for Buyer and Seller are set forth on Schedule B hereto, as may be modified by either party from time to time by providing notice in accordance with Section 11(l) of this Agreement.

(f) This Agreement shall not be deemed to create any agency, employee or servant relationship or partnership, joint venture or trust between the parties hereto or any of their respective affiliates.

3.  Cost of Transition Services.

(a) Buyer shall pay Seller two (2) monthly payments of $14,500 each for the Transition Services set forth on Schedule A1, Schedule A2 and Schedule A3 attached hereto that are to be provided, except as specifically set forth on Schedule A1, Schedule A2 and Schedule A3, through the date that is sixty (60) days from the date hereof (the "**Termination Date**").

(b) In addition to the payments set forth in Section 3(a) above, Buyer shall bear and pay all costs and expenses incurred by Seller and owed to third parties in connection with the provision of the Transition Services to Buyer, including, without limitation, any necessary third party fees. Seller shall invoice Buyer on a monthly basis for all such costs, expenses and third party fees incurred during the preceding month and each such invoice shall be payable within five Business Days of receipt of the invoice; if Buyer fails to do so, then Seller shall have the option, at its sole discretion, to stop providing such Transition Service immediately.

(c) On the Closing Date and on the date that is thirty (30) days after the Closing Date, Buyer shall pay to Seller the full monthly fee due in accordance with Section 3(a) for the Transition Services to be performed by Seller. Such fee shall be prepaid in full for the entire month and Buyer will not be entitled to any fee

reimbursement or credits in the event Buyer terminates this Agreement or any Transition Services hereunder before the end of any such month.

(d) Buyer shall, in addition to all other amounts payable hereunder, pay all federal, state and local taxes, if any, however designated, which are levied or imposed by reason of the performance by Seller of the Transition Services hereunder, other than any taxes based upon or measured by Seller's income or corporate franchise or similar taxes.

4. Service Level; Disclaimer; Limitation of Liability; Indemnity.

(a) Seller covenants that it shall perform the Transition Services in a comparable manner to the manner in which such services were provided, and with the same degree of care, skill and prudence, by or on behalf of Seller for the Business during the six (6) month period prior to the Closing; provided, however, that in no event shall the scope of the Transition Services performed hereunder exceed that described on Schedule A1, Schedule A2 and Schedule A3 attached hereto.

(b) BUYER ACKNOWLEDGES THAT OTHER THAN AS EXPRESSLY PROVIDED HEREIN, NEITHER SELLER NOR ANY OF ITS AFFILIATES MAKES ANY WARRANTIES REGARDING THE ACCEPTABILITY, SUITABILITY, AVAILABILITY OR PERFORMANCE OF (i) THE TRANSITION SERVICES OR (ii) ANY SOFTWARE, DATA, PRODUCTS, PROCESSES, MATERIALS, PROGRAMMING OR OTHER INFORMATION PROVIDED IN CONNECTION WITH THE TRANSITION SERVICES (COLLECTIVELY, THE "**MATERIALS**"). ALL SUCH TRANSITION SERVICES AND MATERIALS ARE PROVIDED ON AN "AS IS/WHERE IS", "AS AVAILABLE" AND "WITH ALL FAULTS" BASIS, AND WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF TITLE, MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE. NEITHER SELLER NOR ITS OFFICERS, DIRECTORS, REPRESENTATIVES, AGENTS, DEALERS, SUPPLIERS, PARENTS, SUBSIDIARIES OR AFFILIATES, WARRANT THAT THE TRANSITION SERVICES OR THE MATERIALS WILL BE SUITABLE, PROVIDED IN A TIMELY MANNER, UNINTERRUPTED, NON-INFRINGING, ACCURATE, COMPLETE, USEFUL, FUNCTIONAL, SECURE, ERROR FREE OR FREE OF COMPUTER VIRUSES, WORMS, TROJAN HORSES, OR OTHER MALICIOUS CODE.

(c) To the maximum extent permitted under applicable law, Buyer shall indemnify and hold harmless Seller, any of its affiliates or any of their respective equityholders, partners, members, officers, directors, employees or agents (each, a "**Seller Indemnified Party**") from and against any and all losses, claims, damages (including special, incidental, indirect, consequential, or punitive damages awarded to a third party), liabilities, costs and expenses (including, reasonable legal fees or other fees, costs or expenses incurred in investigating or defending against any of the foregoing or incurred in enforcing this indemnity against Buyer) (collectively, "**Claims**"), based upon, arising out of or otherwise in connection with the Transition Services or this Agreement,

except as may result from such Seller Indemnified Party's willful misconduct or gross negligence. The foregoing indemnification of the Seller Indemnified Parties is limited to Claims that arise out of actions or events occurring on or after the date of this Agreement. Where indemnification under this Section 4 is sought by a Seller Indemnified Party, the Seller Indemnified Party shall notify Buyer in writing promptly of any Claim or threatened Claim to which the indemnification relates; provided, that the failure of the Seller Indemnified Party to give the notice as provided herein shall not relieve Buyer of its obligations hereunder except to the extent that Buyer is adversely prejudiced thereby. Buyer shall be entitled to participate in the defense of such Claim and, at its option, assume the defense thereof with counsel of its own choosing, at Buyer's sole expense; in which case, provided that Buyer and its counsel diligently defend the claim, Buyer shall not thereafter be responsible for the fees and expenses of the Seller Indemnified Party and such fees and expenses shall not be recoverable as part of any indemnification claim. If Buyer shall assume the defense of any Claim, the Seller Indemnified Party shall be entitled to participate in the defense of such Claim at its expense, it being understood that Buyer shall control such defense. If Buyer elects to assume the defense of any Claim, the Seller Indemnified Party shall cooperate with Buyer in the defense or prosecution thereof. Such cooperation shall include the retention and (upon Buyer's request) the provision to Buyer of records and information which are reasonably relevant to such Claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. If Buyer shall have assumed the defense of a Claim, Buyer shall have the right to settle such Claim without the consent of the Seller Indemnified Party, unless such settlement (i) includes injunctive or other equitable relief imposed against the Seller Indemnified Party, (ii) contains an admission of wrongdoing or liability on behalf of the Seller Indemnified Party or (iii) requires any payment by the Seller Indemnified Party.

(d)     IN NO EVENT SHALL SELLER BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSITION SERVICES, INCLUDING, WITHOUT LIMITATION, LOSS OF ANTICIPATED PROFITS OR ANTICIPATED REVENUE, AND REGARDLESS OF THE FORM OR CATEGORIZATION OF THE ACTION OR THE BASIS OF THE CLAIM, WHETHER BASED ON TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) OR BREACH OF CONTRACT CLAIMS OR ON ANY OTHER BASIS, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(e)     IN NO EVENT SHALL SELLER'S MAXIMUM AGGREGATE LIABILITY TO BUYER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSITION SERVICES EXCEED THE FEES ACTUALLY PAID BY BUYER TO SELLER HEREUNDER, REGARDLESS OF THE BASIS OF THE CLAIM OR FORM OF ANY ACTION, AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY AVAILABLE TO EITHER PARTY.

5.     Limitation on Transition Services Provided.  In providing the Transition Services, Seller shall not be obligated to: (a) hire any additional employees;

(b) maintain the employment of any specific employees; (c) purchase, lease or license any additional equipment or software; or (d) pay any costs related to the transfer or conversion of data to Buyer or any alternate supplier of Transition Services, except as contemplated by the Asset Purchase Agreement. Seller shall not have any responsibility for verifying the correctness of any information given to Buyer for the purpose of providing Transition Services. Seller shall not be required to provide any Transition Services to the extent the performance of such Transition Services shall result in the breach of any software licenses or other Contracts. In addition, Seller shall not be obligated to perform any Transition Services in violation of applicable Laws. As of the date of this Agreement, to the knowledge of Seller (as "knowledge" is defined in the Asset Purchase Agreement), Seller's performance of the Transition Services does not breach its software license(s) with SunGard Investment Systems, LLC - Investran. Buyer acknowledges and agrees that all other software licenses, subscription services and/or other Contracts with third parties required to conduct Buyer's business, including but not limited to those set forth on Schedule C, are the sole responsibility of the Buyer, and as such and to the extent applicable, Buyer shall use commercially efforts to enter into such software licenses, subscription services and/or Contracts with such third parties on or before the Closing Date.

6.     Third-Party Limitations.  Buyer acknowledges and agrees that the Transition Services provided by a third party, or the assets licensed from a third party used in connection with providing the Transition Services, remain subject to the terms and conditions of any applicable agreements with the providers of such Transition Services or licensors of such assets as in effect on the date hereof. On or prior to the execution of this Agreement, Seller shall provide Buyer with a copy of any such third party agreement. Seller shall notify Buyer in writing if Seller determines that Buyer is not adhering to the terms or conditions of any such agreements and, upon such notification, Buyer shall, to the extent reasonably practicable, cure such breach forthwith. Notwithstanding anything to the contrary, Buyer shall be solely responsible for all such breaches.

7.     Procedures.  All of Buyer's use of the Transition Services must comply at all times with this Agreement and with all of Seller's policies and procedures. Additionally, Seller has the right to establish new or additional operational policies, procedures or enhancements from time to time applicable to any of the Seller's other business units and this Agreement. Seller will provide Buyer with the same notice of any such policies, procedures or enhancements that it provides to its other business units. Buyer shall comply with all requirements of such policies, procedures or enhancements.

8.     Force Majeure.   Seller shall have no liability to Buyer if performance of Seller's obligations under this Agreement is prevented or delayed due to an act of God, strike, or other labor dispute, civil commotion, sabotage, fire, flood, explosion, utilities failure, telecommunications interruption or failure, acts of any governments, inability to obtain or delay in obtaining necessary equipment, and any other causes that are not within the reasonable control of Seller, whether or not of the kind specifically enumerated above. Seller shall promptly give notice of any event of force majeure to Buyer and shall indicate in such notice, as accurately as possible, the effect of

such event on the capacity to perform Seller's obligations hereunder and the anticipated duration of such event. Seller shall use commercially reasonable efforts to complete promptly work so delayed. Suspension of Transition Services under this Agreement shall only continue so long as the effect of such events continue to prevent the performance of such obligations.

9.     Term.

(a)     The term of this Agreement (the "**Term**") shall commence on the date hereof and shall remain in effect until the Termination Date, except the term for any Transition Services that specifically survive for longer periods as provided in Schedule A1, Schedule A2 and Schedule A3 shall remain in effect until such date provided in the applicable Schedule for such Transition Services.

(b)     Termination by Seller. Seller may terminate this Agreement, in whole or in part, reserving cumulatively all other remedies and rights under this Agreement and in law and in equity: (i) if Buyer fails to pay any fees and/or charges due hereunder within ten (10) days of the date such fees and/or charges are due and fails to cure such breach within ten (10) days of receipt of notice from Seller; or (ii) if Buyer materially breaches any provision of this Agreement, other than with respect to Buyer's payment obligations.

(c)     Termination by Buyer. Buyer may terminate this Agreement, in whole or in part, reserving cumulatively all other remedies and rights under this Agreement and in law and in equity: (i) if Seller materially breaches any provision of this Agreement and fails to cure such breach within ten (10) days of receipt of notice from Buyer; or (ii) for convenience upon ten (10) days written notice to Seller.

(d)     Termination by Parties. Buyer and Seller may terminate this Agreement by mutual written consent.

(e)     The provisions of Sections 4, and 8 through 12, shall survive the termination or expiration of this Agreement.

(f)     Upon the termination or expiration of this Agreement, Buyer shall not be released from the payment of any amounts owing to Seller under this Agreement, and any such amounts then owed by Buyer shall be immediately due and payable by Buyer.

10.     Confidentiality. The parties hereby covenant and agree that neither Seller nor Buyer nor any of their respective equityholders, affiliates, partners, members, officers, directors, employees or agents ("**Representatives**") will, directly or indirectly, (a) disclose or furnish to any Person, other than the other party hereto or applicable Representatives in connection with this Agreement, any proprietary information of, or confidential information concerning, Buyer, Seller, or any affiliate of Buyer or Seller; *provided, however,* that this covenant of non-disclosure shall not apply to information (i) which is, or at any time becomes available in the public domain (other than as a result of disclosure in violation of this Agreement), (ii) which has been lawfully acquired from a

third party not under a confidentiality obligation with respect to such information to the other party hereto or its Representatives, (iii) which is required to be disclosed by law or court or administrative court (*provided* that the other party hereto is, to the extent legally permissible, provided notice of such required disclosure and a reasonable opportunity to take steps to maintain the confidentiality thereof), and (iv) which is expressly authorized by the Buyer and Seller in writing prior to such disclosure. Upon termination of this Agreement, Buyer will return to Seller (or certify that it has destroyed) all confidential information provided to Buyer.

11.     Seller's Data Systems.  Seller's data systems and the materials provided to Buyer are for Buyer's internal use only and Buyer may only use such systems and materials in connection with the Transition Services.  Title to all data systems and materials used in performing the Transition Services provided hereunder shall remain with Seller or its third party vendors.  Buyer shall not copy, modify, reverse engineer, decompile or in any way alter data systems or materials without Seller's express written consent.

12.     Miscellaneous.

(a)     Payment of Expenses.  Except as set forth herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors, brokers and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expense.

(b)     Business Days.  If any date for payment or notice under this Agreement falls on a Saturday, Sunday or bank holiday, then the referenced date shall move to the first working day following such date, provided that the calculation of business days are never to include Saturdays, Sundays or bank holidays and the calculation of days (without reference to "business" days) shall include Saturdays, Sundays and bank holidays.

(c)     Modifications. The parties may, by written agreement executed by Buyer and Seller, make any modification or amendment of this Agreement.

(d)     No Waiver.  Any delay in enforcing a party's rights under this Agreement or any waiver as to a particular default or other matter shall not constitute a waiver of such party's rights to the future enforcement of its rights under this Agreement, except with respect to an express written and signed waiver relating to a particular matter for a particular period of time.

(e)     Assignment.  Except to the extent contemplated by Section 2, no party hereto shall assign this Agreement or any part hereof without the prior written consent of the other parties.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

(f)     Burden and Benefit.  This Agreement shall be binding upon and, to the extent permitted in this Agreement, shall inure to the benefit of the parties to this Agreement and their respective heirs, personal representatives, successors and assigns.  It is the intent of the parties to this Agreement that no third-party beneficiary rights be created or deemed to exist in favor of any person (other than a Seller Indemnified Party) not a party to this Agreement.

(g)     Entire Agreement.   This Agreement and the Exhibits and Schedules to this Agreement and other documents referred to in this Agreement contain the entire agreement among the parties hereto with respect to the transactions contemplated by this Agreement and supersede all prior agreements with respect to this Agreement, whether written or oral.

(h)     Severability of Provisions.  Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purpose of this Agreement is determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or effect of those provisions of this Agreement which are valid.

(i)     Exhibits and Schedules.  The Exhibits and Schedules attached to this Agreement and referred to in this Agreement are a part of this Agreement for all purposes.  Any reference to a Schedule or an Exhibit as a whole shall include any sub-Schedules or sub-Exhibits.

(j)     No Strict Construction.  This Agreement has been prepared jointly and shall not be strictly construed against either party.

(k)     Ambiguities.  Ambiguities, if any, in this Agreement shall not be construed against any party, irrespective of which party may be deemed to have authored the ambiguous provision.

(l)     Notices.  All notices, requests, demands, applications, services of process, and other communications which are required to be or may be given under this Agreement shall be in writing and shall be deemed to have been duly given if sent by telecopy or facsimile transmission, or delivered by recognized overnight courier or mailed, certified first class mail, postage prepaid, return receipt requested, to the parties hereto at the following addresses:

|  |  |
|---|---|
| If to Seller: | Keith Kooper, President<br>Capmark Investments LP<br>116 Welsh Road<br>Horsham, PA 19044<br>Facsimile:  (215) 441-7645 |
| With a copy to: | Goodwin Procter LLP<br>The New York Times Building |

8

620 Eighth Avenue
New York, NY 10018
Attention: Edward J. Braum
Facsimile: (212) 355-3333

If to Buyer:                TRECAP Partners LLC
1626 Ringling Blvd., Suite 400
Sarasota, FL 34236
Attention: Douglas A. Tibbetts
Facsimile: (941) 373-3836

With a copy to:          Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4675
Attention: R. Terry Miller, Esq.
Facsimile: (214) 969-4343

or to such other address as any party shall have furnished to the other by notice given in accordance with this Section. Such notice shall be effective when received.

(m)    Governing Law.

(i)    The validity, performance, and enforcement of this Agreement and all transaction documents, unless expressly provided to the contrary, shall be governed by the laws of the State of New York, without giving effect to the principles of conflicts of law of such state, and the Bankruptcy Code, to the extent applicable.

(ii)    During the pendency of the Bankruptcy Case, any dispute, controversy or claim arising out of or in connection with this Agreement may only be brought in the Bankruptcy Court, and each of the parties consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts) in any such action or proceeding and waive any objection to venue laid therein.

(n)    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more of the parties, and an executed copy of this Agreement may be delivered by one or more of the parties by facsimile or similar instantaneous electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes as of the date first written above. At the request of any party, all parties hereto agree to execute an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**CAPMARK INVESTMENTS LP**

By: _____
     Name:
     Title:

**TRECAP PARTNERS LLC**

By: _____
     Name:
     Title:

**TRANSITION SERVICE**

DESCRIPTION:      Technology Services

SERVICES OF SELLER:   Seller shall provide the following technology services to Buyer:

1. <u>Internal Network</u>. Seller shall provide the Employees, not to exceed thirty-two (32) in the aggregate, with access to Seller's internal network (including access to the Internet and local and regional telephone use). Buyer understands and agrees that such network access will only include access to the documents and applications set forth in paragraphs 2 and 3 of this Schedule A1 and that such access may be segregated by Seller in such fashion as it deems necessary or advisable in its sole discretion from the remainder of Seller's network (whether by firewall or otherwise).

2. <u>Applications and Software</u>. Seller shall provide Buyer with access to the following proprietary applications: Epitome IDM, REES, Investran and Smart App. Such access will be limited to the access necessary to conduct the REEG business. Buyer understands and agrees that after the Closing Date Buyer shall be responsible for entering into licenses and installing (i) any other subscription services and (ii) any other software or applications required to conduct Buyer's business. Seller will cooperate in providing to Buyer information necessary to secure such licenses, but in no event will Seller incur any costs in connection with the procurement of such licenses. The REES and Smart APP application, data and licensing related thereto will be transferred to Buyer at Closing.

3. <u>Documents and Data</u>. Seller shall provide secure access, segregated by entitlement, to the documents contained in the share drive folders listed on Appendix A to this Schedule A1. Seller shall continue to maintain such documents and data in a manner reasonably consistent with the manner in which such systems are maintained in the six (6) months prior to the Closing Date, including back-up systems, but will perform no improvements or enhancements on behalf of or for the benefit of Buyer. Seller shall provide to Buyer a one-time back-up of all such documents immediately prior to the Termination Date. Data related to Investran and REES, as it relates to the REEG business will be provided to Buyer immediately prior to the Termination Date. Seller to provide all relevant documents, indexing criteria and access (to the extent commercially reasonable) to existing documents maintained in the Epitome IDM during the Term of this Agreement and a copy on the Termination Date.

4. <u>E-mail Forwarding</u>. Seller shall forward emails from the Employees' former Capmark email addresses for one hundred and twenty (120) days after the Closing Date. Such emails shall be forwarded to the TRECAP email addresses identified by Buyer. Employees shall not have access to their former Capmark email accounts after the Closing Date, however, Seller will immediately provide prior to the Termination Date the Employees with a copy

of all PST files for such Employees current email inboxes and archives as of the Closing Date. This shall include the indexing and all archives needed for eMail retention pursuant to applicable law.

5.  <u>Assistance</u>. Seller will make personnel available to Buyer to assist with the foregoing and Buyer will have reasonable access to such personnel during the term of this Transition Service in order to accomplish the foregoing.

6.  IT Hardware that is owned by, or will be transferred to, Buyer will need to remain intact and unaltered until the physical transition of office space has been completed. This includes the non-sterilization of data and software contained in such hardware until the Termination Date.

<u>TERMS OF THE TRANSITION SERVICE</u>: From the Closing Date and through the Termination Date, Buyer will use commercially reasonable efforts to cease use of Seller's network and other information technology systems as soon as possible. Except for the e-mail forwarding services set forth in item 4 above, all Transition Services set forth on this Schedule A1 shall terminate on the Termination Date.

<u>SERVICES BEYOND SCOPE</u>: For each service requested that is beyond the scope of this <u>Schedule A1</u>, and for any expenses incurred in connection with Schedule A1, Seller will pass through its costs to Buyer, including costs of any of Seller's personnel utilized in providing any of such services. Such costs shall be calculated and billed monthly to Buyer.

Appendix A

1. K:\GIA\Investor Rptg & Acctg\Investor Reporting\APIG – All Subfolders in this directory

2. K:\GIA\Investor Rptg & Acctg\Investor Reporting\Riata – All Subfolders in this directory

3. K:\GIA\Investor Rptg & Acctg\Investor Reporting\SAP, LLC – All Subfolders in this directory

4. K:\GIA\Equity Investments\Balance Sheets – All Subfolders in this directory

5. \\gmaccmpa1\shared\Equity Investments\Monthly and Weekly Reports\Monthly Reports\ – All Subfolders in this directory

6. K:\GIA\Equity Investments\2007 Audit\Audited Financial Statements – All Subfolders in this directory

7. \\gmaccmpa1\shared\GIA\Investor Rptg & Acctg\Policies and Procedures\approved policies\Fund Accounting – All Subfolders in this directory

8. K:\GIA\Investor Rptg & Acctg\Resource

9. K:\GIA\Investor Rptg & Acctg\Investor Reporting\Brevard FL Retail, LLC – All subfolders in this directory

10. K:\GIA\Investor Rptg & Acctg\Investor Reporting\CRP III – All subfolders in this directory

11. K:\GIA\Investor Rptg & Acctg\Investor Reporting\UK Equity – All subfolders in this directory

12. K:\GIA\Investor Rptg & Acctg\Investor Reporting\GMAC CRP, LP – All subfolders in this directory

13. K:\GIA\Investor Rptg & Acctg\Investor Reporting\GMAC CRP II, LP – All subfolders in this directory

14. K:\GIA\Investor Rptg & Acctg\Investor Reporting\Crystal City Partners, LLC – All subfolders in this directory

15. K:\GIA\Investor Rptg & Acctg\Investor Reporting\Seacrest – All subfolders in this directory

16. K:\GIA\Investor Rptg & Acctg\Investor Reporting\Investran – All subfolders in this directory

17. H:\ – All subfolders in this (my personal) directory

18. K:\GIA\Investor Rptg & Acctg\Investor Reporting\Tustin

19. K:\GIA\Investor Rptg & Acctg\Investor Reporting\Washingtonian

20. K:\GIA\Investor Rptg & Acctg\Investor Reporting\Daily Cash Account Activity

21. K:\GIA\Investor Rptg & Acctg\Investor Reporting\Bethesda

22. K:\Equity Investments\Partnership Audited Financial Statements

23. K:\GIA\Equity Investments\Balance Sheets

24. K:\GIA\Equity Investments\Tax

25. K:\EquityDealWriteUps\Equity Deal Minutes

26. K:\GIA\Equity Investments\Monthly and Weekly Reports\Monthly Reports\2009

27. K:\GIA\Equity Investments\AgreementsK:\Equity Investments – All Subfolders in this directory

28. K:\ EquityDealWriteUps – All Subfolders in this directory

29. K:\Equity Investments-Marketing – All Subfolders in this directory

30. K:\GIA\Investor Subscription Docs by Fund – All Subfolders in this directory for equity funds

31. N:\ EU – Equity (for London based team)

In addition to items listed above all N / O / P/# drives for employees.

<div align="center">

**SCHEDULE A2**

**TRANSITION SERVICE**

</div>

<u>DESCRIPTION:</u>      Access to Seller's Horsham Facilities

<u>SERVICES OF SELLER:</u>  Seller shall provide the following access to its facilities to Buyer:

- Sellers shall provide the Employees with access to office space at 116 Welsh Road, Horsham, PA 19044 that was in use by such Employees prior to Closing.

- Without limiting the generality of Section 7, Buyer shall, and shall cause the Employees, to comply with all of access and security policies applicable to Seller's facilities. Except as otherwise agreed to by the parties, the Employees shall observe the working hours, working rules and holiday schedules of the Seller.

<u>TERMS OF THE TRANSITION SERVICE:</u>   From the Closing Date, Buyer will use commercially reasonable efforts to vacate Seller's Horsham premises as soon as possible. All Transition Services (including access to facilities) set forth on this Schedule A2 shall terminate on the Termination Date.

For the avoidance of doubt, it is the intention of the parties to provide the Employees access to the foregoing facilities solely to permit use of such facilities from the date hereof until the Termination Date and not to grant Buyer or the Employees a license to use such facilities.

## SCHEDULE A3

## TRANSITION SERVICE

DESCRIPTION: Forwarding of U.S. mail, courier deliveries and bills received by Seller but addressed to the Funds, the Joint Ventures and the Incentive Vehicles and as otherwise relating to the Assets on a post-Closing basis.

SERVICES OF SELLER: Seller will use commercially reasonable efforts to forward any U.S. mail, courier deliveries and bills addressed to the Funds, the Joint Ventures and the Incentive Vehicles and as otherwise relating to the Assets to Buyer's address provided in Section 11(l) of this Agreement.

TERMS OF THE TRANSITION SERVICE: This Transition Service will be provided for one hundred and twenty (120) days after the Closing Date.

## SCHEDULE B

## INITIAL SERVICE COORDINATORS

Seller: John Lucerne

Buyer: Chris Boyle

## SCHEDULE C

## CONSENTS AND ARRANGEMENTS:  SOFTWARE LICENSES, SUBSCRIPTION SERVICES AND OTHER CONTRACTS

Windows OS (Software Licensing Agreement)
Microsoft Office Suite (Software Licensing Agreement)
Adobe Acrobat (Software Licensing Agreement)

Torto Wheaton (Subscription Service)
Korpaz (Subscription Service)
REIS (Subscription Service)
Co-Star (Subscription Service)

Argus (Licensing Agreement and Support Service Contract)
REES (Support Service Contract)
SunGard/Investran (Licensing Agreement and Support Service Contract)

## Exhibit H

### Form of Bidding Procedures

See attached.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------------x
:
**In re** : **Chapter 11**
:
**CAPMARK FINANCIAL GROUP INC.**, *et al.*, : **Case No. 09-13684 (CSS)**
:
**Debtors.** : **Jointly Administered**
:
--------------------------------------------------------------------x

## ORDER (A) SCHEDULING AN AUCTION IN CONNECTION WITH THE SALE OF REAL ESTATE EQUITY INVESTMENT ADVISORY GROUP BUSINESS ASSETS; (B) APPROVING BIDDING PROCEDURES; (C) APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (D) SCHEDULING A SALE HEARING; (E) ESTABLISHING OBJECTION DEADLINE; AND (F) APPROVING SALE HEARING NOTICE AND NOTICE OF ASSUMPTION AND ASSIGNMENT

Upon the motion, dated as of January 15, 2010 (the "Motion"),[1] of Capmark

Financial Group, Inc. ("CFGI") and certain of its subsidiaries and affiliates, as debtors and

debtors in possession (collectively, the "Debtors"),[2] pursuant to sections 105(a), 363, and 365 of

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such term in the Motion.

[2] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), Capmark Affordable Equity Inc. (2381), and Capmark Investments LP (7999). CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania,
(Continued)

title 11, United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1

of the Local Bankruptcy Rules for the District of Delaware (the "Local Rules") requesting the

following relief from this Court:

(I)    entry of an order (the "Bidding Procedures Order"):

    i.    scheduling a hearing (the "Sale Hearing") to consider approval of the proposed sale (the "Sale") by Capmark Investments LP and Capmark Carried Interest LLC (a non-debtor affiliate of the Debtors) (together, the "Sellers"), of certain of the Sellers' assets which substantially comprise the Sellers' real estate equity investment advisory group business (collectively, the "REEG Business"), to (a) TRECAP Partners LLC (the "Purchaser"), under that certain Purchase Agreement (the "Purchase Agreement"), between the Sellers and Purchaser, dated as of January 14, 2010, attached to the Motion as Exhibit C, or (b) another Successful Bidder (as defined below);

    ii.    establishing the objection deadline in connection with the proposed Sale;

    iii.    approving the form, and notice procedures relating to, the (a) Sale Hearing Notice (as defined below), and (b) Notice of Assumption and Assignment (as defined below);

    iv.    scheduling an auction ("Auction") to the extent the Sellers receive additional higher or better offers for the REEG Business;

    v.    approving the bidding procedures (the "Bidding Procedures"), as set forth herein; and

    vi.    approving the break up fee (the "Break-Up Fee") and expense reimbursement ("Expense Reimbursement");

(II)    upon completion of the Sale Hearing, entry of an order (the "Sale Order"):

    i.    if no higher and/or better offers have been received, approving the Sellers' entry into the Purchase Agreement without the necessity of conducting an Auction; or

---

19044. The addresses for all of the Debtors are available at the following World Wide Web address: http://chapter11.epiqsystems.com/capmark.

ii.  if a higher and/or better offer is received, and therefore, an Auction is held, authorizing the Sale of the REEG Business to Purchaser, or to another Successful Bidder (as defined below) at an Auction, free and clear of any and all liens, encumbrances, claims, and interests of any kind, nature or description (collectively, the "Liens") pursuant to section 363(f) of the Bankruptcy Code, pursuant to the Purchase Agreement, or a Modified Purchase Agreement;

and due and proper notice of the Motion having been provided to (i) the U.S. Trustee, (ii) Citibank, N.A. and Citicorp North America, Inc., as administrative agents under the Debtors' prepetition senior credit facility, bridge loan agreement and term loan facility, (iii) counsel to the Purchaser, (iv) Wilmington Trust FSB, as successor trustee under the prepetition senior unsecured floating rate note, 5.875% senior unsecured note, and 6.300% senior unsecured note indentures, (v) counsel to the Committee, and (vi) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b), and it appearing that no other or further notice need be provided; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:[1]

A.  The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.  Good and sufficient notice of the Motion has been given under the circumstances, and no further or other notice is required. A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested persons.

---

[1] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

C. The Debtors' Notice of Auction and Sale, annexed hereto as <u>Schedule 1</u>, is appropriate and reasonably calculated to provide interested parties with timely and proper notice of the Auction and Sale and related deadlines, and no other or further notice is required.

D. The Debtors' notice of the assumption and assignment of the Assigned Contract (the "<u>Notice of Assumption and Assignment</u>"), annexed hereto as Schedule 2, is appropriate and reasonably calculated to provide interested parties with timely and proper notice of the assumption and assignment of the Assigned Contracts and related deadlines and cure amounts, and no other or further notice is required.

NOW THEREFORE, IT IS HEREBY ORDERED THAT:

1. The Motion is granted to the extent described herein.

2. The Bidding Procedures, as set forth below, are approved and shall apply with respect to the proposed sale of the REEG Business (provided the Debtors may modify, amend and waive, as applicable, the Bidding Procedures in their sole discretion after consultation with the Committee):

(a) **Assets to Be Sold**: The assets to be sold shall consist of the assets comprising the REEG Business.

(b) **Confidentiality Agreements**: Upon execution of a confidentiality agreement, in form and substance satisfactory to the Sellers, any party that wishes to conduct due diligence in respect of the REEG Business may be granted access to all material information that has been or will be provided to Purchaser and other bidders; *provided, however,* prior to receipt by a party of any information from the Debtors (including, but not limited to, the Purchase Agreement and its schedules and exhibits, business and financial information and access to representatives of the Sellers), each such party will be required to deliver evidence reasonably satisfactory to the Sellers establishing such party's financial capability to timely consummate a purchase of the REEG Business.

(c) **Bid Deadline**: Any person or entity interested in participating in the Auction must submit a Qualifying Bid (as defined below) on or before February 18, 2010 at 12:00 p.m. noon (prevailing Eastern Time) (the "<u>Bid Deadline</u>") in writing, to (1) counsel to the Debtors, Dewey & LeBoeuf

4

LLP, 1301 Avenue of the Americas, New York, New York, 10019, Attention: Michael P. Kessler, Esq. and Judy G.Z. Liu, Esq., (2) corporate counsel to the Sellers, Goodwin Procter LLP, The New York Times Building, 620 8th Avenue, New York, New York, 10018, (3) Capmark Investments LP, 116 Welsh Road, Horsham, Pennsylvania, 19044, Attention: Keith Kooper, President, and (4) counsel to the Committee appointed in these cases, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036, Attention: Thomas Moers Mayer, Esq. and Amy Caton, Esq.

(d) **Qualifying Bids**: To participate in the bidding process and be deemed a "Qualifying Bidder," each potential bidder (other than the Purchaser) must submit a "Qualifying Bid" by the Bid Deadline. The Purchase Agreement is deemed a Qualifying Bid and Purchaser is deemed a Qualifying Bidder. Otherwise, to constitute a Qualifying Bid a bid must:

   i.   be in writing and state that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the REEG Business on terms and conditions no less favorable to the Sellers than the terms and conditions contained in the Purchase Agreement, and with a purchase price of no less than the Purchaser's purchase price plus the Termination Fee, the Expense Reimbursement, and $500,000;

   ii.  provide details of any assumptions about the transaction that are key to the purchase price, including a break-out of value ascribed, as applicable, to: (a) asset management fees, (b) general partnership interests, and/or (c) incentive management fees;

   iii. include a mark-up of the Purchase Agreement (a "Modified Purchase Agreement") reflecting the variations from the Purchase Agreement, and a clean and executed Modified Purchase Agreement;

   iv.  otherwise include terms and conditions substantially the same in all respects to the Purchase Agreement (including with respect to the representations and warranties);

   v.   provide that such bidder's offer is irrevocable until the closing of the purchase of the REEG Business if such bidder is the Successful Bidder or the Back-Up Bidder (each as defined below);

   vi.  state such bidder is financially capable of consummating the transactions contemplated by the Modified Purchase Agreement, and that there are no financing or due diligence contingencies for the bidder to consummate the Modified Purchase Agreement;

5

vii.  provide that such bidder will not require additional representations or warranties that relate to the limited liability company interests/limited partnership owned by the funds and joint separate accounts except as stated in Article 4 of the Purchase Agreement;

viii.  state such bidder is a registered investment adviser with the SEC;

ix.  provide that such bidder will close on the sale of the REEG Business within the same time period provided for in the Purchase Agreement;

x.  include such financial and other information that will allow the Sellers to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement and evaluate bidder's demonstration of its experience as a fiduciary in the investment management business;

xi.  describe the bidder's intention for the management and employees of the REEG Business, including the bidder's working assumption for sharing of promote revenue with management going forward, if applicable, and the integration of the REEG Business with the bidder's current business with regard to personnel and a pro forma business plan;

xii.  provide a summary of the key economic elements of the bidder's proposal that affect the third party investors of the funds and joint venture separate accounts of the REEG Business including any change, if necessary, to the key economic or governance terms of these investment vehicles;

xiii.  describe any transition services that will be required by the bidder in connection with an acquisition of the REEG Business;

xiv.  include a statement that there are no conditions precedent to the bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid. The bidder's bid and Modified Purchase Agreement should also highlight any governmental or third-party consents needed to consummate the acquisition of the REEG Business to the extent they are not already contemplated in the Purchase Agreement;

xv.  not request or entitle the bidder to any transaction or breakup fee, termination fee, expense reimbursement, or similar type of payment;

6

xvi.   fully disclose the identity of each entity that will be bidding for the REEG Business or otherwise participating in connection with such bid, and the complete terms of any such participation;

xvii.  include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Purchase Agreement;

xviii. include the names and contact information of members of the bidder who will be available to answer questions regarding the offer;

xix.   include the names of external advisors including financial, legal, and accounting firms, as well as industry consultants or other resources;

xx.    include any other information or factors that may be relevant to the Sellers and their advisors in consideration of the bid; and

xxi.   include a cash deposit by wire transfer equal to ten (10%) percent of the amount offered to purchase the REEG Business (the "Good Faith Deposit").

The Sellers shall make a determination regarding whether a bid is a Qualifying Bid, after consultation with the Committee, and shall notify bidders whether their bids have been determined to be Qualifying Bids by no later than one hour before the start of the Auction (as defined below);

(e)   **No Qualifying Bids**: If no timely, conforming Qualifying Bids, other than the Purchase Agreement, are submitted by the Bid Deadline, the Sellers shall not hold an Auction (as defined below) and, instead, shall request at the Sale Hearing that the Court approve the Purchase Agreement with Purchaser.

(f)   **Right to Disseminate Information Relating to Bid**.   At any time, whether before or after the Auction, the Sellers may share or not share, in their sole discretion, any bid for the REEG Business with the other bidders.

(g)   **Auction**: In the event the Sellers timely receive one or more Qualifying Bids other than the Purchase Agreement, the Sellers shall conduct the Auction with respect to the REEG Business.   The Auction will be held at the offices of Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019, on February 23, 2010 at 12:00 p.m. noon (prevailing Eastern Time), or such other location as designated by the Debtors in a notice to all Qualifying Bidders.   The Auction shall be governed by the following procedures (which may be amended, modified

7

and waived, as applicable, by the Debtors at any time in their sole discretion after consultation with the Committee):

i. The Purchaser and the Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

ii. Only representatives of the Debtors, the Purchaser, Qualifying Bidders, counsel and other advisors selected by the Committee, and representatives from the Office of the U.S. Trustee, shall be entitled to be present at the Auction;

iii. The Auction process shall be transcribed by a qualified court reporter, unless otherwise provided herein;

iv. Only the Purchaser and Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

v. Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

vi. Bidding shall commence at the amount of the highest Qualifying Bid submitted by the Qualifying Bidders prior to the Auction and such Bid shall be announced prior to the start of the Auction (the "Initial Highest Bid");

vii. Qualifying Bidders may submit subsequent bids to the Initial Highest Bid and all such subsequent bids must be stated in an amount exceeding each prior bid by USD $250,000 in purchase price consideration;

viii. The Sellers may determine the order in which Qualifying Bidders shall bid at the Auction;

ix. All Qualifying Bidders and the Purchaser shall be able to submit additional bids and make additional modifications to the Purchase Agreement or Modified Purchase Agreement, as applicable, at the Auction as determined by the Sellers at any time in their sole discretion after consultation with the Committee;

x. The Auction may include individual negotiations with the Qualifying Bidders and the Purchaser and/or open bidding in the presence of all other Qualifying Bidders and the Purchaser;

xi. The Sellers may determine, in their sole discretion and after consulting with the Committee, which portions o f the Auction shall be transcribed on the record and which shall not be transcribed;

xii. The Sellers may, in their sole discretion and after consulting with the Committee, discuss any Qualifying Bid with other Qualifying Bidders individually or together in any other group or groups of Qualifying Bidders, as determined by the Sellers;

xiii. The Auction shall continue until there is only one offer that the Sellers determine, after consultation with the Committee and subject to Court approval, with respect to the REEG Business, is the highest and/or best offer from among the Qualifying Bidders submitted at the Auction (the "Successful Bid"). In making this decision, the Debtors may consider any factors they deem relevant, including, without limitation, the amount of the purchase price, the form of consideration being offered, the expense to the Debtors of any obligation to pay the Break-Up Fee and Expense Reimbursement, the likelihood of the Qualifying Bidder's ability to close a transaction and the timing thereof, the number, type, and nature of any changes to the Purchase Agreement requested by each Qualifying Bidder, any contingencies relating to a Qualifying Bidder's offer, and the net benefit to the Debtors' estates. The Purchaser or Qualifying Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the applicable Purchase Agreement or Modified Purchase Agreement; and

xiv. Within three (3) days after conclusion of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments, or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities; *provided, however,* that any Successful Bidder shall have fifteen days to obtain requisite consents. Bids made after the close of the Auction shall not be considered by the Sellers.

(h) **Back-Up Bidder and Return of Good Faith Deposits**:

i. If an Auction is conducted, the Qualifying Bidder with the next highest or otherwise best Qualified Bid, as determined by the Sellers in the exercise of their business judgment at the Auction and in consultation with the Committee, shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until 24 hours after the closing of the sale transaction with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not

9

required, to consummate the Sale with the Back-Up Bidder without further order of the Court.

ii. Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Sellers as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) Business Day following the conclusion of the Auction. Each Good Faith Deposit of the Back-Up Bidder shall be held by the Debtors until one (1) Business Day after the closing of the Sale transaction with the Successful Bidder for the REEG Business.

3. The Break-Up Fee and Expense Reimbursement are approved. The Sellers are hereby authorized and directed to pay the Break-Up Fee and Expense Reimbursement in the event all or substantially all of the REEG Business is sold to another bidder and the Purchase Agreement is terminated as a result of entry of an Order approving an alternative transaction. Upon closing of the alternative transaction, the Sellers shall immediately pay the Break-Up Fee and Expense Reimbursement in cash to the Purchaser as an administrative expense claim in CILP's chapter 11 case pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code. In no event shall the Break-Up Fee or Expense Reimbursement be payable if these chapter 11 cases are converted to chapter 7 cases.

4. The form and manner of providing the Notice of Auction and Sale is hereby approved. Service of the Notice of Auction and Sale, as set forth below, constitutes good and sufficient notice of the Auction and Sale Hearing.

5. The Court shall hold the Sale Hearing on March 4, 2010 at 10:00 a.m. (prevailing Eastern Time) at which time the Court will consider approval of the Sale of the REEG Business, including the Debtors' assumption and assignment of the Assigned Contracts to Purchaser or the Successful Bidder.

6. Any objection (an "Objection") to the Sale of the REEG Business, the assumption and assignment of any Assigned Contracts, or the Cure Amounts must be filed and

10

served so as to be actually received on or before 4:00 p.m. on February 25, 2010 by (a) counsel for the Debtors, Dewey & LeBoeuf LLP, Attention: Michael P. Kessler, Esq., and Judy G.Z. Liu, Esq., 1301 Avenue of the Americas, New York, New York, 10019; (b) local counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware, 19801, Attention: Mark D. Collins, Esq. and Jason M. Madron, Esq.; (c) corporate counsel to the Sellers, Goodwin Procter LLP, The New York Times Building, 620 8th Avenue, New York, New York, 10018, Attention: Edward Braum, Esq.; (d) counsel for Purchaser, Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 4100, Dallas, Texas, 75201-4675, Attention: R. Terry Miller, Esq.; (e) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801; (f) Citibank, N.A. and Citicorp North America, Inc., as administrative agents under the Debtors' prepetition senior credit facility, bridge loan agreement and term loan facility, 1615 Brett Rd. Bldg. 3, New Castle, Delaware, 19720, Attention: Ralph Townley; (g) successor trustee under the prepetition senior unsecured floating rate note, 5.875% senior unsecured note, and 6.300% senior unsecured note indentures, Wilmington Trust FSB, 166 Mercer Street, Suite 2-R, New York, New York, 10012-3249, Attention: Adam Berman; (h) counsel to the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036, Attention: Thomas Moers Mayer, Esq. and Amy Caton, Esq.; and (i) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b). Each Objection must state with specificity the nature of such Objection.

7.     The notices described in the subparagraphs below (collectively, the "Notices") shall be sufficient and no further notice shall be required if given as follows:

> i.     The Debtors shall serve, within 3 business days after entry of the Bidding Procedures Order (the "Mailing Deadline"), by overnight

11

courier, electronic mail, or same-day messenger delivery, and copies of the Notice of Auction and Sale upon: (i) the U.S. Trustee, (ii) attorneys for the Committee, (iii) attorneys for the Purchaser, (iv) any party who, in the past 12 (twelve) months, expressed in writing to the Debtors an interest in acquiring the REEG Business, and who the Debtors and their representatives reasonably and in good faith determine potentially have the desire and financial wherewithal to effectuate the Sale, (v) all parties who are known to possess or assert a secured claim against the REEG Business, (vi) the Internal Revenue Service, (vii) the SEC, (viii) all applicable state attorneys general, local realty enforcement agencies, and local regulatory authorities, and (xi) any parties entitled to notice under Rule 2002-1(b) of the Local Rules for the United States Bankruptcy Court for the District of Delaware.

ii.  On or before the Mailing Deadline, or as soon as practical thereafter, the Sellers will publicize the Notice of Auction and Sale in the Wall Street Journal (National Edition) for one business day.

iii. On or before the Mailing Deadline, CILP (or its agent) shall serve, by overnight courier, electronic mail, or same-day messenger delivery, the Notice of Assumption and Assignment, substantially in the form attached hereto as Schedule 2, upon all known nondebtor parties to the Assigned Contracts. The Notice of Assumption and Assignment shall set forth (i) the intent of CILP to assume the Assigned Contracts and assign them to Purchaser (or to any Successful Bidder), and (ii) applicable Cure Amounts, if any. The Notice of Assumption and Assignment shall identify the Assigned Contracts and the Cure Amounts that the Sellers believe must be paid to cure all defaults under the Assigned Contracts. If no amount is listed on the Notice of Assumption and Assignment, the Sellers believe that there is no Cure Amount due.

8.  Any objections to (i) the assumption and assignment of an Assigned Contract, or (ii) the amount asserted as the Cure Amount (each, an "Assumption and/or Cure Objection") must be in writing and set forth with specificity the nature of the objection and the cure amount that the objecting party believes should be paid in connection with the assumption of the Assigned Contract (the "Claimed Cure Amount").

9.  If an Objection challenges a Cure Amount, the Objection must set forth the Claimed Cure Amount with appropriate documentation in support thereof. Upon receipt of

12

an Objection to a Cure Amount, CILP may, in its sole discretion, hold an amount equal to the Claimed Cure Amount in reserve pending further order of the Court or agreement between the applicable Debtor and the objecting party. So long as CILP holds the Claimed Cure Amount in reserve and otherwise satisfies the requirements for assumption under section 365 of the Bankruptcy Code, CILP may, without further delay, assume and assign the Assigned Contract that is the subject of an Objection relating to that Assigned Contract's Cure Amount.

10. If no Objection to the Cure Amount or the proposed assumption and assignment of an Assigned Contract is timely filed and served, the applicable Debtor may assume and assign the Assigned Contract to Purchaser or the Successful Bidder and the Cure Amount set forth in the Notice of Assumption and Assignment shall be binding upon the respective nondebtor party to the Assigned Contract for all purposes in CILP's chapter 11 case and otherwise. The respective nondebtor party shall be forever barred from objecting to the assumption and assignment of the relevant Assigned Contract and the Cure Amount, including, without limitation, the right to assert any condition to assignment and/or additional cure or other amount with respect to their respective Assigned Contracts.

11. Failure of any objecting person or entity to timely file its Objection shall be an absolute bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion or CILP's assumption and assignment of any of the Assigned Contracts, or the consummation and performance of the Sale (including the transfer free and clear of all Liens).

12. The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Bidding Procedures Order. CILP is hereby authorized and empowered to take such steps, expend such sums of money, and do such other things as may

13

be necessary to implement and effect the terms and requirements of this Bidding Procedures Order.

13. Notwithstanding any other provision contained herein, the Debtors, after consultation with the Committee, may adjourn or cancel the Auction or Sale at any time as an exercise of their sound business judgment.

14. Notwithstanding any potential applicability of Bankruptcy Rule 6004(h) or other Rule, this Bidding Procedures Order shall not be stayed for ten (10) days after the entry hereof and shall be effective and enforceable upon signature hereof.

Dated: January __, 2010
       Wilmington, Delaware

<div style="text-align:right">

_____
THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

</div>

14

# SCHEDULE 1

**(Proposed Notice of Auction and Sale)**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                        :
In re                                   :      Chapter 11
                                        :
CAPMARK FINANCIAL GROUP INC., et al.,   :      Case No. 09-13684 (CSS)
                                        :
         Debtors.                       :      Jointly Administered
                                        :
------------------------------------------------------------x
```

## NOTICE OF AUCTION AND SALE HEARING FOR SALE OF REAL ESTATE EQUITY INVESTMENT ADVISORY GROUP BUSINESS ASSETS

NOTICE IS HEREBY GIVEN, as follows:

1.    On January 15, 2010, Capmark Financial Group, Inc. ("CFGI") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"),[1] filed a motion (the "Motion") pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Bankruptcy Rules for the District of Delaware (the "Local Rules"), seeking approval of, among other things, (i) the establishment of bidding procedures (the "Bidding Procedures"), (ii) the scheduling of an auction (the "Auction"), as necessary, and (iii) the scheduling of a sale

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), Capmark Affordable Equity Inc. (2381), and Capmark Investments LP (7999). CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044. The addresses for all of the Debtors are available at the following World Wide Web address: http://chapter11.epiqsystems.com/capmark.

hearing (the "Sale Hearing") in connection with the proposed sale (the "Sale") by Capmark Investments LP and Capmark Carried Interest LLC (a non-debtor affiliate of the Debtors) (together, the "Sellers"), of the Sellers' REEG Business (as defined below). On [DATE], the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order (the "Bidding Procedures Order") approving, among other things, the Bidding Procedures and the Sale Hearing schedule.

2.     The Sellers and TRECAP Partners LLC (the "Purchaser") have entered into a Purchase Agreement, dated as of January 15, 2010 (the "Purchase Agreement"), regarding the Sale of certain of the Sellers' assets which substantially comprise the Sellers' real estate equity investment advisory group business (collectively, the "REEG Business"), whereby the Sellers have agreed to sell the REEG Business to Purchaser, subject to higher and better offers.

3.     Pursuant to the Bidding Procedures Order, if the Sellers receive any higher or better bids for the REEG Business, the Auction for the REEG Business shall take place on February 23, 2010 at 12:00 p.m. noon (prevailing Eastern Time), at the offices of Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019. Only parties that have submitted a Qualified Bid, as set forth in the Bidding Procedures Order, by no later than February 18, 2010 at 12:00 p.m. noon (prevailing Eastern Time) (the "Bid Deadline") may participate at the Auction. Any party that wishes to take part in this process and submit a bid for the REEG Business must submit their competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

4.     The Bidding Procedures Order provides that a Sale Hearing will be held on March 4, 2010 at 10:00 a.m. (prevailing Eastern Time) before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge, in Room 6 of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware, 19801.

5.     At the Sale Hearing, the Debtors shall request the Court to enter an order, among other things, authorizing the Sale of the REEG Business to Purchaser pursuant to the Purchase Agreement, or authorizing the Sale of the REEG Business to the Successful Bidder (as defined in the Bidding Procedures Order) at the Auction.

6.     At the Sale Hearing, the Court may enter such orders as it deems appropriate under the applicable law and as required by the circumstances and equities of these chapter 11 cases. Any objection (an "Objection") to the Sale of the REEG Business pursuant to the terms of the Purchase Agreement shall be in writing, shall conform to Bankruptcy Rules and the Local Rules, shall set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against CILP's estate or properties, the basis for the Objection and the specific grounds therefor, and shall be served upon (a) counsel for the Debtors, Dewey & LeBoeuf LLP, Attention: Michael P. Kessler, Esq., and Judy G.Z. Liu, Esq., 1301 Avenue of the Americas, New York, New York, 10019; (b) local counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware, 19801, Attention: Mark D. Collins, Esq. and Jason M. Madron, Esq.; (c) corporate counsel to the Sellers, Goodwin Procter LLP, The New York Times Building, 620 8th Avenue, New York, New York, 10018, Attention: Edward Braum, Esq.; (d) counsel for Purchaser, Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 4100, Dallas, Texas, 75201-4675, Attention: R. Terry

2

Miller, Esq.; (e) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801; (f) Citibank, N.A. and Citicorp North America, Inc., as administrative agents under the Debtors' prepetition senior credit facility, bridge loan agreement and term loan facility, 1615 Brett Rd. Bldg. 3, New Castle, Delaware, 19720, Attention: Ralph Townley; (g) successor trustee under the prepetition senior unsecured floating rate note, 5.875% senior unsecured note, and 6.300% senior unsecured note indentures, Wilmington Trust FSB, 166 Mercer Street, Suite 2-R, New York, New York, 10012-3249, Attention: Adam Berman; (h) counsel to the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036, Attention: Thomas Moers Mayer, Esq. and Amy Caton, Esq.; and (i) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b), so as to be actually received no later than February 25, 2010 at 4:00 p.m. (prevailing Eastern Time).

       7.    A copy of the Purchase Agreement is attached as <u>Exhibit C</u> to the Motion.

Dated: January __, 2010
      Wilmington, Delaware

> Mark D. Collins (No. 2981)
> Paul N. Heath (No. 3704)
> Jason M. Madron (No. 4431)
> Lee E. Kaufman (No. 4877)
> RICHARDS, LAYTON & FINGER, P.A.
> One Rodney Square
> 920 North King Street
> Wilmington, Delaware 19801
> Telephone: 302.651.7700
> Facsimile: 302.651.7701
>
> -and-
>
> Martin J. Bienenstock
> Michael P. Kessler
> Judy G.Z. Liu
> DEWEY & LEBOEUF LLP
> 1301 Avenue of the Americas
> New York, New York 10019
> Telephone: 212.259.8000
> Facsimile: 212.259.6333
>
> *Attorneys for the Debtors and Debtors in Possession*

RLF1 3527691v.1

# SCHEDULE 2

## (Proposed Notice of Assumption and Assignment)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------------x
: 
*In re* : **Chapter 11**
: 
**CAPMARK FINANCIAL GROUP INC.,** *et al.*, : **Case No. 09-13684 (CSS)**
: 
Debtors. : **Jointly Administered**
: 
----------------------------------------------------------------x

## NOTICE OF INTENT TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS IN CONNECTION WITH THE PROPOSED SALE OF REAL ESTATE EQUITY INVESTMENT ADVISORY GROUP BUSINESS ASSETS AND THE FIXING OF CURE AMOUNTS AND PROCEDURES ASSOCIATED THEREWITH

NOTICE IS HEREBY GIVEN, as follows:

1.       On [DATE], the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order (the "Bidding Procedures Order"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Bankruptcy Rules for the District of Delaware (the "Local Rules") in the above-captioned chapter 11 cases of Capmark Financial Group, Inc. ("CFGI") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"),[1] approving, among other things, this notice, the scheduling of the

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), Capmark Affordable Equity Inc. (2381), and Capmark Investments LP (7999). CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania,
(Continued)

Sale Hearing, and the procedures for the fixing of cure amounts (the "Cure Amounts") related to the assumption and assignment of certain executory contracts, unexpired leases, and other agreements of CILP (the "Assumed Contracts" with respect to each counterparty listed on Exhibit A attached hereto) in connection with the sale of assets which substantially comprise the Sellers' (as defined below) real estate equity investment advisory group business (the "REEG Business"). Capmark Investments LP ("CILP") will assume the Assumed Contracts and assign them to TRECAP Partners LLC (the "Purchaser"), pursuant to the terms of that certain Purchase Agreement, dated as of January 14, 2010 (the "Purchase Agreement"), between CILP and Capmark Carried Interest LLC (a non-debtor affiliate of the Debtors) (together, the "Sellers") and Purchaser, or to another Successful Bidder (as defined in the Bidding Procedures Order) at an Auction (as defined in the Bidding Procedures Order) for the sale of the REEG Business.

2.      CILP believes any and all defaults (other than the filing of these chapter 11 cases) under the Assumed Contracts can be cured by the payment of the Cure Amounts listed on Exhibit A.

3.      Any objections to (i) the assumption and assignment of an Assumed Contract, or (ii) the amount asserted as the Cure Amount (each, an "Assumption and/or Cure Objection") must be in writing and set forth with specificity the nature of the objection and the cure amount that the objecting party believes should be paid in connection with the assumption of the Assumed Contract (the "Claimed Cure Amount").

4.      To be considered a timely Assumption and/or Cure Objection, the Assumption and/or Cure Objection must be filed with the Court and served upon (a) counsel for the Debtors, Dewey & LeBoeuf LLP, Attention: Michael P. Kessler, Esq., and Judy G.Z. Liu, Esq., 1301 Avenue of the Americas, New York, New York, 10019; (b) local counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware, 19801, Attention: Mark D. Collins, Esq. and Jason M. Madron, Esq.; (c) counsel for Purchaser, Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 4100, Dallas, Texas, 75201-4675, Attention: R. Terry Miller, Esq.; (d) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801; (e) Citibank, N.A. and Citicorp North America, Inc., as administrative agents under the Debtors' prepetition senior credit facility, bridge loan agreement and term loan facility, 1615 Brett Rd. Bldg. 3, New Castle, Delaware, 19720, Attention: Ralph Townley; (f) successor trustee under the prepetition senior unsecured floating rate note, 5.875% senior unsecured note, and 6.300% senior unsecured note indentures, Wilmington Trust FSB, 166 Mercer Street, Suite 2-R, New York, New York, 10012-3249, Attention: Adam Berman; (g) counsel to the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036, Attention: Thomas Moers Mayer, Esq. and Amy Caton, Esq.; and (h) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b), such that it is actually received no later February 25, 2010 at 4:00 p.m. (prevailing Eastern Time).

---

19044.   The addresses for all of the Debtors are available at the following World Wide Web address: http://chapter11.epiqsystems.com/capmark.

5. If an Assumption and/or Cure Objection is timely filed, a hearing with respect to that objection shall be held before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Delaware, at the Sale Hearing.

6. Unless the Assumption and/or Cure Objection is timely filed and served, the assumption and assignment of the applicable Assumed Contract will proceed without further notice at the Sale Hearing to approve the sale of the REEG Business.

7. Parties that fail to file and serve timely Assumption and/or Cure Objections shall be deemed to have waived and released any and all rights to assert Cure Amounts different from those listed on Exhibit A and, subject to payment of the cure amount(s) listed on Exhibit A with respect to their Assume Contract(s), shall be forever barred and estopped from asserting or claiming against the pertinent Debtor, Purchaser, or any assignee of any Assumed Contract that any additional amounts are due or defaults exist, or prohibitions or conditions to assignment exist or must be satisfied, under such Assumed Contract.

8. If no Cure Amounts are due under the Assumed Contract, and the nondebtor party to the Assumed Contract does not otherwise object to CILP's assumption and assignment of the Assumed Contract, no further action need be taken on the part of that nondebtor party.

9. Assumption and/or Cure Objections that object solely to the Cure Amount may not prevent or delay CILP's assumption and assignment of any Assumed Contracts. If a party objects solely to a Cure Amount, CILP may, in its sole discretion, hold the Claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties. So long as CILP holds the Claimed Cure Amount in reserve, and there are no other unresolved objections to assumption and assignment, CILP can, without further delay, assume and assign the Assumed Contract that is the subject of the objection. Under such circumstances, the objecting party's recourse is limited to the funds held in reserve.

10. CILP's decision to assume and assign to Purchaser (or the Successful Bidder) the Assumed Contracts is subject to Court approval and the closing of the Purchase Agreement (the "Closing"). Accordingly, absent such Closing, any of the Assumed Contracts shall not be deemed assumed nor assigned, and shall in all respects be subject to further administration under the Bankruptcy Code. The inclusion of any document on the list of Assumed Contracts shall not constitute or be deemed to be a determination or admission by any Debtor or Purchaser (or the Successful Bidder) that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).

3

Dated: January \_\_, 2010
Wilmington, Delaware

Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Jason M. Madron (No. 4431)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: 302.651.7700
Facsimile: 302.651.7701

-and-

Martin J. Bienenstock
Michael P. Kessler
Judy G.Z. Liu
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: 212.259.8000
Facsimile: 212.259.6333

*Attorneys for the Debtors and Debtors in Possession*