# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x

*In re:*                    :     **Chapter 11**

**CAPMARK FINANCIAL GROUP INC.,** *et al.,*   :     **Case No. 09-13684 (CSS)**

**Debtors.**[1]               .     :     **Jointly Administered**

:     **Hearing Date: February 19, 2010 at 9:00 a.m.**
:     **Objection Deadline: February 12, 2010 at 4:00 p.m.**

-----------------------------------------------------------x

## MOTION, PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, AND LOCAL RULES 2002-1 AND 6004-1, REQUESTING ENTRY OF TWO ORDERS: (I) THE BIDDING PROCEDURES ORDER, (a) SCHEDULING AN AUCTION SALE; (b) APPROVING BIDDING PROCEDURES; (c) APPROVING BREAK-UP FEE; (d) SCHEDULING THE SALE HEARING; (e) ESTABLISHING OBJECTION DEADLINE; AND (f) APPROVING FORM/MANNER OF NOTICE OF AUCTION AND SALE AND NOTICE OF ASSUMPTION AND ASSIGNMENT; AND (II) THE SALE ORDER, APPROVING SALE OF THE TRANSFERRED INTERESTS (INCLUDING ASSUMPTION AND ASSIGNMENT OF CONTRACTS) <u>FREE AND CLEAR OF ALL LIENS, CLAIMS, AND INTERESTS</u>

Capmark Financial Group Inc. ("CFGI") and certain of its subsidiaries and

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), Capmark Affordable Equity Inc. (2381), and Capmark Investments LP (7999). CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044. The addresses for all of the Debtors are available at the following World Wide Web address: http://chapter11.epiqsystems.com/capmark.

affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this motion (the "Motion") requesting entry of two orders: (i) a bidding procedures order, (a) scheduling an auction sale, (b) approving bidding procedures, (c) approving a break-up fee, (d) scheduling a sale hearing, (e) establishing an objection deadline, and (f) approving the proposed form and manner of sale notice and notice of assumption and assignment; and (ii) a sale order, approving the sale of the Debtor-Sellers' Transferred Interests (as defined below) that comprise equity and debt interests in certain special purpose entities representing substantially all of the Debtors' remaining investments in the Mexican market, as more fully discussed below. In support of this Motion the Debtors respectfully represent:

### Background

1.      On October 25, 2009 (the "Commencement Date"), each of the Debtors other than Capmark Investments LP (collectively, the "First Filed Debtors") commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On January 15, 2010 (the "Capmark Investments Commencement Date"), Capmark Investments LP, a wholly-owned subsidiary of CFGI, commenced a voluntary case under chapter 11 of the Bankruptcy Case. The Debtors continue to operate their businesses and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On October 27, 2009, this Court entered an order authorizing the joint administration of the First Filed Debtors' chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 1015-1 of the Local Bankruptcy Rules for the District of Delaware (the "Local Rules"). On January 19, 2010, this Court entered an order authorizing the joint administration of Capmark Investments LP's chapter 11 case with the jointly administered chapter 11 cases of the First Filed Debtors.

3.　　On November 2, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed a statutory unsecured creditors committee pursuant to section 1102 of the Bankruptcy Code (the "Committee").

### Jurisdiction and Venue

4.　　This Court has jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Capmark's Businesses

5.　　The Debtors and their non-debtor subsidiaries and affiliates (together with the Debtors, "Capmark") are a group of commercial real estate finance companies that provide real estate-related products and services to borrowers, investors and other customers along three core business lines: (i) commercial real estate lending and mortgage banking; (ii) investments and funds management; and (iii) commercial loan servicing.[2]

6.　　A detailed description of Capmark's business, capital structure, and the events leading to the commencement of these chapter 11 cases is contained in the *Declaration of Thomas L. Fairfield, Executive Vice President, General Counsel and Secretary of CFGI, in Support of the Debtors' Chapter 11 Petitions and First Day Motions and Applications*, filed on the Commencement Date [Docket No. 13].

### Relief Requested

7.　　By this Motion, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rules 2002-1 and 6004-1, the Debtors request entry of two orders: (i) a bidding procedures order (the "Bidding

---

[2] Pursuant to an order of this Court dated November 24, 2009, the Debtors were authorized to sell all of their commercial mortgage banking and mortgage servicing assets (collectively, the "MSB Business") to Berkadia Commercial Mortgage LLC, which sale closed December 11, 2009.

Procedures Order"), substantially in the form annexed hereto as Exhibit A, (a) scheduling an auction (the "Auction"), at which the Debtor-Sellers (as defined below) shall solicit competing bids for the sale (the "Sale") of the Debtor-Sellers' Transferred Interests (as defined below); (b) approving certain bidding procedures (the "Bidding Procedures") relating to the Sale; (c) approving a break-up fee for the stalking horse bidder as protection against a topping bid; (d) scheduling a hearing (the "Sale Hearing") to approve the Sale of the Debtor-Sellers' Transferred Interests to the stalking horse or to the successful bidder or bidders at the Auction; (e) establishing an objection deadline for filing objections to the Sale (the "Objection Deadline"); (f) approving the proposed form and manner of notice of the Auction and Sale Hearing (the "Notice of Auction and Sale"), annexed to the Bidding Procedures Order as Schedule A-1; and (g) approving the proposed form and manner of notice of assumption and assignment of certain executory contracts as part of the Sale transaction (the "Notice of Assumption and Assignment"), annexed to the Bidding Procedures Order as Schedule A-2; and (ii) upon completion of the Sale Hearing, an order (the "Sale Order"), substantially in the form annexed hereto as Exhibit B, authorizing the Sale of the Debtor-Sellers' Transferred Interests to TESEFA, S.A. de C.V., a Sociedad Anónima de Capital Variable organized under the laws of Mexico ("TESEFA" or "Buyer"), on the terms and conditions set forth in the Sale Agreement (as defined below), annexed hereto as Exhibit C, or to a Successful Bidder or Successful Bidders, free and clear of any and all liens, claims, encumbrances and interests of any kind, nature or description (collectively, the "Liens").[3]

---

[3] If no Qualifying Bids (as defined below) are submitted by the Bid Deadline (as defined below), the Debtors will submit a revised Sale Order reflecting that no Auction was held and that the Sale to Buyer has been approved, blacklined against the Sale Order annexed to this Motion.

### The Transferred Interests

8.     CFGI, Capmark Finance Inc. ("CFI," and together with CFGI, the "Debtor-Sellers") and non-debtor Capmark Mexico, S. de R.L. de C.V., a Sociedad de Responsabilidad Limitada de Capital Variable organized under the laws of Mexico, an affiliate of CFGI ("Capmark Mexico," and together with the Debtor-Sellers, the "Sellers"), have historically invested in Mexican non-performing loans. The Sellers' equity and debt interests in certain special purpose entities that own Mexican non-performing loans are the subject of the proposed sale (the "Transferred Interests"). Many of the special purpose entities are either wholly-owned by the Sellers or held in joint ventures with certain third parties. The Transferred Interests also include the contracts governing the joint venture special purpose entities and certain debt instruments issued by such entities to the Sellers.

9.     The non-performing loan assets held by the Sellers through the Transferred Interests are illiquid and risky by nature. The non-performing loans have uncertain cash flows and require significant oversight by the servicer of the assets. The equity interests in the joint venture special purpose entities are subject to transfer restrictions which prohibit the transfer of the Sellers' interests without the consent of the joint venture partners and/or otherwise grant the joint venture partners rights of first refusal to acquire the Sellers' interests. The Transferred Interests owned by the Debtor-Sellers are referred to herein as the "Debtor-Sellers' Transferred Interests."

10.     As a result of the complexities, difficulties and risks surrounding these assets, in late 2007 Capmark determined it would no longer invest in the Mexican market and the Sellers began the process of winding down their investments in the Mexican non-performing loan market. At that time, the Sellers held approximately $75 million of assets in Mexico. The Sellers decided to run off these investments and/or attempt to sell them on a stand-alone basis.

As part of this process, the Sellers also entered into an agreement to sell the Mexican servicing platform associated with the assets to certain of its Mexican employees through a management buy-out (the "MBO Transaction"). The former employees continue to service the assets underlying the Transferred Interests through their company, Zéndere Holding S.A.P.I. de C.V. ("Zéndere"), a Sociedad Anónima Promotora de Inversión organized under the laws of Mexico. Zéndere is a Guarantor (as defined below) participant in the Buyer's group under the Sale Agreement. As part of the consideration for the MBO Transaction, Zéndere issued to Capmark Mexico a USD $2.2 million note (the "Zéndere Note"). The unpaid principal amount of the Zéndere Note is approximately USD $1.6 million. The proposed Sale contemplates the sale of the Zéndere Note to the Buyer.

11.     Given Capmark's decision to withdraw from the Mexican market, the depreciating value of the Transferred Interests and the Debtors' unwillingness to devote the necessary resources to maintain value in the Debtor-Sellers' Transferred Interests, the Debtors do not believe the assets are a viable component of the Debtors' anticipated reorganization. As a result, the Debtors desire to sell the Debtor-Sellers' Transferred Interests, and non-debtor Capmark Mexico desires to sell its portion of the Transferred Interests, to any party or parties offering the highest and/or best offer for the Transferred Interests.

### The Proposed Sale of the Transferred Interests

12.     The Sellers, Buyer, Promecap S.A. de C.V., a Sociedad Anónima de Capital Variable organized under the laws of Mexico ("Promecap"), Odisea Asset Management, LLC, a Delaware limited liability company ("Odisea," and together with Promecap and Zéndere, the "Guarantors") have entered into that certain purchase agreement (the "Sale Agreement"),

dated as of February 4, 2010, whereby the Buyer has agreed to purchase from Sellers the following assets, which comprise the Transferred Interests:[4]

(a) Capmark Activos I, S. de R.L. de C.V. ("Capmark Activos I"): (i) the outstanding debt of Capmark Activos I issued in favor of CFI, (ii) the outstanding debt of Capmark Activos I issued in favor of Capmark Mexico, and (iii) 2 Social Parts owned by Capmark Mexico and CFI, together representing 100% of the outstanding capital stock of Capmark Activos I;

(b) Capmark Activos III, S. de R.L. de C.V. ("Capmark Activos III"): 1 Social Part owned by CFI and 1 Social Part owned by Capmark Mexico, together representing 100% of the outstanding capital stock of Capmark Activos III;

(c) COEFACT, S.A. de C.V. ("COEFACT"): (i) 25,000 series "A" shares (Fixed capital), (ii) 6,975,000 series "B" shares (Variable capital) of COEFACT owned by Capmark Mexico, together representing 50% of the outstanding stock of COEFACT; and (iii) all rights and obligation of Capmark Mexico under the Shareholders' Agreement dated as of March 19, 2004, between Capmark Mexico and UBS AG;

(d) LLM Inversiones I, S.A. de C.V. ("LLM Inversiones I"): (i) unsecured debentures of LLM Inversiones I issued by Lend Lease Equities, S.A. de C.V. and held by Capmark Mexico (issuance date of December 10, 2003), and (ii) all rights and obligations of Capmark Mexico and CFI under the Assignment and Assumption of Rights and Payment Agreement, dated as of December 10, 2003, among Lend Lease Equities, S.A. de C.V., Capmark Mexico, and CFI;

(e) LLM Inversiones II, S.A. de C.V. ("LLM Inversiones II"): (i) 50,000 series "A" shares (fixed capital) of LLM Inversiones II and (ii) 924,675 series "B" shares (variable capital) owned by Capmark Mexico, together representing 50% of the outstanding capital stock of LLM Inversiones II, and (ii) all rights and obligations of Capmark Mexico under the Shareholders' Agreement dated as of December 15, 2002, among ML IBK Positions Inc., Lend Lease Equities, S.A. de C.V., and LLM Inversiones II;

(f) Recuperadora de Deuda Hipotecaria, S. de R.L. de C.V. (the "RDH Pool"): 1 Social Part of the RDH Pool owned by CFGI, representing 40% of the outstanding capital stock of the RDH Pool, and (ii) all rights and obligations of CFI. under the Amended and Restated Shareholders Agreement dated as of January 18, 2006 among CFI, CIGPF 1 Corp., and UBS AG;

---

[4] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sale Agreement. The number of equity securities set forth in this Exhibit A represent the number of equity securities held by the applicable Seller as of October 9, 2009 and may have been adjusted as a result of pro rata capital reductions effected by the applicable entity.

(g)    VPN Plus, S. de R. L. de C.V. ("VPN Plus I"): (i) 1 Social Part of VPN Plus I owned by CFGI, representing 50% of the outstanding capital stock of VPN Plus I, and (ii) all rights and obligations of CFI under the Shareholders Agreement dated as of September 8, 2005, among CFI and CIGPF I Corp.;

(h)    VPN Plus II, S. de R.L. de C.V. ("VPN Plus II"): (i) 1 Social Part of VPN Plus II owned by CFGI, representing 50% of the outstanding capital stock of VPN Plus II; and (ii) all rights and obligations of CFI under the Shareholders Agreement dated as of September 29, 2005, among CFI and CIGPF I Corp.;

(i)    The Zéndere Note: (i) obligations and rights related to the Stock Purchase Agreement entered into by and among Zéndere I, Corporativo Zéndere I, CFGI, Capmark Mexico, and the Principals named in the Stock Purchase Agreement dated as of November 15, 2007, and (ii) the obligations and rights related to the Stock Pledge Agreement entered into by and among Zéndere I and Corporativo Zéndere I as Pledgors and Capmark Mexico as Pledgee, dated as of December 7, 2007; and

(j)    all contracts relating to the Transferred Interests (the contracts relating to the Debtor-Sellers' Transferred Interests, the "Assigned Contracts").

13.    The Transferred Interests in paragraph 12(a)-(j) that are held by the Debtor-Sellers are the Debtor-Sellers' Transferred Interests. The Transferred Interests comprised of the RDH Pool, COEFACT, Capmark Activos I, Capmark Activos III, VPN Plus I and VPN Plus II are collectively referred to herein as the "Core Interests."

14.    The Sale Agreement provides the Sale of the Transferred Interests to the Buyer is subject to higher or better offers. The principal terms and conditions of the Sale Agreement are as follows:[5]

(a)    **Purchase Price**. The purchase price of the Transferred Interests is MXN $224,605,492 (USD $17,158,555.54),[6] subject to certain upward or downward adjustments (the "Purchase Price"). Approximately USD $15 million of the proposed Purchase Price will be allocated to CFGI and CFI.

(b)    **Break-Up Fee**. In the event the Court does not grant an order approving the sale of the Transferred Interests owned by the Debtor-Sellers to Buyer, and Sellers consummate an Alternative Transaction (as defined in the Sale Agreement) with one or more Successful Bidders, Sellers shall pay in cash to Buyer a break-up fee

---

[5] To the extent there are any inconsistencies between the summary description of the Sale Agreement contained herein and the terms and conditions of the Sale Agreement, the terms of the Sale Agreement control.

[6] The exchange rate was calculated as of February 4, 2010.

(the "Break-Up Fee") in an amount equal to the sum of (a) the reasonable out-of-pocket expenses of Buyer in connection with the negotiation, execution and performance of the letter of intent and the Sale Agreement, not to exceed USD $100,000 in the aggregate (the "Expense Reimbursement") and (b) two percent (2%) of the aggregate Base Purchase Price allocated to the Transferred Interests sold to such Successful Bidder or Successful Bidders (as adjusted pursuant to Section 2.4 (a)(i) and (ii) of the Sale Agreement to the date of the closing of an Alternative Transaction). In no event shall the Break-Up Fee be payable to Buyer if the closing of the Alternative Transaction does not occur within six months of the date of the execution of the Sale Agreement. The Break-Up Fee is not payable from the Debtor-Sellers if, prior to the Break-Up Fee becoming due and payable, the Debtor-Sellers' chapter 11 cases are converted to chapter 7 cases.

(c) **Termination of the Sale Agreement**.

    (i)     <u>Termination by Mutual Consent</u>. At any time prior to the Closing Date, the Sellers and Buyer may terminate the Sale Agreement by mutual written consent.

    (ii)     <u>Termination by Either Party</u>. At any time prior to the Closing Date, either the Sellers or the Buyer may terminate the Sale Agreement if:

        (A)     the Buyer is a Successful Bidder and the closing of the Acquisition does not occur on or before April 15, 2010, or the Buyer is a Back-Up Bidder and the closing of the Alternative Transaction with the Successful Bidder does not occur on or before May 15, 2010; *provided*, that such right to terminate the Sale Agreement shall not be available to any party whose actions or breach of the Sale Agreement has been the cause of or resulted in the failure of the closing of the Acquisition to occur on or before such date;

        (B)     the Bankruptcy Court enters an order authorizing or approving an Alternative Transaction, Buyer is not a Successful Bidder and Sellers determine at the conclusion of the Auction that Buyer is a Back-Up Bidder;

        (C)     the Bankruptcy Court enters an order authorizing or approving an Alternative Transaction, Buyer is not a Successful Bidder, and Sellers determine at the conclusion of the Auction that Buyer is a Back-Up Bidder and the time period requiring Buyer to be a Back-Up Bidder under the Bidding Procedures Order has expired;

        (D)     the chapter 11 case of any Debtor-Seller whose estate includes any portion of the Transferred Interests is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, an examiner with expanded powers or a trustee is appointed pursuant to the Bankruptcy Code or the Bankruptcy Court enters an order pursuant

to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any material portion of a Debtor-Seller's Transferred Interests; or

(E)     the Bankruptcy Court requires an amendment to the Sale Agreement (including, without limitation, the elimination of the Break-Up Fee or the requirement that a Qualifying Bid be for no less than all the Core Interests) that is materially adverse to a party, and such party does not agree to such amendment.

(iii)   <u>Termination by the Sellers</u>.  At any time prior to the Closing Date, the Sellers may terminate the Sale Agreement if the Sellers shall have entered into a definitive agreement in respect of an Alternative Transaction and Buyer is not a Successful Bidder or the Back-Up Bidder.

(iv)    <u>Termination by the Buyer</u>.  At any time prior to the Closing Date, the Buyer may terminate the Sale Agreement if:

(A)     the Bankruptcy Court does not enter the Bidding Procedures Order on or before February 23, 2010, subject to the schedule of the Bankruptcy Court (including the availability of hearing dates) or other circumstances and events outside the control of the Debtor-Sellers;

(B)     (i) within five (5) Business Days after the date of the Auction (as defined in the Bidding Procedures Order), the Sale Order has not been entered by the Bankruptcy Court, subject to the schedule of the Bankruptcy Court (including the availability of hearing dates) or other circumstances and events outside the control of the Debtor-Sellers, or (ii) a stay of the Sale Order has been entered by the Bankruptcy Court barring the Closing;

(C)     the form of Sale Order attached to the Bidding Procedures and Sale Motion is denied or modified in any material adverse respect to the Buyer without the consent of Buyer; or

(D)     previous to entry of the Sale Order approving the sale to Buyer, the Debtors file with the Bankruptcy Court a chapter 11 plan or disclosure statement which contemplates an Alternative Transaction, or any Person files with the Bankruptcy Court a chapter 11 plan or disclosure statement which contemplates an Alternative Transaction and Sellers do not object to or oppose such plan or disclosure statement, and Buyer is not a Successful Bidder.

15.    Moreover, in addition to the above-described salient features of the Sale Agreement, in accordance with Local Rule 6004-1(b)(iv), the Debtors note the following with respect to the Sale Agreement:

(a)    **No Sale to an Insider**:  The prospective Buyer is not an insider of the Debtors within the meaning set forth in section 101(31) of the Bankruptcy Code.  As noted above, prior to the Commencement Date, one of the Guarantors of the Buyer's obligations under the Sale Agreement, Zéndere, purchased the servicing platform associated with the Transferred Interests as part of the MBO Transaction, a management buy-out of the servicing platform by certain of the Debtors' former Mexican employees.

(b)    **Sale Agreements with Management**:  No sale agreements with management have been entered into in connection with the Sale of the Transferred Interests.

(c)    **Releases**:  No releases have been entered into in connection with the Sale of the Transferred Interests.

(d)    **Private Sale/No Competitive Bidding**:  As discussed above, Sellers intend to conduct an Auction for the Sale of the Transferred Interests.  Neither the Sale Agreement nor any other agreement prohibits the Debtor-Sellers from soliciting competing offers for the Transferred Interests and the Debtor-Sellers are not otherwise limited in shopping the Transferred Interests.  Section 3.1(f) of the Sale Agreement provides such solicitation shall be in accordance with the procedures set forth in the Bidding Procedures Order once entered on the Bankruptcy Court's docket or until the entry of the Bidding Procedures Order, consistent with the procedures set forth in the form of Bidding Procedures Order and that from the time of entry of the Sale Order approving the sale of the Debtor-Sellers' Transferred Interests to Buyer to the Closing (the "Non-Solicitation Period"), Sellers shall not, nor shall they authorize or permit any of their respective Representatives or Affiliates to directly or indirectly, solicit, facilitate or encourage submission of any inquiries regarding an Alternative Transaction or respond to any unsolicited inquiries, engage in discussions with or provide information or data to such unsolicited bidders.

(e)    **Closing and Other Deadlines (Closing and Closing Date)**:  As set forth in Section 2.2 of the Sale Agreement, the Closing is scheduled to occur no later than two (2) Business Days after the total and complete satisfaction (or waiver as provided in the Sale Agreement) of all the conditions set forth in the Sale Agreement (other than those conditions that by their nature will be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), unless another time, date and/or place is agreed to in writing by the parties to the Sale Agreement.

(f)  **Good Faith Deposit**:  The Sale Agreement does not require the Buyer's submission of a good faith deposit, but the form of Bidding Procedures Order attached hereto, which is reasonably satisfactory to the Buyer, requires other bidders to submit a good faith deposit in the amount of ten percent (10%) of the Purchase Price.

(g)  **Interim Arrangements with Proposed Buyer**:  No provision of the Sale Agreement addresses interim arrangements with the proposed Buyer.

(h)  **Use of Proceeds**:  No provision of the Sale Agreement addresses the use of proceeds.

(i)  **Tax Exemption**:  No provision of the Sale Agreement addresses the use of tax exemptions.

(j)  **Record Retention**:  Section 6.5(a) of the Sale Agreement provides that Buyer and Debtor-Sellers shall retain all Tax Returns, schedules, work papers, and all material records and other documents relating to Tax matters, of the Entities and their Subsidiaries for the Tax period first ending on or after the Closing Date and for all prior Tax periods until the later of (i) the expiration of the applicable statute of limitations (and, to the extent notice is provided with respect thereto, any extensions thereof) for the Tax periods to which the Tax Returns and other documents relate or (ii) five (5) years following the due date (without extension) for such Tax Returns.  The Sale Agreement does not address the retention of other records, but because the Debtor-Sellers are not selling substantially all of their assets in the Sale, the Debtor-Sellers will retain, or have reasonable access to, their books and records to enable them to administer their chapter 11 cases following the Sale.

(k)  **Sale of Avoidance Actions**:  The Sale Agreement does not involve the sale of, or impose limitations on, any chapter 5 causes of action.

(l)  **Requested Findings as to Successor Liability**:  The proposed Sale Order provides that the Buyer, under no circumstances, shall be deemed to be a successor of the Debtor-Sellers and shall have no successor or vicarious or other liabilities of any kind with respect to the Debtor-Sellers' Transferred Interests, and all persons and entities will be enjoined from asserting any such claims against the Buyer.

(m)  **Sale Free and Clear of Unexpired Leases**:  Pursuant to Section 2.3 of the Sale Agreement, the Buyer shall acquire the Debtor-Sellers' Transferred Interests free and clear of all Liens and other interests.

(n)  **Credit Bid**:  The Debtor-Sellers' Transferred Interests are unencumbered by any Lien, mortgage, or any other security interest.  Accordingly, there will be no credit bidding under section 363(k) of the Bankruptcy Code.

(o) **Relief from Bankruptcy Rule 6004(h)**: The Debtors are requesting relief from the 14-day stay imposed by Rule 6004(h).

## Bidding Procedures and the Auction

16. As noted above, to maximize the value of the Debtor-Sellers' Transferred Interests, the Debtors seek to conduct a competitive bidding process for the Sale of the Transferred Interests pursuant to the Sale Agreement, subject to higher or better offers. The proposed Auction and Bidding Procedures are set forth below (the Debtors may modify, amend, and waive, as applicable, the Bidding Procedures in their sole discretion after consultation with the Committee, except the Debtors may not modify, amend, or waive the Bidding Procedures to provide that a Qualifying Bid can be made for less than the Core Interests without the prior written consent of the Buyer):

(a) **Assets to Be Sold**: The Auction shall consist of the Transferred Interests.

(b) **Confidentiality Agreements**: Upon execution of a confidentiality agreement, in form and substance satisfactory to the Debtor-Sellers, any party that wishes to conduct due diligence in respect of the Transferred Interests may be granted access to all material information that has been or will be provided to the Buyer and other bidders; *provided, however*, prior to receipt by a party of any information from the Debtor-Sellers (including, but not limited to, the Sale Agreement and its schedules and exhibits, business and financial information, and access to representatives of all the Sellers), each such party will be required to deliver evidence reasonably satisfactory to Debtor-Sellers establishing such party's financial capability to timely consummate a purchase of all of the Transferred Interests.

(c) **Bid Deadline**: Any person or entity interested in participating in the Auction must submit a Qualifying Bid (as defined below) on or before March 22, 2010 at 2:00 p.m. (prevailing Eastern Time) (the "Bid Deadline"), in writing, to (1) counsel to the Debtor-Sellers, Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019, Attention: Michael P. Kessler, Esq. and Judy G.Z. Liu, (2) Capmark Financial Group Inc., 116 Welsh Road, Horsham, Pennsylvania, 19044, Attention: Thomas L. Fairfield, Esq., and (3) counsel to the Committee, Kramer Levin Naftalis and Frankel, LLP, Attention: Thomas Moers Mayer, Esq. and Amy Caton, Esq., 1177 Avenue of the Americas, New York, New York, 10036. The Bid Deadline may be extended or otherwise modified by the Debtors in their sole discretion after consultation with the Committee.

(d) **Qualifying Bids**: To participate in the bidding process and be deemed a "Qualifying Bidder," each potential bidder (other than the Buyer) must submit a "Qualifying Bid" by the Bid Deadline. The Sale Agreement is deemed a Qualifying Bid and Buyer is deemed a Qualifying Bidder. Otherwise, to constitute a Qualifying Bid, a bid must:

(i) be in writing and state that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of all the Transferred Interests on terms and conditions no less favorable to the Sellers than the terms and conditions contained in the Sale Agreement; *provided*, the Debtors, after consultation with the Committee, may accept bids for less than all of the Transferred Interests provided such bids (a) are submitted in writing, (b) state that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of no less than the Core Interests (as defined in the Sale Agreement) on terms and conditions no less favorable to the Sellers than the terms and conditions contained in the Sale Agreement, and (c) state that such bidder is prepared to acquire the Transferred Interests included in its bid that are not Core Interests in the event such bidder is not the Successful Bidder for the Core Interests at the Auction;

(ii) include a mark-up of the Sale Agreement (the "Modified Sale Agreement") reflecting the variations from the Sale Agreement, and a clean and executed Modified Sale Agreement;

(iii) otherwise include terms and conditions substantially the same in all respects to the Sale Agreement (including with respect to the representations and warranties);

(iv) provide that such bidder's offer is irrevocable until the closing of the purchase of the Transferred Interests if such bidder is a Successful Bidder or a Back-Up Bidder (each as defined below);

(v) provide that such bidder will close on the sale of the Transferred Interests comprising its bid within the same time period provided for in the Sale Agreement;

(vi) provide that such bidder acknowledges and agrees that it will not be entitled to purchase any Transferred Interest for which the necessary consents or waivers cannot be obtained by such bidder or with respect to which a third party with a right of first refusal exercises such right, and that the purchase price shall be reduced by the purchase allocated to any Transferred Interest that cannot be transferred because the necessary consents and waivers cannot be obtained by such bidder or with respect to which such third party has exercised its right of first refusal;

(vii)    provide that such bidder agrees and recognizes that the sale of Transferred Interests by nondebtor Seller Capmark Mexico shall be governed by the same bidding procedures and requirements set forth in this Order;

(viii)   provide for the immediate payment of the Break-Up Fee to Buyer upon consummation of a sale or sales of the Transferred Interests out of the proceeds of an Alternative Transaction in accordance with the Sale Agreement;

(ix)     provide the bidder is a Qualified Transferee (under and as defined in each of the Shareholder Agreements set forth on Exhibit A of the Sale Agreement);

(x)      exceed the Purchase Price in the Sale Agreement by an initial bid of MXN $6,740,000 (USD $514,896.87) plus the amount of the Break-Up Fee (assuming a sale of all of the Transferred Interests and out of pocket expenses of the Buyer in the amount of USD $100,000), which bid must be separately allocated among each of the Transferred Interests in proportion to the allocations set forth on Exhibit B to the Sale Agreement;

(xi)     to the extent not previously provided during the bidding process, include such financial and other information, including audited financial statements, that will allow the Sellers to make a reasonable determination as to the bidder's financial wherewithal and other capabilities to consummate the transactions contemplated by the Modified Sale Agreement;

(xii)    not request or entitle the bidder to any transaction or breakup fee, termination fee, expense reimbursement or similar type of payment or reimbursement;

(xiii)   not contain any due diligence or financing contingencies of any kind or any conditions precedent to such bidder's obligation to purchase the Transferred Interests other than conditions set forth in the Sale Agreement;

(xiv)    include the names and contact information of members of the bidder who will be available to answer questions regarding the offer;

(xv)     include the names of external advisors to the bidder, including financial, legal and accounting firms, as well as industry consultants or other resources;

(xvi)    include any other information or factors that may be relevant to the Sellers and their advisors in consideration of the bid; and

(xvii)   include a cash deposit in United States Dollars by wire transfer equal to ten percent (10%) of the amount offered to purchase the Transferred Interests (the "Good Faith Deposit").

The Debtors shall make a determination regarding whether a bid is a Qualifying Bid, after consultation with the Committee, and shall notify bidders as to whether their bids have been determined to be Qualifying Bids by no later than March 26, 2010 at 10:00 a.m. (prevailing Eastern Time).

(e)　**No Qualifying Bids**:  If no timely, conforming Qualifying Bids, other than the Sale Agreement, are submitted by the Bid Deadline, the Debtors shall not hold an Auction and, instead, shall request at the Sale Hearing that the Court approve the Sale Agreement with the Buyer.

(f)　**Right to Disseminate Information Relating to Bids**:  At any time, whether before or after the Auction, the Sellers may share or not share, after consultation with the Committee, the details of any bid for the Transferred Interests with the other bidders.

(g)　**Auction**:  In the event the Sellers timely receive one or more Qualifying Bids other than the Sale Agreement, the Sellers shall conduct the Auction with respect to the Transferred Interests.  The Auction will be conducted at the offices of Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019 on March 26, 2010 at 11:00 a.m. (prevailing Eastern Time), or such other location as designated by the Debtors in a notice to all Qualifying Bidders.  The Auction shall be governed by the following procedures (which may be amended, modified and waived, as applicable, by the Debtors at any time in their sole discretion after consultation with the Committee):

(i)　The Buyer and the Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

(ii)　Only representatives of the Debtors, the Buyer, Qualifying Bidders, counsel and other advisors selected by the Committee, and representatives from the Office of the United States Trustee, shall be entitled to be present at the Auction;

(iii)　The Auction process shall be transcribed by a qualified court reporter, unless otherwise provided herein;

(iv)　Only the Buyer and Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

(v)　Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

(vi)　Bidding shall commence at the amount of the highest Qualifying Bid submitted by the Qualifying Bidders prior to the Auction and such Bid shall be announced prior to the start of the Auction (the "Initial Highest Bid");

(vii)    Qualifying Bidders may submit subsequent bids to the Initial Highest Bid and all such subsequent bids must be stated in an amount exceeding each prior bid by MXN $3,370,000 (USD $257,448.43) in purchase price consideration;

(viii)    Each successive bid to the Initial Highest Bid must be separately allocated among each of the Transferred Interests as set forth on Exhibit B to the Sale Agreement;

(ix)    The Sellers may determine, in consultation with the Committee, the order in which Qualifying Bids will be submitted and may modify the ordering of the Qualifying Bids at any time;

(x)    The Sellers may consider Qualifying Bids for substantially all of the Transferred Assets or for individual or any groups of Transferred Assets; *provided*, for the avoidance of doubt, the Sellers' right to consider bids for one or any group of the Transferred Assets does not alter the requirement that a Qualifying Bid be submitted for no less than the Core Interests;

(xi)    The Sellers may require, in consultation with the Committee, that bids subsequent to the Initial Highest Bid be submitted for all the Transferred Interests or for individual or groups of Transferred Interests and may require that subsequent bids allocate purchase price increases for all of the Transferred Interests or individually for each Transferred Interest; provided, for the avoidance of doubt, the Sellers' right to consider bids for one or any group of the Transferred Interests is subject to the requirement that a Qualifying Bid be submitted for no less than the Core Interests;

(xii)    All Qualifying Bidders and the Buyer shall be able to submit additional bids and make additional modifications to the Sale Agreement or Modified Sale Agreement, as applicable, at the Auction as determined by the Sellers at any time after consultation with the Committee;

(xiii)    The Auction may include individual negotiations with the Qualifying Bidders and the Buyer and/or open bidding in the presence of all other Qualifying Bidders and the Buyer;

(xiv)    Consistent with the conduct of the Auction in subsection (xiii) above, the Sellers may determine, after consulting with the Committee, which portions of the Auction shall be transcribed on the record and which shall not be transcribed;

(xv)    The Sellers may determine, after consulting with the Committee, which portions of the Auction shall be transcribed on the record and which shall not be transcribed;

(xvi)    The Sellers may, after consulting with the Committee, discuss any Qualifying Bid with other Qualifying Bidders individually or together in

any other group or groups of Qualifying Bidders, as determined by the Sellers;

(xvii)   The Auction shall continue until there is only one or more offers that the Sellers determine, after consultation with the Committee and subject to Court approval with respect to the Debtor-Sellers' Transferred Interests, is or are the highest and/or otherwise best offer or offers from among the Qualifying Bidders and the Buyer submitted at the Auction (the "Successful Bid" or "Successful Bids"). In making this decision, the Debtors may consider any factors they deem relevant, including, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of a Qualifying Bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Sale Agreement requested by each Qualifying Bidder, any contingencies relating to a Qualifying Bidder's offer and the net benefit to the Debtors' estates. The Buyer or the Qualifying Bidder and/or Qualifying Bidders submitting such Successful Bid and/or Successful Bids shall become the "Successful Bidder" and/or the "Successful Bidders" and shall have such rights and responsibilities of a purchaser, as set forth in the applicable Modified Sale Agreement or Modified Sale Agreements; and

(xviii)  Within three (3) days after conclusion of the Auction, but prior to the Sale Hearing, the Successful Bidder or Successful Bidders shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid or Successful Bids was and/or were made and make and pay for all necessary filings with all applicable governmental or other authorities. Bids made after the close of the Auction shall not be considered by the Sellers.

(h)   **Back-Up Bidder or Bidders and Return of Good Faith Deposits**:

(i)   If an Auction is conducted where the Debtors do not permit separate bids for the individual Transferred Interests and one Qualifying Bidder submits the highest and/or otherwise best Qualifying Bid for all of the Transferred Interests, the Qualifying Bidder with the next highest and/or otherwise best Qualifying Bid for all of the Transferred Interests, as determined by the Sellers in the exercise of their business judgment in consultation with the Committee, at the Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until the earlier of (a) 24 hours after the closing of the Sale transaction with the Successful Bidder or (b) any outside closing date or termination date in the Sale Agreement or Modified Sale Agreement. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to

consummate the Sale with the Back-Up Bidder without further order of the Court.

(ii)     If an Auction is conducted where the Debtors permit separate bids for the individual Transferred Interests as permitted herein and multiple Qualifying Bidders separately submit the highest and/or otherwise best Qualifying Bids for individual Transferred Interests as provided herein, the Qualifying Bidder with the next highest and/or otherwise best Qualifying Bid for a particular Transferred Interest, as determined by the Sellers in the exercise of their business judgment in consultation with the Committee, at the Auction shall be required to serve as a back-up bidder (where more than one Back-Up Bidder exists, the "Back-Up Bidders") and keep such bid open and irrevocable until the earlier of (a) 24 hours after the closing of the Sale transaction with the Successful Bidder or (b) any outside closing date or termination date in the Sale Agreement or Modified Sale Agreement.  Following the Sale Hearing, if a Successful Bidder fails to consummate an approved sale for the Transferred Interest because of a breach or failure to perform on the part of such Successful Bidder, the related Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the Sale of the related Transferred Interest with the applicable Back-Up Bidder without further order of the Court.

(i)     Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Successful Bidders or the Back-Up Bidder or Back-Up Bidders by no later than the fifth (5th) Business Day following the conclusion of the Auction.  Each Good Faith Deposit of a Back-Up Bidder shall be held by the Debtors until the earlier of (a) one (1) Business Day after the closing of the Sale transaction with the related Successful Bidder for the Transferred Interest or Transferred Interests or (b) the date of any termination of the Sale Agreement or Modified Sale Agreement of the Back-Up Bidder.

17.     In accordance with Local Rule 6004-1(c), the Debtors note the following

with respect to the Auction and the Bidding Procedures:

(a)     **Provisions Governing Qualifications of Bidders**:  *See* preceding paragraph 16(d).

(b)     **Provisions Governing Qualified Bids**:  *See* preceding paragraph 16(d).

(c)     **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**:

(i)     No Shop or No-Solicitation Provisions:  *See* preceding paragraph 15(d); Sale Agreement, Section 3.1(f).

      (ii)     <u>Break-Up/Topping Fees and Expense Reimbursement</u>:  *See* preceding paragraph 14(b); Sale Agreement, Section 3.3.

      (iii)    <u>Bidding Increments</u>: *See* preceding paragraph 16(g)(vii).

      (iv)    <u>Treatment of Break-Up or Topping Fees and Expense Reimbursement at Auction</u>: *See* preceding paragraph 16(g)(xii).

   **(d)**    **Modification of Bidding and Auction Procedures**: *See* preceding paragraph 16.

   **(e)**    **Closing with Alternative Backup Bidder**: *See* preceding paragraph 16(h).

<u>**Approval of the Bidding Procedures and the Auction**</u>

18.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe the Sale of the Debtor-Sellers' Transferred Interests pursuant to a public auction governed by the proposed Bidding Procedures will maximize the sale proceeds received by the estate, which is the paramount goal in any proposed sale of property of the estate. *In re Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS 2764, at *253 (Bankr. D. Del. Aug. 15, 2007) ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.") (internal citations omitted).

19.     The Bidding Procedures allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood the Debtors will receive the best possible consideration for the Debtor-Sellers' Transferred Interests. Bidding procedures should be approved when they provide a benefit to the estate by maximizing the value of the assets and enhance competitive bidding. *Id.* (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 535-37 (3d Cir. 1999) (discussing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate)); *In re Reliant Energy Channelview LP*, 2010 U.S. App. LEXIS 956, at *11-13 (3d Cir. Jan. 15, 2010). The Debtors believe the proposed Bidding Procedures are

consistent with other procedures previously approved in this district, by this Court and other bankruptcy courts.

20.     Although the Debtors believe the value to be provided pursuant to the terms set forth in the Sale Agreement is fair and reasonable, the Debtors submit the Bidding Procedures and the Auction will ensure the Debtors' estates receive the highest or best value available by allowing the market to test the Purchase Price (as defined in the Sale Agreement) of the Debtor-Sellers' Transferred Interests. The Debtors thus request the Court's approval of the process and procedures set forth in the Bidding Procedures for the submission and consideration of competing bids from other interested parties for the Debtor-Sellers' Transferred Interests.

### Approval of the Sale Hearing
### Schedule and Notice of Auction and Sale

21.     The Debtors request that the Court schedule a Sale Hearing on or about April 1, 2010 at 10:00 a.m. (prevailing Eastern Time), or as soon as practicable thereafter, to consider approval of the Sale Agreement and the sale contemplated thereby, or the approval of any higher or better offer, if any, resulting from an Auction. Bankruptcy Rule 6004(a) provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k), and if applicable, in accordance with section 363(b)(2) of the Code." Bankruptcy Rule 2002(a)(2) requires that the Debtors give all creditors and certain other parties "at least 20 days' notice by mail" of the Sale. Bankruptcy Rule 6004(b) also provides that objections to the proposed Sale "shall be filed and served not less than seven days before the date set for the proposed action or within the time fixed by the court."

22.     The Notice of Auction and Sale contains the type of information required under Bankruptcy Rule 2002(c), and also includes information regarding the Auction procedures

to the extent a higher or better offer than the Sale Agreement is obtained and an Auction takes place. Therefore, the Debtors request that this Court approve the form and content of the Notice of Auction and Sale. The Debtors propose at least 20 days' notice for the Sale Hearing, which complies with the notice procedures mandated by the Bankruptcy Rules, according to the following procedures:

(a)     The Debtors (or their agent) shall serve, within five (5) business days after entry of the Bidding Procedures Order (the "Mailing Deadline"), by overnight courier, electronic mail, or same-day messenger delivery, and copies of the Notice of Auction and Sale, substantially in the form attached to the Bidding Procedures Order as Schedule A-1, upon: (i) the U.S. Trustee, (ii) attorneys for the Committee, (iii) attorneys for Buyer, (iv) any party who, in the past twelve (12) months, expressed in writing to the Debtors an interest in acquiring the Transferred Interests, and who the Debtors and their representatives reasonably and in good faith determine potentially have the desire and financial wherewithal to effectuate the Sale, (v) all parties who are known to possess or assert a secured claim against the Transferred Interests, (vi) all applicable state attorneys general, local realty enforcement agencies, and local regulatory authorities, and (vii) any parties entitled to notice under Local Rule 2002-1(b).

(b)     On or before the Mailing Deadline, or as soon as practicable thereafter, the Debtors will publicize the Notice of Auction and Sale in the Wall Street Journal (National Edition) for two (2) consecutive business days.

23.     The Debtors submit that such notice shall constitute good and sufficient notice of the Auction and the Sale of the Debtor-Sellers' Transferred Interests, and that no other or further notice need be given. Accordingly, the Debtors request that the Court approve the form and manner of the Sale Notice.

**Approval of Procedures for Assumption
and Assignment of Assigned Contracts**

24.     To facilitate the Sale and the assumption and assignment of the Assigned Contracts, the Debtors will serve a notice of intent to assume and assign the executory contracts that are part of the Sale (the "Notice of Assumption and Assignment") on all nondebtor parties to the Assigned Contracts according to the following procedures:

(a)     On or before the Mailing Deadline, the Debtors (or their agent) shall serve, by overnight courier, electronic mail, or same-day messenger delivery, the Notice of Assumption and Assignment (the "Notice of Assumption and Assignment"), substantially in the form attached to the Bidding Procedures Order as Schedule A-2, upon all known nondebtor parties to the Assigned Contracts. The Notice of Assumption and Assignment shall set forth (i) the intent of the Debtors to assume the Assigned Contracts and assign them to Buyer or the Successful Bidder, as applicable and (ii) applicable cure amounts (the "Cure Amounts"), if any. The Notice of Assumption and Assignment shall identify the Assigned Contracts and the Cure Amounts that the Debtors believe must be paid to cure all defaults under the Assigned Contracts. If no amount is listed on the Notice of Assumption and Assignment, the Debtors believe there is no Cure Amount due.

(b)     Bankruptcy Rule 6006(a) provides that "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease other than as part of a plan, is governed by Rule 9014." Any objections to (i) the assumption and assignment of an Assigned Contract, or (ii) the amount asserted as the Cure Amount (each, an "Assumption and/or Cure Objection") must be in writing and set forth with specificity the nature of the objection and the cure amount that the objecting party believes should be paid in connection with the assumption of the Assigned Contract (the "Claimed Cure Amount").

(c)     If an Assumption and/or Cure Objection is timely filed, the Debtors request that a hearing with respect to that objection shall be held before the Court at the Sale Hearing. If, however, an Assumption and/or Cure Objection is not timely filed and served, the assumption and assignment of the applicable Assigned Contract will proceed without further notice at the Sale Hearing to approve the Sale of the Debtor-Sellers' Transferred Interests. The Debtors also request that parties that fail to file and serve timely Assumption and/or Cure Objections shall be deemed to have waived and released any and all rights to assert Cure Amounts differing from those listed on the exhibit to the Notice of Assumption and Assignment and, subject to payment of the Cure Amount(s) listed on such contract with respect to their assigned contract(s), shall be forever barred and estopped from asserting or claiming against the pertinent Seller, Buyer, or any Successful Bidder that any additional amounts are due or defaults exist, or prohibitions or conditions to assignment exist or must be satisfied, under such Assigned Contract.

(d)     If no Cure Amounts are due under the Assigned Contract, and the nondebtor party to the Assigned Contract does not otherwise object to the pertinent Seller's assumption and assignment of the Assigned Contract, no further action need be taken on the part of that nondebtor party. The Debtors also request that Assumption and/or Cure Objections that object solely to the Cure Amount may not prevent or delay the pertinent Sellers' assumption and assignment of any Assigned Contracts. If a party objects solely to a Cure Amount, the pertinent Seller may, in its sole discretion, hold the Claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties. So long as the pertinent Seller holds the Claimed Cure Amount in reserve, and there are no

other unresolved objections to assumption and assignment, the pertinent Seller can, without further delay, assume and assign the Assigned Contract that is the subject of the objection. Under such circumstances, the objecting party's recourse shall be limited to the funds held in reserve.

25. The Sellers submit the aforementioned procedures provide sufficient notice to nondebtor parties to the Assigned Contracts and should be approved in all respects.

## **Approval of Objection Deadline**

26. The Debtors request that, pursuant to Bankruptcy Rule 9014, objections, if any, to the Sale (a "Sale Objection") or an Assumption and/or Cure Objection (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware, 19801, on or before March 25, 2010 at 4:00 p.m. (prevailing Eastern Time) (the "Objection Deadline"), or on such later date and time as the Debtors may agree, and (iv) be served with a copy on: (a) counsel for the Debtors, Dewey & LeBoeuf LLP, Attention: Michael P. Kessler, Esq., and Judy G.Z. Liu, Esq., 1301 Avenue of the Americas, New York, New York, 10019; (b) local counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware, 19801, Attention: Mark D. Collins, Esq. and Jason M. Madron, Esq.; (c) counsel for the Buyer, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York, 10019, Attention: Brian S. Hermann, Esq. and Julie M. D'Ambruoso, Esq.; (d) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801; (e) successor trustee under the prepetition senior unsecured floating rate note, 5.875% senior unsecured note, and 6.300% senior unsecured note indentures, Wilmington Trust FSB, 166 Mercer Street, Suite 2-R, New York, New York, 10012-3249, Attention: Adam Berman; (f) counsel to the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036, Attention: Thomas Moers Mayer,

Esq. and Amy Caton, Esq.; and (g) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b).

**Basis for Relief Requested**

**A.     Approval of the Sale under Bankruptcy Code Sections 363(b) and 105(a) is Warranted**

27.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (providing that debtors in possession have "all the rights . . . of a trustee"). In addition, section 105(a) provides the authority for this Court to carry out the provisions of section 363(b). *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."). Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if the sale is based upon the sound business judgment of the debtor. *See In re Dura Auto. Sys.,* 2007 Bankr. LEXIS at *258 (citing *Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Penn., Inc.,* 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson Ry. Co.,* 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision); and *In re Montgomery Ward Holding Corp.,* 242 B.R 147, 153 (D. Del. 1999) (same).

28.     When a valid business judgment exists, the law vests the debtor's decision to sell assets with a strong presumption that "in making a business decision, the directors of a

25

corporation acted on an informed basis, in good faith, and in honest belief that the action taken was in the best interests of the company." *In re Dura Auto. Sys.*, 2007 Bankr. LEXIS at *260 (citing *The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992)). Once a court is satisfied there is a sound business judgment for the proposed sale, the court must then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See, e.g., Del. and Hudson Ry. Co.*, 124 B.R. at 166.

29.     The Debtors submit that the decision to sell the Debtor-Sellers' Transferred Interests is based upon their sound business judgment and should be approved. Both before and after the Commencement Date, the Debtors have worked diligently with their financial advisors to explore alternatives to sell certain of their business assets in circumstances like those presented here where sales would provide value to the estates and relieve the Debtors from ongoing operational expenses. The Debtors believe that if no timely, conforming Qualifying Bids other than the Sale Agreement are submitted by the Bid Deadline, the prompt Sale of the Debtor-Sellers' Transferred Interests without an Auction and without further delay presents the best opportunity to maximize and preserve value for their estates.

30.     In addition, the Debtors believe their prepetition marketing efforts, arms' length negotiations with the Buyer, and the proposed Bidding Procedures will achieve the best results for their estates and maximize value for all constituents. Furthermore, the Bidding Procedures contemplate an open auction process and are designed to ensure that the ultimate purchase price of the Debtor-Sellers' Transferred Interests is fair and reasonable. Thus, the

Debtors submit that the proposed sale of the Debtor-Sellers' Transferred Interests is within their sound business judgment.

**B.    Sale of Debtor-Sellers' Transferred Interests Free and Clear of Interests is Warranted**

31.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions are satisfied:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

32.    The Debtors believe that one or more of these tests in section 363(f) of the Bankruptcy Code are easily satisfied with respect to the Sale of the Debtor-Sellers' Transferred Interests. First and foremost, the Debtor-Sellers' Transferred Interests are unencumbered by any recorded lien, security interest, mortgage, judgment or other encumbrance. To the extent there is any unrecorded "interest" in the Debtor-Sellers' Transferred Interests other than the Debtors', the Debtors submit that subsection 363(f)(5) would apply to permit the Sale free and clear of such interest. The Debtors believe the rights of any unknown claimant could be valued and allowed as a claim against the Debtor-Sellers' estates, and thus the claimant could be compelled to accept a money satisfaction of its interest in property, and section 363(f)(5) would be satisfied. *In re*

*Trans World Airlines, Inc.*, 322 F.3d 283, 289, 291 (3d Cir. 2003) (the Court of Appeals for the Third Circuit held that section 363(f)(5) was satisfied in respect of successor liability claims because "[h]ad TWA liquidated its assets under Chapter 7 of the Bankruptcy Code, the claims at issue would have been converted to dollar amounts and the claimants would have received the distribution provided to other general unsecured creditors on account of their claims.").

33.    Because the section 363(f) requirements have been met, the Buyer should not be liable, as a successor to the Debtor-Sellers' Transferred Interests or otherwise, for any of the Debtors' pre-petition liabilities, unless expressly assumed. As a matter of logic, bankruptcy estates would be unable to sell assets for fair value if the estates' liabilities followed the assets. The Third Circuit Court of Appeals has held that a buyer of a debtor's assets pursuant to sections 363(b) or 363(f) takes free from successor liability resulting from any pre-existing claims. *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of . . . successor liability claims achieves the purpose of [Bankruptcy Code] section 363 intended by Congress"), *aff'd*, 332 F.3d 283, 285 (3d Cir. 2003) ("Because section 363(f) of the Bankruptcy Code permits a sale of property 'free and clear' of an 'interest in such property' and because the claims against TWA here were connected to or arise from the assets sold, we affirm the Bankruptcy Court's order approving the sale 'free and clear' of successor liability.").

**C.     Assumption and Assignment of Executory Contracts is Warranted**

34.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to Court approval, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. 11 U.S.C. § 365. The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease may be assumed is the debtor's "business judgment"

that the assumption is in its economic best interests. *See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing the business judgment test as "traditional").

35.     To facilitate and effect the Sale of the Debtor-Sellers' Transferred Interests, the Buyer has agreed to take assignment of the Assigned Contracts. The Debtors believe they can demonstrate at the Sale Hearing that all requirements for assumption and/or assignment of such contracts will be satisfied. The Debtors have evaluated the financial wherewithal of the Buyer (and will evaluate the financial wherewithal of other potential bidders) and, in exercising their sound business judgment, believe that selling the Debtor-Sellers' Transferred Interests and assuming and assigning the Assigned Contracts to the Buyer (or other Successful Bidder) would be in the best interests of their estates. Moreover, as noted above, each nondebtor party to an Assigned Contract will receive notice of the proposed assumption and assignment, and the proposed cure amount, and have a reasonable opportunity to object thereto.

**D.     Finding of Good Faith is Warranted**

36.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Seventh Circuit in *In re Andy Frain Serv., Inc.*, held that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

798 F.2d 1113, 1125 (7th Cir. 1986) (emphasis and citations omitted).

37.     Other than as disclosed above with respect to Zéndere's role as Guarantor under the Sale Agreement, the Buyer is an entity unrelated to the Debtors. The Sale Agreement was intensely negotiated at arms'-length with all parties involved acting in good faith, and each party was represented by sophisticated counsel. The Debtors are unaware of any facts or circumstances that might compromise or taint the Buyer's good faith in negotiating and entering into the Sale Agreement. Accordingly, the Debtors request the Court determine Buyer has acted in good faith and is entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

**E.     The Break-Up Fee (Including the Expense Reimbursement) is Reasonable and Appropriate**

38.     Bidding incentives, such as the Break-Up Fee (which includes the Expense Reimbursement), encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." *In re S. N.A, Nut Co.*, 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); *see also In re 995 Fifth Ave. Assoc. L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

39.     A proposed bidding incentive, such as the Break-Up Fee, should be approved when it is in the best interests of the estate. *See S. N.A. Nut Co.*, 186 B.R. at 104; *see also In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus.*,

*Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate, and in this Circuit, that benefit must meet the administrative expense standards of the Bankruptcy Code. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533 (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context); *see also In re Reliant Energy Channelview LP*, 2010 U.S. App. LEXIS 956, at *19-20 (following *O'Brien* and holding that break-up fee was not an actual and necessary administrative expense where the stalking horse bid was not expressly conditioned upon the approval of the break-up fee).

40.     Here, the Break-Up Fee will only be paid if the Debtor-Sellers' Transferred Interests are sold to a purchaser with a bid that is higher and/or otherwise better than Buyer's offer for the Debtor-Sellers' Transferred Interests, including taking into account the cost of the Break-Up Fee when considering the competing bid. If this occurs, the Debtor will effectively net at least the amount offered by the Buyer and consequently the Debtors' estates will have benefited from the floor set by Buyer's initial bid.

41.     "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *In re Integrated Res.*, 147 B.R. at 660. As is customary, the Break-Up Fee was required by the Buyer as a condition to its spending the significant time and expense to negotiate and ultimately agree to the Sale Agreement. The Debtors believe that the Break-Up Fee will not stifle bidding. To the contrary, the Debtors believe that in the event of an auction, the Break-Up Fee will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional

bidders." *Id.* at 662. In other words, if the assets are sold to a competing bidder, it will – in all likelihood – be because of the Buyer's crucial role as an initial bidder generating interest in the assets.

42.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed Purchase Price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." *Id.* The Break-Up Fee is equal to approximately 2% of the Purchase Price, plus the Expense Reimbursement capped at $100,000 (making the maximum aggregate Break-Up Fee equal to 2.58% of the Purchase Price), which is within the range of fees typically paid in other significant sales transactions that have been approved by this Court. *See, e.g., In re Maxide Acquisition, Inc.*, No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (approving break-up fee of 3%, or $2.5 million, in connection with a $75 million sale); *In re Ameriserve Food Distrib., Inc.*, No. 00-00358 (PJW) (Bankr. D. Del. June 15, 2000) (approving break-up fee of 3.6%, or $4 million, in connection with $110 million sale). Given the Purchase Price, the Debtors, in their business judgment, believe the Break-Up Fee is appropriate.

43.     For these reasons, and given the benefits conferred upon the Debtors' estates by the Buyer's entry into the APA, the Debtors respectfully request that the Court approve the payment of the Break-Up Fee and its treatment as an administrative expense of the Debtors and their estates under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code.

## Relief from Fourteen-Day Waiting Period is Warranted

44.     The Debtors request the Court to waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and order that, if and when entered, the Sale Order be effective immediately. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease

of property . . . is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise."

45.     The purpose of these rules is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Bankruptcy Rules 6004(h). Although these rules and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the fourteen-day stay period, Collier on Bankruptcy suggests the stay period should be waived to allow a transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev. ¶ 6004.10 (15th rev. ed. 2006). Further, it suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

## Notice

46.     No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion shall be provided by overnight delivery to (i) the U.S. Trustee, (ii) counsel to the Buyer, (iii) Wilmington Trust FSB, as successor trustee under the prepetition 6.300% senior unsecured note, unsecured floating rate note and 5.875% senior unsecured note indentures, (iv) counsel to the Committee, and (v) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b). The Debtors submit that no other or further notice need be provided.

## No Previous Request

47.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request (i) entry of the proposed Bidding Procedures Order, (ii) at the completion of the Sale Hearing, entry of the Sale Order approving

the Sale of the Debtor-Sellers' Transferred Interests to the Buyer, or, in the event of a higher

and/or otherwise better offer is received at the Auction, the Successful Bidders, and (iii) such

other and further relief as the Court may deem just and appropriate.

Dated: February 4, 2010
     Wilmington, Delaware

                             */s/ Jason M. Madron*
                             Mark D. Collins (No. 2981)
                             Paul N. Heath (No. 3704)
                             Jason M. Madron (No. 4431)
                             Lee E. Kaufman (No. 4877)
                             RICHARDS, LAYTON & FINGER, P.A.
                             One Rodney Square
                             920 North King Street
                             Wilmington, Delaware 19801
                             Telephone: 302.651.7700
                             Facsimile: 302.651.7701

                             -and-

                             Martin J. Bienenstock
                             Michael P. Kessler
                             Judy G.Z. Liu
                             DEWEY & LEBOEUF LLP
                             1301 Avenue of the Americas
                             New York, New York 10019
                             Telephone: 212.259.8000
                             Facsimile: 212.259.6333

                             *Attorneys for the Debtors and Debtors in*
                             *Possession*