# EXHIBIT C

## (Sale Agreement)

PURCHASE AGREEMENT

dated as of February 1, 2010

between

Capmark Financial Group Inc.,

Capmark Finance Inc.,

Capmark México Holding, S. de R.L. de C.V.

Odisea Asset Management, LLC

Zéndere Holding S.A.P.I. de C.V.,

Promecap S.A. de C.V.

and

TESEFA, S.A. de C.V

relating to the purchase and sale

of

the Interests listed on Exhibit A hereto.

# TABLE OF CONTENTS

Article I Definitions ...................................................................................................................2
Article II Purchase and Sale..........................................................................................................7
Article III Bankruptcy...................................................................................................................9
Article IV Representations and Warranties of Sellers ....................................................................11
Article V Representations and Warranties of Buyer........................................................................13
Article VI Covenants ...................................................................................................................15
Article VII Conditions to Closing.................................................................................................17
Article VIII Termination...............................................................................................................19
Article IX Indemnification............................................................................................................22
Article X Miscellaneous ..............................................................................................................24

# PURCHASE AGREEMENT

PURCHASE AGREEMENT, dated as of February 1, 2010 (this "Agreement"), between Capmark Financial Group Inc., a Nevada corporation, Capmark Finance Inc., a California corporation, Capmark México Holding, S. de R.L. de C.V., a Sociedad de Responsabilidad Limitada de Capital Variable organized under the laws of México (together, "Sellers"), TESEFA, S.A. de C.V., a Sociedad Anonima de Capital Variable organized under the laws of México ("Buyer"), Odisea Asset Management, LLC, a Delaware limited liability company ("Odisea"), Zéndere Holding S.A.P.I. de C.V. a Sociedad Anónima Promotora de Inversión de Capital Variable organized under the laws of México ("Zéndere"), and Promecap S.A. de C.V., a Sociedad Civil organized under the laws of México ("Promecap" and, together with Odisea and Zéndere "Guarantors").

## W I T N E S S E T H:

WHEREAS, Sellers own the equity and debt interests as set forth on Exhibit A hereto of the entities listed on Exhibit A hereto (the "Entities" and such equity and debt interests, the "Interests");

WHEREAS, Capmark Financial Group Inc. and Capmark Finance Inc. (together, the "Debtor Sellers") and certain of their subsidiaries and affiliates (collectively, the "Debtors") filed for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on October 25, 2009 (the "Chapter 11 Cases"), which cases are pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and

WHEREAS, Sellers desire to sell the Interests to Buyer, and Buyer desires to purchase the Interests from Sellers, upon the terms and subject to the conditions set forth in this Agreement and, with respect to the Debtor Sellers, in accordance with sections 105, 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing premises and the respective representations and warranties, covenants and agreements contained herein, the parties hereto agree as follows:

## Article I   Definitions

1.1     Definitions. When used in this Agreement, the following terms shall have the meanings assigned to them in this Section 1.1, or in the applicable Section of this Agreement to which reference is made in this Section 1.1.

"Affiliate" means, with respect to Buyer, any other Person directly or indirectly controlling, controlled by or under common control with Buyer, and, with respect to Sellers, "Affiliate" means any other Person directly or indirectly controlling, controlled by or under common control with any Seller (other than any Person directly or indirectly controlling Capmark Financial Group Inc.).

NY2 2045537.7

"Alternative Transaction" means any transaction or series of related transactions involving any direct or indirect acquisition (by asset purchase, stock purchase, merger, or otherwise) by any third party or third parties of all or any portion of the Interests, whether pursuant to Section 363 of the Bankruptcy Code or a chapter 11 plan of reorganization.

"Authorization" means any authorization, approval, consent, waiver, resolution, agreement, certificate, license, permit or franchise of or from any Governmental Entity or other Person or pursuant to any Law.

"Business Day" means a day other than a Saturday, Sunday or other day on which banks located in New York City are authorized or required by Law to close.

"Capital Stock" means (a) in the case of a corporation, such entity's shares of capital stock, (b) in the case of a partnership or limited liability company, such entity's partnership or membership interests or units (whether general or limited), and (c) any other interest that confers on a Person the right to receive a share of the profits and losses, or distribution of assets, of the issuing entity.

"Capmark México" means Capmark México Holding, S. de R.L. de C.V.

"Charter Documents" means, with respect to any entity, the certificate of incorporation, the articles of incorporation, by-laws, articles of organization, limited liability company agreement, partnership agreement, formation agreement, joint venture agreement or other similar organizational documents of such entity (in each case, as amended).

"CFGI" means Capmark Financial Group Inc.

"CFI" means Capmark Finance Inc.

"Code" means the Internal Revenue Code of 1986, as amended.

"Core Interests" means the RDH Interests, and the Interests in COEFACT, S.A. de C.V., Capmark Activos I, S. de R.L. de C.V., Capmark Activos III, S. de R.L. de C.V., VPN Plus, S. de R.L. de C.V. and VPN Plus II, S. de R.L. de C.V.

"Debtor Sellers' Transferred Interests" means the Transferred Interests owned by the Debtor Sellers.

"Fenix Assets" means the outstanding debt of Fenix Mercury held by Capmark México and the Social Part in Fenix Mercury owned by Capmark México representing 40% of the outstanding Capital Stock of Fenix Mercury.

"Fenix Mercury" means Fenix Mercury I, S. de R.L. de C.V.

"Final Order" means an Order: (a) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending or (b) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; provided that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed with respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

"Governmental Entity" means any entity or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to United States federal, state, local, or municipal government, foreign, international, multinational or other government, including any department, commission, board, agency, bureau, subdivision, instrumentality, official or other regulatory, administrative or judicial authority thereof, and any non-governmental regulatory body to the extent that the rules and regulations or orders of such body have the force of Law.

"Law" means any statute, law (including common law), constitution, treaty, ordinance, code, order, decree, judgment, rule, regulation and any other binding requirement or determination of any Governmental Entity.

"Lien" means, with respect to any Interest, any mortgage, lien, pledge, charge, security interest, adverse claim, preference, priority or other security interest or preferential arrangement or other encumbrance in respect of such Interest, including Liens of any type whatsoever and any right of first offer or first refusal to the extent exercisable (and not otherwise waived) in connection with the transactions contemplated herein (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed).

"Order" means any award, injunction, judgment, decree, order, ruling, subpoena or verdict or other decision issued, promulgated or entered by or with any Governmental Entity of competent jurisdiction.

"Person" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated association, a Governmental Entity or any agency, instrumentality or political subdivision of a Governmental Entity, or any other entity or body.

"RDH Interests" means the Interests in Recuperadora de Deuda Hipotecaria, S. de R.L. de C.V.

"Representative" of a Person means such Person's controlled Affiliates and the officers, directors, managers, employees, advisors, representatives (including legal counsel, financial advisors and accountants) and agents of such Person or its controlled Affiliates.

"Retained Interests" means the Interests, if any, that are not included in the Acquisition due to (i) the timely and proper exercise by third parties of their rights of first refusal to acquire such Interests or (ii) the failure, after Seller's exercise of commercially reasonable efforts, to acquire a third-party Authorization required to effectuate the transfer of such Interests.

"Sale Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases.

"Securities Act" means the Securities Act of 1933, as amended.

"Subsidiary" or "Subsidiaries" means, with respect to any party, any Person, of which (a) such party or any other Subsidiary of such party is a general partner (excluding partnerships, the general partnership interests of which are held by such party or any Subsidiary of such party do not have a majority of the voting interest in such partnership), or (b) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such Person is directly or indirectly owned or controlled by such party and/or by any one or more of its Subsidiaries.

"Tax" or "Taxes" means any and all federal, state, local, or foreign net or gross income, gross receipts, net proceeds, sales, use, ad valorem, value added, franchise, bank shares, withholding, payroll, employment, excise, property, deed, stamp, alternative or add-on minimum, environmental, profits, windfall profits, transaction, license, lease, service, service use, occupation, severance, energy, unemployment, social security, workers' compensation, capital, premium, and other taxes, assessments, customs, duties, fees, or levies, together with any interest, penalties, additions to tax, or additional amounts with respect thereto.

"Tax Returns" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Taxing Authority" means any Governmental Entity having jurisdiction with respect to any Tax.

"Transferred Interests" means the Interests other than the Retained Interests.

"Transfer Taxes" means sales, use, transfer, real property transfer, recording, documentary, stamp, registration, stock transfer, and any similar Taxes.

"VAT" means value-added taxes.

1.2    Other Defined Terms. The following terms have the meanings assigned to such terms in the Sections of the Agreement set forth below:

Acquisition ......................................................................................... Section 2.1

Adjustment Amount .............................................................................. Section 2.4

Agreement ........................................................................................... Preamble

Base Purchase Price ............................................................................. Section 2.1

Bankruptcy Code .................................................................................. Recitals

Bankruptcy Court ................................................................................. Recitals

Bids ..................................................................................................... Section 3.1(f)

Bidders ................................................................................................ Section 3.1(f)

Bidding Procedures and Sale Motion ................................................... Section 3.1(a)

Bidding Procedures Order ..................................................................... Section 3.1(a)

Break-Up Fee ....................................................................................... Section 3.3

Buyer ................................................................................................... Preamble

Chapter 11 Cases .................................................................................. Recitals

Closing ................................................................................................. Section 2.2

Closing Date ......................................................................................... Section 2.2

Confidentiality Agreement .................................................................... Section 8.2

Cutoff Date ........................................................................................... Section 2.4

Debtor .................................................................................................. Recitals

Debtor Sellers ....................................................................................... Recitals

Entity .................................................................................................... Recitals

Guarantee ............................................................................................. Section 10.8

Guarantors ............................................................................................ Preamble

Indemnitee ............................................................................................ Section 9.2

Indemnitor ............................................................................................ Section 9.1

Interests ................................................................................................ Recitals

Losses .................................................................................................. Section 9.2

Non-Solicitation Period .............................................................. Section 3.1(f)

Odisea ................................................................................................. Preamble

Promecap ............................................................................................. Preamble

Purchase Price .................................................................................. Section 2.1

Qualifiying Bid ............................................................................... Section 3.1(b)

Sellers ................................................................................................. Preamble

Successful Bidder or Successful Bidders ...................................... Section 3.1(f)

Zéndere .............................................................................................. Preamble

## Article II  Purchase and Sale

2.1    Purchase and Sale of the Transferred Interests. Upon the terms and subject to the conditions of this Agreement, at the Closing, Sellers shall sell to Buyer, and Buyer shall purchase from Sellers, all right, title and interest of Sellers in the Transferred Interests, and with respect to the Transferred Interests owned by the Debtor Sellers (the "Debtor Sellers' Transferred Interests"), free and clear of all Liens and other interests. The aggregate purchase price for the Transferred Interests (the "Purchase Price") shall be $224,605,492.00 Mexican pesos (the "Base Purchase Price"), as increased by (if the Adjustment Amount is a positive number) or decreased by (if the Adjustment Amount is a negative number) the Adjustment Amount.  The Purchase Price shall be paid as provided in Section 2.3.  The purchase and sale of the Transferred Interests is referred to in this Agreement as the "Acquisition".

2.2    Closing Date. The closing of the Acquisition (the "Closing") shall take place at the offices of Promecap, Bosques de Alisos No. 47-A, 3er piso, México City, México, at 10:00 a.m. on a date to be specified in writing  by the parties which shall be no later than two (2) Business Days after the total and complete satisfaction (or waiver as provided herein) of all the conditions set forth in this Agreement (other than those conditions that by their nature will be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), unless another time, date and/or place is agreed to in writing by the parties. The date upon which the Closing occurs is herein referred to as the "Closing Date."

2.3    Transactions to be Effected at the Closing.

(a)    At the Closing, Buyer shall deliver to Sellers (i) the Purchase Price in immediately available funds by wire transfer to an account of each Seller (in proportion to the Purchase Price allocable to the Transferred Interests owned by each such Seller) designated in writing by Sellers to Buyer no later than ten (10) Business Days prior to the Closing Date, and (ii) all other documents, instruments or certificates required to be delivered by Buyer at or prior to the Closing pursuant to this Agreement.

(b)     At the Closing, Sellers shall deliver to Buyer (i) all documents and instruments necessary to vest in Buyer all of Sellers' right, title and interest in and to the Transferred Interests free and clear of all Liens and, in the case of the Debtor Sellers' Transferred Interests, other interests, (ii) a certified copy of the Sale Order and (iii) all other documents, instruments or certificates required to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

2.4     Adjustment Amount.  (a)  The "Adjustment Amount", which may be a positive or a negative number, is an amount equal to the sum of: (i) the amount of capital contributions and other cash payments made by Sellers to the Entities relating to the Transferred Interests after October 9, 2009 (the "Cutoff Date") to and including the Closing Date, less (ii) distributions (whether in the form of a dividend, return of capital, payment of principal or interest on any debt, or repurchase or redemption of any shares or any debt or any other distribution of any kind) in respect of the Transferred Interests paid to Sellers or any of their Affiliates after the Cutoff Date and to and including the Closing Date, less (iii) the amount of the Base Purchase Price allocated to any Retained Interest, as set forth on Exhibit B.  For the avoidance of doubt, notwithstanding the existence of any Retained Interest(s), but subject to the terms and conditions of this Agreement (including the conditions to Closing set forth in Article VII), the parties to this Agreement shall remain obligated to close the Acquisition with respect to the Transferred Interests; provided, however, that, notwithstanding anything to the contrary contained herein, Buyer shall not be obligated to consummate the Closing if the Transferred Interests do not include the RDH Interests.

(b)     Sellers shall provide written notice to Buyer of the amount of any capital contributions and other cash payments made or to be made by Sellers to the Entities relating to the Transferred Interests after the Cutoff Date to and including the Closing Date and any distributions received or to be received by Sellers from such Entities after the Cutoff Date to and including the Closing Date, in each case no later than ten (10) Business Days prior to the Closing Date and shall update such notice, if necessary, by written notice to Buyer on the Closing Date.

2.5     Post-Closing Purchase Price Adjustment.  Any VAT reimbursements (or distributions attributable to VAT reimbursements) that are received by Buyer or its agent after the Closing Date, to the extent attributable to any period or portion thereof ending on or before the Closing Date, shall be allocated as follows:  (i) 70% to Buyer, and (ii) 30% to Sellers.  Buyer shall promptly notify Sellers of any such reimbursements, and the portion of such reimbursements allocated to Sellers shall be remitted by Buyer to Sellers by wire transfer as promptly as practicable after the collection thereof pursuant to Sellers' written wiring instructions.

## Article III  Bankruptcy

3.1     Bankruptcy Actions.

(a)     No later than five (5) Business Days following the execution of this Agreement, Debtor Sellers shall file a motion (the "Bidding Procedures and Sale Motion "), which motion shall be in a form reasonably satisfactory to Buyer, seeking (i) entry of a bidding procedures Order (the "Bidding Procedures Order"), and (ii) entry of the Sale Order, authorizing the sale of the Debtor Sellers' Transferred Interests pursuant to Sections 363 and 365 of the Bankruptcy Code, free and clear of all Liens and other interests as provided in Section 363(f) of the Bankruptcy Code.  By entering into this Agreement, Buyer acknowledges and agrees that the form of the Bidding Procedures and Sale Motion, which includes forms of the Bidding Procedures Order and the Sale Order, previously provided to Buyer is reasonably satisfactory to Buyer.

(b)     A bid will only be considered by Sellers as qualified for participation in the auction process (each, a "Qualifying Bid") if it meets the requirements for a Qualifying Bid set forth in the Bidding Procedures Order.  A Qualifying Bid shall, among other things, provide for the purchase of no less than all of the Core Interests.  Buyer and Sellers hereby agree and acknowledge that the requirements and procedures set forth in the Bidding Procedures Order shall apply to all of Sellers' Interests, whether owned by the Debtor Sellers or Capmark Mexico, and Sellers may sell Interests to the Successful Bidder(s) with respect thereto, whether such Interests are held by the Debtor Sellers or Capmark Mexico.

(c)     The Debtor Sellers shall use reasonable efforts to obtain entry of the Bidding Procedures Order by February 19, 2010 or, if such date is not practicable, as soon as reasonably practicable thereafter, subject to the schedule of the Bankruptcy Court (including the availability of hearing dates) or other circumstances and events outside the control of the Debtor Sellers.

(d)     Debtor Sellers shall use reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order as soon as reasonably practicable and in any event within five (5) Business Days of the close of the Auction, subject to the schedule of the Bankruptcy Court (including the availability of hearing dates) or other circumstances and events outside the control of the Debtor Sellers.

(e)     To the extent Buyer is a Successful Bidder, each of Sellers and Buyer agree to take such actions as are reasonably necessary or appropriate to obtain any Order from the Bankruptcy Court necessary to effectuate the sale of the Transferred Interests with respect to which Buyer is the Successful Bidder that are held by the Debtor Sellers, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court including for purposes, among others, of providing necessary assurances of performance by Buyer of its obligations under this Agreement and demonstrating that Buyer is a good faith buyer under Section 363(m) of the Bankruptcy Code; provided, however, in no event shall Buyer or Sellers be required to agree to any amendment of this Agreement that is materially adverse to such party.  The

parties hereto acknowledge and agree that any amendment modifying the Break-Up Fee or the requirement that a Qualifying Bid be for no less than all of the Core Interest shall be deemed to be material and adverse to Buyer. Sellers shall consult with Buyer and their respective Representatives concerning the Bidding Procedures Order, the Sale Order and any other Orders of the Bankruptcy Court and bankruptcy proceedings in connection with the transactions contemplated by this Agreement and provide Buyer with copies of all applications, pleadings, notices, proposed orders and other documents relating to such transactions as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.

(f)     Non-Solicitation; Other Bids. Buyer acknowledges that (i) from the date hereof until the entry of the Sale Order on the Bankruptcy Court's docket, Sellers may solicit bids ("Bids") from other prospective buyers (collectively, "Bidders") for the sale of the Interests held by Sellers, in accordance with (A) the procedures set forth in the Bidding Procedures Order once entered on the Bankruptcy Court's docket or (B) until the entry of the Bidding Procedures Order, consistent with the procedures set forth in the form of Bidding Procedures Order; provided, however, that (i) Sellers may not, until such time that the Bidder or Bidders selected following the Auction to acquire all or any portion of the Transferred Interests pursuant to an Alternative Transaction (the "Successful Bidder" or "Successful Bidders"), enter into definitive agreement(s) with any such Bidder or Bidders for the sale of any Interest and consummate the sale of any Interest held by Sellers to any such Bidder or Bidders, other than in each case any Interest with respect to which such Bidder or Bidders have exercised a right of first refusal granted prior to the date of this Agreement. From the time of entry of the Sale Order approving the sale of the Debtor Sellers' Transferred Interests to Buyer to the Closing (the "Non-Solicitation Period"), Sellers shall not, nor shall they authorize or permit any of their respective Representatives or Affiliates to directly or indirectly, solicit, facilitate or encourage submission of any inquiries regarding an Alternative Transaction or respond to any unsolicited inquiries, engage in discussions with or provide information or data to such unsolicited Bidders. For the avoidance of doubt, no provision of this Agreement shall limit the ability of Sellers to enter into any agreement to sell all or any portion of the Interests to one or more Successful Bidders with respect to such Interests following the Auction. Sellers shall promptly provide Buyer with copies of any information or materials about the Interests provided to any prospective Bidders that has not already been provided to Buyer.

3.2     Bankruptcy Matters. Buyer acknowledges that this Agreement and the sale of the Debtor Sellers' Transferred Interests are subject to Authorization of the Bankruptcy Court. Buyer further acknowledges that to obtain such Authorization, each Debtor Seller must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Interests held by it, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to its creditors and interested parties as ordered by the Bankruptcy Court.

3.3     Break-Up Fee. In the event the Bankruptcy Court does not grant an order approving the sale of the Transferred Interests owned by the Debtor Sellers to Buyer, and Sellers consummate an Alternative Transaction with one or more Successful

Bidders, then, in consideration of Buyer having expended considerable time and expense in connection with the negotiation of this Agreement and the identification and quantification of the assets of Sellers, Sellers shall pay in cash to Buyer a break-up fee (the "Break-Up Fee") in an amount equal to the sum of (a) the reasonable out-of-pocket expenses of Buyer in connection with the negotiation, execution and performance of the letter of intent and this Agreement, not to exceed $100,000 (USD) in the aggregate and (b) two percent (2%) of the aggregate Base Purchase Price allocated to the Transferred Interests sold to such Successful Bidder or Successful Bidders (as adjusted pursuant to Section 2.4 (a)(i) and (ii) to the date of the closing of an Alternative Transaction); provided that in no event shall the Break-Up Fee be payable to Buyer if the closing of the Alternative Transaction does or do not occur within six months of the date of the execution of this Agreement. Upon the closing of an Alternative Transaction, the Break-Up Fee shall be payable directly to Buyer by each respective Seller pro rata in proportion to the amounts allocable to the purchase price consideration such Seller is to receive from such Alternative Transaction (it being agreed and understood that such payment shall reduce the allocable proceeds to be received by each Seller from the Successful Bidder and the value attributed to the Successful Bidder's Bid shall include such direct payment to Buyer). In no event shall the Break-Up Fee be payable from the Debtor Sellers if, prior to such Break-Up Fee becoming due and payable, the Chapter 11 Cases are converted to chapter 7 cases.

### Article IV    Representations and Warranties of Sellers

Each Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date, as follows:

4.1    Organization and Good Standing. Such Seller and each of the Entities relating to the Interests to be sold by such Seller at Closing (i) is duly organized and validly existing under the Laws of the jurisdiction of its organization, (ii) has all requisite power and authority to own, lease and operate its assets and  properties and to carry on its business as is currently being conducted and (iii) is duly qualified and, to the extent such concept is relevant in such jurisdiction, is in good standing under the laws of each jurisdiction in which its ownership or operation of property or the conduct of its business requires such qualification.

4.2    Authority and Enforceability. Such Seller has the requisite power and authority to enter into and deliver this Agreement and, subject to any required Order or Authorization of the Bankruptcy Court, to perform its obligations under this Agreement. The execution and delivery of this Agreement and the performance by such Seller of its obligations under this Agreement have been duly authorized by such Seller. This Agreement has been duly executed and delivered by such Seller and, assuming due authorization, execution and delivery by Buyer, constitutes the valid and binding obligation of such Seller, enforceable against it in accordance with the terms hereof, except as such enforceability may be limited by (a) bankruptcy, insolvency,

reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally, and (b) the availability of injunctive relief and other equitable remedies.

4.3    No Conflicts; Authorizations. Assuming the accuracy of Buyer's representations and warranties set forth in Section 5.8, and except as set forth on Schedule 4.3:

(a)    the execution and delivery of this Agreement by such Seller does not, and the performance by such Seller of its obligations hereunder and the consummation by such Seller of the transactions contemplated hereby (in each case, with or without the giving of notice or lapse of time, or both) will not, directly or indirectly,

(i)    violate the provisions of any of the Charter Documents of such Seller or the Entities relating to the Interests to be sold by such Seller at Closing,

(ii)    violate, conflict with or result in any breach, default or contravention of (or with due notice or lapse of time or both would result in any breach, default or contravention of), the loss of any material benefit under or the creation of any Lien under or require notice under, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which any Seller is a party or by which any Interests are bound, or

(iii) violate or c    onflict with any Law, Authorization or Order applicable to such Seller or such Entities, or give any Governmental Entity or other Person the right to challenge any of the transactions contemplated by this Agreement or to exercise any remedy, obtain any relief under or revoke or otherwise modify any rights held under, any such Law, Authorization or Order; and

(iv)    there are no options, warrants, conversion privileges, subscription or purchase rights, rights to equity or profits interests or other rights to purchase or otherwise acquire the Interests and no rights of first offer, rights of first refusal, buy/sell rights or other similar rights with respect to the Interests are triggered by the transactions contemplated by this Agreement (including the filing of the Chapter 11 Cases by the Debtors); and

(b)    no Authorization or Order of, registration, declaration or filing with, or notice to, any Governmental Entity or other Person is required by or with respect to such Seller or the Entities relating to the Interests to be sold by such Seller at Closing hereunder in connection with the execution and delivery of this Agreement and the consummation of the Acquisition, other than the filing of the Mexican federal tax certificate referred to in Section 6.1 and any Authorization or Order required by the Bankruptcy Court.

4.4     Interests.

(a)     As of the date hereof, all of the Interests, and as of the Closing Date, all of the Transferred Interests, are owned of record and beneficially by such Seller, have been duly authorized and validly issued, are fully paid and nonassessable and are free and clear of any Liens (assuming the receipt of all consents set forth on Schedule 4.3).

(b)     Assuming the accuracy of Buyer's representations and warranties set forth in Section 5.8, upon transfer of the Transferred Interests to be sold by such Seller hereunder to Buyer in accordance with the terms of Article II, Buyer will receive valid title to such Transferred Interests free and clear of all Liens and, in the case of the Debtor Sellers' Transferred Interests, other interests.  Except as set forth on Schedule 4.4(b), the Interests are not subject to any stockholder agreement, voting agreement, voting trust or any other similar arrangement which has the effect of restricting or limiting the transfer, voting or other rights associated with such Interests.

4.5     Brokers or Finders. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of such Seller or any Affiliate of such Seller.

4.6     Limitation of Sellers' Representations and Warranties.  Sellers are not making any representation or warranty whatsoever, express or implied, except those representations and warranties of Sellers explicitly set forth in Article IV.  Except as otherwise expressly set forth in this Article IV, the Interests being acquired by Buyer at the Closing as a result of this Agreement shall be acquired by Buyer on an "as-is, where-is" basis and in their then present condition, and Buyer shall rely solely upon its own examination thereof and the representations and warranties set forth in this Article IV.


**Article V   Representations and Warranties of Buyer**

Buyer represents and warrants to Sellers as of the date hereof and as of the Closing Date as follows:

5.1     Organization and Good Standing. Buyer (i) is a corporation duly organized and validly existing under the Laws of the jurisdiction of its organization, (ii) has all requisite power and authority to own, lease and operate its properties and to carry on its business as is currently being conducted and (iii) is duly qualified and is in good standing under the laws of each jurisdiction in which its ownership or operation of property or the conduct of its business requires such qualification.  As of the date hereof, Odisea owns 1% of the Capital Stock of Buyer; Zéndere owns 6 % of the Capital Stock of Buyer and Subsidiary Servicios de Estrategia Patrimonial, S.A. de C.V., an Affiliate of Promecap, owns 93% of the Capital Stock of Buyer.

5.2     Authority and Enforceability. Buyer has the requisite power and authority to enter into and deliver this Agreement and, subject to any required Order or Authorization of the Bankruptcy Court, to perform its obligations under this Agreement. The execution and delivery of this Agreement and the performance by Buyer of its obligations under this Agreement have been duly authorized by Buyer. This Agreement has been duly executed and delivered by Buyer and, assuming due authorization, execution and delivery by Sellers, constitutes the valid and binding obligation of Buyer, enforceable against it in accordance with the terms hereof, except as such enforceability may be limited by (a) bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally, and (b) the availability of injunctive relief and other equitable remedies.

5.3     No Conflicts; Authorizations.

(a)     The execution and delivery of this Agreement by Buyer do not, and the consummation of the Acquisition by Buyer will not (i) violate the provisions of any of the Charter Documents of Buyer (ii) violate, conflict with or result in any breach, default or contravention of (or with due notice or lapse of time or both would result in any breach, default or contravention of), the loss of any material benefit under or the creation of any Lien under or require notice under, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which Buyer is a party or by which any of its assets are bound or (iii) violate or conflict with any Law, Authorization or Order applicable to Buyer, or give any Governmental Entity or other Person the right to challenge any of the transactions contemplated by this Agreement or to exercise any remedy, obtain any relief under or revoke or otherwise modify any rights held under, any such Law, Authorization or Order.

(b)     No Authorization or Order of, registration, declaration or filing with, or notice to, any Governmental Entity or other Person is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the Acquisition other than, the filing of the Mexican federal tax certificate referred to in Section 6.1 and any Authorization or Order required by the Bankruptcy Court.

5.4     Purchase for Investment. The Interests purchased by Buyer pursuant to this Agreement are being acquired for Buyer's own account for investment only and not with a view to any public distribution thereof. Buyer shall not offer to sell or otherwise dispose of, or sell or otherwise dispose of, the Interests so acquired by it in violation of any of the registration requirements of the Securities Act. Buyer has such knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Interests. Buyer is an "accredited investor" as defined in Rule 501 of the Securities Act. Buyer will not, directly or indirectly, dispose of the Interests except in compliance with applicable federal and state and foreign securities laws.

5.5     Inspections. Buyer is an informed and sophisticated participant in the Transaction and has undertaken such investigation, and has been provided with and

has evaluated such documents and information, as it has deemed necessary in connection with the execution, delivery and performance of this Agreement.

5.6     Availability of Funds. Buyer, together with the Guarantors, has cash available or has existing borrowing facilities which together are sufficient to enable it to consummate the Acquisition. Buyer, together with the Guarantors, has available, and at the Closing Buyer shall have available, sufficient funds to satisfy, among other things, its obligation to pay (a) the Purchase Price and (b) all expenses incurred by Buyer in connection with the transactions contemplated hereby. In no event shall the receipt or availability of any funds or financing by Buyer or any Affiliate or any other financing or other transactions be a condition to any of Buyer's obligations hereunder.

5.7     Brokers or Finders. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer or any Affiliate of Buyer.

5.8     Qualified Transferee. Buyer is a "Qualified Transferee" as defined in each of the Shareholders Agreements set forth on Exhibit A.

5.9     Limitation of Buyer's Representations and Warranties. Buyer is not making any representation or warranty whatsoever, expressed or implied, except those representations and warranties of Buyer explicitly set forth in Article V..

## Article VI   Covenants

6.1     Regulatory Approvals. Subject to the terms and conditions of this Agreement, including without limitation Section 3.1 and Section 3.2, each of Buyer and Sellers shall promptly apply for, and take all commercially reasonable actions necessary to obtain or make, as applicable, all Authorizations, Orders, declarations and filings with, and notices to, any Governmental Entity or other Person required to be obtained or made by it for the consummation of the Acquisition and the transactions contemplated by this Agreement. Each party shall cooperate with and promptly furnish information to the other party necessary in connection with any requirements imposed upon such other party in connection with the consummation of the Acquisition. Buyer and Sellers shall be equally responsible for all filing and other similar fees payable in connection with such filings, and for any local counsel fees, provided, however, that Zéndere and Odisea will contribute up to an aggregate of $15,000 (USD) to pay for Zéndere's coordination and any fees and expenses relating to the preparation and filing the Mexican federal tax certificate required to be filed at Closing. Sellers shall pay for any expenses in excess of the initial $15,000 (USD) relating to such filing.

6.2     Servicing. Zéndere Holding S.A.P.I. de C.V. shall cause Zéndere, S.A. de C.V. to continue to service the Fenix Assets pursuant to the existing servicing agreement by which Zéndere, S.A. de C.V. currently services the Fenix Assets, including with respect to fees for servicing the Fenix Assets.

6.3     <u>Public Announcements</u>. Except as required by Law or the Bankruptcy Court, neither Buyer nor Sellers shall issue any press releases or otherwise make any public statements with respect to the Transaction without the prior approval of the other parties; provided that each of the parties may make internal announcements to their respective employees that are consistent with the parties' prior permissible public disclosures, if any, regarding the Acquisition.

6.4     <u>Resignations</u>. On the Closing Date, Sellers shall cause to be delivered to Buyer duly signed resignations, effective as of the Closing, of all members of the boards of directors or comparable governing bodies of the Entities in which the Transferred Interests are held that are also employees of Sellers of their positions as directors (and, if requested by Buyer prior to Closing, of officers of their positions as officers) of the Entities in which the Transferred Interests are held.

6.5     <u>Tax Matters</u>.

(a)     <u>Cooperation in Filing Tax Returns</u>. Buyer and Sellers shall, and shall each cause its Subsidiaries and the Entities to provide to the other such cooperation and information, as and to the extent reasonably requested, in connection with the filing of any Tax Return, amended Tax Return or claim for refund, determining liability for Taxes or a right to refund of Taxes, or in conducting any audit, litigation or other proceeding with respect to Taxes. Such cooperation and information shall include providing copies of all relevant portions of relevant Tax Returns, together with relevant accompanying schedules and relevant work papers, relevant documents relating to rulings and other determinations by Taxing Authorities, and relevant records concerning the ownership and Tax basis of property, which any such party may possess. Each party will retain all Tax Returns, schedules, work papers, and all material records and other documents relating to Tax matters, of the Entities and their Subsidiaries for the Tax period first ending on or after the Closing Date and for all prior Tax periods until the later of either (i) the expiration of the applicable statute of limitations (and, to the extent notice is provided with respect thereto, any extensions thereof) for the Tax periods to which the Tax Returns and other documents relate or (ii) five (5) years following the due date (without extension) for such Tax Returns. Thereafter, the party holding such Tax Returns or other documents may dispose of them. Each party shall make its employees reasonably available on a mutually convenient basis at its cost to provide explanation of any documents or information so provided.

(b)     <u>Payment of Transfer Taxes and Fees</u>. Except as provided in Section 6.1 with respect to the cost of preparing the Mexican federal tax certificate, and except for any income or capitals gains tax owed by Sellers as a result of Sellers' sale of the Transferred Interests pursuant to this Agreement (which income or capital gains tax shall be obligations of Sellers), Buyer shall pay all Transfer Taxes, if any, arising out of or in connection with the Acquisition, and shall indemnify, defend, and hold harmless Sellers with respect to such Transfer Taxes. Buyer shall file all necessary documentation and Tax Returns with respect to such Transfer Taxes.

(c)     Purchase Price Allocation.  Buyer and Sellers shall allocate the Purchase Price among the Transferred Interests in accordance with Exhibit B hereto (subject to adjustment pursuant to the Adjustment Amount and Section 9.3), which allocation shall be conclusive and binding upon Buyer and Sellers for all purposes, and the parties agree that all returns and reports shall be prepared in a manner consistent with (and Buyer and Sellers shall not otherwise file a return or report inconsistent with) such allocation unless required by the Internal Revenue Service or any other applicable taxing authority.  Sellers shall allocate among themselves the proceeds of the Purchase Price to the applicable Seller of the relevant Transferred Interest.

6.6     Further Assurances. Subject to the terms of this Agreement, including without limitation Section 3.2, each of Buyer and Sellers shall execute such documents and other instruments and take such further actions as may be reasonably required to carry out the provisions hereof (including satisfaction, but not waiver, of the Closing conditions set forth in Article VII).

6.7     Notices and Consents.  Each Seller will give any notices to third parties and each Seller will use commercially reasonable efforts to obtain any Authorizations set forth on Schedule 4.3 necessary to transfer the Interests with respect to which Buyer is a Successful Bidder.

## Article VII  Conditions to Closing

7.1     Conditions to Obligations of Buyer and Sellers. The obligations of Buyer and Sellers to consummate the Acquisition are subject to the satisfaction (or waiver by Buyer and Sellers, each in their sole discretion) on or prior to the Closing Date of the following conditions:

(a) All Authorizations and Orders of, declarations and filings with, and notices to any Governmental Entity required to permit the Acquisition shall have been obtained or made and shall be in full force and effect.

(b) No restraining order, preliminary or permanent injunction or other Order preventing the consummation of the Acquisition shall be in effect. No Law shall have been enacted or shall be deemed applicable to the Acquisition which makes the consummation of the Acquisition illegal.

(c) The Bankruptcy Court shall have entered the Sale Order and such Order shall be a Final Order, or if an appeal has been taken and the Sale Order is not a Final Order, no stay has been entered barring the Closing.

(d) All third-party Authorizations required to effectuate the transfer of the Transferred Interests shall have been obtained and shall be in full force and effect.

(e) Buyer shall have executed a joinder or other agreement in form and substance satisfactory to the other parties to the Shareholders Agreements set forth on Exhibit A, binding Buyer to each such Shareholders Agreement.

(f) Buyer shall have executed an agreement pursuant to which Buyer assumes all of the rights and obligations of CFI and Capmark México Holding, S. de R.L. de C.V. under the Assignment and Assumption of Rights and Payment Agreement, dated as of December 10, 2003, by and among Lend Lease Equities, S.A. de C.V., CFI and Capmark México Holding, S. de R.L. de C.V.

7.2     Conditions to Obligation of Buyer. The obligation of Buyer to consummate the Acquisition is subject to the satisfaction (or waiver by Buyer in its sole discretion) of all of the following further conditions:

(a)     The representations and warranties of Sellers (i) set forth in Section 4.4 shall have been true and correct at and as of the date hereof and shall be true and correct at and as of the Closing Date as if made at and as of the Closing Date and (ii) other than those set forth in Section 4.4 shall have been true and correct in all material respects at and as of the date hereof and shall be true and correct in all material respects at and as of the Closing Date as if made at and as of the Closing Date, except to the extent that such representations and warranties refer specifically to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date, and Buyer shall have received a certificate dated the Closing Date signed on behalf of Sellers by an authorized officer of Sellers to such effect.

(b)     Sellers shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Sellers at or prior to the Closing Date. Buyer shall have received a certificate dated the Closing Date signed on behalf of Sellers by an authorized officer of Sellers to such effect.

(c)     The Debtor Sellers shall have delivered to Buyer a certificate of the Secretary of Sellers dated the Closing Date and certifying to the incumbency and specimen signature of each officer of Sellers executing this Agreement and the other agreements and documents delivered pursuant to this Agreement, and a certification by another officer of Sellers as to the incumbency and signature of the Secretary of Sellers. Capmark México shall have delivered to Buyer a copy of the public instrument containing the power of attorney granted by Capmark México to execute this Agreement.

(d)     Sellers shall have executed all necessary legal formalities in order to transfer their rights under the Transferred Interests and all related documents and corresponding rights and economic interests to Buyer.

(e)     The Transferred Interests shall include the RDH Interests.

7.3   Conditions to Obligation of Sellers. The obligation of Sellers to consummate the Acquisition is subject to the satisfaction (or waiver by Sellers in their sole discretion) of the following further conditions:

(a)    The representations and warranties of Buyer set forth in this Agreement shall have been true and correct in all material respects at and as of the date hereof and shall be true and correct in all material respects at and as of the Closing Date as if made at and as of the Closing Date, except to the extent that such representations and warranties refer specifically to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date, and Sellers shall have received a certificate dated the Closing Date signed on behalf of Buyer by an authorized officer of Buyer to such effect.

(b)    Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Buyer at or prior to the Closing Date, and Sellers shall have received a certificate signed on behalf of Buyer by the President of Buyer to such effect.

(c)    Buyer shall have delivered to Sellers a certificate of the Secretary of Buyer dated the Closing Date and certifying to the incumbency and specimen signature of each officer of Buyer executing this Agreement and the other agreements and documents delivered pursuant to this Agreement, and a certification by another officer of Buyer as to the incumbency and signature of the Secretary of Buyer.

## Article VIII

### Termination

8.1   Termination.

(a)    This Agreement may be terminated and the Acquisition abandoned at any time prior to the Closing:

(i)    by mutual written consent of Buyer and Sellers;

(ii)   by Buyer or Sellers if:

(A)    the Buyer is a Successful Bidder and the closing of the Acquisition does not occur on or before April 15, 2010 or the Buyer is a Back-Up Bidder and the closing of the Alternative Transaction with the Successful Bidder does not occur on or before May 15, 2010; provided, that the right to terminate this Agreement under this clause (ii)(A) shall not be available to any party whose actions or breach of this Agreement has been the cause of or resulted in the

*Signature Page to Purchase Agreement*

failure of the closing of the Acquisition to occur on or before such date;

(B)     the Bankruptcy Court enters an order authorizing or approving an Alternative Transaction, Buyer is not a Successful Bidder and Sellers do not identify Buyer as the Back-Up Bidder at the conclusion of the Auction (each as defined in the Bidding Procedures Order);

(C)     the Bankruptcy Court enters an order authorizing or approving an Alternative Transaction, Buyer is not a Successful Bidder, and Sellers identify Buyer at the conclusion of the Auction (as defined in the Bidding Procedures Order) as a Back-Up Bidder (as defined in the Bidding Procedures Order) and the time period requiring Buyer to be a Back-Up Bidder under the Bidding Procedures Order has expired;

(D)     the Chapter 11 Case of any Debtor Seller whose estate includes any portion of the Transferred Interests is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, an examiner with expanded powers or a trustee is appointed pursuant to the Bankruptcy Code or the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any material portion of a Debtor Seller's Transferred Interests; or

(E)     the Bankruptcy Court requires an amendment to this Agreement that is materially adverse to a party, and such party does not agree to such amendment (provided that the parties hereto acknowledge and agree that any amendment modifying the Break-Up Fee or the requirement that a Qualifying Bid be for less than all of the Core Interests shall be deemed to be material and adverse to Buyer);

(iii) by     Sellers if Sellers shall have entered into a definitive agreement in respect of an Alternative Transaction and Buyer is not a Successful Bidder or the Back-Up Bidder (as defined in the Bidding Procedures Order); and

(iv)     by Buyer if:

(A)     the Bankruptcy Court does not enter the Bidding Procedures Order on or before February 23, 2010, subject to the schedule of the Bankruptcy Court (including the

*Signature Page to Purchase Agreement*

availability of hearing dates) or other circumstances and
events outside the control of the Debtor Sellers;

(B)  (i) within five (5) Business Days after the date of the
Auction (as defined in the Bidding Procedures Order), the
Sale Order has not been entered by the Bankruptcy Court,
subject to the schedule of the Bankruptcy Court (including
the availability of hearing dates) or other circumstances and
events outside the control of the Debtor Sellers, or (ii) a
stay of the Sale Order has been entered by the Bankruptcy
Court barring the Closing;

(C)  the form of Sale Order attached to the Bidding Procedures
and Sale Motion is denied or modified in any material
adverse respect to the Buyer without the consent of Buyer;
or

(D)  previous to entry of the Sale Order approving the sale to
Buyer, the Debtors file with the Bankruptcy Court a chapter
11 plan or disclosure statement which contemplates an
Alternative Transaction, or any Person files with the
Bankruptcy Court a chapter 11 plan or disclosure statement
which contemplates an Alternative Transaction and Sellers
do not object to or oppose such plan or disclosure
statement, and Buyer is not a Successful Bidder.

(b)  The party desiring to terminate this Agreement pursuant to
Section 8.1(a)(ii), (iii) or (iv) shall give written notice of such termination to the other
party hereto.

8.2  Effect of Termination. In the event of termination of this
Agreement as provided in Section 8.1, this Agreement shall immediately become null and
void and there shall be no liability or obligation on the part of Buyer or Sellers or their
respective officers, directors, stockholders or Affiliates, except as set forth in Section 8.3
and Section 3.3 (Break-Up Fee) (if applicable); provided that the provisions of Section
3.3 (Break-Up Fee) (if applicable), Section 6.3 (Public Announcements) and Section 8.3
(Remedies), Article VIII and Article X of this Agreement and the Confidentiality
Agreement dated as of August 13, 2009, among CFGI, Promecap and Nuevos Negocios
DM San Luis, S.A. de C.V. (the "Confidentiality Agreement") shall remain in full force
and effect and survive any termination of this Agreement; provided further that nothing
herein shall limit the right of Sellers to disclose prior to the entry of a Sale Order
approving the sale of the Debtor Sellers' Transferred Interests to Buyer any information
in respect of Sellers, the Entities and the Interests to qualified bidders that have executed
an appropriate confidentiality agreement.

8.3  Remedies. Any party terminating this Agreement pursuant to
Section 8.1 shall have the right to recover damages sustained by such party as a result of

*Signature Page to Purchase Agreement*

any breach by the other party of any representation, warranty, covenant or agreement contained in this Agreement or fraud or willful misconduct; provided, however, that the party seeking relief is not in breach of any representation, warranty, covenant or agreement contained in this Agreement under circumstances which would have permitted the other party to terminate the Agreement under Section 8.1; and, provided, further, that Buyer's exclusive remedies for a breach of any representation or warranty shall be indemnification pursuant to Section 9.2 and its right to terminate this Agreement pursuant to Section 8.1. Any obligation to pay the Break-Up Fee pursuant to the terms of this Agreement shall be absolute and unconditional; such payment shall constitute an administrative expense of the Debtors' and their debtor Affiliates' estates under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and shall be payable as specified herein, and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever; provided, however, the Break-Up Fee shall not be payable if, prior to such Break-Up Fee becoming due and payable, the Chapter 11 Cases convert to chapter 7. Sellers and Buyer agree that the Break-Up Fee is a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby and shall be payable as specified herein and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever.

## Article IX    Indemnification

9.1    Survival. All representations and warranties contained in this Agreement, or in any certificate or other document delivered pursuant to this Agreement, shall terminate upon the Closing; provided, that notwithstanding the foregoing, the representation and warranty of any Seller that is not a Debtor as of the Closing (such a Seller, an "Indemnitor") contained in Section 4.4(a) of this Agreement shall survive Closing for a period of eighteen (18) months.

9.2    Indemnification by Indemnitors. Each Indemnitor shall indemnify and defend Buyer and its Affiliates and their respective stockholders, members, managers, officers, directors, employees, agents, successors and assigns (the "Indemnitees ") against, and shall hold them harmless from, any and all losses, liabilities, damages, claims (including third party claims), charges, interest, penalties, Taxes, diminution in value, costs and expenses (including legal, consultant, accounting and other professional fees, and fees and costs incurred in enforcing rights under this Section 9.2) (collectively, "Losses") resulting from, arising out of, or incurred by any Indemnitee in connection with, or otherwise with respect to the failure of the representation and warranty made by such Indemnitor in Section 4.4(a) to be true and correct as of the date of this Agreement or as of the Closing Date.

9.3    Indemnification Procedures.

(a)    Notice of Claim. The Indemnitee agrees that, upon its obtaining knowledge of facts indicating that there may be a basis for a claim for indemnity under the provisions of Section 9.2, including receipt by it of notice of any such claim, judicial

or otherwise, it will give prompt notice thereof to each Indemnitor, which notice shall include all information relating to such matter as Indemnitee shall then have with respect to such claim, including, a copy of any written claim or notice received by Indemnitee.

(b)     Defense of Claims.  Promptly upon receipt of written notice of a claim for indemnity as required by Section 9.3(a), Indemnitor shall assume and control the defense of any such claim and the payment of expenses related thereto.  Seller and Buyer agree that:

(i)     Indemnitor will not be liable for any settlement of any claim effected by Indemnitee without Indemnitor's express prior written consent, which consent may not be unreasonably conditioned, withheld or delayed;

(ii)     Indemnitor will not settle any claim without the express prior written consent of Indemnitee, which consent may not be unreasonably conditioned, withheld or delayed, provided, however, that no such consent shall be required so long as Indemnitee is fully released of all liability in connection therewith (if any such settlement is effected without Indemnitee's consent, Indemnitor shall promptly provided Indemnitee true and complete copies of such settlement); and

(iii)I    ndemnitee may elect to employ separate counsel and participate in the defense of any such claim, but in such event, Indemnitee will be responsible for the fees and expenses of such separate counsel, unless Indemnitor has failed to promptly and adequately assume the defense of such claim, in which event Indemnitor shall be responsible for the fees and expenses of one such separate counsel employed by Indemnitee.

(iv)     If requested by Indemnitor, Indemnitee agrees to cooperate with Indemnitor and its counsel in reasonably contesting any claim for which Indemnitor would have responsibility hereunder.  Indemnitor agrees to reimburse Indemnitee for any reasonable expenses incurred in so cooperating or acting at the request of Indemnitor or its counsel.

9.4     Limitation on Damages.  The aggregate liability of any Indemnitor for indemnification pursuant to this Article IX shall not exceed the Purchase Price for the Transferred Interests sold by such Indemnitor, as set forth in Exhibit B.

9.5     Indemnification Payments.  Any payment hereunder shall be made by wire transfer of immediately available funds to such account or accounts as the Indemnitee shall designate to Indemnitor(s) in writing.

9.6     Exclusive Remedy.  After the Closing, the indemnification set forth in this Article IX shall be the exclusive remedies of the Indemnitees for any

misrepresentation, breach or failure of warranty or representation of an Indemnitor in Section 4.4(a) of this Agreement.

## Article X  Miscellaneous

10.1    <u>Notices</u>. Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a private courier as established by the sender by evidence obtained from the courier, (c) on the date sent by e-mail or facsimile, with confirmation of transmission, if sent during normal business hours of the recipient, if not, then on the next business day, or (d) on the fifth day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications, to be valid, must be addressed as follows:

If to Buyer, to:

Promecap, S.A. de C.V.
Bosque de Alisos No. 47 A – 3er piso
Col. Bosques de las Lomas
05120 México, D.F.
Attn: Federico Chávez Peón Mijares
Facsimile: (52 55) 5259 6269

-and-

Zéndere Holding, S.A.P.I. de C.V.
Jaime Balmes 11 Torre A Piso 7
Colonia Los Morales.
11510 México, D.F.
Attn: Eduardo Flores Alonso & Bernardo Strimling Fridman
Tel (5255) 59 80 39 10

-and-

Odisea Asset Management, LLC
42 Jones Park Drive
Riverside, CT 06878
Attn: James Viceconte
Tel (203) 249 6661

With a required copy to:

Galicia y Robles, S.C.
Blvd Manuel Ávila Camacho No. 24 piso 7
Colonia Lomas de Chapultepec
México City; México  11000
Attn: Alejandro Chico P.
Facsimile: 011525555409202 ext. 2247

-and-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
United States
Attn:  Brian S. Hermann, Esq. and Julie M. D'Ambruoso, Esq.
Facsimile: (212) 757-3990


If to Sellers, to:

Capmark Financial Group Inc.
116 Welsh Road
Horsham, PA   19044
Tel:  215-328-3674
Fax: 215-441-7238
Attn: Thomas L. Fairfield, General Counsel


with a required copy to:

Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019
Attention:  John J. Altorelli, Esq.
Facsimile:  (212) 632-0367


or to such other address or to the attention of such Person or Persons as the recipient
party has specified by prior written notice to the sending party (or in the case of counsel,
to such other readily ascertainable business address as such counsel may hereafter
maintain). If more than one method for sending notice as set forth above is used, the
earliest notice date established as set forth above shall control.

*Signature Page to Purchase Agreement*

10.2    Amendments and Waivers.

(a)    Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)    No failure or delay by any party in exercising any right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(c)    To the maximum extent permitted by Law, (i) no waiver that may be given by a party shall be applicable except in the specific instance for which it was given and (ii) no notice to or demand on one party shall be deemed to be a waiver of any obligation of such party or the right of the party giving such notice or demand to take further action without notice or demand.

10.3    Right of First Refusal. If Capmark México desires to sell the Fenix Assets, then Capmark México shall promptly inform Buyer of its desire and provide to Buyer a notice summarizing all material terms of such proposed sale to a third party, and Buyer will have a right of first refusal to acquire the Fenix Assets, on terms no less favorable to Sellers than those contained in such offer including in respect of the purchase price, exercisable by written notice to Sellers within thirty (30) days of Buyer's receipt of a copy of such offer from Sellers. If Buyer exercises such right of first refusal in accordance with the terms hereof, Buyer and Sellers shall use commercially reasonable efforts to consummate the sale of the Fenix Assets to Buyer within sixty (60) days of Sellers' receipt of written notice from Buyer exercising Buyer's right of first refusal. If Buyer and Sellers are unable to consummate the sale of the Fenix Assets to Buyer within such period, Sellers may sell the Fenix Assets to such third party on terms and conditions no less favorable to Sellers than the terms and conditions contained in the written offer from such third party.

10.4    Expenses. Except as otherwise provided in this Agreement, each party shall bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties, whether or not the Acquisition is consummated.

10.5    Successors and Assigns. This Agreement may not be assigned by any party hereto without the prior written consent of the other parties hereto. Subject to the foregoing, all of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

10.6    Governing Law. This Agreement and the Exhibits and Schedules hereto shall be governed by and interpreted and enforced in accordance with the Laws of the State of New York, without giving effect to any choice of Law or conflict of Laws

rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York.

10.7    Consent to Jurisdiction. Each of the parties irrevocably and unconditionally submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York or any New York State court sitting in Manhattan for the purposes of enforcing this Agreement. In any action, suit or other proceeding, each of the Parties irrevocably and unconditionally waives and agrees not to assert by way of motion, as a defense or otherwise any claims that it is not subject to the jurisdiction of the above courts, that such action or suit is brought in an inconvenient forum or that the venue of such action, suit or other proceeding is improper. Each of the Parties also agrees that any final and nonappealable judgment against a Party in connection with any action, suit or other proceeding shall be conclusive and binding on such Party and that such award or judgment may be enforced in any court of competent jurisdiction, either within or outside of the United States. A certified or exemplified copy of such award or judgment shall be conclusive evidence of the fact and amount of such award or judgment. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

10.8    Guaranty. Subject to the terms and conditions set forth in this Agreement, each of the Guarantors hereby irrevocably guarantee to Sellers, severally and not jointly and each in proportion to its (or, in the case of Promecap, its Affiliate's) ownership of the Capital Stock of Buyer as set forth in Section 5.1, all of the obligations and liabilities of Buyer that are to be performed by Buyer under this Agreement from the date of this Agreement through the Closing Date, including the punctual payment, when and as due, of the Purchase Price. Each Guarantor agrees that Sellers may enforce the Guarantee without the necessity of first exhausting remedies against Buyer in respect of the guaranteed obligations. This guarantee shall terminate and be of no further force or effect upon the date the Guarantor obligations under this guarantee are irrevocably satisfied and paid in full.

10.9    Counterparts. This Agreement may be executed in counterparts, and either party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and both of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. The parties agree that the delivery of this Agreement may be effected by means of an exchange of facsimile signatures with original copies to follow by mail or courier service.

10.10   Third Party Beneficiaries. No provision of this Agreement is intended to confer upon any Person other than the parties hereto and their permitted successors and assigns any rights or remedies hereunder.

10.11 <u>Entire Agreement</u>. This Agreement and the documents, instruments and other agreements specifically referred to herein or delivered pursuant hereto set forth the entire understanding of the parties hereto with respect to the Acquisition. All exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement. Any and all previous agreements and understandings between or among the parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement, except for the Confidentiality Agreement which shall continue in full force and effect in accordance with its terms.

10.12 <u>Captions</u>. All captions contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

10.13 <u>Specific Performance</u>. Buyer and Sellers each agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by them in accordance with the terms hereof and that each party shall be entitled to specific performance of the terms hereof, in addition to any other remedy at Law or equity.

10.14 <u>Interpretation</u>.

(a) The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(b) The terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(c) When a reference is made in this Agreement to an Article, Section, paragraph, Exhibit or Schedule, such reference is to an Article, Section, paragraph, Exhibit or Schedule to this Agreement unless otherwise specified.

(d) The word "include", "includes", and "including" when used in this Agreement shall be deemed to be followed by the words "without limitation", unless otherwise specified.

(e) A reference to any party to this Agreement or any other agreement or document shall include such party's predecessors, successors and permitted assigns.

(f) Reference to any Law means such Law as amended, modified, codified, replaced or reenacted, and all rules and regulations promulgated thereunder.

(g) The parties have participated jointly in the negotiation and drafting of this Agreement. Any rule of construction or interpretation otherwise requiring this

Agreement to be construed or interpreted against any party by virtue of the authorship of this Agreement shall not apply to the construction and interpretation hereof.

(h)     All accounting terms used and not defined herein shall have the respective meanings given to them under United States generally accepted accounting principles.

(i)     "Commercially reasonable efforts" shall not require the payment of any fees or financial accommodations other than customary regulatory filing fees.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

TESEFA, S.A. de C.V.

By: _____
Name:
Title:

CAPMARK FINANCIAL GROUP INC.

By: _Thomas L. Fairfield_____
Name: Thomas L. FAIRFIELD
Title: Executive Vice President

CAPMARK FINANCE INC.

By: _Thomas L. Fairfield_____
Name: Thomas L. FAIRFIELD
Title: Executive Vice President

CAPMARK MÉXICO HOLDING, S. DE R.L. DE C.V.

By: _Thomas L. Fairfield_____
Name: Thomas L. FAIRFIELD
Title: Attorney in Fact

PROMECAP S.A. DE C.V.

By: _____
Name: Federico Chávez Peón and Irma Teresa Oliva
Title: Attorneys-in-fact

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

TESEFA, S.A. de C.V.

By: _____

Name: Federico Chávez Peón and Rodrigo Gómez Alarcón

Title: Attorneys-in-fact

ODISEA ASSET MANAGEMENT, LLC

By: _____
Name: James F. Viceconte
Title: Chief Executive Officer

ZÉNDERE HOLDING S.A.P.I. DE C.V.

By: _____
Name: Eduardo Flores Alonso
Title: Chief Executive Officer

PROMECAP, S.A. de C.V.

By: _____

Name: Federico Chávez Peón and Irma Teresa Oliva

Title: Attorneys-in-fact

# EXHIBIT A

## TRANSFERRED INTERESTS[1]

### *COEFACT, S.A. de C.V.*

1. (i) 25,000 Series "A" shares (Fixed capital) and (ii) 6,975,000 Series "B" shares (Variable capital) owned by Capmark México Holding, S. de R.L. de C.V., together representing 50% of the outstanding capital stock of the company.

2. All rights and obligations of Capmark México Holding, S. de R.L. de C.V. under the Shareholders' Agreement dated as of March 19, 2004 between Capmark México Holding, S. de R.L. de C.V. and UBS AG

### *CAPMARK ACTIVOS I, S. de R.L. de C.V.*

1. All outstanding debt of the company that is in favor of Capmark Finance Inc.

2. All outstanding debt of the company that is in favor of Capmark México Holding, S. de R.L. de C.V.

3. 2 Social Parts owned by (i) Capmark México Holding, S. de R.L. de C.V. and (ii) Capmark Finance Inc., together representing 100% of the outstanding capital stock of the company.

### *CAPMARK ACTIVOS III, S. de R.L. de C.V.*

1. 1 Social Part owned by (i) Capmark Financial Group Inc and (ii) 1 Social Part owned by Capmark México Holding, S. de R.L. de C.V., together representing 100% of the outstanding capital stock of the company.

### *LLM INVERSIONES I, S.A. de C.V.*

1. All Unsecured Debentures issued by Lend Lease Equities, S.A. de C.V. and held by Capmark México Holding, S. de R.L. de C.V. (Issuance Date was December 10, 2003).

2. All rights and obligations of Capmark México Holding, S. de R.L. de C.V. and Capmark Finance Inc. under the Assignment and Assumption of Rights and Payment Agreement, dated as of December 10, 2003, among Lend Lease Equities, S.A. de C.V., Capmark México Holding, S. de R.L. de C.V. and Capmark Finance Inc.

---

[1] The number of equity securities set forth in this Exhibit A represent the number of equity securities held by the applicable Seller as of October 9, 2009 and may have been adjusted as a result of pro rata capital reductions effected by the applicable Entity.

NY2 2045537.7

### LLM INVERSIONES II, S.A. de C.V.

1. (i) 50,000 Series "A" shares (Fixed capital) and (ii) 924,675 Series "B" shares (Variable capital) owned by Capmark México Holding, S. de R.L. de C.V., together representing 50% of the outstanding capital stock of the company.

2. All rights and obligations of Capmark México Holding, S. de R.L. de C.V. under the Shareholders' Agreement dated as of December 15, 2002 among ML IBK Positions Inc., Lend Lease Equities, S.A. de C.V. and LLM Inversiones II, S.A. de C.V.

### RECUPERADORA DE DEUDA HIPOTECARIA, S. de R.L. de C.V.

1. 1 Social Part owned by Capmark Financial Group Inc., representing 40% of the outstanding capital stock of the company.

2. All rights and obligations of Capmark Financial Group Inc. under the Amended and Restated Shareholders Agreement dated as of January 18, 2006 among Capmark Financial Group Inc. CIGPF I Corp. and UBS AG.

### VPN PLUS, S de R.L. de C.V.

1. 1 Social Part owned by Capmark Financial Group Inc., representing 50% of the outstanding capital stock of the company.

2. All rights and obligations of Capmark Financial Group Inc. under the Shareholders Agreement dated as of September 8, 2005 among Capmark Financial Group Inc. and CIGPF I Corp.

### VPN PLUS II, S. de R.L. de C.V.

1. 1 Social Part owned by Capmark Financial Group Inc., representing 50% of the outstanding capital stock of the company.

2. All rights and obligations of Capmark Financial Group Inc. under the Shareholders Agreement dated as of September 29, 2005 among Capmark Financial Group Inc. and CIGPF I Corp.

### ZÉNDERE NOTES

1. Obligations and rights related to the Stock Purchase Agreement entered into by and among Zéndere I, S.A. de C.V., Corporativo Zéndere I, S.A.P.I. de C.V., Capmark Financial Group Inc, Capmark México Holding, S. de R.L. de C.V., and the Principals named in such agreement dated as of November 15, 2007.

2. Obligations and rights related to the Stock Pledge Agreement entered into by and among Zéndere I, S.A. de C.V. and Corporativo Zéndere I, S.A.P.I de C.V. as

A-2

Pledgors and Capmark México Holding, S. de R.L. de C.V. as Pledgee dated December 07, 2007.

# EXHIBIT B

## ALLOCATION OF BASE PURCHASE PRICE

## BASE PURCHASE PRICE ALLOCATION IN MEXICAN PESOS

| ASSET | BASE PURCHASE PRICE ALLOCATION |
|---|---|
| Capmark Activos I, S. de R.L. de C.V. | 16,432,657 |
| Capmark Activos III, S. de R.L. de C.V. | 826,800 |
| Coefact, S.A. de C.V. | 3,617,252 |
| LLM Inversiones I, S.A. de C.V. | 3,100,501 |
| LLM Inversiónes II, S.A. de C.V, | 516,750 |
| Recuperadora de Deuda Hipotecaria, S. de R.L. de C.V. | 128,800,000 |
| VPN Plus, S. de R.I. de C.V. | 20,153,259 |
| VPN Plus II, S. de R.I, de C.V. | 29,454,763 |
| Zéndere Notes | 21,703,510 |
| **TOTAL:** | **224,605,492** |

NY2 2045537.7

**Schedule 4.3**

**No Conflicts; Authorizations**

(1) Rights of first refusal of the holders of Capital Stock of the Entities arising by operation of the Laws of México.

(2) Rights of first refusal of the parties to the Shareholders Agreements set forth on Exhibit A pursuant to the terms of such Shareholders Agreements.

(3) Authorizations of the parties to the Shareholders Agreements set forth on Exhibit A (i.e., those Authorizations required pursuant to such Shareholders Agreements and resolutions of the parties thereto approving the Acquisition).

(4) Authorization of Lend Lease Equities S.A. de C.V. and Merrill Lynch Mortgage Capital, Inc. under the Assignment and Assumption of Rights and Payment Agreement, dated as of December 10, 2003, among Lend Lease Equities, S.A. de C.V., Capmark México Holding, S. de R.L. de C.V. and Capmark Finance Inc.

(5) Authorization and Order of the Bankruptcy Court.

1

## Schedule 4.4(b)

## Transferred Interests

(1) Assignment and Assumption of Rights and Payment Agreement, dated as of December 10, 2003, among Lend Lease Equities, S.A. de C.V., Capmark México Holding, S. de R.L. de C.V. and Capmark Finance Inc.

(2) The Shareholders Agreements set forth on Exhibit A.

NY2 2045537.7