# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
:
In re: : Chapter 11
:
CAPMARK FINANCIAL GROUP INC., *et al.*, : Case No. 09-13684 (CSS)
:
Debtors. : Jointly Administered
:
: **Hearing Date:  March 4, 2010 at 10:00 a.m.**
: **Objection Deadline:  February 25, 2010 at 4:00 p.m.**
---------------------------------------------------------------x

## MOTION, PURSUANT TO SECTIONS 105(a), 363(b), 363(c), AND 503(c) OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, AND 9014, AND LOCAL RULES 2002-1 AND 6004-1, REQUESTING ENTRY OF AN ORDER: (I) APPROVING DEBTORS' PERFORMANCE INCENTIVE PLAN FOR INSIDER EMPLOYEES, (II) CONFIRMING THAT DEBTORS' CONTINUATION OF DISCRETIONARY BONUS PLAN FOR NON-INSIDER EMPLOYEES IS AN ORDINARY COURSE TRANSACTION OR, ALTERNATIVELY, APPROVING THE BONUS PLAN OUTSIDE THE ORDINARY COURSE, AND (III) <u>AUTHORIZING PAYMENTS UNDER SUCH PLANS</u>

Capmark Financial Group Inc. ("<u>CFGI</u>") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>"), submit this motion (the "<u>Motion</u>") for entry of an order (the "<u>Order</u>"), substantially in the proposed form annexed hereto as <u>Exhibit A</u>:  (i) approving the Debtors' postpetition performance incentive plan (the "<u>Performance Incentive Plan</u>") for Insider Employees (as defined below),[1] a copy of which is annexed hereto as <u>Exhibit B</u> and has been submitted under seal by a separate motion filed concurrently herewith; (ii) confirming that Debtors' continuation of their prepetition discretionary bonus plan (the "<u>Bonus Plan</u>") on a postpetition basis for Employees that are not

---

[1] Pursuant to an order dated December 23, 2009 (the "<u>Insider Determination Order</u>"), following the Debtors' submission of substantial evidence regarding the insider and non-insider status of their employees, this Court determined which of the Debtors' employees (other than employees of Capmark Investments LP) are "insiders" as defined by section 101(31) of the Bankruptcy Code and for the purposes of section 503(c) of the Bankruptcy (the "<u>Insider Employees</u>").  The Insider Employees are identified in Exhibit A to the Insider Determination Order.  At the hearing on this Motion, the Debtors intend to produce evidence establishing that two employees of Capmark Investments LP should also be considered "insiders" under the Bankruptcy Code and "Insider Employees" for purposes of the Performance Incentive Plan.

insiders of the Debtors (the "<u>Non-Insider Employees</u>") is a transaction in the ordinary course of business or, alternatively, approving the discretionary bonus plan outside the ordinary course of business; and (iii) authorizing payments under such plans. In further support of this Motion, the Debtors respectfully represent:

## **<u>Background</u>**

1. On October 25, 2009 (the "<u>Commencement Date</u>"), each of the Debtors other than Capmark Investments LP (collectively, the "<u>First Filed Debtors</u>") commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). On January 15, 2010, Capmark Investments LP, a wholly-owned subsidiary of CFGI, commenced a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code.

2. On October 27, 2009, this Court entered an order authorizing the joint administration of the First Filed Debtors' chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"). On January 19, 2010, this Court entered an order authorizing the joint administration of Capmark Investments LP's chapter 11 case with the jointly administered chapter 11 cases of the First Filed Debtors.

3. On November 2, 2009, the Office of the United States Trustee (the "<u>U.S. Trustee</u>") appointed a statutory unsecured creditors committee pursuant to section 1102 of the Bankruptcy Code (the "<u>Committee</u>").

## Jurisdiction and Venue

4.     This Court has jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Capmark's Businesses

5.     The Debtors and their non-debtor subsidiaries and affiliates (together with the Debtors, "Capmark") are a group of commercial real estate finance companies that provide real estate-related products and services to borrowers, investors and other customers along three core business lines:  (i) commercial real estate lending and mortgage banking; (ii) investments and funds management; and (iii) commercial loan servicing.

6.     A detailed description of Capmark's business, capital structure, and the events leading to the commencement of these chapter 11 cases is contained in the Declaration of Thomas L. Fairfield, Executive Vice President, General Counsel and Secretary of CFGI, in Support of the Debtors' Chapter 11 Petitions and First Day Motions and Applications, filed on the Commencement Date [Docket No. 13].

## Relief Requested

7.     By this Motion, the Debtors request entry of an order, pursuant to sections 105(a), 363(b), 363(c), and 503(c) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9014, and Local Rules 2002-1 and 6004-1: (i) approving a Performance Incentive Plan designed to motivate and encourage Insider Employees to achieve various important and strategic goals in these chapter 11 cases in an expeditious, efficient, and highly valuable manner and to compensate the Insider Employees upon achieving these goals; (ii) confirming that the discretionary postpetition payment of regular and supplemental bonus awards to Non-Insider Employees under the Debtors' 2009 Bonus Plan, which are to be awarded in the normal course

of business in 2010, and the similar implementation of a 2010 Bonus Plan under which payments will be awarded in 2011 if a chapter 11 plan has not been earlier confirmed, are transactions in the ordinary course of business or, alternatively, may be approved as non-ordinary course transactions which are a reasonable exercise of the Debtors' sound business judgment; and (iii) authorizing the Debtors to make all payments under such plans.

### Performance Incentive Plan for Insider Employees

8.      Since the Commencement Date the Insider Employees have dedicated themselves to achieving a maximization of value for all stakeholders of the Debtors' estates by providing services under extreme conditions and exigent circumstances, far beyond the ordinary call of duty.   In particular, the Insider Employees have been instrumental in structuring, negotiating and closing three substantial sales (the sales of the MSB Business, the Military Housing Business, and the Debtors' equity in their Japanese servicing platform), which collectively have realized in excess of $1billion of cash for the estates.   The Insider Employees have also been instrumental in addressing the substantial claims of the Federal Deposit Insurance Corporation (the "FDIC") in these chapter 11 cases by successfully negotiating and gaining approval of a motion authorizing, among other things, CFGI to satisfy the claims of the FDIC in these cases (including, without limitation, under sections 365(o) and 507(a)(9) of the Bankruptcy Code) and to provide additional needed capital to Capmark Bank, a wholly-owned subsidiary of CFGI.   And among other accomplishments, the Insider Employees have also been instrumental in designing and beginning the implementation of an asset management and operating plan, and a cost reduction plan, which will maximize the realization of value from the Debtors' assets and achieve substantial expense and operational savings for the estates in 2010.   Moreover, the Debtors have also opened discussions with the various creditor constituencies to begin the process of moving toward the formulation of a chapter 11 plan.

9.      Although these highly valued and valuable efforts have been integral to the early success of these chapter 11 cases, much remains to be done, including, among other things, negotiating and completing additional assets sales and dispositions, creating wind-down and business plans for the Debtors' businesses, analyzing and settling claims, and crafting, negotiating and confirming a chapter 11 plan.   All of these tasks will require substantial contributions from the Insider Employees, whose continuing best efforts are absolutely critical to the continued success of these cases.

10.      To incentivize the Insider Employees to continue working tirelessly on these matters, the Debtors have developed a Performance Incentive Plan designed to align the interests of the Insider Employees with the interests of the Debtors' stakeholders and to meet the legal requirements for authorization and approval of a postpetition performance incentive plan for Insider Employees.

11.      As discussed in greater detail below, the Performance Incentive Plan provides for performance incentive payments to Insider Employees based upon their achievement of certain objective measures or milestones (the "Milestones") in these chapter 11 cases.   The Milestones include the achievement of various value-creating benchmarks, such as asset sales, management of other asset dispositions, successful business transitions, implementation of cost-reduction plans, and the expeditious confirmation of a chapter 11 plan.

12.      The Performance Incentive Plan provides for a maximum aggregate payout of $8.8 million if all Milestones are achieved.   The maximum incentive payment that may be earned by each Insider Employee is set forth on Exhibit B hereto, which has been filed under seal.[2]   The Debtors believe the Performance Incentive Plan will provide significant value at a

---

[2]   The Debtors will also provide copies of the Performance Incentive Plan to the U.S. Trustee and the Committee, subject to appropriate confidentiality protections.

relatively small cost to the estates. This is particularly true given the value, size, and complexity of the Debtors' businesses, and the complexity of the issues that have already arisen and will surely continue to arise in these cases. The Debtors believe the amounts they seek authority to pay to Insider Employees in the aggregate and individually are reasonable and responsibly targeted to create maximum value, thus serving the best interests of the Debtors' estates.

### A. General Terms of the Performance Incentive Plan

13. In additional to the Milestones, the Performance Incentive Plan is governed by certain general terms. Insider Employees participating in the Performance Incentive Plan will not be eligible for incentive payments if (a) they determine not to participate in the plan, or (b) they resign voluntarily or are terminated for cause before they are entitled to incentive payments under the plan. A participating Insider Employee terminated for reasons other than cause will be entitled to only those Milestone incentive payments which have vested at the time of severance and the vested Milestone payments shall reduce any amount of severance payable to such Insider Employee under the Debtors' separate severance plan (the "Severance Plan"). In addition, as a condition precedent to receiving any incentive payments under the Performance Incentive Plan, participating Insider Employees will be required to provide the Debtors with a general release and waiver of, among other things, all claims for unpaid compensation.

### B. Milestones and Payments under the Performance Incentive Plan

14. Pursuant to the Performance Incentive Plan, the Debtors shall reserve and set aside approximately $8.8 million for a pool (the "Plan Pool") to finance the maximum incentive payments to Insider Employees upon achievement of the Milestones. For Insider Employees whose Milestones relate solely to the disposition of business platforms, 100% of the amounts reserved in the Plan Pool relating to such disposition will be payable upon completion

of such Milestones.  For certain other Insider Employees whose Milestones include matters other than business dispositions, 50% of the Plan Pool will become payable to participating Insider Employees upon the achievement of the Milestones and the remaining 50% will be deferred over time, with 25% paid in June 2011 and the remaining 25% paid in December 2011.  For Insider Employees involved in the transfer of certain asset management operations from the Debtors to Capmark Bank, 50% of the related Plan Pool will be paid upon achieving the Milestone for successful transition of asset management operations to Capmark Bank and the remaining 50% will be paid 180 days following successful transfer of the operations.

15.     The Milestones triggering the vesting of payments from the Plan Pool are summarized as follows:

(i)     *Assets Sales/Dispositions*

16.     The fundamental purpose of any chapter 11 case is to maximize the value of a debtor's estate.  In accordance with this goal, the Debtors, through the efforts of the Insider Employees, have endeavored to realize the maximum value for assets that have been sold, and will endeavor to similarly realize the maximum value for future asset sales.  For remaining sales and dispositions that have yet to be consummated or are still in progress, the Performance Incentive Plan provides for specific targeted payments to Insider Employees whose efforts are integral to the asset sales or orderly disposition and transition of business platforms.  The Milestones associated with these dispositions include integral tasks that must be undertaken to properly transition business platforms to acquiring entities.

(ii)    *Plan Confirmation and Emergence from Bankruptcy*

17.     The Debtors are endeavoring to conclude these cases as quickly as possible, expedite distributions to creditors, and reorganize the viable part of the Debtors' businesses.  Upon confirmation of a chapter 11 plan and emergence from bankruptcy, the

Performance Incentive Plan provides for specific targeted payments to Insider Employees whose efforts are necessary to the formulation, negotiation and confirmation of a chapter 11 plan and the emergence of the Debtors from chapter 11.

### (iii) *Expense Reduction and Operating Plans*

18. The Debtors have established an expense reduction plan which is designed to lower the costs of running their businesses during 2010 and beyond through staff reductions and continued targeted reductions in overhead costs. The Debtors are also crafting an operating plan for 2010, aimed at further reducing costs of the businesses and streamlining the Debtors' corporate hierarchy. The Performance Incentive Plan provides for incentive payments for reaching certain Milestones relating to the successful implementation of the expense reduction plan and the operating plan.

### (iv) *Asia*

19. The Debtors' Asian operations are complex and require the stewardship of Insider Employees to achieve various important objectives, which include certain objectives already outlined as Milestones herein (such as confirmation of a plan and emergence from chapter 11) and various other objectives. The Performance Incentive Plan creates separate awards for achieving Asia-specific Milestones, including (a) the repatriation to CFGI of funds in excess of $50 million relating to an asset sale in Taiwan, (b) evaluation of the outsourcing of certain assets, (c) administering an outsourcing bid process, and (d) finalizing a management plan after completion of the outsourcing review process.

### (v) *Asset Management Transitions*

20. The Debtors are seeking to transition their asset management functions in a manner that will more effectively align asset management personnel with the organizations that hold the assets under management. To incentivize Insider Employees to perform the necessary

transition services, the Performance Incentive Plan provides for Milestone incentive payments upon (a) substantial completion of the asset management and support functions relating thereto into Capmark Bank, (b) reassignment of the asset management responsibilities consistent with the reorganization of the group, (c) updating of the loan level business plans for 2010, and (d) obtaining required approvals from regulatory authorities.

*(vi)    LIHTC Goals*

21.     Given the large contingent liabilities associated with the Debtors' low income housing tax credit ("LIHTC") business and the inability of the Debtors to reorganize the management side of the LIHTC business in bankruptcy, the Debtors have developed specific Milestones designed to incentivize Insider Employees to achieve certain value-generating results relating to the business.  Specifically, the Performance Incentive Plan provides that Insider Employees will receive specific Milestone payments for (a) settling 80% or more of the LIHTC secured guarantee liabilities and obtaining court approval for the same, (b) transferring the LIHTC funds to one or more successor managers or sub-managers and obtaining court approval for the same, and (c) establishing a plan for monetizing and wind-down of remaining platform assets.

**The Ordinary Course Discretionary Bonus Plan for Non-Insider Employees**

22.     Prior to the Commencement Date the Debtors regularly awarded annual bonuses to their Employees (both insiders and non-insiders) pursuant to the Bonus Plan.[3]  Under the Bonus Plan, at the beginning of each calendar year (the "Plan Year") the Compensation Committee of the Board of Directors would review and approve (i) adoption of a Bonus Plan for

---

[3]  Although Insider Employees traditionally received prepetition bonus awards under the Bonus Plan, the Debtors will continue to make postpetition awards and payments under the Bonus Plan only to Non-Insider Employees.  The Insider Employees will be entitled to postpetition incentive payments solely pursuant to the terms of the Performance Incentive Plan, to the extent approved by this Court.

that Plan Year, (ii) the methodology to be used for calculating the aggregate discretionary bonus pool after the Plan Year, and (iii) the projected but non-binding aggregate payout under the Bonus Plan for the Plan Year.  At that time, the Compensation Committee also established the Bonus Year preliminary non-binding targets for both the percentage of net income to be used in calculating the discretionary bonus pool and thus the dollar value of the pool.  Nonetheless, except as to the variance adopted in the 2009 Plan Year as discussed below, in the prepetition years, no bonuses or entitlements to bonuses were approved and awarded during a Plan Year.

23.     As soon as practicable after the end of each Plan Year, the Chief Executive Officer (the "CEO") and the Chief Administrative Officer ("CAO") of CFGI presented recommendations to the Compensation Committee of the Board of Directors with respect to the final discretionary bonus pool, including the calculations and rationale for such recommendations.  Taking into account the joint recommendation of the CEO and the CAO, the Compensation Committee then determined in its sole discretion the final percentage of net income to be used in calculating the discretionary bonus pool and thus the final dollar value of the pool.

24.     The bonus payments under the Bonus Plan are thus wholly discretionary; the Bonus Plan specifically provides (a) no individual bonus award or any other payment is deemed to be earned prior to the time it is actually paid and (b) no Employee has a vested interest or entitlement to a payment or award of any part of the bonus pool prior to actual payment thereof.[4]  Upon approval by the Compensation Committee, payment of an award under the Bonus Plan remains subject to additional conditions, such as continuous employment through the bonus payment date.

---

[4] As discussed below, during the 2009 Plan Year (in the prepetition period), bonuses were awarded and paid to certain Employees during the same Plan Year as a retention tool.

25.     In each year before the 2009 Bonus Plan Year, discretionary bonuses were awarded in the early part of the calendar year following the Plan Year in which work was performed.  However, to incentivize certain Employees to remain with the Debtors in the difficult time period leading up to the filing of these cases and thereafter, certain Employees were awarded a large portion of their 2009 Bonus Plan bonuses in May and June 2009, which were counted towards and allocable to the 2009 Plan Year.  The amounts awarded under these prepetition bonuses were payable over time, with final payments due on March 31, 2010.  The intervention of these chapter 11 cases precluded further payments absent a court order.  Pursuant to an order dated November 24, 2009, this Court approved the bonuses awarded prepetition for the 2009 Plan Year (and prepetition awards still outstanding for the 2008 Plan Year) subject to a further determination of which Employees are non-insiders that are entitled to payment under the Bonus Plan.  Pursuant to the Insider Determination Order, this Court determined which Employees are Insider Employees who cannot be paid retentive bonuses and authorized the Debtors to pay the prepetition amounts awarded to Non-Insider Employees under the Bonus Plan for the 2008 and 2009 Plan Years.

26.     The Debtors are now planning to award bonuses for the 2009 Plan Year for Non-Insider Employees in the normal course of business as described above.  The 2009 Bonus Plan awards that are the subject of this Motion are solely postpetition awards; the Debtors have no prepetition obligation to pay these bonus awards and the Non-Insider Employees to receive the awards have no prepetition claim to them.  The CEO and the CAO of CFGI will soon make recommendations to the Compensation Committee of the Board of Directors with respect to the bonuses to be paid to Non-Insider Employees for 2009 Plan Year, which will include awards to Employees who were not awarded any such bonuses before the Commencement Date

and certain supplemental and incremental amounts payable to certain of the Non-Insider Employees who were awarded and paid prepetition bonuses. The total amount the Debtors plan to pay for bonuses under the 2009 Bonus Plan is approximately $2.4 million. The Debtors are also planning to continue the Bonus Plan for the 2010 Plan Year, with payments to be awarded in early 2011 if approved by the Compensation Committee.[5]

27.     The Debtors believe awarding the postpetition bonuses to Non-Insider Employees are transactions in the ordinary course of business. As discussed below, however, the Debtors seek a precautionary order confirming that the continuation of the Bonus Plan is ordinary course.

<u>**Basis for Relief Requested**</u>

**I.     The Performance Incentive Plan Should Be Approved Pursuant to Sections 105(a), 363(b)(1) and 503(c)(3) of the Bankruptcy Code**

    **A.     The Performance Incentive Plan Meets the Requirements of Section 363(b)(1) of the Bankruptcy Code**

28.     Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts have held the use, sale or lease of property of the estate outside the ordinary course of business should be authorized when there is a "sound business purpose" that justifies such use of estate property. *See In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (adopting the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B .R. 147, 153 (D. Del. 1999) (same); and *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986)

---

[5]   As they did with the 2009 bonuses awarded under the Bonus Plan prior to the Commencement Date, the Debtors may also award certain of the 2010 Bonus Plan bonuses during the 2010 calendar year as a further retention tool for Non-Insider Employees, but such early awards will not exceed $1 million in the aggregate.

(same).  Thus, courts should approve transactions supported by the sound business judgment of a debtor's management.  *See In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *see also Montgomery Ward*, 242 B.R. at 153.

29.    Once the debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule."  The business judgment rule is a presumption that, in reaching a business decision, the corporation's management "acted on an informed basis, in good faith, and in honest belief that the action taken was in the best interests of the company." *In re Dura Auto. Sys.*, 2007 Bankr. LEXIS, at *260 (citing *The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Von Gorkum*, 488 A.2d 858, 872 (Del. 1985)).  As a result, objections to a debtor's business decisions will only be entertained when they allege "bad faith, self-interest, or gross negligence." *See Integrated Res.*, 147 B.R. at 656; *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (business judgment standard mandates that a court approve a debtor's business decision unless the decision is the product of bad faith, whim or caprice); *In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) ("The business judgment test dictates that a court should approve a debtor's decision to reject a contract unless that decision is the product of bad faith or a gross abuse of discretion.").  Courts will approve the use of property of the estate outside of the ordinary course upon the showing of a sound business purpose and are cautious not to supplant the Debtors' business judgment with their own. *See*, *e.g.*, *In re Crystal Apparel*, 207 B.R. 406, 410 (S.D.N.Y. 1997) ("[C]ourts must exercise great deference in reviewing a corporation's desire to pay its employees.").

30. The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See id.*; *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under Bankruptcy Code section 363(b) when there is a legitimate business justification).

31. As discussed above, the Performance Incentive Plan is a critical part of the Debtors' goal to confirm a successful plan and maximize recoveries to creditors. The Debtors reasonably believe the implementation of the Performance Incentive Plan is necessary to appropriately compensate the Debtors' Insider Employees, given the enormous additional burdens placed on them in these cases, and to ensure the Insider Employees remain motivated to perform the important tasks necessary to ensure confirmation of a successful chapter 11 plan. Indeed, if the Debtors are not authorized to implement the Performance Incentive Plan, the Debtors believe the dedication, confidence and cooperation of their Insider Employees would waver at this critical juncture in the Debtors' reorganization efforts. As a result, the Debtors believe the Performance Incentive Plan should be approved as a reasonable exercise of their sound business judgment.

**B.      The Performance Incentive Plan Should Be Evaluated and Authorized Under Section 503(c)(3) of the Bankruptcy Code Using the Same Standard as Applies Under Section 363(b)(1) of the Bankruptcy Code**

32. Section 503(c)(3) states, in relevant part, "there shall neither be allowed, nor paid . . . other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case . . . ." Courts analyzing payments under section 503(c)(3) have been unanimous in holding that the business judgment test is the proper standard for determining whether incentive programs and payments are justified by the facts and circumstances of a case. *See*, *e.g.*, *In re Werner Holding Co. (DE), Inc.*, No. 06-10578 (Carey,

J.) (Bankr. D. Del. July 20, 2006, Aug. 22, 2006, and Dec. 20, 2006); *In re Nobex Corp.*, No. 05-20050 (Walrath, J.) (Bankr. D. Del. May 15, 2006 and Dec. 21, 2005); *In re Riverstone Networks Inc.*, No. 06-10110 (Sontchi, J.) (Bankr. D. Del. March 28, 2006); *In re Pliant Corp.*, No. 06-10001 (Walrath, J.) (Bankr. D. Del. Mar. 14, 2006).

        33.      Indeed, in *Nobex Corp.*, Judge Walrath stated:

> [Section 503](c)(3) was meant to provide a standard, albeit not as clear, for any other transfers or obligations made outside the ordinary course of business. . . . I read (c)(3) to be the catch-all and the standard under (c)(3) for any transfers or obligations made outside the ordinary course of business are those that are justified by the facts and circumstances of the case . . . I find it quite frankly nothing more than a reiteration of the standard under 363 . . . under which courts have previously authorized transfers outside the ordinary course of business and that [are], based on the business judgment of the debtor. . . .”

January 12, 2006, Hearing Tr. at 86-87, *In re Nobex Corp.*, No. 05-20050 (Walrath, J.) (Bankr. D. Del. Jan. 20, 2006) (order approving management incentive); *see also In re Global Home Products, LLC*, 369 B.R. 778, 783 (Bankr. Del. 2007) (“If the Court finds the [debtor's proposed management incentive plans] are a [key employee retention plan], they are subject to the bright light and restrictions of § 503(c). If they are plans intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363.”)

        34.      As a result, whether the Court applies sections 503(c) or 363(b) to evaluate the Performance Incentive Plan, the business judgment standard should apply and the Debtors believe the decision to implement the Performance Incentive Plan meets the applicable business judgment standards.

        35.      First, the Performance Incentive Plan will incentivize participants to continue the significant efforts they have made since the Commencement Date and to continue to meet their increased responsibilities and burdens over the coming months in preparing for and closing various asset sales, followed by the efficient wind-down and restructuring of other

businesses and resolution of these chapter 11 cases.  As outlined above, the Performance Incentive Plan is structured to maximize value for the Debtors' estates and creditors.  Moreover, the case-management incentives set forth in the Performance Incentive Plan depend upon the minimization of cash outflow through both the efficient management and expedited conclusion of these chapter 11 cases.  Thus, the motivations of Insider Employees are aligned with the goals of the Debtors and their creditors.

36.     Further, the Debtors' ability to preserve the value of their assets would be substantially hindered if the Debtors are unable to properly incentivize the Insider Employees. The fact that the Debtors are essentially now in the business of preserving assets for sale, winding down certain operations and servicing assets for run-off post-confirmation makes it very difficult to attract new employees, let alone those of a caliber equal to the Insider Employees. Providing incentives to encourage Insider Employees to focus on the Debtors' objectives, and to motivate them to provide optimal levels of performance, is necessary to successfully maintain the businesses and their value for the benefit of the estates and their creditors.

37.     Moreover, the $8.8 million maximum cost of the Performance Incentive Plan is reasonable, particularly in context of the magnitude of the asset dispositions the Insider Employees are overseeing and the size of these cases.  Indeed, the Debtors' ability to generate better recoveries for creditors depends primarily upon the proper and timely execution of asset dispositions, along with a dedicated focus toward the efficient management of these cases, which require substantial knowledge of the Debtors' businesses.  The Debtors believe the Insider Employees are best equipped – given their knowledge of, and history with, the businesses – to perform these essential tasks.

38.     Targeted incentive programs have been recognized repeatedly, by this and other courts, as having particular value in motivating management teams to achieve important goals in chapter 11 cases. *See*, *e.g.*, *In re Tribune Co.*, No. 08-13141 (Carey, J.) (Bankr. D. Del. Jan. 28, 2010) (approving Management Incentive Plan, with maximum payout of $45.6 million covering 720 management employees, where payments were tied to achievement of operating cash flow goals); *In re Simmons Bedding Co.*, No. 09-14037 (Walrath, J.) (Bankr. D. Del. Dec. 10, 2009) (approving cash payments under management incentive plan based on monthly or year-to-date EBITDA targets); *In re Advanced Mktg. Servs., Inc.*, 06-11480 (Sontchi, J.) (Bankr. D. Del. Mar. 13, 2007) (approving cash payments under management incentive plan based on consummation of asset sale); *In re Werner Holding Co. (DE), Inc.*, No. 06-10578 (Carey, J.) (Bankr. D. Del. Dec. 27, 2006) (approving employee incentive plan proving for cash payments as rewards for attainment of collective operational restructuring goals and personal performance goals in support thereof); *In re Global Home Prods. LLC*, (Gross, J.) (Bankr. D. Del. May 30, 2006) (approving management incentive program provided plan participants fulfilled their obligations to the debtors through the closing of a sale of substantially all the debtors' assets); *In re Riverstone Networks, Inc.*, No 06-10110 (Sontchi, J.) (Bankr. D. Del. Apr. 3, 2006) (approving an employee bonus program providing for cash payments for successful completion of individual and company performance goals); *In re Pliant Corp.*, No. 06-10001 (Walrath, J.) (Bankr. D. Del. Feb. 21, 2006) (approving management incentive compensation plan providing for cash awards for achieving organizational and personal performance goals); and *In re Nobex Corp.*, No. 05-20050 (Walrath, J.) (Bankr. D. Del. Jan. 20, 2006) (approving "sale-related incentive pay" to officers, contingent on a successful sale of the company for a price in excess of

the offered by an existing stalking horse bidder, in connection with the debtor's pursuit of a sale of the company).

39. In light of the reasonable and objective Milestones set forth in the Performance Incentive Plan, and the recognition by Courts that similar incentive plans align insider employees' interests with the objectives of all stakeholders in chapter 11 cases, the Debtors believe implementation of the Performance Incentive Plan is a reasonable business judgment that will prove valuable to the estates.

## C. The Performance Incentive Plan Should Not Be Evaluated under Sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code

40. Section 503(c) of the Bankruptcy Code provides criteria for approving certain types of payments to insiders and "other transfers or obligations that are outside the ordinary course of business . . . ." Specifically, section 503(c) is comprised of three subsections: (1) a prohibition against retention payments to insiders unless certain conditions are met; (2) a prohibition against severance payments to insiders unless certain conditions are met; and (3) standards governing "other transfers and obligations that are outside the ordinary course of business . . . ."

41. Sections 503(c)(l) and 503(c)(2) do not restrict payments under the Performance Incentive Plan. Pursuant to the statute's plain language, section 503(c)(l) only limits retention plans for insiders, and section 503(c)(2) only addresses the requirements for severance plans for insiders. Neither section applies to performance-based incentive plans. *See*, *e.g.*, *In re Global Home Prods.*, 369 B.R. 778, 783 (Bankr. Del. 2007) ("If [the proposed plans] are plans to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."); *In re Nobex Corp.,* No. 05-20050 (Walrath, J.), Jan. 12, 2006 Hearing Tr. at 67 (Bankr. D. Del. 2006); *In re Dana Corp.*, 358 B.R. 567, 584 (Bankr. S.D.N.Y 2006) ("[b]y

presenting an executive compensation package that properly [motivates senior management] to produce and increase the value of the estate, the [debtor has] established that section 503(c)(1) does not apply to [the debtor's motion]."); *In re Calpine Corp.*, No. 05-60200 (Lifland, J.), April 26, 2006 Hearing Tr. at 87 (Bankr. S.D.N.Y. 2006).

   42. With respect to section 503(c)(1), the Performance Incentive Plan is not intended to provide bonuses to Insider Employees for retention purposes. Instead, the Performance Incentive Plan is only comprised of targeted incentive payments to the Insider Employees for the critical roles they play in the Debtors' operations. The participants in the Performance Incentive Plan are either directly involved with the implementation of proposed assets sales and dispositions, or the management of the Debtors' operations so as to ensure value is retained in the assets subject to disposition, sale or reorganization. The incentive payments are based upon the successful achievement of the Milestones – certain asset-related goals, the efficient management of the bankruptcy cases, and the expedited completion of these cases in a manner that will preserve and create value for all stakeholders. Without reaching their respective Milestones the Insider Employees will not be entitled to receive a Performance Incentive Plan incentive payment whether or not they remain employed for any particular period of time. Consequently, the Performance Incentive Plan is properly characterized as a performance-based incentive compensation plan, not a retention plan for insiders subject to the requirements of section 503(c)(1) of the Bankruptcy Code.

   43. The Performance Incentive Plan has been crafted with great care to ensure that it directly incentivizes all participants to meet certain objectively based performance objectives. Even assuming *arguendo* the Performance Incentive Plan has an indirect effect of reducing the Debtors' attrition rate among those Insider Employees covered by the plan, that fact

does not convert the Performance Incentive Plan to a "retention" plan. All successful incentive-based plans have the byproduct of incentivizing eligible employees to remain with a debtor. Indeed, as this Court previously noted, any payment to an employee is at least partially motivated by the purpose of retaining the employee, but so long as the primary purpose of an insider compensation plan is to incentivize the employees to perform work, the plan does not implicate section 503(c)(1) of the Bankruptcy Code. *See In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (Sontchi, J.) ("although the modification of the 2006 bonus program has some retentive effect, it is for the primary purpose of motivating employees and, thus, the limitations of section 503(c)(1) are not applicable"); *In re Dana Corp.*, 358 B.R. at 577.

44. Nor does the Performance Incentive Plan constitute severance for insiders subject to the provisions of section 503(c)(2) of the Bankruptcy Code. It does not provide benefits to participating Insider Employees upon termination of their employment with the Debtors. *See* 11 U.S.C. § 503(c)(2). Pursuant to an order dated January 19, 2010, the Court has already authorized severance payments to Insider Employees under the Debtors' Severance Plan. To the extent an Insider Employee is severed before achieving a particular Milestone, the Insider Employee will not have a right to receive payment of the related Milestone payment. If an Insider Employee is severed after achieving a particular Milestone, the Insider Employee shall only have a right to severance payments under the Severance Plan equal to the difference between the Milestone payments that are vested at termination and the severance benefit otherwise payable under the Severance Plan – *i.e.*, Milestone payments will be a credit against future severance payments. In the event the vested Milestone payments earned by an Insider Employee are equal to or greater than the severance benefit payable at termination, the Insider Employee will only be entitled to the vested Milestone payments. The Performance Incentive

Plan is thus truly a performance incentive plan and not a severance plan subject to the requirements of section 503(c)(2) of the Bankruptcy Code.

45.     Given that the Performance Incentive Plan is not a retention plan or a severance plan, the only provision of section 503(c) that is implicated is subsection (3). Indeed, as one court explained:

> If section 503(c)(1) and (c)(2) are not operative, a court may consider whether the payments are permissible under section 503(c)(3), which limits payments made to management and employees, among others, outside the ordinary course, unless such payments are shown to be justified under the facts and circumstances of the chapter 11 case. As one treatise points out, the test appears to be no more stringent a test than the one courts must apply in approving any administrative expense under 503(b)(1)(A).

*In re Dana Corp.*, 358 B.R. at 576 (citing 4 Collier on Bankruptcy § 503.17[3] (15th ed. 1982)).

**D.     The Performance Incentive Plan May Additionally be Authorized Pursuant to Section 105(a) of the Bankruptcy Code**

46.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, bankruptcy courts have expansive powers to fashion any order or decree that is in the interest of preserving or protecting the value of a debtor's assets. *See In re Croton River Club, Inc.*, 52 F.3d 41 (2d. Cir. 1995).

47.     As discussed above, the Debtors strongly and reasonably believe the Performance Incentive Plan is critical to their ability to maximize returns to creditors and achieve a successful resolution of the remaining hurdles in these chapter 11 cases. As a result, the Debtors believe section 105(a) of the Bankruptcy Code also provides ample grounds for the Court to exercise its broad equitable powers in approving the Performance Incentive Plan.

**II. Continuation of the Bonus Plan for Non-Insider Employees is an Ordinary Course Transaction; Alternatively, Continuation of the Bonus Plan is a Reasonable Exercise of the Debtors' Business Judgment**

    **A. Continuation of the Bonus Plan is a Transaction in the Ordinary Course of Business Pursuant to Section 363(c)(1) of the Bankruptcy Code**

48.    Section 363(c)(1) of the Bankruptcy Code provides that, unless a court orders otherwise, a debtor in possession may enter into transactions, including the use, sale or lease of estate property in the ordinary course of business, without notice and a hearing. 11 U.S.C. § 363(c)(1). As stated by the Third Circuit, "[t]he framework of section 363 is designed to allow a trustee (or debtor in possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary." *Teamsters Local Union No. 1 v. Health & Welfare Fund (In re Roth Am., Inc.)*, 975 F.2d 949, 952 (3d Cir. 1992). As this Court has recognized, "if the Court determines that a transaction is in the ordinary course of a debtor's business, the Court will not entertain an objection to the transaction, provided that the conduct involves a business judgment made in good faith upon a reasonable basis and within the scope of authority under the Bankruptcy Code." *Nellson Nutraceutical, Inc.*, 369 B.R. at 797.

49.    The Bankruptcy Code does not specify what constitutes "ordinary course of business." The Third Circuit (like most other courts) has adopted a two-step inquiry for determining whether a transaction is ordinary course, consisting of a horizontal and a vertical dimension. *Id.*; *see also In re Vision Materials, Inc.*, 325 B.R. 138, 143-45 (Bankr. D. Del. 2005) (citing *In re Roth Am.*, *reconsidered on other grounds*, 327 B.R. 719 (Bankr. D. Del. 2005)).

50.     The horizontal test asks "whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." *Roth Am.*, 975 F.2d at 953.

51.     The vertical inquiry "(more appropriately characterized as the creditors' expectation test) analyzes the transactions from the vantage point of a hypothetical creditor and [considers] whether the transaction subjects a creditor to economic risk of a nature different from those accepted when he decided to extend credit." *Id.* (quotations omitted).  The "touchstone" of ordinariness is the "interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter into in the ordinary course of its business." *Id*.  Thus, the "primary focus is on the debtor's pre-petition business practices and conduct, although a court must also consider the changing circumstances inherent in the hypothetical creditor's expectations." *Id.*  In effect, this test asks whether creditors should have expected the transaction to occur as a normal business practice.

52.     Judge Lifland of the Bankruptcy Court for the Southern District of New York, in *Dana Corp.*, applied the foregoing two-step analysis to an annual incentive plan for key employees.  In that case, the debtors sought court approval of a long-term incentive plan, but took the position that no such approval was necessary with respect to the company's separate short-term annual bonus program for 2006.  *In re Dana Corp.*, 358 B.R. at 579-80.  The short-term program for 2006 was a "refinement of the [prepetition] 2005 short-term incentive program, reflecting current business conditions and a reduction in the number of participants." *Id.*  It was similar to Dana's previous incentive programs.  *Id*.  The court agreed that the debtors' short-term incentive plan was within the ordinary course of business because it "has been a common component of compensation plans at Dana for the past fifty years and does not differ

significantly from Dana's prepetition practice." *Id.* at 581. *See also In re Global Home Prods., LLC*, 369 B.R. 778, 786 (citing *Dana* with approval and finding that incentive plans that were nearly identical to those previously used and approved by the debtors "are clearly in the ordinary course of the Debtors' businesses.").

53.    Similarly, in *Nellson Nutraceutical*, this Court held that debtors' continuation of their prepetition employee bonus compensation program, as modified postpetition in accordance with past practice and industry practice, was an ordinary course transaction which did not require notice and hearing. 369 B.R. at 796-800. In *Nellson Nutraceutical*, the debtors continued their prepetition bonus plan during the first year of the bankruptcy without seeking this Court's approval. The debtors thereafter modified the terms of the bonus plan when certain targets were not achieved by employees under the plan, and sought a precautionary ruling that the modification to the bonus plan was an ordinary course transaction. This Court determined that the modification to the plan was an ordinary course transaction given that (i) comparable companies had established similar bonus plans as a regular part of their compensation practices and modified the performance targets under such plans in a manner similar to the debtors, and (ii) the debtors had an established history over several years of implementing and modifying the bonus plan. Having determined that the debtors' plan met the horizontal and vertical test, this Court found "the evidence presented by the Debtors was more than sufficient to satisfy the relatively light evidentiary burden of establishing that the Debtors made a business judgment in good faith upon a reasonable basis." *Id.* at 799.

54.    Applying the same horizontal and vertical test adopted by courts in this Circuit, the Debtors believe the continuation of the Bonus Plan is an ordinary course transaction.

55.     Just like the "short-term" incentive plan in *re Dana*, and the modified employee compensation bonus plan in *Nellson Nutraceutical*, continuation of the Bonus Plan here is completely consistent with the company's prepetition practice and with plans commonly adopted by other companies in the industry.  As a result, creditors would reasonably have expected the Debtors would continue to provide bonus compensation to their Employees in the ordinary course during these chapter 11 cases.

56.     Paying discretionary bonuses as an aspect of total employee compensation is extremely common in the Debtors' industry.  Indeed, virtually every large company has a bonus compensation program, and the Debtors do not believe the Bonus Plan differs materially from the type of discretionary bonus plans that are often utilized as part of the compensation programs for employees in companies like the Debtors.  At the hearing on this Motion, the Debtors will produce evidence establishing that the terms of the Bonus Plan are consistent with plans adopted by similar companies in the industry.  The Debtors' proposed bonuses therefore satisfy the "horizontal" test.

57.     Moreover, as discussed above, the Bonus Plan has been in place for a number of years, and the Debtors have always made payments under the plan on an annual basis as a normal part of the Employees' compensation package.  At the hearing on this Motion, the Debtors will produce evidence establishing that the continuation of the Bonus Plan is consistent with their prepetition practice.  Given these facts, the bonuses also meet the "vertical" test.

58.     The Debtors' decision to continue the Bonus Plan payments for the 2009 and 2010 Plan Years is an ordinary course transaction.  The Debtors' believe continuation of the Bonus Plan makes good business sense, is reasonable in light of past practice and current expectations and is fully within their scope of authority under the Bankruptcy Code.  As a result,

the Debtors submit continuation of the Bonus Plan is undoubtedly within the ordinary course of business and believe this Court should confirm the same.

**B.** **Alternatively, Implementation of the Bonus Plan is a Valid Exercise of the Debtors' Business Judgment Under Section 363(b) of the Bankruptcy Code**

59. To the extent this Court finds that continuation of the Bonus Plan is not an ordinary course transaction, the Debtors believe continuation of the Bonus Plan is nevertheless a sound exercise of their business judgment. As set forth above, the Debtors may use property of the estate outside the ordinary course of business when there is a "sound business purpose" that justifies such use of estate property. *See* 11 U.S.C. § 363(b)(1).

60. For years leading up to the Commencement Date, the Bonus Plan, although wholly discretionary, was an ordinary course compensation that the Debtors awarded to the Non-Insider Employees, and the Debtors believe that continuation of the plan for such Employees is essential to retain the much-needed services of the Non-Insider Employees during the balance of these chapter 11 cases. The Debtors believe that a failure to continue the discretionary Bonus Plan could lead to a serious loss of morale among the Non-Insider Employees and lead to departures of a substantial number of such Employees that, under the circumstances presented by these chapter 11 cases, could not easily be replaced.

61. Courts have routinely found that a debtor's use of reasonable bonuses and other incentive payments to retain employees is a valid exercise of a debtor's business judgment. *See*, *e.g.*, *In re Global Home Prods*. at 784 ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); *In re Am. W. Airlines, Inc.*, 171 B.R. 674, 678 (Bankr. D. Ariz. 1994) (it is the proper use of a debtor's business judgment to propose bonuses for employees who helped propel the debtor successfully through the bankruptcy process); *In re Interco Inc.*, 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)

("debtors' business judgment" was controlling in the approval of a "performance/retention program").  Generally, courts will approve non-insider employee retention programs in chapter 11 cases if the debtor has used proper business judgment in formulating the plan and the court finds the incentives to be fair and reasonable.  *See*, *e.g.*, *In re Montgomery Ward* (approving an employee retention program covering 500 employees with a maximum aggregate payout of approximately $17.6 million, where the employee retention program was designed to stabilize the company's employee turn-over rate, boost employee morale and retain employees where their employment would be essential to the debtor's reorganization); *In re Premium Paper Holdco, LLC*, No. 06-10269 (Bankr. D. Del. June 23, 2006) (Sontchi, J.) (approving an employee retention and incentive program); *In re Aerovox, Inc.*, 269 B.R. 74 (Bankr. D. Mass. 2001) (approving employee retention program as a chapter 11 administrative expense).

62.     The Debtors submit that authorizing discretionary bonus compensation to a broad swath of the Debtors' Non-Insider Employees is not only a reasonable exercise of the Debtors' business judgment, but also necessary to maintain the focus and commitment of the Debtors' Non-Insider Employees during these cases.  Only through the dedication and commitment of the Debtors' Non-Insider Employees – working hand in hand with the Insider Employees – have the Debtors been able to achieve so much.

63.     Ultimately, the Bonus Plan will serve the purpose of motivating and retaining the Debtors' Non-Insider employees.  They will remain on task with respect to their job responsibilities and professional goals, and should be fairly compensated for their efforts.  The costs associated with the Bonus Plan are small in relation to the potential risks to the Debtors' businesses if Employee morale were to suffer from a failure to continue the Bonus Plan.

64.     For these reasons, to the extent it is not ordinary course, the Debtors submit that continuation of the Bonus Plan represents a sound exercise of the Debtors' business judgment and should be approved.

**<u>Notice</u>**

65.     No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been provided by first-class mail to (i) the U.S. Trustee, (ii) Wilmington Trust FSB, as successor trustee under the prepetition indentures for the senior unsecured floating rate notes, 5.875% senior unsecured notes, and 6.300% senior unsecured notes, (iii) attorneys for the Committee, and (iv) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b).  The Debtors submit that no other or further notice need be provided.

**<u>No Previous Request</u>**

66.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request an Order: (i) approving the Performance Incentive Plan; (ii) confirming that the Debtors' continuation of the Bonus Plan is an ordinary course transaction or, alternatively, approving the Bonus Plan as a transaction outside the ordinary course; (iii) authorizing the Debtors to make all payments under such plans; and (iv) granting such other and further relief as is just and proper.

Dated: February 11, 2010        Respectfully submitted,
      Wilmington, Delaware

*/s/ Lee E. Kaufman*_____
Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Jason M. Madron (No. 4431)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: 302.651.7700
Facsimile: 302.651.7701

-and-

Martin J. Bienenstock
Michael P. Kessler
Judy G. Z. Liu
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: 212.259.8000
Facsimile: 212.259.6333

*Attorneys for the Debtors and*
*Debtors in Possession*