## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

| | |
|---|---|
| *In re* | Chapter 11 |
| **CAPMARK FINANCIAL GROUP INC.**, *et al.*, | Case No. 09-13684 (CSS) |
| **Debtors.**[1] | **Jointly Administered** |
| | Re: Docket Nos. 809 and 810 |

---------------------------------------------------------------- x

## DECLARATION OF THOMAS L. FAIRFIELD
## IN SUPPORT OF MOTION, PURSUANT TO SECTIONS
## 105(a), 363(b), 363(c), AND 503(c) OF THE BANKRUPTCY CODE,
## BANKRUPTCY RULES 2002, 6004, AND 9014, AND LOCAL RULES
## 2002-1 AND 6004-1, REQUESTING ENTRY OF AN ORDER: (I) APPROVING
## DEBTORS' PERFORMANCE INCENTIVE PLAN FOR INSIDER EMPLOYEES, (II)
## CONFIRMING THAT DEBTORS' CONTINUATION OF DISCRETIONARY BONUS
## PLAN FOR NON-INSIDER EMPLOYEES IS AN ORDINARY COURSE TRANSACTION
## OR, ALTERNATIVELY, APPROVING THE BONUS PLAN OUTSIDE THE ORDINARY
## COURSE, AND (III) AUTHORIZING PAYMENTS UNDER SUCH PLANS

Thomas L. Fairfield, pursuant to section 1746, title 28, United States Code, hereby

declares as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), Capmark Affordable Equity Inc. (2381), and Capmark Investments LP (7999). CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044. The addresses for all of the Debtors are available at the following World Wide Web address: http://chapter11.epiqsystems.com/capmark

1.     I am the Executive Vice President, General Counsel and Secretary of Capmark Financial Group Inc. ("CFGI").

2.     Unless otherwise stated, all facts set forth in this declaration (the "Declaration") are based upon: (a) my personal knowledge; (b) my experience as Executive Vice President, General Counsel and Secretary of CFGI; and (c) information provided to me by authorized representatives of CFGI, and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"), concerning the operation, structure, and financial affairs of the Debtors; and (d) information provided to me by employees and consultants of the Debtors working under my supervision or the supervision of an authorized representative of CFGI. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

3.     I make this Declaration in support of the Motion, Pursuant to Sections 105(a), 363(b), 363(c), and 503(c) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9014, and Local Rules 2002-1 and 6004-1, Requesting Entry of an Order: (I) Approving Debtors' Performance Incentive Plan for Insider Employees, (II) Confirming That Debtors' Continuation of Discretionary Bonus Plan for Non-Insider Employees is an Ordinary Course Transaction or, Alternatively, Approving the Bonus Plan Outside the Ordinary Course, and (III) Authorizing Payments Under Such Plans (the "Motion"), filed on February 11, 2010.[2]

4.     I support the Debtors' request for approval of the Performance Incentive Plan for Insider Employees as, in my opinion, (i) the adoption and implementation of the Performance Incentive Plan is a sound and reasonable exercise of the Debtors' business judgment and (ii) the proposed incentive payments under the Performance Incentive Plan are

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

designed to incentivize Insider Employees to achieve important and significant objective measures or milestones (the "Milestones") critical to the ultimate outcome of these chapter 11 cases. I also support the continuation of the Debtors' discretionary Bonus Plan for Non-Insider Employees as I believe continuation of the Bonus Plan is a transaction in the ordinary course of the Debtors' businesses or, alternatively, a sound and reasonable exercise of the Debtors' business judgment under the circumstances presented in these cases. The bases for my opinion are set forth below.

## Creation and Design of Performance Incentive Plan

5.    To incentivize the Insider Employees to achieve important, yet difficult strategic objectives in these chapter 11 cases, I, along with the other members of senior management of the Debtors and certain of the Debtors' advisors and consultants, began planning the adoption of the Performance Incentive Plan following this Court's entry, on December 23, 2009, of an order determining which of the Debtors' employees are Insider Employees. Given that financial services companies like the Debtors traditionally pay employees using a framework of a base salary plus bonus model, the Debtors believe that adoption of the Performance Incentive Plan is integral and necessary to maximize value in these chapter 11 cases, as it will motivate the Insider Employees under the challenging circumstances confronting them to continue providing the unique, valuable and necessary services which the Debtors' believe only the Insider Employees can provide.

6.    The Performance Incentive Plan is specifically designed to align the interests of the Insider Employees with the strategic goals of the Debtors and creditor constituencies in these chapter 11 cases. In November 2009, the Debtors and their advisors met with the statutory committee of unsecured creditors (the "Committee") appointed in these chapter 11 cases and the Committee's advisors. During that meeting, the Debtors' management

3

and advisors provided the Committee with an overview of the Debtors' businesses and the strategic goals and objectives for each of the businesses during these cases. Viewed at a high level, these goals and objectives include, among other things, implementing a major cost reduction and operational business plan aimed at maximizing returns to creditors, completing complex sales and asset dispositions, as well as managing and transitioning asset platforms in a streamlined manner which will reduce costs and generate value. Given the highly specialized and complex nature of the Debtors' business platforms and assets, achieving these goals and objectives requires even more extraordinary efforts from the Debtors' employees, who are already overburdened with myriad additional duties attendant to these chapter 11 cases, piled onto desks that were previously overflowing with just the normal demands and responsibilities that challenge these employees on a daily basis in the performance of their duties. I believe the Insider Employees are best-equipped to ensure the Debtors meet these goals and objectives, given the high caliber of their specialized knowledge and skills, and their experience with the Debtors' businesses. Indeed, since presenting these goals and objectives to the Committee in November 2009, the Debtors have focused their efforts on achieving these strategic goals and objectives, and the Insider Employees have provided the invaluable skills, knowledge and services necessary to do so.

7. The Milestones set forth in the Performance Incentive Plan are building blocks specifically crafted to facilitate the accomplishment of the strategic goals and objectives that ultimately must be achieved as a necessary predicate to emerging from chapter 11. Attached hereto as Exhibit A is a description I prepared of each of the Milestones in the Performance Incentive Plan, which explains in detail the substantive requirements necessary to achieve each Milestone and the benefits the Debtors believe will inure to the estates upon the achievement of

4

each Milestone. Absent a fair and targeted program to incentivize the Insider Employees to strive even harder on a daily basis to complete their assigned Milestones, the Debtors will fall far short of achieving the Milestones, and thus, will lose the value to the estates the Milestones are designed to achieve, which could prolong the Debtors' tenure in chapter 11.

8. In assigning values to the Milestones and the total compensation payable to each Insider Employee under the Performance Incentive Plan, the Debtors first determined the appropriate alignment of Milestones to the individual Insider Employees tasked with the achievement of a specific Milestone. In this regard, the Debtors assessed the importance of each Insider Employee's role to the achievement of a particular business group's objectives going forward. The Debtors also assessed the risk associated with achievement of the Milestones associated with a particular Insider Employee if he or she were not properly incentivized to achieve the Milestones. For example, in aligning asset monetization Milestones with Insider Employees, the Debtors determined the level of knowledge and experience specific Insider Employees possessed with respect to particular assets to determine which Insider Employees would be best positioned to execute the Milestone and monetize the assets in a manner designed to achieve the best recoveries possible for the estates.

9. In connection with the development of the Performance Incentive Plan and the Insider Employee awards thereunder, the Debtors reviewed of a number of factors, including (i) the value of achieving the respective Milestones to the Debtors' estates; (ii) the difficulty of achieving the respective Milestones; (iii) the historical bonus compensation data for each Insider Employee and the amount of compensation each Insider Employee would be paid in the ordinary course of business for his or her contribution to achieving desired outcomes for the businesses; and (iv) the relative expected contributions of the different Insider Employees to the

5

achievement of the respective Milestones. Based on this analysis, the Debtors determined the amount of the awards for each milestone, the amounts payable to each Insider Employee for achievement of the Milestones relevant to that individual and the total amount of compensation payable under the Performance Incentive Plan if all milestones were achieved.

10.    In formulating the Performance Incentive Plan, the Debtors also reviewed performance incentive plans approved in the recent chapter 11 cases of other financial services companies and certain other companies, including: Lehman Brothers Holdings Inc.; CIT Group, Inc.; General Growth Properties, Inc.; New Century Financial Corporation; American Home Mortgage Investment Corp.; Refco, Inc.; Delta Financial Corporation; Homebanc Mortgage Corporation; ResMAE Mortgage Corp.; Journal Register Company; Extended Stay Inc.; and Nortel Networks Inc. Although the Debtors drew on the incentive compensation plans in formulating the Performance Incentive Plan, I and the other senior managers of the Debtors also recognized the need to tailor the Milestones and structure of the Performance Incentive Plan to the Debtors' specific businesses goals and objectives, as discussed above. As a result, while comparable plans were reviewed and evaluated in developing the Performance Incentive Plan, the plan is the product of a detailed review of the specific goals and objectives of the Debtors' businesses and reflects senior management's understanding of the significant expertise and extraordinary efforts that will be required by the Insider Employees to achieve the Milestones.

### Discussions and Negotiations with the
### Committee Regarding the Performance Incentive Plan

11.    In crafting the Performance Incentive Plan, the Debtors also engaged in extensive discussions and negotiations with the Committee and its advisors. In late November 2009, at the same meeting where the Debtors discussed their strategic goals and objectives with the Committee, the Debtors also discussed the adoption of an incentive payment plan to

6

compensate the Insider Employees during the chapter 11 cases. At that time, the Committee and its advisors asked the Debtors to return to the Committee with a written proposal to pay incentive compensation to Insider Employees in a manner that would incentivize them to achieve the Debtors' goals and objectives in the chapter 11 cases. In early December, the Debtors' advisors and consultants had further meetings with Alvarez & Marsal ("A&M"), one of the Committee's financial advisors, to discuss the high level direction and conceptual framework for the Performance Incentive Plan.

12.     During the remainder of December 2009 and January 2010, the Debtors focused on formulating and negotiating the Performance Incentive Plan, consistent with the process described above. In late January 2010, members of the Debtors' senior management, as well as certain of the Debtors' advisors and consultants, presented a draft form of the Performance Incentive Plan for review by A&M. During the weeks that followed, the Debtors' senior management, advisors and consultants negotiated the terms of the Performance Incentive Plan with A&M. Much of the negotiations centered on the dollar amounts being paid to individual Insider Employees and the nature and requirements of the Milestones.

13.     In early February, A&M met with the Debtors' senior management to review the incentive payments that would be made to Insider Employees and the Milestones associated with such payments. A&M also indicated to the Debtors that A&M was conducting its own analysis of the sizing of the dollar amounts proposed to be paid to each Insider Employee and requested historical compensation data for such employees with which to conduct its independent analysis.

14.     Although the Debtors aimed to file the Motion for approval of the Performance Incentive Plan and continuation of the Bonus Plan with the Committee's full and

final support, at the time of filing the Motion on February 11, 2010, the Committee and Debtors were still negotiating several outstanding points, including the compensation for Insider Employees who sit on the Executive Committee of CFGI. Nevertheless, given the uncertainty faced by the Insider Employees relating to their compensation and the effect such uncertainty was having on morale, the Debtors determined to file the Motion to ensure the Performance Incentive Plan would be heard at the omnibus hearing scheduled by the Court for March 4, 2010. The Debtors' senior management and advisors then continued to engage the Committee and its advisors, including individual members of the Committee, to discuss a final resolution of the outstanding issues under the Performance Incentive Plan.

15. Finally, on February 26, 2010, the Debtors and the Committee reached an agreement on modifications to the Performance Incentive Plan for Insider Employees, and agreed to defer for further discussion issues regarding the nature of the Milestones and timing of incentive payments for the Insider Employees who sit on CFGI's Executive Committee, and to seek approval of that aspect of the Performance Incentive Plan at a subsequent hearing. As a result, the Committee now fully supports the Motion and the Debtors' request for approval of the Performance Incentive Plan for all Insider Employees except the Executive Committee members. The Debtors and the Committee have resolved to continue negotiating in good faith regarding the compensation terms relating to the Executive Committee members until such an agreement is reached, which both sides are confident will occur.

### Retention of Johnson Associates, Inc. to Review Performance Incentive Plan

16. Notwithstanding the comprehensive efforts the Debtors undertook to ensure the Performance Incentive Plan meets the requirements for approval under the Bankruptcy Code and the extensive negotiations the Debtors conducted with the Committee and its advisors to ensure the Committee would be satisfied with the plan, the Debtors also retained

8

an independent compensation consultant, Johnson Associates, Inc. ("Johnson"), to provide the Debtors with their expertise to ensure the reasonableness of the plan. Johnson is a compensation consulting firm specializing in executive compensation for financial services firms, with over 15 years of experience in the industry, including extensive experience in analyzing and creating incentive compensation plans in chapter 11 cases. Johnson performed an independent analysis of the Performance Incentive Plan's substantive provisions, comparing the plan's provisions against those adopted and approved for similar companies in other chapter 11 cases. After performing its analysis, Johnson independently concluded the Performance Incentive Plan is reasonable and consistent with comparable plans approved in other chapter 11 cases. Johnson's methodology and conclusions are set forth in the declaration of Jeff Pratas Visithpanich, a Principal of Johnson, which has been filed contemporaneously in support of the Motion and approval of the Performance Incentive Plan. Johnson's complete expert report is attached to Mr. Visithpanich's declaration.

### The Adoption and Implementation of the Performance
### Incentive Plan is a Reasonable Exercise of the Debtors' Business Judgment

17.     I believe the adoption and implementation of the Performance Incentive Plan represents a reasonable exercise of the Debtors' sound business judgment because (i) the Performance Incentive Plan will incentivize Insider Employees to continue the significant efforts they have made since the Commencement Date and continue to meet their increased responsibilities and burdens over the coming months in achieving the Debtors' business goals and objectives in these chapter 11 cases, thus aligning the interests of the Insider Employees with the goals of the Debtors and their creditors; (ii) the Debtors' ability to preserve the value of their businesses and assets would be substantially hindered if the Debtors are unable to properly incentivize the Insider Employees through incentive payments tied to achieving important

9

business goals and objectives; (iii) the total cost of the Performance Incentive Plan is reasonable, particularly in context of the magnitude and complexity of the Debtors' businesses, and the complexity of the issues that have already arisen and will surely continue to arise in these cases; (iv) the specific Milestones established under the Performance Incentive Plan were carefully and conscientiously crafted to ensure the Debtors' business goals and objectives will be more susceptible to realization; and (v) the amounts the Debtors propose paying Insider Employees in the aggregate and individually are reasonable and responsibly targeted to create maximum value, thus serving the best interests of the Debtors' estates.

18.     I also believe the Performance Incentive Plan is necessary to maximize and preserve value for the Debtors' estates.  Based upon my extensive involvement in the formulation of the Performance Incentive Plan, I believe that proceeding in these chapter 11 cases without such a plan in place would undermine the ability of the Debtors to achieve the strategic business goals and objectives that necessarily must be accomplished to emerge from chapter 11 on an expedited schedule to achieve maximum values for distributions to all creditors of the estates.

## Continuation of the Bonus Plan for Non-Insider Employees is Consistent with the Debtors' Prepetition Ordinary Course Business Practices

19.     As discussed in the Motion, prior to the Commencement Date, the Debtors regularly awarded annual bonuses to their employees (both insiders and non-insiders) pursuant to the discretionary Bonus Plan.

20.     The Bonus Plan traces its creation to CFGI's predecessor in interest, GMAC Commercial Holding Corp. ("GMAC Commercial"), which had a discretionary bonus program in place following the 1994 separation of GMAC Mortgage LLC's residential and commercial real estate financing operations.  The parameters for the bonus program were

10

dictated by GMAC LLC, given that GMAC Commercial was a wholly-owned subsidiary of GMAC Mortgage LLC. Typically, the benchmarks and formulas for the bonus program were communicated to management of GMAC Commercial through a memorandum from one of the officers of GMAC Mortgage LLC, although the payment of bonuses under the program was always discretionary.

21.     Following the sale of a controlling interest in GMAC Commercial in 2006 to the present controlling investors, GMAC Commercial was renamed CFGI and the Compensation Committee of the Board of Directors of CFGI devised a new formula for awarding bonuses to employees, which is discussed in detail in the Motion, resulting in formulation of the present Bonus Plan. The concept of the Bonus Plan has thus remained the same since the mid-1990s; the Bonus Plan was and continues to be a wholly discretionary plan whereby allocations to individual employees are completely discretionary and are considered earned as of the date of payment, which, as discussed in the Motion, has usually been during the first quarter following the Plan Year to which bonus awards relate. In 2007, the Bonus Plan was memorialized for the first time based upon the Bonus Plan as it existed and was implemented in 2006.

22.     I believe that continuation of the Debtors' Bonus Plan, as described in the Motion, is consistent with the Debtors' prepetition practices and the terms governing payments made under the Bonus Plan as it existed from 1995 through 2006 and for the written Plan Years in 2007, 2008, and 2009. The Debtors do not seek to alter basic terms of the Bonus Plan and instead merely wish to continue compensating their Non-Insider Employees in a manner that is consistent with prepetition practice. I note that for the 2010 Plan Year, the Debtors have agreed with the Committee that the bonus pool will be no greater than $8.6 million (for the Debtors and

the non-Debtor subsidiaries combined). I do not believe this limitation alters the fundamental terms of the Bonus Plan, as the payments to be made from the established pool will still be within the full discretion of the Compensation Committee.

## Continuation of the Bonus Plan for Non-Insider
## Employees is Also a Reasonable Exercise of the Debtors' Business Judgment

23. Continuation of the Debtors' Bonus Plan for Non-Insider Employees represents both an ordinary course business practice and a reasonable exercise of the Debtors' sound business judgment. As discussed above, the Bonus Plan has for many years been part of the ordinary course compensation the Debtors routinely awarded to their employees in additional to their base salaries, and I believe that continuation of the Bonus Plan for Non-Insider Employees is essential to retain the much-needed services of such employees during the balance of these chapter 11 cases. I believe that a failure to continue the discretionary Bonus Plan could lead to a serious loss of morale among the Non-Insider Employees and lead to departures of a substantial number of such employees that, under the circumstances presented by these chapter 11 cases, could not easily be replaced.

24. I believe that continuing the Bonus Plan for Non-Insider Employees is not only a reasonable exercise of the Debtors' business judgment, but also necessary to maintain the focus and commitment of the Non-Insider Employees during these cases. Only through the dedication and commitment of the Non-Insider Employees – working hand in hand with the Insider Employees – have the Debtors been able to achieve so much to date.

25. Ultimately, I believe the Bonus Plan will serve the purpose of motivating and retaining the Non-Insider Employees. They will remain on task with respect to their job responsibilities and professional goals, and should be fairly compensated for their efforts. The

12

costs associated with the Bonus Plan are small in relation to the potential risks to the Debtors'
businesses if employee morale were to suffer from a failure to continue the Bonus Plan.

I declare under penalty of perjury that the foregoing is true and correct.

March 3, 2010

Thomas L. Fairfield
Thomas L. Fairfield

# EXHIBIT A

**Milestone Memorandum**

The milestones contained in the PIP Plan are substantive and represent important objectives of the Debtors that will promote the maximization of value of the Debtors' estates.

All of the milestones included in the PIP are listed on page 4 of the PIP presentation materials filed with the Bankruptcy Court. This memorandum summarizes the substance of each milestone (*i e*, the challenges to achieving the milestone) and the benefits to the Debtors' estates that will result from the achievement of the milestone.

**Milestone 1--Completion of Reorganization of Asset Management Group to: (1) transition appropriate numbers of asset management and credit personnel into Capmark Bank; (2) establish an appropriate reporting structure for the groups within the Bank and non-Bank; (3) reassign asset management responsibilities consistent with the reorganization of the group; (4) update loan level business plans for 2010 that are approved of the Capmark Bank board of directors; and (5) obtain any required approvals from regulatory authorities with respect to the foregoing**

**Substance of the Milestone**

This milestone involves a significant reorganization of the asset management and credit department staff including the transfer of more than 100 employees into Capmark Bank from Capmark Finance Inc. As part of this reorganization, among other things, the responsible insider employees will need to reassign certain assets to new asset managers, restructure the asset management teams in terms of management and reporting responsibilities, transition loan level information among the asset management and credit personnel as needed and update the loan level business plans. With more than 700 commercial real estate loans in the portfolio, many of which involve complex capital structures, multiple lenders or specialized collateral, the achievement of this milestone requires a significant amount of planning and execution to complete the reorganization without loss of knowledge or delays in the decision making process that could adversely affect the management of the loans, many of which are in some form of workout process.

**Benefits to the Debtors' Estates**

The key benefits of achievement of this milestone to the Debtors' estates are (1) better alignment of personnel with the Capmark entity that owns the asset to ensure better control of the entity's assets by its own employees, (2) more efficient management by elimination of redundant processes, (3) better alignment of asset management and credit costs among Capmark entities based on asset ownership and (4) more direct control by Capmark Bank of its key functions. These goals are supported by management, the Unsecured Creditors Committee and applicable banking regulatory authorities.

## Milestone 2—Complete the transfer of the management of the LIHTC funds to one or more successor managers or sub-managers

### Substance of the Milestone

This milestone involves the transfer of management of approximately 65 LIHTC funds that own equity in over 500 affordable housing properties. In order to achieve this milestone, the responsible insider employees will need to (1) identify qualified candidates to assume the responsibilities, (2) manage a process to obtain firm proposals from potential successor managers, provide sufficient information to the potential managers to enable them to submit proposals, (3) communicate with the fund investors and credit enhancement counterparties to obtain consent to the successor manager transfer and (4) close the transaction and transfer the relevant employees and information to the successor manager. All of these tasks must be accomplished in coordination with the attempted settlement of the secured LIHTC guarantee liabilities and with the cooperation and/or consent of the secured parties and fund investors.

### Benefits to the Debtors' Estates

The accomplishment of this objective is important to the Debtors' estates because it will (1) eliminate the current operating losses associated with the management of the LIHTC funds (fund management expenses exceed asset management fee revenue); (2) allow for an effective transition of fund management responsibilities so that fund losses and guarantee claims are minimized; and (3) facilitate settlement of fund guarantee liabilities by removing fund management uncertainty.

## Milestone 3—Confirmation of Plan of Reorganization (a "Plan")

### Substance of the Milestone

This milestone requires two major challenges to be successfully addressed (1) resolution of creditor claims and issues with respect to value allocation to obtain the necessary level of support for a Plan and (2) design of applicable structural elements of a plan, including corporate and capital structure, tax structure, securities law aspects and accounting and financial reporting features to ensure that the Plan can be consummated without material adverse tax or legal consequences to stakeholders.

In light of the number of creditor groups, including (1) secured bank lenders; (2) unsecured bank lenders; (3) bondholders; (4) Japanese lenders; (5) secured LIHTC parties and (6) other unsecured creditors, and the number of issues that have been raised by the various groups, developing and obtaining the necessary support for a Plan will be complex and difficult but important to the outcome of this case.

Several areas of potential dispute among creditor groups have already been identified. In order to facilitate the resolution of these potential disputes, the relevant insider employees will need to (1) conduct an extensive review of the Debtors' and their subsidiaries' financial history and capital structure, (2) assess the impact of the

financial history and capital structure on the claims of the various creditor groups, (3) work with the Debtors' legal and financial advisers to develop appropriate proposals for resolution of intercreditor issues consistent with the analysis of the merits of the different claims, and (4) participate as needed in the negotiation of these issues.

In addition, the plan design entails a high degree of difficulty because of the complexity of the organization, the international nature of the business and assets, the regulatory issues associated with the potential change in ownership of Capmark Bank and other factors. The responsible insider employees will be required to provide substantial and detailed information and analysis of the Debtors' and their subsidiaries' assets, tax basis, legal structure and future prospects, including preparing necessary financial and tax models, to ensure development of an optimal structure for the reorganized companies.

**Benefits to the Debtors' Estates**

The value of confirming a Plan to the estate is that Capmark can emerge from bankruptcy proceedings, refocus the management and employees on maximization of value, eliminate the direct costs and fees related to the bankruptcy process, including the fees of bankruptcy related professionals, and improve Capmark's negotiating position in connection with asset sales, regulatory matters and other aspects of the business. If a Plan is not confirmed expeditiously, the Debtors' estates would likely face substantial additional fees and expenses associated with the ongoing bankruptcy proceeding as well as potential expenses associated with litigation that may arise out of intercreditor disputes.

## Milestone 4—Repatriation of Funds from the sale of Fontainebleau in excess of $50 million by March 31, 2010

**Substance of the Milestone**

This milestone relates to the sale of a significant real estate equity investment in China that required the marketing and sale of this investment in China, which involved identifying and contacting qualified potential buyers with the requisite capital and investment expertise in China commercial real estate, and then negotiating and closing a transaction in compliance with Chinese legal requirements. In addition the transaction needed to be structured to permit repatriation of cash to the United States in compliance with applicable Chinese currency laws. Completing a sale of commercial real estate in China at a favorable price is something that is difficult in the current worldwide recession and requires special expertise in the Chinese market. Although portions of this milestone have been achieved, various other matters are still in process to complete it.

**Benefits to the Debtors' Estates**

The transaction will generate $56 million of proceeds to the Debtors' estates, representing a gain of approximately $9 million above book value.

3

**Milestone 5—(1) Evaluate outsourcing vs. internal management for Asia assets, (2) administer outsourcing bidding process, and (3) finalize management plan after completion of process**

**Substance of the Milestone**

This milestone involves evaluating the alternatives for most effectively managing the assets comprising Capmark's Asia operations. The book value of the assets comprising our Asia operations was in excess of $1.0 billion as of December 31, 2009. A majority of these assets are Japanese commercial real estate equity investments, maturity defaulted commercial real estate loans requiring disposition of the underlying collateral, and non-performing loans held by Capmark's Japanese subsidiaries. The achievement of this milestone involves (1) identifying qualified candidates to assume asset management responsibilities, particularly with respect to the Japanese assets, (2) obtaining and evaluating proposals from such candidates, (3) determining whether internal management or external management will generate the most value and (4) developing a plan, if necessary, for transitioning the asset management to an external manager and integrating that external manager's operations with the internal corporate IT, financial reporting and tax functions.

**Benefits to the Debtors' Estates**

Given the total value of the assets associated with the Asia operations, the ability to monetize these assets at favorable values is important to the total recovery of creditors of the Debtors' Estates. The achievement of this milestone will enable the Debtors to implement the most effective approach to monetization of these assets. Potential benefits of outsourcing include (a) cost savings compared to internal staffing costs, (b) possible increased access to external market expertise, and (c) mitigation of risk of internal staff attrition in Asia.

**Milestone 6—Settle 80% or more of the secured LIHTC guarantee liabilities and obtain applicable agreements or court orders with respect to release of any excess collateral**

**Substance of the Milestone**

This milestone involves the settlement of secured LIHTC guarantee obligations with an aggregate face amount of approximately $1.2 billion collateralized by approximately $312 million of pledged securities. In order to achieve this milestone, Capmark will need to settle the secured obligations with the primary secured parties (Morgan Stanley, AMBAC and Merrill Lynch). Settlement of these obligations through negotiation or court process requires significant preparation, analysis and negotiation, as well as expertise and knowledge of the Capmark LIHTC funds.

**Benefits to the Debtors' Estates**

Settlement of the secured guaranteed obligations will benefit the Debtors' estates by minimizing the amount of claims against the estates and possibly recovering excess collateral.

**Milestone 7—Complete Taiwan Asset Sale, termination of remaining Taiwan employees, and repatriation of at least $50 million of proceeds from Taiwan to parent**

**Substance of the Milestone**

This milestone relates to the marketing, negotiation and closing of the sale of Capmark's Taiwan assets as well as the winding down of the Taiwan operations and the repatriation of the proceeds of the sales out of Taiwan. The Taiwan assets were principally comprised of commercial real estate equity and non-performing loan investments. The Taiwan market was significantly affected by the global credit crisis and the sale of these assets and winding down of the related operations has been a time consuming process requiring local market knowledge. Another part of the milestone requires repatriation of cash to the US affiliates, which involves compliance with local tax and regulatory requirements. Finally, the termination of the remaining Taiwan employees as part of winding down Capmark's Taiwan operations has involved executing an orderly wind down of the staff in compliance with local legal requirements. Although portions of this milestone have been achieved, various remaining tax and asset matters are still in process.

**Benefits to the Debtors' Estates**

The achievement of this milestone substantially benefits the Debtors' estates by returning cash to the Debtors' estates from the sale of illiquid assets Taiwan as well as accomplishing the efficient winding down of the remaining Taiwan operations to reduce costs, recover remaining assets and resolve remaining tax liabilities.

**Milestone 8—Complete reorganization of Capmark Bank operations relating to: (1) finalization of new management organizational chart and reporting structure, (2) transition of personnel and responsibilities for operational support functions including IT, internal audit, accounting, treasury, legal and facilities; (3) update intercompany service agreements and other agreements with affiliates to reflect changes in personnel and responsibilities; and (4) obtain any required approvals from regulatory authorities with respect to the foregoing**

**Substance of the Milestone**

This milestone involves the reorganization of Capmark Bank operations in connection with the transfer of a significant number of employees to Capmark Bank from the non-bank affiliates. The transfer of employees and related functions to Capmark Bank requires, among other things, (1) a review of the functions and services previously

5

outsourced by Capmark Bank to the affiliated companies; (2) reallocation of functions and responsibilities among Capmark Bank personnel and employees of non-bank affiliates; (3) revision or replacement of existing agreements between Capmark Bank and non-bank affiliates to reflect changes in the intercompany service arrangements; and (4) ensuring compliance with applicable banking regulations and obtaining any needed regulatory approvals.

**Benefits to the Debtors' Estates**

The completion of this milestone will be of significant benefit to the Debtors' estates by allowing Capmark Bank to complete the reorganization of its operations in connection with the transfer of significant numbers of personnel from the non-bank affiliates. This reorganization will enable Capmark Bank to be more self-sufficient and to better control its assets and operations which will enhance the value of Capmark Bank and reduce regulatory risks. It will also result in more effective cost allocation between the Debtors, on the one hand, and Capmark Bank on the other hand, by ensuring that the personnel responsible for Capmark Bank operations are employed by Capmark Bank.

**Milestone 9—Withdrawal of Capmark Investments' Securities and Exchange Commission ("SEC") registration**

**Substance of the Milestone**

This milestone involves winding down the operations of Capmark's SEC registered investment adviser and completing the withdrawal of the investment adviser registration. In order to accomplish this milestone, the responsible insider employees must (1) arrange for all investment adviser client accounts to be closed or transitioned to other advisers; (2) completion of all wind down responsibilities, including compliance with reporting and regulatory withdrawal requirements; and (3) communicate the wind-down and withdrawal plans successfully with the SEC staff to ensure timely acceptance of the withdrawal application.

**Benefits to the Debtors' Estates**

Successful withdrawal of the SEC registration will benefit the Debtors' estates by avoiding possible regulatory violations and sanctions and eliminating reporting and compliance obligations so as to permit further reduction of staff and expenses.

**Milestone 10—Complete the sale of Capmark Investments' debt fund management agreement**

**Substance of the Milestone**

This milestone involves the marketing, negotiation and sale of the management contract and general partner interest for the Capmark Structured Real Estate Partners investment fund (the "Debt Fund"). This is a large and complex fund with over $1 billion of invested capital from large institutional investors, including certain state

pension funds and sovereign wealth funds. The responsible insiders need to set up and implement a marketing process, establish and manage a data room for due diligence, manage an extensive due diligence process with potential buyers, explain complex assets and structures within the fund, negotiate a purchase and sale agreement and assist with a consent process to obtain limited partner approval of the selected buyer. During this process the responsible insiders need to communicate with the fund investors in order to keep them informed and maintain their support for the process.

**Benefits to the Debtors' Estates**

The achievement of this milestone will result in significant benefits to the Debtors' estates, including the receipt of the purchase price from the sale and the orderly transfer of the management responsibility for the Debt Fund to an asset manager that will manage the Debt Fund for the long term, thereby reducing concerns of fund investors and mitigating the risk of adverse actions by such investors. The successful sale of the management agreement for the Debt Fund will facilitate the prompt wind-down of the investment adviser and the reduction of costs necessary to maintain the registered adviser.

## Milestone 11—Complete the sale of Capmark Investments' equity fund platform

**Substance of the Milestone**

This milestone involves the marketing, negotiation and sale of the management contracts and general partner interests for the ten commercial real estate equity investment funds managed by Capmark Investments. These funds have over $1 billion of invested capital from large institutional investors, including certain state pension funds. The responsible insiders need to set up and implement a marketing process, establish and manage a data room for due diligence, manage an extensive due diligence process with potential buyers, explain complex assets and structures within the funds and assist with a consent process to obtain limited partner approval of the selected buyer. During this process the responsible insiders need to communicate with the fund investors in order to keep them informed and maintain their support for the process. A sale agreement has been executed with respect to the equity funds platform but the transaction has not yet been consummated.

**Benefits to the Debtors' Estates**

The achievement of this milestone will result in significant benefits to the Debtors' estates, including the receipt of the purchase price from the sale, the orderly transfer of the management responsibility for the real estate equity funds managed by Capmark Investments and the transfer of the equity funds personnel to the buyer, which will manage the equity funds for the long term, thereby reducing concerns of fund investors and mitigating the risk of adverse actions by such investors. The successful sale of the management agreement for the equity funds platform will also facilitate the prompt wind-down of the investment adviser and the reduction of costs necessary to maintain the registered adviser.

7

**Milestone 12—Establish updated financial reporting and auditing plan for period through confirmation of Plan of Reorganization, including plan for fulfilling post-closing financial reporting obligations to Berkadia under Transition Services Agreement**

**Substance of the Milestone**

The achievement of this milestone requires the responsible insider employees to develop and implement a financial reporting and auditing plan that is appropriate for Capmark and its stakeholders through confirmation of the Plan of Reorganization as well as to fulfill the financial reporting responsibilities under the Transition Services Agreement with Berkadia with respect to the sale of the MSB Business. This plan needs to be developed in light of the significant changes in the operations and personnel of Capmark resulting from the sale of significant operations and departure of financial and accounting personnel in connection with those transactions.

**Benefits to the Debtors' Estates**

The achievement of this milestone will ensure that (1) appropriate financial reporting of Capmark's operations continues through the bankruptcy process; (2) all required financial reporting by Capmark's subsidiaries, including various non-Debtor subsidiaries is continued; (3) all financial reporting services required to be provided to Berkadia under the Transition Services Agreement are completed; (4) that staff is reorganized to shift responsibilities in light of the changes in the business operations and personnel resulting from the significant sale transactions and different reporting requirements associated with the bankruptcy process; and (5) that the foregoing is accomplished in a manner that minimizes costs and mitigates risks.

**Milestone 13—Complete post-transfer transitional matters with respect to the LIHTC platform, including data migration, platform wind-down, transition of responsibilities for accounting and tax reporting**

**Substance of the Milestone**

This milestone requires the responsible insider employees to complete significant post-transfer matters related to the LIHTC platform. The LIHTC platform involves a tremendous amount of information related to more than 500 affordable housing properties and approximately 65 funds, for which the Debtors' and their subsidiaries have performed financial reporting and asset management services. The transition of fund management responsibilities, data and systems is a significant undertaking that must be carefully managed to avoid mistakes and omissions and allow both the Debtors and their subsidiaries and the successor fund manager to obtain or retain any necessary data or systems and avoid transition issues that could increase fund liabilities and costs.

RLF1 3544385v 1

**Benefits to the Debtors' Estates**

The achievement of this milestone will (1) avoid an increase of liabilities under LIHTC fund guarantees, (2) help ensure the consent and cooperation of LIHTC fund investors and credit enhancement counterparties to the transfer of fund management responsibilities to the successor manager, and (3) ensure that both the successor manager and Capmark have access to the necessary data, systems and personnel to fulfill their respective responsibilities and conduct their ongoing business operations with a minimum of disruption and risk of loss.

## Milestone 14—Prepare tax compliance plan for period through confirmation of Plan of Reorganization

**Substance of the Milestone**

This milestone requires the responsible insider employees to establish a tax compliance plan through the time of confirmation of a Plan of Reorganization. This entails (1) ensuring that all US federal, US state and local and foreign tax returns are prepared and filed on a timely basis; (2) reviewing proposed actions relating the Debtors' outstanding debt obligations and capital structure and providing tax guidance as to how to proceed without creating adverse tax consequences to the Debtors' estates; and (3) providing input into the Plan of Reorganization development process to minimize adverse tax consequences to the Debtors' estates from changes in capital structure, ownership, cancellation of indebtedness, asset transfers and the like.

**Benefits to the Debtors' Estates**

In light of (1) the significant amount of tax regulation to which the Debtors and their affiliates are subject both in the US and in foreign jurisdictions; (2) the complexity of the corporate organizational and transaction structures that the Debtors and their subsidiaries have in place; (3) the significance and volume of corporate transactions taking place during the bankruptcy proceeding; and (4) the complexity and materiality of tax matters to the development of an effective Plan of Reorganization, it is clear that the accomplishment of this milestone is of critical importance to the value of the Debtors' estates.

## Milestone 15—Complete sale of Mexico assets

**Substance of the Milestone**

This milestone requires the responsible insider employees to conduct a process to sell the Debtors' Mexico assets, which comprise interests in 9 pools of real estate related assets (principally non-performing loans) located in Mexico. A majority of these assets are owned through joint ventures with other institutional investors. Consequently, these assets are illiquid and difficult to monitor from the United States. The manager of the assets is a firm managed by individuals that were formerly employed by subsidiaries of the Debtors but left to form an independent company in 2007. The

9

Debtors have been engaged in discussions with the prospective buyer for many months and believe that it would require significant additional effort and potentially significant additional time to identify another qualified purchaser and complete a sale at a fair price if this transaction is not closed.

**Benefits to the Debtors' Estates**

The achievement of this milestone will (1) generate approximately $18 million of proceeds for the Debtors' estates immediately; (2) eliminate the need to dedicate resources to monitoring the Mexican assets; and (3) eliminate the risk of a decline in asset cash flows or loss of the services of the asset management company during any longer term holding period if the assets are not sold in the near term.

**Milestone 16—Substantial completion of the transition of Servicing to Berkadia**

**Substance of the Milestone**

This milestone requires the responsible insider employees to complete various services under the Transition Services Agreement relating to the sale of the MSB business to Berkadia, including (1) financial reporting services; (2) migration of data from the Debtors' systems to Berkadia systems; (3) transfer of software and hardware platforms included in the sale; (4) payroll services; (5) tax preparation services; (6) mail services; (7) accounts payable processing; and (8) transition of litigation processes. The successful completion of these transition services was an issue of significant negotiation and a particular concern of the advisers to the Unsecured Creditors Committee in connection with the sale of the MSB business.

**Benefits to the Debtors' Estates**

The successful completion of the transition matters related to the sale of the MSB business to Berkadia will result in significant benefits to the Debtors' estates including: (1) avoidance of liability for indemnification claims under the Transition Services Agreement signed in connection with the sale transaction; and (2) maintenance of the smooth conduct of the Debtors' business operations while going through the potentially disruptive process of separating the functions, personnel, hardware and software supporting this previously major part of the Debtors' business and that were previously integrated with the rest of the Debtors' operations.

**Milestone 17—Prepare acceptable plan for streamlining of corporate entities and elimination of unnecessary subsidiaries**

**Substance of the Milestone**

This milestone requires the responsible insider employees to develop a plan for streamlining the corporate structure of the Debtors and their subsidiaries and eliminating unnecessary subsidiaries. Many of the Debtors' business units utilized complex transaction structures in connection with their business operations and investments. These structures were put in place for a variety of reasons, including tax

10

planning, financial structuring and operational considerations. The use of complex structures over time resulted in a corporate structure with hundreds of subsidiaries in both domestic and foreign jurisdictions. The elimination of unnecessary subsidiaries without creating unnecessary tax or other liabilities or costs requires careful planning and execution with the various business units and corporate support functions, including the financial reporting, tax, legal and treasury groups.

**Benefits to the Debtors' Estates**

The achievement of this milestone will benefit the Debtors' estates by (1) reducing costs associated with maintenance of subsidiaries that are no longer needed (filing fees, local taxes, agent fees, etc.); and (2) reducing the complexity of the organization and thereby simplifying financial and tax reporting.

## Milestone 18—Complete wind-down or sale of the broker-dealer

**Substance of the Milestone**

This milestone requires the responsible insider employees to develop a plan to either wind down the operations of the SEC registered broker-dealer subsidiary or find a suitable buyer and execute a sale transaction. In order to accomplish this milestone, the responsible insiders will need to satisfy applicable requirements of the SEC and FINRA, provide for the termination or transfer of all remaining accounts and operations, provide for the satisfaction of all known liabilities and the disposition of all assets and make applicable regulatory filings related to the foregoing.

**Benefits to the Debtors' Estates**

The benefits to the Debtors' estates include (1) the elimination of regulatory compliance requirements related to the broker-dealer, including preparation and filing of separate audited financial statements, required monthly financial reports, SEC and FINRA examinations and other similar requirements and the costs related thereto; and (2) the ability to distribute the net remaining assets of the broker-dealer after satisfaction of liabilities to the Debtor parent company.

## Milestone 19—Establish acceptable loan level disposition tracking and reporting system for Capmark Bank and non-bank portfolios

**Substance of the Milestone**

The establishment of an acceptable loan level disposition tracking and reporting system for Capmark Bank and the Debtors' other loan portfolios requires the responsible insiders to design and implement new systems to track and report significant amounts of loan level data. This will require significant and well coordinated efforts among the asset management, credit and IT staffs to capture the relevant information in an efficient manner and generate timely reports that will be useful to senior management, board members and stakeholders.

11

**Benefits to the Debtors' Estates**

The achievement of this milestone will improve the ability of management and board members to quickly evaluate large amounts of data regarding the progress of value recovery with respect to the loan portfolios of both Capmark Bank and the Debtors' non-bank subsidiaries. This improvement is important given the impact of stressed market conditions on the Debtors' and their subsidiaries' commercial real estate loan portfolios and the importance of quickly identifying developments or trends that could affect either the recovery on a specific asset or a larger portion of the portfolio or the effectiveness of the asset management strategies being employed.

## Milestone 20—Complete the sale or resolution of the New Markets Tax Credit Platform

**Substance of the Milestone**

This milestone requires the responsible insider employees to develop a plan for selling or otherwise resolving the future management of the New Market Tax Credit Platform, which is a complex platform comprised of a large number of tax leveraged tax credit funds. Each fund typically has an upper tier, a middle tier and a lower tier, all of which have equity or debt holders, member entities and responsibilities and functions. In order to achieve an acceptable sale or other resolution transaction, the insiders will be required to balance the interests of the major tax credit equity investors with the interests of the Debtors, which hold the majority of the upper tier fund loans. This will be a complex negotiation that will involve issues of economics, control, tax credit indemnities and other relevant considerations.

**Benefits to the Debtors' Estates**

If this milestone is achieved, the Debtors' estates are expected to benefit from (1) the reduction or elimination of a possible $720 million tax credit indemnification obligation of one of the Debtors (for no payment); (2) the elimination of fund management responsibilities (which are currently not generating a profit); and (3) the potential for acceleration of the receipt of cash from the sale of upper tier fund loans.

## Milestone 21—Prepare and deliver to Unsecured Creditors Committee (as part of updated operating plan) a new facilities plan for all Capmark locations, including whether to assume or reject specific leases

**Substance of the Milestone**

This milestone requires the responsible insider employees to develop and implement a new facilities plan for all Capmark locations, including whether to assume or reject specific leases for which the Debtors' are lessees. This requires a detailed analysis of the cost of the current leases, the availability of less costly alternatives, the potential damages claims resulting from the rejection of any leases, the costs of relocation, the opportunities for subleasing, the interest of Berkadia in space formerly

12

occupied by the Debtors' MSB employees and related considerations. The milestone also requires a substantial negotiation with landlords relating to both existing and replacement leased facilities. With 35 locations at the time of the bankruptcy filing, this milestone entails a substantial and highly coordinated effort.

**Benefits to the Debtors' Estates**

The Debtors' estates will obtain significant benefits from the completion of this milestone, including (1) potentially significant cost reductions from the rejection or renegotiation of leases as well as from relocating to less expensive locations and (2) preservation of enterprise value by accomplishing a significant number of relocations without disruption of the business.

## Milestone 22-- Sale or other resolution of the Japan Non-Performing Loan Portfolio

**Substance of the Milestone**

This milestone requires the responsible insider to evaluate alternatives for most effectively monetizing the Japanese portfolio of non-performing loans owned by the Debtors' Japanese subsidiaries. As of December 31, 2009, the Japan NPL portfolio consisted of approximately 150 loans and had a book value of approximately $128 million. The achievement of this milestone involves (1) identifying and contacting potential buyers, (2) managing the bidding process, (3) structuring and negotiating a transaction, (4) evaluating proposals and preparing a recommendation and (5) finalizing the management plan for the ultimate sale or retention of the non-performing loan portfolio.

**Benefits to the Debtors' Estates**

The achievement of this milestone will result in substantial benefits to the Debtors' estates, including (1) the generation of substantial cash proceeds, (2) the elimination of uncertainty related to the collectability of future cash flows from a large distressed asset pool and (3) the ability to reduce the costs and complexity associated with monitoring a large number of smaller loan assets.

13