IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x

*In re:*                                                        :      **Chapter 11**
                                                                :
**CAPMARK FINANCIAL GROUP INC.,** *et al.,*    :      **Case No. 09-13684 (CSS)**
                                                                :
                    **Debtors.**[1]                             :      **Jointly Administered**
                                                                :
                                                                :      **Hearing Date (Bidding Procedures):**
                                                                :      **June 1, 2010 at 3:00 p.m.**
                                                                :
                                                                :      **Objection Deadline (Bidding Procedures):**
                                                                :      **May 25, 2010 at 4:00 p.m.**

---------------------------------------------------------------x

**MOTION, PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY
CODE, BANKRUPTCY RULES 2002, 6004, 9014, AND 9019, AND LOCAL RULES 2002-1
AND 6004-1, REQUESTING ENTRY OF TWO ORDERS IN CONNECTION WITH SALE
OF GEORGETOWN PARK PARTNERS, LLC LOAN: (I) ORDER (A) SCHEDULING AN
AUCTION; (B) APPROVING BIDDING PROCEDURES; (C) APPROVING BREAK-UP
FEE AND EXPENSE REIMBURSEMENT; (D) SCHEDULING SALE HEARING; (E)
ESTABLISHING SALE OBJECTION DEADLINE; AND (F) APPROVING AUCTION AND
SALE HEARING NOTICE; AND (II) ORDER APPROVING SALE OF GEORGETOWN
PARK PARTNERS, LLC LOAN FREE AND CLEAR OF ALL LIENS, CLAIMS AND
ENCUMBRANCES AND APPROVING RELATED SETTLEMENT**

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), Capmark Affordable Equity Inc. (2381), and Capmark Investments LP (7999). CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044. The addresses for all of the Debtors are available at the following World Wide Web address: http://chapter11.epiqsystems.com/capmark.

Capmark Financial Group Inc. ("CFGI") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this motion (the "Motion") requesting two orders, (i) a bidding procedures order, establishing, inter alia, certain procedures and scheduling relating to Debtor Capmark Finance Inc.'s ("CFI" or the "Seller") sale of a certain real estate loan, and (ii) upon the completion of a sale hearing on the proposed loan sale, a sale order approving the sale free and clear of all liens, claims, and encumbrances (other than the Designated Defenses, as defined and described below), and relief related thereto, including, but not limited to, the settlement of certain claims.  In support of this Motion the Debtors respectfully represent:

## Background

1.      On October 25, 2009 (the "Commencement Date"), each of the Debtors other than Capmark Investments LP (collectively, the "First Filed Debtors") commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On January 15, 2010, Capmark Investments LP ("CILP"), a wholly-owned subsidiary of CFGI, commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On October 27, 2009, this Court entered an order authorizing the joint administration of the First Filed Debtors' chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 1015-1 of the Local Bankruptcy Rules for the District of Delaware (the "Local Rules").  On January 19, 2010, this Court entered an order jointly administering CILP's chapter 11 case with the jointly administered chapter 11 cases of the First Filed Debtors.

3.     On November 2, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed a statutory unsecured creditors' committee pursuant to section 1102 of the Bankruptcy Code (the "Committee").

### Capmark's Businesses

4.     The Debtors and their non-debtor subsidiaries and affiliates (together with the Debtors, "Capmark") are a group of commercial real estate finance companies that provide real estate-related products and services to borrowers, investors and other customers along three core business lines: (i) commercial real estate lending and mortgage banking; (ii) investments and funds management; and (iii) commercial loan servicing.[2]

5.     A detailed description of Capmark's business, capital structure, and the events leading to the commencement of these chapter 11 cases is contained in the *Declaration of Thomas L Fairfield, Executive Vice President, General Counsel and Secretary of CFGI, in Support of the Debtors' Chapter 11 Petitions and First Day Motions and Applications*, filed on the Commencement Date [Docket No. 13].

### Jurisdiction and Venue

6.     This Court has jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

7.     By this Motion, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9014, and 9019, and Local Rules 2002-1 and 6004-1, the Debtors request two orders: (i) a bidding procedures order (the "Bidding Procedures Order"),

---

[2] Pursuant to an order of this Court dated November 24, 2009, the Debtors were authorized to sell all of their commercial mortgage banking and mortgage servicing assets (collectively, the "MSB Business") to Berkadia Commercial Mortgage LLC, which sale closed December 11, 2009

substantially in the form annexed hereto as <u>Exhibit A</u>, (a) scheduling an auction (the "<u>Auction</u>"), at which Seller shall solicit competing bids for the sale (the "<u>Sale</u>") of the Seller's ownership interest in a loan in the original maximum principal amount of $70,400,000 made to Georgetown Park Partners, LLC, together with the accompanying loan file (collectively, the "<u>Georgetown Loan</u>");[3] (b) approving certain bidding procedures (the "<u>Bidding Procedures</u>") related thereto; (c) approving a break-up fee and expense reimbursement for the stalking horse bidder as protection against a competing bid; (d) scheduling a hearing (the "<u>Sale Hearing</u>") to consider approval of the Sale of the Georgetown Loan to the stalking horse bidder or to another successful bidder at the Auction; (e) establishing a deadline by which any objections to the Sale must be filed (the "<u>Objection Deadline</u>"); and (f) approving the proposed form and manner of notice of the Auction and Sale Hearing (the "<u>Auction and Sale Hearing Notice</u>"), annexed to the Bidding Procedures Order as <u>Schedule 1</u>; and (ii) upon the completion of the Sale Hearing, an order (the "<u>Sale Order</u>"), substantially in the form annexed hereto as <u>Exhibit B</u>, approving the Sale of the Georgetown Loan to the stalking horse bidder or to another successful bidder, free and clear of any and all liens, claims, encumbrances, and interests of any kind, nature, or description (collectively, the "<u>Liens</u>"),[4] other than the Designated Defenses, and granting relief related thereto, including, but not limited to, approving the settlement of certain claims (but only if the Sale is to the Purchaser).

8.    The Georgetown Loan relates to debt financing provided by the Seller to Georgetown Park Partners, LLC, the borrower, in connection with the latter's ownership of the Georgetown Park shopping mall and office complex, located in Washington, D.C., which property secures the borrower's obligations arising under the Georgetown Loan.

---

[3] The aggregate principal amount currently outstanding under the Georgetown Loan is $68,330,763.67.

[4] If the Auction is held and a sale of the Georgetown Loan is agreed to according to a Modified Purchase Agreement (as defined herein), the Debtors will submit a revised sale order reflecting the sale contemplated by the Modified Purchase Agreement, along with a blackline against the Sale Order to reflect any changes made.

## The Proposed Sale of the Georgetown Loan
## to Angelo Gordon Real Estate Inc.

9.     The Seller has entered into that certain Loan Purchase and Sale Agreement

(the "Purchase Agreement"), dated as of May 10, 2010, with Angelo Gordon Real Estate Inc. (the

"Purchaser"), whereby Purchaser has agreed to purchase the Georgetown Loan from the Seller, on

certain terms and conditions, and to act as a "stalking horse" in the Debtors' pursuit of higher or

better offers.  A copy of the Purchase Agreement is annexed hereto as Exhibit C.

### Summary of Purchase Agreement[5]

10.    The salient terms of the Purchase Agreement are as follows:

(a)    **Assets to be Sold**.  The assets to be sold shall consist of the assets
comprising the Georgetown Loan.  The assets are to be sold free and clear of
Liens other than the Designated Defenses, which are defined in the Purchase
Agreement as:

> only (a) any claims of the Borrower Parties, (b) any defenses
> of the Borrower Parties to the enforcement of the Georgetown
> Loan or the Mortgage, (c) any claims or defenses of Eastbanc,
> Inc., Anthony Lanier or any other person or entity, with
> respect to the rights of the holder of the Georgetown Loan or
> the Mortgage against the Property, and (d) any claims or
> defenses of any person or entity arising after the Closing Date;
> *provided, however*, that the term "Designated Defenses" shall
> not include any claim by any person for the recovery of money
> or property previously transferred to Seller or its Affiliates,
> including any claim for recovery of principal, interest, or other
> payments made to Seller and any claim for the recovery of
> damages arising from conduct of the Seller or its Affiliates
> occurring prior to the Closing Date; and *provided, further*, that
> nothing contained in this Agreement shall prejudice or
> adversely affect Purchaser's right or ability to assert claims,
> counterclaims, defenses or other arguments in respect of the
> Designated Defenses, including the right to assert that
> defenses to the enforcement of the Loan and any constructive
> trust claim of Eastbanc, Inc. or Anthony Lanier are without
> merit.

---

[5] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Purchase
Agreement  To the extent there are any inconsistencies between the summary description of the Purchase Agreement
contained herein and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement control

(b)     **Purchase Price.** Purchaser shall pay to Seller an amount equal to fifty-three million dollars ($53,000,000) (the "Base Purchase Price") adjusted as follows (as so adjusted, the "Purchase Price"):

   i.     the Base Purchase Price shall be decreased by any amounts received by Seller after the date of the Purchase Agreement which are applied by Seller to reduce the principal balance of the Georgetown Loan, including, without limitation, amounts applied to reduce such principal balance pursuant to section 2(b) of the Cash Management Agreement;

   ii.    the Base Purchase Price shall be increased by the lesser of (A) the amount (calculated as of the Closing Date) of all accrued and unpaid interest (at the non-default rate) on the Georgetown Loan for the period from and including February 15, 2010 (or, if later, the date through which interest on the Georgetown Loan at the non-default rate has been paid as of the Closing Date, including pursuant to section 2 of the Cash Management Agreement and/or as contemplated in section 5.2(f)) through the Closing Date, and (B) the net operating income for such period as determined in good faith by Lender; and

   iii.   the Base Purchase Price shall be increased by the aggregate amount of any so called "protective advances" reasonably made by Seller to the extent permitted under the Georgetown Loan Documents after the date of the Purchase Agreement but only to pay (1) insurance premiums that are due and unpaid, (2) real estate taxes that are due and payable (*i e*, delinquent), and (3) life safety matters and to protect the collateral from imminent damage (it being agreed by Seller that as of the date of the Purchase Agreement Seller is not aware of the need for any protective advances).

(c)     **Additional Consideration.** In addition to the Purchase Price, the Purchase Agreement provides Seller with protection from claims by the Borrower Parties. As discussed further below, pursuant to the Settlement to be entered into at closing, certain of the Borrower Parties are releasing the Seller and its affiliates, including CILP, from claims, and the proofs of claim filed by certain of the Borrower Parties against Seller and CILP shall be withdrawn with prejudice. As further protection, under the Purchase Agreement, the Purchaser has agreed to indemnify the Seller and its affiliates from claims by the Borrower Parties (other than those who granted a release) in an amount up to $3.3 million.

(d)     **Break-Up Fee and Expense Reimbursement.** In consideration for Purchaser having expended considerable time and expense in connection with the Purchase Agreement and the negotiation thereof, Seller shall pay to Purchaser a break-up fee in an amount equal to $1,340,000 (the "Break-Up Fee") following the termination of the Purchase Agreement, only if such termination is pursuant to sections 6.2(c) (*i.e.*, the Seller defaults on its

material obligations under the Purchase Agreement) or 6.3(a) (*i.e.*, the Court enters an order approving a Competing Bid agreed to by Seller). If Purchaser becomes entitled to payment of the Break-Up Fee pursuant to the Purchase Agreement, or if Seller becomes entitled to the Expense Reimbursement pursuant to section 6.2(b) (*i.e.*, the Sale Order is not entered other than as a direct result of Purchaser being in breach of its obligations under the Purchase Agreement), Seller shall also reimburse Purchaser for actual legal fees and other out-of-pocket expenses not exceeding $500,000 incurred and paid by Seller in connection with negotiating the Purchase Agreement, negotiating with the Borrower Parties, performing due diligence with respect to the Georgetown Loan, the Eastbanc Litigation and the Property, and being represented in Seller's bankruptcy proceeding (the "Expense Reimbursement").

(e)   **Timing of Payment of Break-Up Fee and Expense Reimbursement.** The payment of the Expense Reimbursement, if payable pursuant to sections 6.2(b) and 9.1(a) of the Purchase Agreement, shall be payable on the first Business Day following Purchaser's termination of the Purchase Agreement pursuant to Section 6.2(b) of the Purchase Agreement. The payment of the Break-Up Fee and Expense Reimbursement, if payable pursuant to sections 6.2(c) and 9.1(a) of the Purchase Agreement, shall be payable on the first Business Day following Purchaser's termination of the Purchase Agreement pursuant to section 6.2(c) of the Purchase Agreement. The payment of the Break-Up Fee and Expense Reimbursement, if payable pursuant to sections 6.3(a) and 9.1(a) of the Purchase Agreement, shall be made on or before the earlier to occur of (a) the third (3rd) Business Day after the closing of the sale in respect of a Competing Bid and (b) the thirtieth (30th) day following the Bankruptcy Court's entry of an order approving a Competing Bid.

(f)   **Termination of Purchase Agreement.** The Purchase Agreement may be terminated as follows:

i.   If Purchaser fails or refuses to consummate the Closing in accordance with the Purchase Agreement, or Purchaser otherwise defaults on any of its material obligations under the Purchase Agreement, including Purchaser's breach in any material respect of any representation or warranty set forth in section 4.1, and fails to cure such breach within seven (7) days following notice from Seller of such breach (but in no event later than the Closing Date; *provided, however*, with respect to any breach other than failure to pay the Purchase Price or to make a delivery required under clauses (i)-(v), (vii) and (viii) of section 3.3, if Seller first notifies Purchaser of any such breach within three (3) Business Days prior to the Closing Date, then Purchaser shall have the right to adjourn the Closing Date to a date not later than three (3) Business Days after the date of Seller's notice of such breach to enable Purchaser to cure such breach), then in any such case Seller shall have the right, as its sole and exclusive remedy, to terminate the Purchase Agreement by Notice to Purchaser and Escrow Agent, in

which case, (i) the Deposit shall be delivered by the Escrow Agent to Seller and Seller shall be entitled to retain the Deposit, free of any and all Claims by Purchaser, as full and complete liquidated damages, the parties hereto having concluded that a precise measure of damages in such event would be impossible to calculate and determine and are not a penalty, (ii) the Purchase Agreement shall thereupon terminate and become void and of no further force or effect, and (iii) neither Seller nor Purchaser shall have any further rights or obligations under the Purchase Agreement, except those, if any, which are expressly stated to survive the termination of the Purchase Agreement;

ii.     If (i) the Bidding Procedures Order is not entered within forty (40) days from the date of the Purchase Agreement (other than if the Bidding Procedures Order is not entered within such forty (40) day period as a direct result of Purchaser being in breach of its obligations under the Purchase Agreement, which breach continues for more than three (3) Business Days after written notice from Seller) or (ii) the Bidding Procedures Order, once entered, has been vacated, reversed or modified in any manner materially adverse to Purchaser, without Purchaser's consent (other than if the Bidding Procedures Order is vacated, reversed or modified in any manner materially adverse to Purchaser as a direct result of Purchaser being in breach of its obligations under the Purchase Agreement, which breach continues for more than three (3) Business Days after written notice from Seller), then in either such case, Purchaser may terminate the Purchase Agreement, the Deposit shall be delivered by the Escrow Agent to Purchaser, and neither Seller nor Purchaser shall have any further rights or obligations under the Purchase Agreement, except those, if any, which are expressly stated to survive the termination of the Purchase Agreement;

iii.    If (i) the Bidding Procedures Order is entered within forty (40) days from the date of the Purchase Agreement, but the Sale Order is not entered within eighty-five (85) days from the date of the Purchase Agreement (other than if the Sale Order is not entered within such eighty-five (85) day period as a direct result of Purchaser being in breach of its obligations under the Purchase Agreement, which breach continues for more than three (3) Business Days after written notice from Seller), or (ii) the Sale Order, once entered, has been vacated, reversed or modified in any manner materially adverse to Purchaser, without Purchaser's consent (other than if the Sale Order is vacated, reversed or modified in any manner materially adverse to Purchaser as a direct result of Purchaser being in breach of its obligations under the Purchase Agreement, which breach continues for more than three (3) Business Days after written notice from Seller), then in either such case, Purchaser may terminate the Purchase Agreement, the Deposit shall be delivered by the Escrow Agent to Purchaser, Seller shall pay the Expense Reimbursement to Purchaser and neither Seller nor

Purchaser shall have any further rights or obligations under the Purchase Agreement, except those, if any, which are expressly stated to survive the termination of the Purchase Agreement; *provided* that Seller shall not be required to pay the Expense Reimbursement if the Bankruptcy Court or an appellate court concludes that the Purchaser is not a "good faith" purchaser under section 363(m) of the Bankruptcy Code (however in such event the Deposit shall be returned to Purchaser by the Escrow Agent if Purchaser is then otherwise entitled to receive a return of the Deposit under the other provisions of the Purchase Agreement);

iv.    If Seller fails or refuses to consummate the Closing in accordance with the Purchase Agreement for any reason other than Seller's failure to secure all of the Bankruptcy Court Authorizations prior to the Closing, or Seller otherwise defaults on any of its material obligations under the Purchase Agreement, including Seller's breach in any material respect of any representation or warranty set forth in section 5.2, and fails to cure such breach within seven (7) days following notice from Purchaser of such Breach, and in each such case Purchaser is otherwise ready, willing and able to consummate the Closing in accordance with the Purchase Agreement, then Purchaser shall have the right, as its sole and exclusive remedy, to either (i) terminate the Purchase Agreement upon Notice to Seller and Escrow Agent, in which case, (x) the Deposit shall be delivered by the Escrow Agent to Purchaser, and (y) neither Seller nor Purchaser shall have any further rights or obligations under the Purchase Agreement, except those, if any, which are expressly stated to survive the termination of the Purchase Agreement, or (ii) bring an action for specific performance of Seller's obligations under the Purchase Agreement; *provided, however*, if the Bankruptcy Court does not allow such action for specific performance (and the Closing has not occurred), then, in lieu of such relief, Seller shall pay the Break-Up Fee and Expense Reimbursement to Purchaser, and in which event the Purchase Agreement shall terminate, the Deposit shall be delivered by the Escrow Agent to Purchaser, and neither Seller nor Purchaser shall have any further rights or obligations under the Purchase Agreement, except those, if any, which are expressly stated to survive the termination of the Purchase Agreement;

v.    If prior to the Closing it is determined that there are any material loan documents evidencing and securing the Georgetown Loan, or any written material amendments and written material modifications thereto, or written material termination thereof, which are not identified on Exhibit K and which are adverse in any material respect to the holder of the Georgetown Loan, and the same does not constitute a breach of section 5.2(g)(2), (3) or (4), then Purchaser shall have the right to terminate the Purchase Agreement prior to the Closing by giving written notice of such termination to Seller not later than five (5)

9

Business Days after Purchaser has received written notice of the matter in question (but not thereafter), in which event the Purchase Agreement shall terminate, the Deposit shall be delivered by the Escrow Agent to Purchaser, and neither Seller nor Purchaser shall have any further rights or obligations under the Purchase Agreement, except those, if any, which are expressly stated to survive the termination of the Purchase Agreement.  Purchaser agrees that for all purposes of the Purchase Agreement, any interest rate cap agreement, or assignment, amendment or acknowledgement thereof, shall be deemed *not* to be a material loan document so long as such agreement, or assignment, amendment or acknowledgement relates to an interest rate cap agreement that has expired prior to the Closing Date;

vi.    If Seller shall have entered into an agreement with respect to a Competing Bid, and the Bankruptcy Court shall enter an order approving such Competing Bid, subject to the limitations set forth in the Bidding Procedures Order and subject to Purchaser's right to payment of the Break-Up Fee and Expense Reimbursement in accordance with the provisions of the Purchase Agreement and the Bidding Procedures Order, then either Purchaser or Seller may terminate the Purchase Agreement, following which termination the Deposit shall be delivered by the Escrow Agent to Purchaser, and neither Seller nor Purchaser shall have any further rights or obligations under the Purchase Agreement, except those, if any, which are expressly stated to survive the termination of the Purchase Agreement;

vii.    The Purchase Agreement shall terminate immediately if the Bankruptcy Case is dismissed or converted to a Chapter 7 bankruptcy case under the Bankruptcy Code, or an interim or permanent trustee is appointed in the Bankruptcy Case, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed in the Bankruptcy Case, in which case the Deposit shall be delivered by the Escrow Agent to Purchaser and neither Seller nor Purchaser shall have any further rights or obligations under the Purchase Agreement, except those, if any, which are expressly stated to survive the termination of the Purchase Agreement; and

viii.    If for any reason, other than as a result of a breach by any party of their respective obligations under the Purchase Agreement, the Closing has not occurred within one hundred eighty (180) days of the date of the Purchase Agreement, then either Purchaser or Seller may terminate the Purchase Agreement, following which termination the Deposit shall be delivered by the Escrow Agent to Purchaser, and neither Seller nor Purchaser shall have any further rights or obligations under the Purchase Agreement, except those, if any,

which are expressly stated to survive the termination of the Purchase Agreement.

(g) **Requirement of Bankruptcy Court Approval.**  The Seller and Purchaser agree that (a) Seller's obligations to consummate the sale of the Georgetown Loan are expressly conditioned upon the entry of the Sale Order (including the finding by the Bankruptcy Court that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code), and the Sale Order being in full force and effect as of the Closing Date, and (b) Seller's obligations to pay the Break-Up Fee and Expense Reimbursement under the Purchase Agreement are expressly conditioned upon the entry of the Bidding Procedures Order and the Bidding Procedures Order being in full force and effect at the time such payment is due.

(h) **Closing Date.**  The Closing will occur at 10:00 a.m. (Prevailing Eastern Time) on the date (the "<u>Closing Date</u>") that is the first Business Day following the passing of three (3) Business Days after the entry of the Sale Order, provided that (i) no appeal has been made thereunder during such three (3) Business Day period challenging the finding by the Bankruptcy Court that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, and (ii) as of the Closing Date, the Sale Order (x) has not been revoked or modified in any manner materially adverse to Purchaser without Purchaser's consent, and (y) is not subject to a stay.

11.    In addition to the aforementioned salient features of the Purchase Agreement, in accordance with Local Rule 6004-1(b)(iv), the Debtors note the following with respect to the Purchase Agreement:

(a) **No Sale to an Insider**:  The prospective Purchaser is not an insider of the Debtors within the meaning set forth in section 101(31) of the Bankruptcy Code.

(b) **No Agreements with Management**:  The Purchase Agreement does not provide for any special or separate agreements with management or key employees of the Seller regarding compensation or future employment.

(c) **Releases**: Section 7.5 of the Purchase Agreement provides for the release by the Purchaser of any claim or interest against the Seller relating to the Georgetown Loan.  Further, Exhibit L is the Release Agreement between Seller, granting a release in favor of Purchaser, and release by Debtor CILP (a non-Seller Debtor) is contained at Exhibit O.  A discussion of these releases as part of a settlement (the "<u>Settlement</u>") pursuant to Bankruptcy Rule 9019 is discussed more fully below.

(d) **No Private Sale; Competitive Bidding**:  As discussed above, the Seller intends to conduct an open bidding process for the Sale of the Georgetown

Loan. Neither the Purchase Agreement nor any other agreement prohibits the Seller from soliciting competing offers for the Georgetown Loan and the Seller is not otherwise limited in marketing the Georgetown Loan.

(e)     **Closing and Other Deadlines**:    The Closing Date is discussed in the preceding paragraph 10(h).

(f)     **Good Faith Deposit**:  Pursuant to section 3.2(b) of the Purchase Agreement, Purchaser has submitted a deposit in the amount of $10,000,000, on certain terms and conditions.

(g)     **Interim Arrangements with Proposed Purchaser**:  In accordance with section 5.6 of the Purchase Agreement, Seller has agreed to follow the direction of Purchaser in connection with certain aspects of the pending foreclosure of the Georgetown Loan (*e.g.*, in certain circumstances, Seller shall postpone the foreclosure sale upon the request of the Purchaser to a date not later than 30 days beyond the scheduled closing date).  In addition, pursuant to section 5.6 of the Purchase Agreement, Seller has agreed not to take certain actions in respect of the foreclosure and the Georgetown Loan without Purchaser's consent (*e.g.*, conduct the foreclosure sale).  Section 5.6(b) of the Purchase Agreement limits Seller's ability to release property insurance proceeds to the Borrower without Purchaser's consent.

(h)     **Use of Proceeds**:  The Purchase Agreement does not provide for any use of Sale proceeds.

(i)     **No Tax Exemption**:    The Purchase Agreement does not seek any tax exemption.

(j)     **Record Retention**:  The entire Georgetown Loan file is being transferred pursuant to the Purchase Agreement.  Pursuant to section 3.5 of the Purchase Agreement, however, Seller will have the continuing right during the period commencing on the Closing Date and continuing until the fifth (5th) anniversary of the Closing Date to inspect and make extracts from or copies of documents in the Loan File, on reasonable notice to the Purchaser and at Seller's expense.  Before destruction of any document in the Loan File at any time during the period commencing on the Closing Date and continuing until the fifth (5th) anniversary of the Closing Date, Purchaser agrees to give reasonable notice to Seller and to allow Seller, at Seller's expense, to recover the document from Purchaser.

(k)     **No Sale of Avoidance Actions**:  The Purchase Agreement does not involve the sale of, or impose limitations on, any chapter 5 causes of action.

(l)     **Requested Findings as to Successor Liability**:  A condition to closing is entry of the Sale Order which is to provide that the Georgetown Loan is sold free and clear of all claims, liens, and encumbrances, including successor liability claims, other than the Designated Defenses.

(m) **Sale Free and Clear of Unexpired Leases**: The Purchase Agreement does not provide for a sale free and clear of any unexpired leases.

(n) **Credit Bidding**: The Purchase Agreement does not provide for credit bidding by the Purchaser pursuant to Bankruptcy Code section 363(k) of the Bankruptcy Code. Nothing herein prohibits the Secured Lenders (as defined below) from asserting credit bidding rights pursuant to Bankruptcy Code section 363(k), subject to any defenses that may be raised by any party in interest.

(o) **Relief from Bankruptcy Rule 6004(h)**: The Seller is requesting relief from the ten-day stay imposed by Bankruptcy Rule 6004(h).

### The Proposed Settlement under the Purchase Agreement

12. Georgetown Park Partners, LLC (the borrower under the Georgetown Loan) ("Borrower") and WDC Georgetown Park Manager LLC, the managing member of Georgetown Park Partners ("WDC Georgetown Manager"), each filed proofs of claim against CFI and CILP. The claims assert damages of $19.2 million for breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppels and detrimental reliance, breach of fiduciary duty, breach of the duty of loyalty, clogging the equity of redemption, equitable subordination, recoupment and setoff. The claims are also asserted as defenses to the enforcement of the Georgetown Loan. The claims consist of $3 million of a forfeited deposit under a loan purchase contract and $16.2 million as compensation for the difference between the purchase price under the loan purchase contract and the balance due on the Georgetown Loan.

13. The Purchase Agreement contemplates a Settlement through the release agreements (attached as Exhibits L and O to the Purchase Agreement) that would be executed and delivered at the closing of the Sale.[6] Pursuant to the release agreement attached as Exhibit L to the Purchase Agreement, WDC Holdings, LLC (the guarantor of the Georgetown Loan) ("Guarantor"), WDC Georgetown Manager, WDC Georgetown Park, LLC (the sole member of WDC Georgetown Manager) ("WDC Georgetown Member"), and Herbert Miller (a principal and direct or indirect

---

[6] A Qualifying Bid (as defined herein) need not include a release in favor of Seller

equity owner of the foregoing) are releasing CFI and its affiliates, including CILP, from all claims. In addition, at closing of the Sale to Purchaser, the Borrower and WDC Georgetown Manager will withdraw with prejudice their proofs of claims against the Debtors. It is contemplated that the Settlement (including the exchange of releases and the withdrawal of proofs of claim) will only be consummated in connection with the closing of the Sale to the Purchaser, and will not be consummated in connection with the closing of the Sale to a Successful Bidder (as defined herein) who is not the Purchaser.

14.    Pursuant to the release agreement attached as Exhibit O to the Purchase Agreement, CILP is releasing Guarantor, WDC Georgetown Manager, WDC Georgetown Member, the Borrower and Herbert Miller. CILP's release becomes void if any of the released parties (including Borrower) assert a claim against CILP or CFI.[7] CFI is not granting a release of such parties (as CFI's claims against those parties are part of the assets being sold to Purchaser).

15.    While Borrower is not granting a release pursuant to the Exhibit L release agreement, it is receiving a release pursuant to the Exhibit O release agreement, but such release will be voided if Borrower asserts a claim against CILP or CFI. Further, Borrower is withdrawing its proofs of claim filed in the Debtors' cases with prejudice.

16.    Also, the Purchase Agreement provides that Purchaser will provide a $3.3 million indemnification to CFI and its affiliates in respect of claims asserted by the Borrower Parties, i.e., Borrower, Guarantor, WDC Georgetown Manager, WDC Georgetown Member, Herbert Miller, and the Capmark equity members (i.e., Capmark Commercial Realty Partners II, L.P., Capmark Commercial Realty Partners IIA (REIT), Inc. and Commercial Realty Manager IIA (REIT), Inc.).

---

[7] CILP is not aware of any affirmative claims it has or may have against the parties being released.

## Bidding Procedures and the Auction

17.    To maximize the value of the Georgetown Loan, the Debtors seek to implement a competitive bidding process for the Sale of the Georgetown Loan to solicit higher or better offers in an orderly and efficient manner.  The proposed Auction and Bidding Procedures are as follows:

(a)    **Assets to Be Sold**:  The assets to be sold shall consist of the assets comprising the Georgetown Loan.

(b)    **Confidentiality Agreements**:  Upon execution of a confidentiality agreement, in form and substance satisfactory to the Seller, any party that wishes to conduct due diligence in respect of the Georgetown Loan may be granted access to all material information that has been or will be provided to Purchaser and other bidders; *provided, however*, that prior to receipt by a party of any information from the Seller (including, but not limited to, the Purchase Agreement and its schedules and exhibits, business and financial information and access to representatives of the Seller), each such party will be required to deliver evidence reasonably satisfactory to the Seller establishing such party's financial capability to timely consummate a purchase of the Georgetown Loan.

(c)    **Bid Deadline**:  Any person or entity interested in participating in the Auction must submit a Qualifying Bid (as defined below) on or before June 14, 2010 at 12:00 p.m. (noon) (Eastern Daylight Time) (the "Bid Deadline") in writing, to (i) counsel to the Debtors, Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York 10019, Attention:  Michael P. Kessler, Esq. and Judy G.Z. Liu, Esq., (ii) corporate counsel to the Seller, Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022, Attention:  Louis J. Hait, Esq. and Benjamin Mintz, Esq., (iii) Capmark Finance Inc., 485 Madison Avenue, New York, New York 10022, Attention: Jonathan Kohan, and (iv) counsel to the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attention:  Thomas Moers Mayer, Esq. and Joshua Brody, Esq.

(d)    **Qualifying Bids**:  To participate in the bidding process and be deemed a "Qualifying Bidder," each potential bidder (other than the Purchaser) must submit a "Qualifying Bid" by the Bid Deadline.  The Purchase Agreement is deemed a Qualifying Bid and Purchaser is deemed a Qualifying Bidder. Otherwise, to constitute a Qualifying Bid a bid must:

i.    Be in writing and state that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the Georgetown Loan on aggregate terms and conditions no less favorable to the Seller than the terms and

15

conditions contained in the Purchase Agreement, and with a cash purchase price of no less than the Purchaser's Purchase Price plus the Break-Up Fee, the Expense Reimbursement, and $500,000; *provided* that a Qualifying Bid need not include a release in favor of Seller from the Borrower Parties;

ii.    Have a purchase price consisting only of cash;

iii.   Provide details of any assumptions about the transaction that are key to the purchase price;

iv.    Include a mark-up of the Purchase Agreement (a "Modified Purchase Agreement") reflecting the variations from the Purchase Agreement, and a clean and executed Modified Purchase Agreement;

v.     Otherwise include terms and conditions substantially the same in all respects to the Purchase Agreement (including with respect to the representations and warranties);

vi.    Provide that such bidder's offer is irrevocable until the closing of the purchase of the Georgetown Loan if such bidder is the Successful Bidder or the Back-Up Bidder (each as defined below) including, without limitation, without regard to whether the Borrower under the Georgetown Loan becomes the subject of a bankruptcy proceeding;

vii.   State such bidder is financially capable of consummating the transactions contemplated by the Modified Purchase Agreement, and that there are no financing, due diligence, or other material contingencies for the bidder to consummate the Modified Purchase Agreement;

viii.  Provide that such bidder will close on the sale of the Georgetown Loan within the same time period provided for in the Purchase Agreement;

ix.    Include such financial and other information that will allow the Seller to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement;

x.     Include a statement that there are no conditions precedent to the bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

xi.    Not request or entitle the bidder to any transaction or break-up fee, termination fee, expense reimbursement, or similar type of payment;

xii.   Fully disclose the identity of each entity that will be bidding for the Georgetown Loan or otherwise participating in connection with such bid, and the complete terms of any such participation;

xiii.  Include any other information or factors that may be relevant to the Seller and its advisors in consideration of the bid; and

xiv.   Include a cash deposit by wire transfer equal to $10,000,000 (the "Good Faith Deposit") with such deposit being non-refundable on terms consistent with those set forth in the Purchase Agreement.

The Seller shall make a determination regarding whether a bid is a Qualifying Bid, after consultation with the Committee, and shall notify bidders whether their bids have been determined to be Qualifying Bids by no later than one hour before the start of the Auction.

(e)    **No Qualifying Bids**:  If no timely, conforming Qualifying Bids, other than the Purchase Agreement, are submitted by the Bid Deadline, the Seller shall not hold an Auction and, instead, shall request at the Sale Hearing that this Court approve the Purchase Agreement with Purchaser.

(f)    **Auction**:  In the event the Seller timely receives one or more Qualifying Bids other than the Purchase Agreement, the Seller shall conduct the Auction with respect to the Georgetown Loan.  The Auction will be held at the offices of Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022, on June 16, 2010 at 10:00 a.m. (Eastern Daylight Time), or such other location as designated by the Debtors in a notice to all Qualifying Bidders.  The Auction shall be governed by the following procedures (which may be amended, modified and waived, as applicable, by the Debtors at any time in their sole discretion after consultation with the Committee except that any such modification, amendment or waiver that is materially different than the Bidding Procedures set forth herein or that adversely affects Purchaser's rights in respect of the Deposit, the Break-Up Fee, or the Expense Reimbursement may not be made without Purchaser's consent):

i.    The Purchaser and the Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

ii.   Only representatives of the Debtors, the Purchaser, Qualifying Bidders, counsel and other advisors selected by the Committee, and representatives from the Office of the U.S. Trustee, shall be entitled to be present at the Auction;

iii.  Upon the commencement of the Auction, the identity of each Qualifying Bidder and the material terms of its Qualifying Bid shall be disclosed to all other Qualifying Bidders;

iv.   The Auction shall be transcribed by a qualified court reporter, unless otherwise provided herein;

17

v.    Only the Purchaser and Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

vi.   Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

vii.  Bidding shall commence at the amount of the highest Qualifying Bid submitted by the Qualifying Bidders prior to the Auction, as determined by the Seller after consultation with the Committee, and such bid shall be announced prior to the start of the Auction (the "Initial Highest Bid");

viii. Qualifying Bidders, including Purchaser, may submit subsequent bids to the Initial Highest Bid and all such subsequent bids must be stated in an amount exceeding each prior bid by $250,000 in cash purchase price consideration;

ix.   The Seller may determine the order in which Qualifying Bidders shall bid at the Auction;

x.    All Qualifying Bidders and the Purchaser shall be able to submit additional bids and make additional modifications to the Purchase Agreement or Modified Purchase Agreement, as applicable, at the Auction as determined by the Seller at any time in its sole discretion after consultation with the Committee;

xi.   The Debtors shall credit the amount of the Break-Up Fee and Expense Reimbursement to each and every bid submitted by Purchaser at the Auction meaning that if the Purchaser's subsequent bid is the then-highest and best bid at the Auction, any subsequent bid must exceed Purchaser's bid by the amount of the Break-Up Fee plus the Expense Reimbursement plus $250,000 in cash purchase price consideration.

xii.  The Auction may include individual negotiations with the Qualifying Bidders and the Purchaser and/or open bidding in the presence of all other Qualifying Bidders and the Purchaser;

xiii. Subject to Local Rule 6004(c)(ii)(D), the Seller may determine, in its sole discretion and after consultation with the Committee, whether and to what extent individual negotiations or discussions conducted with Qualifying Bidders during the Auction shall be transcribed;

xiv.  The Seller may, in its sole discretion and after consultation with the Committee, discuss any Qualifying Bid with other Qualifying Bidders individually or together in any other group or groups of Qualifying Bidders, as determined by the Seller;

xv.   The Auction shall continue until there is only one offer that the Seller determines, after consultation with the Committee and subject to

18

Court approval, is the highest and/or best offer for the Georgetown Loan from among the Qualifying Bids submitted at the Auction (the "Successful Bid"). In making this decision, the Seller may consider any factors it deems relevant, including, without limitation, the amount of the purchase price, the form of consideration being offered, the expense to the Debtors of any obligation to pay the Break-Up Fee and Expense Reimbursement, the likelihood of the Qualifying Bidder's ability to comply with the terms of the applicable Modified Purchase Agreement and otherwise close a transaction and the timing thereof, the number, type, and nature of any changes to the Purchase Agreement requested by each Qualifying Bidder, any contingencies relating to a Qualifying Bidder's offer, the extent of any releases or indemnities granted to Seller and the net benefit to the Debtors' estates. The Purchaser or Qualifying Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the applicable Purchase Agreement or Modified Purchase Agreement; and

xvi. Within three (3) days after conclusion of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments, or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Bids made after the close of the Auction shall not be considered by the Seller.

(g)    **Back-Up Bidder and Return of Good Faith Deposits**:

i. If an Auction is conducted, the Qualifying Bidder (including the Purchaser with respect to its offer in the Purchase Agreement) with the next highest or otherwise best Qualifying Bid, as determined by the Seller in the exercise of its business judgment at the Auction and in consultation with the Committee, shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until twelve (12) business days after the conclusion of the Auction. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the Sale with the Back-Up Bidder without further order of the Court.

ii. Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Seller as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) business day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall be held by the Debtors until the earlier of (a) thirteen (13) days after the conclusion of the Auction and (b) one

(1) business day after the closing of the Sale transaction with the Successful Bidder.

18. In accordance with Local Rule 6004-1(c), the Debtors note the following with respect to the Auction and the Bidding Procedures:

(a) **Provisions Governing Qualifications of Bidders**: *See* preceding paragraphs 17(d).

(b) **Provisions Governing Qualifying Bids**: *See* preceding paragraphs 17(d) and (e).

(c) **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**:

    i. No Shop or No-Solicitation Provisions: Pursuant to section 9.2(a) of the Purchase Agreement, Seller has agreed not to solicit or initiate any inquiry, offer or proposal from any person regarding the sale or other disposition of the Georgetown Loan between the date of the Purchase Agreement and the entry of the Bidding Procedures Order (or the earlier termination of the Purchase Agreement); *provided* that during such time, Seller is permitted to respond to unsolicited inquiries and offers to purchase the Georgetown Loan including supplying information in connection therewith. Following entry of the Bidding Procedures Order, Seller is not restrained from solicitation or from marketing the Georgetown Loan for sale. Seller is serving a copy of this Motion on prospective purchasers identified by Seller.

    ii. Break-Up/Topping Fees and Expense Reimbursement: *See* preceding paragraphs 17(d).

    iii. Bidding Increments: *See* preceding paragraph 17(f)(vii).

    iv. Treatment of Break-Up or Topping Fees and Expense Reimbursement at Auction: *See* preceding paragraphs 17(f)(x).

(d) **Modification of Bidding and Auction Procedures**: *See* preceding paragraphs 17(d) and (f).

(e) **Closing with Alternative Backup Bidder**: *See* preceding paragraph 17(g).

**Approval of the Bidding Procedures and the Auction**

19. Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe the Sale of the Georgetown Loan pursuant to a public auction governed by the proposed Bidding

Procedures will maximize the sale proceeds received by the estate, which is the paramount goal in any proposed sale of property of the estate. *In re Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS 2764, at *253 (Bankr. D. Del. Aug. 15, 2007) ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.") (internal citations omitted).

20.      The Bidding Procedures allow the Debtors to conduct the Sale process in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors receive the best possible consideration for the Georgetown Loan.  Bidding procedures should be approved when they provide a benefit to the estate by maximizing the value of the assets and enhance competitive bidding. *Id.* (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 535-37 (3d Cir. 1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate))   The Debtors believe the proposed Bidding Procedures are consistent with procedures previously approved in this district and others.

21.      Although the Debtors believe the value to be provided pursuant to the terms set forth in the Purchase Agreement is fair and reasonable, the Debtors submit that the Bidding Procedures and the Auction will ensure that the Debtors' estates receive the most value possible by allowing the market to test the Purchase Price of the Georgetown Loan.  The Debtors, thus, request the Court to approve the process and procedures set forth in the Bidding Procedures for the submission and consideration of competing bids for the Georgetown Loan from other interested parties.

### Approval of the Sale Hearing
### Schedule and Auction and Sale Hearing Notice

22.      The Debtors request that the Court schedule a Sale Hearing on or before June 22, 2010 at 3:00 p.m. (Eastern Daylight Time), or as soon as practicable thereafter, to consider approval of the Purchase Agreement and the Sale contemplated thereby, or the approval of any

higher or better offer, if any, resulting from an Auction. Bankruptcy Rule 6004(a) provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k), and if applicable, in accordance with section 363(b)(2) of the Code." Bankruptcy Rule 2002(a)(2) requires that Debtors give all creditors and certain other parties "at least 20 days' notice by mail" of the Sale. Bankruptcy Rule 6004(b) also provides that objections to the proposed Sale "shall be filed and served not less than five days before the date set for the proposed action or within the time fixed by the court."

        23.     The Auction and Sale Hearing Notice contains the type of information required under Bankruptcy Rule 2002(c), and also includes information regarding Auction procedures in the event a higher or better offer than the Purchase Agreement is received and an Auction is necessary. Therefore, the Debtors request the Court approve the form and manner of the Auction and Sale Hearing Notice. The Debtors propose at least 21 days' notice for the Sale Hearing, which complies with the notice procedures mandated by the Bankruptcy Rules, according to the following procedures:

        i.     The Debtors shall serve, within three (3) business days after entry of the Bidding Procedures Order (the "Mailing Deadline"), by overnight courier, electronic mail, or same-day messenger delivery, and copies of the Auction and Sale Hearing Notice upon: (i) the U.S. Trustee, (ii) counsel to the Committee, (iii) counsel to the Purchaser, (iv) any party who, in the past twelve (12) months, expressed in writing to the Debtors an interest in acquiring the Georgetown Loan, and who the Debtors and their representatives reasonably and in good faith determine potentially have the desire and financial wherewithal to effectuate the Sale, (v) all parties who are known to possess or assert a secured claim against the Georgetown Loan, (vi) the Internal Revenue Service, (vii) the Securities & Exchange Commission, (viii) all applicable state attorneys general, local realty enforcement agencies, and local regulatory authorities, (ix) any parties entitled to notice under Local Rule 2002-1(b), (x) each Borrower Party, (xi) Eastbanc, Inc., and (xii) Anthony Lanier.

ii.    On or before the Mailing Deadline, or as soon as practicable thereafter, the Debtors will publicize the Auction and Sale Hearing Notice in the Wall Street Journal (National Edition) for one business day.

24.    The Debtors submit that such notice shall constitute good and sufficient notice of the Auction and the Sale of the Georgetown Loan, and that no other or further notice is necessary. Accordingly, the Debtors request the Court to approve the form and manner of the Auction and Sale Hearing Notice.

## Approval of Objection Deadline

25.    The Debtors request that, pursuant to Bankruptcy Rule 9014, any objections to the Sale or Settlement (an "Objection") (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801, on or before 4:00 p.m. (Eastern Daylight Time) on June 18, 2010 (the "Objection Deadline"), or on such later date and time as the Debtors may agree; and (iv) be served with a copy on: (a) counsel for the Debtors, Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York 10019, Attention: Michael P. Kessler, Esq., and Judy G.Z. Liu, Esq.; (b) local counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attention: Mark D. Collins, Esq. and Jason M. Madron, Esq.; (c) corporate counsel to the Seller, Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022, Attention: Louis J. Hait, Esq. and Benjamin Mintz, Esq.; (d) counsel for Purchaser, Duval & Stachenfeld LLP, 101 Park Avenue, 11th Floor, New York, New York 10178, Attention: Kirk L. Brett, Esq.; (e) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (f) successor trustee under the prepetition senior unsecured floating rate note, 5.875% senior unsecured note, and 6.300% senior unsecured note indentures, Wilmington Trust FSB, 166 Mercer Street, Suite 2-R, New York, New York 10012-3249, Attention: Adam Berman; (g) counsel to the Committee, Kramer Levin Naftalis &

Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attention: Thomas

Moers Mayer, Esq. and Joshua Brody, Esq.; and (h) all parties requesting notice pursuant to

Bankruptcy Rule 2002 and Local Rule 2002-1(b).

### Basis for Requested Relief

**A.    Approval of the Sale and Settlement under Bankruptcy Code Sections
363(b), 105(a) and Bankruptcy Rule 9019 is Warranted**

26.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (providing

that debtors in possession have "all the rights . . . of a trustee"). In addition, section 105(a) provides

the authority for this Court to carry out the provisions of section 363(b). *See* 11 U.S.C. § 105(a)

("The court may issue any order, process, or judgment that is necessary or appropriate to carry out

the provisions of this title."). Although section 363(b) of the Bankruptcy Code does not specify a

standard for determining when it is appropriate for a court to authorize the use, sale or lease of

property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is

based upon the sound business judgment of the debtor. *In re Dura Auto. Sys.*, 2007 Bankr. LEXIS

at *258 (citing *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996)); *Comm. of Equity*

*Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts*

*Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business

judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson Ry. Co.*, 124

B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment"

test in *Abbotts Dairies*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)

(same).

27.    When a valid business judgment exists, the law vests the debtor's decision to

sell assets with a strong presumption that "in making a business decision, the directors of a

corporation acted on an informed basis, in good faith, and in honest belief that the action taken was in the best interests of the company." *In re Dura Auto. Sys*, 2007 Bankr. LEXIS, at *260 (citing *The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Von Gorkum*, 488 A.2d 858, 872 (Del. 1985))). Once a court is satisfied there is a sound business judgment for the proposed sale, the court must then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See, e.g., Del. and Hudson Ry. Co.*, 124 B.R. at 166.

28. The Debtors submit that the decision to sell the Georgetown Loan is based upon their sound business judgment and should be approved. Both before and after the Commencement Date, the Debtors have worked diligently to explore alternatives to sell certain of their business assets where such sales would provide greater value to the estates, relieve the Debtors of ongoing operational expenses, as well as mitigate any potential liability. In the Debtors' business judgment, the Georgetown Loan is such an asset. If no timely, conforming Qualifying Bids other than the Purchase Agreement are submitted by the Bid Deadline, the Debtors believe the prompt Sale of the Georgetown Loan to the Purchaser without an Auction and without further delay presents the best opportunity to maximize and preserve value for their estates.

29. The Seller has determined that the Sale of the Georgetown Loan provides the Seller with a more certain and timely recovery on the Georgetown Loan than that which would be realized through the Seller's continued exercise of remedies in respect of the matured Georgetown Loan. Seller has previously commenced foreclosure proceedings against the mortgage property securing the Georgetown Loan. The Seller believes the Borrower may take steps to oppose the foreclosure proceedings, including by filing bankruptcy, and by asserting claims and defenses against the Seller (as detailed in Borrower's proof of claim against Seller). In addition, EastBanc,

Inc. ("EastBanc") has a pending lawsuit against certain of the Borrower Parties and on account

thereof has filed a *lis pendens* against the property securing the Georgetown Loan. EastBanc has

filed a proof of claim against Seller asserting that it holds equitable title to the property securing the

Georgetown Loan and contending that if Seller obtains an ownership interest in the property

through a foreclosure, that such interest will be held in constructive trust for EastBanc. Importantly,

under the Purchase Agreement, the Purchaser has accepted the risks of these potential clouds on

title and as to the enforceability of the Georgetown Loan.

      30.    In addition, the Debtors believe their extensive prepetition marketing efforts,

arms'-length negotiations with Purchaser, and the proposed Bidding Procedures taken together will

achieve the best results for their estates and maximize value for all parties in interest. Thus, the

Debtors submit that the proposed Sale of the Georgetown Loan is within their sound business

judgment.

      31.    The Debtors further submit that the Settlement contemplated by the Purchase

Agreement is in the Debtors' best interests and should be approved as a settlement of the parties'

disputes under Bankruptcy Rule 9019. Bankruptcy Rule 9019(a) provides that "[o]n motion by the

trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R.

Bankr. P. 9019(a). Compromises are favored in bankruptcy so as to minimize litigation and

expedite a bankruptcy estate's administration. *In re Martin,* 91 F.3d 389, 393 (3d Cir. 1996) ("The

decision of whether to approve a particular compromise lies within the discretion of the Bankruptcy

Judge and pursuant to Bankruptcy Rule 9019(a).").

      32.    In ruling on a settlement motion pursuant to Bankruptcy Rule 9019(a), the

court must find that the proposed settlement is fair and equitable and in the best interests of the

debtor's estate. *See Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v.*

*Anderson,* 390 U.S. 414, 424 (1968); *In re Nutraquest, Inc.,* 434 F.3d 639, 644 (3d Cir. 2006).

Under the fair and equitable standard, courts look to the fairness of the settlement to other persons not party to the settlement. *In re Nutraquest, Inc*, 434 F.3d at 645. In doing so, the court should examine the settlement and determine whether it "falls below the lowest point in the range of reasonableness." *Official Unsecured Creditors' Comm. of Pennsylvania Truck Lines, Inc. v. Pennsylvania Truck Lines, Inc. (In re Pennsylvania Truck Lines)*, 150 B.R. 595, 598 (E.D. Pa. 1992), *aff'd*, 8 F.3d 212 (3d Cir. 1993); *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 390, 396 (Bankr. E.D. Pa. 1986); *In re World Health-Alternatives, Inc*, 344 B.R. 291, 296 (Bankr. D. Del. 2006).

33.    Courts in the Third Circuit also consider the following four criteria when faced with a proposed settlement: "(1) the probability of success in the litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d at 393; *In re Nutraquest, Inc.*, 434 F.3d at 644-45. While not among the four factors generally considered when reviewing a proposed settlement, participation by sophisticated parties and counsel is an additional factor considered by some courts. *See In re Ionosphere Clubs*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994). The decision to approve or deny a particular compromise or settlement involving a bankruptcy estate thus lies within the sound discretion of the court. *See, e.g*, *In re Martin*, 91 F.3d at 393.

34.    Considering all the complex facts underlying the various issues involved in the disputes of the parties relating to the Settlement and the great time and expense that would be involved in litigating these disputes to a final resolution, the Debtors submit the proposed Settlement is fair and equitable under the circumstances, falls well within the range of reasonableness, and should be approved in all respects. Applying the standard set forth in *Martin* and *TMT Trailer Ferry*, this Court should approve the Settlement as a fair and equitable

compromise because (i) the probability of success in the litigation over the disputes is unknown and uncertain; (ii) there would be difficulties in collection; (iii) the benefits of the Settlement, as compared to the complexity of the alleged claims and the expense, inconvenience and delay inherent in protracted litigation related to each of the disputes, outweighs the risks associated with fully litigating the merits; and (iv) the Settlement is fair and equitable and in the best interests of the Debtors and their creditors. The Settlement was approved by the Debtors in the exercise of their sound business judgment following difficult, protracted, arms'-length negotiations with the other settling parties.

*The Benefits of the Settlement Compared to the Costs of Litigation*

35.    Each of the settling parties is represented by competent and sophisticated counsel, who would vigorously prosecute and defend their clients' respective claims with respect to the matters resolved in the Settlement. While the Debtors believe they have strong defenses to the claims that were asserted against them, there is no assurance the various litigations would be resolved in a more favorable manner to the Debtors' estates than the result negotiated in the Settlement.

*The Difficulties in Collection*

36.    In determining whether to approve settlements, courts review whether difficulties in collection of any eventual awards or judgments would result in substantially lower recoveries for most, if not all, creditors. *See In re Key3Media Group, Inc.*, 336 B.R. 87, 97 (Bankr. D. Del. 2005). As more fully set forth below, the Debtors submit that the Settlement, as opposed to protracted litigation, will result in greater and sooner recoveries for all creditors in these chapter 11 cases by facilitating the Sale and the withdrawal of certain proofs of claim filed in the Debtors' cases, with prejudice.

*Prospect of Complex and Protracted Litigation if the Settlement is Not Approved*

37.    The complexity of the disputes surrounding the Settlement, and their impact on the Sale, and the expenses necessarily attendant with protracted litigation related thereto, strongly militates in favor of approving the Settlement.

38.    Indeed, resolution of these issues may involve a protracted and expensive claim objection process, involving substantial attorneys' and experts' fees and costs that could eventually negate significant value and recoveries that the proposed Settlement and Sale is designed to provide to the Debtors and their estates.  The Settlement further obviates any ongoing need for the Debtors' management to devote time and resources to assisting counsel to litigating the disputes, and instead, frees up human resources to focus on the timely administration and resolution of these chapter 11 cases.

*The Settlement is in the Best Interest of Creditors*

39.    Upon analysis of the foregoing arguments, the Debtors believe that if the Settlement is not approved, creditors could receive diminished and much later distributions in these cases.  Based on the foregoing, the Debtors believe the terms and conditions of the Settlement are fair and reasonable in light of the costs and potential risks associated with protracted litigation over the disputes.

40.    In summary, the mutual releases contemplated by the Purchase Agreement are fair and equitable, in the best interests of the Debtors' creditors, and represent the Debtors' sound business judgment, and, if the Sale is to Purchaser, the transactions contemplated by the Purchase Agreement should be approved in all respects by the Court pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

**B.      Sale of the Georgetown Loan Free and Clear of Interests is Warranted**

41.      Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions are satisfied:

(1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)      such entity consents;

(3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)      such interest is in bona fide dispute; or

(5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).   The Debtors believe one or more of these tests in section 363(f) of the Bankruptcy Code are easily satisfied with respect to the proposed Sale.

42.      On December 22, 2009, this Court entered the *Final Order (I) Authorizing Use of Certain Cash Collateral Postpetition and (II) Providing Adequate Protection to Prepetition Secured Parties in Connection Therewith* [Docket No. 517] (the "Cash Collateral Order").   The Cash Collateral Order contains, among other things, a procedure by which the Debtors must obtain the consent of the Debtors' secured lenders (the "Secured Lenders") to sell certain loans comprising part of the collateral held as security for that certain $1.5 billion Term Loan Credit and Guaranty Agreement, dated as of May 29, 2009 (the "Collateral").   Specifically, Paragraph 9 of the Cash Collateral Order authorizes the Debtors to sell Collateral, for which (i) the unpaid principal balance of such Collateral is in excess of $10 million or (ii) the total proceeds for the sale of such Collateral are in excess of $10 million, but in each case, only so long as the Debtors give prior written notice of the sale and at least seventy percent (70%) of the Secured Lenders do not object in writing within five (5) business days of receipt of notice of the proposed sale.   The Georgetown Loan comprises part of the Collateral, and the Debtors have provided notice of the Sale and this Motion to the

Secured Lenders. Any such Lien of the Secured Lenders over the Georgetown Loan shall attach to the Sale proceeds received in accordance with the Cash Collateral Order and the Prepetition Secured Credit Documents (as defined in the Cash Collateral Order). Nothing herein prohibits the Secured Lenders from asserting credit bidding rights pursuant to Bankruptcy Code section 363(k), subject to any defenses that may be raised by any party in interest.

43.     Section 363(f)(2) applies to those parties that have failed to object to or otherwise dispute the Sale. As dozens of courts have recognized, where an entity has not objected to a section 363 sale, consent may be implied for purposes of section 363(f)(2). *See, e.g.*, *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002) (in context of section 363(f), "lack of objection (provided of course there is notice) counts as consent."); *In re James*, 203 B.R. 449, 453 (Bankr. W.D. Mo. 1997) (section 363(f)(2) satisfied where secured creditor failed to object to proposed sale and thus "implicitly conveyed its consent to the sale"); *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (because of tax lien holder's failure to object to sale, it "may be deemed to have consented to the sale for purposes of section 363(f)(2)"); *In re Elliot*, 94 B.R. 343, 345-46 (E.D. Pa. 1988) (implied consent sufficient to authorize section 363(f)(2) sale; consent implied from non-debtor that "received notice of the proposed sale and also admits that it did not file any timely objection."); *In re Gabel*, 61 B.R. 661, 664-65 (Bankr. W.D. La. 1985) (estopping secured creditor that was properly noticed and failed to object from denying its implied consent to sale of property under 363(f)).

44.     Further, the Debtors believe the rights of any claimant could be valued and allowed as a claim against CFI's estate and the claimant could be compelled to accept a money satisfaction of its interest in the property, thus satisfying section 363(f)(5). *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289, 291 (3d Cir. 2003) (the Court of Appeals for the Third Circuit held that section 363(f)(5) was satisfied in respect of successor liability claims because "[h]ad TWA

31

liquidated its assets under Chapter 7 of the Bankruptcy Code, the claims at issue would have been converted to dollar amounts and the claimants would have received the distribution provided to other general unsecured creditors on account of their claims.").

45.    Because the section 363(f) requirements have been met, Purchaser should not be liable, as a successor to the Georgetown Loan or otherwise, for any of the Debtors' pre-petition liabilities, unless expressly assumed. As a matter of logic, bankruptcy estates would be unable to sell assets for fair value if the estates' liabilities followed the assets. The Third Circuit Court of Appeals has held that a buyer of a debtor's assets pursuant to sections 363(b) or 363(f) takes free from successor liability resulting from any pre-existing claims. *See*, *e.g.*, *In re Trans World Airlines, Inc*, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of . . . successor liability claims achieves the purpose of [Bankruptcy Code] section 363 intended by Congress"), *aff'd*, 332 F.3d 283, 285 (3d Cir. 2003) ("Because section 363(f) of the Bankruptcy Code permits a sale of property 'free and clear' of an 'interest in such property' and because the claims against TWA here were connected to or arise from the assets sold, we affirm the Bankruptcy Court's order approving the sale 'free and clear' of successor liability.").

46.    The Georgetown Loan is not being sold free and clear of the Designated Defenses[8] and the Purchaser or the Successful Bidder will acquire the Georgetown Loan subject to the Designated Defenses, if any.

---

[8] The Purchase Agreement defines "Designated Defenses" as:

[O]nly (a) any claims of the Borrower Parties, (b) any defenses of the Borrower Parties to the enforcement of the [Georgetown] Loan or the Mortgage, (c) any claims or defenses of Eastbanc, Inc, Anthony Lanier or any other person or entity, with respect to the rights of the holder of the [Georgetown] Loan or the Mortgage against the Property, and (d) any claims or defenses of any person or entity arising after the Closing Date; *provided, however*, that the term "Designated Defenses" shall not include any claim by any person for the recovery of money or property previously transferred to Seller or its Affiliates, including any claim for recovery of principal, interest, or other payments made to Seller and any claim for the recovery of damages arising from conduct of the Seller or its Affiliates occurring prior to the Closing Date; and *provided, further*, that nothing contained in this Agreement shall prejudice or adversely affect Purchaser's right or ability to assert claims, counterclaims, defenses or other arguments in respect of the Designated

**C.    Finding of Good Faith is Warranted**

47.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Seventh Circuit in *In re Andy Frain Serv., Inc*, held that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

798 F.2d 1113, 1125 (7th Cir. 1986) (emphasis and citations omitted).

48.    Purchaser is an entity unrelated to the Debtors. The Purchase Agreement was intensely negotiated at arms'-length, all parties involved acted in good faith, and each party was represented by sophisticated counsel. The Debtors are unaware of any facts or circumstances that might compromise or taint Purchaser's good faith in negotiating and entering into the Purchase Agreement.[9] Accordingly, the Debtors request the Court to find that Purchaser has acted in good

---

Defenses, including the right to assert that defenses to the enforcement of the Loan and any constructive trust claim of Eastbanc, Inc. or Anthony Lanier are without merit.

[9] Purchaser has represented and disclosed in the Purchase Agreement that:

Neither Borrower, any Affiliate of Borrower nor any Person owning a direct or indirect legal or beneficial ownership interest in Borrower owns any direct or indirect legal or beneficial ownership interest in Purchaser (and will not own any direct or indirect legal or beneficial ownership interest in any assignee pursuant to Section 8.12); provided, however, Seller acknowledges that Purchaser has disclosed to Seller that Purchaser has entered into a consulting and services arrangement with Western Development Corporation, a Maryland corporation ("WDC") pursuant to which WDC may obtain fees and other benefits for services rendered in connection with the future development of the Property and such arrangement shall not be deemed to be a breach of this Section 4.1(f).

Purchase Agreement § 4.1(f). The Seller does not believe that Purchaser's arrangement with WDC, a party related to certain of the Borrower Parties, in any way compromises or taints Purchaser's good faith in negotiating and entering into the Purchase Agreement.

RLF1 3571522v 1

faith and is entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

> **D.    The Break-Up Fee and Expense Reimbursement are Reasonable and Appropriate**

49.    Bidding incentives, such as the Break-Up Fee and Expense Reimbursement, encourage potential purchasers to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." *In re S N A. Nut Co* , 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); *see also In re 995 Fifth Ave. Assoc. L.P* , 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

50.    A proposed bidding incentive, such as the Break-Up Fee, should be approved when it is in the best interests of the estate. *S.N.A Nut*, 186 B.R. at 104; *see also In re Am West Airlines, Inc* , 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus , Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. *In re O'Brien Envtl Energy*, 181 F.3d 527 at 533 (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context); *see also In re Reliant Energy Channelview LP*, 2010 U.S. App. LEXIS 956, at *1-20 (3d Cir. Jan. 15, 2010) (same).

51.    Here, the Break-Up Fee and Expense Reimbursement will be paid in the event the Georgetown Loan is sold to a bidder presenting a higher or better offer than that of

34

Purchaser, taking into account the Break-Up Fee and Expense Reimbursement in comparing offers.[10]  In such case, the Debtors will receive more than the Purchase Price offered by Purchaser. Further, the stalking horse bid is expressly conditioned on approval of the Break-Up Fee and Expense Reimbursement contemplated by the Bidding Procedures Order.  Consequently, the Debtors' estates will benefit from the floor set by Purchaser's offer, and it is an actual and necessary cost of preserving the estates.

52.    "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *In re Integrated Res., Inc.*, 147 B.R. at 660.  As is customary, the Break-Up Fee and Expense Reimbursement required by the Purchaser are compensation for investing considerable time and expense in negotiating and entering into the Purchase Agreement.  The Debtors do not believe the Break-Up Fee and Expense Reimbursement will stifle bidding.  To the contrary, the Debtors believe that, should an auction be held, the Break-Up Fee and Expense Reimbursement will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *Id.* at 662.  If the Georgetown Loan is sold to a competing bidder, the sale likely will be the result of Purchaser's crucial role as an initial bidder generating interest in the assets and establishing a minimum acceptable price.

53.    In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and

---

[10] The Purchaser may also be entitled to receive the Break-Up Fee and Expense Reimbursement if Seller fails or refuses to consummate the Closing for any reason other than Seller's failure to obtain required authorizations from the Bankruptcy Court or if Seller defaults on any of its material obligations under the Purchase Agreement including by breaching in any material respect a representation or warranty set forth in the Purchase Agreement.  In addition, the Purchaser may be entitled in certain circumstances to receive the Expense Reimbursement if the Bidding Procedures Order is entered but the Sale Order is not ultimately entered (except as a direct result of Purchaser's breach of its obligations under the Purchase Agreement or because the Bankruptcy Court is unwilling to conclude that the Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code).

35

expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." *Id.* The Break-Up Fee is equal to approximately 2.53% of the Purchase Price (and together with the Expense Reimbursement, is 3.47% of the Purchase Price as defined in the Purchase Agreement) which is within the range of break-up fees typically paid in sales transactions that have been approved by this Court. *See, e.g.*, *In re Maxide Acquisition, Inc.*, No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (approving break-up fee of 3%, or $2.5 million, in connection with a $75 million sale); *In re Ameriserve Food Distrib., Inc.*, No. 00-00358 (PJW) (Bankr. D. Del. June 15, 2000) (approving break-up fee of 3.6%, or $4 million, in connection with $110 million sale). Given the size of the Purchase Price, the Debtors, in their business judgment, believe the amount of the Break-Up Fee, $1,340,000, is appropriate, and also submit that the Expense Reimbursement of $500,000 is appropriate (which, together, approximate 3.5% of the gross Purchase Price).

54.    For these reasons, the Debtors respectfully request that the Court approve the Break-Up Fee and Expense Reimbursement.

**Relief from Ten-Day Waiting Periods**

55.    The Debtors request the Court to waive the ten-day stay period under Bankruptcy Rules 6004(h) and order that, if and when entered, the Sale Order be effective immediately. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of ten days after entry of the order, unless the court orders otherwise."

56.    The purpose of these rules is to provide sufficient time for an objecting party to appeal before an order is effective. *See* Advisory Committee Notes to Bankruptcy Rule 6004(h). Although these rules and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the ten-day stay period, Collier on Bankruptcy suggests the ten-day stay

period should be waived to allow a transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶ 6004.10 (15th rev. ed. 2006). Further, it suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

### Notice

57.    No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion shall be provided on the date hereof by U.S. first-class mail to (i) the U.S. Trustee, (ii) counsel to the agent for the Secured Lenders, (iii) counsel to the Purchaser, (iv) Wilmington Trust FSB, as successor trustee under the prepetition senior unsecured floating rate note, 5.875% senior unsecured note, and 6.300% senior unsecured note indentures, (v) counsel to the Committee, (vi) any party who, in the past twelve (12) months, expressed in writing to the Debtors an interest in acquiring the Georgetown Loan, and who the Debtors and their representatives reasonably and in good faith determine potentially have the desire and financial wherewithal to effectuate the Sale, (vii) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b), (viii) each Borrower Party, (ix) Eastbanc, Inc., and (x) Anthony Lanier. The Debtors submit that no other or further notice need be provided.

### No Previous Request

58.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request (i) entry of the proposed Bidding Procedures Order, (ii) at the completion of the Sale Hearing, entry of the Sale Order approving the Sale of the Georgetown Loan to Purchaser and the Settlement related thereto, or, in the event of a higher or better offer is received at an Auction, approving the Sale to the Successful Bidder (which would not include approval of the Settlement if the Sale is not to Purchaser), and (iii) such other and further relief as the Court may deem just and appropriate.

Dated: May 14, 2010
      Wilmington, Delaware

                    Mark D. Collins (No. 2981)
                    Paul N. Heath (No. 3704)
                    Jason M. Madron (No. 4431)
                    Lee E. Kaufman (No. 4877)
                    RICHARDS, LAYTON & FINGER, P.A.
                    One Rodney Square
                    920 North King Street
                    Wilmington, Delaware 19801
                    Telephone:  302.651.7700
                    Facsimile:  302.651.7701

                    -and-

                    Martin J. Bienenstock
                    Michael P. Kessler
                    Judy G.Z. Liu
                    DEWEY & LEBOEUF LLP
                    1301 Avenue of the Americas
                    New York, New York 10019
                    Telephone:  212.259.8000
                    Facsimile:  212.259.6333

                    *Attorneys for the Debtors and Debtors in Possession*

38