# Exhibit C

**Purchase Agreement**

**LOAN PURCHASE AND SALE AGREEMENT**

**Between**

**CAPMARK FINANCE INC., debtor in possession**

**and**

**ANGELO GORDON REAL ESTATE INC., a Delaware corporation**

# TABLE OF CONTENTS

Page

Article I DEFINITIONS AND RULES OF CONSTRUCTION ........................................ 1
    Section 1.1    Definitions ............................................................................. 1
    Section 1.2    Rules of Construction ........................................................... 1

Article II SALE AND PURCHASE OF THE LOAN ...................................................... 1
    Section 2.1    Agreement to Sell and Purchase the Loan ......................... 1

Article III THE CLOSING ................................................................................................. 1
    Section 3.1    Time and Location of the Closing ...................................... 1
    Section 3.2    Payment of and Adjustment to Purchase Price ................. 2
    Section 3.3    Purchaser's Closing Documents ......................................... 4
    Section 3.4    Seller's Closing Documents ................................................ 5
    Section 3.5    Delivery of the Loan File .................................................... 6
    Section 3.6    Recording and Filing Closing Documents ......................... 6
    Section 3.7    Servicing the Loan .............................................................. 6
    Section 3.8    Confidentiality .................................................................... 6
    Section 3.9    Title Insurance .................................................................... 6
    Section 3.10   No Continuing Interest in Loan .......................................... 7
    Section 3.11   Payments after Closing ...................................................... 7

Article IV PURCHASER'S REPRESENTATIONS, WARRANTIES AND
    AGREEMENTS ....................................................................................................... 7
    Section 4.1    Certain Representations ...................................................... 7
    Section 4.2    No Reliance ......................................................................... 8
    Section 4.3    No Securities ..................................................................... 10
    Section 4.4    Environmental, Seismic, Engineering and Structural Risks ........ 10
    Section 4.5    Litigation .......................................................................... 10

Article V SELLER'S REPRESENTATIONS, WARRANTIES AND AGREEMENTS ............ 10
    Section 5.1    No Implied Representations or Warranties ...................... 10
    Section 5.2    Seller's Representations and Warranties ......................... 11
    Section 5.3    Survival Period ................................................................. 12
    Section 5.4    Reserve Accounts ............................................................. 13
    Section 5.5    Brokers .............................................................................. 13
    Section 5.6    Loan; Foreclosure Proceeding ......................................... 13

Article VI DEFAULTS AND REMEDIES AND OTHER TERMINATION RIGHTS .............. 15
    Section 6.1    Seller's Remedies ............................................................. 15
    Section 6.2    Purchaser's Remedies ...................................................... 15
    Section 6.3    Other Termination Rights ................................................. 17

Article VII INDEMNIFICATION and release ................................................................ 17
    Section 7.1    Indemnification ................................................................. 17
    Section 7.2    Notice and Defense of Claims ......................................... 18

Page

Section 7.3    Settlement ........................................................................ 20
Section 7.4    Environmental Indemnity ................................................ 20
Section 7.5    Release ............................................................................ 20

Article VIII MISCELLANEOUS ................................................................ 21
Section 8.1    Notices ............................................................................ 21
Section 8.2    Applicable Law ............................................................... 21
Section 8.3    Seller's Discretion .......................................................... 21
Section 8.4    Unenforceable Provisions ............................................... 21
Section 8.5    Survival ........................................................................... 22
Section 8.6    Entire Agreement ............................................................ 22
Section 8.7    No Oral Amendment........................................................ 22
Section 8.8    Time of the Essence ........................................................ 22
Section 8.9    Successors and Assigns.................................................... 22
Section 8.10   Duplicates and Counterparts ........................................... 22
Section 8.11   Rights Cumulative; Waivers............................................ 22
Section 8.12   Assignment ..................................................................... 23
Section 8.13   Fees and Expenses .......................................................... 23
Section 8.14   [Intentionally Omitted]. .................................................. 23
Section 8.15   Waiver of Jury Trial........................................................ 23
Section 8.16   Seller's Authority; Bankruptcy Court Authorization.................. 23
Section 8.17   No Third Party Beneficiaries .......................................... 23
Section 8.18   Headings ......................................................................... 24
Section 8.19   Jurisdiction; Venue; Consent to Service of Process ....... 24
Section 8.20   Further Actions ............................................................... 24

Article IX BANKRUPTCY COURT MATTERS ........................................ 24
Section 9.1    Approval of Break-Up Fee and Expense Reimbursement........... 25
Section 9.2    Competing Transaction.................................................... 25
Section 9.3    Bankruptcy Court Filings................................................. 26
Section 9.4    Notice of Sale.................................................................. 27
Section 9.5    Treatment of Monetary Obligations................................. 27
Section 9.6    Prevailing Party Legal Fees ............................................ 27

List of Exhibits

Exhibit A - The Loan
Exhibit B - Definitions
Exhibit C - Rules of Construction
Exhibit D - Escrow Agent's Wiring Instructions
Exhibit E - Receipt for Loan File
Exhibit F - Form of Notice of Withdrawal
Exhibit G - Form of Allonge
Exhibit H - Form of Bill of Sale, Assignment and Assumption of Notes and Loan Documents
Exhibit I - Form of Notice to Borrower
Exhibit J - Escrow Provisions
Exhibit K - Loan Documents
Exhibit L - Release of Lender Agreement
Exhibit M - Form of Guaranty
Exhibit N - Certificate of Assistant Secretary
Exhibit O - Release By Capmark Investments LP
Exhibit P - Bidding Procedures Order
Exhibit Q - Sale Order

i

## LOAN PURCHASE AND SALE AGREEMENT

THIS LOAN PURCHASE AND SALE AGREEMENT made as of May 10, 2010 by and between CAPMARK FINANCE INC., debtor in possession (**"Seller"**), having an address at 485 Madison Avenue, New York, New York 10022, and ANGELO GORDON REAL ESTATE INC., a Delaware corporation (**"Purchaser"**), having an address at c/o Angelo, Gordon & Co., L.P., 245 Park Avenue, 26th Floor, New York, New York 10167.

RECITALS:

A.    Seller is the owner of the loan described on **Exhibit A** (the **"Loan"**);

B.    On October 25, 2009, Seller filed a voluntary petition (the "**Bankruptcy Case**") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware; and

C.    Seller wishes to sell the Loan and Purchaser, having conducted its own due diligence review of the Loan and the Property (as defined in **Exhibit B**), wishes to purchase the Loan, in accordance with Section 363 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are expressly acknowledged, Seller and Purchaser agree as follows:

<strong>ARTICLE I</strong>

<strong>DEFINITIONS AND RULES OF CONSTRUCTION</strong>

Section 1.1    Definitions.  Capitalized terms used in this Agreement are defined in Exhibit B or in the body of this Agreement with a cross-reference in Exhibit B.

Section 1.2    Rules of Construction.  This Agreement will be interpreted in accordance with the rules of construction set forth in Exhibit C.

<strong>ARTICLE II</strong>

<strong>SALE AND PURCHASE OF THE LOAN</strong>

Section 2.1    Agreement to Sell and Purchase the Loan.  Seller agrees to sell and Purchaser agrees to purchase the Loan and the Loan File in accordance with this Agreement.

<strong>ARTICLE III</strong>

<strong>THE CLOSING</strong>

Section 3.1    Time and Location of the Closing.  The Closing will occur at 10:00 AM (EST) on the date (the "Closing Date") (TIME BEING OF THE ESSENCE with respect to

the Closing Date) that is the first Business Day following the passing of three (3) Business Days after the entry of the Sale Order, provided that (i) no appeal has been made thereunder during such three (3) Business Day period challenging the finding by the Bankruptcy Court that the Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (ii) as of the Closing Date, the Sale Order (x) has not been revoked or modified in any manner materially adverse to Purchaser without Purchaser's consent, and (y) is not subject to a stay. The Closing will take place at Seller's attorney's offices at Kaye Scholer LLP, 425 Park Avenue, New York, New York or at such other location as Seller and Purchaser may agree.

Section 3.2    Payment of and Adjustment to Purchase Price

.

(a)    Purchaser shall pay to Seller, as consideration for the purchase of the Loan, an amount equal to FIFTY THREE MILLION DOLLARS ($53,000,000) (**"Base Purchase Price"**), adjusted as follows (as so adjusted, the "**Purchase Price**"):

(i)    the Base Purchase Price shall be decreased by any amounts received by Seller after the date hereof which are applied by Seller to reduce the principal balance of the Loan including, without limitation, amounts applied to reduce such principal balance pursuant to Section 2(b) of the Cash Management Agreement;

(ii)    the Base Purchase Price shall be increased by the lesser of (A) the amount (calculated as of the Closing Date) of all accrued and unpaid interest (at the non-default rate) on the Loan for the period from and including February 15, 2010 (or, if later, the date through which interest on the Loan at the non-default rate has been paid as of the Closing Date, including pursuant to Section 2 of the Cash Management Agreement and/or as contemplated in Section 5.2(f)) through the Closing Date, and (B) the net operating income for such period as determined in good faith by Seller; and

(iii)the B    ase Purchase Price shall be increased by the aggregate amount of any so called "protective advances" reasonably made by Seller to the extent permitted under the Loan Documents after the date hereof but only to pay (1) insurance premiums the due and unpaid, (2) real estate taxes that are due and payable (i.e. delinquent), and (3) life safety matters and to protect the collateral from imminent damage (it being agreed by Seller that as of the date hereof Seller is not aware of the need for any protective advances).

The Purchase Price shall be payable as provided in paragraphs (b), (c) and (d) below.

(b)    By no later than 5:00 PM (EDT) on May 10, 2010, TIME BEING OF THE ESSENCE WITH RESPECT TO SUCH TIME AND DATE, Purchaser shall pay a deposit of $10,000,000 (together with interest earned thereon, the "**Deposit**") by wire transfer of such amount in immediately available federal funds to Fidelity National Title Insurance Company ("**Escrow Agent**") to the account designated by the Escrow Agent pursuant to the wiring instructions set forth on **Exhibit D** attached hereto. If Purchaser fails to pay the Deposit as and when required under this paragraph then Seller shall have the right to terminate this Agreement by written notice to Purchaser given at any time prior to the funding of the Deposit by Purchaser to Escrow Agent, in which case neither Seller nor Purchaser shall have any further rights or

obligations under this Agreement, except those, if any, which are expressly stated to survive the termination of this Agreement. The Escrow Agent shall hold and pay over the Deposit in accordance with the provisions set forth on **Exhibit J** attached hereto. Except as otherwise expressly provided in this Agreement, the Deposit shall be non-refundable to Purchaser. The Deposit shall form no part of the Seller's chapter 11 bankruptcy estate under section 541(a) of the Bankruptcy Code or otherwise, and the Seller shall claim no right, title or interest in the Deposit other than as set forth herein.

(c)     The Purchase Price less the Deposit shall be paid by Purchaser to Seller on the Closing Date by delivery of such amount to Seller by wire transfer of immediately available funds to an account specified in writing by Seller. The Escrow Agent shall deliver the Deposit to Seller on the Closing Date.

(d)     On the Closing Date, Seller shall transfer to the Purchaser by wire transfer in immediately available funds (i) an amount equal to all positive Reserve Account Balances (if any) as of the Closing Date (subject to the provisions of Section 5.4), (ii) an amount equal to the then balance, if any, in the New Lockbox Account, and (iii) any other funds of Borrower then held by Lender and not previously applied by Lender pursuant to Section 3.2(e), Section 5.4 or any other provisions of this Agreement or of the Loan Documents.

(e)     Provided that Purchaser is not in breach of any of its material obligations hereunder for more than three (3) Business Days after written notice from Seller of such breach, Seller agrees (A) not to apply any cash revenues of the Property (other than proceeds of insurance or condemnation awards) that Seller receives during the term of this Agreement (or which Seller may be holding on the date hereof) for any purpose other than (i) to pay accrued and unpaid interest (at the non-default rate) on the Loan, (ii) to repay any principal amount of the Loan or (iii) to apply any such revenues as required under any of the Loan Documents (i.e. application is not at the discretion of Seller) or, subject to Section 3.2(f) below, as required or permitted under the Cash Management Agreement and (B) not to apply any proceeds of insurance or condemnation awards that Seller receives during the term of this Agreement (or which Seller may be holding on the date hereof) other than in accordance with the provisions of Section 5.6(b). Subject to the provisions of Section 5.6(b), nothing in this Agreement shall be construed so as to restrict or limit Seller from applying any such cash revenues as set forth in the immediately preceding sentence.

(f)     Notwithstanding anything to the contrary contained in this Agreement:

(i) Seller shall have the right throughout the term of this Agreement to take any and all actions that Seller determines to be reasonably necessary to implement the terms of the Cash Management Agreement;

(ii) provided that Purchaser is not in breach of any of its material obligations hereunder for more than three (3) Business Days after written notice from Seller of such breach, Seller shall not apply funds paid to Lender pursuant to Section 2(b) of the Cash Management Agreement other than to pay any then accrued and unpaid interest (at the non-default rate) and/or principal.

(iii) provided that Purchaser is not in breach of any of its material obligations hereunder for more than three (3) Business Days after written notice from Seller of such breach, Seller shall not apply funds in the New Lockbox Account other than substantially in accordance with the Cash Management Agreement and, as to any funds held by Lender pursuant to Section 2(d) of the Cash Management Agreement, Seller shall not apply such funds other than to pay accrued and unpaid interest (at the non-default rate) on the Loan or for the purposes described in Section 3.2(a)(iii) or for the actual out-of-pocket costs of any action taken by Seller pursuant to the 2nd, 3rd or 4th sentences of Section 5.6(a).

(iv) provided that Purchaser is not in breach of any of its material obligations hereunder for more than three (3) Business Days after written notice from Seller of such breach, Seller agrees (A) if Seller determines that it is reasonably necessary to pay any sums for the purposes described in Section 3.2(a)(iii), Seller will first use any then balance of funds in the "Suspension Reserve" for such purpose before making any "protective advances" for such purpose and (B) Seller shall not apply any funds in the "Suspension Reserve" other than to pay accrued and unpaid interest at the non-default rate or for the purposes described in Section 3.2(a)(iii) (but Seller shall not use more than $86,565.05 of funds in the Suspense Reserve for the purposes described in Section 3.2(a)(iii)).

Section 3.3    Purchaser's Closing Documents. Purchaser will deliver (or cause to be delivered) the following Closing Documents to Seller at the Closing:

(i)    an executed receipt for the Loan File, in the form of **Exhibit E**;

(ii)    a copy of an executed Notice of Withdrawal of Proofs of Claim in the form attached hereto as **Exhibit F** which has been filed with the Bankruptcy Court, together with evidence of such filing;

(iii)an    executed Bill of Sale, Assignment and Assumption of Loan Documents, in the form of **Exhibit H**;

(iv)    an executed letter in the form of **Exhibit I**, addressed to Borrower notifying Borrower of the transfer of the Loan to Purchaser and directing Borrower to make all debt service and any other payments required under the Loan from and after the Closing Date to Purchaser or Purchaser's designee;

(v)    a certificate of Purchaser's (or its Manager's or Managing Member's) secretary or assistant secretary, certifying as to the incumbency of the signatories authorized to execute this Agreement and the Closing Documents required to be executed and delivered by Purchaser;

(vi)    a certificate of Purchaser certifying that all representations and warranties made by Purchaser in this Agreement remain true, correct and complete in all material respects on the Closing Date as though the representations and warranties were made on and as of the Closing Date;

(vii)    a Release Agreement, executed by WDC Holdings, LLC; Herbert Miller; WDC Georgetown Park Manager, LLC; and WDC Georgetown Park, LLC, in the form of **Exhibit L** attached hereto; and

(viii)    a Guaranty of Indemnification Obligations executed by the AG Fund Guarantors, in the form of **Exhibit M** attached hereto, pursuant to which the AG Fund Guarantors guaranty (on a several basis) Purchaser's indemnification obligations under Section 7.1(b).

Section 3.4    Seller's Closing Documents.  Seller's delivery of the Loan File and any other Closing Documents that Seller is required to deliver (or cause to be delivered) in accordance with this Agreement will be conditioned on Seller's concurrent receipt of the Purchase Price and the Closing Documents that Purchaser is required to deliver in accordance with this Agreement.  At the Closing, when Seller has received the Purchase Price and the Closing Documents that Purchaser is required to deliver (or cause to be delivered) to Seller in accordance with this Agreement, Seller will transfer, assign, set-over and convey to Purchaser, without recourse (except as otherwise expressly set forth in this Agreement), all of Seller's right, title and interest in and to the Loan and the Loan File.  Seller will deliver (or cause to be delivered) the following Closing Documents to Purchaser at the Closing:

(i)    each Note, each of which shall be endorsed pursuant to an allonge in the form of **Exhibit G**;

(ii)    an executed Bill of Sale, Assignment and Assumption of Notes and Loan Documents, in the form of **Exhibit H**;

(iii) a Re    lease Agreement, executed by Seller, in the form of **Exhibit L** attached hereto;

(iv)    Amendments to UCC Financing Statements reflecting the transfer of the Loan to Purchaser;

(v)    the Loan File (which, at Seller's election, may be delivered electronically as to some or all of the Loan File described in clause (e) of the definition of Loan File);

(vi)    an executed letter in the form of **Exhibit I**, addressed to Borrower notifying Borrower of the transfer of the Loan to Purchaser and directing Borrower to make all debt service and any other payments required under the Loan from and after the Closing Date to Purchaser or Purchaser's designee;

(vii)    a certified copy of the Sale Order;

(viii)    a certificate of Seller's secretary or assistant secretary substantially in the form of **Exhibit N** hereto certifying as to the incumbency of the signatories authorized to execute this Agreement and the Closing Documents required to be executed and delivered by Seller; and

(ix)     a certificate of Seller certifying that all representations and warranties made by Seller in this Agreement which pursuant to Section 5.2 are required to be true and correct as of the Closing Date remain true, correct and complete in all respects on the Closing Date as though the representations and warranties were made on and as of the Closing Date.

(x)     a Release of Borrower executed by Capmark Investments, Inc., in the form of **Exhibit O** attached hereto

Section 3.5     Delivery of the Loan File.

(a)     The Loan File will be delivered to Purchaser at the Closing in accordance with this Article III. From and after delivery of the Loan File to Purchaser, neither Seller nor Seller's Affiliates, agents, employees, representatives or trustees will have any responsibility for the Loan File and Purchaser will bear all risk of loss or damage with respect to the Loan File. Upon delivery of the Loan File to Purchaser, Purchaser will arrange to move the Loan File, at Purchaser's expense, to a location designated by Purchaser.

(b)     After delivery of the Loan File to Purchaser in accordance with this Agreement, Seller will have the continuing right during the period commencing on the Closing Date and continuing until the fifth (5th) anniversary of the Closing Date to inspect and make extracts from or copies of documents in the Loan File, on reasonable Notice to Purchaser and at Seller's expense. Before destruction of any document in the Loan File at any time during the period commencing on the Closing Date and continuing until the fifth (5th) anniversary of the Closing Date, Purchaser agrees to give reasonable Notice to Seller and to allow Seller, at Seller's expense, to recover the document from Purchaser.

Section 3.6     Recording and Filing Closing Documents. Purchaser will record or file, as the case may be, at Purchaser's own expense, the assignment of the Note and Loan Documents and the UCC Financing Statements to Purchaser from Seller.

Section 3.7     Servicing the Loan. Seller will sell the Loan and Purchaser will purchase the Loan on a servicing-released basis. All of Seller's rights and obligations with respect to the servicing of the Loan will pass to Purchaser as of the Closing Date.

Section 3.8     Confidentiality. The terms of the Confidentiality Agreement between Seller and Purchaser dated as of April 23, 2010 and of the Confidentiality Agreement between Seller and Purchaser dated as of May 5, 2010 shall continue in full force and effect during the term of this Agreement and following any termination of this Agreement, provided that nothing in this Agreement is intended to modify any provisions of either such confidentiality agreement, including any provisions of such confidentiality agreements regarding the termination or expiration dates thereof.

Section 3.9     Title Insurance. Purchaser will be solely responsible for the cost of any endorsement to Seller's existing mortgage title insurance policy and the cost of any other title insurance desired by Purchaser, and the procurement of any endorsement or other insurance will not be a condition to the Closing.

Section 3.10    No Continuing Interest in Loan. After the Closing, except as expressly provided in Section 3.5, Seller will retain no further interest in the Loan, the Loan Documents or the Loan File, including any revenues or payments relating to the Loan and/or the Loan Documents, and neither Seller nor its Affiliates, agents, employees, representatives and trustees will provide any further servicing of the Loan or any foreclosure or other management services.

Section 3.11    Payments after Closing. All revenues and payments, if any, received by Seller in connection with the Loan after the Closing Date (whether paid or payable by Borrower or any guarantor of the Loan, or any other party including, without limitation, casualty insurance proceeds), except for the receipt by Seller of the Purchase Price from Purchaser, shall be the exclusive property of Purchaser, irrespective of whether such revenue or payment relates or applies to any period of time prior to or after the Closing Date and shall be held by Seller in trust for Purchaser and promptly remitted to Purchaser in the form received by Seller, except that, with respect to all checks, drafts or other instruments, Seller shall provide all necessary endorsements, without representation, warranty or recourse, to enable Purchaser to negotiate the same.

## ARTICLE IV

## PURCHASER'S REPRESENTATIONS, WARRANTIES AND AGREEMENTS

Section 4.1    Certain Representations. Purchaser hereby represents and warrants to Seller as follows (all of which representations shall be true and correct as of the date hereof and as of the Closing Date, except where expressly stated to be as of the date hereof):

(a)    Purchaser is and through the Closing Date will continue to be duly organized, validly existing and in good standing under the laws of the state or commonwealth in which it was organized or incorporated.

(b)    Purchaser has and through the Closing Date will continue to have all necessary approvals, whether governmental or otherwise, and full right, power and authority, to (i) execute and deliver this Agreement and (ii) perform its obligations under this Agreement and consummate the Closing in accordance with this Agreement.

(c)    Purchaser's execution and delivery of this Agreement, Purchaser's performance of its obligations under this Agreement and consummation of the transaction contemplated by this Agreement do not and through the Closing Date will continue not to (i) conflict with any laws or agreements binding on Purchaser or (ii) result in a default under any agreements binding on Purchaser.

(d)    This Agreement constitutes and through the Closing Date will continue to constitute a legal, valid and binding obligation of Purchaser, enforceable in accordance with this Agreement, except to the extent that enforceability of the obligations may be subject to bankruptcy, insolvency, moratorium and other similar laws affecting the rights of creditors generally and to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). Notwithstanding the foregoing, Seller agrees that Purchaser

makes no representation or warranty as to the effectiveness or binding nature of any documents delivered (or caused to be delivered) by Purchaser at the Closing pursuant to this Agreement which are executed and delivered by parties other than Purchaser or Affiliates of Purchaser (including, without limitation, the Notice of Withdrawal of the Proofs of Claim referred to in Section 3.3(ii)) and Seller shall have no recourse or remedy against Purchaser as a result of any such document being ineffective or not binding on any of the parties thereto.  Purchaser's only obligation with regard to the documents described in Section 3.3(ii) and Section 3.3(vii) is to deliver original, executed versions of those documents to Seller at Closing and provide evidence to Seller that the Notice of Withdrawal of the Proofs of Claim referred to in Section 3.3(ii) was filed with the Bankruptcy Court.

(e)     As of the date hereof, Purchaser has not dealt with any broker or finder in connection with the purchase and sale of the Loan.

(f)     Neither Borrower, any Affiliate of Borrower nor any Person owning a direct or indirect legal or beneficial ownership interest in Borrower owns any direct or indirect legal or beneficial ownership interest in Purchaser (and will not own any direct or indirect legal or beneficial ownership interest in any assignee pursuant to Section 8.12); provided, however, Seller acknowledges that Purchaser has disclosed to Seller that Purchaser has entered into a consulting and services arrangement with Western Development Corporation, a Maryland corporation ("WDC") pursuant to which WDC may obtain fees and other benefits for services rendered in connection with the future development of the Property and such arrangement shall not be deemed to be a breach of this Section 4.1(f).

(g)     As of the date hereof neither Purchaser nor, to Purchaser's Knowledge, any Person holding any legal or beneficial ownership interest in Purchaser (whether directly or indirectly) (i) appears on any Government List, (ii) is included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the Persons referred to or described in any Government List, (iii) has conducted business with or engaged in any transaction with any Person named on any Government List or any Person included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the Persons referred to or described in any Government List, (iv) is a Person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Presidential Executive Orders in respect thereof, (v) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offence or (vi) is currently under investigation by any Governmental Authority for alleged criminal activity.  Between the date hereof and the Closing Date, Purchaser shall take such precautions as are consistent with its past practices to prevent any person described in the preceding clauses (i) through (vi) from acquiring, directly or indirectly, any legal or beneficial ownership interest in Purchaser.

Section 4.2     No Reliance.

(a)    Purchaser is and through the Closing Date will continue to be familiar with all aspects of the Loan and the Property. In particular, Purchaser has not relied on any oral or written statements, representations or warranties by Seller or by Seller's Affiliates, agents, employees, representatives, counsel or trustees or by any broker or agent pertaining to the Loan, the Borrower or any of its Affiliates, or the Property, including as to any leases, environmental or other physical condition, cash flow statements or other financial information, except for those representations and warranties set forth in Article V of this Agreement. Purchaser's decision to purchase the Loan is based solely on Purchaser's due diligence review and independent evaluation of the Loan and the Property. Purchaser is a sophisticated purchaser, with experience in owning and holding commercial mortgage loans in the nature of the Loan. Purchaser is familiar with the risks associated with commercial mortgage loan sale transactions, which ordinarily include commercial mortgage loans of varying quality and which involve purchases based on limited information, disclosures and representations and warranties. Purchaser recognizes the special nature of the transaction that is the subject of this Agreement, understands and is freely taking all risks involved in connection with the transaction and acknowledges that the nature and risks are reflected in the Purchase Price and in the terms and conditions pursuant to which Purchaser is willing to purchase and Seller is willing to sell the Loan.

(b)    No agent, counsel, employee or representative of Seller or other agent or broker has been authorized to make, and Purchaser has not relied on, any statements other than those expressly set forth in this Agreement. Purchaser is not relying on any continued actions or efforts on the part of Seller or Seller's Affiliates, agents, employees, representatives, counsel or trustees with respect to the Loan. After the Closing, Seller will retain no further interest in the Loan (except as expressly provided in Section 3.5) and neither Seller nor its Affiliates, agents, employees, representatives and trustees will provide any further servicing of the Loan or any foreclosure or other management services. Seller has not guaranteed and does not guarantee payment of the Loan or performance of Borrower's or any guarantor's, indemnitor's or any other Person's obligations under the documents in the Loan File and Seller has not guaranteed and does not guarantee the condition, performance, rate of return, value or yield of the Loan or the Property. The Loan is being sold on an "AS-IS", "WHERE–IS" basis and "WITH ALL FAULTS", free and clear of all liens, claims and interests against the Loan (subject, however, to the Designated Defenses and all matters set forth in this Section 4.2 and in Section 5.1).

(c)    Neither Seller nor Seller's Affiliates, agents, employees, representatives or trustees will have any obligation under this Agreement to discharge or satisfy, or to expend any amount or incur any liability in order to discharge or satisfy, any lien, encumbrance, agreement or other matter affecting the Property or to purchase any title endorsement that Purchaser wishes to secure in connection with the transaction. Without limiting the provisions of this Section 4.2, Seller makes no representation or warranty with respect to the status of title to the Property or any liens or encumbrances thereon or with respect to Seller's existing mortgage title insurance policy, including as to the effectiveness or enforceability thereof. Purchaser waives all Claims against Seller by reason of the insurer under such existing mortgage title insurance policy denying coverage for any reason, including Seller's Knowledge as to any matter.

(d)    Without limiting any of the other provisions of this Section 4.2, Purchaser acknowledges that (i) it is fully familiar with the lawsuit filed in the Superior Court of the District of Columbia entitled Eastbanc, Inc. and Anthony M. Lanier v. Georgetown Park

Associates II Limited Partnership, Georgetown Park Partners, LLC and Herbert S. Miller (Case No. 2006 CA 2291 B) (the "**Eastbanc Litigation**"), and the Notice of Pendency filed in connection therewith and (ii) neither Seller nor any of Seller's Affiliates, agents, employees, representatives, counsel or trustees or any other agent or broker have made any representations or warranties to Purchaser or provided any assurances to Purchaser regarding the projected outcome of such litigation or the impact of such litigation and/or the Notice of Pendency on the value, marketability, financeability or any other aspect of the Property or the Loan or anything else and (iii) in entering into this Agreement and agreeing to buy the Loan, Purchaser assumes any and all risks relating to such litigation and the Notice of Pendency.

(e)     Purchaser acknowledges that Seller has prior to the date hereof commenced, but not completed, the foreclosure of the Mortgage (the "**Foreclosure**" or the "**Foreclosure Proceeding**"). Without limiting any of the other provision of this Section 4.2, Purchaser acknowledges that neither Seller nor any of Seller's Affiliates, agents, employees, representatives, counsel or trustees or any other agent or broker have made any representations or warranties to Purchaser regarding whether or not the action taken by Seller or its counsel, employees, consultants or contractors to commence and prosecute such foreclosure have been in compliance with applicable laws or statutes regarding foreclosure of real property in the District of Columbia and Purchaser assumes all risk of any such non-compliance with such laws and statutes and waives any claims against Seller, its counsel, employees, consultants or contractors by reason of any such non-compliance.

Section 4.3     No Securities. Purchaser's acquisition of the Loan does not constitute a purchase of securities within the meaning of federal or state securities laws, and in light of the representations, warranties, covenants and acknowledgments contained in this Agreement, Purchaser waives all rights, if any, to make any Claim in connection with any federal or state securities law.

Section 4.4     Environmental, Seismic, Engineering and Structural Risks. Certain environmental, seismic, engineering and structural risks may exist with respect to the Property. Purchaser has analyzed or has had an opportunity to analyze the environmental, seismic, engineering, and structural issues pertaining to the Property and is acquiring the Loan subject to the risks mentioned above.

Section 4.5     Litigation. Purchaser will not (a) institute any legal action in the name of Seller, or (b) intentionally through misrepresentation, nondisclosure or concealment mislead any person to believe that Purchaser is Seller or an agent or affiliate of Seller.

## ARTICLE V

## SELLER'S REPRESENTATIONS, WARRANTIES AND AGREEMENTS

Section 5.1     No Implied Representations or Warranties. Seller has not and will not be deemed to have made and specifically disclaims any implied warranties or representations under this Agreement. Except as expressly provided in this Agreement, but without limiting the foregoing, Seller makes no representations or warranties (and Purchaser assumes all risk) with respect to (a) the Loan or the Loan File; (b) the priority, perfection or enforceability of the Note,

the Mortgage or any other document in the Loan File; (c) the presence or absence of defaults under, defenses to or offsets against or counterclaims with respect to the Note, the Mortgage or any other document in the Loan File; (d) the status or financial condition of Borrower or any of its Affiliates (including whether any bankruptcy filing will be filed by or against Borrower prior to Closing) (e) any fact or condition respecting the Loan or the Property; or (f) any of the matters referred to in Section 4.2, and Purchaser's obligation to consummate the Closing shall be absolute notwithstanding any of the foregoing (but subject to the satisfaction of the other closing conditions, obligations and deliveries set forth in this Agreement), and notwithstanding any bankruptcy filing with respect to Borrower prior to Closing.

Section 5.2    Seller's Representations and Warranties. Seller hereby represents and warrants to Purchaser as follows:

(a)    Seller is and through the Closing Date will continue to be duly organized, validly existing and in good standing under the laws of the State of its incorporation.

(b)    Subject to Section 8.16, Seller has, and will have as of the Closing Date, all necessary approvals, whether governmental or otherwise, and full right, power and authority, to (i) execute and deliver this Agreement and any documents to be executed and delivered by Seller pursuant to this Agreement (**"Seller's Closing Documents"**) and (ii) perform its obligations under this Agreement and consummate the Closing in accordance with this Agreement.

(c)    Subject to Section 8.16, Seller's execution and delivery of this Agreement and Seller's Closing Documents, and Seller's performance of its obligations under this Agreement and consummation of the transaction contemplated by this Agreement do not and through the Closing Date will continue not to (i) conflict with any laws or agreements binding on Seller or (ii) result in a default under any agreements binding on Seller.

(d)    Subject to Section 8.16, this Agreement and each of Seller's Closing Documents constitutes and through the Closing Date will continue to constitute a legal, valid and binding obligation of Seller, enforceable in accordance with their terms, except to the extent that enforceability of the obligations may be subject to bankruptcy, insolvency, moratorium and other similar laws affecting the rights of creditors generally and to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(e)    (i) Seller is, and as of the Closing Date will be, the sole legal and beneficial owner and holder of the Loan, (ii) at Closing, Seller will transfer the Loan to Purchaser, free and clear of all liens and encumbrances, except for the Designated Defenses, if any in accordance with the Sale Order, and (iii) Seller has not, and as of the Closing Date will not have, executed any agreement subordinating the lien of the Mortgage to any other lien or claim.

(f)    The aggregate outstanding principal balance of the Loan as of the date hereof is $68,330,763.67. All accrued and unpaid interest on the Loan (at the non-default rate) has been paid through February 15, 2010 (provided that Seller is holding $203,312.57 in a "Suspension Reserve" and Seller intends (but shall not be obligated) to apply to a portion thereof

in the amount of $116,747.52 to pay interest (at the non-default rate) for the period from and including February 15, 2010 to and including March 14, 2010).

(g)    (1) the Loan File includes the loan documents described on **Exhibit K** hereto, (2) to Seller's Knowledge, **Exhibit K** is a complete list of all material loan documents evidencing and securing the Loan, including all written amendments and written modifications thereto, (3) Seller has delivered to Purchaser a true, correct and complete copy of each loan document listed on **Exhibit K**, (4) to Seller's Knowledge, except as set forth on **Exhibit K**, none of the documents set forth on Exhibit K have been modified or terminated, (5) Seller has not, and as of the Closing Date will not have, executed and delivered any release of lien releasing any real property from the lien of the Mortgage, and (6) Seller has not, and as of the Closing Date will not have, (x) entered into any written extension of the maturity date of the Loan, or (y) waived in writing the event of default under the Loan that has arisen as a result of Borrower's failure to pay the Loan in full on its maturity date.

(h)    To Seller's Knowledge, Seller has not, and through the Closing Date will not have (other than with respect to a Competing Bid) entered into any agreement with Eastbanc, Inc. or Anthony M. Lanier (or any of his Affiliates) that will be binding upon the Property or Purchaser or the Loan upon Purchaser's purchase of the Loan.

(i)    To Seller's Knowledge, other than the Eastbanc Litigation, any proofs of claim filed in Seller's bankruptcy proceeding (including, the proofs of claim filed by Eastbanc, Inc., Borrower, and WDC Georgetown Park Manager, LLC) and any claims brought by Borrower or a Borrower Party, as of the date hereof Seller has received no written notice of any pending litigation brought by a third party against Seller with respect to the Loan.

(j)    The Reserve Account Balances held by Seller on May 4, 2010 are as follows: (i) a "Ground Rent Reserve" in the amount of $197,160.67 and (ii) a "Suspension Reserve" in the amount of $203,312.57 (the latter consisting of the $116,747.52 referred to in Section 5.2(f) and another $86,565.05).

Section 5.3    Survival Period. The representations and warranties of Seller set forth in this Article V and the agreements and covenants of Seller set forth in this Agreement shall survive the Closing for a period of ninety (90) days (the "Survival Period") (other than the indemnification obligations contained in Section 5.5, which shall survive indefinitely). Purchaser shall only be permitted to make a Claim against Seller for a breach of any representation or warranty made by Seller in this Article V, and/or a breach of any such agreement of covenant of Seller set forth in this Agreement, if (a) such breach is a Material Breach, (b) such Material Breach shall have been first discovered by Purchaser during the period commencing after the Closing and ending prior to the expiration of the Survival Period, (c) Notice of such Material Breach shall have been given to Seller by Purchaser prior to the expiration of the Survival Period and (d) an action, suit or other proceeding shall have been commenced by Purchaser, or a Claim for such Material Breach shall have been filed by Purchaser, against Seller prior to the expiration of the Survival Period. In the event that Purchaser asserts a Claim on account of a Material Breach in accordance with this Section 5.3, Seller shall have the right, within thirty (30) days of Purchaser's delivery of Notice thereof to cure such Material Breach and if such Material Breach is cured by Seller within such thirty (30)

day period, Seller shall have no liability on account of such Material Breach. Notwithstanding anything to the contrary contained herein, the amount of any Claim arising out of a Material Breach shall be limited to the lesser of (x) the actual amount of the loss suffered by Purchaser as a result of such Material Breach (excluding special, punitive, consequential, incidental and similar damages) and (y) the amount of the Purchase Price.

Section 5.4     Reserve Accounts. At all times prior to Closing, Seller shall have the absolute right (but no obligation) to apply any sums in the Reserve Accounts towards payments for interest (including interest at the default rate), late charges, principal, taxes, insurance, operating expenses, legal fees and expenses, asset management fees and/or lease supervisory fees in accordance with prior practices (in Seller's discretion), and any other purposes permitted under the Loan Documents.

Section 5.5     Brokers. If Seller engages any broker or finder in connection with the purchase and sale of the Loan, Seller shall pay the fees of such broker or finder (the "**Broker**"). Seller and Purchaser agree that should any claim be made for a commission, finder's fee or other compensation (other than by Broker, whose fee shall be paid by Seller), the party who dealt with such broker or finder will hold the other harmless from and against any and all claims, liabilities, losses, damages, costs or expenses as a result of such claim, including, without limitation, reasonable attorneys' fees and expenses, incurred in connection therewith. The provisions of this Section 5.5 shall survive the Closing or the earlier termination of this Agreement.

Section 5.6     Loan; Foreclosure Proceeding.

(a)     Unless and until the Closing shall occur, Seller shall retain all of its rights and remedies with respect to the Loan and the Foreclosure and may do anything necessary to preserve its rights thereunder, including, without limitation, the unilateral right to seek the appointment of a Receiver for the Property. The parties acknowledge that the Seller has given (or is in the process of giving) notice that the originally scheduled May 5, 2010 foreclosure sale is or will be postponed to June 3, 2010, and Seller may, at its election, cancel the sale without prejudice and, at its further election, record a new notice of foreclosure (and advertise such sale, as deemed appropriate by Seller). Provided that Purchaser is not in breach of any of its material obligations hereunder for more than three (3) Business Days after written notice from Seller of such breach, if the then scheduled sale date will occur prior to the Closing Date, then upon written request from Purchaser given at least three (3) Business Days before the then scheduled sale date, Seller shall, no later than the last date on which Seller may lawfully do so, (a) postpone such sale date to a date that is not later than thirty (30) calendar days beyond the scheduled sale date set forth in the most recently recorded foreclosure notice upon which the sale is based, or (b) cancel the sale without prejudice, and at Seller's further election, record a new notice of foreclosure (and advertise such sale, as deemed appropriate by Seller). Additionally, if the then scheduled sale date will occur prior to the then scheduled Closing Date, then Seller may, if it so elects, unilaterally take any action described in the immediately preceding sentence. Notwithstanding anything to the contrary contained herein, if Purchaser is not in breach of any of its material obligations hereunder for more than three (3) Business Days following notice from Seller of such breach, Seller shall not, without the written consent of Purchaser, (1) cause the trustee to conduct the foreclosure sale; (2) modify, amend or supplement any Loan Document in

writing in any material respect (provided that Purchaser will not unreasonably withhold its consent to a modification of the Cash Management Agreement requested by the Loan servicer); (3) enter into any written agreement to forbear from exercising Seller's rights and remedies under the Loan Documents beyond the Closing Date (other than postponing, cancelling, advertising or re-recording for the foreclosure sale as provided above), (4) accept a discounted payoff of the Loan, (5) voluntarily act to terminate the Foreclosure Proceeding with prejudice, (6) release Borrower in writing from any of its obligations under the Loan, or waive in writing any default(s) by Borrower under the Loan; (7) encumber the Loan (other than with respect to a Competing Bid as contemplated by the Bidding Procedures Order) or consent in writing to any encumbrance of the Property; or (8) release any material collateral for the Loan in writing (other than as required (as determined by Seller in its sole but good faith judgment) by the terms of the Loan Documents) and in which case, Seller shall give prompt written notice of the same to Purchaser; provided, however, that the foregoing shall not be deemed to restrict Lender or limit any of Lender's rights or actions with respect to the collection and/or application of any rents or revenue or cash flow from the Property, or with respect to Lender's application of any funds in any Reserve Account, or (9) consent to any written request of Borrower, other than as required (as determined by Seller in its sole but good faith judgment) by the Loan Documents or as may otherwise be determined by Seller to be commercially reasonable (and in each such case, Seller shall give prompt written notice of the same to Purchaser).

(b)    Provided Purchaser is not in default of any of its material obligations hereunder, Seller shall not, without Purchaser's consent, elect to release any property insurance proceeds (as distinguished from proceeds from liability insurance, business interruption insurance or rental loss insurance, all of which proceeds (other than liability insurance proceeds payable to Lender on account of losses incurred by Lender that are covered by such liability insurance), Lender agrees to deposit in the New Lockbox Account)) to Borrower for restoration following a casualty at the Property, unless required to do so pursuant to the terms of the Loan Documents, and except to the extent determined by Seller in its sole but good faith judgment, as being necessary (i) to comply (or cause the Property to comply) with any applicable legal requirements, or (ii) to preserve or protect the Property and render it in a safe condition. In the event that Seller applies any casualty insurance proceeds towards the principal balance of the Loan, then the Purchase Price shall be reduced (dollar for dollar) by the amount of such application (as contemplated by Section 3.2), and in the event that Seller is holding any such proceeds on the Closing Date, Seller shall deliver the same (for no additional consideration) to Purchaser (in the form received by Seller, except that, with respect to all checks, drafts or other instruments, Seller shall provide all necessary endorsements, without representation, warranty or recourse, to enable Purchaser to negotiate the same).

(c)    Upon Purchaser's request, in connection with (but not prior to) the Closing, Seller shall take such actions (if any) as are necessary to transfer Seller's rights in the Foreclosure Proceeding to Purchaser. The provisions of this Section 5.6(c) shall survive the Closing.

## ARTICLE VI

## DEFAULTS AND REMEDIES AND OTHER TERMINATION RIGHTS

Section 6.1    Seller's Remedies. If Purchaser fails or refuses to consummate the Closing in accordance with this Agreement, or Purchaser otherwise defaults on any of its material obligations hereunder, including Purchaser's breach in any material respect of any representation or warranty set forth in Section 4.1, and fails to cure such breach within seven (7) days following notice from Seller of such breach (but in no event later than the Closing Date; provided, however, with respect to any breach other than failure to pay the Purchase Price or to make a delivery required under clauses (i)-(v), (vii) and (viii) of Section 3.3, if Seller first notifies Purchaser of any such breach within three (3) Business Days prior to the Closing Date, then Purchaser shall have the right to adjourn the Closing Date to a date not later than three (3) Business Days after the date of Seller's notice of such breach to enable Purchaser to cure such breach), then in any such case Seller shall have the right, as its sole and exclusive remedy, to terminate this Agreement by Notice to Purchaser and Escrow Agent, in which case, (i) the Deposit shall be delivered by the Escrow Agent to Seller and Seller shall be entitled to retain the Deposit, free of any and all Claims by Purchaser, as full and complete liquidated damages, the parties hereto having concluded that a precise measure of damages in such event would be impossible to calculate and determine and are not a penalty, (ii) this Agreement shall thereupon terminate and become void and of no further force or effect and (iii) neither Seller nor Purchaser shall have any further rights or obligations under this Agreement, except those, if any, which are expressly stated to survive the termination of this Agreement.

Section 6.2    Purchaser's Remedies.

(a)    If (i) the Bidding Procedures Order is not entered within forty (40) days from the date hereof (other than if the Bidding Procedures Order is not entered within such forty (40) day period as a direct result of Purchaser being in breach of its obligations under this Agreement, which breach continues for more than three (3) Business Days after written notice from Seller) or (ii) the Bidding Procedures Order, once entered, has been vacated, reversed or modified in any manner materially adverse to Purchaser, without Purchaser's consent (other than if the Bidding Procedures Order is vacated, reversed or modified in any manner materially adverse to Purchaser as a direct result of Purchaser being in breach of its obligations under this Agreement, which breach continues for more than three (3) Business Days after written notice from Seller), then in either such case, Purchaser may terminate this Agreement, the Deposit shall be delivered by the Escrow Agent to Purchaser, and neither Seller nor Purchaser shall have any further rights or obligations under this Agreement, except those, if any, which are expressly stated to survive the termination of this Agreement.

(b)    If (i) the Bidding Procedures Order is entered within forty (40) days from the date hereof, but the Sale Order is not entered within eighty-five (85) days from the date hereof (other than if the Sale Order is not entered within such eighty-five (85) day period as a direct result of Purchaser being in breach of its obligations under this Agreement, which breach continues for more than three (3) Business Days after written notice from Seller), or (ii) the Sale Order, once entered, has been vacated, reversed or modified in any manner materially adverse to Purchaser, without Purchaser's consent (other than if the Sale Order is vacated, reversed or

modified in any manner materially adverse to Purchaser as a direct result of Purchaser being in breach of its obligations under this Agreement, which breach continues for more than three (3) Business Days after written notice from Seller), then in either such case, Purchaser may terminate this Agreement, the Deposit shall be delivered by the Escrow Agent to Purchaser, Seller shall pay the Expense Reimbursement to Purchaser and neither Seller nor Purchaser shall have any further rights or obligations under this Agreement, except those, if any, which are expressly stated to survive the termination of this Agreement; *provided* that Seller shall not be required to pay the Expense Reimbursement if the Bankruptcy Court or an appellate court concludes that the Purchaser is not a "good faith" purchaser under Section 363(m) of the Bankruptcy Code (however in such event the Deposit shall be returned to Purchaser by the Escrow Agent if Purchaser is then otherwise entitled to receive a return of the Deposit under the other provisions of this Agreement).

(c)     If Seller fails or refuses to consummate the Closing in accordance with this Agreement for any reason other than Seller's failure to secure all of the Bankruptcy Court Authorizations prior to the Closing, or Seller otherwise defaults on any of its material obligations hereunder, including Seller's breach in any material respect of any representation or warranty set forth in Section 5.2, and fails to cure such breach within seven (7) days following notice from Purchaser of such Breach, and in each such case Purchaser is otherwise ready, willing and able to consummate the Closing in accordance with this Agreement, then Purchaser shall have the right, as its sole and exclusive remedy, to either (i) terminate this Agreement upon Notice to Seller and Escrow Agent, in which case, (x) the Deposit shall be delivered by the Escrow Agent to Purchaser, and (y) neither Seller nor Purchaser shall have any further rights or obligations under this Agreement, except those, if any, which are expressly stated to survive the termination of this Agreement, or (ii) bring an action for specific performance of Seller's obligations under this Agreement; provided, however, if the Bankruptcy Court does not allow such action for specific performance (and the Closing has not occurred), then, in lieu of such relief, Seller shall pay the Break-Up Fee and Expense Reimbursement to Purchaser, and in which event this Agreement shall terminate, the Deposit shall be delivered by the Escrow Agent to Purchaser, and neither Seller nor Purchaser shall have any further rights or obligations under this Agreement, except those, if any, which are expressly stated to survive the termination of this Agreement.

(d)     If prior to the Closing it is determined that there are any material loan documents evidencing and securing the Loan, or any written material amendments and written material modifications thereto, or written termination thereof, which are not identified on Exhibit K and which are adverse in any material respect to the holder of the Loan, and the same does not constitute a breach of Section 5.2(g)(2), (3) or (4), then Purchaser shall have the right to terminate this Agreement prior to the Closing by giving written notice of such termination to Seller not later than five (5) Business Days after Purchaser has received written notice of the matter in question (but not thereafter), in which event this Agreement shall terminate, the Deposit shall be delivered by the Escrow Agent to Purchaser, and neither Seller nor Purchaser shall have any further rights or obligations under this Agreement, except those, if any, which are expressly stated to survive the termination of this Agreement.  Purchaser agrees that for all purposes of this Agreement, any interest rate cap agreement, or assignment, amendment or acknowledgement thereof, shall be deemed *not* to be a material loan document so long as such agreement, or assignment, amendment or acknowledgement relates to an interest rate cap agreement that has expired prior to the Closing Date

Section 6.3    Other Termination Rights.

(a)    If Seller shall have entered into an agreement with respect to a Competing Bid, and the Bankruptcy Court shall enter an order approving such Competing Bid, subject to the limitations set forth in the Bidding Procedures Order and subject to Purchaser's right to payment of the Break-Up Fee and Expense Reimbursement in accordance with the provisions of this Agreement and the Bidding Procedures Order, then either Purchaser or Seller may terminate this Agreement, following which termination the Deposit shall be delivered by the Escrow Agent to Purchaser, and neither Seller nor Purchaser shall have any further rights or obligations under this Agreement, except those, if any, which are expressly stated to survive the termination of this Agreement.

(b)    This Agreement shall terminate immediately if the Bankruptcy Case is dismissed or converted to a Chapter 7 bankruptcy case under the Bankruptcy Code, or an interim or permanent trustee is appointed in the Bankruptcy Case, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed in the Bankruptcy Case, in which case the Deposit shall be delivered by the Escrow Agent to Purchaser and neither Seller nor Purchaser shall have any further rights or obligations under this Agreement, except those, if any, which are expressly stated to survive the termination of this Agreement.

(c)    If for any reason, other than as a result of a breach by any party of their respective obligations hereunder, the Closing has not occurred within one hundred eighty (180) days of the date hereof, then either Purchaser or Seller may terminate this Agreement, following which termination the Deposit shall be delivered by the Escrow Agent to Purchaser, and neither Seller nor Purchaser shall have any further rights or obligations under this Agreement, except those, if any, which are expressly stated to survive the termination of this Agreement.

## ARTICLE VII

## INDEMNIFICATION AND RELEASE

Section 7.1    Indemnification.

(a)    Purchaser agrees to indemnify, hold harmless and defend Seller, Seller's Affiliates, agents, employees, representatives and trustees, the existing trustees under any deed of trust securing the Loan and any predecessor or successor of Seller (collectively, the "**Indemnified Persons**") for, from and against any and all Claims, costs and expenses, including reasonable attorney's fees, to which any of the Indemnified Persons may become subject on account of, arising out of or related to any act, omission, conduct or activity of Purchaser or any of Purchaser's Affiliates, agents, employees, members, partners, principals, representatives or trustees at any time on, prior to or after the Closing Date, in each case, only to the extent arising out of or related to (but not to the extent attributable to the fraud, bad faith, gross negligence, or willful misconduct of an Indemnified Person) (a) Purchaser's due diligence review of the Loan or the Property; (b) the Loan, including the servicing of the Loan and/or the Foreclosure Action; and (c) any inaccuracy in or breach of Purchaser's representations, warranties, covenants or acknowledgments made pursuant to this Agreement, which indemnification obligation(s) shall

survive the Closing or the earlier termination of this Agreement, and which shall apply regardless of whether or not any or all of the Bankruptcy Court Authorizations have or have not been obtained. The foregoing indemnity shall not apply to (i) any claim made by Eastbanc, Inc. or Anthony M. Lanier based on matters occurring prior to the Closing Date, or (ii) to any claim made by the Capmark Parties based on matters occurring prior to the Closing Date. Purchaser's liability under this <u>Section 7.1(a)</u> shall include liability for special, punitive or consequential damages that are claimed by or that become due to a third party pursuant to a claim that is otherwise covered by this indemnity, but Purchaser's liability under this Section 7.1(a) shall not include special, punitive or consequential damages suffered by any Indemnified Person independent of a claim by a third party.

(b)    Without limiting the provisions of <u>subsection (a)</u> above, in the event the purchase and sale of the Loan contemplated hereunder shall close, Purchaser agrees to indemnify, hold harmless and defend the Indemnified Persons for, from and against any and all Claims (including, without limitation, all proofs of claim filed by any Borrower Parties, other than a Borrower Party that has executed the release delivered pursuant to <u>Section 3.3(vii)</u>, including proofs of claim numbers 1633, 1634, 1483, 1484, 1619 and 1622 in the bankruptcy proceedings of Seller, Capmark Investments LP and their affiliates), losses, damages, liabilities, costs and expenses, including reasonable attorney's fees (whether incurred to defend such parties or in connection with legal proceedings taken to enforce Purchaser's obligations under this <u>Section 7.1(b)</u>, provided, in the latter case, the applicable Indemnified Person is the prevailing party in such legal proceeding) suffered or incurred by, or made against any of the Indemnified Persons, in each case to the extent arising out of or related to any Claim asserted by any Borrower Party (excluding a Borrower Party that has executed the release delivered pursuant to Section 3.3(vii)) in connection with any Loan-Related Matters. The provisions of this <u>Section 7.1(b)</u> shall survive the Closing and shall cover proofs of claim numbers 1633, 1634, 1483, 1484, 1619 and 1622 referred to above and all other Claims to which this <u>Section 7.1(b)</u> applies, in each case which are asserted in writing against any Indemnified Persons on or prior to the second anniversary of the Closing Date (but shall not cover any claims first asserted in writing against any Indemnified Persons after such second anniversary). Notwithstanding anything to the contrary contained in this <u>Section 7.1(b) or in Section 7.2</u>, the maximum liability of Purchaser under this <u>Section 7.1(b)</u> (including, without limitation, for any legal fees and expenses payable pursuant to Section 7.2 with respect to <u>Section 7.1(b)</u> Claims) shall not exceed Three Million Three Hundred Thousand Dollars ($3,300,000) (the "**Section 7.1(b) Indemnity Cap**"). Purchaser's liability under this <u>Section 7.1(b)</u> shall include liability for special, punitive or consequential damages that are claimed by or that become due to a third party pursuant to a claim that is otherwise covered by this indemnity, but Purchaser's liability under this Section 7.1(b) shall not include special, punitive or consequential damages suffered by any Indemnified Person independent of a claim by a third party. Notwithstanding anything to the contrary contained in this Section 7.1(b), Purchaser shall not have obligations under this Section 7.1(b) with respect to a Claim if written notice of such Claim was not given to Purchaser prior to the 90th day following the 2nd anniversary of the date hereof. The AG Fund Guarantors shall severally guaranty the obligations of Purchaser under this <u>Section 7.1(b)</u> pursuant to the Guaranty of Indemnification Obligations in the form attached hereto as <u>Exhibit M</u>.

Section 7.2    Notice and Defense of Claims.

(a)      Promptly after an Indemnified Person receives written notice of a Claim for which such Indemnified Person seeks indemnification under this Section (a "**Section 7.1 Claim**"), the Indemnified Person shall deliver Notice to Purchaser of such Section 7.1 Claim (an "**Indemnification Notice**"), provided, however, that any failure by the Indemnified Person to deliver such Indemnification Notice to Purchaser will not relieve Purchaser of liability under this Article VII except to the extent that Purchaser is actually prejudiced by such failure to give notice promptly.

(b)      Purchaser shall have the right, at its sole option and expense, to assume control of the defense of, and to defend against, negotiate, settle or otherwise deal with, any Section 7.1 Claim with counsel of its choice, provided that (i) Purchaser shall within twenty (20) days (or sooner, if the nature of the Section 7.1 Claim so requires) notify the Indemnified Person in writing of Purchaser's election to do so and (ii) such counsel selected by Purchaser shall be subject to the reasonable approval of the Indemnified Person. Notwithstanding any such election by Purchaser, the Indemnified Person(s) may fully participate in (but not control) any of the foregoing with counsel of its choice and at its expense (subject, however, to the immediately following sentence). If Purchaser elects to assume control of the defense of a Section 7.1 Claim, and diligently prosecutes such defense, any fees and expenses of legal counsel employed by the Indemnified Person(s) with respect to such Section 7.1 Claim (subject to the Section 7.1(b) Indemnity Cap) shall be considered costs and expenses for which the Indemnified Person(s) shall be entitled to indemnification under this Section 7.1 if either (i) such Indemnified Person has determined in good faith upon advice of counsel that a conflict or potential conflict of interest exists with regard to the subject matter of the Section 7.1(b) Claim, in which case the fees and expenses of the Indemnified Person's counsel shall be paid by Purchaser, or (ii) with respect to a Section 7.1 Claim under <u>Section 7.1(b)</u> above (a "**Section 7.1(b) Claim**"), the maximum amount of probable damages (as reasonably estimated in good faith by Seller) in the subject Section 7.1(b) Claim, when taken together with all other then existing Section 7.1(b) Claims and all payments made by Purchaser and/or any AG Fund Guarantors in connection with any prior Section 7.1(b) Claims, exceeds $3,000,000 (a "**Material Section 7.1(b) Claim**").

(c)      Each of the parties hereto agrees to cooperate fully with each other in all commercially reasonable respects in connection with the defense, negotiation or settlement of any Section 7.1 Claim. Without limiting the foregoing, in connection with any Material Section 7.1(b) Claim and at an Indemnified Person's election, Purchaser agrees to collaborate with and consult with such Indemnified Person in each step of all proceedings and substantive negotiations, and the Indemnified Person shall be entitled to actively and fully participate in the defense of any such Material Section 7.1(b) Claim in accordance with the provisions of this Section 7.2.

(d)      Notwithstanding anything contained in this Section 7 to the contrary, Purchaser shall not, in connection with the defense of any Claim or related Claims arising out of the same general allegations or circumstances, be liable for the fees and expenses of more than one separate firm of attorneys for all such Indemnified Persons, which firm shall be designated in writing by the Indemnified Persons.

(e)      To the extent Purchaser elects not to defend a Section 7.1 Claim, or does not timely notify the Indemnified Person(s) in writing of its election to assume the defense

thereof, and the Indemnified Person(s) defends against any such Section 7.1 Claim, the Indemnified Person(s) may (regardless of whether or not the Section 7.1 Claim is a Material Section 7.1(b) Claim) (i) retain counsel, at the expense of Purchaser (subject, however, in the case of Section 7.1(b) Claim, to the Section 7.1(b) Indemnity Cap), and (ii) control the defense of such Section 7.1 Claim.

Section 7.3    Settlement.

(a)    Except as set forth in Section 7.2(d) and Section 7.2(e), neither Purchaser nor any Indemnified Person may, without the written consent of the other (not to be unreasonably withheld in the case of a settlement), (i) permit a default judgment or consent to entry of any judgment thereunder, or (ii) settle or compromise any Section 7.1 Claim, or (iii) admit any liability, unless as part of such settlement (A) the claimant seeking to settle such Section 7.1 Claim provides to the other party an unqualified release from all liability in respect of the Section 7.1 Claim, and (B) the settlement does not (i) require the admission of any material wrongdoing or payment or (ii) any other consideration from the other party unless, in the case of a consent, settlement or compromise desired by Purchaser, the only relief provided is monetary damages that are paid in full by Purchaser through the indemnity provided in this Section 7 or otherwise.

(b)    If (i) a firm written offer is made to compromise or settle any Claim subject to indemnification under Section 7.1(a) or (ii) a firm written offer is made to compromise or settle any Section 7.1(b) Claim and the total "all in" cost of such compromise or settlement of such Section 7.1(b) Claim, including all payments to the claimant and all legal fees and expenses of the Indemnified Persons for which Purchaser would be liable under this Article VII in connection therewith, is less than the Section 7.1(b) Indemnity Cap, and, in the case of either (i) or (ii) the compromise or settlement satisfies the requirements of Section 7.3(a) and the Purchaser proposes to accept such compromise or settlement but the Indemnified Persons against whom the Claim is assert refuse(s) to consent to such compromise or settlement ("Non-Consenting Persons"), then (A) Purchaser shall be excused from, and such Non-Consenting Persons shall be collectively and solely responsible for, all further defense of such Claim (but Purchaser shall cooperate in transferring such defense responsibilities) and (B) the liability of Purchaser relating to such Claim shall not exceed the total "all in" cost thereof as described above.

Section 7.4    Environmental Indemnity.  Nothing in this Agreement or any documents delivered pursuant to this Agreement will prejudice Seller from seeking the benefit of the Environmental Indemnity Agreement referred to in Exhibit K, provided the same does not detract from the benefits afforded Purchaser under such indemnity.

Section 7.5    Release.  In the event the purchase and sale of the Loan contemplated hereunder shall close, then Purchaser, for itself and for each of its successors, legal representatives and assigns (the "**Purchaser Parties**"), hereby remises, releases, acquits and forever discharges Seller, Seller's Affiliates, agents, employees, representatives and trustees, the existing trustees under any deed of trust securing the Loan and any predecessor or successor of Seller (collectively, the "**Seller Released Parties**") of and from any and all loss, liability, claim, damage or expense (including reasonable legal fees and expenses), manner of actions, causes of

actions, choses in action, suits, debts, dues, sums of money, compensation, accounts, rentals, commissions, reckonings, bonds, bills, specialties, covenants, rights, contracts, controversies, agreements, promises, costs, damages, judgments, executions, claims and demands whatsoever (regardless of by whom raised) in law or in equity, which the Purchaser Parties or any of them now have, ever had or may ever have against Seller Released Parties or any of them, singly or in any combination, on account of, arising out of, or in connection with the Loan, Borrower or the collateral securing the Loan or the relationship of any of Seller Released Parties with the Borrower Parties, excluding, however, from such claims, any obligations or liabilities of Seller expressly set forth in this Agreement or expressly set forth in any agreement or document delivered pursuant hereto. The provisions of this <u>Section 7.5</u> shall survive the Closing.

## ARTICLE VIII

## MISCELLANEOUS

    Section 8.1  Notices. All Notices must be in writing and (a) delivered personally by a process server providing a sworn declaration evidencing the date of service, the individual served, and the address where the service was made; (b) sent by certified mail, return receipt requested; or (c) delivered by nationally recognized overnight delivery service providing evidence of the date of delivery, with all charges prepaid, addressed to the appropriate party at its address listed in <u>Exhibit B</u>. Seller and Purchaser each may change from time to time the address to which Notices must be sent, by Notice given in accordance with this Section. All Notices given in accordance with this Section will be deemed to have been given three (3) Business Days after having been deposited in any mail depository regularly maintained by the United States postal service, if sent by certified mail, or one (1) Business Day after having been deposited with a nationally recognized overnight delivery service, if sent by overnight delivery or on the date of personal service, if served by a process server.

    Section 8.2  Applicable Law. This Agreement is governed by and will be construed in accordance with the laws of the State of New York or any applicable Federal law (without regard to any conflict of law provisions that would result in the application of the laws of another jurisdiction).

    Section 8.3  Seller's Discretion. Wherever under this Agreement Seller has the right to approve or determine any matter, Seller's approval or determination will be in Seller's reasonable discretion unless expressly provided to the contrary in this Agreement. Wherever under this Agreement any matter is required to be satisfactory to Seller, Seller's determination that the matter is satisfactory will be in Seller's reasonable discretion unless expressly provided to the contrary in this Agreement.

    Section 8.4  Unenforceable Provisions. If any provision of this Agreement is found to be illegal or unenforceable or would operate to invalidate this Agreement, then the provision will be deemed to be expunged and this Agreement will be construed as though the provision was not contained in this Agreement and the remainder of this Agreement will remain in full force and effect; provided that if any provision of this Agreement, as applied to any party or to any circumstance, is adjudged by the Bankruptcy Court or other governmental authority

with proper jurisdiction to be invalid or unenforceable in accordance with its terms, the parties agree to reasonably cooperate to modify this Agreement to, as best as reasonably possible under the circumstances, grant the parties hereto the substance of the agreements originally contemplated hereby.

Section 8.5    Survival. Unless expressly provided to the contrary in this Agreement, and subject to Section 5.3, Seller's and Purchaser's representations, warranties and covenants contained in this Agreement will continue in full force and effect and survive the Closing and any other act or omission that might otherwise be construed as a release or discharge and will not merge into the Closing Documents, but instead will be independently enforceable.

Section 8.6    Entire Agreement. This Agreement (including all exhibits and any other attachments) constitutes the entire understanding between the parties hereto regarding the subject matter of this Agreement, supersedes any and all previous communications and understandings between the parties (including any bid, indication of interest, commitment letter, or letter of interest) regarding the subject matter of this Agreement, and binds and inures to the benefit of the Parties, their successors and permitted assigns.

Section 8.7    No Oral Amendment. This Agreement may not be amended, waived or terminated orally or by any act or omission made individually by Seller or Purchaser but may be amended, waived or terminated only by a written document signed by the party against which enforcement of the amendment, waiver or termination is sought.

Section 8.8    Time of the Essence. Time is of the essence with respect to Purchaser's payment of the Purchase Price on the Closing Date and the performance of its other obligations under this Agreement.

Section 8.9    Successors and Assigns. This Agreement binds Seller and Purchaser and their respective successors and assigns and inures to the benefit of Seller and Purchaser and their respective successors and permitted assigns. Article VII also inures to the benefit of all Indemnified Persons pursuant to Article VII.

Section 8.10    Duplicates and Counterparts. Duplicate counterparts of this Agreement may be executed and together will constitute a single original document. An electronic facsimile (including a pdf) shall be considered an original signature for all purposes of this Agreement,

Section 8.11    Rights Cumulative: Waivers. The rights of each of Seller and Purchaser under this Agreement are cumulative and may be exercised as often as such party considers appropriate. The rights of each of Seller and Purchaser under this Agreement will not be capable of being waived or varied otherwise than by an express waiver or variation in writing. Any failure to exercise or any delay in exercising any of such rights will not operate as a waiver or variation of that or any other such right. Any defective or partial exercise of any of such rights will not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of any party will in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

Section 8.12    Assignment. This Agreement is not assignable by Purchaser other than as provided in this Section 8.12. Purchaser may assign this Agreement, upon prior written notice to, but without the consent of Seller to a corporation, partnership, limited liability company or other entity, provided that such entity is controlled by principals or affiliates of, or funds managed by, an AG Entity; provided, however, that Purchaser delivers to Seller within one (1) Business Day thereafter (but in any event prior to the Closing Date), an executed copy of the document or instrument that effectuates such assignment and the assumption by the assignee of all of Purchaser's obligations and liabilities hereunder (which assignment and assumption agreement shall be in form and content reasonably acceptable to Seller, and which shall contain a representation by the assignee substantially the same as that set forth in Section 4.1(g)). For purposes of this Agreement, "**AG Entity**" shall mean any corporation, partnership, limited liability company, or other entity that is directly or indirectly controlled by Angelo, Gordon & Co., L.P., or managed or controlled (directly or indirectly) by Angelo, Gordon & Co., L.P. Upon any assignment and assumption in accordance with this Section 8.12, the party named as Purchaser herein shall be released from further liability under this Agreement, and the assignee shall be deemed the Purchaser herein.

Section 8.13    Fees and Expenses. Seller and Purchaser each will bear the fees and expenses of its respective accountants, appraisers, attorneys and other consultants and other costs and expenses in connection with the preparation of this Agreement and the consummation of the transaction contemplated by this Agreement. Notwithstanding the foregoing, Purchaser shall be responsible for the fees incurred by Seller's foreclosure counsel and any other fees and expenses in connection with the foreclosure of the Mortgage, including fees of the auctioneer and advertising costs and fee of the substitute trustee under the Mortgage (up to a maximum aggregate amount of $100,000).

Section 8.14    [Intentionally Omitted].

Section 8.15    Waiver of Jury Trial. Seller and Purchaser waive trial by jury in any proceeding brought or Claim asserted in connection with the transaction contemplated by this Agreement.

Section 8.16    Seller's Authority; Bankruptcy Court Authorization. Nothing contained in this Agreement will create any obligation on the part of Seller under this Agreement unless and until Seller has executed and delivered to Purchaser a counterpart copy of this Agreement. The parties further acknowledge and agree that (a) Seller's obligations to consummate the sale of the Loan and the Loan File hereunder are expressly conditioned upon the entry of the Sale Order (including the finding by the Bankruptcy Court that the Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code), and the Sale Order being in full force and effect as of the Closing Date, and (b) Seller's obligations to pay the Break-Up Fee and Expense Reimbursement hereunder are expressly conditioned upon the entry of the Bidding Procedures Order and the Bidding Procedures Order being in full force and effect at the time such payment is due (the satisfaction of clauses (a) and (b) hereof, collectively, the "**Bankruptcy Court Authorizations**").

Section 8.17    No Third Party Beneficiaries. Except for Indemnified Persons, nothing expressed or mentioned in this Agreement is intended or will be construed to give any

other person any legal or equitable right, remedy or claim under or in respect of this Agreement, or any provisions herein contained, this Agreement and all conditions and provisions hereof being intended to be and being for the sole and exclusive benefit of Seller and Purchaser and for the benefit of no other Person.

Section 8.18    Headings. The headings in this Agreement are for purposes of reference only and will not limit or otherwise affect the meaning hereof.

Section 8.19    Jurisdiction; Venue; Consent to Service of Process.

(a)    Until the chapter 11 cases of Seller and its affiliated debtors and debtors in possession are closed or dismissed, each of Seller and Purchaser hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of and agrees that venue shall be proper in the United States Bankruptcy Court for the District of Delaware, and any appellate court therefrom, in any action or proceeding arising out of or relating to or connected with this Agreement. Each of Seller and Purchaser hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in such court until such chapter 11 cases are closed or dismissed.

(b)    Following the closing or dismissal of the chapter 11 cases of Seller and its affiliated debtors and debtors in possession, each of Seller and Purchaser hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of and agrees that venue shall be proper in the United States Bankruptcy Court for the District of Delaware or any state or federal court in New York County in the State of New York, and any appellate court therefrom. Each of Seller and Purchaser hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in any such court at any time following the closing or dismissal of such chapter 11 cases.

(c)    Each of Seller and Purchaser agrees that a final judgment in any such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of Seller and Purchaser hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in the above identified court. Each of Seller and Purchaser hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

Section 8.20    Further Actions. Seller and Purchaser hereby covenant and agree to execute and deliver all such documents and to take all such further actions as any of them may reasonably request from time to time to carry out the intent and purpose of this Agreement and to consummate the transactions contemplated hereby, provided that any costs incurred shall be at the expense of the requesting party.

# ARTICLE IX

# BANKRUPTCY COURT MATTERS

Section 9.1    Approval of Break-Up Fee and Expense Reimbursement.

(a)    In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, Seller shall pay to Purchaser a break-up fee in an amount equal to $1,340,000 (the "**Break-Up Fee**") following the termination of this Agreement, only if such termination is pursuant to Sections 6.2(c) or 6.3(a). If Purchaser becomes entitled to payment of the Break-Up Fee pursuant to this Agreement, or if Purchaser becomes entitled to the Expense Reimbursement pursuant to Section 6.2(b), Seller shall also reimburse Purchaser for actual legal fees and other out-of-pocket expenses not exceeding $500,000 incurred and paid by Purchaser in connection with negotiating this Agreement, negotiating with the Borrower Parties, performing due diligence with respect to the Loan, the Eastbanc Litigation and the Property, and being represented in Seller's bankruptcy proceeding (the "**Expense Reimbursement**").    Seller acknowledges and agrees that (i) the approval of the Break-Up Fee and Expense Reimbursement is an integral part of the transactions contemplated by this Agreement, (ii) in the absence of Seller's obligation to pay the Break-Up Fee and Expense Reimbursement and its agreement to request such status, Purchaser would not have entered into this Agreement, (iii) the entry of Purchaser into this Agreement is beneficial to Seller, and (iv) the Break-Up Fee and Expense Reimbursement are reasonable in relation to Purchaser's efforts and to the magnitude of the transactions contemplated hereby. The Break-Up Fee and/or Expense Reimbursement, as applicable, shall be payable to Purchaser in accordance with the Bidding Procedures Order only in the event that each of the following occurs: (i) this Agreement is terminated by Purchaser pursuant to either Section 6.2(b) (with respect to the Expense Reimbursement only and only to the extent provided therein) or Section 6.2(c) of this Agreement or by Purchaser or Seller pursuant to Section 6.3(a) of this Agreement and (ii) Purchaser does not purchase the Loan.

(b)    The payment of the Expense Reimbursement, if payable pursuant to Sections 6.2(b) and 9.1(a) of this Agreement, shall be payable on the first Business Day following Purchaser's termination of this Agreement pursuant to Section 6.2(b) of this Agreement.  The payment of the Break-Up Fee and Expense Reimbursement, if payable pursuant to Sections 6.2(c) and 9.1(a) of this Agreement, shall be payable on the first Business Day following Purchaser's termination of this Agreement pursuant to Section 6.2(c) of this Agreement.  The payment of the Break-Up Fee and Expense Reimbursement, if payable pursuant to Sections 6.3(a) and 9.1(a) of this Agreement, shall be made on or before the earlier to occur of (a) the third (3rd) Business Day after the closing of the sale in respect of a Competing Bid and (b) the thirtieth (30th) day following the Bankruptcy Court's entry of an order approving a Competing Bid.

Section 9.2    Competing Transaction.  Purchaser acknowledges that Seller is required to consider competing bids (each a "Competing Bid") pursuant to the Bidding Procedures Order.

(a)    From the date of this Agreement until the earlier of the date that the Bankruptcy Court enters the Bidding Procedures Order or the termination of this Agreement, except as otherwise required by the Bankruptcy Court, Seller shall not solicit or initiate any inquiry, offer or proposal from any Person regarding the sale or other disposition of the Loan; provided, however, that Seller and its Representatives shall be permitted at all times to respond

to any unsolicited inquiries or offers to purchase the Loan and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Loan to prospective purchasers and negotiating one or more Competing Bids. For the avoidance of doubt, any statements made by Seller in the Bidding Procedures Order or in the hearing in connection therewith or the service of the Sale Motion on prospective purchasers shall not be deemed to be a solicitation for purposes of this Agreement.

(b)    Following the entry of the Bidding Procedures Order by the Bankruptcy Court and until the Closing is consummated, Seller shall be permitted to cause its Representatives to market and initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Representatives) in connection with any sale or other disposition of the Loan, alone or in connection with the sale or other disposition of any other asset of Seller. In addition, during such time period, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase the Loan and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the assets of Seller to prospective purchasers.

Section 9.3    Bankruptcy Court Filings. As promptly as practicable following the execution of this Agreement, but in no event later than three (3) Business Days after the date of this Agreement, Seller shall file with and seek the approval of the Bankruptcy Court of the Sale Motion, and the entry by the Bankruptcy Court of the Bidding Procedures Order approving the payment of the Break-Up Fee and Expense Reimbursement. Seller agrees to seek a hearing on approval of (i) the Bidding Procedures Order on June 1, 2010, and (ii) the Sale Order within 25 days after the entry of the Bidding Procedures Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and the Bidding Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court or for providing to parties in interest in Seller's bankruptcy proceeding (subject in the latter case to a reasonable confidentiality agreement where appropriate) for the purposes, among others, of providing necessary assurances of performance by Purchaser and/or the AG Fund Guarantors under this Agreement and the Guaranty and providing evidence concerning whether Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Purchaser agrees that the provisions of the Confidentiality Agreement dated May 4, 2010 between Seller and Purchaser are not intended to limit Purchaser's obligations under this Section 9.3, provided, however, notwithstanding the foregoing, or anything else in this Agreement to the contrary, (x) neither Purchaser nor any of the AG Fund Guarantors, shall be obligated to disclose information that is deemed by Purchaser in its sole but good faith discretion to be required to be kept confidential, or is privileged or proprietary in nature such as by way of example and not limitation, the names of, or any other identifying information regarding, investors in the AG Fund Guarantors, details or amounts of any management fees or other similar compensation, or matters concerning any other transactions that may constitute investments of the AG Fund Guarantors or Affiliates of Purchaser and (y) the AG Fund Guarantors shall not be required to deliver further financial information pertaining to such AG Fund Guarantors that is in addition to the financial information being delivered prior to the date hereof, and the failure to deliver or disclose additional information under the foregoing clauses (x) or (y) shall not be deemed a breach of this Agreement. Notwithstanding anything to the contrary in this Agreement, (a) Purchaser is not

warranting that the Bankruptcy Court will conclude that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (b) Purchaser shall not be in breach of its obligations under this Agreement solely as a result of any determination of the Bankruptcy Court that Purchaser is not entitled to the protections of Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, each party shall use their respective commercially reasonable efforts to defend against such appeal. In the event that an appeal is taken, or a stay pending appeal is requested from the Sale Order or the Bidding Procedures Order, Seller shall promptly notify Purchaser of such appeal or stay request and provide to Purchaser a copy of the relevant notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders. From and after the date hereof, Seller shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order.

Section 9.4    Notice of Sale. Notice of the sale of the Loan contemplated in this Agreement shall be in a form reasonably acceptable to Purchaser and be served in accordance with applicable law (including, to the extent applicable, Bankruptcy Rules 2002 and 6004 and any local rules or orders of the Bankruptcy Court) on all Persons required to receive notice by this Agreement, the Bankruptcy Court and applicable law.

Section 9.5    Treatment of Monetary Obligations. All monetary obligations of Seller under this Agreement, including the Break-Up Fee and Expense Reimbursement and any claims asserted by Purchaser under this Agreement, shall be entitled to administrative expense priority in the Seller's Chapter 11 cases pursuant to Sections 503(b) and 507(a) of the Bankruptcy Code.

Section 9.6    Prevailing Party Legal Fees. If any action or proceeding is commenced to enforce this Agreement or any provision hereof, the losing party in such dispute shall reimburse the prevailing party for all reasonable attorneys' fees incurred by the prevailing party in such action or proceeding.

[Signatures to Follow]

IN WITNESS WHEREOF, Seller and Purchaser have executed and delivered this Agreement as of the date first set forth above.

PURCHASER:

ANGELO GORDON REAL ESTATE INC.,
    a Delaware corporation

By:  _____
      Name:
      Title: _____

SELLER:

CAPMARK FINANCE INC., debtor in possession

By:  _____
      Name:  William Gallagher
      Title:

ESCROW AGENT HEREBY AGREES
TO THE PROVISONS OF EXHIBIT J AND
ACKNOWELDGES RECEIPT OF THE DEPOSIT

FIDELITY NATIONAL TITLE INSURANCE COMPANY

By _____
    Name:
    Title:

EXHIBIT A

## THE LOAN

Loan in the original maximum principal amount of $70,400,000, which loan is evidenced by the following promissory notes:

1)    That certain Promissory Note A dated February 28, 2007 from Georgetown Park Partners, LLC to Capmark Finance Inc. in the principal amount of $66,000,000.

2)    That certain Promissory Note B dated February 28, 2007 from Georgetown Park Partners, LLC to Capmark Finance Inc. in the principal amount of $4,400,000.

EXHIBIT B

DEFINITIONS

"**Affiliate**" is defined, with respect to any specified Person, as any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise. The terms "controlling" and "controlled" have meanings correlative to the foregoing definition of "control."

"**AG Fund Guarantors**" is defined collectively as AG Realty Fund VII (TE), L.P., AG Realty Fund VII, L.P., AG Realty Fund VII(AC), L.P., AG KIC Realty Fund, L.P. and AG Realty VII(AU) Investments, L.P.

"**Agreement**" is defined as this Loan Purchase and Sale Agreement.

"**Bankruptcy Code**" is defined as the United States Code, 11 U.S.C. § 101 et seq.

"**Bankruptcy Court**" is defined as the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Court Authorizations**" is defined in Section 8.16.

"**Bidding Procedures Order**" is defined as an order of the Bankruptcy Court, substantially in the form of Exhibit P hereto, with such changes as are reasonably acceptable to Purchaser and Seller.

"**Borrower**" is defined as Georgetown Park Partners, LLC, the current obligor on the Note, and the owner of the Property subject to the Mortgage.

"**Borrower Parties**" is defined, collectively, as Borrower; Guarantor; Herbert Miller; WDC Georgetown Park Manager, LLC; WDC Georgetown Park , LLC; Capmark Commercial Realty Partners II, L.P.; Capmark Commercial Realty Partners IIA (REIT), Inc., and Commercial Realty Manager IIA (REIT), Inc., and their respective successors and assigns.

"**Break-Up Fee**" is defined in Section 9.1(a).

"**Broker**" is defined in Section 5.5.

"**Business Day**" is defined as any day, other than a Saturday, a Sunday, a federal holiday or any day on which banking institutions in New York City are not generally open for business.

"**Capmark Parties**" is defined, collectively, as Capmark Commercial Realty Partners II, L.P.; Capmark Commercial Realty Partners IIA (REIT), Inc., and Commercial Realty Manager IIA (REIT), Inc.

"**Cash Management Agreement**" is defined as the letter agreement relating to cash management identified in Exhibit K.

"**Claim**" is defined as any assertion, cause of action, claim, demand or legal proceeding.

"**Closing**" is defined as delivery of the Closing Documents, payment of the Purchase Price and sale and purchase of the Loan in accordance with this Agreement.

"**Closing Date**" is defined in Section 3.1.

"**Closing Documents**" is defined as all documents that are required to be delivered (or cause to be delivered) by Seller and/or Purchaser at the Closing in accordance with this Agreement.

"**Competing Bid**" is defined in Section 9.2.

"**Debt**" is defined in the Loan Agreement described in Exhibit K.

"**Deposit**" is defined in Section 3.2.

"**Designated Defenses**" is defined as only (a) any claims of the Borrower Parties, (b) any defenses of the Borrower Parties to the enforcement of the Loan or the Mortgage, (c) any claims or defenses of Eastbanc, Inc., Anthony Lanier or any other person or entity, with respect to the rights of the holder of the Loan or the Mortgage against the Property, and (d) any claims or defenses of any person or entity arising after the Closing Date; *provided, however*, that the term "Designated Defenses" shall not include any claim by any person for the recovery of money or property previously transferred to Seller or its Affiliates, including any claim for recovery of principal, interest, or other payments made to Seller and any claim for the recovery of damages arising from conduct of the Seller or its Affiliates occurring prior to the Closing Date; and *provided, further*, that nothing contained in this Agreement shall prejudice or adversely affect Purchaser's right or ability to assert claims, counterclaims, defenses or other arguments in respect of the Designated Defenses, including the right to assert that defenses to the enforcement of the Loan and any constructive trust claim of Eastbanc, Inc. or Anthony Lanier are without merit.

"**Eastbanc Litigation**" is defined in Section 4.2(d).

"**Environmental Claims**" is defined as any claims now existing or hereafter arising under that certain Environmental Indemnity Agreement dated February 28, 2007 made by Georgetown Park Partners, LLC and WDC Holdings, LLC in favor of Capmark Finance Inc. and all other Indemnified Parties (as defined therein).

"**Escrow Agent**" is defined in Section 3.2. Escrow Agent's address for Notices is set forth on **Exhibit J**.

"**Expense Reimbursement**" is defined in Section 9.1(a).

"**Foreclosure Proceeding**" is defined in Section 4.2(e).

"**Government List**" means (a) the OFAC SDN List, (b) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Seller notified Purchaser, in writing prior to the date hereof, is now included in "Government Lists" or (c) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America that Seller notified Purchaser in writing prior to the date hereof is now included in "Government Lists".

"**Guarantor**" is defined as, WDC Holdings, LLC, the guarantor of certain of Borrower's obligations with respect to the Loan.

"**Guaranty**" is defined as the Guaranty to be executed by the AG Fund Guarantors pursuant to Section 7.1(b).

"**Indemnified Persons**" is defined in Section 7.1.

"**Lender Party**" is defined as Lender together with Lender's successors and assigns, predecessors, servicers, subservicers, parents, subsidiaries and/or affiliated companies and the shareholders, trustees officers, directors, partners, members, beneficial owners, attorneys in fact, employees, agents, representatives and attorneys of all of the foregoing and their respective heirs, executors, administrators, attorneys, successors, legal representatives and assigns.

"**Loan**" is defined in the Recitals to this Agreement.

"**Loan File**" is defined as, with respect to the Loan,

a)  the original Note (or a copy of the Note together with a "lost note affidavit" in a form reasonably acceptable to Purchaser);
b)  the original or a Seller certified copy of the original Mortgage;
c)  the original or a Seller certified copy of all original assumption, modification and substitution agreements in those instances where the Note, the Mortgage or any other documents in the Loan File have been assumed or modified;
d)  the original or a Seller certified copy of that certain Loan Policy of Title Insurance No. 1412-837870 issued by Fidelity National Title Insurance Company in favor of Capmark Finance Inc. in the amount of $70,400,000.00, dated as of March 1, 2007; and
e)  all other material documents, files, correspondence, third party studies, and surveys relating to the Loan or the Property to the extent in Seller's possession, other than those that are deemed by Seller in its sole but good faith discretion is required to be kept confidential, or is privileged or proprietary in nature.
f)  the Loan documents identified on Exhibit K.

"**Loan-Related Matters**" means any thing, cause, matter, transaction, act or omission of any nature whatsoever of, or involving, in whole or in part, directly or indirectly, any of the following (i) the Loan, or any of the Loan Documents, (ii) the Property, (iii) the Debt, (iv)

any and all matters described in (or relating to or arising out the matters described in) all proofs of claim filed by Borrower, WDC Georgetown Park Manager, LLC, Herbert Miller and/or any other Borrower Parties (including proofs of claim numbers 1633, 1634, 1483, 1484, 1619 and 1622) in the bankruptcy proceedings of Lender, Capmark Investments LP and their affiliates or (v) any transactions, occurrences, acts, omissions, statements, promises, agreements or undertakings of any Lender Party (or of any contractor, counsel or representative of a Lender Party) made or omitted to be made in connection with any of the foregoing <u>clauses (i)</u> through <u>(iv)</u> or other matters arising out of the relationship between any Borrower Parties and any Lender Party with respect thereto, including any and all documents executed in connection therewith or any other document, instrument or agreement and the representations and warranties set forth herein or therein.

"**Material Breach**" is defined as a breach of any representation and warranty of Seller expressly set forth in Article V of this Agreement that causes a loss in the value of the Loan in an amount exceeding $500,000.

"**Mortgage**" is defined as, with respect to the Loan, the mortgages, deeds of trust or other instruments purporting to create a continuing lien and security interest against the Property, as from time to time amended, modified, renewed or extended.

"**New Lockbox Account**" shall have the meaning given to such term in the Cash Management Agreement.

"**Note**" means, collectively, the promissory notes described on Exhibit A of this Agreement, as from time to time amended, modified, renewed or extended.

"**Notice**" is defined as any and all acceptances, approvals, consents, demands, notices, requests and other communications required or permitted to be given under this Agreement.

"**Notice of Pendency**" is defined as the Notice of Pendency of Action recorded against the Property on October 17, 2006 as Instrument No. 2006141043.

"**OFAC**" means the United States Department of Treasury Office of Foreign Assets Control.

"**OFAC SDN List**" means the list of "Specially Designated Nationals and Blocked Persons" maintained by OFAC.

"**Patriot Act Offense**" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (a) the criminal laws against terrorism or (b) any laws or regulations relating to money laundering or terrorist financing, including, without limitation, the Bank Secrecy Act, 31 U.S.C. sections 5301 *et seq.*; the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56 (a/k/a the USA Patriot Act); Laundering of Monetary Instruments, 18 U.S.C. section 1956; Engaging in Monetary

Transactions in Property Derived from Specified Unlawful Activity, 18 U.S.C. section 1957; the Financial Recordkeeping and Reporting of Currency and Foreign Transaction Regulations, 31 C.F.R. Part 103; and any similar laws or regulations currently in force or hereafter enacted. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**Property**" is defined as the property encumbered by the Mortgage.

"**Purchase Price**" is defined in Section 3.2.

"**Purchaser**" is defined in the introductory paragraph.   Purchaser's address for Notices is as follows:

> Angelo Gordon Real Estate Inc.
> 245 Park Avenue, 26th Floor
> New York, New York 10167
> Attention: Dana Roffman
>
> with a courtesy copy to:
>
> Duval & Stachenfeld LLP
> 101 Park Avenue, 11th Floor
> New York, New York 10178
> Attention:  Terri L. Adler, Esq.

"**Purchaser's Knowledge**" is defined as the actual (as opposed to imputed or constructive) knowledge of Dana Roffman, without any duty of investigation or inquiry; provided, that the foregoing shall not impose any personal liability on Dana Roffman.

"**Representatives**" is defined as, with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, advisors and other representatives.

"**Reserve Accounts**" is defined as the "Ground Rent Reserve" and the "Suspension Reserve" referred to in Section 5.2(j) which as of the date hereof are the only reserves being held by or on behalf of Lender pursuant to the Loan Documents.

"**Reserve Account Balance**" is defined as the positive balance of funds, if any, held by or on behalf of the Seller in the Reserve Accounts.

"**Sale Motion**" means the motion or motions of the Seller, in form and substance reasonably acceptable to Purchaser, seeking approval and entry of the Bidding Procedures Order and the Sale Order.

"**Sale Order**" means an order of the Bankruptcy Court substantially in the form of **Exhibit Q** hereto, with such changes as are reasonably acceptable to Purchaser and Seller.

"**Seller**" is defined in the introductory paragraph.  Seller's address for Notices is as follows:

> Capmark Finance Inc.
> 485 Madison Avenue
> New York, New York 10022
> Attention:  Jonathan B. Kohan

with a copy to:

> Kaye Scholer LLP
> 425 Park Avenue
> New York, New York 10022
> Attention:  Louis J. Hait, Esq.

"**Seller's Knowledge**" is defined as the actual (as opposed to imputed or constructive) knowledge of Jonathan Kohan, Claudia Piper, or Lori Blonder without any duty of investigation or inquiry; provided, that the foregoing shall not impose any personal liability on Jonathan Kohan, Claudia Piper, or Lori Blonder.

"**Survival Period**" is defined in Section 5.3.

"**UCC Financing Statement**" is defined as a financing statement executed and filed pursuant to the Uniform Commercial Code, as in effect in the relevant jurisdiction.

EXHIBIT C

RULES OF CONSTRUCTION

1.    References in this Agreement to numbered Articles or Sections are references to the Articles and Sections of this Agreement.  References in this Agreement to lettered Exhibits and numbered Attachments are references to the Exhibits and Attachments attached to this Agreement, all of which are incorporated in and constitute a part of this Agreement.  Article, Section, Exhibit and Attachment captions used in this Agreement are for reference only and do not describe or limit the substance, scope or intent of this Agreement or the individual Articles, Sections, Exhibits or Attachments of this Agreement.

2.    The terms "include", "including" and similar terms are construed as if followed by the phase "without limitation."

3.    The term "Property" is construed as if followed by the phrase "or any part thereof."

4.    The singular of any word includes the plural and the plural includes the singular.  The use of any gender includes all genders.

5.    The term "provisions" includes terms, covenants, conditions, agreements and requirements.

6.    The term "amend" includes modify, supplement, renew, extend, replace, restate and substitute and the term "amendment" includes modification, supplement, renewal, extension, replacement, restatement and substitution.

7.    Reference to any specific law or to any document or agreement includes any future amendments to or replacements of the law, document or agreement, as the case may be.

8.    No inference in favor of or against a party with respect to this Agreement may be drawn from the fact that the party drafted this Agreement.

9.    All obligations, rights, remedies and waivers contained in this Agreement will be construed as being limited only to the  extent required to be enforceable under the law.

EXHIBIT D

## ESCROW AGENT'S WIRING INSTRUCTION

ABA#:            021000021

SWIFT CODE#:     CHASUS33

BANK:            JP MORGAN CHASE REAL ESTATE DIVISION
                 717 TRAVIS
                 MAIL CODE TX2-S085
                 HOUSTON, TX 77002

BANK CONTACT:    PATRICIA R. REYES
                 (713) 216-3988

ACCT NAME:       FIDELITY NATIONAL TITLE INSURANCE
                 COMPANY

ACCT#:           06171176

FNT TITLE#:      22351

TITLE OFFICER:   Tom Glatthaar

FNT CONTACT:     ACCOUNTING DEPARTMENT
                 (212) 481-5858


PLEASE NOTE: REFERENCE TO TITLE # MUST APPEAR ON ALL WIRES.

EXHIBIT E

RECEIPT FOR LOAN FILE

RECEIPT

_____ ("Purchaser") acknowledges receipt, in conformance with the requirements of the Loan Purchase and Sale Agreement dated as of _____, between Capmark Finance Inc., debtor in possession ("Seller") and Purchaser (the "Agreement"), of the documents in the Loan File (as defined in the Agreement; capitalized terms not defined in this receipt have the meanings given them in the Agreement) that are described in Schedule A attached to this receipt.

PURCHASER:

[_____]

By:   _____
      Name:
      Title:

EXHIBIT E

## SCHEDULE A

- The original Note (or a copy thereof together with a "lost note affidavit" of Seller);

- the original or Seller certified copy of the original Mortgage;

- the original or Seller certified copy of all original assumption, modification and substitution agreements in those instances where the Note, the Mortgage or any other documents in the Loan File have been assumed or modified;

- the original or Seller certified copy of lender's title insurance policy for the Loan; and

- all other material documents, files, correspondence, third party studies, and surveys relating to the Loan or the Property, to the extent in Seller's possession, other than those that are deemed by Seller in its sole discretion to be confidential, privileged or proprietary in nature.

EXHIBIT F

Form of Notice of Withdrawal

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------------x
                                           :
In re                                      :        Chapter 11 Case No.
                                           :
CAPMARK FINANCIAL GROUP INC., et al.,      :
                                           :        09-13684 (CSS)
        Debtors.                           :
                                           :        Jointly Administered
                                           :
------------------------------------------------------------------x
```

## NOTICE OF WITHDRAWAL OF PROOF OF CLAIM NUMBERS 1633
## AND 1634 FILED BY GEORGETOWN PARK PARTNERS, LLC
## AND PROOF OF CLAIM NUMBERS 1483, 1484, 1619 AND 1622
## FILED BY WDC GEORGETOWN PARK MANAGER, LLC

(A)    **PLEASE TAKE NOTICE** that on or about April 23, 2010, Georgetown

Park Partners, LLC filed Proof of Claim Number 1633 against Capmark Investments LP and

Proof of Claim Number 1634 against Capmark Finance Inc. (Chapter 11 Case No. 09-13689).[1]

---

[1]    The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are:  Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P.

(B)    **PLEASE TAKE NOTICE** that on or about April 23, 2010, WDC

Georgetown Park Manager, LLC filed Proof of Claim Numbers 1483 and 1622 against Capmark

Investments LP and Proof of Claim Numbers 1484 and 1619 against Capmark Finance Inc.

(C)    **PLEASE TAKE NOTICE** that Georgetown Park Partners, LLC hereby

withdraws with prejudice Proof of Claim Numbers 1633 and 1634, true copies of which are

annexed hereto.

(D)    **PLEASE TAKE NOTICE** that WDC Georgetown Park Manager, LLC

hereby withdraws with prejudice Proof of Claim Numbers 1483, 1484, 1619 and 1622, true

copies of which are annexed hereto.

Dated: _____

GEORGETOWN PARK PARTNERS, LLC

By: WDC Georgetown Park Manager, LLC

By: _____
       Herbert S. Miller
       Chairman, Board of Managers

WDC GEORGETOWN PARK MANAGER, LLC

By: _____
       Herbert S. Miller
       Chairman, Board of Managers

---

(9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), Capmark
Affordable Equity Inc. (2381), and Capmark Investments LP (7999). CFGI's corporate headquarters is
located at 116 Welsh Road, Horsham, Pennsylvania, 19044. The addresses for all of the Debtors are
available at the following World Wide Web address: http://chapter11.epiqsystems.com/capmark.

EXHIBIT G

## FORM OF ALLONGE

CAPMARK FINANCE INC., debtor in possession ("Transferor") hereby assigns and endorses to _____, a _____ ("Transferee"), the attached [DESCRIBED NOTE] (the "Note") dated as of February 28, 2007 by Georgetown Park Partners, LLC, a Delaware limited liability company to Transferor.

Except for the representations and warranties expressly made by Transferor to Transferee pursuant to Article V of that certain Loan Purchase and Sale Agreement dated as of May __, 2010 between Transferor and Transferee, (and subject to the "Survival Period" referred to in Section 5.3 thereof), this endorsement is made by Transferor to Transferee (a) on an "AS IS", "WHERE IS" basis "WITH ALL FAULTS", (b) subject to any and all claims and/or defenses of all types and (c) without representation, warranty or recourse (express or implied) of any kind.

Dated: _____ __, 2010

CAPMARK FINANCE INC., debtor in possession

By: _____
      Name:
      Title:

EXHIBIT H

## FORM OF BILL OF SALE, ASSIGNMENT AND ASSUMPTION OF NOTES AND LOAN DOCUMENTS

Return Recorded Copy To:

Fidelity National Title Insurance Company
1 Park Avenue, Suite 1402
New York, NY 10016
Attention: Kenneth Cohen

### BILL OF SALE, ASSIGNMENT AND ASSUMPTION OF NOTES AND LOAN DOCUMENTS

**Holder of Notes and Lien:**   CAPMARK FINANCE INC., debtor in possession
                                485 Madison Avenue, 21st Floor
                                New York, NY 10022

**Assignee:**

**Loan Documents:**       **SEE EXHIBIT A ATTACHED HERETO**
                          (collectively, and together with all other documents, instruments,
                          assignment and other agreements that evidence or secure
                          repayment of the indebtedness evidenced by the Notes (defined
                          below) the "Loan Documents")

The Notes (items 1 and 2 on Exhibit A) and the lien securing repayment thereof are described in that certain Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing executed by Georgetown Park Partners, LLC, a Delaware limited liability company ("Borrower"), to Kelly M. Wrenn, Trustee for the benefit of Capmark Finance Inc., dated February 28, 2007 and recorded March 1, 2007 as Instrument No. 2007028716, as affected by Deed of Appointment of Substitute Trustee dated March 25, 2010 and recorded March 31, 2010 as Instrument No. 2010028334 with the District of Columbia Recorder of Deeds.

The property subject to the Lien (the "Property") is described in Exhibit B attached hereto and incorporated herein for all purposes.

As used herein, "Lien" shall include all liens held by the Holder against the Property, and all rights against the Borrower and any other parties referenced in the Loan Documents, as renewed, extended and/or modified.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Holder of the Notes and Loan Documents hereby sells, transfers and assigns the Note and Loan Documents and all Lender Claims (as such term is defined in the LPSA described below) to Assignee and to Assignee's successors and assigns, and, except for the

representations and warranties expressly made by Holder to Assignee pursuant to Article V of that certain Loan Purchase and Sale Agreement dated as of May __, 2010 (the "LPSA") made by and between Holder and Assignee, as the same may have been amended, modified or otherwise supplemented (and subject to the "survival period" referred to in Section 5.3 thereof), this Assignment and Assumption of Notes and Loan Documents is made to Assignee (a) on an "AS IS" "WHERE IS" basis "WITH ALL FAULTS", (b) subject to any and all claims and/or defenses of all types and (c) without representation, warranty or recourse (express or implied) of any kind.

Notwithstanding the foregoing, however, Assignor shall be afforded the non-exclusive benefits of the holder of the Loan (as such term is defined Exhibit L to the LPSA) with respect to the Environmental Claims provided, however, that the exercise or enjoyment of same does not detract from the exercise or enjoyment of same by Assignee.

Assignee hereby assumes all obligations of Holder under the Loan Documents to which Holder is a party.

This Bill of Sale, Assignment and Assumption of Notes and Loan Documents may be executed in counterparts which together will constitute a single original document.

Executed this ___ day of _____, 2010.

CAPMARK FINANCE INC., debtor in possession

By: _____
      Name:
      Title:

STATE OF           §
                    §
COUNTY OF        §

     This instrument was acknowledged before me on this ___ day of _____, 2010, by _____, a _____ of Capmark Finance Inc., debtor in possession, on behalf of said association.

_____
Notary Public/State of _____

[ASSIGNEE], a _____

By: _____
        Name:
        Title:

STATE OF              §
                            §
COUNTY OF         §

    This instrument was acknowledged before me on this ___ day of _____, 2010, by _____, a _____ of _____, a _____, on behalf of said association.


_____
Notary Public/State of _____

3

## EXHIBIT A: DESCRIPTION OF LOAN DOCUMENTS

### 1.NOTE   NO. 1:

Title of Note: _____ Promissory Note A _____

Original principal amount: ____ $66,000,000 _____

Date of Note: _____ February 28, 2007 _____

Payable to the order of: _____ Capmark Finance Inc. _____

### 2.NOTE   NO. 2:

Title of Note: _____ Promissory Note B _____

Original principal amount: ____ $4,400,000 _____

Date of Note: _____ February 28, 2007 _____

Payable to the order of _____ Capmark Finance Inc. _____

### 3.LO   AN AGREEMENT:

Title of Loan Agreement: _____ Loan Agreement _____

Date of Loan Agreement: _____ February 28, 2007 _____

Parties to Loan Agreement:

Borrower: Georgetown Park Partners, LLC _____

Lender: Capmark Finance Inc. _____

### 4.DEED O   F TRUST:

Title of Deed of Trust: Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing _____

Recorded in the Land Records of the District of Columbia as Instrument No. 2007028716 on March 1, 2007.

### 5.G   UARANTY AGREEMENT:

Title of Guaranty Agreement: __ Guaranty (Exceptions to Nonrecourse Liability)

Date of Guaranty Agreement: __ February 28, 2007 _____

Executed by: _____ WDC Holdings, LLC _____

Executed in favor of: Capmark Finance Inc. _____

### 6.OTH   ER:

Title of Document: _____ UCC Financing Statement _____

Recorded in the Land Records of the District of Columbia as Instrument No. 2007028718 on March 1, 2007.

**7.OTH  ER:**

Title of Document: _____ UCC Financing Statement _____

Recorded with the Delaware Department of State, U.C.C. Filing Section, as Instrument No. 2007-0784545 on March 1, 2007.

**8.TI  TLE POLICY:**

Title of Document: _____ Loan Policy of Title Insurance. Policy No. 1412-837870, issued by Fidelity National Title Insurance Company, File No. D06-5665. _____

Date of Policy: _____ March 1, 2007 _____

Name of Insured: _____ Capmark Finance Inc., a California corporation, and/or its successors and assigns, as their interests may appear.

Title vested in: _____ Georgetown Park Partners, LLC _____

**9.ENVIRONMENTAL   INDEMNITY:**

Title of Document: Environmental Indemnity Agreement _____

Date of Agreement: _____ February 28, 2007 _____

Executed by: Georgetown Park Partners, LLC and WDC Holdings, LLC

Executed in favor of: Capmark Finance Inc. and all other Indemnified Parties (as defined therein) _____

**10. ASSIGNMENT OF LEASES AND RENTS:**

Title of Document: Assignment of Leases and Rents _____

Date of Agreement: _____ February 28, 2007 _____

Executed by: Georgetown Park Partners, LLC _____

Executed in favor of: Capmark Finance Inc. _____

Recorded in the Land Records of the District of Columbia as Instrument No. 2007028717 on March 1, 2007.

**11. ASSIGNMENT AND SUBORDINATION OF PROPERTY MANAGEMENT:**

Title of Document: _____ Assignment of Property Management Contract and Subordination of Management Fees _____

Date of Agreement: _____ March 15, 2007 _____

Executed by: _____ Georgetown Park Partners, LLC and General Growth Management, Inc. _____

Executed in favor of: Capmark Finance Inc. _____

**12. ASSIGNMENT OF RATE CAP:**

Title of Document: _____ Assignment of Interest Rate Cap as Collateral

Date of Agreement: _____ February 28, 2007

Executed by: _____ Georgetown Park Partners, LLC

Executed in favor of: _____ Capmark Finance Inc.

### 13. O&M AGREEMENT:

Title of Document: Operations and Maintenance Agreement (Asbestos)

Date of Agreement: _____ February 28, 2007

Parties to Agreement:

Borrower: Georgetown Park Partners, LLC

Lender: Capmark Finance Inc.

### 14. OTHER:

Title of Document: Post Closing Agreement

Date of Agreement: _____ February 28, 2007

Parties to Agreement:

Borrower: Georgetown Park Partners, LLC

Lender: Capmark Finance Inc.

## Exhibit B

## THE PROPERTY

## PARCEL I

The following parcels of land being parts of Lots 64 and 65 in Square 1200, which parcels are more particularly described as follows:

**Parcel 1**

All that certain real property which lies below (but not above) a horizontal plane, the elevation of which is 67.00 feet above the District of Columbia Department of Transportation Engineer's Datum Line which designates as zero an elevation 0.7 feet below sea level as determined by the United States Coast and Geodetic Survey Datum, which is bounded by and lies within Lot 64 in Square 1200 as shown on a plat of subdivision recorded in the Office of the Surveyor of the District of Columbia in Book 167 at page 171;

Less and Except those portions of said land included within the Georgetown Park Condominium as described in the Condominium Declaration dated October 9, 1980, recorded October 21, 1980, as Instrument No. 33628 and shown on the Plat and Plans of Condominium Subdivision – The Georgetown Park Condominium, recorded in said Surveyor's Office in Condominium Plat Book 27 at page 8, et seq.; and

**Parcel 2**

All that certain real property which lies below (but not above) a horizontal plane the elevation of which is 82.04 feet above said Engineer's Datum Line which is bounded by and lies within Lot 65 in Square 1200 as shown on a plat of subdivision, recorded in said Surveyor's Office in Book 169 at Page 47; saving and excepting therefrom a sixteen-inch strip or parcel of land being northerly of and adjacent to the southerly or North 87 degrees 44' 37" West 184.11 foot and West 160.00 lines of said Lot 65; and also less and except the following six portions of said land, namely:

1.    those portions of said land included within the Georgetown Park Condominium as described in the First Amendment to the Condominium Declaration, dated December 28, 1981, recorded February 11, 1982, as Instrument No. 3912 and shown on the Plat and Plans of Condominium Subdivision – The Georgetown Park Condominium Expanded Phase II, recorded in said Surveyor's Office in Condominium Plat Book 30 at page 9, et seq.;

Also those portions of said land included within the Georgetown Park Condominium as described in the Third Amendment to Condominium Declaration recorded November 18, 1982 as Instrument No. 29856 and shown on the Plat and Plans of Condominium Subdivision – The Georgetown Park Condominium Expanded Phase III recorded in Condominium Book 31 at page. 41, et seq. of said Surveyor's Office Records.

Also those portions of said land included within the Georgetown Park Condominium as described in the Fourth Amendment to Condominium Declaration recorded June 2, 1983 as Instrument No. 16164 and shown on the Plat and Plans of Condominium Subdivision – The Georgetown Park Condominium Corrected Phase III and III-A recorded in Condominium Book 32 at page 21, et seq. of said Surveyor's Office Records.

Also those portions of said land included within the Georgetown Park Condominium as described in the Fifth Amendment to Condominium Declaration recorded December 20, 1983 as Instrument No. 41339 and shown on the Plat and Plans of Condominium Subdivision – The Georgetown Park Condominium Expanded Phase IV recorded in Condominium Book 33 at page 13, et seq. of said Surveyor's Office records.

2.  the area of condominium parking for Phase III and potential future phases of the Condominium described in three parts: Parts (b)(i) and (b)(ii) consist of all that certain real property which lies above (but not below) a horizontal plane the elevation of which is 26.87 feet above said Datum Line and below (but not above) a horizontal plane the elevation of which is 34.87 feet above said Datum Line, which parcels are bounded by and lie within the parcels of land described as follows: Part (b)(i) Beginning the two following courses from a point on the southerly line of "M" Street at the end of the East 90.28 foot line of Lot 65, (1) South 89.00 feet, (2) West 17.00 feet and running thence the eighteen following courses across said Lot 65, West 13.00 feet, thence South 2.00 feet thence, West 59.21 feet, thence, North 42.75 feet, thence East 1.43 feet, thence North 25.00 feet, thence, East 20.00 feet, thence North 20.75 feet, thence East 9.00 feet, thence South 20.75 feet, thence East 11.00 feet, thence North 20.75 feet, thence East 38.00 feet, thence South 64.50 feet, thence West 14.00 feet, thence South 13.00 feet, thence East 7.22 feet, thence South 9.00 feet to the place of beginning; Part (b)(ii) Beginning the two following courses from a point on the southerly line of "M" Street at the end of the East 69.00 foot line of Lot 65 as shown on said plat of Lot 65, (1) South 89.00 feet, (2) West 2.00 feet and running thence the eleven following courses across said Lot 65, South 1.00 foot, thence West 48.00 feet, thence, North 22.00 feet, thence, West 19.85 feet, thence, North 64.67 feet, thence, East 60.00 feet, thence, South 76.92 feet, thence, East 9.85 feet, thence, South 74 degrees 24' 22" East 23.36 feet, thence South 3.47 feet, thence, West 22.50 feet, to the place of beginning; Part (b)(iii) All that certain real property lying above (but not below) a sloping plane which at its junction with the 7th course of the parcel described below is 15.03 feet above said Datum Line and at its junction with the 1st course of the parcel is 18.21 feet above said Datum Line, and which is below (but not above) a sloping plane which at its junction with the 7th course of the parcel is 23.00 feet above said Datum Line and at its junction with the 1st course of the parcel is 26.20 feet above said Datum Line which is bounded by and lies within the parcel of land described as follows: Beginning on the two following courses from the southwest corner of Lot 65, as shown on said plat of Lot 65, (1) North 119.85 feet, (2) East 192.00 feet, and running thence the eight following courses across said Lot 65 (1) South 60.00 feet, thence (2) West 50.00 feet, thence (3) North 20.00 feet, thence (4) West 10.00 feet, thence (5) South 20.00 feet, thence (6) West 10.00 feet, thence (7) North 60.00 feet, thence (8) East 70.00 feet, to the place of beginning.

3.     The Condominium Regime Entrance Area to Wisconsin Avenue; being all that land lying above (but not below) a horizontal plane the elevation of which is 65.16 feet above said Datum Line and below (but not above) a horizontal plane the elevation of which is 82.04 feet above said Datum Line, which is bounded by and lies within the parcel of land described as follows: Beginning at a point on the South 72.00 foot line of said Lot 65, 42.00 feet from the beginning thereof, said line being the westerly line of Wisconsin Avenue and running thence, South 12.50 feet with said westerly line of Wisconsin Avenue, thence, West 59.00 feet, thence, North 12.50 feet, thence, East 59.00 feet to the place of beginning.

4.     The elevator shaft at the Condominium Regime Entrance to Wisconsin Avenue; being all that land lying below (but not above) a horizontal plane the elevation of which is 65.16 feet above said Datum Line, which is bounded by and lies within the parcel of land described as follows: Beginning the two following courses from a point on the westerly line of Wisconsin Avenue at the beginning of the South 72.00 foot line of Lot 65 as shown on said plat of Lot 65, (1) South 47.83 feet, (2) West 32.00 feet and running thence the four following courses across said Lot 65, South 6.67 feet, thence, West 9.67 feet, thence, North 6.67 feet, thence, East 9.67 feet to the place of beginning.

5.     The stairway at the Condominium Regime Entrance to Wisconsin Avenue; being all that land lying above (but not below) a horizontal plane the elevation of which is 34.54 feet above said Datum Line and below (but not above) a horizontal plane the elevation of which is 65.16 feet above said Datum Line, which is bounded by and lies within the parcel of land described as follows: Beginning at the two following courses from a point on the westerly line of Wisconsin Avenue at the beginning of the South 72.00 foot line of Lot 65 as shown on said plat of Lot 65, (1) South 54.50 feet, (2) West 41.67 feet and running thence the four following courses across said Lot 65, West 17.22 feet, thence North 12.50 feet, thence East 17.33 feet, thence South 12.50 feet to the place of beginning.

6.     All that parcel of land consisting of a 12 foot by 80 foot strip at the Northeast corner of Lot 48, Square 1200, described as follows: Beginning at the intersection of the north line of Lot 48 and the westerly line of Wisconsin Avenue, thence South along the westerly line of Wisconsin Avenue 12 feet; thence West along a line parallel to the north line of Lot 48, 80 feet to Warehouse Lot; thence North to the north line of Lot 48, 12 feet; thence east along the north line of Lot 48, 80 feet to the point of beginning.

## Parcel 3

All that certain real property which lies above (but not below) a horizontal plane the elevation of which is 82.04 feet above said Datum Lime and below (but not above) a horizontal plane the elevation of which is 94.19 feet above said Datum Line, which is bounded by and lies within the parcel of land described as follows: Beginning at the end of the East 90.28 foot line of Lot 65, said line being the southerly line of "M" Street, as shown on said plat of Lot 65 and running thence, South 89.00 feet, thence, West 10.00 feet, thence, North 9.00 feet, thence, West 16.00 feet, thence, South 9.00 feet, thence, West 1.78 feet, thence, South 24.00 feet, thence, West

62.50 feet, thence, North 113.00 feet, thence, East 90.28 feet, with the aforementioned southerly line of "M" Street to the place of beginning.

## Parcel 4

All that certain real property which lies above (but not below) a horizontal plane the elevation of which is 94.19 feet above said Datum Line and below (but not above) a horizontal plane the elevation of which is 111.52 feet above said Datum Line, which is bounded by and lies within the parcel of land described as follows:  Beginning at the end of the East 90.28 foot line of Lot 65, being the southerly line of "M" Street, as shown on said plat of Lot 65 and running thence, South 89.00 feet, thence, West 10.00 feet, thence, North 9.00 feet, thence West 7.00 feet, thence, North 25.00 feet, thence, West 50.80 feet, thence North 9.67 feet, thence, West 7.75 feet, thence, South 15.00 feet, thence, West 4.33 feet, thence, South 6.00 feet, thence, West 10.40 feet, thence, North 66.33 feet, thence, East 90.28 feet with the aforementioned southerly line of "M" Street, to the place of beginning.

## Parcel 5

All that certain real property which lies above (but not below) a horizontal plane the elevation of which is 82.04 feet above said Datum Line and below (but not above) a horizontal plane the elevation of which is 92.00 feet above said Datum Line, which is bounded by and lies within the six parcels of land described as follows:

(a)    Beginning at a point on the westerly or North 252.22 foot line of Lot 65, being the easterly line of former Warehouse Place, as shown on said plat of Lot 65, 44.50 feet from the beginning of said line and running thence the ten following courses across said Lot 65, East 20.90 feet, south 11.75 feet, thence East 3.50 feet, thence, South 10.50 feet, thence, South 41 degrees 04' 50" East 2.59 feet, thence South 4.40 feet, thence West 11.80 feet, thence North 1.80 feet, thence West 14.30 feet, thence North 26.80 feet to the place of beginning.

1.    Beginning the two following courses from the southwest corner of Lot 65, as shown on aforesaid plat of Lot 65, (1) North 15.70 feet, (2) East 95.83 feet, and running thence the fourteen following courses across said Lot 65, North 20.33 feet, thence East 5.50 feet, thence North 14.17 feet, thence East 4.33 feet, thence south 8.67 feet, thence East 16.33 feet, thence North 8.67 feet, thence East 20.00 feet, thence South 28.75 feet, thence East 1.00 feet, thence South 11.00 feet, thence West 20.83 feet, thence North 5.25 feet, thence West 26.33 feet, to the place of beginning.

2.    Beginning the two following courses from the southwest corner of Lot 65, as shown on aforesaid plat of Lot 65, (1) North 15.70 feet, (2) East 157.33 feet, and running thence the four following courses across said Lot 65, North 34.33 feet, thence East 16.83 feet, thence South 34.33 feet, thence West 16.83 feet, to the place of beginning.

3.    Beginning the two following courses from the southwest corner of Lot 65, as shown on aforesaid plat of Lot 65, (1) North 15.70 feet, (2) East 214.83 feet, and running thence the six following courses across said Lot 65, North 19.67 feet, thence East 6.17 feet, thence North 14.67 feet, thence East 15.42 feet, thence South 34.33 feet, thence West 21.58 feet, to the place of beginning.

4.    Beginning the two following courses from the southwest corner of Lot 65, as shown on aforesaid plat of Lot 65, (1) North 56.85 feet, (2) East 290.50 feet, and running thence the six following courses across said Lot 65, North 23.50 feet, thence East 17.25 feet, thence South 16.50 feet, thence West 0.67 foot, thence South 7.00 feet, thence West 16.58 feet, to the place of beginning.

5.    Beginning the two following courses from the southwest corner of Lot 65, as shown on aforesaid plat of Lot 65, (1) North 129.85 feet, (2) East 77.00 feet, and running thence the six following courses across said Lot 65, North 32.33 feet, thence East 22.00± feet, thence South 29.50 feet, thence West 16.00± feet, thence South 2.83 feet, thence West 6.00 feet, to the place of beginning.

**Parcel 6**

All that certain real property which lies above (but not below) a horizontal plane the elevation of which is 82.04 feet above said Datum Line and below (but not above) a horizontal plane the elevation of which is 100.00 feet above said Datum Line, which is bounded by and lies within the parcel of land described as follows: Beginning the two following courses from the southwest corner of Lot 65, as shown on aforesaid plat of Lot 65, (1) North 76.85 feet, (2) East 59.00 feet, and running thence the sixteen following courses across said Lot 65, North 46.00 feet, thence East 26.00 feet, thence South 9.25 feet, thence East 94.00 feet (being the fourth or East 94.00 foot line mentioned below), thence North 2.00 feet, thence North 45 degrees East 19.25 feet, thence East 19.25 feet, thence South 45 degrees East 19.25 feet, thence South 19.25 feet, thence South 45 degrees West 19.25 feet, thence West 19.25 feet, thence North 45 degrees West 19.25 feet, thence North 8.25 feet, thence West 94.00 feet, thence South 27.75 feet, thence West 26.00 feet, to the place of beginning; less and except that portion of Parcel 6 lying above (but not below) a horizontal plane the elevation of which is 91.00 feet above said Datum Line which is bounded by and lies within the parcel of land described as follows: Beginning at the end of the fourth or East 94.00 foot line of Parcel 6 as described above thence running the following four distances across Lot 65, South 9.00 feet, thence West 94.00 feet, thence North 9.00 feet, thence East 94.00 feet to the point of beginning.

**Parcel 7**

All that certain real property which lies above (but not below) a horizontal plane the elevation of which is 82.04 feet above said Datum Line and below (but not above) a horizontal plane the elevation of which is 110.00 feet above said Datum Line, which is bounded by and lies within the parcel of land described as follows: Beginning at a point on the westerly or North 252.22 foot line of said Lot 65, being the easterly line of Warehouse Place, as shown on said plat of Lot 65, 162.22 feet from the beginning of said line and running thence the four following courses across said Lot 65, East 21.00 feet, thence South 22.50 feet, thence West 21.00 feet, thence North 22.50 feet, to the place of beginning.

## PARCEL II

All that parcel of land at the northeast corner of Lot 48, Square 1200, which lies below (but not above) a horizontal plane the elevation of which is 82.04 feet above said Datum Line,

which is bounded by and lies within the parcel being as follows: Beginning at the intersection of the north line of Lot 48 and the westerly line of Wisconsin Avenue, thence south along the westerly line of Wisconsin Avenue 12 feet, thence west along a line parallel to the north line of Lot 48, 80 feet to Warehouse Lot, thence north to the north line of Lot 48, 12 feet, thence east along the north line of Lot 48, 80 feet to the point of beginning.

## PARCEL III

Part of Lots 48 and 49 in Square numbered 1200 as follows:

Beginning for the same at a point in the West line of Wisconsin Avenue, formerly High Street, distant 56 feet South from a 12 foot wide alley as described in Deed to Gilbert Vanderwerken, recorded September 24, 1851, among the Land Records of the District of Columbia, in Liber J.A.S. 30 at folio 484.

The point of beginning being also the Southeast corner of the land conveyed to Washington and Georgetown Railroad Co., by Deed recorded April 16, 1883, among said Land Records in Liber 1037 at folio 306; thence south along the West line of Wisconsin Avenue, formerly High Street, 31 feet more or less to the South line of the land conveyed to the Corporation of Georgetown by Deed recorded November 14, 1822, among said Land Records in Liber W.B. 6 at folio 333; thence South and still along the west line of Wisconsin Avenue, formerly High Street, 13.50 feet, more or less, to the North line of the tow-path of the Chesapeake and Ohio Canal; thence Northwesterly along said last mentioned line 80 feet, more or less, to a point of intersection with a Squarely prolongation of the West line of said Lot 48; thence running North along said prolonged line reversed to the Southwest corner of said Lot 48; thence East along said South line of said part of Lot 48, 80 feet to the West line of Wisconsin Avenue, formerly High Street, and the place of beginning. Said land being also known as Lot 842, Square 1200.

## PARCEL IV

A.      An east bridge crossing the Chesapeake and Ohio Canal at the point 120 feet from the Wisconsin Avenue bridge, being 18.2 feet above the canal tow-path (at elevation 56.5 feet) and 12 feet in width and presenting an elevation of 5 feet 6 inches, top to bottom.

B.      A west bridge crossing the Chesapeake and Ohio Canal at a point 60 feet east of the former right-of-way of Warehouse Place and consisting of two levels, one 24.2 feet above the tow-path (at elevation 62.5 feet), and one 42.2 feet above the tow-path (at elevation 80.5 feet).

## PARCEL V

A.      The Condominium Regime Entrance Area to Wisconsin Avenue being all that land lying above (but not below) a horizontal plane the elevation of which is 65.16 feet above said Datum Line and below (but not above) a horizontal plane the elevation of which is 82.04 feet above said Datum Line, which is bounded by and lies within the parcel of land described as follows:

Beginning at a point on the South 72.00 foot line of said Lot 65, 42.00 feet from the beginning thereof, said line being the westerly line of Wisconsin Avenue and running thence South 12.50 feet with said westerly line of Wisconsin Avenue, thence West 59.00 feet, thence North 12.50 feet, thence East 59.00 feet to the place of beginning.

B.     The stairway at the Condominium Regime Entrance to Wisconsin Avenue being all that land lying above (but not below) a horizontal plane the elevation of which is 34.54 feet above said Datum Line and below (but not above) a horizontal plane the elevation of which is 65.16 feet above said Datum Line, which is bounded by and lies within the parcel of land described as follows:

Beginning the two following courses from a point on the westerly line of Wisconsin Avenue at the beginning of the South 72.00 foot line of Lot 65 as shown on said plat of Lot 65, (1) South 54.50 feet, (2) West 41.67 feet and running thence the four following courses across said Lot 65, West 17.33 feet, thence North 12.50 feet, thence East 17.33 feet, thence South 12.50 feet to the place of beginning.

## PARCEL VI

The areas captioned "General Common Driveway Areas Shaded Thus To Be Easements To Commercial Storage Areas" on plat attached to Storage Access Easement Agreement (Common Elements) recorded as Instrument No. 17918 on July 19, 1982 among the Land Records of the District of Columbia.

## PARCEL VII

The areas captioned "Parking Spaces PD 31, PD 32 and PD 33 Shaded Thus To Be Easements To Commercial Storage Areas" on plat attached to Storage Access Easement Agreement (Parking Units) recorded as Instrument No. 17917 on July 19, 1982 among the Land Records of the District of Columbia.

## PARCEL VIII

**Parcel 1**

Part of former Lots 804 through 811 inclusive, in Square 1200 and described as follows:

Parts of Lots numbered Forty-Three (43) and Forty-Four (44) in Square numbered Twelve Hundred (1200) (formerly Square numbered Thirty (30) in "Old Georgetown"), and being (1) all of the lands conveyed by V. Stewart Davis and C. Wendel Shoemaker, Trustees under the Will of James H. Caton, deceased, and James M. Caton and Helen Caton Zust, life tenant and remainderman, respectively, under said Will (The said James M. Caton being also sole heir at law of James H. Caton) and Grace A. Caton, wife of said James M. Caton, to Georgetown Junk Company, Inc., by Deed dated October 5, 1951 and recorded among the Land Records of the District of Columbia, Book 9582 at Page 137; (2) all the lands conveyed by Leopold Selis and Mary Selis, his wife, to Georgetown Junk Company, Inc., by Deed dated March 9, 1953 and recorded among the Land Records in Book 9987 at page 264; (3) all the lands conveyed by Capital Transit Company, to Georgetown Junk Company, Inc., by Deed dated

December 1, 1953 and recorded among the said Land Records in Book 10110 at Page 61; and (4) all the lands conveyed by I. Erwin Bolotin and Bessie K. Bolotin, his wife, to Georgetown Junk Company, Incorporated, by Deed dated November 4, 1954 and recorded among the aforesaid Land Records in Book 10308 at Page 347; and being more particularly described as follows:

Beginning for the same at a pipe set in the westerly line of East Market Space, distant 85.70 feet measured along said easterly line, from the southerly line of "M" Street, and marking the northwesterly corner of former Lot 811, Square 1200, thence crossing said Square 1200 with the northerly line of said former Lot 811, the following six (6) courses:

1.    North 89 deg. 52 min. 00 sec. East, 34.60 feet to a nail set;

2.    South 86 deg. 26 min. 00 sec. East, 16.20 feet to a nail set;

3.    Due South, 2.00 feet to a nail set;

4.    North 89 deg. 00 min. 00 sec. East, 40.24 feet to a nail set;

5.    Due South, 1.32 feet to a nail set; and

6.    South 86 deg. 39 min. 00 sec. East, 33.32 feet to a point in the easterly face of an existing one-story masonry building, said face being on the westerly line of former Warehouse Place; thence with said westerly line of former Warehouse Place and with the easterly lines of former Lots 811, 810, 809, 808, 807 and 804 of said Square 1200.

7.    South 00 deg. 20 min. 00 sec. East, 160.31 feet to a point in the northerly line of the lands now or formerly owned by the C & O Canal Company; thence with said northerly line of now or former Lot 803 of the aforesaid Square 1200 (also being the southerly line of Lot 67 in Square 1200, Subdivision Book 176 at page 197), the following five (5) courses;

8.    Due West, 40.01 feet to a point;

9.    North, 13.05 feet to a point;

10.    North 74 deg. 32 min. 00 sec. West, 19.96 feet to a point;

11.    South, 3.15 feet to a point; and

12.    Due West, 67 feet, more or less, to a point in the aforesaid easterly line of East Market Space, thence with said easterly line and with the westerly line of former Lots 806 through 811;

13.    Due North 151.82 feet to the place of beginning, containing 19,263 square feet or 0.4422 of an acre of land, more or less.

All of the above described land being known for assessment and taxation purposes as Lots numbered Eight Hundred Four (804) through Eight Hundred Eleven (811), both inclusive, in

Square numbered Twelve Hundred (1200), as described in accordance with a plat of survey prepared by Ben Dyer Associates, Inc., dated April 15, 1979.

**Parcel 2**

Lot 835, Square 1200, described as follows:

Part of Lot 43 "Old Georgetown", in Square 1200, described in accordance with a plat of survey made by Bernard P. Locraft, Civil Engineer, May 24, 1968 (revised May 28, 1968) as follows:

Beginning for the same at the Northeast corner of said lot; and running thence South 89 deg. 41 min. West along the South line of "M" Street 21.50 feet to the center wall between houses known as Nos. 3256 and 3258 "M" Street, N.W., running thence South 00 deg. 19 min. East, 90.51 feet to intersect a line drawn North 86 deg. 39 min. West from the West line of former Warehouse Place and distant 91.89 feet South from the South line of "M" Street; thence along said line reversed, South 86 deg. 39 mm. East 21.57 feet to said West line of former Warehouse Place; thence North 00 deg. 20 min. West, 91.89 feet along said West line of former Warehouse Place to the place of beginning.

NOTE: At the date hereof the above described land is designated on the Records of the Assessor to the District of Columbia for taxation purposes as lot 835 in square 1200.

**Parcel 3**

Part of Lot 67 in Square 1200, described as follows:

Beginning for the same at a point lying on the south line of "M" Street, N.W. (90 feet wide, public street), said point also being on the northerly line of Lot 67 in Square 1200 recorded in Subdivision Book 176 at Page 197 among the Records of the Office of the Surveyor for the District of Columbia, being 31.58 feet easterly from the westerly end thereof; thence running with a portion of the said northerly line of Lot 67, Square 1200 (S.B. 176, PG. 197); thence

1.      Due East, 103.25 feet to a point; thence leaving the aforesaid northerly line of Lot 67, Square 1200 (S.B. 176, PG. 197) and running so as to cross and include a portion of Lot 67, Square 1200 (S.B. 176, PG. 197) the following eight (8) courses and distances

2.      Due South, 90.69 feet to a point; thence

3.      North 86'39'00" West, 11.78 feet to a point; thence

4.      Due North, 1.32 feet to a point; thence

5.      South 89'00'00" West, 40.24 feet to a point; thence

6.      Due North, 2.00 feet to a point; thence

7.      South 86'26'00" West, 16.10 feet to a point; thence