## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **CAPMARK FINANCIAL GROUP INC.,** *et al.,* | **Case No. 09-13684 (CSS)** |
| **Debtors.**[1] | **Jointly Administered** |
|  | **Hearing Date: July 14, 2010 at 1:00 p.m.** |
|  | **Objection Deadline: July 7, 2010 at 4:00 p.m.** |

-----------------------------------------------------------x

### MOTION, PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, AND 9014, AND LOCAL RULES 2002-1 AND 6004-1, REQUESTING ENTRY OF THE FOLLOWING ORDERS: (I) AN ORDER AUTHORIZING PRIVATE SALE OF ALL OUTSTANDING SHARES IN CAPMARK SECURITIES INC. FREE AND CLEAR OF ALL CLAIMS AND INTERESTS, OR, IN THE ALTERNATIVE, (II) (a) A BIDDING PROCEDURES ORDER, (i) SCHEDULING AN AUCTION FOR THE SALE OF THE SHARES; (ii) APPROVING BIDDING PROCEDURES; (iii) APPROVING BREAK-UP FEE; (iv) SCHEDULING SALE HEARING; (v) ESTABLISHING OBJECTION DEADLINE; AND (vi) APPROVING AUCTION AND SALE HEARING NOTICE; AND (b) THE SALE ORDER

Capmark Financial Group Inc. ("CFGI") and certain of its subsidiaries and

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), Capmark Affordable Equity Inc. (2381), and Capmark Investments LP (7999). CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044. The addresses for all of the Debtors are available at the following World Wide Web address: http://chapter11.epiqsystems.com/capmark.

affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this motion (the "Motion") requesting an order approving a private sale to MountainView Capital Holdings, LLC (the "Buyer") of all the issued and outstanding shares (the "Shares") that Debtor Capmark Capital Inc. ("CCI," or the "Seller") holds in Capmark Securities Inc. ("Capmark Securities") pursuant to the Sale Agreement (as defined below). In the alternative, if the Court declines to approve a private sale of the Shares, the Debtors seek entry of two orders: (i) a bidding procedures order, scheduling an auction, approving bidding procedures and the break-up fee, scheduling a sale hearing and objection deadline, and approving the notice of the auction and proposed sale of the Shares; and (ii) a sale order, approving the terms of the sale of the Shares to the highest and/or otherwise best bidder, as more fully discussed below.

## Background

1.      On October 25, 2009 (the "Commencement Date"), each of the Debtors other than Capmark Investments LP (collectively, the "First Filed Debtors") commenced a voluntary case under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). On January 15, 2010, Capmark Investments LP ("CILP"), a wholly-owned subsidiary of CFGI, commenced a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession as authorized by section 1107(a) and 1108 of the Bankruptcy Code.

2.      On October 27, 2009, this Court entered an order authorizing the joint administration of the Debtors' chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 1015-1 of the Local Bankruptcy Rules for the District of Delaware (the "Local Rules"). On January 19, 2010, this Court entered an order jointly administering CILP's chapter 11 case with the jointly administered chapter 11 cases of the First Filed Debtors.

2

3.      On November 2, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed a statutory creditors committee pursuant to section 1102 of the Bankruptcy Code (the "Creditors Committee").

## Capmark's Businesses

4.      The Debtors and their non-debtor subsidiaries and affiliates (together with the Debtors, "Capmark") are a group of commercial real estate finance companies that provide real estate-related products and services to borrowers, investors and other customers along three core business lines:  (i) commercial real estate lending and mortgage banking; (ii) investments and funds management; and (iii) commercial loan servicing.[2]

5.      A detailed description of Capmark's business, capital structure, and the events leading to the commencement of these chapter 11 cases is contained in the *Declaration of Thomas L. Fairfield, Executive Vice President, General Counsel and Secretary of CFGI, in Support of the Debtors' Chapter 11 Petitions and First Day Motions and Applications*, filed on the Commencement Date [Docket No. 13].

## Jurisdiction and Venue

6.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

7.      By this Motion, pursuant to sections 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 9014, and Local Rules 2002-1 and 6004-1, the Debtors request entry of an order (the "Private Sale Order"), substantially in the form of Exhibit A

---

[2] Pursuant to an order of this Court dated November 24, 2009, the Debtors were authorized to sell all of their commercial mortgage banking and mortgage servicing assets (collectively, the "MSB Business") to Berkadia Commercial Mortgage, LLC, which sale closed December 11, 2009.

3

attached hereto, approving a private sale (the "Sale") of the Shares, pursuant to the Purchase Agreement (the "Sale Agreement"), between Seller and Buyer, dated as of June 23, 2010, free and clear of any and all liens, claims, encumbrances, and interests (collectively, the "Liens"). A copy of the Sale Agreement is attached hereto as Exhibit B. As explained below, due to the low value of the Shares relative to the costs associated with continuing to operate or wind down Capmark Securities, and other considerations, Seller conducted only an informal inquiry into the marketplace for prospective purchasers. After receiving two offers, Seller evaluated the closing risks associated with each offer and determined that the transaction contemplated by the Sale Agreement is the best option for disposing of Seller's Shares in Capmark Securities Inc. in an expedient manner that will maximize value to the Debtors' estates.

8.    In the alternative, if the Court declines to approve the Sale pursuant to the Private Sale Order on July 14, 2010, the Debtors request entry of an order (the "Bidding Procedures Order"), substantially in the form of Exhibit C attached hereto:

(i)    scheduling an auction (the "Auction") on August 13, 2010 at 10:00 AM (Eastern Daylight Time), at which Sellers (as defined below) will solicit competing bids for the Sale of the Shares (as defined below);

(ii)    approving the bidding procedures (the "Bidding Procedures") set forth in the Bidding Procedures Order for the Sale of the Shares;

(iii)   approving a break-up fee (the "Break-Up Fee") for the stalking horse bidder as protection against a topping bid that represents a higher and/or otherwise better offer;

(iv)   scheduling August 16, 2010 at 3:00 PM (Eastern Daylight Time) as the date and time for the hearing (the "Sale Hearing") to approve the Sale of the Shares to the winning bidder at the Auction;

(v)    establishing the objection deadline in connection with the proposed Sale; and

(vi)   approving the proposed form of notice of the Auction and the Sale Hearing (the "Auction and Sale Hearing Notice"), annexed as Schedule 1 to the Bidding Procedures Order.

4

If the Court enters the Bidding Procedures Order and bids are received at the Auction, the Debtors request entry of an order authorizing the Sale of the Shares to the Successful Bidder on substantially the same terms and conditions set forth in the Sale Agreement or a Modified Sale Agreement (as defined below), free and clear of any and all Liens pursuant to section 363(f) of the Bankruptcy Code.[3] If no higher and/or otherwise better bids are received before or at the Auction, the Debtors request approval of the Sale to Buyer pursuant to the Sale Agreement.

### Capmark Securities' Business

9.     Capmark Securities, a wholly owned non-debtor subsidiary of Seller, is a fixed-income general securities broker-dealer registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934 and is a member of the Financial Industry Regulatory Authority ("FINRA"). Capmark Securities was established primarily to engage in regulated business activities for transactions generated by affiliates, most of which have filed for bankruptcy and are in a wind-down process. Such affiliates generated substantially all of Capmark Securities' business.

10.     Historically, Capmark Securities engaged in multi-family affordable housing bond finance, the defeasance of commercial mortgage loans, and Military Housing finance. In 2007, Capmark Securities sold its multi-family affordable housing bond finance business. In 2008, Capmark Securities partially sold and otherwise began winding down its commercial loan defeasance business. In 2009, Capmark Securities sold its Military Housing finance business.

---

[3] The proposed Private Sale Order contemplates the Sale of the Shares to Buyer as a private sale pursuant to the Sale Agreement. If, as an alternative to the private sale, the Court enters the Bidding Procedures Order and a higher and/or otherwise better offer than the Sale Agreement is received, Sellers will submit a revised version of the Private Sale Order (with a blackline against the Private Sale Order) reflecting the proposed sale to the Successful Bidder.

RLF1 3584670v. 1

11.     As a result of the commencement of the Debtors' chapter 11 cases, Capmark Securities has halted nearly all of its operations and is essentially a dormant business.  Capmark Securities has continued to provide services relating to Fannie Mae's Designated Underwriting and Servicing ("DUS") multifamily mortgage loan program, which loans were originated through the MSB Business sold to Berkadia.[4]  Additionally, Capmark Securities has generally supported securities activities of various Capmark affiliates, such as the holding and maintenance of brokerage accounts.  Such support services do not generate any revenue.  As a result, Capmark Securities generates very little income but continues to have approximately $100,000 in monthly operating costs.  Other than as noted herein, Capmark Securities' business activities have ceased.

### Decision to Sell Capmark Securities

12.     After the sale of the MSB Business to Berkadia, the Debtors had initially determined it would be in the best interests of their estates to wind down Capmark Securities' business and bear the associated shut-down costs.  Based on their understanding that a negotiated purchase price for the equity of a broker-dealer that has been in existence since 1979 would be relatively low, the Debtors did not believe a formal and costly marketing process to sell the business was warranted.  However, during the week of March 8, 2010, the Debtors received an unsolicited offer of $100,000 from Buyer, which equals the market purchase price offered by buyers for broker-dealer "shell" businesses on www.Bdmarket.com, an online auction website where broker-dealer businesses are regularly advertised and sold.

13.     The interest of Buyer caused the Debtors to reevaluate the wind-down decision.  Given the continued cost of operating Capmark Securities, the Debtors have analyzed

---

[4] As of June 30, 2010, Capmark Securities will cease to provide services relating to Fannie Mae's DUS multifamily mortgage loan program.

RLF1 3584670v. 1

whether an expedited sale or a wind-down would be the most cost efficient means to create value and mitigate ongoing costs. A wind-down presents several additional costs that can be avoided by an expeditious sale, including (a) costs of severing approximately three employees who will continue to be employed by Capmark Securities following the sale, (b) costs associated with the termination of contracts which Capmark Securities will no longer need to terminate as a result of the sale, and (c) costs that will continue to be incurred for operating the business during the wind-down process. Based on this analysis, the Debtors determined that an expeditious sale presents the best option to maximize value of the Shares rather than a wind-down of Capmark Securities. However, the Debtors still attempted to obtain greater value for the Shares, and after substantial negotiations between the parties, Buyer increased its offer to $250,000, more than twice the initial offer.

14.     In late April 2010, after the Debtors had already engaged in substantial discussions with Buyer, another party, Cortlandt Capital Holdings Inc. ("Cortlandt") also made an inquiry about whether the Debtors would sell Capmark Securities. On April 8, 2010 and April 19, 2010, Capmark Securities entered into confidentiality agreements with Buyer and Cortlandt, respectively. Thereafter, Cortlandt made an offer in writing to CCI to purchase the Shares for $250,000.

15.     The Debtors still carefully considered the two offers with the aid of their legal and financial advisors, including Loughlin Meghji + Company, and after consultation with the Creditors Committee, the Debtors determined Buyer's offer to be the highest and/or otherwise best available offer for the Shares. Among other reasons for selecting Buyer's offer, the Debtors determined that Buyer's offer provides for the greatest likelihood of a successful and expedient closing because Buyer's offer had fewer contingencies and two of Buyer's officers

7

were former officers of Capmark Securities and therefore have greater familiarity with its business operations. Although stock sales are traditionally more difficult to negotiate due to the fear of buyers that unknown liabilities may be embedded in the acquired company, the Debtors believe that Buyer's familiarity with the business of Capmark Securities has allowed a swift negotiation of the terms of the proposed stock sale, notwithstanding the potential risks to Buyer. In addition, based on their familiarity with Buyer and a regulated entity owned by Buyer, FINRA and Capmark Securities clearing broker advised that they had no objections to Buyer's acquisition of Capmark Securities. The lack of objection, combined with the similarity between Buyer and Capmark Securities' products and business lines, led the Debtors to believe that the process of securing final FINRA approval and clearing broker approval would be more streamlined and prone to success.[5] As a result, Seller entered into a letter of intent with Buyer on June 7, 2010, which granted Buyer exclusivity to enter into a sale agreement with Seller or before June 30, 2010. Cortlandt thereafter submitted a revised offer for the Shares, which removed financing contingencies and increased the purchase price to $350,000, but the Debtors did not entertain the offer given that the executed letter of intent with Buyer included the exclusivity provision. Seller believes, given the context, the minimal marketing efforts for the sale of the Shares were fair and sufficient and, as a result, no formal bidding procedures and additional sale process should be required before approving the Sale to Buyer under the Sale Agreement. Although the Debtors may be able to obtain some incrementally higher price for the Shares, the additional time and financial resources required to further market and negotiate the Sale of the Shares and operate the business in the interim would likely cost more than any gain in purchase price that would result from further bidding. Under the circumstances presented, the

---

[5] Indeed, FINRA stated to David Cheung, a Capmark Securities officer, that it informed Buyer that the proposed Sale of the Shares to Buyer would cause the least delay.

reasonableness of the private sale process is self-evident. The Creditors Committee has indicated its agreement with this analysis.

## The Proposed Sale to Buyer Pursuant to the Sale Agreement[6]

16.     On June 23, 2010, Seller entered into the Sale Agreement with Buyer. The following is a summary of the salient provisions of the Sale Agreement:

(A)     **Sale of Shares**. The Sale Agreement provides for the Sale of the Shares and each right attaching to the Shares. The Shares constitute all of the issued and outstanding capital stock of Capmark Securities.

(B)     **Purchase Price**. The purchase price of the Shares is the aggregate of (i) two hundred and fifty thousand dollars ($250,000) (the "Base Purchase Price") as increased by the adjustment amount (the "Adjustment Amount") described as follows (as so increased, the "Purchase Price"):

> (i)     The Adjustment Amount equals the sum of (a) reimbursement of the required cash on hand (*e.g.* deposits to comply with the clearing agreement and net capital requirements) as set forth on Schedule 2.2(a) of the Sale Agreement and (b) the net book value of the assets listed on Schedule 2.2(b) and the Liabilities identified by Seller as of the Closing Date, minus (c) $100,000 (the "Working Capital Amount").

(C)     **Liability Escrow Fund**:  On or prior to the Closing, Capmark Securities is to fund an escrow account (the "Liability Escrow Fund") in an amount equal to certain identified liabilities which are still outstanding as of the Closing Date (the "Post-Closing Liabilities").[7]  The Liability Escrow Fund will be controlled in accordance with the Escrow Agreement, in the form of Exhibit A to the Sale Agreement, provided, however that the Liability Escrow Fund will only be used to settle the Post-Closing Liabilities. After the settlement of all of the Post-Closing Liabilities, the remaining amounts in the Liability Escrow Fund, if any, shall be paid to Seller.[8]

(D)     **Working Capital Adjustment**.  The Sale Agreement provides for a working capital adjustment that occurs no later than 120 days after the Closing Date (the "Post-

---

[6] This summary of the salient terms of the Sale Agreement is provided for convenience purposes only, and is qualified in its entirety by the precise terms and conditions of the Sale Agreement. To the extent of any inconsistency between the summary set forth herein and the Sale Agreement, the terms and conditions of the Sale Agreement shall govern. Capitalized terms used in this summary, but not defined herein, shall have the meanings ascribed to them in the Sale Agreement.

[7] The Post-Closing Liabilities would also have to be satisfied in a wind-down situation.

[8] The Liability Escrow Fund currently contains funds to satisfy Capmark Securities' obligations on two real property leases in the value of $2.8 million and $110,000. The obligations arising from these two leases will also be payable in a wind-down situation.

9

Closing True-Up Date"). The working capital adjustment is intended to permit Capmark Securities, after the Closing, to satisfy any Liabilities arising on or prior to the Closing Date and that would be required to be set forth on a balance sheet prepared in accordance with Generally Accepted Accounting Principles, other than (i) the Post-Closing Liabilities and (ii) liabilities that are provided for in the calculation of the Adjustment Amount (the "Post-Closing Payment Amount"). Buyer shall pay Seller an amount, if positive, equal to the Working Capital Amount (defined in paragraph 16(B)(i)) minus the Post-Closing Payment Amount. Conversely, Seller shall pay Buyer an amount, if positive, equal to the Post-Closing Payment Amount minus the Working Capital Amount, provided, however, that such payment shall not exceed $400,000 and any amounts due Buyer hereunder shall be paid out of the Liability Escrow Fund (defined in paragraph 16(C)).

(E) **Break-Up Fee.** In the event the Bankruptcy Court does not grant an order approving a private sale of the Shares to Buyer, and Seller consummates an Alternative Transaction with one or more Successful Bidders, then Seller shall pay $50,000 to Buyer (the "Break-Up Fee"); provided that in no event shall the Break-Up be payable to Buyer if the closing of the Alternative Transaction(s) does or does not occur within six months of the date of the execution of the Sale Agreement. Upon the closing of an Alternative Transaction, the Break-Up Fee shall be payable directly to Buyer from the proceeds of the Alternative Transaction. In no event shall the Break-Up Fee be payable if, prior to such Break-Up Fee becoming due and payable, Seller's chapter 11 case is converted to a chapter 7 case.

(F) **Conduct of Business.** From the date of the Sale Agreement through the Closing Date, Seller agrees to cause Capmark Securities to conduct its business in its ordinary course and not take certain actions, such as issue or sell any Shares or other securities of Capmark Securities, grant or announce any increase in the salaries, bonuses or other benefits payable by Capmark Securities to the employees who are to remain with Capmark Securities following the Closing, and enter into any material contract, agreement or arrangement. Notwithstanding the foregoing, the Sale Agreement provides that Seller and Capmark Securities make take the following actions, among others: (i) actions in connection with the wind-down, including but not limited to, terminating employees, terminating intercompany agreements or canceling contracts and leases, provided, however, that they will not take any actions which would have a material adverse effect on the Assumed Assets; (ii) pay, transfer, settle or otherwise satisfy the Post-Closing Liabilities and any other Liabilities of Capmark Securities (including, without limitation, any intercompany debts); (iii) declare a dividend as discussed in section G below; and (iv) may, in its discretion, pay a bonus to certain of its employees.

(G) **Pre-Closing Dividend.** On or prior to the Closing, Capmark Securities will declare a dividend in an amount up to the amount of its stockholders' equity to Seller, which dividend may be payable in cash or in kind including non-cash assets, provided that the net capital of Capmark Securities will be maintained at not less than $250,000. The stockholders' equity of Capmark Securities as of May 31, 2010 was approximately $22,590,001.

10

(H)  **Closing and Other Deadlines (Closing and Completion Dates)**: As set forth in Section 2.4 of the Sale Agreement, the closing (the "Closing," as defined in the Sale Agreement) is scheduled to occur on the "Closing Date," which shall be specified in writing by the parties and be as soon as reasonably practicable after the total and complete satisfaction (or waiver as provided in the Sale Agreement) of all the conditions set forth in the Sale Agreement (other than those conditions that by their nature will be satisfied at the Closing but subject to the satisfaction or waiver of such conditions at the Closing), unless another time, date and/or place is agreed to in writing by the parties. Additionally, pursuant to section 8.1(a)(iv)(C) of the Sale Agreement, Buyer may terminate the transaction if Buyer delivers to Seller by June 30, 2010 (the "Completion Date") a written notice that Buyer has elected not to consummate the transaction because Buyer's due diligence performed after the date of the Sale Agreement has uncovered facts that would have a material adverse effect on Capmark Securities. Following the Completion Date, Buyer may not terminate the Sale Agreement based upon matters identified during Buyer's due diligence. Finally, Buyer or Seller may terminate the proposed Sale if the Closing does not occur by August 20, 2010, provided that the right to terminate shall not be available to any party whose actions or breach of the Sale Agreement has been the cause or resulted in the failure of the Closing to occur before August 20, 2010.

(I)  **Non-Solicitation/Competition.** Upon entry of a Sale Order approving the sale of the Shares to Buyer and until the Closing (the "Non-Solicitation Period"), Seller shall not, or authorize or permit any of its respective Representatives or Affiliates to directly or indirectly, solicit, facilitate or encourage submission of any inquiries regarding an Alternative Transaction ("Solicitation Activities") or respond to any unsolicited inquiries, engage in discussions with or provide information or data to other prospective buyers ("Information Activities"). From the date of the Sale Agreement to the Non-Solicitation Period, Seller may engage in Information Activities, but shall not engage in Soliciting Activities unless and to the extent Seller determines in good faith that the failure to engage in the Soliciting Activities would be a breach of its fiduciary duties under applicable law. However, in the event this Court does not approve the Private Sale and requires a bidding process for the Sale of the Shares, from the date this Court orders a bidding process until this Court's entry of a Sale Order, Seller may solicit bids from other prospective buyers for the Sale of the Shares, in accordance with the procedures set forth in the Bidding Procedures Order. However, Seller may not enter into definitive agreements with any prospective buyer(s) until such time that a prospective buyer or buyers is/are selected as presenting the highest and/or otherwise best offer(s) to acquire all of the Shares pursuant to an Alternative Transaction.

(J)  **Closing Conditions**. The Completion of the transaction contemplated by the Sale Agreement is subject to the satisfaction of certain closing conditions intended to protect the interests of Seller and Buyer, including, but not limited to, (i) the truth and accuracy of material representations and warranties made by Buyer and Seller, (ii) the entry of a Sale Order by this Court finding that Buyer is a good faith purchaser entitled to the protection of section 363(m) of the Bankruptcy Code, and (iii) the receipt by Buyer and Seller, as applicable, of all governmental and regulatory approvals and third party consents required in connection with the Sale.

11

17. In addition to the above-described salient features of the Sale Agreement, in accordance with Local Rule 6004-1(b)(iv), the Debtors note the following with respect to the Sale Agreement:

(A) **No Sale to an Insider**: Buyer is not an insider of the Debtors within the meaning set forth in section 101(31) of the Bankruptcy Code. However, the Debtors note that two executive officers of Buyer are former employees and officers of Capmark Securities.

(B) **Sale Agreements with Management**: With the exception of David Lausa, David Cheung and Stan Voth (the "Employees"), prior to the Closing, Seller shall terminate the employment of each employee of Capmark Securities. Seller shall be responsible for all liabilities with respect to terminated employees for all wages, compensations, benefits, severance pay, payroll taxes and all other liabilities attributable to the terminated employees' employment with Seller. After the closing, Buyer shall cause Capmark Securities to provide: (1) each of the Employees with a base salary no less than the Employee's base salary as of the date of the Sale Agreement; and (2) benefits under employee benefit plans that are comparable in the aggregate to those currently provided by Seller or its Affiliates to the Employees based upon the aggregate costs of such benefits to Seller with respect to the Employees as of the Closing Date.

(C) **Releases**: The Sale Agreement provides for a mutual release, in the form of Exhibit B to the Sale Agreement, to be entered into by Buyer, CCI, Newman SB Holding Co. LLC, Debtors Capmark Affordable Equity Holdings Inc. (f/k/a/ PFG Holding Corp.), Capmark Financial Group Inc. and Capmark Finance Inc.

(D) **Private Sale/No Competitive Bidding**: As discussed below, Seller believes the pre-Commencement Date marketing efforts for sale of the Shares were fair and reasonable in light of the relatively small size of the transaction and that no formal bidding procedures and process should be required before approving the Sale to Buyer under the Sale Agreement. In fact, to insist on an auction process now would only jeopardize and delay the Sale, causing potential harm to the Debtors' estates.

(E) **Conversion to Limited Liability Company**: Seller agrees to cause the Company to be converted to a Delaware limited liability company that is characterized as a disregarded entity for federal income tax purposes on the business day immediately preceding the Closing Date and, in cooperation with Buyer, to cause the name of the Capmark Securities following such conversion to be "MountainView Securities, LLC." Buyer agrees to pay all costs and reimburse any reasonable, direct, out of pocket, third party costs incurred by the Seller or its affiliates associated with the conversion excluding any liability for income or capital gains taxes or other taxes that are based upon the income or gross receipts of Seller.

(F) **Good Faith Deposit**: No provisions in the Sale Agreement address the use of a Good Faith Deposit.

(G)    **Interim Arrangements with Proposed Buyer**:  From the date hereof until the Closing, upon reasonable notice, Seller and Capmark Securities and their Representatives shall (i) afford Buyer and its authorized representatives reasonable access to the offices, properties, operations and books and records of Capmark Securities, (ii) furnish the authorized representatives of Buyer such financial and operating data and other information regarding Capmark Securities as Buyer may from time to time reasonably request, (iii) notify Buyer in writing within a reasonable period of time if Seller obtains Knowledge of any fact or condition that causes or constitutes a breach of any of Seller's representations and warranties, or of any fact or condition that could reasonably be expected to cause or constitute a breach of any such representation or warranty, and (iv) notify Buyer in writing as soon as practicable, but in any event within one (1) Business Day of any material changes to Seller's proceedings with the Bankruptcy Court that could be reasonably expected to affect the Acquisition, this Agreement or the Assumed Assets.

(H)    **Use of Proceeds**:  No provisions in the Sale Agreement address the use of proceeds.

(I)    **Tax Exemption**:  No tax exemptions under section 1146(a) of the Bankruptcy Code are contemplated in connection with the Sale Agreement.

(J)    **Record Retention**:  While the Sale Agreement does not address the retention of records, Seller is not selling substantially all of its assets.  Seller will thus retain, or have reasonable access to, its books and records to enable it to administer its chapter 11 case following the sale.

(K)    **Sale of Avoidance Actions**:  The Sale Agreement does not involve the sale of, or impose limitations on, any chapter 5 causes of action.

(L)    **Requested Findings as to Successor Liability**:  The Sale Agreement provides for the Sale of the Shares free and clear of all Liens as provided in section 363(f) of the Bankruptcy Code.  Additionally, Buyer shall pay all Transfer Taxes, if any, arising out of or in connection with the transaction, and shall indemnify, defend and hold harmless Seller with respect to such Transfer Taxes.

(M)    **Sale Free and Clear of Unexpired Leases**:  No provisions in the Sale Agreement address the sale free and clear of unexpired leases.

(N)    **Credit Bid**:  The Shares are unencumbered by any Lien, mortgage, or any other security interest.  Accordingly, there will be no credit bidding under section 363(k) of the Bankruptcy Code.

(O)    **Relief from Bankruptcy Rule 6004(h)**:  Seller is requesting relief from the 14-day stay imposed by Rule 6004(h).

RLF1 3584670v. 1

## Need for Immediate Private Sale

18.     After weighing the relative costs of winding down Capmark Securities and conducting an expedient sale of the Shares, and after conducting the informal marketing process discussed above, the Debtors came to the conclusion that the Sale of the Shares represents the highest and/or otherwise best available offer for Seller to realize maximum value for the Debtors' estates. The Debtors have identified several reasons why a prompt private sale presents the best option for Seller at the moment.

19.     As discussed above, the Debtors believe liquidation of Capmark Securities would be more costly than a quick and orderly sale. Currently, broker-dealer "shells" such as Capmark Securities generally sell for approximately $100,000, as evidenced by the listings on www.Bdmarket.com, an online auction website where broker-dealer businesses are regularly advertised and sold. Therefore, the Debtors believe that the Purchase Price of $250,000, more than double the market price, represents a fair offer for Capmark Securities, particularly given the certainty of closing provided by Buyer.  Second, the Debtors are currently incurring approximately $100,000 per month for expenses related to operating Capmark Securities. Therefore, prolonged efforts to market or auction the business or any other substantial delay in the transaction would result in additional operating costs for the Debtors that are not proportionate to the value of the assets involved. The Debtors believe that a private sale to Buyer represents the quickest way to consummate a sale of Capmark Securities. Buyer, through a subsidiary, already owns a broker-dealer license in the same Colorado FINRA district that governs the FINRA operations of Capmark Securities. Although Capmark Securities and Buyer have different FINRA coordinators, the favorable reputation of Buyer in the Colorado FINRA district will expedite a sale of Capmark Securities to Buyer.  Buyer, Capmark Securities and Seller have already had conversations with the FINRA 3A District, which has indicated its

14

willingness to approve the sale of Capmark Securities and to attempt to shorten the normal approval time. Buyer is also highly motivated to acquire Capmark Securities as soon as possible for business reasons and has demonstrated a desire to move quickly towards a sale. Buyer has indicated a need to acquire Capmark Securities on or before August 20, 2010 and has established August 20, 2010 as a terminal date for the Sale Agreement. Because of Buyer's familiarity with Capmark Securities and its business history, Buyer has quickly agreed to a sale of the Capmark Securities stock notwithstanding the fact that Seller is in bankruptcy and is not willing to provide any material continuing indemnities to Buyer post-closing. Buyer is an ongoing business with substantial operations and sufficient cash on hand to pay the purchase price and consummate the sale transaction, without a financing contingency.

20.     Further, the Debtors believe that a public bidding process for the Shares would not create more value than a private sale for their estates, since prospective bidders would need to bid an unrealistically high amount to overcome the cost involved with a bidding process. To illustrate, as discussed above, the Debtors are currently disbursing around $100,000 a month in costs to operate Capmark Securities. An auction process would delay the sale of Capmark Securities and burden the estates with additional operational costs of this magnitude. Also, the Debtors will incur additional legal fees and expenses in connection with an auction, as well as pay the Break-Up Fee to the Buyer, should another bidder emerge as the Successful Bidder.

21.     In light of the foregoing, the Debtors submit that the prompt Sale of the Shares pursuant to the Sale Agreement to Buyer without further delay necessarily attendant to formal marketing and auction is the best way to maximize and preserve the value for the Debtors' estates. Absent a prompt Sale, the value of Capmark Securities could decline substantially, resulting in an unnecessary loss of recovery for the Debtors' estates and their

RLF1 3584670v. 1

creditors. Buyer has already indicated the need to consummate the Sale of the Shares on or prior to August 20, 2010, and the Sale Agreement includes a termination right for Buyer if the Closing does not occur by that date. The Debtors have consulted with the Creditors Committee regarding the proposed private sale to Buyer, and the Creditors Committee has noted its agreement with the Debtors' proceeding with a private sale under these circumstances.

**Alternative to Private Sale:**
**Court-Approved Bidding Procedures and Auction**

22.      The Debtors believe the Court should approve the Sale of the Shares as a private sale to Buyer as soon as possible. However, in the event the Court declines to enter the Private Sale Order and requires a public bidding process, the Debtors seek to implement a competitive auction and bidding process for the Sale of the Shares pursuant to the Sale Agreement, subject to higher and/or otherwise better offers. The proposed Auction and Bidding Procedures are as follows:

(A)      **Assets to Be Sold**: The assets to be sold shall consist of the Shares (as defined herein);

(B)      **Confidentiality Sale Agreements**: Upon execution of a confidentiality agreement, in form and substance satisfactory to Seller, any qualifying party that wishes to conduct due diligence with respect to the Shares may be granted access to all material information that has been or will be provided to Buyer and other bidders; *provided, however*, that prior to receipt by a party of any information from Seller (including, but not limited to, the Sale Agreement and its schedules and exhibits, business and financial information and access to representatives of Seller), each such party will be required to deliver evidence reasonably satisfactory to Seller establishing such party's financial and other capability to timely consummate a purchase of the Shares.

(C)      **Bid Deadline**: Any person or entity interested in participating in the Auction must submit a Qualifying Bid (as defined below) on or before August 11, 2010 at 4:00 PM (Eastern Daylight Time) (the "Bid Deadline") in writing, to (1) counsel to the Debtors, Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019, Attention: Michael P. Kessler, Esq. and Judy G.Z. Liu, Esq.; (2) Capmark Financial Group Inc., 116 Welsh Road, Horsham, Pennsylvania, 19044, Attention: Thomas L. Fairfield, Esq.; (3) counsel for Buyer, Jones Walker, 201 St. Charles Avenue, New Orleans, Louisiana 70170-5100, Attention: Patrick Vance; and (4) counsel for the

16

Creditors Committee, Kramer Levin Naftalis & Frankel LLP, Attention: Joshua Brody, Esq., 1177 Avenue of the Americas, New York, NY 10036.

(D)  **Qualifying Bids**:  To participate in the bidding process and be deemed a "Qualifying Bidder", each potential bidder (other than Buyer) must submit a "Qualifying Bid" by the Bid Deadline.  The Sale Agreement is deemed a Qualifying Bid and Buyer is deemed a Qualifying Bidder.  Otherwise, to constitute a Qualifying Bid, a bid must:

> (i)    be in writing and state that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the Shares on aggregate terms and conditions no less favorable to Seller than the terms and conditions contained in the Sale Agreement, and with a cash purchase price of no less than the Buyer's Purchase Price, plus the Break-Up Fee, plus an additional $25,000.

> (ii)   Provide for a purchase price consisting only of cash;

> (iii)  provide details of any assumptions about the transaction that are key to the purchase price;

> (iv)   include a mark-up of the Sale Agreement (a "Modified Sale Agreement") reflecting the variations from the Sale Agreement  and a clean and executed Modified Sale Agreement;

> (v)    provide that such bidder's offer is irrevocable until the closing of the purchase of the Shares if such bidder is the Successful Bidder or the Back-Up Bidder (each as defined below);

> (vi)   otherwise include terms and conditions substantially the same in all respects to the Sale Agreement (including with respect to the representations and warranties);

> (vii)  state that such bidder is financially able to consummate the transactions contemplated by the Modified Sale Agreement, and that there are no financing, due diligence, or other material contingencies for the bidder to consummate the Modified Sale Agreement;

> (viii) provide that such bidder will close on the sale of the Shares within the same time period provided for in the Sale Agreement;

> (ix)   include such financial and other information that will allow Seller to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement;

> (x)    include a statement that there are no conditions precedent to the bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

RLF1 3584670v. 1

(xi) not request or entitle the bidder to any transaction or break-up fee, termination fee, expense reimbursement, or similar type of payment;

(xii) fully disclose the identity of each entity that will be bidding for the Shares or otherwise participating in connection with such bid, and the complete terms of any such participation;

(xiii) include any other information or factors that may be relevant to Seller and its advisors in consideration of the bid;

(xiv) describe any transition services that will be required by the bidder in connection with an acquisition of the Shares;

(xv) include a statement that any governmental or third-party consents needed to consummate the acquisition of the Shares, to the extent they are not already contemplated in the Sale Agreement, can and will be obtained before the Closing;

(xvi) not contain any due diligence or financing contingencies of any kind;

(xvii) include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Sale Agreement;

(xviii) include the names and contact information of members of the bidder who will be available to answer questions regarding the offer;

(xix) include a cash deposit by wire transfer equal to ten percent (10%) of the Purchase Price, or such higher amount offered to purchase the Shares (the "Good Faith Deposit") with such deposit being non-refundable on terms consistent with those set forth in the Sale Agreement

The Debtors, after consultation with the Creditors Committee, shall make a determination regarding whether a bid is a Qualifying Bid and shall notify bidders whether their bids have been determined to be Qualifying Bids by no later than 2:00 PM (Eastern Daylight Time) on August 12, 2010;

(E)     **No Qualifying Bid**: If no timely, conforming Qualifying Bids other than the Sale Agreement are submitted by the Bid Deadline, the Debtors shall not hold an Auction and, instead, shall request at the Sale Hearing that the Court enter the Private Sale Order approving the Sale Agreement with Buyer.

(F)     **Auction**: In the event the Debtors timely receive one or more Qualifying Bids other than the Sale Agreement, the Debtors shall conduct the Auction with respect to the Shares. The Auction will be conducted at the offices of Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York, 10019 on August 13, 2010 at 10:00 AM (Eastern Daylight Time), or such other location as designated by the Debtors in a notice to all Qualifying Bidders. The Auction shall be governed by the following procedures (which may be amended, modified and waived, as applicable, by the Debtors at any time

18

in their sole discretion after consultation with the Creditors Committee except that any such modification, amendment or waiver that is materially different than the Bidding Procedures set forth herein or that adversely affect Buyer's rights in respect of the Break-Up Fee may not be made without Buyer's consent):

(i)     Buyer and the Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

(ii)    Only representatives of the Debtors, Buyer, Qualifying Bidders, counsel and other advisors selected by the Creditors Committee and representatives from the Office of the United States Trustee, shall be entitled to be present at the Auction;

(iii)   Upon the commencement of the Auction, the identity of each Qualifying Bidder and the material terms of its Qualifying Bid shall be disclosed to all other Qualifying Bidders;

(iv)    The Auction process shall be transcribed by a qualified court reporter;

(v)     Only Buyer and Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

(vi)    Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

(vii)   Bidding shall commence at the amount of the highest Qualifying Bid submitted by the Qualifying Bidders prior to the Auction, as determined by Seller after consultation with the Creditors Committee, and such bid shall be announced prior to the start of the Auction (the "Initial Highest Bid");

(viii)  Qualifying Bidders, including Buyer, may submit subsequent bids to the Initial Highest Bid and all such subsequent bids must be stated in an amount exceeding each prior bid by $25,000 in cash purchase price consideration;

(ix)    Seller may determine the order in which Qualifying Bidders shall bid at the Auction;

(x)     All Qualifying Bidders and Buyer shall have the right to submit additional bids and make additional modifications to the Sale Agreement or Modified Sale Agreement, as applicable, at the Auction as determined by Seller at any time in its sole discretion after consultation with the Creditors Committee;

(xi)    The Debtors shall credit the amount of the Break-Up Fee to each and every bid submitted by Buyer at the Auction meaning that if Buyer's subsequent bid is the then-highest and best bid at the Auction, any subsequent bid must exceed Buyer's bid by the amount of the Break-Up Fee in cash purchase price consideration;

19

(xii) The Auction may include individual negotiations with the Qualifying Bidders and Buyer and/or open bidding in the presence of all other Qualifying Bidders and Buyer;

(xiii) Subject to Local Rule 6004(c)(ii)(D), Seller may determine, in its sole discretion and after consultation with the Creditors Committee, whether and to what extent individual negotiations or discussions conducted with Qualifying Bidders during the Auction shall be transcribed;

(xiv) Seller may, in its sole discretion and after consultation with the Creditors Committee, discuss any Qualifying Bid with other Qualifying Bidders individually or together in any other group or groups of Qualifying Bidders, as determined by Seller;

(xv) The Auction shall continue until there is only one offer that Seller determines, in consultation with the Creditors Committee and subject to Court approval, is the highest or best offer for the Shares from among the Qualifying Bids submitted at the Auction (the "Successful Bid"). In making this decision, Seller may consider any factors it deems relevant, including, without limitation, the amount of the purchase price, the form of consideration being offered, the expense to the Debtors of any obligation to pay the Break-Up Fee, the likelihood of the Qualifying Bidder's ability to comply with the terms of the applicable Modified Sale Agreement and otherwise close a transaction and the timing thereof, the number, type and nature of any changes to the Sale Agreement requested by each Qualifying Bidder, any contingencies relating to a Qualifying Bidder's offer, and the net benefit to the Debtors' estates. Buyer or Qualifying Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the applicable Sale Agreement or Modified Sale Agreement; and

(xvi) Within three (3) days after conclusion of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Bids made after the close of the Auction shall not be considered by Seller.

(G) **Back-Up Bidder and Return of Good Faith Deposits:**

(i) If an Auction is conducted, the Qualifying Bidder with the next highest and/or otherwise best Qualifying Bid, as determined by Seller in the exercise of its business judgment at the Auction and in consultation with the Creditors Committee shall be required to serve as a back-up bidder (the "Back-Up Bidder"). Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court. In the case

20

where Buyer serves as the Back-Up Bidder, Buyer shall only be required to keep its bid open and irrevocable until and through August 20, 2010. In the case where a Qualifying Bidder other than Buyer serves as the Back-Up Bidder, the Back-Up Bidder shall be required to keep such bid open and irrevocable until twelve (12) business days after the conclusion of the Auction.

(ii)    Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder (other than Buyer)[9] not selected by Seller as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) business day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall be held by the Debtors until the earlier of (a) thirteen (13) days after the conclusion of the Auction and (b) one (1) business day after the closing of the Sale transaction with the Successful Bidder.

23.    In accordance with Local Rule 6004-1(c)(i), the Debtors respectfully represent the following with respect to the Auction:

(A)    **Provisions Governing Qualifications of Bidders**: *See* preceding paragraph 22(B)-(D).

(B)    **Provisions Governing Qualifying Bids**: *See* preceding paragraphs 22(C)-(D).

(C)    **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**: Not applicable.

    (i)    No Shop or No-Solicitation Provisions: *See* preceding paragraph 16(I); Sale Agreement section 3.1(e).

    (ii)    Break-Up/Topping Fees and Expense Reimbursement: *See* preceding paragraph 16(E); Sale Agreement, Section 3.3.

    (iii)    Bidding Increments: *See* preceding paragraph 22(F)(viii).[10]

    (iv)    Treatment of Break-Up or Topping Fees and Expense Reimbursement at Auction: *See* preceding paragraphs 16(E) and 22(F); Sale Agreement, Sections 3.3, 8.3.

(D)    **Modification of Bidding and Auction Procedures**: Not applicable.

(E)    **Closing with Alternative Backup Bidder**: *See* preceding paragraph 22(G).

---

[9] The Sale Agreement does not provide for the payment of a Good Faith Deposit by Buyer. *See* preceding paragraph 17(F).
    [10] The Sale Agreement does not provide for Bidding Increments.

RLF1 3584670v. 1

**Approval of the Sale Hearing Schedule and Auction and Sale Hearing Notice**

24.     If an Auction and Bidding Procedures are required, the Debtors request that the Court schedule a Sale Hearing on August 16, 2010 at 3:00 PM (Eastern Daylight Time) to consider approval of the Sale Agreement and the Sale contemplated thereby, or the approval of any higher and/or otherwise better offer, if any, resulting from an Auction.  Bankruptcy Rule 6004(a) provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) and, if applicable, in accordance with § 363(b)(2) of the Code."  Bankruptcy Rule 2002(a)(2) requires the Debtors give all creditors and certain other parties "at least 21 days' notice by mail" of the proposed Sale.  Bankruptcy Rule 6004(b) also provides that objections to the proposed Sale "shall be filed and served not less than seven days before the date set for the proposed action or within the time fixed by the court."

25.     The Auction and Sale Hearing Notice contains the type of information required under Bankruptcy Rule 2002(c), and also includes information regarding the Auction procedures to the extent a higher and/or otherwise better offer than the Sale Agreement is received and an Auction is necessary.  Therefore, if the Court requires a bidding and auction process, the Debtors request that this Court approve the form and manner of the Auction and Sale Hearing Notice.  The Debtors propose at least 21 days' notice for the Sale Hearing, which complies with the notice procedures mandated by the Bankruptcy Rules, according to the following procedures:

(a)     The Debtors shall serve, within 3 business days after entry of the Bidding Procedures Order (the "Mailing Deadline"), by overnight courier, electronic mail, or same-day messenger delivery, copies of the Auction and Sale Hearing Notice upon: (i) the U.S. Trustee, (ii) counsel for the Creditors Committee, (iii) attorneys for Buyer, (iv) any party who, in the past 12 (twelve) months, expressed in writing to the Debtors an interest in acquiring the Shares, and who the Debtors and their representatives reasonably and in good faith determine, after

22

consultation with the Creditors Committee, potentially have the desire and financial wherewithal to effectuate the Sale, (v) the Internal Revenue Service, (vi) the Securities Exchange Commission, (vii) FINRA, and (viii) any parties entitled to notice under Rule 2002-1(b) of the Local Rules for the United States Bankruptcy Court District of Delaware.

(b)     On or before the Mailing Deadline, or as soon as practicable thereafter, the Debtors will publicize the Auction and Sale Hearing Notice in the Wall Street Journal (National Edition) for one (1) business day.

26.     The Debtors submit that such notice shall constitute good and sufficient notice of the Auction and the Sale of the Shares, and that no other or further notice is necessary. Accordingly, the Debtors request the Court approve the form and manner of the Auction and Sale Hearing Notice.

## Approval of Objection Deadline

27.     The Debtors request that, pursuant to Bankruptcy Rule 9014, any objections to the Sale (a "Sale Objection") (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware, 19801, on or before August 9, 2010 at 4:00 PM (Eastern Daylight Time) (the "Objection Deadline"), or on such later date and time as the Debtors may agree, and (iv) be served with a copy on: (a) counsel for the Debtors, Dewey & LeBoeuf LLP, Attention: Michael P. Kessler, Esq., and Judy G.Z. Liu, Esq., 1301 Avenue of the Americas, New York, New York, 10019; (b) local counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attention: Mark D. Collins, Esq. and Jason M. Madron, Esq.; (c) counsel for Buyer, 201 St. Charles Avenue, New Orleans, Louisiana 70170-5100, Attention: Patrick Vance; (d) counsel for the agent for the Debtors' secured lenders (the "Secured Lenders"); (e) Wilmington Trust FSB, as successor trustee under the prepetition senior unsecured floating rate note, 5.875% senior unsecured note, and 6.300% senior unsecured note indentures; (f) the U.S. Trustee, 844 King

23

Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (g) counsel for the Creditors

Committee, Kramer Levin Naftalis & Frankel LLP, Attention: Joshua Brody, Esq., 1177 Avenue

of the Americas, New York, NY 10036; (h) administrative agent under the Debtors' prepetition

senior credit facility, bridge loan agreement and term loan facility at Citicorp North America,

Inc., 1615 Brett Rd. Bldg. 3, New Castle, Delaware, 19720, Attention: Ralph Townley; and (i)

all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b).

### Basis for Relief Requested

**A.** **Approval of the Sale under Bankruptcy Code Sections 363(b) and 105(a) is Warranted**

28.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (providing

that debtors in possession have "all the rights . . . of a trustee"). In addition, section 105(a)

provides the authority for this Court to carry out the provisions of section 363(b). *See* 11 U.S.C.

§ 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate

to carry out the provisions of this title."). Although section 363(b) does not specify a standard

for determining when it is appropriate for a court to authorize the use, sale or lease of property of

the estate, bankruptcy courts routinely authorize sales of a debtor's assets if the sale is based

upon the sound business judgment of the debtor. *In re Dura Auto. Sys.,* 2007 Bankr. LEXIS

2764 at *258 (Bankr. D. Del. 2007) (citing *Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d

Cir. 1996)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063,

1070 (2d Cir. 1983); *In re Abbotts Dairies of Penn., Inc.,* 788 F.2d 143 (3d Cir. 1986) (implicitly

adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re*

*Delaware and Hudson Ry. Co.,* 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit

24

adopted the "sound business judgment" test in the *Abbotts Dairies* decision); *In re Montgomery Ward Holding Corp.,* 242 B.R 147, 153 (D. Del. 1999) (same).

29.     When a valid business judgment exists, the law vests the debtor's decision to sell assets with a strong presumption that "in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in honest belief that the action taken was in the best interests of the company." *In re Dura Auto. Sys.,* 2007 Bankr. LEXIS at *260 (citing *The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Von Gorkum,* 488 A.2d 858, 872 (Del. 1985)). Once a court is satisfied there is a sound business judgment for the proposed sale, the court must then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See, e.g., Del. and Hudson Ry. Co.,* 124 B.R. at 166.

30.     The Debtors believe a prompt private Sale of the Shares to Buyer without further delay or an auction process is the best opportunity to maximize and preserve value for the Debtors' estates. The Debtors conducted adequate marketing of the Shares, commensurate to their expected value, and the Debtors do not believe any alternative bidder could close a sale of the Shares more expeditiously than Buyer. In the Debtors' sound business judgment, the best available offer for the Shares is Buyer's offer. Accordingly, the Court should immediately enter the Private Sale Order.

## B.     Approval of the Private Sale to Buyer is Warranted

31.     Bankruptcy Rule 6004 sets forth the procedural parameters for asset sales outside of the ordinary course of business and provides that such sales may be effected by either public or private sale. Fed. R. Bankr. P. 6004(f)(l); *see also* Local Rule 6004-1(iv)(D), which

contemplates private sales. Accordingly, a debtor may sell assets of the estate outside of the ordinary course of business without conducting a public auction thereof, or, as the case may be, soliciting bids higher and/or otherwise better than that contained in a privately negotiated purchase agreement. *See In re Woodscape Ltd. P'ship*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) ("There is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

32.     It has been held that a "bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)." *In re Ancor Exploration Co.,* 30 B.R. 802, 808 (N.D. Okla. 1983). To this end, Courts in this and other districts often allow a chapter 11 debtor to sell assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code. *See, e.g., In re IH 1 Inc. (f/k/a Indalex Holdings Fin., Inc.)*, No. 09-10982 (PJW) (Bankr. D. Del. Sept. 28, 2009) [Docket No. 673] (approving private sale of nonresidential real property); *In re Goody's, LLC*, No. 09-10124 (CSS) (Bankr. D. Del. Mar. 18, 2009) [Docket No. 507] (approving private sale of certain merchandise); *In re KB Toys, Inc.*, No. 08-13269 (KJC) (Bankr. D. Del. Jan. 14, 2009) [Docket No. 265] (approving private sale where consideration was fair and reasonable, was the highest or best offer, provided a greater recovery for creditors than would be provided by any other available alternative, and constituted reasonably equivalent value and fair consideration); *In re KCMVNO, Inc. (f/k/a Movida Commc'ns, Inc.)*, No. 08-10600 (BLS) (Bankr. D. Del. Dec. 19, 2008) [Docket No. 365] (same); *In re Midway Games, Inc.*, No. 09-20465 (KG) (Bankr. D. Del. Oct. 1, 2008) [Docket No. 657] (same); *In re Powermate Holding Corp.*, No. 08-10498 (KG) (Bankr. D. Del. May 5, 2008) [Docket No. 213] (same); *In re Thompson Prods., Inc.*, No. 08-

10319 (PJW) (Bankr. D. Del Mar. 20, 2008) [Docket No. 121] (approving private sale of any and all assets, where private sale was last and best chance to maximize value of debtors' assets and avoid liquidation, and purchase Sale Agreement was negotiated at arm's length and in good faith); *Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*, 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving a private sale of a chapter 11 debtor's assets where the standards of section 363(b) were met); and *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming the right of a chapter 11 debtor to transfer assets by private sale).

33.     Indeed, a debtor is obligated to maximize the return to its estate resulting from an asset sale, whether public or private. *See In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) ("When a debtor or trustee conducts a sale under § 363(b), it has an obligation to maximize revenues for the estate."); *In re Nepsco, Inc.*, 36 B.R. 25, 26 (D. Me. 1983) ("Clearly, the thrust of the statutory scheme is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, *i.e.*, the creditors of the estate."). Accordingly, if a debtor concludes that a particular private purchase offer is the "most advantageous of the estate," a court should defer to the debtor's business judgment. *Bakalis*, 220 B.R. at 532. As noted, having sufficiently considered all available alternatives to the Sale of the Shares to Buyer, the Debtors believe the proposed Sale is a sound exercise of their business judgment and represents the best means of maximizing and preserving the value of Capmark Securities, when considering all facts, including the additional costs attendant to marketing and undertaking a bidding process, and the additional costs of operation during the extended bidding period. Therefore, a private Sale of the Shares to Buyer is warranted.

RLF1 3584670v. 1

**C.    As an Alternative to the Private Sale to Buyer, Seller's Proposed Bidding and Auction Procedures Should be Approved**

34.    As stated above, pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. If the Court declines to approve a private sale and instead requires the Sale to be effectuated through a bidding and auction process sanctioned by the Court, the Debtors believe the proposed Bidding Procedures are fair, reasonable and appropriate under the circumstances, and will maximize the sale proceeds received by the estate, which is the paramount goal in any proposed sale of property of the estate. *In re Dura Auto. Sys., Inc.,* 2007 Bankr. LEXIS at *253 ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.") (internal citations omitted).

35.    The Bidding Procedures allow the Debtors to conduct the Sale process in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby offering an additional opportunity for the Debtors to obtain the greatest consideration possible for the Shares. Bidding procedures should be approved when they provide a benefit to the estate by enhancing competitive bidding. *Id.* (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc.,* 181 F.3d 527, 535-537 (3d Cir. 1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate)). The Debtors believe the Bidding Procedures are consistent with other procedures previously approved in this district and others.

36.    Although the Debtors believe the Purchase Price, pursuant to the terms set forth in the Sale Agreement, is fair and reasonable, the Debtors submit that, if required, the Bidding Procedures and the Auction will ensure the Debtors exhaust all opportunities to obtain the highest or best offer available, by allowing the market to test the Purchase Price provided in

28

the Sale Agreement. Accordingly, if the Court declines to grant Seller's request for a private sale, the Debtors alternatively request the Court's approval of the process and procedures set forth in the Bidding Procedures for the submission and consideration of competing bids for the Shares from other interested parties.

**D.    Sale of Shares Free and Clear of Liens is Warranted**

37.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions are satisfied:

> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

38.    The Debtors believe that one or more of these tests in section 363(f) of the Bankruptcy Code are easily satisfied with respect to the Sale of the Shares. First and foremost, the Shares are unencumbered by any recorded lien, security interest, mortgage, judgment or other encumbrance. To the extent there is any unrecorded "interest" in the Shares other than the Debtors', the Debtors submit that subsection 363(f)(5) would apply to permit the Sale free and clear of such interest. The Debtors believe the rights of any unknown claimant could be valued and allowed as a claim against the Debtors' estates, and thus the claimant could be compelled to accept a money satisfaction of its interest in property, and section 363(f)(5) would be satisfied.

29

*In re Trans World Airlines, Inc.*, 322 F.3d 283, 289, 291 (3d Cir. 2003) (the Court of Appeals for the Third Circuit held that section 363(f)(5) was satisfied in respect of successor liability claims because "[h]ad TWA liquidated its assets under Chapter 7 of the Bankruptcy Code, the claims at issue would have been converted to dollar amounts and the claimants would have received the distribution provided to other general unsecured creditors on account of their claims."). In addition, because Seller is unaware of the existence of any interest in, or of the right of any third party to assert such an interest in, the Shares, Seller submits that the surprise assertion of an interest will be in bona fide dispute and, therefore, subsection 363(f)(4) would apply.

39.    Because the section 363(f) requirements have been met, Buyer should not be liable, as a successor to the Shares or otherwise, for any of the Debtors' pre-petition liabilities, unless expressly assumed. As a matter of logic, bankruptcy estates would be unable to sell assets for fair value if the estates' liabilities followed the assets. The Third Circuit Court of Appeals has held that a buyer of a debtor's assets pursuant to sections 363(b) or 363(f) takes free from successor liability resulting from any pre-existing claims. *See, e.g.*, *In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of . . . successor liability claims achieves the purpose of [Bankruptcy Code] section 363 intended by Congress"), *aff'd*, 332 F.3d 283, 285 (3d Cir. 2003) ("Because section 363(f) of the Bankruptcy Code permits a sale of property 'free and clear' of an 'interest in such property' and because the claims against TWA here were connected to or arise from the assets sold, we affirm the Bankruptcy Court's order approving the sale 'free and clear' of successor liability.").

E.    **Finding of Good Faith is Warranted**

40.    Section 363(m) of the Bankruptcy Code provides:

RLF1 3584670v. 1

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Seventh Circuit in *In re Andy Frain Serv., Inc.*, held that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

798 F.2d 1113, 1125 (7th Cir. 1986) (emphasis and citations omitted).

41. Although former officers of Capmark Securities are now officers of the Buyer, the Sale Agreement was intensely negotiated at arms'-length with all parties involved acting in good faith, and each party was represented by sophisticated counsel. The Debtors are unaware of any facts or circumstances that might compromise or taint Buyer's good faith in negotiating and entering into the Sale Agreement. Accordingly, the Debtors request the Court determine that Buyer has acted in good faith and is entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

**F.    The Break-Up Fee is Reasonable and Appropriate**

42. Bidding incentives, such as the Break-Up Fee, encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." *In re S. N.A, Nut Co.*, 186

31

B.R. 98, 101 (Bankr. N.D. Ill. 1995); *see also In re 995 Fifth Ave. Assoc. L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

43.     A proposed bidding incentive, such as the Break-Up Fee, should be approved when it is in the best interests of the estate. *S.N.A. Nut Co.*, 186 B.R. at 104; *see also In re America West Airlines, Inc.,* 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc,,* 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context). *See In re Reliant Energy Channelview LP,* 2010 U.S. App. LEXIS 956, at *1-20 (3d Cir. Jan. 15, 2010) (same).

44.     Here, the Break-Up Fee will only be paid if the Shares are sold to a purchaser with a bid that is higher and/or otherwise better than Buyer's offer for the Shares, including taking into account the cost of the Break-Up Fee when considering the competing bid. In such case, Seller will receive more than the Purchased Price offered by Buyer. Further, the stalking horse bid is expressly conditioned on approval of the Break-Up Fee contemplated by the Bidding Procedures Order. Consequently, the Debtors' estates will benefit from the floor set by Buyer's offer, and it is an actual and necessary cost of preserving the estates.

45.     "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *In re Integrated Res., Inc.,* 147

B.R. 650, 660 (S.D.N.Y. 1992). As is customary, the Break-Up Fee is required by the Buyer as a condition to it spending the significant time and expense to negotiate and ultimately agree to the Sale Agreement. The Debtors believe the Break-Up Fee will not stifle bidding. To the contrary, the Debtors believe that, should an auction be held, the Break-Up Fee will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *Id.* at 662. If the Shares are sold to a competing bidder, the Sale will be a result of Buyer's crucial role as an initial bidder generating interest in the Shares and establishing a minimal acceptable price.

46.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." *Id.* This Court has historically approved fees in the range of 3% of the purchase price. *See, e.g., In re Maxide Acquisition, Inc.,* No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (approving break-up fee of 3%, or $2.5 million, in connection with a $75 million sale); *In re Ameriserve Food Distrib., Inc.,* No. 00-00358 (PJW) (Bankr. D. Del. June 15, 2000) (approving break-up fee of 3.6%, or $4 million, in connection with $110 million sale). The Debtors are aware that the Break-Up Fee of $50,000 constitutes 20% of the Purchase Price and is significantly higher than similar fees approved in other transactions. However, the Debtors, in their business judgment, believe the Break-Up Fee is appropriate because Buyer will incur substantial costs in performing negotiations and due diligence connected with the Sale, which is a substantially complex transaction relative to the Purchase Price. The Debtors submit that a break-up fee above the

33

typical range and even significantly above the range is appropriate where, as here, the Purchase Price is relatively low when compared to the complexity of the transaction and the cost of implementing the transaction. As a result, the Break-Up Fee reflects the costs attendant to such a complex transaction. Notably, under the Sale Agreement, Buyer is receiving only the Break-Up Fee and not any additional expense reimbursements.

47.     For these reasons, and given the benefits conferred upon the Debtors' estates by the Buyer's entry into the Sale Agreement, the Debtors respectfully request that the Court approve the Break-Up Fee.

## G.     Relief From Fourteen-Day Waiting Period is Warranted

48.     The Debtors request the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and order that, if and when entered, the Private Sale Order be effective immediately. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise."

49.     The Advisory Committee Note to the 1999 amendments of the Bankruptcy Code indicates that the purpose of Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* 10 COLLIER ON BANKRUPTCY ¶ 6004.10 (2010). Although these rules and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the fourteen-day stay period, Collier suggests the fourteen-day stay period should be waived to allow a transaction to close immediately "where there has been no objection to the procedure." *Id.* Further, it suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

34

## Notice

50.    No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion shall be provided by U.S. first-class mail on the date hereof to (i) the U.S. Trustee, (ii) counsel for the agent for the Secured Lenders, (iii) Wilmington Trust FSB, as successor trustee under the prepetition senior unsecured floating rate note, 5.875% senior unsecured note indentures, and 6.300% senior unsecured note, (iv) counsel to the Creditors Committee, (v) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b), and (vi) any other parties that have expressed an interest in writing in purchasing the Shares in the last twelve months.   The Debtors submit that no other or further notice need be provided.

## No Previous Request

51.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

RLF1 3584670v. 1

WHEREFORE the Debtors respectfully request (i) entry of the Private Sale Order, or, in the alternative, (ii) (a) entry of the proposed Bidding Procedures Order and (b) at the completion of the Sale Hearing, entry of the Sale Order approving the Sale of the Shares to the Buyer, or, in the event of a higher and/or otherwise better offer, the Successful Bidder, and (iii) such other and further relief as the Court may deem just and appropriate.

Dated: June 23, 2010
      Wilmington, Delaware

                              */s/ Jason M. Madron*

                              Mark D. Collins (No. 2981)
                              Paul N. Heath (No. 3704)
                              Jason M. Madron (No. 4431)
                              Lee E. Kaufman (No. 4877)
                              RICHARDS, LAYTON & FINGER, P.A.
                              One Rodney Square
                              920 North King Street
                              Wilmington, Delaware 19801
                              Telephone:  302.651.7700
                              Facsimile:  302.651.7701

                              -and-

                              Martin J. Bienenstock
                              Michael P. Kessler
                              Judy G.Z. Liu
                              DEWEY & LEBOEUF LLP
                              1301 Avenue of the Americas
                              New York, New York 10019
                              Telephone:  212.259.8000
                              Facsimile:  212.259.6333

                              *Attorneys for the Debtors and Debtors in Possession*

RLF1 3584670v. 1