IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                                            :
In re                                                       :   Chapter 11
                                                            :
CAPMARK FINANCIAL GROUP INC., et al.,                       :
                                                            :   Case No. 09-13684 (CSS)
        Debtors.¹                                           :
                                                            :   Jointly Administered
                                                            :
------------------------------------------------------------x
```

DECLARATION OF DAVID LAUSA
IN SUPPORT OF MOTION, PURSUANT TO SECTIONS 105(a)
AND 363 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, AND
9014, AND LOCAL RULES 2002-1 AND 6004-1, REQUESTING ENTRY OF THE
FOLLOWING ORDERS:  (I) AN ORDER AUTHORIZING PRIVATE SALE OF ALL
OUTSTANDING SHARES IN CAPMARK SECURITIES INC. FREE AND CLEAR OF
ALL CLAIMS AND INTERESTS, OR, IN THE ALTERNATIVE, (II) (a) A BIDDING
PROCEDURES ORDER, (i) SCHEDULING AN AUCTION FOR THE SALE OF THE
SHARES; (ii) APPROVING BIDDING PROCEDURES; (iii) APPROVING BREAK-UP
FEE; (iv) SCHEDULING SALE HEARING; (v) ESTABLISHING OBJECTION
DEADLINE; AND (vi) APPROVING AUCTION AND
<u>SALE HEARING NOTICE; AND (b) THE SALE ORDER</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are:  Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), Capmark Affordable Equity Inc. (2381), and Capmark Investments LP (7999).  CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044.  The addresses for all of the Debtors are available at the following World Wide Web address: http://chapter11.epiqsystems.com/capmark.

David Lausa, pursuant to section 1746, title 28, United States Code, hereby declares as follows:

1. I am President of Capmark Securities Inc. ("Capmark Securities"), operating out of Capmark Securities' office at 1801 California Street, Suite 3900, Denver, Colorado, 80202. CSI is a wholly-owned subsidiary of Debtor Capmark Capital Inc. (the "Seller").

2. Unless otherwise stated, all facts set forth in this declaration (the "Declaration") are based upon: (a) my personal knowledge; (b) my experience as President at Capmark Securities; (c) information provided to me by authorized representatives and professionals of Capmark Securities concerning the operation, structure, and financial affairs of Capmark Securities; and (d) information provided to me by employees of Capmark Securities working under my supervision. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of Seller and Capmark Securities.

3. I make this Declaration in support of the *Motion, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9014, and Local Rules 2002-1 and 6004-1, Requesting Entry of the Following Orders: (I) an Order Authorizing Private Sale of All Outstanding Shares in Capmark Securities Inc. Free and Clear of All Claims and Interests, or, in the Alternative, (II) (a) a Bidding Procedures Order, (i) Scheduling an Auction for the Sale of the Shares; (ii) Approving Bidding Procedures; (iii) Approving Break-Up Fee; (iv) Scheduling Sale Hearing; (v) Establishing Objection Deadline; and (vi) Approving Auction and Sale Hearing Notice; and (b) the Sale Order*, filed on June 23, 2010 [Docket No. 1345].

4.  I support the Debtors' request for approval of the Private Sale Order,[2] as, in my opinion, the proposed Purchase Price of $250,000 (i) is a reasonable price for a broker-dealer business shell such as Capmark Securities; (ii) resulted from good faith, arm's length negotiation between the Seller and MountainView Capital Holdings, LLC (the "Buyer"); and (iii) represents the sound exercise of the Debtors' business judgment.  The bases for my opinion are set forth below.[3]

5.  During the course of my employment, I have become intimately familiar with Capmark Securities' business, financial affairs, capital structure, and restructuring alternatives and options.  In addition, I was engaged in all stages of the negotiation between the Seller and Buyer that resulted in the current Purchase Price of $250,000.  Accordingly, I have the necessary background to attest to the propriety and reasonableness of the Sale and, in particular, the Purchase Price.

**Decision to Sell Capmark Securities and Negotiation of Purchase Price**

6.  In early 2010, after the sale of the MSB Business to Berkadia, I was requested by the Debtors' management to either begin the process of winding down Capmark Securities or seeking a sale of the broker-dealer, with the assistance of my colleague David Cheung.  While determining which course presented the optimal solution for the Debtors and their estates, we were approached by two parties in the Denver area that expressed an interest in purchasing Capmark Securities for $50,000 or less.  Although these offers were too low to

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

[3] For a detailed description of (i) Capmark Securities' business, (ii) the Debtors' reasons for requesting a private sale, and (iii) the circumstances surrounding the Debtors' selection of the Buyer and entry into the Sale Agreement, please refer to the declaration of David Cheung, Senior Vice President, Director of Compliance and General Counsel of Capmark Securities (the "Cheung Declaration"), which is being filed concurrently herewith in support of the Sale and the Motion.

represent a financially sensible alternative to winding down Capmark Securities, during the week of March 8, 2010, Capmark Securities received an unsolicited offer of $100,000 from the Buyer.

7. With the possibility of a serious bidder at a substantially higher price, I engaged the Debtors' management in a discussion regarding what would be an acceptable price for Capmark Securities. After considering the time, attorneys' fees and other expenses that would be involved in negotiating and consummating a sale transaction, the Debtors' management, along with Capmark Securities, concluded that a sale of Capmark Securities would not be financially warranted unless a buyer agreed to pay in excess of $100,000 to cover the costs of documenting, negotiating and closing a transaction. I then informed the Buyer that, in order for the Debtors' management to pursue a sale rather than a wind-down, it would need to offer at least $250,000.

8. Thereafter, David Cheung and I continued to discuss with the Buyer the prospect of a sale transaction and permitted the Buyer to begin the necessary due diligence on Capmark Securities. In late April 2010, after the Debtors had already engaged in substantial discussions with Buyer, another party, Cortlandt Capital Holdings, Inc. ("Cortlandt"), also made an inquiry regarding the sale of Capmark Securities. On April 30, 2010, David Cheung and I participated in a conference call with Cortlandt. During that call, we conveyed to Cortlandt the Debtors' resolve not to sell Capmark Securities for less than $250,000.[4]

---

[4] After this call, Cortlandt made an offer in writing to Seller to purchase Capmark Securities for $250,000, which was subject to certain conditions not present in Buyer's offer. However, as set forth in the Cheung Declaration, the Debtors elected to proceed with Buyer's offer, since, among other reasons, (i) Buyer was already familiar with, and seemed most determined to acquire, Capmark Securities' business; and (ii) FINRA and Capmark Securities' clearing broker had expressed approval for a sale to the Buyer. After Seller's entry into a letter of intent with the Buyer on June 7, 2010, Cortlandt submitted a revised offer that increased the purchase price to $350,000 and removed some unfavorable conditions to a transaction. However, the Debtors were not able to entertain the offer given that the executed letter of intent with Buyer granted the Buyer exclusivity to enter into a sale agreement with Seller on or before June 30, 2010.

9. Only after the possibility of an expedient closing with the Buyer and consideration of $250,000 was presented did a sale become the preferred disposition of Capmark Securities, given the business' liabilities would be assumed by Buyer and the ongoing costs associated with the operation of the business would be mostly avoided. Although the Debtors could be able to obtain some incrementally higher price for the Shares, the Debtors believed that the additional time and financial resources required to further market and negotiate the Sale of the Shares and operate the business in the interim would likely cost more than any gain in Purchase Price that would result from further bidding.

### The Purchase Price is Reasonable and Should Be Approved

10. In preparation for any discussions that might require a comparative quote, I called a principal officer of www.Bdexchange.com, an online auction website where broker-dealer businesses are regularly advertised and sold at prices ranging from $5,000 to $80,000. The Bdexchange officer informed me that I could purchase a fully licensed broker-dealer with full service for $100,000. It is my understanding that other similar online auction websites, such as www.Bdmarket.com, advertise and sell broker-dealers of equivalent quality at similar prices. Based on my knowledge of the market for broker-dealer business shells, as well as the facts surrounding the proposed Sale set forth above, I submit that the Purchase Price of $250,000 (i) is reasonable; (ii) resulted from good faith, arm's length negotiation between the Seller and Buyer; and (iii) represents the sound exercise of the Debtors' business judgment. Therefore, I believe that the Sale to the Buyer at the present Purchase Price should, without reservation, be approved.

Dated: July 13, 2010

_____
David Lausa