# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CAPMARK FINANCIAL GROUP, INC., *et al.*, | Case No. 09-13684 (CSS) (Jointly Administered) |
| Debtors. | **Objection Deadline:** **August 24, 2010 at 4:00 p.m.** **Hearing Date:** **September 15, 2010 at 9:30 a.m.** |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING IT LEAVE, STANDING AND AUTHORITY TO PROSECUTE <u>CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

JURISDICTION ......................................................................................................... 4

PROCEDURAL BACKGROUND............................................................................. 4

FACTUAL BACKGROUND ..................................................................................... 5

    A.    The Unsecured Debt. ................................................................................ 5

    B.    Just Prior to the Bankruptcy, $1.5 Billion of the Unsecured Bank Debt
        is Converted to Secured Debt. ................................................................ 8

    C.    Predictably, the Debtors Take No Action to Challenge the Secured
        Credit Facility, Nor the Proof of Claim Filed With Respect Thereto. ................. 11

    D.    Substantial Claims Exist. ....................................................................... 13

RELIEF REQUESTED............................................................................................. 20

BASIS FOR RELIEF ............................................................................................... 20

    A.    The Debtors Unjustifiably Refused to Pursue the Claims and
        Unjustifiably Denied the Committee Standing. .................................... 24

    B.    The Claims Are Clearly Colorable and Would Benefit the Estates. .................. 28

        1.    The Claims are Colorable. ........................................................ 28

            a.    Constructive Fraudulent Conveyance. .......................... 29

            b.    Intentional Fraudulent Conveyance. ............................. 35

            c.    Equitable Subordination.............................................. 37

            d.    Preference. .................................................................. 39

        2.    Prosecution of the Claims Will Benefit the Debtors' Estates
            and Their Creditors. ................................................................. 41

NOTICE.................................................................................................................... 43

CONCLUSION......................................................................................................... 44

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<small>CASES</small>

*Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.),*
    285 B.R. 848 (Bankr. S.D.N.Y. 2002) ...................................................................................25

*Advisory Comm. of Major Funding Corp. v. Sommers (In re Advisory Comm. of Major Funding Corp.),*
    109 F.3d 219 (5th Cir. 1997) ..............................................................................................22

*Anand v. Nat'l Republic Bank (In re Anand),*
    210 B.R. 456 (Bankr. N.D. Ill. 1997) .................................................................................33

*Anand v. Nat'l Republic Bank,*
    239 B.R. 511 (N.D. Ill. 1999) .............................................................................................33

*Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.),*
    423 B.R. 76 (Bankr. D. Del. 2010) .....................................................................................30

*Asarco LLC v. Ams. Mining Corp.,*
    396 B.R. 278 (S.D. Tex. 2008) ...........................................................................................30

*BFP v. Resolution Trust Corp.,*
    511 U.S. 531 (1994) ............................................................................................................31

*Cain v. Hyatt,*
    101 B.R. 440 (E.D. Pa. 1989) .............................................................................................20

*Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Group),*
    66 F.3d 1436 (6th Cir. 1995) ..............................................................................................24

*Citicorp Venture Capital v. Committee of Creditors Holding Unsecured Claims,*
    160 F.3d 982 (3d Cir. 1998) ...............................................................................................37

*Commodity Futures Trading Comm'n v. Weintraub,*
    471 U.S. 343 (1985) ............................................................................................................21

*Commodore Int'l v. Gould (In re Commodore Int'l Ltd.),*
    262 F.3d 96 (2d Cir. 2001) ...........................................................................................21, 23

*Corzin v. Fordu (In re Fordu),*
    201 F.3d 693 (6th Cir. 1999) ..............................................................................................34

*Dayton Title Agency, Inc., et al. v. White Family Cos., Inc. (In re Dayton Title Agency, Inc.)*,
262 B.R. 719 (Bankr. S.D. Ohio 2001), *rev'd on other grounds*, 284 B.R. 238 (S.D. Ohio 2002) ............................................................................................................33

*Dean v. Davis*,
242 U.S. 438 (1917)............................................................................................................35

*Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*,
340 B.R. 266 (Bankr. E.D. Pa. 2006) ................................................................................31

*Flint Ink Corp. v. Calascibetta*,
No. 06-2517 (GEB), 2007 U.S. Dist. LEXIS 66615 (D.N.J. Aug. 31, 2007)........................39

*Fogel v. Zell*,
221 F.3d 955 (7th Cir. 2000) ............................................................................................24

*G-I Holdings, Inc. v. Those Parties Listed On Exhibit A (In re G-I Holdings, Inc.)*,
313 B.R. 612 (Bankr. D.N.J. 2004), *rev'd in part and remanded*, *Official Comm. of Asbestos Claimants v. Bank of N.Y. (In re G-I Holdings, Inc.)*, No. 04-3423 (WGB), 2006 U.S. Dist. LEXIS 45510 (D.N.J. June 21, 2006) .................................................. passim

*In re American Properties, Inc.*,
14 B.R. 637 (Bankr. D. Kan. 1981) ............................................................................35, 36

*In re Countdown of Connecticut, Inc.*,
115 B.R. 18 (Bankr. D. Conn. 1990) ............................................................................32, 33

*In re iPCS, Inc.*,
297 B.R. 283 (Bankr. N.D. Ga. 2003) ..............................................................................28

*In re Mars Stores*,
150 B.R. 869 (Bankr. D. Mass. 1993) ..............................................................................34

*In re Mason*,
48 B.R. 382 (Bankr. M.D. Ala. 1984)................................................................................34

*In re McKeesport Steel Castings Co.*,
799 F.2d 91 (3d Cir. 1986)................................................................................................23

*In re Mobile Steel Co.*,
563 F.2d 692 (5th Cir. 1977) ............................................................................................37

*In re Monsour Med. Ctr.*,
5 B.R. 715 (Bankr. W.D. Pa. 1980) ..................................................................................23

*In re Nationwide Sports Distrib.*,
227 B.R. 455 (Bankr. E.D. Pa. 1998) ................................................................................21

*In re Nicolet, Inc.*,
   80 B.R. 733 (Bankr. E.D. Pa. 1987) .................................................................23

*In re STN Enters.*,
   779 F.2d 901 (2d Cir. 1985)...............................................................24, 28, 29

*In re White*,
   258 B.R. 129 (Bankr. D.N.J. 2001) ...............................................................39

*Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*,
   316 B.R. 141 (D. Del. 2004) ...........................................................................23

*Integrated Solutions v. Serv. Support Specialties*,
   124 F.3d 487 (3d Cir. 1997).............................................................................20

*La. World Exposition v. Federal Ins. Co.*,
   858 F.2d 233 (5th Cir. 1988) ...........................................................................21

*Liberty Mut. Ins. Co. v. Official Unsecured Creditors' Comm. of Spaulding Composites
   Co. ( In re Spaulding Composites Co.)*,
   207 B.R. 899 (B.A.P. 9th Cir. 1997).................................................................21

*Lustig v. Chwiecko (In re Harris)*,
   195 B.R. 577 (Bankr. W.D.N.Y. 1995) ...........................................................36

*Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L.)*,
   92 F.3d 139 (3d Cir. 1996)...............................................................................30

*Murphy v. Nunes (In re Terrific Seafoods)*,
   197 B.R. 724 (Bankr. D. Mass. 1996) .............................................................36

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*,
   361 B.R. 369 (Bankr. S.D.N.Y. 2007) .............................................................38

*Official Comm. of Unsecured Creditors of America's Hobby Ctr. v. Hudson United Bank
   (In re America's Hobby Ctr.)*,
   223 B.R. 275 (Bankr. S.D.N.Y. 1998)..............................................................29

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp.
   v. Chinery*,
   330 F.3d 548 (3d Cir. 2003).................................................................22, 23, 25

*Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Servs., Inc.
   (In re KDI Holdings, Inc.)*,
   277 B.R. 493 (Bankr. S.D.N.Y. 1999)..............................................................29

*Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*,
405 B.R. 527 (Bankr. D. Del. 2009) ...................................................................30

*Official Comm. of Unsecured Creditors of Grand Eagle Cos. v. Asea Brown Boveri, Inc. (In re Grand Eagle Cos.)*,
310 B.R. 79 (Bankr. N.D. Ohio 2004) ................................................................24

*Official Comm. of Unsecured Creditors v. Cablevision Sys. Corp. (In re Valley Media, Inc.)*,
No. 01-11353(PJW), Adv. Proc. No. 02-04553, 2003 Bankr. LEXIS 940, at *2
(Bankr. D. Del. Aug. 14, 2003)..................................................................24, 25

*Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*,
304 B.R. 214 (Bankr. W.D. Pa. 2004) ...........................................................26, 42

*Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*,
326 B.R. 532 (W.D. Pa. 2005) .........................................................................25

*Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*,
299 B.R. 732, 748 (Bankr. D. Del. 2003) ...............................................31, 32, 33

*Roeder v. Lockwood (In re Lockwood Auto Group, Inc.)*,
No. 05-13558-TPA, Adv. No. 06-1100, 2010 Bankr. LEXIS 1377 (Bankr. W.D. Pa.
May 14, 2010)....................................................................................37, 38

*Schreiber v. Stephenson (In re Emerson)*,
235 B.R. 702 (Bankr. D.N.H. 1999) ...................................................................34

*Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*,
348 B.R. 234 (Bankr. D. Del. 2005), *rev'd in part on other grounds*,
554 F.3d 382 (3d Cir. 2009)............................................................37, 38, 40

*Solomon v. Stillwater Nat'l Bank & Trust Co. (In re Solomon)*,
299 B.R. 626 (B.A.P. 10th Cir. 2003).................................................................33

*Southtrust Bank N.A. v. Jackson (In re Dur Jac Ltd.)*,
254 B.R. 279 (Bankr. M.D. Ala. 2000)................................................................24

*TSIC, Inc. v. Thalheimer (In re TSIC, Inc.)*,
No. 08-10322 (KG), Adv. Proc. No. 08-51902 (KG), 2010 Bankr. LEXIS 1146,
at *14-15 (Bankr. D. Del. Apr. 28, 2010) ...........................................................40

*U.S. v. Noland*,
517 U.S. 535 (1996)..........................................................................................37

*Walsh v. Westmoreland Human Opportunities, Inc. (In re Life Serv. Sys.),*
279 B.R. 504 (Bankr. W.D. Pa. 2002) ...................................................21

**STATUTES**

11 U.S.C. §§ 101 *et seq.* ........................................................................4

11 U.S.C. § 101(2)(A) ...........................................................................39

11 U.S.C. § 101(31)(B)(i) ......................................................................39

11 U.S.C. § 101(31)(E) ..........................................................................39

11 U.S.C. § 105(a) ........................................................................4, 20, 22

11 U.S.C. § 363(a) .................................................................................11

11 U.S.C. § 503(b)(3)(B) ........................................................................22

11 U.S.C. § 510(c) .................................................................................38

11 U.S.C. § 541(a)(1) .............................................................................20

11 U.S.C. § 544(b) .................................................................................22

11 U.S.C. § 547 .....................................................................................39

11 U.S.C. § 547(b) .................................................................................39

11 U.S.C. § 548 ................................................................................29, 35

11 U.S.C. § 548(a) .................................................................................32

11 U.S.C. § 548(a)(1)(A) ........................................................................35

11 U.S.C. § 548(a)(1)(B) ........................................................................29

11 U.S.C. § 548(d)(2)(A) ........................................................................31

11 U.S.C. § 1102 ................................................................................5, 21

11 U.S.C. § 1103(c)(2)-(3) ......................................................................22

11 U.S.C. § 1103(c)(5) ...............................................................4, 20, 21, 22

11 U.S.C. § 1107 ...................................................................................20

11 U.S.C. § 1107(a) .........................................................................4, 5, 20

11 U.S.C. § 1108 ....................................................................................5

11 U.S.C. § 1109(b) ....................................................................................4, 20, 22

28 U.S.C. § 157 ...............................................................................................4

28 U.S.C. § 157(b)(2) .....................................................................................4

28 U.S.C. § 1334 .............................................................................................4

28 U.S.C. § 1408 .............................................................................................4

28 U.S.C. § 1409 .............................................................................................4

**OTHER AUTHORITIES**

7 COLLIER ON BANKRUPTCY ¶ 1103.05[6][a] (15th rev. ed. 2002) ................23

Fed. R. Bankr. P. 1015(b) ...............................................................................5

Del. Bankr. L.R. 1015-1 ..................................................................................5

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CAPMARK FINANCIAL GROUP, INC., *et al.*, | Case No. 09-13684 (CSS) (Jointly Administered) |
| Debtors. | **Objection Deadline: August 24, 2010 at 4:00 p.m. Hearing Date: September 15, 2010 at 9:30 a.m.** |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING IT LEAVE, STANDING AND AUTHORITY TO PROSECUTE CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" or "Capmark"), by and through its undersigned counsel, hereby moves (the "Motion") for entry of an order authorizing the Committee to prosecute various claims and causes of action on behalf of the Debtors' Estates including, among others, to avoid and recover fraudulent transfers and preferences and equitably subordinate claims as more fully described herein. In support of the Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[1]

The Debtors' liquidating Estates hold Claims against the Debtors' secured lenders that if prosecuted likely will free up to *$1.5 billion* for distribution to all creditors. The Debtors have failed to pursue these Claims, and have refused to cooperate in their prosecution by declining the Committee's request to assign such claims to the Committee and by hindering the Committee's

---

[1] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings assigned to them in the body of this Motion.

ability to investigate the same. The reason for the Debtors' refusal is clear to the Committee: the Debtors were actively involved in the Secured Debt transaction and, as a result, do not want an independent examination of the *bona fides* of the transaction in which they actively participated.

The Debtors, the Agents under their Pre-Petition Credit Facilities, and many of their pre-petition lenders, including insiders, orchestrated and effectuated a pre-petition transfer of $1.5 billion of secured debt (the "Secured Debt") incurred by Capmark Financial Group, Inc. ("CFGI") and its guarantor subsidiaries. Faced with Capmark's imminent, inevitable bankruptcy, the Agents and Lenders collaborated with the Debtors to receive a $1.5 billion payment on an unsecured loan through a supposedly "new" loan from the same Agents and virtually identical lenders, including insiders, but on a secured basis. Nowhere near $1.5 billion of value was given to the Debtors' Estates for this transfer. The Committee submits that the transaction at issue was a fraudulent conveyance and was also preferential.

As a result of the Secured Debt transaction, $1.5 billion of unsecured debt was replaced with $1.5 billion of Secured Debt with the Debtors granting liens on their assets while receiving little to no value in exchange, all to the detriment of the Debtors' Estates and unsecured creditors. Indeed, the Debtors' lack of assets to support a fair distribution to unsecured creditors in these bankruptcy cases is the direct result of this troubling transaction. Because CFGI and its Debtor guarantors were insolvent and reasonably equivalent value was not given for the liens granted under the Secured Debt transaction, the Secured Debt and the liens granted to secure it should be avoided as constructively fraudulent transfers. Moreover, because the Debtors, Agents and Lenders entered into the Secured Credit Facility with actual intent to hinder, delay and defraud the Debtors' unsecured creditors, the Secured Debt and the liens granted to secure it

should be avoided as actual fraudulent transfers, and because such conduct is inequitable, the Citi Claim should be equitably subordinated. Finally, transfers to the Insider Lenders merely five months before the bankruptcy filing should be avoided as preferences.

In connection with seeking recovery for in excess of $1.5 billion as a "secured" creditor with respect to this transaction, Citicorp filed the Citi Claim; all amounts sought thereunder are subject to recovery by the Estates under fraudulent conveyance law. However, even if the Court does not entirely disallow the Citi Claim on that basis, the claim is still not secured at anywhere near $1.5 billion. In May 2009, the pertinent Debtor guarantors did not have the capacity to incur anywhere close to $1.5 billion of indebtedness without rendering themselves insolvent, and "savings clauses" in the guaranties expressly limited such guaranties to amounts that would not render these guarantors insolvent and constitute fraudulent transfers.

On May 25, 2010, the Committee sent a letter to the Debtors requesting that the Debtors stipulate to the Committee's standing to pursue certain potential causes of action on behalf of the Estates, including the recovery of fraudulent conveyances and preferential transfers, and equitable subordination of the Citi Claim. This request was flatly and unjustifiably denied. Despite the Debtors having taken no action in pursuit of the Claims, and because they have no intention of doing so, the Debtors are squandering the Estates' most valuable Claims, in a transparent effort to squelch a thorough investigation and prosecution of a highly suspect transaction.

Indeed, rather than permitting and assisting the Committee in the pursuit of such Claims, the Debtors have erected hurdle after hurdle to impair the pursuit thereof. The Committee's informal requests for the documents and information underlying the Secured Credit Facility transaction were rejected. The Committee's 2004 Motion to obtain such information was met by

approximately 72 pages of objections, opposing affidavits and exhibits. While on the eve of the

hearing on the 2004 Motion the Debtors capitulated and agreed to provide *some* of the sought

after information, they continued to tie up the discovery process by, for example, proposing

onerous protective orders (wherein they sought to reserve the right to unilaterally withhold any

discovery from production) and refusing to agree to enter a discovery order committing to the

production of witnesses involved in the transaction.

Notwithstanding the paucity of information provided to date, the Claims (as defined

below) both (i) are colorable, and (ii) will benefit the Debtors' liquidating Estates. Accordingly,

the Committee respectfully requests that it be granted standing to pursue the Claims.

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief requested

herein are sections 105(a), 1103(c)(5), 1107(a) and 1109(b) of title 11 of the United States

Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

## PROCEDURAL BACKGROUND

2. On October 25, 2009 (the "Petition Date"), each of the Debtors other than

Capmark Investments LP (the "First Filed Debtors") filed voluntary petitions for relief under

chapter 11 of the Bankruptcy Code. On January 15, 2010, Capmark Investments LP, a wholly-

owned subsidiary of CFGI, commenced its voluntary case under chapter 11 of the Bankruptcy

Code. On July 29, 2010, Protech Holdings C, LLC, an Ohio single member limited liability

company and an affiliate of the First Filed Debtors and Capmark Investments LP, commenced

its voluntary case under chapter 11 of the Bankruptcy Code. The Debtors continue to operate

their businesses and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On October 27, 2009, this Court entered an order authorizing the joint administration of the First Filed Debtors' chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Bankruptcy Rules for the District of Delaware (the "Local Rules").  On January 19, 2010, this Court entered an order jointly administering Capmark Investments LP's chapter 11 case with the jointly administered chapter 11 cases of the First Filed Debtors.

4.      The Committee was appointed on November 2, 2009, by the United States Trustee for the District of Delaware (the "U.S. Trustee") pursuant to section 1102 of the Bankruptcy Code, to represent the interests of all unsecured creditors in these chapter 11 cases.

## FACTUAL BACKGROUND

### A.      The Unsecured Debt.

5.      On March 23, 2006, a group of private equity investors ("GMACCH Investor LLC"), which included affiliates of Goldman, Sachs & Co. (the "Goldman Affiliates")[2] and Dune Real Estate Parallel Fund LP ("Dune"), acquired a controlling stake in what is now CFGI from CFGI's former parent.  Capmark Financial Group Inc. Form 10-K dated April 24, 2009 (for year ended December 31, 2008) at 251.

6.      To finance the March 23, 2006 transaction, the Debtors incurred approximately $8.7 billion of debt at the closing.  Specifically, CFGI and certain of its subsidiaries entered into two unsecured debt facilities (the "Pre-Petition Credit Facilities"): (i) that certain Unsecured

---

[2] The Goldman Affiliates are GS Capital Partners V Fund, L.P; GS Capital Partners V Offshore Fund, L.P.; GS Capital Partners V GmbH & Co. KG; and GS Capital Partners V Institutional, L.P.  *See* Capmark Financial Group Inc. Form 10-K dated April 24, 2009 (for year ended December 31, 2008) at 251.

Credit Facility in the principal amount of $5.5 billion[3] (as amended from time to time, the "2006 Credit Facility"), the terms of which are governed by that certain Credit Agreement among CFGI, certain of its subsidiaries, the lenders party thereto (including Goldman Sachs Canada Credit Partners Co., Goldman Sachs Credit Partners L.P., Goldman Sachs Lending Partners LLC, Goldman Sachs Mortgage Company, Dune Real Estate Fund LP, and Dune), Citibank N.A. ("Citibank") as Administrative Agent, J.P. Morgan Securities Inc. (as "Syndication Agent"), and Credit Suisse, Deutsche Bank Securities Inc., Goldman Sachs Credit Partners L.P. and The Royal Bank of Scotland plc (collectively, as "Documentation Agents") dated as of March 23, 2006 (as amended from time to time, the "Credit Agreement"); and (ii) that certain Unsecured Bridge Loan Facility in the principal amount of $5.25 billion (as amended from time to time, the "Bridge Loan," and the amounts extended thereunder, together with the amounts under the 2006 Credit Facility, the "Unsecured Bank Debt"), the terms of which are governed by that certain Bridge Loan Agreement among CFGI, the lenders party thereto (including Goldman Sachs Credit Partners L.P.), Citicorp North America, Inc. ("Citicorp," and together with Citibank, the "Agents") as Administrative Agent, the Syndication Agent, the Documentation Agents, and Citigroup Global Markets Inc., J.P. Morgan Securities Inc., Credit Suisse, Deutsche Bank Securities Inc., Goldman Sachs Credit Partners L.P. and The Royal Bank of Scotland plc as Joint Lead Arrangers and Joint Bookrunners, dated as of March 23, 2006 (as amended from time to time, the "Bridge Loan Agreement").[4]

---

[3] The 2006 Credit Facility is comprised of various sub-facilities, including (i) several term loans totaling $2.75 billion and (ii) several revolving lines of credit totaling $2.75 billion.

[4] From time to time, Capmark and its Unsecured Bank Debt lenders entered into various amendments to the Pre-Petition Credit Facilities. *See* Capmark Financial Group Inc. Form 8-K dated May 8, 2009 at 2-3; Capmark Financial Group Inc. Amended Form 10-K/A dated April 28, 2009 (for year ended December 31, 2008) at 96.

7.     CFGI and certain of its subsidiaries are borrowers (the "Borrowers") under the Credit Agreement,[5] and CFGI is a guarantor of the obligations of each Borrower thereunder. Additionally, nine of CFGI's direct and indirect subsidiaries (the "Guarantors") guaranteed CFGI's obligations under the Credit Agreement pursuant to a separate guaranty agreement. CFGI is the sole borrower under the Bridge Loan.  The same Guarantors under the Credit Agreement also guaranteed CFGI's obligations under the Bridge Loan pursuant to a separate guaranty agreement.[6]  *The Pre-Petition Credit Facilities were unsecured debt obligations of the Debtors that ranked* *pari passu* *with all other unsecured obligations.*

8.     In May 2007, CFGI issued $2.55 billion of senior unsecured notes.  The notes consisted of:  (i) $850 million of Floating Rate Senior Notes Due May 10, 2010; (ii) $1.2 billion of 5.875% Senior Notes Due May 10, 2012; and (iii) $500 million of 6.300% Senior Notes Due May 10, 2017 (collectively, the "Notes").  Each series of Notes was issued pursuant to a separate indenture dated as of May 10, 2007 (collectively, the "Indentures") between CFGI, the Guarantors, and Deutsche Bank Trust Company Americas ("DBTCA"), as Indenture Trustee.[7] Substantially all of the proceeds from the issuance of the Notes were used to repay a portion of the Bridge Loan.

---

[5] Credit Agreement Borrowers are: CFGI; Capmark AB No. 2 Limited; Capmark Bank; Capmark Bank Europe, Public [Limited] Company; Capmark Canada Limited; Capmark EI Ireland Limited; Capmark Finance Inc. ("CFI"); Capmark Funding Japan KK; Capmark Ireland Limited; Capmark Japan, KK; and SJM Cap, LLC.

[6] Credit Agreement and Bridge Loan Guarantors are: Enableus, Inc.; Capmark Capital Inc. ("CCI"); CFI; Capmark Investments LP; Commercial Equity Investments, Inc.; Crystal Ball Holdings of Bermuda Limited; Mortgage Investments, LLC; Net Lease Acquisition LLC; and SJM Cap, LLC.  Additional guarantors (the "Additional Guarantors") were added on the Credit Agreement and Bridge Loan as of May 29, 2009.  Additional Guarantors became guarantors of CFGI's obligations under the Notes, as defined herein, on June 3, 2009.  The Additional Guarantors are: Capmark Affordable Equity Holdings Inc.; Capmark REO Holding LLC ("Capmark REO"); and Summit Crest Ventures LLC.

[7] Wilmington Trust FSB has subsequently replaced DBTCA as trustee under the Indentures.

9.      Prior to incurring the Secured Debt (as defined below) approximately $5.3 billion was outstanding under the 2006 Credit Facility, and the balance on the Bridge Loan was approximately $825 million.

**B.      Just Prior to the Bankruptcy, $1.5 Billion of the
Unsecured Bank Debt is Converted to Secured Debt.**

10.      In May 2009, CFGI, the Guarantors,[8] the Additional Guarantors and various lenders that held debt under one or both of the 2006 Credit Facility or Bridge Loan (the "Lenders") entered into a $1.5 billion secured term loan facility (the "Secured Credit Facility") whereby Capmark incurred the $1.5 billion in Secured Debt in exchange for the unsecured debt held by the Lenders in substantially the same amount.  As described below, while the pre-petition Debtors were insolvent, and with bankruptcy a virtual certainty, the Debtors and the Agents and Lenders converted $1.5 billion of unsecured debt into secured debt, moving the Lenders ahead of all other unsecured creditors while the Debtor entities received little to no value in exchange.

11.      All four of the Goldman Sachs entities which were lenders under the 2006 Credit Facility and/or Bridge Loan (collectively, the "Goldman Lenders"), and both Dune entities which were lenders under the 2006 Credit Facility (collectively, the "Dune Lenders") were Lenders under the Secured Credit Facility.  The Goldman Sachs Lenders and the Dune Lenders committed to certain amounts and percentages of the Secured Debt in the aggregate[9] -- and therefore their unsecured holdings were paid off in like amounts.  The terms of the Secured Credit Facility are governed by that certain Term Facility Credit Agreement and Guaranty

---

[8] Enableus, Inc. was sold by CFGI pre-petition and released of its guarantee obligations, and neither it nor Crystal Ball Holdings of Bermuda Limited is a debtor under the Bankruptcy Code.  Thus, no estates exist as to these two Guarantors on behalf of which the Committee could pursue the Claims (as defined herein).

[9] The Committee believes that such amounts may be confidential.

Agreement, dated May 29, 2009, among CFGI as Borrower, the Guarantor parties thereto, Citicorp as Administrative Agent, Citibank as Collateral Agent, JPMorgan Chase Bank, N.A. as Syndication Agent, the Lender parties thereto, and Citigroup Global Markets Inc. and J.P. Morgan Securities Inc. as Joint Lead Arrangers and Joint Bookrunners (the "Secured Credit Facility Agreement"). In connection therewith, CFGI also entered into that certain Security Agreement dated May 29, 2009, among CFGI, the grantors party thereto, and Citibank as Collateral Agent (the "Security Agreement").

12. Each Guarantor party executed the Secured Credit Facility Agreement, which purported to obligate each Guarantor party to repay the Secured Debt subject to certain limitations. Pursuant to the Security Agreement, (i) CFGI pledged and granted security interests on all of CFGI's U.S. and Canadian mortgage loan assets and foreclosed real estate (excluding assets held by Capmark Bank) and the proceeds of such assets (the "Collateral") and (ii) each Guarantor party thereto, including CFI, Capmark REO and CCI, granted security interests on certain of its assets to secure its obligations to repay the Secured Debt under the Secured Credit Facility Agreement.

13. The Secured Credit Facility, along with $75 million of cash of the Debtors, was used to exchange a corresponding amount of outstanding debt under the Pre-Petition Credit Facilities with the same Agents and virtually identical Lenders. Indeed, the Secured Credit Facility expressly mandates that the proceeds thereof be used only to finance the repayment of the 2006 Credit Facility and Bridge Loan. *Thus, the Agents and Lenders merely exchanged unsecured debt for secured debt to the prejudice of all other unsecured creditors for little to no consideration.*

14. After the Agents, Lenders and Debtors orchestrated this suspect transaction, the Debtors had to take one added, troubling step, to make it work. In order to consummate the Secured Credit Facility transaction, the Debtors were forced to obtain a last-minute amendment from DBTCA under the Indentures to remove a restriction that required Capmark secure the Notes equally and ratably with additional secured debt under certain conditions. Capmark's Chief Financial Officer and Executive Vice President executed officers' certificates (the "Officers' Certificates") attesting to the propriety of removing this restriction, on which DBTCA maintains it was authorized to rely. *See Capmark Financial Group Inc., et al., v. Gruss Global Investors Master Fund, Ltd., et al. (In re Capmark Financial Group, Inc.), Complaint for Declaratory and Injunctive Relief to Confirm Applicability of Automatic Stay or Alternatively to Impose Section 105 Stay*, Case No. 09-13684 (CSS), Adv. No. 10-50000 (CSS), at ¶¶ 3, 70, 73 [Docket No. 1] (Bankr. D. Del.) (Jan. 5, 2010) (the "Adversary Complaint"). DBTCA's removal of the restriction was not initially included in the Debtors' public disclosures, and is subject to a pending lawsuit (the "DBTCA Lawsuit"). Contemporaneously with filing its answer in the DBTCA Lawsuit, DBTCA served and filed a third party complaint (the "Third Party Complaint") against certain Capmark affiliates[10] (the "DBTCA Third Party Defendants") alleging, *inter alia,* that the DBTCA Third Party Defendants are required to indemnify DBTCA for, and/or contribute to, DBTCA's losses incurred in connection with the DBTCA Lawsuit, because DBTCA was entitled, and indeed required, to rely conclusively on the Officers' Certificates which stood by the validity of amending the Indentures to allow the incurrence of the Secured Debt. *Id.* at ¶ 77.

---

[10] These affiliates were: CFGI; CCI; CFI; Commercial Equity Investments, Inc.; Mortgage Investments, LLC; Net Lease Acquisition LLC; SJM Cap, LLC; Capmark Investments LP; and Crystal Ball Holding of Bermuda Limited. Adversary Complaint at 1, ¶ 5, n.2.

15.     Capmark's officers, directors and advisors are substantially the same today as they were at the time the Secured Credit Facility was consummated -- indeed, all of CFGI's directors as of March 31, 2009 appear to still be directors of the company today, and CFGI's President, Chief Executive Officer, Secretary, General Counsel, Chief Risk Officer and three of its Executive Vice Presidents, are evidently the same.[11]

**C.     Predictably, the Debtors Take No Action to Challenge the Secured Credit Facility, Nor the Proof of Claim Filed With Respect Thereto.**

16.     On December 22, 2009, the Court entered the *Final Order (I) Authorizing Use of Certain Cash Collateral Postpetition and (II) Providing Adequate Protection to Prepetition Secured Parties in Connection Therewith* [Docket No. 517] (the "Cash Collateral Order"). The Cash Collateral Order authorizes the Debtors to use cash collateral, as defined in section 363(a) of the Bankruptcy Code, for the period from the Petition Date through the date that is the earliest to occur of December 31, 2010, or certain other triggering events. Cash Collateral Order at ¶ 3. Although the Debtors did not waive standing to challenge the liens and obligations set forth in the Secured Credit Facility Agreement and Security Agreement, the Cash Collateral Order allows any party in interest granted standing by the Court to challenge such liens and obligations, provided that such challenge is brought within sixty (60) days (the "Action Notice Period") after Citicorp delivers written notice indicating that the Lenders are electing to commence the Action Notice Period. *Id.* at ¶14. Citicorp has not delivered the notice, but could do so at any time. In any event, the Debtors have taken no action of any kind to avoid the Secured Debt or the liens granted with respect thereto, to recover the preferences paid to insiders, or to object to the Citi Claim (as defined below).

---

[11] *See* Capmark Financial Group Inc. Form 424B3, dated April 27, 2009 at 220-21; Hoover's Company Records, Capmark Financial Group Inc., dated June 8, 2010; Capmark Financial Group website, http://www.gmaccm.com/capmark/MainPage.aspx?id=263&TSMTID=263&TSMTT=1&TSMID=0 (accessed Aug. 5, 2010).

17.     On April 21, 2010, Citicorp filed that certain proof of claim number 601 (the "Citi Claim") in connection with the Secured Debt.  In the Citi Claim, Citicorp asserts claims for: (i) principal in the amount of $1.5 billion as of the Petition Date, as reduced from time to time by payments made pursuant to the Cash Collateral Order; (ii) interest in the amount of $5 million as of the Petition Date; (iii) fees and expenses in a to-be-determined amount; (iv) amounts pursuant to the Cash Collateral Order in the event adequate protection provided therein is insufficient to compensate for diminution in value of the Lenders' interests in the Collateral; and (v) an unliquidated amount for breach of representations under the Secured Credit Facility Agreement and Security Agreement to the extent any party asserts any obligations thereunder should be avoided, reduced, or disallowed.  Citi Claim at ¶¶ 7-11.  The Debtors have not challenged the Citi Claim.

18.     On May 17, 2010, following repeated demands by the Committee's professionals for the Debtors' analysis of potential claims (which the Debtors have the fiduciary duty to investigate and analyze), the Debtors finally presented the Committee with (i) a "fact" memorandum (the "Debtors' Memo") in which the Debtors seek to justify their actions in connection with the Secured Credit Facility, and which discusses the Debtors' financings without any legal analysis of the Estates' causes of action and objections with respect thereto, and (ii) a one-page "term sheet" (the "May 17 Term Sheet") that was not negotiated with the Committee and which proposes a "settlement" to the Agents and Lenders, on behalf of the Debtors, that is contrary to the facts of these cases and applicable law.  On July 1, 2010, the Debtors proposed a revised and even more unacceptable term sheet which seeks to whitewash the Claims (as defined herein) (the "July 1 Term Sheet," and together with the May 17 Term Sheet, the "Term Sheets"), in response to the Committee's proposed term sheet, dated June 14

(the "June 14 Term Sheet").  The Debtors' Memo and the Term Sheets all confirm the Debtors' refusal to pursue the Claims.

**D.**     **Substantial Claims Exist.**

19.     Although the Committee has, to date, received only very limited Bankruptcy Rule 2004 discovery, extensive factual and legal research has been conducted to determine whether any viable claims exist and any applicable defenses to such claims.

20.     Even based only on the information the Committee currently has, the Committee has concluded that substantial claims exist against the Agents and/or Lenders including, but not limited to, claims for: (i) avoiding and/or recovering the payments, obligations, guaranties, liens and security interests that were granted in favor of the Agents and/or Lenders without reasonably equivalent consideration, and/or for the purpose of hindering, delaying and defrauding the Debtors' unsecured creditors, (ii) avoiding and/or recovering the payments, obligations, guaranties, liens and security interests that were granted in favor of insiders of the Debtors, or affiliates of such insiders, namely the Goldman Lenders and the Dune Lenders (collectively, the "Insider Lenders"), that were incurred or transferred during the statutory preference period, and (iii) equitably subordinating the Agents' liens and claims to the claims of unsecured creditors (collectively, the "Claims").

21.     The Committee believes there are also numerous other bases on which to object to the Citi Claim, as set forth in more detail in the Proposed Complaint.[12]  For example, even

---

[12] The Proposed Complaint includes objections to the Citi Claim, which the Committee currently has standing to prosecute, because any party in interest in a bankruptcy case may object to a proof of claim.  11 U.S.C. §§ 502(a), 1109(b).  Indeed, the Bar Date Order entered in these cases expressly provides that the Committee may object to proofs of claim, and the Debtors have expressly acknowledged the Committee's rights in this regard.  *See Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof,* dated February 19, 2010 [Docket No. 835], at 10; *see Debtors' Objection to the Motion of the Official Committee of Unsecured Creditors for Leave to Conduct Bankruptcy Rule 2004 Discovery* [Docket No. 1353] (the "Objection"), at ¶ 33 ("It is true that the Committee has standing to object to any proof of claim as a party in interest in these chapter 11 cases.").  However, by this Motion the Committee also seeks authority to object to the Citi Claim on

putting aside the fraudulent conveyances, the Citi Claim is not actually secured at anywhere near $1.5 billion. The Committee's financial advisor, Houlihan Lokey Howard & Zukin, has determined that the only substantial value available to secure the Citi Claim resides at CFI. On March 23, 2006, the date the Unsecured Bank Debt was issued, the book value of CFI's assets exceeded the book value of CFI's direct liabilities by only $1,097,732,000 (significantly less than the total $8.7 billion of Unsecured Bank Debt that was issued). The guaranties associated with the 2006 Credit Facility and Bridge Loan (the "Guaranties") each contain a "savings clause" which provides that "the obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the obligations . . . not constituting a fraudulent transfer or conveyance." Thus, by virtue of the savings clauses, among other things, the maximum amount of CFI's liability under the Guaranties for the Unsecured Bank Debt was $1,097,732,000. When the Debtors replaced $1.5 billion of the Unsecured Bank Debt with the Secured Debt, that $1.5 billion amount of Unsecured Bank Debt that was replaced constituted 17.2% of the total $8.7 billion in Unsecured Bank Debt. Likewise, the share of the $1,097,732,000 in Guaranties (initially issued by CFI in 2006) that were replaced in 2009 was approximately $189 million (*i.e.*, 17.2% of $1,097,732,000). Immediately prior to the Secured Credit Facility transaction, CFI was insolvent. The Secured Credit Facility Agreement contains a similar "savings clause" to the one implicated by the 2006 transactions that states that "the Agents, the Secured Parties and such Guarantors hereby irrevocably agree that the Guaranteed Obligations of such Guarantor under this Guaranty at any time shall be limited to the maximum amount as will not result in the Guaranteed Obligations of such Guarantor under this Guaranty constituting a fraudulent transfer or conveyance." Secured Credit Facility Agreement at § 8.09.

behalf of the Estates and to assert any objections thereto which the Debtors may have, for the same reasons set forth herein with respect to why it seeks authority to pursue the Claims.

Under applicable fraudulent transfer law and the "savings clause" contained in CFI's guaranty of the Secured Credit Facility, CFI could only guaranty an amount for which it received reasonably equivalent value (among other similar limitations), which, in this case, was limited to the amount of its existing obligations under the Guaranties, *i.e.*, $1,097,732,000 spread pro rata over $8.7 billion (*i.e.*, $189 million). Put another way, on May 29, 2009, when the Secured Debt "refinanced" $1.5 billion of the Unsecured Bank Debt, the secured Lenders stepped into the shoes of the unsecured banks and only the $189 million in CFI Guaranties backing the previous indebtedness was available, and reallocated to the new guaranty under the Secured Credit Facility Agreement. Thus, even if the Lenders under the Secured Debt are actually secured, they are only secured at CFI to the extent of their claim -- $189 million.[13]

22.      On May 25, 2010, the Committee wrote the Debtors' counsel (the "Demand Letter") requesting that the Debtors provide voluntary discovery to the Committee and stipulate to the Committee's standing to pursue the Claims. On June 3, 2010, these requests were unjustifiably denied when the Debtors informed the Committee that they would not assign the Claims to the Committee. Instead, the Debtors further attempted to justify their actions in connection with the Secured Credit Facility. A copy of the Demand Letter is attached hereto as Exhibit A.[14]

23.      On June 15, 2010, the Committee filed the *Motion of the Official Committee of Unsecured Creditors for Leave to Conduct Bankruptcy Rule 2004 Discovery* [Docket No. 1316]

---

[13] The Committee believes that there may also potentially have been some assets available at Capmark REO and/or CCI at the time the Secured Debt transaction was consummated, in an amount which the Committee believes may be confidential. Applying the same 17.2% formula to these potentially available assets would provide for some additional guaranties by these two subsidiaries.

[14] The Debtors' June 3, 2010 denial of the Committee's request for standing to pursue the Claims was attached as Exhibit C to *Declaration of Arielle Kane in Support of Debtors' Objection to the Motion of the Official Committee of Unsecured Creditors for Leave to Conduct Bankruptcy Rule 2004 Discovery,* dated June 24, 2010 [Docket No. 1355].

(the "2004 Motion"). In the 2004 Motion, the Committee requested authority to seek discovery from the Debtors in connection with the Committee's analysis of the claims and interests in these cases and relevant to (i) the potential Estate causes of action including, without limitation, the Claims and (ii) allowance or disallowance of the Citi Claim.

24.     On June 24, 2010, the Debtors filed their Objection to the 2004 Motion. Therein, the Debtors fiercely defended and attempted to justify the Secured Credit Facility, contending that

> [i]mportantly, the Secured Credit Facility . . . avoided an immediate payment default . . . and a covenant default . . . the Debtors procured an extension . . . in exchange for granting limited collateral . . . . These actions enabled the Debtors to avoid an immediate bankruptcy, to maintain substantial liquidity to fund its [sic] ongoing business . . . and to enter into a put agreement . . . . The time also provided the Debtors the ability to make satisfactory arrangements with the FDIC, which have benefited the estates, as well as the opportunity to commence negotiations of a consensual restructuring plan[.]

Objection at ¶¶ 8-9. The Debtors further demonstrated in the Objection their opposition to pursuing the Claims by stating that they "believe that it is in *all* creditors' best interests to broker a resolution for the treatment of all claims, thereby hastening their emergence from chapter 11." *Id.* at n.12. Clearly, the Debtors cannot negotiate a meaningful deal if they are entirely unwilling to litigate.

25.     The Committee replied to the Objection on July 2, 2010 [Docket No. 1407], and reached a stipulated agreement with the Debtors resolving the 2004 Motion on July 14, 2010, that provided the Committee with far less material than it initially sought, which was entered by the Court on July 15, 2010 (the "Debtors' Discovery Stipulation").[15] Likewise, the Committee

---

[15] *See Certification of Counsel Regarding Stipulation Resolving the Official Committee of Unsecured Creditors' Motion for Leave to Conduct Bankruptcy Rule 2004 Discovery,* dated July 14, 2010 [Docket No. 1443], and *Order*

had entered into a stipulation regarding Bankruptcy Rule 2004 discovery with the Agents (prior to filing a 2004 Motion), which was entered by the Court on July 1, 2010 (the "Agents' Discovery Stipulation" and, together with the Debtors' Discovery Stipulation, the "Discovery Stipulations").[16]  It is notably ironic that the Agents, the very parties against whom the investigation is directed, stipulated to provide the Committee with appropriate discovery, whereas the Committee had to file extensive Bankruptcy Rule 2004 motions and related papers with this Court before the Debtors agreed to provide any discovery at all.  At any rate, pursuant to the Discovery Stipulations, the Debtors commenced document production on August 2, 2010 and are slated to complete same by August 27, 2010, while the Agents began producing documents on July 23, 2010 with a completion deadline of August 13, 2010.  Debtors' Discovery Stipulation at Exhibit 1 ¶ 4; Agents' Discovery Stipulation at Exhibit A ¶ 1.  Both the Discovery Stipulations also contemplate related depositions, although the Debtors have not yet consented to provide the Committee with any witnesses, only to negotiate in good faith as to whether they will do so.  Debtors' Discovery Stipulation at Exhibit 1 ¶ 6; Agents' Discovery Stipulation at Exhibit A ¶ 3.  Even after entry of the Debtors' Discovery Stipulation, the Debtors continued to hold up the production process by, for example, proposing an onerous protective order in which they sought to reserve the right to unilaterally withhold any non-privileged document from production, and refusing to commit to make witnesses available for deposition.

---

*Granting Stipulation Resolving the Official Committee of Unsecured Creditors' Motion for Leave to Conduct Bankruptcy Rule 2004 Discovery,* dated July 15, 2010 [Docket No. 1448].

[16] *See Certification of Counsel Regarding Stipulation Governing Certain Discovery Matters Between the Official Committee of Unsecured Creditors and Citibank, N.A. and Citicorp North America, Inc.,* dated June 30, 2010 [Docket No. 1385], and *Order Approving Stipulation Governing Certain Discovery Matters Between the Official Committee of Unsecured Creditors, and Citibank, N.A. and Citicorp North America, Inc.,* dated July 1, 2010 [Docket No. 1400].

26.     As described above and in the proposed form of Complaint attached hereto as Exhibit B (the "Proposed Complaint")[17], the Committee has already identified the Claims, even without yet having the benefit of full document discovery and depositions of the relevant parties, including representatives of the Debtors and Agents.  While, as described herein, the Claims are valid and substantial, falling well within the "colorable" standard under which the Court must decide this Motion, the Committee fully expects that the documents and testimony it will obtain pursuant to the Discovery Stipulations will yield further evidence in support of the Claims and/or additional claims.  Although the Committee would rather have filed this Motion having had the full benefit of discovery, it is constrained to file this Motion at this time because it understands that the Debtors may take action in short order seeking to validate the Citi Claim and the liens granted under the Secured Credit Facility to the prejudice of the Estates.  Indeed, it appears that the Debtors may even be seeking to conclude a sweetheart "settlement" with the Agents and Lenders, without Committee consent, *i.e.*, "around" the Committee, and propose the same to this Court.

27.     The Committee believes that because of the Debtors' intimate participation in the Secured Credit Facility just one year ago, the Debtors are seeking to justify their own actions in connection with the transaction (or, at a minimum are acting with blinders on) rather than negotiating a plan that will yield the highest possible distribution for unsecured creditors, which would require pursuit of the Claims.  The Debtors are thus attempting to block the pursuit of such Claims, motivated by their inherent conflicts and desire to protect potentially complicit insiders.  For example, high ranking executives of various Debtors signed the Secured Credit

---

[17] The Proposed Complaint is submitted herewith in as substantially final format as possible at this point in time, prior to depositions, completion of the Agents' and Debtors' document production and other discovery.  The Committee reserves all and waives none of its rights to amend, modify and/or supplement the Proposed Complaint, including but not limited to with respect to any discovery it receives pursuant to the Discovery Stipulations and/or otherwise.

Facility Agreement as well as the Officers' Certificates. Substantially all of the Debtors' officers, including CFGI's President, Chief Executive Officer, Secretary, General Counsel, Chief Risk Officer and three of its Executive Vice Presidents, hold the same positions they held at the time the Secured Credit Facility was consummated. CFGI's board of directors remains unchanged as well.[18] Moreover, the Debtors' financial advisors, Lazard Frères & Co. ("Lazard"), also participated in the transaction, and the Debtors' current bankruptcy counsel, Dewey & LeBoeuf LLP ("D&L"), was general restructuring counsel to Capmark at the time.

28. The Debtors' recounting of the history of the Secured Debt transaction is neither independent nor objective. Their conflicts are evident in the Debtors' Memo, the Term Sheets and the Objection, all of which seek to justify the Debtors' actions (*see*, *e.g.*, Objection at ¶¶ 8-9), and give very short shrift to the Claims and objections to the Citi Claim. Indeed, the Debtors already presupposed in the Adversary Complaint that it was "unlikely" that DBTCA would be held liable for amending the Indentures to allow incurrence of the Secured Debt, and complained that litigating claims relating to the same would "significantly affect the administration of the Debtors' estates" and "require discovery of the officers and other key employees of the Debtors," in complete disregard of whether such litigation could yield significant benefits for the Debtors' unsecured creditors, to whom the Debtors have a fiduciary duty. Adversary Complaint at ¶¶ 9, 82. Likewise, as set forth above, the Debtors devoted paragraphs of their Objection to the Committee's 2004 Motion to defending the transaction.

---

[18] *See supra* note 11. Based on these sources, current executives that were at CFGI during consummation of the Secured Credit Facility transaction are: Thomas L. Fairfield, Executive Vice President, Secretary and General Counsel; William C. Gallagher, Executive Vice President and Chief Risk Officer; Jay N. Levine, President and Chief Executive Officer; and Michael I. Lipson, Executive Vice President. All CFGI directors as of March 31, 2009 are apparently still on the board today, specifically: Steven P. Baum, Peter F. Bechen, Dennis D. Dammerman (Chairman); Edward A. Fox, Bradley J. Gross, John F. Grundhofer, William C. Hall, Jr., Thomas A. Kendall, Konrad R. Kruger, Jay N. Levine, Daniel R. Neidich, Scott C. Nuttal, Tager C. Olson, and Rajinder Singh. Mr. Gross is also a managing director of Goldman Sachs & Co., and Mr. Neidich is the Chairman and Co-Chief Executive Officer of Dune Capital Management, which he co-founded. Capmark Financial Group Inc. Form 424B3, dated April 27, 2009 at 224-25.

Moreover, as also discussed above, the Debtors have openly communicated a desire to take action in short order to allow the Citi Claim and validate the liens granted by the Secured Credit Facility, and upon information and belief, have held conversations with other constituencies in these cases in which they stated that they may "settle around" the Committee. In short, given the substantial fraudulent conveyance and preference Claims that exist with respect to the Secured Debt and the Debtors' inherent conflicts and demonstrated unwillingness to attack or even investigate the transaction, these cases clearly merit conferring the Committee with standing to prosecute the Claims.

## RELIEF REQUESTED

29.     Pursuant to sections 105(a), 1103(c)(5) and 1109(b) of the Bankruptcy Code, the Committee respectfully requests entry of an order authorizing the Committee to bring the Claims and file the Proposed Complaint.[19]

## BASIS FOR RELIEF

30.     Section 1107 of the Bankruptcy Code provides that a debtor in possession shall perform all of the functions and duties of a trustee serving in a chapter 11 reorganization and that, among these duties, are the duties to collect property of its estate, examine proofs of claim and object to the allowance of any claim that is improper. *See* 11 U.S.C. § 1107(a). Property of the estate includes "all legal or equitable interests of the debtor," and these interests include all causes of action belonging to the debtor at the time the case is commenced. *See* 11 U.S.C. § 541(a)(1); *see also Integrated Solutions v. Serv. Support Specialties*, 124 F.3d 487, 490 (3d Cir. 1997) ("The Bankruptcy Code defines a bankrupt's estate broadly to encompass all kinds of property, including intangibles and causes of action."); *Cain v. Hyatt*, 101 B.R. 440, 441-42

---

[19] *See supra* note 17.

(E.D. Pa. 1989) ("Courts have uniformly held that the broad scope of § 541 encompasses causes of action existing at the time of the commencement of the bankruptcy action.") (citations omitted).

31.    A debtor is obligated to maximize the value of its estate for the benefit of its creditors and all parties in interest.  *See, e.g., Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) ("The trustee is 'accountable for all property received,'… and has the duty to maximize the value of the estate") (internal quotations omitted). Accordingly, a debtor is duty bound to pursue claims and defenses that will increase the value of its estate.  *See, e.g., Commodore Int'l v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 99 (2d Cir. 2001) ("The [debtor in possession] has an obligation to pursue all actions that are in the best interests of creditors and the estate.") (quoting *Liberty Mut. Ins. Co. v. Official Unsecured Creditors' Comm. of Spaulding Composites Co. ( In re Spaulding Composites Co.)*, 207 B.R. 899, 904 (B.A.P. 9th Cir. 1997)); *La. World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 249 (5th Cir. 1988) ("If a valid -- and potentially profitable -- cause of action exists . . . which the debtor-in-possession may assert on behalf of the corporation, *all* creditors are harmed when the debtor-in-possession refuses to pursue it.  The value of the estate is not maximized and the ultimate recovery of all creditors is diminished.").

32.    A creditors' committee represents the interests of all general unsecured creditors. *See Walsh v. Westmoreland Human Opportunities, Inc. (In re Life Serv. Sys.)*, 279 B.R. 504, 510 (Bankr. W.D. Pa. 2002) (citing *In re Nationwide Sports Distrib.*, 227 B.R. 455, 463 (Bankr. E.D. Pa. 1998)).  Section 1103(c)(5) of the Bankruptcy Code provides as follows:

(c)    A committee appointed under section 1102 of this title may –

(2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of

the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

(3) participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated . . .

* * *

(5) perform such other services as are in the interest of those represented.

11 U.S.C. § 1103(c)(2)-(3), (5); *see also Advisory Comm. of Major Funding Corp. v. Sommers (In re Advisory Comm. of Major Funding Corp.)*, 109 F.3d 219, 224 (5th Cir. 1997) ("Section 1103 provides the tools with which . . . creditors' committee[s] work.").  Additionally, section 1109(b) of the Bankruptcy Code provides that "[a] party in interest, including the debtor, the trustee, *a creditors' committee* . . . may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C. § 1109(b) (emphasis added).

33.     The Third Circuit has held that the Bankruptcy Code provides a qualified right for a creditors' committee to commence actions in the name of the estate with approval of the bankruptcy court.  *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003) (en banc) ("*Cybergenics II*") (holding that it is "unmistakably clear that Congress approved of creditors' committees suing derivatively to recover property for the benefit of the estate.  Avoiding fraudulent transfers through § 544(b) is a perfect application of that function").  The Third Circuit in *Cybergenics II* held that sections 503(b)(3)(B), 1103(c)(5), and 1109(b) of the Bankruptcy Code, together with the bankruptcy court's equitable powers granted under section 105(a), reflect Congress's intent to allow a committee to pursue an avoidance action for the estate's direct benefit.  *See id.* at 569, 572.

34.     Courts in the Third Circuit have taken a permissive approach in approving a committee's standing to pursue actions on behalf of the estate and its creditors. *See*, *e.g.*, *id.* at 553 ("'Nearly all courts considering the issue [of authorizing a creditor's committee to act on behalf of the debtor] have permitted creditors' committees to bring actions in the name of the debtor in possession if the committee is able to establish' that a debtor is neglecting its fiduciary duty.") (quoting 7 COLLIER ON BANKRUPTCY ¶ 1103.05[6][a] (15th rev. ed. 2002)); *In re Nicolet, Inc.*, 80 B.R. 733, 737-39 (Bankr. E.D. Pa. 1987) (referring to the "liberal approach" employed by the Third Circuit, and observing that the vast majority of bankruptcy court decisions have authorized creditors' committees to take such actions) (citing *In re McKeesport Steel Castings Co.*, 799 F.2d 91 (3d Cir. 1986)) (additional internal citations omitted); *In re Monsour Med. Ctr.*, 5 B.R. 715, 718 (Bankr. W.D. Pa. 1980) (holding that a creditors' committee's implied authority to sue to avoid a preference or fraudulent transfer continues under the Bankruptcy Code).

35.     "Although *Cybergenics* did not specifically lay out the procedures that should be followed in allowing creditors derivative standing, the Third Circuit expressed its agreement with the approaches taken by the Second and Seventh Circuits . . . .  Under these guidelines generally, derivative standing requires: (1) a colorable claim, (2) that the trustee unjustifiably refused to pursue the claim, and (3) the permission of the bankruptcy court to initiate the action." *Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004) (citing *G-I Holdings, Inc. v. Those Parties Listed On Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 628 & n.16 (Bankr. D.N.J. 2004), *rev'd in part and remanded*, *Official Comm. of Asbestos Claimants v. Bank of N.Y. (In re G-I Holdings, Inc.)*, No. 04-3423 (WGB), 2006 U.S. Dist. LEXIS 45510 (D.N.J. June 21, 2006); *Commodore*, 262 F.3d at 100;

*Fogel v. Zell*, 221 F.3d 955, 966 (7th Cir. 2000); *Official Comm. of Unsecured Creditors v.*

*Cablevision Sys. Corp. (In re Valley Media, Inc.)*, No. 01-11353(PJW), Adv. Proc. No. 02-

04553, 2003 Bankr. LEXIS 940, at *2 (Bankr. D. Del. Aug. 14, 2003)).  As stated in *G-I*

*Holdings*,

> A committee may have derivative standing to initiate an avoidance
> action on behalf of the debtor where:  1) a demand has been made
> upon the statutorily authorized party to take action; 2) the demand
> is declined; 3) a colorable claim that would benefit the estate if
> successful exists, based on a cost-benefit analysis performed by the
> court; and 4) the inaction is an abuse of discretion (*i.e.,* unjustified)
> in light of the debtor-in-possession's duties in a Chapter 11 case.

(citing *Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Group)*, 66 F.3d 1436,

1446 (6th Cir. 1995)); *see also Official Comm. of Unsecured Creditors of Grand Eagle Cos. v.*

*Asea Brown Boveri, Inc. (In re Grand Eagle Cos.)*, 310 B.R. 79, 94 (Bankr. N.D. Ohio 2004);

*Southtrust Bank N.A. v. Jackson (In re Dur Jac Ltd.)*, 254 B.R. 279, 286 (Bankr. M.D. Ala.

2000).  Here, the Committee submits this Motion for the Court's approval, and respectfully

submits that it easily satisfies all prongs set forth by these tests.

**A.      The Debtors Unjustifiably Refused to Pursue the Claims
        and Unjustifiably Denied the Committee Standing.**

        36.      As set forth above, on May 25, 2010, the Committee sent the Demand Letter,

attached hereto as <u>Exhibit A</u>, to the Debtors' counsel requesting that the Debtors provide

voluntary discovery and stipulate to the Committee's standing to pursue the Claims.  These

requests were unjustifiably denied in the letter referred to above dated June 3, 2010 (and

following numerous requests thereafter), when the Debtors informed the Committee that they

would not assign the Claims to the Committee.  *See In re STN Enters.*, 779 F.2d 901, 905 (2d

Cir. 1985) (if debtor fails to pursue litigation likely to benefit the estate, such failure is

unjustifiable).  Based on the inherent conflicts of interest identified above, it is not surprising that the Debtors refused to assign standing with respect to the Claims to the Committee.

37.     Where, as here, the debtor has "a conflict of interest in pursuing an estate claim so that it is effectively disqualified from pursuing an action which is otherwise a colorable claim, the debtor (or a trustee) can be viewed as delinquent and the creditors committee should be authorized to pursue the cause of action." *Valley Media*, 2003 Bankr. LEXIS 940, at *6-7.  As the Third Circuit in *Cybergenics II* explained, a debtor-in-possession serving as trustee in a chapter 11 case "gives rise to the proverbial problem of the fox guarding the henhouse.  If no trustee is appointed, the debtor -- really, the debtor's management -- bears a fiduciary duty to avoid fraudulent transfers that *it itself made*," and is sure to jump at "any opportunity to avoid bringing a claim that would amount to reputational self-immolation."  330 F.3d at 573 (emphasis added).  *See also G-I Holdings*, 313 B.R. at 643 (assuming that even the mere "influence of conflicts of interest" must have affected debtor's decision not to bring avoidance actions).  Thus, it is often not "realistic" to "order[] the debtor itself to pursue" an avoidance claim "given management's . . . conflicts of interest." *Cybergenics II*, 330 F.3d at 575, 578.  "These conflicts of interest can arise even in situations where there is no concern that a debtor's management is trying to save its own skin." *Id.* at 573.  Accordingly, "[t]he possibility of a derivative suit by a creditors' committee provides a critical safeguard against lax pursuit of avoidance actions" due to the influence of conflicts of interest. *Id.  See also Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 545, 549 (W.D. Pa. 2005) (affirming bankruptcy court's authorization of committee to bring derivative action where debtor's management had conflict of interest); *Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.)*, 285 B.R. 848, 855 (Bankr. S.D.N.Y. 2002) ("[I]t is permissible, not

uncommon, and often desirable for official committees to seek and obtain the right to assert the claim on behalf of the estate -- either when there is doubt as to the debtor's ability or inclination to prosecute the claim vigorously, or where the debtor consensually cedes control of the litigation over to the committee.") (citations omitted).

38.     Indeed, conflicts are such strong evidence of a debtor's inability to fairly prosecute avoidance actions that in some cases, the existence of conflicts alone, without any formal request or demand on the part of the creditors' committee, will satisfy the unjustifiable refusal component of the derivative standing test.  In *G-I Holdings*, for example, the court found as much against a backdrop of conflicts strikingly similar to those in the instant cases.  313 B.R. at 629-30.  There, the creditors committee never formally requested that the debtor initiate the avoidance action, but (as is also true in the instant cases) the transactions at issue were implemented by executives who still remained in charge, and both the debtor and transferee had taken positions adverse to the proposed attacks in the past.  *Id.* at 630.  The court explained that "a debtor's refusal to pursue an avoidance action can be implied even where no formal demand has been made by a creditors committee," and that the conflicts in the case before it presented "ample evidence" of the debtor's sure refusal.  *Id.*  Accordingly, the court found that the conflicts rendered demand made and declined within the meaning of the test.  *Id.  See also Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214, 222 (Bankr. W.D. Pa. 2004) ("it cannot be said that a formal request, in order to obtain a formal refusal, a request which would surely be refused, should be required.").

39.     The inherent conflicts here, like those in *G-I Holdings*, are in and of themselves enough to render the Debtors utterly unwilling and unable to prosecute the valuable Claims for

the benefit of all unsecured creditors in these cases.  As discussed above, the Debtors' conflicts include the following:

- High ranking executives of various Debtors signed the Secured Credit Facility Agreement and Security Agreement.

- The Debtors' CFO and Executive VP executed certificates attesting to the validity of amending the Indentures so Capmark could incur the Secured Debt.

- All of CFGI's directors at the time of the Secured Credit Facility are apparently still with the company today, and CFGI's President, Chief Executive Officer, Secretary, General Counsel, Chief Risk Officer and three of its Executive Vice Presidents, are the same.

- The Debtors presuppose in the Adversary Complaint that it is "unlikely" that DBTCA will be held liable for amending the Indentures to allow incurrence of the Secured Debt.  Adversary Complaint at ¶ 82.

- The Debtors openly justify and defend the Secured Credit Facility in the Debtors' Memo and the Objection, (*see*, *e.g.*, Objection at ¶¶ 8-9), and oppose litigation in the Objection (*id.* at n.12).

- The Debtors presented the Committee with the May 17 Term Sheet proposing a "settlement" to the Agents, which was not negotiated with the Committee, and the July 1 Term Sheet, which contemplated even less distribution to unsecured creditors, after the Debtors purported to negotiate.

- The Debtors have communicated that they may seek validation of the Citi Claim and may "settle around" the Committee.

- D&L, the Debtors' bankruptcy counsel in these chapter 11 cases, was the Debtors' general restructuring counsel at the time of the Secured Debt transaction.

- Lazard, the Debtors' financial advisors in these chapter 11 cases, participated in the Secured Debt transaction.

40.     Indeed, even had the Committee not sent the Demand Letter, the unjustified refusal portion of the derivative standing test would still be satisfied due to the existence of these conflicts, and in light of the Debtors' positions taken throughout these proceedings and their reluctance to pursue the Claims and complete inaction with respect thereto.  It is axiomatic that the Debtors should not be permitted to withhold standing in order to prevent the Claims from being pursued by a disinterested constituency.

**B.     The Claims Are Clearly Colorable and Would Benefit the Estates.**

41.     The Claims are "colorable" within the meaning of the standard relevant to this Motion; indeed, the Committee strongly believes it will be successful in prosecuting and realizing on the Claims.  Moreover, as *$1.5 billion* are at stake (including insider preferences) and given the size of these Estates (which are liquidating), the costs of prosecution would be relatively small.  Accordingly, pursuit of the Claims would greatly benefit Capmark's Estates and unsecured creditors.

**1.     The Claims are Colorable.**

42.     To establish a "colorable" claim, the "derivative standing test requires the Court to decide whether the Committee has asserted 'claims for relief that *on appropriate proof* would support a recovery.'"  *G-I Holdings*, 313 B.R. at 631 (quoting *STN*, 779 F.2d at 905) (emphasis added).  "'Because the creditors' committee is *not required to present its proof,* the first inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim.'"  *G-I Holdings*, 313 B.R. at 631 (quoting *In re iPCS, Inc.*, 297 B.R. 283, 291

(Bankr. N.D. Ga. 2003), quoting *Official Comm. of Unsecured Creditors of America's Hobby Ctr. v. Hudson United Bank (In re America's Hobby Ctr.)*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998); *Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999)) (emphasis added). "When considering a motion to dismiss, a court must accept as true the allegations and facts pleaded in the complaint and any and all reasonable inferences derived from those facts." *G-I Holdings*, 313 B.R. at 631 (citations omitted). "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim which would entitle him or her to relief." *Id.* (citations, quotations, and marks omitted). *See also STN*, 779 F.2d at 905-06 (the bankruptcy court need not conduct a "mini-trial" to determine whether a "colorable" claim exists). If the Court accepts all of the Committee's factual allegations as true – which it must at this stage of the proceedings – the Proposed Complaint would plainly survive a motion to dismiss; thus, the Proposed Complaint also satisfies the standard that the Claims are "colorable."

       a.    <u>Constructive Fraudulent Conveyance</u>.

43.    The Proposed Complaint seeks to avoid the Secured Debt and the liens that secured it as constructively fraudulent pursuant to section 548 of the Bankruptcy Code and applicable state law. Such claims generally require that the Committee allege that the Debtors were insolvent (or rendered insolvent) and received less than fair consideration (or reasonably equivalent value) from the obligations and transfers at issue. *See* 11 U.S.C. § 548(a)(1)(B).

44.    **Insolvency.** Even based on the limited information available to the Committee, it is abundantly clear that CFGI, CFI, Capmark REO and CCI were each insolvent in May 2009. For example, the Debtors' June 2009 quarterly report lists a negative book value for CFGI of

approximately $1 billion.  *See* Capmark Financial Group Inc. Quarterly Report, dated

September 2, 2009 (for period ended June 30, 2009) at 2.

45.     **Reasonably Equivalent Value / Fair Consideration.**  As noted by this Court,

"[t]he term 'reasonably equivalent value' is not defined by the Bankruptcy Code." *Aphton*

*Corp. v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 89 (Bankr. D. Del. 2010*)*.  After a

court has determined that "value" was given, the court must then look to the "totality of the

circumstances" to determine the reasonable equivalency of the value conferred, including: (1)

fair market value of the benefit received, (2) the good faith of the transferee, and (3) whether the

transaction was at arm's-length.  *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors*

*of R.M.L. (In re R.M.L.)*, 92 F.3d 139, 145, 148-50 (3d Cir. 1996).  *See also Asarco LLC v. Ams.*

*Mining Corp.*, 396 B.R. 278, 338 (S.D. Tex. 2008) ("The more widely accepted approach [in

determining fair consideration] is to look at the totality of the circumstances") (citing cases).

*See Aphton*, 423 B.R. at 89, 94 (stating totality of the circumstances test and refusing to dismiss

fraudulent conveyance count on grounds that it was a disguised preferential transfer; trustee was

not prohibited from asserting "other recovery theories such as fraudulent conveyance" and

complaint alleged facially plausible fraudulent conveyance action) (citing *Official Comm. of*

*Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re*

*Fedders N. Am., Inc.)*, 405 B.R. 527, 544 (Bankr. D. Del. 2009)).  The *R.M.L.* court held that

the fraudulent conveyance laws are intended to protect the debtor's creditors and, therefore, the

determination of "whether the debtor *received* reasonable value must be determined from the

standpoint of the creditors."  92 F.3d at 150 (emphasis in original) (internal quotation and marks

omitted).  Just because a lender may have parted with quantifiable value does not necessarily

confer equal, reasonably equivalent value on the debtor. *Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266, 286 (Bankr. E.D. Pa. 2006).

46.     In *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, the court rejected the notion that there was a "*per se* rule" that transfers to secure a new or antecedent debt constitute reasonably equivalent value. 299 B.R. 732, 748 (Bankr. D. Del. 2003) (also noting that while § 548(d)(2)(A) defines "value" to include the securing of a present or antecedent debt, the term "reasonably equivalent" is not defined in the Bankruptcy Code). *See id.* at n.8 (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1994)).

47.     Similar to the situation in these cases, in *Exide,* lenders amended covenants in exchange for additional security interests and guaranties from subsidiaries, and then granted additional forbearance to allow the debtors to file their bankruptcy petition just after the 90-day preference period. 299 B.R. at 736. The committee and an investor, R2 Investments, brought a complaint which, among other things, sought to void subsidiary guaranties and pledges, alleging that the subsidiary guarantors had received less than reasonably equivalent value and that the parent borrower had received "little, if any, measurable benefit" from the guaranties and pledges. The lenders moved to dismiss the case based, in part, on the assertion that any transfer to secure new or antecedent debt was, as a matter of law, reasonably equivalent value. *Id.* at 747.

48.     The *Exide* court held that a court must follow the totality of the circumstances test to determine whether a transaction "conferred realizable commercial value [that was] reasonably equivalent value to the realizable commercial value of the assets transferred [here, the guaranties, pledges, and security interests]." *Id.* at 748 (internal citations omitted). "The

value of the collateral guaranties and pledges necessarily requires an evidentiary record from which a court may rule." *Id.* The totality of the circumstances test involves a "host" of factors and depends on the facts of each case. *Id.*

49. Likewise, the court in *In re Countdown of Connecticut, Inc.* found that factual analysis was necessary to determine whether reasonably equivalent value was received in a fraudulent conveyance action based on security granted in connection with antecedent debt. 115 B.R. 18 (Bankr. D. Conn. 1990). There, the debtor had executed a pre-petition promissory note in favor of the lender defendant in exchange for a line of credit for the same amount. *Id.* at 19. A year later, the debtor defaulted, and the defendant waived the default in exchange for a new note from the debtor and a security interest in all of the debtor's property. *Id.* Less than a year later, the debtor filed for bankruptcy protection, and a chapter 11 trustee was appointed. *Id.* The trustee commenced an adversary proceeding alleging, *inter alia*, that the security interest was a fraudulent conveyance under section 548(a) of the Bankruptcy Code. *Id.*

50. The defendant moved for summary judgment, arguing that the debtor obviously received value by transferring the security interest, and that because the security interest extended only up to the amount of the antecedent debt, as a matter of law that value must have been reasonably equivalent. *Id.* The court disagreed, noting that it is "generally a question of fact as to whether an exchange is made for reasonably equivalent value." *Id.* at 21 (citations omitted). The court explained that "[i]f reasonably equivalent value were determined from the perspective of what is received by the transferee, the defendant might well be correct." *Id.* However, "the analysis of an allegedly fraudulent transfer must be directed at what the debtor surrendered *and* what the debtor received." *Id.* at 21 (internal quotation and marks omitted) (emphasis added). The court found that in the situation before it, what the debtor transferred

may well have been worth more than the amount of the promissory note, such as if the debtor's assets were worth more than that amount and the debtor lost an opportunity to obtain credit from other sources by providing a blanket lien. *Id.* Accordingly, the court denied the defendant's motion for summary judgment. *Id.* at 22.

51.     *Exide* and *Countdown of Connecticut* are not alone in such holdings. As the *Exide* court correctly noted, the district court opinion in *Anand v. Nat'l Republic Bank*, 239 B.R. 511 (N.D. Ill. 1999), while affirming on the merits the bankruptcy court's finding of reasonably equivalent value, did not actually adopt the bankruptcy court's *per se* rule, and instead, supported the totality of the circumstances test. Indeed, the district court went so far as to state that "a *per se* rule would represent a departure from the Seventh Circuit's emphasis on 'all the facts of each case' as part of the reasonably equivalent value analysis." *Id.* at 518. Thus, the *Anand* district court examined "additional factors" it found itself "constrained to consider," namely the value the debtor actually received in exchange for the interest. *Id.* at 518-19. *Cf. Anand v. Nat'l Republic Bank (In re Anand)*, 210 B.R. 456 (Bankr. N.D. Ill. 1997).

52.     Numerous other courts have adopted the "totality of the circumstances" test. *See, e.g.*, *Solomon v. Stillwater Nat'l Bank & Trust Co. (In re Solomon)*, 299 B.R. 626, 636 (B.A.P. 10th Cir. 2003) ("if faced with a § 548(a)(1)(B) antecedent debt case. . . the Tenth Circuit would examine what the debtor received in exchange for the securing of an antecedent debt to determine REV [*i.e.*, reasonably equivalent value] and would not follow the . . . per se rule."); *Dayton Title Agency, Inc., et al. v. White Family Cos., Inc. (In re Dayton Title Agency, Inc.)*, 262 B.R. 719, 731 (Bankr. S.D. Ohio 2001) (noting in the context of analyzing fraudulent conveyance action under Ohio's UFTA that "'courts generally compare the value of the property transferred with the value of that received in exchange for the transfer'"), *rev'd on*

*other grounds*, 284 B.R. 238 (S.D. Ohio 2002) (quoting *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 707 (6th Cir. 1999)); *Schreiber v. Stephenson (In re Emerson)*, 235 B.R. 702, 711 (Bankr. D.N.H. 1999) (record supported a finding that debtors received at best a $20,000 credit on a loan secured by a plane that may have been worth as much as $35,000); *In re Mars Stores*, 150 B.R. 869, 884-85 (Bankr. D. Mass. 1993) ("In the absence of agreement as to the amount of secured debt and the value of the assets encumbered by the security interests . . . the Court cannot grant summary judgment . . . .  Both the Bankruptcy Code and the UFCA contemplate a comparison of the antecedent debt and value of the property transferred."); *In re Mason*, 48 B.R. 382, 384 (Bankr. M.D. Ala. 1984) (setting aside mortgage as fraudulent conveyance where mortgage on house worth $60,000 to $80,000 was granted to secure $20,000 antecedent debt).

53.     Here, faced with Capmark's inevitable and imminent bankruptcy, the Agents collaborated with the Debtors to receive a $1.5 billion payment on an unsecured loan vis-à-vis a supposedly "new" loan from the same Agents and virtually identical lenders, including the Insider Lenders, but on a secured basis.  The new "secured" debt did not provide Capmark with any new liquidity or materially enhance Capmark's financial condition.  Specifically, the $1.5 billion of otherwise unsecured debt that was replaced with the Secured Debt burdened Capmark's balance sheet with $1.5 billion of secured debt that would be nearly impossible to restructure inside or outside of bankruptcy at a time when Capmark was undisputedly insolvent. Indeed, Capmark ended up in bankruptcy less than five months after entering into the Secured Credit Facility and just two months after expiration of the non-insider statutory preference period.  In other words, the Agents and Lenders benefited themselves with the bad faith design of shifting losses to the Debtors' unsecured creditors.

54.     The evidence will show that the various payments, obligations, guaranties, liens and security interests that were granted in favor of the Agents and Lenders pursuant to the Secured Credit Facility were worth well more to the Debtors and, thus, to the Debtors' unsecured creditors, than any purported "value" the Agents and Lenders contend they bestowed upon the Debtors in exchange (solely for the Agents' and Lenders' own benefits of their unsecured debt positions).  Thus, the Capmark liquidating Estates' constructive fraudulent conveyance claims against the Agents and Lenders are colorable.

b.     Intentional Fraudulent Conveyance.

55.     In addition to the constructive fraudulent conveyance claims, the Proposed Complaint sets forth related claims for intentional fraudulent conveyance pursuant to section 548 of the Bankruptcy Code and applicable state law.  Such claims generally require that the Committee allege that the Debtors made the transfer or incurred the debt at issue with actual intent to hinder, delay or defraud.  *See* 11 U.S.C. § 548(a)(1)(A).

56.     The Committee believes that the evidence will show that the Debtors, Agents and Lenders entered into the Secured Credit Facility with actual intent to hinder, delay or defraud present or future unsecured creditors of the Debtors in order to prefer certain, but not all, creditors during a time in which the Debtors also intended to file for bankruptcy and did so just outside of the preference period.

57.     As the Supreme Court has long since explained, "where [an] advance is made to enable the debtor to make a preferential payment with bankruptcy in contemplation, the transaction presents an element upon which fraud may be predicated."  *Dean v. Davis*, 242 U.S. 438, 444 (1917).  For example, in *In re American Properties, Inc.*, the debtor obtained a loan and cancellation of debt from a creditor, signed promissory notes and granted a security interest, and used the proceeds of the loan to pay the creditor's unsecured claim.  14 B.R. 637, 638-39

(Bankr. D. Kan. 1981). The court found that the purpose of the scheme was to "pay off an unsecured debt and create a secured debt," and that the requisite intent to hinder, delay and defraud creditors was thus present. *Id.* at 642-43. *See id.* at 643 ("the parent company and a group of subsidiary . . . companies were desperately trying to weather a financial hurricane. With . . . full knowledge that the transaction . . . would be detrimental to the creditors of [debtor], nevertheless [debtor's president] . . . intentionally entered into the transaction and transferred a mortgage . . . . The transaction . . . was entered into intentionally, to satisfy a . . . debt and with full knowledge harm would come to the creditors of [debtor], hindering or delaying the ability of these creditors to receive satisfaction of debts owed to them."). *See also Murphy v. Nunes (In re Terrific Seafoods)*, 197 B.R. 724, 732 (Bankr. D. Mass. 1996) (finding badges of fraud present where debtor made purchases of goods and used receipts upon resale to reduce indebtedness to bank; a transfer to an entity with which the debtor has a "closer financial relationship than with other creditors" evidences one of the classic badges of intentional fraud); *Lustig v. Chwiecko (In re Harris)*, 195 B.R. 577, 583 (Bankr. W.D.N.Y. 1995) ("[A] transfer which might otherwise be avoidable as a preference, except for the fact that it occurs outside of the applicable ninety-day or one year period provided for under Section 547(b)(4) . . . can nevertheless be an avoidable fraudulent transfer, under Section 548 or any applicable state law available to the Trustee under Section 544, if it is made with actual intent to hinder, delay or defraud a creditor or creditors generally.").

58.     Moreover, as a direct and proximate result of the Secured Credit Facility, the Debtors and their respective creditors suffered losses amounting to at least the value of the interests conveyed thereby, and the Agents and Lenders are the initial transferees of the Secured

Debt and/or are the entities for whose benefit the Secured Debt was extended. Accordingly, colorable claims exist for actual or intentional fraudulent conveyance.

        c.    <u>Equitable Subordination</u>.

59.    In the Proposed Complaint, the Committee seeks to equitably subordinate the Secured Debt to all other claims against the Debtors, in the event the Secured Debt is not avoided. "Before ordering equitable subordination, most courts have required a showing involving three elements: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code." *Citicorp Venture Capital v. Committee of Creditors Holding Unsecured Claims*, 160 F.3d 982, 987 (3d Cir. 1998) (citing *U.S. v. Noland*, 517 U.S. 535 (1996) (adopting test in *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977)); *see also Shubert v. Lucent Techs. Inc.* (*In re Winstar Commc'ns, Inc.*), 554 F.3d 382, 411 (3d Cir. 2009) (same). "The standard for imposing equitable subordination, even as to non-insider creditors, is not that rigid. The standard is not necessarily one of fraud, but of 'inequitable conduct', a more flexible inquiry developed on a case by case basis." *Roeder v. Lockwood (In re Lockwood Auto Group, Inc.)*, No. 05-13558-TPA, Adv. No. 06-1100, 2010 Bankr. LEXIS 1377, at *34 (Bankr. W.D. Pa. May 14, 2010). When an insider is involved, "the proof required to prove equitable subordination is not demanding. In such cases, a bankruptcy trustee need only show 'material evidence' of unfair conduct." *Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 348 B.R. 234, 284 (Bankr. D. Del. 2005), *rev'd in part on other grounds*, *Winstar*, 554 F.3d at 382 (citations omitted). "In considering a motion to dismiss an equitable subordination claim, the Court accepts as true all of the material allegations in the

Plaintiff's complaint." *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 386 (Bankr. S.D.N.Y. 2007) (internal quotation and marks omitted).

60.     Here, the Agents and Lenders, including the Insider Lenders, engaged in clearly inequitable conduct by, among other things, layering secured debt on the Debtors' already undercapitalized capital structure, acting solely to enhance their pre-petition unsecured debt positions, and negotiating in bad faith with the Debtors, thereby decreasing the amounts available for distribution to unsecured creditors by *$1.5 billion*.  As set forth above and in the Proposed Complaint, the Debtors, Agents and Lenders engaged in actual fraud by purposefully securing the Agents' otherwise unsecured pre-petition indebtedness with the intent to hinder, delay and defraud the Debtors' other unsecured creditors and prefer themselves. *See Lockwood*, 2010 Bankr. LEXIS 1377, at *34 (refusing to grant defendant summary judgment on equitable subordination count for same reasons that trustee adequately pled intentional fraudulent transfer).   In furtherance thereof, a last-minute amendment to the Indentures was obtained from DBTCA without notice to, or the consent of, affected creditors, and was not timely disclosed.

61.     The Agents' and Lenders' actions conferred on them unfair advantages, including, but not limited to, the Agents' and Lenders' putative secured position and concomitant control over the Debtors pre-petition.  The Agents' and Lenders' actions injured Capmark's unsecured creditors by decreasing the amount of funds available to pay them in the amount of *$1.5 billion*. Subordinating amounts owed under the Secured Credit Facility under section 510(c) is not inconsistent with other provisions of the Bankruptcy Code.[20]

62.     Because the Agents and Lenders conducted themselves inequitably, resulting in injury to the Debtors' other unsecured creditors and conferring an unfair advantage to

---

[20] The Proposed Complaint does not ask to subordinate debt to equity. *Contra Winstar*, 554 F.3d at 414 (finding bankruptcy court's equitable subordination holding was inconsistent with the Bankruptcy Code because § 510(c) does not permit the subordination of debt to equity).

themselves, and such subordination is not inconsistent with other provisions of the Bankruptcy Code, a colorable claim exists to equitably subordinate the Citi Claim.

        d.    <u>Preference</u>.

63.    The Proposed Complaint seeks to avoid transfers to the Insider Lenders as preferential under section 547 of the Bankruptcy Code. Such claim requires the Committee to show:

> a transfer of an interest of the debtor in property: (1) . . . made to or for the benefit of a creditor; (2) for or on account of an antecedent debt ow[]ed by the debtor before such transfer was made; (3) while the debtor was insolvent; (4) . . . between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) [that such transfer] enabled such creditor to receive more than such creditor would receive if (a) the case were a case under Chapter 7, (b) the transfer had not been made, and (c) such creditor received payment of such debt to the extent provided by the provisions of Title 11 of the United States Code.

*Flint Ink Corp. v. Calascibetta*, No. 06-2517 (GEB), 2007 U.S. Dist. LEXIS 66615, at *12-13 (D.N.J. Aug. 31, 2007) (citing 11 U.S.C. § 547(b); *In re White*, 258 B.R. 129, 132 (Bankr. D.N.J. 2001)).

64.    The Bankruptcy Code contains a list of entities that are always deemed "insiders" of a debtor, which include a director of a corporate debtor or an "affiliate, *or insider of an affiliate* as if such affiliate were the debtor." 11 U.S.C. §§ 101(31)(B)(i), (E) (emphasis added). "Affiliate" is a term also defined in the Bankruptcy Code and includes, in pertinent part, an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor." 11 U.S.C. § 101(2)(A) (emphasis added). "Under Third Circuit precedent, the determination of an insider is 'best described as a mixed question of law and fact.' The definition of 'insider' under the Code is flexible and not amenable to precise formulation. An insider is any person or entity whose relationship with a

debtor is sufficiently close that any transactions between them ought to be subjected to closer scrutiny." *TSIC, Inc. v. Thalheimer (In re TSIC, Inc.)*, No. 08-10322 (KG), Adv. Proc. No. 08-51902 (KG), 2010 Bankr. LEXIS 1146, at *14-15 (Bankr. D. Del. Apr. 28, 2010) (quoting *Winstar*, 554 F.3d at 394).

65.     As set forth in the Proposed Complaint, the Insider Lenders were/are Unsecured Bank Debt lenders as well as Lenders under the Secured Credit Facility.  The Insider Lenders are insiders of the Debtors because of (i) the Goldman Affiliates' and Dune's equity ownership in GMACCH Investor LLC, which owns 75.4% of the outstanding common stock of CFGI, (ii) CFGI director Bradley J. Gross's position as a managing director of Goldman, Sachs & Co.; and (iii) CFGI director Daniel Neidich's position as Chairman and Co-Chief Executive Officer of Dune Capital Management.

66.     As the Debtors have stated in public filings, GMACCH Investor LLC, whose members include the Goldman Affiliates and Dune, is "able to . . . significantly influence our business and affairs," and interests of GMACCH Investor LLC members "and their affiliates could conflict with the interests of . . . our creditors," including by "pursuing acquisitions, divestitures, financings or other transactions that, in their judgment, could enhance their equity investments, even though those transactions might involve risks to our creditors."  Capmark Financial Group Inc. Form 10-K dated April 24, 2009 (for year ended December 31, 2008) at 28.  Mr. Gross has been a director of CFGI since November 2008 and a managing director of Goldman, Sachs & Co. since 2007, and from 2003 until 2007 was a vice president at Goldman, Sachs & Co.  Capmark Financial Group Inc. Form 424B3, dated April 27, 2009 at 224.  Mr. Neidich has served as a director of CFGI since March 2006, and is Chairman and Co-Chief Executive Officer of Dune Capital Management, which he co-founded in October 2004. *Id.* at

225. Prior thereto, Mr. Neidich was employed by Goldman, Sachs & Co., where he worked in positions ranging from partner to head of the real estate department to Managing Director, from 1978 to 2003. *Id.*

67. Transfers to insiders were made on account of both pre and post-petition Secured Debt. The transfers in connection with the Secured Debt were made in or about May 2009, which was between ninety days and one year prior to the Petition Date.

68. The transfers were made to or for the benefit of the Insider Lenders for or on account of an antecedent debt (*i.e.*, the Unsecured Bank Debt) owed by the Debtors before they entered into the Secured Credit Facility. Moreover, the transfers made to the Insider Lenders were made while the Debtors were insolvent, as discussed above.

69. The transfers in connection with the Secured Debt (even assuming the Secured Debt itself is not avoided) enabled the Insider Lenders to receive more (*i.e.*, 100%) than they would in chapter 7 had such transfers not been made and the Insider Lenders received payment to the extent provided by the Bankruptcy Code.

70. Thus, the Debtors' Estates have colorable insider preference claims against the Insider Lenders.

### 2. Prosecution of the Claims Will Benefit the Debtors' Estates and Their Creditors.

71. When determining whether the potential cost and benefit renders it worth a committee pursuing litigation, courts within the Third Circuit will examine: "Whether the action is likely to benefit the reorganization estate; The probabilities of legal success in the event the action is pursued; Financial recovery in the event of success; Whether appointment of a trustee or another party to bring the action would be preferable; and The cost to the estate in proceeding

with the action and the terms relative to any attorneys fees." *G-I Holdings*, 2006 U.S. Dist. LEXIS 45510, at *40.

72.     This standard is easily satisfied here. Given the sheer size of the numbers at stake, even a small chance of success weighs strongly in favor of the Committee's pursuit of the Claims; here, the Committee believes that its chances of prevailing are highly probable, because of the reasons set forth herein and the legal authorities cited above. Moreover, the discovery it expects to receive in the upcoming month can serve only to reinforce this likelihood of success. Successful prosecution of the Claims could yield up to *$1.5 billion* for distribution to unsecured creditors. Even if the Committee were to only recover half of the fraudulent conveyance, it would free up over *$750 million* for distribution to all unsecured creditors. The benefits of bringing the Claims far outweigh the costs.

73.     Because these are liquidating chapter 11 cases, the costs of pursuing the Claims would be minimal. Indeed, prosecution would come at no cost to Capmark's business and would not be detrimental to Capmark's employees. The only cost would be professional fees, which would come out of the liquidating Estates' funds that would otherwise be available for distribution to unsecured creditors anyway. Further, because Capmark is liquidating, there is no particular need for the Debtors to remain in control of the Claims and there would be no prejudice resulting from the Committee being assigned the claims, particularly because the usual time pressures associated with emerging from a chapter 11 reorganization are simply not present in a liquidating case. *See Nat'l Forge*, 304 B.R. at 218, 223 (finding in case with liquidating plan that there was "no risk that the Creditors' Committee is usurping the Debtor's role in bringing the Complaint . . . . Any funds that the Creditors' Committee expends in

pursuit of the Complaint are funds that would otherwise be available for distribution to its constituents").

74.     Finally, the Committee is the only independent Estate fiduciary that did not participate in the subject transaction and is not conflicted; it is the only party that can fairly and impartially investigate and pursue the Claims.  As discussed above, undeniable conflicts exist that prevent the Debtors from prosecuting the Claims against the Agents and Lenders.  The Debtors' stated reasons for denying the Demand Letter are self-serving.  Thus, the only other alternative to prosecute the Claims would be to appoint a trustee to do so.  That would be wasteful.  The Committee has invested significant time and expense in investigating the Claims. The Committee has already drafted the Proposed Complaint and negotiated the Discovery Stipulations, and is ready to begin prosecuting the Claims immediately.  The appointment of a trustee or conversion of these cases would only increase the administrative burden on the Debtors' Estates to the detriment of all stakeholders.  It is most economical for the Committee to be granted standing to bring the Claims.

75.     Accordingly, the substantial benefits to the Debtors' Estates more than merit the time and expense of prosecuting the Claims.  Based on all of the foregoing, the Committee has satisfied the requirements to obtain authority to prosecute, address, litigate, and, if appropriate, settle the Claims and to pursue all other actions, objections and rights with respect to same.

## NOTICE

76.     Notice of this Motion has been given to counsel to the Debtors, counsel to the Agents and all other parties that have requested receipt of notices in these cases.  In light of the nature of the relief requested herein, the Committee requests that such notice be deemed adequate and sufficient.

## <u>CONCLUSION</u>

WHEREFORE, the Committee respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: August 10, 2010
      Wilmington, Delaware

By: */s/ Jamie L. Edmonson*
    Neil B. Glassman (No. 2087)
    Jamie L. Edmonson (No. 4247)
    GianClaudio Finizio (No. 4253)
    BAYARD, P.A.
    222 Delaware Avenue, Suite 900
    Wilmington, Delaware 19899
    (302) 655-5000
    (302) 658-6395 (facsimile)

*Co-Counsel to the Official Committee of Unsecured Creditors*

and

Adam L. Shiff
David E. Ross
Jeffrey R. Gleit
Michele L. Angell
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700
(212) 506-1800 (facsimile)

*Special Litigation Counsel for the Official Committee of Unsecured Creditors*