**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------x

In re:

CAPMARK FINANCIAL GROUP INC., et al.,

Debtors.

---------------------------------------------------------x

: Chapter 11
:
: Case No. 09-13684 (CSS)
:
: Jointly Administered
:
: **Hearing Date: October 14, 2010 at 9:30 a.m. (ET)**
:
Related to Docket No. 1636

**OBJECTION OF _AD HOC_ GROUP OF HOLDERS OF CAPMARK'S
UNSECURED BANK DEBT TO DEBTORS' MOTION, PURSUANT
TO BANKRUPTCY RULE 9019 AND BANKRUPTCY CODE
SECTIONS 363(B) AND 549(A)(2)(B), FOR AN ORDER APPROVING
SETTLEMENT BETWEEN DEBTORS AND THEIR PREPETITION
SECURED CREDIT FACILITY LENDERS**

The _Ad Hoc_ Group of Holders of Capmark's Unsecured Bank Debt (the "_Ad Hoc_

Group")[1] submits this objection to the _Motion, Pursuant to Bankruptcy Rule 9019 and_

_Bankruptcy Code Section 363(b) and 549(a)(2)(B), for Order Approving Settlement Between_

_Debtors and Their Prepetition Secured Credit Facility Lenders_, dated September 3, 2010

[Docket No. 1636] (the "9019 Motion"),[2] and, in support of its objection, respectfully represents

as follows:

---

[1]   The _Ad Hoc_ Group of Holders of Capmark's Unsecured Bank Debt consists of certain entities that hold (and/or are investment managers with respect to) claims against the Debtors under that certain Credit Agreement, dated as of March 23, 2006, among Capmark Financial Group Inc., as borrower, the subsidiary guarantors party thereto, Citibank, N.A., as administrative agent, the other agents thereto, and the financial institutions and other persons or entities party thereto.  The current members of the _Ad Hoc_ Group include: (i) Anchorage Capital Master Offshore Ltd., (ii) Apollo Capital Management, L.P., (iii) King Street Capital Management, L.P., (iv) Marathon Asset Management, LP, (v) OZ Special Master Fund, Ltd., (vi) Paulson & Co. Inc., and (vii) Strategic Value Partners, L.L.C.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the 9019 Motion.

## PRELIMINARY STATEMENT

1.     Six months prior to the Commencement Date, the Debtors purported to grant $1.5 billion in liens on their previously unencumbered assets for the benefit of certain unsecured pre-petition lenders that did not provide any new money in exchange for the grant. Now, rather than afford the Committee, the *Ad Hoc* Group, and the other parties in interest a reasonable opportunity to fully investigate the facts and circumstances surrounding this grant, the Debtors are attempting to hastily cramdown a Settlement with such lenders *without any support from unsecured creditors* who are the actual economic stakeholders in these liquidating chapter 11 cases. Moreover, the Settlement impermissibly dictates the terms of any future chapter 11 plan and circumvents the requirements of section 1129 of the Bankruptcy Code - the hallmarks of a *sub rosa* chapter 11 plan.

2.     The Debtors are attempting to "dress up" their scheme as a purported "compromise and settlement" in an effort to divert the Court's attention from the true substance of their request – that the Court authorize what is essentially a full payoff of the allegedly secured claim[3] from approximately *$965 million of almost entirely unencumbered cash*[4] that does not represent proceeds from the disputed liens. In addition to "settling" the causes of action relating to the granting of these liens in a manner extremely favorable to the allegedly secured lenders[5] and not in the paramount interests of creditors, the Debtors seek to *immediately distribute such $965 million outside of a chapter 11 plan* to the same secured group under the guise of a "compromise and settlement" without *any* of the necessary findings, such as findings that the scheme is feasible or in the best interests of creditors, among others. The Bankruptcy

---

[3]     For purposes hereof, the term "Secured Claim" shall refer to the allegedly secured claims arising under the Secured Credit Facility.

[4]     The *Ad Hoc Group* has learned that approximately $735 million of the $965 million is unencumbered.

[5]     For purposes hereof, the term "Secured Lenders" shall refer to lenders holding Secured Claims. The use of such terms shall not constitute an admission as to the validity of the purported liens.

Code affords legal protections to creditors so that debtors cannot concoct arbitrary distributive schemes and have them approved under the standards applicable to a compromise and settlement of claims without satisfying the confirmation requirements of section 1129. The Debtors' request simply cannot be fashioned outside of a chapter 11 plan and should not be countenanced by this Court.

3.    In essence, the Debtors' so-called "Settlement" is hardly a settlement at all, and is more aptly labeled a "motion for summary judgment" as to the validity of the Secured Lenders' purported liens and their entitlement to post-petition interest, without affording unsecured creditors any reasonable opportunity to challenge such assertions. Instead, the Debtors have vigorously opposed the Committee's efforts to obtain standing to challenge the purported liens while unilaterally negotiating an elaborate transaction that compromises the litigation in a manner they had hoped might simply pass muster with the Court as being above the "lowest point" in the range of reasonableness. *See* 9019 Motion at ¶ 32.

4.    Rather than conferring a benefit on the Debtors' estates, however, the proposed Settlement is likely to inflict significant harm on unsecured creditors. The Committee has noted that courts in the Third Circuit have required a "totality of the circumstances" examination of whether a debtor received reasonably equivalent value under a transaction challenged as a constructive fraudulent transfer. As such, the Debtors' attempt to "pull the rug out" from underneath the Committee before subjecting the purported liens they granted on the eve of bankruptcy to reasonable discovery is contrary to efforts to maximize recoveries for unsecured creditors. Moreover, by sweeping virtually all of their unencumbered cash to fund the "Settlement," the Debtors are subjecting their unsecured creditors to an involuntary "investment" in the Secured Lenders' illiquid collateral pool and the significant risks associated therewith.

5.    Despite the Debtors' advocacy as to the merits of the litigation,[6] the actual economic stakeholders in these cases should be afforded a real opportunity to weigh in on what is unquestionably the ultimate issue impacting their recoveries.  The Bankruptcy Code requires nothing less.  By undermining the Committee's efforts to prosecute the litigation and forcing the "Settlement" upon unsecured creditors outside of a chapter 11 plan, the Debtors frustrate this objective.

6.    All of the Debtors' stakeholders have long recognized that the inevitable challenge to the purported liens would be, in fact, the single most critical issue for unsecured creditors in these cases.  The Committee has argued consistently that the risk to the validity of the purported liens is very real, as evidenced by the Committee Motion and the draft complaint attached thereto.  It is thus disappointing that all parties in interest other than the Debtors recognize the significance to unsecured creditors of the causes of action the Debtors so blithely seek to compromise without any support from the actual economic stakeholders.[7]

7.    Although the Debtors purport to have negotiated the proposed "compromise and settlement" on behalf of their estates, in reality, they only artificially included unsecured creditors in their negotiations with the Secured Lenders (despite the active involvement in these cases of both the Committee and the *Ad Hoc* Group), and disregarded viable alternatives proposed by the *Ad Hoc* Group to the "cramdown settlement" embedded in their 9019 Motion.  While the Debtors purport to have included their unsecured creditors in the

---

[6]    The *Ad Hoc* Group respectfully incorporates by reference the arguments in favor of the merits of the Causes of Action as set forth in the Committee Motion and in the Committee's objection to the 9019 Motion, filed contemporaneously herewith.

[7]    Indeed, on September 8, 2010, in the context of the Debtors' "emergency" request to shorten notice and have the 9019 Motion considered on an expedited basis, the Court acknowledged the magnitude of the proposed Settlement in the context of the ultimate resolution of these chapter 11 cases.  The Court's observation is spot on.

negotiation process, these efforts now seem to be superficial (or planned), as the Debtors

announced the terms of the Settlement as a *fait accomplis.*

8.     The exclusion of unsecured creditors is particularly offensive given that

the Debtors are not seeking to reorganize, but are simply liquidating their estates.  Worse yet, the

Debtors' Settlement goes far beyond merely compromising the causes of actions asserted against

the Secured Lenders regarding the validity of their liens (the "Causes of Action").  In fact, the

Debtors agreed *to satisfy* the disputed Secured Claim without the support of the unsecured

creditor groups by immediately distributing approximately $965 million of cash, the bulk of

which is not, on any basis, even *potentially* subject to the Secured Lenders' liens.  The *Ad Hoc*

Group is aware of no precedent for this type of distribution by a debtor to a secured creditor

group under these circumstances outside of a chapter 11 plan that unsecured creditors have an

opportunity to vote on.

9.     The reason for the Debtors' clouded vision with respect to the Causes of

Action is quite clear: the very same parties that orchestrated and recommended the challenged

transaction less than six months prior to the Debtors' bankruptcy filing are now charged with

assessing the merits of the challenges.  Hence, the Debtors' pronouncement that the challenges

are unlikely to succeed hardly comes as a surprise.  Even without questioning their good faith,

the Debtors' inherent conflict of interest effectively precludes them from negotiating a settlement

at arm's length, and the Court's analysis of the 9019 Motion should be governed accordingly.

**"Settlement" Not Product of Arm's Length Negotiations**

10.     The Debtors' actions reveal that their heralded "settlement process" has

been nothing more than an elaborate charade.  From the outset of these cases, the *Ad Hoc* Group

has made *every possible effort* to negotiate a fair and reasonable settlement that would be

acceptable to the Secured Lenders and the unsecured creditors alike. Together with the Committee, the *Ad Hoc* Group has proposed viable alternatives to the Debtors' chosen path. However, the Debtors have refused to allow any views other than their own to influence the process and have rebuffed the *Ad Hoc* Group's efforts.

11.     Following the Debtors' failed pre-petition efforts to negotiate a consensual reorganization, the *Ad Hoc* Group approached the Debtors upon the commencement of these cases to discuss its interest in negotiating a consensual chapter 11 plan. The *Ad Hoc* Group's initial efforts were disregarded, as the Debtors indicated that they were solely focused on closing the sale of their mortgage servicing business and consummating a settlement with the FDIC. After the sale closed and the FDIC settlement was approved, in early January 2010, the *Ad Hoc* Group once again approached the Debtors to discuss the parameters of a consensual plan. The *Ad Hoc* Group's efforts were again dismissed, and its members were advised that the Debtors intended to gain traction with the Committee before working with individual creditor constituencies on a global compromise.

12.     It was not until February 2010 that the Debtors agreed to sit down with the *Ad Hoc* Group's professionals to discuss the prospects for a consensual chapter 11 plan. Already at this juncture, however, it was evident that the Debtors were extremely litigation adverse. The Debtors indicated that they wanted to be out of chapter 11 by *June 2010*, and expressed concern that litigation would delay their emergence and therefore threaten the value of their assets. The *Ad Hoc* Group was accordingly advised that the Debtors would not agree to grant standing to any party to challenge the Secured Lenders' liens, but that they were conducting an internal factual analysis – a so-called "white paper" – that would bring the parties closer together and facilitate settlement.

13.     The parties in interest awaited the "white paper" for three months while the Debtors continued to withhold consent for the Committee to bring the Causes of Action and settlement discussions were tabled.  During this period, the *Ad Hoc* Group proposed a global compromise that would provide for (i) a reduction in the amount of the Secured Claim or, alternatively, (ii) the establishment of a post-confirmation litigation trust to pursue claims against the Secured Lenders.  Each of these alternatives would enable the Debtors to immediately emerge from bankruptcy protection, thereby addressing their stated goal.  Although the *Ad Hoc* Group believed it had developed a structure that alleviated the Debtors' concerns, their settlement proposal was rebuffed because, according to the Debtors, it failed to gain the Committee's support.

14.     When the Debtors' "white paper" was finally delivered in May 2010, it read as though it were written with the purpose of supporting the May 2009 transaction, as it simply lauded the alleged benefits the Debtors' estates had derived from the transaction.  The Debtors indicated that they also prepared a legal analysis of the arguments, but this analysis was never shared with unsecured creditors.

15.     Simultaneously with the delivery of the "white paper," the Debtors presented a global settlement proposal to all of their creditors, expressing an expectation that neither the secured nor the unsecured creditors would like the proposal, as the former would want a smaller discount, and the latter would want a greater one, but that the reduction in the amount of the Secured Claim they were proposing was appropriate on the basis of their factual and legal analysis of the litigation risk.  Notably, the Debtors' settlement proposal was ***vastly*** superior to the proposal currently before the Court: it provided for a far greater reduction in the

amount of the Secured Claim, and did not provide for the immediate payment of *any* unencumbered cash or post-petition interest to the Secured Lenders.

16.     In response, the Committee and the *Ad Hoc* Group delivered a joint counter-proposal to the Debtors that incorporated a similar settlement structure and provided for a reasonable reduction in the amount of the Secured Claim or, alternatively, the establishment of a post-confirmation litigation trust permitting the Debtors to immediately emerge from chapter 11. Once again, however, the Debtors refused to engage in meaningful settlement discussions and the joint settlement proposal was ignored.[8]

17.     Twice, the *Ad Hoc* Group developed reasonable settlement proposals that addressed the Debtors' stated desire for (i) a quick emergence from chapter 11, and (ii) a unified position of both unsecured creditor groups. Twice, the *Ad Hoc* Group's efforts were rebuffed. In the absence of a good faith, arm's length settlement dialogue, the Committee was compelled to undertake discovery and seek standing from the Court to challenge the Secured Lenders' liens on behalf of the Debtors' estates. Within weeks thereof, the Debtors attempted to moot the Committee's request by proposing the Settlement currently before the Court. The *Ad Hoc* Group firmly believes that the interests of all of the Debtors' unsecured creditors would be better served by denying the 9019 Motion and permitting the Committee's litigation efforts to proceed.

**Purported Benefits of "Settlement" Are Grossly Misleading**

18.     Setting aside, for the moment, the Debtors' exclusion of their unsecured creditors from the negotiations with the Secured Lenders, the Court should be aware that the Debtors' have "dressed up" their proposed Settlement to create an appearance that their estates

---

[8]     The *Ad Hoc* Group subsequently learned that the Debtors submitted a modified proposal to the Committee, although its economic terms were inferior to the Debtors' original global settlement proposal.

are receiving adequate consideration for compromising the Causes of Action that may invalidate $1.5 billion of secured debt. The unsecured creditors are not fooled.

19.    The Debtors' Settlement effectively embodies three separate requests for relief, each of which is inappropriate in and of itself: (i) authorization to pay the Secured Lenders nearly $65 million in post-petition interest and an estimated $10 million to $15 million in professional fees without a finding pursuant to 11 U.S.C. § 506 that the Secured Lenders are oversecured;[9] (ii) authorization to pay the Secured Lenders 91% of the face amount of their claim from almost entirely *unencumbered cash* prior to confirmation of a chapter 11 plan; and (iii) authorization to release and waive the Causes of Action for no tangible consideration. By combining each of these requests under the guise of a global settlement pursuant to Bankruptcy Rule 9019 and arguing in favor of an expansive application of the business judgment rule, however, the Debtors cannot sidestep the applicable provisions of the Bankruptcy Code.

20.    Moreover, the Debtors' primary arguments in support of the Settlement are grossly misleading. Contrary to their assertion, the Debtors have not negotiated a 9% reduction in the amount of the Secured Claim. The 9% reduction in the face amount of the Secured Claim – $135 million – is offset by the post-petition interest and fees of approximately $77.5 million the Secured Lenders stand to receive under the Settlement, as set forth below:

---

[9]    These figures are estimates based upon the *Ad Hoc* Group's information and belief.

| Face Amount of Secured Claim | $1,500,000,000 (100%) |
| Proposed Reduction per Settlement | $135,000,000 (9%) |
| (Post-Petition Interest)[*] | ($65,000,000) (4.33%) |
| (Secured Lender Professional Fees)[*] | ($12,500,000) (0.83%) |
| Actual Reduction to Secured Claim | $57,500,000 (3.8%) |

[*]estimate

Hence, the "savings" the Debtors have negotiated are but 3.8% of the face amount of the Secured

Claim – allowing for a current cash payment that may actually *exceed* the net present value of

the ultimate recovery on the claim – even assuming the disputed liens are ultimately deemed

valid by the Court.  The Secured Lenders are well aware of this arithmetic.

21.    Likewise, the Debtors are not – as they claim – saving their estates future

debt service of 4.75% on the unpaid principal balance of the Secured Credit Facility.  As a matter

of law, the Secured Lenders are not entitled to post-petition interest absent a determination that

the value of their collateral exceeded the value of their claim on the Commencement Date.

Neither the Debtors nor the Secured Lenders have demonstrated that the Secured Lenders'

claims are oversecured.[10]  Until such time as the Debtors carry their burden of demonstrating that

the Secured Lenders' claims are oversecured, the Court should give no weight to any purported

interest savings to the Debtors' estates.

**Settlement Constitutes an Impermissible *Sub Rosa* Plan**

22.    The most egregious and offensive aspect of the proposed "Settlement" is

the Debtors' attempt to impetuously shift every risk associated with the liquidation of the

Secured Lenders' purported collateral to their unsecured creditors by paying down the Secured

---

[10]    Notably, the proposed Settlement eviscerates the carefully negotiated provisions of the Cash Collateral Order that provide a mechanism for the claw-back of the post-petition payments made to the Secured Lenders if the Committee prevails on the Causes of Action.  Indeed, the unsecured creditors' ability to be made whole will be unjustifiably frustrated in the event the proceeds of the Secured Lenders' collateral ultimately yield less than 96.2% of the Secured Claim.

Claim with largely *unencumbered* cash that would otherwise be available to satisfy unsecured claims.

23.     It is a fundamental tenet of bankruptcy law that creditors are entitled to the various protections of section 1129 of the Bankruptcy Code before a debtor may make distributions on account of pre-petition claims.  By proposing to make immediate distributions to the Secured Lenders from unencumbered cash under the guise of a Bankruptcy Rule 9019 settlement, the Debtors seek to avoid the statutory requirements they must otherwise satisfy in obtaining confirmation of a chapter 11 plan.  Unsecured creditors must be afforded their statutory rights and protections provided under section 1129 of the Bankruptcy Code.

24.     Given the vast uncertainties associated with the liquidation of the so-called "pledge pool" – the infirmities of which the Secured Lenders are very well aware – there is a real question as to whether the Debtors' proposed scheme of replacing unencumbered cash with an interest in the "pledge pool" assets would satisfy the "best interests of creditors test" of section 1129(a)(7) and the feasibility requirement of section 1129(a)(11), among others.[11]  At a minimum, creditors are entitled to the disclosure required by section 1125 of the Bankruptcy Code – including information regarding the Debtors' ability to fund future liquidation activities and support existing investments – before considering whether this *de facto* plan passes muster. Indeed, the Debtors' proposed scheme is far more prejudicial than other transactions that have been struck down by bankruptcy courts as impermissibly dictating the terms of a chapter 11 plan *sub rosa*.  As the Court noted on September 8, 2010, "this is obviously a lot of money and the significant remaining piece of what needs to be done in this case." Hr'g Tr. 16, Sept. 8, 2010. The Debtors should not be permitted to make a $965 million distribution to the Secured Lenders

---

[11]     Based upon information and belief, there is significant uncertainty as to whether the "pledge pool" will yield the amount of future cash proceeds the Debtors are currently projecting.

from almost entirely unencumbered cash without satisfying the requirements of section 1129 of
the Bankruptcy Code.

25.    For each of the foregoing reasons, and as set forth in detail below, the
9019 Motion should be denied.

## OBJECTION

26.    As discussed in detail in the 9019 Motion, the Debtors propose to pay
down "91%" of the Settling Lenders'[12] allocable share of the approximately $1.5 billion of
principal owing under the Secured Credit Facility, of which 85% is payable on or before
November 1, 2010, and the rest on or before November 30, 2010.  The Debtors are also allowing
the Secured Lenders to retain all post-petition interest they have received under the Cash
Collateral Order and propose to continue paying such interest (at the non-default rate), as well as
the fees of the Secured Lenders' professionals, through the consummation of the Settlement.
Finally, the Settlement provides the Secured Lenders and the Debtors' insiders with a release
from all claims relating to the Prepetition Secured Credit Documents, the incurrence of the
Prepetition Secured Credit Obligations, or any actions related thereto or taken in connection with
the negotiation and execution thereof, thus mooting the Committee Motion and preventing the
Committee from pursuing the Causes of Action to the obvious detriment of all of the Debtors'
unsecured creditors, including the members of the *Ad Hoc* Group.[13]

27.    The Debtors attempt to justify the cashing out of the Secured Lenders
prior to confirmation of a chapter 11 plan – which would have been the proper time for paying

---

[12]    While the Settlement afforded each Secured Lender an opportunity to opt out of the Settlement,
unsurprisingly, the *Ad Hoc* Group has learned that none of the Secured Lenders has availed itself of this
opportunity.  As such, the proposed Settlement is now between the Debtors and all of the Secured Lenders.

[13]    The *Ad Hoc Group* filed a statement in support of the Committee Motion [Docket No. 1611].

down valid pre-petition claims – by asserting that such early payout will spare their estates the continuing accrual of post-petition interest.

28.     Hence, the Settlement appears to be based on two unsupported assumptions: (a) there is *less than a 4% chance* that the estates (or the Committee on their behalf) will prevail on the Causes of Action, and (b) the Secured Lenders are over-secured. The Debtors have failed to present *any* evidence, let alone meet their burden of the preponderance of the evidence,[14] with respect to these two fundamental assumptions underlying the Settlement. A Settlement based upon these unproven assumptions simply cannot be approved.

29.     Furthermore, the Settlement should not be approved because it amounts to an impermissible *sub rosa* plan. By providing for the immediate payment of over 96% of the Secured Claim from $965 million of almost entirely unencumbered cash without *any* findings that such scheme is in the best interests of creditors or feasible, among others, the Settlement impermissibly dictates the terms of any future chapter 11 plan and circumvents the requirements of section 1129 of the Bankruptcy Code. Moreover, the Settlement does not meet the Third Circuit standards for a "fair and equitable" settlement, is not in the paramount interest of creditors, and was not the product of arm's length bargaining. Finally, rather than conferring a benefit on the Debtors' estates, the Settlement is likely to inflict significant harm on the estates and their unsecured creditors given the significant risks attendant to sweeping $965 million in almost entirely unencumbered cash and replacing it with the illiquid "pledge pool."

A.     **Debtors Cannot Demonstrate That Settlement Is "Fair and Equitable"**

30.     The *Ad Hoc* Group does not challenge the notion that settlements of disputes are generally favored. Nevertheless, the Third Circuit has held that due to the "unique

---

[14]     "[T]he party seeking the approval [of a settlement under Bankruptcy Rule 9019] has the burden of showing by a preponderance of the evidence that the proposed settlement is in the best interest of the estate." *Velde v. First Int'l Bank & Trust (In re Y-Knot Constr., Inc.)*, 369 B.R. 405, 408 (B.A.P. 8th Cir. 2007).

nature of the bankruptcy process," before a bankruptcy court approves a particular settlement, it must determine that such settlement is "fair and equitable." *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (*citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968)). The Debtors bear the burden to persuade the Court that the Settlement meets the "fair and equitable" standard and should be approved. *See Y-Knot Constr., supra.*

31.     Courts within the Third Circuit have adopted a four factor test for determining whether a settlement proposed pursuant to Bankruptcy Rule 9019 is "fair and equitable." *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). The four factors adopted by the *Martin* court are: (1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors and a proper deference to their reasonable views. *Id.*; *Fry's Metals, Inc. v. Gibbons (In re RF Indus. Inc.)*, 283 F.3d 159 (3d Cir. 2002).

32.     Courts within the Third Circuit have also applied a seven factor test articulated by the United States Bankruptcy Court for the Southern District of New York in *In re Texaco, Inc.*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988). *See In re Exide Techs.*, 303 B.R. 48 (Bankr. D. Del. 2003); *In re Allegheny Int'l, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990). This Court has placed particular emphasis on the seventh factor of the *Texaco* test: "[t]he extent to which the settlement is truly the product of 'arms-length' bargaining, and not of fraud or collusion." *In re Exide Techs.*, 303 B.R. at 68 (citing *Texaco*). The Debtors have not met their burden under either test, and, accordingly, the 9019 Motion should be denied.

1.      **Settlement Not in "Paramount Interest of Creditors"**

33.      It is telling that the 9019 Motion – which is 40 pages long – contains

merely two sentences analyzing the most important prong of the *Martin* test: the paramount

interest of creditors.[15]   Courts in the Third Circuit have interpreted the "paramount interest of

creditors" factor to mean giving proper deference to the views of a debtor's creditors.  *See, e.g.,*

*Key3Media Group, Inc. v. Pulver.com, Inc. (In re Key3Media Group, Inc.)*, 336 B.R. 87 (Bankr.

D. Del. 2005); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 836-37 (Bankr. D. Del.

2008) (denying confirmation of a plan because those parties whose rights were severely

impacted by settlement incorporated into plan were not afforded meaningful participation in

negotiations of settlement).   Not a single one of the Debtors' unsecured creditors has come out to

support the proposed "Settlement."[16]   Hence, the reason for the Debtors' reluctance to discuss

this factor of the *Martin* test is obvious: it weighs ***heavily against*** approval of the Settlement and

compels denial of the 9019 Motion.

34.      The Third Circuit has held that this element of the "fair and equitable"

standard requires a finding that the settlement is fair not just as between the settling creditor and

the estate, but also as to the other, non-settling creditors.  *In re Nutraquest, Inc.*, 434 F.3d at 645;

*see also In re Spansion, Inc.*, 2009 Bankr. LEXIS 1283, at *12 (Bankr. D. Del. June 2, 2009)

---

[15]      The 9019 Motion simply provides:

> Upon analysis of the foregoing arguments, the Debtors believe that if the Settlement is not
> approved, and litigation commenced, creditors could receive highly diminished and later
> distributions in these cases.   The Debtors believe the terms and conditions of the Settlement are
> fair and reasonable in light of the costs and risks associated with protracted litigation over the
> disputes.

> 9019 Motion at ¶ 60.

[16]      Tellingly, in only one of the fourteen cases cited by the Debtors in support of approval of their Settlement
pursuant to Bankruptcy Rule 9019 did a court approve a debtor's proposed settlement over the objection of
the official committee of unsecured creditors – as the Debtors' seek in their 9019 Motion.   Moreover, in
that lone case, at least one major unsecured creditor expressly supported the settlement.  *See Official
Unsecured Creditors' Comm. of Pa. Truck Lines, Inc. v. Pa. Truck Lines, Inc. (In re Pa. Truck Lines, Inc.)*,
150 B.R. 595, 600 (E.D. Pa. 1992).

("[u]nder the 'fair and equitable' standard, [the courts looks] to the fairness of the settlement to the other persons, *i.e.*, the parties who did not settle."). Indeed, a basic notion of fairness requires consideration of the effect on all involved parties. *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 464 (2d Cir. 2007) (*citing U.S. v. AWECO*, Inc. (*In re AWECO, Inc.*), 725 F.2d 293, 298 (5th Cir. 1984)).

35.    The principle that a settlement must treat affected creditors reasonably in order to be "fair and equitable" applies all the more where a settlement is proposed *in the context of a liquidation* – such as the present cases – rather than a reorganization. "In a liquidating Chapter 11, *more deference is shown to the unsecureds' viewpoint* than in a reorganization case 'because the principle [sic] underlying rationale for the 'business judgment rule', *i.e.*, that a DIP is entitled to some free reign in fulfilling its perceived mission of aiding the economy . . . is lacking in such circumstances.'" *In re S.N.A. Nut Co.*, 186 B.R. 98, 105 (Bankr. N.D. Ill. 1995) (citations omitted) (emphasis added).

36.    In a case bearing striking similarities to *Capmark, In re Exide Techs., supra,* this Court rejected a proposed settlement between the debtor and its pre-petition lenders. Because the unsecured creditors overwhelmingly opposed the proposed settlement, were not included in the negotiation of its terms, and would be directly affected by its implementation, this Court determined that the settlement was *not* in the paramount interests of creditors and struck it down. *In re Exide Techs.*, 303 B.R. at 70-71. The Court noted that an important element in the determination of whether a settlement should be approved is whether it was negotiated with, and/or supported by, the creditors' committee, finding:

> Unsecured creditors are not voluntary investors in the Debtor and their position on the settlement, under these circumstances, is entitled to *substantial weight*.

*Id.* at 70 (emphasis provided).

37.     As in *Exide*, the unsecured creditors here did not negotiate the Settlement, will be directly impacted by its terms, and overwhelmingly oppose its implementation. In fact, as set forth above, not a single unsecured creditor has offered support for the Settlement. To the contrary, both the Committee and the *Ad Hoc* Group – the only known organized groups of unsecured creditors in these cases – vigorously oppose the Settlement. Given the absence of any support from unsecured creditors, the proposed Settlement should be denied.

### 2.     Terms of Settlement Are Grossly Unfair to Unsecured Creditors

38.     The reason for the absence of any support for the proposed Settlement is quite clear: its terms are neither fair nor equitable, nor do they reflect any of the unsecured creditors' input. As an initial matter, the Settlement proposes to sweep approximately *$965 million* of almost entirely *unencumbered cash* – the bulk of which would otherwise be available to satisfy unsecured claims – and immediately pay such amount to the Secured Lenders. Through this act, the Debtors seek to saddle their unsecured creditors with every risk associated with the liquidation of the Secured Lenders' illiquid collateral, while stripping them of their valuable interest in cash free from the Secured Lenders' purported liens.

39.     There is simply nothing in the Bankruptcy Code that either demands the payment of any secured claims in cash or permits the payment of a pre-petition claim prior to confirmation of a chapter 11 plan – especially from unencumbered cash that would otherwise be available to satisfy unsecured claims and absent the unsecured creditors' consent. *See In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 940-41 (Bankr. D. Del. 1992) (finding that Bankruptcy Code does not permit Chapter 11 debtor to pay pre-petition debts prior to plan confirmation); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368 (Bankr. S.D. Tex. 2001) (noting that general rule is that payment of pre-petition claims prior to confirmation is proscribed). If the Secured Lenders'

claims ultimately prove to be secured, they are entitled to receive the bargain of the security represented by their collateral – nothing more.

40.    Worse yet, the Settlement permits the Secured Lenders to (i) retain all post-petition interest and fees they have received to date, (ii) continue to accrue, and be paid for, further interest and fees through the effectiveness of the Settlement, and (iii) permanently eviscerate the carefully negotiated "claw-back" provisions of the Cash Collateral Order that give the Debtors' estates the right to recharacterize and potentially recover post-petition payments made to the Secured Lenders if the Court determines that the Secured Lenders were not entitled to adequate protection.

41.    There is *nothing* in the record of these cases that demonstrates that the Secured Lenders are entitled to *any* of the post-petition interest and fees that they will retain pursuant to the Settlement, totaling approximately $78 million.  The Debtors have submitted no evidence that the Secured Claim is oversecured, and there has been no finding that the Secured Lenders' liens are not subject to avoidance.  Nonetheless, the Settlement entitles the Secured Lenders to the immediate realization of $965 million in almost entirely unencumbered cash, the retention of over $400 million in post-petition payments received to date, and permanently shields them from any future challenge to the validity of their liens, their entitlement to post-petition interest and fees, and any liability related to the Secured Credit Facility.

42.    Hence, through the Settlement, the Debtors effectively seek summary judgment against their unsecured creditors on both the Causes of Action and the value of the Secured Lenders' collateral without due process or the opportunity for the parties in interest to conduct appropriate discovery.  The Debtors' actions represent an outrageous and wanton

disregard for the interests of their unsecured creditors – to whom they owe a fiduciary duty – and should not be condoned by this Court.

43.     The Debtors attempt to justify these remarkable features of the Settlement by citing cases that stand for the unremarkable proposition that a debtor's use of property of the estate under section 363 of the Bankruptcy Code is justified if based on the debtor's "sound business judgment." 9019 Motion at ¶ 62.  However, *not a single one* of these cases support the payment of pre-petition claims prior to confirmation of a plan.  In fact, in the Third Circuit, the *only* justification for the payment of pre-petition claims prior to plan confirmation is the "doctrine of necessity," a much higher standard than the debtor's business judgment.  *See, e.g., Official Comm. of Unsecured Creditors v. Motor Coach Indus., Int'l, Inc. (In re Motor Coach Indus., Int'l, Inc.)*, 2009 WL 330993, at *2 n.5 (D. Del. Feb. 10, 2009) (*citing In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 192 (Bankr. D. Del. 1994)).  Thus, "[t]he Third Circuit held that a court could authorize the payment of pre-petition claims [only] if such payment was essential to the continued operation of the debtor." *In re Just For Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999) (*citing In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981)).

44.     Even assuming, *arguendo*, that the use of the business judgment rule could justify these payments outside of a plan, in a liquidating chapter 11 – such as the present case – the debtor's business judgment is accorded significantly less deference than in a reorganization case, while the opinion of the debtor's unsecured creditors gains more weight.  *See In re S.N.A. Nut*, 186 B.R. at 105 (denying debtor's request to make out-of-the-ordinary-course payment under section 363(b) and finding that, in a liquidation, "no particular deference should be given to the debtor's business decision.").  Notably, none of the cases cited by the Debtors in support of the asserted business judgment standard was decided in the context of a liquidation.

45.     In short, the proposed Settlement does not come remotely close to satisfying the applicable "paramount interests of creditors" test adopted by this Circuit in *Martin*. In fact, based upon the record before the Court, the Debtors have not demonstrated *any* benefits to their estates flowing from the proposed Settlement. In the absence of a factual record demonstrating that the Secured Lenders are oversecured – let alone secured at all – any argument alleging benefits to the Debtors' estates attributable to "interest savings" is premature and irrelevant. Likewise, any statement quantifying an alleged "discount" to the Secured Claim is of no consequence absent demonstrations as to the validity of the Secured Creditors' liens and the value of their collateral. Accordingly, the Court should give proper deference to the clearly expressed preferences of the unsecured creditors against the Settlement, and the 9019 Motion should be denied.

### 3.     Settlement Not Product of Arm's Length Negotiations

46.     In determining whether a proposed settlement is "fair and equitable," Courts within the Third Circuit have also examined the extent to which the settlement is truly the product of 'arms-length' bargaining, and not of fraud or collusion. *In re Exide Techs.*, 303 B.R. at 68; *In re Allegheny*, 118 B.R. at 313 ("The final criterion is the extent to which the settlement is truly the product of arm's length negotiations and not of fraud or collusion."). As set forth below, Courts have struck down settlements as lacking requisite evidence of arm's length bargaining where, as here, (i) the settlement was driven by motivations other than maximizing recoveries for creditors, (ii) the parties negotiating the settlement were not truly adverse, and (iii) the party negotiating the settlement on behalf of creditors lacked an economic incentive to extract the best settlement possible. The settlement proponent bears the burden of demonstrating that the settlement was the product of arm's length bargaining. *See In re Matco Elecs. Group, Inc.*, 287 B.R. 68, 76 (Bankr. N.D.N.Y. 2002).

a.    *Settlement Driven by Motivations Other than Maximizing Recovery of Creditors*

47.    A proposed settlement is not the product of arm's length bargaining where it is driven by motivations other than maximizing recovery of creditors. *See Dacotah Mktg. & Research, L.L.C. v. Versatility, Inc.*, 21 F. Supp. 2d 570, 578 (E.D. Va. 1998) (settlement not arm's length when "the plaintiff no longer seeks to gain as much as possible through settlement, but is otherwise motivated"); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852 (1999) (settlement not arm's length where negotiating party had incentives other than realizing "best possible arrangement" for stakeholders).

48.    In discussions with their creditors, the Debtors have acknowledged that the litigation over the validity of the Secured Lenders' liens is the final obstacle standing in the way of their emergence from chapter 11.  Indeed, early this year, the Debtors' advised the *Ad Hoc* Group of their desire to emerge from chapter 11 by *June 2010* and their intention to withhold consent to the Committee's request for standing to prosecute the Causes of Action to ensure their estates would not be mired in chapter 11 indefinitely.  The Debtors' desire to resolve this "final piece of the puzzle" and emerge from chapter 11 potentially contributed to their haste to agree to a settlement that they hoped would merely satisfy the "lowest point" in the range of reasonableness, regardless of its impact on their unsecured creditors.

49.    In addition, substantially all of the Debtors' officers, including CFGI's President, Chief Executive Officer, Secretary, General Counsel, Chief Risk Officer, and three of its Executive Vice Presidents, hold the same positions they held at the time the Secured Credit Facility was consummated.  In fact, several high ranking executives of certain of the Debtors are signatories to the Secured Credit Facility.  Moreover, many of the Debtors' professionals also participated in the challenged transaction.  Even without questioning their good faith, how can

these parties fairly negotiate a settlement of the Causes of Action when they participated, six months before the Commencement Date, in the very transactions that are being challenged? Certainly, these individuals faced an uncomfortable dilemma of being called upon as fiduciaries to scrutinize and challenge the transaction they designed and implemented. Given these circumstances, the Debtors' estates would be best suited by permitting the Committee to weigh in on any settlement of the Causes of Action.

50.    Finally, the Settlement provides releases for the Debtors' officers, directors, and professionals from any causes of action relating to the Secured Credit Facility. Without questioning their good faith, the mere existence of this "perk" creates a conflict that would not otherwise exist had an independent party been charged with negotiating the Settlement.

51.    Because the Debtors were potentially driven by motivating factors other than maximizing recoveries for their unsecured creditors, the Settlement was not negotiated at arm's length.

**b.    *Parties to Settlement Are Not Truly Adverse***

52.    In order for a settlement to be considered an arm's length agreement, it must be the product of negotiations between truly adverse parties. *Berry v. School Dist. of Benton Harbor*, 184 F.R.D. 93, 105  (W.D. Mich. 1998) (finding a lack of arm's length negotiations when the parties "failed to approach the settlement as true adversaries."). Given their overlapping interests in protecting the efficacy of the May 2009 transaction they jointly orchestrated, coupled with the benefits they will receive from mutual releases of claims related thereto, the Debtors and the Secured Lenders are hardly the type of "adverse parties" that would engage in vigorous negotiations emblematic of arm's length dealings.

c.    *Actual Economic Stakeholder Excluded from Negotiations*

53.    Courts have rejected settlements as lacking arm's length bargaining where the party holding the actual economic stake is excluded from the settlement negotiations and does not support the settlement. *In re Exide*, 303 B.R. at 71 ("settlement was not the result of arms-length bargaining" where committee – the party directly affected by it – was excluded from settlement negotiations among debtor and its pre-petition lenders); *In re Matco Elecs. Group, Inc.*, 287 B.R. at 78.

54.    In the instant cases, the liquidating Debtors have no economic interest in maximizing recoveries from the Causes of Action.  As in *Exide*, the lone constituency that has an economic stake in the outcome and is actually adverse to the Secured Lenders – the unsecured creditors – was systematically excluded from negotiations of the Settlement.  Although the Debtors may contend to have included their unsecured creditors in a global settlement process, in reality, the Settlement does not reflect *any* input from unsecured creditors, and is contrary to efforts to maximize unsecured creditor recoveries.  Accordingly, the Debtors cannot demonstrate that the Settlement they negotiated solely with the Secured Lenders reflects the product of arm's length bargaining.

d.    *Numerous Aspects of the Settlement Are Highly Suspect*

55.    Additionally, the Settlement presents all the "red flags" that have been identified by other courts as indicative of unfairness and of being below the lowest range of reasonableness.  For example, in *In re Matco Elecs. Group, Inc.*, 287 B.R. at 75, the court refused to approve a proposed settlement, having identified the following "red flags" attesting to its unfairness:  (i) rather than being proposed by a disinterested trustee, the settlement was being proposed by the debtor's shareholder who had a vested interest in the outcome of underlying litigation; (ii) releases were being granted to the debtor's insiders without any justification; and

(iii) the settlement released causes of action asserted by the creditors' committee, yet, the committee, though bound by its terms, was not party to the settlement. 287 B.R. at 76. *See also In re Nutritional Sourcing Corp.*, 398 B.R. at 836-37 (refusing to "hold that a settlement was fair and equitable under Rule 9019 when those parties whose rights were severely adversely impacted were not afforded meaningful participation in the negotiations."); *In re Present Co.*, 141 B.R. 18 (Bankr. W.D.N.Y. 1992) (refusing to approve settlement where only parties supporting it were insiders and where creditors' committee was denied opportunity to conduct discovery with respect to claims that were being released). As this Court has previously noted, "Third Circuit courts have made clear that 'all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise' should be considered as well." *In re Nutritional Sourcing Corp.*, 398 B.R. at 833 (citing *In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998)). The existence of the "red flags" similar to those identified above compel a finding that the Settlement should not be approved.

4.      **Other Elements of *Martin* Test Not Satisfied**

56.      As set forth above, the first and third prongs of the *Martin* test require an analysis of (i) the probability of success in litigation, and (ii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it, respectively. *Martin*, 91 F.3d at 393. Despite the unsubstantiated and self-serving statements in the 9019 Motion, the Debtors have not met their burden of demonstrating that the Committee is unlikely to prevail on the merits of the litigation, or that the Committee's likelihood of success of victory is ***less than 4%***.

57.      The determination of whether a settlement is fair and equitable requires the Court to exercise "informed, independent judgment" and not merely rely upon the Debtors' unsupported conclusions. *See Official Comm. of Unsecured Creditors of Int'l Distrib. Ctrs., Inc.*

*v. Talcott, Inc. (In re Int'l Distrib. Ctrs., Inc.)*, 103 B.R. 420, 422 (S.D.N.Y. 1989).  Approval of a settlement without a sufficient factual foundation will inherently constitute an abuse of discretion.  *In re AWECO, Inc.*, 725 F.2d at 299.  A bankruptcy court "must be apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate" in order to be fully informed.  *See In re Martin*, 91 F.3d at 394.

58.    The Committee Motion sets forth serious legal arguments challenging the Secured Claim that the Committee will address at the hearing on the 9019 Motion.  At the very least, the Debtors must explain the process by which they have valued the probability of the Committee's success on the merits of the Causes of Action, after factoring in the projected litigation costs, at less than 4%.  There is not a shred of evidence in the 9019 Motion that demonstrates that this position is appropriate or supported by the facts of these cases.[17]  By failing to provide any support for such "range of reasonableness" calculation, the Debtors effectively request that the Court simply trust that their calculations are valid.  The Court "may not simply accept [a party's] word that the settlement is reasonable, nor may [the Court] merely 'rubber-stamp' the [party's] proposal."  *LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.)*, 841 F.2d 159, 162 (7th Cir. 1987).  Similarly, the Court must be satisfied that "there has been sufficient discovery of the underlying claims . . . to enable counsel to act intelligently."  *In re Del Grosso*, 106 B.R. 165, 168 (Bankr. N.D. Ill. 1989) (listing sufficient discovery as one of necessary showings for approval of proposed settlement).  Because the Debtors did nothing to demonstrate that these prongs of the *Martin* test weigh in their favor, they have failed to meet their evidentiary burden with respect to such prongs.

---

[17]    To the contrary, the Debtors must demonstrate why a mere 3.8% discount to the face amount of the Secured Claim is appropriate, particularly where participations in the Secured Credit Facility have traded at a deep discount to par both before and during the pendency of these cases, and a 3.8% reduction may not even account for the net present value of the ultimate recovery on the Secured Claim, considering the collateral is unlikely to be liquidated for some time.

59. With respect to the remaining prong of the *Martin* test, there clearly is no concern here about difficulty of collection. Indeed, were the Committee to prevail on the Causes of Action, no collection whatsoever would be necessary. The outcome of the litigation would simply be reflected in the distribution scheme under a chapter 11 plan. Accordingly, this prong weighs against approval of the Settlement.

60. As the Third Circuit has stated in *In re RFE Indus. Inc.*, the overall goal of the *Martin* test is to maximize the recovery to the Debtors' creditors. As demonstrated above, the proposed Settlement fails to do so.

**B.    Settlement Constitutes *Sub Rosa* Plan and Thus Cannot Be Approved**

61. In addition to the foregoing, the Settlement should not be approved because it constitutes an impermissible *sub rosa* plan. Courts have long recognized that debtors cannot subvert the terms and policies of the Bankruptcy Code by proposing pre-plan transactions that predetermine the terms of the chapter 11 plan without providing to their creditors the all-important protections established by Congress for the plan process. *See, e.g., Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) ("[T]he debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa*..."); *In re Iridium Operating*, 478 F.3d at 466 (stating generally that trustee is prohibited from actions that would amount to *sub rosa* plan). The prohibition on transactions that amount to *sub rosa* plans applies to settlements to the same degree as to sales under section 363 of the Bankruptcy Code. *See, e.g., Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 354 (5th Cir. 1997) (Bankruptcy Code "does not authorize the trustee to enter [into] a settlement if the result

amounts to a *sub rosa* plan"); *In re Global Vision Prods., Inc.*, 2009 WL 2170253 (S.D.N.Y.

July 14, 2009) (same); *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997) (denying approval

of settlement upon finding that its terms "exceed[ed] the boundaries of a Rule 9019 compromise"

by, among other things, granting releases of claims which debtor held for benefit of estate).

62.     The Settlement is, in effect, a *sub rosa* plan because it (i) fixes the

treatment of the Secured Lenders' claims, including their entitlement to post-petition interest and

fees, (ii) exhausts the Debtors' unencumbered cash, thus severely limiting the Debtors' options

with respect to any future plan treatment for unsecured claims, (iii) releases the Causes of Action

that would have been a significant source of the plan funding, and (iv) otherwise releases claims

against the Secured Lenders and the Debtors' insiders.[18]

63.     In *Ohio Co. v. Maynard (In re Hillsborough Holdings Corp.)*, 153 B.R.

936 (Bankr. M.D. Fla. 1993), the court refused to approve a settlement that (i) fixed the amount

of the secured lenders' claims, (ii) established the right of the lenders to, and the calculation of,

post-petition interest and fees, (iii) required the debtors to make post-petition interest payments,

and (iv) provided for the waiver of default interest. *Id.* at 938-39. The court, stating that such

settlement would improperly "predetermine the rights of the [lenders] and the treatment of the

[lenders'] claims prior to the Confirmation Hearing," found it to be "premature" and based its

refusal to approve the settlement on the finding that it would "dictate the terms of a future plan of

reorganization." *Id.* at 940. The proposed Settlement before the Court is even more outrageous.

Not only does the Settlement predetermine the amount and the treatment of the Secured Lenders'

---

[18]     The Settlement includes broad releases for (a) all the Secured Lenders who do not opt out of the Settlement, (b) the Debtors and their estates, (c) the Non-Debtor Guarantors, and (d) each of their respective direct and indirect parent companies, subsidiaries, and affiliates, each of their respective predecessors, successors, and assigns, and all of each of their respective past and present employees, general partners, officers, directors, managers, stockholders, and professionals. *See* 9019 Motion at ¶ 4.

claims prior to plan confirmation, but the Secured Lenders' claims are proposed to be *paid* prior to confirmation.

64.    The Debtors' misguided understanding of the appropriate scope of a Bankruptcy Rule 9019 compromise is embodied by their misplaced reliance on *In re Louise's, Inc.*, 211 B.R. at 798. *See* 9019 Motion at ¶ 29.   In *In re Louise's* – relied upon by the Debtors in support of the approval of their proposed 9019 Settlement – the court *denied* approval of a proposed settlement where, as here, the settlement was "really a proposed plan of reorganization disguised as a Rule 9019 compromise" that "exceed[ed] the boundaries of a Rule 9019 compromise." *Id.* at 801.   Indeed, the Debtors *themselves* have admitted that the outcome of their 9019 Motion "necessarily will dictate the form and substance of a chapter 11 plan." *Debtors' Second Motion Pursuant to Section 1121(d) of the Bankruptcy Code for an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances* Thereof, dated August 25, 2010 [Docket No. 1597], ¶ 18.

65.    Given the vast uncertainties associated with the liquidation of the so-called "pledge pool," there is a real question as to whether the Debtors' proposed scheme of replacing unsecured creditors' cash with an interest in the pledge pool would satisfy the "best interests of creditors test" of section 1129(a)(7) and the feasibility requirement of section 1129(a)(11), among others.   At a minimum, creditors are entitled to the disclosure required by section 1125 of the Bankruptcy Code – including information regarding the Debtors' ability to fund future liquidation activities and support existing investments – before considering whether this *de facto* plan passes muster. *In re Hillsborough Holdings Corp.*, 153 B.R. at 940 (refusing to approve a settlement that would "preordain the treatment of creditors" and bind other parties "without the benefit of the confirmation process.")   Indeed, the Debtors' proposed scheme is far more

prejudicial than other transactions that have been struck down by bankruptcy courts as dictating the terms of a chapter 11 plan *sub rosa* and binding the other parties in interest.  The Debtors should not be permitted to make distributions to the Secured Lenders from unencumbered cash without satisfying the various requirements of section 1129 of the Bankruptcy Code.

66.    Based on the foregoing, the terms of the proposed Settlement substantially determine the nature of the Debtors' future chapter 11 plan in clear violation of the principles articulated in *Braniff Airways* and its progeny, and the Court should deny approval of the Settlement as an impermissible *sub rosa* plan.

## CONCLUSION

The *Ad Hoc* Group requests that this Court (i) deny the 9019 Motion and grant the Committee standing to prosecute and, subject to approval of the Court, settle the Causes of Action, (ii), in the alternative, adjourn the hearing on the Settlement until confirmation of a chapter 11 plan in these cases, and (iii) grant such other relief as is just and proper.

Dated: Wilmington, Delaware
       October 6, 2010

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____

Robert J. Dehney, Esq. (No. 3578)
Gregory T. Donilon, Esq. (No. 4244)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

-and-

MILBANK, TWEED, HADLEY & McCLOY LLP
Matthew S. Barr
Tyson M. Lomazow
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

-and-

JENNER & BLOCK LLP
Andrew Weissmann
Marc Hankin
Brian J. Fischer
919 3rd Ave, 37th Floor
New York, New York 10022
Telephone: (212) 891-1600
Facsimile: (212) 891-1699

*Attorneys for Ad Hoc Group of Holders of
Capmark's Unsecured Bank Debt*