## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CAPMARK FINANCIAL GROUP, INC., *et al.*, | Case No. 09-13684 (CSS) (Jointly Administered) |
| Debtors. | Hearing Date: October 14, 2010 at 9:30 a.m. |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' (I) OBJECTION TO
DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 9019 AND
BANKRUPTCY CODE SECTIONS 363(b) AND 549(a)(2)(B) AND (II) REPLY TO
OBJECTIONS TO THE COMMITTEE'S MOTION FOR ENTRY OF
AN ORDER GRANTING IT LEAVE, STANDING AND AUTHORITY TO
PROSECUTE CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES**

KL3 2797170 10

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 2

FACTUAL BACKGROUND ............................................................................................. 4

ARGUMENT ..................................................................................................................... 6

I.    THE PROPOSED DISTRIBUTIONS TO THE LENDERS ARE
      IMPERMISSIBLE UNDER THE BANKRUPTCY CODE ..................................... 6

      A.    The Debtors Are Not Authorized to Use Unencumbered Cash to
            Pay Prepetition Claims Prior to the Confirmation of a Plan ......................... 6

      B.    The Debtors May Not Circumvent Critical Chapter 11 Protections by
            Purporting to Implement the Settlement Under 11 U.S.C. § 363(b) ............. 8

      C.    The Debtors Have Not Shown that the Settlement Is Better than
            Liquidation for Unsecured Creditors ......................................................... 11

II.   THE SETTLEMENT SHOULD BE REJECTED BY THE COURT ON
      ITS OWN TERMS ............................................................................................... 14

      A.    The Settlement Is Outside the Range of Reasonableness .......................... 16

            1.    The Vast Benefit of the Settlement to the Lenders Renders
                  the Supposed Settlement "Discount" Illusory ................................. 16

            2.    The Claims Against the Lenders Have Significant Value ................. 17

                  a.    The Settlement is Unreasonable Given the Merits of
                        the Constructive Fraudulent Conveyance Claim ..................... 17

                        i     The Debtors Did Not Receive Reasonably Equivalent
                              Value in Exchange for the Liens ..................................... 17

                        ii    The Secured Lenders Cannot Employ Section 548(c) ...... 21

                  b.    The Guaranty Claims Settled at 91% of $1.5 Billion Are Limited
                        By Their Terms to Approximately 17% of that Amount and
                        Thus The Settlement is Outside of the Range of Reasonableness ......... 24

i

## TABLE OF CONTENTS
### (continued)

Page

|   |   |   |   |
|---|---|---|---|
|   |   | 3. | The Settlement Is Not in the Paramount Interest of Creditors Because Even the Purported Settlement Amount is Not Within the Range of Reasonable Recoveries ...................................................................30 |
|   | B. | The Settlement Is Not in the Paramount Interest of Creditors Because the Negotiation Process Was Flawed and the Settlement Was Not an Arms Length Transaction ..........................................................................32 |   |
| III. | THE STANDING MOTION SHOULD BE GRANTED ....................................................35 |   |   |
|   | A. | The Standing Motion Is Essentially Unopposed as to the Insider Preference Claims......................................................................................36 |   |
|   | B. | The Debtors Have Unjustifiably Failed to Pursue the Constructive Fraudulent Conveyance Claim ....................................................................38 |   |
|   |   | 1. | The Debtors are Conflicted..............................................................38 |
|   |   | 2. | The Debtors Have Failed to Pursue the Claims................................40 |
|   | C. | The Claims are Colorable ........................................................................42 |   |
|   | D. | Litigation Would Benefit the Debtors' Estates.........................................45 |   |
| CONCLUSION........................................................................................................49 |   |   |   |
| ADDENDUM A .......................................................................................................51 |   |   |   |

KL3 2797170 10

## TABLE OF AUTHORITIES

Page

### CASES

*In re Abbotts Dairies of Pa., Inc.,*
788 F.2d 143 (3d Cir. 1986) .................................................................................................8

*ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.),*
361 B.R. 337 (S.D.N.Y. 2007),
*aff'd,* 544 F.3d 420 (2d Cir. 2008).......................................................................................41

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.),*
330 B.R. 364 (Bankr. S.D.N.Y. 2005)..................................................................40, 44, 46, 47

*In re After Six,*
154 B.R. 876 (Bankr. E.D. Pa. 1993) ............................................................................16 n.7

*Air Line Pilots Ass'n Int'l v. Am. Nat'l Bank & Trust Co. of Chicago*
*(In re Ionosphere Clubs, Inc.),*
156 B.R. 414 (S.D.N.Y. 1993),
*aff'd,* 17 F.3d 600 (2d Cir. 1994).........................................................................................32

*Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.),*
423 B.R. 76 (Bankr. D. Del. 2010)...........................................................................18, 42, 43

*In re Applied Theory Corp.,*
Nos. 02-11868 through 02-11874, 2008 Bankr. LEXIS 1373
(Bankr. S.D.N.Y. Apr. 24, 2008).............................................................................................8

*Argus Mgmt. Group v. Rodman (In re CVEO Corp.),*
No. 01-0223 (MFW), 2004 Bankr. LEXIS 2123 (Bankr. D. Del. Dec. 15, 2004) ................22

*In re Arkoosh Produce, Inc.,*
No. 00-41817, 2003 Bankr. LEXIS 2222 (Bankr. D. Idaho July 1, 2003)......................30, 31

*In re Arter & Hadden, LLP,*
373 B.R. 31 (Bankr. N.D. Ohio 2007)...................................................................................33

*ASARCO LLC v. Ams. Mining Corp.,*
396 B.R. 278 (S.D. Tex. 2008)...............................................................................................18

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009).................................................................................................42, 43

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Babcock & Wilcox Co.,*
250 F.3d 955 (5th Cir. 2001) ........................................................................................................9

*Bayou Superfund LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC),*
362 B.R. 624 (Bankr. S.D.N.Y. 2007) ........................................................................................22

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ...............................................................................................................42, 43

*Blixseth v. Kirschner (In re Yellowstone Mountain Club LLC),*
No. 08-61570-11, Adv. No. 09-00014, 2010 Bankr. LEXIS 2702
(Bankr. D. Mont. Aug. 16, 2010) ...............................................................................................29

*Charys Liquidating Trust v. Growth Mgmt., LLC (In re Charys Holding Co.),*
No. 08-10289 (BLS), Adv. Pro. No. 10-50204 (BLS), 2010 Bankr. LEXIS 2073
(Bankr. D. Del. July 14, 2010) ....................................................................................................44

*In re Columbia Gas Sys., Inc.,*
171 B.R. 189 (Bankr. D. Del. 1994) .............................................................................................6

*In re Columbia Gas Sys., Inc.,*
No. 91-803, 1995 Bankr. LEXIS 936 (Bankr. D. Del. June 16, 1995) ......................................32

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),*
722 F.2d 1063 (2d Cir. 1983) ........................................................................................................9

*Comm. of Unsecured Creditors of Interstate Cigar Co. v. Interstate Cigar Distribution*
*(In re Interstate Cigar Co.),*
240 B.R. 816 (Bankr. E.D.N.Y. 1999) ........................................................................................15

*Commodore International v. Gould (In re Commodore International Ltd.),*
262 F.3d 96 (2d Cir. 2001) ..........................................................................................................41

*Contrarian Funds, LLC v. WestPoint Stevens, Inc. (In re WestPoint Stevens, Inc.),*
333 B.R. 30 (S.D.N.Y. 2005),
*rev'd on other grounds,* 600 F.3d 231 (2d Cir. 2010) ..........................................................10, 11

*Cooper v. Centar Invs. (Asia) Ltd. (In re TriGem Am. Corp.),*
431 B.R. 855 (Bankr. C.D. Cal. 2010) ........................................................................................29

*In re Copperfield Invs., LLC,*
421 B.R. 604 (Bankr. E.D.N.Y. 2010) ........................................................................................44

## TABLE OF AUTHORITIES
### (continued)

Page

*Covey v. Commercial Nat'l Bank,*
   960 F.2d 657 (7th Cir. 1992) .......................................................................................27, 28

*In re Crowthers McCall Pattern, Inc.,*
   120 B.R. 279 (Bankr. S.D.N.Y. 1990)..................................................................................12

*Cullen v. Riley (In re Masters Mates & Pilots Pension Plan),*
   957 F.2d 1020 (2d Cir. 1992) ...............................................................................................33

*In re Dalen,*
   259 B.R. 586 (Bankr. W.D. Mich. 2001) ..............................................................................11

*In re Del. & Hudson Ry.,*
   124 B.R. 169 (D. Del. 1991)....................................................................................................8

*EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.),*
   No. 09-1554, 2010 U.S. App. LEXIS 11183 (3d Cir. June 1, 2010).....................................18

*In re Eastwind Group, Inc.,*
   303 B.R. 743 (Bankr. E.D. Pa. 2004) .....................................................................................8

*Eddy v. Nat'l Union Fire Ins. Co. (In re Med. Asset Mgmt., Inc.),*
   249 B.R. 659 (Bankr. W.D. Pa. 2000)...................................................................................33

*In re Exide Techs.,*
   303 B.R. 48 (Bankr. D. Del. 2003)............................................................................15, 30, 32

*Fowler v. UPMC Shadyside,*
   578 F.3d 203 (3d Cir. 2009) ..................................................................................................42

*G-I Holdings, Inc. v. Those Parties Listed On Exhibit A (In re G-I Holdings, Inc.),*
   313 B.R. 612 (Bankr. D.N.J. 2004),
   *rev'd in part and remanded,* 2006 U.S. Dist. LEXIS 45510
   (D.N.J. June 21, 2006)....................................................................................38, 39, 42, 46

*In re Genesis Health Ventures, Inc.,*
   266 B.R. 591 (Bankr. D. Del. 2001).....................................................................................12

*Gredd v. Bear, Stearns Sec. Corp. (Manhattan Inv. Fund, Ltd.),*
   310 B.R. 500 (Bankr. S.D.N.Y. 2002)...................................................................................23

v

## TABLE OF AUTHORITIES
### (continued)

*In re GTI Capital Holdings, LLC,*
   373 B.R. 671 (Bankr. D. Ariz. 2007)....................................................................................18

*Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.),*
   316 B.R. 141 (D. Del. 2004)................................................................................................35

*Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc.*
*(In re Continental Air Lines, Inc.),*
   780 F.2d 1223 (5th Cir. 1986) ........................................................................................9, 10

*In re Iridium Operating LLC,*
   478 F.3d 452 (2d Cir. 2007) ...............................................................................................11

*In re Just For Feet, Inc.,*
   242 B.R. 821 (D. Del. 1999)..................................................................................................6

*In re LTV Steel Co.,*
   333 B.R. 397 (Bankr. N.D. Ohio 2005)..........................................................................47, 49

*Lavigna v. Lipshie (In re Wise),*
   173 B.R. 75 (Bankr. E.D.N.Y. 1994) ..................................................................................23

*In re Le-Nature's Inc.,*
   No. 08-1518, 2009 U.S. Dist. LEXIS 85073 (W.D. Pa. Sept. 16, 2009)........................43 n.19

*In re Lehigh & New England Ry.,*
   657 F.2d 570 (3d Cir. 1981) .............................................................................................6, 7

*In re Matco Elecs. Group, Inc.,*
   287 B.R. 68 (Bankr. N.D.N.Y. 2002) ..................................................................................15

*In re MCorp Fin., Inc.,*
   137 B.R. 219 (Bankr. S.D. Tex. 1992) ................................................................................12

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.,*
   945 F.2d 635 (3d Cir. 1991) ...............................................................................................29

*Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L.*
*(In re R.M.L., Inc.),*
   92 F.3d 139 (3d Cir. 1996) .............................................................................18, 26, 28, 44

## TABLE OF AUTHORITIES
### (continued)

Page

*In re MIG, Inc.,*
No. 09-12118(KG), 2009 Bankr. LEXIS 4313 (Bankr. D. Del. Dec. 18, 2009) ....................43

*Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Servs., Inc.),*
361 B.R. 747 (Bankr. D. Del. 2007) ..............................................................................................44

*Myers v. Martin (In re Martin),*
91 F.3d 389 (3d Cir. 1996) ......................................................................................................14

*In re Nat'l Org. for Children, Inc.,*
No. 06-10777ELF, 2007 Bankr. LEXIS 1878 (Bankr. E.D. Pa. May 31, 2007).......................8

*In re Neenah Enters.,*
Case No. 10-10360, 2010 Bankr. LEXIS 3058 (Bankr. D. Del. July 6, 2010) .......................11

*In re Nicolet,*
80 B.R. 733 (Bankr. E.D. Pa. 1987) .....................................................................................41

*In re Northwestern Corp.,*
No. 03-12872 (CGC), 2004 Bankr. LEXIS 1022 (Bankr. D. Del. July 23, 2004) ................32

*In re Nutritional Sourcing Corp.,*
398 B.R. 816 (Bankr. D. Del. 2008) .....................................................................................33

*Official Comm. of Asbestos Claimants v. Bank of N.Y. (In re G-I Holdings, Inc.),*
No. 04-3423, 2006 U.S. Dist. LEXIS 45510 (D.N.J. June 21, 2006).........................35, 42, 46

*Official Comm. of Asbestos Personal Injury Claimants v. Sealed Air Corp.*
*(In re W.R. Grace & Co.),*
281 B.R. 852 (Bankr. D. Del. 2002)..............................................................................27 n.14

*Official Comm. of Equity Sec. Holders v. Mabey,*
832 F.2d 299 (4th Cir. 1987) ...................................................................................................7

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel.*
*Cybergenics Corp. v. Chinery,*
330 F.3d 548 (3d Cir. 2003) ...................................................................................................40

*Official Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat'l Amusements Inc.*
*(In re Midway Games Inc.),*
428 B.R. 303 (Bankr. D. Del. 2010) .................................................................................36, 45

KL3 2797170 10

## TABLE OF AUTHORITIES
### (continued)

*Official Comm. of Unsecured Creditors of Wickes v. Wilson,*
  No. 06 C 0869, 2006 U.S. Dist. LEXIS 32602 (N.D. Ill. May 23, 2006) ...............................48

*Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.),*
  304 B.R. 214 (Bankr. W.D. Pa. 2004).............................................................................38, 48

*Official Committee of Equity Security Holders v. Monsanto Co. (In re Solutia Inc.),*
  No. 03-17949 (PCB), 2006 Bankr. LEXIS 2295 (Bankr. S.D.N.Y. Sept. 14, 2006) .......41, 42

*PW Enters. v. N.D. Racing Commc'ns (In re Racing Servs., Inc.),*
  540 F.3d 892 (8th Cir. 2008) ................................................................................................46

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),*
  700 F.2d 935 (5th Cir. 1983) ..................................................................................................9

*Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer
  Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.),*
  444 F.3d 203 (3d Cir. 2006) .................................................................................................44

*In re Phoenix Steel Corp.,*
  82 B.R. 334 (Bankr. D. Del. 1987)..........................................................................................8

*In re Present Co.,*
  141 B.R. 18 (Bankr. W.D.N.Y. 1992) ...................................................................................40

*Rosenberg Real Estate Equity Fund III v. Air Beds, Inc. (In re Air Beds, Inc.),*
  92 B.R. 419 (B.A.P. 9th Cir. 1988) ....................................................................................6, 8

*In re Saba Enters.,*
  421 B.R. 626 (Bankr. S.D.N.Y. 2009)...........................................................................43 n.19

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.),*
  337 B.R. 791 (Bankr. S.D.N.Y. 2005)...................................................................................22

*In re S.N.A. Nut Co.,*
  186 B.R. 98 (Bankr. N.D. Ill. 1995) .....................................................................................15

*Southern Pac. Transp. Co. v. Voluntary Purchasing Groups, Inc.,*
  252 B.R. 373 (E.D. Tex. 2000).............................................................................................12

*In re Spansion, Inc.,*
  No. 09-10690 (KJC), 2009 Bankr. LEXIS 1283 (Bankr. D. Del. June 2, 2009)..............14, 31

### TABLE OF AUTHORITIES
(continued)

Page

*In re STN Enters.,*
   779 F.2d 901 (2d Cir. 1985) ...................................................................................36, 43, 46

*United States v. Aweco, Inc. (In re Aweco, Inc.),*
   725 F.2d 293 (5th Cir. 1984) ........................................................................................11, 33

*In re W. Pointe Props., L.P.,*
   249 B.R. 273 (Bankr. E.D. Tenn. 2000) ..............................................................................31

*In re Xonics Photochemical, Inc.,*
   841 F.2d 198 (7th Cir. 1988) ...............................................................................26, 27, 28

### STATUTES

11 U.S.C. § 105(a) .................................................................................................................7

11 U.S.C. § 363(b) .....................................................................................................8, 9, 10, 11

11 U.S.C. § 544(b) .................................................................................................................35

11 U.S.C. § 548(c) ................................................................................................18, 21, 21 n.11

11 U.S.C. § 1101 *et seq.* ........................................................................................................6

11 U.S.C. § 1123(a)(5) ......................................................................................................6, 8

11 U.S.C. § 1125 .................................................................................................................10

11 U.S.C. § 1126 .................................................................................................................10

11 U.S.C. § 1129(a) ..................................................................................................9, 10, 11, 12

11 U.S.C. § 1129(b) ...........................................................................................................10,11

Fed. R. Bankr. P. 3021 .........................................................................................................6

Fed. R. Bankr. P. 2004 ....................................................................................................36 n.16

Fed. R. Bankr. P. 9019 ..................................................................................................*passim*

KL3 2797170 10

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CAPMARK FINANCIAL GROUP, INC., *et al.*, | Case No. 09-13684 (CSS) (Jointly Administered) |
| Debtors. | |
| | **Hearing Date: October 14, 2010 at 9:30 a.m.** |

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS' (I) OBJECTION TO DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 9019 AND BANKRUPTCY CODE SECTIONS 363(b) AND 549(a)(2)(B) AND (II) REPLY TO OBJECTIONS TO THE COMMITTEE'S MOTION FOR ENTRY OF AN ORDER GRANTING IT LEAVE, STANDING AND AUTHORITY TO PROSECUTE CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES

The Official Committee of Unsecured Creditors (the "Committee") of the above-

captioned debtors and debtors-in-possession (collectively, the "Debtors," or "Capmark"), by and

through its undersigned counsel, hereby: (i) objects to the *Debtors' Motion, Pursuant to*

*Bankruptcy Rule 9019 and Bankruptcy Code Sections 363(b) and 549(a)(2)(B), for an Order*

*Approving Settlement Between Debtors and Their Prepetition Secured Credit Facility Lenders*

[Docket No. 1636] (the "9019 Motion"), and (ii) replies to the objections and responses of the

Debtors [Docket No. 1620] (the "Debtors' Objection"), Citicorp North America Inc. [Docket No.

1619] (the "Citicorp Objection"), the Ad Hoc Committee of Prepetition Secured Lenders

[Docket No. 1615] (the "Secured Lenders' Objection"), the Goldman Lenders [Docket No. 1616]

(the "Goldman Response"), and Dune Real Estate [Docket No. 1610] (the "Dune Response")

(collectively, the "STN Objections") to the Committee's motion [Docket No. 1526] (the

"Standing Motion") seeking entry of an order authorizing the Committee to prosecute various

claims and causes of action on behalf of the Debtors' estates.  In support of this objection and

reply (the "Objection"), the Committee respectfully represents as follows:[1]

## PRELIMINARY STATEMENT

1.      In May 2009, the Debtors secured $1.5 billion of previously unsecured upstream guaranties. The Committee has asserted that the security interests are voidable as a fraudulent transfer and that the guaranties are limited by their terms and applicable law. The Debtors propose to settle claims against their secured lenders by an immediate 91% cash distribution paid, in substantial part, from $735 million in unencumbered cash that would otherwise go to unsecured creditors.

2.      The settlement thus compels a swap: cash for collateral consisting of a portfolio of mixed quality mortgages and real estate assets. The swap violates the Bankruptcy Code and falls below the range of reasonableness required by Rule 9019.

3.      Under the Code, the Debtors have no authority to pay prepetition claims prior to confirmation of a plan (and ignore the substantive and procedural protections of a plan process) unless such payment is necessary to preserve the value of an ongoing business. These Debtors are liquidating. Under the Code, the Debtors cannot do in a settlement what they could not do under a plan: the Debtors cannot swap unencumbered cash for collateral unless the Debtors can prove that unsecured creditors do better under the swap than they would in liquidation. The Debtors have offered no proof and have not met their burden.

4.      Under Rule 9019, the Settlement must be in the range of reasonableness. The Settlement fails that test. The benefits are nominal and, as noted above, unproven; the claims settled have significant value. Because the Debtors do not dispute that they were insolvent in

---

[1] Capitalized terms not defined herein have the meanings assigned to them in the Standing Motion. Certain factual materials cited herein are attached as exhibits to the Declaration of Jeffrey R. Gleit (the "Gleit Decl.") filed herewith.

May 2009, the Committee's fraudulent transfer challenge to the Lenders' security interest turns solely on the question whether the Debtors received reasonably equivalent value in exchange for granting $1.5 billion in liens on their property just weeks outside the 90-day non-insider preference period. Under Third Circuit law, this determination is fact-specific and cannot be disposed of summarily. The Debtors assert a repetitive laundry list of supposed indirect benefits from the refinancing, but fail to offer affirmative evidence that much the same results could not have been achieved without granting massive liens on their assets.

5.      Finally, discovery shows that the Debtors accorded no value to the Committee's separate challenge to the *amount* of the Lenders' upstream guaranty claim against CFI (the "Guaranty Limitation Claim"). The Lenders' claims under the guaranties, first issued in 2006, are limited by a "savings clause" to amounts that would not create a fraudulent conveyance. Because CFI's net worth in 2006 was only around **Redacted**   , that was the most it could guaranty without becoming insolvent, and that amount was spread out over $8.7 billion of outstanding unsecured debt (with 17.2%, or approximately **Redacted**   , attributable to the $1.5 billion in debt eventually retired). When the Debtors essentially exchanged that amount of unsecured debt for secured debt in 2009, CFI was insolvent and unable to *increase* the amount of its guaranty. Thus, the Lenders in the Secured Credit Facility could do no more than step into the shoes of the unsecured banks, with the same **Redacted**   in asset value allocated to back up the new $1.5 billion facility.

6.      Accordingly, even if the Lenders are secured, their security is limited to this share of CFI's assets. Attempting to avoid this conclusion, the Debtors argue that the guaranties must be "discounted" for fraudulent conveyance purposes based on the supposedly remote likelihood that they would be called, ignoring that (i) the guaranty at issue here was *not* contingent but

3

made CFI directly liable as a primary obligor, and (ii) CFI's ownership of the bulk of Capmark's valuable assets made it exceedingly likely that its value would be deployed to satisfy the Secured Credit Facility, whether through default or refinancing.

7.      A separate ground for denying approval to the Settlement is the skewed process that generated it. The Debtors were in an uncomfortable and conflicted position. They had to scrutinize and challenge their own decision to encumber the Debtors' assets on the brink of bankruptcy in a transaction that required a unilateral amendment to the Debtors' bond indenture now the subject of litigation outside this bankruptcy. Discovery shows that the Debtors did not try to get the most for the claims – indeed, their counsel promised the Lenders par subject only to the need to meet the requirements of Rule 9019.

8.      This flawed process independently supports both denial of the 9019 Motion and granting of the Standing Motion to permit the Committee to pursue the Claims against the Lenders as a vigorous, unconflicted fiduciary. The Claims against the Lenders are colorable, well-pleaded, and present massive upside for the estates. Rather than permitting the conflicted Debtors essentially to give the Claims away for a peppercorn, the Court should deny the 9019 Motion, grant the Standing Motion, and permit the real parties in interest to advocate for their own interests.

## FACTUAL BACKGROUND

9.      The factual background of the Debtors' financial history, including the incurrence of its unsecured debt in 2006 and 2007 and the exchange of $1.5 billion of unsecured bank debt into secured bank debt in 2009, is set forth in detail in the Committee's Standing Motion and is incorporated herein by reference.

4

KL3 2797170 10

10.     Within two weeks after the filing of the Standing Motion and the Committee's motion seeking the termination of further principal payments under the Cash Collateral Order, the Debtors informed the Committee that they had reached a settlement with the Lenders. Although the Debtors' professionals gave the Committee an overview of what the settlement generally entailed, it was not until the 9019 Motion was filed on the Friday night of Labor Day weekend that the Committee was able to review the actual settlement agreement.[2]  In addition, there were no discussions between the Debtors and the Committee regarding any settlement following the filing of the Standing Motion and, with perhaps one or two exceptions, virtually no communications about the Settlement whatsoever.

11.     As set forth in the 9019 Motion, the Debtors have reached an agreement with the Lenders to settle the significant causes of action that the Debtors' estates possess (as described below and in the Standing Motion) (the "Settlement").[3]  In exchange for a full release of these causes of action, the Lenders have agreed to what the Debtors characterize in their motion as "a 9% reduction in the principal amount of such claims as of the petition date." 9019 Motion ¶ 4. To obtain this 9% discount, the Debtors must pay, primarily from cash that is not encumbered by the Lenders' liens, the outstanding settled amount of the Lenders' claim – approximately $965 million[4] – by no later than November 30, 2010.  The Lenders would also receive post-petition

---

[2] Indeed, although the Debtors mentioned the Settlement in a number of pleadings, the only detail disclosed had been the alleged 9% discount.  There was no mention that the Debtors would be required to immediately pay the entire balance of the settled claim amount in cash.

[3] Although the Settlement Agreement (as defined in the 9019 Motion) was executed only with certain of the Lenders, the Committee understands that the Debtors have not received any Opt Out Notices (as defined in the 9019 Motion) and, accordingly, the Settlement Agreement has been accepted by all of the Lenders.

[4] The face amount of the Lenders' claim is $1.5 billion.  Pursuant to the Cash Collateral Order, over the course of these cases the Lenders have received approximately $400 million in principal repayments, leaving a balance of $1.1 billion. Subtracting the agreed-to discount of $135 million leaves a balance of

interest, fees, and expenses – amounts to which the Lenders would not be entitled if the

Committee were successful in prosecuting the various causes of action against them.[5]

## ARGUMENT

## I.   THE PROPOSED DISTRIBUTIONS TO THE LENDERS ARE
IMPERMISSIBLE UNDER THE BANKRUPTCY CODE

### A.   The Debtors Are Not Authorized to Use Unencumbered Cash
to Pay Prepetition Claims Prior to the Confirmation of a Plan

12.   In a chapter 11 case, "a distribution on pre-petition debt . . . should not take place

except pursuant to a confirmed plan of reorganization, absent extraordinary circumstances."

*Rosenberg Real Estate Equity Fund III v. Air Beds, Inc. (In re Air Beds, Inc.),* 92 B.R. 419, 422

(B.A.P. 9th Cir. 1988). *See* 11 U.S.C. § 1101 *et seq.*; Fed. R. Bankr. P. 3021 (authorizing

distribution to creditors only after plan is confirmed and claim is allowed). This rule reflects, in

part, a concern that disposing of assets prematurely may deprive a debtor of the means necessary

to implement a plan, in violation of 11 U.S.C. § 1123(a)(5). *Air Beds,* 92 B.R. at 423.

13.   A court may authorize the interim payment of prepetition claims only where it is

*essential* to the continued operation of a reorganizing debtor. *In re Lehigh & New England Ry.,*

657 F.2d 570, 581-82 (3d Cir. 1981); *see also In re Just For Feet, Inc.,* 242 B.R. 821, 824-25

(D. Del. 1999) (finding that payment of prepetition claims of certain trade vendors was critical to

debtor's survival during chapter 11 reorganization); *In re Columbia Gas Sys., Inc.,* 171 B.R. 189,

191-92 (Bankr. D. Del. 1994) (finding no legal basis to approve settlement to immediately pay

---

$965 million. The Debtors have approximately $230 million in cash that are proceeds of the Lenders'
collateral. Accordingly, the Debtors will need to use approximately $735 million in unencumbered cash
to consummate the Settlement Agreement.

[5] Under the Settlement, the Prepetition Agents would receive fees and expenses through the date of a
chapter 11 plan, notwithstanding that, if the Settlement is approved, the amounts under the Secured
Facility will long before have been paid in full.

prepetition obligations to creditors because "to justify payment of one class of pre-prepetition creditors in advance of a confirmed plan, the debtor must show that payment is essential to the continued operation of the business"). This standard is commonly referred to as the "necessity of payment" doctrine. In *Lehigh*, the court explained that "to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the continued operation of the [debtor's business] in serious jeopardy." 657 F.2d at 581-82. In such circumstances, payment is in the interest of all parties. *Id.* The Third Circuit held that the "necessity of payment" rule had no application in *Lehigh* since the business of the debtor was no longer in operation. *Id.*

14.     Even powerful equitable considerations are insufficient to overrule the bar on interim distributions. *See Official Comm. of Equity Sec. Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir. 1987). In *Mabey*, the Fourth Circuit reversed approval of an emergency treatment fund established to assist claimants seriously injured by the use of a contraceptive device marketed by the debtor, holding that the Bankruptcy Code does not permit payment of prepetition creditors "except under and pursuant to a plan of reorganization that has been properly presented and approved," and that this limitation could not be circumvented by invoking the bankruptcy court's equitable powers under 11 U.S.C. § 105(a). *See* 832 F.2d at 302.

15.     Here, the proposed Settlement requires the Debtors to pay prepetition obligations with property of the estates (including $735 million of unencumbered cash) over the objection of unsecured creditors and in advance of a confirmed (or even proposed) plan. This payment cannot be justified under the "necessity of payment" doctrine, because the Debtors (like the debtor in *Lehigh*) are no longer operating an active business but are instead liquidating. Disposing of most of the estates' unencumbered cash in one fell swoop risks impairing the

7

Debtors' ability to fund a plan, raising the very 11 U.S.C. § 1123(a)(5) concern noted in *In re Air Beds*. The Settlement thus must be rejected at the threshold for the simple reason that it improperly uses unencumbered cash to pay prepetition creditors outside of and prior to approval of a plan.

## B. The Debtors May Not Circumvent Critical Chapter 11 Protections by Purporting to Implement the Settlement Under 11 U.S.C. § 363(b)

16.     The Debtors rely on Bankruptcy Code Section 363(b) and case law thereunder to argue that the Settlement's swap of cash-for-collateral can be approved so long as the Debtors can demonstrate that (i) the Settlement is supported by the sound exercise of the debtor's business judgment, (ii) the terms are fair and equitable, and (iii) the Settlement is being entered into in good faith. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147-50 (3d Cir. 1986); *In re Del. & Hudson Ry.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

17.     As an initial matter, the Debtors' reliance on their business judgment is misplaced because the Debtors are seeking to approve a settlement. In determining whether or not to approve a settlement, a court does not defer to the debtor's business judgment, but, rather, "the trustee still bears the burden of proving that the settlement is fair and equitable and therefore, should be approved." *See In re Nat'l Org. for Children, Inc.*, No. 06-10777ELF, 2007 Bankr. LEXIS 1878, at \*23 (Bankr. E.D. Pa. May 31, 2007) (citing *In re Eastwind Group, Inc.*, 303 B.R. 743, 750-51 (Bankr. E.D. Pa. 2004)). The debtor's burden is "to provide the court with sufficient information *to permit the court to conclude* that the compromise falls within the reasonable range of litigation possibilities." *Nat'l Org. for Children*, 2007 Bankr. LEXIS 1878, at \*23 (citing *Key3Media Group, Inc. v. Pulver.com, Inc. (In re Key3Media Group, Inc.)*, 336 B.R. 87, 93 (Bankr. D. Del. 2005)) (emphasis added). *See also In re Applied Theory Corp.*, Nos.

8

02-11868 through 02-11874, 2008 Bankr. LEXIS 1373, at \*22 (Bankr. S.D.N.Y. Apr. 24, 2008) ("While the Trustee more than adequately evidenced appropriate care and business judgment in negotiating the settlement, on a motion for approval of a settlement under Fed.R.Bankr.P. 9019 (as contrasted, e.g., to a motion under section 363), *that is not the test. A bankruptcy court must find, instead, that the settlement is in the best interests of the estate*.") (emphasis added). The Debtors' purported exercised of business judgment is thus an insufficient basis on which to approve the Settlement.

18. It is well established, moreover, that Section 363(b) is not to be used as a means of avoiding Chapter 11's plan confirmation procedures. "[T]he provisions of § 363 permitting a trustee to use, sell, or lease the assets *do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan*." *In re Babcock & Wilcox Co.*, 250 F.3d 955, 960 (5th Cir. 2001) (emphasis added); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1069, 1071 (2d Cir. 1983) (recognizing that unfettered use of Section 363 "swallows up Chapter 11's safeguards" and cautioning against "short-circuit[ing] or side-step[ping] Chapter 11"); *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with the sale of assets.").

19. In *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223 (5th Cir. 1986), the Fifth Circuit clarified that *Braniff* is not limited to sales that dictate the terms of a plan but rather is implicated any time a critical chapter 11 protection (including Section 1129(a)(7)), is threatened through transactions

9

under Section 363(b). "[I]f a debtor were allowed to reorganize the estate in some fundamental fashion pursuant to § 363(b), creditor's rights under, for example, 11 U.S.C. §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) might become meaningless. Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposal were first raised in the reorganization plan." *Id.* at 1227.

20.     Most importantly, "[n]othing in the language of the relevant subsections of Bankruptcy Code Section 363 . . . provides the Bankruptcy Court with authority to impair the claim satisfaction rights of objecting creditors." *Contrarian Funds, LLC v. WestPoint Stevens, Inc. (In re WestPoint Stevens, Inc.)*, 333 B.R. 30, 51 (S.D.N.Y. 2005), *rev'd on other grounds*, 600 F.3d 231 (2d Cir. 2010). "The fact that a transaction including a section 363(b) sale of assets may ultimately be in the best economic interests of a debtor's various constituencies does not authorize the court to ignore the creditors' rights and procedural requirements of Chapter 11." *Id.* at 52.

21.     In *WestPoint Stevens*, the Bankruptcy Court approved a proposed sale of the debtors' business in return for stock and subscription rights in the purchaser and provided for the secured lenders' liens to attach to those non-cash sale proceeds. The court, however, proceeded further to explicitly determine the value of the secured creditors' claims and then allocate a precise amount of the (non-cash) sale consideration to various creditors in satisfaction of those claims. 333 B.R. at 35-36. The District Court reversed the Bankruptcy Court's determinations and held that valuing claims and allocating consideration in respect of the secured creditors' claims exceeded the Bankruptcy Court's authority under Section 363(b) and improperly encroached on the plan process. *Id.* at 50-55.

10

22.     As in *WestPoint Stevens*, the Debtors here seek the Court's authorization, prior to

even proposing a plan, to perform direct distributions to secured creditors and to impair the claim

satisfaction rights of all unsecured creditors by requiring them to look to the Lenders' collateral

for payment rather than the unencumbered cash to which they would otherwise be entitled. The

Debtors even admit that the outcome of the 9019 Motion "necessarily will dictate the form and

substance of a chapter 11 plan." *See Debtors' Second Motion Pursuant to Section 1121(d) of the

Bankruptcy Code for an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and

Solicit Acceptances Thereof,* dated August 25, 2010 [Docket No. 1597], ¶ 18. The Settlement, if

approved, will indisputably change the fundamental nature of the estates' assets and limit a

future reorganization plan, which Section 363(b) does not authorize.

## C.    The Debtors Have Not Shown that the Settlement Is Better than Liquidation for Unsecured Creditors

23.     Even if the Debtors were not categorically barred from fundamentally altering the

estates' asset base by using \$735 million of free cash to make distributions on prepetition claims

outside of a plan process, the Court should not approve the proposed Settlement unless the same

transaction could be accomplished under a plan of reorganization; the Debtors should not be

permitted to do through a Rule 9019 settlement what they could not do under a plan. The burden

is on the Debtors. They must show, by a preponderance of the evidence, *see In re Neenah

Enterprises*, Case No. 10-10360, 2010 Bankr. LEXIS 3058, at *15 (Bankr. D. Del. July 6, 2010),

that the proposed transaction complies with the plan confirmation requirements of 11 U.S.C.

§ 1129(a) and 1129(b). *See, e.g., United States v. Aweco, Inc. (In re Aweco, Inc.)*, 725 F.2d 293,

298 (5th Cir. 1984) (pre-plan settlement cannot be approved unless it would be "fair and

equitable" under 1129(b) with respect to objecting senior creditors); *In re Dalen*, 259 B.R. 586,

600 (Bankr. W.D. Mich. 2001) ("[S]ettlements and compromises which substantially affect a

11

debtor's reorganization, whether incorporated into the plan itself or reached prior to plan confirmation, must meet the same standards for the plan confirmation as any other plan term, including the requirement that each term be "fair and equitable."); *cf. In re Iridium Operating LLC*, 478 F.3d 452, 463 (2d Cir. 2007) (compliance with absolute priority rule, while not required, is "most important factor" in determining whether settlement was "fair and equitable" under Rule 9019).

24.    Here, the Debtors cannot prove that the proposed Settlement meets the most basic threshold of fairness under the Bankruptcy Code – the requirement that each dissenting creditor receive under a chapter 11 plan not less than the creditor would receive were the debtor liquidated under chapter 7. *See* 11 U.S.C. 1129(a)(7)(A)(ii). The burden of meeting this test is on the Debtors, which must submit evidence from which the court can "independently determine the value of the distributions under the plan in order to ascertain whether this requirement is satisfied." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 610 (Bankr. D. Del. 2001). This "judgment is to be made on the basis of evidence, not assumptions." *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990). "[T]here must be evidence in the record establishing by a preponderance of the evidence that [creditors] will not receive less under the Plan than in liquidation." *Southern Pac. Transp. Co. v. Voluntary Purchasing Groups, Inc.*, 252 B.R. 373, 391 n.79 (E.D. Tex. 2000) (overturning confirmation order in part on Section 1129(a)(7) grounds). *See also In re MCorp Fin., Inc.*, 137 B.R. 219, 228 (Bankr. S.D. Tex. 1992) (denying confirmation where "[d]ebtors have failed to provide the court with evidence such that an independent factual determination could be made that the proposed plans are in fact in the best interests of the estate").

12

25.     If the Debtors were liquidated today, unsecured creditors would get the cash, and the Lenders would have to look to their collateral. The Settlement enforces a swap of those interests, allowing the Lenders to walk off immediately with risk-free cash, while leaving unsecured creditors to both await a plan process and, thereafter, take their chances with what might be realized over time from the mix of assets constituting the collateral – which includes both performing and non-performing loans and other real estate assets of uncertain value. The Debtors assert in conclusory fashion that this will benefit unsecured creditors by cutting off the Lenders' postpetition interest, but they make no showing that this benefit, plus the Lenders' nominal haircut, outweighs the costs of the delay and risks being imposed upon unsecured creditors.

26.     Moreover, the Debtors have done nothing to satisfy their burden with respect to the most important aspect of their argument – that the actual value of the collateral is in excess of the Lenders' claims. Although the Debtors have informed the Committee that their business judgment is based on a valuation report prepared by Duff & Phelps (the "D&P Report") in agreeing to the Settlement, the Debtors have not submitted such report, have not offered Duff & Phelps as a witness, and indeed have offered no evidence whatsoever as to what the collateral is actually worth. Whether the collateral is worth the cash is a decision for this Court, not the Debtors' business judgment.[6]

---

[6] The Committee has previously asked the court to stop payments of principal to the Lenders on the ground that the *total value* of the collateral appears to exceed the total claims of the Lenders. This is different from the test required by this proceeding – the *present value* of the collateral must exceed the cash paid therefor. In addition, the Committee's assertion that the Lenders are oversecured was based entirely on the Debtors' assertions to the Committee and was *before* the Committee was provided with a copy of the D&P Report.

## II. THE SETTLEMENT SHOULD BE REJECTED
## BY THE COURT ON ITS OWN TERMS

27.    Even if the Bankruptcy Code otherwise permitted the Settlement's proposed swap

of cash for collateral, the Court should still disapprove the Settlement under Rule 9019 because it

assigns virtually no value to significant legal claims against the Lenders and was the product of a

deeply flawed process.

28.    In determining whether to approve a settlement under Rule 9019, a bankruptcy

court must "assess and balance the value of the claim that is being compromised against the

value to the estate of the acceptance of the compromise proposal." *Myers v. Martin (In re*

*Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). The Third Circuit "recognize[s] four criteria that a

bankruptcy court should consider in striking this balance: (1) the probability of success in

litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved,

and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest

of the creditors." *Id.* (citation omitted). A settlement that is not within the "reasonable range of

litigation possibilities" should not be approved. *In re Spansion, Inc.*, No. 09-10690 (KJC), 2009

Bankr. LEXIS 1283, at *13 (Bankr. D. Del. June 2, 2009) (internal quotation and marks

omitted). "The Debtors carry the burden of persuading the court that the compromise falls

within the reasonable range of litigation possibilities." *Id.* at *13-14 (citation omitted).

29.    Here, the Settlement falls far short of satisfying this standard, because *each* of the

*Martin* factors weigh strongly in favor of rejecting the Settlement. *First*, as explained below,

there is a high probability of success if the Committee were to litigate the Constructive

Fraudulent Conveyance Claim and the Guaranty Limitation Claim. *Second*, as the Debtors

admit, there is no reason to believe that there would be any problem collecting any judgment

awarded. *Third*, litigating the claims would not be inordinately complex, especially in the

14

context of these multi-billion dollar estates, and particularly since it is uncontested that the Debtors were insolvent in 2009. *See* 9019 Motion ¶ 46. *Finally*, and most importantly, as discussed below, the massive giveaway of unencumbered cash in return for a nominal haircut to the Lenders' claims, assigning scant value to significant litigation claims, is certainly *not* in the paramount interests of creditors.

30. The official unsecured creditors' committee's position on a settlement is particularly important. "Unsecured creditors are not voluntary investors in the Debtor and their position on the settlement . . . is entitled to substantial weight." *In re Exide Techs.*, 303 B.R. 48, 70 (Bankr. D. Del. 2003). *See also, e.g., In re Matco Elecs. Group, Inc.*, 287 B.R. 68, 77, 79 (Bankr. N.D.N.Y. 2002) (denying Rule 9019 motion based on "serious objections" expressed by unsecured creditors through creditors committee, which had concluded that pursuing adversary proceeding presented best chance for recovery); *Comm. of Unsecured Creditors of Interstate Cigar Co. v. Interstate Cigar Distribution (In re Interstate Cigar Co.)*, 240 B.R. 816, 824-25 (Bankr. E.D.N.Y. 1999) (more harm to debtor's largest unsecured creditor than benefit to bankruptcy estate where settlement amount was significantly below potential recovery in pending litigation, and party with most to lose from proposed settlement, debtor's largest unsecured creditor, strongly opposed it).

31. Balanced against the strong opposition of the real parties in interest, a debtor's own views in support of a settlement are entitled to relatively less weight where, as here, it is merely managing a liquidation rather than making forward-looking business judgments in the course of reorganizing an operating business. *See In re S.N.A. Nut Co.*, 186 B.R. 98, 105 (Bankr. N.D. Ill. 1995) (in liquidating chapter 11, deference to business judgment not warranted, especially where unsecured creditors' committee opposes payment of break up fee that was not

15

KL3 2797170 10

in best interests of estate).[7]  Here, the Committee *strongly* opposes the Settlement, as do

essentially *all* unsecured creditors in these cases.  Indeed, an ad hoc group of bank debt holders

(the "Ad Hoc Unsecureds"), who hold in excess of $1.5 billion of unsecured claims in these

cases, filed a joinder supporting the Standing Motion and intend to object to the 9019 Motion.[8]

Accordingly, the Committee submits that the Court should not give deference to the Debtors'

views on the settlement.

### A.   The Settlement Is Outside the Range of Reasonableness

32.    In assessing the reasonableness of the settlement, the value of the claims that

would be released through the Settlement must be weighed against the negligible concessions

actually reflected in the Lenders' proposed treatment.

#### 1.   The Vast Benefit of the Settlement to the Lenders Renders the Supposed Settlement "Discount" Illusory

33.    The Settlement consists, nominally, of a 9% discount in the Lenders' principal

claims.[9]  Viewed as a litigation risk discount, this minimal haircut obviously assigns little value

to the claims against the Lenders.  But the Lenders are actually giving up far less than even this

---

[7] *But see In re After Six*, 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993) (noting that although "[t]his case is clearly a liquidating Chapter 11 case and that factor justifies some greater deference to the Committee's viewpoints than were it a reorganization case . . . a liquidating Chapter 11 case is nevertheless first and foremost a Chapter 11 case" and because the Committee had not sought appointment of a trustee or conversion of the case to a chapter 7 "the Committee's views must be subjected to the deference to the Debtor's wishes").

[8] *See Statement of Ad Hoc Group of Holders of Capmark's Unsecured Bank Debt in Support of Motion of the Official Committee of Unsecured Creditors for Leave, Standing and Authority to Prosecute Causes of Action on Behalf of the Debtors' Estates*, dated August 31, 2010 [Docket No. 1611] (the "Standing Joinder").

[9] The Debtors' focus on a 9% discount is misleading.  In absolute dollars, the Settlement saves the estates $135 million.  As part of the Settlement, however, the Debtors agreed to let the Lenders keep approximately $75 million in postpetition interest and fees - amounts to which the Lenders would not be entitled if the Committee were successful in prosecuting the claims described herein and in the Standing Motion – and to be paid millions of dollars in additional fees.

16

minimal figure suggests, because they are getting their minimally discounted principal *in cash immediately*, while forcing unsecured creditors to look to the Lenders' collateral for eventual payment under a plan. As noted above, this shifts significant risk from the Lenders – who after all bargained to look to *the collateral* to obtain any special treatment – to unsecured creditors, who (absent this settlement) would have a right to access the estate's unencumbered cash. In addition, the Debtors further ignore that obtaining cash now gives additional value to the Lenders (based on the time value of money), at the expense of the unsecured creditors, who will now be able to receive only minimal (if any) cash when a chapter 11 plan is consummated.

34.     This provides a massive benefit to the Lenders, who would be free to immediately reinvest this cash in other investments likely yielding a greater rate of return than the 4.75% currently paid by the Secured Credit Facility. And it makes the unsecured creditors the involuntary purchasers of a portfolio of distressed assets as to which predicting a future rate of return can be no more than guesswork (and as to which the Debtors have failed to introduce any evidence whatsoever).

## 2.     The Claims Against the Lenders Have Significant Value

35.     The Settlement is unreasonable in assigning essentially no value to at least two substantial claims against the Lenders – the Constructive Fraudulent Conveyance Claim and the Guaranty Limitation Claim.

### a.     The Settlement is Unreasonable Given the Merits of the Constructive Fraudulent Conveyance Claim

#### i     The Debtors Did Not Receive Reasonably Equivalent Value in Exchange for the Liens

36.     As discussed above, the only issue contested with respect to the Constructive Fraudulent Conveyance Claim is whether the Debtors received reasonably equivalent value in

17

exchange for granting security interests on their assets. This Court has noted that "[t]he term 'reasonably equivalent value' is not defined by the Bankruptcy Code." *Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 89 (Bankr. D. Del. 2010). Accordingly, when evaluating whether a debtor received reasonably equivalent value for a transfer, courts look to the "totality of the circumstances," which may include (1) fair market value of the benefit received, (2) the good faith of the transferee, and (3) whether the transaction was at arm's-length. *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L., Inc.)*, 92 F.3d 139, 145, 148-50 (3d Cir. 1996). "The determination of whether the debtor received [reasonably equivalent value] should be made from the standpoint of the debtor's creditors, by looking at the net effect of the transfer on the *unsecured creditors*." *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 337 (S.D. Tex. 2008) (citing *In re GTI Capital Holdings, LLC*, 373 B.R. 671, 677 (Bankr. D. Ariz. 2007)) (applying Delaware law) (emphasis added). *See also EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.)*, No. 09-1554, 2010 U.S. App. LEXIS 11183, at *4 (3d Cir. June 1, 2010) ("Because the fraudulent conveyance laws are intended to protect the debtor's creditors, the question whether the debtor received reasonable value must be determined from the standpoint of the creditors.") (internal citations, quotations and marks omitted).

37.     The Debtors assert that they could have repaid those portions of the Bridge Loan that were due, and that securing such amounts therefore could not be a fraudulent transfer as a matter of law. *See* 9019 Motion ¶ 47. The Debtors are wrong for three reasons: *First*, the cases cited by the Debtors for this proposition are not Third Circuit law, which as set forth in *R.M.L.*, requires that the Court consider the totality of the circumstances. Indeed, the Debtors acknowledge that "the totality of the circumstances approach required by the Third Circuit is necessarily fact-specific and *cannot be determined on a motion to dismiss*." *See* 9019 Motion at

18

29 n.24 (internal citations omitted) (emphasis added). *Second,* the standard under Section 548 of the Bankruptcy Code and applicable state law is one of *insolvency,* not liquidity. It is irrelevant to the constructive fraudulent conveyance inquiry whether the Debtors were or were not liquid enough to have repaid their antecedent debts in cash. What matters, since they were admittedly *insolvent,* is whether they received reasonably equivalent value. *Third,* and more importantly, the Debtors' factual assertion that they could have actually paid the amounts that were due under the Bridge Loan is wrong.

## Redacted

38.     The Debtors recite a variety of ways in which they purportedly received reasonably equivalent value in exchange for granting at least $1.5 billion worth of liens and security interests on their assets while insolvent (9019 Motion at 17-18), and this list is essentially echoed in the Secured Lenders' Objection (at ¶ 33). The Debtors and Lenders cite *no* factual support for *any* of these assertions or beliefs that would justify including them as "indirect" benefits, or establish that the Secured Credit Facility was necessary to accomplish any of them. It is ironic that the Debtors ask the Court essentially to rubber stamp these bare

---

[10] *See also*

## Redacted

assertions while repeatedly accusing the Committee of failing to proffer evidence in support of litigation claims that are only at the pleading stage.

39.    The Debtors' (and Lenders') contentions in this regard, while set forth in a lengthy and repetitive fashion in an obvious effort to appear more impressive, boil down to just two alleged "benefits" that the Debtors supposedly received for granting liens on their assets while insolvent: (i) it afforded the Debtors a breathing spell to deal with Capmark Bank and avoid an FDIC seizure of the Bank and (ii) it gave the Debtors the ability to preserve the value of their various servicing businesses and to sell certain other assets. These benefits, however, are at best amorphous and, at worst, of no value at all.

40.    With respect to the supposed FDIC seizure of Capmark Bank, the Debtors have not offered any evidence whatsoever that such a risk was at all a reality.

## Redacted

Moreover, the Debtors did not have any written agreements with the FDIC to avoid a bank seizure prior to the filing of these cases, the FDIC never sought seizure even after filing, and the Debtors did not obtain *any* relief regarding the FDIC until *after* these cases were commenced.

41.    With respect to the preservation of the North American servicing business and other asset sales, the Debtors' unsupported assertions are belied by the facts. For example,

## Redacted

20

# Redacted

Moreover, the Debtors have sold a number of their assets/platforms (e.g., the Military Housing business, Investment Management business, and Mexican business) during the course of these cases and there is no evidence that the Debtors suffered any diminution in the value of the assets as the result of a bankruptcy filing or that they would have been unable to sell such assets had they filed for bankruptcy in May 2009 instead of giving the Lenders $1.5 billion in collateral.

42.     The Committee attaches to this Objection as "Addendum A" a chart listing in more detail the Debtors' assertions regarding indirect benefits purportedly flowing from the refinancing and the Committee's point-by-point response. Of course, the Court need not resolve these disputes at this stage of the proceedings. It is enough to observe that there are, at minimum, serious potential issues of fact presented by the Debtors' assertion that they actually received reasonably equivalent value in return for encumbering their assets. As a result, the Constructive Fraudulent Conveyance Claim cannot reasonably be abandoned for no or negligible consideration.

## ii     The Secured Lenders Cannot Employ Section 548(c)

43.     The Debtors further argue that the Constructive Fraudulent Conveyance Claim must fail because "the good faith of the transferee serves as a defense to any fraudulent transfer action" (Debtors' Objection at ¶ 70), presumably relying on Section 548(c) of the Bankruptcy Code.[11]

---

[11] Section 548(c) of the Bankruptcy Code provides that "[e]xcept to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation." 11 U.S.C. § 548(c).

21

44.     As an initial matter, the Section 548(c) defense is inapplicable at the pleading

stages of a case and should not be accounted for in the instant 9019 analysis. Whether transferee

defendants acted in good faith is an issue of fact that should not be considered on a motion to

dismiss standard, where the plaintiff has adequately alleged the relevant facts. For example, in

*Argus Management Group v. Rodman (In re CVEO Corp.)*, No. 01-0223 (MFW), 2004 Bankr.

LEXIS 2123, at *3, *12-13 (Bankr. D. Del. Dec. 15, 2004), the defendants moved to dismiss the

trustee's complaint seeking to avoid and recover certain pre-petition transfers to the defendant

pursuant to Sections 548 and 550 of the Bankruptcy Code, based in part on Section 548(c). In

denying the motion to dismiss, the court held that whether a defendant can avail itself of the

good faith defense "is a factual determination . . . which cannot be made at this stage of the

proceeding. Therefore, we decline to dismiss the Complaint on this ground." *Id.* at *13.

Moreover, the good faith/value defense provided by Section 548(c) is an affirmative defense, and

the burden is on the *defendant-transferee* (not the Debtors) to plead and establish facts to prove

the defense. *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791,

802, 805 (Bankr. S.D.N.Y. 2005) (internal citation omitted) (section "'548(c) of the Bankruptcy

Code designates the transferee's good faith as an affirmative defense which may be proved by

the transferee at trail' and the plaintiff need not plead lack of good faith as an element of the

claim itself . . . . Under the Bankruptcy Code, § 548(c) 'has been construed as an affirmative

defense, all elements of which must be proven by the defendant-transferee.'"). As an affirmative

defense that must be raised by the defendant-transferee, proof of lack of good faith need not be

pled in the Committee's complaint. *See Bayou Superfund LLC v. WAM Long/Short Fund II, L.P.

(In re Bayou Group, LLC)*, 362 B.R. 624, 639 (Bankr. S.D.N.Y. 2007) (lack of good faith is not

element of Section 548(a)(1) that must be pled, and plaintiffs entitled to conduct discovery on

22

issue of defendants' good faith to determine if facts rebutting defense exist that require trial);
*Lavigna v. Lipshie (In re Wise)*, 173 B.R. 75, 78-79 (Bankr. E.D.N.Y. 1994) (denying motion to
dismiss because good faith may not be determined on face of complaint); *Gredd v. Bear, Stearns
Sec. Corp. (Manhattan Inv. Fund, Ltd.)*, 310 B.R. 500, 508 (Bankr. S.D.N.Y. 2002) ("[S]ection
548(c) designates the transferee's good faith as an *affirmative defense* which may be raised and
proved by the transferee at trial.").

45.     The Lenders cannot employ Section 548(c) because they did not take for value or
in good faith. For example, in order to consummate the Secured Credit Facility transaction, the
Debtors were forced to obtain a last-minute amendment from Deutsche Bank, which was,
importantly, also a Secured Credit Facility Lender, under the Indentures, to remove a restriction
that required Capmark secure the Notes equally and ratably with additional secured debt under
certain conditions. Deutsche Bank's removal of the restriction was not initially included in the
Debtors' public disclosures, and is subject to the pending Deutsche Bank Lawsuit. Indeed, the
Debtors and Lenders can only attempt to justify this improper action by writing off the last-
minute elimination of a $1.5 billion lien basket as a mere scrivener's error. 9019 Motion at ¶ 24.

46.

# Redacted

23

# Redacted

). It is

noteworthy that the claims subject to the DBTCA Lawsuit are not settled by the Settlement – so,

certain Lenders can pursue them too.

> **b.   The Guaranty Claims Settled at 91% of $1.5 Billion Are Limited**
> **By Their Terms to Approximately 17% of that Amount and**
> **Thus The Settlement is Outside of the Range of Reasonableness**

47.   Assuming *arguendo* that the May 2009 refinancing was not a fraudulent

conveyance, the Settlement is still unreasonable because the value available for the secured claim

arises under an upstream guaranty from CFI. The 2009 Term Loan, which the Debtors propose

to repay immediately at 91% of principal, is a secured loan only to the extent that the CFI

guaranty of such loan is allowed as a secured claim. As the Debtors state, however, the terms of

the guaranty itself limit the amount of that claim to the amount that is valid under fraudulent

transfer laws. *See* 9019 Motion ¶ 22 & n.11; *see also* Standing Motion ¶ 21; Proposed

Complaint ¶¶ 119-38.

48.   The Debtors concede that CFI was insolvent in May 2009. Thus, CFI's 2009

guaranty of its parent CFGI's debt would be invalid except to the extent that CFI received

consideration in exchange for such guaranty. The only consideration CFI received, however,

was repayment of a portion of its pre-existing liability under its 2006 guaranty of the Bridge

Loan. The repaid liability (and thus the guaranty capacity available to back the new secured

loan) was necessarily limited to approximately   **Redacted**   for the following reasons.

49.   As set forth in the Debtors' Fact Memo, at the closing of the March 23, 2006

transaction, CFGI entered into two unsecured debt facilities, the 2006 Credit Facility and the

Bridge Loan, that resulted in CFGI incurring approximately $8.7 billion in debt (the "Unsecured

24

Bank Debt"). A number of CFGI's direct and indirect subsidiaries, including CFI, issued "guaranties" making them directly and (by the terms of each guaranty) *primarily* liable for CFGI's $8.7 billion in obligations under the Unsecured Bank Debt.[12] However, all of the Guaranties contained "saving clauses" providing as follows: "the obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the obligations . . . not constituting a fraudulent transfer or conveyance."

50.     Other than a conclusory statement that CFI received an unquantified benefit from the leveraged buy-out of CFGI, the Debtors make no showing that CFI received *any* consideration for guarantying CFGI's debt. Therefore, for CFI's guaranty to survive fraudulent transfer challenge, the obligations under the guaranty must be limited under the savings clause to the amount that would leave CFI solvent. According to the Debtors' balance sheet, CFI's net worth at the time of the 2006 closing was calculated at approximately $1,097,732.00.[13]

## Redacted

---

[12] Section 1(a) of the 2006 Credit Facility Guaranty provides that "[e]ach Guarantor hereby guarantees, as *primary obligor and not merely as surety . . . the prompt payment in full when due*." Section 2 of the 2006 Credit Facility Guaranty further provides that "[t]he obligations of each Guarantor . . . are absolute, unconditional and irrevocable." Section 2(d) of such guaranty also provides that "any beneficiary of the Guaranteed Obligations [may proceed] against a Guarantor without proceeding against any Borrower." (Gleit Decl. Ex. H).

[13] The Committee believes that

## Redacted

25

under its guaranty of *all* $8.7 billion of CFGI bank could not exceed    Redacted    – that is, only
Redacted    backed all $8.7 billion of the original indebtedness.

51.    The May 2009 transaction refinanced $1.5 billion of the $8.7 billion, or
approximately 17.2% of CFGI's debt. Since the only value provided to CFI in the 2009
transaction was the satisfying of its liability under its guarantee of the 2006 Credit Agreement,
CFI's new May 2009 guaranty could refinance only 17.2% of CFI's guaranty liabilities.

52.    Accordingly, the claim under CFI's 2009 guaranty must be limited to 17.2% of
Redacted    In other words, when the Secured Debt purported to "refinance" $1.5 billion of the
Unsecured Bank Debt, the Lenders stepped into the shoes of the unsecured banks, and only the
same    Redacted    of value at CFI backing $1.5 billion of the 2006 Unsecured Bank Debt was
available and reallocated to the 2009 guaranty of $1.5 billion of 2009 CFGI debt under the
Secured Credit Facility Agreement. Thus, even if the Lenders under the Secured Debt are
actually secured, they are secured at CFI only to the extent    Redacted    and the secured
portion of the Lenders' claim must necessarily be limited to such amount.

53.    The Debtors and the Lenders argue that CFI in fact could guarantee the entire
$8.7 billion in debt without the guaranty being a fraudulent conveyance because the liability was
"contingent" and not likely to be enforced. *See* 9019 Motion at 34; Secured Lenders' Objection
at 22-23. The authority cited for this proposition is inapposite. *Mellon Bank, N.A. v. Official
Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139 (3d Cir.
1996), concerned whether a debtor could properly carry as an "asset" proceeds from loans that
were highly unlikely to close. *See id.* at 156. *In re Xonics Photochemical, Inc.*, 841 F.2d 198
(7th Cir. 1988), suggests in dicta that a contingent liability must be discounted to the product of
the amount of the claim multiplied by the probability that the contingency will occur and the

26

liability will become real. *Id.* at 200. Taken to its logical extreme, this analysis would turn every guarantor into an insurance company whose guaranty capacity could be ten times its net worth, based on low "actuarial" odds of having to pay any particular amount. The Third Circuit has not applied *Xonics* in the context of contingent liabilities, much less validated the idea that a guarantor can guaranty many times its net worth without creating a fraudulent conveyance.[14]

54.     A subsequent Seventh Circuit case, *Covey v. Commercial Nat'l Bank*, 960 F.2d 657 (7th Cir. 1992), suggests that in the real world, the treatment of "contingent" guaranties cannot be taken to this extreme. In *Covey*, the Seventh Circuit affirmed the bankruptcy court's finding that a company became insolvent upon guaranteeing its parent's debt. 960 F.2d at 658-59. The court held that the solvency of the company at the time of the transaction had to be calculated based on how much a third party buyer would have paid for the debtor's "entire package of assets and liabilities." *Id.* at 660.

55.     Here, no third-party buyer of CFI's "entire package of assets and liabilities" would have assumed CFI's guaranty obligations at a discount for at least two reasons. *First*, CFI's guaranties are not contingent obligations that require the banks to exhaust their remedies against CFGI before seeking payment from CFI. Rather, CFI executed a guaranty of payment that specifically provides that the obligations thereunder are *primary obligations* – they are not contingent on CFGI's failure to pay. *See* Section 1(a) of the 2006 Credit Facility Guaranty (providing that "[e]ach Guarantor hereby guarantees, as *primary obligor and not merely as*

---

[14] In *Official Comm. of Asbestos Personal Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 281 B.R. 852 (Bankr. D. Del. 2002), the court held that certain unknown but already existing asbestos tort claims were not "truly contingent liabilities" like the ones at issue in *Xonics* and held that the tort claims did not need to be discounted for the probability they would occur. *Id.* at *18-39. The Committee respectfully submits that *W.R. Grace* had it backwards – tort claims that may never arise at all should be subject to a probability discount, while a guaranty of payment, which states that it is a primary obligation of the guarantor – as the 2006 guaranty does – should not be subject to much if any discount. No reported decision has followed the *W.R. Grace* rationale.

*surety*"); *see also* Section 2 ("each Guarantor hereby expressly waives . . . any requirement that the Agent or any Lender . . . proceed against . . . any Borrower") (Gleit Decl. Ex. H). At maturity of the 2006 Credit Agreement (an event that was in no way contingent), CFI was primarily liable for the loan as if CFI had signed the note as borrower. This distinction was not presented to the *Xonics* or *Covey* courts and not considered in *R.M.L.* Just as no buyer of CFGI's assets would assume CFGI's obligations under its note at a discount, no buyer of CFI's assets would assume CFI's guaranty liabilities at a discount.

56.      *Second,* CFI's assets and liabilities comprised the lion's share of CFGI's total assets. CFGI was and is a holding company with no assets other than intercompany claims and the equity interest in Capmark Bank (which, under FDIC restrictions, had no ability to repay CFGI's loans). Accordingly, the assets of CFI would necessarily be required to repay loans to CFGI and, therefore, the probability that CFI would have to pay on its guaranty, whether through default or refinancing, approached 100%. Thus, even if the *Xonics* dictum were to be followed, the "discount" applied to the obligations under CFI's 2006 guaranty would be slight indeed.[15]

57.      Significantly, the Debtors do not suggest, or offer to prove, what precise "discount" should be applied to allow **Redacted** in CFI net worth to support more **Redacted** million in obligations under the CFI guaranty of the Secured Credit Facility.

58.      The Lenders argue (Secured Lenders' Objection at 23) that the Committee's analysis ignores "reasonably equivalent value" that CFI might have received for guaranteeing ten times its net worth. The funds actually loaned in 2006 went to CFGI; how much "stuck" at CFGI, and was not immediately dispersed to CFGI's selling shareholder, is not clear. While CFI

---

[15] It should also be noted that the 2006 Credit Agreement and the 2009 Secured Term Loan Agreement themselves treat guaranty liabilities as undiscounted – that is, when the banks limited Capmark's ability to borrow any additional money, a dollar of guaranteed borrowed money was equivalent to a dollar of borrowed money.

28

may have received some of the funds, it did so through an intercompany loan that remains on the books as an obligation to CFGI – meaning that CFI incurred two dollars of obligation for every dollar it received. Any "indirect" benefit to CFI based on synergies for the overall corporate group would have to be quantified and scrutinized to determine if they represented "realizable commercial value" cognizable for purposes of analyzing reasonably equivalent value. *See Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991). It would be the Lenders' burden to identify and support such value; they have not yet done so. *See, e.g., Blixseth v. Kirschner (In re Yellowstone Mountain Club LLC)*, No. 08-61570-11, Adv. No. 09-00014, 2010 Bankr. LEXIS 2702, at \*181-82 (Bankr. D. Mont. Aug. 16, 2010); *Cooper v. Centar Invs. (Asia) Ltd. (In re TriGem Am. Corp.)*, 431 B.R. 855, 868 (Bankr. C.D. Cal. 2010).

59.     Finally, the Debtors posit a phony "conflict" in the Committee's position, because the argument to limit the amount of the guaranties would apply to all guaranties, including those supporting the unrefinanced unsecured bank debt and the bonds issues in 2007. *See* Debtors' Objection at 29-30. This argument is a red herring. Each of the Debtors' debt obligations (*i.e.*, 2009 Bank Debt, 2006 Bank Debt, and Bond Debt) share the same borrower/issuer (CFGI) and (with a few minor exceptions) the same guarantors. Accordingly, a limit on the guaranty amounts would simply free value at each guarantor for the repayment of intercompany claims owed to CFGI – where all creditors are unsecured and the value would be shared pro rata.

60.     The Debtors have agreed to pay the Lenders *several times* the amount of their validly guaranteed claim as calculated above. The Settlement thus unreasonably assigned zero weight to this substantial claim.

29

### 3.     The Settlement Is Not in the Paramount Interest of
###          Creditors Because Even the Purported Settlement
###          Amount is Not Within the Range of Reasonable Recoveries

61.     Even assuming *arguendo* that the Settlement provided the estates with the full net

benefit of a 9% discount on the Citi Claim, 9% is still disproportionately small in view of the

valuable claims being released. As discussed above, both the Constructive Fraudulent

Conveyance Claim and the Guaranty Limitation Claim are, *at minimum*, serious, colorable

claims that would have meaningful settlement value in an arm's length negotiation. Without

even reaching the question whether the Debtors' agreement to the Settlement in fact reflected an

arm's length process, releasing these claims for negligible value is inherently unreasonable and

should not be approved under Bankruptcy Rule 9019.

62.     Releasing valuable claims for disproportionally small amounts fails to satisfy

Rule 9019. In *Exide*, the court denied confirmation of a plan, overwhelmingly rejected by the

creditors committee, that purported to settle claims subject to a committee-initiated adversary

proceeding. 303 B.R. at 66-68, 71. Because the debtor had "failed to demonstrate that the

Creditors Committee is not likely to succeed at trial . . . . even assuming, without deciding, that

the Creditors Committee's 'high end' projections [of $500 million] are overly optimistic, the

offer of no more than $8.5 million by the Prepetition Lenders to the unsecured creditors in

settlement of this matter is below the lowest range of reasonableness." *Id.* at 69-70.

63.     Likewise, in *In re Arkoosh Produce, Inc.*, No. 00-41817, 2003 Bankr. LEXIS

2222, at \*32 (Bankr. D. Idaho July 1, 2003), a proposed settlement was rejected as "anemic in

comparison to . . . *potential* liability to the bankruptcy estate and to the *possible* recovery." *Id.* at

\*40 (emphasis added). The *Arkoosh* court acknowledged that avoidance of complex litigation

and its attendant expense and delay weighed in favor of approving the settlement before it.

30

However, there was "a *plausible* argument" that the trustee could prove an avoidable transfer, and although the trustee's overall probability of success in litigation "cut[] in both directions depending upon the claim," litigation could have yielded a recovery substantially in excess of the settlement amounts. *Id.* at *10, *32 (emphasis added). Thus, the settlement was rejected. The court explained that "the interest of creditors in this case is best served by ensuring they receive the highest recovery from the estate that is reasonably attainable." *Id.* at *35.

64.     Similarly, in *Spansion*, in rejecting the Rule 9019 motion before it, the court found particularly significant that "the initial evaluation of the *potential* damages that could be recovered in th[e] litigation was *significantly higher* than the payment amount contained in the [s]ettlement." 2009 Bankr. LEXIS 1283, at *24 (emphasis added); *see also In re West Pointe Props., L.P.*, 249 B.R. 273 (Bankr. E.D. Tenn. 2000) (motion to compromise claims denied where debtor's damages could be substantial if successful in prosecution of its claim). Here, the sheer size of potential benefit to the estates in the event either of the claims described above were to be sustained would render even a genuine 9% haircut well outside of the range of reasonableness.

65.     Moreover, the Committee believes that there is a plausible theory that the *entire* Secured Credit Facility could be avoided as an insider preference, due to the involvement of insider Goldman Sachs and/or Dune entities and individuals therefrom participating in the transaction as both board members and Lenders.  Indeed,

# Redacted

31

**Redacted**

The Debtors' failure to account, in the

9019 Motion, for the possibility of setting aside the entire $1.5 billion transaction as an insider

preference puts the Settlement even further outside the range of reasonableness.

## B. The Settlement Is Not in the Paramount Interest of Creditors Because the Negotiation Process Was Flawed and the Settlement Was Not an Arms Length Transaction

66. Approval of the Settlement should also be denied because it was the product of a

flawed process. "[T]he 'reasonableness' of [a] settlement depends upon all factors, including . . .

the extent to which the settlement is truly the product of 'arms length' bargaining, and not of

fraud or collusion." *In re Northwestern Corp.*, No. 03-12872 (CGC), 2004 Bankr. LEXIS 1022,

at *8 (Bankr. D. Del. July 23, 2004) (quoting *Air Line Pilots Ass'n. Int'l v. Am. Nat'l Bank &*

*Trust Co. of Chicago (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 428 (S.D.N.Y. 1993), *aff'd*,

17 F.3d 600 (2d Cir. 1994)). *See also In re Columbia Gas Sys.*, No. 91-803, 1995 Bankr. LEXIS

936, at *2 (Bankr. D. Del. June 16, 1995) (same). A key factor in this regard is whether the

parties most affected by the settlement were included in the negotiation process. In *Exide*, for

example, the court found that a settlement was not fair and equitable in part because it was "not

the result of arms-length bargaining with the unsecured creditors, who . . . are directly affected,"

but rather was "the result of discussions between the Prepetition Lenders and the Debtor only."

303 B.R. at 68, 71.

67. Here, the Settlement was negotiated *exclusively* among the Debtors, Agents, and

Lenders; the Committee was *never* at the negotiating table and the Debtors did not consult with

unsecured creditors in any meaningful way. While the Debtors did meet with the Committee

months before the Debtors agreed to the Settlement, the Committee heard nothing from the

Debtors in the weeks before the Debtors filed the Settlement Motion – and indeed only found out

32

about the Settlement from a third party. That fact alone warrants heightened scrutiny of a settlement that dramatically alters the rights of unsecured creditors. "'[L]ooking only to the fairness of the settlement as between the debtor and the settling claimant [and ignoring third-party rights] contravenes a basic notion of fairness.'" *In re Arter & Hadden, LLP*, 373 B.R. 31, 36 (Bankr. N.D. Ohio 2007) (quoting *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1994)). Accordingly, "where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval." *Cullen v. Riley (In re Masters Mates & Pilots Pension Plan)*, 957 F.2d 1020, 1026 (2d Cir. 1992). "This is especially true where . . . the proposed settlement would enjoin certain objecting junior creditors who are not parties to the settlement from pursuing causes of action they *may* have against a party to the settlement other than debtor." *Eddy v. Nat'l Union Fire Ins. Co. (In re Med. Asset Mgmt., Inc.)*, 249 B.R. 659, 664 (Bankr. W.D. Pa. 2000) (emphasis added); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 835 (Bankr. D. Del. 2008) (settlement not approved where it severely and adversely affected trade creditors not at negotiating table).

68.     The exclusion of the Committee from all negotiations is especially troubling because there is reason to doubt the vigor with which the Debtors pursued potential claims against the Lenders. Without questioning the subjective good faith of either the Debtors' officers or their experienced bankruptcy professionals, it is apparent that the Debtors were, from the start, in an awkward position: required by their fiduciary duties to the estates to investigate and prosecute claims that might reflect poorly on their own conduct – a conflict explained in more detail in the Standing Motion.

69.     Unfortunately, the available record

**Redacted**

33

**Redacted**

70.

**Redacted**

71.     The Debtors' position that the 9019 Motion was the result of "months of hard-fought negotiations" (Debtors' Objection ¶ 12) is also inconsistent with public admissions of their predisposed beliefs that the Claims are weak and/or meritless, and that the Secured Credit Facility was justified -- most notably in the Fact Memo.  It is axiomatic that settlement negotiations cannot possibly be "hard-fought," or even non-illusory, when the potential plaintiff has gone on public record for all to see, including the would-be defendants, asserting its lack of belief in the claims it is purporting to negotiate, and singing the praises of the transaction it would supposedly seek to avoid.

72.     Remarkably,

**Redacted**

34

# Redacted

73.     Against this backdrop, it is simply untenable to assert that "hard-fought

negotiations" took place on the unsecured creditors' behalf. It is no wonder that the Lenders

gave up little if anything, when they knew full well that the Debtors were completely prepared to

go forward with a declaratory judgment action seeking to allow the Citi Claim.

## III.    THE STANDING MOTION SHOULD BE GRANTED

74.     In addition to rejecting the 9019 Motion, the Court should grant the Standing

Motion. "Although *Cybergenics* did not specifically lay out the procedures that should be

followed in allowing creditors derivative standing, the Third Circuit expressed its agreement

with the approaches taken by the Second and Seventh Circuits . . . . Under these guidelines

generally, derivative standing requires: (1) a colorable claim, (2) that the trustee unjustifiably

refused to pursue the claim, and (3) the permission of the bankruptcy court to initiate the action."

*Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del.

2004) (internal citations omitted).   While some courts also conduct a cost-benefit analysis in

connection with this inquiry, *see, e.g., Official Comm. of Asbestos Claimants v. Bank of N.Y. (In

re G-I Holdings, Inc.)*, No. 04-3423 (WGB), 2006 U.S. Dist. LEXIS 45510, at *40 (D.N.J. June

21, 2006), this Court has found that such an analysis may not be necessary in all situations, *see*

35

*Official Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat'l Amusements Inc. (In re Midway Games Inc.)*, 428 B.R. 303, 311 (Bankr. D. Del. 2010). In any event, the inquiry should not turn into a mini-trial. *See In re STN Enters.*, 779 F.2d 901, 905-06 (2d Cir. 1985).

75.    The STN Objections, which are replete with irrelevant propositions, inapposite cases, and even attempts to persuade this Court to ignore settled law, seek to obscure the simple truth that the Committee has satisfied each prong of the above-cited test. That is *all* the Committee is required to demonstrate at this point in the proceedings.[16]

## A.    The Standing Motion Is Essentially Unopposed as to the Insider Preference Claims

76.    The Standing Motion should be granted as to the insider preference claims (the "Insider Preference Claims"), and the Committee should be authorized to prosecute these claims against Dune Real Estate and the Goldman Lenders. First, no party objected to the Standing Motion as it relates to the Insider Preference Claims. Instead, Dune Real Estate filed the Dune Response, a limited statement contesting some factual allegations; the Goldman Lenders filed the Goldman Response making similar assertions; and the Debtors, in the Debtors' Objection, also contested only certain factual allegations relating to those parties. Second, the Goldman Lenders practically endorsed the Standing Motion, conceding that the "standard for granting the Committee standing and authority to prosecute claims . . . is not a particularly high standard to meet" and that the Goldman Lenders did not "care which entity prosecutes this frivolous action [the Insider Preference Claim]." Goldman Response at 1.

---

[16] As set forth in the Standing Motion, the Committee moved for derivative standing before receiving the vast majority of its Bankruptcy Rule 2004 discovery, and also, of course, prior to serving document requests in connection with the 9019 Motion and taking any depositions. Standing Motion ¶ 26. Upon reviewing documents produced by the Debtors and other parties, the Committee has determined to withdraw the portion of its Standing Motion seeking authority to prosecute the intentional fraudulent conveyance claim and to equitably subordinate the Citi Claim.

36

77.

**Redacted**

---

[17] *See, e.g.,*

**Redacted**

**B.     The Debtors Have Unjustifiably Failed to Pursue
        the Constructive Fraudulent Conveyance Claim**

78.     The Debtors here have clearly failed to pursue the Constructive Fraudulent

Conveyance Claim within the meaning of the derivative standing test. As discussed above, they

have openly and repeatedly asserted their beliefs that the Claims are weak or of little merit, both

on public record and

# Redacted

Finally, the Debtors entered into the Settlement, which,

as also discussed above, essentially seeks to pay the Lenders in full anyway. The Debtors cannot

seriously contend, against the backdrop of these undisputable facts, that they have really pursued

the Constructive Fraudulent Conveyance Claim.

### 1.     The Debtors are Conflicted

79.     The STN Objections wholly fail to acknowledge that the "unjustifiable failure"

prong of the derivative standing test may be satisfied by the existence of conflicts in and of

themselves, as set forth in the Standing Motion (¶¶ 37-40). *See G-I Holdings, Inc. v. Those

Parties Listed On Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 630 (Bankr. D.N.J. 2004)

(holding that debtor conflicts rendered demand made and denied within the meaning of the

derivative standing tests, where transaction at issue was implemented by debtor executives that

remained in charge, and debtors had taken positions adverse to avoidance actions), *rev'd in part

and remanded*, 2006 U.S. Dist. LEXIS 45510 (D.N.J. June 21, 2006); *Official Comm. of

Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214, 222 (Bankr. W.D. Pa. 2004)

(debtor's opposition to committee's emergency *nunc pro tunc* standing motion satisfied demand

element). The Debtors refute neither this point of law, nor the facts that demonstrate their own

inherent conflicts with respect to the Secured Credit Facility raised by the Committee in the Standing Motion.

80.     As the *G-I* court explained with respect to demand on conflicted debtors, "form should not override substance." *G-I Holdings*, 313 B.R. at 630. Although the Debtors assert that they did not refuse to pursue the Claims, it is axiomatic that a conflicted debtor should not be able to derail a creditors committee's pursuit of derivative standing with the hollow recitation of the words that it "may . . . commence avoidance actions." Debtors' Objection at ¶ 53. Indeed, it is clear that the only litigation that the Debtors intended to commence was a declaratory judgment action seeking to *validate* the Lenders' liens. *See* above at ¶ 72.

81.     This is no surprise in light of the Debtors' conflicts with respect to the Secured Credit Facility. As set forth in the Standing Motion (at ¶¶ 14-18, 22-28, 36-40, 74), these conflicts include that high ranking executives of various Debtors signed the Secured Credit Facility Agreement and Security Agreement; the Debtors' CFO and Executive VP executed certificates attesting to the validity of amending the Indentures so Capmark could incur the Secured Debt; all of CFGI's directors at the time of the Secured Credit Facility are apparently still with the company today, and CFGI's President, Chief Executive Officer, Secretary, General Counsel, Chief Risk Officer and three of its Executive Vice Presidents, are the same.

# Redacted

39

## 2.     The Debtors Have Failed to Pursue the Claims

82.     Despite the Debtors' disabling conflicts with respect to the Secured Credit
Facility, which excused the need to make formal demand, the Committee in fact requested that
the Debtors confer it with standing to pursue the Claims. *See* Demand Letter (Standing Motion,
Exhibit A). The Debtors refused, and instead sought to "settle" around the Committee –
memorializing their efforts in the 9019 Motion which was filed *after* the Debtors' Objection.
This does not establish that the Debtors "pursued" the Claims – quite the opposite. The 9019
Motion demonstrates only that the Debtors and Lenders were finally forced to acknowledge the
existence of the Claims, but settled the Claims for essentially nothing. Indeed, where, as here, a
proposed settlement is clearly unreasonable, a court may itself *suggest* that the creditors
committee move for derivative standing. *See In re Present Co.*, 141 B.R. 18, 25 (Bankr.
W.D.N.Y. 1992) (denying unreasonable Rule 9019 compromise upon creditor committee's
objection, and suggesting committee move for derivative standing as a conflict resolution tool).

83.     The Third Circuit has emphasized that "[t]he possibility of a derivative suit *by a
creditors' committee* provides a critical safeguard against lax pursuit of avoidance actions" due
to, *inter alia*, "the influence of conflicts of interest." *Official Comm. of Unsecured Creditors of
Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (en
banc) (citation and quotations omitted) (emphasis added). *See also Adelphia Commc'ns Corp. v.
Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 369 (Bankr. S.D.N.Y. 2005)
(derivative standing test inquires into whether "the prosecution of the proposed litigation *by the
Committee concerned* would be in the best interests of the estate.") (emphasis added). Thus, the
9019 Motion does not eliminate the need for the inquiry into whether *the Committee* is the best
party to pursue the Constructive Fraudulent Conveyance Claim, but rather demonstrates

40

precisely why the Committee is the *only* estate fiduciary that is not conflicted with respect to the relevant transaction and thus in a position to determine the appropriate resolution of the Claims. *See ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 355 (S.D.N.Y. 2007) (settlement required consent of committee authorized to litigate inter-creditor disputes), *aff'd*, 544 F.3d 420 (2d Cir. 2008).

84.     The Debtors' reliance on *Commodore International v. Gould (In re Commodore International Ltd.)*, 262 F.3d 96 (2d Cir. 2001), and *In re Nicolet*, 80 B.R. 733 (Bankr. E.D. Pa. 1987) (Debtors' Objection at ¶¶ 19-20), and the Secured Lenders' citation to *Official Committee of Equity Security Holders v. Monsanto Co. (In re Solutia Inc.)*, No. 03-17949 (PCB), 2006 Bankr. LEXIS 2295 (Bankr. S.D.N.Y. Sept. 14, 2006) (Secured Lenders' Objection at ¶ 20), for the proposition that the Standing Motion has been rendered moot by the 9019 Motion, are misguided. The Debtors fail to acknowledge that, in *Commodore*, the debtor Bahamian corporations whose bankruptcy proceedings were also pending in the Bahamas, had, through their Bahamian liquidators, brought suit in the Bahamas "asserting *identical* claims," and that it was "of equal (if not greater) moment" to the court's decision that under Bahamian law, the Bahamian liquidators could not have consented to the creditor committee derivative suit. 262 F.3d at 98, 100 n.3 (emphasis added). In *Nicolet*, which preceded the Third Circuit's seminal *Cybergenics* opinion by sixteen years, the court explained that it was denying the committee's standing motion "*solely* because the [debtor] has *instituted suit*," and emphasized that its decision was "of course without prejudice to the Committee . . . to attempt to file an independent action if the [debtors's] suit is delayed or in some way rendered less than totally effective." 80 B.R. at 740 (emphasis added). Finally, although the *Solutia* opinion cited by the Secured Lenders summarily denies the equity committee standing without discussion of any facts and

41

circumstances, *Solutia* is distinguishable because the equity committee there had filed a complaint that included counts on behalf of the debtor, without seeking standing from the court, nearly a year *after* the debtor had already commenced an adversary proceeding on its own.[18]

## C.    The Claims are Colorable

85.    As discussed above at ¶¶ 76-84, the Committee has alleged colorable claims, and the Proposed Complaint included with the Standing Motion more than satisfies the relevant pleading standard. As an initial matter, the Committee was not even *required* to provide a draft complaint with the Standing Motion. As the court in *G-I Holdings* explained, "[a]lthough the Committee did not file a proposed complaint in conjunction with its motion for leave to prosecute the . . . Claims, it did file a summary of claims to be asserted by the Committee. The motion was sufficiently detailed to provide the Bankruptcy Court with enough information to determine standing." 2006 U.S. Dist. LEXIS 45510, at *45-46.

86.    At any rate, the Committee is not required to present proof of the Claims for the Court to grant the Standing Motion. Although, as this Court explained in a motion to dismiss an adversary proceeding, Supreme Court decisions have recently called upon plaintiffs to "'plead more than the possibility of relief to survive a motion to dismiss,'" *Aphton*, 423 B.R. at 86 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)), *Twombly* and *Iqbal*'s pleading mandates do not change the test for a committee seeking derivative standing to litigate claims on an estate's behalf. A creditors' committee is not required to submit its proof with a

---

[18] *See Motion of Pharmacia Corporation and Monsanto Company to Dismiss the Complaint of the Official Committee of Equity Security Holders Pursuant to Rules 7012(b)(1) and (6) of the Federal Rules of Bankruptcy Procedure, or in the Alternative, to Stay the Adversary Proceeding Pursuant to Section 105(a) of the Bankruptcy Code*, Adv. Proc. No. 05-01202 (PCB) (Bankr. S.D.N.Y. May 24, 2005) [Docket No. 5], at ¶¶ 9, 38, 42, 46, 49.

motion seeking derivative standing. *See In re MIG, Inc.*, No. 09-12118(KG), 2009 Bankr.

LEXIS 4313, at *4 (Bankr. D. Del. Dec. 18, 2009) (citing *STN*, 779 F.2d at 905-06) (court

examines whether "committee presents . . . claims for relief that *on appropriate proof* would

support a recovery.") (emphasis added).

87.    Moreover, the draft Proposed Complaint satisfies all pleading requirements in any

event. As this Court succinctly explained post-*Twombly* and *Iqbal*, "there are two elements that

must be deemed facially plausible in order to survive a motion to dismiss a claim for constructive

fraudulent transfer: (i) the debtor's insolvency; and (ii) whether the debtor received reasonably

equivalent value for the transfer." *Aphton*, 423 B.R. at 92. Here, the Debtors concede

insolvency (9019 Motion ¶ 46), so all that remains with respect to pleading the Constructive

Fraudulent Conveyance Claim would be the adequacy of the Committee's allegations regarding

lack of reasonably equivalent value. *Id.* In *Aphton*, the defendants sought dismissal of a

fraudulent conveyance claim, arguing that the transfer of money and stock to former noteholders

was used to retire antecedent debt and therefore could not form the basis for a constructive

fraudulent conveyance claim. *Id.* at 92-93. This Court held, however, that because the

complaint alleged that the debtor was insolvent at the time of the conveyance, it was *facially

plausible* that there was not reasonably equivalent value in the exchange. *Id.* at 93. Courts in the

Third Circuit and throughout the country have made similar findings in the post-*Twombly*, post-

*Iqbal* landscape.[19]

---

[19] *See, e.g.*, *In re Le-Nature's Inc.*, No. 08-1518, 2009 U.S. Dist. LEXIS 85073, at *70-71 (W.D. Pa. Sept.
16, 2009) (finding that whether reasonably equivalent value was provided by payments on outstanding
loans, fees and expenses was a question of fact); *In re Saba Enters.*, 421 B.R. 626, 646 (Bankr. S.D.N.Y.
2009) ("Even under the more stringent 'flexible plausibility' standard recently established in *Twombly*,
courts have found in the constructive fraudulent transfer context that the plaintiff does not need to plead
specific facts to support the relevant allegations.").

88.     "The Third Circuit utilizes a totality of the circumstances test in determining

whether reasonably equivalent value was given, and that factual inquiry is not suitable for

determination on a motion to dismiss." *Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus.*

*Fin. Servs., Inc.)*, 361 B.R. 747, 760 (Bankr. D. Del. 2007). Indeed, this proposition is well-

settled, and for good reason. The "totality of the circumstances" test includes examination of

various extremely fact-intensive factors, including but not limited to fair market value of the

benefit received, the good faith of the parties and whether the transaction was at arms-length.

*R.M.L.*, 92 F.3d at 148-50; *Charys Liquidating Trust v. Growth Mgmt., LLC (In re Charys*

*Holding Co.)*, No. 08-10289 (BLS), Adv. Pro. No. 10-50204 (BLS), 2010 Bankr. LEXIS 2073, at

*21 (Bankr. D. Del. July 14, 2010). "This analysis is inherently fact driven." *Id.* (internal

citation omitted). *See also Pension Transfer Corp. v. Beneficiaries Under the Third Amendment*

*to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d

203, 213 (3d Cir. 2006) (describing reasonably equivalent value inquiry as a "factual analysis");

*R.M.L.*, 92 F.3d at 149 (when analyzing fraudulent transfer, court must make "an express factual

determination as to whether the debtor received any value at all."). Because such a fact-intensive

inquiry does not lend itself to a decision on a motion to dismiss, such a claim cannot be

dismissed as not being colorable, as the inquiries are comparable. *See In re Copperfield Invs.,*

*LLC*, 421 B.R. 604, 609 (Bankr. E.D.N.Y. 2010).

89.     For the various reasons discussed above, the Committee contends and has pled

that the Debtors received next to no value in connection with Secured Credit Facility. The

Committee cannot be required to affirmatively prove this negative contention at this stage, and

the fact that the Debtors disagree is not a ripe issue. Moreover, the Committee expects that if the

Standing Motion were granted and the Committee were to commence an adversary proceeding

44

on the estates' behalf, if would amend, modify and supplement the Proposed Complaint based on discovery, as it was compelled to file the Standing Motion when it did, prior to receiving the vast majority of its discovery and prior to the Debtors seeking to conclude a sweetheart "settlement" with the Agents and Lenders without Committee consent or involvement.

### D.    Litigation Would Benefit the Debtors' Estates

90.    "It is plain that on . . . STN motions the Committees do not have to show a likelihood of success on the merits." *Adelphia*, 330 B.R. at 384. "Rather, those proposing to pursue litigation on behalf of an estate must give the Court comfort that their litigation will be a sensible expenditure of estate resources. That means, as a practical matter, providing the Court with a predicate for concluding that the claims will, *if proven*, provide a basis for recovery, and that the proposed litigation will not be a hopeless fling. It also means, as a practical matter, that the prospective rewards can reasonably be expected to be commensurate with the litigation's foreseeable cost. *But no more than that is required*." *Id.* (emphasis added). Indeed, the Delaware bankruptcy court has found that where, as here, the potential recovery is clearly and significantly greater than attendant litigation costs, it need not even embark on a separate and repetitive cost-benefit analysis in connection with a motion for derivative standing. *See Midway*, 428 B.R. at 311 ("Although the Court did not decide the requisite cost/benefit question which is a factor in determining standing, the *potential recovery clearly and greatly outweighs the cost* . . . .") (emphasis added). Prosecution of the Constructive Fraudulent Conveyance Claim more than satisfies any limited cost-benefit analysis the Court may perform with respect to the Standing Motion. Here, avoidance of the Secured Credit Facility would put potentially *$1.5 billion* back into the estates.

45

91.    When courts within the Third Circuit and elsewhere have conducted separate cost-benefit analyses, they have examined the following factors: whether the action is likely to benefit the reorganization estate; the probabilities of legal success in the event the action is pursued; financial recovery in the event of success; whether appointment of a trustee or another party to bring the action would be preferable; and the cost to the estate in proceeding with the action and the terms relative to any attorneys fees. *G-I Holdings*, 2006 U.S. Dist. LEXIS 45510, at *40. "The Bankruptcy Court . . . is free to make that determination as it sees fit; it is not required . . . to hold an evidentiary hearing. STN counsels that the examination of whether an action asserting such claim(s) is likely to benefit the reorganization estate can be done 'on affidavit and other submission, by evidentiary hearing or otherwise.'" *Id.* at *47 (quoting STN, 779 F.2d at 905-06). Importantly, "a trustee *almost certainly* abuses his discretion by refusing to bring a creditor's claim that, *if successful*, would clearly benefit the estate." *PW Enters. v. N.D. Racing Commc'ns (In re Racing Servs., Inc.)*, 540 F.3d 892, 900 (8th Cir. 2008) (emphasis added) (additional emphasis omitted).

92.    With respect to the first factor, successful prosecution of the Constructive Fraudulent Conveyance Claim is not only likely, but *certain*, to benefit the Debtors' estates, as avoidance of the liens granted in connection with the Secured Credit Facility would yield up to *$1.5 billion* for distribution to unsecured creditors. As the *Adelphia* court put the inquiry, "it is obvious to the Court . . . that the prosecution of the litigation by the Creditors' Committee here would be in the best interests of the estate. That determination is, to be blunt about it, an easy one. *The potential recoveries would be enormous; the cost of prosecution will be relatively modest (by the standards of the amount at stake)*." 330 B.R. at 384 (emphasis added). Indeed, the *Adelphia* court explained that "[w]hile the Defendants plainly have defenses that will require

46

serious consideration, and likely will have more to say when the facts are explored, the substantial sums to be recovered . . . more than justify the substantial sums that prosecuting the litigation would cost." *Id.* at 383. Here, even if the Committee were to avoid *only* the liens granted with respect to the Secured Credit Facility that did not go towards repaying the Bridge Loan, that would free over *$900 million* for the estates.

93.    Second, with respect to probability of legal success, "[i]t is plain that on . . . STN motions the Committees do not have to show a likelihood of success on the merits." *Adelphia,* 330 B.R. at 384. The Committee has set forth its probability of legal success in detail above, well beyond what it believes is required for any limited cost-benefit analysis that may be conducted in connection with derivative standing. *See* above at ¶¶ 76-92.

94.    Third, even the Debtors cannot possibly contest that the size of financial recovery *in the event of success,* which is the relevant inquiry here, is enormous as up to $1.5 billion could become available for distribution to unsecured creditors.

95.    Fourth, it is even more clear now than it was at the time the Committee filed the Standing Motion that the Committee is the only independent estate fiduciary that is willing and able to fairly and impartially investigate and pursue the Claims. The appointment of a trustee or conversion of these cases would significantly increase the administrative burden on the Debtors' estates to the detriment of all stakeholders. It is most economical and practical for the Committee to be granted standing to pursue its claims.

96.    Finally, by contrast, the costs and other potential downsides of pursuing the Claims would be minimal. The Lenders' suggestion (based on another, unrelated case, in another context) that it would cost $54 million to litigate insolvency (Secured Lenders' Objection at ¶ 45) is facially absurd – among other reasons, because the Debtors have *conceded*

47

the issue. In any event, even that amount is only approximately 3.6% of the $1.5 billion at stake. *See, e.g., In re LTV Steel Co.*, 333 B.R. 397, 404 (Bankr. N.D. Ohio 2005) (costs justified where official administrative claimant committee "contends that it will cost between $3-5 million to commence and prosecute the causes of action against a potential collection of $100 million," *i.e.*, 3-5%). Furthermore, because the Debtors are liquidating, litigation would come at no cost to Capmark's business, and would not be detrimental to Capmark's employees. Indeed, there is no particular need for the liquidating Debtors to remain in control of the claims, and there would be no prejudice resulting from the Committee taking them over, particularly because the usual time pressures associated with emerging from chapter 11 reorganization are simply not present in a liquidating case. *See Nat'l Forge*, 304 B.R. at 218, 223 (finding in case with liquidating plan that there was "no risk that the Creditors' Committee is usurping the Debtor's role in bringing the Complaint."); *Official Comm. of Unsecured Creditors of Wickes v. Wilson*, No. 06 C 0869, 2006 U.S. Dist. LEXIS 32602, at \*19 (N.D. Ill. May 23, 2006) (administrative urgencies associated with reorganization are not present when debtor plans to file a liquidating plan).

97.     The only cost in granting the Standing Motion would be professional fees, which would come out of the liquidating estates' funds that would otherwise be available for distribution to the Committee's own unsecured constituents, who strongly believe that the Committee should gain control of the Constructive Fraudulent Conveyance Claim and Insider Preference Claims.[20] *See Nat'l Forge*, 326 B.R. at 218, 223 n.8 (rejecting assertion that professional fees would dissipate estate where creditors supported prosecution of claims that

---

[20] Indeed, the Ad Hoc Unsecureds object to the 9019 Motion and filed a joinder in support of the Committee's Standing Motion. *See* Standing Joinder at ¶ 6 ("The Standing Motion demonstrates that it is imperative that a fiduciary that was not involved in the structuring, negotiation and execution of the Secured Credit Facility be granted the authority to pursue such claims with respect to the liens granted under that facility . . . . the Ad Hoc Unsecured Bank Group supports the Committee's request for entry of an order granting the relief sought in the Standing Motion.").

would be paid for from their funds); *LTV Steel*, 333 B.R. at 405 (granting derivative standing in part, noting that "[t]here is no question that the Administrative Committee represents the constituency that stands to gain or lose based on the outcome of the litigation (including whether or not the litigation is pursued.")).

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court (i) deny the 9019 Motion; (ii) grant the Standing Motion subject to the limitations above; and (iii) grant any such other and further relief as it deems just and proper.

KL3 2797170 10

Dated: October 6, 2010
Wilmington, Delaware

By: /s/ Evan T. Miller
Neil B. Glassman (No. 2087)
Jamie L. Edmonson (No. 4247)
GianClaudio Finizio (No. 4253)
Evan T. Miller (No. 5364)
BAYARD, P.A.
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899
(302) 655-5000
(302) 658-6395 (facsimile)

*Co-Counsel to the Official Committee of
Unsecured Creditors*

Thomas Moers Mayer
Jeffrey S. Trachtman
Joshua Brody
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP[21]
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
(212) 715-8000 (facsimile)

*Counsel to the Official Committee of Unsecured
Creditors*

Adam L. Shiff
David E. Ross
Jeffrey R. Gleit
Michele L. Angell
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700
(212) 506-1800 (facsimile)

*Special Litigation Counsel for the Official
Committee of Unsecured Creditors*

---

[21] Kramer Levin represents the Committee in connection with the matters addressed in Point I and Point II(A)(2)(b) of this brief.

KL3 2797170.10

**Addendum A**

| DEBTORS' AND LENDERS' ASSERTION: | COMMITTEE'S RESPONSE: |
|---|---|
| The maturity of the Bridge Loan was extended to April 2010, avoiding a payment default and allowing Capmark time to pursue efforts to restructure its debt obligations. | The Secured Credit Facility converted $590.6 million of the Bridge Loan and $984.4 million of the 2006 Credit Facility into secured debt. Even if the Court were to assume that the Debtors received $590.6 million in value from the repayment of the Bridge Loan (a proposition that the Committee disputes), the Debtors granted an additional *$984.4 million* in liens relating to the 2006 Credit Facility, which was merely in alleged covenant default. |
| Capmark avoided an immediate "free fall" bankruptcy filing, which would have made it far more difficult to sell its assets and operating platforms for value. | This conclusory statement is belied by the course of events.<br><br><br><br>**Redacted**<br><br><br><br><br><br>Moreover, the Debtors have sold a number of their assets/platforms (*e.g.*, the Military Housing business, Investment Management business, and Mexican assets) during the course of these cases.<br><br>Although Citicorp argues that the May 2009 transaction allowed the Debtors to sell their Premier Asset Management sale (Citicorp Objection at ¶ 12), this business was an asset of an Asian non-debtor; it was not affected by the current bankruptcy and Citicorp does not |

51

| DEBTORS' AND LENDERS' ASSERTION: | COMMITTEE'S RESPONSE: |
|---|---|
|  | show how it would have been affected by an earlier bankruptcy.<br><br>Filing for bankruptcy in May 2009 instead of entering into the Secured Credit Facility would have left significantly more value available to unsecured creditors, from whose perspective reasonably equivalent value is measured. |
| Capmark used only approximately $75 million of its existing cash to repay or prepay debt in the transaction, helping to maintain significant liquidity to fund its cash needs, including funding servicing advances required under the CMBS servicing agreements. | It is difficult to see how the Debtors argue that this constitutes value, when, combined with having received no new liquidity from the Secured Debt, Capmark's net liquidity actually decreased by $75 million.<br><br>**Redacted** |
| The leverage ratio covenant was removed from the Credit Agreement and the default of that ratio was eliminated. | *See* above: avoidance of default and hence bankruptcy in May 2009 did not provide more value to the estates from the perspective of unsecured creditors, and the Debtors have not alleged that it did. |
| The maturity of the 2006 Credit Facility remained March 23, 2011 provided that certain conditions were met. | The Debtors fail to show how extension of maturity provided value to the estates from the perspective of unsecured creditors. |
| Capmark avoided the downgrade of its servicer rating to a level that would have triggered defaults in its CMBS servicing contracts and termination of those contracts for no consideration (citing unknown information provided by Capmark management). | Default and bankruptcy in May 2009 would have resulted in a downgrade of Capmark's servicer rating, but the Committee disputes that such downgrade would have caused CMBS counterparties to terminate Capmark's servicing contracts. Replacing a Servicer takes time. Other debtors have sold their servicing businesses in chapter 11 and Capmark could have done so without encumbering $1.5 billion of its assets.<br><br>It is unclear, and the Debtors do not explain, how the Secured Credit Facility was even connected with this purported "benefit." Moreover,<br><br>**Redacted** |

52

| DEBTORS' AND LENDERS' ASSERTION: | COMMITTEE'S RESPONSE: |
|---|---|
| | **Redacted** |
| Capmark avoided termination of its underwriting and servicing agreements and licenses with Fannie Mae, Freddie Mac and HUD, which would have substantially impaired the value of its North America servicing and mortgage banking business (citing unknown information provided by Capmark management). | It is unclear whether all, any or only a portion of these contracts would have been terminated. Upon information and belief, based on the Committee's and its professionals' investigations thus far in these early stages of the proceedings, *at worst* only half of these contracts would have been terminated. |
| Capmark was able to prepare plans for Capmark Bank to remain properly capitalized and discuss those plans in detail with banking regulators, helping to avoid an FDIC receivership of Capmark Bank (citing unknown information provided by Capmark management). | No value. Based on information obtained from the FDIC's website, average capital ratios of banks seized in the late 2008 through early 2009 timeframe were in the low single digits, as opposed to Capmark, whose capital ratios were all in the mid double-digits in May 2009. Even Lehman Brothers' banks were not seized by the FDIC and the holding company did not have to contribute capital until approximately 6 months after Lehman's bankruptcy filing.<br><br>The FDIC was not likely to seize Capmark Bank simply because of a chapter 11 filing, at any rate. The FDIC routinely negotiates with bankruptcy debtors. Indeed, the Debtors did not reach a settlement with the FDIC until *after* the petition date and there was nothing that prevented the Debtors from making the same capital infusions postpetition that made prepetition |

53

| DEBTORS' AND LENDERS' ASSERTION: | COMMITTEE'S RESPONSE: |
|---|---|
| Capmark was able to wind down most of its derivatives contracts with third parties in an orderly manner prior to the bankruptcy filing (citing unknown information provided by Capmark management). | Capmark only had $100 million of exposure. At any rate, it is unclear how the Secured Credit Facility would have any effect on Capmark's ability to wind down its derivative contracts, and the Debtors do not purport to explain. |
| Unlike other mortgage servicers who virtually forfeited the value of their servicing in chapter 11, Capmark was able to sign an Asset Put Agreement with Berkadia LLC in early September with respect to a sale of the servicing and mortgage banking businesses, which transaction closed in December 2009, generating total cash proceeds to Capmark of approximately $509.64 million. | As discussed above,<br><br>**Redacted**<br><br>Even if some of the servicing business's value were lost by an earlier chapter 11 filing due to a transfer of the fee for service businesses, the other portions of the business would likely have been protected by the automatic stay.<br><br>Even if the Estates had lost the full $509.64 million of net proceeds from the sale, unsecured creditors, *i.e.*, the Estates, would still be significantly better off than they are in the wake of the Secured Credit Facility. |
| Capmark was able to obtain court approval of an order permitting a capital contribution to Capmark Bank and limiting the FDIC's claim in the chapter 11 cases under the Capital Maintenance Agreement to a claim against CFGI in the amount of capital contributed (and to be contributed) to Capmark Bank under the order. | The Debtors do not explain how this purported value resulted from the Secured Credit Facility.<br><br>[ **Redacted** ] |

54