# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| *In re* | : | **Chapter 11** |
|  | : |  |
| **CAPMARK FINANCIAL GROUP INC.,** *et al.*, | : | **Case No. 09-13684 (CSS)** |
|  | : |  |
| **Debtors.** | : | **Jointly Administered** |
|  | : |  |

-----------------------------------------------------------------x    Re:  Docket Nos. 1526 and 1636

**DEBTORS' (I) REPLY TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' AND THE *AD HOC* GROUP OF HOLDERS OF CAPMARK'S UNSECURED BANK DEBT'S OBJECTIONS TO DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 9019 AND BANKRUPTCY CODE SECTIONS 363(b) AND 549(a)(2)(B) FOR ORDER APPROVING SETTLEMENT BETWEEN DEBTORS AND THEIR PREPETITION SECURED CREDIT FACILITY LENDERS, AND (II) SUR-REPLY TO REPLIES TO DEBTORS' OBJECTIONS TO THE COMMITTEE'S MOTION FOR ENTRY OF AN ORDER GRANTING IT LEAVE, STANDING, AND AUTHORITY TO PROSECUTE CAUSES OF ACTION <u>ON BEHALF OF THE DEBTORS' ESTATES</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 2

ARGUMENT ............................................................................................................................... 8

I.      PAYMENT OF PREPETITION SECURED CLAIMS BEFORE CONFIRMATION IS PERMITTED PURSUANT TO BANKRUPTCY CODE SECTIONS 361, 363(B), 363(E), AND THIS COURT'S CASH COLLATERAL ORDER ................................................................................................ 8

II.     THE SETTLEMENT IS NOT AN IMPERMISSIBLE SUB ROSA PLAN .................... 12

III.    SECTION 1129(A)(7) IS INAPPLICABLE TO A PRE-CONFIRMATION SETTLEMENT ................................................................................ 15

IV.     THE COURT SHOULD APPROVE THE SETTLEMENT BECAUSE THE SETTLEMENT IS WITHIN THE RANGE OF REASONABLENESS ................................................................................................. 17

        A.      THE COMMITTEE SEEKS APPLICATION OF AN IMPROPER STANDARD OF REVIEW FOR A SETTLEMENT ............................................ 17

        B.      POTENTIAL AVOIDANCE ACTIONS AGAINST THE SECURED LENDERS HAVE LITTLE OR NO MERIT .................................... 21

                (i)     The Constructive Fraudulent Transfer Claim Has Virtually No Merit ..... 21

                (ii)    The Secured Lenders' Guaranty Claims Are Not Limited ....................... 28

        C.      THE BENEFITS OF THE SETTLEMENT ARE NOT ILLUSORY ................................................................................................ 37

        D.      THE PURPORTED SETTLEMENT AMOUNT IS WITHIN THE RANGE OF REASONABLENESS ...................................................... 40

        E.      THE SETTLEMENT NEGOTIATIONS WERE HARD-FOUGHT AND AT ARMS-LENGTH ................................................................... 43

V.      THE STANDING MOTION SHOULD BE DENIED ..................................................... 46

        A.      THE DEBTORS' DECISION TO SETTLE WITH THE SECURED LENDERS RATHER THAN PURSUE MERITLESS AVOIDANCE CLAIMS WAS PRUDENT .......................................................... 46

        B.      THE SETTLEMENT DOES NOT STAND AS A BAR TO INSIDER PREFERENCE CLAIMS .............................................................. 48

CONCLUSION ........................................................................................................................ 50

i

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
                                              :
*In re*                                       :    Chapter 11
                                              :
**CAPMARK FINANCIAL GROUP INC.,** *et al.,*   :    Case No. 09-13684 (CSS)
                                              :
        **Debtors.**[1]                       :    Jointly Administered
                                              :
-------------------------------------------------------------x    Re: Docket Nos. 1526 and 1636

### DEBTORS' (I) REPLY TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' AND THE *AD HOC* GROUP OF HOLDERS OF CAPMARK'S UNSECURED BANK DEBT'S OBJECTIONS TO DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 9019 AND BANKRUPTCY CODE SECTIONS 363(b) AND 549(a)(2)(B) FOR ORDER APPROVING SETTLEMENT BETWEEN DEBTORS AND THEIR PREPETITION SECURED CREDIT FACILITY LENDERS, AND (II) SUR-REPLY TO REPLIES TO DEBTORS' OBJECTIONS TO THE COMMITTEE'S MOTION FOR ENTRY OF AN ORDER GRANTING IT LEAVE, STANDING, AND AUTHORITY TO PROSECUTE CAUSES OF ACTION <u>ON BEHALF OF THE DEBTORS' ESTATES</u>

Capmark Financial Group Inc. and its subsidiaries and affiliates, as debtors and

debtors in possession (collectively, the "<u>Debtors</u>"), submit this reply and sur-reply (collectively,

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are:  Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), Capmark Affordable Equity Inc. (2381), Capmark Investments LP (7999), and Protech Holdings C, LLC (7929).  CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044.  The addresses for all of the Debtors are available at the following World Wide Web address:  http://chapter11.epiqsystems.com/capmark.

the "Reply") in further support of the *Debtors' Motion, Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 363(b) and 549(a)(2)(B), for Order Approving Settlement Between Debtors and their Prepetition Secured Credit Facility Lenders,* dated as of September 3, 2010 [Docket No. 1636] (the "Settlement Motion"),[2] in reply to the objections filed by the Official Committee of Unsecured Creditors (the "Committee") [Docket No. 1848] (the "Committee Objection"), and the Ad Hoc Group of Holders of Capmark's Unsecured Bank Debt (the "Ad Hoc Group") [Docket No. 1841] (the "Ad Hoc Group Objection"), and in further reply to the replies to the objections and responses of the Debtors [Docket No. 1620], Citicorp North America Inc. [Docket No. 1619], the Ad Hoc Committee of Prepetition Secured Lenders [Docket No. 1615], the Goldman Lenders [Docket No. 1616], and Dune Real Estate [Docket No. 1610] (collectively, the "Standing Objections") to the Committee's *Motion for Entry of An Order Granting It Leave, Standing, and Authority To Prosecute Causes of Action on Behalf of the Debtors' Estates,* dated as of August 31, 2010 [Docket No. 1526] (the "Standing Motion").[3]

## PRELIMINARY STATEMENT

1.     In September 2010, after months of intensive negotiations over the Secured Lenders' claims, the Debtors were able to strike a deal which enhances the value of the estate – and thus the distributions available to the unsecured creditors whose interests are represented by the Objectors – by upwards of $300 million.   In particular, the Settlement provides for a $135 million discount off of the Secured Lenders' claims, pre-empts what would surely be a long, drawn-out and costly litigation, increases greatly the likelihood of a speedy

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Motion.  Certain factual materials cited herein are attached as exhibits to the Declaration of Paul J. Brodnicki II, filed herewith in support of the Settlement Motion ("Brodnicki Decl.").

[3] The Committee and Ad Hoc Group are referred to together as the "Objectors" herein.

emergence from chapter 11 (and the accompanying ability to realize a greater return on liquidated assets), and saves the Debtors tens of millions of dollars in interest payments.

2.      The Debtors will prove each of these tangible benefits at this week's hearing.  In addition, the Debtors will also submit evidence that the Settlement provides a host of other benefits, including a simplified governance structure, increased stability and employee retention, and reduced pressure from regulators, particularly the FDIC.

3.      In exchange for these benefits, the Debtors agreed to pay the discounted remainder of the Secured Lenders' $1.5 billion claim (about $975 million), along with postpetition interest and fees, and to forgo the right to pursue certain avoidance claims against the Secured Lenders relating to the 2009 Transaction.  Although the Debtors used the possibility of such avoidance actions – for constructive fraudulent conveyance and the guaranty limitation, among others – as a negotiating tool with the Secured Lenders, their exhaustive analysis of these claims led the Debtors to conclude that none (except possibly cramdown under a plan at a low interest rate) had merit.

4.      It was this extensive analysis that drove the Debtors to work towards a favorable negotiated resolution.  As fiduciaries to the estates, the Debtors believe that trading these meritless causes of action for a discount off the Secured Lenders' claims was the best result for all creditors, far superior to the alternative: plunging the estate into a lengthy, chaotic, and ultimately groundless "mutually assured destruction" litigation involving the Committee against the Secured Lenders, and the Secured Lenders against the unsecured claimholders.  One can safely assume the Secured Lenders will defend an avoidance claim against them by putting the validity and amount of the unsecured claims directly in the crosshairs of the litigation.  The net result would be an indefinitely delayed emergence from chapter 11 and the loss of millions of

dollars in value from the estates for nothing more than the ghost of a chance at a large – and improper – payoff.

5.    The Committee, eyes wide at the size of the secured loan, was apparently less concerned with the actual facts.  Once it realized the Debtors wanted no part of a shakedown of the Secured Lenders, the Committee determined to take matters into its own hands.  The results have been predictable.  Already, the Committee has been forced to sheepishly drop its once-heated demand that it be allowed to pursue avoidance actions for intentional fraud and equitable subordination.  And production of hundreds of thousands of pages of documents and multiple depositions turned out to wholly support the Debtors' positions, serving only to drive home the reasonableness of the Settlement.

6.    Nevertheless, the Objectors refuse to be put off, advancing a series of arguments that cannot withstand the slightest scrutiny.  They first assert, as a general matter, that the Debtors have no authority to pay prepetition claims prior to confirmation of a plan.  But Bankruptcy Code Sections 361, 363(b) and 363(e) expressly allow pre-confirmation payments of secured debt, and nearly $400 million of that debt has already been paid pursuant to the Cash Collateral Order the Committee itself helped negotiate.  Indeed, several courts have permitted debtors to refinance secured debt during chapter 11 to reduce the estate's interest expenses, which is also one of the many benefits of the Settlement.

7.    Next, the Objectors contend the Settlement is an impermissible *sub rosa* plan, but fail to identify one element of the Settlement that fits within the standard for identifying a *sub rosa* plan.  As the Settlement neither (i) disposes of all the Debtors' assets, (ii) disposes of all claims against the estates, or (iii) restrict creditors' right to vote, it is not a *sub rosa* plan.  In

4

any event, all of the checks and balances of the plan process have been preserved here, where the two major unsecured constituencies are able to vigorously oppose the Settlement.

8.    The same fate applies to the Objectors' argument that the Settlement violates the "best interests of creditors" test under section 1129(a)(7), as there is zero support for applying this test outside the confines of plan confirmation.  In any event, the Secured Claims must be resolved, regardless of whether the Debtors are in chapter 7 or chapter 11, and, as Judge Gonzales in *Enron*[4] made clear, if a settlement is reasonable, it will be approved in chapter 7 and chapter 11, so the 1129(a)(7) analysis must assume that outcome.

9.    Each of these arguments, however, is little more than a prelude for the Objectors' main theme: their insistence, in the face of contrary fact and law, that the Debtors have legitimate and meritorious claims for (1) constructive fraudulent conveyance, (2) a limitation of the Secured Lenders' guaranty claims to 17.2% of their face value by operation of savings clauses in the 2006 guaranties, and (3) insider preferences.

10.    The fraudulent conveyance claim is doomed by the fact that Capmark received reasonably equivalent value for its grant of a lien, as it used the proceeds of the 2009 Transaction to pay down an antecedent debt of exactly the same amount.  As the net result was a one-to-one equivalence, the 2009 Transaction could not, by any definition, have been a fraudulent transfer.  Regardless, as the Debtors will prove definitively at the hearing, the 2009 Transaction produced a number of other benefits.

11.    The Committee's assertion that the Secured Lenders' guaranty claims at CFI are limited to a fraction of their total value because the 2006 Transaction constituted a constructive fraudulent conveyance is also both legally and factually wrong.  Not only does the

---

[4] *In re Enron Corp.*, 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. 2004).

Committee evince a fundamental misunderstanding of the operation of the guaranty clauses, it also willfully ignores undisputed evidence that CFGI was highly solvent and had sufficient salable value in itself and its subsidiaries to pay all debts should they suddenly become due.  It follows that no creditor could have been harmed, a fact fatal to any constructive fraudulent conveyance claim.  Moreover, the Committee does not explain how it reconciles the fact that if its theory were indeed correct, this would necessarily mean those guaranties issued by CFI to many of the Committee's constituent unsecured claimholders as part of the 2006 and 2007 Transactions would also be *wholly* voidable, as CFI's solvency and ability to provide guaranties would have been "used up" as part of the 2006 Transaction.

12.    Finally, any reference to the potential insider preference actions in the Objections is irrelevant, as the Debtors specifically carved those particular causes of action out from the releases granted in the Settlement.

13.    Where, then, does all this leave the Objectors?  They cannot credibly attack the very real benefits provided by the Settlement to the Debtors, and remain silent with regard to *all* of them except the $135 million discount.  The best the Committee can do is argue the $135 million is only 8.5% (rather than 9%) of the *total amount* of Secured Lenders' claims, including fees and interest, while the Ad Hoc Group engages in fuzzy math to arrive at an artificially reduced discount.  Nor can the Objectors credibly assert that any of the avoidance actions they want to bring has a reasonable prospect for success.  And their contention that the Debtors are hopelessly conflicted is belied by the Committee's own decision to drop its claim for intentional fraud, as well as the record, which demonstrates conclusively that negotiations between the Debtors and Secured Lenders were hard-fought and contentious (with the Debtors on several occasions threatening to throw open Secured Lenders' claims to litigation that would

involve the Committee), that Debtors' management and Board scrupulously observed their fiduciary duties in analyzing all aspects of the Settlement, and that – contrary to its representation – the Committee was consulted throughout the negotiation process.

14.    So the Objectors ultimately fall back on their opening position:  urging this Court to sanction the nuclear option of all-out litigation strictly to pursue a lottery ticket bonanza.  The Objectors make this pitch either in the vain hope that one of the avoidance actions might succeed, resulting in a larger piece of a smaller pie for unsecured claimholders, or because the immense diminution of value to the estates that would result from such litigation and the corresponding delay in emergence might lead the other parties to cut the Objectors a larger slice of the pie without even having to prove their spurious claims.  Unfortunately for the Objectors, however, it is well within the range of reasonableness to turn down a pricey lottery ticket for a valuable sure thing, which is exactly what the Debtors have done here.  Even assuming *arguendo* that a strong-arm litigation in the face of all the exposed facts may still be a reasonable decision, the law is clear that the existence of an alternative reasonable decisions is not a basis for denying the reasonable decision chosen by the Debtors – and just as courts do not choose their preferred reasonable decisions over an alternative reasonable decision selected by the Debtors, neither can the Objectors.

15.    Debtors respectfully request that this Court approve the Settlement.

RLF1 3618340v. 1

## ARGUMENT

I.    **PAYMENT OF PREPETITION SECURED CLAIMS BEFORE CONFIRMATION IS PERMITTED PURSUANT TO BANKRUPTCY CODE SECTIONS 361, 363(b), 363(e), AND THIS COURT'S CASH COLLATERAL ORDER[5]**

16.    The Objectors' contention that, absent extraordinary circumstances, the Debtors are barred from satisfying the Secured Claims before plan confirmation is unavailing, as it ignores the Debtors' ability under sections 361, 363(b), and 363(e) of the Bankruptcy Code to refinance uneconomical prepetition debt.[6]    Indeed, this type of refinancing was approved in two different instances in the *Calpine* chapter 11 cases, and each time was affirmed on appeal by separate District Courts.

17.    In *Law Debenture Trust Co. v. Calpine Corp. (In re Calpine Corp.)*, 356 B.R. 585, 589 (S.D.N.Y. 2007), the debtors sought to satisfy approximately $645 million of secured notes without paying a make-whole premium.    To partially fund the payment, the debtors used the proceeds of the noteholders' collateral.    However, the proceeds were only sufficient to pay approximately $400 million of the $645 million outstanding under the notes.    *Id.* at 588-89.    To make up the difference, the debtors used the proceeds of their DIP facility, which was not part of the noteholders' collateral.    *Id.* at 589.    As justification for the prepayment, the debtors noted the negative interest spread between the rate they were currently paying on the notes (9.625%) and the rate they were earning on their cash (4.42%) and paying on their DIP facility (7.9%).    *Id.* at 588-589.    In affirming the Bankruptcy Court's decision to approve the

---

[5] The Cash Collateral Order, dated December 22, 2009 [Docket No. 517] and entered in these chapter 11 cases with the Committee's tacit approval, provides for preconfirmation payments in respect of the secured claims up to at least $400 million.

[6] By their express terms, Bankruptcy Code sections 363(b) and (e) authorize preconfirmation payments in respect of secured claims.    *See* 11 U.S.C. §363(b) ("The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."); and 11 U.S.C. §363(e) ("Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.").

8

prepayment, the District Court (Scheindlin, D.J.) held that the repayment of debt outside a plan was "an appropriate use of cash under sections 363(b) and 105(a)" and "the repayment of the outstanding principal of the [n]otes stopped the unnecessary loss of funds from [d]ebtors' estates." *Id.* at 597. Similarly, the same court (Daniels, D.J.) recently affirmed a decision approving the payment of prepetition notes outside a plan in *HSBC Bank USA v. Calpine Corp.*, No. 07 Civ. 2088, 2010 U.S. Dist. LEXIS 96792 (S.D.N.Y. Sept. 14, 2010). In doing so, the District Court found that "[r]epayment saved [d]ebtor substantial amounts of money and it did not dictate the terms of a reorganization plan." *Id.* at *33.

18.     In *United States ex rel. Rural Electrification Admin. v. Wabash Valley Power Ass'n (In re Wabash Valley Power Ass'n)*, 167 B.R. 885 (S.D. Ind. 1994), over the objection of the non-refinanced creditor, the court approved the refinancing of expensive prepetition debt using cash collateral that secured both the loan being refinanced as well as the loan held by the non-refinanced creditor. The court further noted that even if the promissory notes for the refinanced did not constitute cash collateral and were determined to be property of the estate, the debtor could use it to do so under section 363(b). *Id.* at 889, n.7; *see also In re Indus. Office Bldg. Corp.*, 171 F.2d 890, 893 (3d Cir. 1949) (affirming decision permitting the repayment of bonds under Chapter X of the Bankruptcy Act where such payment would not interfere with the debtor's ability to continue its business and its prospects for reorganization).

19.     Thus, both the statute and the jurisprudence directly support repayment of the Secured Claims in these cases. Putting aside the merits of the compromise of the validity and amount of the Secured Claims, which will need to be decided by this Court in the first instance, the immediate payment of the claims in cash is smart economics. Presuming this Court approves the Settlement, there is no reason not to rectify the Debtors' negative interest spread by paying

the Settlement amount now.  The Debtors submit that the evidence at the hearing will establish that the Debtors have sufficient cash to satisfy the Secured Claims (at the compromised amount), while continuing to operate their businesses, and to confirm chapter 11 plans.

20.     The decisions cited by the Objectors in opposition to repayment of the Secured Claims are inapposite.  For instance, in *In re Air Beds, Inc.*, 92 B.R. 419 (B.A.P. 9th Cir. 1988), the court rejected the payment of a claim prior to confirmation because the debtor was proposing to distribute the proceeds of a sale of assets to a party with a claim potentially junior to that held by the party objecting to the settlement, and the court found a liquidating plan could not be effectuated without the proceeds.[7]  *Id.* at 423.  That is not the situation before this Court – in fact, it is the opposite.

21.     Each of the "necessity of payment" cases cited by the Committee[8] involves the payment of *unsecured* debt prior to confirmation.  The distinction is notable.  When a non-priority unsecured creditor is paid before confirmation, it is at the expense of similarly situated unsecured creditors not receiving the same treatment.  With a secured claimholder, however, the concern of disparate treatment is not present, as the secured claimholder has an entitlement to be paid in full the value of its collateral before any residual value flows down to other claimants.  That unencumbered cash is being used to repay the Secured Claims does not change the calculus, as the Committee has already conceded that the Secured Claims are

---

[7]  The unique circumstances in *Air Beds* require further elaboration.  As noted above, the debtor was seeking authority to distribute the proceeds of a sale to the holder of a tax lien on the assets being sold.  *Id.* at 421.  A landlord holding an administrative claim for unpaid rent objected to the distribution on the ground that the debtor was likely headed to liquidation (the landlord indicated its intent to move to convert the case to chapter 7) and that, under section 724(b), the landlord's administrative expense claim would have priority over a tax lien, even though the lien was on the assets that were sold.  *Id.* at 422-23.  In that instance, it would be wholly improper for the debtor to abrogate the priority scheme outlined in section 724(b).

[8]  *In re Lehigh & New England Ry. Co.*, 657 F.2d 570 (3d Cir. 1981); *In re Just for Feet, Inc.*, 242 B.R. 821 (D. Del. 1999); *In re Columbia Gas Sys.*, 171 B.R. 189 (Bankr. D. Del. 1994).

10

oversecured[9] and the Debtors could, as the debtor did in *Calpine*, borrow the necessary funds under section 364 of the Bankruptcy Code.

22.     Moreover, the Committee's reliance on *Official Comm. of Equity Security Holders v. Mabey*, 832 F.2d 299 (4th Cir. 1987), is equally misplaced.  The Fourth Circuit in *Mabey* was confronted with a showstopper:  the debtor was attempting to pay unallowed claims with no means to recover the money.[10]  Additionally, the court emphasized it found no authority to pay *unsecured* claims prior to plan confirmation.[11]  *Mabey*, 832 F.2d at 300-03.  Here, Bankruptcy Code sections 361 and 363 require payments in respect of secured claims prior to plan confirmation and this Court's Cash Collateral Order, which the Committee helped negotiate. The Cash Collateral Order has permitted the estates to make principal repayments to the Secured

---

[9] Motion of the Official Committee of Unsecured Creditors Seeking Entry of an Order Terminating the Requirement that Additional Principal Payments Be Made Subject to the Cash Collateral Order, dated August 10, 2010 [Docket No. 1527].

[10] *Mabey*, 832 F.2d at 301, provides:

> Robins and the Equity Committee have challenged the validity and amount of many of these claims, and none of these alleged Dalkon Shield claims have yet been 'estimated' pursuant to 11 U.S.C. 502(c) or 'allowed' pursuant to 11 U.S.C. 502(a).

Indeed, the debtor conceded, *id.*, unallowed claims may be paid and there was no way of recovering the money:

> However, if the claim of a participant is ultimately disallowed under a plan of reorganization, or valued at Fifteen Thousand Dollars or less, the claimant, while not being required to repay any amounts paid on her behalf for reconstructive surgery, will receive no additional distribution.

[11] The significance of the unsecured status of the claims at issue in *Mabey* cannot be minimized, as the Fourth Circuit repeated in its decision:

> The Bankruptcy Code does not permit a distribution to *unsecured* creditors in a Chapter 11 proceeding except under and pursuant to a plan of reorganization that has been properly presented and approved. . . . The clear language of these statutes, as well as the Bankruptcy Rules applicable thereto, does not authorize the payment in part or in full, or the advance of monies to or for the benefit of *unsecured* claimants prior to the approval of the plan of reorganization. The creation of the Emergency Treatment Program has no authority to support it in the Bankruptcy Code and violates the clear policy of Chapter 11 reorganizations by allowing piecemeal, pre-confirmation payments to certain *unsecured* creditors.

*Mabey*, 832 F.2d at 302 (emphasis added).

RLF1 3618340v. 1

Lenders of $400 million to date.  Finally, although immaterial to the instant contested matter, to avoid overlooking the obvious, *Mabey* has not been followed in the Third Circuit or any other Circuit Court to the knowledge of the Debtors.

## II.    THE SETTLEMENT IS NOT AN IMPERMISSIBLE SUB ROSA PLAN

23.    The Objectors' argument that the Settlement is an impermissible *sub rosa* plan must also be rejected, as it is supported by neither law nor fact.

24.    A settlement constitutes a *sub rosa* plan when the settlement has the effect of dictating the terms of a prospective chapter 11 plan.  *See Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors & Debtors in Possession (In re Tower Auto. Inc.),* 241 F.R.D. 162, 168 (S.D.N.Y. 2006).  To be found to dictate the terms of a plan, the settlement must either (i) dispose of all claims against the estate, or (ii) restrict creditors' rights to vote.[12]  *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 354-55 (5th Cir. 1997)*; In re Tower*, 241 F.R.D. at 169; *DeBenedictis v. Truesdell (In re Global Vision Prods.)*, No. 09 Civ. 347, 2009 U.S. Dist. LEXIS 64213, at *20 (S.D.N.Y. July 13, 2009).  It cannot be seriously argued that any of these categories apply to the Settlement, and the Objectors wisely refrain from making that argument.

25.    Instead, the Objectors argue that preconfirmation approval of the Settlement deprives them of critical protections present in a chapter 11 confirmation process.  *See* Committee Objection at ¶19; Ad Hoc Objection at ¶65.  This is categorically incorrect.  If one assumed the Debtors proposed a chapter 11 plan for CFI that provided the Secured Lenders the same Settlement at issue, and provided the unsecured claimholders all the stock in the reorganized debtor, section 1129(a)(10) would be satisfied by the acceptance by the Secured

---

[12] The third condition (disposing of virtually all of the debtor's assets) is no longer widely followed.  It is now not unusual for a chapter 11 debtor to sell all of its assets in advance of filing a chapter 11 plan.

Lenders, just as they have accepted the Settlement.  The confirmation hearing would start with consideration of the Settlement, just as the instant Settlement hearing will be conducted.  In other words, the unsecured claimholders are not losing any procedural or substantive protections.

26.    The Objectors further argue that unsecured claimholders are denied the alleged entitlement to the Debtors' unencumbered cash to fund their recoveries in a plan.  *See* Committee Objection at ¶22; Ad Hoc Objection at ¶62.  First, the Collateral being unencumbered as a result of the Settlement can be sold or worked out to produce more cash.  Second, unsecured claimholders do not have a right to any specific property to fund their recoveries.  A plan can provide unsecured claimholders with many alternative forms of consideration (stock, unsecured notes, cash, etc.), so long as their treatment under the plan conforms to section 1129 of the Bankruptcy Code.  *See* 11 U.S.C. § 1129.  The Objectors turn the principles of secured claims status on its head.  That some creditors have collateral for their claims does not give the unsecured creditors some preferred right to the estate's unencumbered assets.

27.    The Ad Hoc Group goes further and argues that the releases contained in the Settlement transform it into a *sub rosa* plan.[13]  If the Ad Hoc Group were correct, the bankruptcy court could never approve a settlement outside a plan because all or nearly all settlements provide for exchanges of mutual releases.  Indeed, no one can afford to settle if after the settlement either side can bring more claims.  Such releases are a natural and expected term in a settlement agreement, as the point of settlement is to finally and fully resolve outstanding disputes between the parties.    Without such releases, a settlement would be ineffective.  Moreover, no direct claims held by any third parties are being released, so it is plainly false for

---

[13] As is specified in more detail in section 2 of the Settlement Agreement, the Debtors and the Secured Lenders have agreed, effective upon approval by this Court, to mutually release each other and their respective direct and indirect parent companies, subsidiaries, and affiliates, each of their respective predecessors, successors, and assigns, and all of each of their respective past and present employees, general partners, officers, directors, managers, stockholders, and professionals (collectively, the "Released Parties").

the Ad Hoc Group to claim that unsecured claimholders are being deprived of rights they currently possess.  To the extent the unsecured claimholders possess direct causes of action against any of the Released Parties, those rights are unaffected by the Settlement.  Notably, the Debtors are not releasing any claims against their officers and directors.

28.     Again, none of the Objectors' complaints implicate the prohibition against dictating the terms of a prospective plan.  Rather, the best evidence the Objectors can muster in making this allegation is to quote the Debtors' exclusivity motion in which the Debtors make the unremarkable statement that the Settlement clears the way to proposing and confirming a chapter 11 plan.[14]  *See* Committee Objection at ¶22; Ad Hoc Objection at ¶64.

29.     What the Objectors refuse to acknowledge is that until the secured claims are resolved, there will be *no* allowed claims eligible for distributions in these cases.  As explained in our analysis of the Committee's attempt to use the savings clause in the guaranty to limit the allowed secured claims against CFI, the first in time rule and the documents' language provide the secured claims an advantage over the bond claims against CFI because the bonds were not issued until 2007.  Therefore, if the secured claims are litigated, all the claims will be litigated.  That is why the Settlement clears the way for chapter 11 plans, and that is exactly what a debtor should be doing, as compromises are favored in chapter 11.  *See In re Global Vision Prods.*, at *18.  Clearing the way to a confirmable plan by entering into settlements is not only permissible, but applauded.  *See In re Sea Containers*, No. 08-11156, 2008 Bankr. LEXIS 2363, at *33 (finding that, though a settlement paves the way for a plan, it does not itself constitute a

---

[14] *See Debtors' Second Motion Pursuant to Section 1121(d) of the Bankruptcy Code for an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof*, dated as of August 25, 2010 [Docket No. 1597] at ¶ 18 ("Whether the Committee's Motion will be approved, or the Debtors will prevail in obtaining approval of the Settlement and thereby resolve this significant challenge to filing a chapter 11 plan, is unknown at this time.  What is clear, however, is that the outcome of these matters necessarily will dictate the form and substance of a chapter 11 plan.").

14

*sub rosa* plan); *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 467 (2d Cir. 2007) (determining that clearing the way towards confirmation of a plan is a proper business justification to approve a settlement).

30.     As to the decisions relied on by the Objectors, each involved circumstances that are inapt to the Settlement before this Court.  *See In re Hillsborough Holdings Corp.*, 153 B.R. 936 (Bankr. M.D. Fla. 1993) (denying approval of a settlement with the debtor's banks because it found that there was no actual controversy to be settled, as well as disapproving of pre-determining class treatment piecemeal without the benefit of a plan and disclosure statement[15]); *In re Louise's, Inc.*, 211 B.R. 798 (D. Del. 1997) (the debtor, in connection with the settlement of an exclusivity dispute, agreed to transfer day-to-day operating control to its largest creditor and permit that creditor to file a plan that transferred ownership to the creditor); *Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30 (S.D.N.Y. 2005) (sale order reversed because it mandated the satisfaction of secured lender claims with illiquid equity securities without the secured lender's consent).

## III.    SECTION 1129(A)(7) IS INAPPLICABLE TO A PRE-CONFIRMATION SETTLEMENT

31.     The Objectors' argument that the Settlement cannot be approved because the Debtors have not satisfied section 1129(a)(7) is illogical and legally unsupportable.  As a practical matter, section 1129(a)(7) protects creditors from receiving less value than they would receive in a chapter 7 liquidation case.  The Settlement has no impact on distributions to unsecured claimholders other than to increase the value of their distributions by up to $285 million.

---

[15] Contrast *In re Hillsborough Holdings* with *Iridium*, 478 F.2d at 459, where the Second Circuit, facing a situation not unlike the present circumstances, affirmed a lower court decision approving a settlement with certain bank lenders whose liens and claims were deemed valid in exchange for a reduction in the lenders' recovery.

32.     To support their novel argument that 1129(a)(7) applies to this Court's consideration of the Settlement, Objectors cite decisions referencing the "fair and equitable" standard for the approval of settlements under Rule 9019 as articulated by the Supreme Court in *TMT Trailer Ferry*.   These decisions have held that "fair and equitable" are terms of art referring to the absolute priority rule found in section 1129(b) of the Bankruptcy Code.   The Objectors then make the unwarranted leap from that limited premise to presume that all requirements of section 1129 must be met for a settlement to be approved.   Again, the Objectors cite no authority (and the Debtors could locate none) for such an extension and it is contrary to the plain language of section 1129(a), which states "The court shall confirm a *plan* only if all of the following requirements are met: . . ."

33.     The Objectors' section 1129(a)(7) argument is a red herring for another reason.   As noted above, the Objectors insist the Settlement deprives the unsecured claimholders of a right they do not possess, namely the entitlement to specific property to fund their recoveries.   This does not change in a liquidation scenario.   *See* 11 U.S.C. § 726.   Moreover, as the court in *In re Enron Corp.*, No. 01-18034, 2004 Bankr. LEXIS 2549, at *118-19 (Bankr. S.D.N.Y. July 15, 2004), observed, section 1129(a)(7) requires an "apples to apples" comparison that contains the same settlement.   In *Enron*, the issue of substantive consolidation was settled by providing each creditor or each Enron debtor a distribution computed 70% as if there was no substantive consolidation and 30% as if there were substantive consolidation.   Entities objecting to confirmation asserted that section 1129(a)(7) must be applied as if there were no substantive consolidation.   The court ruled the issue would have to be settled in chapter 7 the same as in chapter 11 and assumed the same settlement would be done in chapter 7.   *Id*. at *117-120. Similarly, the secured claims here would have to be settled in chapter 7 the same as they need to

be settled in chapter 11. Therefore, the Settlement has no impact on the best interest test. Therefore, even if the instant Settlement were proposed as part of a chapter 11 plan, in applying the best interests test, the Court would compare outcomes in chapter 11 with the settlement to outcomes in chapter 7 with the settlement. The Objectors provide no reason the unsecured claimholders would receive a larger recovery in chapter 7 if the Settlement is approved. Finally, liquidating the Debtors' assets in a fire-sale process rather than pursuant to a chapter 11 plan that works them over time in a going concern environment in anticipation of market improvement cannot possibly yield better results and the Committee does not claim otherwise.

## IV. THE COURT SHOULD APPROVE THE SETTLEMENT BECAUSE THE SETTLEMENT IS WITHIN THE RANGE OF REASONABLENESS

### A. THE COMMITTEE SEEKS APPLICATION OF AN IMPROPER STANDARD OF REVIEW FOR A SETTLEMENT

34. The Objectors argue the Settlement cannot be approved because it purportedly assigns no value to the sole remaining claim the Committee seeks standing to litigate[16] and was the result of a "deeply flawed" process. Putting aside the unsubstantiated allegations about lack of process between the Committee and the Debtors,[17] the Objectors'

---

[16] In the Committee Objection, the Committee withdraws its request for standing to assert claims for intent to delay, hinder, or defraud creditors and for equitable subordination, having recognized the claims are wholly without merit. *See* Committee Objection, ¶ 75 n.16. Given that the Settlement preserves for the estates the insider preference claims, the only claim the Committee appears to contest settling is constructive fraudulent conveyance. The Committee also purports to assert a "Guaranty Limitation Claim," based on a savings clause, which, as discussed below, is based on (i) a defective legal analysis providing that a guarantor's balance sheet should include the guaranteed debt at its undiscounted face value and not its probable liability or the guarantor's rights of reimbursement from the primary obligor, and (ii) a set of facts diametrically opposed to the only facts asserted by any witness, namely that in 2006 and 2007 Capmark had sufficient salable value to repay all its debts in full in cash, including its guaranteed debts.

[17] The allegation the Settlement derives from a deeply flawed process between the Debtors and unsecured claimholders is both legally immaterial and contrary to undisputed facts, namely (a) that this is perhaps the only or one of the only chapter 11 cases where communications between the debtor and the statutory creditors' committee are so plentiful and extensive that (i) the Debtors provided the Committee with a complete written statement of facts and oral analysis of all legal issues and (ii) the Committee provided the Debtors with its written legal analysis of the avoidance claims, and (b) the Debtors' continual engagement and discussions with the Committee regarding the claims, including: (i) meeting with ad hoc groups of unsecured creditors before these cases, (ii) the extensive negotiations between the Debtors, the Committee, and all other major stakeholders in these cases regarding

17

arguments to prosecute the constructive fraudulent transfer claim should be treated as what they are – a transparent attempt to substitute nonviable fraudulent transfer claims for nonexistent voidable preference claims to create a false impression that the Debtors' settlement, which enhances the Debtors' estates by close to $300 million, is too small.

35.    To do this, the Objectors claim there are "serious issues" of fact that will require expensive and complex litigation to resolve.  In effect, the Objectors push the Court to adopt a "colorable claim" standard in reviewing a Bankruptcy Rule 9019 settlement, which is contrary to the United States Supreme Court's standard for evaluating bankruptcy settlements set forth in *Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

36.    As noted in the Settlement Motion, the Court's inquiry on a settlement precludes a mini-trial on the merits:  "the Court's task is not to decide the numerous questions of law and fact raised by objections but rather to canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness."  *In re Exide Techs.*, 303 B.R. 48, 68 (Bankr. D. Del. 2003) (internal citations omitted); *see also* Settlement Motion at ¶¶ 28-31.[18] Notably, "the court does not have to be convinced that the settlement is the best possible compromise."  *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004) (citing *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994)).  The Court must only conclude the settlement is within "the reasonable range of litigation possibilities."  *In re Penn Cent. Transp.*

---

resolving the claims, and (iii) the Debtors' communications with the Committee about the Settlement, all as discussed below.

[18] The Bankruptcy Rule 9019 settlement standard is completely different than the colorable claim/motion-to-dismiss standard urged by the Committee.  On a motion to dismiss, the inquiry "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 740 (Bankr. D. Del. 2003) (internal citation omitted).  On a settlement, the Court need only "canvass the issues" to determine whether it was reasonable for the Debtors to conclude there is a low probability of success in ultimately prevailing on the merits of the constructive fraudulent transfer claim.

*Co.*, 596 F.2d 1127, 1151 (3d Cir. 1979).[19]    The Debtors believe the Settlement is the best possible outcome.

37.    Throughout their objections, the Objectors attempt to side-step this standard and a careful review of the four-factored *Martin* test employed by courts in the Third Circuit in reviewing the reasonableness of a settlement.[20]    *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).  In doing so, the Committee suggests the Settlement may only be approved if the Committee agrees with it and, citing *In re Exide*, 303 B.R. at 70, argues that, as a representative of purported involuntary investors in the Debtors, its views should be accorded the decisive weight in assessing the settlement.[21]

---

[19] One bankruptcy court recently admonished parties regarding the proper settlement standard under Bankruptcy Rule 9019 after being deluged with evidence and arguments that amounted to a mini-trial on claims being settled:

> It is important to remember that the focus of the court's determination of whether or not to approve the compromise is not the result that might have obtained had the case been tried, but rather the reasonable calculus of a range of settlement possibilities – based upon reasonable investigation and knowledge of pertinent facts – exercised by the Trustee at the time the compromise was entered into.  The parties had a great deal of difficulty separating trial of the case on its merits from determination of the contested matter regarding approval of the Trustee's compromise . . . .  The court mentions the foregoing to note that many of the arguments advanced by the parties in their post-trial memoranda relate to the merits of the adversary proceeding rather than to the circumstances of the compromise itself.

*Bayer v. Trs. of Ind. Univ. (In re Fort Wayne Telsat, Inc.)*, No. 05-12177, 2010 Bankr. LEXIS 1612, at *28-29 (Bankr. N.D. Ind. Apr. 25, 2010).

[20] The four *Martin* factors are:  (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.  *Martin*, 91 F.3d at 393.

[21] The notion that the parties seeking to commence litigation are advocating on behalf of involuntary investors akin to trade creditors is belied by the composition of the members of the Committee and the Ad Hoc Group, none of whom should be confused with unwitting creditors forced to become investors of a bankrupt debtor.  The Committee's composition is such that only one of its five members is positioned as the decision-maker: (i) two members were recused from voting because they hold secured debt; (ii) another member is the indenture trustee for the bonds who is obligated by the indentures to vote at the direction of a majority of bondholders; and (iii) the remaining member holds junior or subordinated debt that will not share in any distribution of value.  As to the Ad Hoc Group, its opposition is understandable considering that it has no tactical incentive to support the Settlement.  It stands to reason that, by opposing the Settlement, the unsecured creditors have some chance of exacting a retrade from the Secured Lenders if the Secured Lenders believe the Settlement might not be approved.  For these reasons, it is far from clear these creditor groups speak for all unsecured creditors of the estates.

38.     There is no *per se* rule that the views of a committee or other creditors are dispositive on the reasonableness of a settlement.[22]    Instead, as the Objectors' own cited decisions note, a debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the balance of the *Martin* factors, including the paramount interests of creditors, weighs in favor of settlement.    *See, e.g., In re Key3Media Group, Inc.*, 336 B.R. 87, 97 (Bankr. D. Del. 2005) (approving settlement of avoidance claims by debtor over objection of largest creditors in case and noting that while such creditors' interests should be accorded proper deference, "the objections of [the creditors] cannot be permitted to predominate over the best interests of the estates as whole"); *In re Matco Elecs. Group, Inc.*, 287 B.R. 68, 77-79 (Bankr. N.D.N.Y 2002) (finding that court could approve the debtor's settlement over the objection of the creditors' committee, but declining to do so because of "red flags" surrounding the settlement, including that debtor's officer who signed the settlement was a shareholder of the settling counterparty, debtor's counsel had taken no part in the settlement, and all signatories had been granted releases for no consideration); *see also In re Sea Containers, Ltd.*, No. 06-11156 (KG), 2008 WL 4296562, at *11 (Bankr. D. Del. Sept. 19, 2008) (approving settlement over objection of creditors most impacted by settlement where creditors failed to convince court "the settlement so affects their position as to be unfair").[23]

---

[22] A *per se* rule, or even weighing the creditors' views as the Objectors suggest, exposes the Debtors to renegade creditors preferring to risk estate assets in a litigation lottery or litigate under blackmail or strong-arm strategies. The Court should not and cannot countenance such strategies.

[23] The Committee also suggests that the Debtors' views should be given little weight because these cases are purported liquidating chapter 11 cases.  The Debtors disagree with this suggestion, given that the Debtors' continued business operations involve billions of dollars of assets and a fully functioning bank, which will continue under any chapter 11 plan and also provide a platform for new business.  Notably, the solitary case offered in support of this argument involved a debtor's business judgment under Bankruptcy Code section 363(b) in agreeing to a break-up fee, rather than the issue of whether the debtor acted reasonably in reviewing and agreeing to settle claims under Bankruptcy Rule 9019.  *See In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995).

RLF1 3618340v. 1

39.     For these reasons too, *Exide*, which the Ad Hoc Group claims "bear[s] striking similarities" to this case, does not alter the proper standard of review.  Although the *Exide* court considered strongly the views of creditors, it did not treat them as dispositive and only considered their views as one element of the four-factor *Martin* test.  303 B.R. at 70.[24]

## B.  POTENTIAL AVOIDANCE ACTIONS AGAINST THE SECURED LENDERS HAVE LITTLE OR NO MERIT

### (i)     The Constructive Fraudulent Transfer Claim Has Virtually No Merit

40.     In May 2009, the Debtors borrowed $1.5 billion contemporaneously secured by certain of the Debtors' assets and used the funds to repay $1.5 billion of antecedent unsecured debt.  Approximately five months passed before the Debtors commenced their chapter 11 cases.  Therefore, any voidable preference claims arising from the repayment disappeared (except perhaps for insider preference actions if two Secured Lenders, Goldman Sachs and Dune, were insiders and the transfers were voidable in the first place).  Instead, the Objectors posit a constructive fraudulent transfer claim based on the Debtors allegedly not receiving fair consideration/reasonably equivalent value, among other benefits flowing from the 2009 Transaction, in return for securing antecedent debt.  First, given that Bankruptcy Code section 548(d)(2) expressly defines "value" to include repayment or securing of antecedent debt, the only question is whether the value was reasonably equivalent.  It is undisputed that the Debtors only granted collateral to secure the amount of money borrowed and used to repay an equivalent

---

[24] The facts in *Exide* are clearly not similar.  In that case, the debtor agreed early in the case to waive its right to prosecute claims against secured lenders and ceded such right to the committee.  303 B.R. at 54.  The committee then commenced the actions and prosecuted the claims for close to a year before the debtor proposed a plan that incorporated a settlement of the actions.  When the votes were tallied for the plan, unsecured claimholders voted overwhelmingly against the plan's confirmation, rejecting the settlement.  *Id*. at 57.  Here, the Debtors (i) specifically reserved the right to bring avoidance actions against the Secured Lenders in the Cash Collateral Order (as defined in the Settlement Motion), (ii) carefully analyzed the merits of those claims, and (iii) despite the low probability of success, reached a settlement that creates substantial value for the estates.

amount of debt. Therefore, it is an impossibility that the Debtors did not receive reasonably equivalent value. They retired the same amount of antecedent debt they incurred!

41. To convert these indisputable facts into a litigable issue, the Objectors pretend there is not a one-to-one match of payment to antecedent debt retired by citing decisions wrestling with "reasonably equivalent value" where, for example, the issues were (a) whether the grant of new enhanced benefits to employees provided the debtors reasonably equivalent value to the amount of the pension plan surplus the debtors consumed, *In re Fruehauf Trailer Corp.*, (b) whether a commitment fee for a new loan with almost no chance of closing due to closing conditions that would not occur was reasonably equivalent value for the commitment, *In re R.M.L., Inc.*, and (c) whether the synergistic benefits to the target company of a leveraged buyout were reasonably equivalent to the pledging of its assets to secure a loan whose proceeds went to the selling shareholders, *In re Metro Commc'ns, Inc.*[25]  The Objectors further claim that CFI's guaranty of debt in 2009 was a constructively fraudulent transfer because CFI was insolvent at the time, thereby rendering the secured claims voidable. The Objectors, however, omit a key fact: CFI's guaranty in 2009 simply replaced its preexisting guaranty of the same amount of debt. Thus, CFI's insolvency is immaterial because it obtained reasonably equivalent value for

---

[25] *See, e.g., Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 215-16 (3d Cir. 2006) (grant of pension plan surplus to retain certain insider employees was not a transfer for reasonably equivalent value where a key employee retention program would have cost half as much at fair market value and amendment to plan to forego surplus was not consummated in good faith or at arm's length); *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 153-54 (3d Cir. 1996) (debtor did not receive reasonably equivalent value when it paid commitment fees of $390,000 for the opportunity to obtain a loan of $53 million that had negligible chances of closing); *Mellon Bank, N.A. v. Metro Commc'ns, Inc. (In re Metro Commc'ns, Inc.)*, 945 F.2d 635, 647-48 (3d Cir. 1991) (creditors' committee failed to satisfy its burden of showing that debtor-target in leveraged buyout did not receive reasonably equivalent value in exchange for guarantying and securing its acquiring parent's debt where debtor-target obtained benefits of synergies and ability to obtain credit, and committee "acted on the blind assumption that . . . [such indirect benefits] . . . had no value"). *But see In re Exide*, 299 B.R. at 740, 748 (declining to follow a "per se rule that transfers to secure new or antecedent debt always constitute reasonably equivalent value" and finding that the adversary plaintiffs had met their "exceedingly low" threshold "to satisfy pleading requirements," but doing so on a motion to dismiss rather than a settlement); *Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Svcs., Inc.)*, 361 B.R. 747, 760 (Bankr. D. Del. 2007) (same). Unsurprisingly, the Objectors make no effort to explain why the transfers in any of these cases are analogous to the 2009 Transaction.

issuing the new guaranty, in the form of the cancellation of its prior guaranty of the same amount of debt.

42.    Relying on the Bankruptcy Code and applicable New York law, courts in this and other jurisdictions have repeatedly recognized that paying or securing antecedent debt, even in the absence of any other indirect benefits, constitutes fair consideration/reasonably equivalent value.  *See* Settlement Motion at 28-29 nn. 23-24 (collecting cases); *see also Official Comm. of Unsecured Creditors of Champion Enters., Inc. v. Credit Suisse (In re Champion Enters., Inc.)*, Adv. No. 10-50514 (KG), 2010 WL 3522132, at *17-20 (Bankr. D. Del. Sept. 1, 2010) (dismissing claim asserted by creditors' committee under New York fraudulent conveyance law because debtor received fair consideration when it secured antecedent debt of certain lenders, including purported insider lenders); *Pardo v. Gonzaba (In re APF Co.)*, 308 B.R. 183, 187 (Bankr. D. Del. 2004) (finding constructive fraud claim could be susceptible to motion to dismiss where allegations aver challenged transfers satisfied antecedent debt).

43.    The jurisprudence under New York fraudulent conveyance law is so clear and time-tested as to leave no question that the Debtors have no valid claim under Bankruptcy Code section 544.  Although section 548 of the Bankruptcy Code does not import the precise language that provides paying or securing antecedent debt is fair consideration, it refers instead to "reasonably equivalent value" as the test.  Nonetheless, the case law under section 548 is similarly persuasive in holding that paying or securing antecedent debt is reasonably equivalent value.  Where, as here, the direct benefit is a dollar-for-dollar exchange, the Debtors submit the inquiry may begin and end with the direct benefit.  *See In re Fruehauf Trailer Corp.*, 444 F.3d at 213 (analysis requires review of "direct" and "indirect" benefits in assessing whether reasonably equivalent value was received by a debtor, but calculating "direct" benefits, "such as an

23

investment of cash that yields a cash return . . . is typically easy," whereas an analysis of indirect benefits is necessarily more complex, requiring a more searching fact-specific inquiry).

44.     The Objectors urge the Court to apply a completely contradictory test where the totality of the circumstances accords no weight to the fact that securing antecedent debt constitutes fair consideration *per se* under applicable New York law or a clear direct benefit under Third Circuit law.  Although the Objectors try to confuse the issue, there is no doubt here that a direct benefit of equivalent value inured to the Debtors upon the exchange of antecedent debt and guaranties for new debt and guaranties on a *dollar-for-dollar* basis.

45.     The Committee's argument further unravels when it attempts to refute the basic point that the Debtors could merely have paid the Bridge Loan in full, in cash, when it came due.  Unquestionably, payment of antecedent debt constitutes fair consideration or reasonably equivalent value.  Recognizing the futility of a challenge to this legal conclusion, the Committee instead argues that, as a factual matter, the Debtors were incapable of repaying the matured Bridge Loan.  For instance, the Committee claims the Debtors' CEO and President, Jay Levine, testified in his deposition that the Debtors did not have sufficient cash to pay the Bridge Loan when it matured.  *See* Committee Objection at 19.  But Mr. Levine said no such thing. Rather, he made clear that the Debtors had more than $1 billion in cash on hand at the time the $833 million Bridge Loan came due.  *See* Transcript of Deposition of Jay Levine, dated October 1, 2010 ("Levine Tr.") at 72:23-73:2, 77:10-12 (Brodnicki Decl., Ex. A).[26]  Unsurprisingly, the Committee's assertion is also at odds with other facts adduced during discovery.[27]

---

[26] Giving the Committee the benefit of the doubt that its mischaracterization of Mr. Levine's testimony only reflects a lack of careful reading of the transcript of the deposition *it took*, the Debtors note the full transcript reveals Mr. Levine did not say the Debtors were unable to pay the Bridge Loan at maturity.  Indeed, he testified the Debtors had over $1 billion in cash at the time.  Levine Tr. at 77:10-12.  Rather, in response to the question of whether the Debtors could have paid the Bridge Loan *and* had enough liquidity to remain a going concern, Mr. Levine answered he did not know if they would.  Levine Tr. at 77:18.  Mr. Levine then further explained the Debtors decided they were only *willing* to reduce their liquidity by $75 million in payment of the Bridge Loan because they needed to

46.     Bereft of any real evidence in support of its position, and in furtherance of its effort to channel the Court's attention away from the antecedent debt payment, the Committee attempts to manufacture ominous-sounding "serious potential issues of fact" regarding the indirect benefits of the 2009 Transaction.  *See* Committee Objection at 21.  In particular, the Committee highlights a couple of emails and snippets of deposition testimony devoid of any content to undermine the Debtors' representations that the 2009 Transaction helped preserve value for the estate by, *inter alia*, (i) affording the Debtors a breathing spell to address complex issues surrounding Capmark Bank, and (ii) allowing the Debtors time to arrange for the sale of the Debtors' North American servicing and mortgage lending business.   The Committee's argument that a preferable course for maximizing value would have been a precipitous free-fall bankruptcy is unsupported.  As the evidence in the deposition record clearly shows, at the time of consummation of the 2009 Transaction, the Debtors were determining how to preserve and maximize their value for creditors if an out-of-court restructuring proved unattainable.   In addition, the Debtors focused their efforts on ensuring that parties would not take advance actions that would have led to a precipitous loss in value across various assets and businesses.[28]

---

preserve cash to operate their businesses and further ongoing holistic restructuring negotiations.  Levine Tr. at 79:10-25.  And that, of course, is precisely what the Debtors accomplished when they exchanged unsecured debt for secured debt, enabling them to part with only $75 million in liquidity (rather than $833 million) to pay down the maturing Bridge Loan.  The Committee fails to note this part of Mr. Levine's testimony.

[27] *See* Transcript of Deposition of Tagar Olson, dated October 4, 2010 ("Olson Tr.") at 39:2-3 (Brodnicki Decl., Ex. B) (answering question regarding the options considered in addressing the maturity of the Bridge Loan: "One was to repay the bridge loan for cash"); *See* Transcript of Deposition of Thomas L. Fairfield, dated October 6, 2010 ("Fairfield Tr.") at 23:6-14 (Brodnicki Decl., Ex. C) ("And we were also concerned, given the continuation in the first part of 2009 of adverse market conditions and concerns about liquidity, that repaying the bridge loan might not be in the best interests of the company, and the company stakeholders, or at least repaying it in full in cash, because we-it might be better to preserve liquidity for-for other corporate purposes.").

[28] The documents produced to the Objectors are replete with information regarding the Debtors' efforts to stave off adverse consequences from counterparty actions, the immediate threat posed to the Debtors' core businesses during the time period leading up to entry into the 2009 Transaction, and the benefits the Debtors expected to gain (and did gain) from the 2009 Transaction.  A few of the many examples of these documents include the following:  As early as February 2, 2009, at a meeting of CFGI's Board of Directors, Mr. Fairfield, CFGI's General Counsel, provided the Board with an update regarding the adverse effects of breaches of the ratio covenants in the Debtors' debt documents, which were relieved by the 2009 Transaction:

At the same time, the Debtors were mindful of the need to reach an agreement with all stakeholders to achieve a holistic restructuring.[29]   The 2009 Transaction and the liquidity it maintained was the best viable option at the time to pursue these goals.[30]

47.    The Committee also raises a series of arguments calling into question whether the Secured Lenders, as defendants in a fraudulent conveyance action, could avail themselves of the good faith transferee defense under Bankruptcy Code section 548(c).[31] Apparently realizing that section 548(c) expressly provides the Secured Lenders are entitled to keep CFI's 2009 guaranty because they took it in exchange for a 2006 guaranty, the Committee

---

> Mr. Fairfield explained that [a breach of the leverage ratio covenants] could lead to other adverse consequences, such as a downgrade in Capmark Servicing's servicer ratings and which could result in the termination of the Company's CMBS servicing contracts as well as the servicing contracts with Fannie Mae, Freddie Mac and HUD.

See CFGI Board Minutes for Meeting Held on February 2, 2009, CAPMARK070317 (Brodnicki Decl. Ex. D). Thereafter, pressure increased on the Debtors' core businesses, and the situation had become more serious.  Indeed, in early May 2009, Mr. Levine, the Debtors' President and CEO, reported to CFGI's Board the following:

> Mr. Levine reviewed the discussions with the Government Sponsored Entities ("GSEs") including Fannie Mae, who were increasingly pressuring the Company over the uncertainty of the restructuring negotiations with the lenders. Mr. Levine explained that the GSEs were considering contract terminations with the Company.  He said that he and others at the Company would be going to Washington, D.C. this week to meet with representatives of the GSEs and brief them on the Company's intention to immediately pursue a sale of the servicing platform, as a way to avoid GSE termination actions and preserve value for the Company.

See CFGI Board Minutes for Meeting Held on May 3, 2009, CAPMARK070403 (Brodnicki Decl. Ex. E).

[29] See Levine Tr. 79:14-25 ("[T]he goal of management and the board was to effectuate a holistic restructuring of the debt, including all the classes of debt, and one of those things that was important to effectuate that would have been cash retained by the company.  So in order to be able to manage an entire restructuring, which was the goal of the company from the beginning until the end, having cash in our account was one of the critical elements that we were trying to preserve."); see also Fairfield Tr. 34:13-36:23.

[30] In early May 2009, Tagar Olsen, a member of CFGI's Board and of the Special Committee appointed by the Board to analyze restructuring alternatives, reported to the Board the pressures on the core businesses that would be relived by the 2009 Transaction.  See CFGI Board Minutes for Meeting Held on May 7, 2009, CAPMARK070408 (Brodnicki Decl. Ex. F) ("Mr. Tagar C. Olson echoed the sentiment that a bank deal would allay many of the FDIC's concerns as well as stabilize the servicing platform (and potentially yield more value for the Company) and enable the Company to engage with all of its creditors on a more orderly basis.").

[31] Under Bankruptcy Code section 548(c), where a transferee establishes it accepted the transfer or obligation (i) in good faith and (ii) for value, the transferee may retain the property transferred or enforce the obligation incurred by the debtor to the extent of the value given by the transferee in exchange.  See 11 U.S.C. § 548(c).

26

attempts to challenge the Secured Lenders' good faith. Notably, the collateral security was granted for a new loan. It was repayment of $1.5 billion of the old guaranteed loan and the grant of a new guaranty to replace the old guaranty that is preserved by section 548(c). The Committee argues the good faith defense would not be available to the Secured Lenders, citing emails showing the Secured Lenders were aware of an error in the indentures that was corrected before the Secured Facility was effectuated. The Debtors considered the indenture amendment issue and do not believe the Secured Lenders' awareness of the amendment would either dissuade them from raising the good faith defense or undermine a defense on the merits.[32] As the evidence produced in discovery shows, and as the Debtors will further show at the hearing, the correction to the indentures was made only after a scrivener's error was discovered and a reasonable investigation was undertaken to ensure correcting the error would accord with the drafters' original intent as it was written into the actual proxy materials explaining the transaction. There are simply no facts suggesting the Secured Lenders did not act in good faith when they became aware of the error and asked that it to be corrected before closing. The Committee has not cited one piece of evidence to the contrary, and its abandonment of an intentional fraud claim belies its assertion that the Secured Lenders did not enter into the Secured Credit Facility in good faith.

48.     In the final analysis, it is clear the Objectors are unhappy the 2009 Transaction occurred outside the preference period and are determined to see whether the Secured Lenders can be stripped of more. All of the Objectors' arguments are focused on accomplishing through nonviable fraudulent transfer claims what they cannot do under

---

[32] The Committee also claims the good-faith defense is not appropriate in considering the settlement because the "defense is inapplicable at the pleading stages of a case" and the burden is on the defendant-transferee to plead and establish the defense. Here again the Committee attempts to divert the Court away from applying the standard applicable to settlements under Bankruptcy Rule 9019 and Supreme Court authority.

preference law.  But courts in this and other districts have made clear that attempts to restyle preference claims as fraudulent transfer claims should be given no consideration.  *See*, *e.g.*, *In re Sharp Int'l*, 403 F.3d 43, 54 (2d Cir. 2005) ("preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because '[t]he basic object of fraudulent transfer law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them.'") (emphasis in original) (quoting *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995)); *Official Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse (In re Champion Enters.)*, 2010 Bankr. LEXIS 2720, at *62 (Bankr. D. Del. Sept. 1, 2010) (preference payments favoring one group of creditors does not constitute a fraudulent transfer); Settlement Motion at ¶ 49.

49.    The Debtors have devoted a great amount of time and effort to analyzing the constructive fraudulent transfer claim, and for the reasons set forth in the Settlement Motion and herein, they believe it has virtually no chance of success.  As a result, the Debtors submit the instant settlement is far above the lowest point in the range of reasonableness, and is a much preferable mode of creating value for the estates than attempting to resurrect preference claims, which no longer exist (if they ever did).[33]

*(ii)    The Secured Lenders' Guaranty Claims Are Not Limited*

50.    The Committee next accuses the Debtors of ignoring the purported merit of its so-called "Guaranty Limitation Claim" (set forth in Count XII of its draft complaint).  The Committee argues the Secured Lenders' guaranty claims at CFI are limited to 17.2% of their total amount on the theory the incurrence of guaranty debt in the 2006 Transaction constituted a

---

[33] It is significant to note that not a single unsecured creditor approached the Debtors before the preference period expired with a suggestion, request, or demand that the Debtors file for bankruptcy to preserve the preference claim.

constructively fraudulent incurrence of debt if not limited by a savings clause in the guaranty. To the contrary, the Settlement Motion squarely addresses this potential cause of action, *see* Settlement Motion at ¶¶ 51-52, and the Debtors' management and directors considered it in negotiating the Settlement.[34]  As set forth in the Settlement Motion and below, the Committee's theory is demonstrably fallacious, legally and factually.

51.    The Committee asserts that because CFI's net worth was $1.1 billion in 2006, its guaranty could not be valid for more than $1.1 billion and, in fact, the Committee spins a theory that would limit CFI's guaranty of bank debt to far less.  Legally, the Committee is wrong:  (a) the probability of the guaranty being triggered at the time of the 2006 Transaction was not 100%, and (b) CFI had reimbursement claims against CFGI for whatever amount CFI would pay on its guaranty of CFGI's debt.  Factually, the Committee is wrong because it ignores the Debtors' expert's determination that in 2006, CFGI had sufficient salable value in itself and its subsidiaries to repay CFI in full for all amounts CFI was liable to pay on its guaranty, thereby showing that no creditors were harmed by CFI's incurrence of its guaranty liability.

52.    As noted in the Settlement Motion, the Debtors engaged in exhaustive factual research concerning the 2006 Transaction, including the retention of Duff & Phelps to perform an analysis of the solvency of CFGI (on an enterprise basis) and the individual guarantors (including CFI) at the time of and following the 2006 Transaction.  The Debtors' expert determined that, at the time of the 2006 Transaction, CFGI's net worth exceeded $2 billion and it was capable of marshalling all its assets (CFGI directly and indirectly owns all Capmark subsidiaries) to pay all its debts (without regard to any savings clauses), including the

---

[34] This theory was detailed in the memorandum provided by Kramer Levin Naftalis & Frankel, LLP (counsel to the Committee) to the Debtors in April 2010.  The Debtors' management and directors considered all of the Committee's theories and arguments in determining whether to enter into the Settlement.  *See* Fairfield Tr. at 153:15-154:9; Transcript of Deposition of Mohsin Yusufali Meghji, dated October 7, 2010 ("Meghji Tr.") at 159:11-160:2, 161:13-19 (Brodnicki Decl., Ex. G).

new $8.4 billion borrowed in connection with the 2006 Transaction, should all such debts suddenly become due.  Accordingly, the 2006 Transaction could not have been a constructively fraudulent transaction with respect to CFGI or any of the guarantors because there is no such thing as a cause of action for a fraudulent transfer when no creditor is harmed.  The undisputed facts are that if CFI paid the full $8.4 billion on its guaranty, CFI would obtain full reimbursement from CFGI.  Of course, as a practical matter, CFI would not have to make those payments on its guaranty because CFGI would have been able to pay the bank debt without CFI's help.

53.    The Committee simply ignores these *uncontested* facts and the errors in its legal analysis, all of which are fatal to the Committee's theory.  *See* Settlement Motion at ¶ 52, n.27.  For example, the lynchpin of the Committee's theory is that guaranty obligations (either generally or in this specific case) are *absolute* obligations and not contingent on default of the principal obligor.  In pertinent part, the applicable guaranties provide:

> Section 1. Guaranty.  (a) Each Guarantor hereby guarantees, as primary obligor and not merely as surety, to each Lender … the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the principal of and interest on the Borrowing made by the Lenders to and the Notes (if any) held by each Lender of, the Company and all other amounts from time to time owing to the Lenders . . . by the Company under the Loan Agreement, the Notes or any of the other Loan Documents, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "*Guaranteed Obligations*").  Each Guarantor hereby further agrees that *if the Company*[35] *shall fail to pay in full when due* . . . any of the Guaranteed Obligations, such Guarantor will promptly pay the same, without any demand or notice whatsoever . . . .[36]

---

[35] Defined as CFGI.

[36] Bridge Loan Guaranty, Section 1(a).  Substantially the same provision is found in the Credit Agreement Guaranty 1(a).  All corporate credit agreements and related documents cited herein and relevant to the issues on the Settlement will be offered into evidence by the Debtors at the hearing on the Settlement.

(emphasis added.)  The Committee labors mightily to construe the language "as primary obligor and not merely as surety" as creating a principal obligation on the part of each guarantor that is coextensive with CFGI's principal obligations.  Notably, the language the Committee touts as creating absolute – not contingent – obligations is common in commercial guaranties and means the guarantor undertakes its *guaranty* obligation as a primary obligation and not as a principal obligation.[37]  But, it does not matter!  Whether the obligation is principal or contingent, CFI holds reimbursement claims for paying CFGI's debt.  These reimbursement claims prevent the guaranty from having rendered CFI insolvent in 2006.

54.     The Committee argues the relevant contingency triggering the guarantors' obligations is maturity.  Committee Objection at ¶ 55.  Not so.  But, by making this argument, the Committee shows its theory depends on rewriting the guaranty.  The last sentence of the quoted guaranty language above provides CFI shall pay "if" CFGI fails to pay when due.  The

---

[37] *See, e.g., Nat'l Energy & Gas Transmission, Inc. v. Liberty Elec. Power, LLC (In re Nat'l Energy & Gas Transmission, Inc.)*, 492 F.3d 297, 299, 301 (2d Cir. 2007) (finding guaranty language guaranteeing obligations "as primary obligor and not merely as surety," created a contingent obligation triggered by principal's default); *Tennenbaum Capital Partners LLC v. Kennedy*, No. 07 Civ. 9695(LTS)(DCF), 2009 WL 2913679, at *1 n.2, *6 (S.D.N.Y. Sept. 11, 2009) (same); *Bank One v. Cullen*, No. 04-CV-72118-DT, 2005 WL 3465722, at *5 (E.D. Mich. Dec. 18, 2005) (same); *Primeco, Inc. v. Artemis, S.A.*, No. 95 Civ. 3843, 1995 WL 766311, at *4 (S.D.N.Y. Dec. 29, 1995) (same); *GE Capital Mortg Servs., Inc. v. Pinnacle Mortg. Inv. Corp.*, 897 F. Supp. 842, 845, 847 (E.D. Pa. 1995) (applying New York law, concluding parties sought to create contingent obligation despite language in guaranty stating "this Guaranty is a primary obligation of the Guarantor."); *Am. Express Bank, Ltd. v. Coker*, No. 89 Civ. 1989 (MJL), 1990 WL 100888, at *2 (S.D.N.Y. Jul. 13, 1990) (finding language guaranteeing "as primary obligor and not merely as surety," undertook the obligation to pay all sums due upon declaration of default . . . ."); and *Bank One v. Moore*, No. 263919, 2006 WL 3335013, at *2 (Mich. Ct. App. Nov. 16, 2006) (concluding guaranty that, "absolutely and unconditionally guaranties to the Bank, *as primary obligor and not merely as surety*, the full and prompt payment of the Liabilities when due," constituted a clear manifestation of the parties' intent that defendants should answer as guarantors, not principal obligors).  Indeed, this or similar language is found in each of the guaranties subject of the following cases – not one finding the language changed the guaranty from a contingent to actual obligation:  *Alliant Tax Credit Fund 31-A v. Taylor 8 Assocs.*, No. 08-12938, 2009 WL 3270186, at *4 (E.D. Mich. Oct. 9, 2009); *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co.*, No. 03-8554 (DCP), 2008 WL 465169, at *3 (S.D.N.Y. Feb. 6, 2008); *Cadlerock Joint Venture II v. Fielder*, No. 06-15445, 2008 WL 2224089, at *3 (E.D. Mich. May 29, 2008); *In re Drexel Burnham Lambert Group*, 113 B.R. 830, 834 (Bankr. S.D.N.Y. 1990); and *Newcourt Fin. USA Inc. v. P. O'Reilly Enters.*, Index No. 14335-00, 2001 WL 856099, at *1 (N.Y. Sup. Ct. Apr. 30, 2001).

Committee's theory requires that CFI pay on maturity regardless of CFGI's failure to pay.[38]   The

law and the language of the relevant agreements all plainly provide that the contingency is one of

*default* of the principal, not merely maturity of the underlying obligation.   Under New York law

(which governs all the relevant agreements), a guaranty is "a promise to answer for the payment

of some debt or the performance of some obligation, on default of such payment or performance,

by a third person who is liable or expected to become liable therefore *in the first instance*."   *Pink*

*v. Inv. Syndicate Title & Guaranty Co.*, 246 A.D. 172, 175 (N.Y. App. Div. 1936) (emphasis

added).   A guarantor's liability, thus, is inchoate and matures only upon the default of the

principal obligor.[39]

       55.    This is consistent with the balance of the provisions in both the Bridge

Loan and Credit Agreements, which provide unequivocally that the Company (*i.e.*, CFGI), and

not the guarantors, is obligated to repay the obligations owing to the lenders in the first

instance.[40]   The language of the Bridge Loan and Credit Agreement guaranties also plainly states

---

[38] As aforesaid, the Committee's distinction between principal and contingent obligations of CFI under the guaranty is immaterial in any event because CFI obtains reimbursement and subrogation claims whenever it pays CFGI's debt.

[39] *See, e.g.*, *Michaels v. Chem. Bank*, 110 Misc. 2d 74, 76 (N.Y. Sup. Ct. 1981) ("A guarantee of payment is an obligation to answer for the debt of another and is contingent upon his default. . . . It is but an inchoate obligation since the condition precedent to its operation (viz., default by the debtor) may never occur."); *see also New York City Dep't of Fin. v. Twin Rivers, Inc.*, 920 F. Supp. 50, 52 (S.D.N.Y. 1996) ("A guaranty is a collateral promise to answer for the payment of a debt or obligation of another, *in the event the first person liable to pay or perform the obligation fails*.") (emphasis added); *Robbins Int'l, Inc. v. Robbins MBW Corp. (In re Robbins Int'l, Inc.)*, 275 B.R. 456, 468 (S.D.N.Y. 2002) ("When a secondary obligor is bound to pay for the debt or answer for the default of the principal obligor to the obligee, the secondary obligor is said to have suretyship status.").

[40] *See* Bridge Loan Agreement § 2.7 ("Repayment of Loans; Evidence of Debt.  (a) The Company shall repay the aggregate outstanding principal amount of the Loans made to the Company to the Agent for the ratable account of the Lenders on the Maturity Date. . . ."); *id.* at § 2.7(b) ("The Company hereby further agrees to pay interest . . . on the unpaid principal amount of each Loan made to the Company. . . ."); *id.* at § 3.4 ("This Agreement constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms . . . ."). These unambiguous provisions plainly state the undertaking to make principal and interest payments to the lenders lies with the Company.  The guarantors are not mentioned even though the documents were entered into contemporaneously.  Other language in the Bridge Loan and Credit Agreements similarly evidence the fact that the guarantors' obligations are derivative of and collateral to those of CFGI.  For example, "Guarantors" is defined in the Bridge Loan Agreement specifically to preclude the notion that the Guaranties create a co-obligation on par with CFGI's obligations.  Rather, "Guarantors" is defined as those subsidiaries of the Company that execute guaranties or

that the obligations of the guarantors are derivative of those of CFGI.  Section 1(a) of the Bridge

Loan Guaranty (quoted above) states that the obligations being guaranteed are the obligations of

"the Company" – *i.e.*, CFGI – on the underlying financing agreements.  The last clause makes

clear the guaranty is one for payment, not merely for collection, and thus, the lenders need not

exhaust efforts to collect from the principal obligor on the debt before demanding performance

under the guaranty following a default.  Similarly, section 1(c) of each guaranty, reads in part,

"*in the event* any payment shall be required to be made to any Lender or the Agent under this

Guaranty" (emphasis added), thus acknowledging the Guaranty is a contingent obligation that

might never be triggered.

      56.    The Committee nonetheless alleges that CFI held the "lion's share" of

CFGI's total assets and thus "the assets of CFI would necessarily be required to repay loans to

CFGI and, therefore, the probability that CFI would have to pay on its guaranty, whether through

default or refinancing, approached 100%."  Committee Objection at ¶ 56.  The Committee's

supposition is erroneous and ignores established facts, most pointedly that CFGI on a

consolidated basis was highly solvent (by over $2 billion) following the 2006 Transaction.

CFGI's resources were thus ample to fulfill any obligations that might be called upon at the

time.[41]  Indeed, CFGI could sell its shares in CFI, which CFGI wholly owned, to repay CFGI's

---

guaranty supplements "guaranteeing *the other Loan Parties'* [defined to include the Company and each Guarantor] obligations under the Loan Documents."  (Emphasis added.)  Section 5.12 of each of the Bridge Loan and Credit Agreements, entitled "Covenant to Guaranty Obligations," provides that should any new wholly-owned first or second tier subsidiary be formed, the Company shall cause it to execute a guaranty or guaranty supplement "guaranteeing *the Company's obligations* under the Loan Documents."  (Emphasis added.)

[41] One significant asset, completely ignored by the Committee, was the approximately $5.6 billion intercompany receivable owed by CFI to CFGI.  Notably, the Committee was careful to use CFI's net worth computed after subtracting its $5.6 billion liability to CFGI.  CFGI could easily have called CFI to pay on its intercompany receivable without affecting CFI's solvency one penny.  Alternatively, even if CFI had to make payment on account of its guaranty, it could offset any such payments against the receivable owing to its parent, the principal obligor. Thus, even if the practical realities of how payment could be effected were relevant for purposes of assessing solvency – and the Debtors submit they are not – it is clear that all of the enterprise's liabilities could have been satisfied without affecting CFI's balance sheet.

debt.  The different sources of value throughout CFGI's enterprise do not bear on the likelihood of a CFGI default.  Put simply, if CFGI could repay all the principal obligations it incurred in connection with the 2006 Transaction, the guaranties provided by CFI and others in connection with that transaction would either not be triggered or, if triggered, the guarantors could obtain full reimbursement from CFGI for each dollar paid pursuant to the guaranties.  Thus, none of CFI's or the other guarantors' creditors would have suffered harm from the granting of the guaranties – the linchpin of a constructively fraudulent transaction.

57.     Also, as set forth in the Settlement Motion, it is well recognized that contingent debts are estimated according to their *probable liability* for purposes of assessing solvency.   In other words, such liabilities are not included at face value, but instead are discounted to the probability that the contingency will be triggered.[42]  *See R.M.L.*, 92 F.3d at 156; *Travelers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 197 (3d Cir. 1998).  Here, the probabilities do not change the result because when CFI issued guaranties in 2006, its reimbursement claims against CFGI would offset whatever liability is assigned to its guaranties.  Indeed, by statute, New York law goes one step further, requiring proof of the probability a guaranty will be triggered before it can be included in any computation of liabilities.  New York Debt. & Cred. Law § 271 (A debtor is insolvent when "the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.");  *see also*, *e.g.*, *Staten Island Sav. Bank v. Reddington*, 260 A.D.2d 365, 366 (N.Y. App. Div. 1999) (finding the word "probable" (as it modifies "liability" in § 271(1)) meaningless, unless the party claiming

---

[42] This concept is embedded in the various agreements in this case, providing in the definition of "Solvent" or "Solvency" the following:  "Unless otherwise provided under applicable law, the amount of contingent liabilities at any time shall be computed as the amount that, *in light of all the facts and circumstances existing at such time*, represents the amount that can *reasonably be expected to become an actual or matured liability*."   *E.g.*, Credit Agreement at 21 (emphasis added).

insolvency was required to proffer some evidence "as to the probability, at the time of the challenged conveyance, that a contingent liability will be imposed and, if so, in what amount.").

58.     The Committee's efforts to distinguish *R.M.L.* and *Xonics* are to no avail, for the Committee's entire argument stems from the false premise that guaranties are the same as principal obligations.[43]  The Committee's invocation of *Covey v. Commercial Nat'l Bank* is most curious given it, too, holds contingent obligations must be reduced and recorded based on the probability they will become actual.  960 F.2d 657, 659 (7th Cir. 1992) ("To disregard the probability that the firm will not be called on to pay is to regard all firms as insolvent all of the time, for all firms face some (remote) contingencies exceeding the value of their assets."); *see also In re Xonics Photochemical, Inc.*, 841 F.2d 198, 199-200 (7th Cir. 1988) (finding the notion of applying contingent liabilities at their face amount to be "absurd" because it would mean any entity with significant contingent debts will be insolvent, which is "something no one believes." Contingent obligations "must be reduced to [their] present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities.").

59.     Even assuming, *arguendo*, that contingent obligations should be recorded at face value on an entity's balance sheet, that cannot end the analysis where valid offsets apply to reduce those obligations.  When a guarantor pays a guaranteed debt, the guarantor obtains a right of reimbursement or subrogation against the principal obligor whose debt was guaranteed,[44]

---

[43] These cases and many others in and out of the Third Circuit recognize contingent liabilities like guaranties must be recorded according to their probable liability.  *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L. Inc.)*, 92 F.3d 139, 156 (3d Cir. 1996) (holding a contingent asset or liability must be valued to "take into consideration the likelihood of that event occurring from an objective standpoint."); *see also In re Hall*, 304 F.3d 743, 748 (7th Cir. 2002); *In re Trans World Airlines, Inc.*, 134 F.3d at 197-98; *cf. Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1991) ("In valuing the cost of [the debtor's] guaranty, the right of contribution from co-guarantors needs to be balanced against the amount of debt for which [the debtor] is liable . . . . 'If there are multiple guarantors of the same obligation, the right of contribution entitles a paying guarantor to have its co-guarantors pay it their proportionate share of the principal debt it paid.'") (internal citations omitted).

[44] The guarantor also obtains a right of contribution against any co-guarantors.

which rights offset the contingent liability. *In re Ollag Constr. Equip. Corp.*, 578 F.2d 904, 908 (2d Cir. 1978); *In re Hemphill*, 18 B.R. 38, 47 (Bankr. S.D. Iowa 1982); *In re Flagstaff Foodservice Corp.*, 56 B.R. 899, 906 (Bankr. S.D.N.Y. 1986).

60.    Finally, the Committee's argument exposes how the Committee contrived a "bondholder's position" because it excluded its bank debtholder members from voting on the Settlement in view of their holding both secured and unsecured claims. In 2006, there were no CFGI bonds outstanding. CFI was only guaranteeing CFGI's bank debt. The Committee fails to explain its theory that the portion of CFI's guaranty that the Committee concedes was unavoidable in 2006 must be allocated partially to the bank debt in 2006 and partially to the bond debt that did not exist until 2007. The Committee's obfuscation of that issue demonstrates that contrary to the Committee's contention, if the Settlement is not approved, the secured claimholders will have every incentive to challenge the allowability of the bond claims against CFI if any portion of the secured claims may be disallowed against CFI. The Committee nowhere explains how its theory can be reconciled with basic legal principles holding the creditor "first in time" receives the spoils. The terms of the savings clause certainly indicate the 2006 bank debtholders would be entitled to the full amount of any limited guaranty at CFI, which would eliminate all bondholder recovery entirely at the guarantor level. Put differently, if CFI were only able to guaranty up to $866 million in debt in 2006, as the Committee posits, its guaranty "capacity" would have been "used up" at that time. Any later guaranties issued by CFI (*e.g.*, the 2007 bonds) would be wholly voidable because CFI would have no excess net worth to absorb additional guaranty obligations. The Committee makes light of the fact that it is conflicted, but fails to explain how its tortured guaranty limitation theory can be reconciled with

the words of the savings clause, which operate as of the time the guaranty was issued in 2006, and fundamental "first in time" principles.

### C.    THE BENEFITS OF THE SETTLEMENT ARE NOT ILLUSORY

61.    In attempting to demonstrate that the Settlement is outside the range of reasonableness, the Objectors contend that the Settlement's benefits to the estate are "illusory." The Committee makes this half-hearted argument, and for good reason: it is wholly unsupported by the facts.  As the Debtors explained in the Settlement Motion, as several witnesses have testified over the last ten days, and as will be shown at the hearing, the Settlement enhances the value of the estates in a variety of significant ways, both tangible and intangible.

62.    Specifically, the Settlement provides at least the following tangible benefits:  (1) a $135 million discount on the Secured Lenders' claims; (2) avoidance of a full-blown litigation, which would cost the estate some $50 to $75 million in litigation costs, and would almost certainly be unsuccessful in avoiding the Secured Lenders' claims; (3) an estimated $40 million in interest savings; and (4) an earlier emergence date, likely saving the estates $60 to $70 million in professional fees while allowing them to enjoy higher rates of return on assets liquidated outside bankruptcy.  In addition, intangible benefits include:  (1) an opportunity for an earlier post-bankruptcy simplified governance structure; (2) stability leading to better employee morale and retention; and (3) reduced pressure from regulators, particularly the FDIC.  *See*, *e.g.*, Meghji. Tr. at 146:15-156:3; Fairfield Tr. at 149:16-152:23.

63.    Except as to the claim discount, the Objectors do not say a word about *any* of these benefits.  Although the Ad Hoc Group concedes that, under the terms of the Settlement, the Secured Lenders will be paid $135 million less than the value of their claims, it asserts that the discount is not "real" because the Settlement allows the Secured Lenders to keep postpetition interest and fees they would not be entitled to *if their claims were successfully avoided*.  To

37

achieve its desired result, the Ad Hoc Group plays a game of arithmetricks.  Rather than acknowledge that $135 million is 9% of $1.5 billion, the Ad Hoc Group contend the savings are closer to 4%, which they arrive at by reducing the $135 million by $77.5 million representing postpetition interest and fees, and dividing the difference ($57.5 million) by $1.5 billion to yield 3.8%.  Given that the Ad Hoc Group admit that the postpetition interest and fees are claims, they conspicuously fail to divide the savings under the settlement, $135 million, by total claims ($1.5 billion plus $77 million), yielding 8.56%.  In so arguing, the Ad Hoc Group is simply rehashing its and the Committee's improper argument about the merits of its contemplated avoidance actions, two of which (intent to delay, hinder, or defraud and equitable subordination) the Committee no longer touts.  *See infra* Section V.

64.     The Committee also completely ignores that litigating the avoidance claims would impose substantial costs upon the estates.  Were the Debtors to litigate these claims (or allow the Committee to litigate them), the estates' fees would skyrocket.  The Debtors' Chief Restructuring Officer testified that litigation over the Secured Claims would, even if it lasted only a year, cost the estates between $50 and $75 million.  Meghji. Tr. at 146:4-23.  Additionally, given the roughly six million dollar monthly professionals costs of the bankruptcy, the corresponding anticipated earlier emergence from bankruptcy resulting from the Settlement would increase the estates' value by an additional $45 to $60 million.  Delaying emergence from chapter 11 will also pose a significant opportunity cost in terms of the often depressed prices yielded by assets liquidated in bankruptcy rather than outside bankruptcy.  Meghji Tr. at 148:6-13.  Yet these $110 to $150 million in quantifiable cost savings – an additional benefit to the estate over and above the $135 million discount – are mentioned nowhere by the Committee.  Strikingly, the Committee is also silent as to the roughly $40 million that will accrue to the estate

because the Debtors are paying down a loan charging 4.75% interest with cash earning 0.25%. Meghji Tr. at 149:14-17.

65.     Because it cannot, at the end of the day, contest the fact that the Settlement almost certainly represents close to $300 million in value added to the estates, the Committee complains that the Secured Lenders are receiving cash instead of Collateral.  The Committee argues this is a windfall to the Secured Lenders and unfair to unsecured claimholders:  first, because the Secured Lenders will ostensibly reinvest that cash and earn a "greater rate of return than the 4.75% currently paid" on the loan, and second, because the Committee is burdened with a portfolio of assets "as to which predicting a future rate of return can be no more than guesswork."  Committee Objection at ¶ 34.

66.     The inherent contradiction between these two arguments is apparent.  If anything, the future value of the portfolio of assets pledged as Collateral – which has been the subject of extensive study by the Debtors and their independent experts[45] – is far less speculative than asserted by the Committee, as was shown in the depositions and will be shown at the hearing.  And what the Secured Lenders may or may not be able to do with cash is hardly an issue to be weighed in determining the benefits of the Settlement to the Debtors.  Indeed, this is a first, namely to argue against the Settlement because a creditor believes the party being paid cash may actually use the cash profitably.

67.     Finally, the Committee's strident protests about the cash payment come with particular ill grace given the fact that it was consulted on this very issue by the Debtors. Meghji Tr. at 105:7-22.  Given the fact that the cash being held by the estates is earning almost nothing, while the market value of the collateral has the potential to appreciate (and will almost

---

[45] Indeed, as the Debtors will establish at the hearing, both the Debtors and their independent experts have concluded that the secured loan was actually overcollateralized, and that the collateral is worth approximately $1.5 billion (compared to the $1.1 billion current principal balance).

certainly do so as a result of the Debtors' emergence), there was and is no good reason to prefer cash over collateral.  The Committee's real issue is not that the Settlement will be paid in cash; it is that the Committee would like the Settlement to extract more than a 9% discount.

D.    **THE PURPORTED SETTLEMENT AMOUNT IS WITHIN THE RANGE OF REASONABLENESS**

68.    As set forth in the Settlement Motion, the Settlement is fair, equitable, and lies above the lowest point in the range of reasonable potential litigation possibilities.  *See* Settlement Motion, at ¶¶ 28-34.  The Committee's argument that the Settlement – which would enhance the value of the Debtors' estates by an estimated $285 million – is not in the paramount interest of the creditors is built on the erroneous avoidance theories analyzed above.

69.    The Committee urges this Court to place undue emphasis on only one factor to the exclusion of all others:  the *potential* monetary value of a remote recovery as compared to the *actual* monetary value of the proposed Settlement.  Committee Objection at ¶¶ 29-30.  To support its proposition, the Committee cites cases that it misconstrues or that are simply inapplicable.

70.    The Committee mistakenly relies on *In re Exide Techs.* for the contention that "[r]eleasing valuable claims for disproportionately small amounts fails to satisfy Rule 9019." Committee Objection at ¶ 30.  Simply by relying on *Exide*, the Committee implicitly admits it has no case.  In *Exide*, the settlement was for 1.7% of a claim with no additional benefits.  Specifically, the proposed settlement in *Exide* contained a proposed $8.5 million settlement of adversarial proceedings potentially worth as much as $500 million.  *In re Exide Techs.*, 303 B.R. at 70.  This compares to the Debtors' initial 9% savings with additional benefits more than doubling the Settlement's value.  The *Exide* court found the settlement offer fell below the lowest range of reasonableness because the offer also failed to satisfy *many* factors integral to

40

assessing the settlement, not simply because, as the Committee suggests, the court viewed the offer as a "tip, a simple token or gesture for people to come on board with a plan to make it consensual." *Id.* at 71. The Settlement proposed by the Debtors in their Settlement Motion would provide the estates with nearly $300 million – hardly a "tip" or a "simple token or gesture" as described in *Exide*.[46]

71.     As discussed in the Settlement Motion and herein, and contrary to the facts in *West Pointe Props.*, genuine obstacles exist regarding obtaining a judgment avoiding the Secured Claims. The Debtors believe the reasonableness of the Settlement is abundantly clear because the avoidance claims are almost certain to result in no recovery, while costing the estates up to $75 million to litigate and causing the estates to suffer a negative interest spread every month. That means the 9% discount on the Secured Lenders' claims and the other benefits that result from avoiding litigation (interest savings, litigation savings and the savings from emergence) represents total upside value. Even if the likelihood of losing were only 75% to 95%, the Debtors believe pursuit of the claims is irresponsible because a loss gains the estates nothing.

72.     Lastly, the Committee's assertion that the "*entire* Secured Credit Facility could be avoided as an insider preference," Committee Objection at ¶ 65, is a red herring, as the Committee well knows. Tellingly, the Committee's Objection spelling out the Debtors' potential avoidance actions nowhere asserts, or even suggests, that if one or more Secured Lenders are insiders, all lenders must be treated as insiders. That notion comes from the Debtors' attorneys'

---

[46] The other cases relied upon by the Committee are similarly inapposite. In both *Arkoosh Produce, Inc.*, No. 00-41817, 2003 Bankr. LEXIS 2222 (Bankr. D. Id. July 1, 2003), and *In re West Pointe Props., L.P.*, 249 B.R. 273, 287 (Bankr. E.D. Tenn. 2000), the courts found that the claims at issue were "good" and meritorious, respectively. Moreover, the potential recovery in *Arkoosh* was found to be far greater than the *de minimus* settlement offer. Finally, the proposed settlement in *In re Spansion*, No. 09-10690, 2009 Bankr. LEXIS 1283, at *28 (Bankr. D. Del. June 2, 2009), which the Spansion debtors had adopted in the absence of any legal advice, was rejected on the grounds that the court simply did not have sufficient information to evaluate it.

negotiations with the Secured Lenders' attorneys, wherein Martin Bienenstock informed Kirkland & Ellis it should consider all the Secured Lenders' exposure from that theory. Suffice it to say, the Committee has failed to cite any authority whatsoever for that theory. Importantly, the Settlement does not purport to settle potential insider claims against Goldman Sachs and Dune, the two purported insider Secured Lenders. *See* Settlement Motion at n.5. Notably, putting aside the insider issue,[47] whether there was a voidable preference is highly questionable because the debt was repaid pursuant to a note whose maturity occurred contemporaneously with the repayment. In any event, there is nothing in the Settlement Agreement *whatsoever* that prevents the Debtors from pursuing claims for insider preferences against Goldman Sachs and Dune. Their alleged insider preference liability is wholly preserved.

73.     In sum, the Debtors believe the Settlement falls inside the range of reasonableness. *First*, based on the foregoing analyses the Committee's assertion that the avoidance claims have a "high probability of success" is based on demonstrably flawed legal theories that also omit key facts. Prosecuting these theories risks losing valuable consideration in the Settlement. *Second*, the Debtors do not dispute that collection would be problematic. *Third*, there is little doubt the claims would be expensive to litigate unless the Court were prepared to rule on pure legal issues before extensive discovery. *Fourth*, unsecured claimholders stand to benefit greatly from the settlement as it settles very weak claims that are likely worth $0 for nearly $300 million in value, enhancing recoveries for all unsecured claimholders. *Finally*, it must remembered that the unsecured claimholders are hedge funds who figure they have nothing

---

[47] Neither Goldman Sachs nor Dune satisfy the express tests for insider listed in Bankruptcy Code section 101(31)(B). The issue is whether they should be deemed insiders based on the word "includes" in the preamble to section 101(31).

to lose by opposing the Settlement because maybe the Secured Lenders will blink and offer a bit more.[48]

### E.    THE SETTLEMENT NEGOTIATIONS WERE HARD-FOUGHT AND AT ARMS-LENGTH

74.    The Settlement was the product of months of hard-fought and arms-length negotiations between the Debtors and their Secured Lenders.  The Committee contends it was shut out of the process and was not consulted "in any meaningful way."  That contention is belied by the following, which will be established at the hearing.

75.    First, the Debtors invited the Committee to participate at all levels of the negotiation seeking an overall resolution of claims.  To that end, the Debtors approached representatives of all its significant constituents (including the Committee and the Ad Hoc Group) in the spring of 2010 regarding a global settlement proposal.  At that time, the Debtors informed all constituents it was their desire to have a global resolution of claims, but if that could not be accomplished, the Debtors would still try to reach agreement with whatever constituents it

---

[48] In his deposition, CFGI Board Member Tagar Olson, who served on the Special Committee of the Board charged with evaluating the Settlement, perhaps summed up the rationale for the Settlement best:

> Q.    And why do you think it's fair to the estate to pay the secured lenders cash today in exchange for their collateral?
>
> A.    For a number of reasons.  I think, first of all, those secured lenders are taking a discount of 9 percent against their–their claims against the estate.  I was highly involved and highly focused on making sure that those claims against that secured pool were correct, that they were appropriate to grant, and they were done for all of the right reasons.  And as a fiduciary and a board member of Capmark, I was very involved in those negotiations.  I firmly believe, personally, as well as based upon advice from our advisors and counsel, that they have full claim to their 100 percent in terms of their secured claims against that estate.  I think that given the uncertainty around the litigation process and the time value of money with respect to a litigation, that taking a 9 percent discount is a fair and reasonable determination, in terms of giving them cash today.  And it's clearly less than what I believe they ultimately have claim to, under their secured claims, but I think getting cash for that today and settling today and moving on is a good outcome ultimately–well, it's–it's an acceptable outcome for them and I think should be viewed as a good outcome for the estate.

Olson Tr. at 101:23-103:5.

could on reasonable terms that would enable the Debtors to formulate chapter 11 plans under which distributions would not be interminably delayed while all claims are attacked. The Debtors met regularly with the Committee and informed them of the status of their negotiations. Indeed, after the two Committee members that hold both secured and unsecured debt agreed with the Debtors on a settlement of the secured claims, the Debtors stopped trying to convince the other Secured Lenders to join the deal because the Committee provided reasons the deal may not enhance the Debtors' estates. The instant Settlement – a different formulation than the original proposal – came about because the Debtors took the Committee's comments to heart and modified the settlement offer.

76.     In the weeks prior to the filing of the Standing Motion, the parties met. The Debtors informed the Committee at that time that negotiations with the Secured Lenders were progressing and the Debtors hoped to have a settlement and to file a 9019 motion to approve the settlement soon. Before the Debtors could do so, however, the Committee filed the Standing Motion. As soon as an agreement in principle was reached with the Secured Lenders, the Debtors reached out to the Committee (though, as noted in the Committee Objection, word of the near-finalization of the Settlement had already leaked). The Debtors' management and advisors flew to Minnesota to meet with the Committee's chair and advisors to discuss the terms of the Settlement and what the deal would mean for the estates. The Debtors had fully briefed the Committee and its advisors regarding the Settlement terms and entertained all manner of questions thereon. All of this began weeks before the Debtors filed the Settlement Motion and continued right up to the days prior to filing the motion.

77.     Second, the Ad Hoc Group suggests the Debtors' negotiations with their Secured Lenders were tainted somehow because the Committee did not participate in those

negotiations.   As an initial matter, the unsecured claimholders' decision not to engage in negotiations with the Secured Lenders was their choice.   The Ad Hoc Group or any other creditor was at liberty at any time to engage with any party in interest.

78.    Third, the Ad Hoc Group misconstrues the Settlement Agreement when it argues the Debtors are improperly releasing their officers and directors.   The release provision in the Settlement Agreement is between the Debtors and the Secured Lenders.   The Secured Lenders, and only the Secured Lenders, are releasing the Debtors and their officers and directors. *See* Settlement Agreement at §2.   Neither the Debtors nor their estates are releasing any claims against their officers and directors.

79.    Fourth, the Committee flashes a prepetition email from Mr. Bienenstock, counsel to the Debtors, to counsel for the Secured Lenders in which Mr. Bienenstock states the Debtors' desire to maximize secured claimholders' returns within the bounds of a settlement the Court can approve.   Committee Objection at ¶ 70.   The Debtors are proud of this.   The Debtors' duty is to maximize the returns of all parties in interest within the bounds of the law.   The Debtors say the same to any and all of their constituents.   Indeed, it is a debtor's obligation to try to maximize returns for all its parties in interest within the bounds of the law, exactly as Mr. Bienenstock's email states.

80.    Fifth, the Committee misrepresents the nature of the litigation the Debtors proposed to bring had the Settlement not been reached.   Consistent with their view of the relative merits of potential causes of action against the Secured Lenders, the Debtors prepared a declaratory judgment complaint for filing, if a settlement was not reached, seeking to determine the validity, enforceability, and extent of the liens granted to the Secured Lenders.   The draft complaint named the prepetition secured and unsecured agents as well as the indenture trustee,

representing all major creditor constituencies.  The purpose of the complaint was to initiate litigation while retaining the right to settle later on appropriate terms.  The Committee would have the right to petition to intervene (and the Debtors expected it would do so) to assert all the same claims objections it proposed to bring in connection with its standing motion.  In other words, the initiation of litigation was designed to air these very disputes and provide the Committee and unsecured lenders a forum to prosecute the claims the Committee seeks standing to bring.  The need to reach a resolution by litigation, however, was mooted by the proposed Settlement.  The Committee complains that the Debtors' declaratory judgment complaint includes certain counts that would allow the secured claims.  This raises an important issue. Being a debtor in possession with statutory duties to creditors is not synonymous with having a duty to "shake down" creditors.  When a claim is allowable, the Debtors do not believe there is a fiduciary duty to object to it, even if the Debtors could make the Secured Lenders' lives miserable enough to extract a settlement.  Conversely, when there are gray areas and facts and issues in doubt, the Debtors exploited them for the maximum benefit to the estates.

## V.    THE STANDING MOTION SHOULD BE DENIED

### A.    THE DEBTORS' DECISION TO SETTLE WITH THE SECURED LENDERS RATHER THAN PURSUE MERITLESS AVOIDANCE CLAIMS WAS PRUDENT

81.    The Debtors' Objection showed (1) the Debtors had not unjustifiably refused to pursue the various claims urged on them by the Committee; and (2) such claims might not even survive a motion to dismiss, much less meet the Third Circuit's standard for "colorable claims."

82.    With regard to its claims for actual intent to hinder, delay, or defraud and equitable subordination, the Committee has now explicitly conceded that the Debtors were correct and that those claims have no merit.  *See* Committee Objection at ¶ 75, n. 16.  This

46

belated conclusion stands in sharp contrast to the heated assertions of unethical conduct contained in the Committee's opening brief.

83.     As for constructive fraudulent conveyance (the sole remaining claim for which the Settlement provides a release), the Committee has failed completely to address the points raised in the Debtors' Objection.  As discussed above, it has no answer for the fact that the Debtors did indeed receive reasonably equivalent value in 2009 when CFI issued one secured guaranty of $1.5 billion of CFGI debt to replace a guaranty of $1.5 billion of debt that was repaid.  Nor does it have any evidence that the Debtors did not act in good faith: if it did, there would be no reason for it to have dropped the intentional fraud claim.  To mask these fundamental weaknesses in its argument, the Committee repeatedly urges this Court to allow it to proceed solely because the "potential recovery" is so great.  Put another way, the Committee would have this Court sanction a year or more of contentious litigation, delayed emergence from chapter 11, and a significant diminution in the estate's value, all for a lottery ticket.  For this reason alone, the Committee's request should be denied.

84.     Separately, the Committee's request must be objectively assessed.  This is not a simple request by a committee to prosecute avoidance claims.  This is a request by a statutory committee to pursue a shakedown strategy.  The Debtors retained experts under extraordinary protections of their objectivity.  Duff & Phelps were not told how their opinions would be used and were not given any indication of what the Debtors wanted them to conclude, precisely so their opinions could be relied on by the Debtors' board and management and by the Court.  As it turns out, the Debtors had sufficient salable value in 2006 and 2007 to repay all their creditors in cash in full.  None of the guaranties could be avoidable because no creditors were harmed.  To the extent a guaranty created a liability, there was an offsetting asset created

representing the guarantor's reimbursement, subrogation, and contribution claims.  In 2009, one CFI guaranty was issued to cover $1.5 billion of new debt as CFI's old guaranteed debt was reduced by $1.5 billion.  Five months passed after $1.5 billion of debt was repaid and before bankruptcy.  There simply are no serious avoidance claims.  The machinery of the Court and bankruptcy process should be used to vindicate legitimate avoidance claims, but not to shake down creditors by using immense estate assets to fuel litigation until the creditors cry uncle.

### B.    THE SETTLEMENT DOES NOT STAND AS A BAR TO INSIDER PREFERENCE CLAIMS

85.    In their Objection, the Debtors showed the Committee was not entitled to derivative standing to pursue potential insider preference claims against "Goldman Sachs" (comprised of four separate Goldman lenders) and "Dune" (comprised of two Dune lenders), as the Debtors *never refused* to bring such claims against those entities, and indeed *specifically carved them out* of the Settlement.  Standing Objection at ¶¶ 16, 47-48; Settlement Motion at ¶ 4(vii).  The case law is clear that absent extraordinary circumstances, derivative standing may not be granted in the absence of such refusal.  *See*, *e.g.*, *Infinity Inv. Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004).  It is thus surprising to see the Committee assert that "the standing motion is essentially unopposed as to the insider preference claim" and that "no party objected to the Standing Motion as it relates to the Insider Preference Claims."  The Debtors did object to the Committee bring preference claims, and continue to do so.

86.    Nonetheless, the Committee attempts to get around that inconvenient fact by contending the Debtors are "ultimately conflicted" in pursuing such claims.  Committee Objection at ¶ 77.  After reviewing hundreds of thousands of pages of documents and taking four depositions, however, the Committee's sole "evidence" of such a conflict is that (1) two members of Capmark's Board of Directors – Bradley Gross of Goldman Sachs & Co., and

Daniel Neidich, of Dune Capital Management – are employed by companies affiliated with certain of the Secured Lender entities, and (2) Messrs. Gross and Neidich, "on information and belief," served on the Board's Special Committee tasked with evaluating the various restructuring alternatives open to the Debtors. *Id.* Using the Committee's logic, the Committee cannot pursue avoidance claims because three of its members hold claims subject to attack.

87. The Committee's position is unsupportable as a matter of fact and law. As an initial matter, the Committee does not bother to inform this Court that both Mr. Gross and Mr. Neidich – the latter of whom never served on the Board's Special Committee – *recused themselves* from voting on the Board's decision to enter into the Secured Credit Facility so as to avoid even the appearance of impropriety. *See* CFGI Special Committee Board Minutes for Meeting Held on February 19, 2009, CAPMARK070241 (Brodnicki Decl. Ex. H) (listing members of the Special Committee, which did not include Mr. Neidich); CFGI Board Minutes for Meeting Held on May 7, 2009, CAPMARK070408 (Brodnicki Decl. Ex. F) (noting Messrs. Gross' and Neidich's abstentions from voting on 2009 Transaction). Even if they had not done so, however, the Committee's assertions would still fall woefully short of establishing the sort of conflict needed to rob a Debtor of the ability to pursue its own claims – a fact the Committee implicitly admits by failing to cite to a single decision supporting its position.[49] *See*, *e.g.*, *In re Valley Media*, No. 01-11353, 2003 Bankr. LEXIS 940 (Bankr. D. Del. Aug. 14, 2003).

---

[49] The Committee has failed to even allege (much less submit evidence showing) that (1) there was any sort of financial relationship between the Goldman lending entities (Goldman Sachs Credit Partners L.P., Goldman Sachs Canada Credit Partners Co., Goldman Sachs Mortgage Company and Goldman Sachs Lending Partners LLC) and GMACCH, Mr. Gross' direct employer and an equity investor in Capmark; (2) the Goldman lending entities had any contact with or control over Mr. Gross; and (3) the Dune lending entities had any contact with or control over Mr. Neidich. The above-board nature of the 2009 Transaction is buttressed by the Committee's tucked-away footnote announcing its sudden decision to drop its previously full-throated claims of intentional fraud.

## CONCLUSION

WHEREFORE the Debtors respectfully request an order (i) granting the Settlement Motion, (ii) denying the Standing Motion, and (iii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated: October 12, 2010
      Wilmington, Delaware

Respectfully submitted,


*/s/ Lee E. Kaufman*
Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Jason M. Madron (No. 4431)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

Martin J. Bienenstock
Michael P. Kessler
Judy G. Z. Liu
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 259-8000

*Attorneys for the Debtors and Debtors in Possession*