**REDACTED**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Capmark Financial Group Inc., *et al.*, | Case No.: 09-13684 (CSS)<br>(Jointly Administered) |
| Debtors. | Related Docket No. 1636 |

---

**REPLY OF THE AD HOC COMMITTEE OF PREPETITION SECURED LENDERS TO THE OBJECTIONS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE AD HOC GROUP OF HOLDERS OF CAPMARK'S UNSECURED BANK DEBT TO THE DEBTORS' MOTION, PURSUANT TO BANKRUPTCY RULE 9019 AND BANKRUPTCY CODE SECTIONS 363(b) AND 549(a)(2)(B), FOR ORDER APPROVING SETTLEMENT BETWEEN DEBTORS AND THEIR PREPETITION SECURED CREDIT FACILITY LENDERS**

---

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT...............................................................................................................5

I.   THE COMMITTEE'S FRAUDULENT TRANSFER CLAIMS ARE
     MERITLESS. ......................................................................................................5

     A.   The Committee Has Dropped its Intentional Fraudulent Transfer Claims. .............6

     B.   The Committee's Constructive Fraudulent Transfer Claims Are Meritless
          Because the Debtors Received Reasonably Equivalent Value from the
          2009 Secured Facility. ......................................................................................6

          1.   The Committee Cannot Obscure the Fundamental Benefit That the
               Debtors Received From 2009 Secured Facility. .........................................6

          2.   The Committee's Attacks on the Additional Benefits That the
               Debtors Received Fail...............................................................................13

     C.   The Committee's Argument Regarding The 2006 Guaranty Is Unfounded..........22

II.  THE UNSECURED COMMITTEES' ATTEMPTS TO CHALLENGE THE
     SETTLEMENT'S VALUE AND STRUCTURE LACK MERIT. ...............................25

     A.   The Unsecured Committees' Arguments Fail to Move the Settlement
          Below the Lowest Point in the Range of Reasonableness. ....................................25

     B.   The Unsecured Committees' Argument That the Debtors Cannot Pay the
          Secured Lenders Prior to Plan Confirmation Is Misplaced. .................................30

          1.   The Unsecured Committees' Objection to the Cash Payment Fails. .........30

          2.   The Unsecured Committees' Attempt to Construe the Settlement as
               a *Sub Rosa* Plan Fails..............................................................................34

     C.   The Unsecured Committees' Attempt to Obtain Special Deference Fails. ...........35

III. THE UNSECURED COMMITTEES' CLAIM THAT THE SETTLEMENT
     IS A SWEETHEART DEAL IS UNSUPPORTABLE. .................................................36

CONCLUSION .........................................................................................................39

i

# TABLE OF AUTHORITIES

**Cases**

*Chase & Sanborn Co. v. Arab Banking Corp.,*
    904 F.2d 588 (11th Cir. 1990) ............................................................... 24

*Cuevas v. Hudson United Bank,*
    No. 09-cv-6029, 2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002)........................ 9

*HSBC Bank USA, Nat. Ass'n v. Calpine Corp. ("HSBC"),*
    No. 07 Civ 3088 (GBD), 2010 WL 3835200 (S.D.N.Y. Sep. 15, 2010) .................. 31, 35

*In re After Six, Inc.,*
    154 B.R. 876 (Bankr. E.D. Pa. 1993) .................................................... 37

*In re AmFin Financial Corporation,*
    Case No. 09-21323 (Bankr. N.D. Ohio) .................................................. 21

*In re APF Co.,*
    308 B.R. 183 (Bankr. D. Del. 2004) ..................................................... 9

*In re Aphton Corp.,*
    423 B.R. 76 (Bankr. D. Del. 2010) ...................................................... 13

*In re AppliedTheory Corp.,*
    323 B.R. 838 (Bankr. S.D.N.Y. 2005)................................................... 8, 9

*In re AWECO, Inc.,*
    725 F.2d 293 (5th Cir. 1984) ............................................................. 36

*In re B.Z. Corp.,*
    34 B.R. 546 (Bankr. E.D. Pa. 1983) ..................................................... 9

*In re Buffets Holdings, Inc.,*
    No. 08 10141 (Bankr. D. Del. Feb. 22, 2008).......................................... 33

*In re Calpine Corp.,*
    356 B.R. 585 (S.D.N.Y. 2007)......................................................... 33, 34

*In re Calpine Corp.,*
    No. 05-60200 (BRL) (Bankr. S.D.N.Y. May 17, 2006) ............................... 33

*In re Champion,*
    No. 09-14014 (KG), Ad. No. 10-50514 (KG), 2010 WL 3522132 (Bankr. D. Del.
    Sep. 1, 2010) .................................................................. 2, 8, 9, 11

*In re Columbia Gas Sys., Inc.,*
    171 B.R. 189 (Bankr. D. Del. 1994) ..................................................... 32

*In re Dalen,*
    259 B.R. 586 (Bankr. W.D. Mich. 2001) ........................................................................ 36

*In re Exide Techs.,*
    303 B.R. 48 (Bankr. D. Del. 2003) ................................................... 5, 11, 30

*In re Exide Techs., Inc. (Exide I),*
    299 B.R. 732 (Bankr. D. Del. 2003) .......................................................... 11, 30

*In re Flying J Inc.,*
    No. 08-13384 (Bankr. D. Del. July 29, 2009) .................................................. 33

*In re Hines Horticulture, Inc.,*
    No. 08 11922 (Bankr. D. Del. August 22, 2008) ............................................. 33

*In re Hoop Holdings Inc.,*
    No. 08 10544 (Bankr. D. Del. Apr. 16, 2008) ................................................. 33

*In re Indalex Holdings Fin. Inc.,*
    No. 09 10982 Bankr. D. Del. May 1, 2009) .................................................... 33

*In re Iridium Operating LLC,*
    478 F.3d 452 (2d Cir. 2007) ............................................................... 32, 35

*In re Just for Feet, Inc.,*
    242 B.R. 821 (D. Del. 1999) .................................................................. 32

*In re Lehigh & New England,*
    657 F.2d 570 (3d Cir. 1981) .................................................................. 32

*In re Linens Holding Co.,*
    No. 08 10832 (Bankr. D. Del. May 28, 2008) ................................................. 33

*In re Martin,*
    91 F.3d 389 (3d Cir. 1996) .................................................................... 6

*In re Marvel Entm't Group, Inc.,*
    222 B.R. 243 (D. Del. 1998) .................................................................. 35

*In re Masonite Corp.,*
    No. 09-10844 (Bankr. D. Del. March 17, 2009) .............................................. 33

*In re Motor Coach Indus., Int'l, Inc.,*
    No. 08-12136-BLS, 2009 WL 330993 (D. Del. Feb. 10, 2009) ......................... 32

*In re Muzak Holdings LLC,*
    No. 09-10422 (Bankr. D. Del. February 12, 2009) ........................................... 33

*In re Pope & Talbot, Inc.*,
   No. 07-11738 (Bankr. D. Del. November 21, 2007) ............................................................ 33

*In re Refco, Inc.*,
   No. 05-60006 (Bankr. S.D.N.Y. September 29, 2006) ...................................................... 32

*In re S.N.A. Nut Co.*,
   186 B.R. 98 (Bankr. N.D. Ill. 1995) ............................................................................ 37

*In re Sea Containers Ltd.*,
   No. 06-11156(KJC), 2008 WL 4296562 (Bankr. D. Del. Sep. 19, 2008) ....................... 35

*In re The Majestic Star Casino, LLC*,
   No. 09-14136 (Bankr. D. Del. November 25 2009) ....................................................... 33

*In re Trace Int'l Holdings, Inc.*,
   301 B.R. 801 (Bankr. S.D.N.Y. 2003) .......................................................................... 9

*In re Tropicana Entm't, LLC*,
   No. 08-10856 (Bankr. D. Del. May 6, 2008) ................................................................ 33

*In re Verasun Energy Corp.*,
   No. 08-12606 (Bankr. D. Del. April 15, 2009) .............................................................. 33

*In re Visteon Corp.*,
   No. 09-11786 (CSS) (Bankr. D. Del. June 1 2009) ........................................................ 33

*In re Wickes Holdings, LLC*,
   No. 08-10212 (Bankr. D. Del. February 5, 2008) .......................................................... 33

*In re World Health Alternatives, Inc.*,
   344 B.R. 291 (Bankr. D. Del. 2006) ............................................................................. 5

*In the Matter of Xonics Photochemicals, Inc.*,
   841 F.2d 198 (7th Cir. 1988) ..................................................................................... 24

*Morgan Guar. Trust Co. v. Hellenic Lines Ltd.*,
   621 F. Supp. 198 (S.D.N.Y. 1985) ................................................................................ 9

*Telefast, Inc. v. VU-TV, Inc.*,
   591 F. Supp. 1368 (D.N.J. 1984) ................................................................................. 9

*United States on Behalf of Rural Electrification Admin. v. Wabash Valley Power Ass'n,
   Inc.*,
   167 B.R. 885 (Bankr. S.D. Ind. 1994) ........................................................................ 32

*United States on Behalf of Small Business Admin. v. Stanko*,
   Civ. A. No. 90-7250, 1992 WL 211550 (E.D. Pa. Aug. 24, 1992) ................................ 23

*VFB LLC v. Campbell Soup Co.*,
    482 F.3d 624 (3d Cir. 2007)................................................................................................ 11

The Ad Hoc Committee[1] respectfully submits this memorandum of law in response to the Objections[2] of the Official Committee of Unsecured Creditors (the "Committee") and the Ad Hoc Group of Holders of Capmark's Unsecured Bank Debt (the "Ad Hoc Unsecured Group") to the Debtors' Rule 9019 Motion.[3]

## PRELIMINARY STATEMENT

1.    In the Ad Hoc Committee Objection to the Standing Motion, we stated that the Committee was trying to persuade the Court to gamble—literally go "all in"—on their speculative and baseless fraudulent transfer theories, using the Debtors' estate as their kitty. After reading the Objections of the Committee and the Ad Hoc Unsecured Group (together, the "Unsecured Committees"), the better gambling analogy is a shell game. Every time one of the Committee's arguments turns up empty, the Committee reshuffles the shells and presents the Court with a different set of disingenuous conspiracy theories and unfounded allegations. The purpose of all this is to distract the Court from the dispositive facts: namely that the proposed settlement (the "Settlement") resolves incredibly weak fraudulent transfer theories and provides the Debtors with a significant discount of 9% on the Secured Lenders' claims plus over $105 million in other benefits.

---

[1]    Capitalized terms not defined herein have the meaning provided in the Objection of the Ad Hoc Committee of Prepetition Secured Lenders to the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting it Leave, Standing, and Authority to Prosecute Causes of Action on Behalf of the Debtors' Estates (Docket No. 1615) (the "Ad Hoc Committee Objection to the Standing Motion").  Certain factual materials cited herein are attached to the Declaration of Maria Ginzburg filed herewith (the "Ginzburg Decl.").

[2]    Official Committee of Unsecured Creditors (I) Objection to Debtors' Motion Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Sections 363(b) and 549(a)(2)(B) and (II) Reply to Objections to the Committee's Motion for Entry of an Order Granting it Leave, Standing, and Authority to Prosecute Causes of Action on Behalf of the Debtors' Estates (the "Committee Objection") (Docket No. 1848); Objection of *Ad Hoc* Group of Holders of Capmark's Unsecured Bank Debt To Debtors' Motion, Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Sections 363(b) and 549(a)(2)(B), for an Order Approving Settlement Between Debtors and Their Prepetition Secured Credit Facility Lenders (the "Ad Hoc Unsecured Group Objection") (Docket No. 1841).

[3]    The Committee Objection contains a Reply in support of its Standing Motion.  As set forth in the Ad Hoc Committee Objection to the Standing Motion, the Committee's request for derivative standing is moot in light of the Rule 9019 Motion and meritless under applicable law.

2.      The Unsecured Committee's shell game takes form in a number of ways.  *First,*
after accusing the Debtors and the Secured Lenders of conspiring to commit intentional fraud on
Capmark's creditors, the Committee has ***voluntarily dropped*** its allegations of intentional fraud
and equitable subordination—premised on a theory that the Debtors and Secured Lenders
executed the 2009 Secured Facility in some sort of sweetheart arrangement.  The Committee
admits it has no evidence to support these claims.  (Committee Objection ¶ 75 n.16.)

3.      ***Second,*** while the Committee tries to argue that the Third Circuit has embraced a
unique position applying the "totality of the circumstances" test to grants of collateral in support
of antecedent debt, the Committee failed to cite the Delaware Bankruptcy Court's decision just
last month in *In re Champion*, No. 09-14014 (KG), Ad. No. 10-50514 (KG), 2010 WL 3522132
(Bankr. D. Del. Sep. 1, 2010), that held just the opposite.  Judge Kevin Gross found that a grant
of collateral for antecedent debt was not a fraudulent transfer as a matter of law, just as we have
said: "Additions of collateral do not enable lenders to receive anything more than what they
have loaned and the debtor's liabilities are not increased as a result of collateralization."  *Id.* at
*19.

4.      ***Third,*** faced with patently weak fraudulent conveyance claims, the Unsecured
Committees embrace a new conspiracy theory, focused on casting the Settlement itself as unfair.
In particular, the Unsecured Committees attack the cash payment aspect of the settlement.  But

REDACTED

5.    *Fourth*, the Committee tries to get away from the fact that the cash payment saves the estate $56 million, in our estimation, of interest accruing on the debt by arguing that the Secured Lenders should not receive such interest because they are under-secured.  However, the Committee

REDACTED

Notably, the Committee's brief does not reply to the Objections filed in response to its motion to terminate principal payments.  Moreover, all the valuation evidence presented demonstrates that the Secured Lenders are over-secured:  both the Debtors' independent valuation expert, Duff & Phelps, and the Debtors' internal asset managers have concluded that the Collateral is worth more than the Secured Lenders' claim and is increasing in value in the current real estate market.

6.    *Fifth*, as a measure of last resort, the Unsecured Committees have also tried to stretch the law and the facts every which way to impose a heightened level of scrutiny on the Settlement, but their arguments are unavailing.  As discussed below, courts routinely defer to the Debtors' business judgment and approve pre-confirmation payments to secured lenders, especially in circumstances such as these where tens of millions of dollars in interest savings will benefit the estates.

7.    All of these slights of hand are designed to obfuscate the fundamental facts in this case.  The Committee cannot mount a credible fraudulent conveyance attack on the 2009 Secured Facility.  The Ad Hoc Unsecured Committee does not even address fraudulent conveyance.  The Committee must show that there was no reasonably equivalent value provided for this transaction.  But the 2009 Secured Facility was a refinancing that provided Capmark with

$1.5 billion of funding for $1.5 billion of debt obligation. The debt was all refinanced—no new debt was imposed on the company. The collateral wasgranted in order to obtain the extensions of maturities on prior debt and necessary covenant relief on prior debt reflected market terms, and was bargained for at arm's-length. This is dispositive of reasonably equivalent value in and of itself. The Committee does not challenge these facts. Indeed, some of the unsecured lenders who negotiated this transaction are now members of the Committee and support the Settlement.

8.      The Committee does not address the question of reasonably equivalent value head on, but focuses on trying to discredit the additional benefits that Capmark received by virtue of the refinancing. Capmark entered into the financing in order to buy time and liquidity to stabilize its business and to work on comprehensive negotiations with all its creditors. As a result, the Debtors were able to realize a myriad of further benefits for the estates—ranging from stabilizing and selling its servicing business for $1 billion to working out its regulatory issues with the FDIC, SEC, Fannie Mae, Freddie Mac HUD, and Japanese regulators. While the Committee tries to discount these benefits, arguing that the Company could have filed a free-fall chapter 11 in May 2009 and accomplished the same thing, the Committee's arguments are based on conjecture and are factually flawed.   Moreover,

REDACTED

9.      Equally flawed is the Committee's convoluted savings clause argument, which tries to limit the 2009 guarantees to the 2009 Secured Facility by virtue of the savings clause in the guaranties for the 2006 unsecured loans. The Committee still fails to understand that a guaranty is a contingent liability that must be valued at a discount. Capmark's attempt to turn the guaranty into an absolute liability for each guarantor and the parent would impose a

cumulative liability on Capmark of $74 billion—nine times the value of the 2006 debt on the Capmark estate. This defies economic sense. The Debtors' solvency report in fact did value the 2006 guarantees as a contingent liability, and found the guarantors solvent. The Committee does not challenge this report, but rather relies on it to assert that Capmark was insolvent in 2009. Again, the Committee can't have it both ways.

10.    In sum, the Settlement provides a 9% discount to the Secured Lenders' claims, an additional savings of approximately $56 million by virtue of the cash payment, and an additional $50 million-plus in saved litigation fees. The evidence demonstrates it was negotiated in an often contentious, arm's-length fashion for over six months. The Debtors properly exercised their business judgment in approving the Settlement. And, for all of these reasons, we submit so should the Court.

## ARGUMENT

11.    As much as the Unsecured Committees want to avoid the applicable standard, the touchstone for evaluating a proposed settlement is whether it "falls below the lowest point in the range of reasonableness." *In re Exide Techs.*, 303 B.R. 48, 68 (Bankr. D. Del. 2003) (quotation marks and citation omitted); *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) ("[T]he court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal quotation marks and citations omitted). And by any measure, the Settlement falls well within this standard.

## I.    THE COMMITTEE'S FRAUDULENT TRANSFER CLAIMS ARE MERITLESS.

12.    In analyzing what falls within the range of reasonableness, the "probability of success in litigation" is an essential factor, and it is dispositive in this case. *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996). The Committee stubbornly clings to fraudulent transfer theories

5

that cannot succeed. (Committee Objection ¶¶ 36-42.) The Ad Hoc Unsecured Group does not even argue the merits of the fraudulent transfer claims in its Objection.

### A.   The Committee Has Dropped its Intentional Fraudulent Transfer Claims.

13.   The Committee has already admitted that one of its fraudulent transfer theories is baseless.   After devoting pages of its Standing Motion to a conspiracy theory between the Debtors and Secured Lenders aimed at defrauding the unsecured creditors, the Committee has now *voluntarily dropped* its intentional fraudulent transfer and equitable subordination theories. (*See* Standing Motion ¶¶ 18, 20, 55-62; Committee Objection ¶ 75 n.16.)   The Committee explains that, after reviewing discovery, there is nothing there. The fate of the intentional fraud claims is a bellwether for the Committee's constructive fraud claims.

### B.   The Committee's Constructive Fraudulent Transfer Claims Are Meritless Because the Debtors Received Reasonably Equivalent Value from the 2009 Secured Facility.

14.   With its intentional fraud theories withdrawn, the Committee recognizes that for its constructive fraudulent transfer claims to succeed, it must demonstrate that the Debtors did not receive reasonably equivalent value for the 2009 Secured Facility. (Committee Objection ¶¶ 36-42). But the Committee's challenge to reasonably equivalent value fails both as a matter of law and fact.

#### 1.   The Committee Cannot Obscure the Fundamental Benefit That the Debtors Received From 2009 Secured Facility.

15.   The Committee does not address the fundamental fact that the 2009 Secured Facility, which was a refinancing, gave the Debtors the continued benefit of $1.5 billion, in exchange for extending the maturities and waiving covenant defaults for $1.5 billion of existing debt.   Specifically, it is undisputed that the 2009 transaction extended the maturities of the $833 million Bridge Loan coming due in March 2009, and forestalled the defaults and

acceleration of bank loan debt and bonds that could have resulted in the immediate, concurrent maturity of Capmark's $8.4 billion of outstanding debt.  The Bridge Loan lenders and the Bank Lenders waived the leverage covenant that Capmark could not meet.  Zero additional debt was incurred.

16.    Thus, the refinancing bought the Debtors the time and opportunity to work on restructuring efforts and maximize the value of the estates for the benefit of all creditors.  As

REDACTED

17.    The unremarkable fact that collateral was provided as a term of the transaction does not impact the reasonably equivalent value analysis.  The Debtors did not give up an additional $1.5 billion by pledging the Collateral, because the Collateral can only be liquidated to pay the existing $1.5 billion debt—thus the net liability to the Debtors remained the same.

18.    Judge Kevin Gross's decision last month in *In re Champion*, Bankr. No. 09-14014 (KG), Ad. No. 10-50514 (KG), 2010 WL 3522132 (Bankr. D. Del. Sep. 1, 2010), which the Unsecured Committees notably omit from their Objections, makes exactly this point.  In that

case, the debtors had been on the verge of defaulting on their secured credit facility and amended

the facility to provide additional collateral to the secured lenders. *Id.* at *2. Applying New

York's Uniform Fraudulent Conveyance Act (the "UFCA"), Judge Gross granted the lenders'

motion to dismiss the fraudulent transfer claims, holding that the additional collateral granted for

an antecedent debt was not a fraudulent transfer as a matter of law:

> These Transfers are security interests granted by Champion in respect of an
> antecedent debt and, like repayment of antecedent debt, they are necessarily fair
> consideration under the Fraudulent Conveyance Act. . . . *Additions of collateral
> do not enable lenders to receive anything more than what they have loaned and
> the debtor's liabilities are not increased as a result of the collateralization.*

*Id.* at *19 (emphasis added) (citing *In re AppliedTheory Corp.*, 323 B.R. 838, 841-844 (Bankr.

S.D.N.Y. 2005) ("[T]he granting of a security interest in respect of an antecedent debt constitutes

reasonably equivalent value or fair consideration . . . .")). While the case applied the "fair

consideration" concept under New York's UFCA, "[c]ourts typically use [fair consideration and

reasonably equivalent value] interchangeably, and do not usually make a distinction between"

these terms.[4] 323 B.R. at 840-41. *Champion* thus confirms that granting a security interest to

satisfy an antecedent debt is reasonably equivalent value as a matter of law.[5]

---

[4]    New York law governs the 2009 Secured Facility contractually.

REDACTED

[5]    *Champion* is consistent with a long line of prior cases holding that satisfying an antecedent debt—by granting a
security interest or otherwise—constitutes reasonably equivalent value. *See, e.g., In re AppliedTheory Corp.*,
330 B.R. 362, 364 (S.D.N.Y. 2005) (holding that a debtor received reasonably equivalent value when it granted
a security interest in all of its assets in return for a new loan and forbearance on pursuing default remedies on
the old loan); *In re APF Co.*, 308 B.R. 183, 187 (Bankr. D. Del. 2004) (finding that payment made on
promissory note by chapter 11 debtor was in satisfaction of an antecedent debt, and thus, constituted reasonably
equivalent value); *In re Trace Int'l Holdings, Inc.*, 301 B.R. 801, 805 (Bankr. S.D.N.Y. 2003) ("An 'antecedent
debt' satisfies the requirement of fair consideration and reasonably equivalent value, and putting aside transfers
to insiders, the payment of an existing liability is not fraudulent."); *Cuevas v. Hudson United Bank*, No. 09-cv-
6029, 2002 WL 31412465 at *6 (S.D.N.Y. Oct. 24, 2002) (finding that a pledge of collateral to secure
antecedent debt was not a fraudulent conveyance because debtor received reasonably equivalent value in
extending those loans and gaining creditor's agreement to forbear pursuing remedies); *Morgan Guar. Trust Co.
v. Hellenic Lines Ltd.*, 621 F. Supp. 198, 222 (S.D.N.Y. 1985) (refinancing of a mortgage, which included
forbearance on principal payments for a preexisting loan, was not a fraudulent conveyance); *Telefast, Inc. v.
VU-TV, Inc.*, 591 F. Supp. 1368, 1379 (D.N.J. 1984) (subsidiary's guaranty of the parent's loan provided

19.     Even if, *arguendo*, this Court were to go beyond the well-reasoned rationale in *Champion* and the overwhelming authority on point (*see* footnote 5), and look to the "totality of the circumstances" as the Committee advocates, the record shows that, as a matter of fact, the Debtors received reasonably equivalent value from the 2009 refinancing. The transaction bought the Debtors the time, opportunity, and liquidity needed to maximize the estates' values by (i) seeking a comprehensive out-of-court restructuring with its regulators and creditors and (ii) engaging in an orderly bankruptcy process, having shored up the value of its key assets and worked out is regulatory issues.[6]                      REDACTED                                The opportunity to pursue an orderly, comprehensive restructuring was inherently valuable. And as long as this opportunity was purchased at a market price—which, as discussed below, it was—reasonably equivalent value was provided. The many additional benefits that this opportunity conferred on the Debtors demonstrate that the 2009 Secured Facility provided *more* than reasonably equivalent value.

20.     The Committee's arguments do not directly address this point. Rather, the Committee focuses on a separate, irrelevant issue:  it argues that the unsecured creditors could have received more if the Debtors had entered into a hypothetical free-fall bankruptcy in May 2009. (Committee Objection at ¶¶ 40-42.) To this end, a day after it submitted its Objection, the Committee produced a report                      REDACTED

Presumably the Committee will submit this report at the hearing on the Rule

---

[6]  indirect benefits to subsidiary, and thus, provided sufficient reasonably equivalent value so as to survive fraudulent conveyance challenge); *In re B.Z. Corp.*, 34 B.R. 546, 548 (Bankr. E.D. Pa. 1983) (holding that debtors loan payments were "not avoidable since under §548(d)(2)(A) the payments were made for value, i.e., 'the satisfaction of . . . [an] antecedent debt of the debtor'") (citation omitted).

REDACTED

9019 Motion.

REDACTED

21.    The Committee's point—        REDACTED            —is flawed for several

reasons.[8]  *First*, the Committee fundamentally misunderstands reasonably equivalent value.

Reasonably equivalent value is not measured by comparing what one group of creditors may

receive today to what they supposedly could have received if the Debtors had chosen a

completely different restructuring path over a year ago.  Rather, whether the Debtors received

reasonably equivalent value for a transfer of assets turns on whether the Debtors received

"roughly the value [they] gave" for those assets—*in the real world*.  *VFB LLC v. Campbell Soup

Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (citation omitted).

22.    Here, by extending the maturities on their debt, the Debtors received the use of

$1.5 billion for up to two additional years and relief from a leverage covenant that they could not

meet.  In exchange, they paid interest, provided collateral, and agreed to different loan covenants

with which they could live.  Providing collateral in this context constitutes reasonably equivalent

value as a matter of law.  *See In re Champion*, 2010 WL 3522132 at *19.

23.    Moreover, the Committee has not—and cannot—dispute that the terms of the

2009 Secured Facility were arm's-length market terms.  Even applying the standard in *Exide*, on

---
[7]

REDACTED

[8]    As the Ad Hoc Committee has not had the opportunity to depose Mr. Geer before submitting this brief, it
reserves the right to supplement these points at the hearing.

which the Committee relies, "[m]arket value is an important component of the test.  In addition, the test involves a host of other factors, including the good faith of the parties, the difference between the amount paid and the fair market value, and whether the transaction was arms length."  *In re Exide Techs., Inc. (Exide I)*, 299 B.R. 732, 748 (Bankr. D. Del. 2003) (quotation marks and citation omitted).

REDACTED

25.    Not only do the terms of the transaction show that the Secured Facility was a market deal, but also the factual record reflecting the negotiations themselves demonstrates that the 2009 Secured Facility was negotiated at arm's-length.  For example,

REDACTED

11

REDACTED

These emails, as well as the dozens of term sheets that were exchanged before the 2009 Secured Facility was accepted, demonstrate that the transaction was the product of an arm's-length process.

26.    *Second*, even if, *arguendo*,                comparison between the unsecured creditors' supposed recovery today and their recovery in a speculative, hypothetical free-fall chapter 11 filing in 2009 had any relevance to the reasonably equivalent value analysis—and it does not—his methodology makes no sense.

REDACTED

The analysis thus conflates preference law with fraudulent transfer law. The fact that some creditors may recover more because they have liens does not bear on the reasonably equivalent value analysis, which focuses on whether the debtors received equivalent value for their transfer. *See In re Aphton Corp.*, 423 B.R. 76, 93 (Bankr. D. Del. 2010) ("Courts

---

[9]                REDACTED

have held that there is a distinction between a preference and a fraudulent transfer and a time-barred preference action may not be disguised as a fraudulent transfer action."). Taken to its logical conclusion, the Committee's argument would mean that securing antecedent debt would never provide reasonably equivalent value because it may later change the waterfall of payments to creditors in a bankruptcy.                  analysis says nothing about the value that the Debtors received from the 2009 Secured Facility and his report should be ignored for this reason alone.

27.    *Third*, the analysis is flawed because it does not even try to demonstrate what really would have happened if the Debtors had entered into a free-fall chapter 11 in May 2009.

        takes no position on what really would have happened to the servicing business and the related servicing assets if the Debtors had to sell the business in May 2009; or on what would have occurred if Capmark had to negotiate with the FDIC, HUD, SEC, Fannie Mae, Freddie Mac and Japanese regulators without the benefit of the stability and liquidity afforded by the 2009 Secured Facility; or on how the credit agencies and servicing agreement counterparties would have reacted when the servicing agreements were in default and perhaps had terminated automatically as a result of possible credit rating downgrades.    REDACTED

> ### 2. The Committee's Attacks on the Additional Benefits That the Debtors Received Fail.

28.    As stated above, the 2009 Secured Facility provided reasonably equivalent value to the Debtors because the Debtors received the extended use of $1.5 billion for an extension of the maturities of $1.5 billion of debt, and granted collateral in support of this exchange on arm's-length, marker terms. The refinancing provided the Debtors with time and opportunity to engage in an organized, comprehensive restructuring. This had value in itself and the Debtors paid a market price for that value.

13

29.    What the Debtors did with the time and opportunity created myriad *additional* benefits.  As set forth in the Debtors' Rule 9019 Motion and the Ad Hoc Committee Objection to the Standing Motion, and as corroborated by deposition testimony of Capmark's management team, the refinancing provided at least ten concrete business benefits to the Debtors:

REDACTED

_____

10

REDACTED

14

REDACTED

30.    The Committee tries to discredit two of these additional benefits in particular: (i) the sale of the Debtors' servicing business and (ii) the stabilization of the Capmark Bank. (Committee Objection ¶¶ 39-42.)  The Committee asserts that the benefits are not real, or that they could have been accomplished in a free-fall chapter 11 filing in May 2009. The Committee's arguments, however, are based on conjecture, not fact, and fly in the face of consistent documentary and testimonial evidence to the contrary.

> i.    **The Committee Fails to Rebut that the 2009 Secured Facility Helped Stabilize the Debtors' Servicing Business and Allowed for its Successful Sale.**

31.    The Committee's argument that the servicing business did not benefit from the preservation of liquidity at Capmark fails to address the fundamental nature of the servicing business.  (Committee Objection ¶ 41.)  Loan servicers administer loans from the time the proceeds are dispersed until the time the loan is paid off.  For example, they send monthly payment statements and collect monthly payments, maintain records of payments and balances, collect and pay taxes and insurance, and remit funds to the noteholders.    REDACTED explained, liquidity is crucial to the servicing business because servicers *advance* principal and

15

interest payments to the noteholder when the loan is non-performing.   REDACTED

In other words, the servicer fronts the cash for non-performing borrowers and is liable to its servicing agreement counterparties for those sums until the loans terminate.  Ultimately, when a loan is terminated, the servicer can collect on what it advanced from the loan's repayment or from foreclosure on the loan collateral, but while the loan is outstanding, the servicer must extend its own funds to cover the shortfall.

REDACTED

Recognizing this aspect of the business, industry servicing agreements contain strict credit requirements and servicer agreements can automatically terminate if a servicer falls below a certain threshold.   REDACTED

32.    In May 2009, as mortgage defaults rose, Capmark's servicing business faced a liquidity crisis and was in danger of defaulting on its agreements and collapsing.[11]  The ratings on Capmark's servicing business recently had been downgraded and further downgrades would have led to automatic terminations.              testified that:

REDACTED

---

[11]                             REDACTED

16

REDACTED

33.    The 2009 Secured Facility propped up the business by preserving both the Debtors' liquidity and credit ratings.  The Committee argues in conclusory fashion that the threat of servicer terminations was not real.  This is belied by the actual terminations, and the testimony of Capmark's management team, who lived through the sale process, regularly spoke to the managers of the servicing business, and knew the threat was real.  For example,

REDACTED

Thus, entering bankruptcy likely would have triggered additional servicing terminations, further depleting the value of the business.

34.    As a result of the stability in the servicing business created by the Secured Facility, when the Debtors decided to sell the business, they were able to engage in an organized

17

sales process outside of bankruptcy that resulted in the sale of the business to

REDACTED

35.    The Committee's argument that          sent an offer letter to explore a purchase of the servicing business in May 2009, and thus the same sale could have happened in a free-fall bankruptcy is an unfounded leap of logic. (Committee Objection at ¶ 41.)  As a threshold matter, the letter was a non-binding, exploratory communication that did not even propose a purchase price.                    REDACTED

The fact that it was made on the eve of Capmark's efforts to refinance the 2006 Debt suggests          was looking to buy the business at a distressed price to take advantage Capmark's precarious financial situation.

REDACTED

The sale of the business occurred *after* the Secured Facility stabilized the servicing agreements.

REDACTED

This price was higher than if the business had been sold in a free-fall bankruptcy (which

---
12

REDACTED

may have prevented the sale from happening at all).                     REDACTED

### ii.    The Committee Fails to Rebut the Benefit of Stabilizing Capmark Bank.

36.    The Committee's attempt to undermine the benefit that the 2009 Secured Facility conferred by stabilizing Capmark Bank also fails.  Its bald assertion that the FDIC would not have negatively impacted the value of the Bank to creditors by seizing the bank, or by demanding greater re-capitalization of the Bank if the Debtors had filed a free-fall bankruptcy in May 2009 is contradicted by the testimony of Capmark representatives who worked directly with the FDIC and heard its concerns.  (Committee Objection at ¶ 40.)                explained that

REDACTED

These witnesses are in the best position to know whether Capmark Bank was at risk.

37.    Further, the Committee's view is undermined by the fact that after lengthy negotiations, Capmark had to

19

REDACTED

Without the 2009 Secured Facility, Capmark would not have had the liquidity available to make these contributions and still run its business.

38.          conclusion that the FDIC would not have seized Capmark Bank because its capital ratio was higher than those of other banks seized in June 2009 is superficial and should be disregarded.          does not address the key fact that Capmark Bank's capital was concentrated in a declining asset:   real estate loans.


REDACTED



Like Capmark and its creditors, the FDIC knew that these assets were declining and would be subject to imminent write-downs and that additional capital would be needed to maintain an acceptable capital ratio.

39.   Before the 2009 refinancing, then, the Debtors' were on a slippery slope toward bank seizure or at least the risk of such a seizure—a result that happened to AmTrust Bank on December 4, 2010 in the case of *AmFin Financial Corporation*, Case No. 09-21323 (Bankr. N.D. Ohio).  In that case, which was filed on November 30, 2009 and which Mr. Geer omits from his report, the FDIC seized the Debtors' bank just four days after the petition date because the

---

13

REDACTED

Debtors' failed to maintain the capital ratio commitments at the bank.  (Motion for the Entry of an Order, Pursuant to Section 365(o) of the Bankruptcy Code, Requiring AmTrust Financial Corporation to Cure Immediately the Deficit Under Its Capital Maintenance Commitments to the Office of Thrift Supervision to Maintain the Capital of AmTrust Bank (Docket No. 371) ¶¶ 9-15 (Ginzburg Decl. Ex. 17).)

40.    The Committee and             argue that the Lehman Brothers banks survived a chapter 11 filing, and the Capmark Bank would have too if the Debtors had filed in May 2009.

REDACTED            The facts and circumstances surrounding the Lehman Brothers case, however, are unique for a variety of reasons that need no explanation.  And, as

REDACTED

41.    In any case,

REDACTED

42.    In sum, the 2009 Secured Facility provided a clear benefit by allowing the Debtors' to reach a resolution with the FDIC.  Absent such a resolution, the Debtors feared that

the FDIC would act to the detriment of creditors.                    REDACTED

### C.    The Committee's Argument Regarding The 2006 Guaranty Is Unfounded.

43.    The Committee continues to pursue its convoluted and illogical theory that the savings clauses in the 2006 credit facilities limit the Secured Lenders' claim against the 2009 Guarantors to $149 million. (Committee Objection ¶¶ 5, 47-60.) The Committee argues that the 2009 guaranty is limited to its pro-rata share of the 2006 guaranty, which it argues is, in turn, limited by the savings clause. (Committee Objection at ¶¶ 50-60.) Still ignoring the law and the economic fact that a guaranty is a contingent liability, the Committee continues to ascribe the full face value of the 2006 debt (over $8 billion) as a liability to each guarantor. The Committee then focuses on CFI, only one eight original 2006 Guarantors, and states that the shareholder's equity of this one subsidiary was lower than the full value of the debt it guarantied and so the 2009 guaranty must be reduced to $149 million.[14] (Committee Objection ¶ 52.) This argument fails for multiple reasons. (*See* Ad Hoc Committee Objection to Standing Motion ¶¶ 39-41.)

44.    *First*, the Committee still refuses to accept that a guaranty is a contingent liability. The language in the guaranty on which the Committee relies to argue otherwise—stating that the guarantors are liable as a "primary obligor and not just as surety"—does not change that fact. A contingent liability is "[o]ne which is not now fixed and absolute, but which will become so in case of the occurrence of some future and uncertain event." *United States on Behalf of Small Business Admin. v. Stanko*, Civ. A. No. 90-7250, 1992 WL 211550, at *8 n.9 (E.D. Pa. Aug. 24, 1992) (quoting *Black's Law Dictionary* 291 (5th ed. 1979)). The 2006 guaranty was still

---

[14]
                              REDACTED

22

dependant on the parent company's obligations:

REDACTED

If the parent terminated or satisfied its obligation, the guarantors would not be liable. The "primary obligor" language that the Committee cites simply means that the lenders could choose to collect from the guarantors without first exhausting collection remedies against the parent. It does not change the guaranty's contingent nature

45.     *Second,* the Committee's theory makes no economic sense. Applying the full $8.4 debt amount as a liability to each guarantor and the parent would result in a combined liability for the enterprise of $75.6 billion—nine times the amount of debt borrowed! That result defies economic reality. As case law makes clear, the amount of the guaranty liability should be discounted for the probability that it would become payable. *See In the Matter of Xonics Photochemicals, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) (Posner, J.) (stating that "it is necessary to discount [a contingent liability] by the probability that the contingency will occur and the liability become real"); *Chase & Sanborn Co. v. Arab Banking Corp.*, 904 F.2d 588, 594 (11th Cir. 1990) (holding that "a contingent liability cannot be valued as its potential face amount"). Thus, the Committee's assumption that CFI incurred a liability above its net assets is unsupported.

46.     *Third,* contrary to the Committee's argument that the Debtors have failed to value this discount,

REDACTED

23

Capmark and CFI were solvent in 2006.    (Draft Duff & Phelps Solvency Report
CAPMARK149076-77 (Ginzburg Decl. 20).)  The Committee has not challenged this report.

47.    In its report,


REDACTED


Thus, when the value of the guaranty was subtracted from the
guarantors' assets, the guarantors, including CFI, were solvent.

Because the uncontroverted evidence shows that the value of the
guaranty did not exceed the guarantor subsidiaries' net worth, the Committee's savings clause
argument falls flat.

48.    Further,


REDACTED


The Committee continues to ignore the valuable
subrogation rights CFI would have against its parent, and also the rights of contribution that CFI
would have against its co-guarantors as joint and severally liable guarantors.

24

49.    *Fourth*, before the savings clauses would even arguably apply, it must first be shown that CFI and the other subsidiary guarantors did not receive reasonably equivalent value for their guarantees in the 2006 transaction.   The record is devoid of any evidence that this is true. The Committee simply questions whether this was the case but offers no factual support for it whatsoever.  (Committee Objection ¶¶ 47-58.)   The speculative nature of this argument undermines it completely.

50.    Each of these points is independently fatal to the Committee's savings clause theory.

## II.   THE UNSECURED COMMITTEES' ATTEMPTS TO CHALLENGE THE SETTLEMENT'S VALUE AND STRUCTURE LACK MERIT.

51.    The Unsecured Committees' challenges to the substance and process of the Settlement should be rejected.  Especially in light of the Committee's weak legal theories, the Settlement provides a significant discount on the Secured Lenders' claim, plus additional savings of interest and legal fees.   Contrary to the Unsecured Committees' attempts to portray the Debtors and Secured Lenders as conspiring against them, the Settlement was negotiated in a lengthy, contentious arm's-length process.

### A.    The Unsecured Committees' Arguments Fail to Move the Settlement Below the Lowest Point in the Range of Reasonableness.

52.    The record demonstrates that the Settlement will provide over $240 million to the Debtors' estates.  First, it is undisputed that the 9% discount on the Secured Lenders' claim is worth $135 million to the estates.  Second, the Settlement provides significant interest savings by using cash currently held in an account earning *almost 0%* interest to pay down secured debt accruing interest at          The Ad Hoc Committee estimates these savings at $56 million.

REDACTED

REDACTED                    Indeed, post-confirmation, the interest rates

on the secured debt would rise to market value in the currently in the double-digits. (*See* Ad Hoc

Committee Objection to Standing Motion ¶ 46.)  Third, the Settlement will also save the estates

between $50 and $75 million in litigation costs.              REDACTED          ; *see also* Ad Hoc

Committee Objection to Standing Motion ¶¶ 45-46.)

   53. In addition to these identified financial benefits,

REDACTED

   Given the Settlement's substantial benefits and the fraudulent transfer claims'

high costs and likelihood of failure, the Debtors' decision is anything but unreasonable.

   54. The Committee's argument that the Secured Lenders are not entitled to interest

and fees because they are under-secured is not credible.  In August, the Committee *conceded* that

the Secured Lenders are

REDACTED

(the "Principal Payments Motion").                    The Committee argued

that this substantial equity cushion should preclude further payments of principal to the Secured

Lenders.[15]  Now, the Committee reverses course 180 degrees, and claims that the collateral is insufficient to cover the Secured Lenders' principal.  The Committee should not be permitted to take *opposite factual* positions on the same point *at the same time*.

55.    Regardless, all the evidence regarding the collateral valuation shows that the secured lenders are over-secured.  The Committee argues there is no evidence that the Collateral is sufficient to support the Secured Lenders' claim, yet it ignores

REDACTED

56.                    confirmed that the Collateral is sufficient to cover the Secured Lenders' claim based on

REDACTED

---

[15]  The Principal Payments Motion is still before the Court although the Committee has notably failed to reply to the Ad Hoc Committee's Objection to the Principal Payments Motion in its papers filed last week.

REDACTED

The Committee offers no alternative valuation.

57.    Nor does the Committee credibly challenge that it would cost the estates $50 million or more to litigate the fraudulent transfer claims in full.  It summarily states that the fraudulent transfer claims are simple and straightforward.  (Committee Objection ¶ 35.)  The Debtors' draft declaratory judgment action demonstrates exactly the opposite:  its prayer for relief, for example,

REDACTED

Indeed, fully litigating this matter would require multiple parties to submit competing solvency and collateral valuations from a series of experts covering multiple time frames (2006, 2007, 2009 and 2010) and would also require continued discovery from numerous parties and third parties, including the lending banks, indenture trustees, law firms, agent banks, bondholders, and Committee members.  Just the expedited discovery for the Rule 9019 Motion has resulted in nine depositions, the production of over 60,000 pages of documents, evidence and testimony from three experts, and extensive briefing.  Additionally, the Secured Lenders could pursue counterclaims against the unsecured creditors for avoidance actions, further complicating the litigation.  For example, assuming, *arguendo*, that the May 2009 collateral grant was a fraudulent transfer, the Secured Lenders could argue that the unsecured creditors—who received proceeds of the supposedly fraudulent May 2009 collateral grant—are transferees "for whose benefit" the collateral transfer

28

was made under section 550(a)(1) and, as such, must return those proceeds to the estate. There can be no mistake that litigating the fraudulent transfer claims in this case would be multi-layered, expensive, and time consuming.

58.    For these reasons, the Unsecured Committees' arguments that the Settlement falls below the lowest point in the range of reasonableness by providing "negligible consideration" and "essentially no value" to the Debtors' estates are baseless. (Committee Objection ¶¶ 35, 42.) Their reliance on *In re Exide Technologies*, 303 B.R. 48 (Bankr. D. Del. 2003), is misplaced. In that case, the court refused to approve a settlement that would have provided the debtors with $8.5 million for a $500 million claim. The 1.7% compromise—described as a "tip, a simple token or gesture"—fell below the lowest point in the range of reasonable. *Id.* at 70 n.36. In contrast, the $135 million value that the Debtors' estates will receive from this Settlement is 9% of the $1.5 billion claim, no "simple token." In addition, the claims in *Exide* were significantly more robust that those in this case and included intentional fraud and aiding and abetting breach of fiduciary duty claims based on the secured lenders' manipulation of the debtors. Specifically, the secured lenders obtained liens on all of the Debtors' foreign subsidiaries' assets and capital stock but only agreed "to forbear for a period just days longer than the 90-day preference period." *Exide I*, 299 B.R. at 736. The Committee does not and cannot make similar allegations here.

59.    In light of the significant litigation risk that the Committee bears, the substantial discount to the Secured Lenders' claim, and the other benefits provided by this Settlement, there is no basis to overturn the Debtors' business judgment that the Settlement exceeds the lowest point in the range of reasonableness.

29

**B.      The Unsecured Committees' Argument That the Debtors Cannot Pay the
Secured Lenders Prior to Plan Confirmation Is Misplaced.**

60.      The Unsecured Committees' claim that the Settlement is improperly structured

because (i) it pays the Secured Lenders prior to confirmation and/or (ii) it is a *sub rosa* plan.

Both arguments are meritless.

61.      As a threshold matter, discovery has revealed that, contrary to these arguments,

REDACTED

**1.      The Unsecured Committees' Objection to the Cash Payment Fails.**

62.      Courts have repeatedly held that debtors can repay secured creditors prior to

confirmation of a chapter 11 plan where there "a good business reason to grant such an

30

application." *HSBC Bank USA, Nat. Ass'n v. Calpine Corp.* (*"HSBC"*), No. 07 Civ 3088 (GBD), 2010 WL 3835200, at *10 (S.D.N.Y. Sep. 15, 2010) (upholding bankruptcy court order authorizing repayment of secured creditor prior to confirmation of a plan of reorganization) (citing *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007)).[16] Since the Debtors' Motion sets forth clear business reasons for the repayment of the 2009 Secured Facility prior to confirmation—most notably, the savings of what we estimate as $56 million in interest payments because the secured debt is accruing  REDACTED   while the estates' cash is accruing virtually zero interest and settling a meritless, expensive litigation—it should be granted.

63.     The Unsecured Committees ignore this well-established standard and erroneously rely on the "necessity of payment" doctrine that only applies to the payment of **unsecured** claims. (Committee Objection at ¶¶13-15; Ad Hoc Unsecured Group Objection at ¶¶ 42-43). The Unsecured Committees' cases are therefore factually and legally inapplicable. *See In re Lehigh & New England*, 657 F.2d 570, 581-82 (3d Cir. 1981) (applying the "necessity of payment doctrine" to unsecured claims); *In re Motor Coach Indus., Int'l, Inc.*, No. 08-12136-BLS, 2009 WL 330993, *2 n.5 (D. Del. Feb. 10, 2009) (refusing to authorize the pre-plan payment of unsecured trade vendor claims); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999) (same); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (refusing to authorize the pre-plan payment of unsecured rate refund claims).

---

[16]   As discussed below, another decision from the Calpine bankruptcy upheld a similar order allowing for the repayment of different secured creditors. *In re Calpine Corp.*, 356 B.R. 585, 596-97 (S.D.N.Y. 2007); *see also United States on Behalf of Rural Electrification Admin. v. Wabash Valley Power Ass'n, Inc.*, 167 B.R. 885, 888-889 (Bankr. S.D. Ind. 1994) (authorizing the refinancing of secured debt with new secured debt at a lower interest rate under section 363(b)); *In re Refco, Inc.*, No. 05-60006 (Bankr. S.D.N.Y. September 29, 2006) (approving a settlement pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 363(b) that provided for the secured lenders to be repaid in full prior to a plan of reorganization where the repayment would provide substantial interest savings to the debtors' estates).

64.    As this Court well knows, the payment of secured claims prior to plan confirmation is commonly approved in a variety of circumstances where a sound business reason exists to do so, including (i) motions to pay secured lenders pursuant to section 363(b) as a use of estate assets outside the ordinary course of business;[17] (ii) motions to pay prepetition lienholder[18] and secured tax claims;[19] (iii) motions to pay proceeds to a secured lenders from sale of collateral;[20] and (iv) pursuant to a "roll-up" debtor-in-possession financing facility.[21]   In none of those situations do the debtors have to meet the "necessity of payment" doctrine.

65.    In *In re Calpine Corp.*, 356 B.R. 585 (S.D.N.Y. 2007), for example, the court approved a payment that resembles the payment under this Settlement.   In that case, the debtors filed a motion to repay—prior to plan confirmation—approximately $646 of secured debt (the "Calgen Debt") with, among other things, $412 million of cash held in a cash collateral account.

---

[17]   *See, e.g. In re Verasun Energy Corp.*, No. 08-12606 (Bankr. D. Del. April 15, 2009); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. September 22, 2008) (approving repayment of a secured credit facility prior to confirmation of a plan); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. May 17, 2006) (approving repayment of a secured credit facility four months into the case and prior to confirmation of a plan over an objection that the payments outside of a plan were prohibited).

[18]   *See, e.g., In re Visteon Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. June 1 2009) ("first-day" order authorizing debtors to pay prepetition lien claims); *In re Hines Horticulture, Inc.*, No. 08 11922 (Bankr. D. Del. August 22, 2008) (same); *In re Tropicana Entm't, LLC*, No. 08-10856 (Bankr. D. Del. May 6, 2008) (same); *In re Wickes Holdings, LLC*, No. 08-10212 (Bankr. D. Del. February 5, 2008) (same).

[19]   *See, e.g., In re The Majestic Star Casino, LLC*, No. 09-14136 (Bankr. D. Del. November 25 2009) (approving the payment of secured tax claims because it would only affect timing, and not amount, of payment); *In re Masonite Corp.*, No. 09-10844 (Bankr. D. Del. March 17, 2009) (same); *In re Muzak Holdings LLC*, No. 09-10422 (Bankr. D. Del. February 12, 2009) (same); *In re Tropicana Entm't, LLC*, No. 08-10856 (Bankr. D. Del. May 6, 2008) (same); *In re Wickes Holdings, LLC*, Case No. 08-10212 (Bankr. D. Del. February 5, 2008) (same); *In re Pope & Talbot, Inc.*, No. 07-11738 (Bankr. D. Del. Novemer 21, 2007) (same).

[20]   *See, e.g., In re Flying J Inc.*, No. 08-13384 (Bankr. D. Del. July 29, 2009) (approving sale of collateral and the use of the sale proceeds to pay down the secured lenders); *In re Hines Horticulture, Inc.* No. 08-11922 (Bankr. D. Del. December 19, 2008)

[21]   *See, e.g., In re Indalex Holdings Fin. Inc.*, No. 09 10982 Bankr. D. Del. May 1, 2009) (approving approximately debtor in possession credit facility that provided for the roll up of the debtors' prepetition credit facility); *In re Linens Holding Co.*, No. 08 10832 (Bankr. D. Del. May 28, 2008) (approving debtor in possession credit facility providing for the roll up of certain prepetition obligations); *In re Hoop Holdings Inc.*, No. 08 10544 (Bankr. D. Del. Apr. 16, 2008) (same); *In re Buffets Holdings, Inc.*, No. 08 10141 (Bankr. D. Del. Feb. 22, 2008) (same).

The cash was earning an interest rate of 4.4%, whereas the secured debt had a 9.6% interest rate. *Id.* at 558-89. The rest of the funds ($234 million) was provided by a debtor-in-possession financing facility (the "Calpine DIP"), which incurred interest at 7.9% and was secured by assets other than those securing the Calgen Debt. Thus, by drawing down on the Calpine DIP, cash unencumbered by the liens securing the Calgen Debt was used to repay the Calgen Debt and generate interest savings of $1.95 million per month. *Id.*

66.     The holders of the Calgen Debt objected, asserting, among other things, that there was a prohibition on making distributions prior to the confirmation of a plan of reorganization. The Bankruptcy Court (Judge Lifland) overruled the objection and held that held that "Section 363 offers the appropriate use of cash . . . [a]nd to the extent [section] 105 applies here, to back stop that . . . it is appropriate for the Debtor[s] and those creditors of the estate to receive those payments at this particular point in time." *Id.* at 590. On appeal, the district court upheld Judge Lifland's ruling and endorsed the use of section 363(b) to repay secured creditors prior to a plan of reorganization where the debtors have provided a sound business reason for the repayment, such as reduction in interest costs: "it is undisputed that the repayment of the outstanding principal of the [Calgen Debt] stopped the unnecessary loss of funds from Debtors' estates. Accordingly, Judge Lifland's granting of Debtors' Repayment Motion was an appropriate use of cash under sections 363(b) and 105(a)." *Id.* at 597.

67.     The Debtors have clearly met the business judgment standard with respect to the Rule 9019 Motion. The exact same reasons supporting the repayment of the Calgen Debt in Calpine—interest savings and a negative spread on cash in a cash collateral account—apply here. And the Debtors' have additional reasons to make the payment here: to obtain a discount on the Secured Lenders' claim and avoid expensive litigation over meritless fraudulent transfer claims.

33

2.     **The Unsecured Committees' Attempt to Construe the Settlement as a**
       ***Sub Rosa* Plan Fails.**

68.    In another ill-fated attempt to alter the standard for approval of this Settlement,

the Unsecured Committees' argument that the Settlement constitutes a *sub rosa* plan is incorrect

as a matter of law.  (Committee Objection at ¶¶18-22; Ad Hoc Unsecured Group Objection at

¶¶61-66.)  "Pre-confirmation transactions *do not* constitute illegal *de facto* reorganization plans

when they *do not*, *inter alia*, dispose of all of a debtor's assets, all of a creditor's claims against a

debtor, or restrict creditors' rights to vote on a reorganization plan." *HSBC*, 2010 WL 3835200

at *10 (emphasis added and citation omitted); *see also In re Iridium*, 478 F.3d at 466 (holding

that entering into a settlement did not constitute an impermissible "sub rosa" plan because a

sound business justification existed for the settlement and litigation would not benefit the estate);

*In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 251 (D. Del. 1998) (holding that a settlement

that bound a party to support a specific plan of reorganization was not a *sub rosa* plan); *In re Sea

Containers Ltd.*, No. 06-11156(KJC), 2008 WL 4296562, *11 n.13 (Bankr. D. Del. Sep. 19,

2008) (approving a settlement over the objection of the party most affected by the settlement and

holding that "[w]hile this settlement paves the way for the Debtors to achieve confirmation of a

plan, the settlement in and of itself does not constitute a 'sub rosa plan.'").  In *HSBC*, the court

specifically held that the ***repayment of secured creditors prior to a plan of reorganization*** did

not constitute a *sub rosa* plan because it did not dictate the terms of recoveries for all creditors,

did not impair any party's voting rights, and did not dispose of all the debtors' assets.  2010 WL

3835200 at *10.

69.    The result is the same here.  Repaying the Secured Lenders pre-plan does not

create a *sub rosa* plan because the Settlement does not (i) dispose of all (or even most) of the

Debtors' assets; (ii) dispose of all creditors' claims; or (iii) restrict the right of any creditor to

vote on the ultimate plan of reorganization. All it does is reduce the principal amount owed to the Secured Lenders, resolve any potential claims between the Secured Lenders and the Debtors, and provide for discounted payment of the Secured Lenders' claims. Although the Debtors' assets will change, there are still substantial issues to be dealt with through a plan of reorganization, including the consideration to be provided to the remaining creditors, the Debtors' ultimate corporate structure after emergence from chapter 11, and post-emergence corporate governance provisions. For these reasons, the Settlement does not even come close to constituting a *sub rosa* plan.[22]

### C.    The Unsecured Committees' Attempt to Obtain Special Deference Fails.

70.    The Unsecured Committees incorrectly argue that their objections to the Settlement are entitled to heightened deference because the Debtors are liquidating. (Committee Objection ¶¶ 30-31; Ad Hoc Unsecured Group Objection ¶¶ 35-37.) This is wrong factually and legally. The Debtors are not in a liquidation mode but will dispose of certain assets

REDACTED

---

[22]    Likewise, the Committee's assertion the Debtors are required to prove the Settlement provides at least as much to unsecured creditors as a liquidation also fails. (Committee Objection at ¶¶ 23-26.) Since the Settlement does not constitute a *sub rosa* plan, the "best interests of creditors" test under section 1129(a)(7)(A)(ii) does not apply. The authority the Committee cites for this position is easily distinguishable. *In re AWECO, Inc.*, 725 F.2d 293 (5th Cir. 1984) involved the immediate cash payment to an unsecured creditor before it was clear that superior priority claims would be paid in full, here there are no creditors higher in priority than the Secured Lenders. Further, *In re Dalen*, 259 B.R. 586(Bankr. W.D. Mich. 2001), applied the best interests test to a settlement contained in a plan of reorganization, since the debtors in *Dalen* were seeking confirmation of a plan of reorganization, all the requirements of section 1129 of the Bankruptcy Code applied. Id. at 600. Finally, even if the best interest of creditors test did apply to the Settlement, as discussed above, there is ample evidence that the Secured Lenders would be paid in full in a chapter 7 liquidation since the legal claims against the Secured Lenders are extremely weak and the Secured Lenders are over-secured. As a result, the unsecured creditors would be far worse off in a chapter 7 liquidation than if the Settlement is approved.

71.    Moreover, the Ad Unsecured Hoc Group's cited authority, *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995), does not stand for the proposition that a court should weigh unsecured creditors' views more heavily than a debtor's views.  That case involved a motion to pay a break-up fee, not a settlement that would have benefited the estates as is the case here.  *Id.* at 104.  And *In re S.N.A. Nut Co.* relied on *In re After Six, Inc.*, 154 B.R. 876 (Bankr. E.D. Pa. 1993), which explained that while in a liquidating Chapter 11 case, unsecured creditors' viewpoints are entitled to "some greater deference . . . a liquidating Chapter 11 case is nevertheless first and foremost a Chapter 11 case. Having neither sought to convert this case to a Chapter 7 case nor to appoint a trustee, ***the Committee has relegated its constituency to a position where, under the Code, its views must be subjected to the deference to the Debtor's wishes.***"  *Id.* at 882-83 (emphasis added) (citations omitted).  Accordingly, because this not a truly a liquidation and because the Committee did not seek to convert these cases to a chapter 7, there is no reason to grant the Unsecured Committees' positions more deference than those of the Debtors.

### III.    THE UNSECURED COMMITTEES' CLAIM THAT THE SETTLEMENT IS A SWEETHEART DEAL IS UNSUPPORTABLE.

72.    Even though the factual record has forced the Committee to abandon its theory that the May 2009 refinancing was a "sweetheart deal," the Unsecured Committees have concocted a new conspiracy theory that the now the Settlement (as opposed to the 2009 Secured Facility) is not "the product of 'arms length' bargaining . . . ."  (Committee Objection ¶ 66; Ad Hoc Unsecured Group Objection ¶ 46.)  The record, however, shows that the Debtors agreed to the Settlement only after rigorously researching the fraudulent transfer claims and aggressively negotiating with the Secured Lenders.

73.    The negotiations spanned over six months and involved hundreds of emails, phone calls, and meetings—presumably, a preordained deal could have taken less effort.  The parties worked long and hard to resolve a long list of disputed terms, and the negotiations almost broke down at various points.  For example,

REDACTED

Most fundamentally, the Debtors demanded—and ultimately extracted—a substantial discount on the principal owed to the Secured Lenders.[23]  And a sampling of the parties' correspondence shows that, although they eventually reached a deal, they were never "sweethearts":

REDACTED

---

[23]    Out of over a thousand documents concerning settlement negotiations produced by the Secured Lenders, the Committee cites a single email from the Debtors from October 2009—before negotiations even commenced in earnest—noting that full payment to the Secured Lenders might be possible *if* a compromise on collateral could be reached.  (Committee Objection ¶ 70.)  As time progressed, however, the Debtors moved away from this position and demanded a substantial discount on the Secured Lenders' claims.

[24]

[25]                            REDACTED

[26]

●                              REDACTED

There is nothing in the record to indicate that the Debtors' capitulated to the Secured Lenders'

demands.

74.    The Unsecured Committees' specific arguments about the Settlement process are

meritless.    *First*, the Debtors' threat to file a declaratory judgment action regarding the

fraudulent transfer claims was not meaningless. (Committee Objection at ¶ 72.) To the contrary,

it would have launched the Secured Lenders into an immediate and extremely expensive and

complex litigation.  The Debtors' proposed complaint would have required the Court to formally

resolve

                              REDACTED

only shows that the Debtors believe the fraudulent transfer theories are

weak.  Moreover, if the Complaint was filed, it would have opened the door for litigation by all

parties-in-interest, including the Unsecured Committees.  The threat of litigation was made, not

to assuage the Secured Lenders, but rather to force them to agree to a higher discount.

75.    *Second*, the Unsecured Committees' argument that the Debtors are conflicted is

meritless. (Committee Objection ¶¶ 67-73; Ad Hoc Unsecured Group Objection ¶ 49.)  The fact

that the Debtors' management and advisors negotiated the May 2009 refinancing cannot in and

of itself undermine their ability to independently negotiate the Settlement.  If a debtors'

managers cannot pursue claims on behalf of the estates because they participated in a transaction

related to those claims, then debtors rarely would be able to pursue their own claims.  The

---

[27]                          REDACTED

Unsecured Committees' cite no authority for their novel theory, which, taken to its logical end, would require every company to clean house upon filing for chapter 11.

## CONCLUSION

76.    The Unsecured Committees' inability to support the fraudulent transfer claims, their unfounded attacks on the substance of the Settlement, and their last-resort collusion theory do not obscure the fact that this is a beneficial Settlement that was fairly bargained for.  For the foregoing reasons, the Court should grant the Debtors' Rule 9019 Motion.

Dated: New York, New York
      October 12, 2010

                /s/ Kathleen P. Makowski
                Laura Davis Jones (No. 2436)
                Kathleen P.  Makowski (No. 3648)
                PACHULSKI STANG ZIEHL & JONES LLP
                919 North Market Street, 17th Floor
                Wilmington, Delaware  19801
                Telephone:    (302) 652-4100
                Facsimile:    (302) 652-4400

                      - and -

                /s/ Maria Ginzburg
                James H.M. Sprayregen
                Edward O. Sassower
                Andrew R. McGaan
                Maria Ginzburg
                Mark E. McKane
                KIRKLAND & ELLIS LLP
                601 Lexington Avenue
                New York, New York  10022-4611
                Telephone:    (212) 446-4800
                Facsimile:    (212) 446-4900

                *Attorneys for the Ad Hoc Committee of Secured Lenders*