**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------x
| | |
|---|---|
| *In re* | : |
| | :    **Chapter 11** |
| **CAPMARK FINANCIAL GROUP INC.,** *et* | : |
| *al.,* | :    **Case No. 09-13684 (CSS)** |
| | : |
| Debtors. | x    **Jointly Administered** |

----------------------------------------------------------------

**FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]**

## I.    INTRODUCTION

1.    Before the court are competing motions relating to the claims of the Debtors' secured lenders as well as potential claims against those lenders. The Debtors' secured lenders assert a secured claim in the amount of approximately $1.1 billion plus interest, fees and expenses. Their collateral consists of $200 million in cash and a pool of commercial mortgage loans that the Debtors value between $1.3 and $1.5 billion.

2.    The Debtors have filed a motion seeking Court approval of a settlement that may be briefly summarized as follows: the Debtors release potential fraudulent transfer actions and objections to the secured lenders' claims in return for an immediate, pre-plan payment to the lenders of cash equal to 91 percent of the original principal amount of the claims in addition to post-petition interest and fees of approximately $75 million that the secured lenders have already received. Of the total

---

[1] This constitutes the Court's findings of fact and conclusions of law under Bankruptcy Rules 7052 and 9014.

$975 million in cash to be paid under the settlement approximately $775 million is not pledged to the secured banks.

3.      Basically, the settlement provides for a "cash for collateral" swap where the secured lenders are foregoing their collateral, which the Debtors value between $1.3 and $1.5 billion, in exchange for an upfront cash payment.  Under the settlement, the secured lenders are receiving a full release.  The Debtors believe that the settlement will save the Debtors' estate no less than $300 million.

4.      The Official Committee opposes the settlement.  It asserts that the Court **cannot** approve the settlement because there is no basis in the law to allow for the payment through a settlement and outside of a plan of reorganization of a secured creditors' pre-petition claim, especially in a liquidating case where the payment is being made from unencumbered cash and the unsecured creditors oppose the payment.

5.      The Official Committee further argues that the Court **should not** approve the settlement.  It believes there are valid causes of action that can be asserted against the secured lenders relating both to the initial issuance of the debt in 2006 and the granting of liens in 2009.  Because of the asserted strength of those litigation claims, the Official Committee believes that the Debtor has settled too cheaply.  In addition, the Official Committee disputes that the collateral being left behind – the pool of commercial mortgage loans – is worth anywhere near the $1.3 billion to $1.5 billion figure asserted by the Debtors and that risk associated with the collateral's value is unfairly being transferred to the unsecured creditors.  Finally, the Official Committee

believes the settlement should not be approved because it was achieved through an unfair process in which the unsecured creditors were not allowed to participate.

6.      The law governing settlements under Bankruptcy Rule 9019 is well-settled. The Court may approve a settlement that is "fair and equitable."  To determine whether a settlement is fair and equitable, the Court need only canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness.  Whether a settlement is above the lowest point in the range of reasonableness, in turn, is determined by considering the *Martin* factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  Of course, the Court may not approve a settlement that would violate applicable law, regardless of whether it is a "good deal" for a debtor.

7.      Based upon the extensive record developed in a four-day evidentiary hearing and over 200 pages of briefing, the Court believes it has adequately canvassed the issues and finds that it **can** approve the settlement in this case.  The Court disagrees with the Official Committee's assertion that there is no basis in the law to allow for the payment through a settlement and outside of a plan of reorganization of a secured creditor's pre-petition claim.  There is ample authority under the Bankruptcy Code for such payment.  Nonetheless, there is no per se rule – it depends on the facts and circumstances of the case.  While this settlement certainly tests the limits of that authority, the Court finds that payment of the pre-petition secured claim in this

instance does not violate the Bankruptcy Code. A key element in the Court's ruling is its finding, based upon the evidence submitted at the Hearing, that the value of the collateral being left behind is well in excess of the unencumbered cash for which it is being swapped.

8.      In addition, the Court finds that it **should** approve the settlement. Litigation over the secured lenders' claim would be complicated, time consuming and expensive. Despite the Official Committee's assertions otherwise, the Court finds that the litigation claims against the secured lenders have a low probability of being successful. Given the prohibitive cost and the low likelihood of success, it is certainly within the lowest range of reasonableness for the Debtors to enter this settlement. Moreover, as noted above, the Court finds that the value of the collateral being left behind is well in excess of the cash for which it is being swapped. Finally, the Court believes that the settlement was a result of arm's length bargaining and the process was fair and equitable. While it is usually desirable to involve an official committee in these types of negotiations it is certainly not required. Thus, applying the *Martin* factors, the Court will approve the settlement.

9.      In addition to opposing the settlement, the Official Committee seeks authority to sue the secured lenders to avoid the secured lenders' liens as preferential or fraudulent. The Court will deny that motion as moot.

## II.    PROCEDURAL HISTORY

10.     On October 25, 2009 (the "Petition Date"), Capmark Financial Group Inc. ("CFGI") and its subsidiaries and affiliates (collectively, the "Debtors," "Company," or

"Capmark") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.[2] The Debtors continue to operate their businesses and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code. These cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Bankruptcy Rules for the District of Delaware.

11.     On November 2, 2009, the Official Committee of Unsecured Creditors ("Official Committee") was appointed pursuant to section 1102 of the Bankruptcy Code.

### A.     The Motions

12.     On August 10, 2010, the Official Committee filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting it Leave, Standing, and Authority to Prosecute Causes of Action on Behalf of the Debtors' Estates* [Docket No. 1526] (the "Standing Motion"), in which the Official Committee seeks entry of an order authorizing it to sue the secured lenders to avoid as fraudulent and preferential the Debtors' May 2009 grant of $1.5 billion of liens and, in the alternative, to limit the amount of the lenders' secured claims on fraudulent transfer theories.[3] The Ad Hoc Group of Holders of Capmark's Unsecured Bank Debt (the "Ad Hoc Unsecured

---

[2] On January 15, 2010, Capmark Investments LP, a wholly owned subsidiary of CFGI, commenced its voluntary case under chapter 11 of the Bankruptcy Code. On July 29, 2010, Protech Holdings C, LLC, an Ohio single member limited liability company and an affiliate of the Debtors commenced its voluntary case under chapter 11 of the Bankruptcy Code.

[3] On the same day, the Official Committee filed its *Motion of the Official Committee of Unsecured Creditors Seeking Entry of an Order Terminating the Requirement that Additional Principal Payments be Made Subject to the Cash Collateral Order* [Docket No. 1527] (the "Payment Termination Motion"). The Official Committee subsequently withdrew the Payment Termination Motion without prejudice.

Committee") filed a statement in support of the Standing Motion. [Docket No. 1611]. The Debtors and the Ad Hoc Committee of Prepetition Secured Lenders (the "Ad Hoc Secured Committee"), among others, oppose the Standing Motion.

13.    On September 3, 2010, the Debtors filed the *Debtors' Motion, Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 363(b) and 549(a)(2)(B), for Order Approving Settlement Between Debtors and their Prepetition Secured Credit Facility Lenders*, [Docket No. 1636] (the "Settlement Motion"), requesting approval of a settlement with their secured lenders compromising and settling the secured claims arising under the $1.5 billion Secured Credit Facility (the "Settlement"). The Ad Hoc Secured Committee and others support the motion. The Official Committee and the Ad Hoc Unsecured Committee oppose the Settlement Motion.

**B.    Hearing and Witnesses**

14.    The Court held a hearing to consider the Settlement Motion and the Standing Motion (the "Hearing") on October 14, 15, 18, 19, and 26, 2010.  At the Hearing, the Court heard opening and closing statements from all parties and testimony from five witnesses called by the Debtors in support of the Settlement: (i) Thomas L. Fairfield, Executive Vice President, General Counsel, and Secretary of CFGI; (ii) Mohsin Meghji, Chief Restructuring Officer of the Debtors and a principal and managing director of Loughlin Meghji & Co. ("LM+Co"); (iii) Edwin Litolff, a real estate consultant and Senior Adviser to Duff & Phelps, LLC ("D&P"); (iv) William Gallagher, Chief Risk Officer of CFGI and Capmark Finance Inc. ("CFI"); and (v) Dr. Timothy Luehrman, a professor at Harvard Business School and Senior Advisor to

D&P.  The Official Committee called one witness in opposition to the Settlement, Bradley Geer of Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan").  The parties also propounded numerous exhibits admitted into evidence during the Hearing.

## III.    FINDINGS OF FACT

### A.    THE TRANSACTIONS

15.    The Settlement Motion and Standing Motion implicate three key transactions.

#### (i)    The 2006 Transaction

16.    On March 23, 2006, a group of four private equity investors (the "Investors") acquired an approximate 78% controlling interest in what is now CFGI from CFGI's former parent, GMAC Mortgage LLC ("GMAC"), for $1.5 billion (the "2006 Transaction").  *See* Hr'g Tr. 54:4–16 (Fairfield); Debtors' Demonstrative Ex. A (2006 Transaction Chart).  GMAC retained just over 21% of CFGI's equity following the 2006 Transaction.  At the same time, the debt of CFGI was substantially refinanced with new bank debt that replaced the existing debt of CFGI.  *See* Hr'g Tr. 55:17–20; 56:6–16 (Fairfield).  The key features of the 2006 Transaction are illustrated below.  *See* Hr'g Tr. 55:17–56:20 (Fairfield); Debtors' Demonstrative Ex. A.



17.    As depicted above, in connection with the 2006 Transaction, CFGI and certain of its subsidiaries entered into two unsecured debt facilities:  (a) a $5.5 billion credit facility (the "Credit Facility"), consisting of both a term loan and revolving credit line, with a final maturity date of March 23, 2011; and (b) a $5.25 billion bridge loan facility (the "Bridge Loan"), with an original maturity date of March 23, 2008, with an option to extend for one year through March 23, 2009.  *See* Hr'g Tr. 55:3–16 (Fairfield). The terms of the Credit Facility are governed by a Credit Agreement dated as of March 23, 2006 (as amended, the "Credit Agreement").  *See* Debtors' Ex. 4(a); Hr'g Tr. 54:4– 55:16 (Fairfield).  The terms of the Bridge Loan are governed by a Bridge Loan Agreement dated as of March 23, 2006 (as amended, the "Bridge Loan Agreement").

*See* Debtors' Ex. 2(a); Hr'g Tr. 54:4–55:16; 57:13–58:2 (Fairfield); Debtors' Ex. 1, at 11 (CFGI Form S-4, dated Mar. 14, 2008).

18.    *Borrowings and Payments.*   At the closing of the 2006 Transaction, CFGI borrowed approximately $8.357 billion under the Credit Facility and Bridge Loan.  *See* Hr'g Tr. 56:10–20 (Fairfield); Debtors' Ex. 48, App'x 1 (Expert Report of Timothy A. Luehrman [hereinafter "Luehrman Rep."]).   The proceeds of these borrowings were used to pay approximately $7.8 billion of preexisting indebtedness and closing costs and expenses of the 2006 Transaction and for general corporate purposes.  *See* Hr'g Tr. 56:10–20 (Fairfield).

19.    *The Guaranties.*   Nine of CFGI's direct (including CFI) and indirect subsidiaries (collectively, the "Guarantors") guaranteed CFGI's obligations under both the Credit Agreement and Bridge Loan Agreement in separate respective guaranty agreements (the "Credit Agreement Guaranty," (Debtors' Ex. 5), and the "Bridge Loan Guaranty," (Debtors' Ex. 3)).  *See* Hr'g Tr. 57:4–12; 59:10–15; 61:15–22 (Fairfield).

20.    Section 1(a) of the Credit Agreement Guaranty, (Debtors' Ex. 5), provides:

> Each Guarantor hereby guarantees, as primary obligor and not merely as surety, to each Lender and the Agent and their respective successors and assigns the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the principal of and interest on the Borrowings made by the Lenders to and the Notes (if any) held by each Lender of, the Company, all obligations owing from time to time by the Company under any Hedge Agreement entered into by any Lender or Affiliate of any Lender (or any Person that was a lender at the time such Hedge Agreement was entered into) (collectively, "Guaranteed Hedge Agreements"), and

> all other amounts from time to time owing to the Lenders or the Agent by the Company under the Credit Agreement, the Notes or any of the other Loan Documents, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "Guaranteed Obligations"). Each Guarantor hereby further agrees that if the Company shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, such Guarantor will promptly pay the same without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

A substantially identical provision can be found at Section 1(a) of the Bridge Loan Guaranty. *See* Debtors' Ex. 3.

21.    The Credit Agreement Guarantors and Bridge Loan Guarantors are jointly and severally liable for their guarantee obligations and the Guarantors agreed that, in the event payment shall be required under the Guaranties, each Guarantor will contribute the maximum amount permitted by law "so as to maximize the aggregate amount of the Guaranteed Obligations paid to the Lenders … under or in respect of the Loan Documents."  Debtors' Ex. 5 (Credit Agreement Guaranty), at § 1(c); Debtors' Ex. 3 (Bridge Loan Guaranty), at § 1(c).

22.    *The Savings Clauses.*  Additionally, both the Credit Agreement Guaranty and Bridge Loan Guaranty contain "savings clauses" limiting the obligations of each Guarantor to the maximum amount allowable under governing fraudulent transfer laws.  The language of the Credit Agreement Guaranty's savings clause is as follows:

> Each Guarantor, and by its acceptance of this Guaranty, the Agent and each Lender hereby confirms that it is the intention of all such Persons that this Guaranty and the obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law (as hereinafter defined), the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the obligations of each Guarantor hereunder. To effectuate the foregoing intention, the Agent, the Lenders and the Guarantors hereby irrevocably agree that the obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance. For purposes hereof, "Bankruptcy Law" means any proceeding of the type referred to in subsection 7.l(f) of the Credit Agreement or Title 11 U.S. Code, or any similar foreign, federal or state law for the relief of debtors.

Debtors' Ex. 5, at 1.  A substantially identical provision can be found at Section 1(b) of the Bridge Loan Guaranty.  *See* Debtors' Ex. 3.

23.  *Credit Ratings.*  In connection with the closing of the 2006 Transaction, CFGI's long term unsecured debt was rated Baa3 by Moody's Investors Services Inc., BBB- by Standard & Poor's Financial Services LLC, and BBB by Fitch Inc.  Each of these ratings categorized the debt as "investment grade," albeit at the low range of the spectrum.  *See* Hr'g Tr. 63:2–5 (Fairfield); Debtors' Ex. 1, at 11 (Form S-4); Debtors' Ex. 48 (Luehrman Rep.), at 72–73.

24.  *2006 Financial Condition.*  The parties have stipulated that, at the time of the 2006 Transaction, CFGI could have sold or caused the sale of its assets and

businesses and used the proceeds to satisfy all of its debts and the debts of its subsidiaries. Hr'g Tr. 460:15-462:5 (Bienenstock) ("[W]hen the guarantees were issued on March 23, 2006, by the Capmark subsidiaries, that on that day Capmark Financial Group, Inc., the holding company, could have, if it wanted to, have caused the sale of its assets and businesses to pay off all creditors at all levels in full."); Hr'g Tr. 462:12-15 (Mayer's agreement); *see also id.* at 931:24-932:2  (Horowitz) ("[T]he Committee is not challenging the conclusions with regard to CFGI's solvency.").

25.    *Voidability of Subsequently Incurred Obligations.*  The parties agree that all claims replacing debt or guaranties issued in 2006 must be tested by whether the debt or guaranties were voidable in 2006. Hr'g Tr. 36:4-10 (Mayer)   ("[E]verybody's claim has to be measured as of 2006, and if you take out somebody who was there in 2006, you step into their shoes.  That's our argument."); Hr'g Tr. 37:10-38:14 (Mayer) ("There's no real argument that the bonds are going to be at war with the banks, because the bonds refunded out previous bank claims.").

26.    *CFGI's Solvency, Capital Adequacy, Ability to Pay Debts.*  Capmark's financial condition at the time of the 2006 Transaction was strong.   *See* Hr'g Tr. 62:5–10 (Fairfield).   The Company had very good earnings in the prior year and had stockholders' equity of approximately $2 billion.  *Id.* at 62:21–63:1.  In connection with the closing of the 2006 Transaction, CFGI was required to apply purchase accounting to 79 percent of its closing date balance sheet, which included adjusting all of the assets and liabilities to their fair values as of March 23, 2006 to the extent of 79 percent.  *See* Debtors' Ex. 1 (Form S-4 Statement), at F-13–F-14.  The March 23, 2006 balance sheet

was audited by Deloitte & Touche, CFGI's independent public accountants. *See id.* at F-2.

27.    In connection with CFGI's audited consolidated financial statements for year ending December 31, 2007, CFGI presented balance sheets as of March 22, 2006—prior to the consummation of the 2006 Transaction—and March 23, 2006, adjusted to take account of the 2006 Transaction. *See* Debtors' Ex. 1 (Form S-4), at F-14. On a book value basis, the consolidated net worth of the Capmark enterprise—*i.e.*, the amount its assets exceeded its liabilities without taking into account "mezzanine equity" or securities that are conditionally redeemable—was $1.972 billion the day before the 2006 Transaction and $2.029 billion as of the date the 2006 Transaction closed. *Id.* Thus, on a book value basis, the consolidated positive net worth of the CFGI enterprise was enhanced by the 2006 Transaction. *See* Debtors' Ex. 48 (Luehrman Rep), at 5–6.

28.    At the time of the 2006 Transaction, CFGI was solvent, adequately capitalized, and able to pay its debts as they matured. *See* Hr'g Tr. 940:3–13 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 1–7, 23–65 (solvency), 66–71 (adequate capital), 72–76 (ability to pay debts). Moreover, at the time of the 2006 Transaction, CFGI had the ability to pay in full all the liabilities of CFGI and its subsidiaries (including the Credit Facility and Bridge Loan) by selling its assets or businesses (including subsidiaries) for their fair values. *See* Hr'g Tr. 943:19–944:10 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 5–7; *see also* Hr'g Tr. 931:24–932:2 (Luehrman) ("[T]he Committee is not challenging [Dr. Luehrman's] conclusions with regard to CFGI's solvency.").

29.    *CFI's Solvency*.    At the time of the 2006 Transaction, CFI was solvent, adequately capitalized, and able to pay its debts as they matured.    *See* Hr'g Tr. 956:6–21 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 1–2, 7, 42 (solvency), 70 (adequate capital), 76 (ability to pay debts).    CFI's assets exceeded its liabilities by $1.1 billion upon the closing of the 2006 Transaction.    *See* Hr'g Tr. 941:3–11 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 43.    The Guaranties had a low likelihood of being called and, therefore, should not be included as a liability at fair value in an amount that would render CFI insolvent on a balance sheet basis.    *See* Hr'g Tr. 944:11–15 (Luehrman).    If called upon to pay on its Guaranty, CFI could have recovered in full from CFGI upon its subrogation claim.    *Id*. at 944:3–10; Debtors' Ex. 48 (Luehrman Rep.), at 5–7.    As of March 23, 2006, CFGI had more than $5 billion in intercompany payables to CFI, which would have allowed CFI, in the event it had to pay on its guaranty, to offset the payable against its guaranty liability.    *See* Hr'g Tr. 951:9–17 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at App'x 3, p. 3 n.5.

(ii)    **The 2007 Transaction**

30.    Slightly more than a year after consummating the 2006 Transaction, in May 2007, CFGI accessed the credit markets again and issued $2.55 billion of senior unsecured notes (the "2007 Transaction").    *See* Hr'g Tr. 64:4–65:14 (Fairfield); Debtors' Ex. 10 (Offering Circular).    The notes consisted of:  (i) $850 million of Floating Rate Senior Notes Due May 10, 2010; (ii) $1.2 billion of 5.875% Senior Notes Due May 10, 2012; and (iii) $500 million of 6.300% Senior Notes Due May 10, 2017 (collectively, the "Notes").    *See id.*  The purpose of the Notes offering was to convert bridge (short-term)

debt into medium to longer term debt.  *See* Hr'g Tr. 63:17–64:3 (Fairfield).  The key

features of the 2007 Transaction are illustrated below.  Debtors' Demonstrative Ex. B.



31.    The Notes were offered pursuant to an offering circular (the "Offering

Circular") prepared by CFGI's outside counsel, Simpson Thacher & Bartlett LLP

("STB").  *See* Hr'g Tr. 67:3–8, 67:23–68:2 (Fairfield); Debtors' Ex. 10 (Offering Circular).

Each series of Notes was issued pursuant to a separate indenture (the "Indentures")

between CFGI, the Guarantors, and Deutsche Bank Trust Company Americas

("DBTCA"), as Indenture Trustee.  *See* Hr'g Tr. 66:6–19 (Fairfield); Debtors' Ex. 10

(Offering Circular).  The Indentures (Debtors' Exs. 7–9) were drafted by counsel for the

underwriters, Shearman & Sterling LLP ("S&S").  *See* Hr'g Tr. 68:3–6 (Fairfield).  The

same subsidiary Guarantors of CFGI's obligations under the Credit Agreement and Bridge Loan Agreement guaranteed CFGI's obligations under the Notes. *See* Hr'g Tr. 57:4–10 (Fairfield); Debtors' Exs. 7–9, art. 10, § 10.01.

32. *The Savings Clauses.* As with the then-existing Credit Agreement Guaranties and Bridge Loan Guaranties, the guaranties on the Notes are subject to a "savings clause," limiting each Guarantor's liability to the maximum amount allowable under applicable fraudulent transfer laws. *See* Debtors' Exs. 7–9. Section 10.02(a) of each Indenture provides:

> Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations guaranteed hereunder by any Guarantor shall not exceed the maximum amount that can be hereby guaranteed without rendering this Indenture, as it relates to such Guarantor, voidable under applicable Bankruptcy Laws or laws relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

33. *Use of Proceeds.* The proceeds from the issuance of the Notes (approximately $2.50 billion in total) were used as follows: (i) approximately $2.017 billion was used to repay principal under the Bridge Loan; (ii) approximately $449.3 million was used to repay two third-party debt facilities on which CFI was a principal obligor (and CFGI was a guarantor); and (iii) approximately $34.6 million was used to repay a Canadian swing line facility with Capmark Canada Ltd. *See* Hr'g Tr. 63:4–66:3 (Fairfield). Thus, virtually all of the proceeds of the 2007 Transaction were used to pay antecedent debt. *Id.*

34.   *The Guaranties.*   Pursuant to Article 10 of each Indenture, the Guarantors jointly and severally guaranteed CFGI's obligations under the Notes.   *See* Hr'g Tr. 64:18–23 (Fairfield); Debtors' Exs. 7–9 (Indentures), 10 (Offering Circular).   Section 10.01 of each Indenture provides, in relevant part:

> (a) Each Guarantor hereby jointly and severally, irrevocably and unconditionally guarantees, as a primary obligor and not merely as a surety on a senior basis, to each Holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture … and the Notes and (ii) the full punctual performance … of all other obligations of the Issuer … under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "Guaranteed Obligations").
>
> * * *
>
> (g) In furtherance of the foregoing … upon the failure of the Issuer to pay the principal of or interest on any Guaranteed Obligation when and as the same shall become due … each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid … all … obligations of the Issuer to the Holders an the Trustee.

35.   *Credit Ratings.*   Both before and after the 2007 Transaction, CFGI's long-term unsecured debt maintained its "investment grade" rating from the three major ratings agencies.   *See* Hr'g Tr. 68:7–15, 22 to 69:2 (Fairfield); Debtors' Ex. 1 (Form S-4), at 103; Debtors' Ex. 10 (Offering Circular), at 95.

36.   *CFGI's Solvency, Capital Adequacy, Ability to Pay Debts.*   At the time of the 2007 Transaction, Capmark's financial condition was strong.   *See* Hr'g Tr. 69:3–9

(Fairfield).  Capmark's earnings in 2006 had been positive, and the first quarter of 2007 was extremely profitable.  *Id.*  The net worth of Capmark on a consolidated basis as of March 31, 2007, was approximately $2.5 billion.  *Id.* at 68:16–21.  At the time of the 2007 Transaction, CFGI was solvent, adequately capitalized, and able to pay its debts as they matured.  *See* Debtors' Ex. 48 (Luehrman Rep.), at 1–7, 23–65 (solvency), 66–71 (adequate capital), 72–76 (ability to pay debts).  Moreover, CFGI had the ability to pay in full all the liabilities of CFGI and its subsidiaries (including the Notes) by selling its assets or businesses (including subsidiaries) for their fair values as of the date of the 2007 Transaction.  *See id.*; Hr'g Tr. 931:24–932:2 (Luehrman) ("[T]he Committee is not challenging [Dr. Luehrman's] conclusions with regard to CFGI's solvency.").

37.  *CFI's Solvency.*  At the time of the 2007 Transaction, CFI was solvent, adequately capitalized, and able to pay its debts as they matured.  *See* Hr'g Tr. 956:6–21 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 1–2, 7, 42 (solvency), 70 (adequate capital), 76 (ability to pay debts).  CFI's assets exceeded its liabilities by $1.1 billion upon the closing of the 2007 Transaction.  *See* Debtors' Ex. 48  (Luehrman Rep.), at 43.  The Guaranties had a low likelihood of being called and, therefore, should not be included as a liability at fair value in an amount that would render CFI insolvent on a balance sheet basis.  *See* Hr'g Tr. 944:11–15 (Luehrman).  If called upon to pay on its Guaranty, CFI could have recovered in full from CFGI upon its subrogation claim. *Id.* at 944:3–10; Debtors' Ex. 48  (Luehrman Rep.), at 5–7.  As of March 31, 2007, CFGI had more than $2.6 billion in intercompany payables to CFI, which would have allowed

18

CFI, in the event it had to pay on its guaranty, to offset the payable against its guaranty liability.  *See* Debtors' Ex. 48 (Luehrman Rep.), at App'x 3, p. 3 n.5.

       (iii)   **The 2009 Transaction**

           *a.      Events Leading Up to Entry into the 2009 Transaction*

38.    As a result of the turmoil in the credit markets and a decline in the value of its mortgage-related assets, Capmark found itself in an increasingly challenging financial situation at the end of 2008.  *See* Hr'g Tr. 69:10–70:8, 87:8–88:3 (Fairfield). Markets in which Capmark operated its businesses had experienced significant stress and disruptions beginning in July 2007, as the credit markets began to deteriorate.  *Id.* That stress and disruption accelerated significantly in the fall of 2008 with the Lehman bankruptcy, which created a great deal of uncertainty and fear in the market, causing asset values to decline and liquidity to dry up.  *Id.*  In addition, although Capmark had not experienced significant losses prior to the fourth quarter of 2008, it expected to incur a substantial loss in the fourth quarter (which ultimately exceeded $1 billion).  *Id.* at 71:15–23 (Fairfield); 758:18–759:3 (Gallagher); AHG Ex. 2 at 32.  In response, the Company took steps to limit new commitments, cut expenses, and preserve liquidity. *See* Hr'g Tr. 71:15–23 (Fairfield).

39.    In the fall of 2008, as conditions worsened, Capmark began to consider other options and, at the beginning of 2009, retained several professional advisors, including LM+Co, Lazard Frères & Co. LLC ("Lazard"), and Dewey & LeBoeuf LLP ("D&L"), to assist the Debtors in a potential restructuring of the balance sheet.  *See* Hr'g Tr. 70:16–71:1 (Fairfield); Debtors' Exs. 11(a), (c)–(d) (Board Minutes).  The

Company began exploring a variety of alternatives aimed at extending maturities, preserving liquidity, and potentially converting a meaningful amount of debt to equity to resize and stabilize the balance sheet for the longer term. *See* Hr'g Tr. 71:15–72:3 (Fairfield).   These included, *inter alia*, different types of recapitalizations, debt for equity swaps, the exchange of smaller amounts of secured debt for larger amounts of unsecured debt, dividing the company into a "good bank" (holding good assets) and a "bad bank" (holding distressed assets), and converting to a bank holding company to obtain access to TARP and other federal funding programs.  *See* Hr'g Tr. 72:3–21; 78:23–79:21; 125:21–126:5 (Fairfield); Debtors Exs. 11(a), (b), (d), (f), & (g) (Board Minutes).  The Company hoped that by taking a proactive role, it could head off the various pressures facing the Company and ensure its own long-term viability. *Id.*

40.    This was not an easy task.  Tom Fairfield, Capmark's General Counsel and an Executive Vice President, testified that the Company was "under pressure from virtually every corner of its businesses."  Hr'g Tr. 131:7–10 (Fairfield).[4]  These included pressure from:  (i) the  Federal  Deposit  Insurance  Corporation  ("FDIC"); (ii) Government-Sponsored Entities ("GSEs"), including Fannie Mae, Freddie Mac, and HUD, for which Capmark acted as servicer; (iii) the credit and servicer rating agencies; and (iv) others, such as the SEC and derivatives counterparties.  *Id.* at 73:22, 75:23, 106:12–108:18, 109:6–131:10; *see also* Debtors' Exs. 11(e)–(g), (i)–(k), (t)–(u), and (w) (Board Minutes); Debtors' Exs. 12–15 (Credit Rating Downgrades), 18 (Servicer Rating Downgrade), and 19 (E-mail from Jay Levine, dated Apr. 28, 2009).

---

[4] The court found Mr. Fairfield's testimony credible.

41.    The Company's most pressing financial challenge in early 2009 was the March 23, 2009 due date for the $833 million remaining principal balance on the Bridge Loan.  *See* Hr'g Tr. 73:22–74:6, 77:18–22, 88:6–19, 149:22–150:10, 153:11–24 (Fairfield); Debtors' Exs. 11(a)–(aa) (Board Minutes).  Additionally, the Company's 2008 losses posed a significant risk that it would breach the leverage ratio covenant in the Credit Agreement, *see* Debtors' Ex. 4(a), at 65, which would immediately throw $6.3 billion of bank debt into default and give the banks (and the noteholders) the right to accelerate that debt.  *See* Hr'g Tr. 76:12–77:17 (Fairfield).  Capmark's corporate debt ratings, which had been downgraded earlier, were again downgraded by all three of the major ratings agencies.  *See* Hr'g Tr. 75:24–76:11 (Fairfield); Debtors' Exs. 12-15 (Credit Rating Downgrades).  In addition, in light of the substantial loss incurred by Capmark in the fourth quarter of 2008 and the potential breach of the leverage ratio covenant, Capmark's independent auditors, Deloitte & Touche, indicated that it was considering a going concern qualification with respect to Capmark's year-end 2008 financial statements, which would have exacerbated the problems with, and increased the pressure from, virtually all of Capmark's constituencies.  *See* Hr'g Tr. 76:12, 77:17, 115:15–22 (Fairfield).

42.    Moreover, as the default rate on mortgages serviced by Capmark increased, it was obligated to advance money to cover those shortfalls at a net monthly rate of between $100 and $150 million.  *See* Hr'g Tr. 74:7–75:23 (Fairfield).  If those advances were not paid, Capmark risked termination of its servicing contracts with the GSEs and commercial mortgaged-backed securities ("CMBS") counterparties.  *Id*.  Any

further downgrades to Capmark's servicer ratings (which had already been downgraded, *see* Debtors' Ex. 18 (Servicer Downgrade), would likely have led to the termination of such servicing contracts. *See* Hr'g Tr. 109:2–112:11 (Fairfield).

43. The GSEs were concerned about Capmark's financial stability as potentially impacting their servicing portfolios and insisted that if Capmark did not quickly deal with potential defaults under the bank debt and enhance its long-term financial position, the GSEs would be compelled to terminate their contracts with the Debtors. *See* Hr'g Tr. 111:3–11, 113:24–122:10 (Fairfield); Debtors' Exs. 11(t)–(u) (Board Minutes), 19 (E-mail from Jay Levine dated Apr. 28, 2009). Any termination would have been a major blow to Capmark, not merely because its contracts with GSEs were a major source of revenue, but also because they would have likely triggered further terminations by CMBS counterparties. *Id.* As Jay Levine, Capmark's CEO, reported to the Board of Directors: "[I]f the GSE and HUD contracts are terminated, the company's servicer rating may be lowered and the trustees of the CMBS servicing may terminate the associated pooling and servicing agreements, resulting in a significant loss to the company." Hr'g Tr. 119:7–21 (Fairfield); *see also* Debtors' Ex. 11(t) (Board Minutes).

44. During this same time period, the Company also faced increased scrutiny by the FDIC in connection with its banking business. *See* Hr'g Tr. 112:11, 113:11–19, 117:4–21, 122:11–129:13 (Fairfield). Because the FDIC considered CFGI the primary financial support for Capmark Bank as well as the obligor on the Bank's capital maintenance agreement, Capmark's management thought it crucial to address

proactively the Company's financial stability issues and to avoid bankruptcy. *See* Hr'g Tr. 122:20–127:10 (Fairfield). The Company, which was being advised in its dealings with the FDIC by regulatory counsel at Sullivan & Cromwell LLP ("S&C"), including the former general counsel of the FDIC, as well as regulatory advisors at Promontory Financial Group, LLC, viewed seizure of Capmark Bank by the FDIC as a significant risk. *Id.*; *see also* Hr'g Tr. 79:22–80:12, 122:11 (Fairfield); Debtors' Exs. 11(f)–(g), (i), (l), (p)–(q).

45.   Faced with this set of circumstances, Capmark made a critical decision in the beginning of 2009: it would not make the $833 million Bridge Loan payment due on March 23, 2009, despite having approximately $1.5 billion in cash on hand. *See* Hr'g Tr. 78:8–22 (Fairfield). As both Mr. Fairfield and Mr. Levine testified, the Debtors' primary goal at this point was to effect a holistic restructuring of the balance sheet, maintaining their core businesses and continuing as a going concern. *Id.*; *see also* Hr'g Tr. 1084:16–1086:24 (Levine). The Company believed that using up so much of its liquidity to pay a short-term debt would negatively impact the company's ability to restructure itself successfully, and would eventually force the company to file for bankruptcy. *Id.*

46.   Among the restructuring alternatives being considered in early 2009 was a chapter 11 filing. *See* Hr'g Tr. 84:3–7 (Fairfield). Capmark was extremely averse to the idea of filing for bankruptcy. *Id.* at 84:8–85:23. As Mr. Fairfield explained:

> We were trying to achieve a restructuring of the company …
> that would allow it to continue and retain its businesses and
> operate into the future.

\*      \*      \*

> [T]he company believed that filing a bankruptcy at that
> point would essentially destroy the businesses, that we
> would not be able to continue to retain them or operate
> them. These kinds of businesses don't typically do well in a
> bankruptcy. And that was our view and the view of our
> advisors, so we used a lot of efforts to try to avoid that.

*Id.* at 84:11–85:2. In particular, the Company believed that the GSEs, CMBS trustees, and large insurance counterparties would not have been willing to continue doing business with the Company in bankruptcy. *Id.* Mr. Fairfield testified that in the March, April, and May 2009 timeframe, a Capmark bankruptcy was neither inevitable nor highly likely and that the best alternative for all of the stakeholders was to maintain the core businesses, restructure the debt, and continue to operate as a going concern. *See* Hr'g Tr. 85:24–86:13 (Fairfield).

47. Capmark began negotiating with the Bridge Loan Lenders (who also held a large percentage of the outstanding debt under the Credit Agreement) in February 2009. *See* Hr'g Tr. 89:4–90:7, 92:3–95:21, 104:10–106:4 (Fairfield); Debtors' Exs. 11(d)-(s) (Board Minutes). At first, the banks were completely unwilling to compromise. *See* Hr'g Tr. 92:3–95:21 (Fairfield); Debtors' Exs. 11(d)–(f) (Board Minutes). On February 23rd, the bank steering committee (which was responsible for negotiating on the banks' behalf) presented Capmark with a term sheet requiring "repayment in full of the $833 million Bridge Loan due March 23, 2009, and the extension of additional liquidity to the company pursuant to new secured credit facilities secured by substantially all assets of the company." Hr'g Tr. 92:12–23 (Fairfield); Debtors' Ex.

11(e) (Board Minutes).  The bank steering committee added that it was not prepared to provide the company with any extension of the bridge loan maturity.  *Id*.  On March 6th, the bank steering committee communicated the same message to the Company's financial advisors, informing Lazard that it would not agree to any meeting regarding a Capmark restructuring until the Company "agreed to repay the $833 million bridge loan due March 23, 2009 in full."  Hr'g Tr. 94:20–96:1 (Fairfield); Debtors' Ex. 11(g) (Board Minutes).  On March 15th, the bank steering committee again told Lazard that it would not budge.  *See* Hr'g Tr. 96:6–97:4 (Fairfield); Debtors' Ex. 11(i) (Board Minutes). Indeed, as late as March 17th—just six days before the Bridge Loan came due—the lenders were demanding full cash payment of the Bridge Loan on March 23rd, or a short-term extension of the loan maturity in return for collateral on *all* of the Capmark group's assets.  *See* Hr'g Tr. 97:1–98:22 (Fairfield); Debtors' Ex. 11(j) (Board Minutes).

48.    The banks' demand for full payment of the Bridge Loan was unacceptable to the Company.  *See* Hr'g Tr. 98:2–100:4 (Fairfield); Debtors' Exs. 11(e)–(g), (i)–(j) (Board Minutes).  Capmark refused to pay down the debt or grant liens on all its assets; the Company believed that doing so would not be "prudent, and in the interests of the company and the stakeholders given the liquidity needs and other issues" described above.  *See* Hr'g Tr. 99:4–9 (Fairfield).  Having spent enormous time reviewing and evaluating different potential restructuring alternatives, Capmark believed it was necessary to accomplish a holistic solution to retain as much of the Company's assets and liquidity as possible to both fund the ongoing businesses and keep counterparties comfortable, and to retain consideration for future debt exchanges or other

recapitalization transactions.  *See* Hr'g Tr. 99:10–24 (Fairfield); Debtors' Exs. 11(g), (i)–(j) (Board Minutes).  As a result, Capmark refused to back down in the face of the banks' demands and even made contingent plans to file for bankruptcy in the event no resolution was reached with the banks, and the Company found itself in default (a position Capmark adopted as a negotiation tactic as well).  *See* Hr'g Tr. 100:1–16; 153:11–24 (Fairfield).

49.    Finally, on March 19th, the banks "blinked."  Hr'g Tr. 100:17–19 (Fairfield).  The banks "finally accepted the fact that [the Company was] not going to repay [the Bridge Loan], and then indicated that they would accept something less than full repayment of the bridge loan, and indicated a willingness to grant an extension of a couple of weeks to engage in further discussions …."  Hr'g Tr. 100:19–101:2 (Fairfield).  Capmark's Board approved the extension.  *See id.* at 101:3–23; Debtors' Ex. 11(k) (Board Minutes).  The next two months were characterized by extensive arm's length, hard-fought, and often contentious negotiations.  *See* Hr'g Tr. 131:11–23 (Fairfield).  There were numerous disagreements between Capmark and the Bridge Lenders, as well as disagreements within the Bridge Lender group.  *See* Hr'g Tr. 104:10–106:4 (Fairfield).  The most difficult issues involved (i) the amount of the repayment of the Bridge Loan, (ii) the amount of collateral to secure any bank debt going forward, (iii) the Company's ability to use unencumbered cash in connection with a bond exchange or bond buy-back, (iv) whether there should be financial covenants going forward and (v) the amount of fees and interest payable to the banks.  *Id.*  Talks threatened to break down on several occasions, and the Board met seventeen

times between March 6 and May 7, 2009, the date on which the parties reached an

agreement in principle.[5]  *See* Hr'g Tr. 86:21–88:20; 98:7–100:16; 104:14–106:11 (Fairfield);

Debtors' Exs. 11(f)–(w) (Board Minutes).  Finally, on May 29th, the parties executed a

$1.5 billion secured credit facility that, along with just $75 million of the Debtors' cash,

would be used to pay down $1.575 billion of existing debt, including a large part of the

remaining balance on the Bridge Loan.  *See* Hr'g Tr. 131:24-136:8 (Fairfield).

<div align="center">

*b.*    *Terms of the 2009 Transaction*

</div>

50.    Specifically, CFGI, the Guarantors, the Additional Guarantors, and certain

of CFGI's existing bank lenders entered into a $1.5 billion secured term loan facility

(the "Secured Credit Facility"), secured by a pledge and grant of security interest on all

of Capmark's U.S. and Canadian mortgage loan assets and foreclosed real estate

(excluding assets held by Capmark Bank) and the proceeds of such assets (the "2009

Transaction").  *Id.*  The terms of the Secured Credit Facility are governed by a term

facility credit and guaranty agreement, dated as of May 29, 2009 (the "Secured Term

Loan Agreement"), *see* Debtors' Ex. 21, and a separate security agreement dated May

29, 2009.  *See* Debtors' Ex. 22; Debtors' Ex. 23 (Press Release, dated May 29, 2009).

51.    As part of the 2009 Transaction, the parties entered into amendments to

both the Credit Agreement and Bridge Loan Agreement to, among other things,

(i) terminate any borrowing capacity under the revolving credit portion of the Credit

Facility and convert any outstanding borrowings thereunder to term loans, *see* Debtors'

---

[5] The resolution was approved by all Board Members other than representatives of Dune and Goldman, who abstained from the vote because affiliates of each of them were lenders under the Credit Facility.  *See* Hr'g Tr. 137:15–139:19 (Fairfield); Debtors' Ex. 11(w) (Board Minutes).

Ex. 4(d); (ii) eliminate the leverage ratio covenant, *see* Debtors' Exs. 2(j), 4(d); (iii) create an express exception to the "limitation on liens" covenants in both the Credit Agreement and Bridge Loan Agreement to permit Capmark to enter into the secured Credit Facility, *see id.*; and (iv) add three new guarantors (the "Additional Guarantors") as guarantors of CFGI's obligations, *see id.*; *see also* Hr'g Tr. 132:13–135:1 (Fairfield). The amendments also extended the maturities of all facilities (including the remainder of the Bridge Loan, which had matured) to coincide with the maturity of the secured Credit Facility–*i.e.*, to at least April 15, 2010, with the possibility to extend further to March 23, 2011.  *See* Hr'g Tr. 149:22–150:10 (Fairfield); Debtors' Exs. 2(j), at 10–11; 4(d), at 11–13 (Amendment No. 9 to the Bridge Loan Agreement and Amendment No. 3 to the Credit Agreement).  In addition, the 2009 Transaction limited the collateral to the North American commercial mortgage loan pool; permitted Capmark to use up to $150 million in cash in connection with bond repurchases or other recapitalization transactions; and granted Capmark the right to pledge collateral to other creditors, including bondholders (under certain conditions) to facilitate potential future restructurings.  *See* Hr'g Tr. 133:13–134:11 (Fairfield).

52.    Nicholas Leone of Blackstone Advisory Partners L.P., an expert witness for the Ad Hoc Secured Committee, examined the key terms of the Secured Credit Facility, and concluded that those terms—namely, the loan-to-value ratio of the secured transaction, the interest rate spread, the borrower's credit quality, and the maturity date—were consistent with terms that would have been required by third-party financing sources in 2009.  *See* Hr'g Tr. 524:20–525:2 (Leone).  As such, the key

terms of the 2009 Secured Credit Facility were "market terms" that would be expected in an arm's length transaction between a company comparable to Capmark and third-party financing sources in 2009. *Id.* These facts were stipulated among the parties. *Id.*

53.    The key features of the 2009 Transaction are illustrated in Debtors' Demonstrative Ex. C.



54.    *Perfection.* The secured lenders' security interests in the pledged collateral were validly perfected as a condition to closing the Secured Credit Facility. *See* Debtors' Ex. 21, at 40 (Secured Credit Facility). The maturity date of the Secured Credit Facility is March 23, 2011. *Id.* at 16.

55.    *The Guaranties and Additional Guarantors.* The same Guarantors that guaranteed CFGI's obligations under the Credit Agreement and Bridge Loan

Agreement, together with the newly added Additional Guarantors, jointly and severally guaranteed the obligations of CFGI under or in respect of the Secured Credit Facility.  *See* Hr'g Tr. 134:19–22, 135:7–11 (Fairfield).  Section 8.01 of the Secured Credit Facility provides, in relevant part:

> Each Guarantor, jointly and severally, unconditionally and irrevocably guarantees … the punctual payment when due … of all of the Obligations of each of the other Loan Parties now or hereafter existing under or in respect of the Loan Documents ….

56.    *The Savings Clause.*  The Secured Credit Facility also contains a "savings clause" limiting the maximum amount guaranteed by each Guarantor under the applicable guaranty to the maximum amount allowable under the governing fraudulent transfer laws.  Section 8.09 of the Secured Credit Facility (Debtors' Ex. 21) provides, in relevant part:

> Each Guarantor …, and by its acceptance of this Guaranty, the Agents and each Secured Party, hereby confirms that it is the intention of all such Persons that this Guaranty … not constitute a fraudulent transfer or conveyance for purposes of U.S. bankruptcy laws, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Guaranteed Obligations of such Guarantor hereunder.  To effectuate the foregoing intention, … [the parties] hereby irrevocably agree that the Guaranteed Obligations … under this Guaranty at any time shall be limited to the maximum amount as will not result in the Guaranteed Obligations … constituting a fraudulent transfer or conveyance.  Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall

be required to be made … under this Guaranty … , such Guarantor will contribute, to the maximum extent permitted by law … so as to maximize the aggregate amount paid to such Lender or Secured Party under or in respect of the Loan Documents.

57.   *The Indenture Amendments.*   In connection with the closing of the Secured Credit Facility, CFGI, the Guarantors, and the Indenture Trustee also executed an amendment to the Indentures to correct an "ambiguity, omission, defect, or inconsistency" in the "limitation on liens" covenant in each Indenture.  Hr'g Tr. 139:3–149:5 (Fairfield).   The covenant limited (and was intended to limit) the amount of secured debt CFGI could incur to $1.5 billion, unless CFGI provided the noteholders with an equal and ratable share in any collateral securing indebtedness above $1.5 billion. *See id.*

58.   Due to a scrivener's error, the words "secured by Liens," highlighted below, were omitted from Section 4.04 of each Indenture.   Hr'g Tr. 139:13–142:11 (Fairfield).   As explained by Mr. Fairfield:   "The original bond indenture omitted several words in the exception to the restriction on liens that were properly reflected, accurately reflected in the offering circular, but were not contained in the final indenture." *Id*. at 139:15–20 (Fairfield).  Following review of the issue and consultation with both STB (counsel for CFGI and the drafter of the offering circular) and S&S (underwriters' counsel and the drafter of the Indentures) it was unanimously concluded that the omission of the words "secured by Liens" in the indentures was a drafting error that did not reflect the business deal, which was accurately reflected in the offering circular. *Id*. at 139:21–140:4.  S&S confirmed the mistake it had made in

drafting the indentures both orally and in writing. *Id*. at 141:24–142:11; *see also* Debtors'
Ex. 11(x), at 1 (May 18, 2009 CFGI Board Minutes) ("Mr. Fairfield stated that in the
course of negotiating the bank loan transaction, the parties have become aware of a
drafting error in Section 4.04 of the bond Indenture under which the collateral grant
contemplated by the bank loan term sheet would be made.  Mr. Fairfield stated that the
Company's outside counsel [STB] had brought this matter to bank counsel's attention
prior to the execution of the term sheet and that bank counsel [S&S], which was also
underwriter counsel in the bond issuance transaction, agreed with the Company's
position on the intended meaning of the provision."); Debtors' Ex. 33 (Giove email)
(S&S's S. Giove agreeing that "the Basket Provision as set forth in the Offering Circular
accurately reflects the mutual intention and agreement of the parties with respect to
that provision."); Hr'g Tr. 141:24-142:11; 148:7-149:5 (Fairfield).  Mr. Fairfield further
explained that a literal reading of the indentures without the words "secured by Liens"
would have rendered the lien basket meaningless given that Capmark already had
approximately $8 billion unsecured indebtedness.  In effect, there would have been no
lien basket at all, in contrast with the terms of the existing credit facilities which
permitted the incurrence of secured debt in terms similar to that described in the
offering circular.  *See* Hr'g Tr. 140:11–141:11 (Fairfield).  Moreover, when CFGI
registered new Notes to exchange for the original Notes in 2008 pursuant to a Form S-4
registration statement (as required by the original Note Indentures), the prospectus
contained the correct description of the lien basket provision.  *See* Debtors' Ex. 1 (Form
S-4), at 222.

59.   The Offering Circular for the Notes correctly stated the language of the covenant by including the words "secured by Liens" and the Indenture amendments conformed to what the Offering Circular disclosed.  *See* Hr'g Tr. 139:3–20 (Fairfield); Debtors' Ex. 10 (Offering Circular), at 191.

60.   Capmark was advised that the indentures contained provisions which allowed for the correction of omissions or defects without the need for prior notice and consent of the noteholders.  *See* Hr'g Tr. 142:14–22, 288:12–19 (Fairfield); *see also* Debtors' Exs. 7–9, § 9.01.  Capmark thereafter followed the procedures set forth in the indentures for amending the indentures via the issuance of supplemental indentures. *Id*.  Sections 4.04 of the Indentures were thus amended as of May 20, 2009, to add the words "secured by liens" (as emphasized below):

> Notwithstanding the foregoing, the restrictions set forth in this "Limitation on Liens" covenant will not apply to the incurrence of any Liens securing Indebtedness which, together with other outstanding Indebtedness of ours or our Guarantors **secured by Liens** (not including Indebtedness secured by Liens otherwise permitted under the foregoing numbered exceptions) does not exceed the greater of (i) 10% of Consolidated Net Tangible Assets and (ii) $1.5 billion.

61.   In accordance with the procedures set forth in the indentures, CFGI advised the indenture trustee, DBTCA, of the drafting error.   DBTCA was also presented with Officers' Certificates executed by officers of CFGI and Opinions of Counsel executed by STB (on which the CFGI board of directors was also permitted to rely), each certifying that the Supplemental Indentures were valid pursuant to the terms of each Indenture.  *See* Debtors' Exs. 24–26 (Officers' Certificates); Debtors' Exs.

27–29 (STB Opinions of Counsel); Hr'g Tr. 143:20–144:7 (Fairfield).  Upon presentation of the Officers' Certificates and Opinions of Counsel, DBTCA executed the First Supplemental Indentures (the "Supplemental Indentures").  *See* Debtors' Exs. 30–32 (First Supplemental Indentures).  DBTCA executed the Supplemental Indentures on or about May 20, 2009 and thereafter provided notice of the amendments to the bondholders.  *See* Hr'g Tr. 149:14–17 (Fairfield).   DBTCA and CFGI acted in good faith and in compliance with the obligations of the Indenture Trustee and issuer under the Indentures and in all other respects in executing the Supplemental Indentures.  *See* Hr'g Tr. 139:3–149:5 (Fairfield).

62.    *Use of Proceeds.*  The proceeds from the Secured Credit Facility, together with $75 million from CFGI, were used to pay antecedent debt of CFGI and the subsidiary Guarantors, as follows:  (i) approximately $984.4 million was used to pay a portion of the amounts owed under the Credit Facility, *see* Debtors' Ex. 4(d); and (ii) the balance, approximately $590.6 million, was used to pay a portion of the amounts owed under the Bridge Loan.  *See* Debtors' Ex. 2(j); Hr'g Tr. 132:13–24 (Fairfield).

63.    *Solvency, Capital Adequacy, Ability to Pay Debts.*  Following the 2009 Transaction, neither CFGI nor its subsidiary Guarantors were solvent, adequately capitalized, or able to pay their debts as they matured.  *See* Debtors' Ex. 48 (Luehrman Rep.), at 1–8.

c.    *Benefits of the 2009 Transaction*

64.    In addition to the value received as a result of the paydown of $1.5 billion in antecedent debt, elimination of the Debtors' near-term loan defaults and an extension of the maturity dates of the Bridge Loan and the Credit Facility also provided the Debtors with a host of other direct and indirect benefits.  *See* Hr'g Tr. 140:22; 154:11 (Fairfield).

65.    The success of the Debtors' negotiating team in limiting the amount of collateral granted to the banks allowed the Debtors to retain enough unencumbered assets to work towards their primary goal—effecting a holistic restructuring and maintaining the company's core businesses over the long term.  *Id.*  Stated differently, entry into the Secured Credit Facility "averted what would have likely been a bankruptcy filing," *id.*, which would have been "very, very detrimental to value."  *Id.* at 154:12–155:24 (Fairfield).

66.    Entry into the Secured Credit Facility headed off further downgrades to the Debtors' servicer ratings and significantly alleviated the risk of servicing contract terminations by the GSEs and the CMBS trustees.  *See* Hr'g Tr. 154:12–159:19 (Fairfield). Had the Debtors not been able to push off the Bridge Loan maturity, their belief— based on their communications with GSEs and others, what had actually happened to other distressed servicers, and the professional advice the Debtors received—was that the major CMBS servicing counterparties and the GSEs would have moved very aggressively to terminate their relationships with the Debtors.  Hr'g Tr. 156:12–159:19 (Fairfield).  Instead, the Debtors continued to maintain their working relationship with

the GSEs and the vast majority of their CMBS counterparties until they sold the servicing business for roughly $1 billion in the fall of 2009. *See* Hr'g Tr. 163:14–164:13 (Fairfield).

67.     The sale of the servicing business for a favorable price was another major benefit of the Secured Credit Facility. *See* Hr'g Tr. 152:10–153:10 (Fairfield). Had the Debtors not obtained the Bridge Loan extension and averted other loan defaults, they would have risked termination of the servicing and pooling agreements, and likely would have been forced into a quick sale of that business, for which the Debtors would not have been able to obtain as much value as they later did. *See* Hr'g Tr. 156:12–159:19 (Fairfield). With the Secured Credit Facility in place, the Debtors had the time to explore a sale of the servicing business in an orderly and organized manner. *See* Hr'g Tr. 162:8–163:18 (Fairfield). The Debtors hired advisors, solicited bids from some twenty companies, and eventually entered into a put agreement with Berkadia on September 2, 2009, which not only gave the Debtors the option to sell at a favorable price, but also allowed them to retain the business in the event they were able to effectuate the holistic restructuring they were still working towards at that time. *See* Hr'g Tr. 159:20–164:13 (Fairfield). Before entering into the Secured Credit Facility, by contrast, the Debtors had had no time to organize an auction and had received only one vague expression of "interest" in the servicing business, made before any due diligence had occurred and without any reference to price. *See* Hr'g Tr. 159:20–161:19 (Fairfield).

36

68.    The 2009 Transaction also relieved the significant pressure the Debtors had been receiving from the FDIC in connection with Capmark Bank.  *See* Hr'g Tr. 151:5–10 (Fairfield).  It allowed the Debtors to head off what they believed, based on advice from William Kroener of S&C, the former General Counsel of the FDIC, would have been adverse regulatory action by the FDIC, including a potential seizure of Capmark Bank.  *See* Hr'g Tr. 155:4–24 (Fairfield); Debtors' Exs. 11(p)–(q) (Board Minutes).  The Debtors were able to continue negotiations with the FDIC throughout the Summer and Fall and ultimately succeeded in heading off what might have been a devastating bank seizure or, in the event of an immediate bankruptcy, a significant priority claim against assets of CFI. *See* Hr'g Tr. 174:12–175:12 (Fairfield).

69.    In short, by entering into the Secured Credit Facility, Capmark avoided what likely would have been a bankruptcy filing.  *See* Hr'g Tr. 154:1–2 (Fairfield). Capmark's objective at this time was to stay out of bankruptcy and proceed if at all possible with a holistic restructuring plan which would enable it to operate its businesses as a going concern.  *See id*. at 151:16–21, 154:3–11 (Fairfield).

*d.    Claims Against The Secured Lenders*

70.    The Official Committee and the Ad Hoc Unsecured Committee assert that substantial claims exist against the secured lenders. These actions include claims for: (i) avoiding and/or recovering the payments, obligations, guaranties, liens and security interests that were granted in favor of the secured lenders without reasonably equivalent consideration, and/or for the purpose of hindering, delaying and defrauding the Debtors' unsecured creditors, and (ii) avoiding and/or recovering the

payments, obligations, guaranties, liens and security interests that were granted in favor of insiders of the Debtors, or affiliates of such insiders that were incurred or transferred during the statutory preference period.

71.    The Official Committee also asserts that the amount of the secured lenders' secured claim is limited by reason of operation of the "savings clause" contained in the 2006 Guaranty.

### B.    DEBTORS' DECISION TO COMMENCE CHAPTER 11 CASES

72.    Having secured an extension of their short-term debt obligations while holding on to a large percentage of unencumbered assets, the Debtors spent the Summer and early Fall of 2009 attempting to negotiate a comprehensive restructuring with all of their creditors. *See* Hr'g Tr. 167:8–168:1 (Fairfield). Members of the Debtors' management, as well as their outside advisors, met repeatedly with representatives of the various secured and unsecured groups and discussed a variety of potential resolutions. *See id.*; Hr'g Tr. 172:24–174:11 (Fairfield).

73.    The Debtors were aware they would have to file for bankruptcy on or before August 27, 2009 to preserve a bankruptcy preference action against the secured lenders. *See* Hr'g Tr. 168:24–172:23 (Fairfield). In the days and weeks prior to that date, both management and the Board of CFGI discussed the benefits and drawbacks of such an approach. *See id.*; *see also* Debtors' Ex. 35 (Board Minutes); Official Committee Ex. 16 (E-mail from Jay Levine, dated Aug. 26, 2009); Hr'g Tr. 1094:10–1096:22 (Olson).


74.     Ultimately, the Debtors decided not to commence chapter 11 cases before the expiration of the preference period for several reasons.  First, negotiations with both secured and unsecured lenders over a consensual and comprehensive out-of-court restructuring were continuing and remained the primary goal of the Debtors and their stakeholders.  *See* Hr'g Tr. 169:16–174:11; 176:6–21; 187:8–189:11; 248:7–13 (Fairfield); Debtors' Ex. 35 (Board Minutes).  Notably, none of the bondholders ever contacted the Debtors to suggest or demand they file for bankruptcy to preserve potential preference claims.  *See* Hr'g Tr. 171:24–172:23 (Fairfield).  Second, the Debtors were currently engaged in delicate negotiations with Berkadia over the servicing business, and had not yet entered into the put agreement which would ultimately allow it to realize almost a billion dollars for the sale of the servicing business.  *See* Hr'g Tr. 175:13–176:5 (Fairfield).  The Debtors were concerned that a precipitous bankruptcy filing would irreparably damage their relationship with the GSEs and servicing counterparties, resulting in substantial loss of value to their chapter 11 estates.  *See* Hr'g Tr. 169:5–15 (Fairfield); Debtors' Ex 35 (Board Minutes).  Finally, the Debtors were engaged in ongoing discussions with the FDIC regarding CFGI's capital maintenance agreement.  *See* Hr'g Tr. 173:12–175:12 (Fairfield).  The Debtors believed that filing for bankruptcy without a consensual and amicable resolution with the FDIC could result in a priority claim for the FDIC under section 365(o) of the Bankruptcy Code.  *See* Hr'g Tr. 174:17–175:12 (Fairfield).  In addition, Capmark was able to terminate substantially all of its derivative contracts prior to filing for bankruptcy.  *See* Hr'g Tr. 176:22–177:4 (Fairfield).

75.    The Debtors eventually commenced their chapter 11 cases in October 2009, and did so only after satisfying themselves that a holistic restructuring was not possible outside chapter 11.

### C.    EXPERT TESTIMONY REGARDING SOLVENCY OF THE DEBTORS DURING THE 2006, 2007, AND 2009 TRANSACTIONS

76.    Through their counsel, Debtors retained Dr. Timothy Luehrman, a corporate finance and valuation professor at Harvard Business School, to provide an independent analysis of CFGI's solvency, capital adequacy, and ability to pay debts as they mature (as a consolidated entity), as well as that of the subsidiary Guarantors as of the dates of the 2006, 2007, and 2009 Transactions.    *See* Hr'g Tr. 930:21–931:22 (Luehrman).    Dr. Luehrman has over twenty years of experience in the areas of business valuations and corporate finance.    *See* Hr'g Tr. 917:11–920:8 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at Ex. 2 (Luehrman CV).    At the Settlement Hearing, Dr. Luehrman was certified as an expert in solvency determinations and corporate finance without objection.    *See* Hr'g Tr. 933:13–934:11 (Luehrman).    Dr. Luehrman testified that he was never instructed by the Debtors or D&L as to what solvency conclusions they thought preferable.    *See* Hr'g Tr. 932:14–23; 1038:14–20 (Luehrman). As such, Dr. Luehrman's sole mission was to formulate his best opinions.[6]    *Id.*

(i)    **Dr. Luehrman's Opinions:  2006 and 2007**

77.    As of the dates of the 2006 and 2007 Transactions, Dr. Luehrman determined that on an enterprise basis, CFGI was solvent, adequately capitalized, and able to pay debts as they matured.    *See* Hr'g Tr. 940:9–13; 941:3–14 (Luehrman);

---

[6] The court found Dr. Luehrman's testimony credible.

Debtors' Ex. 48 (Luehrman Rep.), at 5–8, 42, 56, 59, 70, 76.   Dr. Luehrman similarly found the subsidiary Guarantors as a whole, and CFI in particular, were solvent, adequately capitalized, and able to pay debts as they matured on that date.   Hr'g Tr. 940:10–13; 941:3–14 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 5–8, 42–47, 55–56, 70–71, 76.

78.     Based on the foregoing determinations, Dr. Luehrman explained the savings clauses in the guarantees were not triggered and had no effect on the amount guaranteed.  Hr'g Tr. 940:14-941:2 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.) at 5-8, 42, 45.

79.     Dr. Luehrman was also asked to determine whether CFGI, at the time of each Transaction, could have sold or caused the sale of its assets and businesses and used the proceeds to satisfy all its debts and those of its subsidiaries.  *See* Hr'g Tr. 931:12–16 (Luehrman).  He determined CFGI could have satisfied all liabilities of the enterprise as of the dates of the 2006 and 2007 Transactions by selling its assets and businesses.  *See* Hr'g Tr. 951:18–952:1 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 5–7, 61.

80.     Moreover, had CFI been called upon to make payment on its guaranty of CFGI's 2006 debt, CFGI would have been able under its subrogation obligation to reimburse CFI completely for any such payment.  *See* Hr'g Tr. 944:3–10; 951:1–17 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 44–45.  Accordingly, CFI's entering into its Guaranty at the time of the 2006 Transaction could not possibly have rendered it insolvent, inadequately capitalized, or unable to pay its debts as they matured.  Hr'g

Tr. 944:11–15 (Luehrman).  Dr. Luehrman also testified that, at the time of the 2006 Transaction, it would have been possible to structure a sale of CFI on a standalone basis even if it still held the Guaranty of CFGI's 2006 debt as one of its contingent liabilities.  *See* Hr'g Tr. 945:9–23 (Luehrman).  Dr. Luehrman reached the same conclusions with respect to the 2007 Transaction.  *See* Debtors' Ex. 48 (Luehrman Rep.), at 44–45.

81.    Dr. Luehrman testified that his conclusions concerning the solvency of CFGI and the subsidiary Guarantors at the 2006 and 2007 transaction dates were not close calls.  Hr'g Tr. 940:3-941:23 (Luehrman).  A conservative estimate of CFGI's equity cushion at the time of the 2006 Transaction ranged from $2.1 billion to more than $3.8 billion.  *See* Hr'g Tr. 941:15–23; 942:22–943:17 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 25 (Figure 3-1.A.).  Accordingly, CFGI could have paid its liabilities and those of its subsidiaries and still have had at least $2.1 billion in remaining value at the time of the 2006 Transaction.  *See* Debtors' Ex. 48 (Luehrman Rep.), at 25 (Figure 3-1.A.).  The results for 2007 were even higher.  A conservative estimate of CFGI's equity cushion at the time of the 2007 Transaction ranged from $2.6 billion to over $8.8 billion, thus ensuring CFGI could have paid all its and its subsidiaries' liabilities at the time of the 2007 Transaction.  Debtors' Ex. 48 (Luehrman Rep.), at 25 (Figure 3-1.B.).  In neither transaction, therefore, were any of CFGI's or the subsidiary Guarantors' creditors harmed by the guaranties they issued.

(ii)    **Dr. Luehrman's Opinions:  2009**

82.    Dr. Luehrman also analyzed the solvency of CFGI and the subsidiary Guarantors as of the date of the 2009 Transaction and found that CFGI was insolvent, inadequately capitalized, and unable to pay debts as they matured as of the date of the 2009 Transaction.  Debtors' Ex. 48 (Luehrman Rep.), at 5–7.  Dr. Luehrman also found that CFI and the remaining subsidiary Guarantors were likewise insolvent at the time of, or rendered insolvent by, the 2009 Transaction.  *Id.* at 7–8.

(iii)    **Dr. Luehrman's Methodology**

83.    Dr. Luehrman testified he employed several methodologies to reach his conclusions.  *See* Hr'g Tr. 945:24–947:17 (Luehrman).  Each methodology is designed to determine the *fair value* of the assets of CFGI or the subsidiary Guarantors, which is then compared to the *face amount* of the entity's liabilities to determine whether the entity is solvent.  *See* Hr'g Tr. 934:13–16; 945:24–947:17 (Luehrman).

84.    The first methodology employed by Dr. Luehrman is the "adjusted balance sheet approach."  *See* Hr'g Tr. 946:7–16 (Luehrman); Debtors' Ex 48 (Luehrman Rep.), at 26–27, 29–47.  Dr. Luehrman reviewed each entities' assets and liabilities as of the date of the key transactions, including assets and liabilities not included on GAAP balance sheets.  Hr'g Tr. 946:7–16 (Luehrman); Debtors' Ex 48 (Luehrman Rep.), at 26–27, 29–47.  Dr. Luehrman then adjusted the on-and-off balance sheet assets to reflect their fair market value.  *See* Hr'g Tr. 946:7–16 (Luehrman); Debtors' Ex 48 (Luehrman Rep.), at 26–27, 29–47.  On-and-off balance sheet liabilities are left at their stated values

pursuant to the adjusted balance sheet approach.  *See* Hr'g Tr. 946:7–16 (Luehrman);

Debtors' Ex 48 (Luehrman Rep.), at 26–27, 29–47.

85.    Dr. Luehrman's second methodology for assessing solvency was the

"market approach," which involved identifying a group of comparable companies (as

determined by contemporary actors in the marketplace) and examining how those

comparable companies were trading at the relevant dates to arrive at a fair value of the

assets or the enterprise.  *See* Hr'g Tr. 946:17–947:1; 947:22–948:11 (Luehrman); Debtors'

Ex 48 (Luehrman Rep.), at 27, 48–56.  Again, the market approach fixes liabilities at

their face value.  *See* Hr'g Tr. 946:17–947:1 (Luehrman); Debtors' Ex 48 (Luehrman

Rep.), at 27, 48–56.

86.    Dr. Luehrman's third and final solvency methodology was the

"discounted cash flow" analysis, whereby the present value of the projected net cash

flow is determined to estimate the fair value of the entity's assets.  Hr'g Tr. 947:2–11

(Luehrman); Debtors' Ex 48 (Luehrman Rep.), at 28, 57–60.  Under this approach as

well, each entity's liabilities are left at their face value.  Hr'g Tr. 947:2–11 (Luehrman);

Debtors' Ex 48 (Luehrman Rep.), at 28, 57-60.

87.    All three methodologies performed by Dr. Luehrman concurred in their

results for each of the three dates of measure.  *See* Hr'g Tr. 947:12–17 (Luehrman);

Debtors' Ex 48 (Luehrman Rep.), at 23.   Dr. Luehrman also stress-tested each

methodology and the inputs used therein to ensure that his conclusions were accurate

and not biased toward any particular result.  Hr'g Tr. 952:2–953:22; 977:21–978:11

(Luehrman).

88.    Dr. Luehrman took great pains to use conservative assumptions throughout his analysis and performed stress testing to ensure that his conclusions were correct and not biased.  Hr'g Tr. 952:2-953:22 (Luehrman).

89.    As one cross check of solvency, Dr. Luehrman studied the value of the 2006 Credit Agreement and Bridge Loan Guaranties to determine if those Guaranties would impact his conclusion that the CFGI consolidated entities, the subsidiary Guarantors, and CFI individually were solvent in 2006 after the Credit Agreement and Bridge Loan were executed.  Hr'g Tr. 954:18–955:11 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 62, App'x 6.

90.    Dr. Luehrman determined a conservative estimate of the value of the Guaranties by likening the Guaranties to put options and used standard option pricing models to estimate their value.  *See* Hr'g Tr. 957:20–958:12; 986:12–15; 989:17–24 (Luehrman) ("[T]he idea there was to use conservative inputs … to lead to a value which I could then compare with some confidence to the solvency cushion that was computed …. "); Hr'g Tr. 990:1–5 (Luehrman).  Valuing a guaranty as a put option is consistent with the majority practice in corporate finance courses.  *See id.* at 921:6–11 (Luehrman) ("It's become fairly standard in most corporate finance courses to convey an understanding of a financial guaranty as a contingent claim; namely, some type of an option, a put option most often that can sometimes be valued using standard models."); Hr'g Tr. 921:20–922:5 (Luehrman) ("The basic principle is that a guaranty is like a put option in the sense that the beneficiary of the guaranty has the right to put the debt, if it's debt that's being guaranteed, to the guarantor for the face value, and

has the right to do that even if, and especially if, the value of the underlying assets is less than the face amount of the debt. And so that's exactly analogous to a put option."). Dr. Luehrman's put option approach is also consistent with the Financial Accounting Standard Board's Interpretation No. 45 ("FIN 45"), which requires that certain non-exempt companies put guaranties on their balance sheet at fair value at the inception of the guarantee. *See* Hr'g Tr. 922:12–923:9 (Luehrman). Dr. Luehrman has considerable experience working with clients to interpret FIN 45, and has valued guarantees pursuant to FIN 45 by employing a put option analysis. *See* Hr'g Tr. 923:13–924:11 (Luehrman).

91. Employing this put option analysis, Dr. Luehrman concluded a conservative estimate of the cost to the entire CFGI enterprise of a put option to replace the subsidiary Guaranties at the time of the 2006 Transaction was approximately $878 million, which is higher than what the fair value of the Guaranties would be. *See* Hr'g Tr. 965:16–21 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at App'x 6 (Figure 6-6). As the Guaranties are a joint and several liability of these subsidiary Guarantors, Dr. Luehrman matched the liability to the collective assets, which were $1.368 billion, and concluded that there were ample assets to cover the value of the Guaranties. *See* Debtors' Ex. 48 (Luehrman Rep.), at App'x 6 (Figure 6-17). One reason why $878 million was higher than the fair value of the guaranties is that Dr. Luehrman computed the cost of a put option to offload approximately $10.75 billion of guaranteed debt rather than the actual $8.4 billion outstanding because the credit facilities allowed for additional advances. Hr'g Tr. 960:7-961:1 (Luehrman). Other reasons why the $878

million figure was too high are that Dr. Luehrman used extra high volatility estimates and average tenure estimates. *Id.* at 960:7-965:21 (Luehrman). Notably, even the inflated $878 million value of the Guaranty is lower than the net worth of even a single subsidiary Guarantor CFI, which was $1.098 billion at the time of the 2006 Transaction. *See* Debtors' Ex. 48 (Luehrman Rep.), at 32 (Figure 4-1B).

92.    Dr. Luehrman's put value equivalent of the 2006 Guaranties of the subsidiary Guaranties only corroborates and does not change his conclusions that in 2006 and 2007, the CFGI enterprise, the subsidiary Guarantors, and CFI were each solvent even after the key financings. Hr'g Tr. 951:18–952:1 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 5-7, App'x 6. Moreover, Dr. Luehrman's put option analysis was designed to result in a biased-high value of the Guaranties, as it was created using the highest of the range of reasonable volatility assumptions.[7] *See* Hr'g Tr. 965:16–21 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at App'x 6.

93.    In response to the Official Committee's argument that it is necessary to record CFI's 2006 Guaranties as an absolute liability for full face value, Dr. Luehrman testified logically and credibly that it would be inappropriate to do so. Hr'g Tr. 965:22–

---

[7] By way of example, the Official Committee, in its cross-examination of Dr. Luehrman, sought to demonstrate that using higher "volatility" figures would result in a higher put option value for the 2006 Guaranties. Hr'g Tr. 1010:24–1014:3 (Luehrman). In sum, greater volatility would lead to a higher overall value for the put option. Hr'g Tr. 963:9–14; 1010:24–1011:3 (Luehrman). However, as Dr. Luehrman testified, the relevant volatility is asset volatility, but because asset volatility is not readily ascertainable from capital market data, he used an assumed equity volatility (which is higher than asset volatility). Hr'g Tr. 963:3–14 (Luehrman). Moreover, the equity volatility Dr. Luehrman used was higher than the expected equity volatility determined by CFGI as of the date of the 2006 Transaction and as reported in SEC filings. *Compare* Debtors' Ex. 48 (Luehrman Rep.) at App'x 6 (Figure 6-6: assuming a 24% asset volatility rate) *with* Debtors' Ex. 10 at F-69 (using 23.25% expected stock price volatility for valuing stock options as of March 23, 2006).

966:4 (Luehrman).  This is because it is inappropriate to record the full face value of a liability that is contingent.  *Id.*  Rather, it is necessary to determine the fair value of the liability that should be recorded based on the likelihood of it being called and in what amount.  *Id.*  In addition, in assessing solvency, it is necessary to take into account various offsets to that liability, including the fact that multiple Guarantors guaranteed CFGI's obligations jointly and severally and the liability would be offset by enforceable subrogation or reimbursement claims.  *See* Hr'g Tr. 965:22–968:13 (Luehrman); *see also* Hr'g Tr. 324:2–325:11 (Fairfield).  As Dr. Luehrman explained, just as one would not put a $1 lottery ticket on a balance sheet for the amount of the jackpot, one would not put a guaranty on the balance sheet for its maximum liability if there are contingent assets such as subrogation and contribution rights.  Hr'g Tr. 966:5-968:13 (Luehrman).

(iv)    **Testimony of Bradley C. Geer: 2009**

94.    In response to the Debtors' assertion that Capmark received $1.5 billion dollars of value for the liens granted to the Lenders in connection with the Secured Credit Facility, the Official Committee called Bradley C. Geer, an expert on restructuring and related valuation.  Mr. Geer testified that from the standpoint of unsecured creditors the Debtors did not receive anywhere near $1.5 billion in value for the $1.5 billion security interest granted the Lenders in the Secured Credit Facility.  Hr'g Tr. 877:11-22, 885:21-886:5. (Geer).  Mr. Geer further testified that unsecured creditors would have received a 44.4% recovery had Capmark not entered into the Secured Credit Facility and that unsecured creditors are now projected to receive a 33% recovery in this case.  Hr'g Tr.  885:3-11, 883:3-9 (Geer).

95.     Thus, Mr. Geer testified that the Debtors' unsecured creditors lost 25% of their recovery as a result of the liens granted to the Lenders through the Secured Credit Facility. Hr'g Tr.  878:14-22 (Geer).[8]

### D.     THE SECURED CREDIT FACILITY IS SIGNIFICANTLY OVERSECURED

#### (i)     Composition of the Pledged Pool

96.     The assets granted as collateral to secure the Secured Credit Facility (the "Pledged Pool") consist of U.S. and Canadian commercial mortgage loans, real-estate-owned assets ("REO"), loans originated as part of the Debtors' New Markets Tax Credit transactions, and cash proceeds of the foregoing.  *See* Hr'g Tr. 629:7–17 (Gallagher); Debtors' Exs. 43 & 45, at 6 (Sept. 2 Pledged Pool Presentation).  As of June 30, 2010, there were approximately 127 loans and 18 properties in the Pledged Pool. *See* Debtors' Ex. 45, at 6; *see also* Hr'g Tr. 628:7–13 (Gallagher).

97.     A "large percentage" of the Pledged Pool is "distressed."  Hr'g Tr. 623:17-19 (Gallagher).  Specifically, nearly 60% of the Pledged Pool is classified as "non-performing," and over 77% of the Pledged Pool is on the Debtors' "watchlist." (Debtors' Ex. 45, at 854.)

98.     Loans classified by the Debtors as "non-performing" have not paid interest in 90 days, or might still be paying, but management has "decided that it would be inappropriate to take interest income or interest into income," and thus payments received are "appl[ied] against principal."  Hr'g Tr. 690:24-691:7 (Gallagher).

---

[8] The Court, Mr. Geer's testimony credible but very limited in scope and utility.

99.    Likewise, "watchlist" loans "are still paying but we don't think will be for that long a period of time or where we think the probability of having a problem is more pronounced, or loans that are not paying." Hr'g Tr. 689:11-21 (Gallagher).

100.    According to the Debtors, the Pledged Pool's "[c]redit characteristics have declined severely since September 2008." Debtors Ex. 45 at 869. In a less than two-year period beginning September 2008, the portion of the Pledged Pool loans on the watchlist (based on unpaid principal balance) nearly tripled, climbing from 26.8% to 77.1%, and the portion of the Pledged Pool loans classified as non-performing (also based on unpaid principal balance) grew more than six-fold from 9.5% to 59.4%. Debtors Ex. 45 at 869.

101.    The Debtors' risk rating system classifies loan risk from 1 through 12, with 1 signifying the least amount of risk, and 12 the most. Hr'g Tr. 692:15-695:5 (Gallagher); Official Committee Ex. 55 at 898. A loan classified as 11 under the risk rating system is on the watchlist and may be subject to default, protracted or unlikely resolution, or impairment. Official Committee Ex. 55 at 898. As of June 2010, the Pledged Pool's weighted average "risk rating" was 10.8. Debtors Ex. 45 at 868.

(ii)    **Management of the Pledged Pool**

102.    William Gallagher, the Debtors' Chief Risk Officer and a member of the Debtors' Executive Committee, is the senior executive responsible for managing and monetizing the assets of the Pledged Pool. [9] *See* Hr'g Tr. 623:7–14, 627:6–9 (Gallagher). Mr. Gallagher joined the Debtors in March 2009 after working for approximately

---

[9] The Court found Mr. Gallagher's testimony to be particularly credible.

twenty years at Greenwich Capital/Royal Bank of Scotland ("RBS"), where he served as Chief Credit Officer. *See* Hr'g Tr. 617:17–18; 618:9–13; 619:12–15 (Gallagher). In his role at Greenwich Capital, Mr. Gallagher managed similar (albeit less distressed) pools of commercial mortgage loans, ranging from several billions of dollars to $10 billion. *See* Hr'g Tr. 619:16–622:3 (Gallagher).

103. Mr. Gallagher oversees a staff of nineteen asset managers whose sole responsibility is reviewing and monetizing the Pledged Pool. *See* Hr'g Tr. 627:15–628:16 (Gallagher). The Debtors' asset managers review each asset on a discrete basis, and based on such review, employ a variety of strategies to maximize value from the assets in the Pledged Pool. *See* Hr'g Tr. 624:10–630:9; 655:13–657:8 (Gallagher). The strategies include (i) restructuring loans with borrowers or sponsors, (ii) achieving full payment or partial payment of the loans, (iii) achieving discounted payoffs at a premium to the underlying real estate collateral, (iv) foreclosing on the collateral, (v) selling the foreclosed assets, and (vi) engaging in short sales. *See* Hr'g Tr. 623:7–626:9, 629:18–630:9, 665:17–668:15 (Gallagher).

(iii)  **Historical Performance and Value of the Pledged Pool**

104. Since soon after the October 25, 2009 Commencement Date, the Debtors have been providing information and periodic updates to the Official Committee and the Ad Hoc Unsecured Committee regarding the value and monetization of the Pledged Pool, including monthly updates beginning in February 2010. *See* Hr'g Tr. 634:6–24 (Gallagher); *see also* Debtors' Exs. 43 & 45; Official Committee Exs. 56–58; AHG Ex. 1. After entering into the Settlement Agreement, the Debtors submitted an

updated report, dated September 2, 2010 (the "September 2 Report"), to the Official

Committee and the Ad Hoc Unsecured Committee.  *See* Debtors Exs. 43 & 45.

105.   As detailed in the September 2 Report, at its inception in May 2009, the

Pledged Pool's aggregate unpaid principal balance was $2.615 billion and its net book

value was $2.166 billion.  *See* Hr'g Tr. 630:10–18 (Gallagher); Debtors' Exs. 43 & 45, at 6.

As of July 31, 2010, the aggregate unpaid principal balance of the Pledged Pool was

$1.725 billion and its net book value was $1.284 billion, excluding $161 million in cash

proceeds generated by the assets and maintained in a cash collateral account.  *See* Hr'g

Tr. 645:8–21 (Gallagher); Debtors' Exs. 43 & 45, at 6.   The difference between book

value and unpaid principal balance of the Pledged Pool is equal to Pledged Pool-

related loss reserves on the Debtors' books, thereby reflecting the distressed nature of

the non-performing and under-performing loans in the Pool.   *See* Hr'g Tr. 630:19–

631:17 (Gallagher).   As a result of further asset recoveries since July 31, 2010, the

Debtors now have nearly $200 million in Pledged Pool cash collateral.   *See* Hr'g Tr.

645:5–7 (Gallagher).

106.   Since May 2009, the Pledged Pool assets have suffered an average loss

severity[10] of approximately 28% for loans in default and 27% overall, in line with the

Debtors' projections.   *See* Hr'g Tr. 639:21–640:10; 647:6–648:18 (Gallagher); Debtors'

Exs. 43 & 45, at 7, 9.  In total, the Pledged Pool generated approximately $710 million in

recoveries (including interest payments) from its inception in May 2009 through

---

[10] Average loss severity is the amount of loss as a percentage of principal balance.

August 2010, also in line with projections. *See* Hr'g Tr. 638:5–640:6 (Gallagher); Debtors' Exs. 43 & 45, at 5, 7.

### (iv)   Projected Performance of the Pledged Pool

107.   The evidence adduced at the Hearing overwhelmingly established the Debtors reasonably expect to recover an additional approximate $1.457 billion from the Pledged Pool for the period from September 2010 to December 2013. *See* Hr'g Tr. 638:18-639:9 (Gallagher); Debtors' Exs. 43 & 45, at 5, 10.   Seventy-five percent of such recoveries ($1.098 billion) will come from payments of principal and interest on loans and the sale of REO properties, and the remaining 25% ($358 million) from the disposition of loans and cash relating to the New Markets Tax Credit program. *See* Hr'g Tr. 649:10–652:8 (Gallagher); Debtors' Exs. 43 & 45, at 9.

108.   The Debtors' recovery projections are based on continued asset-by-asset analyses performed by the Debtors' asset management team. *See* Hr'g Tr. 655:13-656:20 (Gallagher); Debtors' Exs. 43 & 45, at 13–16.   For each asset, the asset managers have determined a strategy to monetize the asset, the anticipated resolution date, and the expected recovery on the asset. *See* Hr'g Tr. 657:9–665:11 (Gallagher); Debtors' Exs. 43 & 45, at 13–16.   In doing so, the Debtors assumed a greater loss severity than that already suffered by the Pledged Pool, ranging from 36% on defaulted loans to 29% on all Pledged Pool assets. [11] *See* Hr'g Tr. 652:9–24 (Gallagher); Debtors' Ex. 45, at 9.

---

[11] The Debtors' projected recoveries through the second quarter of 2011 assume the Debtors will sell the assets in their New Markets Tax Credit program. *See* Hr'g Tr. at 650:11–22 (Gallagher).  But even if the anticipated transaction does not occur, the Debtors' projections actually go up over long term since a proposed sale of the New Markets Tax Credits assets assumes a discount in price to achieve a quicker sale. *See* Hr'g Tr. at 650:23–652:8; 805:4–806:9 (Gallagher).

109.    The more time the asset management team devotes to specific asset resolutions, the more confident it is that the Company will recover the projected $1.457 billion.  *See* Hr'g Tr. 671:8–672:13 (Gallagher).  While individual Pledged Pool assets have been monetized for amounts other than those originally projected, taken as a whole, monetization of Pledged Pool assets has resulted in recoveries consistent with the Debtors' projections.  Hr'g Tr. 800:16–801:17 (Gallagher).  Indeed, the Debtors' recovery projections have increased by approximately 5% overall since November 2009.  Hr'g Tr. 672:14–21 (Gallagher).

<div align="center">(v)    <b>The Secured Credit Facility is Oversecured</b></div>

110.    The testimony and exhibits introduced at the Hearing which were essentially uncontested establishes that the Secured Credit Facility is oversecured by a significant margin.  The current balance of the Secured Term Loan is approximately $1.1 billion.  *See* Hr'g Tr. 638:18–639:9 (Gallagher).  The Debtors' July 31, 2010, numbers, as set forth in the September 2 Report, establish the expected collections from the Pledged Pool are projected to be approximately $1.6 billion, including $161 million in cash collateral (now $200 million) and $1.457 of additional recoveries the Debtors anticipate realizing by the end of 2012.  *See* Hr'g Tr. 638:3–639:9; 643:5-19 (Gallagher); Debtors' Exs. 43 & 45, at 5, 9–10.  As a result, the Pledged Pool has a projected cushion of almost $500 million over the outstanding balance of the Secured Credit Facility, and

$625 million over the discounted balance of the Secured Credit Facility under the Settlement.[12]  *See* Hr'g Tr. 643:5–644:2 (Gallagher).

111.    Mr. Gallagher testified he is "very confident" the Debtors will collect the $1.457 of additional recoveries by the end of 2013, *see* Hr'g Tr. 672:8–13 (Gallagher), and he believes the chances the Debtors' projections will not be met on a magnitude which could affect unsecured creditor recoveries (*i.e.*, as much as $500 million to $625 million) is "extremely unlikely" and "very remote."    *See* Hr'g Tr. 806:15–807:4 (Gallagher).  Indeed, using the Debtors' uncontroverted projections, which utilize more conservative severity rates than those historically experienced by the Pledged Pool, the Debtors anticipate the $975 million in cash payments to be paid under the Settlement will be recouped in full through monetization of the Pledged Pool by the first or second quarter of 2012, with 91% of the collections by the end of 2013.  *See* Hr'g Tr. 640:11–641:16 (Gallagher); Debtors' Exs. 43 & 45, at 5, 9–10.

(vi)    **Duff and Phelps' Independent Valuation of the Pledged Pool**

112.    Through their counsel, Debtors retained D&P in March 2009 to conduct an independent valuation of the Pledged Pool to ensure the Debtors' valuation, based on estimated recoveries, is consistent with market projections.  *See* Hr'g Tr. 190:3–8, 196:12–197:15, 199:9–201:20 (Fairfield), 444:17–22 (Litolff).  The D&P valuation team was led by Edwin Litolff, a real estate consultant and senior adviser at D&P with thirty-three years of experience in appraising real estate and promissory notes secured

---

[12] These numbers do not include an additional $40 million in cash proceeds that relate to the New Market Tax Credit loans.  *See* Hr'g Tr. 644:4–645:3 (Gallagher).  Although these amounts are not currently available because of reinvestment requirements of the New Markets Tax Credit program, the funds will likely become available in the future. *See* Hr'g Tr. 644:21–645:2, 650:11–14, 805:4–806:5 (Gallagher) .

by real estate. *See* Hr'g Tr. 433:15–439:6, 444:8–16 (Litolff). Mr. Litolff's complete

resume and qualifications are set forth in Debtors' Exhibit 46, at CAPMARK193571–80.

At the Hearing, Mr. Litolff was qualified without objection as an expert in real estate

valuation and appraisal. [13] *See* Hr'g Tr. 439:7-11 (Litolff).

113.   In analyzing the value of the Pledged Pool, the D&P team conferred with

the Debtors' asset managers on numerous occasions and collected a voluminous

amount of underlying documentation regarding the assets in the pool. *See* Hr'g Tr.

445:1–446:15 (Litolff). The Debtors provided all information requested by D&P and

D&P had all of the information and data necessary for it to prepare its valuation. *Id*.

The D&P team employed methodologies typically used in valuing promissory notes

secured by real estate, including the discounted cash-flow method and comparisons to

similar real estate. *See* Hr'g Tr. 446:16–449:2 (Litolff). Notably, Mr. Litolff and others

testified that D&P was never instructed by the Debtors on whether a high or low

valuation of the Pledged Pool would be preferable. *See* Hr'g Tr. 200:1–201:1 (Fairfield);

450:6–16 (Litolff); 743:6–744:12 (Gallagher).

114.   Based on its independent analysis, D&P found the market value of the

Pledged Pool was $1.52 billion and the liquidation value was $1.35 billion as of July 31,

---

[10] The court finds Mr. Litolff's testimony to be of limited utility. Mr. Litolff misunderstands the role of an expert witness. He testified that it is not necessary for an expert witness to show all the work performed to arrive at the expert's conclusion, because in his view his opinion should be accorded weight solely by virtue of his experience and credentials. Hr'g Tr. 515:14-516:11, 522:8-17 (Litolff). Moreover, Mr. Litolff's report does not explain how he reached certain of his conclusions. Hr'g Tr. 517:1-5 (Litolff). For example, the D&P valuation report does not explain how the performing loans were categorized into different tiers of quality nor which loans were placed into which tier. Hr'g Tr. 521:13-20 (Litolff). Nor, he admits, can the rationale for placing loans into certain categories – which he admits was largely based on personal judgment – be found in the D&P work papers. Hr'g Tr. 522:1-7 (Litolff).

2010, and the market value was $1.77 billion and the liquidation value was $1.55 billion as of October 31, 2009.  *See* Hr'g Tr. 450:17–452:7 (Litolff); Debtors' Ex 46, at 9–10.  The outstanding balance under the Secured Credit Facility was $1.5 billion at October 31, 2004, and $1.110 billion at July 31, 2010.  *Id*.  D&P first reported these conclusions to the Debtors in the second half of July 2010 and executed a final copy of its report on October 12, 2010.  *See* Hr'g Tr. 452:11-453:18 (Litolff); Debtors' Ex. 46, at 3–4. The valuation findings in the final report were consistent with the valuation findings in the earlier working copies provided to the Debtors and their counsel.  *See* Hr'g Tr. 453:7–11 (Litolff).  *Cf*. Ex. 42, at 9–10, *with* Ex. 46, at 9–10.

115.   Although D&P reached the same general conclusion as the Debtors, D&P's methodology differed from the Debtors' in two ways.  First, D&P utilized a three-tiered system for classifying the assets based on nominally different risk profiles and then applied three separate discount rates based on those profiles, *see* Hr'g Tr. 517:14–518:17 (Litolff); Debtors' Ex. 46, at 31–34, whereas the Debtors employed twelve risk ratings and applied various severity rates to the assets.  The uncontroverted testimony of Mr. Litolff, however, revealed that regardless of designation, the D&P analysis relied on the same asset-by-asset analysis applied by the Debtors in reviewing expected recoveries from the assets.  *See* Hr'g Tr. 447:5–18 (Litolff); Debtors' Ex 46.

116.   Second, D&P applied its discount rates to a different (and higher) unpaid principal balance than that utilized by the Debtors.  *See* Debtors' Ex. 46, at 34. Specifically, D&P used $1.877 billion as the unpaid principal balance in computing the discounted expected total recovery, whereas Mr. Gallagher and his team used only

$1.664 billion.  *Id.*; Hr'g Tr. 604:19–606:17 (Litolff).  As Mr. Litolff explained, however, the Debtors' numbers reflected the net book value of the Pledged Pool as of July 31, 2010, after loss write-downs.  *See* Hr'g Tr. 605:13–21 (Litolff).  The unpaid principal balance used by the Debtors was not an appropriate number to utilize in an economic valuation analysis of the type undertaken by D&P because the D&P analysis begins with un-discounted numbers and then calculates write-downs from the gross unpaid principal balances.  *See* Hr'g Tr. 575:21–577:4; 604:19–605:21 (Litolff).  In any event, Mr. Litolff testified, even if D&P's discount rates were applied to the Debtors' already-discounted unpaid principal balance of $1.664 billion, the expected total recovery would still be $1.074 billion for the remaining life of the Pledged Pool, excluding the existing $200 million of cash collateral.  *See* Hr'g Tr. 606:1–17  (Litolff).  Thus, even if the Debtors' already-discounted principal balance had been used in D&P's valuation, after factoring in the cash collateral, the Pledged Pool would be worth $1.274 billion in the aggregate, or approximately $165 million more than the current unpaid principal balance of the Secured Term Facility, and approximately $300 million more than the amount to be paid under the Settlement.  *See* Hr'g Tr. 606:17–607:7 (Litolff).

117.  There are, however, significant issues with Mr. Litolff's report.  Cross-examination revealed that there are material unexplained discrepancies between the portfolio Mr. Litolff described and the real Pledged Pool portfolio – both measured at the same July 31, 2010 date, both in terms of absolute size and quality of assets.

118.  First, the D&P valuation report shows a portfolio of performing loans, non-performing loans and REO with a total unpaid principal value ("UPB") as of July

31, 2010 of $1.877 billion -- Debtors Ex. 46 at p. 34; Hr'g Tr. 532:3-22, 539:9-14 (Litolff) -- while on the Capmark's books the total UPB of the loan portfolio and REO as of that same date was only $1.685 billion – a difference of nearly $200 million. Debtors' Ex. 45 at p. 6, 19; Hr'g Tr. 539:2-8 (Litolff).

119.   Second, Mr. Litolff describes a remarkably high-quality portfolio in which almost two-thirds of the loans are classified as "performing", the majority of which he projected would be paid off in full at maturity for a realization of full value on UPB. Hr'g Tr. 547:6-12 (Litolff).   Capmark's own documents tell a very different story, revealing that 50 to 60% of the portfolio was non-performing as of the July 31, 2010 valuation date.   Hr'g Tr. 545:20-546:3 (Litolff); *compare* Debtors' Ex. 45 at 13-16 *with* Debtors' Ex. 46 at 12-14.   In fact, Mr. Gallagher, testified that the Debtors expect that fully 75% of the Pledged Pool loans will eventually default.

120.   Mr. Litolff did nothing to educate himself about Capmark's classification system before he performed the Pledged Pool valuation and did not put any weight on Capmark's classification system in doing the valuation.   Hr'g Tr. 545:3-10 (Litolff). Prior to his cross-examination, Mr. Litolff had never even seen a description of the Capmark risk rating system.  Hr'g Tr. 549:17-19 (Litolff).

121.   D&P moved 20 loans classified by Capmark as non-performing to performing.   and 27 loans classified by Capmark as non-performing to performing with balloon issues.  Hr'g Tr. 557:12-19 (Litolff);  Hr'g Tr. 565:20-566:11 (Litolff). These actions by themselves created a loan portfolio very distant from the reality of the Capmark loans.

122.   Third, Mr. Litolff assumes that if a loan has a loan to value ("LTV") of 100% or less, the loan is performing and Capmark will recover in full at maturity.  Hr'g Tr. 561:17-22 (Litolff).  Mr. Litolff does not take make any determination as to how the recovery would occur – if it would be through refinancing or foreclosure and sale.  Hr'g Tr. 562:7-11 (Litolff).  Mr. Litolff's belief that all loans with UPB approaching or equal to current market value of the collateral will perform to maturity and then be paid off in full cannot be reconciled with his admissions that (a) it is impossible to refinance property on a non-recourse basis at anything approaching 100% LTV, and (b) on foreclosure sales, Capmark realizes substantially less than 100 % of the market value of the property.  Hr'g Tr. 563:16-564:3, 564:4-8 (Litolff).

123.   Fourth, the comparable transactions chosen by D&P are not particularly comparable.  The D&P Valuation Report at page 29 lists twelve "selected transactions" that were relied upon by D&P to reach its conclusion about the appropriate discount rate to use to value performing loans and performing loans with balloon issues.  Debtors Ex. 46.  None of these transactions are similar to the Pledged Pool, and there is strong reason to believe that the assets at issue in those sales were of higher quality than the Pledged Pool.  For example, the majority of the loans in the Capmark portfolio are of a vintage between 2005 and 2007, when real estate values were at the highest levels in history, and therefore have higher loss severities than loans from other periods.  Hr'g Tr. 589:8-20 (Litolff)  Mr. Litolff did not make any adjustments to reflect differences in vintages between the loans purchased in the comparables and the Capmark loans.  Hr'g Tr. 590:1-7 (Litolff).

60

124.   Mr. Litolff failed to consider and adjust for other significant differences as well.  For example, the only loan transaction the report includes as "Tier 2" is an Apollo transaction consisting of a portfolio of 55 loans for the total amount of $50 million, which had LTV of 73.6% and an equity cushion of more than 25%.  These loans had a weighted average life of 120 months, which is significantly more than the Capmark portfolio.  Mr. Litolff does not know whether there are make-whole provisions in those loans. Hr'g Tr. 592:3-16, 593:6-594:7 (Litolff); Debtors' Ex. 46, p. 30; Official Committee Ex. 53.  For "Tier 3" the only comparable used by D&P is an acquisition of a participation in a first lien position on an office building in Manhattan by Colony Capital, which Mr. Litolff admitted might well have been oversecured and reasonably expected to realize full recovery.  Debtors' Ex. 46, p. 30; Official Committee Ex. 53; Hr'g Tr. 592:17-593:5 (Litolff).

125.   Based on what Mr. Litolff considered to be comparable market transactions, he used an indicative percentage of UPB as a guideline value. For the performing loans, Mr. Litolff used 80%.  For the non-performing loans, he used 50%, and for the REO he used 75%.  Debtors' Ex. 46, p. 34; Hr'g Tr. 576:8-577:4 (Litolff).  For the reasons stated above, it is likely that these values are too high.  Even accepting those values, when Mr. Litolff's indicative percentages of UPB are applied to the actual breakdown of Capmark's Pledged Pool, the result of the valuation of the Pledged Pool would be approximately $282 million lower that the value concluded by D&P.  Debtors Ex. 45, p. 6, 19 Hr'g Tr. 580:6-16 (Litolff).

126. As noted above, there are significant problems with Mr. Litolff's testimony. Nonetheless, the court will consider Mr. Litolff's testimony as a "backup" or "stress tests" to Mr. Gallagher's much more credible testimony.

### E.    THE SETTLEMENT

#### (i)    *Settlement Negotiations*

127. Beginning in April 2010, the various creditor groups began settlement negotiations over the banks' secured claims. *See* Hr'g Tr. 178:3–11 (Fairfield). There were four principal groups involved in these negotiations: (i) the Debtors, advised by D&L, Lazard, and LM+Co; (ii) the Ad Hoc Secured Committee, advised by Kirkland & Ellis LLP and The Blackstone Group L.P.; (iii) the Official Committee, advised by Kramer Levin Naftalis & Frankel LLP and Houlihan; and (iv) the Ad Hoc Unsecured Committee, represented by Milbank, Tweed, Hadley & McCloy LLP. *See* Hr'g Tr. 179:5–180:11 (Fairfield); 358:21–362:2 (Meghji).

128. Throughout this process, the Debtors' goal was to achieve a consensual settlement of the banks' secured claims involving all the parties. *See* Hr'g Tr. 180:17–181:2 (Fairfield); 362:3-18 (Meghji). In an effort to achieve that consensual settlement with all parties, the Debtors met with each constituent group on a number of occasions and conferred by telephone many times. *See* Hr'g Tr. 178:12–180:21, 184:17–185:2, 234:3–23 (Fairfield); 358:21–361:4 (Meghji). However, the Debtors also informed all three of the other groups that they were not averse to reaching a reasonable settlement with any one group if they were unable to reach a universal agreement. *See* Hr'g Tr. 181:3–182:6 (Fairfield), 362:19–364:17 (Meghji). As part of their negotiations, the

Debtors circulated to the Ad Hoc Secured Committee a draft declaratory judgment motion regarding the various avoidance claims to convey the message that, were a settlement not reached, the Debtors would throw open the avoidance claims to litigation (and, presumably, the Official Committee would seek to intervene in the action).  *See* Hr'g Tr. 181:22–182:16 (Fairfield); Official Committee Ex. 13.

129.    Negotiations between the Debtors and the Ad Hoc Secured Committee were extensive, contentious, and very difficult.  *See* Hr'g Tr. 184:17–185:2 (Fairfield); 364:18–22 (Meghji).  There was a lot of back-and-forth, and a wide variety of structures were discussed over the course of the negotiations.  *See* Hr'g Tr. 365:23-366:8 (Meghji). Some of the key sticking points of the negotiations included the value of the potential avoidance actions, the value of the Pledged Pool, the interest rate on any note emerging from the bankruptcy, the payment of interest and fees, and the grant of an unsecured deficiency claim to the secured lenders in the event they gave back some of their collateral.  *See* Hr'g Tr. 185:19–189:4 (Fairfield), 364:23–366:8 (Meghji).

130. With regard to the value of the avoidance actions, the Debtors' management and Board of Directors sought counsel from D&L, which advised them continuously during the negotiations and provided an exhaustive memorandum of about 100 pages, analyzing the potential avoidance actions.  *See* Hr'g Tr. 189:12–196:4 (Fairfield).  Management also reviewed a memorandum drafted and provided by counsel to the Official Committee, and held several meetings with both counsel for the Official Committee and D&L, at which the relative merits of the potential avoidance actions were discussed.  *See* Hr'g Tr. 218:9–219:15 (Fairfield).  Both Mr. Fairfield and

Mr. Meghji testified they could not recall a single claim raised in the Official Committee's various briefs regarding the Debtors' Settlement Motion or the Official Committee's Standing Motion that they had not been apprised of and advised about during these meetings with D&L and counsel for the Official Committee, or that they had not considered in ultimately deciding to enter into the Settlement Agreement. *See* Hr'g Tr. 219:16–23 (Fairfield); 387:8–388:7 (Meghji). In addition, Capmark requested its counsel to prepare a fact memorandum describing all of the material facts relating to the 2006, 2007, and 2009 Transactions, copies of which were provided to management and the Board of Capmark, as well as the Official Committee, the Ad Hoc Secured Committee, and the Ad Hoc Unsecured Committee. *See* Hr'g Tr. 182:17–183:18, 185:3–10 (Fairfield); Debtors' Ex. 38 (D&L Fact Memorandum).

131. Eventually, it was the Debtors and the Ad Hoc Secured Committee that first reached tentative agreement, deciding to pursue a structure involving a cash payment at an absolute discount off the original principal amount of the secured lenders' claim. *See* Hr'g Tr. 187:12–16, 187:23, 189:4 (Fairfield). One of the reasons why the Debtors pursued an absolute discount, as opposed to collateral sharing, was feedback they had received from the unsecured creditors expressing a preference for a discount structure. *See* Hr'g Tr. 188:16–20 (Fairfield). Moreover, given the strong likelihood that the secured lenders were oversecured, the Debtors believed that if they entered into a settlement that merely provided for a reduction or give-back of collateral, the secured lenders would receive payment in full and the estate would reap no benefit. *See* Hr'g Tr. 188:6–15, 189:5–11 (Fairfield).

132.   It turned out that the Debtors would benefit more by repaying the secured claim in cash at a discount, than by repaying the secured claim with a new debt instrument in a discounted amount.  *See* Hr'g Tr. 188:21–189:4 (Fairfield).  The reason was that the Debtors were paying 4.75% interest on the debt, while only earning 0.25% interest on the monies held by the Debtors' estates.  *See* Hr'g Tr. 379:23–380:6 (Meghji), 224:3–225:5 (Fairfield).   Although representatives of the Debtors initially had some concerns about such a structure, these concerns—which centered around liquidity, the value of the Pledged Pool, and the unsecured creditors' reaction to a cash settlement— were allayed over the course of the negotiations.  *See* Hr'g Tr. 187:23–189:4 (Fairfield); 367:23–368:4 (Meghji).

133.   First, the Debtors investigated the liquidity projections for the Company, and satisfied themselves that the Company had enough cash to pay the Settlement and meet its obligations as they come due.  *See* Hr'g Tr. 366:20–367:23 (Meghji).

134.   Second, the Debtors' management and Board spent a significant amount of time with the Company's asset management team to review their projections for the Pledged Pool and concluded that the secured lenders were oversecured.  *See* Hr'g Tr. 367:24–369:12 (Meghji).  In addition, the D&P report confirmed the Company's internal conclusion that the Pledged Pool was worth quite a bit more than the secured loan.  *See* Hr'g Tr. 200:1–201:2, 202:12, 220:3–221:11, 222:20, 223:7 (Fairfield); 643:5–644:2, 806:20– 807:4 (Gallagher); Debtors' Exs. 43 & 45 (Sept. 2 Pledged Pool Presentation).

135.   Finally, management was concerned about how the unsecured lenders would react to the idea of a cash settlement.  As a result, they asked Mr. Bienenstock of

D&L, who was heading up negotiations with the other parties, to approach Mr. Mayer, representing the Official Committee, to sound him out about the Official Committee's reaction to a cash settlement between the Debtors and the Ad Hoc Secured Committee. *See* Hr'g Tr. 188:16–20 (Fairfield).  After that conversation took place, the Debtors no longer had any concerns about the structure of the Settlement.  *Id.*; Hr'g Tr. 369:13–370:1, 376:24–377:2 (Meghji).

136.  Management and the Board also sought legal advice concerning the Settlement, and, in particular, the value of the avoidance actions which were to be released.  Debtors' Exs. 40(a)–(f).  Counsel reviewed the D&L legal memorandum, the Official Committee legal memorandum, and the D&L fact memorandum with the Debtors' Board and management team.  *See* Hr'g Tr. 192:3–193:11, 195:20–196:4, 218:9–219:23, 221:12–222:19, 241:5–242:21 (Fairfield).  Management and the Board also reviewed the benefits of the Settlement, as described below in paragraphs 139– 146.  *See* Hr'g Tr. 223:8–229:8 (Fairfield); 377:9–388:7 (Meghji).

137.  Ultimately, management and the Board concluded that the chances they could successfully avoid the secured lenders' claims and collateral were "very low." Hr'g Tr. 222:12–19 (Fairfield); 382:13–22 (Meghji).  Despite this fact, the Debtors bargained hard with the secured lenders, and used the threat of avoidance actions (in the form of the draft declaratory judgment complaint and e-mail exchanges between counsel), a potential cramdown plan, and a dispute over what interest rate would apply to the secured claims to negotiate a settlement they thought "fair and

reasonable" for all stakeholders.  *See* Hr'g Tr. 181:22–182:16, 184:8–189:11 (Fairfield); Official Committee Ex. 13 (E-mail attaching Draft Declaratory Judgment Complaint).

138.  The Debtors, RBS, JP Morgan Chase, and the members of the Ad Hoc Secured Committee executed the Settlement Agreement on September 2, 2010.  *See* Hr'g Tr. 210:4–10, 211:1–14 (Fairfield); Debtors' Ex. 39(a) (Settlement Agreement).  Its key terms are (a) a 9% discount off of the original principal balance of $1.5 billion, which is worth $135 million if none of the secured lenders opt out of the Settlement (none did); (b) cash payment, in two installments, of the discounted remaining principal amount; (c) release of all avoidance claims against the settling lenders (except for insider preference claims against several Goldman and Dune lending entities; (d) release of the liens on the Pledged Pool, freeing it up for the benefit of the estate; and (e) payment of the secured lenders' postpetition fees and interest, which total around $77 million.  *See* Hr'g Tr. 208:15–210:3 (Fairfield); 356:7–357:11 (Meghji); Debtors' Exs. 39(a) & 40(e)–(f).

   (ii)  *Benefits of the Settlement*

139.  Throughout this period, the Board and management held extensive discussions about the settlement negotiations.  The Board and the Board's Special Committee overseeing the settlement negotiations met repeatedly to discuss where negotiations stood, as well as various proposed terms.  *See* Hr'g Tr. 211:12–215:13 (Fairfield); Debtors' Exs. 40(a)–(f) (Board Minutes), 44 (E-mail from Tom Fairfield to Board, dated July 8, 2010).

140.    As negotiations progressed, management asked LM+Co. to analyze the financial benefits and effects of various proposed settlement structures upon the Debtors and their estates.  *See* Hr'g Tr. 223:8–224:2 (Fairfield), 377:9–378:13 (Meghji). Mr. Meghji, who had been appointed the Debtors' CRO in June 2009 and was also intimately involved in negotiations over the Settlement, led this effort, and was primarily responsible for reporting back to management and the Board on LM+Co.'s conclusions.  He attended every Board meeting during this period, and discussed his analysis with the members of the Board on numerous occasions.  *See* Hr'g Tr. 377:9–378:13 (Meghji); Debtors' Exs. 40(a)–(f) (Board Minutes).

141.    LM+Co.'s analysis showed the Settlement Agreement is worth between $270 and $310 million to the Debtors' estates.  *See* Hr'g Tr. 380:10–12 (Meghji).  First, the 9% discount on the original principal amount of the claim is worth exactly $135 million, as no settling lenders exercised their right to opt out of the Settlement.  *See* Hr'g Tr. 208:18–20, 224:3–5 (Fairfield), 378:14–19 (Meghji).  If postpetition fees and interest—which are part of the secured lenders' claim—are added to the $1.5 billion principal balance for the purpose of doing this calculation, the percentage value of the discount is closer to 8.6%, but the total dollar discount of $135 million remains the same.  *See* Hr'g Tr. 385:23–387:7, 408:18–411:3 (Meghji).

142.    Second, LM+Co. concluded, based on discussions with both in-house and outside counsel, that if the Settlement is approved, "it paves the way for the company to do a plan of reorganization and exit from bankruptcy much sooner."  Hr'g Tr. 378:2–23 (Meghji).  The current cost to the estates for professional fees and costs in these cases

is in the range of $6 million to $7 million per month. *See* Hr'g Tr. 379:13–22 (Meghji). Taking a conservative position, LM+Co. estimated that "once the company gets out of bankruptcy, it will save at least $5 million a month of those costs." *Id*.; *see also* Hr'g Tr. 226:8–21 (Fairfield). Given its expectation that emergence will accelerate by nine to twelve months if the Settlement is approved, the Settlement will result in between $45 and $60 million in savings in professional fees and costs. *See* Hr'g Tr. 379:19–22, 380:6 (Meghji).

143. The third quantifiable benefit of the Settlement is the avoidance of a prolonged, full-blown litigation between the Debtors and unsecured creditors on one hand, and secured creditors on the other hand, if the Settlement is not approved. *See* Hr'g Tr. 221:23–222:19, 225:10–226:11, 247:10–258:8, 317:13–318:4 (Fairfield); 378:20– 379:7 (Meghji). LM+Co. assumed—again, based on discussions with counsel—that this litigation would continue for nine to twelve months, and cost the estate between $50 and $75 million, *see id*.; Mr. Fairfield estimated a broader range of between $50 and $100 million, *see* Hr'g Tr. 226:4–7 (Fairfield).

144. Fourth, LM+Co. calculated the Settlement will save the estate approximately $65 million in continuing interest payments, $40 million within the first 12 months. *See* Hr'g Tr. 379:23–380:6 (Meghji), 224:3–225:5 (Fairfield). This is because the estate is currently paying 4.75% annual interest on the balance of the secured loan, while the cash it will use to pay off that loan if the Settlement is approved is earning only 0.25% interest per year. *Id*.

145.   In addition, Mr. Meghji testified that the Settlement also brings with it other, less quantifiable benefits.  First, the Settlement would result in a simplified governance structure, both pre-emergence and post-emergence, where monetization decisions would be made by only one set of decision-makers, presumably resulting in a more efficient and cost-effective process.  *See* Hr'g Tr. 380:18–381:5 (Meghji).  Second, although the Debtors are liquidating many of their assets, certain businesses (such as Capmark Bank) continue to function as going concerns, and the increased certainty that would come about as a result of emergence from bankruptcy would help retain key employees, especially in an improving business environment.  *See* Hr'g Tr. 381:18–382:1 (Meghji).  Third, Mr. Meghji expects the Settlement and quicker emergence from bankruptcy will reduce pressure from the FDIC, which is uncomfortable dealing with bankrupt parent companies of regulated banks.  *See* Hr'g Tr. 381:6–17 (Meghji).  Finally, there is a real monetary benefit (though one which is ultimately unquantifiable) to selling assets outside of bankruptcy rather than in bankruptcy.  *See* Hr'g Tr. 382:2–12 (Meghji).

146.   It is exceedingly unlikely that the Pledged Pool will lose the hundreds of millions of dollars it would have to lose for it to be outweighed by the amount of the cash settlement.  *See* Hr'g Tr. 806:20–807:4 (Gallagher).  As a result, the fact that they will be paid from the monetized collateral rather than from the Debtors' cash reserves in the short term does not impose any real risk on the unsecured claimholders.  *See* Hr'g Tr. 672:8–13, 673:3–674:1 (Gallagher).  Moreover, the Debtors currently estimate that all $975 million to be paid under the Settlement Agreement will be recouped by

the first or second quarter of 2012.    *See* Hr'g Tr. 220:24–221:20 (Fairfield); 650:1–5

(Gallagher); Debtors' 43 & 45, at 5, 9.  It is based on these facts, as well as the avoidance

actions' low likelihood of success, that Mr. Fairfield and Mr. Meghji, along with the

rest of the Debtors' management and its Board of Directors, concluded unanimously

that the Settlement was fair and reasonable to all stakeholders.  *See* Hr'g Tr. 216:21–

217:17,   221:12–222:19,   226:22–229:8,   241:5–242:21   (Fairfield);   377:3–8,   382:15–22

(Meghji).

## IV.    CONCLUSIONS OF LAW

### A.    JURISDICTION AND VENUE

147.    This Court has jurisdiction to consider and determine this matter pursuant

to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### B.    BURDEN OF PROOF

148.    To obtain approval of a settlement, the Debtors must demonstrate the

settlement satisfies, by a preponderance of the evidence, the requirements imposed by

Bankruptcy Rule 9019 and the Third Circuit's decision in *Meyers v. Martin (In re*

*Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).  *See Grogan v. Garner*, 498 U.S. 279, 291 (1991);

*Velde v. First Int'l Bank & Trust (In re Y-Knot Constr., Inc.)*, 369 B.R. 405, 408 (B.A.P. 8th

Cir. 2007) ("Trustee, as the party seeking the approval of the Settlement Agreement,

has the burden of showing by a preponderance of the evidence that the proposed

settlement is in the best interest of the estate.") (citation omitted); *In re Retz*, No. 04-

60302-7, 2005 Bankr. LEXIS 3121, at *26 (Bankr. D. Mont. June 20, 2005).  As specified

below, the Debtors have satisfied that burden by demonstrating that the *Martin* factors

support approval of the Settlement.

### C.    THE RELIEF SOUGHT IS APPROPRIATE UNDER RULE 9019

149.    As a threshold matter, the Official Committee and Ad Hoc Secured

Committee argue that there is no legal authority authorizing the Court to approve this

settlement under Rule 9019 because the settlement (i) fixes the treatment of a secured

lender's claims, including its entitlement to post-petition interest and fees, without a

finding that the lender is over-secured, (ii) nearly exhausts the debtor's unencumbered

cash, thus severely limiting its options with respect to any future plan treatment for

unsecured claims, and (iii) releases causes of action that would otherwise constitute a

significant source of plan funding.

150.    First, the Official Committee and Ad Hoc Secured Committee argue that,

as a general matter, prepetition claims cannot be paid prior to proposal and

confirmation of a chapter 11 plan absent a showing that such payments are necessary

to preserve a debtor's business. *Official Committee of Unsecured Creditors v. Motor Coach*

*Indus., Int'l, Inc. (In re Motor Coach Indus., Int'l, Inc.)*, Bankr. No. 08-12136, Civ. No. 09-

078, 20009 WL 330993, at *2 (D. Del. Feb. 10, 2009). They assert that no such showing

has been made here.

151.    Second, they argue that the settlement would improperly deprive the

unsecured creditors of the protections established under section 1129 of the

Bankruptcy Code.  *Motorola, Inc. v. Official Committee of Unsecured Creditors (In re*

*Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007); *Contrarian Funds, LLC v. WestPoint*

*Stevens, Inc. (In re WestPoint Stevens, Inc.)*, 333 B.R. 30, 51 (S.D.N.Y. 2005), *rev'd on other grounds*, 600 F.3d 231 (2d Cir. 2010).

152.   Third, they argue that the settlement is an improper *sub rosa* plan because it dictates the form and substance of a chapter 11 plan because this "exceeds the boundaries of a Rule 9019 compromise." *In re Louise's*, 211 B.R. 798, 801 (D. Del. 1997).

153.   Finally, they argue that the secured lenders are not entitled to an award of post-petition interest and fees until it is determined that such creditor is oversecured in accordance with section 506(b) of the Bankruptcy Code.

154.   As set forth below, the Court disagrees with each of these arguments.

**D.    UNDER THE FACTS AND CIRCUMSTANCES OF THIS CASE, PAYMENT OF THE SECURED CLAIMS IS APPROPRIATE**

155.   As part of the Settlement, the Debtors are required to satisfy the secured claims in cash prior to confirmation of a chapter 11 plan.  The Official Committee and the Ad Hoc Unsecured Committee argue that there is no basis in the law to allow for the payment through a settlement and outside of a plan of reorganization of a secured creditors' pre-petition claim, especially in a liquidating case where the payment is being made from unencumbered cash and the unsecured creditors oppose the payment. The Court disagrees.

156.   There is no *per se* rule against paying pre-petition secured claims outside of a plan of reorganization. Indeed, such payments are routinely made in a number of different contexts.  For example, post-petition refinancing of uneconomical *secured* debt through a DIP loan may be authorized by section 363(b) of the Bankruptcy Code as a

use of estate property outside the ordinary course of business. *See Law Debenture Trust Co. v. Calpine Corp. (In re Calpine Corp.)*, 356 B.R. 585, 589 (S.D.N.Y. 2007); *HSBC Bank USA v. Calpine Corp.*, No. 07 Civ. 3088, 2010 U.S. Dist. LEXIS 96792, at *32-34 (S.D.N.Y. Sept. 14, 2010); *United States ex rel. Rural Electrification Admin. v. Wabash Valley Power Ass'n (In re Wabash Valley Power Ass'n)*, 167 B.R. 885, 889 (S.D. Ind. 1994); *In re Indus. Office Bldg. Corp.*, 171 F.2d 890, 893 (3d Cir. 1949). Such refinancing can be accomplished through an existing lender or a new "take out" lender.

157.    Similarly, prepetition secured claims can be paid off through a "roll-up." Most simply, a   is the payment of a pre-petition debt with the proceeds of a post-petition loan. Roll-ups most commonly arise where a pre-petition secured creditor is also providing a post-petition DIP loan under section 364(c) and/or (d) of the Bankruptcy Code. The proceeds of the DIP loan are used to pay off or replace the pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt plus any new money being lent to the debtor.[14] As a result, the entirety of the pre-petition and post-petition debt enjoys the post-petition protection of section 364(c) and/or (d) as well as the terms of the DIP order.[15] In both a refinancing and a roll-up, the pre-

---

[14] In reality, actual money rarely changes hands. The pre-petition loan is deemed satisfied and the post-petition loan includes the amount of the pre-petition debt.

[15] A "creeping roll-up" is identical to a roll-up except that the payment of the pre-petition debt occurs over time. Creeping roll-ups are most commonly used with revolving lines of credit or "revolvers." In a typical revolver, the debtor has a zero-balance account. As payments are received by the debtor from third parties they are deposited in an account with the lender and applied, usually daily, to reduce the debt. As payments are made by the debtor to third parties the debt increases. Thus, the amount of the debt rises and falls on an almost daily basis. In a creeping roll-up, payments received post-petition by the debtor are used to reduce the pre-petition debt. In addition, the debtor's post-petition payments to third parties serve to increase the post-petition debt. Thus, the pre-petition revolver is gradually "paid off" and replaced with the post-petition revolver – often before the final DIP hearing. Again, actual money rarely changes hands.

petition secured claim is paid through the issuance of new debt rather than from unencumbered cash.  For present purposes, however, there is no difference.  The point is that a pre-petition secured claim can be paid outside of a plan of reorganization.

158.    In addition, a secured creditor may be granted relief from the automatic stay to proceed against its collateral to satisfy its prepetition claim.  Section 362 the of the Bankruptcy Code specifically provides for stay relief both for "cause, including the lack of adequate protection of an interest in property "and if "(A) the debtor does not have equity in such property; and (B) such property is not necessary to effect of reorganization."  The effect of section 362(d) is, in a somewhat roundabout way, to allow for secured creditor to be paid on its prepetition claim in appropriate circumstances through taking possession of its collateral.  Moreover, the alternative to stay relief – providing adequate protection – may involve the payment of the claim to protect the secured creditor from diminution of the value of its collateral during the chapter 11 cases.  *See* 11 U.S.C. §§ 361, 363(e).

159.    Also, secured creditors are often paid in connection with a sale of all or substantially all of a debtor's assets under section 363 the Bankruptcy Code. A sale of assets under section 363 can be thought of as nothing more than conversion of assets from a "going concern" to cash.  After such a conversion or "liquidation" of a debtor's assets, one can argue that a motion for stay relief would almost certainly be granted to allow the secured creditor to proceed against the cash.  Rather than requiring the filing of a stay relief motion, the order approving the sale often allows for the immediate payment of all or part of the secured creditor's claim.

160.   These are just a few examples of ways in which a secured creditor may be paid all or part of its prepetition secured claim other than through a plan of reorganization. The point is that there is ample authority for such a payment. The question is whether making the payment is justified by the facts and circumstances of a particular case.

161.   Although the unsecured committees argued otherwise in their briefing and during the evidentiary portion of the hearing, they acknowledged as much in closing argument:

> THE COURT: You just put the rabbit in the hat by saying "under these circumstances." I think [Debtors' counsel] is responding to arguments that have been made which implied you can never pay a prepetition secured debt on a post-petition basis, other than through a plan. That's wrong.
>
> MR. BARR: Well, off in full? Not out of their own collateral?
>
> THE COURT: See, you're putting the rabbit in the hat again. That's different. He's . . . responding, I think fairly, to at least the implication in some of the papers from your side that say look, you can never pay a secured creditor its prepetition secured debt post-petition except through a plan. That's not true. Under certain circumstances and facts you can.
>
> MR. BARR: Correct, Your Honor.
>
> THE COURT: So the issue is does this meet the facts and circumstances where it would be appropriate.
>
> MR. BARR: Right.

H'rg. Tr. 1270:2-24.

162.   So, the court turns to whether the payment of the secured claims through the Settlement is appropriate in this case. It is true that this is a liquidating case where the settlement payment is being made from unencumbered cash and the unsecured creditors oppose the payment. This raises a number of concerns. For example, in such a case where it appears that the secured creditor is oversecured, the interests of unsecured creditors should be given particular weight. In doing so, however, the Court is not required to defer completely to the unsecured creditors' representatives. Rather, the Court must exercise its independent judgment to the issue before it.

163.   This Settlement certainly tests the limits of the authority to pay prepetition secured claims outside a plan.  Nonetheless, the Court finds that payment of the pre-petition secured claim in this instance does not violate the Bankruptcy Code.  A key element in the Court's ruling is its finding, based upon the evidence submitted at the Hearing, that the value of the collateral being left behind is well in excess of the unencumbered cash for which it is being swapped. In short, based upon the evidence adduced at the Hearing, the Court finds that the unsecured creditors are not harmed in any way by the Settlement. Indeed, just the opposite.

164.   For example, the evidence at the Hearing established that the Debtors currently pay 4.75% interest on the secured claims, while earning approximately 0.25% interest on their cash deposits.  Thus, the Debtors are experiencing a negative interest spread of approximately 4.5%.  Repayment of the secured claims will thus save the Debtors' estates in the range of $40 and $65 million, as the difference between interest charges saved as offset by the interest on deposits to be lost by using cash to complete

the Settlement.  The Settlement will also save the estates approximately $50 to $75 million in estimated litigation costs and expenses that would be incurred in litigating the avoidance actions and the oversecured status of the secured claims, and an estimated $60 to $70 million in professional fees and costs to be saved by an earlier emergence from bankruptcy under a settlement scenario.  The total savings of approximately $320 million places this Settlement at minimum above the lowest point in the range of litigation outcomes.  This Court also heard un-rebutted testimony that the Debtors will have sufficient cash to satisfy the secured claims (at the compromised amount), while continuing to operate their businesses, and to confirm chapter 11 plans. The Settlement provides both tangible and intangible benefits that flow directly to the unsecured creditors.

165.   Thus, the court finds, under the facts and circumstances of this case, that the payment of the secured lenders' prepetition claims under the Settlement is appropriate and authorized under the Bankruptcy Code.

### E.    SECTION 1129(A)(7) IS INAPPLICABLE TO THE SETTLEMENT

166.   As a matter of law, section 1129(a)(7) does not apply to the decision whether to approve a settlement outside of a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(7) ("The court shall confirm a *plan* only if all of the following requirements are met….") (emphasis added).  No party has cited any authority for such a proposition and it is rejected on its face.

167.   Significantly, approval of the Settlement outside a chapter 11 plan also does not deprive unsecured claimholders of any protection they have from section

1129(a)(7) if the Settlement were embodied in a chapter 11 plan.  The reason is that if a claim is settled in a chapter 11 plan, once the court determines that the settlement should be approved, the court will assume the same settlement would be made in chapter 7 for purposes of applying section 1129(a)(7).  *See In re Enron Corp.*, Ch. 11 Case No. 01-16034, 2004 Bankr. LEXIS 2549, at *117-20 (Bankr. S.D.N.Y. July 15, 2004) (observing that section 1129(a)(7) requires an "apples to apples" comparison that contains the same settlement, and "assuming common legal issues are resolved the same way [in chapter 7 and chapter 11]").

### F.    THE SETTLEMENT IS NOT AN IMPERMISSIBLE SUB ROSA PLAN

168.    A settlement constitutes a *sub rosa* plan when the settlement has the effect of dictating the terms of a prospective chapter 11 plan.  *See Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors & Debtors in Possession (In re Tower Auto. Inc.)*, 241 F.R.D. 162, 168 (S.D.N.Y. 2006).   To be found to dictate the terms of a plan, the settlement must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote.  *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 354-55 (5th Cir. 1997); *In re Tower Auto Inc.*, 241 F.R.D. at 169; *DeBenedictis v. Truesdell (In re Global Vision Prods., Inc.)*, No. 09 Cv. 347 (BSJ), 2009 U.S. Dist. LEXIS 64213, at *20 (S.D.N.Y. July 13, 2009).   Neither of these categories applies to the Settlement, and no evidence was adduced at the Settlement Hearing to support a contrary finding.

169.    Further, pre-confirmation approval of the Settlement does not deprive any party of critical protections in a chapter 11 confirmation process as the Settlement

could have been proposed in the context of a chapter 11 plan process, and the confirmation hearing would have been conducted (and the Settlement would have been considered) in exactly the same manner as it was at the Hearing.

170.   Moreover, the use of unencumbered cash to satisfy the secured claims is not improper, as unsecured claimholders do not have a right to any specific property to fund their recoveries.

171.   Also, the releases contained in the Settlement do not transform it into a *sub rosa* plan.  *See* Settlement Agreement at § 2.  Releases are a necessary and expected term in a settlement agreement, as the point of settlement is to finally and fully resolve outstanding disputes between the parties.  Without such releases, a settlement would be ineffective.  Additionally, the Settlement neither releases direct claims held by any third parties nor any claims held by the Debtors against their officers and directors.

## G.    THE SECURED CLAIMS ARE OVERSECURED UNDER SECTION 506(b) OF THE BANKRUPTCY CODE

172.   As stated in the Findings of Fact, the current value of the collateral exceeds the outstanding amount of the secured claims.  Accordingly, under section 506(b) of the Bankruptcy Code, the secured lenders are oversecured and entitled to interest and reasonable fees, costs, or charges provided under the Secured Credit Facility.

### H.   THE SETTLEMENT IS FAIR AND EQUITABLE, IS IN THE BEST INTEREST OF THE ESTATES, AND MEETS THE STANDARDS UNDER *MARTIN*

173.   Having discussed whether the Court **can** approve the settlement, we turn to the question of whether the Court **should** approve the settlement.

174.   Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  This Court may approve a settlement that is "fair and equitable." *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Nutraquest, Inc.*, 434 F.3d 639, 644, 646 (3d Cir. 2006); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

175.   In determining the fairness and equity of a compromise in bankruptcy, the Third Circuit requires a bankruptcy court to "apprise[] itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated, and estimate[ ] the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." *In re Penn Cent. Transp. Co.*, 596 F.2d 1127, 1146 (3d Cir. 1979); *see also In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) ("the ultimate inquiry … [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'") (quoting *In re Louise's Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).

176.   The court need not decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness.  *See In re W.T. Grant Co.*, 699 F.2d

599, 608 (2d Cir. 1983) (citing *Newan v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)); *see also In re World Health Alt., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) ("the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotation marks omitted); *In re Key3Media Grp.*, 336 B.R. 87, 92-93 (Bankr. D. Del. 2005) (citing *In re Jasmine, Ltd.*, 258 B.R. 119, 123 (D.N.J. 2000)); *Official Unsecured Creditors' Comm. of Pa. Truck Lines, Inc. v. Pa. Truck Lines, Inc. (In re Pa. Truck Lines, Inc.)*, 150 B.R. 595, 598 (E.D. Pa. 1992), *aff'd*, 8 F.3d 812 (3d Cir. 1993); *In re Grant Broad. of Phila., Inc.*, 71 B.R. 390, 396 (Bankr. E.D. Pa. 1987).

177.   In determining whether the Settlement is above the lowest point in the range of reasonableness, this Court must consider the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d at 393; *accord In re Nutraquest, Inc.*, 434 F.3d at 644-45.

178.   Subject to undertaking the inquiries described above, the decision to approve or deny a particular compromise or settlement involving a bankruptcy estate lies within the sound discretion of the court. *See In re World Health Alt.*, 344 B.R. at 296; *see also In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986); *Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994). In addition, the Court should exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *see also Martin*, 91 F.3d at 393;

*Shugrue*, 165 B.R. at 123 (noting that "the general rule [is] that settlements are favored and, in fact, encouraged by the approval process….").

179.    Pursuant to Bankruptcy Code section 544(b), New York law applies in analyzing aspects of the 2009 Transaction that relate back to 2006.  The transaction was negotiated and closed in New York, the secured and unsecured creditors' agents are located in New York, and the parties chose New York as the governing law.

180.    Under Bankruptcy Rule 9019(a), the Court is not required to conduct a full evidentiary hearing as a prerequisite to approving a compromise.  *Jasmine*, 258 B.R. at 123 (stating that when deciding whether to approve a proposed compromise in a bankruptcy, the court is not to conduct a "mini-trial on the merits") (citations omitted); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) (noting that the court "need not conduct a 'mini-trial' to determine the merits of the underlying litigation" being settled).   In this case, a substantial evidentiary record was presented by the Debtors that facilitates this Court's consideration of the issues and of the fairness and reasonableness of the Settlement.

*Probability of Success in Litigation*

181.  For the reasons stated below, based on the evidence adduced at the Hearing and this Court's Findings of Fact, the Debtors have demonstrated that an action against the secured lenders to avoid the liens or guaranties granted in the 2009 Transaction or to challenge the oversecured status of the secured claims is unlikely to succeed.  Liens were granted more than ninety days before the Petition Date, and the guaranties replaced guaranties issued in 2006 which did not harm any creditor of any

subsidiary because in 2006 CFGI could have paid in full in cash all its debt that was guaranteed.  This evidence, when compared with the expense, inconvenience, and delay inherent in litigating such disputes weighs in favor of approving the Settlement. The Settlement:  (a) provides a reasonable and substantial discount on the secured claims, (b) eliminates the cash drain on the estate that would result from protracted, hard-fought litigation, and likely delays in confirming plans for the Debtors or delays in distributions under those plans, including the incurrence of professional fees, and (c) will save the estates substantial interest charges on the secured claims.  The Settlement falls comfortably above the lowest point in the range of reasonableness.

182.   To prevail on a charge of constructive fraud under sections 544 or 548 of the Bankruptcy Code, a plaintiff must prove that (a) the debtor (i) was insolvent or rendered insolvent by the transaction, (ii) was left with an unreasonably small capital, or (iii) believed it would incur debts beyond its ability to pay, *and* (b) "fair consideration" or "a reasonably equivalent value" was lacking.  11 U.S.C. §§544(b), 548(a)(1); N.Y. Debt. & Cred. Law § 272.

183.   As to (a), above, the Debtors concede insolvency at the time of the closing of the 2009 Transaction.  But, the 2009 guaranties replaced guaranties issued in 2006. While the Debtors contend the replacement is reasonably equivalent value, the Official Committee contends the Court must consider the totality of the circumstances in 2009. Suffice it to say, there is considerable authority that the replacement of one guaranty by another constitutes reasonably equivalent value and the instances in which the appellate courts have looked to the totality of the circumstances are quite different than

the facts here.[16]   Therefore, it is reasonable for the Debtors to have settled on the assumption the substitution of the 2009 guaranties for the 2006 guaranties would be reasonably equivalent value.   Accordingly, the validity of the 2009 guaranties will turn on the validity of the 2006 guaranties.

184.   In the case of the 2009 Transaction, all proceeds of the secured Credit Facility were used to repay or prepay antecedent bank debt.   CFGI and the remaining Guarantors received in return for their new obligations and guaranties a reduction of their exposure of existing bank debt in an equivalent amount.   Accordingly, the economics of the 2009 Transaction were balance sheet neutral – collectively, the Debtors had no more debt following the transaction than they had before.

---

[16] Paying or collateralizing antecedent debt constitutes 'value' and 'fair consideration' under the Bankruptcy Code and New York law.  11 U.S.C. § 548(d)(2)(A) ("'value' means property, or satisfaction or securing of a present or antecedent debt"); N.Y. Debt. & Cred. Law § 272(b) (providing "fair consideration" includes securing antecedent debt, provided the debt is not "disproportionately small as compared with the value of the property, or obligation obtained."); *see also Official Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse (In re Champion Enters.)*, No. 09-14014, 2010 Bankr. LEXIS 2720, at *55-56 (Bankr. D. Del. Sept. 1, 2010); *Walker v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 89 (Bankr. D. Del. 2010) (Sontchi, J.) ("Courts have held that when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent.") (citing, *inter alia, In re APF Corp.*, 308 B.R. 183); *In re AppliedTheory Corp.*, 330 B.R. 362, 364 (S.D.N.Y. 2005) (satisfaction or securing of antecedent debt is fair consideration as a matter of law); *In re APF Corp.*, 308 B.R. at 187 (Trustee could not state § 548 constructive fraud claim because "the payments [made on the promissory note] were made for value … satisfaction of an antecedent debt[.]") (citations and internal quotation marks omitted); *Anand v. Nat'l Republic Bank of Chicago*, 239 B.R. 511, 517-18 (N.D. Ill. 1999) (affirming bankruptcy court finding following factual analysis that securing equivalent amount of antecedent debt in exchange for forbearance, among other things, constituted reasonably equivalent value); *B.Z. Corp. v. Cont'l Bank (In re B.Z. Corp.)*, 34 B.R. 546, 548 (Bankr. E.D. Pa. 1983) ("The loan payments made [by the debtor] are not avoidable since under § 548(d)(2)(A) the payments were made for value, *i.e.*, 'the satisfaction of … [an] antecedent debt of the debtor.'"); *see also In re Aphton Corp.*, 423 B.R. at 89 ("Courts have held that when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent.") (citing cases); *Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 249 (2d Cir. 1987) ("In general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an [insider] …."); *Rosen v. Gratton (In re Rosen Auto Leasing, Inc.)*, 346 B.R. 798, 805 (B.A.P. 8th Cir. 2006) ("For purposes of fraudulent transfer analysis, value includes the satisfaction of antecedent debt."); *Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 446 (Bankr. D. Del. 2005) (holding that overpayment of taxes due constituted reasonably equivalent value); *In re First Alliance Mortg. Co.*, 298 B.R. 652, 665-66 (C.D. Cal. 2003) ("Repayments of fully secured obligations … do not hinder, delay, or defraud creditors … and therefore cannot be fraudulent.").

185.    Based on the findings above, there is a high likelihood that CFI's issuance of its guaranty in 2006 would not be voidable because it appears no creditor of CFI or any other subsidiary guarantor could have been harmed by the 2006 guaranties of CFGI's bank debt.  Therefore, the benefits of the Settlement outweigh the probability of success on the avoidance actions.

186.    Further, the claims secured in the 2009 Transaction were not limited by the savings clauses contained in the 2006 Guarantees.  The 2006 Guarantees were likely not fraudulent transfers because no creditors were harmed, given that CFGI owned assets and businesses at the time which, if sold at fair market values, could have paid off all CFGI's debts.  Guarantees are contingent obligations and inchoate until a default by the principal obligor (*i.e.*, CFGI).  *See New York City Dep't of Fin. v. Twin Rivers, Inc.*, 920 F. Supp. 50, 52 (S.D.N.Y. 1996) ("A guaranty is a collateral promise to answer for the payment of a debt or obligation of another, in the event the first person liable to pay or perform the obligation fails."); *Michaels v. Chem. Bank*, 441 N.Y.S.2d 638, 640 (N.Y. Sup. Ct. 1981) ("A guaranty … is collateral, and only meaningful in relation to, the independent obligation to pay … of the primary obligor, and is contingent upon his default. … It is but an inchoate obligation since the condition precedent to its operation (*viz.*, default by the debtor) may never occur.") (emphasis added); *see also Robbins Int'l, Inc. v. Robbins MBW Corp. (In re Robbins Int'l, Inc.)*, 275 B.R. 456, 468 (S.D.N.Y. 2002) ("When a secondary obligor is bound to pay for the debt or answer for the default of the principal obligor to the obligee, the secondary obligor is said to have suretyship

status.") (internal quotation marks omitted) (citing *Chem. Bank v. Meltzer*, 712 N.E.2d 656, 660 (N.Y. 1999)).

187.   The Settlement on the assumption the 2006 guaranties were likely not voidable is also vindicated on other theories.   The well-settled jurisprudence shows that guarantees are liquidated based upon their probabilities of being called.  *See, e.g., Mellon Bank v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L. Inc.)*, 92 F.3d 139, 156 (3d Cir. 1996) (holding a contingent asset or liability must be valued to "take into consideration the likelihood of that event occurring from an objective standpoint."); *see also In re Hall*, 304 F.3d 743, 748 (7th Cir. 2002); *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 197-98 (3d Cir. 1998); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 199-200 (7th Cir. 1988); *cf. Mellon Bank v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1991) ("In valuing the cost of [the debtor's] guaranty, the right of contribution from co-guarantors needs to be balanced against the amount of debt for which [the debtor] is liable .… 'If there are multiple guarantors of the same obligation, the right of contribution entitles a paying guarantor to have its co-guarantors pay it their proportionate share of the principal debt it paid.'") (citations omitted).

188.   In light of the well-settled jurisprudence regarding the contingent nature of guarantees and the listing of the probability of the guarantees being called on the Debtors' balance sheet, the Official Committee's and Ad Hoc Unsecured Committee's arguments to the contrary do not appear to have plausible likelihood of success.

189. Based on the established facts surrounding the 2006 and 2009 Transactions, the elements of a constructively fraudulent transfer would be exceedingly difficult to establish by a preponderance of the evidence.  Accordingly, in weighing the Settlement against the Debtors' likelihood of prevailing against the secured lenders on a constructive fraudulent transfer charge, and taking into account the costs, risks, and uncertainty that would arise from denying the Settlement Motion in favor of pursuing litigation, the Court concludes the first prong of the *Martin* test weighs in favor of approving the Settlement.

190. The 2009 Transaction was not a preference within the meaning of Bankruptcy Code section 547(b) because more than 90 days had passed after the transaction and before Debtors commenced their chapter 11 cases.  A debtor may prefer one creditor over another without running afoul of the fraudulent conveyance laws.  *Champion Enters.*, 2010 Bankr. LEXIS, at *62; *Brown v. GE Capital Corp. (In re Foxmeyer Corp.)*, 296 B.R. 327, 337 (Bankr. D. Del. 2003) (analyzing both Bankruptcy Code section 548 and New York law); *see also In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 330 (Bankr. S.D.N.Y. 2001) ("If a debtor gives a mortgage to secure a debt it already has – an antecedent debt … the giving of that mortgage may be a preference, but it is not a fraudulent conveyance.").

191. Where a bona fide antecedent debt exists, a debtor's payment on account of that creditor's claim, even if it has the result of preferring that creditor over others, is not by itself a fraudulent transfer.  By extension, where payment on account of an antecedent debt can be made without running afoul of the fraudulent transfer laws, a

debtor may take the lesser step of granting an interest in collateral to secure an antecedent debt. *In re Champion Enters.*, 2010 Bankr. LEXIS 2720, at *55-56; *Nisselson v. Softbank Am Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 398-99 (Bankr. S.D.N.Y. 2007) (citing, *inter alia*, *Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*, No. 01 Civ. 6209 (DC), 2002 WL 31412465, at *6 (S.D.N.Y. 2002) (stating that debtor "received 'value' when its antecedent debt was extended and collateralized," and affirming dismissal of fraudulent transfer complaint where grant of collateral worth more than twice the value of the existing debt exchanged for forbearance and extension of existing loan because creditor could only collect against collateral up to the amount defaulted, remainder preserved by the debtor)); *Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 734 n.13 (Bankr. S.D.N.Y. 2008) ("[T]he delivery of collateral to secure a non-avoidable debt or obligation constitutes a transfer supported by 'fair consideration' that cannot be set aside under the NYDCL.") (citing *Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest. Inc.)*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006)).

*Likely Difficulties in Collection*

192.    The Court concludes there would be no difficulties in collection.

*Complexity, Expense, Inconvenience, and Delay*

193.    The complexity of the facts and law surrounding the 2009 Transaction (and, by extension, the 2006 and 2007 Transactions), and the related expense also strongly favors approval of the Settlement. The diversion of additional valuable time and resources to pursue the avoidance action, which, as set forth above, has low and

uncertain probabilities of success, will further deplete the Debtors' estates by material amounts in the tens of millions of dollars as a result of protracted and expensive costs of litigation, and the incurrence of additional costs that would be incurred in extending the duration of these chapter 11 cases.

*Paramount Interest of Creditors*

194.   The Debtors have satisfied this element of the *Martin* test by demonstrating the numerous tangible and intangible benefits provided by the Settlement.

195.   There is no *per se* rule that the views of a committee or other creditors are dispositive on the reasonableness of a settlement.  A *per se* rule would unduly expose the Debtors to the demands of creditors preferring to risk estate assets in a litigation lottery or litigate under blackmail or strong-arm strategies.  Instead, a debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the balance of the *Martin* factors, including the paramount interests of creditors, weighs in favor of settlement.  *See, e.g., In re Key3Media Grp., Inc.*, 336 B.R. at 97 (approving settlement of avoidance claims by debtor over objection of largest creditors in case and noting that while creditors' interests should be accorded proper deference, their objections "cannot be permitted to predominate over the best interests of the estates as whole"); *In re Matco Elecs. Grp., Inc.*, 287 B.R. 68, 77-79 (Bankr. N.D.N.Y. 2002) (finding that court could approve the debtor's settlement over the objection of the creditors' committee, but declining to do so because of "red flags" surrounding the settlement, including that debtor's officer who signed the settlement

was a shareholder of the settling counterparty, debtor's counsel had taken no part in the settlement, and all signatories had been granted releases for no consideration); *see also In re Sea Containers, Ltd.*, No. 06-11156 (KJC), 2008 WL 4296562, at *11 (Bankr. D. Del. Sept. 19, 2008) (approving settlement over objection of creditors most impacted by settlement where creditors failed to convince court "the settlement so affects their position as to be unfair.").

196.    The Official Committee and the Ad Hoc Unsecured Committee argue that the Settlement is not the paramount interests of creditors because it is the result of a flawed process in which the unsecured creditors did not participate. The Debtors counter that they kept the unsecured committees fully apprised of developments.

197.    There can be no question that the Official Committee and Ad Hoc Unsecured Committee did not substantively participate in the settlement negotiations. Those negotiations were primarily between the secured lenders and Debtors' counsel. Nonetheless, there is nothing in the record to reflect that anything untoward occurred. While it is certainly true that the settlement affects the Debtors' unsecured creditors, there is no requirement that those creditors be actively involved in the settlement negotiations. Certainly it is within the debtors prerogative to exclude them. Moreover, there is no support for the Official Committee's insinuation that the Debtors' professionals were conflicted in their negotiations with the secured lenders.

198.    Finally, the court disagrees with the assertion that the Settlement is unfair because the unsecured committees were not given a reasonable opportunity to prepare for the Hearing. The parties engaged in extensive discovery, albeit on an expedited

basis. Moreover, the Official Committee has had access to virtually all the information necessary to value the Pledge Pool for several months. That they chose not to perform a formal valuation of those assets during that time is neither a shortfall on their part nor a reason to delay the Hearing.

199.   In short, the Debtors engaged in arm's length good-faith negotiation with the secured lenders and the Official Committee and Ad Hoc Unsecured Committee were given appropriate notice and an ample opportunity to conduct discovery in preparation for the Hearing.

## I.      THE OFFICIAL COMMITTEE'S STANDING MOTION IS MOOT

200.   In light of the Court's ruling approving the Settlement, the Court determines the Official Committee's Standing Motion is moot.

## J.      CONCLUSION

201.   In sum, based on the established facts surrounding the 2006, 2007, and 2009 Transactions, and having applied the well-settled jurisprudence regarding whether the proposed Settlement satisfies the standard for approving settlements presented under Bankruptcy Rule 9019, the Court concludes the Settlement is (i) above the lowest point of the range of litigation outcomes, (ii) fair and reasonable, (iii) satisfies each element of the *Martin* test, and (iv) serves the best interests of the Debtors, their estates, and all parties in interest.  Accordingly, the Court will approve the Settlement Motion and will deny the Standing Motion as moot.

202.    Debtors' counsel is instructed to submit a proposed order under certification of counsel.


Dated: November 1, 2010

_____
CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE