IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------x
                                      :

*In re*                          :     **Chapter 11**
                                        :

**CAPMARK FINANCIAL GROUP INC.,** *et al.,*   :     **Case No. 09-13684 (CSS)**
                                        :

            **Debtors.**[1]              :     **Jointly Administered**
                                        :
                                        :     **Hearing Date: April 11, 2011 at 10:00 a.m.**
                                        :     **Objection Deadline: April 4, 2011 at 4:00 p.m.**
------------------------------------------------------------------x

**MOTION, PURSUANT TO SECTIONS 105(a), 363(b), AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, AND LOCAL RULES 2002-1 AND 6004-1, REQUESTING ENTRY OF TWO ORDERS IN CONNECTION WITH THE SALE OF CERTAIN EQUITY INTERESTS IN REAL ESTATE DEBT INVESTMENT ADVISORY GROUP BUSINESS (INCLUDING ASSUMPTION AND ASSIGNMENT OF CONTRACTS): (I) A BIDDING PROCEDURES ORDER (A) SCHEDULING AN AUCTION, (B) APPROVING BIDDING PROCEDURES, (C) APPROVING A TERMINATION FEE AND EXPENSE REIMBURSEMENT, (D) SCHEDULING A SALE HEARING, (E) ESTABLISHING AN OBJECTION DEADLINE, AND (F) APPROVING THE FORM AND MANNER OF THE NOTICE OF AUCTION AND SALE HEARING AND NOTICE OF ASSUMPTION AND**

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member IX, LLC (5452), Paramount Managing Member XI, LLC (5455), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XV, LLC (4192), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Broadway Street XVI, L.P. (7725), Broadway Street XVIII, L.P. (9799), Broadway Street Georgia I, LLC (9740), Capmark Managing Member 4.5 LLC (8979), Capmark Affordable Equity Inc. (2381), Capmark Investments LP (7999) and Protech Holdings C, LLC (7929)  CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania, 19044  The addresses for all of the Debtors are available at the following World Wide Web address: http://chapter11 epiqsystems com/capmark.

**ASSIGNMENT; AND (II) A SALE ORDER APPROVING THE SALE FREE AND
CLEAR OF ALL LIENS, ENCUMBRANCES, CLAIMS, AND INTERESTS**

Capmark Financial Group Inc. ("CFGI") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this motion (the "Motion") requesting entry of two orders in connection with the sale of certain Sale Assets (as defined below) constituting substantially all of the REDG Business (as defined below): (i) a bidding procedures order (a) scheduling an auction, (b) approving bidding procedures, (c) approving a termination fee and expense reimbursement, (d) scheduling a sale hearing, (e) establishing an objection deadline, and (f) approving the form and manner of the proposed notice of the auction and sale hearing and notice of assumption and assignment; and (ii) a sale order approving the sale of the Sale Assets free and clear of all liens, encumbrances, claims, and interests. In support of this Motion, the Debtors respectfully represent:

<u>Background</u>

1.      On October 25, 2009 (the "Commencement Date"), each of the Debtors other than Capmark Investments LP and Protech Holdings C, LLC (collectively, the "First Filed Debtors") commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On January 15, 2010, Capmark Investments LP ("CILP"), a wholly-owned subsidiary of CFGI, commenced a voluntary case under chapter 11 of the Bankruptcy Code. On July 29, 2010, Protech Holdings C, LLC ("Protech C"), a limited liability company indirectly held by Debtor Capmark Affordable Equity Holdings Inc., commenced a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code.

2

2.    On October 27, 2009, this Court entered an order authorizing the joint administration of the First Filed Debtors' chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). On January 19, 2010, this Court entered an order authorizing the joint administration of CILP's chapter 11 case with the jointly administered chapter 11 cases of the First Filed Debtors. On February 19, 2010, this Court entered an order authorizing the application to CILP of any and all generally applicable orders previously entered in the First Filed Debtors' cases. On August 16, 2010, this Court entered an order authorizing the application to Protech C of any and all generally applicable orders previously entered in these chapter 11 cases. On August 17, 2010, this Court entered an order authorizing the joint administration of Protech C's chapter 11 case with the chapter 11 cases of all other Debtors.

3.    On November 2, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed a statutory unsecured creditors' committee pursuant to section 1102 of the Bankruptcy Code (the "Committee").

## Jurisdiction and Venue

4.    This Court has jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Capmark's Businesses

5.    The Debtors and their non-debtor subsidiaries and affiliates (together with the Debtors, "Capmark") are a group of commercial real estate finance companies that provide real estate-related products and services to borrowers, investors, and other customers along three

3

core business lines: (i) commercial real estate lending and mortgage banking; (ii) investments

and funds management; and (iii) commercial loan servicing.[2]

6.    A detailed description of Capmark's business, capital structure, and the

events leading to the commencement of these chapter 11 cases is contained in the *Declaration of*

*Thomas L. Fairfield, Executive Vice President, General Counsel and Secretary of CFGI, in*

*Support of the Debtors' Chapter 11 Petitions and First Day Motions and Applications*, filed on

the Commencement Date [Docket No. 13].

## Relief Requested

7.    By this Motion, pursuant to sections 105(a), 363(b), and 365 of the

Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002-1 and

6004-1, the Debtors request entry of two orders:

(i)    a bidding procedures order (the "Bidding Procedures Order"), substantially in the
form attached hereto as Exhibit A,

    (a)    scheduling a hearing (the "Sale Hearing") to consider approval of the
proposed sale (the "Sale") of certain Sale Assets (including the assumption
and assignment of certain contracts) by CILP and Capmark Finance Inc.
("CFI", and together with CILP, the "Sellers") to PCCP Pool I, LLC (the
"Buyer"), or another Successful Bidder (as defined below) pursuant to that
certain Purchase Agreement, dated as of March 15, 2011, between the
Sellers and the Buyer (the "Sale Agreement"), attached hereto as
Exhibit C;[3]

    (b)    establishing the objection deadline in connection with the proposed Sale;

    (c)    approving the form of, and notice procedures relating to, the Notice of
Auction and Sale Hearing and the Notice of Assumption and Assignment
(each as defined below);

---

[2] Pursuant to an order of this Court dated November 24, 2009, the Debtors were authorized to sell all of
their commercial mortgage banking and mortgage servicing assets to Berkadia Commercial Mortgage LLC, which
sale closed December 11, 2009.

[3] The schedules to the copy of the Sale Agreement attached to this Motion contain redactions because
certain information in the schedules is of a confidential and commercially sensitive nature. Concurrently herewith,
the Debtors filed a motion seeking authority to file the unredacted schedules under seal.

(d)    scheduling an auction (the "<u>Auction</u>") to the extent that the Sellers receive additional higher and/or otherwise better offers for the Sale Assets;

(e)    approving the bidding procedures (the "<u>Bidding Procedures</u>") set forth in the Bidding Procedures Order; and

(f)    approving the Termination Fee and Expense Reimbursement (each as defined below) provided for in the Sale Agreement; and

(ii)    upon completion of the Sale Hearing, an order (the "<u>Sale Order</u>"), substantially in the form attached hereto as <u>Exhibit B</u>,

(a)    if no higher and/or otherwise better offers have been received, approving the Sellers' entry into the Sale Agreement without the necessity of conducting an Auction; or

(b)    if a higher and/or otherwise better offer is received for the Sale Assets, and therefore, an Auction is held, authorizing the Sale of the Sale Assets to the Buyer, or to another Successful Bidder, at an Auction, in each case, free and clear of any and all liens, encumbrances, claims, and interests of any kind, nature or description (collectively, the "<u>Liens</u>"), pursuant to section 363(f) of the Bankruptcy Code, pursuant to the Sale Agreement, or a Modified Sale Agreement (as defined below).

## The Sale Assets

8.    As part of its business operations, Debtor CILP has historically managed a non-debtor private real estate debt investment fund, Capmark Structured Real Estate Partners L.P. (the "<u>Fund</u>"). The Fund commenced operations in August 2006 as CILP's exclusive vehicle for investing in U.S. debt related real estate investments, including mortgage loans and securities, opportunistic loans, and high yield commercial mortgage backed securities. As of December 31, 2010, the Fund has called capital contributions of $1.06 billion of equity from and has distributed $102.7 million in cash to the Fund limited partners. Capmark Structured GP, L.P., a Delaware limited partnership and non-debtor affiliate of CILP (the "<u>Capmark General Partner</u>") is the general partner of and owns a limited partnership interest under a Partnership Agreement that governs the Fund. Capmark Investments Structured Fund GP LLC, a Delaware limited liability company (the "<u>Company</u>"), is the sole general partner of the Capmark General

5

Partner. CILP owns the sole membership interest in the Company (the "Company Membership Interest"). Debtor CFI owns the sole limited partner interest in the Capmark General Partner (the "LP Interest").

9.    Additionally, the Fund and non-debtor Capmark Structured Real Estate REIT, Inc. (the "REIT") are parties to separate Investment Management Agreements with CILP, both of which are dated as of September 27, 2006 (together, the "Purchased Contracts," as defined in the Sale Agreement), pursuant to which the Fund or the REIT, as the case may be, has engaged CILP as its investment manager with respect to the acquisition, management, and disposition of investments for the Fund and its subsidiaries, or the REIT and its subsidiaries, as the case may be.[4]

10.    The Sellers' respective (i) rights and obligations under the Purchased Contracts, (ii) the Company Membership Interest, and (iii) LP Interest, as applicable, are hereinafter collectively referred to as the "Sale Assets." The Sale of the Sale Assets will dispose of all of the Sellers' assets in the real estate debt investment advisory group business (the "REDG Business").

11.    The Sellers submit that the decision to sell their assets in the REDG Business is based upon their sound business judgment and should be approved. Both before and after the Commencement Date, the Debtors have worked diligently to explore alternatives to sell certain of their business assets where such sales would provide greater value to their estates,

---

[4]    Urdang Capital Management, Inc. (the "Subadvisor") and CILP are party to that certain Master Subadvisory Agreement (the "Subadvisory Agreement"), dated as of September 30, 2009. Pursuant to the Subadvisory Agreement, the Subadvisor has agreed to, among other things, provide subadvisory services to CILP related to, among other things, asset management services, investment entity management, investor reporting and communications, and accounting and cash management. In addition, pursuant to the Subadvisory Agreement, the Subadvisor had certain rights of first refusal with respect to the sale and transfer of the Capmark General Partner's general partnership interest in the Fund and CILP's interests in the Investment Management Agreements, which rights the Debtors believe were satisfied in the initial phase of the bidding process.

relieve the Debtors of ongoing operational expenses, as well as mitigate any potential liability.[5] Due to the Sellers' financial difficulties, the third party investors in the Fund have stated a strong preference that the REDG Business be sold as soon as possible to minimize interruption to the active management required of the Fund's portfolio. In light of the foregoing, the Sellers, in consultation with their professionals, do not believe continued ownership of the REDG Business is in the best interests of the Sellers' estates. If no timely, conforming Qualifying Bids other than the Sale Agreement are submitted by the Bid Deadline (each as defined below), the Sellers believe the prompt Sale of the REDG Business to the Buyer without an Auction and without further delay presents the best opportunity to maximize and preserve value for their estates. The Sellers believe that extensive marketing efforts, arm's length negotiations with the Buyer, consultation with the Fund's limited partner advisory board, and the proposed Bidding Procedures together will achieve the best results for their estates and maximize value for all parties in interest.

## Summary of the Sale Agreement[6]

12.     The Sale Agreement provides that the Sale of the Sale Assets is subject to higher and/or better offers from competing bidders. The principal terms and conditions of the Sale Agreement are as follows:

(i)     **Purchase Price.** The purchase price for the Sale of the Sale Assets (the "Purchase Price") is $7,550,000 less the sum of (a) a $377,500 deposit (the "Deposit") and (b) the amount of any distributions paid to the Capmark General Partner, as general partner or as limited partner of the Fund after the date of the Sale Agreement but prior to Closing.

---

[5] Pursuant to an order of this Court dated March 4, 2010, the Debtors were authorized to sell all of their real estate *equity* investment advisory group business to TRECAP Partners, LLC, which sale closed on March 19, 2010.

[6] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Agreement. To the extent there are any inconsistencies between the summary description contained herein and the terms and conditions of the Sale Agreement, the terms of the Sale Agreement control.

(ii)    **Termination Fee and Expense Reimbursement**.  In the event that (a) the Sale Agreement is terminated under certain circumstances, (b) the Buyer is not then in default under the Sale Agreement, and (c) an Alternative Transaction closes within six months of such termination, the Buyer is entitled to a break-up fee in cash of 2.5% of the Purchase Price (the "Termination Fee") and the aggregate amount of the Buyer's reasonable fees and expenses incurred in connection with its evaluation, consideration, and negotiation of the transaction with the Sellers, supported by an appropriate invoice (the "Expense Reimbursement"); *provided, however*, that in no event shall the sum of the Termination Fee and the Expense Reimbursement exceed 3% of the Purchase Price.  The Expense Reimbursement shall constitute an administrative expense claim in the Sellers' chapter 11 cases pursuant to sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code.

(iii)   **No Sale of Individual Assets**.  The Sale Agreement provides that the proposed Sale is an integrated transaction and that no Sale Asset will be sold individually.

(iv)    **Termination of the Sale Agreement**.  The Sale Agreement may be terminated prior to Closing under the following circumstances:

(a)    Mutual Written Consent.  The Sale Agreement may be terminated by mutual written consent of the Sellers and the Buyer.

(b)    Termination by the Sellers or the Buyer.  At any time prior to Closing, either the Sellers or the Buyer may terminate the Sale Agreement if:

(1)    the Bidding Procedures Order is not entered by the later of (a) twenty (20) days after the filing of this Motion and (b) the next omnibus hearing date following the filing of this Motion;

(2)    the Auction has not occurred on or before the date that is fifty (50) days from the date of the Sale Agreement (unless the Auction is not held because no other Qualifying Bids have been received); *provided, however*, that a party may only terminate the Sale Agreement for failure of the Auction occurring if it is not in material breach of its representations, warranties, covenants, or agreements;

(3)    the Closing has not occurred on or before the date that is seventy (70) days from the date of the Sale Agreement (the "Drop Dead Date"); *provided, however*, that a party may only terminate the Sale Agreement if Closing does not occur on or before the Drop Dead Date and the party is not in material breach of its representations, warranties, covenants, or agreements;

(4)    the Court enters an order authorizing or approving an Alternative Transaction, the Buyer is the Back-Up Bidder, and the Alternative Transaction has not occurred on or before the Drop Dead Date;

(5)    the Court enters an order authorizing or approving an Alternative Transaction and the Buyer is not the Back-Up Bidder; or

(6)    the Court does not enter a Sale Order by the Drop Dead Date; *provided, however*, that a party may only terminate the Sale Agreement if the Sale Order is not entered by the Drop Dead Date and the party is not in material breach of its representations, warranties, covenants, or agreements.

(c)    <u>Termination by the Sellers</u>.    The Sellers may terminate the Sale Agreement by notice to the Buyer in the event of a material breach by the Buyer of the Buyer's representations, warranties, covenants, or agreements, which breach would result in a failure to satisfy the Sale Agreement's conditions to Closing by the Drop Dead Date, unless such breach by the Buyer is capable of being cured and is cured within the earlier of thirty (30) days following such notice of breach and the Drop Dead Date; *provided*, that nothing shall restrict the Sellers from terminating the Sale Agreement immediately upon notice to the Buyer if such breach is not capable of being cured.

(d)    <u>Termination by the Buyer</u>.  The Buyer may terminate the Sale Agreement by notice to the Sellers in the event of a material breach by the Sellers of their representations, warranties, covenants, or agreements, which breach would result in a failure to satisfy the Sale Agreement's conditions to Closing by the Drop Dead Date, unless such breach by the Sellers is capable of being cured and is cured within the earlier of thirty (30) days following such notice of breach and the Drop Dead Date.

13.    In addition to the above-described salient features of the Sale Agreement, in accordance with Local Rule 6004-1(b)(iv), the Debtors note the following with respect to the Sale Agreement:

(i)    **No Sale to an Insider**:  The Buyer is not an insider of the Debtors within the meaning set forth in section 101(31) of the Bankruptcy Code.

(ii)    **Agreements with Management**:  The Buyer has not discussed or entered into any agreements with management or key employees regarding compensation or future employment.

(iii)    **Releases**: No releases have been entered into in connection with the Sale.

(iv)    **No Private Sale/No Competitive Bidding**:  As described above, the Sellers intend to conduct an Auction for the Sale of the Sale Assets.  The Sale Agreement does not prohibit the Sellers from soliciting competing offers and the Sellers are not otherwise limited in shopping the Sale Assets; *provided, however*, that such

solicitation shall be in accordance with the procedures set forth in the Bidding Procedures Order once entered on the Court's docket.

(v)     **Closing and Other Deadlines (Closing and Closing Date)**: Pursuant to Section 2.6 of the Sale Agreement, closing (the "Closing") is scheduled to occur on the date that is three (3) Business Days after the conditions to Closing set forth in Article 6 of the Sale Agreement have been satisfied or waived, which date shall be on or before the Drop Dead Date.

(vi)    **Deposit**: Pursuant to Section 2.5 of the Sale Agreement, the Buyer is required to submit a Deposit of $377,500. Further, the Bidding Procedures Order requires other bidders to submit a good faith deposit of ten percent (10%) of the amount offered to purchase the Sale Assets.

(vii)   **Interim Arrangements with the Buyer**: Pursuant to Section 5.14 of the Sale Agreement, the Buyer and the Sellers agreed to cooperate with each other and provide information and reasonable access to relevant books and records, as may be necessary or desirable in connection with the preparation of financial statements of the Buyer, the Sellers, or their affiliates and/or the preparation of any audit report in respect thereof.

(viii)  **Use of Proceeds**: No provision of the Sale Agreement addresses the use of proceeds.

(ix)    **Tax Exemption**: No provision of the Sale Agreement addresses the use of tax exemptions.

(x)     **Record Retention**: The Sellers are not selling substantially all of their assets under the Sale Agreement. The Sellers will thus retain, or have reasonable access to, their books and records to enable them to administer their chapter 11 cases following the Sale. Moreover, Section 5.14 of the Sale Agreement provides that the Buyers and Sellers will cooperate with in providing information and reasonable access to relevant books and records relating to the Fund and the REDG Business and otherwise, as may be necessary or desirable in connection with the preparation of financial statements of Buyer, Sellers and/or their respective affiliates and/or the preparation of any audit report in respect thereof.

(xi)    **Sale of Avoidance Actions**: The Sale Agreement does not involve the sale of, or impose limitations on, any chapter 5 cause of action.

(xii)   **Requested Findings as to Successor Liability**: A condition to Closing is entry of the Sale Order, which provides that the Buyer, under no circumstances, shall be deemed to be a successor of either Seller.

(xiii)  **Sale Free and Clear of Unexpired Leases**: Pursuant to Section 2.1 of the Sale Agreement, the Buyer acquires the Sale Assets free and clear of all Encumbrances, which term includes any leases given for the purposes of security.

10

(xiv)  **Credit Bid**:  The Sale Assets are unencumbered by any Lien, mortgage, or other security interest.  Accordingly, there will be no credit bidding pursuant to section 363(k) of the Bankruptcy Code.

(xv)  **Relief from Bankruptcy Rule 6004(h) and 6006(d)**:  The Debtors are requesting relief from the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

### Bidding Procedures and the Auction

14.    As noted above, to maximize the value of the Sale Assets, the Sellers seek to conduct a competitive bidding process pursuant to the Sale Agreement, subject to higher or better offers.  The proposed Bidding Procedures are set forth below (the Sellers, in their sole discretion, may modify, amend, and waive, as applicable, the Bidding Procedures after consultation with the Committee):

(i)  **Assets to Be Sold**:  The Auction shall consist of all of the Sale Assets collectively in an integrated transaction and shall not involve the sale of any individual Sale Asset.

(ii)  **Confidentiality Agreements**:  Upon execution of a confidentiality agreement, in form and substance satisfactory to the Sellers, any party that wishes to conduct due diligence in respect of the Sale Assets may be granted access to all material information that has previously been provided to (or is simultaneously provided to) the Buyer and other bidders; *provided*, *however*, prior to receipt by a party of any information from the Sellers (including, but not limited to, the Sale Agreement and its schedules and exhibits, business and financial information and access to representatives of the Sellers), each such party will be required to deliver evidence reasonably satisfactory to the Sellers establishing such party's financial capability to timely consummate a purchase of all of the Sale Assets.  In any event, the Buyer shall be provided access to all due diligence materials, management presentations and other information provided to any potential bidder hereunder that were not previously made available to the Buyer at the same time such access is provided to such other potential bidder.  The availability of additional due diligence shall cease on the date of the Auction.

(iii)  **Bid Deadline**:  Any person or entity interested in participating in the Auction must submit a Qualifying Bid (as defined below) by 2:00 p.m. (prevailing Eastern Time) on April 22, 2011 (the "Bid Deadline"), in writing, to (a) counsel to the Sellers, Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York 10019, Attention:  Michael P. Kessler, Esq. and Judy G.Z. Liu, Esq., (b) Capmark Investments LP, 116 Welsh Road, Horsham, Pennsylvania 19044, Attention:  Alyssa Brodzinski, (c) Capmark Finance Inc., 116 Welsh Road, Horsham, Pennsylvania 19044, Attention: Thomas L. Fairfield, General Counsel,

11

(d) counsel to the Committee, Kramer Levin Naftalis and Frankel, LLP, 1177 Avenue of the Americas, New York, New York 10036; Attention: Thomas Moers Mayer, Esq. and Joshua Brody, Esq., (e) PCCP Pool I, LLC, 222 North Sepulveda Blvd., Suite 2222, El Segundo, California 90245, Attention: William R. Lindsay, and (f) counsel to the Buyer, Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, California 90071, Attention: Jennifer Bellah Maguire, Esq. and Oscar Garza, Esq. The Bid Deadline may be extended or otherwise modified by the Sellers in their sole discretion after consultation with the Committee; *provided, however*, that the Sellers shall notify the Buyer if such Bid Deadline is extended more than three (3) Business Days; *provided, further*, that once the Bid Deadline (as the same may have been theretofore extended or modified from time to time) has expired, the Sellers may not then establish a new Bid Deadline without the consent of Buyer.

(iv)    **Qualifying Bids**:    Only the Qualifying Bidders (as defined below) may participate in the bidding process. In order to be deemed a "Qualifying Bidder" each potential bidder (other than the Buyer) must submit a "Qualifying Bid" by the Bid Deadline. The Sale Agreement is deemed a Qualifying Bid and the Buyer is deemed a Qualifying Bidder. Otherwise, to constitute a Qualifying Bid, a bid must:

(a)    be in writing and state that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of all the Sale Assets on terms and conditions no less favorable to the Sellers than the terms and conditions contained in the Sale Agreement;

(b)    include a mark-up of the Sale Agreement (the "Modified Sale Agreement") reflecting the variations from the Sale Agreement, and a clean and executed Modified Sale Agreement, together with all exhibits and schedules thereto, and other ancillary agreements described in the Modified Sale Agreement; *provided*, that the management fees and each of the other terms set forth in Annex A to the Modified Sale Agreement may not be any less favorable to the Limited Partners (as defined in the Partnership Agreement) of the Fund, in the aggregate, than the management fees and each of the other terms set forth in Annex A to the Sale Agreement;

(c)    otherwise include terms and conditions substantially the same in all respects to the Sale Agreement (including with respect to the representations and warranties);

(d)    include an acknowledgement or letter that such bidder's offer is irrevocable until the closing of the purchase of the Sale Assets if such bidder is a Successful Bidder or the Back-Up Bidder (each as defined below);

(e)   be for all of the Sale Assets and not individual Sale Assets, and provide that such bidder will close on the sale of all of the Sale Assets within the same time period provided for in the Sale Agreement;

(f)   provide for the immediate payment of the Termination Fee and the Expense Reimbursement in cash[7] upon consummation of an Alternative Transaction out of the proceeds of a sale of any of the Sale Assets to a Person other than the Buyer and/or its Affiliates in accordance with the Sale Agreement;

(g)   include evidence, in form and substance satisfactory to the Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Sale Agreement;

(h)   exceed the Purchase Price in the Sale Agreement by an initial bid of at least $75,000 plus the amounts of the Termination Fee and the Expense Reimbursement, which bid must be in cash;[8]

(i)   to the extent not previously provided during the bidding process, include a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction pursuant to the Modified Sale Agreement (including current audited financial statements and latest unaudited financial statements), that will allow the Sellers to make a reasonable determination as to the bidder's financial wherewithal and other capabilities to consummate the transactions contemplated by the Modified Sale Agreement;

(j)   not request or entitle the bidder to any transaction or break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement;

(k)   not contain any due diligence or financing contingencies of any kind or any conditions precedent to such bidder's obligation to purchase the Sale Assets other than conditions set forth in the Sale Agreement;

(l)   include full disclosure regarding the identity of each entity that will be bidding for the Sale Assets or otherwise participating in connection with the offer and the names and contact information of members of the bidder who will be available to answer questions regarding the offer;

---

[7]   The Sale Agreement provides that such aggregate payment of both the Termination Fee and the Expense Reimbursement shall not exceed 3% of the Purchase Price

[8]   For example, assuming the Termination Fee and Expense Reimbursement equal 3% of the Purchase Price, then the initial bid must be at least $7,851,500, which equals the sum of (i) the Purchase Price of $7,550,000, (ii) $226,500 (3% of the Purchase Price of $7,550,000), and (iii) $75,000 (the minimum bid increment)

(m)    include the names of external advisors to the bidder, including financial, legal, and accounting firms, as well as industry consultants or other resources;

(n)    include any other information or factors that may be relevant to or reasonably requested by the Sellers and their advisors in consideration of the bid;

(o)    include a cash deposit in United States Dollars by wire transfer equal to ten percent (10%) of the amount offered to purchase the Sale Assets (the "Good Faith Deposit"); and

(p)    be received on or before the Bid Deadline.

The Sellers shall make a determination regarding whether a bid is a Qualifying Bid, after consultation with the Committee, and shall notify the bidders as to whether their bids have been determined to be Qualifying Bids by no later than April 25, 2011, at 5:00 p.m. (prevailing Eastern Time). Promptly following receipt, the Sellers shall deliver written copies of all Qualifying Bids along with all materials required under section 2(d) of the Bidding Procedures Order to the Buyer's counsel, Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, California 90071, Attention: Jennifer Bellah Maguire, Esq. and Oscar Garza, Esq.

(v)    **No Qualifying Bids**: If no timely, conforming Qualifying Bid, other than the Sale Agreement, is submitted by the Bid Deadline, the Sellers shall not hold an Auction and, instead, shall request at the Sale Hearing that the Court approve the Sale Agreement with the Buyer.

(vi)    **Right to Disseminate Information Relating to Bids**: At any time, whether before or after the Auction, the Sellers may share or not share, after consultation with the Committee, the details of any Qualifying Bid for the Sale Assets with the other bidders.

(vii)    **Auction**: In the event the Sellers timely receive one or more Qualifying Bids in addition to the Sale Agreement, they shall conduct the Auction with respect to the Sale Assets. The Auction will be conducted at the offices of Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York 10019, on April 26, 2011, at 11:00 a.m. (prevailing Eastern Time), or such other location in New York County, New York as designated by the Sellers in a timely notice to all the Qualifying Bidders. The Auction shall be governed by the following procedures (which may be amended, modified, and waived, as applicable, by the Sellers at any time in their sole discretion after consultation with the Committee; provided that no such modification, amendment, or waiver may modify, amend, or waive the terms and conditions of the Sale Agreement without the consent of the Buyer):

(a)     The Buyer and the other Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

(b)     Only representatives of the Sellers, the Buyer, the other Qualifying Bidders, counsel and other advisors selected by the Committee, and representatives from the U.S. Trustee, shall be entitled to be present at the Auction;

(c)     The Auction process shall be transcribed by a qualified court reporter, unless otherwise provided herein;

(d)     Only the Buyer and the other Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

(e)     Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

(f)     As soon as practicable prior to the Auction, the Sellers will provide copies of the Qualifying Bid which the Sellers believe, in their reasonable business judgment, is the highest or otherwise best offer, which shall include cash consideration in excess of the Purchase Price under the Sale Agreement at least equal to the Termination Fee plus the Expense Reimbursement plus $75,000 (the "Initial Highest Bid") to the Buyer and the other Qualifying Bidders which have informed the Sellers of their intent to participate in the Auction;[9]

(g)     Bidding shall commence the Auction at the amount of the Initial Highest Bid;

(h)     Qualifying Bidders may submit subsequent bids to the Initial Highest Bid and all such subsequent bids must be at least $75,000 higher in cash purchase price consideration than the previous bid. The Sellers shall credit the amount of the Termination Fee and the Expense Reimbursement to each and every bid submitted by the Buyer at the Auction, meaning that if the Buyer's subsequent bid is the then highest and best bid at the Auction, any subsequent bid must exceed the Buyer's bid in cash purchase price consideration by the sum of the amount of the Termination Fee plus the Expense Reimbursement plus $75,000;[10]

---

[9] For example, assuming the Termination Fee and Expense Reimbursement equal 3% of the Purchase Price, then the initial bid must be at least $7,851,500, which equals the sum of (i) the Purchase Price of $7,550,000, (ii) $226,500 (3% of the Purchase Price of $7,550,000), and (iii) $75,000 (the minimum bid increment)

[10] For example, assuming the Termination Fee and Expense Reimbursement equal 3% of the Purchase Price, then the initial bid must be at least $7,851,500. Any subsequent bid must be for at least $7,926,500 in cash (i.e., the initial bid of $7,851,500 plus the minimum bid increment of $75,000) If the Buyer were to submit such bid for $7,926,500, any subsequent bidder would need to bid at least $8,228,000 in cash to be considered to have

15

(i)     The Sellers may determine, in consultation with the Committee, the order in which Qualifying Bids will be submitted and may modify the ordering of the Qualifying Bids at any time;

(j)     All Qualifying Bidders shall be able to submit additional bids and make additional modifications to the Sale Agreement or Modified Sale Agreements, as applicable, at the Auction; *provided*, that the management fees and each of the other terms set forth in <u>Exhibit D</u> to the Modified Sale Agreement may not be any less favorable to the Limited Partners (as defined in the Partnership Agreement) of the Fund than the management fees and each of the other terms set forth in <u>Exhibit D</u> to the Sale Agreement;

(k)     The Auction may include individual negotiations with the Qualifying Bidders and the Buyer and/or open bidding in the presence of all other Qualifying Bidders and the Buyer; *provided*, *however*, all material terms of each subsequent bid will be fully disclosed to all bidders throughout the Auction;

(l)     Consistent with the conduct of the Auction in subsection (k) above, the Sellers may conduct, at the Sellers' sole discretion after consultation with the Committee, portions of their negotiations with any Qualified Bidder without having such negotiations transcribed;

(m)     The Auction shall continue until there is only one offer that the Sellers determine, after consultation with the Committee and subject to Court approval, is the highest and/or otherwise best offer from among the Qualifying Bidders and the Buyer submitted at the Auction for the Sale Assets (the "<u>Successful Bid</u>"). In making this decision, the Sellers shall consider any factors they deem relevant, including, without limitation, the amount of the purchase price, the Termination Fee, the Expense Reimbursement, the form of consideration being offered, the likelihood of a Qualifying Bidder's ability to close a transaction and the timing thereof, the ability of a Qualifying Bidder to obtain Approvals and Permits, the number, type and nature of any changes to the Sale Agreement requested by a Qualifying Bidder, any contingencies relating to a Qualifying Bidder's offer, and the net benefit to the Sellers' estates. The Buyer or the Qualifying Bidder submitting such Successful Bid shall become the "<u>Successful Bidder</u>" and shall have such rights and responsibilities of a purchaser, as set forth in the Sale Agreement or Modified Sale Agreement, as applicable;

---

submitted the highest bid (*i e* , (i) $7,926,500 (the amount of the previous bid), plus (ii) 75,000 (the minimum bid increment), plus (iii) $226,500 (the amount of the Termination Fee and Expense Reimbursement)).

(n) Within three (3) days after conclusion of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments, or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities; and

(o) Bids made after the close of the Auction shall not be considered by the Sellers.

(viii) **Back-Up Bidder and Return of Good Faith Deposits**:

(a) If an Auction is conducted in which a Qualifying Bidder submits the highest and/or otherwise best Qualifying Bid for all of the Sale Assets, the Qualifying Bidder with the next highest and/or otherwise best Qualifying Bid for all of the Sale Assets, as determined by the Sellers at the Auction in the exercise of their business judgment and in consultation with the Committee, shall be required to serve as the back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until the earlier of (i) 24 hours after the closing of the Sale transaction with the Successful Bidder, or (ii) the Drop Dead Date or any other outside closing date or termination date in the Sale Agreement or Modified Sale Agreement. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Sellers will be authorized, but not required, to consummate the Sale with the Back-Up Bidder without further order of the Court.

(b) Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Sellers as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) Business Day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall be held by the Sellers until the earlier of (i) one (1) Business Day after the closing of the Sale transaction with the Successful Bidder for the Sale Assets, or (ii) the date of any termination of the Sale Agreement or Modified Sale Agreement of the Back-Up Bidder.

15. In accordance with Local Rule 6004-1(c)(i), the Debtors note the following with respect to the Auction and the Bidding Procedures:

(i) **Provisions Governing Qualifications of Bidders and Qualified Bids**: *See* preceding paragraph 14(iv).

(ii)    **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**:

    (a)    No Shop or No-Solicitation Provisions:  The Bidding Procedures do not include a provision limiting the Sellers' ability to solicit higher or otherwise better bids.

    (b)    Break-Up/Topping Fees and Expense Reimbursement:  *See* preceding paragraph 14(ii); and Section 8.1(a) of the Sale Agreement.

    (c)    Bidding Increments:  *See* preceding paragraph 14(vii)(f)-(h).

    (d)    Treatment of Break-Up or Topping Fees and Expense Reimbursement at Auction:  *See* preceding paragraphs 14(iv)-(vii)(h).

(iii)   **Modification of Bidding and Auction Procedures**:  See preceding paragraphs 14 and 14(vii), relating to the modification of Bidding Procedures and Auction procedures, respectively, by the Seller following consultation with the Committee.

(iv)    **Closing with Alternative Backup Bidder**:  *See* preceding paragraph 14(viii)(a).

### Approval of the Bidding Procedures and the Auction

16.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction.  The Sellers believe the Sale of the Sale Assets pursuant to a public auction governed by the proposed Bidding Procedures will maximize the sale proceeds received by the Sellers' estates, which is the paramount goal in any proposed sale of property of the estate. *In re Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS 2764, at *253 (Bankr. D. Del. Aug. 15, 2007) ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate") (citations omitted).

17.    The Bidding Procedures allow the Sellers to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood the Sellers will receive the best possible consideration for the Sale Assets.  Bidding procedures should be approved when they provide a benefit to debtors' estates by maximizing asset values and enhancing competitive bidding. *Id.* (citing

18

*Calpine Corp. v. O'Brien Env't Energy, Inc.*, 181 F.3d 527, 535-37 (3d Cir. 1999)); *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-08 (3d Cir. 2010).  The Sellers believe the proposed Bidding Procedures are consistent with other procedures previously approved in this district and other districts.

        18.    Although the Sellers believe the value to be provided by the Buyer under the Sale Agreement is fair and reasonable, the Sellers submit that the Bidding Procedures and the Auction will ensure the Sellers' estates receive the best value available by allowing the market to test the Purchase Price of the Sale Assets.  The Sellers thus request Court approval of the proposed Bidding Procedures for the submission and consideration of competing bids from other interested parties.

**Approval of the Sale Hearing Schedule
and Notice of Auction and Sale Hearing**

        19.    The Debtors request that the Court schedule a Sale Hearing on or about April 28, 2011, at 10:00 a.m. (prevailing Eastern Time), or as soon as practicable thereafter, to consider approval of the Sale Agreement and the Sale contemplated thereby, or the approval of any higher or better offer, if any, resulting from the Auction.  Bankruptcy Rule 6004(a) provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k), and if applicable, in accordance with section 363(b)(2) of the Code."  Fed. R. Bankr. P. 6004(a).  Bankruptcy Rule 2002(a)(2) requires that the Sellers give all creditors and certain other parties "at least 21 days' notice by mail" of the Sale.  Bankruptcy Rule 6004(b) also provides that objections to the proposed Sale "shall be filed and served not less than seven days before the date set for the proposed action or within the time fixed by the court."

19

20.    The Notice of Auction and Sale Hearing contains the type of information required under Bankruptcy Rule 2002(c) and also includes information regarding the Auction procedures, to the extent a higher or better offer than the Sale Agreement is obtained and an Auction takes place.    Therefore, the Debtors request that the Court approve the form of and notice procedures relating to the Notice of Auction and Sale Hearing.    The Debtors propose at least 21 days' notice for the Sale Hearing, which complies with the notice procedures mandated by the Bankruptcy Rules, according to the following procedures:

(i)    The Sellers (or their agent) shall serve, within five (5) Business Days after entry of the Bidding Procedures Order (the "Mailing Deadline"), by overnight courier, electronic mail, or same-day messenger delivery, copies of the Notice of Auction and Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Schedule 1 (the "Notice of Auction and Sale Hearing"), upon:  (a) the U.S. Trustee, (b) counsel to the Committee, (c) counsel to the Buyer, (d) any party who, in the past twelve (12) months, expressed to the Debtors an interest in acquiring the Sale Assets, and who the Debtors and their representatives reasonably and in good faith determine potentially have the desire and financial wherewithal to effectuate the Sale, (e) all parties who are known to possess or assert a claim against the Sale Assets, (f) all parties who hold a right to consent to the transfer or sale of the Sale Assets, (g) any parties entitled to notice under Bankruptcy Rule 2002 and Local Rule 2002-1(b), (h) all non-debtor parties to the Partnership Agreement, and (i) all non-debtor parties to the Purchased Contracts.

(ii)    On or before the Mailing Deadline, or as soon as practicable thereafter, the Sellers (or their agent) will publicize the Notice of Auction and Sale Hearing in the Wall Street Journal (National Edition) for two (2) consecutive business days.

21.    The Sellers submit that such notice shall constitute good and sufficient notice of the Auction and the Sale of the Sale Assets, and that no other or further notice need be given.    Accordingly, the Sellers request that the Court approve the form of and notice procedures relating to the Notice of Auction and Sale Hearing.

### Approval of Procedures for Assumption and Assignment of Purchased Contracts

22.    To facilitate the Sale and the assumption and assignment of the Purchased Contracts (as defined below), the Sellers will serve a Notice of Assumption and Assignment,

substantially in the form attached to the Bidding Procedures Order as <u>Schedule 2</u> (the "<u>Notice of Assumption and Assignment</u>"), on the non-debtor parties to the Purchased Contracts proposed to be assumed by CILP and assigned to the Buyer or the Successful Bidder in connection with the Sale (the "<u>Purchased Contracts</u>") according to the following procedures:

(i)     On or before the Mailing Deadline, the Sellers (or their agent) shall serve, by overnight courier, electronic mail, or same-day messenger delivery, the Notice of Assumption and Assignment, upon all known non-debtor parties to the Purchased Contracts. The Notice of Assumption and Assignment shall set forth (a) the intent of CILP to assume the Purchased Contracts and assign the contracts to the Buyer or the Successful Bidder, as applicable, and (b) applicable cure amount (the "<u>Cure Amount</u>"), if any. The Notice of Assumption and Assignment shall identify the Purchased Contracts and the Cure Amount that CILP believes must be paid in order to cure all defaults. If no amount is listed on the Notice of Assumption and Assignment, CILP believes that there is no Cure Amount due.

(ii)    Bankruptcy Rule 6006(a) provides that "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease other than as part of a plan, is governed by Rule 9014." Any objections to (a) the assumption and assignment of the Purchased Contracts by CILP, or (b) the amount asserted as the Cure Amount (each, an "<u>Assumption and/or Cure Objection</u>") must be in writing and set forth with specificity the nature of the objection and the cure amount that the objecting party believes should be paid in connection with the assumption of the Purchased Contracts (the "<u>Claimed Cure Amount</u>").

(iii)   If an Assumption and/or Cure Objection is timely filed, the Sellers request a hearing with respect to that objection be held before the Court at the Sale Hearing. If, however, an Assumption and/or Cure Objection is not timely filed and served, the assumption and assignment of the Purchased Contracts will proceed without further notice at the Sale Hearing to approve the Sale of the Sale Assets. The Sellers also request that failure to file and serve timely an Assumption and/or Cure Objections shall be deemed to have waived and released any and all rights to assert a Cure Amount different from that listed on the exhibit to the Notice of Assumption and Assignment and, subject to payment of the Cure Amount listed for such contract, shall be forever barred and estopped from asserting or claiming against CILP, the Buyer, or any Successful Bidder that any additional amounts are due or defaults exist, or prohibitions or conditions to assignment exist or must be satisfied, under such Purchased Contracts.

(iv)    If no Cure Amount is due under the Purchased Contracts, and the non-debtor parties to the Purchased Contracts do not otherwise object to CILP's assumption and assignment of the Purchased Contracts, no further action need be taken on the part of such non-debtor parties. The Sellers also request that any Assumption and/or Cure Objection that objects solely to the Cure Amount not prevent or delay

21

CILP's assumption and assignment of the Purchased Contracts. If a party objects solely to a Cure Amount, CILP may, in its sole discretion, hold the Claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties. So long as CILP holds the Claimed Cure Amount in reserve, and there are no other unresolved objections to assumption and assignment, CILP can, without further delay, assume, and assign the Purchased Contract that is the subject of the objection. Under such circumstances, the objecting party's recourse shall be limited to the funds held in reserve.

23.    The Debtors submit that the aforementioned procedures provide sufficient notice to the non-debtor parties to the Purchased Contracts and should be approved by the Court in all respects.

### Approval of Objection Deadline

24.    The Debtors request that, pursuant to Bankruptcy Rule 9014, objections, if any, to the Sale (a "Sale Objection"), or an Assumption and/or Cure Objection must (a) specify the nature of such objection, and (b) be filed with the Court and served so as to be actually received on or before 4:00 p.m. on April 21, 2011 (the "Objection Deadline"), upon: (i) counsel to the Debtors, Dewey & LeBoeuf LLP, Attention: Michael P. Kessler, Esq. and Judy G.Z. Liu, Esq., 1301 Avenue of the Americas, New York, New York 10019; (ii) local counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attention: Mark D. Collins, Esq.; (iii) counsel to the Buyer, Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, California 90071, Attention: Jennifer Bellah Maguire, Esq. and Oscar Garza, Esq.; (iv) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (v) Wilmington Trust FSB, as successor trustee under the prepetition indentures for the senior unsecured floating rate notes, 5.875% senior unsecured notes, and 6.300% senior unsecured notes, 166 Mercer Street, Suite 2-R, New York, New York 10012-3249, Attention: Adam Berman; (vi) counsel to the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York

22

10036, Attention:   Thomas Moers Mayer, Esq. and Joshua Brody, Esq.; and (vii) all parties

requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b).

**Basis for Relief Requested**

**A.   Approval of the Sale under Bankruptcy Code Sections 363(b) and 105(a) is Warranted**

25.   Section 363(b) of the Bankruptcy Code provides, in relevant part, "the

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (providing

that debtors in possession have "all the rights . . . of a trustee").   In addition, section 105(a)

provides the authority for the Court to carry out the provisions of section 363(b). *See* 11 U.S.C.

§ 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate

to carry out the provisions of this title").   Although section 363(b) does not specify a standard for

determining when it is appropriate for a court to authorize the use, sale, or lease of property of

the estate, bankruptcy courts routinely authorize sales of a debtor's assets if the sale is based

upon the sound business judgment of the debtor. *See In re Dura Auto. Sys.*, 2007 Bankr. LEXIS,

at *258 (citing *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996)); *Comm. of

Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *In

re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound

business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson

Ry Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound

business judgment" test in the *Abbotts Dairies* decision); and *In re Montgomery Ward Holding

Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same).

26.   When a valid business judgment exists, the law vests the debtor's decision

to sell assets with a strong presumption that "in making a business decision, the directors of a

23

corporation acted on an informed basis, in good faith, and in honest belief that the action taken was in the best interests of the company." *In re Dura Auto. Sys*, 2007 Bankr. LEXIS at *260 (citing *The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992)). Once a court is satisfied there is a sound business judgment for the proposed sale, the court must then determine whether (i) the debtor in possession has provided interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See, e.g., Del and Hudson Ry. Co.*, 124 B.R. at 166.

27.    The Sellers submit that the decision to sell the Sale Assets is based upon their sound business judgment and should be approved.    Both before and after the Commencement Date, the Sellers worked diligently with their financial advisors to explore alternatives to sell certain of their business assets in circumstances like those presented here, where sales would provide value to the estates and relieve the Sellers from ongoing operational expenses. The Sellers believe that if no timely and conforming Qualifying Bids other than the Sale Agreement are submitted by the Bid Deadline, the prompt Sale of the Sale Assets without an Auction and without further delay presents the best opportunity to maximize and preserve value for their estates.

28.    In addition, the Sellers believe their marketing efforts, arm's length negotiations with the Buyer, and the proposed Bidding Procedures will achieve the best results for their estates and maximize value for all constituents. Furthermore, the Bidding Procedures contemplate an open Auction process and are designed to ensure the highest or otherwise best purchase price for the Sale Assets. Thus, the Sellers submit the proposed Sale is an exercise of their sound business judgment.

24

**B.    Sale of the Sale Assets Free and Clear of Interests is Warranted**

        29.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions are satisfied:

    (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    (2)    such entity consents;

    (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)    such interest is in bona fide dispute; or

    (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

        30.    The Sellers believe that one or more of these tests in section 363(f) of the Bankruptcy Code are easily satisfied with respect to the Sale of the Sale Assets. First, the Sale Assets are unencumbered by any recorded lien, security interest, mortgage, judgment, or other encumbrance. Second, to the extent there is any other unrecorded "interest" in the Sale Assets other than the Sellers', the Sellers submit that subsection 363(f)(5) would apply to permit the Sale free and clear of such interest. The Sellers believe the rights of any claimant could be valued and allowed as a claim against the Sellers' estates, and thus the claimant could be compelled to accept a money satisfaction of its interest in property, and section 363(f)(5) would be satisfied. *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289, 291 (3d Cir. 2003) (the Court of Appeals for the Third Circuit held that section 363(f)(5) was satisfied in respect of successor liability claims because "[h]ad TWA liquidated its assets under Chapter 7 of the Bankruptcy Code, the claims at issue would have been converted to dollar amounts and the claimants would

25

have received the distribution provided to other general unsecured creditors on account of their claims").

31.    Because the section 363(f) requirements have been met, the Buyer should not be liable, as a successor to the Sale Assets or otherwise, for any of the Sellers' prepetition liabilities, unless expressly assumed. As a matter of logic, bankruptcy estates would be unable to sell assets for fair value if the estates' liabilities followed the assets. The Third Circuit Court of Appeals has held that a buyer of a debtor's assets pursuant to sections 363(b) or 363(f) takes free from successor liability resulting from any pre-existing claims. *See, e.g., In re Trans World Airlines, Inc*, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of . . . successor liability claims achieves the purpose of [Bankruptcy Code] section 363 intended by Congress"), *aff'd*, 332 F.3d 283, 285 (3d Cir. 2003) ("Because section 363(f) of the Bankruptcy Code permits a sale of property 'free and clear' of an 'interest in such property' and because the claims against TWA here were connected to or arise from the assets sold, we affirm the Bankruptcy Court's order approving the sale 'free and clear' of successor liability").

## C.    Assumption and Assignment of the Purchased Contracts

32.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to Court approval, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365. The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease may be assumed is the debtor's "business judgment" that the assumption is in its economic best interests. *See, e.g., Sharon Steel Corp v. Nat'l Fuel Gas Distrib. Corp*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing the business judgment test as "traditional").

26

33.    To facilitate and effect the Sale of the Sale Assets, the Buyer has agreed to take assignment of the Purchased Contracts. The Sellers believe they can demonstrate at the Sale Hearing that all requirements for assumption and/or assignment of the Purchased Contracts will be satisfied.[11]    The Sellers have evaluated the financial wherewithal of the Buyer (and will evaluate the financial wherewithal of other potential bidders) and, in exercising their sound business judgment, believe that selling the Sale Assets to, and assuming and assigning the Purchased Contracts to, the Buyer or another Successful Bidder would be in the best interests of the Sellers' estates. Moreover, each non-debtor party to the Purchased Contracts, each Limited Partner of the Fund, and each member of the Fund's limited partner advisory board will receive notice of the proposed assumption and assignment, and the proposed cure amount, and have a reasonable opportunity to object thereto.

## D.    Finding of Good Faith is Warranted

34.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Seventh Circuit in *In re Andy Frain Serv., Inc.*, held:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other

---

[11]    The Sellers are in the process of obtaining all necessary consents to the assumption and assignment of the Purchased Contracts and the transfer of the Sale Assets, and anticipate obtaining all such consents prior to the Sale Hearing.

27

> bidders or the trustee, or an attempt to take grossly unfair advantage of
> other bidders.

798 F.2d 1113, 1125 (7th Cir. 1986) (emphasis and citations omitted).

35.     The Sale Agreement was intensely negotiated at arm's length. All parties involved acted in good faith and were represented by sophisticated counsel. The Debtors are unaware of any facts or circumstances that might compromise or taint the Buyer's good faith in negotiating and entering into the Sale Agreement. Accordingly, the Debtors request that the Court determine that the Buyer has acted in good faith and is entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

**E.     The Termination Fee and Expense Reimbursement are Reasonable and Appropriate**

36.     Bidding incentives, such as the Termination Fee and Expense Reimbursement, encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." *In re S N A, Nut Co*, 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); *see also In re 995 Fifth Ave. Assoc. L P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

37.     Bidding incentives such as the Termination Fee and Expense Reimbursement should be approved when they are in the best interests of the estate. *See S. N.A Nut Co.*, 186 B.R. at 104; *see also In re America West Airlines, Inc*, 166 B.R. 908 (Bankr. D. Ariz. 1994); and *In re Hupp Indus., Inc*, 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this

28

requires that the bidding incentives provide some benefit to the debtor's estate, and in this Circuit, that benefit must meet the administrative expense standards of the Bankruptcy Code. *See Calpine Corp v O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533 (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context); *see also In re Reliant Energy Channelview LP*, 594 F.3d at 206-09 (following *O'Brien* and holding that break-up fee was not an actual and necessary administrative expense where the stalking horse bid was not expressly conditioned upon the approval of the break-up fee).

38.    Here, the Termination Fee and Expense Reimbursement will only be paid if the Sale Assets are sold to a purchaser with a bid that is higher and/or otherwise better than the Buyer's offer for the Sale Assets, including taking into account the cost of the Termination Fee and Expense Reimbursement when considering the competing bid. If this occurs, the Sellers will effectively net at least the amount offered by the Buyer and consequently the Sellers' estates will benefit from the floor set by the Buyer's initial bid.

39.    "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *In re Integrated Res.*, 147 B.R. at 660. As is customary, the Termination Fee and Expense Reimbursement were required by the Buyer as a condition to its spending the significant time and expense to negotiate and ultimately agree to the Sale Agreement. The Sellers believe the Termination Fee and Expense Reimbursement will not stifle bidding. To the contrary, the Sellers believe that in the event of an Auction, the Termination Fee and Expense Reimbursement will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to

29

establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *Id.* at 662. In other words, if the assets are sold to a competing bidder, it will – in all likelihood – be because of the Buyer's crucial role as an initial bidder.

40.    In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed Purchase Price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." *Id.* The Termination Fee is equal to 2.5% of the Purchase Price and the sum of the Termination Fee and Expense Reimbursement is capped at 3% of the Purchase Price, which is within the range of fees typically paid in other significant sales transactions that have been approved by the Court. *See, e.g., In re Maxide Acquisition, Inc.*, No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (approving break-up fee of 3%, or $2.5 million, in connection with a $75 million sale); *In re Ameriserve Food Distrib., Inc.*, No. 00-00358 (PJW) (Bankr. D. Del. June 15, 2000) (approving break-up fee of 3.6%, or $4 million, in connection with $110 million sale). Given the Purchase Price, the Sellers, in their business judgment, believes the Termination Fee and Expense Reimbursement are appropriate.

41.    For these reasons, and given the benefits conferred upon the Sellers' estate by the Buyer's entry into the Sale Agreement, the Sellers respectfully request that the Court approve the payment of the Termination Fee and Expense Reimbursement and their treatment as an administrative expense of the Sellers and their estates under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code.

### Relief from Fourteen-Day Waiting Period is Warranted

42.    The Debtors request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) and order that, if and when entered, the Sale Order

be effective immediately. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

43.    The purpose of these rules is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Bankruptcy Rules 6004(h) and 6006(d). Although these rules and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the fourteen-day stay period, Collier on Bankruptcy suggests the stay period should be waived to allow a transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶ 6004.10 (15th rev. ed. 2006). Further, it suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

## Notice

44.    No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been provided by overnight delivery to (i) the U.S. Trustee, (ii) counsel to the Buyer, (iii) Wilmington Trust FSB, as successor trustee under the prepetition indentures for the senior unsecured floating rate notes, 5.875% senior unsecured notes, and 6.300% senior unsecured notes, (iv) counsel to the Committee, (v) any party who, in the past twelve (12) months, expressed to the Debtors an interest in acquiring the Sale Assets, and who the Debtors and their representatives reasonably and in good faith determined potentially have the desire and financial wherewithal to effectuate the Sale, (vi) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b), (vii) all non-debtor parties to the

31

Partnership Agreement, and (viii) all non-debtor parties to the Purchased Contracts. The Sellers submit that no other or further notice need be provided.

<u>**No Previous Request**</u>

45.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

32

WHEREFORE the Debtors respectfully request (i) entry of the proposed Bidding Procedures Order, (ii) at the completion of the Sale Hearing, entry of the Sale Order approving the Sale of the Sale Assets to the Buyer, or, in the event of a higher and/or otherwise better offer is received at the Auction, the Successful Bidder, and (iii) such other and further relief as the Court may deem just and appropriate.

Dated: March 18, 2011
      Wilmington, Delaware

Respectfully submitted,

*Marisa A. Terranova*

Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Jason M. Madron (No. 4431)
Lee E. Kaufman (No. 4877)
Marisa A. Terranova (No. 5396)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

Martin J. Bienenstock
Michael P. Kessler
Judy G. Z. Liu
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 259-8000
Facsimile:  (212) 259-6333

*Attorneys for the Debtors and Debtors in Possession*

RLF1 3926224v 1