# EXHIBIT A

## Normandy Sale Agreement

# Purchase Agreement

PURCHASE AGREEMENT

AMONG

NREF II ACQUISITIONS, LLC

("BUYER")

AND

CAPMARK INVESTMENTS LP, DEBTOR-IN-POSSESSION

AND

CAPMARK FINANCE INC., DEBTOR-IN-POSSESSION

("SELLERS")

April 29, 2011

# TABLE OF CONTENTS

Page

ARTICLE 1          CERTAIN DEFINITIONS ........................................................................ 2

ARTICLE 2          TRANSACTIONS ................................................................................. 3

2.1      Transactions at Closing ................................................................. 3
2.2      Excluded Assets ........................................................................... 3
2.3      Assumed Liabilities and Termination of Obligations ................... 3
2.4      Excluded Liabilities ..................................................................... 9
2.5      Good Faith Deposit. ..................................................................... 9
2.6      Closing ......................................................................................... 9
2.7      Allocation of Purchase Price......................................................... 9
2.8      Investment Advisory Fees............................................................. 9

ARTICLE 3          REPRESENTATIONS AND WARRANTIES OF BUYER ................... 10

3.1      Organization and Qualification of Buyer...................................... 10
3.2      Authority ...................................................................................... 10
3.3      No Conflict.................................................................................... 10
3.4      Approvals and Permits.................................................................. 11
3.5      Accredited Investor....................................................................... 11
3.6      Financing....................................................................................... 11
3.7      No Broker....................................................................................... 11
3.8      ERISA ........................................................................................... 11
3.9      Investment Adviser........................................................................ 11
3.10     Limitation of Buyer Warranties .................................................... 11

ARTICLE 4          REPRESENTATIONS AND WARRANTIES OF SELLERS................. 12

4.1      Organization and Qualification of Sellers...................................... 12
4.2      Organization and Qualification of Fund ......................................... 12
4.3      Intermediate Entities .................................................................... 12
4.4      Authority ....................................................................................... 12
4.5      No Conflict..................................................................................... 13
4.6      Approvals and Permits .................................................................. 13
4.7      Purchased Contracts...................................................................... 13
4.8      Fund Constituent Documents and Side Letters.............................. 14
4.9      Tax Matters. ................................................................................... 14
4.10     Compliance with Legal Requirements............................................ 15
4.11     Broker ........................................................................................... 15
4.12     Distributions; Clawback................................................................. 16
4.13     Fund Partners................................................................................. 16
4.14     Capmark General Partner............................................................... 16
4.15     Financial Statements; Undisclosed Liabilities; Absence of
         Developments. ............................................................................... 16

i

| | | |
|---|---|---|
| 4.16 | Litigation | 17 |
| 4.17 | Title | 17 |
| 4.18 | ERISA | 17 |
| 4.19 | Investment Company Act | 17 |
| 4.20 | Repurchase Facilities and Subscription Facility | 17 |
| 4.21 | Documentation | 17 |
| 4.22 | No Dissolution | 18 |
| 4.23 | Fund Management Fee | 18 |
| 4.24 | Fund Liabilities; Fund Expenses | 18 |
| 4.25 | Disclaimer of Other Representations and Warranties | 18 |

**ARTICLE 5   COVENANTS** .......................................... 18

| | | |
|---|---|---|
| 5.1 | Conduct of Business | 18 |
| 5.2 | Reasonable Efforts; Further Assurances | 19 |
| 5.3 | Certain Filings | 19 |
| 5.4 | Obtaining Approvals and Permits | 19 |
| 5.5 | Required Orders | 19 |
| 5.6 | Notices | 19 |
| 5.7 | Change of Name; Use of Name. | 20 |
| 5.8 | Track Record; Certain Assets | 20 |
| 5.9 | Management Fees and other Payments | 20 |
| 5.10 | Non-Disparagement | 20 |
| 5.11 | Tax Matters. | 20 |
| 5.12 | [Intentionally Omitted]. | 21 |
| 5.13 | Distributions | 21 |
| 5.14 | Financial Information | 21 |
| 5.15 | Transition Services | 21 |

**ARTICLE 6   CONDITIONS TO CLOSING** ......................... 21

| | | |
|---|---|---|
| 6.1 | Conditions to the Obligations of Buyer and Sellers | 21 |
| 6.2 | Conditions to the Obligations of Buyer | 21 |
| 6.3 | Conditions to the Obligation of Sellers | 24 |

**ARTICLE 7   TERMINATION** ...................................... 25

| | | |
|---|---|---|
| 7.1 | Conditions of Termination | 25 |
| 7.2 | Effect of Termination; Remedies | 26 |
| 7.3 | Good Faith Deposit | 26 |

**ARTICLE 8   BANKRUPTCY MATTERS** ........................... 27

| | | |
|---|---|---|
| 8.1 | Bankruptcy Court Approval | 27 |
| 8.2 | Bidding Procedures | 27 |

**ARTICLE 9   MISCELLANEOUS PROVISIONS** ................... 27

ii

| | | |
|---|---|---|
| 9.1 | Nonsurvival of Representations and Warranties | 27 |
| 9.2 | Expenses | 27 |
| 9.3 | Waivers | 27 |
| 9.4 | Notices | 28 |
| 9.5 | Entire Agreement; Amendments | 29 |
| 9.6 | Binding Effect; Benefits | 29 |
| 9.7 | Headings, Schedules, and Exhibits | 29 |
| 9.8 | Counterparts and Facsimile Signatures | 29 |
| 9.9 | Governing Law. | 30 |
| 9.10 | Specific Performance | 30 |
| 9.11 | Third Parties; Joint Ventures | 30 |
| 9.12 | Construction | 30 |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of FIRPTA Certificate |
| Exhibit B-1 | Form of CILP Assignment and Assumption Agreement |
| Exhibit B-2 | Form of CFI Assignment and Assumption Agreement |
| Exhibit C | Form of Sale Order |
| Exhibit D | Form of Guaranty |

# PURCHASE AGREEMENT

This Purchase Agreement (this "Agreement") is made and entered into as of April 29, 2011, by and between NREF II Acquisitions, LLC, a Delaware limited liability company ("Buyer"), Capmark Finance Inc., Debtor-in-Possession, a California corporation ("CFI"), and Capmark Investments LP, Debtor-in-Possession, a Delaware limited partnership ("CILP" and, together with CFI, "Sellers").

## Recitals

WHEREAS, CILP is engaged in the business of managing a private real estate debt investment fund with co-mingled investors (the "Business");

WHEREAS, CILP is the sole member of Capmark Investments Structured Fund GP LLC, a Delaware limited liability company (the "Company");

WHEREAS, the Company is the sole general partner of Capmark Structured GP, L.P., a Delaware limited partnership (the "Capmark General Partner");

WHEREAS, CFI is the sole limited partner of the Capmark General Partner;

WHEREAS, the Capmark General Partner is the sole general partner of Capmark Structured Real Estate Partners, L.P. (the "Fund");

WHEREAS, Buyer desires to purchase from CILP, and CILP desires to sell to Buyer, all of the membership interests held by CILP in the Company, and all of CILP's rights and obligations under the investment management agreement between CILP and the Fund and the investment management agreement between CILP and Capmark Structured Real Estate REIT, Inc., a Maryland corporation (the "REIT"), and Buyer desires to purchase from CFI, and CFI desires to sell to Buyer, CFI's limited partnership interest in the Capmark General Partner, in each case upon the terms and conditions, and for the consideration, set forth in this Agreement;

WHEREAS, Sellers and certain of their Affiliates (as hereinafter defined), have each commenced a voluntary case (each, a "Bankruptcy Case") under chapter 11 of title 11, United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, (a) this Agreement is executed by Buyer and submitted as a part of an auction sale process administered by the Bankruptcy Court pursuant to the Bidding Procedures Order (as hereinafter defined) and is intended to be consistent with and controlled by the terms of the Bidding Procedures Order and (b) this Agreement shall be deemed a binding and irrevocable offer to acquire the Assets in accordance with the terms hereof and the Bidding Procedures Order, subject to the approval of the Bankruptcy Court and to the termination of this Agreement in accordance with the terms and conditions set forth in Section 7.1; and

NOW, THEREFORE, in consideration of the mutual covenants and promises in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Sellers agree as follows:

# ARTICLE 1
## Certain Definitions

As used in this Agreement, the following terms, whether in singular or plural forms, shall have the following meanings:

"Acquired Entities" has the meaning given in Section 4.9(a).

"Advisory Board" has the meaning given in the Partnership Agreement.

"Affiliate" means, with respect to any Person, any other Person controlling, controlled by or under common control with such Person, with "control" (including, with correlative meaning the terms "controlling" or "controlled") for such purpose meaning the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or voting interests, by contract or otherwise.

"Agreement" has the meaning given in the preamble.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, wind-up, amalgamation, assignment, conveyance, liquidation, or similar transaction, of the Assets, in a transaction or series of transactions with one or more Persons other than Buyer and/or its Affiliates.

"Approvals" means authorizations, consents, amendments, waivers and modifications of any third party (other than a Governmental Authority).

"Assets" means collectively the Company Membership Interest, the LP Interest and the Purchased Contracts.

"Assignment and Assumption Agreements" has the meaning given in Section 6.2(d).

"Assumed Liabilities" means any and all obligations and liabilities of Sellers (or any Intermediate Entity) arising under the terms of the agreements with respect to the Assets and arising only after the Closing, including without limitation, all such obligations and liabilities arising only after the Closing (a) of the Capmark General Partner as general partner or limited partner under the Partnership Agreement, (b) of CFI as limited partner of the Capmark General Partner, (c) of the Capmark General Partner under the Side Letters, (d) of the Company as general partner of the Capmark General Partner, (e) of the Capmark General Partner as general partner of the Fund, and (f) of CILP under the Purchased Contracts.

"Auction" has the meaning given in the Bidding Procedures Order.

"Balance Sheet Date" has the meaning given in Section 4.15(a).

"Back-Up Bidder" has the meaning given in the Bidding Procedures Order.

"Bankruptcy Case" has the meaning given in the recitals.

"Bankruptcy Code" has the meaning given in the recitals.

"Bankruptcy Court" has the meaning given in the recitals.

"Bidding Procedures" has the meaning given in the Bidding Procedures Order.

"Bidding Procedures Order" means that certain Order (I) Scheduling an Auction Sale in Connection with the Sale of Certain Equity Interests in Real Estate Debt Investment Advisory Group Business (Including Assumption and Assignment of Contracts), (II) Approving Bidding Procedures, (III) Approving a Termination Fee and Expense Reimbursement, (IV) Scheduling a Sale Hearing, (V) Establishing an Objection Deadline, and (VI) Approving the Form and Manner of the Notice of Auction and Sale Hearing and Notice of Assumption and Assignment entered on April 5, 2011 [Docket #2702] in the chapter 11 case for Capmark Financial Group, Inc. pending in the United States Bankruptcy Court, District of Delaware and jointly administered with its affiliated debtors under case # 09-13684.

"Business" has the meaning given in the recitals.

"Business Day" means any day other than Saturday, Sunday or a day on which banking institutions in New York, New York are required or authorized to be closed.

"Buyer" has the meaning given in the preamble.

"Capital Commitment" has the meaning given in the Partnership Agreement.

"Capmark General Partner" has the meaning given in the recitals.

"Cayman Blocker" has the meaning given in Section 4.9(a).

"CFI" has the meaning given in the preamble.

"CILP" has the meaning given in the preamble.

"Closing" means the consummation and effectuation of the transactions contemplated by this Agreement pursuant to the terms and conditions of this Agreement.

"Closing Date" has the meaning given in Section 2.6.

"Code" means the Internal Revenue Code of 1986, as amended, or any successor law, and the rules and regulations promulgated thereunder, all as the same may from time to time be in effect.

"Company" has the meaning set forth in the recitals.

"Company Membership Interest" shall mean the entire membership interest in the Company.

"Contemplated Transactions" means the transactions contemplated to occur on the Closing Date pursuant to this Agreement and the other Transaction Documents.

"Contract" means any binding written contract, mortgage, deed of trust, bond, indenture, lease, license, note, franchise, certificate, option, warrant, right, or other instrument, document, obligation, subcontract, or agreement, and any binding oral obligation, right, or agreement.

"Dissolution Vote" has the meaning given in the Partnership Agreement.

"Drop Dead Date" has the meaning given in Section 7.1(b)(ii).

"Encumbrance" means any security agreement, financing statement filed with any Governmental Authority, conditional sale or other title retention agreement, any lease, consignment or bailment given for purposes of security, any lien, mortgage, indenture, pledge, option, right of first offer, right of first refusal, encumbrance, charge, limitation, constructive trust or other trust, claim (as such term is defined in Section 101(5) of the Bankruptcy Code), attachment, exception to or defect in title or other ownership interest of any kind, which otherwise constitutes an interest in or claim against property, whether arising pursuant to any Legal Requirement, Contract, or otherwise.

"ERISA" means the Employee Retirement Income Security Act of 1974 (as amended)

"ERISA Plan" means any pension, profit sharing or other employee benefit plan, or other plan, account or arrangement that is subject to Title I of ERISA or Section 4975 of the Code and entities whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement for purposes of Title I of ERISA or Section 4975 of the Code.

"Excluded Assets" means all of Sellers' assets other than the Assets.

"Excluded Liabilities" means any obligations or liabilities other than the Assumed Liabilities, including all obligations or liabilities of Sellers arising out of or related to (a) the activities, operations, acts or omissions, including any failure to comply with any Legal Requirements of any Purchased Contract, of Sellers in respect of the Fund or REIT attributable to the period prior to the Closing, (b) any Contract or arrangement with any current or former employee, officer, consultant or agent of Sellers or their Affiliates, (c) any liability for Taxes of Sellers for any period (or portion thereof) ending on or prior to the Closing, (d) any fees payable to brokers or financial advisers engaged by Sellers in connection with the transactions contemplated hereby, and (e) CILP's performance of its obligations and duties (or failure to perform its obligations and duties) as investment manager to the Fund and the REIT pursuant to the Purchased Contracts.

"Expense Reimbursement" has the meaning ascribed to such term in the Stalking Horse Purchase Agreement.

"Fund" has the meaning given in the recitals.

"Fund Constituent Documents" means the Certificate of Limited Partnership of Capmark Structured Real Estate Partners, L.P., dated August 17, 2006, and the Partnership Agreement.

"Fund Group" means the Intermediate Entities, the Fund, the REIT or any direct or indirect Subsidiary of the Fund or the REIT.

4

"Fund Investment Management Agreement" means the Amended and Restated Investment Management Agreement, dated as of September 27, 2006, between CILP and the Fund.

"GAAP" means U.S. generally accepted accounting principles in effect at the time that any applicable financial statements were prepared or that any act requiring the application of GAAP was performed or, as to any jurisdiction other than the U.S., the equivalent accounting and financial standards that are in effect in such jurisdiction.

"Good Faith Deposit" has the meaning given in Section 2.5(a).

"Governmental Authority" means the United States of America, any state, commonwealth, territory, or possession thereof, any foreign government, and any political subdivision or quasi-governmental authority of any of the foregoing, including, but not limited to, courts, tribunals, departments, commissions, boards, bureaus, agencies, counties, municipalities, provinces, parishes, and other instrumentalities.

"Guaranty" means the guaranty of Normandy Real Estate Fund II, L.P., substantially in the form of Exhibit D.

"Incentive Distribution" has the meaning set forth in the Partnership Agreement.

"Intermediate Entities" means the Company and the Capmark General Partner.

"Intermediate Entity Constituent Documents" means, for each Intermediate Entity, its formation and governing agreements, each as amended.

"Investment Advisory Fees" has the meaning set forth in Section 2.8.

"Judgment" means any judgment, writ, order, injunction, award, or decree of any court, judge, justice, or magistrate, including any bankruptcy court or judge, any binding arbitration and any order of or by any Governmental Authority.

"Legal Requirements" means applicable common law and any statute, ordinance, code or other law, rule, regulation, order, technical or other standard, requirement, or procedure enacted, adopted, promulgated, applied, or followed by any Governmental Authority, including Judgments.

"Limited Partner" has the meaning set forth in the Partnership Agreement.

"Litigation" means any claim, action, suit, proceeding, arbitration, mediation, investigation, hearing, or other activity or procedure that could result in a Judgment.

"LP Interest" means the limited partnership interest in the Capmark General Partner.

"Material Adverse Effect" with respect to any Person means any fact, circumstance, effect, change, event or development that is, or is reasonably likely to be, materially adverse to the business, properties, financial condition or results of operations of such Person and its

Subsidiaries, taken as a whole, excluding any fact, circumstance, effect, change, event or development to the extent that it results from or arises out of: (a) changes or conditions generally affecting the industries or markets in which such Person and any of its Subsidiaries operate, except to the extent such effect has a disproportionate effect on such Person and its Subsidiaries, taken as a whole, relative to others in such businesses, (b) general economic or regulatory, legislative or political conditions, except to the extent such effect has a disproportionate effect on such Person and its Subsidiaries, taken as a whole, relative to others in the businesses in which such Person and any of its Subsidiaries operate, (c) any failure by such Person or any of its Subsidiaries to meet any internal or published projections, forecasts, estimates or predictions in respect of recoveries, revenues, earnings or other financial or operating metrics for any period (it being understood that the facts or occurrences giving rise to or contributing to such failure may be deemed to constitute, or be taken into account in determining whether there has been or will be, a Material Adverse Effect), (d) the public announcement or pendency of the transactions contemplated by this Agreement, (e) any change in applicable Legal Requirements, regulation or accounting principle (or authoritative interpretation thereof), except to the extent such effect has a disproportionate effect on such Person and its Subsidiaries, taken as a whole, relative to others in the businesses in which such Person and any of its Subsidiaries operate, (f) geopolitical conditions, the outbreak or escalation of hostilities, any acts of war, sabotage or terrorism, or any escalation or worsening of any such acts of war, sabotage or terrorism threatened or underway as of the date of this Agreement, except to the extent such effect has a disproportionate effect on such Person and its Subsidiaries, taken as a whole, relative to others in the businesses in which such Person and any of its Subsidiaries operate, (g) the Bankruptcy Cases or (h) any action required to be taken pursuant to this Agreement.

"Partnership Agreement" means the Second Amended and Restated Limited Partnership Agreement of the Fund, dated as of December 1, 2006 among the Capmark General Partner and the limited partners party thereto as amended by that certain First Amendment and Consent to the Second Amended and Restated Agreement of Limited Partnership of Capmark Structured Real Estate Partners, L.P., dated as of April 16, 2007, among the Capmark General Partner and the limited partners party thereto.

"Permits" means permits, licenses, franchises, approvals, certificates, consents, waivers, concessions, exemptions, orders, registrations, notices or other authorizations of any Governmental Authority.

"Permitted Encumbrances" means Encumbrances for Taxes, assessments and governmental charges not yet due and payable, Encumbrances arising under the terms of any Purchased Contract, Intermediate Entity Constituent Document, Fund Constituent Document, or the Subadvisory Agreement and Encumbrances arising after the Closing Date that are not the result of a breach by Sellers of this Agreement.

"Purchased Contracts" means the Fund Investment Management Agreement and the REIT Investment Management Agreement.

"Purchase Price" has the meaning given in Section 2.6.

"Purchase Price Allocation" has the meaning given in Section 2.7.

"REIT" has the meaning set forth in the recitals.

"REIT Investment Management Agreement" means the Investment Management Agreement, dated as of September 27, 2006, between the REIT and CILP.

"Repurchase Facilities" means (i) the Master Repurchase Agreement with Greenwich Capital Financial Products Inc., dated as of December 20, 2007, (ii) the Master Repurchase Agreement with J.P. Morgan Securities Inc., dated as of August 11, 2008, and (iii) the Master Repurchase Agreement with J.P. Morgan Chase Funding Inc., dated as of January 28, 2009.

"Sale" means the proposed sale of the Assets by Sellers to Buyer pursuant to this Agreement and subject to the conditions and limitations herein.

"Sale Hearing" has the meaning given in the Bidding Procedures Order.

"Sale Order" means an order of the Bankruptcy Court substantially in the form of Exhibit C.

"Schedule of Investments" has the meaning given in Section 4.15(b).

"Securities Act" has the meaning given in Section 3.5.

"Sellers" has the meaning given in the preamble.

"Side Letters" has the meaning given in Section 4.8.

"Stalking Horse Purchase Agreement" means that certain Purchase Agreement, dated as of March 15, 2011, between Sellers and PCCP Pool I, LLC.

"Subadvisor" means Urdang Capital Management, Inc., a Delaware corporation.

"Subadvisory Agreement" means the Master Subadvisory Agreement dated as of September 30, 2009 between CILP and the Subadvisor.

"Subscription Facility" means the Revolving Credit Facility with WestLB AG, New York Branch, dated as of August 31, 2006.

"Subsidiary" means, with respect to any Person, any other Person controlled by such first Person, directly or indirectly, through one or more intermediaries, provided that unless specified in a particular provision, neither the Fund nor any of its Subsidiaries shall be considered a Subsidiary of the Intermediate Entities.

"Tax" and, with correlative meaning, "Taxes" means with respect to any Person (a) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including, without limitation, any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, ad valorem, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains,

withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), custom duty or other tax, governmental fee or other like assessment, charge, or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign) whether such Tax is disputed or not and (b) liability for the payment of any amounts of the type described in clause (a) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person.

"Tax Return" shall mean any return, declaration, report, claim for refund, or information return or statement or other form relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Fee" has the meaning ascribed to such term in the Stalking Horse Purchase Agreement.

"Transaction Documents" means this Agreement, the Assignment and Assumption Agreements, and the Closing certificates contemplated by Article 6 hereof.

"Transfer Taxes" has the meaning given in Section 5.11(d).

# ARTICLE 2
## Transactions

2.1    Transactions at Closing.  Subject to the terms and conditions set forth in this Agreement, at the Closing, (a) CILP shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, accept assignment and acquire from CILP, (i) the Company Membership Interest, and (ii) all of CILP's right, title and interest in, to and under the Purchased Contracts, and (b) CFI shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, accept assignment and acquire from CFI, the LP Interest, in each case free and clear of all Encumbrances, in accordance with Section 363(f) of the Bankruptcy Code.

2.2    Excluded Assets.  Nothing contained herein shall be deemed to sell, transfer, assign or convey any Excluded Assets to Buyer, and Sellers shall retain all right, title and interest in, to and under the Excluded Assets.

2.3    Assumed Liabilities and Termination of Obligations.  Subject to the terms and conditions of this Agreement, from and after the Closing, (a) Buyer shall assume and pay, discharge, and perform all of the Assumed Liabilities, and shall have no obligation or liability with respect to any Excluded Liability, and Sellers shall have no obligation or liability with respect to any Assumed Liability, (b) Buyer shall become investment manager of the Fund and the REIT and shall assume all rights and Assumed Liabilities as investment manager, pursuant to the terms of the Purchased Contracts, and (c) Buyer shall cause the General Partner to perform all of its Assumed Liabilities as general partner of the Fund pursuant to the terms of the Fund Constituent Documents and the Side Letters.

2.4    Excluded Liabilities.  It is expressly understood and agreed that Buyer is not assuming or becoming obligated to pay, perform or otherwise discharge or in any other manner becoming liable or responsible for any of the Excluded Liabilities.  Sellers shall remain liable for and shall pay when due all of the Excluded Liabilities.  Buyer has no, and from and after the Closing, Buyer shall have no liability with respect to any Excluded Liability.

2.5    Good Faith Deposit.

(a)    As of the date hereof, Buyer has delivered to Sellers $800,000 (the "Good Faith Deposit"), to be held by Sellers in trust, subject to Section 7.3 hereof.

(b)    Upon the execution of this Agreement, Normandy Real Estate Fund II, L.P. shall concurrently execute and deliver to Sellers the Guaranty.

2.6    Closing.  The Closing shall take place at 10:00 a.m. Eastern Time on the date that is three (3) Business Days after each of the conditions to closing set forth in Article 6 hereof have been satisfied or validly waived, which date shall be on or before the Drop Dead Date, in the offices of Dewey & LeBoeuf LLP in New York, New York or on such other date or at such other time or place as is mutually agreed upon by the parties hereto (the day on which the Closing takes place being the "Closing Date").  At the Closing, $12,700,000 (the "Purchase Price"), less the Good Faith Deposit, shall be paid to Sellers as follows:

(a)    Buyer shall pay $12,000,000 to CILP in respect of the Purchased Contracts and $350,000 to CILP in respect of the Company Membership Interest by wire transfer of immediately available funds to the accounts designated by CILP; and

(b)    Buyer shall pay $350,000 to CFI in respect of the LP Interest by wire transfer of immediately available funds to the accounts designated by CFI.

Upon the Closing, Buyer and Sellers agree that the Good Faith Deposit shall be retained by Sellers and that (i) the portion of the Good Faith Deposit retained by CILP shall be an amount such that the percentage that such amount represents of the total Good Faith Deposit shall equal the percentage that the amount set forth in Section 2.6(a) represents of the total Purchase Price, and (ii) the portion of the Good Faith Deposit retained by CFI shall be an amount such that the percentage that such amount represents of the total Good Faith Deposit shall equal the percentage that the amount set forth in Section 2.6(b) represents of the total Purchase Price.

2.7    Allocation of Purchase Price.  Buyer and Sellers agree that the Purchase Price shall be allocated among the Assets in the manner reflected in Sections 2.6(a) and (b) (the "Purchase Price Allocation").  Buyer and Sellers agree that the form of the transactions, the consideration provided for in this Agreement and the Purchase Price Allocation were arrived at on the basis of arm's length negotiation between Buyer and Sellers, and shall be respected by each of them and their respective Affiliates for federal, state, local and other tax reporting purposes, and that none of them will assert or maintain a position inconsistent with the foregoing unless required by law or in connection with a good faith settlement of an audit.

2.8    Investment Advisory Fees.  Notwithstanding anything to the contrary in the Partnership Agreement or the Fund Investment Management Agreement, until such time as the

Partnership Agreement may be amended in accordance with its terms, Buyer (a) agrees that the investment advisory fees (the "Investment Advisory Fees") Buyer shall be entitled to receive after the Closing pursuant to the Fund Investment Management Agreement will not exceed the amounts set forth on Annex A and (b) with respect to the period after the Closing, waives its right to receive or collect any Investment Advisory Fees in excess of such amounts.

## ARTICLE 3
## Representations and Warranties of Buyer

Buyer represents and warrants to Sellers, as of the date of this Agreement (or, if made as of a specified date, as of such date), as follows:

3.1    Organization and Qualification of Buyer.  Buyer is a Delaware limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own and lease the properties and assets it currently owns and leases and to conduct its activities as such activities are currently conducted except where the failure to have such power or authority would not have a Material Adverse Effect.  Buyer is duly qualified to do business and is in good standing in all jurisdictions in which the ownership or leasing of the Assets makes such qualification necessary, except where the failure to be so qualified or in good standing would not have a Material Adverse Effect.

3.2    Authority.  Buyer has all requisite limited liability company power and authority to execute and deliver this Agreement and each of the other Transaction Documents to which Buyer will be a party, and, subject to any required order or authorization of the Bankruptcy Court to perform this Agreement and each of the other Transaction Documents to which Buyer will be a party and to consummate the Contemplated Transactions.  The execution, delivery, and performance of this Agreement and each of the other Transaction Documents to which Buyer will be a party and the consummation of the Contemplated Transactions by Buyer have been duly and validly authorized by all necessary action on the part of Buyer.  This Agreement has been duly and validly executed and delivered by Buyer and is the valid and binding obligation of Buyer, and each of the other Transaction Documents to which Buyer will be a party, upon execution and delivery by Buyer will be valid and binding obligations of Buyer, in each case enforceable against Buyer in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization moratorium or similar laws affecting creditor's rights generally and by general principles of equity.

3.3    No Conflict.  Assuming the making of the filings and notifications and the receipt of the Approvals and Permits set forth on Schedule 3.3 and Schedule 4.5, the execution, delivery, and performance by Buyer of this Agreement do not and will not: (i) conflict with or violate any provision of the formation and governing documents of Buyer; (ii) violate any material provision of any Legal Requirement; (iii) without regard to requirements of notice or lapse of time, conflict with, violate, result in a breach of, constitute a default under, accelerate, or permit the acceleration of the performance required by, any material Contract to which Buyer is a party; or (iv) result in the creation or imposition of or any material Encumbrance by which Buyer or the assets or properties owned or leased by it are bound or affected.

3.4    Approvals and Permits.  No Approval or Permit of, or filing with, or notification to, any Governmental Authority or other third party is required on the part of Buyer in connection with the execution and delivery of this Agreement or any other Transaction Document to which Buyer will be a party or the compliance by Buyer with any of the provisions hereof or thereof, or the consummation of the Contemplated Transaction, other than those set forth on Schedule 3.3, and those the failure to obtain or make would not have a material adverse effect on Buyer's ability to consummate the Contemplated Transactions or perform its obligations hereunder.

3.5    Accredited Investor.  Buyer (a) has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto, (b) is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time, (c) is acquiring the Company Membership Interest and the LP Interest for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof, (d) understands that the Company Membership Interest and the LP Interest have not been registered under the Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any jurisdiction and cannot be disposed of unless subsequently registered and/or qualified under applicable securities laws or sold pursuant to an exemption therefrom, and (e) is an "accredited investor" as such term is defined in Regulation D, Rule 501 of the Securities Act.  Buyer is an informed and sophisticated participant in the Contemplated Transactions and has undertaken such investigation, and has been provided with and has evaluated such documents and information, as it has deemed necessary in connection with the execution, delivery and performance of this Agreement.

3.6    Financing.  Buyer has available, and at the Closing shall have available, sufficient funds to satisfy, among other things, its obligation to pay (a) the Purchase Price and (b) all expenses incurred or to be incurred by Buyer in connection with the transactions contemplated hereby.  Documents provided by Buyer to Sellers establishing Buyer's financial capability to timely consummate a purchase of the Assets are true and complete in all material respects.

3.7    No Broker.  Except as set forth on Schedule 3.7, no brokers or financial advisers to whom any fees would be payable in connection with the Contemplated Transactions have been engaged by Buyer or any of its Affiliates.  Buyer is solely responsible for any payment, fee or commission that may be due to any broker or financial adviser set forth on Schedule 3.7 in connection with the Contemplated Transactions.

3.8    ERISA.  Buyer is not an ERISA Plan and is not acting on behalf of an ERISA Plan or acquiring the Assets with funds that are deemed to constitute "plan assets" of an ERISA Plan for purposes of Title I of ERISA or Section 4975 of the Code.

3.9    Investment Adviser.  As of or promptly after the Closing Date, Buyer or an appropriate Affiliate of Buyer will be registered as an investment adviser under the Investment Advisers Act of 1940, as amended.

3.10    Limitation of Buyer Warranties.  Buyer is not making any representation or warranty whatsoever, expressed or implied, except those representations and warranties of Buyer

explicitly set forth in this Agreement, the schedules hereto, or in any certificate or other Transaction Document and delivered by Buyer herewith and the representations and warranties may only be relied upon by Sellers.

## ARTICLE 4
## Representations and Warranties of Sellers

Sellers represent and warrant to Buyer, as of the date of this Agreement (or, if made as of a specified date, as of such date), as follows:

4.1     Organization and Qualification of Sellers.  CILP is a limited partnership duly organized, validly existing, and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own and lease the properties and assets it currently owns and leases and to conduct its activities as such activities are currently conducted, except where the failure to have such power or authority would not have a Material Adverse Effect.  CILP is duly qualified to do business as a foreign limited partnership and is in good standing in all jurisdictions in which the ownership or leasing of the properties and assets owned or leased by it or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing would not have a Material Adverse Effect.  CFI is a corporation duly organized, validly existing, and in good standing under the laws of the State of California, and has all requisite power and authority to own and lease the properties and assets it currently owns and leases and to conduct its activities as such activities are currently conducted, except where the failure to have such power or authority would not have a Material Adverse Effect. CFI is duly qualified to do business as a foreign corporation and is in good standing in all jurisdictions in which the ownership or leasing of the properties and assets owned or leased by it or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing would not have a Material Adverse Effect.

4.2     Organization and Qualification of Fund.  The Fund is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own and lease the property and assets it currently owns and leases and to conduct its activities as currently conducted except where the failure to have such power or authority would not have a Material Adverse Effect.  The Fund is duly qualified to do business as a foreign limited partnership and is in good standing in all jurisdictions in which the ownership or leasing of the assets or properties owned or leased by it or the nature of its activities makes such qualifications necessary, except where the failure to be so qualified or in good standing would not have a Material Adverse Effect.

4.3     Intermediate Entities.  The Company is a direct, wholly-owned Subsidiary of CILP.  The Company is the sole general partner of the Capmark General Partner.  CFI is the sole limited partner of the Capmark General Partner.  Each of the Intermediate Entities is duly organized, validly existing, and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own and lease the properties and assets it currently owns and leases and to conduct its activities as such activities are currently conducted except where the failure to have such power or authority would not have a Material Adverse Effect.  Each Intermediate Entity is duly qualified to do business as a foreign entity and is in good standing in all jurisdictions in which the ownership or leasing of the properties and assets owned or leased

by it or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing would not have a Material Adverse Effect. Neither Intermediate Entity has a Subsidiary (other than an Intermediate Entity).

4.4    Authority. Each Seller has the requisite power and authority to execute and deliver this Agreement and each of the other Transaction Documents to which it will be a party, and, subject to any required order or authorization of the Bankruptcy Court, to perform this Agreement and each of the other Transaction Documents to which it will be a party and consummate the Contemplated Transactions. The execution, delivery, and performance of this Agreement and each of the other Transaction Documents to which such Seller will be a party and the consummation of the Contemplated Transactions by such Seller have been duly and validly authorized by all necessary action on the part of such Seller. This Agreement has been duly and validly executed and delivered by each Seller, and, subject to any required order or authorization of the Bankruptcy Court, is the valid and binding obligation of such Seller, and each of the other Transaction Documents to which such Seller will be a party, upon execution and delivery by such Seller, and subject to any required order or authorization of the Bankruptcy Court, will be valid and binding obligations of such Seller, in each case enforceable against such Seller in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization moratorium or similar laws affecting creditor's rights generally and by general principles of equity.

4.5    No Conflict. Assuming the making of the filings and notifications and the receipt of the Approvals and Permits set forth on Schedule 4.5, the execution, delivery, and performance by each Seller of this Agreement and the other Transaction Documents to which it will be a party do not and will not: (a) conflict with or violate any provision of its certificate of incorporation or certificate of limited partnership or partnership agreement or bylaws, or any of the Fund Constituent Documents or the Intermediate Entity Constituent Documents (b) violate any material provision of any Legal Requirement; (c) without regard to requirements of notice or lapse of time, conflict with, violate, result in a breach of, constitute a default under, accelerate, or permit the acceleration of the performance required by, any material Contract to which any member of the Fund Group is a party or by which any member of the Fund Group or any member's assets is bound; or (d) result in the creation or imposition of any material Encumbrance against or upon the Assets.

4.6    Approvals and Permits. No Approval or Permit of, or filing with, or notification to, any Governmental Authority or other third party is required on the part of any Seller in connection with the execution and delivery of this Agreement or the other Transaction Documents to which such Seller will be a party or the compliance by any Seller with any of the provisions hereof or thereof, or the consummation of the Contemplated Transaction, other than those set forth on Schedule 4.5 and those the failure to obtain or make would not have a material adverse effect on such Seller's ability to consummate the Contemplated Transactions or perform its obligations hereunder.

4.7    Purchased Contracts. CILP has delivered or made available to Buyer true and complete copies of each of the Purchased Contracts, including any amendments thereto. Each of the Purchased Contracts is valid, in full force and effect, and enforceable in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency,

reorganization moratorium or similar laws affecting creditor's rights generally and by general principles of equity. None of the parties to any of the Purchased Contracts has ever been in material default thereunder or has ever waived any material right or agreed to any material forbearance or concession thereunder. The Purchased Contracts constitute the only contracts or arrangements for investment management services to which any member of the Fund Group is a party.

4.8    <u>Fund Constituent Documents and Side Letters</u>. <u>Schedule 4.8</u> contains a list of all of the Fund Constituent Documents and each side letter or similar written agreement entered into with respect to the Fund that establishes rights or otherwise benefits any investor in the Fund outside of the Fund Constituent Documents ("<u>Side Letters</u>"). CILP has delivered or made available to Buyer true and complete copies of each Fund Constituent Document and Side Letters and all amendments thereto. Each of the Fund Constituent Documents and Side Letters is valid, in full force and effect, and enforceable in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization moratorium or similar laws affecting creditor's rights generally and by general principles of equity.

4.9    <u>Tax Matters</u>.

(a)    All Tax Returns required to be filed by the Intermediate Entities, the Fund, the REIT, Capmark Structured Real Estate Ltd., a corporation organized under the laws of the Cayman Islands (the "<u>Cayman Blocker</u>"), and their direct and indirect Subsidiaries (collectively, with the Fund, the Intermediate Entities, the REIT and the Cayman Blocker, the "<u>Acquired Entities</u>") have been filed, and all such Tax Returns are true, correct and complete in all material respects. All Taxes required to be paid by any of the Acquired Entities, whether or not shown on any Tax Return, have been paid. None of the Acquired Entities has accrued a material liability for Taxes that has not been paid.

(b)    CILP has previously delivered or made available to Buyer true, correct and complete copies of (i) all Tax Returns filed by or on behalf of the Acquired Entities for all completed Tax years of the Acquired Entities that remain open for audit or review by the relevant Governmental Authority and (ii) all ruling requests, private letter rulings, notices of proposed deficiencies, closing agreements, settlement agreements, and any similar documents or communication sent or received by any of the Acquired Entities relating to Taxes.

(c)    None of the Acquired Entities or CILP has been notified in writing that any Governmental Authority has raised any issues, or intends to raise any issues, in connection with any Tax Return or Taxes of any of the Acquired Entities.

(d)    There are no pending Tax audits or written inquiries and no waivers of statutes of limitations with respect to Taxes have been given or requested in writing with respect to any of the Acquired Entities.

(e)    None of the Acquired Entities has ever been notified in writing by any Governmental Authority in a jurisdiction in which such Acquired Entity does not file Tax Returns that it is liable for Tax or required to file a Tax Return in that jurisdiction.

(f)     The Fund qualifies (and has since the date of its formation qualified) and will qualify immediately after the Closing Date, to be treated as a partnership for U.S. federal income tax purposes. Since the date of its formation, the REIT has (i) qualified as a "real estate investment trust" within the meaning of Section 856 of the Code, (ii) not been a "pension-held REIT" within the meaning of Section 856(h)(3)(D) of the Code, (iii) not failed to be a "domestically-controlled qualified investment entity" within the meaning of Section 897(h)(4) of the Code, and (iv) not been a "personal holding company" within the meaning of Section 542 of the Code. Since the date of its formation, each of the Company, the Capmark General Partner, CSREP LV Sub, LLC, a Nevada limited liability company, and (except as otherwise provided in this Section 4.9(f)) each of the other Acquired Entities has properly been classified as a disregarded entity for U.S. federal income tax purposes. Since the date of its formation, Capmark VII CRE LTD, a corporation organized under the laws of the Cayman Islands, has been a qualified REIT subsidiary for U.S. federal income tax purposes. Since the date of its formation, each of CSREP RP Finance, LLC, a Delaware limited liability company, and CSREP/MSF Multifamily Preferred LLC, a Delaware limited liability company, has been classified and treated as a partnership for U.S. federal income tax purposes. Except as set forth on Schedule 4.9(f), none of the Fund, Sellers or any of their Affiliates, nor any Governmental Authority, has taken a position or action inconsistent with the federal income tax classification or treatment of any of the entities described in this Section 4.9(f).

(g)     Each of the Sellers (or if a Seller is a disregarded entity, the party to whom the relevant sale would be attributed for U.S. federal tax purposes) is not a "foreign person" within the meaning of Code Section 1445.

(h)     There are no liens for Taxes on any of the Acquired Entities or any assets of the Acquired Entities other than liens for Taxes not yet due and payable.

(i)     The Fund is or will be an "electing investment partnership" within the meaning of Section 743(e)(6) of the Code beginning in 2009. The Fund has never revoked an election made pursuant to Code Section 754.

(j)     None of the Acquired Entities is a party to any tax sharing, tax allocation or similar agreement, and none of the Acquired Entities is responsible for the Tax liability of any other person by law, by contract or otherwise.

4.10    Compliance with Legal Requirements. CILP and the Capmark General Partner has operated and currently operates in compliance with all applicable Legal Requirements, except for such noncompliance as would not have a Material Adverse Effect. None of CILP nor the Capmark General Partner has received written notice claiming a violation by the Fund or CILP of any material Legal Requirement applicable to the Fund or CILP in respect of the Fund.

4.11    Broker. Any brokers or financial advisers to whom any fees would be payable in connection with the Contemplated Transactions that have been engaged by Sellers or any of their Affiliates and any resulting payment, fee or commission shall be an Excluded Liability and Sellers are solely responsible for any payment, fee or commission that may be due to any such brokers or financial advisers.

4.12    Distributions; Clawback.  Schedule 4.12 sets forth a list of all distributions and payments made by the Fund to any of the Partners (as defined in the Partnership Agreement) on or prior to the date of this Agreement, including distributions to the Capmark General Partner under Section 8.2 of the Partnership Agreement.  Since the formation of the Fund, (a) no Person has been requested or was obligated to restore funds to or reimburse the Fund with respect to any distributions previously made by the Fund pursuant to the terms of the Partnership Agreement, and assuming the Fund were to be dissolved as of the date hereof or on the Closing Date, no Person would be required to restore funds to or reimburse the Fund with respect to any distributions previously made by the Fund pursuant to the terms of the Partnership Agreement and (b) as of the Closing Date, the Fund has not made, nor will the Fund be required to make at Closing, any Incentive Distributions.

4.13    Fund Partners.

(a)    Schedule 4.13(a) sets forth a true, correct and complete list, as of the date of this Agreement, of each partner in the Fund and such partner's Capital Commitment, aggregate capital contributions to date and remaining unfunded Capital Commitment.

(b)    No Person other than the partners set forth on Schedule 4.13(b) has any equity interest in the Fund or any option or other right to acquire an interest in the Fund, other than any option or other right which may have been granted by a partner in the Fund.

(c)    Except as set forth on Schedule 4.13(c) which defaults have been cured or waived, no limited partner of the Fund has defaulted in the payment when due of any Capital Call (as defined in the Partnership Agreement) nor has any Capital Call been made in respect of which any Partner's required Capital Contribution is outstanding.

4.14    Capmark General Partner.  No Person (other than the Capmark General Partner) is a general partner under the Partnership Agreement.  No Person other than the Capmark General Partner and CILP has any direct or indirect right to, or interest in, any Incentive Distribution that is or could be owed by the Fund pursuant to the terms of the Fund Constituent Documents.

4.15    Financial Statements; Undisclosed Liabilities; Absence of Developments.

(a)    CILP has previously provided or made available to Buyer true, correct and complete copies of (i) the unaudited financials for the Fund as of and for the fiscal quarters ended June 30, 2010 and September 30, 2010 (the "Balance Sheet Date"), (ii) the audited financials for the Fund as of and for the fiscal year ended December 31, 2009, and (iii) the audited financials for the Fund as of and for the fiscal year ended December 31, 2008 ((i) — (iii) collectively being referred to herein as the "Financial Statements").  The Financial Statements were prepared in accordance with GAAP throughout the periods covered thereby and present fairly the financial condition of the Fund as of such dates and the results of operations of the Fund for such periods.

(b)    Without limitation of the representations in Section 4.15(a), the "Schedule of Investments" that forms a part of the 2009 Financial Statements, is true, correct and complete in all material respects as of the date thereof.  As of the date of the Schedule of Investments, the Fund, either directly or through a wholly-owned Subsidiary of the Fund, owned beneficially, and

had good and marketable title to, each investment reflected in the Schedule of Investments, free and clear of all Encumbrances, other than as reflected in the 2009 Balance Sheet and notes to the 2009 Financial Statements.

(c)     Except as set forth on Schedule 4.15(c), neither the Fund nor the Capmark General Partner has any material liabilities that, if known, would be required to be reflected or reserved against on a consolidated balance sheet of the Fund or the Capmark General Partner prepared in accordance with GAAP or on the notes thereto.

(d)     Except as set forth on Schedule 4.15(d), since the Balance Sheet Date there has not been any change, event or occurrence with respect to the Fund or the Assets that has had or would be reasonably likely to have a Material Adverse Effect.

4.16     Litigation. Except as set forth on Schedule 4.16:

(a)     there is no Litigation pending or, to the knowledge of Sellers, threatened against any member of the Fund Group;

(b)     no member of the Fund Group is subject to any Judgment;

(c)     no Limited Partner has ever instituted or, to the knowledge of Sellers, threatened in writing to institute Litigation against the Capmark General Partner or the Fund; and

(d)     neither the Capmark General Partner nor the Fund has ever instituted or threatened to institute Litigation against a Limited Partner;

4.17     Title. As of the date hereof, each Seller owns beneficially and of record, and has good and marketable title to the Assets to be sold by it hereunder, free and clear of all Encumbrances, other than Permitted Encumbrances. As of the Closing Date, after giving effect to the Contemplated Transactions, Buyer shall acquire good and marketable title to the Assets, free and clear of all Encumbrances (other than any Encumbrances arising under a Purchased Contract, Intermediate Entity Constituent Document or Fund Constituent Document).

4.18     ERISA. ERISA Plans do not own, in the aggregate, twenty-five percent (25%) or more of the value of any class of equity interest in the Fund.

4.19     Investment Company Act. To the knowledge of Sellers, each member of the Fund Group is exempt from the provisions of the Investment Company Act of 1940, as amended, pursuant to exemptions provided in Sections 3(c)(1) or 3(c)(7) of the Investment Company Act of 1940, as amended.

4.20     Repurchase Facilities and Subscription Facility. The Repurchase Facilities and the Subscription Facility have been repaid in full and validly discharged.

4.21     Documentation. True and complete copies of the Fund Constituent Documents, the Subadvisory Agreement and any other agreements between any member of the Fund Group or the Acquired Entities, on the one hand, and the Subadvisor or its related Persons, on the other hand, have been delivered or made available to Buyer.

4.22    No Dissolution.  Sellers have not received any notice of (i) a Dissolution Vote having been proposed or taken, or (ii) any votes having been proposed or taken, to liquidate or dissolve the Fund or the REIT.

4.23    Fund Management Fee.  Effective October 1, 2009, the Capmark General Partner voluntarily changed the base amount used for the calculation of the Fund's management fee from a fee calculated as a percentage of the capital commitment of each Limited Partner of the Fund as more fully described in Section 9.2(a)(i) of the Partnership Agreement to a fee calculated as a percentage of the net equity invested of each Limited Partner as more fully described in Section 9.2(a)(ii) of the Partnership Agreement.

4.24    Fund Liabilities; Fund Expenses.  As of the date of this Agreement, all costs, expenses and liabilities of any type of the Fund and its Subsidiaries that are due and payable have been paid in full.  A true and correct schedule of the accounts payable of the members of the Fund Group as of December 31, 2010 is attached hereto as Schedule 4.24.

4.25    Disclaimer of Other Representations and Warranties.  Neither Seller is making any representation or warranty whatsoever, express or implied, except those representations or warranties of Sellers explicitly set forth in this Agreement, the schedules hereto, or in any certificate or other Transaction Document.  Subject to the terms of this Agreement and the representations and warranties of Sellers provided in this Agreement and the Transaction Documents, the Assets being acquired by Buyer at the Closing as a result of this Agreement, and the Contemplated Transactions shall be acquired by Buyer on an "as is, where is" basis and in their present condition, and Buyer shall rely solely upon its own examination thereof and the representations and warranties set forth set forth in this Agreement, the schedules hereto, or in any certificate or other Transaction Document.

ARTICLE 5
Covenants

5.1    Conduct of Business.  Except as otherwise contemplated by this Agreement, and other than those filings and proceedings before the Bankruptcy Court and the incurrence of expenses required thereunder, CILP covenants and agrees that from the date hereof to the Closing Date, it shall cause the members of the Fund Group to conduct their respective businesses only in the ordinary course of business consistent with past practices and as may be required in accordance with the standard of care under the Fund Constituent Documents, the Purchased Contracts or the constituent documents of entities in the Fund Group.  Between the date of this Agreement and Closing, Sellers (a) shall promptly provide Buyer with copies of all reports, correspondence and other information relating to the Fund and its Subsidiaries, (b) shall not make or agree to make or permit the Capmark General Partner to make or agree to make any payments or distributions to the Partners without the prior written consent of Buyer, (c) shall not make any Capital Calls without the prior written consent of Buyer, (d) shall cause the Fund or its Subsidiaries, as applicable, to pay in full all costs, expenses, liabilities, indebtedness, obligations commitments, expenses, deficiencies or guaranties of any type of the Fund and its Subsidiaries that become due and payable, other than those being contested in good faith, (e) shall cause the Fund and the Fund Group members not to incur any fees or expenses other than (i) management fees under the Purchased Contracts, (ii) legal fees and expenses of the Fund and/or the members

18

of the Fund Group (it being understood that the legal fees and expenses of counsel to Sellers incurred in connection with the negotiation, drafting and execution of this Agreement shall not constitute legal fees of the Fund and/or the members of the Fund Group), (iii) the legal fees and expenses of the Advisory Board, (iv) other fees and expenses of the Fund and/or the members of the Fund Group incurred in the ordinary course of business and consistent with past practice, and (v) other fees and expenses of the Fund and/or the members of the Fund Group the incurrence of which is approved by Buyer and (f) shall cause the members of the Fund Group to provide Buyer with reasonable access at reasonable times to all of such books, records and documents of the Fund Group as Buyer may request and as are available to the Fund Group.

5.2    Reasonable Efforts; Further Assurances.  Subject to the terms and conditions of this Agreement, including without limitation, Article 7, Buyer and Sellers will use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary to cause the conditions to its obligations to close to be satisfied and to consummate the Contemplated Transactions.  To the extent consistent with the terms and conditions of this Agreement, Sellers and Buyer agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to give effect to the transactions contemplated in this Agreement and the other Transaction Documents, and consummate the Closing.  For the avoidance of doubt, nothing in this Agreement shall prohibit Buyer from contacting the Limited Partners directly regarding the transactions or approvals contemplated by this Agreement.

5.3    Certain Filings.  Sellers and Buyer shall cooperate with one another and shall use their commercially reasonable efforts (a) to determine whether any action by or in respect of, or filing with, any Government Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material Contracts, in connection with the consummation of the Contemplated Transactions, and (b) to cause such actions to be taken, such filings to be made, and such information to be furnished in connection therewith and seek timely to obtain any such actions, consents, approvals or waivers.

5.4    Obtaining Approvals and Permits.  Sellers and Buyer shall cooperate in soliciting and obtaining the Approvals and Permits set forth on Schedule 3.3 and Schedule 4.5.

5.5    Required Orders.  Between the date hereof and the Closing Date, Buyer shall take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.

5.6    Notices.  If at any time (a) Buyer becomes aware of any material breach by Sellers of any representation, warranty, covenant or agreement contained herein or (b) any Seller becomes aware of any material breach by Buyer of any representation, warranty, covenant or agreement contained herein, the party becoming aware of such breach shall promptly notify the other parties, in accordance with Section 9.4. Any disclosure of such breach will have no effect on a party's representations, warranties or covenants hereunder or otherwise relieve a party of liability for such breach.

5.7     Change of Name; Use of Name.

(a)     Buyer shall within thirty (30) days of the Closing Date change the name of the Fund and the members of the Fund Group to a name that does not include the word "Capmark" or is not otherwise similar to such name.

(b)     Subject to the terms and conditions of this Agreement, Sellers hereby grant to Buyer, for a period of up to nine (9) months immediately following the Closing Date, a non-exclusive, non-transferable, royalty-free, fully paid up, transitional license, with no right to sublicense, to use the "Capmark" name solely for use on or in connection with the transition of the Business to Buyer and to properly effectuate the transactions contemplated by this Agreement, it being understood that Buyer shall use commercially reasonable efforts to provide a quality of services in connection with the "Capmark" name at least consistent with the quality of the services provided by Sellers prior to and through the Closing Date. Buyer shall not, except as specifically permitted in this Agreement or approved in advance by Sellers, use the "Capmark" name or give consent to the use of the "Capmark" name to any other Person for any reason or in any manner. For the avoidance of doubt, Buyer acknowledges and agrees that the name "Capmark" is intellectual property that is owned by Affiliates of Sellers and is an Excluded Asset.

5.8     Track Record; Certain Assets. Effective as of Closing, CILP hereby consents to the use by Buyer of the Fund's track record and financial models, subject to Buyer's compliance with applicable laws and regulations.

5.9     Management Fees and other Payments. From and after the Closing, Buyer shall cause the Fund to promptly (and, in any event, within forty (40) days after the last day of the fiscal quarter in which the Closing occurs, unless the Closing occurs on the last day of a fiscal quarter, then forty (40) days from the Closing Date) pay to CILP, all Investment Advisory Fees earned by CILP prior to the Closing from the Fund which have accrued and become payable since the last payment date for such fees, but which were never waived and were unpaid as of the Closing. Such Investment Advisory Fees shall represent all accrued but unpaid Investment Advisory Fees through and including the Closing Date. Buyer agrees to not waive any rights under the Fund Constituent Documents with respect to such accrued but unpaid Investment Advisory Fees until such time that CILP has been paid all such fees described in this Section 5.9.

5.10    Non-Disparagement. Following the Closing, neither Sellers, on the one hand, nor Buyer, on the other hand, will disparage the other, or any of their shareholders, members, partners, representatives, directors, officers, employees, or agents; provided, however, that any statements made under oath in any legal proceeding or arbitration proceeding by either party, or any of their shareholders, members, partners, representatives, directors, officers, employees, or agents shall not be deemed a violation of this Section 5.10.

5.11    Tax Matters.

(a)     Tax Return Preparation. CILP shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Acquired Entities with respect to each taxable period ending on or prior to the Closing Date. All such Tax Returns shall be prepared in a

manner consistent with past practice except as required by applicable law. Buyer shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Acquired Entities with respect to each taxable period beginning after or including any period after the Closing Date; provided that for any taxable period that begins before but does not end on the Closing Date, such Tax Returns shall be prepared in a manner consistent with past practice except as required by applicable law.

(b)     Subsequent Allocations.  Buyer, as the owner (directly and indirectly) of the general partner, shall cause the Fund to "close its books" for U.S. federal income tax purposes with respect to CFI as of the Closing Date, and CFI shall not be allocated any income, gain, loss deduction or other item arising after such date, in each case, to the extent permitted under Section 706 of the Code; provided that Buyer may use the "proration method" with respect to CFI if it causes any extraordinary items (as described in Proposed Treasury Regulation § 1.706-4(d)(3)) to be allocated to partners in proportion to their interests on the date such items are taken into account.

(c)     Tax Cooperation.

(i)     The parties hereto shall and shall cause their Affiliates to reasonably cooperate as and to the extent reasonably requested by the other party in connection with the filing of Tax Returns and any audit, Litigation or other proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon the other party's request and cost) the provision of records and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(ii)     The parties hereto further agree upon written request from and at the sole cost of the other party, to use their commercially reasonable efforts to obtain any certificates or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed on the requesting party.

(d)     Conveyance Taxes.  Sellers shall pay all sales, use, value added, transfer, stamp, documentary, excise, real property transfer or gains, or similar Taxes (collectively, "Transfer Taxes") incurred by reason of the transactions contemplated by this Agreement, and Sellers shall, at their own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and, if required, Buyer shall join in the execution of any such Tax Returns and other documentation.

(e)     Electing Investment Partnership.  To the extent the Fund is, or elects to be treated as, an "electing investment partnership" for purposes of Section 743(e)(6) of the Code for the taxable year that includes the Closing Date, Sellers agree that they will comply with Section 743(e) of the Code, the Treasury Regulations promulgated thereunder and any guidance issued in respect thereof (including, but not limited to Notice 2005-32), including supplying Buyer with all information necessary to enable Buyer to comply with Section 743(e) of the Code.

(f)     Certain Tax-Related Actions.  Following the execution hereof, without Buyer's advance written consent (not to be unreasonably withheld or delayed), Sellers shall not and shall cause their Affiliates not to make any new, or change or revoke any existing, material election with respect to Taxes with respect to any of the Acquired Entities, settle any material Tax liability that would adversely affect Buyer or any of the Acquired Entities after the Closing, file any Tax Return with respect to the Acquired Entities other than in the ordinary course of business consistent with past practice, take or any action that would change the federal income tax classification of any of the Acquired Entities as set forth in Section 4.9, or extend the statute of limitations with respect to Taxes of any of the Acquired Entities.

5.12    [Intentionally Omitted].

5.13    Distributions.  All distributions made or paid by the Fund (a) on or before the Closing Date in respect of the interest of the Capmark General Partner as general partner or limited partner of the Fund shall be for the account of Sellers, and (b) after the Closing Date in respect of the interest of the Capmark General Partner as general partner or limited partner of the Fund shall be for the account of Buyer.  The party receiving distributions from the Fund that are for the benefit of the other party pursuant to the terms of the immediately preceding sentence, agrees to promptly (and in any event within two (2) Business Days of the receipt thereof) pay over or account to the other party for all such distributions made in respect of the interest of the Capmark General Partner as general partner or limited partner of the Fund.  Any distribution after the date of this Agreement but before the Closing in respect of the interest of the Capmark General Partner as general partner or limited partner of the Fund shall be made in accordance with Section 5.1, and, to the extent any such distribution to the Capmark General Partner is distributed by the Capmark General Partner after the date of this Agreement but before the Closing, shall result in a reduction of the Purchase Price payable by Buyer pursuant to Section 2.6.

5.14    Financial Information.  Buyer and Sellers shall cooperate with each other, their respective counsel and auditors, and provide information and reasonable access to relevant books and records relating to the Fund and the Business and otherwise, as may be necessary or desirable in connection with the preparation of financial statements of Buyer, Sellers and/or their respective Affiliates and/or the preparation of any audit report in respect thereof.  Sellers shall reimburse Buyer for all out-of-pocket expenses incurred by Buyer in connection with its compliance with this covenant for the benefit of Sellers.  Buyer shall reimburse Sellers for all out-of-pocket expenses incurred by Sellers in connection with their compliance with this covenant for the benefit of Buyer.

5.15    Transition Services.

(a)     Sellers shall, upon the request of Buyer, pursuant to Section 4 of the Subadvisory Agreement, request and obtain from Subadvisor and deliver to Buyer all documents and/or information regarding the Fund Group held by Subadvisor as is reasonably requested from time to time between the date hereof and Closing by Buyer.  Sellers shall deliver the requested documents and/or information to Buyer as promptly as practicable, but in no event later than five (5) Business Days following any such request by Buyer.

(b)     Sellers agree to use commercially reasonable efforts (which, for the avoidance of doubt, shall not require incurring any out-of-pocket fees or expenses) to assist Buyer, at its request, in the negotiation and execution of an agreement with Subadvisor for the provision of certain short-term transitional services (not expected to exceed two to four months, depending on the activity) to be provided by Subadvisor (or personnel of Subadvisor) to Buyer (including, without limitation: work-out negotiations, tax filings, audit preparation and completion and investor reporting) and the subsequent transition of such services to Buyer. The expense of performance of such agreements shall be at the sole cost and expense of Buyer.

## ARTICLE 6
### Conditions to Closing

6.1     <u>Conditions to the Obligations of Buyer and Sellers</u>. The obligations of Buyer and Sellers to consummate at Closing the Contemplated Transactions shall be subject to the following conditions:

(a)     no preliminary or permanent injunction or other order, decree or ruling issued by any Governmental Authority nor any statute, rule, regulation or executive order promulgated or enacted by any Government Authority shall be in effect that would make the acquisition or holding directly or indirectly by Buyer of the Assets illegal or otherwise prevent the consummation of the Contemplated Transactions;

(b)     the Bankruptcy Court shall have entered the Sale Order substantially in the form attached hereto as <u>Exhibit C</u>, with such changes as the Bankruptcy Court may require, authorizing the sale of the Assets to Buyer and providing such other relief as may be necessary or appropriate to allow the consummation of the Contemplated Transactions;

(c)     receipt of the written consent of the Fund to the assignment by CILP to Buyer, and the assumption by Buyer from CILP, of all of CILP's rights and obligations under the Fund Investment Management Agreement; and

(d)     receipt of the written consent of the REIT to the assignment by CILP to Buyer, and the assumption by Buyer from CILP, of all of CILP's rights and obligations under the REIT Investment Management Agreement.

6.2     <u>Conditions to the Obligations of Buyer</u>. The obligations of Buyer to consummate at Closing the Contemplated Transactions shall be subject to the following conditions, which may be waived by Buyer:

(a)     Sellers shall have performed and complied in all material respects with their obligations and covenants to be performed and complied with by them hereunder on or prior to the Closing Date;

(b)     the representations and warranties of Sellers in this Agreement shall be correct when made and at the Closing Date in all material respects with the same force and effect as though made at such time (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date);

(c)     each Seller shall have furnished to Buyer a certificate, dated the Closing Date, signed by a responsible and authorized officer of such Seller, to the effect that all conditions set forth in Sections 6.2(a), (b) and (k) have been satisfied;

(d)     CILP shall have executed and delivered to Buyer the Assignment and Assumption Agreement in the form attached as Exhibit B-1 and CFI shall have executed and delivered to Buyer the Assignment and Assumption Agreement in the form attached as Exhibit B-2 (collectively, the "Assignment and Assumption Agreements");

(e)     Buyer shall have received (i) a certificate of good standing with respect to CILP issued by the Secretary of State of Delaware dated within ten (10) days prior to Closing, (ii) a certificate of good standing for the Fund issued by the Secretary of State of Delaware, dated within ten (10) days prior to Closing, (iii) a certificate of good standing with respect to CFI issued by the Secretary of State of California dated within ten (10) days prior to Closing, and (iv) a copy of the Sale Order, as entered by the Bankruptcy Court;

(f)     Buyer shall have received a certificate of the secretary or assistant secretary of each Seller, dated the Closing Date, as to the incumbency and signature of the officers of such Seller executing this Agreement and any certificate, agreement or other documents to be delivered pursuant hereto, together with evidence of the incumbency of such secretary;

(g)     Buyer shall have received a copy of the resolutions of each Seller authorizing the execution, delivery and performance of this Agreement and the consummation of the Contemplated Transactions, certified by the secretary or assistant secretary of such Seller as of the Closing Date;

(h)     Buyer shall have received evidence of the making of the filings and notifications and the receipt of the Approvals and Permits set forth on Schedules 4.5;

(i)     Buyer shall have received an affidavit that satisfies the requirements of Code Section 1445(b)(2), in the form attached as Exhibit A, from each Seller;

(j)     Sellers shall not have received any notice of (i) a Dissolution Vote having been proposed or taken, or (ii) any other vote having been proposed or taken, to liquidate or dissolve the Fund or the REIT; and

(k)     effective as of the Closing, after giving effect to the Contemplated Transactions, the Subadvisory Agreement shall have been terminated in accordance with its terms without any liability or cost that could be imposed upon or affect the Assets or the Purchased Contracts.

6.3     Conditions to the Obligation of Sellers.  The obligations of Sellers to consummate the Contemplated Transactions shall be subject to the following conditions, which may be waived by Sellers:

(a)     Buyer shall have performed and complied in all material respects with its obligations and covenants to be performed and complied with by it hereunder on or prior to the Closing Date;

(b)     the representations and warranties of Buyer in this Agreement shall be correct when made and at the Closing Date in all material respects with the same force and effect as though made at such time (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date);

(c)     Buyer shall have furnished to Sellers a certificate, dated the Closing Date, signed by an authorized officer of Buyer, to the effect that all conditions set forth in Sections 6.3(a) and (b) above have been satisfied;

(d)     the Advisory Board shall have duly approved Buyer to replace CILP as the Investment Manager (as defined in the Partnership Agreement) in accordance with Section 10.3 of the Partnership Agreement, as required by Section 10.4(f) of the Partnership Agreement;

(e)     Sellers shall have received a copy of the resolutions of Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the Contemplated Transactions, certified by the secretary or assistant secretary of Buyer on the Closing Date;

(f)     Sellers shall have received a certificate of good standing with respect to Buyer issued by the Secretary of State of Buyer's state of formation, dated within ten (10) days prior to Closing;

(g)     Sellers shall have received a certificate of the secretary or assistant secretary of Buyer, dated the Closing Date, as to the incumbency and signature of the officers of Buyer executing this Agreement and any certificate, agreement or other documents to be delivered pursuant hereto, together with evidence of the incumbency of such secretary or assistant secretary;

(h)     Buyer shall have paid the Purchase Price;

(i)     Buyer shall have executed and delivered to Sellers the Assignment and Assumption Agreements; and

(j)     Sellers shall have received the Good Faith Deposit as contemplated in Section 2.5(a).

## ARTICLE 7
### Termination

7.1     Conditions of Termination.  This Agreement may be terminated at any time before the Closing:

(a)     by mutual written consent of Sellers and Buyer;

(b)     by Sellers or Buyer, by notice to the other party, if:

        (i)     the Auction shall not have occurred on or before May 4, 2011; provided, however, that a party shall only be permitted to terminate this Agreement pursuant to this clause if it is not then in material breach of any of its representations, warranties, covenants or agreements contained herein; or

        (ii)     the Closing shall not have occurred on or before May 24, 2011 (the "Drop Dead Date"); provided, however, that a party shall only be permitted to terminate this Agreement pursuant to this clause if it is not then in material breach of any of its representations, warranties, covenants or agreements contained herein; or

        (iii) .    the Bankruptcy Court shall have entered an order authorizing or approving an Alternative Transaction, Buyer is the Back-Up Bidder, and the consummation of the Alternative Transaction shall not have occurred on or before the Drop Dead Date; or

        (iv)     the Bankruptcy Court shall have entered an order authorizing or approving an Alternative Transaction and Buyer is not the Back-Up Bidder; or

        (v)     the Bankruptcy Court does not enter a Sale Order by the Drop Dead Date; provided, however, that a party shall only be permitted to terminate this Agreement pursuant to this clause if it is not then in material breach of any of its representations, warranties, covenants or agreements contained herein; or

(c)     (i) by Sellers by notice to Buyer in the event of a material breach by Buyer of Buyer's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Article 6 by the Drop Dead Date, unless such breach by Buyer is capable of being cured and is cured within the earlier of (A) thirty (30) days of such notice of breach, and (B) the Drop Dead Date; provided that nothing herein shall restrict Sellers from terminating this Agreement immediately upon notice thereof to Buyer if such breach is not capable of being cured; or (ii) by Buyer by notice to Sellers in the event of a material breach by either Seller of such Seller's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Article 6 by the Drop Dead Date, unless such breach by any Seller is capable of being cured and is cured within the earlier of (A) thirty (30) days of such notice of breach, and (B) the Drop Dead Date.

    7.2     Effect of Termination; Remedies.  In the event of termination pursuant to Section 7.1, this Agreement shall become null and void and have no effect (other than Articles 7 and 9 and Section 8.1, which shall survive termination), with no liability on the part of Sellers or Buyer, or their respective Affiliates, with respect to this Agreement, except for any liability provided for in Sections 7.3 or 9.2 inclusive.

    7.3     Good Faith Deposit.  If this Agreement is terminated pursuant to Section 7.1 of this Agreement, then the Good Faith Deposit shall be returned to Buyer within three (3) Business Days from the date of termination unless this Agreement is terminated by Sellers pursuant to

Section 7.1(b)(ii) where the Closing shall not have occurred due to the failure of the conditions contained in Section 6.3 to be satisfied by the Drop Dead Date (other than the conditions in Section 6.3(d) and any condition that by its nature is to be satisfied by actions to be taken at the Closing by Buyer if Buyer is prepared to take such actions on such date) or pursuant to Section 7.1(c)(i), in which case Sellers shall be paid the Good Faith Deposit.

### ARTICLE 8
### Bankruptcy Matters

8.1   Bankruptcy Court Approval.

    (a)    Reserved.

    (b)    Reserved.

    (c)    In the event an appeal is taken or a stay pending appeal is requested, with respect to the Sale Order, Sellers shall promptly notify Buyer of such appeal or stay request and shall promptly provide to Buyer a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

8.2   Bidding Procedures. Buyer acknowledges that this Agreement and the sale of the Assets are subject to the authorization of the Bankruptcy Court and to the rights of the Subadvisor under the Subadvisory Agreement. Buyer further acknowledges that to obtain authorization of the Bankruptcy Court, Sellers must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to its creditors and interested parties as ordered by the Bankruptcy Court, and conducting an Auction in respect of the Assets.

### ARTICLE 9
### Miscellaneous Provisions

9.1   Nonsurvival of Representations and Warranties. The representations and warranties of the parties contained in this Agreement or in any other Transaction Document or instrument or writing delivered in connection with this Agreement shall terminate at Closing.

9.2   Expenses. Except as otherwise provided elsewhere in this Agreement, each of the parties hereto shall pay its own expenses and the fees and expenses of its counsel, accountants, and other experts in connection with this Agreement.

9.3   Waivers. The waiver by any party hereto of any condition or of a breach of another provision of this Agreement shall not operate or be construed as a waiver of any other condition or subsequent breach. The waiver by any party hereto of any of the conditions precedent to its obligations under this Agreement shall not preclude it from seeking redress for breach of this Agreement other than with respect to the condition so waived.

9.4    Notices. All notices, requests, demands, applications, services of process, and other communications which are required to be or may be given under this Agreement shall be in writing and shall be deemed to have been duly given if sent by telecopy or facsimile transmission, or delivered by recognized overnight courier or mailed, certified first class mail, postage prepaid, return receipt requested, to the parties hereto at the following addresses:

To Sellers:

>Capmark Investments LP
>116 Welsh Road
>Horsham, PA 19044
>Attn: Alyssa Brodzinski
>Facsimile: (215) 682-0996

>Capmark Structured GP, L.P.
>116 Welsh Road
>Horsham, PA 19044
>Attn: Alyssa Brodzinski
>Facsimile: (215) 682-0996

>and

>Capmark Finance Inc.
>116 Welsh Road
>Horsham, PA 19044
>Attn: Thomas L. Fairfield
>Facsimile: (215) 441-7238

Copies:

>Dewey & LeBoeuf LLP
>1301 Avenue of the Americas
>New York, NY 10019-6092
>Attention: Alec Fraser
>Facsimile: (212) 259-6333

To Buyer:

>NREF II Acquisitions, LLC
>c/o Normandy Real Estate Partners
>53 Maple Avenue
>Morristown, NJ 07960
>Attention: Gavin Evans
>Facsimile: (973) 898-1140

Copies:

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
Attention: Drew Flowers
Facsimile: (213) 229-6885

or to such other address as any party shall have furnished to the other by notice given in
accordance with this Section. Such notice shall be effective when received.

9.5    Entire Agreement; Amendments. This Agreement and the attachments hereto
embody the entire agreement between the parties hereto with respect to the transfer of the Assets
and the other subject matter hereof and supersedes all prior agreements, options, rights and
understandings, oral or written, with respect thereto. This Agreement may not be modified
orally, but only by an agreement in writing signed by the party or parties against whom any
waiver, change, amendment, modification, or discharge may be sought to be enforced.

9.6    Binding Effect; Benefits. This Agreement shall inure to the benefit of and will be
binding upon the parties hereto and their respective successors and permitted assigns. Neither
Buyer nor Sellers shall assign this Agreement or delegate any of its obligations hereunder to any
other Person without the prior written consent of the other. Notwithstanding anything to the
contrary in this Agreement, Buyer may assign or transfer all or a portion of its rights under this
Agreement to one or more Affiliates without the consent of Sellers; provided that (i) Buyer shall
remain primarily liable for the obligations and liabilities of each of its assignees or transferees,
and (ii) each such assignee or transferee shall execute a joinder agreement in form and substance
reasonably satisfactory to Sellers binding such assignee or transferee to the terms and conditions
of this Agreement as if named Buyer herein and pursuant to which such assignee or transferee
shall make the representations and warranties of Buyer made in this Agreement.

9.7    Headings, Schedules, and Exhibits. The section and other headings in this
Agreement are for reference purposes only and will not affect the meaning of interpretation of
this Agreement. Reference to schedules or exhibits shall, unless otherwise indicated, refer to the
Exhibits and Schedules attached to this Agreement, which shall be incorporated in and constitute
a part of this Agreement by such reference. Any item that could be deemed to be properly
disclosable on more than one schedule to this Agreement shall be deemed to be properly
disclosed on all such schedules if it is disclosed in reasonable detail on any schedule to the
Agreement.

9.8    Counterparts and Facsimile Signatures. This Agreement may be executed in any
number of counterparts, each of which, when executed, shall be deemed to be an original and all
of which together will be deemed to be one and the same instrument. Facsimile or pdf signatures
to this Agreement shall be valid signatures.

9.9     Governing Law.

(a)     The validity, performance, and enforcement of this Agreement and all transaction documents, unless expressly provided to the contrary, shall be governed by the laws of the State of New York, without giving effect to the principles of conflicts of law of such state, and the Bankruptcy Code, to the extent applicable.

(b)     During the pendency of the Bankruptcy Case, any dispute, controversy or claim that arises between Buyer and Sellers under this Agreement may only be brought in the Bankruptcy Court, and each of the parties consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

9.10     Specific Performance.  Buyer and Sellers each agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by it in accordance with the terms hereof and that each party shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.  In the event the terms hereof are specifically enforced, it is the intent of the parties hereto that sale of all of the Assets will be effectuated together as an integrated and indivisible transaction.

9.11     Third Parties; Joint Ventures.  This Agreement constitutes an agreement solely between the parties hereto, and, except as otherwise specifically provided herein, is not intended to and will not confer any rights, remedies, obligations, or liabilities, legal or equitable, including any right of employment, on any Person (including but not limited to any employee or former employee of any Seller) other than the parties hereto and their respective successors, or assigns, or otherwise constitute any Person a third party beneficiary under or by reason of this Agreement.  Nothing in this Agreement, expressed or implied, is intended to or shall constitute the parties hereto partners or participants in a joint venture.

9.12     Construction.  This Agreement has been negotiated by Buyer and Sellers and their respective legal counsel, and legal or equitable principles that might require the construction of this Agreement or any provision of this Agreement against the party drafting this Agreement shall not apply in any construction or interpretation of this Agreement.

*[Signature Page Follows]*

Buyer and Sellers have executed this Agreement as of the date first written above.

SELLERS:

CAPMARK INVESTMENTS LP, Debtor-In-Possession

By: _____
Name: William Gallagher
Title: President

CAPMARK FINANCE INC., Debtor-In-Possession

By: _____
Name: William Gallagher
Title: President

BUYER:

NREF II ACQUISITIONS, LLC

By:     NREF II REIT A, LLC

By:     Normandy Real Estate Fund II, LP, its Manager

By:     Normandy Real Estate Fund II GP, LLC, Its General Partner

By: _____
Name:
Title:

[Signature Page to Purchase Agreement]

Buyer and Sellers have executed this Agreement as of the date first written above.

SELLERS:

CAPMARK INVESTMENTS LP, Debtor-In-Possession

By: _____
       Name:
       Title:

CAPMARK FINANCE INC., Debtor-In-Possession

By: _____
       Name:
       Title:

BUYER:

NREF II ACQUISITIONS, LLC

By:   NREF II REIT A, LLC

By:   Normandy Real Estate Fund II, LP, its Manager

By:   Normandy Real Estate Fund II GP, LLC, Its General Partner

By: _____
       Name: David Welch
       Title: Managing Principal

[Signature Page to Purchase Agreement]

# EXHIBIT B

**Letter Agreement Amending the PCCP Sale Agreement**

# AMENDMENT NO. 1 TO PURCHASE AGREEMENT

AMENDMENT NO. 1 TO PURCHASE AGREEMENT (this "Agreement"), dated as of May 11, 2011, by and among PCCP Pool I, LLC, a Delaware limited liability company ("Buyer"), Capmark Finance Inc., Debtor-in-Possession, a California corporation ("CFI"), and Capmark Investments LP, Debtor-in-Possession, a Delaware limited partnership ("CILP" and, together with CFI, "Sellers").

## Recitals

WHEREAS, Buyer and Sellers have entered into that certain Purchase Agreement dated as of March 15, 2011 (the "Purchase Agreement"), providing for, inter alia, the purchase and sale of the Assets (as defined in the Purchase Agreement);

WHEREAS, capitalized terms used in this Amendment and not defined in this Amendment shall have the meanings ascribed thereto in the Purchase Agreement;

WHEREAS, Sellers and certain of their Affiliates (as hereinafter defined) (collectively, the "Debtors"), have each commenced a voluntary case (each, a "Bankruptcy Case") under chapter 11 of title 11, United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, pursuant to that certain Order (I) Scheduling an Auction Sale in Connection with the Sale of Certain Equity Interests in Real Estate Debt Investment Advisory Group Business (Including Assumption and Assignment of Contracts), (II) Approving Bidding Procedures, (III) Approving a Termination Fee and Expense Reimbursement, (IV) Scheduling a Sale Hearing, (V) Establishing an Objection Deadline, and (VI) Approving the Form and Manner of the Notice of Auction and Sale Hearing and Notice of Assumption and Assignment entered on April 5, 2011 Docket #2702 in the chapter 11 case for Capmark Financial Group, Inc. pending in the Bankruptcy Court jointly administered with its affiliated debtors under case # 09-13684 (the "Bidding Procedures Order"), the Sellers held an Auction for the Assets;

WHEREAS, at the conclusion of the Auction, the Sellers determined that NREF II Acquisitions, LLC was the Successful Bidder (as defined in the Bidding Procedures Order), and that WRT-WSREP LLC was the Back-Up Bidder (as defined in the Bidding Procedures Order);

WHEREAS, the Sellers, in consultation with the statutory unsecured creditors' committee appointed pursuant to section 1102 of the Bankruptcy Code (the "Committee") and in accordance with the Bidding Procedures Order, amended the Bidding Procedures Order to provide for a second Back-Up Bidder to acquire the Assets and assume the Assumed Liabilities in the event Sellers do not consummate the Sale with the Successful Bidder or the Back-Up Bidder, and determined that Buyer was the second Back-Up Bidder ("Second Back-Up Bidder"); and

WHEREAS, Sellers desire that Buyer serve as Second Back-Up Bidder, and Buyer desires to serve as Second Back-Up Bidder, to acquire the Assets and assume the Assumed Liabilities in the event Sellers do not consummate the Sale with the Successful Bidder or the

Back-Up Bidder, in accordance with the terms and conditions of the Purchase Agreement, as amended by this Amendment, following entry of the Sale Order;

NOW, THEREFORE, in consideration of the mutual covenants and promises in this Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Sellers agree as follows:

ARTICLE 1
Amendments.

1.1     Amendment to Definitions.  The definition of "Drop Dead Date" in Article I of the Agreement is hereby amended to read in its entirety as follows:

"Drop Dead Date" has the meaning given in Section 7.1(b)(i)."

1.2     Amendment to Conditions to the Obligations of Buyer and Sellers.  Section 5.1 of the Purchase Agreement is hereby amended to delete the word "and" at the end of clause (c) thereof, to replace the period at the end of clause (d) thereof with a semi-colon and the word "and", and to add a new clause (e), to read in its entirety as follows:

"(e)     there shall not be in effect or binding on Sellers any Contract providing for an Alternative Transaction."

1.3     Amendment to Conditions of Termination.  Section 7.1(b) of the Purchase Agreement is hereby amended to read in its entirety as follows:

"(b)     by Sellers or Buyer, by notice to the other party, if:

(i)     the Closing shall not have occurred on or before June 7, 2011 (the "Drop Dead Date"); provided, however, that a party shall only be permitted to terminate this Agreement pursuant to this clause if it is not then in material breach of any of its representations, warranties, covenants or agreements contained herein; or

(ii)     the Bankruptcy Court shall have entered an order authorizing or approving an Alternative Transaction, and the consummation of the Alternative Transaction shall not have occurred on or before the Drop Dead Date; or

(iii)     Sellers shall have consummated an Alternative Transaction."

1.4     Amendment to Deposit and Bankruptcy Court Approval of the Bidding Procedures Order and Sale Order.  Sections 7.3 and 8.1(a) of the Purchase Agreement are hereby amended by deleting all references therein to "Section 7.1(b)(iii)" and replacing them with references to "Section 7.1(b)(i)".

2

## ARTICLE 2
## Miscellaneous Provisions.

2.1  <u>Effect of Amendment</u>.  This Amendment shall be deemed effective as of the date first written above.  Except as modified by this Amendment, all terms and conditions of the Purchase Agreement shall remain in full force and effect.

2.2  <u>Headings, Schedules, and Exhibits</u>.  The section and other headings in this Amendment are for reference purposes only and will not affect the meaning of interpretation of this Amendment.

2.3  <u>Counterparts and Facsimile Signatures</u>.  This Amendment may be executed in any number of counterparts, each of which, when executed, shall be deemed to be an original and all of which together will be deemed to be one and the same instrument.  Facsimile or pdf signatures to this Amendment shall be valid signatures.

2.4  <u>Governing Law</u>.

(a)  The validity, performance, and enforcement of this Amendment and all transaction documents, unless expressly provided to the contrary, shall be governed by the laws of the State of New York, without giving effect to the principles of conflicts of law of such state, and the Bankruptcy Code, to the extent applicable.

(b)  During the pendency of the Bankruptcy Case, any dispute, controversy or claim that arises between Buyer and Sellers under this Amendment may only be brought in the Bankruptcy Court, and each of the parties consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

***[Signature Page Follows]***

3

Buyer and Sellers have executed this Amendment as of the date first written above.

SELLERS:

CAPMARK INVESTMENTS LP,
Debtor-In-Possession

By: _____
Name: John Lucerne
Title: SVP.

CAPMARK FINANCE INC.,
Debtor-In-Possession

By: _____
Name: Alyssa J. Brodzinski
Title: SVP and Senior Counsel

BUYER:

PCCP POOL I, LLC

By:    PCCP LLC
       Its Managing Member

       By: _____
           Name:
           Title:

Buyer and Sellers have executed this Amendment as of the date first written above.

SELLERS:

CAPMARK INVESTMENTS LP,
Debtor-In-Possession

By:_____
   Name:
   Title:

CAPMARK FINANCE INC.,
Debtor-In-Possession

By:_____
   Name:
   Title:

BUYER:

PCCP POOL I, LLC

By:  PCCP LLC
    Its Managing Member

   By:_____
     Name:
     Title:  Aaron A. Giovara
           Vice President