IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
                                        :
In re                                   :    Chapter 11
                                        :
CAPMARK FINANCIAL GROUP INC., et al.,   :    Case No. 09-13684 (CSS)
                                        :
            Debtors.¹                   :    Jointly Administered
                                        :
                                        :    Hearing Date (Requested):
                                        :    August 19, 2011 at 12:00 p.m. (noon)
                                        :
                                        :    Objection Deadline (Requested):
                                        :    August 16, 2011 at 4:00 p.m.
-----------------------------------------------------------x
```

**MOTION, PURSUANT TO SECTIONS 105(a), 363(b), AND 365 OF THE
BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, AND
LOCAL RULES 2002-1 AND 6004-1, REQUESTING ENTRY OF ORDERS IN
CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL THE REMAINING
ASSETS RELATING TO THE DEBTORS' LOW-INCOME HOUSING TAX CREDIT
BUSINESS (INCLUDING ASSUMPTION AND ASSIGNMENT OF CONTRACTS): (I) A
BIDDING PROCEDURES ORDER (A) SCHEDULING AN AUCTION, (B) APPROVING
BIDDING PROCEDURES, (C) APPROVING A TERMINATION FEE,
(D) SCHEDULING A SALE HEARING, (E) ESTABLISHING AN OBJECTION
DEADLINE, AND (F) APPROVING THE FORM AND MANNER OF THE**

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Summit Crest Ventures, LLC (5690), Capmark Financial Group Inc. (2188), Capmark Capital Inc. (6496), Capmark Finance Inc. (3444), Commercial Equity Investments, Inc. (4153), Mortgage Investments, LLC (6319), Net Lease Acquisition LLC (9658), SJM Cap, LLC (0862), Capmark Affordable Equity Holdings Inc. (2379), Capmark REO Holding LLC (3951), Paramount Managing Member AMBAC II, LLC (3934), Paramount Managing Member AMBAC III, LLC (3999), Paramount Managing Member AMBAC IV, LLC (0117), Paramount Managing Member AMBAC V, LLC (3366), Paramount Managing Member LLC (0184), Paramount Managing Member II, LLC (7457), Paramount Managing Member III, LLC (0196), Paramount Managing Member IV, LLC (0199), Paramount Managing Member V, LLC (0201), Paramount Managing Member VI, LLC (5857), Paramount Managing Member VII, LLC (5855), Paramount Managing Member VIII, LLC (5854), Paramount Managing Member XII, LLC (5457), Paramount Managing Member XVIII, LLC (3087), Paramount Managing Member XIV, LLC (4194), Paramount Managing Member XVI, LLC (4186), Paramount Northeastern Managing Member, LLC (3086), Capmark Affordable Properties Inc. (3435), Paramount Managing Member XXIII, LLC (4754), Paramount Managing Member XXIV, LLC (3615), Paramount Managing Member 30, LLC (6824), Paramount Managing Member 31, LLC (6826), Paramount Managing Member 33, LLC (6831), Broadway Street California, L.P. (7722), Broadway Street 2001, L.P. (0187), Broadway Street XV, L.P. (7730), Capmark Managing Member 4.5 LLC (8979), Capmark Affordable Equity Inc. (2381), Capmark Investments LP (7999), and Protech Holdings C, LLC (7929). CFGI's corporate headquarters is located at 116 Welsh Road, Horsham, Pennsylvania 19044. The addresses for all of the Debtors are available at the following World Wide Web address: http://chapter11.epiqsystems.com/capmark.

**NOTICE OF AUCTION AND SALE HEARING AND NOTICE OF ASSUMPTION AND ASSIGNMENT; AND (II) ONE OR MORE SALE ORDERS APPROVING THE SALE(S) FREE AND CLEAR OF ALL LIENS, ENCUMBRANCES, CLAIMS, AND INTERESTS**

Capmark Financial Group Inc. ("CFGI") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this motion (the "Motion") requesting entry of the following orders in connection with the sale of substantially all the remaining assets in the Debtors' low-income housing tax credits ("LIHTC") business platform: (i) a bidding procedures order (a) scheduling an auction, (b) approving bidding procedures, (c) approving a termination fee, (d) scheduling a sale hearing, (e) establishing an objection deadline, and (f) approving the form and manner of the proposed notice of the auction and sale hearing and notice of assumption and assignment, all in connection with the sale of certain Initial Sale Assets (as defined below), including the right to purchase certain Subsequent Sale Assets (as defined below); and (ii) one or more sale orders approving the sale of the Initial Sale Assets and Subsequent Sale Assets free and clear of all liens, encumbrances, claims, and interests. In support of this Motion, the Debtors respectfully represent:

## Background

1.      On October 25, 2009 (the "Commencement Date"), each of the Debtors other than Capmark Investments LP and Protech Holdings C, LLC (collectively, the "First Filed Debtors") commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On January 15, 2010, Capmark Investments LP ("CILP"), a wholly-owned subsidiary of CFGI, commenced a voluntary case under chapter 11 of the Bankruptcy Code. On July 29, 2010, Protech Holdings C, LLC ("Protech C"), a limited liability company indirectly held by Debtor Capmark Affordable Equity Holdings Inc. ("CAEH"), commenced a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their

RLF1 5294146v. 1

businesses and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code.

2.    On October 27, 2009, this Court entered an order authorizing the joint administration of the First Filed Debtors' chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").  On January 19, 2010, this Court entered an order authorizing the joint administration of CILP's chapter 11 case with the jointly administered chapter 11 cases of the First Filed Debtors.  On February 19, 2010, this Court entered an order authorizing the application to CILP of any and all generally applicable orders previously entered in the First Filed Debtors' cases.  On August 16, 2010, this Court entered an order authorizing the application to Protech C of any and all generally applicable orders previously entered in these chapter 11 cases.  On August 17, 2010, this Court entered an order authorizing the joint administration of Protech C's chapter 11 case with the chapter 11 cases of all other Debtors.

3.    On May 17, 2011, 32 of the 46 Debtors filed a motion to dismiss their chapter 11 cases.  On July 5, 2011, the Court issued an order dismissing the chapter 11 cases of six of the Debtors, Broadway Street Georgia I, LLC, Broadway Street XVI, L.P., Broadway Street XVIII, L.P., Paramount Managing Member IX, LLC, Paramount Managing Member XI, LLC, and Paramount Managing Member XV, LLC, subject to the payment of all remaining allowed and allowable claims (excluding intercompany claims), as well as any unpaid administrative expense claims, including the statutory fees of the United States Trustee, in such cases.  The Debtors have paid all claims, fees, and expenses of the Debtors listed in the immediately preceding sentence and, as a result, those Debtors' chapter 11 cases have been

3

dismissed. The Court adjourned consideration of the motion to dismiss with respect to the other 26 Debtor movants until a later date.

4.    On November 2, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed a statutory unsecured creditors' committee pursuant to section 1102 of the Bankruptcy Code (the "Committee").

## Jurisdiction and Venue

5.    This Court has jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Capmark's Businesses

6.    The Debtors and their non-debtor subsidiaries and affiliates (together with the Debtors, "Capmark") are a group of commercial real estate finance companies that provide real estate-related products and services to borrowers, investors, and other customers along three core business lines: (i) commercial real estate lending and mortgage banking; (ii) investments and funds management; and (iii) commercial loan servicing.[2]

7.    A detailed description of Capmark's business, capital structure, and the events leading to the commencement of these chapter 11 cases is contained in the *Second Amended Disclosure Statement for Joint Plan of Capmark Financial Group Inc. and Certain Affiliated Proponent Debtors Under Chapter 11 of the Bankruptcy Code*, dated July 8, 2011 (as the same may be amended or modified, the "Disclosure Statement") [Docket No. 3226].

---

[2] Pursuant to an order of this Court dated November 24, 2009, the Debtors were authorized to sell all of their commercial mortgage banking and mortgage servicing assets to Berkadia Commercial Mortgage LLC, which sale closed December 11, 2009.

RLF1 5294146v. 1

## Relief Requested

8.     By this Motion, pursuant to sections 105(a), 363(b), and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002-1 and 6004-1, the Debtors request entry of the following orders:

(i)     a bidding procedures order (the "Bidding Procedures Order"), substantially in the form attached hereto as Exhibit A,

    (a)     scheduling a hearing (the "Sale Hearing") to consider approval of the proposed sale (the "Sale") of certain Initial Sale Assets (as defined below) and Subsequent Sale Assets (as defined below) (including the assumption and assignment of certain contracts) by Debtors Capmark Finance Inc. ("CFI"), Capmark Capital Inc. ("CCI"), CAEH, Capmark Affordable Equity Inc. ("CAE"), Capmark Affordable Properties Inc. ("CAP," and together with CFI, CCI, CAEH and CAE, the "Debtor-Sellers"), and Protech Development Corporation ("PDC," and together with the Debtor-Sellers, the "Sellers") to Bear Creek Multi-Family Investments, LLLP (the "Buyer"), pursuant to that certain Purchase Agreement, dated as of August 9, 2011, between the Sellers and the Buyer (the "Sale Agreement"), attached hereto as Exhibit C,[3] or another Successful Bidder (as defined below);

    (b)     establishing the objection deadline in connection with the proposed Sale;

    (c)     approving the form of, and notice procedures relating to, the Notice of Auction and Sale Hearing and the Notice of Assumption and Assignment (each as defined below);

    (d)     scheduling an auction (the "Auction") to the extent that the Sellers receive additional higher and/or otherwise better offers for the Initial Sale Assets, including the right to purchase certain Subsequent Sale Assets;

    (e)     approving the bidding procedures (the "Bidding Procedures") set forth in the Bidding Procedures Order; and

    (f)     approving the Termination Fee (as defined below) provided for in the Sale Agreement; and

---

[3] Given the voluminous nature of the Sale Agreement and the schedules and exhibits thereto, the documents will not be served on parties in interest. Instead, the documents are available at http://chapter11.epiqsystems.com/capmark under the "Key Documents" tab. The schedules to Sale Agreement are partially redacted because certain information therein is of a confidential and commercially sensitive nature. Concurrently herewith, the Debtors filed a motion seeking authority to file the unredacted schedules under seal.

RLF1 5294146v. 1

(ii)    upon completion of the Sale Hearing, one or more orders (each, a "Sale Order"), substantially in the form attached hereto as Exhibit B,

(a)    if no higher and/or otherwise better offers have been received, approving the Debtor-Sellers' entry into the Sale Agreement without the necessity of conducting an Auction and authorizing the Sale of the Initial Sale Assets to the Buyer and, subject to further hearing(s), the Subsequent Sale Assets to the Buyer, free and clear of any and all liens, encumbrances, claims and interests of any kind, nature or description (collectively, the "Liens") pursuant to section 363(f) of the Bankruptcy Code and pursuant to the Sale Agreement; or

(b)    if a higher and/or otherwise better offer is received for the Initial Sale Assets and, therefore, an Auction is held, authorizing the Sale of the Initial Sale Assets, and, subject to further hearing(s), the Subsequent Sale Assets, to the Buyer or to another Successful Bidder at an Auction, in either case free and clear of any and all Liens, pursuant to section 363(f) of the Bankruptcy Code and pursuant to the Sale Agreement or a Modified Sale Agreement (as defined below).

### History of the Debtors' LIHTC Business[4]

9.      The Sale Assets (as defined below) are comprised of substantially all the remaining assets in the Debtors' LIHTC business.  The LIHTC business, commonly known as "LIHTC syndication," generally includes financing and aggregating equity investments in affordable housing properties (the "LIHTC Properties") for sale to institutional third party investors through structured fund transactions.  The LIHTC transactions were structured to meet the requirements of the LIHTC investment and tax credit program created under the federal Tax Reform Act of 1986, enacted to incentivize investment in the development of affordable housing properties.

10.     LIHTC transactions are an integrated set of highly complex agreements and structured transactions under which certain of the Debtors and their affiliates created and

---

[4] The Debtors have described the LIHTC business transactions in greater detail in other pleadings filed with the Court.  The Debtors refer the Court and parties in interest to the previous motions filed in these cases in which the Debtors set forth a more detailed description of the LIHTC Transactions. *See, e.g.*, Docket Nos. 1598 and 2501.

RLF1 5294146v. 1

sponsored LIHTC investment limited liability company funds (the "Funds") in which equity interests were sold to investors.  The parties structured the LIHTC transactions intending for the investors to earn a guaranteed after tax rate of return (the "Rate of Return") on their capital investments in Funds in which the Debtors aggregated and syndicated the equity ownership of LIHTC Properties.  The Rate of Return was to be earned through tax credits and other tax benefits (collectively, the "Tax Benefits") generated by the investors' equity ownership in LIHTC Properties over a minimum duration of 15 years pursuant to specific provisions of the Internal Revenue Code. *See* 26 U.S.C. § 42.

11.    In addition to aggregating LIHTC equity investments in the Funds and selling the Fund equity interests to tax credit investors, the Debtors historically managed the Funds and, with respect to many Funds, guaranteed the Rate of Return to the investors regardless of whether expected tax credits are realized.  In certain instances, third-party credit enhancement guarantors directly guaranteed the Rate of Return to the investors and the Debtors, in turn, provided reimbursement guaranties to the credit enhancers, which obligated the Debtors to pay the credit enhancers if they were called upon to pay the investors under their guaranties.  The Debtors' largest potential liabilities under the LIHTC business platform include the reimbursement guarantees issued to the credit enhancer third-party guarantors of the tax credit investors' Rates of Return and, to a lesser extent, the direct guarantees of the expected Rates of Return to investors.

## Present Status of the LIHTC Business and Assets

12.    Both before and after the Commencement Date, the Debtors and their professional advisors have devoted a substantial amount of time and effort to developing a plan to resolve the claims associated with the LIHTC business while simultaneously working towards transitioning management of the LIHTC Funds and maximizing the value of the assets that

remain in the business platform. As the Debtors anticipated, these efforts have involved complex issues and negotiations to resolve contingent claims and the rights associated with the business, and the Debtors have taken several steps both before and after the Commencement Date to mitigate the claims and ensure an orderly disposition of the business.

13.    In this regard, the Debtors have consummated two substantial settlements and restructurings of LIHTC transactions involving the credit enhancer and investor parties that held large secured LIHTC claims in these cases, Merrill Lynch Capital Services, Inc. and one of its affiliates (together, "Merrill Lynch"), and Morgan Stanley and certain of its affiliates (collectively, "Morgan Stanley"). Pursuant to these settlements and restructurings, the liabilities of the Debtors under the guarantees issued to the credit enhancer parties were terminated and Morgan Stanley's and Merrill Lynch's proofs of claim filed in these cases were withdrawn with prejudice. Certain newly formed non-debtor subsidiaries of the Debtors (each a "LIHTC Newco", and together the "LIHTC Newcos") assumed the Debtors' obligations under the various guarantees and the Debtors' LIHTC Fund management obligations and liabilities. The LIHTC Newcos were capitalized primarily by the assets that were previously pledged as collateral to the third-party credit enhancers. The Debtors own the equity of the LIHTC Newcos but have no liability on the guarantees issued by those entities.

14.    In the Merrill Lynch settlement, the Debtors transferred nearly $60 million of collateral pledged by the Debtors to secure their obligations to Merrill Lynch and other assets relating to the LIHTC transactions to Tax Credit Holdings I, LLC ,a LIHTC Newco owned by certain of the Debtors (the "Merrill Lynch Holdco"). In the Morgan Stanley settlement, the Debtors transferred approximately $163 million of collateral pledged by the Debtors to secure their obligations to Morgan Stanley and other assets relating to the LIHTC transactions to new

8

special purpose entities owned by Tax Credit Holdings II, LLC, a LIHTC Newco holding company that is directly owned by certain of the Debtors (the "Morgan Stanley Holdco," and together with the Merrill Lynch Holdco, the "Existing Holdcos").

15.     The Merrill Lynch and Morgan Stanley settlements resolved approximately 85% of the secured liabilities of the Debtors in the LIHTC business.  Recently, the Debtors' obtained court approval for a similar settlement with Ally Financial Inc. ("Ally Financial"), as successor to the General Motors Acceptance Corporation, which will resolve Ally Financial's unsecured claims relating to several LIHTC transactions through a settlement and restructuring similar to the Morgan Stanley and Merrill Lynch settlements and restructurings described above in exchange for the release and withdrawal of substantially all of Ally Financial's claims in the Debtors' chapter 11 cases, including all LIHTC-related claims.  As part of the Ally Financial settlement, the Debtors will transfer certain LIHTC assets to a new, wholly-owned, special purpose LIHTC Newco (the "Ally Holdco") that will be formed as part of the consummation of the settlement.   The Court approved the Ally Financial settlement and restructuring transactions on July 5, 2011, and the parties intend to close the settlement before August 9, 2011, the objection deadline for the Debtors' chapter 11 plan (the "Plan"), or, at the latest, August 19, 2011, the Plan confirmation hearings in these cases.

16.     There remain several counterparties whose secured LIHTC claims have not been resolved through settlement or otherwise in these cases, including the credit enhancer claims of Ambac Assurance Corporation ("Ambac") and the investor claims of Great West Life & Annuity Insurance Company, Metropolitan Life Insurance Company, and two subsidiaries of JPMorgan Chase, N.A. (First Chicago Leasing Corporation and Washington Mutual, Inc.).  Ally Financial's claims will be settled as part of the Ally Financial settlement.

9

17.     In addition to the retained assets and liabilities described in the foregoing paragraph, the Debtors continue to hold certain other interests and assets in the LIHTC business. These include managing member interests, warehouse and bridge loans, deferred syndication fees, asset management fee receivables, and certain other assets relating to three LIHTC Funds, Paramount Georgia, LLC, Paramount Georgia II, LLC, and Paramount Missouri, LLC (collectively, the "Paramount Funds"). The Debtors also own the equity of a non-debtor special purpose entity, American Tax Credit Corporate Fund XX, LLC ("Fund XX"), which holds equity interests in certain LIHTC Properties that have not been syndicated for investment and other miscellaneous assets in the business. The Debtors and their affiliates also own certain first mortgage bonds, bridge loans, accounts receivable, partnership interests, and other assets relating to the Belmont Villas senior citizen housing facility in West Babylon, New York (the "Belmont Assets").

18.     Lastly, the Debtors hold various interests and rights in certain non-guaranteed LIHTC Funds (the "Non-Guaranteed Funds") and the equity of a subsidiary, Protech Development Corporation ("Protech Development"), which holds various interests and rights in the LIHTC business.

### Proposed Sale of the LIHTC Sale Assets

19.     Throughout these cases, the Debtors have worked diligently to explore alternatives to sell certain of their business assets where such sales would provide greater value to their estates, relieve the Debtors of ongoing operational expenses, and mitigate potential liability. The Debtors believe the proposed Sale, which will divest the estates of substantially all assets that remain in the Debtors' LIHTC business, will achieve all of these important objectives, benefiting the estates in several ways.

10

20.    As the Debtors noted in the Disclosure Statement approved by the Court on July 8, 2011, the Debtors have been engaged in ongoing efforts to wind down the LIHTC operations by transferring management of the Funds and settling the contingent claims of the credit enhancement parties or guaranteed beneficiaries of guaranteed Funds.  The Debtors also have focused on monetizing all unencumbered assets in the business.  Consistent with these goals, the Debtors retained the right to sell the equity of the LIHTC Newcos from prior settlements and consistently disclosed their intent to recover value from this equity, either through distributions of future cash dividends by the LIHTC Newcos or sale of the Debtors' equity in the entities.   In addition, to the extent settlements are achieved with additional counterparties, the Debtors intend to restructure the related LIHTC transactions in a manner similar to the settlements with Morgan Stanley, Merrill Lynch and (if consummated) Ally Financial, *i.e.*, to form new LIHTC Newcos as the vehicles for the restructuring of the obligations of the parties.

21.    As discussed below with respect to the initial and subsequent sales contemplated by the Sale Agreement, the Sale Agreement is consistent with the Debtors' plan for resolving and restructuring the remaining assets and liabilities of the LIHTC platform. Specifically, the proposed Sale contemplates transactions that would allow the Debtors to immediately monetize the LIHTC assets that can be sold at this time, and provides for future sales as further settlements are achieved with counterparties and other LIHTC assets become available for sale.  This two-step sale process provides a path for the Debtors to fully exit the LIHTC business through transfers for value.  For these reasons, the Debtors, in consultation with their professionals, believe divesture of the LIHTC business assets as contemplated by the Sale is in the best interests of the Debtor-Sellers' estates.

11

*Initial Sale Assets*

22.    The Sale Agreement contemplates an Initial Closing[5] for the sale of certain "Initial Sale Assets," which include assets identified on Schedule 1.1(h) of the Sale Agreement, the right to purchase certain Subsequent Sale Assets subject to the terms set forth in the Sale Agreement (as discussed in the next section), and certain miscellaneous assets, such as intellectual property and computer systems. The Initial Sale Assets identified on Schedule 1.1(h) include, among certain other assets, (a) the Debtors' equity interests in the Existing Holdcos resulting from the prior settlements discussed above; (b) equity interests in entities to-be-formed prior to the Initial Closing that will hold the assets relating to the Paramount Funds and Fund XX; and (c) the Belmont Assets.

*Subsequent Sale Assets*

23.    The Sale Agreement next contemplates one or more Subsequent Closings for the sale of certain "Subsequent Sale Assets," which include assets identified on Schedule 1.1(q) of the Sale Agreement.    The Subsequent Sale Assets and Initial Sale Assets are collectively defined as the "Sale Assets." The Subsequent Sale Assets will include the equity interests in to-be-formed entities resulting from the consummation of further settlements and restructuring transactions relating to unresolved Fund liabilities, including the Ally Holdco (collectively, the "Future Holdcos"). The Future Holdcos, if any, will also include the equity in any entity to be formed to hold the Sellers' interests in the Non-Guaranteed Funds. In addition to the equity interest in the Future Holdcos, the Subsequent Sale Assets will include any and all interests of the Debtors relating to Protech Development (the "PDC Assets").

---

[5] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Agreement. To the extent there are any inconsistencies between the summary description contained herein and the terms and conditions of the Sale Agreement, the terms of the Sale Agreement control.

24.     The Sale of each Subsequent Sale Asset is contingent on the consummation of additional LIHTC transactions. The purchaser of the Initial Sale Assets is also purchasing the exclusive right to purchase the Subsequent Sale Assets on certain conditions set forth in Sections 2.1(b) and 2.5(b) of the Sale Agreement. The Sale Agreement contains an End Date for both parties' obligations to continue the sale process on an exclusive basis. Following the Sale of the Sale Assets (assuming all the Sale Assets are sold), the Debtors' remaining LIHTC assets will consist only of certain miscellaneous assets of nominal value.

## Summary of the Sale Agreement[6]

25.     The Sale Agreement provides that the Sale of the Sale Assets is subject to higher and/or better offers from competing bidders. The salient terms and conditions of the Sale Agreement are as follows:

(i)     **Purchase Price**.

(a)     The purchase price for the Initial Sale Assets, including the right to purchase the Subsequent Sale Assets (the "Initial Purchase Price") shall equal (i) $92.7 million, less (ii) to the extent any Fund 20 Holdco Asset is sold, distributed or otherwise transferred to any third party (other than Fund 20 Holdco) prior to the Initial Closing Date, an amount equal to the price of such Fund 20 Asset as set forth on Schedule 1.1(e) of the Sale Agreement.

(b)     The purchase price for the Subsequent Sale Assets (the "Subsequent Purchase Price") purchased by the Buyer and sold by the Sellers at a Subsequent Closing, if any, shall be as follows:

(1)     with respect to any Future Holdco Interest (other than the Ambac Holdco Interest), one dollar ($1) so long as the settlement of guarantee liabilities related to the LIHTC funds in which Ally Financial, Great West Life, MetLife or JPMC is a credit enhancer and/or investor are consistent with the Settlement Proposals relating to such Future Holdco, however, (i) in the event the settlement of guarantee liabilities related to the LIHTC funds in

---

[6] To the extent any description of the terms of the Sale Agreement set forth in this Motion differ from the actual terms of the Sale Agreement, the terms of the Sale Agreement shall govern.

which Ally Financial, Great West Life, MetLife or JPMC is a credit enhancer and/or investor are not consistent with the Settlement Proposals relating to such Future Holdcos (for example, and without limitation, if the Sellers are required to contribute additional capital to the related Future Holdco) then, notwithstanding the foregoing, the Subsequent Purchase Price with respect to the related Future Holdco Interest shall not be one dollar ($1), but rather the parties shall negotiate in good faith to agree upon the terms and conditions for the purchase and sale of such Future Holdco Interest, including the Subsequent Purchase Price therefor, and, for a period of thirty (30) days from the date such Future Holdco enters into definitive agreements relating to such settlement, the Sellers shall negotiate exclusively with the Buyer with respect to the terms and conditions for the purchase and sale of such Future Holdco Interest; provided that, neither the Buyer nor any Seller shall be in breach of its respective obligations if such party negotiates in good faith, but the parties fail to reach agreement on the terms and conditions of such Subsequent Sale by the End Date, and (ii) there shall be no reduction in the aggregate consideration paid to the Sellers pursuant to this Agreement in the event that the Sellers do not settle any guarantee liabilities related to the LIHTC funds in which Ally Financial, Great West Life or JPMC is a credit enhancer and/or investor, any Future Holdco is not formed or capitalized with the Future Holdco Assets or the Subsequent Sale of any Future Holdco Interest is not consummated because requisite Approvals are not obtained or any other reason;

(2)     with respect to the PDC Assets, one dollar ($1);

(3)     with respect to the Ally Substitution Asset, the purchase price listed opposite such Ally Substitution Asset on Schedule 1.1(b); and

(4)     with respect to the Ambac Holdco Interest, $10 million, subject to adjustment if at the Subsequent Closing thereof the collateral is greater or less than $45 million, such adjustment to be based upon a formula to be agreed upon in good faith by the Buyer and Sellers prior to the Initial Closing Date.[7]

(ii)     **Termination Fee**.  In the event (a) the Sale Agreement is terminated under certain circumstances, (b) the Buyer is not then in default under the Sale Agreement, and (c) an Alternative Acquisition closes within six months of such termination, the Buyer is entitled to a break-up fee in cash of 3% of the Initial

---

[7] The Sale Agreement contemplates that to the extent the Ally Financial settlement is not consummated, certain LIHTC inventory properties to be transferred in the settlement will instead be sold to Buyer.

RLF1 5294146v. 1

Purchase Price (the "Termination Fee") from the proceeds of the Alternative Acquisition. The Termination Fee is inclusive of the Buyer's expenses and there is no additional expense reimbursement payable by the Seller to the Buyer.

(iii)   **Sale of Individual Assets**.  The Sale Agreement provides that the proposed Sale of the Initial Sale Assets is an integrated transaction, but the Sale Agreement contemplates that any of the Subsequent Sale Assets may be sold individually.

(iv)   **Termination of the Sale Agreement**.  The Sale Agreement may be terminated prior to the Initial Closing under the following circumstances:

    (a)   <u>Mutual Written Consent</u>.  The Sale Agreement may be terminated by mutual written consent of the Sellers and the Buyer.

    (b)   <u>Termination by the Sellers or the Buyer</u>.  At any time prior to Closing, either the Sellers or the Buyer may terminate the Sale Agreement if:

        (1)   the Buyer is the Successful Bidder or there are no other Qualifying Bidders (as defined in the Bidding Procedures Order) at the Auction and the Initial Closing shall not have occurred by December 31, 2011 (the "Drop Dead Date"); *provided, however,* that a party shall only be permitted to terminate the Sale Agreement pursuant to this clause if it is not then in material breach of any of its representations, warranties, covenants or agreements contained therein;

        (2)   the Court shall have issued an order authorizing or approving an Alternative Acquisition, the Buyer is the Back-Up Bidder, and the Alternative Acquisition is consummated;

        (3)   15 Business Days after the Drop Dead Date, if the Court shall have issued an order authorizing or approving an Alternative Acquisition, the Buyer is the Back-Up Bidder, and the Alternative Acquisition shall not have been consummated by the Drop Dead Date;

        (4)   the Court shall have issued an order authorizing or approving an Alternative Acquisition and the Buyer is not the Back-Up Bidder;

        (5)   the Court shall have rejected any material provision of the Bidding Procedures;

        (6)   the Court does not approve the Buyer as the "stalking horse bidder;

        (7)   the Court rejects any material provisions of this Motion; or

        (8)   following the grant by this Court of a stay pending appeal of with respect to the Sale Order that is not reversed or set aside within the

earlier of (i) 60 days from the granting of such stay and (ii) the Drop Dead Date.

(c) <u>Termination by the Buyer</u>. The Buyer may terminate the Sale Agreement by written notice to the Sellers in the event (i) any condition to the obligations of the Buyer to the Initial Closing set forth in Sections 7.1 or 7.2 of the Sale Agreement shall have become incapable of fulfillment other than as a result of a material breach by the Buyer of any covenant or agreement in the Sale Agreement, and such condition is not waived by the Buyer, or (ii) there is a breach by the Sellers of their representations or warranties made at the Initial Closing, or any covenants or agreement contained in the Sale Agreement and which breach has not been cured by the earlier of (a) 30 Business Days after the giving of written notice by the Buyer to the Sellers of such breach and (b) the Drop Dead Date.

(d) <u>Termination by the Sellers</u>.    The Sellers may terminate the Sale Agreement by written notice to the Buyer in the event (i) any condition to the obligations of the Sellers set forth in Sections 7.1 or 7.3 shall have become incapable of fulfillment other than as a result of a breach by the Sellers of any covenant or agreement contained in the Sale Agreement, and such condition is not waived by the Sellers, or (ii) a material breach by the Buyer of the Buyer's representations or warranties, or any covenants or agreement in the Sale Agreement which would result in a Material Adverse Effect and which breach has not been cured by the earlier of (a) 30 Business Days after the giving of written notice by the Sellers to the Buyer of such breach and (b) the Drop Dead Date.

26.    In addition to the above-described salient features of the Sale Agreement,

in accordance with Local Rule 6004-1(b)(iv), the Debtors note the following with respect to the

Sale Agreement:

(i)    **No Sale to an Insider**:  The Buyer is not an insider of the Debtors within the meaning set forth in section 101(31) of the Bankruptcy Code.

(ii)    **Agreements with Management**:    Pursuant to Section 6.10 of the Sale Agreement, the Buyer has agreed to offer, or cause its Affiliates to offer, employment to each of the employees of the Sellers and their Affiliates who provides services exclusively or primarily with respect to the LIHTC business and who is listed on Schedule 6.10 of the Sale Agreement (each, a "<u>Business Employee</u>"), for employment with the Buyer or its Affiliates effective on the Initial Closing Date.  Each such offer shall be made no later than ten days prior to the Initial Closing Date, and shall provide for (i) base salary no less favorable than the respective base salary amount set forth on Schedule 6.10 (the "<u>Base Salary Amount</u>"), and paid time off and vacation accrual levels no less favorable than the respective paid time off and vacation accrual levels currently in effect for

16

such Business Employee and (ii) benefits under the Buyer Plans that are comparable, respectively, to the Benefit Plans (as defined in the Sale Agreement) maintained by the Sellers immediately prior to the Initial Closing Date for the Hired Employees (as defined below), with comparability determined based on the aggregate cost of such benefits to any particular Seller with respect to the Hired Employees as of the Initial Closing Date. The Buyer shall, or shall cause its Affiliate to, include in any such offer of employment a provision to the effect that acceptance of such offer shall constitute a resignation of employment with the Sellers and their Affiliates effective immediately before the Initial Closing Date without any obligation on the part of any of the Sellers or their Affiliates to provide compensation or benefits to the accepting Business Employee under a Benefit Plan or otherwise in connection with such Business Employee's termination of employment with the Sellers; provided, however, that Buyer has no obligation for causing the insertion of such language to have the legal significance desired by Sellers and their Affiliates.

Each Business Employee that accepts an offer of employment with the Buyer or its Affiliate pursuant to Section 6.10 of the Sale Agreement shall be deemed a "Hired Employee." The Buyer and the Sellers agree to reasonably cooperate to provide such information (including information relating to co-payments, deductibles and out-of-pocket expenses for health benefits provided to Hired Employees) and work in good faith to effectuate an orderly and efficient transition of benefits (including welfare benefits) provided to the Hired Employees on and following the Initial Closing Date. Nothing in Section 6.10 of the Sale Agreement shall require the continuation by the Sellers or the Buyer of any particular Benefit Plan

Notwithstanding these arrangements, the Debtors believe the Sale is fair because the Sale was ultimately reviewed and approved by the Debtors' senior management, none of whom will become Hired Employees that will transfer to the Buyer. Moreover, the Sale has been reviewed and approved by the Board of Directors of each of the Debtor-Sellers.

(iii)  **Releases**:  No releases have been entered into in connection with the Sale.

(iv)  **No Private Sale/Competitive Bidding**:  As described above, the Sellers intend to conduct an Auction for the Sale of the Initial Sale Assets. The Sale Agreement does not prohibit the Sellers from soliciting competing offers and the Sellers are not otherwise limited in shopping the Sale Assets.

(v)  **Closing and Other Deadlines (Closing and Closing Date)**:

(a)  Initial Closing. The Initial Closing will take place in the offices of Dewey & LeBoeuf LLP in New York, New York at 10:00 a.m. (Eastern Daylight Time) on the date that is three Business Days after each of the conditions to closing set forth in Article 7 of the Sale Agreement have been satisfied

or validly waived or on such other date or at such other time or place as is mutually agreed upon by the Buyer and the Sellers.

(b) <u>Subsequent Closings</u>.  Each Subsequent Closing shall take place at such time, date and place as the parties shall agree pursuant to Section 2.6(b) of the Sale Agreement.

(vi) **Deposit**:  The Buyer is not required to submit a deposit.

(vii) **Interim Arrangements with the Buyer**:  Pursuant to Section 6.3 of the Sale Agreement, the Buyer and Sellers agree to cooperate with each other and provide information and reasonable access to (a) determine whether any action by or in respect of, or filing with, any Government Authority is required or any actions, consents, approvals or waivers are required to be obtained from parties to any material Contracts, in connection with the consummation of the Initial Contemplated Transactions (as defined in the Sale Agreement, the transactions contemplated to occur on the Initial Closing Date pursuant to the Sale Agreement and the other Initial Transaction Documents), and to the extent the parties reach agreement on the terms and conditions for the purchase and sale of any Subsequent Sale Asset, in connection with the consummation of the Subsequent Closing in respect of such Subsequent Sale Asset, and (b) cause such actions to be taken, such filings to be made, and such information to be furnished in connection therewith and seek timely to obtain any such actions, consents, approvals or waivers.

**Transition Services Agreement**:  On or prior to the Initial Closing Date, the Buyer and Sellers shall enter into a transition services agreement (the "<u>Transition Services Agreement</u>") containing terms and conditions summarized on Exhibit G to the Sale Agreement.

(viii) **Use of Proceeds**:  No provision of the Sale Agreement addresses the use of proceeds.

(ix) **Tax Exemption**:  No provision of the Sale Agreement addresses the use of tax exemptions.

(x) **Record Retention**:  Pursuant to Section 6.9 of the Sale Agreement, for a period of six years after the Initial Closing Date, the Sellers will have reasonable access to the books and records relating to the Sale Assets, which will enable the Debtor-Sellers to administer the their chapter 11 cases following the Sale.

(xi) **Sale of Avoidance Actions**:  The Sale Agreement does not involve the sale of, or impose limitations on, any chapter 5 cause of action.

(xii) **Requested Findings as to Successor Liability**:  A condition to the Initial Closing is entry of the Sale Order, which provides that the Buyer, under no circumstances, shall be deemed to be a successor of any of the Debtor-Sellers.

(xiii)  **Sale Free and Clear**:  Pursuant to Sections 4.9 and 5.8 of the Sale Agreement, the Buyer shall acquire from the Debtor-Sellers the Sale Assets of such Debtor-Sellers free and clear of all Encumbrances, which term includes any leases.

(xiv)  **Credit Bid**:  The Sale Assets are unencumbered by any Lien, mortgage, or other security interest.  Accordingly, there will be no credit bidding pursuant to section 363(k) of the Bankruptcy Code.

(xv)  **Relief from Bankruptcy Rule 6004(h) and 6006(d)**:  The Debtors are requesting relief from the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

## Bidding Procedures and the Auction

27.     As noted above, to maximize the value of the Initial Sale Assets, the Debtor-Sellers seek to conduct a competitive bidding process pursuant to the Sale Agreement, subject to higher or better offers.  The proposed Bidding Procedures are set forth below (the Sellers, in their sole discretion, may modify, amend, and waive, as applicable, the Bidding Procedures after consultation with the Committee;[8] *provided*, that no such modification, amendment or waiver may modify, amend or waive the terms and conditions of the Sale Agreement without the consent of the Buyer, including, without limitation, any provisions relating to the Termination Fee):

(i)  **Assets to Be Sold**:  The Auction shall consist of all of the Initial Sale Assets, including the right to purchase the Subsequent Sale Assets.

(ii)  **Confidentiality Agreements**:  Upon execution of a confidentiality agreement, in form and substance satisfactory to the Sellers, any party that wishes to conduct due diligence in respect of the Sale Assets may be granted access to all material information that has previously been provided to (or is simultaneously provided to) the Buyer and other bidders; *provided, however*, prior to receipt by a party of any information from the Sellers (including, but not limited to, the Sale Agreement and its schedules and exhibits, business and financial information and access to representatives of the Sellers), each such party will be required to deliver evidence reasonably satisfactory to the Sellers establishing such party's financial capability to timely consummate a purchase of all of the Sale Assets.  In any event, the Buyer shall be provided access to all due diligence materials,

---

[8] The Committee shall have consultation rights pursuant to the Sale Agreement as long as it is still constituted under the provisions of the Plan.

management presentations and other information provided to any potential bidder hereunder that were not previously made available to the Buyer at the same time such access is provided to such other potential bidder. The availability of additional due diligence shall cease on the date of the Auction.

(iii)   **Bid Deadline**: Any person or entity interested in participating in the Auction must submit a Qualifying Bid (as defined below) by 2:00 p.m. (Eastern Daylight Time) on September 13, 2011 (the "Bid Deadline"), in writing, to (a) counsel to the Sellers, Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York 10019, Attention: Michael P. Kessler, Esq., Judy G.Z. Liu, Esq., and Alec Fraser, Esq., (b) Capmark Financial Group Inc., 116 Welsh Road, Horsham, Pennsylvania 19044, Attention: Thomas L. Fairfield, Executive Vice President and Chief Operating Officer, (c) counsel to the Committee, Kramer Levin Naftalis and Frankel, LLP, 1177 Avenue of the Americas, New York, New York 10036, Attention: Thomas Moers Mayer, Esq., and Joshua Brody, Esq., and (d) counsel to the Buyer, Paul Hastings LLP, 600 Peachtree Street, N.E., 24th Floor, Atlanta, Georgia 30308, Attention: Jesse H. Austin, III, Esq. The Bid Deadline may be extended or otherwise modified by the Sellers in their sole discretion after consultation with the Committee.

(iv)   **Qualifying Bids**: Only the Qualifying Bidders (as defined below) may participate in the bidding process. In order to be deemed a "Qualifying Bidder" each potential bidder (other than the Buyer) must submit a "Qualifying Bid" by the Bid Deadline. The Sale Agreement is deemed a Qualifying Bid and the Buyer is deemed a Qualifying Bidder. Otherwise, to constitute a Qualifying Bid, a bid must:

(a)   be in writing and state that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of all the Initial Sale Assets, including the right to purchase the Subsequent Sale Assets on terms and conditions no less favorable to the Sellers than the terms and conditions contained in the Sale Agreement;

(b)   include a mark-up of the Sale Agreement (the "Modified Sale Agreement") reflecting the variations from the Sale Agreement, and a clean and executed Modified Sale Agreement, together with all exhibits and schedules thereto, and other ancillary agreements described in the Modified Sale Agreement;

(c)   otherwise include terms and conditions substantially the same in all respects to the Sale Agreement (including with respect to the representations and warranties);

(d)   include an acknowledgement or letter that such bidder's offer is irrevocable until the closing of the purchase of the Initial Sale Assets if such bidder is a Successful Bidder or a Back-Up Bidder (each as defined below);

(e)    be for all of the Initial Sale Assets, including the right to purchase the Subsequent Sale Assets, and not individual Sale Assets, and provide that such bidder will close on the sale of all of the Initial Sale Assets within the same time period provided for in the Sale Agreement;

(f)    provide for the immediate payment of the Termination Fee in cash upon consummation of an Alternative Acquisition out of the proceeds of a sale of the Initial Sale Assets to a Person other than the Buyer and/or its Affiliates in accordance with the Sale Agreement;

(g)    include evidence, in form and substance satisfactory to the Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Sale Agreement;

(h)    exceed the Initial Purchase Price in the Sale Agreement by an initial bid of at least $920,000 plus the amounts of the Termination Fee, which bid must be in cash;[9]

(i)    to the extent not previously provided during the bidding process, include a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction pursuant to the Modified Sale Agreement (including current audited financial statements and latest unaudited financial statements), that will allow the Sellers to make a reasonable determination as to the bidder's financial wherewithal and other capabilities to consummate the transactions contemplated by the Modified Sale Agreement;

(j)    not request or entitle the bidder to any transaction or break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement;

(k)    not contain any due diligence or financing contingencies of any kind or any conditions precedent to such bidder's obligation to purchase the Initial Sale Assets other than conditions set forth in the Sale Agreement;

(l)    include full disclosure regarding the identity of each entity that will be bidding for the Initial Sale Assets or otherwise participating in connection with the offer and the names and contact information of members of the bidder who will be available to answer questions regarding the offer;

---

[9] For example, utilizing the Termination Fee equal to 3% of the Initial Purchase Price, the initial bid must be at least $96,401,000, which equals the sum of (i) the Initial Purchase Price of $92,700,000, (ii) $2,781,000 (3% of the Initial Purchase Price of $92,700,000), and (iii) $920,000 (the minimum bid increment).

RLF1 5294146v. 1

(m)   include the names of external advisors to the bidder, including financial, legal, and accounting firms, as well as industry consultants or other resources;

(n)   include any other information or factors that may be relevant to or reasonably requested by the Sellers and their advisors in consideration of the bid;

(o)   include a cash deposit in United States Dollars by wire transfer equal to ten percent (10%) of the amount offered to purchase the Initial Sale Assets (the "Good Faith Deposit"); and

(p)   be received on or before the Bid Deadline.

The Sellers shall make a determination regarding whether a bid is a Qualifying Bid, after consultation with the Committee, and shall notify the bidders as to whether their bids have been determined to be Qualifying Bids by no later than September 14, 2011 at 5:00 p.m. (Eastern Daylight Time). Promptly following receipt, the Sellers shall deliver written copies of all Qualifying Bids along with all materials required under section 2(iv) of the Bidding Procedures Order to the Buyer's counsel, Paul Hastings LLP, 600 Peachtree Street, N.E., 24th Floor, Atlanta, Georgia 30308, Attention: Jesse H. Austin, III, Esq.

(v)   **No Qualifying Bids**:  If no timely, conforming Qualifying Bid, other than the Sale Agreement, is submitted by the Bid Deadline, the Sellers shall not hold an Auction and, instead, shall request at the Sale Hearing that the Court approve the Sale Agreement with the Buyer.

(vi)   **Right to Disseminate Information Relating to Bids**:  At any time, whether before or after the Auction, except as otherwise provided herein, the Sellers may share or not share, after consultation with the Committee, the details of any Qualifying Bid with the other bidders.

(vii)   **Auction**:  In the event the Sellers timely receive one or more Qualifying Bids in addition to the Sale Agreement, they shall conduct the Auction with respect to the Initial Sale Assets, including the right to purchase the Subsequent Sale Assets. The Auction will be conducted at the offices of Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York 10019, on September 15, 2011 at 11:00 a.m. (Eastern Daylight Time), or such other location in New York County, New York as designated by the Sellers in a timely notice to all the Qualifying Bidders. The Auction shall be governed by the following procedures (which may be amended, modified, and waived, as applicable, by the Sellers at any time in their sole discretion after consultation with the Committee):

(a)   The Buyer and the other Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

22

(b)     Only representatives of the Sellers, the Buyer, the other Qualifying Bidders, counsel and other advisors selected by the Committee, and representatives from the U.S. Trustee, shall be entitled to be present at the Auction;

(c)     The Auction process shall be transcribed by a qualified court reporter, unless otherwise provided herein;

(d)     Only the Buyer and the other Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

(e)     Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

(f)     As soon as practicable prior to the Auction, the Sellers will provide copies of the Qualifying Bid which the Sellers believe, in their reasonable business judgment, is the highest or otherwise best offer, which shall include cash consideration in excess of the Initial Purchase Price under the Sale Agreement at least equal to the Termination Fee plus $920,000 (the "Initial Highest Bid") to the Buyer and the other Qualifying Bidders which have informed the Sellers of their intent to participate in the Auction;[10]

(g)     Bidding shall commence the Auction at the amount of the Initial Highest Bid;

(h)     Qualifying Bidders may submit subsequent bids to the Initial Highest Bid and all such subsequent bids must be at least $920,000 higher in cash purchase price consideration than the previous bid.  The Sellers shall credit the amount of the Termination Fee to each and every bid submitted by the Buyer at the Auction, meaning that if the Buyer's subsequent bid is the then highest bid at the Auction, any subsequent bid must exceed the Buyer's bid in cash purchase price consideration by the sum of the amount of the Termination Fee plus $920,000;[11]

(i)     The Sellers may determine, in consultation with the Committee, the order in which Qualifying Bids will be submitted and may modify the ordering of the Qualifying Bids at any time;

---

[10] For example, utilizing the Termination Fee equal to 3% of the Initial Purchase Price, the initial bid must be at least $96,401,000, which equals the sum of (i) the Initial Purchase Price of $92,700,000, (ii) $2,781,000 (3% of the Initial Purchase Price of $92,700,000), and (iii) $920,000 (the minimum bid increment).

[11] For example, utilizing the Termination Fee equal to 3% of the Initial Purchase Price, the initial bid must be at least $96,401,000.  Any subsequent bid must be for at least $97,321,000 in cash (i.e., the initial bid of $96,401,000 plus the minimum bid increment of $920,000).  If the Buyer were to submit such bid for $97,321,000, any subsequent bidder would need to bid at least $101,022,000 in cash to be considered to have submitted the highest bid (i.e., (i) $97,231,000 (the amount of the previous bid), plus (ii) 920,000 (the minimum bid increment), plus (iii) $2,781,000  (the amount of the Termination Fee)).

(j)     All Qualifying Bidders shall be able to submit additional bids and make additional modifications to the Sale Agreement or Modified Sale Agreements, as applicable, at the Auction;

(k)     The Auction may include individual negotiations with the Qualifying Bidders and the Buyer and/or open bidding in the presence of all other Qualifying Bidders and the Buyer; *provided, however,* all material terms of each subsequent bid will be fully disclosed to all bidders throughout the Auction;

(l)     Consistent with the conduct of the Auction in subsection (k) above, the Sellers may conduct, at the Sellers' sole discretion after consultation with the Committee, portions of their negotiations with any Qualified Bidder without having such negotiations transcribed;

(m)     The Auction shall continue until there is only one offer that the Sellers determine, after consultation with the Committee and subject to Court approval, is the highest and/or otherwise best offer from among the Qualifying Bidders and the Buyer submitted at the Auction for the Initial Sale Assets (the "Successful Bid").  In making this decision, the Sellers shall consider any factors they deem relevant, including, without limitation, the amount of the purchase price, the Termination Fee, the form of consideration being offered, the likelihood of a Qualifying Bidder's ability to close a transaction and the timing thereof, the likelihood of the Qualifying Bidder's ability to close a transaction on a sale of the Subsequent Sale Assets, the ability of a Qualifying Bidder to obtain Approvals and Permits, the number, type and nature of any changes to the Sale Agreement requested by a Qualifying Bidder, any contingencies relating to a Qualifying Bidder's offer, and the net benefit to the Debtor-Sellers' estates.  The Buyer or the Qualifying Bidder submitting such Successful Bid shall become the "Successful Bidder" and shall have such rights and responsibilities of a buyer, as set forth in the Sale Agreement or Modified Sale Agreement, as applicable;

(n)     Within three days after conclusion of the Auction, but in any event prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments, or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities; and

(o)     Bids made after the close of the Auction shall not be considered by the Sellers.

(viii)   **Back-Up Bidders and Return of Good Faith Deposits**:

(a)    If an Auction is conducted in which a Qualifying Bidder submits the highest and/or otherwise best Qualifying Bid for all of the Initial Sale Assets, the Qualifying Bidder or several Qualifying Bidders with the next highest and/or otherwise best Qualifying Bid(s) for all of the Initial Sale Assets, as determined by the Sellers at the Auction in the exercise of their business judgment and in consultation with the Committee, shall be required to serve as a back-up bidder (each, a "Back-Up Bidder" and together, the "Back-Up Bidders") and keep such bid open and irrevocable until the earlier of (i) 24 hours after the Initial Closing with the Successful Bidder, or (ii) the Drop Dead Date or any other outside closing date or termination date in the Sale Agreement or Modified Sale Agreement; *provided, however*, the Back-Up Bidders will agree to such extensions of the Drop Dead Date or other deadlines in the Sale Agreement or Modified Sale Agreement that will leave their offer open until all highest and/or otherwise best Qualifying Bid(s) ranked above them consummates the Initial Closing or until 15 business days after Drop Dead Date for such other Qualifying Bid(s).  Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the next highest and/or otherwise best Back-Up Bidder(s) will be deemed to be the new Successful Bidder(s), and the Sellers will be authorized, but not required, to consummate the Sale with the Back-Up Bidder(s) without further order of the Court.

(b)    Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Sellers as the Successful Bidder or a Back-Up Bidder by no later than the fifth Business Day following the conclusion of the Auction.  The Good Faith Deposit of the Back-Up Bidder(s) shall be held by the Sellers until the earlier of (i) three Business Days after the closing of the Sale transaction with the Successful Bidder for the Sale Assets, or (ii) the date of any termination of the Sale Agreement or Modified Sale Agreement of the Back-Up Bidder.

28.    In accordance with Local Rule 6004-1(c)(i), the Debtors note the following with respect to the Auction and the Bidding Procedures:

(i)    **Provisions Governing Qualifications of Bidders and Qualified Bids**:  *See* preceding paragraph 27(iv).

(ii)   **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**:

(a)    No Shop or No-Solicitation Provisions:  The Bidding Procedures do not include a provision limiting the Sellers' ability to solicit higher or otherwise better bids.

(b)     Break-Up/Topping Fees:  *See* preceding paragraph 25(ii); and Section 9.1(a) of the Sale Agreement.

(c)     Bidding Increments:  *See* preceding paragraph 27(vii)(f)-(h).

(d)     Treatment of Break-Up or Topping Fees and Expense Reimbursement at Auction:  *See* preceding paragraphs 27(iv)-(vii)(h).

(iii)   **Modification of Bidding and Auction Procedures**:  See preceding paragraph 27 relating to the modification of Bidding Procedures and Auction procedures, respectively, by the Seller following consultation with the Committee.

(iv)    **Closing with Alternative Backup Bidder**:  *See* preceding paragraph 27(viii)(a).

**Approval of the Bidding Procedures and the Auction**

29.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction.  The Debtors believe the Sale of the Initial Sale Assets pursuant to a public auction governed by the proposed Bidding Procedures will maximize the sale proceeds received by the Debtor-Sellers' estates, which is the paramount goal in any proposed sale of property of the estate.  *See In re Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS 2764, at *253 (Bankr. D. Del. Aug. 15, 2007) ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate") (citations omitted).

30.     The Bidding Procedures allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood the Debtor-Sellers will receive the best possible consideration for the Initial Sale Assets.  Bidding procedures should be approved when they provide a benefit to debtors' estates by maximizing asset values and enhancing competitive bidding.  *See id.* (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 535-37 (3d Cir. 1999)); *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-08 (3d Cir. 2010).

RLF1 5294146v. 1

The Debtors believe the proposed Bidding Procedures are consistent with other procedures previously approved in this district and other districts.

31.    Although the Debtors believe the value to be provided by the Buyer under the Sale Agreement is fair and reasonable, the Debtors submit that the Bidding Procedures and the Auction will ensure the Debtor-Sellers' estates receive the best value available by allowing the market to test the Initial Purchase Price of the Initial Sale Assets.  The Debtors thus request Court approval of the proposed Bidding Procedures for the submission and consideration of competing bids from other interested parties.

### Approval of the Sale Hearing Schedule and Notice of Auction and Sale Hearing

32.    The Debtors request that the Court schedule a Sale Hearing on or about September 21, 2011 at 10:00 a.m. (Eastern Daylight Time), or as soon as practicable thereafter, to consider approval of the Sale Agreement and the Sale contemplated thereby, or the approval of any higher or better offer, if any, resulting from the Auction.  Bankruptcy Rule 6004(a) provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k), and if applicable, in accordance with section 363(b)(2) of the Code." Fed. R. Bankr. P. 6004(a). Bankruptcy Rule 2002(a)(2) requires that the Debtor-Sellers give all creditors and certain other parties "at least 21 days' notice by mail" of the Sale. Fed. R. Bankr. P. 2002(a)(2).  Bankruptcy Rule 6004(b) also provides that objections to the proposed Sale "shall be filed and served not less than seven days before the date set for the proposed action or within the time fixed by the court." Fed. R. Bankr. P. 6004(b).

33.    The Notice of Auction and Sale Hearing contains the type of information required under Bankruptcy Rule 2002(c) and also includes information regarding the Auction

procedures, to the extent a higher or better offer than the Sale Agreement is obtained and an

Auction takes place.   Therefore, the Debtors request that the Court approve the form of and

notice procedures relating to the Notice of Auction and Sale Hearing.   The Debtors propose at

least 21 days' notice for the Sale Hearing, which complies with the notice procedures mandated

by the Bankruptcy Rules, according to the following procedures:

> (i)      The Debtors (or their agent) shall serve, within five Business Days after entry of the Bidding Procedures Order (the "Mailing Deadline"), by overnight courier, electronic mail, or same-day messenger delivery, copies of the Notice of Auction and Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Schedule 1 (the "Notice of Auction and Sale Hearing"), upon:   (a) the U.S. Trustee, (b) counsel to the Committee, (c) counsel to the Buyer, (d) any party who, in the past 12 months, expressed to the Debtors an interest in acquiring the Sale Assets, and who the Debtors and their representatives reasonably and in good faith determine potentially have the desire and financial wherewithal to effectuate the Sale, (e) Wentwood Capital Advisors, L.P., (f) all investors and credit enhancers in related LIHTC Funds, (g) plaintiffs in the litigation relating to the Belmont Assets, (h) any parties entitled to notice under Bankruptcy Rule 2002 and Local Rule 2002-1(b), (i) all non-debtor parties to the Initial Acquired Contracts (as defined below), and (j) all relevant tax authorities.

> (ii)     On or before the Mailing Deadline, or as soon as practicable thereafter, the Debtors (or their agent) will publicize the Notice of Auction and Sale Hearing in the *Wall Street Journal* (National Edition) for two consecutive Business Days.

34.     The Debtors submit that such notice shall constitute good and sufficient

notice of the Auction and the Sale of the Initial Sale Assets, and that no other or further notice

need be given.   Accordingly, the Debtor-Sellers request that the Court approve the form of and

notice procedures relating to the Notice of Auction and Sale Hearing.

### Approval of Procedures for Assumption and Assignment of Initial Acquired Contracts

35.     To facilitate the Sale, the Debtor-Sellers intend to assume and assign

certain contracts to the Buyer or the Successful Bidder (the "Initial Acquired Contracts," as

RLF1 5294146v. 1

defined in the Sale Agreement).[12]   The Debtors will serve a Notice of Assumption and Assignment, substantially in the form attached to the Bidding Procedures Order as <u>Schedule 2</u> (the "<u>Notice of Assumption and Assignment</u>"), on the non-debtor parties to the Initial Acquired Contracts proposed to be assigned by the Debtor-Sellers to the Buyer or the Successful Bidder according to the following procedures:

(i)     On or before the Mailing Deadline, the Debtors (or their agent) shall serve, by overnight courier, electronic mail, or same-day messenger delivery the Notice of Assumption and Assignment, upon all known non-debtor parties to the Initial Acquired Contracts.  The Notice of Assumption and Assignment shall set forth (a) the intent to assign the contracts to the Buyer or the Successful Bidder, as applicable, and (b) applicable cure amounts (the "<u>Cure Amount</u>"), if any.  The Notice of Assumption and Assignment shall identify the Initial Acquired Contracts and the Cure Amount that the Debtor-Sellers believe must be paid in order to cure all defaults.  If no amount is listed on the Notice of Assumption and Assignment, the Debtors believe that there is no Cure Amount due.

(ii)    Bankruptcy Rule 6006(a) provides that "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease other than as part of a plan, is governed by Rule 9014." Fed. R. Bankr. P. 6006(a).  Any objections to (a) the assignment of the Initial Acquired Contracts by the Debtor-Sellers, or (b) the amount asserted as the Cure Amount (each, an "<u>Assumption and/or Cure Objection</u>") must be in writing and set forth with specificity the nature of the objection and the cure amount that the objecting party believes should be paid in connection with the assumption of the Initial Acquired Contracts (the "<u>Claimed Cure Amount</u>").

(iii)   If an Assumption and/or Cure Objection is timely filed, the Debtors request a hearing with respect to that objection be held before the Court at the Sale Hearing.  If, however, an Assumption and/or Cure Objection is not timely filed and served, the assumption and assignment of the Initial Acquired Contracts will proceed without further notice at the Sale Hearing to approve the Sale of the Sale Assets.  The Debtors also request that failure to file and serve timely an Assumption and/or Cure Objections shall be deemed to have waived and released any and all rights to assert a Cure Amount different from that listed on the exhibit to the Notice of Assumption and Assignment and, subject to payment of the Cure

---

[12] Most of the Initial Acquired Contracts are loan-related documents and assignments of rights that are not executory contracts.  With respect to those documents, the Debtor-Sellers seek authority pursuant to section 363 of the Bankruptcy Code to transfer the documents as part of the Sale.  Certain of the Initial Acquired Contracts may qualify as executory contracts, however, and the Debtor-Sellers seek authority to assume and assign those Initial Acquired Contracts pursuant to section 365 of the Bankruptcy Code.

Amount listed for such contract, shall be forever barred and estopped from asserting or claiming against the Debtor-Sellers, the Buyer, or any Successful Bidder that any additional amounts are due or defaults exist, or prohibitions or conditions to assignment exist or must be satisfied, under such Initial Acquired Contracts.

(iv)     If no Cure Amount is due under the Initial Acquired Contracts, and the non-debtor parties to the Initial Acquired Contracts do not otherwise object to the Debtor-Sellers' assignment of the Initial Acquired Contracts, no further action need be taken on the part of such non-debtor parties. The Debtors also request that any Assumption and/or Cure Objection that objects solely to the Cure Amount not prevent or delay the Debtor-Sellers' assignment of the Initial Acquired Contracts. If a party objects solely to a Cure Amount, the Debtor-Sellers may, in their sole discretion, hold the Claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties. So long as the Debtor-Sellers hold the Claimed Cure Amount in reserve, and there are no other unresolved objections to assumption and assignment, the Debtor-Sellers can, without further delay, assume, and assign the Purchased Contract that is the subject of the objection. Under such circumstances, the objecting party's recourse shall be limited to the funds held in reserve.

36.     The Debtors submit that the aforementioned procedures provide sufficient notice to the non-debtor parties to the Initial Acquired Contracts and should be approved by the Court in all respects.

### Approval of Objection Deadline

37.     The Debtors request that, pursuant to Bankruptcy Rule 9014, objections, if any, to the Sale (a "Sale Objection"), or an Assumption and/or Cure Objection must (a) specify the nature of such objection, and (b) be filed with the Court and served so as to be actually received on or before 4:00 p.m. (Eastern Daylight Time) on September 16, 2011 (the "Objection Deadline"), upon: (i) counsel to the Debtors, Dewey & LeBoeuf LLP, Attention: Michael P. Kessler, Esq., and Judy G.Z. Liu, Esq., 1301 Avenue of the Americas, New York, New York 10019; (ii) local counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attention: Mark D. Collins, Esq. and Jason M. Madron, Esq.; (iii) counsel to the Buyer, Paul Hastings LLP, 600 Peachtree Street,

N.E., 24th Floor, Atlanta, Georgia 30308, Attention: Jesse H. Austin, III, Esq.; (iv) the U.S.

Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (v) counsel to

the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New

York, New York 10036, Attention: Thomas Moers Mayer, Esq., and Joshua Brody, Esq.; and

(vi) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b).

## Basis for Relief Requested

A.    **Approval of the Sale under Bankruptcy Code Sections 363(b) and 105(a) is Warranted**

38.    Section 363(b) of the Bankruptcy Code provides, in relevant part, "the

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (providing

that debtors in possession have "all the rights ... of a trustee"). In addition, section 105(a)

provides the authority for the Court to carry out the provisions of section 363(b). *See* 11 U.S.C.

§ 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate

to carry out the provisions of this title"). Although section 363(b) does not specify a standard for

determining when it is appropriate for a court to authorize the use, sale, or lease of property of

the estate, bankruptcy courts routinely authorize sales of a debtor's assets if the sale is based

upon the sound business judgment of the debtor. *See In re Dura Auto. Sys.*, 2007 Bankr. LEXIS,

at *258 (citing *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996)); *Comm. of

Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *In

re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound

business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson

Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound

business judgment" test in the *Abbotts Dairies* decision); and *In re Montgomery Ward Holding Corp.*, 242 B.R 147, 153 (D. Del. 1999) (same).

39.      When a valid business judgment exists, the law vests the debtor's decision to sell assets with a strong presumption that "in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in honest belief that the action taken was in the best interests of the company." *In re Dura Auto. Sys.*, 2007 Bankr. LEXIS, at *260 (citing *The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992)).  Once a court is satisfied there is a sound business judgment for the proposed sale, the court must then determine whether (i) the debtor in possession has provided interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See, e.g., Del. and Hudson Ry. Co.*, 124 B.R. at 166.

40.      The Debtor-Sellers submit that the decision to sell the Sale Assets is based upon their sound business judgment and should be approved.  Both before and after the Commencement Date, the Debtors have worked diligently with their financial and legal advisors to explore alternatives to sell certain of their business assets in circumstances like those presented here, where sales would provide value to the estates and relieve the Debtor-Sellers from ongoing operational expenses, as well as mitigate any potential liabilities associated with the assets.  As discussed in detail above, the proposed Sale, which will divest the estates of substantially all assets that remain in the Debtors' LIHTC business, will achieve all of these important objectives, benefiting the estates in several ways. The proposed Sale is consistent with the Debtors' plan for resolving and restructuring the remaining assets and liabilities of the LIHTC platform in that it permits the Debtor-Sellers to immediately monetize the assets that are

capable of sale at this time (*i.e.*, the Initial Sale Assets), and provides for future sales as further settlements are achieved with counterparties and other assets otherwise become available for sale (*i.e.*, the Subsequent Sale Assets).

41.    The Debtor-Sellers believe that if no timely and conforming Qualifying Bids other than the Sale Agreement are submitted by the Bid Deadline, the prompt Sale of the Initial Sale Assets without an Auction and without further delay presents the best opportunity to maximize and preserve value for their estates by monetizing the LIHTC Business immediately. Furthermore, the Sale of all the Sale Assets creates the opportunity for the Debtors to completely divest from the LIHTC Business, resulting in a more immediate monetization of the business.

42.    In addition, the Debtor-Sellers believe their marketing efforts, arm's-length negotiations with the Buyer, and the proposed Bidding Procedures will achieve the best results for their estates and maximize value for all constituents.    Furthermore, the Bidding Procedures contemplate an open Auction process and are designed to ensure the highest and/or otherwise best purchase price for the Initial Sale Assets.    For all these reasons, the Debtor-Sellers submit the proposed Sale is an exercise of their sound business judgment.

**B.    Sale of the Sale Assets Free and Clear of Interests is Warranted**

43.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions are satisfied:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

44.    The Debtors believe that one or more of these tests in section 363(f) of the Bankruptcy Code are easily satisfied with respect to the Sale of the Initial Sale Assets and also believe the tests will be satisfied with respect to the Subsequent Sale Assets.[13] First, the Sale Assets are unencumbered by any recorded lien, security interest, mortgage, judgment, or other encumbrance. Second, to the extent there is any other unrecorded "interest" in the Sale Assets other than the Debtor-Sellers', the Debtors submit that subsection 363(f)(5) would apply to permit the Sale free and clear of such interest. The Debtors believe the rights of any claimant could be valued and allowed as a claim against the Debtor-Sellers' estates, and thus the claimant could be compelled to accept a money satisfaction of its interest in property, and section 363(f)(5) would be satisfied. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289, 291 (3d Cir. 2003) (the Court of Appeals for the Third Circuit held that section 363(f)(5) was satisfied in respect of successor liability claims because "[h]ad TWA liquidated its assets under Chapter 7 of the Bankruptcy Code, the claims at issue would have been converted to dollar amounts and the claimants would have received the distribution provided to other general unsecured creditors on account of their claims").

45.    Because the section 363(f) requirements have been met, the Buyer should not be liable, as a successor to the Sale Assets or otherwise, for any of the Debtor-Sellers'

---

[13] The Debtors seek approval of the sale of the Subsequent Sale Assets free and clear pursuant to section 363(f) of the Bankruptcy Code, subject to such sales closing with the Buyer or another Successful Bidder and the submission of legal and factual arguments in support of such relief at a subsequent hearing or hearings seeking approval of the Subsequent Sale Assets. The Debtors will seek approval of a sale or sales of the Subsequent Sale Assets pursuant to an order or orders that are substantially the same as the Sale Order attached to this Motion.

prepetition liabilities, unless expressly assumed.  As a matter of logic, bankruptcy estates would be unable to sell assets for fair value if the estates' liabilities followed the assets.  The Third Circuit Court of Appeals has held that a buyer of a debtor's assets pursuant to sections 363(b) or 363(f) takes free from successor liability resulting from any pre-existing claims.  *See, e.g., In re Trans World Airlines, Inc.*, No. 01-0056, 2001 Bankr. LEXIS 723, at *13-14 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of ... successor liability claims achieves the purpose of [Bankruptcy Code] section 363 intended by Congress"), *aff'd*, 322 F.3d 283, 285 (3d Cir. 2003) ("Because section 363(f) of the Bankruptcy Code permits a sale of property 'free and clear' of an 'interest in such property' and because the claims against TWA here were connected to or arise from the assets sold, we affirm the Bankruptcy Court's order approving the sale 'free and clear' of successor liability").

C.    **Assumption and Assignment of the Initial Acquired Contracts**

46.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to Court approval, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  *See* 11 U.S.C. § 365.  The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease may be assumed is the debtor's "business judgment" that the assumption is in its economic best interests.  *See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing the business judgment test as "traditional").

47.    To facilitate and effect the Sale of the Initial Sale Assets, the Buyer has agreed to take assignment of the Initial Acquired Contracts.  The Debtors believe they can demonstrate at the Sale Hearing that all requirements for assumption and/or assignment of the Initial Acquired Contracts will be satisfied.  The Debtors have evaluated the financial

35

wherewithal of the Buyer (and will evaluate the financial wherewithal of other potential bidders) and, in exercising their sound business judgment, believe that selling the Initial Sale Assets to, and assuming and assigning the Initial Acquired Contracts to, the Buyer or another Successful Bidder would be in the best interests of the Debtor-Sellers' estates. Moreover, each non-debtor party to the Initial Acquired Contracts will receive notice of the proposed assumption and assignment, and the proposed cure amount, and have a reasonable opportunity to object thereto.

**D.    Finding of Good Faith is Warranted**

48.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Seventh Circuit in *In re Andy Frain Serv., Inc.*, held:

> The requirement that a purchaser act in good faith ... speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

798 F.2d 1113, 1125 (7th Cir. 1986) (emphasis and citations omitted).

49.    The Sale Agreement was intensely negotiated at arm's length. All parties involved acted in good faith and were represented by sophisticated counsel. The Debtors are unaware of any facts or circumstances that might compromise or taint the Buyer's good faith in negotiating and entering into the Sale Agreement. Accordingly, the Debtors request that the Court determine that the Buyer has acted in good faith and is entitled to the protections of a good

faith purchaser under section 363(m) of the Bankruptcy Code.  The Debtors will also seek a

similar finding with respect to any sale of the Subsequent Sale Assets.

**E.      The Termination Fee is Reasonable and Appropriate**

50.      Bidding incentives, such as the Termination Fee, encourage a potential

purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform

the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent

risks and uncertainties of the chapter 11 process.  "Agreements to provide breakup fees or

reimbursement of fees and expenses are meant to compensate the potential acquirer who serves

as a catalyst or 'stalking horse' which attracts more favorable offers." *In re S. N.A, Nut Co.*, 186

B.R. 98, 101 (Bankr. N.D. Ill. 1995); *see also In re 995 Fifth Ave. Assoc. L.P.*, 96 B.R. 24, 28

(Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white

knight to enter the bidding by providing some form of compensation for the risks it is

undertaking") (citations omitted).

51.      Bidding incentives such as the Termination Fee should be approved when

they are in the best interests of the estate.  *See S. N.A. Nut Co.*, 186 B.R. at 104; *see also In re*

*Am. W. Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); and *In re Hupp Indus., Inc.*, 140 B.R.

191 (Bankr. N.D. Ohio 1992).  Typically, this requires that the bidding incentives provide some

benefit to the debtor's estate, and in this Circuit, that benefit must meet the administrative

expense standards of the Bankruptcy Code.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc.*,

181 F.3d at 533 (holding even though bidding incentives are measured against a business

judgment standard in non-bankruptcy transactions, the administrative expense provisions of

Bankruptcy Code section 503(b) govern in the bankruptcy context); *see also In re Reliant Energy*

*Channelview LP*, 594 F.3d at 206-09 (following *O'Brien* and holding that break-up fee was not

an actual and necessary administrative expense where the stalking horse bid was not expressly conditioned upon the approval of the break-up fee).

52.     Here, the Termination Fee will only be paid if the Sale Assets are sold to a purchaser with a bid that is higher and/or otherwise better than the Buyer's offer for the Initial Sale Assets, including taking into account the cost of the Termination Fee when considering the competing bid.  If this occurs, the Sellers will effectively net at least the amount offered by the Buyer and consequently the Debtor-Sellers' estates will benefit from the floor set by the Buyer's initial bid.

53.     "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *In re Integrated Res.*, 147 B.R. at 660.  As is customary, the Termination Fee was required by the Buyer as a condition to its spending the significant time and expense to negotiate and ultimately agree to the Sale Agreement.  The Debtors believe the Termination Fee will not stifle bidding.  To the contrary, the Debtors believe that in the event of an Auction, the Termination Fee will encourage bidding by serving "any of three possible useful functions:  (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders."  *Id.* at 662.  In other words, if the assets are sold to a competing bidder, it will – in all likelihood – be because of the Buyer's crucial role as an initial bidder.

54.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed Purchase Price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser.  When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible."  *Id.*  The Termination Fee is equal to 3% of the Initial Purchase Price, which is within the range of fees

38

typically paid in other significant sales transactions that have been approved by the Court.  *See,*

*e.g., In re Maxide Acquisition, Inc.*, No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005)

(approving break-up fee of 3%, or $2.5 million, in connection with a $75 million sale); *In re*

*Ameriserve Food Distrib., Inc.*, No. 00-00358 (PJW) (Bankr. D. Del. June 15, 2000) (approving

break-up fee of 3.6%, or $4 million, in connection with $110 million sale).  Given the Initial

Purchase Price, the Debtors, in their business judgment, believe the Termination Fee is

appropriate.

   55. For these reasons, and given the benefits conferred upon the Debtor-

Sellers' estates by the Buyer's entry into the Sale Agreement, the Debtors respectfully request

that the Court approve the payment of the Termination Fee and its treatment as an administrative

expense of the Debtor-Sellers and their estates under sections 503(b)(1)(A) and 507(a)(2) of the

Bankruptcy Code.

**F. Court's Jurisdiction Over the Sale of the Sale Assets**

   56. Notwithstanding an intervening entry of a confirmation order or the

occurrence of an effective date of the Debtors' chapter 11 Plan (the "Effective Date"), the

Debtors submit the Court should retain jurisdiction over all matters arising under the Sale of the

Sale Assets, including authorization and approval of any sales of the Subsequent Sale Assets.

   57. In instances where the process for the sale of assets under section 363 of

the Bankruptcy Code commences before confirmation of a chapter 11 plan but the actual sale

occurs after confirmation, courts have retained jurisdiction over the sales even if such sales were

not consummated prior to confirmation.  *See, e.g., In re Caviata Attached Homes, LLC*, No. BK-

N-09-52786-GWZ, 2010 Bankr. LEXIS 4270, at *32-33 (Bankr. D. Nev. Apr. 12, 2010) ("The

Bankruptcy Court shall retain jurisdiction for the following specific purposes … to make such

further orders as will aid in consummation of the Plan, including the sale of any property after

Plan confirmation ...."); *In re Reader's Digest Ass'n*, No. 09-23529, 2010 Bankr. LEXIS 5550, at *105-07 (Bankr. S.D.N.Y. Jan. 19, 2010) ("[T]he Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to ... [e]nter and enforce any order for the sale of property pursuant to sections 363 ...."); *In re Calpine Corp.*, No. 05-60200 (BRL), 2007 Bankr. LEXIS 4390, at *63-64 (Bankr. S.D.N.Y. Dec. 19, 2007) ("[T]he Bankruptcy Court retains jurisdiction after Confirmation to enter an order, pursuant to sections 105(a), 363(b), 363(f), 365, 503, 507, 1123, 1142 and 1146(a) of the Bankruptcy Code:  (a) authorizing the sale of substantially all of the assets of the Debtors or Reorganized Debtors, as applicable, related to the partially completed power plant ...."); *In re PCAA Parent, LLC*, No. 10-10250 (MFW), 2010 Bankr. LEXIS 3186, at *50-52 (Bankr. D. Del. May 17, 2010) ("[N]otwithstanding the entry of this Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction ... [to] [d]ecide or resolve any motions ... that may be pending on the Effective Date.")

58.    In each of these cases, the courts retained jurisdiction over sales that commenced in one form or another prior to confirmation of a chapter 11 plan, but consummated or were intended to consummate after confirmation.  Here, certain of the Debtors, including each of the Debtor-Sellers, have proposed a chapter 11 plan and the Court has approved the Disclosure Statement relating to the plan.  The confirmation hearing for the plan is scheduled to commence on August 19, 2011, after the hearing on the proposed Bidding Procedures Order relating to the Sale.  The Sale will involve the disposition of the Initial Sale Assets, many of which were restructured pursuant to previous Court orders approving restructuring and settlements relating to the assets, and the Subsequent Sale Assets, which will involve the sale of

assets that the Debtors intend to sell only following further Court-approved settlements of the prepetition claims relating to the assets. This Sale process has commenced during the chapter 11 cases but will straddle both the post-confirmation and post-consummation of the Debtors' propose chapter 11 plan. In light of the above and assuming the Court approves the Bidding Procedures for the Sale, the Debtors submit the Sale (including any sales of Subsequent Sale Assets) will arise under these chapter 11 cases. As a result, consistent with the cases above, the Debtors respectfully request the Court retain jurisdiction over the Sale of all the Sale Assets, including future sales of the Subsequent Sale Assets.

## G.    Exemption from Transfer Taxes Under Section 1146 of the Bankruptcy Code

59.    Section 1146(a) of the Bankruptcy Code provides that "[t]he issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax." 11 U.S.C. § 1146(a). In a recent case, the United States Supreme Court held that "[s]ection 1146(a) affords a stamp-tax exemption ... to transfers made pursuant to a Chapter 11 plan that has been confirmed." *Fl. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 53-54 (2008); *see also Baltimore Cnty., Md. v. Hechinger Liquidation Trust (In re Hechinger Inv. Co. of Del. Inc.),* 335 F.3d 243, 252-53 (3d Cir. 2003); *In re PCAA Parent, LLC,* No. 10-10250 (MFW) (Bankr. D. Del. May 14 & 17, 2010) [Docket Nos. 373 & 379] (approving section 1146 exemption in pre-confirmation sale order and confirmation order relating to a section 363 sale that commenced pre-confirmation and closed post-confirmation where plan and confirmation order contained a provision including the retention of jurisdiction); *In re Linens Holding Co.*, No. 08-10832 (CSS), 2009 WL 2163235, at *5 (Bankr. D Del. June 12, 2009).

RLF1 5294146v. 1

60.    The proponent Debtors have already formulated, filed, and solicited votes on a chapter 11 plan.  As discussed above, a hearing to consider confirmation of the plan is scheduled for August 19, 2011.  The Disclosure Statement accompanying the plan makes clear the Debtors' post-confirmation business plan includes managing their businesses, assets and liabilities in a manner that will maximize value to their estates.  As described herein and in the Disclosure Statement, the Debtors currently hold assets and are resolving certain liabilities in connection with LIHTC business.  The disposition of these assets is largely intertwined with the resolution of outstanding claims.  The Debtors have intended to monetize the LIHTC assets consistent with this post-confirmation business plan.    The Debtors believe the proposed transactions embodied in the Sale Agreement are consistent with the Debtors' intent to resolve and restructure the remaining assets and liabilities of the LIHTC platform and sell any remaining assets the Debtors retain in the business.  Specifically, the proposed Sale provides for the immediate disposition of assets that are currently salable, and provides a mechanism for future sales as further settlements are achieved with counterparties, allowing the assets to become available for sale.

61.    Given that the Sale process has commenced now and will straddle the pre- and post-confirmation time periods, as well as the time period after plan consummation, the Debtors have requested the Court retain jurisdiction over all matters relating to the Sale and the Sale Assets under the Sale Agreement.  To ensure the Debtors' proposed chapter 11 plan adequately provides for such jurisdiction, in addition to the retention of jurisdiction provisions of the proposed Bidding Procedures Order and Sale Order, the Debtors intend to offer certain technical amendments to the plan at confirmation relating to the Sale, including changes the Debtors will propose to the retention of jurisdiction provisions of the plan to effectuate the Sale.

RLF1 5294146v. 1

62.    As a result, the Debtors believe the Sale and conveyance of the Sale Assets will be "under a plan confirmed" within the meaning of section 1146 of the Bankruptcy Code, and, accordingly, the related transfers of Sale Assets should not be subject to any stamp tax, recording tax, personal property transfer tax, real estate transfer tax, sales or use tax, or other similar tax or similar government assessment pursuant to section 1146(a) of the Bankruptcy Code.

### Relief from 14-Day Waiting Period is Warranted

63.    The Debtors request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d) and order that, if and when entered, the Sale Order be effective immediately.  Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease … is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

64.    The purpose of these rules is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Bankruptcy Rules 6004(h) and 6006(d).  Although these rules and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the fourteen-day stay period, Collier on Bankruptcy suggests the stay period should be waived to allow a transaction to close immediately "where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY ¶ 6004.10 (15th rev. ed. 2006).  Further, it suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  *Id.*

RLF1 5294146v. 1

## Notice

65.     No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion shall be provided on the date hereof by overnight delivery to (i) the U.S. Trustee, (ii) counsel to the Buyer, (iii) counsel to the Committee, (iv) any party who, in the past 12 months, expressed to the Debtors an interest in acquiring the Sale Assets, and who the Debtors and their representatives reasonably and in good faith determined potentially have the desire and financial wherewithal to effectuate the Sale (the "Expression of Interest Parties"[14]), (v) Wentwood Capital Advisors, L.P., (vi) all investors and credit enhancers in related LIHTC Funds, (vii) plaintiffs in the litigation relating to the Belmont Assets, (viii) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b), (ix) all non-debtor parties to the Initial Acquired Contracts, and (x) all relevant tax authorities.  The Debtors submit that no other or further notice need be provided.

## No Previous Request

66.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

---

[14] The Debtors intend to serve notice of this Motion on the Expression of Interest Parties only on or about August 10, 2011.

RLF1 5294146v. 1

WHEREFORE the Debtors respectfully request (i) entry of the proposed Bidding Procedures Order, (ii) at the completion of the Sale Hearing, entry of the Sale Order approving the Sale of the Initial Sale Assets to the Buyer, or, in the event of a higher and/or otherwise better offer is received at the Auction, the Successful Bidder, and (iii) such other and further relief as the Court may deem just and appropriate.

Dated:  August 9, 2011
      Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

Martin J. Bienenstock
Michael P. Kessler
Judy G. Z. Liu
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 259-8000
Facsimile:  (212) 259-6333

*Attorneys for the Debtors and Debtors in Possession*

RLF1 5294146v. 1